UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SERENITY MARSHALL,                               :
                                                 :
                        Plaintiff,               :
                                                 :
        v.                                       :       No. 11 Civ. 2521 (AJN) (KNF)
                                                 :
STARBUCKS CORPORATION and JENNIFER               :
GURTOV, in her individual and official capacities, :
                                                 :
                        Defendants.              :
                                                 :
                                                 :
------------------------------------------------------------X


**PLAINTIFF'S OPPOSITION TO OBJECTION ON BEHALF OF DEFENDANTS STARBUCKS CORPORATION AND JENNIFER GURTOV TO CERTAIN DISCOVERY RULINGS MADE BY THE MAGISTRATE COURT REGARDING PRIVILEGE**

**THOMPSON WIGDOR LLP**

Kenneth P. Thompson
David E. Gottlieb
85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
kthompson@thompsonwigdor.com
dgottlieb@thompsonwigdor.com

*COUNSEL FOR PLAINTIFF*
*SERENITY MARSHALL*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ..................................................................................................................... 1

    Introduction ....................................................................................................................... 1

    Ms. Marshall's Termination ............................................................................................. 1

    The Current Dispute ......................................................................................................... 3

ARGUMENT ........................................................................................................................... 6

    I.    LEGAL STANDARD UNDER FED. R. CIV. P. 72(a) ............................................ 6

    II.   MAGISTRATE JUDGE FOX'S ORDER ON PLAINTIFF'S MOTION TO COMPEL WAS NOT "CLEARLY ERRONEOUS" OR "CONTRARY TO LAW" ................................................................................................ 7

        A.  Standard For Application Of The Attorney-Client Privilege .................................. 7

        B.  Defendants Cannot Establish That Legal Advice Was Sought ............................... 8

        C.  Defendants Are Not Entitled To A Protective Order Regarding Ms. Ranus' Deposition ............................................................................................... 14

CONCLUSION ..................................................................................................................... 16

## **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
    No. 08-cv-7497 (LBS) (FM), 2011 WL 5126993 (S.D.N.Y. Oct. 26, 2011) ...................... 8

*In re Chase Bank USA, N.A. Check Loan Contract Litigation*,
    No. 09-md-2032, 2011 WL 3268091 (N.D.Cal. July 28, 2011) ........................................ 14

*In re Grand Jury Proceedings*,
    219 F.3d 175 (2d Cir. 2000) ............................................................................................... 7

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*,
    731 F.2d 1032 (2d Cir. 1984) ............................................................................................. 7

*In re Health Management, Inc.*,
    No. 96-cv-0889, 1999 WL 33594132 (E.D.N.Y. Sept. 25, 1999) ...................................... 6

*Lyondell-Citgo Ref., LP v. Petoleos de Venezuela, S.A.*,
    No. 02-cv-0795 (CBM), 2004 WL 2848513 (S.D.N.Y. Dec. 10, 2004) .......................... 14

*Oracle Am., Inc. v. Google Inc.*,
    C 10-03561 (WHA), 2011 WL 5024457 (N.D. Cal. Oct. 20, 2011) ................................ 14

*P. & B. Marina, Ltd. v. Logrande*,
    136 F.R.D. 50 (E.D.N.Y.1991) .......................................................................................... 7

*Rubin v. Valicenti Advisory Services, Inc.*,
    471 F. Supp. 2d 329 (W.D.N.Y. 2007) .............................................................................. 6

*Securities And Exchange Comm'n v. Thrasher*,
    No. 92-cv-6987, 1995 WL 456402 (S.D.N.Y. Aug. 2, 1995) ............................................ 6

*TVT Records v. Is. Def Jam Music Group*,
    214 F.R.D. 143 (S.D.N.Y. 2003) ................................................................................... 7, 8

*U.S. v. International Business Machines, Corp.*,
    66 F.R.D. 206 (S.D.N.Y. 1974) ......................................................................................... 8

*United States v. Singhal*,
    800 F. Supp. 2d 1 (D.D.C. 2011) ..................................................................................... 13

*United States v. United States Gypsum Co.*,
    333 U.S. 364 (1948) ........................................................................................................... 6

*White v. Lenox Hill Hosp.*,
    No. 02-cv-5749 (WHP) (FM), 2005 WL 1081443 (S.D.N.Y. May 10, 2005) .................... 6

**STATE CASES**

*New York State Businessmen's Group, Inc. v. Dalton*,
    154 A.D.2d 801 (3d Dep't 1989) ................................................................................ 14

**STATUTES AND OTHER AUTHORITIES**

Fed R. Civ. P. 72(a) ................................................................................................................ 1, 5

**PRELIMINARY STATEMENT**

Plaintiff Serenity Marshall, by and through undersigned counsel, hereby submits this memorandum of law in opposition to Defendants Starbucks Corporation ("Starbucks") and Jennifer Gurtov's ("DM Gurtov") (collectively, "Defendants") objection to Magistrate Judge Fox's order dated February 22, 2012 (the "Order") pursuant to Fed R. Civ. P. 72(a). Not only are Defendants unable to establish that the Order was "clearly erroneous" or "contrary to law" as required under Rule 72, to the contrary, the Order was consistent with established precedent in the Second Circuit.

**BACKGROUND**

**Introduction**

This is an employment discrimination and retaliation action under the Family and Medical Leave Act ("FMLA") and New York State and City Human Rights Laws. Ms. Marshall, who worked for Defendant Starbucks for nine years including six years as a store manager, was terminated without notice the day she was expected to return from FMLA leave. Ms. Marshall had taken FMLA leave because she required surgery to remove uterine tumors. The FMLA states that "any eligible employee who takes leave . . . shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced." Defendants' failure to permit Ms. Marshall to return to work – let alone the position she held before she went on leave -- is a violation of the FMLA on its face.

**Ms. Marshall's Termination**

Defendants hyperbolically claim that Ms. Marshall was terminated for "falsification of company documents" and violating "cash handling policy." (*See* Defs. Br. 3). The basis for

1

these trumped up charges ware that Ms. Marshall occasionally made bank deposits a day or two late and occasionally recorded information incorrectly in her Daily Records Book ("DRB"). The DRB is a record keeping tool to assist store managers and has virtually no other use within the company. As discovery showed, if these supposed policies were implemented in an even handed manner, Starbucks would be required to terminate virtually all the store managers in DM Gurtov's district.

Ms. Marshall admits that she occasionally made late bank deposits and minor mistakes in her DRB, and that she did so throughout her employment. This was also demonstrated through review of her DRBs in discovery. Defendants were well aware that Ms. Marshall engaged in these practices and occasionally made mistakes as a store manager. To that end, DM Gurtov, who supervised Ms. Marshall for approximately three years, inspected Ms. Marshall's store on at least a quarterly basis (referred to as "Store Plan of Action Visits" or "SPAVs") and during these inspections would review the cash management at the branch including the DRB. (*See* Gurtov Dep. 80:11-90:9, Dec. 21, 2011, Gottlieb Decl., Ex. A). However, Ms. Marshall was never disciplined in any manner for any supposed violations of company policy. Moreover, it became clear in discovery -- through a review of the DRBs of the other store managers supervised by DM Gurtov as well as other documents that relate to cash management -- that all the store managers she supervised engaged in the same practices as Ms. Marshall. However, the other store managers under Ms. Gurtov's charge were never disciplined for these supposed violations of company policy. Seen for what it actually is, Ms. Marshall's practices were at most minor infractions of supposed company policies that were never enforced as to Ms. Marshall or anyone else. It was only after Ms. Marshall disclosed her medical condition and need for medical leave, that these practices purportedly became a basis for termination.

In late December 2010, DM Gurtov conducted a SPAV of Ms. Marshall's store. During this inspection, DM Gurtov and Ms. Marshall first discussed that status of Ms. Marshall's medical condition and her likely leave. (*See* Gurtov Dep. 175:3-176:8). DM Gurtov told Ms. Marshall, among many other things, "I'd like to, but I cannot hold the store for you." (*See* Marshall Dep. 284:11-12, Dec. 8, 2011, Gottlieb Decl., Ex. I). DM Gurtov then conducted her supposed "inspection" which was aimed only at finding a pretextual basis for Ms. Marshall's termination. DM Gurtov immediately reviewed Ms. Marshall's DRB -- which she had also reviewed during her many previous visits -- and feigned outrage at Ms. Marshall's deposit practices. Ms. Marshall did not deny her occasional holding of deposits to the following day, and explained why it was sometimes necessary based on consumer traffic and other business reasons. Ms. Marshall was shocked when DM Gurtov became belligerent and hostile towards her. Ms. Marshall did not admit to any violations of company policy as Defendants argue. Over the course of the next two weeks, Ms. Marshall was not disciplined or even spoken to about any of these supposed violations in any manner. She was permitted to remain store manager without discipline.

Ms. Marshall commenced her FMLA leave on January 5, 2011. Ms. Marshall never heard any word about any supposed violations of policy nor was she given any chance to explain herself until the day she was scheduled to return to work -- when she was terminated.

**The Current Dispute**

Shortly after Ms. Marshall commenced her medical leave, DM Gurtov began the process of terminating Ms. Marshall's employment. To initiate the termination, she contacted Starbucks' Partner Resources Support Center ("PRSC") and spoke to Tina Pizarro. (*See* Gurtov Dep. 221:3-12). Ms. Pizarro purportedly reviewed the matter as presented to her by DM Gurtov to

3

determine whether termination was consistent with company policy. As part of this process, she contacted Shelly Ranus in the Law & Corporate Affairs Department. (*See* Pizarro Dep. 58:5-10, Jan. 11, 2012, Gottlieb Decl., Ex. D; Ranus Decl. at ¶ 2). Ms. Pizarro's communications with DM Gurtov and Ms. Ranus regarding Ms. Marshall's termination were recorded in a Partner Resources Support Center log ("PRSC Log"). (*See* "PRSC Log," Gottlieb Decl., Ex. B). The PRSC Log was produced during discovery but redacted as to all communications between Ms. Pizarro and Ms. Ranus on grounds of attorney-client privilege. (*See* "Defendants' Privilege Log," Gottlieb Decl., Ex. C).

During Ms. Pizarro's deposition, Plaintiff's counsel asked predicate questions to determine whether the privilege was appropriately asserted for the redacted portions. Given the *potential* that the communications were privileged, Defendants' counsel carefully instructed the witness not to testify regarding the content of any communications, but only as to the reason she contacted Ms. Ranus. (*See* Pizarro Dep. 66:8-16). Clearly Defendants' counsel recognized the *reason* for Ms. Pizarro's communication with Ms. Ranus to be the critical issue. Ms. Pizarro testified both with regard to the reasons she (i) generally contacts in-house counsel and (ii) contacted in-house counsel specifically with regard to Ms. Marshall. Ms. Pizarro testified that she regularly contacts legal when dealing with issues involving employees on a leave of absence ("LOA"), and that she did this *to ensure compliance with company policies*. (*See* Pizarro Dep. 67:23-68:8). Defendants, in their advocacy, conflate their desires with the facts. While Defendants would have preferred Ms. Pizarro to testify that she contacted Ms. Ranus "to obtain advice on any legal issues associated with plaintiff's termination" (Defs. Br. 4), those are simply not the facts. Ms. Pizarro affirmatively testified that the reasons she contacts in-house counsel on LOA cases is to ensure compliance with company policy. Ms. Pizarro was also unable to

testify that she sought any legal advice when she contacted Ms. Ranus to discuss Ms. Marshall's termination. (*See* Pizarro Dep. 76:16-77:21). Thus, as explained below, no privilege applies.

On the basis of this testimony, Ms. Marshall sought production of unredacted versions of the PRSC Log and the deposition of Ms. Ranus. (*See* Document Request to Defendants, Jan. 11, 2012 and Notice of Deposition to Shelly Ranus, Jan. 18, 2012, Gottlieb Decl., Ex. E). The communications recorded in the PRSC Log are critical to the basis and reasoning behind Ms. Marshall's termination. Defendants objected to both requests on grounds of privilege. (*See* Defendants' Letter to Plaintiff, Jan. 26, 2012, Gottlieb Decl., Ex. F). In an effort to resolve the issue short of further motion practice, Plaintiff proposed that the PRSC Log be submitted to Magistrate Judge Fox for an *in camera* review and privilege determination. (*See* Plaintiff's Letter to Defendants, Jan. 25, 2012, Gottlieb Decl., Ex. G at 3). Further, Plaintiff stated that the scope of Ms. Ranus' deposition (or whether the deposition would be necessary at all) would be discussed and largely determined based on the ruling following the *in camera* review. (*Id.*) Nonetheless, Defendants moved for a protective order as to Ms. Ranus' deposition and submitted the PRSC Log for an *in camera* review. Magistrate Judge Fox considered (i) the submissions of the parties, (ii) the unredacted PRSC Log (iii) the deposition testimony of Ms. Pizarro and (iv) the oral arguments of the parties, and correctly determined that the privilege did not apply because there was no evidence that Ms. Pizarro was seeking legal advice when she contacted Ms. Ranus. (*See* Tr. of Telephonic Conference before Judge Fox, Gottlieb Decl., Ex. H). Magistrate Judge Fox did not identify any "ambiguity" in the PRSC Log as Defendants claim. Thus, the court correctly ordered production of the unredacted PRSC Log and denied Defendants' request to preclude the deposition of Ms. Ranus' given that she had been involved in non-privileged communications regarding Ms. Marshall's termination.

5

# ARGUMENT

## I. LEGAL STANDARD UNDER FED. R. CIV. P. 72(a)

Pursuant to Fed. R. Civ. P. 72(a) a non-dispositive order may only be modified or set aside if it is "clearly erroneous or contrary to law." A party seeking to overturn a nondispositive ruling under the "clearly erroneous" standard bears a "heavy burden." *White v. Lenox Hill Hosp.*, No. 02-civ-5749 (WHP) (FM), 2005 WL 1081443, *1 (S.D.N.Y. May 10, 2005). Under the "clearly erroneous" standard of review under Rule 72(a), "the magistrate judge's findings should not be rejected merely because the court would have decided the matter differently. Rather, the district court must affirm the decision of the magistrate judge unless the district court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Rubin v. Valicenti Advisory Services, Inc.*, 471 F. Supp. 2d 329, 333 (W.D.N.Y. 2007) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *In re Health Management, Inc.*, No. 96-civ-0889, 1999 WL 33594132, at *4 (E.D.N.Y. Sept.25, 1999)). To establish that a magistrate judge's order is "contrary to law," the district court judge must affirmatively find that the magistrate "failed to apply or misapplied relevant statutes, case law or rules of procedure." *Securities And Exchange Comm'n v. Thrasher*, No. 92-civ-6987, 1995 WL 456402, at *12 (S.D.N.Y. Aug. 2, 1995). Despite Defendants' characterization of the attorney-client privilege as "the oldest of the privileges" and "sacrosanct," discovery orders regarding documents improperly withheld as privileged are subject to this same lofty standard under Rule 72(a).

## II. MAGISTRATE JUDGE FOX'S ORDER ON PLAINTIFF'S MOTION TO COMPEL WAS NOT "CLEARLY ERRONEOUS" OR "CONTRARY TO LAW"

### A. Standard For Application Of The Attorney-Client Privilege

6

The Second Circuit has explained that the attorney-client privilege only applies "(1) **where legal advice of any kind is sought** (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except [where] the protection [is] waived." *TVT Records v. Is. Def Jam Music Group*, 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (emphasis added) (citing *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir. 1984)). "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, a burden not discharged by mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena,* 750 F.2d 223, 224-25 (2d Cir.1984). That is, not only do Defendants have a "heavy burden" to establish that Magistrate Judge Fox's Order was "clearly erroneous" or "contrary to law," they must establish that in the context where the initial burden was already theirs to establish. Moreover, because the privilege "stands in derogation of the public's right to every man's evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000).

It is widely understood that the "[a]pplication of the attorney-client privilege doctrine is complicated in situations where communications claimed to be privileged involve in-house counsel as opposed to outside counsel because in-house attorneys are more likely to mix legal and business functions." *TVT Records*, 214 F.R.D. at 144 (internal quotes and citation omitted).[1]

---

[1] It may be worth noting that Ms. Ranus works in the "Law & Corporate Affairs Department" at Starbucks. *See* Ranus Decl. at ¶ 2. Thus, it appears at least from the title of her department, that the department engages in more than mere legal advice. Also notable, while Ms. Ranus self-servingly declares that she provides legal advice, she does not deny in her

7

The "[a]pplication of the attorney-client privilege to the corporate context poses 'special problems' . . . because in-house counsel often serve dual roles ad legal advisors and business consultants." *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, No. 08-civ-7497 (LBS) (FM), 2011 WL 5126993, at *22 (S.D.N.Y. Oct. 26, 2011) (citations omitted). In the context of the application of the attorney-client privilege in the corporate setting, "[t]he court [] must proceed cautiously, recognizing that the application of the privilege 'risks creating an intolerably large zone of sanctuary since many corporations continuously consult attorneys.'" *Id.* Even if a business decision can be viewed as both business and legal evaluations, "the business aspects of the decision are not protected simply because legal considerations are also involved." *Complex Sys., Inc.* 2011 WL 5126993, at *22 (citations omitted). Significantly, "[a]s a general rule, **communications relating to company policy** do not meet the requirements of the attorney-client privilege and so are not privileged." *U.S. v. International Business Machines, Corp.*, 66 F.R.D. 206, 210 (S.D.N.Y. 1974) (emphasis added).

### B. Defendants Cannot Establish That Legal Advice Was Sought

Defendants cannot establish that Magistrate Judge Fox was "clearly erroneous" and "contrary to law" when he determined that the communications between Ms. Pizarro and Ms. Ranus were not for the purposes of legal advice. While Defendants' counsel claims that there is "little doubt" that the communications at issue are privileged, Magistrate Judge Fox correctly ruled that an *in camera* review of the actual communications in conjunction with the sworn testimony of Ms. Pizarro belies this position and prevents Defendants from establishing their burden that legal advice was sought. (*See* Defs. Br. at 11; Tr. of Telephonic Conference before

---

declaration that she has a dual function and also provides business advice and guidance related to company policies.

8

Judge Fox). Defendants' counsel's self-serving description of the communications at issue as "privileged" does not make it the case.

At her deposition, Ms. Pizarro testified regarding the reasons she contacts in-house counsel both in general on leave of absence ("LOA") matters and also specifically with regard to Ms. Marshall's termination. Ms. Pizarro testified that when she contacts in-house counsel generally it is done to ensure compliance with company policies.

> Mr. Gottlieb: What was the reason you wanted to talk to legal?
>
> Ms. Pizarro: So in matters of LOA it is a general practice of mine to reach out to our legal team.
>
> Q: Anything else?
>
> A: Well, if it is relevant to this case, not that I can recall
>
> Q: Why do you intend to contact legal where there is an issue involving a leave of absence?
>
> A: So in matters that involve a partner when it comes to a protected job status, I want to ensure that I have the full knowledge and/or guidance, support, recommendation whatever you want to call it from our legal department on our decisions.
>
> Q: Why is that?
>
> A: Part of my role is a risk manager to the company. So to ensure we look at things fully. And again, it is an LOA status is just a protected status, that I take to legal on a general basis.
>
> Q: When you contact legal with regard to discipline of an employee who has a protected status, are you doing so for legal advice or for something else?
>
> A: Yes, I did not necessarily mention protected status. I was contacting legal on a general basis for LOA cases.
>
> **Q: Okay. When you contact legal with regard to partners on a leave of absence or who may take a leave of absence, are you contacting legal for legal advice or for something else?**
>
> **A: I would be contacting legal just to have the case fully reviewed to**

9

>    **again to ensure that our thought processes and decisions are in line with the company standards and practices.**
>
>    Q:    Okay. Anything else?
>
>    A:    No.

(Pizarro Dep. 66:8-68:10) (objections omitted) (emphasis added). To be clear, this is not a situation where Ms. Pizarro was asked about the reason she contacts in-house legal in an open-ended manner and perhaps inadvertently failed to include the phrase "legal advice" in her response. To the contrary, Ms. Pizarro was specifically asked whether in these circumstances she is "<u>contacting legal for legal advice or for something else?</u>" and she responded that the reason was to ensure compliance with company policies.[2] Not only did Ms. Pizarro not use the term "legal advice," she also failed to even imply in any manner that her communication with Ms. Ranus relate to the FMLA or any other laws, statutes or potential litigation. Ms. Pizarro was simply unable to testify that she communicates with in-house legal for purposes of obtaining legal advice with regard to LOA cases.

---

[2]    Defendants argue in a footnote that Ms. Pizarro was asked a "series of confusing and repetitive questions" at her deposition and seem to imply that that was the reason Ms. Pizarro did not testify that she contacted Ms. Ranus for legal advice. Of course, as is customary, Ms. Pizarro was advised at the opening of her deposition to inform Plaintiff's counsel if she did not understand any question she was asked or any word she did not understand:

>    Q:   If you do not understand any question that I ask you or even if any word in any question that I ask you, please let me know and I will try to rephrase it in a way that you do understand, okay?
>
>    A:   Okay.

(Pizarro Dep. 5:21-6:2). Clearly Ms. Pizarro understood these directions as during the course of her deposition she stated that she did not understand a few questions unrelated to the privilege issue and Plaintiff's counsel rephrased those questions appropriately. (*See* Pizarro Dep. 22:6-10, 39:22-24, 41:5-9). Ms. Pizarro did not state any confusion regarding the questions related to privilege. Additionally, Ms. Pizarro prepared for her deposition with her highly competent counsel for two hours the day before her deposition. (Pizarro Dep. 7:23-8:10).

10

Moreover, Ms. Pizarro testified about her communications with Ms. Ranus regarding Ms. Marshall's termination, and was unable to testify that the communications were for the purpose of obtaining legal advice.

> Q: Now, specifically with regard to when you called legal for Serenity Marshall, was part of the reason you called legal for overall review as a risk mitigator?
>
> A: I called based on my best practice on LOA cases.
>
> Q: But was that one of the reasons?
>
> A: I don't recall.
>
> Q: Do you recall whether one of the reasons was adherence to company standards?
>
> A: I don't recall.
>
> Q: Do you recall whether one of the reasons you called was for guidance?
>
> A: I don't recall.
>
> Q: Do you recall whether on of the reasons you called was for support?
>
> A: I don't recall.
>
> **Q: Do you recall whether one of the reasons you called was for legal advice?**
>
> **A: I don't recall.**
>
> **Q: Do you recall whether the reason you contacted legal at any point regarding Serenity Marshall was for legal advice?**
>
> **A: I don't recall thinking the nature of why I wanted to talk to legal. It was really for me about a best practice that I do on –**
>
> Q: I'm sorry did I interrupt you?
>
> A: **No, I just said on LOA cases.**

11

(Pizarro Dep. 76:16-77:21) (emphasis added). Ms. Pizarro was unable to testify that her communications with Ms. Ranus "at any point regarding Ms. Marshall" was for the purpose of legal advice. *Id.* (emphasis added). Moreover, the unredacted portions of the documents at issue corroborate that Ms. Pizarro contacted Ms. Ranus for advice related to company policies. Following Ms. Gurtov's initial communication with Ms. Pizarro, Ms. Pizarro noted in the PRSC Log "that it appears the SM violated our policy under section 11 of the partner guide" among other items. (Pizarro Dep. 39:7-39:17) (emphasis added). Accordingly, there is no predicate from which to conclude that those communications are privileged.

Further demonstrating the lack of merit and desperation behind their motion, Defendants argue that an attachment on one of Ms. Pizarro's emails to Ms. Ranus which was titled, "Issue with SM Serenity Marshall #1088330, store 11649 NY / Attorney client privilege," shows that their communications were for the purpose of legal advice. Not only this argument unsupported by any legal authority, Defendants completely misrepresent that Magistrate Judge Fox "did not address" this in the Order. In fact, the truth is the opposite. Defendants *specifically* raised the issue of this email attachment in their application to Magistrate Judge Fox. (*See* Defendants' Letter Application to Judge Fox, Jan. 30, 2012, Gottlieb Decl., Ex. J at 4). Plaintiff *specifically* responded to that argument in her response and cross-application. (*See* Plaintiff's Letter to Judge Fox in Response to Defendants' Letter Application, Jan. 31, 2012, Gottlieb Decl., Ex. K at 3).[3] In any event, the title of the attachment is utterly irrelevant because Ms. Pizarro testified that the

---

[3] It is anticipated that Defendants will explain this misrepresentation by arguing that Magistrate Judge Fox did not *orally* address this issue during oral argument. However, as Defendants are aware, Magistrate Judge Fox stated on the record that he read the submissions and "understood [Defendants'] position quite clearly." (Tr. of Telephonic Conference before Judge Fox 4:3-5).

12

only reason she titled the document with the "attorney-client privilege" label is because in-house legal directs her to do so on all communications.

> Q: Do you know if you typed, came up with the title to that document or is that something generated through the computer system?
>
> A: Yes, that would have been something I typed.
>
> Q: How do you know that?
> A: Just because our computer system doesn't have cases marked that way. Typically when I send a case to legal I will put it in that format.
>
> Q: Okay. So is it fair to say when you send attachments to legal you include the term attorney-client privilege as part of the title?
>
> A: Yes.
>
> **Q: Why do you do that?**
>
> **A: As requested by our legal team on any communication**
>
> **Q: Any other reason?**
>
> **A: I wouldn't be able to speak to that, I don't know. Just as requested by our legal team.**
>
> **Q: There is no reason you do that other than because it is requested by the legal team?**
>
> **A: Correct.**

(Pizarro Dep. 86:23 – 87:13) (emphasis added). Defendants cannot cite any case for the proposition that any communication with in-house counsel becomes a privileged simply by directing employees to write "attorney client privilege" on the document or communication. The case does not exist. *See, e.g., United States v. Singhal*, 800 F. Supp. 2d 1, 10 (D.D.C. 2011) (string of emails labeled "attorney client confidential" not privileged because "[w]hatever other properties "Attorney-client privilege" stamps may have, they certainly do not carry the talismanic power to relieve a party of its obligation to prove each of the privilege's elements in

13

order to take shelter under its protection."); *Oracle Am., Inc. v. Google Inc.*, 10-civ-03561 WHA, 2011 WL 5024457 (N.D. Cal. Oct. 20, 2011) ("Simply labeling a document as privileged and confidential or sending it to a lawyer does not automatically confer privilege."); *In re Chase Bank USA, N.A. Check Loan Contract Litigation*, No. 09-md-2032, 2011 WL 3268091, at *4 (N.D.Cal. July 28, 2011) ("Merely labeling a communication as an attorney-client privileged draft . . . [is] insufficient to confer privilege when the communication is not otherwise for the purpose of facilitating legal advice or services.").

Defendants attempt to create "ambiguity" by submitting a self-serving and conclusory affidavit from Ms. Ranus. *See* Defs. Br. at 11-12. Defendants cannot "create" a privilege where none exists simply by submitting a conclusory, self-serving affidavit from counsel that the communications were privileged. The analysis does not change even where assertion of privilege is "emphatic," as claimed by Defendants. *See Lyondell-Citgo Ref., LP v. Petoleos de Venezuela*, S.A., 02-civ-0795 (CBM), 2004 WL 2848513 (S.D.N.Y. Dec. 10, 2004) (upholding Magistrate Judge's finding that defendant's submission of declaration from attorney stating that contents of document contained legal advice was insufficient to support finding that document protected by attorney-client privilege); *New York State Businessmen's Group, Inc. v. Dalton*, 154 A.D.2d 801 (1989) ("conclusory statements, contained in [plaintiffs'] attorney's affidavits, declaring that [customer] lists are confidential business records and trade secret[s]" ... "palpably insufficient" to demonstrate lists were privileged trade secrets).

Magistrate Judge Fox's Order was sound and supported by significant legal authority. Defendants were unable to meet their burden that the communications between Ms. Pizarro and Ms. Ranus were privileged because there is no evidence whatsoever that the communications were for the purpose of obtaining legal advice. To the contrary, based on the deposition

14

testimony and the PRSC Log, the evidence establishes that the communications involved non-privileged matters pertaining to business-related matters. Accordingly, the Order was neither "clearly erroneous" nor "contrary to law."

### C. **Defendants Are Not Entitled To A Protective Order Regarding Ms. Ranus' Deposition**

Under the Federal Rules of Civil Procedure, litigants are entitled to a liberal scope of discovery. Fed. R. Civ. P. 26(b)(1). Plaintiff does not dispute that Rule 26(c) permits the Court to issue protective orders where good cause is shown. Plaintiff further does not dispute that protection of the attorney-client privilege constitutes good cause for issuance of a protective order. Thus, the critical issue is whether Magistrate Judge Fox was "clearly erroneous" or "contrary to law" in ruling that Ms. Pizarro and Ms. Ranus engaged in non-privileged communications regarding Ms. Marshall's termination. This is not a circumstance in which Plaintiff is seeking to depose "adversary counsel" as Defendants argue. That argument misses the mark completely. To the extent Ms. Pizarro and Ms. Ranus engaged in non-privileged communications regarding Ms. Marshall's termination -- as Magistrate Judge Fox correctly found -- Ms. Ranus is nothing more than a fact witness. Ms. Ranus' position as an attorney does not preclude her from being a fact witness in litigation. Clearly, Ms. Ranus had a pivotal role in the decision to terminate Ms. Marshall and has knowledge of the reasons for Ms. Marshall's termination. Plaintiff is permitted to probe Ms. Ranus regarding this information as it is relevant and discoverable.

## CONCLUSION

Based on the foregoing, Defendants' motion pursuant to Rule 72(a), objecting the Order of Magistrate Judge Fox, should be denied. Defendants have failed to establish that Magistrate Judge Fox's order was clearly erroneous or contrary to law.

Dated: New York, New York
       March 16, 2012

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____
    David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
kthompson@thompsonwigdor.com
dgottlieb@thompsonwigdor.com

*Counsel for Plaintiffs*

16