1

2                UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF NEW YORK

4    SERENITY MARSHALL,              )
                                     )
5                                    )
                  Plaintiff          )
6                                    )   No. 11-CV-2521
                  vs.                )
7                                    )
     STARBUCKS CORPORATION and       )
8    JENNIFER GURTOV, in her         )
     individual and official        )
9    capacities,                     )
                                     )
10                                   )
                  Defendants         )
11   ----------------------------)

12

13

14

15

16            DEPOSITION OF SERENITY MARSHALL

17                 New York, New York

18              Thursday, December 8, 2011

19

20

21

22

23   Reported by:

24   THOMAS A. FERNICOLA, RPR

25   JOB NO. 43896

Page 2

```
 1
 2
 3
 4                    Thursday, December 8, 2011
 5                    10:15 a.m.
 6
 7
 8
 9          DEPOSITION of SERENITY MARSHALL, held
10   at the Offices of Akin Gump Strauss Hauer &
11   Feld, One Bryant Park, 44th Floor, New York, New
12   York  10036, before Thomas A. Fernicola, a
13   Registered Professional Reporter and Notary
14   Public of the State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4        THOMPSON WIGDOR
 5        Attorneys for Plaintiff
 6           85 Fifth Avenue
 7           New York, New York  10003
 8           Tel:  212.257.6800
 9        BY:  DAVID E. GOTTLIEB, ESQ.
10
11
12        AKIN GUMP STRAUSS HAUER & FELD
13        Attorneys for Defendants
14           One Bryant Park
15           New York, New York  10036
16           Tel:  212.872.1000
17        BY:  ESTELA DIAZ, ESQ.
18           SAMIDH GUHA, ESQ.
19           JENNELLE MENENDEZ, ESQ.
20
21
22
23   ALSO PRESENT:
24        CARLOS LOPEZ, Videographer
25
```

Page 4

```
 1
 2                    STIPULATIONS
 3
 4   IT IS HEREBY STIPULATED AND AGREED by and between
 5   the attorneys for the respective parties herein
 6   that this examination may be sworn to before any
 7   Notary Public.
 8
 9   IT IS FURTHER STIPULATED AND AGREED that the
10   filing and certification of the said examination
11   shall be waived.
12
13   IT IS FURTHER STIPULATED AND AGREED that all
14   objections to questions, except as to the form of
15   the question, shall be reserved for the time of
16   trial.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        Proceedings
 2        THE VIDEOGRAPHER:  This is the start
 3   of tape labeled No. 1 of the videotaped
 4   deposition of Serenity Marshall in the
 5   matter of Serenity Marshall versus
 6   Starbucks Corporation.  This deposition is
 7   being held at One Bryant Park, New York,
 8   New York, on December 8, 2011 at
 9   approximately 10:16 a.m.
10        My name is Carlos Lopez from TSG
11   Reporting.  I am the video specialist.  The
12   court reporter is Tom Fernicola in
13   association with TSG Reporting.
14        Will counsel please introduce
15   yourselves for the record.
16        MS. DIAZ:  Sure.
17        Estela Diaz from Akin Gump Strauss
18   Hauer & Feld, for defendants Starbucks and
19   Jennifer Gurtov.
20        I'm here with Jennelle Menendez from
21   Akin Gump Strauss Hauer & Feld, and Samidh
22   Guha.
23        MR. GOTTLIEB:  David Gottlieb from
24   Thompson Wigdor, for the plaintiff.
25        THE VIDEOGRAPHER:  Will the court
```

Proceedings
reporter, please swear in the witness.
S E R E N I T Y M A R S H A L L,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:
BY THE REPORTER:
Q Please state your full name and address for the record.
A Serenity Marshall, 1964 Grand Concourse, 1E, Bronx, New York 10457.
EXAMINATION BY
MS. DIAZ:
Q. Good morning, Ms. Marshall.
A. Good morning.
Q. As you know, my name is Estela Diaz, and I represent Starbucks and Jennifer Gurtov in the lawsuit that you filed against them, and I'm here to take your deposition today.
Do you understand that?
A. Yes.
Q. Okay.
And I'm going to tell you a bit about the process today. I'm basically going to ask you a series of questions, and I expect you to

S. Marshall
answer truthfully and to the best of your ability.
Do you understand that?
A. Yes.
Q. Okay.
Because the court reporter is transcribing everything that we say today, please make sure to give a verbal response, a "yes" or a "no" and not an "uh-huh" or and "uh-uh."
Although I understand the videographer is here today, the court reporter can't transcribe shakes or nods of the head just for "uh-huh's."
So just make sure that give a verbal response.
A. Okay.
Q. And please also make sure to wait until I finish answering -- excuse me -- asking the question before you answer the question, even if you think you know where I'm going. And I'll also do my best to wait until you finish your answer before I ask my next question, just so we're not talking over each

S. Marshall
other and the transcript is clear.
If you do not understand a question, will you let me know?
A. Yes.
Q. Okay.
If you answer a question, I'm going to assume that you heard the question, that you understood the question and that you've given me your best and truthful answer.
So if at any time you feel that you've incorrectly stated something or made a mistake, will you let me know?
A. Yes.
Q. Okay.
And, of course, you may not remember all of the details about things that happened a year ago or two years ago, but I'm entitled to your best recollection.
Do you understand that?
A. Yes.
Q. Okay.
And do you understand that you're under oath today?
A. Yes.

S. Marshall
Q. Okay.
And you understand that by taking that oath, you are required to give me your best and most truthful answer?
A. Yes.
Q. Okay.
And you understand that the oath you took today is the same as if you had taken it in front of a judge in a courtroom?
A. Yes.
Q. Okay.
Your attorney may make some objections today, and unless he tells you not to answer a question, you're still required to proceed and answer my question even if he makes an objection.
Is that clear?
A. Yes.
Q. Okay.
MR. GOTTLIEB: I was going to interject. If I'm making an objection, wait for me to finish my objection so you understand whether or not you should answer the question.

Page 10

S. Marshall

1
2     THE WITNESS:  Understood.
3  BY MS. DIAZ:
4     Q.   And we'll be taking a break roughly
5  every hour or so.  But if you need to take a
6  break before that, just let me know and we can
7  accommodate that; but, please, just wait until
8  the -- you've finished answering a question
9  before you take a break.
10     A.   Okay.
11     Q.   Okay?
12        Is there any reason why you can't
13  give me a truthful answer today?
14     A.   No.
15     Q.   Okay.
16        Is there any reason why you can't
17  understand my questions today?
18        MR. GOTTLIEB:  Objection.
19        You can answer.
20     A.   You haven't asked them.  I don't --
21     Q.   Okay.
22     A.   -- I mean, I don't think I --
23     Q.   Let me ask it in a different way.
24        Is there anything that would effect
25  your memory or understanding today?

Page 11

S. Marshall

1
2     A.   No.
3     Q.   Okay.
4        Are you suffering from any illness?
5     A.   No.
6        MR. GOTTLIEB:  Objection.
7        You can answer.
8     A.   No.
9     Q.   Okay.
10        Are you taking any medication?
11     A.   No.
12     Q.   Okay.
13        And have you eaten or drank anything
14  that would effect your memory today?
15     A.   Yes -- no, I haven't.
16     Q.   Okay.  Okay.
17        Ms. Marshall, have you ever been a
18  party to another lawsuit?
19     A.   No.
20     Q.   Okay.
21        Have you ever had your deposition
22  taken before?
23     A.   No.
24     Q.   Okay.
25        And have you ever testified in court?

Page 12

S. Marshall

1
2     A.   No.
3     Q.   Okay.
4        Have you ever testified under oath in
5  any other proceeding?
6     A.   No.
7     Q.   Okay.
8        Did you testify at your unemployment
9  appeal hearing last year?
10     A.   That was -- yes, I did.
11     Q.   Okay.
12        And do you recall if that testimony
13  was under oath?
14     A.   Actually don't -- yes, it was.
15     Q.   Okay.
16     A.   So then that wasn't something I
17  remembered, yes.  So then the unemployment
18  hearing.
19     Q.   Okay.
20        And you testified truthfully at that
21  hearing?
22     A.   Yes.
23     Q.   Okay.
24        Other than Starbucks, have you ever
25  filed a complaint against a State or a Federal

Page 13

S. Marshall

1
2  agency alleging subscription or harassment?
3     A.   No.
4     Q.   Okay.
5        Have you ever filed an internal
6  complaint against an employer for
7  discrimination or harassment?
8     A.   No.
9     Q.   Ms. Marshall, what have you done to
10  prepare for the deposition today?
11        MR. GOTTLIEB:  Objection.  Just
12  without going into any of the substance of
13  communication you had with counsel, you can
14  answer the question.
15     A.   I met with my lawyer and we spoke on
16  the phone.
17     Q.   Okay.
18        And when was that?
19     A.   Exact dates?
20     Q.   When did you prepare -- when did you
21  speak with your attorney?
22     A.   Approximately a week ago.
23     Q.   Okay.
24     A.   A week ago and once on the phone
25  yesterday.  That's what I remember right now.

4 (Pages 10 to 13)

Page 14

S. Marshall

1
2  Q.   Okay.
3      And when you spoke to him on the
4  phone a week ago, how long was that
5  conversation?
6      MR. GOTTLIEB:  Objection.  That's not
7  what she said.
8      MS. DIAZ:  Excuse me.  Strike that.
9  BY MS. DIAZ:
10      Q.   When you spoke to your attorney a
11  week ago, how long did you speak to him for?
12      A.   Approximately six hours.
13      Q.   Okay.
14      And what about yesterday?
15      A.   20 minutes, approximately.
16      Q.   Okay.
17      Did you review any documents to
18  prepare for your deposition today?
19      A.   Yes.
20      Q.   Do you recall what you reviewed?
21      A.   Yes.
22      Q.   Okay.
23      What did you review?
24      A.   Daily records books, all my past
25  reviews as a store manager, any documentation

Page 15

S. Marshall

1
2  that I received as a store manager.
3      Q.   When you say "documentation that you
4  received as a store manager," what does that
5  mean?
6      A.   Corrective action.
7      Q.   Okay.
8      Did you review anything else?
9      A.   We reviewed the paper I was presented
10  with on the date of my termination.
11      Q.   Okay.
12      A.   I remember that.  We reviewed the, I
13  guess communication leading up to my
14  termination --
15      Q.   U-huh.
16      A.   -- between, I guess Jennifer Gurtov
17  and whoever she communicated with.
18      What else can I remember?
19      That's what I remember for right now.
20      Q.   Okay.
21      And other than Mr. Gottlieb or any of
22  your other attorneys, have you discussed your
23  deposition with anyone else?
24      A.   No.
25      Q.   And, Ms. Marshall, did you search for

Page 16

S. Marshall

1
2  documents related to this case?
3      MR. GOTTLIEB:  Objection.
4      Is there a time frame?
5  BY MS. DIAZ:
6      Q.   Did you search for documents related
7  to this case after the complaint was filed?
8      A.   "Documents" meaning?
9      Q.   Hold on just one second.
10      MS. DIAZ:  I'd like to mark this as
11  Exhibit 1.
12      (Defendants' Exhibit 1, Document,
13  was marked for identification.)
14      MR. GOTTLIEB:  She just needs the
15  marked copy.
16      THE WITNESS:  Okay.
17  BY MS. DIAZ:
18      Q.   Ms. Marshall, take some time to
19  review this document.
20      A.   Sure.
21      (Document Review.)
22      Okay.
23      Q.   Ms. Marshall, have you seen this
24  document before?
25      A.   No.

Page 17

S. Marshall

1
2      Q.   No?
3      A.   I don't believe I have.
4      Q.   Okay.
5      And did you provide your attorney
6  with documents related to this case?
7      A.   Yes.
8      MR. GOTTLIEB:  Objection.  Just
9  without going to the substance of any
10  communications we may have had.
11      A.   So, yes.
12      Q.   Okay.
13      And what did you do to search for --
14  what, if anything, did you do to search for
15  documents related to this case?
16      A.   I looked through the paperwork that I
17  keep at home for anything that I had.
18      Q.   Okay.
19      Did you -- do you have a personal
20  computer?
21      A.   Yes.
22      Q.   Okay.
23      Did you search your personal computer
24  for any documents?
25      A.   I looked for -- I don't have -- I

Page 18

S. Marshall

1  don't believe -- I don't have documents on a
2  personal computer.  So the personal computer
3  was used for -- in regards to this case, any
4  jobs I applied for, which I did through my
5  computer, or I believe that was -- and any
6  communication with any job I might have applied
7  for --
8      Q.   Okay.
9      A.   -- on Facebook.  I believe that was
10  all that I used a personal computer for.
11      Q.   Okay.
12          Do you -- do you have an iPad or
13  anything --
14      A.   No.
15      Q.   -- similar to an iPad?  Okay.
16          Ms. Marshall, what is your date of
17  birth?
18      A.   December 4, 1978.
19      Q.   And what is your current address?
20      A.   1964 Grand Concourse, Bronx, New York
21  10457.
22      Q.   And how long have you lived at that
23  address?
24      A.   Approximately two and a half years.

Page 19

S. Marshall

1      Q.   Okay.
2          And do you live with anyone at that
3  address?
4      A.   I do.
5      Q.   Who do you live with?
6      A.   I have a roommate.
7      Q.   What's your roommates name?
8      A.   My roommates name is Tracy Warrecker.
9      Q.   How do you spell the last name?
10      A.   I think it's W-A-R-R-E-C-K-E-R.
11      Q.   Okay.
12          And before the 1964 Grand Concourse
13  address, where did you live?
14      A.   I lived in Harlem, but I don't
15  remember the address.  I believe -- I believe
16  it was 2363 Seventh Avenue, I believe.
17      Q.   And did you live with anyone at that
18  address?
19      A.   I did.
20      Q.   Who did you live with?
21      A.   Her name is Jenny Lee Briones.
22      Q.   Okay.
23          And how long were you at that
24  address?

Page 20

S. Marshall

1      A.   Approximately one year.
2      Q.   Okay.
3          What about before the 2363 Seventh
4  Avenue address, where did you live before then?
5      A.   I lived in Brooklyn.  It was on
6  Hancock Street.  I don't remember the address.
7      Q.   And how long did you live at that
8  address?
9      A.   Approximately one year.
10      Q.   And did you live with anyone at that
11  address?
12      A.   I did also with Jenny Lee Briones.
13      Q.   Okay.
14          Ms. Marshall, have you ever been
15  married?
16      A.   No.
17      Q.   Are you married -- you're not married
18  currently?
19      A.   No.
20      Q.   Okay.
21          And do you have any children?
22      A.   No.
23      Q.   Okay.
24          Have you graduated from high school?

Page 21

S. Marshall

1      A.   Yes.
2      Q.   When did you graduate?
3      A.   I believe it was '97.
4      Q.   Okay.
5          And what was the name of your high
6  school?
7      A.   DeWitt Clinton.
8      Q.   And where is that located?
9      A.   In the Bronx.
10      Q.   And do you have formal education
11  beyond high school?
12      A.   Yes, I have a B.S. in English.
13      Q.   From?
14      A.   City College.
15      Q.   When did you graduate from City
16  College?
17      A.   I believe it was 2003.
18      Q.   Apart from your degree from City
19  College, have you taken any other courses?
20      A.   Two semesters towards my master's in
21  English, also at City College.
22      Q.   Okay.
23          What about any training, any
24  professional training?

6 (Pages 18 to 21)

Page 22

S. Marshall

1
2       A.   Professional training, no, that I
3   believe, no.
4       Q.   Okay.
5            Ms. Marshall, have you ever been
6   convicted of a felony?
7       A.   No.
8       Q.   Ms. Marshall, before Starbucks, were
9   you employed by other employers?
10      A.   Yes.
11      Q.   Okay.
12           Do you recall your first employer
13  after high school?
14      A.   Yes.
15           MR. GOTTLIEB:  I'm going to object.
16       You can go ahead and answer.
17      A.   White Castle.
18      Q.   Okay.
19           And when did you start working at
20  White Castle?
21      A.   I was 18 by -- my math sucks, but I
22  was born in '78, so...
23      Q.   Okay.
24           And how long did you work at White
25  Castle?

Page 23

S. Marshall

1
2       A.   Approximately two years --
3       Q.   Okay.
4       A.   -- give or take.
5       Q.   Okay.
6            And what was your title there?
7       A.   I don't remember.  I was just cashier
8   and prep cook, or whatever we called it then.
9   So I have no idea what that formal title was.
10      Q.   Okay.
11           And why did you leave White Castle?
12      A.   Because it was White Castle.  Just, I
13  don't even know I had a reason.  It was just
14  time to move on.
15      Q.   Okay.
16           Was it a voluntary --
17      A.   Yes --
18      Q.   -- separation?
19      A.   -- it was.
20      Q.   Okay.
21           And while you were there, did you
22  receive any counseling or discipline?
23           MR. GOTTLIEB:  Objection.
24           You can answer.
25      A.   I don't remember anything specific.

Page 24

S. Marshall

1
2       Q.   And what was the location of the
3   White Castle?
4       A.   It was on Third Avenue in the Bronx,
5   approximately 169th Street.
6       Q.   Okay.
7            Did you obtain another job after
8   White Castle?
9       A.   I did.  I believe that I went to
10  dELia's.  I believe that that's the order, that
11  it was dELia's that I worked at.
12      Q.   What is dELia's?
13      A.   It's -- it's apparel for young women.
14  I worked at the call center.  So I took -- it
15  was primarily then.  They have locations now
16  that I've seen, but it was a catalog.  This was
17  so long ago, there was really no Internet.  So
18  I took orders over the phone.
19      Q.   Okay.
20           And how long did you work at dELia's?
21      A.   It was seasonal.  I just remember it
22  was the holiday season.  It was cold.
23      Q.   Okay.
24           And why did you stop working at
25  dELia's?

Page 25

S. Marshall

1
2       A.   I didn't like it.
3       Q.   Were you ever disciplined while
4   working at dELia's?
5            MR. GOTTLIEB:  Objection.
6       A.   Not that I recall.
7       Q.   Okay.
8            Did you have a job after dELia's?
9       A.   Yes.  That was Pathmark.
10      Q.   Okay.
11           And when did you start working at
12  Pathmark?
13      A.   Maybe I was like 20.  20, 19.
14  Between 19 and 22.
15      Q.   Okay.
16      A.   I think more later.  About 22, I
17  think.
18      Q.   You were around 22 years old when you
19  started there?
20      A.   I believe.
21      Q.   Okay.
22           And how long did you work there?
23      A.   Approximately two years.
24      Q.   Okay.
25           And what was your title there?

7 (Pages 22 to 25)

Page 26

S. Marshall

1
2   A.   I think, I believe we were just
3   called associates.
4   Q.   Okay.
5        And why did you leave Pathmark?
6   A.   Because I started working at
7   Starbucks.
8   Q.   Do you recall the year that you
9   started working at Starbucks?
10  A.   2003?  Was it '2?
11       Gosh.  I have so many years in my
12  head.  2000 and -- this is '11.
13       2002, I believe.
14  Q.   And while you were at Pathmark, did
15  you receive any type of discipline?
16       MR. GOTTLIEB:  Objection.
17       You can answer.
18  A.   Not that I recall.
19  Q.   And, Ms. Marshall, while you were
20  employed at Starbucks, did you hold any other
21  jobs?
22  A.   I overlapped with Pathmark in the
23  beginning for about a month.
24  Q.   Okay.
25       And other than Pathmark, did you hold

Page 27

S. Marshall

1
2   any other jobs while you were employed at
3   Starbucks?
4   A.   No.
5   Q.   Okay.
6        Ms. Marshall, at any of your jobs
7   before Starbucks, did you ever participate in
8   the termination of any employee?
9        MR. GOTTLIEB:  Objection.
10       You can answer.
11  A.   Did I participate?  Meaning?
12  Q.   Were you involved in the decision to
13  terminate an employee?
14       MR. GOTTLIEB:  Objection.
15       You can go ahead and answer.
16  A.   No.
17  Q.   And at any of your previous jobs
18  before Starbucks, did you ever -- were you ever
19  the target of a complaint of harassment or
20  discrimination?
21       MR. GOTTLIEB:  Objection.
22       You can answer.
23  A.   No.
24  Q.   Okay.
25       And, Ms. Marshall, have you ever been

Page 28

S. Marshall

1
2   involved in any lawsuits against any of your
3   previous employers?
4        MR. GOTTLIEB:  Objection.
5        You can answer.
6   A.   No.
7   Q.   And, Ms. Marshall, I think you said
8   you started working at Starbucks in 2002; is
9   that correct?
10  A.   I believe that was my year, yes.
11  Q.   And did you submit an application for
12  a job at Starbucks?
13  A.   I think I would have had to.  I don't
14  physically like remember the day of filling out
15  the application, but, I mean, I had to.
16  Q.   Okay.
17       MS. DIAZ:  I'd like to mark this as
18  Exhibit 2.
19       (Defendants' Exhibit 2, Application
20       for Employment, was marked for
21       identification.)
22  BY MS. DIAZ:
23  Q.   Take a few moments to look at the
24  document.
25  A.   (Document Review.)

Page 29

S. Marshall

1
2        Okay.
3   Q.   Ms. Marshall, do you recognize this
4   document?
5   A.   Yes.
6   Q.   What is it?
7   A.   It is my application.
8   Q.   Okay.
9        And on the second page that's marked
10  Star/Marshall '93, at the bottom is that your
11  signature?
12  A.   It is.
13  Q.   Okay.
14       And is everything on the application
15  accurate?
16       MR. GOTTLIEB:  Objection.
17       You can answer.
18  A.   For 2002, it is accurate, yes.
19  Q.   Okay.
20       Why did you submit an application for
21  employment at Starbucks?
22  A.   Because someone who worked at
23  Pathmark with me also worked at Starbucks and
24  spoke highly of the company.
25  Q.   And did you interview with anyone at

8 (Pages 26 to 29)

Page 30

S. Marshall

1            S. Marshall
2    Starbucks before receiving an offer?
3        A.   I interviewed with the manager who
4    hired me, Christopher Farmer.
5        Q.   Christopher Farmer?
6        A.   Yes.
7        Q.   Okay.
8            And when you were first hired --
9        A.   I mean John Farmer.
10       Q.   John Farmer.
11       A.   His brother was Christopher Farmer.
12       Q.   Okay.
13           And when you were first hired, do you
14   recall receiving the Starbucks New Hire
15   booklet?
16       A.   Yes.
17           MS. DIAZ:  I'd like to mark this as
18       Exhibit 3.
19           (Defendants' Exhibit 3,
20       Acknowledgment of Receipt, was marked for
21       identification.)
22           (Document Review.)
23   BY MS. DIAZ:
24       Q.   Ms. Marshall, do you recognize this
25   document?

Page 31

S. Marshall

1            S. Marshall
2        A.   Yes.
3        Q.   What is it?
4        A.   Acknowledgment of Receipt of Partner
5    Information page.
6        Q.   Okay.
7            Under that heading that you just
8    read, it says, "I acknowledge that I have
9    received a copy of the New Hire booklet."
10           Is it your understanding that you
11   received a copy of the New Hire booklet?
12       A.   Yes.
13       Q.   Okay.
14           And the paragraph underneath that
15   says, "I also understand that statements
16   contained in this section do not constitute a
17   contract and that my employment with Starbucks
18   is not for a fixed term and can be terminated
19   at any time by either the company or me with or
20   without notice."
21           Do you remember reading that
22   language?
23           MR. GOTTLIEB:  Objection.
24           Just answer the question.
25       A.   Yes.

Page 32

S. Marshall

1            S. Marshall
2        Q.   Do you understand that language?
3        A.   Yes.
4        Q.   Ms. Marshall, when you were hired at
5    Starbucks, did you have a title?
6        A.   Barista.
7        Q.   Okay.
8            And how long were you a barista?
9        A.   Approximately three months.
10       Q.   Okay.
11           Did you hold another position after?
12       A.   Shift supervisor.
13       Q.   Okay.
14           And what was the difference between
15   being a shift supervisor and a barista?
16           MR. GOTTLIEB:  Objection.
17       A.   Difference in what?
18       Q.   How did your responsibilities change?
19       A.   I managed others as a supervisor, so
20   I managed baristas.
21       Q.   Okay.
22           And as a shift supervisor, did you
23   have the authority to hire and fire people?
24       A.   No.
25       Q.   Did you have the authority to

Page 33

S. Marshall

1            S. Marshall
2    discipline other employees?
3        A.   Yes.
4        Q.   Okay.
5            You had the authority to issue
6    corrective actions as a shift supervisor?
7        A.   No.
8            MR. GOTTLIEB:  Objection.
9        Q.   Okay.
10           Did you participate in the interview
11   process of partners?
12           MR. GOTTLIEB:  Objection.
13       A.   Not as a shift supervisor.
14       Q.   Okay.
15           And how long were you a shift
16   supervisor?
17       A.   Approximately nine months.
18       Q.   Okay.
19           And what position did you hold after?
20       A.   Assistant store manager.
21       Q.   Okay.
22           And how did your responsibilities
23   change when you became an assistant store
24   manager?
25           MR. GOTTLIEB:  Objection.

9 (Pages 30 to 33)

S. Marshall

1
2    A.   I began -- I managed now both
3  baristas.
4    Q.   I'm sorry, you managed?
5    A.   I managed both baristas and now shift
6  supervisors.
7    Q.   Okay.
8    A.   And now I also began to learn the
9  role of a store manager.
10    Q.   Okay.
11        And did you have the authority to
12  hire and fire other employees at Starbucks as
13  an assistant store manager?
14        MR. GOTTLIEB:  Objection.
15    A.   Not directly.
16    Q.   Did you participate in the -- in the
17  either -- did you participate in the interview
18  process of other employees?
19    A.   I did.
20    Q.   And did you participate in the
21  determination of whether to terminate or
22  separate employees as an assistant store
23  manager?
24    A.   I did.
25    Q.   Okay.

S. Marshall

1
2        And how long did you hold the
3  assistant store manager position?
4    A.   Approximately 18 months.
5    Q.   What was your position after becoming
6  an assistant store manager?
7    A.   Store manager.
8    Q.   When did you become a store manager?
9    A.   Approximately December of 2005, I
10  believe.
11    Q.   And at which store did you become a
12  store manager?
13    A.   The location was Eighth and
14  University.
15    Q.   And who was your DM at that location?
16    A.   His name was Robert Eisley.
17    Q.   And, Ms. Marshall, how long were you
18  at the Eighth and University store location as
19  a store manager?
20    A.   I believe it was approximately one
21  year.
22    Q.   Did you leave that location at some
23  point?
24    A.   I was promoted out of that location.
25    Q.   Okay.

S. Marshall

1
2        And who promoted you?
3    A.   The district manager.  Her name was
4  at the tip of my tongue.  My district manager
5  at the time, whose name I can't remember.
6    Q.   Okay.
7        And when you say that you received a
8  promotion, what does that -- what does that
9  mean?
10    A.   I was moved from a Tier 1 to a Tier 2
11  store.  So I was given a higher volume.
12    Q.   Is that the difference between a
13  Tier 1 and a Tier 2 store, larger volume?
14    A.   That what I was --
15        MR. GOTTLIEB:  Objection.
16        Go ahead.
17    A.   That's what I was -- believed that
18  was the difference, yes.
19    Q.   And when you moved to a Tier 2 store,
20  did you have a different title?
21    A.   No, I did not.
22    Q.   Did you receive an increase in
23  salary?
24    A.   I did.
25    Q.   Do you recall how much?

S. Marshall

1
2    A.   It would be approximate.  I believe I
3  started at 41,5 and I moved to 46,
4  approximately.
5        MR. GOTTLIEB:  Could you read that
6  last answer back for me?
7        (The Record was Read.)
8  BY MS. DIAZ:
9    Q.   Okay.
10        And what -- what store did you move
11  to?
12    A.   6th and Waverly.
13    Q.   Again, do you recall when that
14  occurred?
15    A.   Like I said, it was about a year
16  afterwards; so, that would have been the
17  following December, give or take.
18    Q.   And who was your DM at the 6th and
19  Waverly location?
20    A.   That was whose name I just can't
21  remember.  It was my DM at the time.
22    Q.   And was this person your DM the
23  entire time that you were at 6th and Waverly?
24    A.   No, she was not.
25    Q.   It was a she?

Page 38

S. Marshall
1
2     A.   Yes.
3     Q.   Okay.
4         Who else was your DM at the 6th and
5   Waverly location?
6     A.   I also had Michael Nicodemus, who was
7   my DM.
8     Q.   Anyone else?
9     A.   Then Jennifer Gurtov.
10    Q.   Okay.
11        Do you recall when Jennifer Gurtov
12   became your DM at the 6th and Waverly location?
13    A.   I believe it was '08.
14    Q.   Ms. Marshall, and at some point did
15   you transfer to another Starbucks location?
16    A.   I did.
17    Q.   Which location was that?
18    A.   Hudson and King.
19    Q.   And who transferred you to that
20   location?
21    A.   Jennifer.
22    Q.   Why were you transferred to the
23   Hudson and King location?
24        MR. GOTTLIEB:  Objection.
25    A.   Because I was successful at 6th and

Page 39

S. Marshall
1
2   Waverly, and she believed that I could do the
3   same thing for Hudson and King.
4     Q.   Did you receive a salary increase
5   when you were transferred to Hudson and King?
6     A.   No.
7     Q.   Did you consider it to be a
8   promotion?
9     A.   Not a promotion, no.
10    Q.   So was it a transfer?
11    A.   It was a transfer, but it was a
12   transfer for a good reason, because I was
13   successful and because she believed that I
14   could do the same thing for Hudson and King.
15    Q.   Okay.
16        When you say that "you could do the
17   same thing for Hudson and King," are you
18   referring to something that you had done at 6th
19   and Waverly?
20    A.   I am.
21    Q.   Okay.
22        What had you done at 6th and Waverly?
23    A.   I put together a successful team.  I
24   managed them well.  I promoted out of the
25   store.  I had good financial results.  I was a

Page 40

S. Marshall
1
2   tenured manager.  And those are some of the
3   things I think of now.
4     Q.   Ms. Marshall, when did you -- when
5   did you become a store manager at Hudson and
6   King?
7     A.   October of -- it would be 2010?
8   2009.
9         2009, I believe.
10    Q.   And what -- generally what were your
11   responsibilities as a store manager?
12    A.   To manage my building.
13    Q.   What does -- what does that mean?
14    A.   To ensure that I had hired, trained
15   and managed a group of baristas and supervisors
16   who ultimately just needed to provide
17   exceptional customer service to customers that
18   came in.
19    Q.   Okay.
20        And as a store manager, were you
21   responsible for the hiring and firing at the
22   store?
23    A.   I was.
24    Q.   Okay.
25        And were you responsible for the

Page 41

S. Marshall
1
2   discipline of employees at the store?
3     A.   I was.
4         MR. GOTTLIEB:  Objection.
5   BY MS. DIAZ:
6     Q.   And did you hold store meetings with
7   the employees at the store?
8     A.   I did.
9     Q.   Okay.
10        Did you do any other management tasks
11   while you were at the store?
12    A.   I did scheduling.  I did payroll.
13   Reviews.  I participated in conference calls.
14   I went to meetings.  I went to several things
15   that -- that my role that was asked of me by my
16   DM.
17    Q.   Okay.
18        And, Ms. Marshall, we touched on this
19   a bit earlier, but what was your salary when
20   you first became a store manager?
21    A.   I believe it was 41,5.
22    Q.   Okay.
23        And you received increases -- and did
24   you receive increases throughout your
25   employment as a store manager?

11 (Pages 38 to 41)

Page 42

S. Marshall

1
2    A.   Yes, I did, every year.
3    Q.   Okay.
4         And when you say that you got them
5    every year, was that as part of Starbucks's
6    performance review process?
7         MR. GOTTLIEB:  Objection.
8         You can answer.
9    A.   It was.
10   Q.   Okay.
11        And apart from the salary increases
12   that you received as part of Starbucks's review
13   process, did you receive any other increases in
14   your salary?
15        MR. GOTTLIEB:  Objection.
16        You can answer.
17   A.   Not increases in salary.  I did,
18   however, receive quarterly bonuses on a
19   frequent basis.
20   Q.   Okay.
21        What -- what are the quarterly
22   bonuses?
23        MR. GOTTLIEB:  Objection.
24   A.   The quarterly bonuses are bonuses the
25   company gives to salaried managers based on

Page 43

S. Marshall

1
2    meeting criteria, meeting results.
3    Q.   Okay.
4         And when you say "meeting results,"
5    what does that mean?
6    A.   The set of criteria changed, I
7    believe a couple of times, but it typically
8    resolved around meeting budget, budgeted sales
9    and controllable costs.
10   Q.   Okay.
11   A.   Those are two of the typical things
12   that I remember --
13   Q.   Okay.
14   A.   -- to having achieved to get these
15   bonuses.
16   Q.   Okay.
17        So you received quarterly bonuses.
18   And apart from quarterly bonuses, did you
19   receive any other type of bonus?
20   A.   Nothing I remember.
21   Q.   Okay.
22        And what benefits did you receive at
23   Starbucks?
24   A.   Health benefits, 401(k), stock
25   options, partner discount, markouts.  Those are

Page 44

S. Marshall

1
2    some of the things I remember.
3    Q.   What is a markout?
4    A.   A free pound of coffee every week.
5    Q.   Okay.
6         And when you say "health insurance,"
7    what does that include?
8    A.   Medical, dental, vision.
9    Q.   Did you receive life insurance while
10   you were at Starbucks?
11   A.   Life insurance, yes.
12   Q.   Okay.
13        Other than the benefits that you've
14   mentioned, health insurance, your participation
15   in the 401(k) and stock option program and
16   partner discounts, did you receive any other
17   benefits while you were at Starbucks?
18   A.   There have to be more.  But, I mean,
19   transit check is something I think of.  So
20   there are more that might come to me later, but
21   those are the big ones.
22   Q.   Okay.
23        Sitting here today, can you think of
24   any others?
25   A.   Well, like the transit check.  I said

Page 45

S. Marshall

1
2    discount.  There were companies that, I guess
3    Starbucks did business with, so because of that
4    relationship we received discounts.  I know I
5    received a discount on my phone bill from
6    Sprint because I was a partner, so I remember
7    that.
8    Q.   Is there anything else?
9    A.   Not at this moment.
10   Q.   Okay.
11        And, Ms. Marshall, when you were at
12   Starbucks, was it your understanding that
13   Starbucks had policies and procedures that its
14   employees were required to follow?
15   A.   Yes.
16   Q.   Okay.
17        And was it your understanding that
18   store management was responsible for enforcing
19   those policies?
20   A.   Yes.
21   Q.   And were you aware that certain
22   policy violations could lead to termination?
23   A.   Yes.
24        MS. DIAZ:  I'd like to mark this as
25   Exhibit 4.

12 (Pages 42 to 45)

S. Marshall

1             S. Marshall
2         (Defendants' Exhibit 4, Starbucks's
3     Partner Guide, was marked for
4     identification.)
5   BY MS. DIAZ:
6       Q.   Ms. Marshall, does this document look
7   familiar to you?
8       A.   Well, it says Starbucks's Partner
9   Guide on the bottom, so --
10      Q.   Okay.
11      A.   -- that means it came from the
12  partner guide.
13      MR. GOTTLIEB:  Just for the record,
14    this is a two-page document which appears
15    to be the cover of a large document and
16    then a single page from the middle of it.
17  BY MS. DIAZ:
18      Q.   Ms. Marshall, if you can turn to the
19  page, the second page of the document that's
20  marked Star/Marshall 537.
21      Can you read the section under
22  Corrective Action?
23      MR. GOTTLIEB:  Out loud or to
24    herself?
25      MS. DIAZ:  No, to just review it.

S. Marshall

1             S. Marshall
2       A.   (Document Review.)
3       Okay.
4       Q.   Ms. Marshall, if you can look at the
5   second paragraph.  The last sentence of that
6   paragraph says, "There is no guarantee that a
7   partner will receive a minimum number of
8   warnings prior to termination of employment or
9   that corrective action will occur in any set
10  manner or order."
11      Was that your understanding of
12  Starbucks's policy?
13      MR. GOTTLIEB:  Objection.
14    Are you asking if that's what the
15    document says?
16      MS. DIAZ:  I'm asking her if that was
17    her understanding of what Starbucks's
18    policy was.
19      MR. GOTTLIEB:  Can you just repeat
20    the question?
21      (The Record was Read.)
22      MR. GOTTLIEB:  I'm going to object to
23    the form of the question, to the vagueness
24    and ambiguity of it, but you can answer.
25      A.   That was not my understanding of

S. Marshall

1             S. Marshall
2   Starbucks's policy.
3       Q.   What was your understanding of
4   Starbucks's policy?
5       MR. GOTTLIEB:  Objection.
6     I don't even understand what that
7     question is.
8   BY MS. DIAZ:
9       Q.   What is your understanding of
10  Starbucks's policy with respect to a minimum
11  number of warnings that an employee had to
12  receive before termination?
13      MR. GOTTLIEB:  Objection.
14    THE WITNESS:  Answer, though.
15    MR. GOTTLIEB:  You can answer, yes.
16      A.   Okay.
17      My understanding was that partners
18  received corrective action in an order of
19  typically verbal, written, final.  That was my
20  understanding based on my entire time as a
21  store manager with the company.
22      Q.   Ms. Marshall, and as a store manager,
23  were you responsible for being familiar with
24  Starbucks's policies?
25      MR. GOTTLIEB:  Objection.

S. Marshall

1             S. Marshall
2       A.   Yes.
3       Q.   Okay.
4       And did you review the Starbucks's
5   Partner Guide?
6       MR. GOTTLIEB:  Objection.
7       A.   Ten years ago?
8       Q.   As a store manager, did you review
9   the Starbucks's Partner Guide?
10      A.   No.
11      Q.   Okay.
12      Ms. Marshall, if you could look at
13  the next paragraph, the third paragraph under
14  the Corrective Action heading, which says, "In
15  cases of serious misconduct, immediate
16  termination from employment may be warranted.
17  Examples of serious misconduct include, but are
18  not limited to, violation of safety and/or
19  security rules."  And then the third bullet
20  says "Falsification or misrepresentation of any
21  company document."
22      Was that your -- was that your
23  understanding of Starbucks's policy, that an
24  employee could be determined immediately for
25  violation of serious misconduct?

Page 50

S. Marshall

1          S. Marshall
2      MR. GOTTLIEB:  Objection.
3      You can answer.
4    A.   No.  I would say no.
5    Q.   No.
6      So in cases of theft or misuse of
7 company property, your understanding was that
8 an employee could not be terminated
9 immediately?
10      MR. GOTTLIEB:  Objection.  That's not
11 what she said.
12 BY MS. DIAZ:
13    Q.   Can you answer the question?
14    A.   What I -- repeat the question again.
15      MS. DIAZ:  Can you repeat the
16 question.
17      (The Record was Read.)
18      MR. GOTTLIEB:  I'm going to object to
19 the form of the question.  I think it's
20 confusing.
21      But you can answer.
22    A.   The -- as a store manager for
23 approximately seven years, I don't believe I
24 ever terminated someone immediately for
25 anything.  I've never been in a situation where

Page 51

S. Marshall

1          S. Marshall
2 someone misrep -- what is it, company violation
3 of -- misuse of company property.  I don't
4 really understand what that means.
5      Theft, obviously, is something that
6 you would be terminated for immediately,
7 because that's the exception to Starbucks's
8 rules and practice, which is that you follow a
9 system verbal, written and final.
10    Q.   Okay.
11      And what about the falsification or
12 misrepresentation of any company document?
13      MR. GOTTLIEB:  Objection.
14    A.   Again, I've never been in that
15 situation to see how I would have had to have
16 handled that because I never ran into any of my
17 partners that falsified company documents.  So
18 it's still Starbucks will have me follow verbal
19 and written and final.
20    Q.   Okay.
21      But as a store manager, you were --
22 were you aware of this policy?
23      MR. GOTTLIEB:  Objection.  Which
24 policy?
25      MS. DIAZ:  The policy that an

Page 52

S. Marshall

1          S. Marshall
2 employee may be terminated for the
3 falsification or misrepresentation of a
4 company document.
5      MR. GOTTLIEB:  Objection.
6    A.   Again, I know, I understand the
7 corrective action process, but you want me to
8 say that I knew specifically about the third
9 line?
10    Q.   No.  I'm asking you whether you were
11 aware that the company could terminate somebody
12 immediately for the falsification of a company
13 document.
14      MR. GOTTLIEB:  Objection.
15    A.   Again, I'm going to say no, because
16 I've never been in that situation to have
17 learned about someone falsifying a document to
18 lead to immediate termination.
19    Q.   Okay.
20      And to clarify, earlier you said that
21 as a store manager you never read the
22 Starbucks's Partner Guide?
23      MR. GOTTLIEB:  Objection.
24    A.   No.  It was something that I gave to
25 my new hires.

Page 53

S. Marshall

1          S. Marshall
2    Q.   Ms. Marshall, were Starbucks's cash
3 management policies ever explained to you?
4      MR. GOTTLIEB:  Objection.
5    A.   I did training when I became a shift
6 supervisor; so, I trained seven years ago on
7 how to do the deposit and how to -- everything
8 that went on in the cash log.
9    Q.   And who trained you with respect to
10 cash management policies.
11    A.   My store manager at the time, John
12 Farmer.
13    Q.   And other than the training that you
14 received as a shift supervisor, did you receive
15 any other training with respect to cash
16 management policies?
17    A.   In formal training, let me see, when
18 I was promoted to assistant store manager there
19 was also another training guide that I went
20 through that -- that was a month-long training.
21 And so cash was definitely covered as part of
22 becoming an ASM.
23      THE WITNESS:  I'd like to take a
24 restroom break, if that's possible.
25      MS. DIAZ:  Sure.

14 (Pages 50 to 53)

Page 54

S. Marshall

1       S. Marshall
2           THE VIDEOGRAPHER:  The time is
3   11:07 a.m.  We're going off the record.
4           (Recess taken from 11:07 a.m. to
5       11:15 a.m.)
6           THE VIDEOGRAPHER:  The time is
7   11:15 a.m.  We're back on the record.
8   BY MS. DIAZ:
9       Q.   Ms. Marshall, going back, I asked you
10  whether you had any other jobs at Starbucks --
11  sorry -- any other jobs while you were employed
12  at Starbucks, and you had mentioned that you
13  overlapped with Pathmark for a month?
14      A.   Yes.
15      Q.   Did you also work at Promethean
16  College while you were at Starbucks?
17      A.   Oh, yes, I was a tutor there.
18      Q.   Okay.
19           What did you do there?
20      A.   I was -- what I tutored.  It was work
21  study --
22      Q.   Okay.
23      A.   -- as part of a financial aid
24  package.  So I did do tutoring while I was a
25  shift supervisor.

Page 55

1       S. Marshall
2       Q.   Do you remember for how long?
3       A.   I believe it was my sophomore and
4   junior years, I believe.
5       Q.   Did you hold any other employment
6   while you were at Starbucks other than
7   Promethean College and Pathmark?
8       A.   I don't believe I did.
9       Q.   What about City College, did you have
10  any position with them while you were employed
11  at Starbucks?
12      A.   Besides as a tutor?
13      Q.   Is it -- is Promethean College the
14  same as City College?
15      A.   Well, no.  Oh, I see what we're
16  doing.  I know what the confusion is.
17           Promethean was the name of the
18  literary journal.  So I just -- I was a tutor
19  there as part of work study.  Promethean was
20  the name of the journal, which was not
21  employment.  It was a literary journal.  So I
22  read stories that were submitted.
23      Q.   Okay.
24           So Promethean was a volunteer
25  activity?

Page 56

1       S. Marshall
2       A.   Yes.
3       Q.   And you were a tutor at City
4   College --
5       A.   Yes.
6       Q.   -- while you were at -- okay -- at
7   Starbucks.
8       A.   Yes.
9       Q.   And, Ms. Marshall, going back to the
10  quarterly bonuses that you said you received, I
11  believe you said that they were based on
12  achieving results?
13           MR. GOTTLIEB:  Objection.
14      A.   Yes.
15      Q.   Did your DMs have any input into
16  whether or not you received the bonus?
17           MR. GOTTLIEB:  Objection.
18      A.   I don't think they did.
19      Q.   Okay.
20           And in terms of your training as a
21  shift supervisor, you indicated that your store
22  manager at the time trained you with respect to
23  cash management policies?
24      A.   Yes.
25      Q.   Do you recall what that training

Page 57

1       S. Marshall
2   consisted of?
3       A.   I do a bit.  He -- he taught me how
4   to do a deposit.  So we sat down at the desk
5   and he showed me how to -- the process that he
6   used for counting the money and getting it in
7   the bag and giving it to the bank.
8       Q.   Okay.
9           And did your store manager explain
10  the importance of doing an accurate deposit?
11           MR. GOTTLIEB:  Objection.
12      A.   Yes.
13      Q.   Okay.
14           And did your store manager at the
15  time explain the importance of taking the bank
16  deposit to the bank every day?
17           MR. GOTTLIEB:  Objection.
18      A.   Possibly.
19      Q.   Apart from what -- what you've
20  already described, did your store manager
21  mention anything else with respect to
22  Starbucks's bank deposit practices --
23           MR. GOTTLIEB:  Objection.
24  BY MS. DIAZ:
25      Q.   -- during your training?

15 (Pages 54 to 57)

S. Marshall

1
2     MR. GOTTLIEB: Objection.
3     A.   The big thing I remember is not to --
4  never go to the bank wearing, you know, your
5  uniform or using a Starbucks's logo bag.  So
6  always, you know, be discreet when you going to
7  the bank.  That's always stood out.
8     Q.   Okay.
9          Do you remember anything about the
10 cash management that you received from that
11 store manage while you were a shift supervisor?
12     MR. GOTTLIEB: Objection.
13     A.   Not that I recall.
14     Q.   Okay.
15          Ms. Marshall, you also said that you
16 received training when you became an assistant
17 store manager?
18     A.   Yes.
19     Q.   And did you receive training with
20 respect to Starbucks's cash management policies
21 when you became an assistant store manager?
22     MR. GOTTLIEB: Objection.
23     A.   I think that it was more, because it
24 was training to be an assistant store manager,
25 it was more about the financial aspects of the

S. Marshall

1
2  business.
3          I don't remember it being
4  specifically -- because, you know, store
5  manage -- I mean, an assistant store manager.
6  So that training would have happened as a shift
7  supervisor.  So I don't remember anything
8  specifically like reviewing, again, like how to
9  do a deposit, because that was covered already.
10          I believe it was more just about how
11 to run the business, that financial aspect of
12 it, how to read a P&L, you know, how to monitor
13 the people that work for you and their cash
14 handling.  So I think that, if I recall, it was
15 more geared towards, you know, that management
16 part of the cash process.
17     Q.   Okay.
18          In terms of monitoring cash handling,
19 what -- what do you recall with respect to your
20 training there?
21     MR. GOTTLIEB: Objection.
22     A.   I recall -- what stands out is really
23 just the P&L statement and learning how to read
24 that and how -- how to manage that and, you
25 know, how to understand, you know, how to read

S. Marshall

1
2  your cash over/short and your bag debt.
3          I believe that those are the two
4  lines on the P&L that are dealt with, anything
5  with cash -- besides everything dealt with cash
6  and P&L but, I mean, specifically within the
7  store.
8     Q.   Apart from the P&L were you
9  instructed with respect to supervision of other
10 employees completing bank deposits?
11     MR. GOTTLIEB: Objection.
12     A.   I don't think I under -- repeat it.
13     Q.   Let me -- let me rephrase it.
14          Were you provided training with
15 respect to the supervision of other employees
16 and their cash handling or cash management
17 practices?
18     MR. GOTTLIEB: Objection.
19     A.   Not that I remember specifically.
20 But as a store manager, I managed all aspects
21 of my store.
22     Q.   As an assistant store manager, were
23 you responsible for making sure that the bank
24 deposit was made every day?
25     MR. GOTTLIEB: Objection.

S. Marshall

1
2     A.   No.  That was really my store
3  manager.
4     Q.   Okay.  Okay.
5          And after you were an assistant store
6  manager, you became a store manager; is that
7  correct?
8     A.   Yes.
9     Q.   Did you receive any training with
10 respect to cash management as a store manager?
11     A.   No.
12     Q.   And other than formal training, did
13 you have any conversations with any of your
14 supervisors regarding cash management policies
15 or practices?
16     MR. GOTTLIEB: Objection.
17     A.   As in my -- my people supervised me.
18     Q.   Right.
19          So let's just start with when you
20 were a shift supervisor, did you have any
21 conversations with any of your supervisors
22 regarding cash management?
23     MR. GOTTLIEB: Regarding policies or
24 what specifically?
25     MS. DIAZ: Regarding cash management.

Page 62

S. Marshall

1      S. Marshall
2          MR. GOTTLIEB:  I'm going to object.
3          A.    This seems like such a broad question
4    to me, only because, I mean, it's a business,
5    so we're constantly going to be talking about,
6    you know, the money we're making, the cash
7    we're bringing in, the deposit.  So that's
8    something that we're living and breathing every
9    day.
10         Q.    Okay.
11             I'll be more specific.  As a shift
12   supervisor, did you have any conversations with
13   your supervisors regarding bank deposit
14   practices?
15         MR. GOTTLIEB:  Objection.
16         A.    Instead of my training, I mean, I
17   can't remember anything specifically.  I, you
18   know, it's not that I'm trying to not say that,
19   but it's like, again, I was learning.  Maybe
20   I -- I don't know.  I don't want to make things
21   up.  So I'm going to just say that, you know,
22   cash handling is just something ongoing.  It's
23   something you do every day.  So I can't imagine
24   we didn't have any conversation, but something
25   specific or any sort of like formal

Page 63

1      S. Marshall
2    documentation because I was doing anything
3    wrong, no, or anything of that nature, no.
4          Q.    Okay.
5              And do you recall any reminders with
6    respect to bank deposit practices or policies?
7          MR. GOTTLIEB:  Objection.
8          A.    What do you mean by "a reminder"?
9          Q.    Not a formal documentation because
10   you were doing something wrong, as you said,
11   but just a, hey, Serenity, remember to take the
12   bank deposit to the bank every day?
13         A.    No.
14         MR. GOTTLIEB:  Objection.
15   BY MS. DIAZ:
16         Q.    Okay.
17             As an assistant store manager, did
18   you have --
19         MR. GOTTLIEB:  Was there an answer to
20     that question?  She said no.
21         (A Discussion was Held off the
22     Record.)
23   BY MS. DIAZ:
24         Q.    As an assistant store manager, did
25   you have any conversations with your

Page 64

1      S. Marshall
2    supervisors regarding Starbucks's bank deposit
3    policies or practices?
4          MR. GOTTLIEB:  Objection.  I believe
5      it was already asked.
6          MS. DIAZ:  I asked with respect to
7      her being a shift supervisor.
8          MR. GOTTLIEB:  Okay.  Before that you
9      asked this.
10         A.    Again, something specific I can think
11   of, like, listen, this is -- no.  I mean,
12   again, we -- no.  That was just part of our
13   daily routine.  We did deposits, you know, you
14   got -- went to the bank, you logged, you know,
15   checked over/shorts.  That wasn't, you know,
16   something, again, nothing -- there was never
17   any -- there's no formal sort of documentation
18   about, you know, me doing something wrong with
19   bank deposits.  So, yeah.
20         Q.    Okay.
21             What about as a store manager, did
22   you have conversations with your supervisors
23   regarding bank deposit policies or practices at
24   Starbucks?
25         MR. GOTTLIEB:  Objection.

Page 65

1      S. Marshall
2          A.    What comes to mind is we went to cash
3    simplification.  So that was something that
4    changed during my role as a store manager.  So
5    we sort of changed the way that we did
6    deposits.  So deposits became, I guess, a topic
7    of conversation again.
8          Q.    Okay.
9              And what is cash simplification?
10         A.    It's sort of it -- describe as best I
11   can.  It was a way to try to save time when
12   counting and processing deposits.  So I just
13   remember I had to watch one of my supervisors
14   complete a deposit and I had to record all
15   their movements.  And, you know, I had to
16   reorganize the safe to make it -- just to make
17   it a smarter, leaner, faster process.  I
18   remember that being something that we did.
19         Q.    Okay.
20             And do you recall when the cash
21   simplification process occurred?
22         A.    I was at 6th and Waverly.  So some
23   time during my tenure there.
24         Q.    Okay.
25             Was Jennifer Gurtov your supervisor

17 (Pages 62 to 65)

S. Marshall

1
2    at the time that the cash simplification --
3        A.   She was --
4            MR. GOTTLIEB:  Just wait for her to
5        finish the question.
6            THE WITNESS:  I'm sorry.
7            MR. GOTTLIEB:  That's okay.  Just
8        wait for her to finish the question so it's
9        clear.
10   BY MS. DIAZ:
11       Q.   And just to be clear, the question
12   was, was Jennifer Gurtov your supervisor at the
13   time --
14       A.   She was.
15       Q.   -- that this cash simplification --
16       A.   You paused.
17       Q.   -- at the time that the cash
18   simplification process --
19       A.   She was.
20       Q.   -- was implemented.  Okay.
21           Other than the cash simplification
22   process that was implemented, do you recall any
23   other conversations with your supervisors
24   regarding bank deposit practices during the
25   time that you were a store manager?

S. Marshall

1
2            MR. GOTTLIEB:  Objection.
3        A.   Again, nothing specific.  No -- no.
4        Q.   Okay.
5            And, Ms. Marshall, were you aware
6    that Starbucks's bank deposit practices were
7    important to maintain an accurate accounting of
8    the cash that was in the store?
9            MR. GOTTLIEB:  Objection.
10       A.   Yes.
11       Q.   Okay.
12           And were you aware that Starbucks's
13   policies regarding bank deposit practices were
14   important to the safety of the store and the
15   security of its employees?
16           MR. GOTTLIEB:  Objection.
17       A.   Yes.
18       Q.   Ms. Marshall, did you ever review any
19   documents regarding Starbucks's cash management
20   policies and procedures?
21       A.   Any documents outside of like what
22   you've shown me already?
23       Q.   Any policies or practices with
24   respect to cash management.
25           MR. GOTTLIEB:  Objection.

S. Marshall

1
2        A.   As a store manager, or you mean ever?
3        Q.   Throughout your employment, did you
4    ever receive -- did you ever review any
5    documents with respect to Starbucks's cash
6    management policies?
7            MR. GOTTLIEB:  Objection.
8        A.   No.  We've talked about when I became
9    a shift supervisor that there was training.  I
10   learned how to do a deposit.
11           When I became an ASM there definitely
12   was a huge binder.  So I definitely remember
13   talking -- doing financials.  So, you know, I
14   can't imagine it wasn't in there.
15           Store manager, there was no formal
16   training or processes, so, no.  I talked about
17   cash simplification.  You've shown me the new
18   hire packet.
19           I can't --
20       Q.   Okay.
21           MR. GOTTLIEB:  Are you finished with
22   your answer?
23       A.   Well, I was going to just say, I
24   can't recall anything else beyond what we've
25   talked about right now.

S. Marshall

1
2        Q.   Okay.
3            MS. DIAZ:  I'd like to mark this as
4        Exhibit 5.
5            (Defendants' Exhibit 5, Excerpt,
6        Bates No. Star/Marshall 938 through 943,
7        was marked for identification.)
8    BY MS. DIAZ:
9        Q.   This document is an excerpt of a
10   large document.  It's Bates stamped
11   Star/Marshall 938 through 943.
12           Ms. Marshall --
13           MR. GOTTLIEB:  You're done with 4;
14   right?
15           MS. DIAZ:  Yes.
16       A.   (Document Review.)
17       Q.   Ms. Marshall, does this document look
18   familiar to you?
19       A.   Yes.
20       Q.   Okay.
21           What is it?
22       A.   These are pages from the daily
23   records book.
24       Q.   Okay.
25           And the first page that's marked

Page 70

S. Marshall

1  Star/Marshall 938 at the bottom, is that your
2  handwriting at the top?
3     A.   I believe it is.
4     Q.   Okay.
5         If you can flip to the page that's
6  numbered Star/Marshall 943, it's actually the
7  last page, the title of this page is "Cash
8  Management Log Policies Standards and
9  Procedure." If you go down four headings to
10 "Deposit Log Cash Controller."
11        Do you see that?
12    A.   Yes.
13    Q.   What's a cash controller?
14    A.   That is the person in possession of
15 the safe, is my best definition for it, yeah.
16    Q.   What does that mean, "in possession
17 of the safe"?
18    A.   There should be one person who sort
19 of owns -- I know we can't do quotes --
20 quote/unquote, "owns" the safe. So if I come
21 in, I'm the opening supervisor, I count the
22 safe, I make sure it's accurate, I'm now the
23 cash controller. I control the cash in there
24 because I'm the only one that has access to it.

Page 71

S. Marshall

1     Q.   Okay.
2         And under "Deposit Log," it says,
3  "The deposit must be prepared and transported
4  to the bank every day." And "The deposit must
5  be prepared after 8:00 a.m. and must be
6  transported to the bank by 3:00 p.m."
7         Do you see that?
8     A.   I do.
9     Q.   Okay.
10        Was that your understanding of
11 Starbucks's policy with respect to bank
12 deposits?
13        MR. GOTTLIEB:  Objection.
14    A.   It was.
15    Q.   And the next section says "Deposit
16 Prep Section Procedure"?
17    A.   Uh-huh.
18    Q.   No. 1 says, "Record the start time
19 and CC initials in the deposit prep section on
20 the date the deposit is processed."
21        Was that your understanding of
22 Starbucks's policy with respect to the deposit
23 prep section?
24        MR. GOTTLIEB:  Objection. Are you

Page 72

S. Marshall

1  asking what the document says?
2         MS. DIAZ:  I'm asking what her
3  understanding -- if that's -- if what the
4  document says is compliant with her
5  understanding of the policy.
6         MR. GOTTLIEB:  I think it's a
7  confusing -- are you asking her what the
8  document says is what the document says?
9  That's what it sounds like you're asking.
10 BY MS. DIAZ:
11    Q.   No.
12        Ms. Marshall, was that your
13 understanding of Starbucks's policy?
14        MR. GOTTLIEB:  I'm going to object to
15 the question. I think the term "policy" is
16 ambiguous in this situation.
17    A.   It was.
18    Q.   Okay.
19        And where it says "Deposit witness
20 records their initials after confirming that
21 the CC initials, completion time, deposit split
22 amount, and seal deposit bag number are
23 accurately recorded in the deposit prep
24 section."

Page 73

S. Marshall

1  What is a deposit witness?
2     A.   The person who, exactly what it says,
3  they record their initials after they've
4  confirmed. So everything you just read is the
5  definition of it, yeah.
6     Q.   Okay.
7         The next section says, "Deposit to
8  Bank Section Procedure."
9         "Record CC name taking" -- oh.
10 "Record CC name taking deposit to bank, date to
11 bank, time to bank, and deposit bag number in
12 the deposit to bank section on the date the
13 deposit is processed."
14        Ms. Marshall, was the cash controller
15 the person responsible for taking the deposit
16 to the bank?
17        MR. GOTTLIEB:  Note my objection.
18 Same objection as before.
19    A.   That actually is, in my
20 understanding, actually was it just needed to
21 be a cash controller, really.
22    Q.   A cash controller.
23    A.   Anyone who had the ability to hold
24 keys. So, a supervisor, an ASM.

19 (Pages 70 to 73)

Page 74

S. Marshall
1
2  Q.  Okay.  Okay.
3       And the next section says, "Banking
4  witness records their initials after confirming
5  that the CC initials date and time of the CC
6  departure to bank and sealed bank number are
7  accurate and recorded in the deposit to bank
8  section."
9       Ms. Marshall, was the banking witness
10  required to verify that the cash controller had
11  gone to the bank on the date and time listed in
12  the daily records book?
13       MR. GOTTLIEB:  Objection.  Same
14  objection as before.
15  A.  According to this, yes.
16  Q.  Okay.
17       And when you say "according to this,"
18  you're saying that this is -- that's what the
19  document says?
20  A.  I'm saying that that's what the
21  document says, yes.
22  Q.  Okay.
23       Was your understanding of Starbucks's
24  policy different from what this document says?
25       MR. GOTTLIEB:  Objection.

Page 75

S. Marshall
1
2  A.  I think that this whole document, you
3  know, makes it black and white, and that's not
4  really how you operated within a store.  It was
5  definitely more -- I don't -- I guess ambiguous
6  is the best word I can think of, but it
7  didn't -- it wasn't like, okay, here it is, you
8  have it in front of you, you know this, you've
9  always known this, so you follow this every
10  day.  That's not how it worked.  And that's not
11  even how it was managed.
12       So that's why even just reading that
13  line, CC name, oh, really, it was supposed to
14  be the -- like it was always just a cash
15  controller.  Like as long as -- you obviously
16  wouldn't send a barista down there.  They
17  haven't been trained.  But it was someone who
18  could hold keys, it was fine, they could go to
19  a bank.
20  Q.  Okay.
21       What about the responsibilities of a
22  banking -- banking witness?  What was your
23  understanding in terms of what a banking
24  witness was supposed to be certifying to on the
25  daily records book?

Page 76

S. Marshall
1
2       MR. GOTTLIEB:  Objection.
3  A.  That I just -- I needed a signature.
4  That it was part of, you know, getting the
5  books done.  You needed a signature --
6  Q.  Okay.
7  A.  -- in regards to the deposit, yes.
8  Q.  And did the signature mean anything?
9       MR. GOTTLIEB:  Objection.
10  A.  Did the signature mean anything?
11       I mean, according to Starbucks it had
12  a meaning; but, again, like in practice, you
13  know, you would -- my entire time, you'd get
14  the deposit done and then you'd get your
15  signatures on there.
16       So not saying that it doesn't mean
17  anything, because, obviously, it does.
18  Starbucks has a paper for it.  But in practice
19  you, you know, we would just try and make sure
20  we got our signatures on there.
21  Q.  Okay.
22       MS. DIAZ:  I'd like to mark this as
23  Exhibit 6.
24       (Defendants' Exhibit 6, Document,
25  Bates Nos. 871, 876 and 877, was marked

Page 77

S. Marshall
1
2  for identification.)
3  BY MS. DIAZ:
4  Q.  This is a three-page document.  The
5  front cover page is Bates stamped -- Bates
6  stamped Star/Marshall 871, and I've attached
7  Star/Marshall 876 and 877, which are portions
8  of that document.
9       Ms. Marshall, does this document look
10  familiar to you, the first page?
11  A.  I know what it is because of the
12  heading.  So Safety, Security and Health
13  Resource Manual.  So I know where it comes
14  from.
15  Q.  And as a store manager, do you have
16  access to the Safety, Security and Health
17  Resource Manual?
18  A.  I did.
19  Q.  And how did you have access to it?
20  Was there a paper copy in --
21  A.  In was in what was part of what we
22  called back of house manuals that we called
23  them.  There were -- there were about eight of
24  them.  They sat in the store, and they were --
25  this is nice three pages.  There are about a

20 (Pages 74 to 77)

Page 78

S. Marshall

1
2 thousand pages each and they sort of -- they
3 were just called the back house manuals, and
4 they had different names, depending on what the
5 topic was.
6     Q.   And as a store manager, were you
7 responsible for being familiar with the back of
8 the house manuals?
9     A.   I was responsible for knowing they
10 were there as a resource.
11    Q.   Okay.
12        And did you use the back of the house
13 manuals as a resource?
14    A.   I did.
15    Q.   Okay.
16        Did you ever use the Safety, Security
17 and Health Resource Manual as a resource?
18    A.   I did.
19    Q.   Do you recall for what purposes?
20    A.   When I first became a store manager
21 just, I mean, there's so many things of running
22 a store, you know, you do have to look for
23 resources.
24        So I can remember an incident like
25 learning how to complete incident reports

Page 79

S. Marshall

1
2 correctly and learn how to file them and send
3 them away.  That was part of the -- so I
4 remember having to look that up because it
5 wasn't something I did frequently.
6     Q.   Okay.
7        If you can turn to the second page of
8 the document.  Towards the bottom there's a
9 heading that says "Bank Deposit Transport
10 Standards."  And the first and second bullets
11 say, "For safety reasons, the deposit must only
12 be transported to the bank between the hours of
13 8:00 a.m. and 3:00 p.m."
14        And the second bullet says, "The
15 deposit must be transported to the bank every
16 day the store is open."
17        Was that your understanding of
18 Starbucks's policy --
19        MR. GOTTLIEB:  Objection.
20    Q.   -- with respect to bank deposits?
21        MR. GOTTLIEB:  Objection.
22    A.   Actually, the first one, it was not.
23 3:00 p.m.  I don't think that was ever -- it
24 was always before dark.  I'd heard -- that was
25 typically what we would all say, not that

Page 80

S. Marshall

1
2 specific window, but it was definitely like,
3 you know, before dark.  That was always sort of
4 the general rule we spoke about.
5     Q.   And do you recall how that was
6 communicated to you, that before dark was
7 permissible?
8     A.   No, but it's also the way I trained
9 my own supervisors.  Before dark.  You don't
10 want to go out in the dark with money.  It's
11 just, you know, a common sense practice.  And
12 that was just -- so I can't remember a time.
13 It's just the way at a job where it suddenly
14 becomes a part of your standard operating
15 procedure.
16        MS. DIAZ:  I'd like to mark this as
17    Exhibit 7.
18        (Defendants' Exhibit 7, Document,
19    Bates Nos. Star/Marshall 821 to 868, was
20    marked for identification.)
21        (Document Review.)
22 BY MS. DIAZ:
23    Q.   This is a document Bates stamped
24 Star/Marshall 821 to Star/Marshall 868.  It's a
25 portion of a larger document.

Page 81

S. Marshall

1
2        Ms. Marshall, do you recognize this
3 document?
4     A.   Again, because of the heading Store
5 Operations, so this was also a back of house
6 manual.
7     Q.   Okay.
8        And as a store manager, did you refer
9 to the Store Operations manual?
10    A.   Yes.
11        MR. GOTTLIEB:  Objection.
12 BY MS. DIAZ:
13    Q.   Do you recall for what purposes you
14 referred to the Store Operations manual?
15    A.   Not specifically.  There were --
16 there were resources, they were there, they
17 were large, but -- so I can't remember exactly.
18    Q.   As a store manager, were you
19 responsible for being familiar with the Store
20 Operations manual?
21        MR. GOTTLIEB:  Objection.
22    A.   No.  It was over a thousand pages.  I
23 was responsible for knowing it was there as a
24 resource if I needed something.
25    Q.   Okay.

21 (Pages 78 to 81)

Page 82

S. Marshall

1
2       If you can flip to page 844, the top
3  of that page says, "Preparing and taking the
4  deposit bag to the bank."  And the first bullet
5  says, "The store is required to make one
6  deposit daily unless notified otherwise."
7       Was that your understanding of
8  Starbucks's policy?
9       MR. GOTTLIEB:  Objection.
10      A.   Yes.
11      Q.   If you can flip to page 846, there's
12  a section called "Deposit Trip Standards," and
13  the second bullet starts, says, "The deposit
14  should be transported to the bank each day
15  between the hours of 8:00 a.m. and 3:00 p.m.
16  local time."
17      Was that your understanding of
18  Starbucks's policy?
19      A.   Again, no.  Again, I'd heard after --
20  before dark.  That was sort of the just -- I
21  guess if there was a standard, that was it.
22      Q.   Okay.
23      And, Ms. Marshall --
24      MR. GOTTLIEB:  Are you done with your
25  answer?

Page 83

S. Marshall

1
2       THE WITNESS:  Yes.
3  BY MS. DIAZ:
4       Q.   Ms. Marshall, was that your practice
5  with respect to your store, that the deposit
6  could be taken at any time before dark?
7       A.   I wouldn't say that that was the
8  practice standard to my store.  That was the
9  practice standard to -- I can't say the company
10  because, obviously, I worked at one store in
11  one district, but within everything that I knew
12  being a store manager, being in management,
13  speaking with my peers, you know, I don't -- no
14  one ever said like, "Oh, make sure you get it
15  out before 3:00."  It just wasn't something
16  that came up from the district manager, from
17  the store manager, from my peers.  It just
18  wasn't.
19      Q.   Okay.
20      Do you know -- do you recall speaking
21  to any of your peers about taking the deposit
22  before dark as opposed to before 3:00 p.m.?
23      A.   No.  That wouldn't have been a
24  conversation, really, it really wouldn't have,
25  that I think that -- you know, again, these

Page 84

S. Marshall

1
2  documents are in black and white, but there's
3  also the way that you actually run the business
4  and run the store.
5       Q.   Uh-huh.
6       A.   And, you know, you can -- you really
7  pull policies out.  You can go in the store and
8  see somebody with tattoos.  Tattoos are not
9  allowed to be visible.  I can pull seven places
10  where it probably that, so --
11      Q.   Uh-huh.
12      A.   -- you know, in practice and what
13  truly happens in the store is completely
14  different, or in -- written in these different
15  documents, what actually happens in the store,
16  that, you know, is, again, just standard
17  operating procedure that I knew of in my whole
18  career.
19      Q.   Okay.
20      And did your supervisors ever say it
21  was okay to take the deposit before dark --
22      A.   Before --
23      Q.   -- before dark as opposed to before
24  3:00 p.m.?
25      MR. GOTTLIEB:  Objection.

Page 85

S. Marshall

1
2       A.   Again, that would -- that would mean
3  that it was something that was discussed when,
4  you know, it -- you just kind of ran the store.
5  Like I'd learned how to make -- do a deposit
6  when I was a shift supervisor.  And I was
7  promoted and promoted and given a business and,
8  you know, I ran it to the best of my ability
9  along with, you know, any district manager that
10  came in.
11      But, again, that was never something
12  that came up specifically, like it just never
13  did.
14      Q.   Okay.
15      But it was your -- was it your
16  practice as a store manager to complete the
17  deposit before dark as opposed to before
18  3:00 p.m.?
19      MR. GOTTLIEB:  Objection.
20      A.   That was more my understanding of if
21  there was a window, it was -- it was before
22  dark.
23      Q.   Okay.
24      And that was your practice as a store
25  manager?

22 (Pages 82 to 85)

Page 86

S. Marshall

1
2      A.   And that was my practice, yes.
3           MR. GOTTLIEB: Objection.
4  BY MS. DIAZ:
5      Q.   Okay.
6           If you can flip to page 855, please.
7  The heading says, "Management Cash Control
8  Functions. This section includes information
9  for the store manager only."
10          And please flip to the following
11  page, which is page 856. The heading says,
12  "Manager responsibility for store operating
13  funds. One of the primary responsibilities of
14  store management is to control and protect all
15  funds in the store. The store manager is
16  ultimately accountable for all aspects of cash
17  control being followed on all shifts. The
18  store manager is also responsible for
19  implementing cash control policies, identifying
20  and correcting cash control violations and
21  irregularities, and communicating to the
22  district manager any issues or concerns that
23  arise."
24          Ms. Marshall, were you familiar with
25  this? Were you familiar with this policy?

Page 87

S. Marshall

1
2           MR. GOTTLIEB: Objection. Are you
3  referring to just the section you read?
4           MS. DIAZ: The section.
5           MR. GOTTLIEB: The section that you
6  read?
7           MS. DIAZ: The section that I read.
8      A.   I mean, it's not a policy really. It
9  just says, you know -- I mean, it just says
10  what I'm responsible for it, right? It's not
11  really a policy. It just says I'm responsible
12  for the cash; correct.
13     Q.   Did you understand that as a store
14  manager one of your primary responsibilities
15  was the control and protection of cash in the
16  store?
17     A.   Yes.
18     Q.   And did you understand that as a
19  store manager you were ultimately accountable
20  for all aspects of cash control being followed
21  on all shifts?
22          MR. GOTTLIEB: Objection.
23     A.   Yes.
24     Q.   And did you understand that as a
25  store manager you were responsible for

Page 88

S. Marshall

1
2  implementing cash control policies and
3  identifying cash control violations and
4  irregularities?
5           MR. GOTTLIEB: Objection.
6      A.   Yes.
7      Q.   Ms. Marshall, if you can turn to
8  page 867. The bottom of the page has a heading
9  which says, "Managing cash in your store." It
10  says, "Store managers must remain focused on
11  actively machining cash in your store to
12  prevent cash handling issues and/or cash loss.
13  Store managers are required to review the CML
14  in reporting daily and to take action
15  immediately when cash handling issues or cash
16  loss occurs."
17          What's the CML?
18     A.   Cash Management Log.
19     Q.   Okay.
20          And, Ms. Marshall, did you understand
21  that as a store manager you were required to
22  review the cash management log daily?
23     A.   No.
24     Q.   What was your understanding of the --
25  of Starbucks's policy?

Page 89

S. Marshall

1
2      A.   It needed to be --
3           MR. GOTTLIEB: Objection.
4           Go ahead.
5      A.   It needed to be reviewed. I say no,
6  simply because I can remember at one point
7  when, as part of like -- and all DMs have
8  different ways that they manage and different
9  timelines that they want things done. But I
10  can even remember Jenn Gurtov, as part of like
11  our Monday admin day, where that would go,
12  like, okay, you need to review the cash book
13  for last week. So even in that, it would be a
14  contradiction of what's written in here.
15     Q.   Okay.
16          And you said that you recall Jenn
17  Gurtov talking about the review of the cash
18  management log at a Monday meeting?
19     A.   No. Doing it -- completing that on
20  Mondays as part of our admin day, which is what
21  our Mondays were called, our administrative
22  day, admin day.
23     Q.   Okay.
24          And when did Jenn Gurtov communicate
25  this to you?

23 (Pages 86 to 89)

S. Marshall

1      A.    Specifically, again, like DMs change,
2  different programs change, and their
3  expectations change.  But in reading that, it
4  just made me remember that that was, at one
5  point, something that was her expectation that,
6  you know, make sure you review your cash
7  management log for last week.
8      Q.    Okay.
9          Do you remember when Jenn Gurtov told
10  you to review your cash management log?
11      A.    Well, not just me --
12      MR. GOTTLIEB:  Objection.
13      THE WITNESS:  Sorry.
14      MR. GOTTLIEB:  It's okay.
15      A.    It would not have just been me.
16  Again, it was part of her managing all of us in
17  the district and part of expectations.  It had
18  to be at 6th and Waverly because that was where
19  I was with her the longest.
20      Q.    Okay.
21          Do you recall her telling you that
22  directly?
23      MR. GOTTLIEB:  Objection.

S. Marshall

1  BY MS. DIAZ:
2      Q.    Excuse me.
3          Do you recall Jenn Gurtov telling you
4  that you should review your cash management log
5  on a weekly basis?
6      A.    Yes.
7      MR. GOTTLIEB:  Objection.
8  BY MS. DIAZ:
9      Q.    And did she tell you that directly or
10  was it in a meeting setting?
11      A.    Meeting setting.  Either the huddle,
12  which is where we met in person, or the
13  conference call, because she did both.
14      Q.    Okay.
15          Do you recall -- do you recall
16  whether she said this during a huddle or during
17  a huddle conference call?
18      A.    No.
19      Q.    You don't recall?
20      A.    No.
21      Q.    Okay.
22          Do you recall whether she told it to
23  you directly?
24      MR. GOTTLIEB:  Objection.  I think

S. Marshall

1  you asked this question three times
2  already.
3      A.    Yes.  I am -- I am confused.  Like
4  directly, meaning me and her being the only
5  people present?
6      Q.    Right.
7      A.    No, because there would -- it was
8  standard within her district, so it would have
9  been communicated to all store managers at
10  once.  Whether that was a conference call or a
11  huddle, I don't remember.
12      Q.    Okay.
13          But you believe that it occurred at
14  either a huddle or a conference call?
15      A.    Yes, I'm sure.
16      Q.    And you believe that this happened
17  during the time that you were at 6th and
18  Waverly under her supervision?
19      A.    Yes.
20      Q.    Okay.
21          What -- what do you remember about
22  what Ms. Gurtov said during that huddle or
23  conference call with respect to reviewing the
24  cash management log?

S. Marshall

1      A.    Over/shorts, that was -- that was
2  always something that was very important to
3  everyone.  Like, that's loss of money, so, you
4  know, reviewing that and getting it to her via
5  e-mail.  So this would, you know, all be on
6  e-mail that, you know, she wanted those numbers
7  on Monday.  She wanted the cash over/shorts for
8  the previous week.
9      Q.    Did she ever discuss the bank deposit
10  practices during the huddles or conference
11  calls?
12      A.    No.
13      MR. GOTTLIEB:  Objection.
14      A.    Not that I recall.
15      MS. DIAZ:  I'd like to mark this as
16  Exhibit 8.
17          (Defendants' Exhibit 8, Document,
18  Bates Nos. Star/Marshall 779 through 794,
19  was marked for identification.)
20  BY MS. DIAZ:
21      Q.    This document is Bates stamped
22  Star/Marshall 779 through 794.
23          Ms. Marshall, does this document look
24  familiar to you?

Page 94

S. Marshall

1
2    A.   It does.
3    Q.   What -- what is it?
4    A.   This was what I spoke about earlier,
5    the cash management simplification.
6    Q.   Okay.
7         And do you recall reviewing this
8    document during the cash simplification
9    process?
10   A.   I do.
11   Q.   Okay.
12        Ms. Marshall, if you can turn to
13   page 783.  The top says, "Store Manager
14   Activity."  No. 4 says, "Complete go-see
15   banking work, observe" -- excuse me.  In the
16   second bullet under that says, "Observe two
17   different cash controllers complete the banking
18   process, change order and deposit."
19        Do you recall completing this
20   activity?
21   A.   I do.
22   Q.   Were store managers required to
23   following this planning guide with respect to
24   cash simplification?
25        MR. GOTTLIEB:  Objection.  Are you

Page 95

S. Marshall

1
2    asking -- what are you asking?
3    BY MS. DIAZ:
4    Q.   Were store managers required to
5    follow this guide?
6         MR. GOTTLIEB:  I'm going to object to
7    that.
8    A.   Well, I remember when it was rolled
9    out by Jenn Gurtov to us as a district, and I
10   remember us -- this was part of, again, an
11   overall better way -- it was an entire program
12   that was rolled out and where they kind of
13   analyzed different areas of the business to try
14   to find, you know, cost-saving and time-saving
15   techniques for processes.  So "Better Way" was
16   something that was discussed.
17   Q.   Okay.
18        And is Jenn Gurtov the person who
19   rolled out this Better Way to her store
20   managers?
21   A.   Yes.
22   Q.   Okay.
23        And do you recall where that
24   occurred?
25   A.   No, I don't.  I don't know if it was

Page 96

S. Marshall

1
2    a huddle or a conference call.
3    Q.   Do you recall what Jenn Gurtov said
4    with respect to bank deposits in the context of
5    the Better Way?
6    A.   Well, this specifically we're talking
7    about --
8         MR. GOTTLIEB:  I'm objecting.
9         You can go ahead and answer it.
10   A.   -- it's about a go-see.  So it just
11   says to observe cash control in completing the
12   banking process, which I remember doing.  So I
13   don't know that there was a lot of dialogue
14   around that.  It was just watch someone do a
15   deposit.
16   Q.   Okay.
17        And, Ms. Marshall, as part of the
18   rollout of the cash simplification process and
19   the Better Way, were you required to follow or
20   to conduct certain activities in the Better Way
21   Planning Guide?
22   A.   Yes.
23   Q.   And did you conduct those activities?
24   A.   I believe I conducted them.
25   Q.   Okay.

Page 97

S. Marshall

1
2        You can turn to page 790.  The top
3    says, "Go-See Cash management."  And the first
4    box at the top says, "Schedule yourself in
5    addition to cash controller to do the banking
6    work for the day and schedule and instruct the
7    cash controller to complete the deposit change
8    order and bank run consecutively."
9         Do you recall doing the go-see
10   described on page 790?
11   A.   I do.
12   Q.   And why did you complete the go-see?
13   A.   Why?  Because it was part of the
14   go-see Better Way program.
15   Q.   And, Ms. Marshall, why was the cash
16   simplification process implemented?
17        MR. GOTTLIEB:  Objection.
18        Do you know?
19   A.   I know what I believe was the reason
20   that it was, again, what I've already said, so
21   I'm just repeating that.  It was a way to
22   eliminate repetitive motion.  It was a way that
23   we were supposed to save time when completing
24   bank deposits.  We were supposed to see if
25   there were ways to be leaner around how much

25  (Pages 94 to 97)

S. Marshall

1  
2  time it took in the back and make sure that
3  your safe was organized so that everything was
4  labeled. We had a calculator. You had all the
5  procedures. There was a way to make things run
6  more efficiently.
7     Q. Okay.
8       Was it your understanding that it was
9  designed to help store managers get the bank
10 deposit to the bank every day?
11    A. Not at all.
12      MR. GOTTLIEB: Objection.
13      THE WITNESS: Sorry.
14 BY MS. DIAZ:
15    Q. No?
16    A. No.
17    Q. So in terms of saving time to prepare
18 the bank deposit, would that have helped you as
19 a store manager get the bank deposit to the
20 bank -- excuse me -- get the bank deposit to
21 the bank every day?
22      MR. GOTTLIEB: Objection.
23    A. I don't even think I understand the
24 question.
25    Q. Let me rephrase that.

S. Marshall

1  
2     Did the Better Way cash
3  simplification process save time in the bank
4  deposit process in the store?
5     A. That was the point of it, yes.
6     Q. Okay.
7       And, in your experience, did it save
8  time?
9       MR. GOTTLIEB: Objection.
10    A. Not really. I feel like I was pretty
11 efficient.
12    Q. Okay.
13      MS. DIAZ: I'd like to mark this as
14 Exhibit 9.
15      (Defendants' Exhibit 9, Repeatable
16 Routine Instruction Sheet, was marked for
17 identification.)
18    A. (Document Review.)
19    Q. Ms. Marshall, before we get to this
20 exhibit, I asked you whether the Better Way
21 cash management policy saved time. And you
22 said that -- you said, not really, I feel like
23 I was pretty efficient.
24      What do you mean by "pretty
25 efficient"?

S. Marshall

1  
2     A. I mean that I had been counting money
3  as a cash controller for an extended period of
4  time, and that this system really was about, I
5  mean, it was about saving time in repetitive
6  motion. That was really what it was about.
7       I remember in the go-see you had a
8  scrap of paper and you had to draw a diagram of
9  the person and how many times they touched
10 everything, because it was supposed to minimize
11 movement and touch and repetitive -- like that,
12 to me, was the point of go-see. And that was
13 sort of -- even the way that it was rolled out
14 was that this was to, you know, save time.
15 Like I said, it was to save time, it was
16 eliminate motion, it was to make sure you
17 weren't going over yourself, so...
18    Q. So, in your view, it was only
19 designed to save time with respect to the
20 counting of the funds?
21      MR. GOTTLIEB: Objection. That's not
22 what she said.
23    A. That was part of it. I mean, save
24 time overall in completing. But, again, it's
25 all -- it was to save time, yes. But you asked

S. Marshall

1  
2  me if I felt like I was -- did I feel like it
3  helped, that was the original question, if I
4  felt like it helped because I felt I was pretty
5  efficient.
6       So the answer still remains, no, I
7  don't feel like it helped that much, because I
8  was efficient at counting money. And I
9  don't -- I think that I didn't have any of the
10 issues that might have -- it was designed to
11 help people that maybe didn't stack money
12 properly when they counted, you know. So I
13 already felt like a lot of the things that --
14 were in place to ensure that the deposit was
15 counted. I was already doing those things. So
16 it wasn't eye-opening at all.
17    Q. Okay.
18      And was the policy designed to assist
19 the store in getting the bank deposit to the
20 bank each day?
21      MR. GOTTLIEB: Objection. I don't
22 think she said that when she described the
23 policy.
24      THE WITNESS: Should I still
25 understand that?

Page 102

```
1              S. Marshall
2   BY MS. DIAZ:
3      Q.   If you understand the question.
4          MR. GOTTLIEB:  You can answer the
5      question.
6      A.   Now that you said that, I think that
7   I don't.
8      Q.   Okay.
9          Do you believe that the policy was
10  designed to assist the store in getting the
11  bank deposit to the bank every day?
12         MR. GOTTLIEB:  Objection.
13     A.   I think that that's a question for
14  the people who designed it.  I don't -- I
15  don't -- that's a chunk.  We were talking about
16  saving time within repetitive motion and
17  movement and things like that.  So I feel like
18  if you want to say that -- I don't know.  I
19  really don't.
20     Q.   Just, in your opinion, did the
21  policy --
22         MR. GOTTLIEB:  She just answered the
23     question.
24  BY MS. DIAZ:
25     Q.   In your opinion, did the policy
```

Page 103

```
1              S. Marshall
2   assist the store in getting the bank, deposit
3   to the bank every day?
4      A.   No.
5          MR. GOTTLIEB:  I think she just
6      answered that question.
7   BY MS. DIAZ:
8      Q.   Okay.
9      A.   Because -- yeah.  Because it didn't
10  save me any time, really, so it wouldn't have
11  been any -- it wasn't helpful.
12     Q.   Okay.
13         Ms. Marshall, did your practices with
14  respect to cash counting or bank deposits
15  diverge from the policy and the Better Way
16  Planning Guide?
17         MR. GOTTLIEB:  Objection.
18     A.   I don't understand.
19     Q.   Did what you do in the store with
20  respect to cash counting and bank deposits
21  differ from the cash simplification or Better
22  Way policy?
23         MR. GOTTLIEB:  Objection.  You're
24     referring to the Exhibit 8, which is Bates
25     stamped 779 through 794?
```

Page 104

```
1              S. Marshall
2          MS. DIAZ:  Yes.
3      A.   So you're asking me if the way -- the
4   mechanics of the way I counted cash came from
5   this rollout?
6      Q.   Yes.
7          MR. GOTTLIEB:  Objection.
8      A.   No.
9      Q.   Okay.
10         And how did your system differ?
11     A.   Differ?
12         MR. GOTTLIEB:  Objection.  Just for
13     the record, it's approximately a 20-page
14     document you're asking her to compare her
15     practices to.
16     A.   My recollection of it is that it
17  didn't really differ at all, that I was already
18  doing everything that they suggested to save
19  time.  So that's why it wasn't helpful, because
20  I was already doing those things.
21     Q.   Okay.
22         Ms. Marshall, if you can turn to
23  Exhibit 9.
24     A.   Yes.  This is 9.
25     Q.   Do you recognize this document?
```

Page 105

```
1              S. Marshall
2      A.   I do.
3      Q.   And what is it?
4      A.   Repeatable Routine Instruction Sheet.
5      Q.   Okay.
6          Do you recall seeing this document as
7   part of the Better Way process or
8   implementation?
9      A.   I remember this as being an example.
10  I'm missing the blank one where we created our
11  own repeatable routine.  So this was an
12  instruction sheet and/or an example, because we
13  actually created our own, because it was also
14  customizable for your building and the things
15  that may be -- might be different from store to
16  store and effect that store.
17         So the one that -- I actually created
18  one.  So this is the example that they sent,
19  so, yes, I remember it as an example, but I
20  created my own.
21     Q.   Okay.
22     A.   And everyone who did this created
23  their own.
24     Q.   What did you do with the version that
25  you created on your own?
```

27 (Pages 102 to 105)

Page 106

S. Marshall

1
2      A.   We laminated them, I think.  I
3  believe that was Jenn's direction to laminate
4  them and to keep them, you know, visible.
5      Q.   Okay.
6          And did you keep it visible?
7      A.   For a while, yes.
8      Q.   Okay.
9      A.   But with a lot of things within, I
10  guess most companies, there's always a favor of
11  the month and, you know, it was something that
12  a DM or Jenn Gurtov would check for in the
13  beginning.  And then after a while you kind of
14  just -- you just -- everyone forgets that that
15  happened, including the DM, Jenn Gurtov.  Just
16  isn't there anymore.
17      Q.   And where did you keep the repeatable
18  routine sheet visible?  Was that at the 6th and
19  Waverly store?
20      A.   Yes.
21      Q.   Okay.
22          And what about the 345 Hudson Street
23  store?
24      A.   No.
25      Q.   Ms. Marshall, if you could go to

Page 107

S. Marshall

1
2  No. 6 on the document which says, "Finalize
3  Deposit" in the first column.  The column under
4  "Reasons Why," it says, "Improve accuracy and
5  meet standards."
6          Was it your understanding that
7  finalizing the process, that one of the
8  purposes of finalizing the deposit was to
9  improve accuracy and meet store standards?
10      MR. GOTTLIEB:  Objection.
11      A.   I think that -- okay, so finalizing
12  the deposit is putting stuff in a bag, if you
13  read their example.  Because, again, mine was
14  different.  But if we are just going to use
15  this example.  It's putting funds in the bag,
16  stapling the media in an envelope, and stapling
17  the bag stripped to the cash management log.
18          And so you're asking me if that
19  improves accuracy?  Over what?  Because that's
20  exactly what we did before.  So that's what --
21  I guess I'm not purposely being difficult, I
22  just don't under -- like those processes of
23  putting money in a bag and stapling media and
24  stapling the bag strip to the cash management
25  log was something that was already in practice.

Page 108

S. Marshall

1
2  It wasn't a difference, and so...
3      Q.   So the policy didn't change with
4  respect to finalizing the deposit and putting
5  the funds in a bag or stapling the bag strip to
6  the cash management log?
7      A.   No.
8      MR. GOTTLIEB:  Objection.
9  BY MS. DIAZ:
10      Q.   Was it your understanding that those
11  steps were taken to meet store standards and
12  cash count -- count cash accurately?
13      MR. GOTTLIEB:  Objection.  What steps
14      are you referring to?
15      MS. DIAZ:  The steps I just
16      described.  Consolidating or putting the
17      funds in a bag and stapling the bag strip
18      to the cash management.
19      MR. GOTTLIEB:  You asked if the
20      deposit changed.  She said no.
21  BY MS. DIAZ:
22      Q.   Ms. Marshall, was it your
23  understanding that the steps of finalizing the
24  deposit, putting the funds in a bag and
25  stapling the bag strip to the cash management

Page 109

S. Marshall

1
2  log were taken to meet store standards and
3  count cash accurately?
4      MR. GOTTLIEB:  Objection.  Again, I
5      think it mischaracterizes her testimony
6      when she said the policies didn't change.
7      MS. DIAZ:  I'm just asking a
8      question.
9      MR. GOTTLIEB:  I understand your
10      question, but I think it's kind of
11      mischaracterizing the previous question and
12      answer.  So I'm objecting to the question,
13      but you can answer it.
14      MS. DIAZ:  Can you repeat the
15      question, please.
16      (The Record was Read.)
17      MR. GOTTLIEB:  Objection.
18      You can answer.
19      A.   Well, once you get to putting the
20  money in the bag, the cash has been counted.
21  So then it really doesn't make any sense that
22  that would improve the accuracy, because this
23  what had already -- so once you get to the
24  point where the money is in the bag, the money
25  is counted, you know, the over/shorts are

1          S. Marshall
2   complete, your deposit is done as far as there
3   being an amount within the system.
4          So, I mean, I don't -- again, like
5   that's just -- all this No. 6 is saying is that
6   I'm taking the money and putting it in the bag.
7   So, I mean, obviously, you want it -- it has to
8   go in the bag, if that's what you're asking.
9       Q.   Okay.
10          So do you disagree that finalizing
11   the deposit improves accuracy?
12          MR. GOTTLIEB:  Objection.  When you
13       say "finalizing the deposit," you're asking
14       about the entire line of No. 6 -- on No. 6?
15          MS. DIAZ:  Yes.
16       A.   No, I don't -- it's nothing to
17   disagree to.  Again, it's -- the money has been
18   counted at this point, just looking at 6, the
19   money is counted, you're taking it and you're
20   putting it in the bag.  And that's what has --
21   that's what you have to do and that's what
22   we -- I did.  You take the money, you put it in
23   a deposit bag.
24       Q.   Okay.
25       A.   That's just -- and then you staple

1          S. Marshall
2   all your stuff and you place that in an
3   envelope in the cash management log and you
4   staple the stip to the cash management log.
5   So, yes, that's -- if you're asking if that --
6   that didn't change as far as that was always
7   something I did.
8          So I guess I'm still, like, yes, you
9   put the money in the bag and you staple
10   everything you put in the envelope.  So I don't
11   disagree that it affected anything.  I don't --
12   I just, I guess I don't really understand what
13   you're asking me still --
14       Q.   Okay.
15       A.   -- because I don't know how putting
16   the funds in the bag, like what -- I'm sorry.
17       Q.   That's okay.
18          Let's move on to No. 8, "Complete
19   Banking."  Under the column that says, "Reason
20   Why," it says "Meet safety standards."
21          Was it your understanding that
22   completing the bank deposit every day was
23   designed to meet safety standards?
24          MR. GOTTLIEB:  Objection.
25       A.   Was it my understanding that this

1          S. Marshall
2   line was designed to meet safety standards?
3       Q.   That completing the bank deposit was
4   designed to meet safety standards.
5          MR. GOTTLIEB:  Objection.  Are you
6       asking about the line or completing -- or
7       completing the bank deposit?
8   BY MS. DIAZ:
9       Q.   My question, was it your
10   understanding...
11          MR. GOTTLIEB:  My problem is that
12       first you referenced line 8, then you asked
13       something that was unclear, whether you --
14          MS. DIAZ:  I was just asking a
15       question.
16          MR. GOTTLIEB:  I understand you're
17       just asking a question.  I don't disagree
18       with you on that.  I wanted to make sure
19       that the question is clear for the record
20       and for the witness.
21   BY MS. DIAZ:
22       Q.   Ms. Marshall, was it your
23   understanding that completing the bank deposit
24   every day was designed to meet safety
25   standards?

1          S. Marshall
2          MR. GOTTLIEB:  Again, I just want to
3       have some clarification.
4          MS. DIAZ:  I'm asking a question.
5       I'm not asking --
6          MR. GOTTLIEB:  You're not referring
7       to the document at all?
8          MS. DIAZ:  No.
9          MR. GOTTLIEB:  Okay.
10       A.   So was completing a bank deposit part
11   of a safety standards?
12          I would have characterize completing
13   bank deposits as part of procedure, and -- I
14   would say that completing bank deposits were
15   part of procedure.  And, like I said, that's
16   why you would never go after dark or you would
17   never wear a Starbucks's logo.  So that would
18   be the safety standards around it.
19       Q.   Why do you think it was important --
20   why do you think Starbucks required -- strike
21   that.
22          Why do you think Starbucks required
23   the store to take the bank deposit to the bank
24   every day?
25          MR. GOTTLIEB:  Objection.

Page 114

S. Marshall

1        S. Marshall
2      A.   Why do I think Starbucks required
3   that?  I don't know.  I mean --
4          MR. GOTTLIEB:  Did you get my
5   objection to that?
6          MS. DIAZ:  Counsel, if she answered
7   the question --
8          MR. GOTTLIEB:  I said "objection" and
9   it was not taken down on the record.
10         (A Discussion was Held off the
11   Record.)
12         THE WITNESS:  I am so sorry, I think
13   I got lost now.
14         MS. DIAZ:  I think I did, too.
15         (The Record was Read.)
16   BY MS. DIAZ:
17      Q.   Ms. Marshall, why do you think
18   Starbucks required the store to take the bank
19   deposit to the bank every day?
20         MR. GOTTLIEB:  Objection.
21      A.   Well, I don't know why Starbucks
22   would require something to be done.  I mean,
23   it's money, you know, you want to -- it's a
24   company at the end of the day, right?  So we
25   want to make sure that our money goes to the

Page 115

S. Marshall

1   bank.
2      Q.   As a store manager, did you have an
3   understanding of why that policy was in place?
4          MR. GOTTLIEB:  Objection.  I think
5   you just asked that question.
6          You can answer.
7      A.   If I as a store manager understood
8   why the deposit needed to go to the bank every
9   day?
10     Q.   Uh-huh.
11     A.   Again, I think it was -- I mean, it's
12   money at the end of the day, so it's not --
13   it's money, it needs to go to the bank, like
14   that's just --
15     Q.   Uh-huh.
16     A.   Sort of a common sense answer, but it
17   is.  Like that's what it is.  It's money and it
18   belongs to Starbucks and they want it in the
19   bank, you know, so...
20     Q.   Ms. Marshall, do you think it's safe
21   to keep money in a store day after day?
22         MR. GOTTLIEB:  Objection.
23     A.   I don't think it's not safe, which is
24   why I always kept it in the safe, if I kept a

Page 116

S. Marshall

1   deposit in the store.  And I even wrote, like
2   in the cash management log, like dropped in
3   safe, you know, like bank closed, simply
4   because I thought I was doing the right thing
5   with, okay, I can't get this to the bank.  It's
6   too busy, I can't go.  So I'm going to document
7   that I left it here and I'm going to be very
8   clear on what I've done, because it's here and
9   it's safe and it's inside the store.
10         So I guess I'd have to answer that
11   no, I don't think that it's unsafe.  It
12   wasn't -- you know, if it was in my bag, of
13   course not.  It was in the safe, you know,
14   where it stayed and where it was documented by
15   me in the cash management log that it was
16   present there.  So I did that because I
17   believed, and still do, that there were no
18   safety issues with keeping it inside of a
19   locked safe that was on a, you know, a
20   10-minute timer and couldn't be accessed, and a
21   time delay.
22     Q.   Okay.
23         MR. GOTTLIEB:  It's 12:30 now.  I
24   believe that might be a good time to take a

Page 117

S. Marshall

1   break for lunch.
2          MS. DIAZ:  Sure.
3          THE VIDEOGRAPHER:  The time is 12:22.
4   We're going off the record.
5          (Lunch Recess taken from 12:22 p.m.
6   to 1:26 p.m.)

```
1              S. Marshall
2      A F T E R N O O N   S E S S I O N
3      (Time noted:  1:26 p.m)
4
5          THE VIDEOGRAPHER:  The time is
6      1:26 p.m.  We're back on the record, Tape
7      No. three.
8  BY MS. DIAZ:
9      Q.  Ms. Marshall, before the break you
10     testified that if you kept a deposit in the
11     store, you wrote it in the cash management log;
12     is that correct?
13         A.  I did that on occasion, yes.
14         Q.  What did you do on occasion?
15         A.  I wrote it in the cash management
16     log.
17         Q.  Okay.
18             And what would you write in the cash
19     management log?
20         A.  "Dropped in safe.  Bank closed."
21     Those are the two I can remember writing on
22     occasion.
23         Q.  Okay.
24             So were there times that you kept a
25     deposit in the store but did not document it in
```

```
1              S. Marshall
2      the cash management log?
3          A.  Yes.
4          Q.  Okay.
5              Ms. Marshall, did you ever issue any
6      corrective actions to employees you supervised
7      for violations of cash management policies?
8          A.  For cash over/shorts, so I guess that
9      would fall under that bucket.  So being short
10     while running a register, yes.
11         Q.  Okay.
12             What about did you ever issue
13     corrective actions for failing to comply with
14     bank deposit practices at Starbucks?
15             MR. GOTTLIEB:  Objection.
16             You can answer.
17         A.  I don't believe I did.  I believe
18     it's just over/shorts within running a
19     register.
20         Q.  Okay.
21             MS. DIAZ:  I'd like to mark this as
22     Exhibit 10.
23             (Defendants' Exhibit 10, Memo from
24     Serenity Marshall, was marked for
25     identification.)
```

```
1              S. Marshall
2          A.  (Document Review.)
3              MR. GOTTLIEB:  Is there a question or
4      would you just like her to review the
5      document?
6  BY MS. DIAZ:
7          Q.  I'd like you to review the document.
8          A.  Okay.  I'm done.
9          Q.  Ms. Marshall, do you recognize this
10     document?
11         A.  I do.
12         Q.  What is it?
13         A.  It was a memo I wrote to my shift
14     supervisors and my assistant store manager at
15     the time.
16         Q.  Okay.
17             Who are your shift supervisors
18     assistant on this e-mail?
19         A.  So, Leedel, the first one is my --
20     was my assistant store manager, and the other
21     for our shift supervisors.
22         Q.  Do you remember why you wrote this
23     e-mail?
24         A.  Because when I was reviewing the cash
25     management log, they were making beyond
```

```
1              S. Marshall
2      acceptable errors that...
3          Q.  And what errors were they making in
4      the cash management log?
5          A.  They were forgetting to document the
6      over/shorts for people.  They were forgetting
7      to -- to -- what else were they doing?  They
8      were letting the safe fall below $2400.  The
9      safe needs to stay at a standard, $2,400.
10         Q.  Uh-huh.
11         A.  They would maybe count over to
12     someone and it would be $2 short and the next
13     person would be $3 over.  So they were just
14     sloppy.
15         Q.  And were they forgetting to get
16     either a banking witness or a deposit witness?
17         A.  I put it on here as No. 3.  I sort of
18     just went through the book and just wrote down
19     anything that could possibly be wrong and I
20     logged it as something that they needed to
21     correct.
22         Q.  Okay.
23             So based on this document, do you
24     believe that they were forgetting to get a
25     banking or deposit witness in the cash
```

Page 122

1        S. Marshall
2   management log?
3        MR. GOTTLIEB: Objection. Are you
4     asking based on her recollection or based
5     on -- are you asking what the document
6     says?
7   BY MS. DIAZ:
8     Q.   Based on -- let's start with based on
9   your recollection. Do you recall whether your
10  shift supervisors or assistant store manager
11  was forgetting to get either a banking witness
12  or a deposit witness on the cash management
13  log?
14    A.   They were.
15    Q.   Okay.
16        And based on your recollection, was
17  your assistant manager or your shift
18  supervisors not filling out the deposit prep
19  information in the cash management log?
20    A.   It's possible.
21        I remember that the witnesses, we
22  were not good about that. I remember
23  over/shorts. Those are things I remember for
24  sure. Over/shorts, letting the safe fall below
25  2400, and not counting the tills properly.

Page 123

1        S. Marshall
2   Those are things I remember for sure.
3     Q.   Okay.
4        And No. 3 on this document says, "If
5   you complete the deposit but forget to get
6   witnesses, staple any of the necessary papers
7   to the book," et cetera, "or if you don't
8   completely fill out" -- excuse me, that's
9   not what it -- "or don't completely fill out
10  the deposit prep information, including the
11  bank time and change amount, you will receive a
12  corrective action."
13        Do you remember why you wrote the
14  latter part of that sentence, "if you don't
15  completely fill out the deposit prep
16  information"?
17        MR. GOTTLIEB: I'm just going to
18     object. I think your reading of it was
19     inaccurate. The document speaks for
20     itself, but you can answer the question.
21     A.   Well, I put it here several times.
22  That was a team that I had that was -- it
23  wasn't my best leadership team. They were
24  lackadaisical in a lot of areas.
25        So, I mean, whenever you want to have

Page 124

1        S. Marshall
2   a memo with someone, this isn't a corrective
3   action. You know, I couldn't have used this to
4   go to a written, you know, because, like I
5   said, my experience was you follow -- you had
6   to show that you coached, then you go to a
7   verbal, then you go to a written, then you go
8   to a final.
9        So this was my way of showing that I
10  had coached. And this isn't the only thing
11  that I used was memos. Like I used memos to
12  coach my team on a regular basis. So I would
13  always just include that is safeguard, so if I
14  wanted to then move to a verbal, I could have
15  proof that I already had a coaching
16  conversation.
17    Q.   Okay.
18        And were you coaching your team
19  because they weren't filling out the deposit
20  prep information?
21    A.   Well, it was cash handling, so it was
22  the safe not being accurate, it was them not
23  filling out the over/shorts.
24        What was the other thing I know that
25  for sure? They were not completing all the

Page 125

1        S. Marshall
2   information with each other. They were just
3   not turning over -- they were leaving gaps in
4   time. So things that were unacceptable --
5   because I'm not managing the money. It's one
6   thing if you didn't just write your name down,
7   but now you're allowing the money to become a
8   problem, and not just a signature.
9        So now the tills are not correct,
10  people are short, we don't know who it is, the
11  safe is not staying where it's supposed to.
12  And that was where the real -- the problem came
13  in, what prompted me to write this, because
14  they were allowing the safe, the actual part --
15  the money now --
16    Q.   Uh-huh.
17    A.   -- has become a problem, so that's
18  what prompted me to write it.
19    Q.   And, Ms. Marshall, you mentioned
20  earlier that you went through the cash
21  management log and noted all of the errors that
22  were taking place?
23    A.   No, not the -- some of it is the
24  errors. I kind of just sat down with the page
25  and just kind of like, okay, so what are the

32 (Pages 122 to 125)

Page 126

```
 1              S. Marshall
 2  problems going on.  And I looked through it and
 3  I made notes.
 4      Q.   Okay.
 5           And was the failure to fill out the
 6  deposit prep information one of the failures in
 7  the cash management log?
 8      MR. GOTTLIEB:  Objection.
 9      A.   Again, I don't know if that was
10  specifically one of them, but I did include it
11  as part of the memo.
12      Q.   Okay.
13           And under No. 3 you note that, "You
14  will receive a corrective action"?
15      A.   Yes.
16      Q.   So after this coaching conversation,
17  if someone did not complete -- completely fill
18  out the deposit prep information, could they
19  have received a corrective action?
20      A.   They could have.
21      Q.   Okay.
22           And if you go to the bottom of the --
23  actually, let's start at the top.  The first
24  paragraph says, "Usually I would discuss
25  something like that in a management meeting,
```

Page 127

```
 1              S. Marshall
 2  but this subject is too important to wait.
 3  With the rollout of the cash management
 4  simplification, CHS, we have been experiencing
 5  a lot of problems that need to be addressed
 6  ASAP."
 7           Why was this topic so important?
 8      A.   Because we were losing money.
 9      Q.   And, again, at the bottom in the
10  paragraph that says, "This situation is
11  extremely serious.  The management team is
12  having more trouble with CHS than necessary.
13  If you have any questions ask me ASAP.  I'm
14  making everyone sign this and I'm putting it in
15  your file.  Again, corrective actions will
16  begin on Monday."
17           Why was this situation extremely
18  serious?
19      A.   Money was going missing.  So the safe
20  wasn't being counted over from one person to
21  the other accurately.  I remember that they
22  were leaving gaps, and it was becoming where so
23  if the safe, if you count the safe and you say
24  it's 2380, so now it's $20 missing.  But I come
25  in, I let you leave, I don't count the safe
```

Page 128

```
 1              S. Marshall
 2  before you leave, but then I say it's $40
 3  missing.  Now the fingers are pointing at each
 4  other.  There's no accountability around money.
 5  They weren't counting the tills back.  It was
 6  something that we had to do.  Supposed to count
 7  it back to accurately know, okay, one person is
 8  running this register, we will take it to the
 9  back, we'll count it, we'll bring it back to
10  $200 that it started at, and we'll check to
11  make sure that what we have matches what we
12  should have.
13           They weren't doing that.  They were
14  allowing tills to go -- two and three people
15  would ring on one register, so by the time we
16  counted it, it was short.  Whose shortage is
17  it?  There was no one to hold accountable.  So
18  they were just -- they were -- they were
19  sloppy.  They were a sloppy team.
20      Q.   Do you recall whether bank deposits
21  were being taken to the bank on a daily basis
22  during this time period?
23      A.   No, they weren't.
24      Q.   Did you write this memo for that
25  reason also?
```

Page 129

```
 1              S. Marshall
 2      MR. GOTTLIEB:  Objection.
 3      A.   No.  No.  It's about cash shortage,
 4  safe allowed to fall below 2400.  Oh, there it
 5  is.  "When counting the safe over to someone,
 6  you should time manage well enough that the
 7  next cash controller can count before you clock
 8  out and verify your count.
 9           Over/shorts.  Not letting tills fall
10  below $200.
11           So it was about the money.
12      Q.   Okay.
13           Did you think it was an issue that
14  your team wasn't taking the bank deposits to
15  the bank on a daily basis?
16      MR. GOTTLIEB:  Objection.
17      A.   No.  I didn't even include it.
18      Q.   Okay.
19           But you did think it was an issue
20  that they weren't completely filling out the
21  deposit prep information, including the bank
22  time and change amount; is that correct?
23      A.   I think it was part of overall
24  sloppiness and me trying to eliminate the
25  sloppiness.  So it goes hand in hand with them
```

S. Marshall

1
2 and just holding them accountable for the
3 entire process.
4     Q.    Okay.
5         Ms. Marshall, what were your store
6 hours at Store 11649?
7     A.    We were closed on weekends for the
8 majority of the time I was there.  We did open
9 on Saturday for a few months as an experiment.
10 And Monday through Friday was -- was it 5:30 --
11 I think I moved it from 6:00 a.m to 5:30 a.m.
12 as opening time.  And we closed at 7:30 p.m., I
13 believe.
14     Q.    Okay.
15         And you said that you moved the
16 opening time from 6:00 a.m. to 5:30 a.m.?
17     A.    I believe, yes, that was done.
18     Q.    Did you --
19     A.    Sorry.
20     Q.    Did you have discretion as the store
21 manager to move the opening and closing times
22 of your store?
23     A.    I needed to get permission from my
24 DM.
25     Q.    But you could recommend that?

S. Marshall

1
2     A.    Yes.
3     Q.    That you could recommend -- you could
4 recommend that the store opening or closing be
5 changed?
6     A.    Correct.
7     Q.    Okay.
8         And you mentioned that the Store
9 11649 was open on Saturdays for a period of
10 time as an experiment?
11     A.    Yes.
12     Q.    Do you recall when that was?
13     A.    I don't.
14     Q.    Do you recall for what period of time
15 you were open on Saturdays?
16     A.    Six weeks, approximately.
17     Q.    Okay.
18         And was it towards the end of your
19 time at Store 11649?
20     A.    Yes.
21     Q.    Okay.
22         And why did you decide to close on
23 Saturdays?
24         MR. GOTTLIEB:  Objection.
25         You can answer.

S. Marshall

1
2 BY MS. DIAZ:
3     Q.    Did you decide to close on Saturdays?
4     A.    No.
5     Q.    No?
6         Who decided to close on Saturdays?
7     A.    Jenn did.
8     Q.    Do you know why?
9     A.    The reason she gave was that we just
10 weren't -- weren't making any money.
11     Q.    Okay.
12         And, Ms. Marshall, at Store 11649,
13 was there a specific bank at which you had to
14 make deposits?
15     A.    Yes.
16         MR. GOTTLIEB:  Objection.
17     A.    Yes.
18     Q.    Okay.
19         And where was the bank located in
20 relation to your store?
21     A.    It was next door.
22     Q.    It was in the building next door?
23     A.    Yes.
24     Q.    Okay.
25         And how long did it take you to walk

S. Marshall

1
2 from your store to the bank?
3     A.    Two minutes.
4     Q.    Okay.
5         And what were the bank's hours?
6     A.    It was at Chase.  The banking hours,
7 they closed at 5:00, I believe.  And they
8 weren't open on weekends, I believe.
9     Q.    And, Ms. Marshall, when you took a
10 bank deposit to the bank, was it for that day's
11 registers or the previous day's registers?
12         MR. GOTTLIEB:  Objection.
13     A.    We complete -- the deposit we
14 completed would be the money for the previous
15 day.
16         MS. DIAZ:  I'd like to mark this as
17     Exhibit 11.
18         (Defendants' Exhibit 11, Document,
19     Bates Nos. Star/Marshall 1179 through
20     1362, was marked for identification.)
21 BY MS. DIAZ:
22     Q.    Ms. Marshall, take a few moments to
23 flip through the first few pages of the
24 document.
25     A.    (Document Review.)

Page 134

S. Marshall

1
2     MR. GOTTLIEB:  I want to state for
3  the record that it's Star/Marshall 1179
4  through 1362.  I assume all the pages in
5  that range are included.
6     MS. DIAZ:  Yes.
7     A.   How far would you like me to go?
8     Q.   Just through 1182.  Just flip through
9  it.
10     A.   Okay.  I'm done.
11     Q.   Ms. Marshall, do you recognize this
12  document?
13     A.   I do.
14     Q.   What is it?
15     A.   It's pages from a cash management
16  log.  And just getting to 82, I'm assuming it's
17  going to be from November.
18     Q.   November of what year?
19     A.   2010.
20     Q.   Okay.
21        And is that your handwriting on the
22  top of page 1182?
23     A.   The "Monday"?
24     Q.   Yes.
25     A.   No.

Page 135

S. Marshall

1
2     Q.   Okay.
3        How about on page 11 -- if you could
4  please turn to page 1193.
5     A.   Okay.
6     Q.   What portions of this page include
7  your handwriting?
8     A.   The Deposit Prep and Deposit to Bank.
9     Q.   Okay.
10        And is it all of the lines under
11  Deposit Prep and Deposit to bank?
12     A.   Yes, it is.
13     Q.   Okay.
14        Ms. Marshall, for what day is this
15  cash management log page relate -- what day
16  does this cash management log page relate to?
17     MR. GOTTLIEB:  I object.
18     A.   1193 we're talking about still?
19     Q.   Yes.  It's still Star/Marshall 1193.
20     A.   Monday, November 1, 2010.
21     Q.   Okay.
22        And under Deposit Prep, are those
23  your initials?
24     A.   They are.
25     Q.   Okay.

Page 136

S. Marshall

1
2        And under Deposit Money, is that
3  $409.13?
4     A.   It is.
5     Q.   Were you the cash controller that
6  day?
7     A.   Well, I'm always a cash controller.
8     Q.   Okay.
9     A.   That's also a term used for anyone
10  who, you know, can hold the cash.  But it was
11  also the store manager that went in the
12  building who typically complete a deposit.
13     Q.   Okay.
14        And did -- I see that you filled out
15  the Deposit Prep column.  Does that mean that
16  you prepared the deposit --
17     A.   It does.
18     Q.   -- that day?  Okay.
19        And on the Deposit to Bank column,
20  are those your initials next to Banking
21  Witness?
22     A.   It is.
23     Q.   Okay.
24        And what were you signing off on as a
25  banking witness?

Page 137

S. Marshall

1
2     A.   Niorka went to the bank.
3     MR. GOTTLIEB:  N-I-O-R-K-A.
4     A.   Correct.
5     Q.   And were you verifying that she went
6  to the bank at 1:00 p.m. on November 22nd --
7  excuse me -- on November 2nd, as listed in the
8  book?
9     MR. GOTTLIEB:  Objection.
10     A.   Well, that's the idea, yes.  I mean,
11  do we have the bank slip?
12     Q.   One second.
13        When you say "that's the idea" --
14     MR. GOTTLIEB:  I think she was still
15  answering your question.
16     MS. DIAZ:  Okay.
17     A.   Well, I say that's the idea because,
18  I mean, part of me being here is the fact that
19  the dates don't match.  So for me to say yes
20  and the date doesn't match, then that makes no
21  sense, my answer.
22     Q.   Okay.
23        Let me show you another document and
24  we can go back --
25     MR. GOTTLIEB:  I think she is -- I

Page 138

S. Marshall

1
2  think she's still answering the question.
3      MS. DIAZ:  Okay.
4      MR. GOTTLIEB:  She's trying to look
5  at the entire document.
6      MS. DIAZ:  I'm sorry, I'll let you
7  finish.
8      A.   So I need to see the bank, the Chase
9  Bank receipt to answer that question.
10     Q.   If you can turn to 1187.
11     A.   1187.
12         So, yes.
13     Q.   Okay.
14         Ms. Marshall, what is the document on
15  page 1187?
16     A.   The receipt from Chase Bank.
17     Q.   And what's the date on the receipt?
18     A.   November 2nd.
19     Q.   Then does the deposit amount on
20  November 2nd correlate to the deposit prep
21  amount on November 1st?
22     A.   Yes.
23     Q.   So was the bank deposit for
24  November 1st deposited to the bank on
25  November 2nd?

Page 139

S. Marshall

1
2      A.   Yes.
3          MR. GOTTLIEB:  Objection.
4      A.   Yes.
5      Q.   Ms. Marshall, was this a violation of
6  Starbucks's bank deposit policy?
7          MR. GOTTLIEB:  Objection.
8      A.   As you've shown me written, yes, but
9  not in practice.  Because this is not the first
10  time that you'll find that this has happened.
11  You can go back into like the 6th -- even the
12  Eighth and University document.  So it's
13  something that happened all the time.
14     Q.   Okay.
15         Did you tell any of your supervisors
16  that you were doing this, that you were holding
17  the deposit until the next day?
18         MR. GOTTLIEB:  Objection.
19     A.   To me, to bring that up would mean
20  that it was something that I felt was serious
21  or that I was doing something serious that I
22  need to bring to the DM's attention, which
23  wasn't the case.  Like I didn't -- to me, the
24  money was safely in the building and it was
25  getting to the bank and it was an accurate

Page 140

S. Marshall

1
2  amount.  So I was doing my job being a store
3  manager and a business owner, I was making sure
4  that the money was safe and it was getting
5  there properly.
6          And, you know, again, this is not the
7  first day that you've printed out.  You can go
8  back years and see it, and there have been how
9  many DMs that have gone through these books and
10  have said nothing.  So I just find that
11  question difficult to answer in that way.
12     Q.   Okay.
13         But you never told any of your
14  supervisors that you would hold a deposit in
15  the store until the next day?
16         MR. GOTTLIEB:  Objection.
17     A.   I'm going to say yes, that the book
18  speaks for itself.  So in that sense if we can
19  look at this and point out everything and say
20  that it's clear, then it was very clear to
21  them, because it says it.  And any DM that came
22  in and looked at it would have known.
23         MS. DIAZ:  Can we take a quick break?
24         MR. GOTTLIEB:  Sure.
25         THE VIDEOGRAPHER:  The time is

Page 141

S. Marshall

1
2  1:51 p.m.  We're going off the record.
3         (Recess taken from 1:51 p.m. to 1:55
4  p.m.)
5         THE VIDEOGRAPHER:  The time is
6  1:55 p.m.  We're back on the record.
7  BY MS. DIAZ:
8      Q.   Ms. Marshall, you testified that
9  holding a bank deposit until the following day
10  was an acceptable practice at Starbucks; is
11  that correct?
12     A.   That is correct.
13     Q.   And that you -- did you document when
14  you held a bank deposit until the following
15  day?
16         MR. GOTTLIEB:  Objection.
17     A.   I did say at times I did, yes.
18     Q.   And you testified that your
19  supervisors were aware that you engaged in this
20  practice?
21     A.   Yes.  Based on the fact that it's
22  written here very clearly.  And my books were
23  reviewed by district managers, so they would
24  have seen that.
25     Q.   Did you ever have any conversations

36 (Pages 138 to 141)

S. Marshall

1
2     with them in which you made them aware that you
3     were holding a bank deposit until the following
4     day?
5         A.   No.  It never came up, because it was
6     never treated as something that was important.
7         Q.   Ms. Marshall, if you can turn to
8     page 1210.  What is the date of this cash
9     management log page?
10        A.   This is Wednesday, November 3, 2010.
11        Q.   Okay.
12             And where on this page do you see
13    your handwriting?
14        A.   Deposit Prep and Deposit to Bank.
15        Q.   Okay.
16             And your handwriting on the Deposit
17    Prep column means that you prepared the deposit
18    that day?
19        A.   Yes.
20        Q.   Okay.
21             And are those your initials next to
22    Banking Witness?
23        A.   They are.
24        Q.   And were you verifying that the bank
25    deposit was taken to the bank on November 3?

S. Marshall

1
2         MR. GOTTLIEB:  Objection.
3         A.   Not necessarily.  I was verifying
4     that we got the money to the bank.  That's a
5     better way to put it.  That's what I verified,
6     the money got to the bank.
7         Q.   And that's all that your initials
8     meant to you?
9         MR. GOTTLIEB:  Objection.
10             Go ahead.
11        A.   They are.
12        Q.   Ms. Marshall, if you can turn to
13    page 1206.
14             What is this document?
15        A.   This is a bank receipt from Chase.
16        Q.   And what's the date of the document?
17        A.   November 4, 2010.
18        Q.   And what's the amount on the receipt?
19        A.   3160.04.
20        Q.   Does the bank receipt on page 1206
21    correlate to the cash management log page on
22    November 3?
23             MR. GOTTLIEB:  Objection.
24             Go ahead.
25        A.   It does.

S. Marshall

1
2         Q.   Okay.
3              And was the bank deposit on
4     November 3rd deposited to the bank on
5     November 4th?
6              MR. GOTTLIEB:  Objection.
7         A.   It was.
8         Q.   And did you note that anywhere in the
9     cash management log?
10        A.   No.
11        Q.   Is there any reason why you would
12    have -- strike that.
13             Why did you write November 3rd on
14    Date to Bank?
15             MR. GOTTLIEB:  Objection.
16        A.   That was -- that was an error.  I had
17    gone through the book trying to ensure I wrote
18    something.  It's 11/3.  I put date to bank
19    11/3.
20        Q.   Okay.
21             Did you go back after the fact and
22    fill out the Deposit to Bank section?
23             MR. GOTTLIEB:  Objection.  After what
24    fact?
25

S. Marshall

1
2     BY THE WITNESS:
3         Q.   Did you go back to this page after
4     November 3rd to fill out that section?
5              MR. GOTTLIEB:  Objection.
6         A.   I don't remember for this particular
7     day.  All I can speak to is what may have
8     happened.  I don't remember exactly what
9     happened on November 3rd.
10        Q.   Okay.
11             And then other than it being an
12    error, are there any other reasons why the Date
13    to Bank would say November 3rd instead of
14    November 4th, the date of the actual deposit?
15             MR. GOTTLIEB:  Objection.
16        A.   Absolutely not.  The only explanation
17    is an error.
18        Q.   Ms. Marshall, if you can turn to page
19    1252, please.
20             Can you tell from this page what date
21    this cash management log page relates to?
22        A.   No.
23        Q.   Is your handwriting on this page?
24        A.   It is.  Deposit Prep, Deposit to
25    Bank.

Page 146

S. Marshall
1
2     Q.   Okay.
3          And what is the amount next to
4     deposit number under the Deposit Prep column?
5     A.   3101.36.
6     Q.   And what is the date on -- next to
7     the Date to Bank row under the Deposit to Bank
8     section?
9     A.   11/9/10.
10    Q.   Ms. Marshall, if you could just keep
11    your finger on this page, and also turn to
12    page 1247.
13         What is this document?
14    A.   Bank receipt from Chase.
15    Q.   For what date?
16    A.   November 10, 2011.
17    Q.   And for what amount?
18    A.   3101.36.
19    Q.   Was the deposit for November 9, 2010
20    deposited on November 10, 2010?
21    A.   That's assuming that this page is
22    November 9th.
23    Q.   Okay.
24         Assuming that page 1252 is the cash
25    management log for November 9th, does that mean

Page 147

S. Marshall
1
2     that the deposit for November 9th was deposited
3     on November 10th?
4          MR. GOTTLIEB:  Objection.
5     A.   Yes.
6     Q.   Ms. Marshall, if you can turn to
7     page 1284.  What date is this cash management
8     log page for?
9     A.   Monday, November 15, 2010.
10    Q.   And are the Deposit Prep and Deposit
11    to Bank sections filled out?
12    A.   They are not.
13    Q.   And was that a violation of
14    Starbucks's policy?
15         MR. GOTTLIEB:  Objection.
16    A.   Not the way that I worked and the way
17    that it was acceptable for me to work under my
18    district managers.  I mean, it's not the first
19    time a page -- it's not the first of many times
20    that a page would be missing information.
21    Q.   So it was your practice to leave the
22    deposit information blank?
23         MR. GOTTLIEB:  Objection.  That's not
24    what she said.
25

Page 148

S. Marshall
1
2     BY MS. DIAZ:
3     Q.   Was it your practice to leave the
4     deposit information blank?
5     A.   No, it wasn't my practice.  It was
6     just -- it wasn't -- this just wasn't highly
7     regulated.  When we talked about cash
8     management at Starbucks, we talked about
9     over/shorts.  That was what the dialogue was
10    about, it was over/shorts.  And that's what
11    we -- that's what we talked about, you know.
12         And district managers from when I was
13    promoted would come in and they would review
14    these books, and this is no different than the
15    way it looked in 2006.  And this was just --
16    there was just never any dialogue around it.
17    So practice would mean that it was something I
18    did.  It just wasn't -- it wasn't very
19    important.
20    Q.   How often do you think you left the
21    deposit information blank --
22         MR. GOTTLIEB:  Objection.
23    BY MS. DIAZ:
24    Q.   -- in your daily records books?
25    A.   I would never guess at that.  I

Page 149

S. Marshall
1
2     don't -- I don't know.
3     Q.   More than half of the time?
4     A.   I don't want to guess, because I
5     don't know.  I think we'd have to look at all
6     the books.  But it happened.
7     Q.   Okay.
8          And did you ever have any
9     conversations with your supervisors about
10    leaving the deposit information blank?
11    A.   No, I did not.
12    Q.   Did you have any conversations with
13    the employees that you supervised about leaving
14    the deposit information blank?
15    A.   That memo that we looked at earlier
16    mentions that they should fill that section
17    out.
18    Q.   Ms. Marshall, if you can turn to
19    page --
20    A.   Sorry.
21    Q.   If you can turn to page 1279, please.
22         What is this document?
23    A.   1279?
24    Q.   Yes.
25    A.   This is the tab from the deposit bag.

38 (Pages 146 to 149)

Page 150

S. Marshall

1
2  Q.  Okay.
3      And what's the date of this document?
4  A.  November 16, 2010.
5  Q.  Okay.
6      And what's the amount of the deposit?
7  A.  495.51.
8  Q.  I'm sorry, we're keeping our fingers
9  on a lot of pages.  But if you can also flip to
10 page 1280.
11     What is that document?
12 A.  The bank receipts --
13 Q.  For what --
14 A.  -- from Chase.
15 Q.  For what date?
16 A.  November 17, 2010.
17 Q.  And for what amount?
18 A.  495.51.
19 Q.  Ms. Marshall, does the bank receipt
20 on page 1280 for 495.51 on November 17th
21 correlate to the deposit record on
22 November 16th?
23 A.  No, it doesn't.
24     MR. GOTTLIEB:  Which page are you
25 referring to?

Page 151

S. Marshall

1
2      MS. DIAZ:  1279 and 1280.
3  A.  No.
4      MR. GOTTLIEB:  You're asking if
5  495.51 is on those documents, is that what
6  you're asking?  Is the amount 495 and 51
7  cents appear on both documents?
8  A.  Yes, it does.
9  Q.  Ms. Marshall, was the deposit for
10 November 16, 2010, according to page 1279, in
11 the amount of $495.51?
12 A.  I'm sorry, you're just asking if it
13 was brought on that date; is that what you're
14 saying?
15 Q.  Starting with page 1279 --
16 A.  Yes.  Uh-huh.
17 Q.  -- what does this document indicate?
18 A.  That a deposit was completed on
19 11/16/2010 will in the amount of 495.51.
20 Q.  And when you say "completed," does
21 that mean taken to the bank?
22 A.  No, it doesn't.  It means physically
23 counted.
24 Q.  Okay.
25     And the next page, page 1280,

Page 152

S. Marshall

1
2  indicates that a deposit was taken to the bank
3  in the amount of $495.51 on November 17th?
4  A.  Correct.
5  Q.  Does that correlate to the previous
6  page?
7      MR. GOTTLIEB:  Objection.
8      What do you mean by "correlate"?
9  BY MS. DIAZ:
10 Q.  Was the bank deposit that was
11 prepared on November 16, 2010 taken to the bank
12 on November 17, 2010.
13     MR. GOTTLIEB:  I'm just -- I'm going
14 to object.
15     Do you recall?  Do you recall?
16 BY MS. DIAZ:
17 Q.  You can answer the question.
18     MR. GOTTLIEB:  You're asking her
19 recollection what the documents say.
20     Counsel?
21 A.  I'm answering -- I'm sorry, you
22 guys -- I got off -- I'm confused because I
23 feel like -- I felt this amount, first of all,
24 495.51 is so low that this has to be a
25 Saturday, I'm assuming, or a holiday, because

Page 153

S. Marshall

1
2  my store typically made almost $7,000 a day,
3  which would mean that the bank was closed.
4      So that's why I'm -- so I'm unsure.
5  If it's that low of an amount, would have been
6  a holiday or a Saturday.
7  Q.  Okay.
8      And, Ms. Marshall, what if I
9  represent to you that November 16, 2010 was a
10 Tuesday and November 17, 2010 was a Wednesday?
11     MR. GOTTLIEB:  What's the question?
12     MS. DIAZ:  She's saying she was
13 confused because of the amount of the
14 deposit.
15     MR. GOTTLIEB:  I don't understand
16 what the question pending is.
17 BY MS. DIAZ:
18 Q.  Ms. Marshall, based on the documents
19 on page 1279 and 1280, was the deposit that was
20 prepared on November 16, 2010 taken to the bank
21 on November 17, 2010?
22 A.  It was.
23 Q.  Ms. Marshall, if you can please turn
24 to page 1291.
25     Can you tell what date this cash

Page 154

S. Marshall

1        S. Marshall
2  management log page correlates to?
3     A.   No, I can't.
4     Q.   Okay.
5        And if you start at page 1284 and
6  flip to page 1291, can you determine what date
7  it correlate -- it relates to?
8     A.   Start at 1284?
9     Q.   Right.
10    A.   So we can assume that it's Tuesday,
11 November 16, 2010.
12    Q.   Ms. Marshall, turn to page 1286.
13       What is that document?
14    A.   Receipt from the bank slip.  The bank
15 slip, the strip from the bag where the money
16 went in.
17    Q.   Okay.
18       And what does the -- what does this
19 document indicate?
20    A.   There was a deposit of 2839.12
21 prepared on 11/16/10.
22    Q.   Okay.
23       And going back to the cash management
24 log on page 1291, is the deposit information
25 filled out on that page?

Page 155

S. Marshall

1        S. Marshall
2     A.   It's not.
3     Q.   Okay.
4        If you can turn to page --
5     A.   And I'm not positive that that's my
6  handwriting either.
7     Q.   Okay.
8     A.   So I might not have prepared that or
9  I did.  Let me see.
10       MR. GOTTLIEB:  Just answer the
11    question that she asked.
12       THE WITNESS:  I'm sorry.  I'm sorry.
13 BY MS. DIAZ:
14    Q.   It's okay.
15    A.   I just was curious.  I'm sorry.  Can
16 you start over or repeat the question for me?
17    Q.   Sure.  No problem.
18       MR. GOTTLIEB:  I don't think there
19    was a question, but go ahead.
20 BY MS. DIAZ:
21    Q.   Can you please turn to page 1287.
22       What is this document?
23    A.   Receipt from Chase Bank for a
24 deposit.
25    Q.   For what date?

Page 156

S. Marshall

1        S. Marshall
2     A.   November 17, 2010.
3     Q.   And for what amount?
4     A.   2839.12.
5     Q.   Okay.
6        And based on pages 1286 and 1287, do
7  the documents indicate that a deposit was
8  prepared on November 16 for 2839.12 but not
9  deposited until November 17, 2010?
10    A.   They do.
11    Q.   Ms. Marshall, if you can please turn
12 to page 1337.
13       Ms. Marshall, what date does this
14 cash management log page relate to?
15    A.   Monday, November 22, 2010.
16    Q.   If you can please turn to page 1321.
17       What is this document?
18    A.   This is the 1321, right?
19    Q.   Yes.
20    A.   This is the slip that you completed
21 that went into the deposit bag when you took it
22 to the bank.
23    Q.   Okay.
24       And what is the date on this
25 document?

Page 157

S. Marshall

1        S. Marshall
2     A.   November 22, 2010.
3     Q.   And what is the amount?
4     A.   It looks like 1312.12.
5     Q.   Okay.
6        Actually, turn to page 1320.  What is
7  that document?
8     A.   Receipt from Chase Bank for a
9  deposit.
10    Q.   For what date?
11    A.   11/23/2010.
12    Q.   And for what amount?
13    A.   312.72.
14    Q.   Okay.
15       And looking at document No. 1320 and
16 1321, do these documents indicate that the bank
17 deposit for November 22nd was taken to the bank
18 on November 23rd?
19    A.   Yes.
20    Q.   Ms. Marshall, can you turn to
21 page 1337.
22       Ms. Marshall, actually, turn to
23 page 1329.  What is this document?
24    A.   The slip you prepared that went in
25 the bag that went to the bank.

Page 158

S. Marshall

1
2    Q.    Okay.
3          And what's the date of the document?
4    A.    November 22, 2010.
5    Q.    And what is the amount?
6    A.    It looks like 2852.39.
7    Q.    Okay.
8          And did you fill out this deposit
9    slip?
10   A.    I did.
11   Q.    And take a look at page 1327.
12         What is that document?
13   A.    Receipt from the bank.
14   Q.    For what date?
15   A.    November 23, 2010.
16   Q.    And for what amount?
17   A.    2852.39.
18   Q.    Ms. Marshall, looking at document
19   1327 and 1329, do these documents indicate that
20   the deposit for November 22nd for 2852.39 was
21   deposited to the bank on November 23, 2010?
22   A.    Yes.
23   Q.    Do you know why two deposits were
24   made on November 22nd?
25         MR. GOTTLIEB:  Objection.

Page 159

S. Marshall

1
2    BY MS. DIAZ:
3    Q.    Can you look at page 1320 and
4    page 1327.
5    A.    What day of the week is the 23rd?
6    Q.    The 23rd was a Tuesday and the 22nd
7    was a Monday.
8    A.    So then both were brought on the same
9    day.
10   Q.    Okay.
11   A.    Two were brought on the same day.
12   Q.    And we established that both related
13   to November 22nd.
14         MR. GOTTLIEB:  Objection.
15   A.    What do you mean, "both"?  There were
16   two deposits --
17   Q.    The deposit ticket for both of the
18   deposits were filled out as of November 22,
19   2010.
20         MR. GOTTLIEB:  Objection.
21         Is there a question?  Is there a
22   question?
23         MS. DIAZ:  Hold on.
24   BY MS. DIAZ:
25   Q.    And we established that both of the

Page 160

S. Marshall

1
2    deposits on November 23rd related to
3    November 22nd; is that correct?
4          MR. GOTTLIEB:  Objection.  That's
5    not -- that's an improper question.  The
6    transcript speaks for itself.  If you want
7    to take a position that something was
8    established, that's your prerogative.  But
9    that's not a proper question to ask the
10   witness.
11   BY MS. DIAZ:
12   Q.    You can answer if you understand the
13   question.
14         MR. GOTTLIEB:  I don't understand the
15   question and I'm entitled to understand the
16   question that's being asked.
17   A.    I don't actually understand it
18   either.
19   Q.    Ms. Marshall, on -- Ms. Marshall, if
20   you look at page 1320 --
21   A.    Okay.
22   Q.    -- and page 1321.
23   A.    Okay.
24   Q.    I believe you testified that these
25   documents establish that the deposit prepared

Page 161

S. Marshall

1
2    on November 22, 2010 for 312.72 was deposited
3    on November 23rd; is that correct?
4    A.    Yes.
5          MR. GOTTLIEB:  Is it correct that you
6    believe it or is it correct that that's
7    what she testified to?
8          MS. DIAZ:  I believe the transcript
9    is clear in terms of my question.
10         MR. GOTTLIEB:  If you question was, I
11   believe you testified; is that correct?  I
12   believe you testified, then you --
13         MS. DIAZ:  So she testified.  That's
14   what the question is.  Is that what you
15   testified to.
16         MR. GOTTLIEB:  You're asking her
17   whether she testified to that?  Okay.
18   BY MS. DIAZ:
19   Q.    And, Ms. Marshall, if you turn to
20   page 1327 and 1329.  You also testified that
21   the deposit ticket that was prepared on
22   November 22, 2010 for 2852.39 was deposited on
23   November 23, 2010; is that correct?
24         MR. GOTTLIEB:  Objection.
25   A.    It is.

Page 162

```
 1                S. Marshall
 2     Q.   Okay.  Okay.
 3          MS. DIAZ:  I'd like to mark this as
 4     Exhibit No. 12.
 5          (Defendants' Exhibit 12, Document,
 6     Bates Nos. Star/Marshall 938 through
 7     1178, was marked for identification.)
 8     BY MS. DIAZ:
 9     Q.   Ms. Marshall, if you can turn to
10     page -- let me back up.
11          This document is Bates stamped
12     Star/Marshall 938 through 1178.  Ms. Marshall,
13     can you flip through the first few pages of
14     this document.
15     A.   Where should I stop?
16     Q.   You can stop at 944.
17     A.   Okay.
18     Q.   Do you recognize this document?
19     A.   I do.  It's the December cash
20     management log.
21     Q.   For what year?
22     A.   2010.
23     Q.   Can you please turn to page 948.
24          What is this page?
25     A.   Monday, November 29, 2011.
```

Page 163

```
 1                S. Marshall
 2     Q.   And is this the cash management log
 3     page for that date?
 4     A.   It is.
 5     Q.   And is your handwriting on this page?
 6     A.   It is.
 7     Q.   In what sections?
 8     A.   Deposit Prep, Deposit to Bank.
 9     Q.   Okay.
10          And what is the deposit amount under
11     Deposit Prep?
12     A.   2173.04.
13     Q.   Okay.
14          And what date does this document
15     indicate that the deposit was taken to the
16     bank?
17     A.   November 30th.
18     Q.   Can you please turn to page 945.
19          What is this document?
20     A.   The receipt from the bank.
21     Q.   Okay.
22          For what date?
23     A.   November 30th.
24     Q.   And for what amount?
25     A.   2172.04.
```

Page 164

```
 1                S. Marshall
 2     Q.   Okay.
 3          So was the deposit for November 29,
 4     2010 taken to the bank on November 30, 2010?
 5     A.   It was.
 6     Q.   Ms. Marshall, can you please turn to
 7     page 977.
 8          What is this page?
 9     A.   Thursday -- Thursday, December 2,
10     2010.
11     Q.   Okay.
12          So it's the cash management log for
13     December 2, 2010?
14     A.   Correct.
15     Q.   And is your handwriting on this page?
16     A.   Yes.  With Deposit Prep, Deposit to
17     Bank.
18     Q.   Okay.
19          And what date does this page indicate
20     the deposit was taken to the bank?
21     A.   December 3rd.
22     Q.   Okay.
23          And what was the amount of the
24     deposit based on this page?
25     A.   2877.67.
```

Page 165

```
 1                S. Marshall
 2     Q.   Okay.
 3          Can you please turn to page 972.
 4          What is this document?
 5     A.   Receipt from the bank.
 6     Q.   And what is the date on this
 7     document?
 8     A.   December 6, 2010.
 9     Q.   Okay.
10          And what is the amount?
11     A.   2877.67.
12     Q.   Okay.
13          Ms. Marshall, based on page 977 and
14     page 972, was the deposit for December 2, 2010
15     taken to the bank on December 6, 2010?
16     A.   Yes, it was.
17     Q.   Ms. Marshall, can you please turn to
18     page 983.
19          What date does this cash management
20     log page relate to?
21     A.   Friday, December 3, 2010.
22     Q.   And is your handwriting on this page?
23     A.   It is.
24     Q.   In what sections?
25     A.   Deposit Prep, Deposit to Bank.
```

42 (Pages 162 to 165)

S. Marshall

1
2      Q.   Okay.
3           And what date does this document
4    indicate the deposit was taken to the bank?
5      A.   December 3.
6      Q.   And what amount?
7      A.   2929.49 -- or 2933.51.  Sorry.  I
8    mean the second amount, 2933.51.
9      Q.   Okay.
10          And the "Minus/plus $4" in the
11   Comments column, what does that mean?
12          MR. GOTTLIEB:  Objection.
13     A.   It means that once it was taken to
14   the bank, there was a slight miscount; so, it
15   was actually $4 more.
16     Q.   Okay.
17     A.   And roughly 2 cents more.
18     Q.   If you turn to page 981.
19          What is this document?
20     A.   This is the receipt from Chase Bank.
21     Q.   For what date?
22     A.   December 6, 2010.
23     Q.   And for what amount?
24     A.   2933.51.
25     Q.   Okay.

S. Marshall

1
2           Ms. Marshall, based on pages 983 and
3    981, was this deposit for Friday, December 3,
4    2010, taken to the bank on December 6, 2010?
5      A.   Yes -- excuse me.  Yes.
6      Q.   Ms. Marshall, can you please turn to
7    page 990.
8           Ms. Marshall -- strike that.
9           If you can please turn to page 1000.
10   Which date does this cash management log page
11   relate to?
12     A.   Monday, December 6, 2010.
13     Q.   And is your handwriting on this page?
14     A.   It is.
15     Q.   Where?
16     A.   Deposit Prep.
17     Q.   Okay.
18          Your handwriting is not under Deposit
19   to Bank?
20     A.   Oh, yes, it is.
21     Q.   Where?
22     A.   Banking Witness.
23     Q.   Okay.
24          Is that the only place under the
25   Deposit to Bank section that your handwriting

S. Marshall

1
2    appears?
3      A.   It is.
4      Q.   Okay.
5           And what were you verifying as a
6    banking witness?
7           MR. GOTTLIEB:  Objection.
8      A.   That the money went to the bank.
9      Q.   Okay.
10          Were you verifying that the money
11   went to the bank on December 6, 2010?
12          MR. GOTTLIEB:  Objection.
13     A.   No, not necessarily.  I was verifying
14   that it went to the bank when I signed this.
15     Q.   Okay.
16          But not on a specific date?
17     A.   No, just deposit to bank.
18     Q.   Ms. Marshall, can you please turn to
19   page 998.
20          What is this document?
21     A.   This is receipt from Chase Bank.
22     Q.   For what date?
23     A.   December 8, 2010.
24     Q.   And for what amount?
25     A.   580.50.

S. Marshall

1
2      Q.   Ms. Marshall, based on page 998 and
3    page 1000, was the deposit for Monday,
4    December 6th, taken to the bank on
5    December 8 --
6      A.   Yes.
7      Q.   -- 2010?
8           Ms. Marshall, can you please turn to
9    page 1007.  What date does this cash management
10   log page relate to?
11     A.   I believe that's 12/7/2010, Tuesday.
12     Q.   Okay.
13          And where is your handwriting on this
14   page?
15     A.   Deposit Prep, Deposit to Bank.
16     Q.   Okay.
17          And what date does this document
18   indicate that deposit was taken to the bank?
19     A.   December 7th.
20     Q.   Okay.
21          And are those your initials under
22   Banking Witness?
23     A.   It is.
24     Q.   And what -- what did your initials
25   signify?

Page 170

S. Marshall
1
2    A.   That the deposit went to the bank.
3    Q.   Okay.
4         But not that the deposit went to the
5    bank on December 7th?
6    A.   No.
7    Q.   Okay.
8         And what was the amount of the
9    deposit?
10   A.   3132.76.
11   Q.   Okay.
12        Can you please turn to page 1002.
13   What is this document?
14   A.   Receipt from Chase Bank.
15   Q.   Okay.
16        And what is the date?
17   A.   December 8, 2010.
18   Q.   Okay.
19        And what is the amount?
20   A.   3132.76.
21   Q.   Okay.
22        And based on pages 1002 and 1007, do
23   the documents indicate that the bank deposit
24   for December 7th was taken to the bank on
25   December 8th?

Page 171

S. Marshall
1
2    A.   Yes.
3    Q.   Ms. Marshall, can you please turn to
4    page 1018.
5         What date does this cash management
6    log page relate to?
7    A.   Thursday, December 9, 2010.
8    Q.   And is your handwriting on this page?
9    A.   It is.
10   Q.   Under which sections?
11   A.   Deposit Prep and Deposit to Bank.
12   Q.   Okay.
13        And what date does this document
14   indicate that the deposit was taken to the
15   bank?
16   A.   December 10th.
17   Q.   Okay.
18        And what was the amount?
19   A.   3280.36.
20   Q.   Okay.
21        Please turn to page 1013.
22        What is this document?
23   A.   Receipt from Chase Bank.
24   Q.   For what date?
25   A.   December 10, 2010.

Page 172

S. Marshall
1
2    Q.   And for what amount?
3    A.   3280.36.
4    Q.   Based on document Nos. 1013 and 1018,
5    do the documents indicate that the deposit for
6    Thursday, December 9, 2010, was taken to the
7    bank on December 10, 2010?
8    A.   Yes.
9    Q.   Ms. Marshall, can you please turn to
10   page 1064.
11        What date does this cash management
12   log page relate to?
13   A.   Thursday, December 16, 2010.
14   Q.   And is your handwriting on this page?
15   A.   Yes.
16   Q.   Where?
17   A.   Deposit Witness, Deposit -- and
18   Banking Witness.
19   Q.   Okay.
20        And what date does this document
21   indicate the deposit was taken to the bank?
22   A.   On 12/17.
23   Q.   And what was the amount?
24   A.   2987.69.
25   Q.   Okay.

Page 173

S. Marshall
1
2         Can you please turn to page 1059.
3         What is this document?
4    A.   This is a receipt from Chase Bank.
5    Q.   Okay.
6         For what date?
7    A.   December 17, 2010.
8    Q.   And for what amount?
9    A.   2987.69.
10   Q.   Ms. Marshall, based on documents 1059
11   and 1064, do the documents indicate that the
12   deposit for -- excuse me -- December 16, 2010
13   was deposited on December 17, 2010?
14   A.   Yes.
15   Q.   And, Ms. Marshall, can you please
16   turn to page 1097.
17        What date does this cash management
18   log page relate to?
19   A.   Tuesday, December 21, 2010.
20   Q.   And is your handwriting on this
21   document?
22   A.   It is.
23   Q.   In which sections?
24   A.   Deposit Prep, Deposit to Bank.
25   Q.   Ms. Marshall, did you cross out

44 (Pages 170 to 173)

S. Marshall

1
2   writing on Start Time Deposit Amount,
3   Completion Time, and Time to Bank?
4       A.   Yes.
5       Q.   Do you remember why?
6       A.   I guess I wrote something
7   incorrectly.
8       Q.   Okay.
9           What date does this document indicate
10  you took the deposit for November 20 -- excuse
11  me, December 21st to the bank?
12      A.   December 22, 2010.
13      Q.   Okay.
14          And what was the amount?
15      A.   2922.34.
16      Q.   Can you please turn to page 1092.
17          What is this document?
18      A.   A receipt from Chase Bank.
19      Q.   For what date?
20      A.   December 22, 2010.
21      Q.   And for what amount?
22      A.   2922.34.
23      Q.   Ms. Marshall, based on document
24  No. 1092 and 1097, do the documents indicate
25  that the deposit for December 21, 2010 was

S. Marshall

1
2   taken on -- was taken to the bank on
3   December 22, 2010?
4       A.   Yes.
5           MS. DIAZ:  Can we take a five-minute
6   break?
7           MR. GOTTLIEB:  Sure.
8           THE VIDEOGRAPHER:  The time is
9   2:39 p.m.  We're going off the record.
10          (Recess taken from 2:39 p.m. to 2:47
11  p.m.)
12          THE VIDEOGRAPHER:  The time is
13  2:47 p.m.  We're back on the record.  Video
14  No. 4.
15  BY MS. DIAZ:
16      Q.   Ms. Marshall, as a store manager, did
17  you ever have any difficulties with your
18  duties?
19          MR. GOTTLIEB:  Objection.
20      A.   Difficulties?
21          I think that -- I mean, every role
22  has its challenges that you're going to run
23  into in learning, so...
24      Q.   In your opinion, what were your
25  challenges as a store manager?

S. Marshall

1
2           MR. GOTTLIEB:  Objection.  It's a
3   very broad question.
4       A.   I'll see, if I have to think of
5   something, it was -- I think I was a pretty
6   good store manager overall there.  I had a -- I
7   think at 6th and Waverly I was challenged a bit
8   with EcoSure, which was the company that
9   checked our cleanliness standards.  So I --
10  that would probably be the one thing that comes
11  to mind besides just that everyone's challenged
12  in their jobs at times.
13      Q.   Okay.
14          And was the issue of cleanliness
15  limited to the 6th and Waverly location?
16      A.   No.  I still was learning even at
17  Hudson and King the tricks of the trade of how
18  to, you know, be on point.
19      Q.   And apart from cleanliness, did you
20  have any other issues or challenges as a store
21  manager?
22          MR. GOTTLIEB:  Objection.
23      A.   Again, nothing -- I mean, nothing
24  comes to mind.  It's just you're in a role, you
25  have good days, you have bad days, you're

S. Marshall

1
2   learning.
3       Q.   Did your district managers ever coach
4   you on duties that you weren't fulfilling?
5           MR. GOTTLIEB:  Objection.
6       A.   Any district manager at any time?
7       Q.   As a store manager.
8       A.   That's what I mean.  But any of them.
9           Everyone gets like -- I'm not being
10  vague, but, I mean, everyone gets coached.
11  Like, that is part of the process of -- of
12  learning.  Like, you know, a district manager
13  visits the building, or whatever the name they
14  have for that program, when a district manager
15  comes in and you sit down and you have a
16  conversation and dialogue about the things
17  going on to help you improve as a store
18  manager.
19          So I think, though, that if we're
20  just talking overall in a general sense, like
21  if I had these problem areas, I'd say, no,
22  that's why I became a store manager so quickly,
23  and that's why I moved, you know, to two
24  different stores.
25      Q.   Ms. Marshall, did -- did customers

45 (Pages 174 to 177)

Page 178

S. Marshall

1
2  ever complain about you or the stores that you
3  managed?
4       MR. GOTTLIEB: Objection.
5  BY MS. DIAZ:
6       Q.   Let me back up.
7            Did customers ever complain about
8  you?
9       MR. GOTTLIEB: Objection. While she
10      was store manager?
11  BY MS. DIAZ:
12      Q.   While you were a store manager.
13      A.   I can't recall with something
14  specifically about me; but, again, there -- I
15  know that it's a business. Like, that's part
16  of dealing, that's part of being a manager of,
17  you know, a food service establishment.
18  There's -- that's part of dealing with it. A
19  customer, you know, complaining to either
20  corporate or Jenn doesn't mean that I
21  necessarily, you know, did something wrong.
22           It's now my job, though, to figure
23  out to appease the customer, because that's
24  what my job is, to go back and circle back and
25  figure out what I need to do in that situation.

Page 179

S. Marshall

1
2       So, I mean, I can't -- show me a
3  store that doesn't get bad letters and I'll
4  show you a manager who intercepts the mail, so
5  it's not...
6       MS. DIAZ: I'd like to mark this as
7  Exhibit No. 13.
8       (Defendants' Exhibit 13, Document,
9  Bates Nos. 1828 to 1832, was marked for
10  identification.)
11  BY MS. DIAZ:
12      Q.   Ms. Marshall, take a few minutes to
13  review this document.
14      A.   (Document Review.)
15      MR. GOTTLIEB: For the record, it's
16  Bates stamped 1828 to 1832. Make sure you
17  read the whole document.
18      A.   Okay.
19      Q.   Ms. Marshall, please turn to
20  page 1831. It's an e-mail from Shelby Wood
21  dated Wednesday, June 30, 2010, to Jenn Gurtov
22  and others on the cc list. The e-mail says,
23  "What has happened to my favorite local
24  Starbucks?" And a couple paragraphs -- I'll
25  just go through it.

Page 180

S. Marshall

1
2       It says, "I'm writing you regarding
3  the Starbucks on 345 Hudson Street below Kings
4  Street. My co-workers and I have been going
5  there since it opened twice a day, once in the
6  morning and once around 3:00 p.m. We knew
7  everyone there. They were all so nice and knew
8  our names. We loved going there. Now everyone
9  either left or was transferred and there are
10  all new people there. Now it is only chaos in
11  there all the time and no one is typically
12  happy or nice."
13           Ms. Marshall, were you a store
14  manager at 345 Hudson Street store during that
15  June 30, 2010 time frame period?
16      A.   I was.
17      MR. GOTTLIEB: I'm going to object
18  that the reading of the e-mail was slightly
19  inaccurate, but go ahead and answer the
20  question.
21      A.   I was.
22      Q.   And do you agree that during the
23  June 30, 2010 time period, there was chaos in
24  the store?
25      A.   Not at all.

Page 181

S. Marshall

1
2       Q.   And do you agree that no one was
3  particularly happy or nice?
4       A.   Not at all.
5       Q.   Okay.
6            Ms. Marshall, can you turn to
7  page 1830. Actually, take a look at page 1829,
8  as well. It's an e-mail from Giancarlo
9  Negovetti, replying to Shelby Wood, Jenn
10  Gurtov, among others, on June 30, 2010.
11           On page 1830 the e-mail says, "I
12  couldn't agree more with Shelby's comments.
13  Previously even when the store was busy, it was
14  a smooth operation with friendly staff who
15  seemed to be on top of things. Lately even
16  when it's slow, it's very disorganized."
17           Do you agree with that
18  statement during -- that assessment of the 345
19  Hudson Street store during that time period?
20      A.   Definitely not.
21      Q.   And why not?
22      A.   Why do I not agree with that
23  statement?
24           Because, I mean, it's not accurate.
25  You can't take away -- first of all, Giancarlo

46 (Pages 178 to 181)

Page 182

S. Marshall

1
2  and Shelby became some of my most loyal
3  customers. And out of all the customers that
4  end up like me, in recognizing me, they wished
5  me a very safe, you know, return from my
6  medical leave. So they -- they were definitely
7  my customers after this.
8      I think that they were -- it was a
9  reaction to me coming in and cleaning up that
10 store which had a lot of tenured employees in
11 it who didn't need to be there anymore, who
12 were sort of, I guess, bad apples from the
13 attitude perspective. But when you go to a,
14 you know, a Starbucks, you guys probably have
15 your Starbucks, you get to know the people that
16 work there in a way that makes you feel close
17 to them.
18     So when they started to see all these
19 people that they valued because those people
20 knew them, I think that they reacted to that
21 and that that was what this was, a reaction to
22 that.
23     Q.   When did you join the 345 Hudson
24 Street store?
25     A.   I believe it was in October of 2009.

Page 183

S. Marshall

1
2      Q.   Of 2009?
3          So at the time that this e-mail was
4  written, you had been at that store for
5  approximately eight months?
6          MR. GOTTLIEB: Was that a question?
7  BY MS. DIAZ:
8      Q.   What were you doing during that
9  eight-month period?
10     A.   I was --
11         MR. GOTTLIEB: Objection.
12     A.   Sorry.
13     Q.   In terms -- what were you doing
14 during that eight-month period?
15         MR. GOTTLIEB: Objection. I don't
16 understand what --
17 BY MS. DIAZ:
18     Q.   In terms of cleaning up the store.
19     A.   I was hiring new baristas. I was
20 training existing ones. I was managing the --
21 following Starbucks's process, which is verbal,
22 written, final. So I was doing all of those
23 things to clean up the building.
24         I was comping, so I took over that
25 building from a manager who definitely

Page 184

S. Marshall

1
2  struggled when I took it over from her and was
3  only running with about five people in the
4  morning. I built up that business to where
5  when I left we were running with nine. I
6  introduced headsets. I was the first store
7  manager to pass an EcoSure audit in that
8  building. Everyone else had failed. I was the
9  first one -- even with all my cleanliness
10 issues, I was the first manager to pass.
11         I promoted people out of that
12 building. And I had a lot of -- lot of
13 customer reactions and a lot of customers that
14 really got to know me.
15         So this is definitely just a reaction
16 and, you know, one letter in six years is okay.
17     Q.   Ms. Marshall, please flip to
18 page 1928. And this is an e-mail dated June 30
19 from Jenn Gurtov to Giancarlo Negovetti,
20 amongst others on the previous e-mail.
21         MR. GOTTLIEB: Which page are we
22 referring to?
23         MS. DIAZ: 1829.
24         MR. GOTTLIEB: Okay.
25

Page 185

S. Marshall

1
2  BY MS. DIAZ:
3      Q.   Ms. Marshall, the second paragraph of
4  this e-mail says, "I want you to know that I
5  have also recognized many of the opportunities
6  you've mentioned in the below e-mails. I have
7  been working closely with the store manager of
8  that location, Serenity, for the past six to
9  eight weeks. Our primary focuses have centered
10 around speed of service, friendliness of
11 employees, as well as accuracy of beverages and
12 handoff."
13         I'm going to skip the following
14 sentences -- the following sentence, but then
15 it says, "So suffice it to say I'm not
16 surprised that these are the day parts that
17 you've gotten negative experiences in; however,
18 I am disappointed that you continue to even as
19 recently as this morning."
20         Were you working with Jenn Gurtov on
21 some of these issues that she lists in her
22 e-mail in terms of speed of service and
23 friendliness of employees during this time
24 frame, during the June 30, 2010 time frame?
25     A.   I was constantly working with Jenn.

47 (Pages 182 to 185)

S. Marshall

1    Again, I ran what was from a peak perspective
2    the -- either the busiest or the second busiest
3    store in the district. I almost doubled the
4    customers I brought in during the day part, so
5    I did have to partner her in to help me. Like
6    I said, we used headsets, which was a
7    completely new thing for everybody that worked
8    there that we had to get used to. So she came
9    and she definitely helped me manage that
10   process, you know. There were a lot of moving
11   parts in that building and it was a pretty -- a
12   pretty large location for a Starbucks when
13   we're used to, you know, one table, and I had
14   an entire table, two bathrooms, you know, a
15   full lobby.
16          So it was definitely a challenge in
17   building in the sense of what I was managing
18   and what I was growing that building to be.
19   So, of course, she's a district manager. She
20   is going to come in and she's going to help
21   make sure that I'm doing the right to the
22   business that I'm building.
23          But, again, there wasn't these -- you
24   know, yes, customers -- not every one leaves

S. Marshall

1    everywhere 100 percent happy. And that's what
2    a customer should do. They should then reach
3    out and say what the problems are.
4           And then, again, what my job was,
5    like I said, was to circle back, introduce
6    myself. I met Shelby, I met Carlo. They
7    became, you know, they became my biggest
8    advocates.
9    Q.   Are you aware of any other customer
10   complaints while you were a store manager under
11   Jenn Gurtov's supervision?
12          MR. GOTTLIEB: Objection.
13   A.   There could be. Again, I don't know
14   who doesn't get complaints and that, you know,
15   they get forwarded to me. It's part of the
16   process of being a manager. Someone doesn't
17   have a good experience, and then it's my job to
18   turn around and hold my team accountable,
19   figure out what went wrong, what that process
20   was, if there is someone to hold accountable
21   and figure it out.
22   Q.   Ms. Marshall, what was your
23   relationship with Ms. Gurtov?
24          MR. GOTTLIEB: Objection.

S. Marshall

1    A.   She was my boss.
2    Q.   When did you first meet her?
3    A.   At 6th and Waverly. She was
4    introduced to me by Michael Nicodemus, who was
5    my current district manager. And she was
6    brought in sort of as he handed over the reins,
7    quote/unquote.
8    Q.   Okay.
9           So this -- was this before she became
10   your district manager?
11   A.   This was part of the process of her
12   becoming my district manager. So that was sort
13   of, I guess, there's not -- that was sort of
14   the official introduction. And, you know, we
15   sat down, the three of us had coffee and just
16   sort of did the -- this is your new DM, this is
17   Serenity.
18   Q.   And did you have a personal
19   relationship with her?
20          MR. GOTTLIEB: Objection.
21   A.   What do you mean?
22   Q.   Did you have a friendship with
23   Ms. Gurtov?
24   A.   Like outside of work? No.

S. Marshall

1    Q.   You didn't socialize?
2           MR. GOTTLIEB: Objection.
3    A.   We had -- no. We had lunch together,
4    you know. We would go to lunch together during
5    a visit to the store. That's the extent. And
6    holiday parties.
7    Q.   Would you describe your relationship
8    as strictly professional?
9    A.   Not strictly. I mean, we -- you work
10   with someone for a long time, you get to know
11   them. So, you know, I knew -- I knew about her
12   life a little bit, she knew about my life. You
13   share things when you work with someone
14   closely.
15   Q.   And how would you characterize your
16   relationship with Ms. Gurtov at the 6th and
17   Waverly location? Did you guys have a good
18   working relationship?
19          MR. GOTTLIEB: Objection.
20   A.   Overall, I believe we did. I mean,
21   she's my boss. What boss do you not have your
22   ups and downs with. But, overall, it was -- it
23   was just -- she was just my boss.
24   Q.   What about at the 345 Hudson Street

Page 190

S. Marshall

location, how would you characterize your working relationship with Ms. Gurtov at that store?

A. I would say it even improved if, you know, we worked even more closely together because that store was so important in her district. I mean, that Hudson location had law firms, it had like major offices. We're talking, you know, MTV studios, book publishers. There were a lot of people out there. There was also a block away, the Starbucks's -- like I believe it was the advertisement firm. I can't remember the name of them, but they were a block away. So they were our customers.

So that was a very high-profile store for her, so we definitely stayed connected.

Q. And you indicated Ms. Gurtov assisted you in growing that store, that business?

A. Yes.

Q. Ms. Marshall, do you recall having any disagreements with Ms. Gurtov during the time that she was your district manager?

MR. GOTTLIEB: Objection.

Page 191

S. Marshall

A. Disagreements?

Q. Did you get into any arguments with her?

A. Arguments.

MR. GOTTLIEB: Objection. Are you asking disagreements or arguments?

BY MS. DIAZ:

Q. You can answer the first question, disagreements.

MR. GOTTLIEB: Objection.

A. Again, there's nothing that stands out as specific. Like, she was my boss. Maybe if she wanted me to try something and I disagreed, I'd let her know and we'd discuss it. But at the end of the day, she was my boss, I had to do whatever she thought was best.

MS. DIAZ: Let's mark this as Exhibit 14.

(Defendants' Exhibit 14, Facebook posting, was marked for identification.)

BY MS. DIAZ:

Q. Ms. Marshall, do you recognize this document?

Page 192

S. Marshall

A. Well, I recognize, yes.

Q. What is it?

A. It is a Facebook posting.

Q. And what is the date of your post?

A. December 28, 2009.

Q. Okay.

And the post says, "My boss needs a man and her life so she can leave me alone"; is that correct?

A. Yes.

Q. Do you recall why you wrote that?

A. No, I don't.

Q. Do you recall whether you had any disagreements with Jenn Gurtov around this time period?

MR. GOTTLIEB: Objection.

Are you asking her about the document?

BY MS. DIAZ:

Q. Do you recall whether you had any disagreements with Ms. Gurtov around December 28, 2009?

A. No. I don't -- like, if whatever it was, it wasn't even serious enough for me to

Page 193

S. Marshall

even remember. You know, again, it's your boss. You're not always going to go on happy with everything they may decide, and I put it on Facebook.

Q. Okay.

You Facebook friends with other Starbucks's employees or were -- let me strike that.

Were you Star -- were you Facebook friends with other Starbucks's employees during the December 2009 time period?

A. I was.

Q. And did you think it was appropriate to post something about your boss on Facebook?

A. It wasn't.

Q. Okay.

Ms. Marshall --

MS. DIAZ: I'd like to mark this document as Exhibit 15.

(Defendants' Exhibit 15, Performance Review, was marked for identification.)

BY MS. DIAZ:

Q. Ms. Marshall, take a few moments to

Page 194

```
 1              S. Marshall
 2    review the document.
 3        A.   (Document Review.)
 4           Okay.
 5        Q.   Are you familiar with this document?
 6        A.   Yes.
 7        Q.   What is it?
 8        A.   It's my performance review as a store
 9    manager.
10        Q.   Okay.
11           For what period?
12        A.   This is administered on 9/18.  So
13    that was that -- that previous year.  So fiscal
14    year, I guess that's '07.
15        Q.   Okay.
16           And for which store?
17        A.   This was for 847.
18        Q.   Okay.
19           Was Michael Nicodemus your store
20    manager at -- excuse me -- your district
21    manager at the time?
22        A.   He was.
23        Q.   And is that your signature at the
24    bottom of the page?
25        A.   It is.
```

Page 195

```
 1              S. Marshall
 2        Q.   Did he go over this review with you?
 3        A.   He did.
 4        Q.   And what was your overall rating on
 5    this review?
 6        A.   A 1.9.
 7        Q.   And under Significant
 8    Accomplishments, the last sentence says,
 9    "Scored a 97 percent on the daily records
10    section of the PNAP audit."
11           What does that mean?
12        A.   That was, I believe that acronym is
13    something Partner something Asset and
14    Protection.  So they came in and they went
15    through the book with me.  So they went
16    through, like, it was all about loss and asset
17    and protection.  Called asset and protection.
18    So it was really to see if like I was
19    controlling loss in the building, if I was
20    logging in paid-out.  I remember that section.
21           It was a while ago, but I do remember
22    those things.  We looked at my paid-out to make
23    sure that those were correctly logged.  She
24    looked at my over/shorts to make sure those
25    were correctly logged and followed up on.
```

Page 196

```
 1              S. Marshall
 2    My bad debt.  Then my safe.  I
 3    remember we went through my safe to make sure
 4    that that was accurate, that it was all there.
 5    That -- I believe we had our store credit
 6    cards, what we called a P card, that that was
 7    present.  Coupons, because we just give people
 8    free drink coupons, that those were important,
 9    that those were being held safely.  Keys were
10    being held on you.  So those are the things
11    that I remember.
12        Q.   Okay.
13           As part of the PNAP audit, was your
14    cash management log reviewed?
15        A.   That would be -- that's where
16    paid-out log, over/shorts, all those things are
17    within the cash management log.
18        Q.   Do you recall whether your -- the
19    deposit information section was reviewed?
20           MR. GOTTLIEB:  Objection.
21        A.   I don't recall.
22           MS. DIAZ:  I'd like to mark this as
23    Exhibit 16.
24           (Defendants' Exhibit 16,
25    Performance Review, was marked for
```

Page 197

```
 1              S. Marshall
 2    identification.)
 3    BY MS. DIAZ:
 4        Q.   Ms. Marshall, take a few moments to
 5    review the document and just let me know when
 6    you're done.
 7        A.   (Document Review.)
 8           Okay.
 9        Q.   Ms. Marshall, what is this document?
10        A.   This is my performance review.
11        Q.   For what year?
12        A.   Fiscal year '09.
13        Q.   Okay.
14           And who prepared the review?
15        A.   I believe this was Jenn.  It was '09,
16    so this had to be Jenn.
17        Q.   Jenn Gurtov?
18        A.   Yes.
19        Q.   And did she go over this review with
20    you?
21        A.   She did.
22        Q.   And did you agree with the review?
23        A.   I did.
24        Q.   Okay.
25           And, Ms. Marshall, if you can look at
```

S. Marshall

1  S. Marshall
2  first page, page 206, at the bottom under
3  Review Results and Accomplishments, it's the
4  second paragraph says, "Serenity has struggled
5  throughout fiscal year 2009 to achieve results.
6  In the beginning of the year Serenity struggled
7  achieving results due to opportunities and
8  competencies across the board.  Puts the
9  customer.  Works well with others.  Leads
10 courageously.  Develops continuously.  Achieves
11 results.  After taking an LOA in April,
12 Serenity has showed improvement in
13 competencies."
14     Do you agree with what's written in
15 the review?
16     MR. GOTTLIEB:  Objection.  You're
17     asking about that sentence or that section
18     you read?
19 BY MS. DIAZ:
20     Q.   Do you agree that you struggled in
21 fiscal year 2009 to achieve results?
22     MR. GOTTLIEB:  Objection.
23     A.   I do.
24     Q.   Okay.
25     And do you agree that after you

1  S. Marshall
2  took -- I'll back up.
3     Do you know what LOA stands for?
4     A.   Yes.
5     Q.   What does -- what does that mean?
6     A.   A Leave of Absence.
7     Q.   Okay.
8     And do you agree that after taking a
9  leave of absence in April, you showed
10 improvement in your competencies?
11     A.   Yes.
12     MS. DIAZ:  I'd like to mark this as
13 Exhibit 17.
14     (Defendants' Exhibit 17,
15 Performance Review 2010, was marked for
16 identification.)
17 BY MS. DIAZ:
18     Q.   Ms. Marshall, take a few moments to
19 review it and just let me know when you're
20 done.
21     A.   (Document Review.)
22     Okay.
23     Q.   What is this document?
24     A.   This is my performance review, 2010.
25     Q.   Okay.

1  S. Marshall
2     And who prepared the review?
3     A.   Jenn Gurtov.
4     Q.   And when was this prepared?
5     MR. GOTTLIEB:  Objection.  If you
6  know.
7     A.   When was it prepared?
8  I know when I signed it.
9     Q.   When did you sign it?
10     A.   October 4, 2010.
11     Q.   Okay.
12     And did Ms. Gurtov go over this
13 review with you?
14     A.   Yes.
15     Q.   And did you agree with the review?
16     MR. GOTTLIEB:  Objection.
17     A.   Overall, yes.
18     Q.   Was there anything that you disagreed
19 with?
20     MR. GOTTLIEB:  Take your time.
21     A.   (Document Review.)
22     I remember we had discussion around
23 "leads courageously."
24     Q.   What was your discussion?
25     A.   Well, I thought that I was effective

1  S. Marshall
2  and that, you know, I gave examples of why I
3  led.  I was a district lead on several things.
4  I was in charge of prepping all candidates that
5  were going to be interviewing with Jenn to be
6  promoted, so that I owned that for the entire
7  district, getting them ready, so she trusted in
8  my judgment with promotions.
9     I was in charge of what we started to
10 do, what was called a floating partner, and we
11 split the district in two and every store was
12 responsible for having someone they sort of
13 just scheduled as extra.  And then if there was
14 a call-out anywhere within the district, that
15 person would go to that store to help.  I was
16 in charge of that.  I was the one that
17 coordinated it all with all the managers, so I
18 felt like I did play a huge leadership role
19 within the district.
20     You know, I was part of several
21 different platforms.  I was on a coffee team.
22 So I felt like I had done enough to warrant an
23 effective, but she didn't agree, she said as
24 effective, and it was just, you know, we talked
25 about it.  It was a review.  It was a time to

S. Marshall

1
2  discuss and set expectations.
3      Q.   Okay.
4          And under that section she says that
5  you -- "She has not consistently made timely
6  and effective decisions.  She has pushed
7  decisions upward.  She has waited for things to
8  be clearly defined, sometimes even multiple
9  times, i.e., cleanliness.  She has struggled
10 with helping partners maintain focus during
11 competing priority -- priorities."
12         With respect to the section I just
13 read, do you know what she was referring to?
14     A.   Specifically with the cleanliness,
15 because as I mentioned before, that was
16 something that was always in our discussions on
17 the phones, in person, we talked about
18 cleanliness.  So that was just -- that was
19 something.
20         But everything else is not -- that
21 wasn't...
22     Q.   And, Ms. Marshall, you indicated that
23 during this year you prepped candidates to
24 prepare them for their interviews with
25 Ms. Gurtov?

S. Marshall

1
2      A.   Correct.
3      Q.   Is this for store manager positions
4  or --
5      A.   No.  Barista to shift supervisor and
6  shift supervisor to assistant store manager.
7      Q.   And you indicated that this showed
8  that Ms. Gurtov trusted your judgment?
9      A.   Yes.
10         MR. GOTTLIEB:  Objection.
11 BY MS. DIAZ:
12     Q.   And you were also in charge of the
13 floating partner system that you implemented in
14 the district?
15     A.   Correct.
16     Q.   And did Ms. Gurtov choose you to
17 become the person in charge of the floating
18 partner system?
19         MR. GOTTLIEB:  Objection.
20         Go ahead.
21     A.   She -- there were two of us, because
22 there were about 12 stores, and we split it in
23 two.  And I was the downtown captain, for want
24 of a better word; so, yes, she did.
25     Q.   Okay.

S. Marshall

1
2          And who was the other person that was
3  in charge of the floating partner system?
4      A.   I don't remember who had uptown,
5  honestly.  That was that side of town.  I just,
6  you know, was concerned with my side of town.
7      Q.   Do you remember when you -- when you
8  became in charge of the floating partner
9  system?
10     A.   No, I don't.  It was just something
11 that we introduced to be helpful to the
12 district.  It was district specific.
13     Q.   Do you remember whether you did it
14 for most of 2010?
15     A.   I would say the latter half of 2010.
16     Q.   Were you doing it through October of
17 2010?
18     A.   I believe I was, yes.
19     Q.   Okay.
20         Ms. Marshall, if you could look at
21 the "Achieves Results" paragraph on that same
22 page, page 1579.  It says that you were
23 ineffective.
24     A.   Yes.
25     Q.   If you can just read that paragraph

S. Marshall

1
2  briefly.
3          Did you agree with Ms. Gurtov's
4  comments with respect to your performance under
5  "Achieves Results"?
6          MR. GOTTLIEB:  You want her to read
7  it to herself or on the record?
8          MS. DIAZ:  I can read it.
9          MR. GOTTLIEB:  I'm sorry?
10         MS. DIAZ:  I can read it.
11 BY MS. DIAZ:
12     Q.   "Serenity has not consistently
13 utilized plan due check adjust throughout this
14 past year.  She has also not consistently held
15 herself or her team accountable to success
16 measures.  She has had difficulty causing
17 problem-solving to remove obstacles to her
18 partners.  Again, over the past several months
19 Serenity has shown a renewed focus and has
20 begun leading her team to be successful against
21 achieving results."
22         And skipping for -- skipping to the
23 last sentence, it says, "Areas of continued
24 focus include via QASA, customer voice
25 succession planning, and turnover in cash

Page 206

S. Marshall

1 over/short."
2 MR. GOTTLIEB: Just because you left
3 out a sentence, I want to read -- there was
4 a sentence left out that said, "This must
5 be the foundation for FY11. Serenity is
6 not to lose sight of the success she has
7 had over the past few months and move
8 backwards."
9 BY MS. DIAZ:
10 Q. Do you agree with Ms. Gurtov's
11 statements in that paragraph?
12 A. I did with some of it. We had
13 dialogue around it during my review, and around
14 all the results that I did achieve, and the
15 ones she felt that I could achieve more.
16 But, again, it's a review. It's a
17 time to level set and to discuss expectations
18 and that I "meets expectations" on my
19 review. I didn't go on any plan. There was no
20 documentation. This was just one of the areas
21 that I needed to improve on going forward. It
22 was part of the review where I met expectations
23 overall.
24 Q. Under the "Achieves Results"

Page 207

S. Marshall

1 paragraph, did you disagree with anything in
2 particular that Jenn Gurtov wrote?
3 MR. GOTTLIEB: Objection.
4 A. I did. I felt like I -- I felt like
5 we were very successful at Hudson and King in a
6 lot of areas; so, again, it was just dialogue
7 more than -- "disagreement" is a little bit
8 strong. It was a dialogue, it was a review
9 and, you know, it was time for us to sit down
10 and discuss my previous year.
11 Q. And the review mentions an area of
12 "continued focus as cash over/short."
13 Do you know why that was included in
14 the review?
15 MR. GOTTLIEB: Objection.
16 A. The over/shorts, I believe there was
17 a percentage that you needed to stay in --
18 within. So if you made a certain amount of
19 money, I believe I was like .05 percent or .5
20 percent was sort of a range you wanted to stay
21 in with shortages.
22 Q. Okay.
23 And were you over that range?
24 A. The store --

Page 208

S. Marshall

1 MR. GOTTLIEB: Objection.
2 Go ahead.
3 A. The store, yes, the store at times
4 would show up on the list of being over that
5 range.
6 Q. And is that why -- do you believe
7 that's why that is included here as an area of
8 continued focus?
9 MR. GOTTLIEB: Objection.
10 A. Well, that's exactly what it says,
11 yes, cash over/shorts.
12 MS. DIAZ: I'd like to mark this as
13 Exhibit 18.
14 THE WITNESS: This is where I need to
15 take a restroom break.
16 MS. DIAZ: Sure.
17 THE VIDEOGRAPHER: The time is
18 3:26 p.m. We're going off the record.
19 (Defendants' Exhibit 18, Document,
20 Bates No. Star/Marshall 1585, was marked
21 for identification.)
22 (Recess taken from 3:26 p.m. to
23 3:36 p.m.)
24 THE VIDEOGRAPHER: The time is

Page 209

S. Marshall

1 3:36 p.m. We're back on the record.
2 BY MS. DIAZ:
3 Q. Ms. Marshall, take a few moments to
4 review the document Bates stamped Star/Marshall
5 1585.
6 A. (Document Review.)
7 Okay.
8 Q. Do you recognize this document?
9 A. I do.
10 Q. What is it?
11 A. It's a conversation that I had with
12 Jenn -- me and Jennifer -- Jenn -- oh, my
13 gosh -- that me and Ms. Gurtov had.
14 Q. Okay.
15 And is that your signature at the
16 bottom?
17 A. It is.
18 Q. Okay.
19 And on what date did you sign the
20 document?
21 A. November 25, 2008.
22 Q. Did Ms. Gurtov review this document
23 with you?
24 A. Yes. But documents -- I mean, it's

53 (Pages 206 to 209)

S. Marshall

1
2  really just like a -- it's more like my memo
3  because it -- it doesn't -- it's not -- it's
4  not a corrective action or anything like that.
5  It's the same way the other exhibit we looked
6  at, the memo I wrote to my supervisors where I
7  said that I did it as a way to sort of know
8  that the conversation was, I guess on record,
9  for want of a better term, that that had
10 happened.
11       So this -- so "document" is almost
12 strong.  Like a corrective action document,
13 this was just a conversation that we had and
14 she wanted us to make sure we left on the same
15 page, so she had me sign it.
16   Q.   Is this documentation of a coaching
17 conversation?
18   A.   No.
19       MR. GOTTLIEB: Objection.
20   Q.   No.
21   A.   I don't believe so.  Because if
22 then -- it could have been.  Then she would
23 have just written me up.  We didn't use that
24 term or Starbucks didn't use that term.  This
25 was more of a corrective action.

S. Marshall

1
2       So this is, really, like it says, it
3  was just a recap of a conversation, knowing
4  that she just -- we had this, I signed it, so
5  now going forward she can talk to me about the
6  things that we already agreed on.  But it was
7  just a conversation.
8    Q.   Okay.
9        And do you agree with what
10 Ms. Gurtov -- excuse me.
11       Do you agree with what this record of
12 the conversation says?
13       MR. GOTTLIEB: Objection.
14   A.   I agree with -- meaning that this is
15 what we've discussed, what was on here, yes, we
16 discussed the things written here.
17   Q.   Okay.
18       And apart from the fact that you
19 discussed the things that are written here, did
20 you agree with Ms. Gurtov's assessment of you
21 with respect to these items?
22       MR. GOTTLIEB: Objection.
23   A.   Well, not everything was an
24 assessment.  This was also, again, because it
25 was a conversation and it wasn't anything more

S. Marshall

1
2  serious.  Because if it was all these things,
3  then it wouldn't just be a conversation.  This
4  was also her way of, you know, saying that
5  these are the things she wanted to happen.
6        So not everything written here was
7  these are things you're doing wrong, now make
8  them better.  Because that would be a lot and
9  that would be appropriate to be written up as a
10 store manager.  This was -- this is a
11 conversation.  And some of it was things that
12 she wanted me to change and others were sort of
13 ideas of things that I could do differently.
14   Q.   Okay.
15       Turning specifically to the paragraph
16 that starts with, "Management of shift
17 supervisor performance and cash handling.
18 Serenity will evaluate the daily records book
19 daily and have coaching conversations and
20 documentation in a timely manner."
21       Do you remember what the conversation
22 was with respect to the management of shift
23 supervisor performance and cash handling?
24   A.   We were getting -- we were having a
25 lot of shortages.  We were having -- we were

S. Marshall

1
2  coming outside of that percentage range pretty
3  often.  And by "we," I mean the entire store
4  team, people that rang on the register.  And it
5  goes back to pretty much the same thing I had
6  when I wrote my memo, just -- they, or we, we
7  weren't doing a good job of ensuring that we
8  didn't have cash over/short in the building.
9    Q.   And did you discuss why Ms. Gurtov
10 wanted to -- wanted you to evaluate the daily
11 records book on a daily basis?
12   A.   Cash over/shorts to ensure that these
13 tills were being counted back properly, to
14 ensure that people weren't doubling up on
15 registers and then we couldn't hold anyone
16 accountable; that when deposits were completed,
17 they were writing in the over/shorts.  Because
18 what was in -- that was always the discussion
19 around cash that I knew of, like it wasn't --
20 the pencil whipping of a book, it was actual
21 cash, like making sure that you made money and
22 that that money stayed in the building, in the
23 sense that people weren't coming up short $20
24 every day, $30 here, you know.
25       So, what's the point.  They're

Page 214

S. Marshall

1
2  bringing in all this money and it's walking out
3  the door because of someone who can't count on
4  a register. So that was always what -- and
5  there was conversation around cash and cash
6  management. It was cash management, actual
7  managing of money, and then showing that that
8  money didn't walk out the door.
9      So that's what our dialogue was
10 about, was about ensuring that I was holding my
11 team account able, which was my shift
12 supervisor, my SM, making sure that we could
13 speak to these cash shortages because they were
14 out of the range.
15     Q.   So in the November 2008 time frame,
16 did you discuss any other cash handling or cash
17 management issues with Ms. Gurtov apart from
18 the cash shortage issues that your store was
19 having?
20     A.   No, not that I recall just that.
21 Just...
22     Q.   And after this conversation, did you
23 evaluate the daily records book on a daily
24 basis?
25     MR. GOTTLIEB:  Objection.

Page 215

S. Marshall

1
2      A.   I improved the over/shorts in the
3  building, so I wasn't -- so I did evaluate it,
4  because our over/shorts went down and I didn't
5  have this huge number because it was a pretty
6  big number for my store, you know, having
7  shortages. We say over/shorts, but there was
8  no overages, there were shortages.
9      And so, you know, my store did lose a
10 significant amount of money because of partners
11 that could not count. So I improved that.
12     Q.   Okay.
13     And did you review the daily records
14 book on a daily basis after this conversation?
15     MR. GOTTLIEB:  Objection.
16     A.   I did.
17     Q.   Okay.
18     Ms. Marshall, did you receive any
19 corrective actions from Ms. Gurtov while she
20 was your district manager?
21     A.   I did.
22     Q.   Do you recall what those corrective
23 actions were for?
24     A.   For cleanliness.
25     MS. DIAZ:  I'd like to mark this as

Page 216

S. Marshall

1
2      Exhibit 19.
3      (Defendants' Exhibit 19, Corrective
4      Action, was marked for identification.)
5  BY MS. DIAZ:
6      Q.   Ms. Marshall, take a few moments to
7  review it and let me know when you're done.
8      A.   (Document Review.)
9      Okay.
10     Q.   Ms. Marshall, what is this document?
11     A.   This is a corrective action.
12     Q.   And is that your signature on the
13 second page of the document?
14     A.   It is.
15     Q.   And what is the date of the document?
16     A.   February 20, 2009.
17     Q.   Okay.
18     And what does this corrective action
19 concern?
20     A.   It concerns the cleanliness of my
21 store, which was 847.
22     Q.   Okay.
23     And is that the 6th and Waverly
24 store?
25     A.   It is.

Page 217

S. Marshall

1
2      Q.   And did you agree with this
3  corrective action form?
4      A.   I did not.
5      Q.   Why did you disagree with it?
6      A.   Because it was a visit that happened
7  while I wasn't there. So she, you know, she
8  did a pop-up, but I -- overall it happened, the
9  store wasn't clean when she visited, whether I
10 was there or not.
11     So I did sign it and I understood her
12 point, so I guess I did agree.
13     Q.   Did you express your disagreement
14 with the write-up to Ms. Gurtov at all?
15     A.   It wasn't -- that was a bad word to
16 use. It wasn't a disagreement. I did feel
17 like she didn't come while I was there, so we
18 did talk about that. But, you know, we made
19 these points and, you know, I freely admitted
20 that cleanliness was -- any ongoing issue I
21 had, it was kind of making sure that that was
22 something I stayed on top of.
23     So I understood. I understood it at
24 the end of the day, and that's why I signed it.
25     MS. DIAZ:  I'd like to mark this as

Page 218

```
1              S. Marshall
2     Exhibit 20.
3              (Defendants' Exhibit 20, Corrective
4     Action, was marked for identification.)
5     BY MS. DIAZ:
6        Q.   Ms. Marshall, take a few moments to
7     review the document and let me know when you're
8     done.
9        A.   (Document Review.)
10            Okay.
11       Q.   And what is this document?
12       A.   This is a corrective action for
13    cleanliness.
14       Q.   And have you seen this document
15    before?
16       A.   I believe I have.
17       Q.   Did Ms. Gurtov discuss this
18    corrective action with you?
19       A.   I don't recall.
20       Q.   Do you recognize the signature at the
21    bottom?
22       A.   As Jenn Gurtov's?
23       Q.   Yes.
24       A.   It could be.  I don't know her
25    signature well enough.
```

Page 219

```
1              S. Marshall
2        Q.   Okay.
3             Ms. Marshall, you're not sure if
4     you've seen this document before?
5        A.   Yes.  No, I'm not.
6        MR. GOTTLIEB:  Is there a question?
7     BY THE WITNESS:
8        Q.   Do you recall having a conversation
9     with Ms. Gurtov in the March 2010 time frame
10    about your cleanliness?
11       A.   No, I don't.  Not specifically around
12    then.
13            Again, cleanliness was ongoing.  That
14    was -- that was what we talked about a lot, all
15    the time.  But what's this?
16       Q.   Ms. Marshall, just to be clear, you
17    don't recall seeing this document before?
18       A.   No.
19       Q.   And you don't recall a conversation
20    regarding cleanliness around the March 2010
21    time frame?
22       A.   I do not.
23       MR. GOTTLIEB:  Objection.  That
24    wasn't her testimony.
25            Go ahead.
```

Page 220

```
1              S. Marshall
2        THE WITNESS:  So then I'll ask you to
3     repeat the question.
4        MS. DIAZ:  Can you repeat the
5     question?
6        (The Record was Read.)
7        MR. GOTTLIEB:  Objection.
8        A.   Again, I'll say that we had
9     conversations a lot.  Cleanliness was, as you
10    can see, that was the running theme in, you
11    know, my career and the thing that I knew I
12    needed -- that needed to be worked on.  And
13    that was something we always had conversations
14    about.  It's the one consistent thing that is
15    in everything, which is cleanliness.
16            So, I mean, we talked about
17    cleanliness a lot.  But this document?  No.
18       Q.   Okay.
19            And do you recall receiving a
20    corrective action in the March 2010 time frame
21    for cleanliness?
22       A.   No.
23       Q.   Okay.
24            Ms. Marshall, are you aware of
25    Starbucks's policy with respect to Family
```

Page 221

```
1              S. Marshall
2     Medical Leave Act?
3        A.   I believe I am, yes.
4        Q.   Okay.
5             And did any -- any of the partners
6     that you supervised take FMLA leave while you
7     were a store manager?
8        A.   I actually don't think so.  I think I
9     had a couple people take personal LOA.
10       Q.   Okay.
11       A.   But not under FMLA.
12       Q.   Okay.
13            What about disability leave?
14       A.   I actually don't think I have had
15    any -- it's possible I might have had someone
16    years ago, but I feel like I would have
17    remembered.
18            No, I did.  I believe I did, but
19    that's how long ago it was, that I had someone
20    that took a leave.
21       Q.   Do you recall the person's name?
22       A.   I don't.  I don't.  I think -- it
23    really just might be a personal leave of
24    absence that I managed.
25       Q.   Okay.
```

TSG Reporting 877-702-9580

Page 222

S. Marshall

1      S. Marshall
2           And do you recall at which store it
3  may have been?
4      A.   Eighth and University.
5      Q.   Okay.  Okay.
6           MS. DIAZ:  I'd like to mark this as
7  Exhibit 21.
8           (Defendants' Exhibit 21, Document,
9           Bates Nos. Star/Marshall 517, 549, 550
10          and 551, was marked for identification.)
11 BY MS. DIAZ:
12     Q.   This is Bates stamped Star -- this is
13 a portion of a document.  It's Bates stamped
14 Star/Marshall 517, 549, 550 and 551.
15          Ms. Marshall, do you recognize this
16 document?
17     A.   Because of the name on it.
18     Q.   What is --
19     A.   So Starbucks's Partner Guide, so it
20 means it's part of that.
21     Q.   Ms. Marshall, on page 549 on the
22 bottom right-hand side, there's a section on
23 Family Medical Leave that extends to the next
24 page.  If you look at page 550 on the left-hand
25 side, there's a section called "Requesting

Page 223

1      S. Marshall
2  Family Medical Leave."
3           It says, "To apply for Family Medical
4  Leave, a partner must contact the Starbucks
5  Benefit Center, Leave Administration," and it
6  provides a phone number.
7           Were you aware that that's how you
8  initiated a request for Family Medical Leave?
9      A.   Yes.  If that is the number that
10 corresponds to the number in the front of the
11 daily records book, because that's where all
12 the phone numbers were listed.  So I believe
13 Starbucks, again, that's the number that's
14 listed in the front of the book.
15     Q.   And what's your understanding of
16 Starbucks's policy in terms of requesting an
17 FMLA leave, what did a partner have to do to
18 apply for it?
19     A.   That they needed to contact the
20 benefits people and that they needed to contact
21 the supervisor.
22     Q.   Ms. Marshall, did you take FMLA leave
23 while you were at Starbucks?
24     A.   I did.
25     Q.   How many times?

Page 224

1      S. Marshall
2      A.   Once.
3      Q.   Okay.
4           And when did you request FMLA leave?
5      A.   I'm sorry.  I took it twice.
6      Q.   Okay.
7           When was the first time you took FMLA
8  leave?
9      A.   As an assistant store manager.
10     Q.   Okay.
11          And what was that time frame?
12     A.   Oh, man -- it was either '03 or '04.
13     Q.   Okay.
14          And who was your store manager at the
15 time?
16     A.   Her name was Aveol Joseph (phonetic).
17     Q.   Okay.
18          And who was your district manager at
19 the time?
20     A.   I don't remember.  I think -- it
21 escapes me.  I forget his name.
22     Q.   And how long were you on leave?
23     A.   Two weeks.
24     Q.   Okay.
25          And were your store manager -- was

Page 225

1      S. Marshall
2  your store manager involved in approving your
3  FMLA leave?
4           MR. GOTTLIEB:  Objection.
5           If you know.
6      A.   No, she wasn't.
7      Q.   Okay.
8           And was your district manager
9  involved in approving your FMLA leave?
10          MR. GOTTLIEB:  Objection.
11     A.   What I recall is that there -- I
12 mean, it was a medical -- I had, you know, foot
13 surgery.  So it really -- what I recall is it
14 wasn't about it being approved, because at the
15 end of the day I was having surgery, so to deny
16 it, I couldn't have worked.  It was more -- he
17 was looped in to what was happening and that I
18 would be taking a leave.  That I remember.
19     Q.   Okay.
20          Did you advise your store manager of
21 the dates that you would be out?
22     A.   I did.
23     Q.   Okay.
24          And did you discuss coverage issues
25 with your store manager for the time that you

CRITICAL: Page 58 of 222

Page 226

```
 1              S. Marshall
 2  were going to be on FMLA leave?
 3      A.   No, I did not.
 4      Q.   Okay.
 5           Did you discuss coverage issues with
 6  your district manager at the time?
 7      A.   No.
 8      Q.   Okay.
 9           Ms. Marshall, when was the second
10  time that you took FMLA leave?
11      A.   It was, I believe January 2nd or 3rd
12  of this year.
13      Q.   Okay.
14           MS. DIAZ:  I'd like to mark this as
15      Exhibit 22.
16           (Defendants' Exhibit 22, Letter
17      from Starbucks Benefits Center Leave
18      Administration dated January 3, 2011, was
19      marked for identification.)
20  BY MS. DIAZ:
21      Q.   Take a moment to review the document
22  and let me know when you're done.
23      A.   (Document Review.)
24      Okay.
25      Q.   Ms. Marshall, are you familiar with
```

Page 227

```
 1              S. Marshall
 2  this document?
 3      A.   Yes.
 4      Q.   What is it?
 5      A.   It looks like, if I recall, this is
 6  the cover page that I received with these
 7  things inside of it.
 8           Yes.  The following closing
 9  information.  So this is the cover page.
10      Q.   Okay.
11           And it's Bates stamped SM 130 and
12  it's a letter from the Starbucks Benefits
13  Center Leave Administration dated January 3,
14  2011.
15           Ms. Marshall, is January 3, 2011
16  around the time that you requested FMLA leave
17  from Starbucks?
18      A.   Yes, I believe that was the date.
19      Q.   Okay.
20           And why did you request FMLA leave?
21      A.   Why?
22      Q.   Uh-huh.
23      A.   Because I was no longer able to work
24  and I had a surgery scheduled.
25      Q.   Okay.
```

Page 228

```
 1              S. Marshall
 2           Why were you no longer able to work?
 3      A.   Because of the symptoms around my
 4  fibroids.  I was exhausted, lethargic, I was --
 5  "exhausted" is not even the word.
 6           Then I also because of the fibroids,
 7  they cause me to have my period extremely heavy
 8  to the point of where I was extremely anemic.
 9  My blood count was very, very low.  I -- I was
10  just -- I just had a lot of different symptoms
11  because of what was wrong with me.  Those are
12  just some that I remember right now.
13      Q.   Okay.
14           Do you recall any other symptoms?
15      A.   Not at this moment.
16      Q.   Ms. Marshall, when did you discover
17  that you would definitively need surgery for
18  the fibroids?
19      A.   December 30 -- I believe it was
20  December 30 of 2010.
21      Q.   And what did you do after you
22  discovered that you would need surgery at
23  Starbucks -- excuse me.  What did you do at
24  Starbucks after discovering that you would
25  definitively need surgery?
```

Page 229

```
 1              S. Marshall
 2           MR. GOTTLIEB:  Objection.
 3      A.   Well, that was the 30th.  So, I mean,
 4  the next day was New Year's Eve and we had New
 5  Year's Day, so pretty much two holidays.
 6           Upon returning that Monday, I
 7  immediately called Starbucks Benefits and I
 8  called the DM and let them know that I was
 9  going to be out and, yes, actually hung out,
10  even though I was approved from my doctor to go
11  on leave immediately, I delayed it for two days
12  so that I didn't leave the store just in a bad
13  place.  I made sure I did two schedules.  I
14  made that I contacted other store managers to
15  ensure that there was someone watching my
16  building.  So, you know, I delayed it two days,
17  so I just didn't walk out.
18      Q.   Ms. Marshall, you said that you
19  called the Starbucks hotline on Monday?
20      A.   Yes.  I'm pretty sure that that was
21  Monday.
22      Q.   Okay.
23           Ms. Marshall, you said that you
24  called your DM also?
25      A.   The DM.  He was -- gosh, I can't
```

58 (Pages 226 to 229)

Page 230

S. Marshall

1    S. Marshall
2    remember his name.  He was -- he was overseeing
3    the district.
4        Q.   Okay.
5            Why was another person overseeing the
6    district?
7        A.   Jenn had taken a few days off.
8        Q.   Okay.
9            And what did you tell the other DM
10   when you called him?
11       A.   I said that basically, unfortunately,
12   I just found out on the 30th that I was going
13   to be scheduled for surgery, everything I just
14   told you.  And that I had already called the
15   benefits hotline, and that I was going to stay
16   for the next day or two.  I was going to get
17   schedules done, I was going to leave the store
18   in a good place, but that I was going to be out
19   for surgery.
20       Q.   And what was his response?
21       A.   His response, he was concerned about
22   my health.  He was concerned about my
23   well-being.  And then, secondly, he just wanted
24   to make sure that everything was okay and who
25   would be the contact person.

Page 231

1    S. Marshall
2        Q.   Did you determine who would be in
3    charge of your store while you were gone?
4        A.   I did.
5        Q.   And who was that person?
6        A.   Christopher Martinez.
7        Q.   And how did you determine that Chris
8    would be in charge of your store?
9        A.   I determined it how?  Because we had
10   a close peer relationship and I trusted his
11   judgment to ensure that the store would operate
12   during my absence the same way it would if I
13   was there.
14       Q.   And going back to the conversation
15   with the district manager, did you discuss the
16   length of time that you thought you would be
17   out?
18       A.   I believe I told him it could be
19   anywhere from 8 to 12 weeks.
20       Q.   Okay.
21           And did you discuss Jenn Gurtov with
22   that district manager during that conversation?
23           MR. GOTTLIEB:  Objection.
24       A.   Yes.
25       Q.   What did you say?

Page 232

1    S. Marshall
2        A.   I said, you know, Jenn is away, but I
3    wanted to reach out to you first.  You're
4    watching the store, but I'm going to reach out
5    to Jenn even though she's not, you know, she's
6    not available technically but she's still my
7    DM.  So I'm just letting you know I'll reach
8    out to her, too.  That was the extent of it.
9        Q.   Okay.
10           And do you recall anything else from
11   that conversation with the stand-in DM?
12       A.   Nothing that I recall.
13       Q.   Okay.
14           And did you reach out to Jenn Gurtov
15   to tell her about your leave?
16       A.   I did.
17       Q.   On what day?
18       A.   I don't remember.  I believe it
19   was -- it was either that Monday or Tuesday.
20       Q.   Okay.
21           Did you e-mail her, did you call her?
22       A.   I texted her.  I texted her.
23       Q.   Okay.  Okay.
24           And what did you say in your text
25   message?

Page 233

1    S. Marshall
2        A.   As I recall, it was along the lines
3    of, hey, look, that surgery is actually
4    happening sooner so I, you know, I'm taking a
5    leave.  I know you're on vacation, you're off.
6    Give me a call whenever you can.
7        Q.   Okay.
8            And did she respond to your text?
9        A.   She -- yes, she called me.
10       Q.   Okay.
11           And when did she call you?
12       A.   I want to say it was later that
13   evening.
14       Q.   And what -- what did she say?
15       A.   She said -- I think she was just
16   flown in.  I know it was along the lines of,
17   hey, I'm just getting back in town, I got your
18   text, we'll talk.  That was sort of the extent
19   of it.
20       Q.   Is that all that she said?
21       A.   That's all I recall her saying, yes.
22       Q.   Did you say anything else to her?
23       A.   Beyond anything I said.  No, just --
24   it wasn't a long conversation.  It was really
25   her letting me know I'm getting back in town

S. Marshall

1
2  and letting me know she would call me so I
3  could talk soon.
4      Q.   Okay.
5          Did she say anything about your leave
6  during that phone call?
7      A.   No.
8      Q.   Did she ask you how long you would be
9  out?
10     A.   During that phone call?  No.
11     Q.   Okay.
12         Did she ask you about coverage issues
13 during that phone call?
14     A.   During that phone call, I don't
15 believe, no.
16     Q.   No?
17         Did she ask you how you were feeling?
18     A.   No.
19     Q.   No?  Okay.
20         Other than what we've discussed, do
21 you recall anything else about that
22 conversation?
23     A.   Not that I recall right now, no.
24     Q.   And what was the last -- what was
25 your last day of work before going out on

S. Marshall

1
2  leave?
3      A.   I'm sure it was that Tuesday, which
4  is either the 3rd -- I believe that that's the
5  3rd.  I know that I called on a Monday, and I
6  worked that Monday and I worked that Tuesday, I
7  believe.  And that Wednesday, it was the start
8  of my leave.
9          MS. DIAZ:  I'd like to mark this as
10 Exhibit 23.
11         (Defendants' Exhibit 23, Document,
12     Bates No. SM 163 to SM 164, was marked
13     for identification.)
14 BY MS. DIAZ:
15     Q.   This document is Bates stamped SM163
16 to SM164.
17         Do you recognize this document?
18     A.   I believe this is part of the
19 benefits package you receive in the mail.
20     Q.   Okay.
21         Is it -- what's the date of the
22 document?
23     A.   January 24, 2011.
24     Q.   Okay.
25         And it's from the Starbucks Benefits

S. Marshall

1
2  Center Leave administration; is that correct?
3      A.   Yes.
4      Q.   And, Ms. Marshall, the letter, the
5  first paragraph of the letter says, "Your
6  request for continuous Family Medical Leave has
7  been approved."
8          Skipping forward to the next
9  paragraph, it says that, "Our records indicate
10 that you will be on leave, leave begin date is
11 January 10, 2011."
12         Do you know why that date differs
13 from the first date that you were out of work?
14     A.   No.
15         Isn't there a counting period?  I'm
16 not sure.  I don't know.
17     Q.   Okay.
18         Ms. Marshall, when you went out on
19 leave starting the Wednesday after you found
20 out that you definitely would need surgery,
21 were you in pain?
22         MR. GOTTLIEB:  Objection.
23     A.   When -- was I in pain?  Like
24 continuous, chronic?  No.  I was exhausted,
25 though, yes.  So I literally slept 12 hours a

S. Marshall

1
2  day from the time I left until the time I had
3  surgery.
4      Q.   Okay.
5          And did you commence any treatment
6  starting on January 5th?
7      A.   No.  Because the doctor and I decided
8  that I would come in for surgery a day early to
9  have blood transfusion, because my anemia was
10 so bad that he couldn't operate on me with my
11 blood count that low.
12         So the decision was that I would come
13 in a day early to have blood transfusion.  That
14 was not necessarily the course of treatment,
15 but that was what was decided because of my
16 condition.
17     Q.   Okay.
18         Did the doctor recommend that you go
19 out on leave as soon as possible after he
20 informed you about needing surgery?
21     A.   Yes, he did.
22         MS. DIAZ:  I'd like to mark this as
23 Exhibit 24.
24         (Defendants' Exhibit 24, Document,
25     was marked for identification.)

1          S. Marshall
2  BY MS. DIAZ:
3     Q.   Take a few moments to review the
4  document.
5     A.   (Document Review.)
6          Okay.
7     Q.   Ms. Marshall, do you recognize this
8  document?
9     A.   Yes.
10     Q.   And is that your signature on the
11  second page?
12     A.   It is.
13     Q.   Okay.
14          And what's the date of the -- of your
15  signature?
16     A.   January 14th.
17     Q.   Okay.
18          Ms. Marshall on the first page, Bates
19  numbered 66, there's a section under "Duration
20  of Leave" in which you -- I should back up.
21          Is this your handwriting on the first
22  page?
23     A.   It is.
24     Q.   Under "Continuous Leave," it says
25  "Leave Start Date, January 5, 2011"?

1          S. Marshall
2     A.   It does.
3     Q.   Is that the date that you started
4  leave?
5     A.   I believe it is, yes.
6     Q.   Thank you.
7          Ms. Marshall, do you recall whether
8  any information was missing from your FMLA
9  request or application?
10     A.   Any information?  I don't -- I don't
11  understand.  What information?  Like maybe I
12  need to see --
13     Q.   Sure.
14          Was any information missing from your
15  application for family and medical leave?
16          MR. GOTTLIEB:  Objection.  It's the
17  question you just asked that she didn't
18  understand.
19     A.   Missing information would have
20  resulted in a denial, so I'm guessing the
21  answer has to be no.
22     Q.   Okay.
23          MS. DIAZ:  I'd like --
24          MR. GOTTLIEB:  Don't guess.
25          MS. DIAZ:  I'd like to mark this as

1          S. Marshall
2  Exhibit 25.
3          (Defendants' Exhibit 25, Incomplete
4  Family Medical Leave application,
5  additional information notice, was marked
6  for identification.)
7  BY MS. DIAZ:
8     Q.   Ms. Marshall, do you know what this
9  document is?
10     A.   Yes.
11     Q.   What is it?
12     A.   Incomplete Family Medical Leave
13  application, additional information notice.
14     Q.   And what's the date of the document?
15     A.   January 18th.
16     Q.   And what information was missing from
17  your application?
18     A.   A completed Certification of
19  Healthcare Provider form.
20     Q.   Okay.
21          Do you recall receiving this
22  document?
23     A.   I do.
24          MS. DIAZ:  I'd like to mark this as
25  Exhibit 26.

1          S. Marshall
2          (Defendants' Exhibit 26, Document,
3  Bates Nos. Star/Marshall 60 and 62, was
4  marked for identification.)
5  BY MS. DIAZ:
6     Q.   This is Bates stamped Star/Marshall
7  60 and 62.
8     A.   (Document Review.)
9     Q.   Are you done reviewing the document?
10  I'm sorry?
11     A.   Oh, yes.
12     Q.   Ms. Marshall, do you recognize this
13  document?
14     A.   I do.
15     Q.   What is it?
16     A.   Certification of Healthcare Provider
17  form.
18     Q.   And is your handwriting somewhere --
19  is your handwriting on this document?
20     A.   Yes, it is.
21     Q.   Where on this document is your
22  handwriting located?
23     A.   My name, I.D. number, and I believe
24  that's the start date.
25     Q.   The start date of your health

Page 242

1                    S. Marshall
2    condition?
3        A.   Yes.
4        Q.   And here you indicate that the start
5    date is January 10, 2011.
6             Do you know why you wrote down
7    January 10, 2011 as opposed to January 5, 2011?
8        A.   Yes.  I believe it was because I -- I
9    wanted to pay myself in vacation days.  Or I
10   can't pay myself, but I asked that the manager
11   overseeing the store use vacation days to pay
12   for the beginning.  Because there's like a
13   waiting time when you go into FMLA, and I
14   didn't want to be without pay.  So once you
15   count the waiting period, that is where we come
16   to 10.  I believe that's why I did it.
17       Q.   Okay.
18            Ms. Marshall, did you have a vacation
19   planned at the beginning of January?
20       A.   No, I did not.
21            MS. DIAZ:  Actually, I'd like to mark
22   one more exhibit as Exhibit 27.
23            (Defendants' Exhibit 27, Attending
24   Physician's Statement, was marked for
25   identification.)

Page 243

1                    S. Marshall
2            (Document Review.)
3        A.   Okay.
4        Q.   Ms. Marshall, do you recognize this
5    document?
6        A.   I do.
7        Q.   What is it?
8        A.   The Attending Physician's Statement.
9        Q.   And is that your handwriting at the
10   top under "Patient's Name" and what's a
11   redacted Social Security number?
12       A.   It is.
13       Q.   Okay.
14            And is that the signature of your
15   doctor at the bottom?
16       A.   I hope so.  I gave it to him to fill
17   out.
18       Q.   Okay.
19            Ms. Marshall, this document towards
20   the middle says that the date the symptoms
21   first appeared is December 30th of 2010.
22            Is that the date that you were
23   informed that you would need surgery?
24       A.   It is.
25       Q.   Okay.

Page 244

1                    S. Marshall
2            And it indicates that your surgery
3    was expected to be performed on January 26,
4    2011.
5            Was that the date of your surgery?
6        A.   Yes.
7        Q.   And the document indicates that the
8    date you were first unable to work is
9    January 10, 2011; is that accurate?
10       A.   No.  It was the 3rd.  But, again, I
11   believe that I put the 10th because I wanted to
12   use vacation time.  And, obviously, you can't
13   pay yourself twice.  I can't get paid a
14   vacation and say that, you know, I was on a
15   leave.  And you have to have a waiting period,
16   so that's got to be why I put the 10th.
17       Q.   Okay.
18            That is your handwriting, January 10,
19   2011?
20       A.   It is.
21       Q.   Okay.
22            And, Ms. Marshall, you indicated that
23   you did not have a vacation planned in the
24   beginning of January?
25       A.   I did not.

Page 245

1                    S. Marshall
2            MS. DIAZ:  I'd like to mark this as
3    Exhibit 28.
4            (Defendants' Exhibit 28, Vacation
5    Request, was marked for identification.)
6    BY MS. DIAZ:
7        Q.   Ms. Marshall, do you recognize this
8    document?
9        A.   I do.
10       Q.   What is it?
11       A.   It's vacation request.
12       Q.   Okay.
13            And is it a vacation request from you
14   to Jenn Gurtov?
15       A.   It is.
16       Q.   And the date is October 15, 2010; is
17   that correct?
18       A.   Yes.
19       Q.   Okay.
20            And in this e-mail you requested
21   vacation from January 3 to January 10 of 2011;
22   is that correct?
23       A.   That is.  Jenn required us to give
24   her all of her vacation requests at once.  So I
25   just literally picked days, a week within each

62 (Pages 242 to 245)

Page 246

S. Marshall

1  quarter.
2      Q.   Okay.
3          So you -- were you planning to take
4  vacation during that time period?
5      A.   If I wouldn't have had to go to this
6  surgery, I probably would have stuck to the
7  vacation, yes.
8      Q.   Did you make any plans to go
9  anywhere --
10     A.   No.
11     Q.   -- during that time period?
12     A.   Not a place.
13         MR. GOTTLIEB:  Just wait for her to
14     finish the question.
15         THE WITNESS:  I'm so sorry.
16         MR. GOTTLIEB:  That's okay.
17     A.   No, I didn't.
18     Q.   Okay.
19         Did -- what did you do between
20  January 3rd and January 10th at the start of
21  your leave?
22         MR. GOTTLIEB:  Objection.
23     A.   I slept a lot.  I watched every
24  season of Grey's Anatomy.  I went to

Page 247

S. Marshall

1  Dr. Schacter's office, because that was the
2  reason I got the incomplete file, because there
3  was a problem, his secretary saying she faxed
4  it and them saying they did not receive it.  So
5  I went there like twice.  But I really just
6  relaxed.
7      Q.   Ms. Marshall, before the medical
8  leave that you took in January 2011, and apart
9  from the medical leave or FMLA leave that you
10  took in 2003 and 2004, did you ever take any
11  other type of leave while you were at
12  Starbucks?
13         MR. GOTTLIEB:  Objection.
14     A.   I took a personal LOA.
15     Q.   Okay.
16         And when was that?
17     A.   I was store manager at 6th and
18  Waverly.  Was that in -- I believe it was '09.
19     Q.   Okay.
20         Why did you take a personal leave?
21     A.   Because I had -- my younger sister
22  had some -- is diagnosed with some mental
23  disabilities and disorders.  And I took the
24  leave because she was being released from a

Page 248

S. Marshall

1  residential facility and just kind of trying
2  to -- thinking of taking custody of her and all
3  that was going on in my personal life around
4  that, around my sister and her conditions.
5      Q.   Okay.
6          And how long was your leave?
7      A.   30 days.
8      Q.   Okay.
9          And who -- what did you do to
10  initiate the leave?
11     A.   I told Jenn basically everything I
12  just told you, that I felt like I needed a
13  personal leave and that these are the reasons.
14     Q.   Okay.
15         And what was Jenn's response?
16     A.   She had me fill out the paperwork and
17  I sent it to HR.  And then I took myself off
18  the schedule.
19     Q.   Did Ms. Gurtov have to approve your
20  leave?
21         MR. GOTTLIEB:  Objection.
22     A.   I don't know if she had to approve a
23  personal leave.
24     Q.   Okay.

Page 249

S. Marshall

1          Did you discuss coverage issues
2  before you went on your personal leave?
3      A.   Yes.
4      Q.   Okay.
5          Do you remember what you discussed?
6      A.   Yes.  We discussed who would -- who
7  would oversee my store.
8      Q.   Okay.
9          And did Ms. Gurtov ask you how long
10  you would be out?
11     A.   Well, it was a 30-day -- personal
12  leave is 30 days, so...
13     Q.   Okay.
14         MS. DIAZ:  I'd like to mark this as
15     Exhibit 29.
16         (Defendants' Exhibit 29, Personal
17     Leave of Absence Request Form, was marked
18     for identification.)
19  BY MS. DIAZ:
20     Q.   Ms. Marshall, do you recognize this
21  document?
22     A.   I do.
23     Q.   What is it?
24     A.   Starbucks's personal leave of absence

Page 250

S. Marshall

1   S. Marshall
2   request form.
3       Q.   Okay.
4           And is this your signature towards
5   the bottom?
6       A.   It is.
7       Q.   And under "Requested Leave Dates," is
8   that your handwriting?
9       A.   It is.
10      Q.   To your recollection, are those the
11  dates of your personal leave?
12      A.   To my recollection, I believe it is.
13      Q.   Okay.
14          And, Ms. Marshall, at -- do you
15  recognize Jenn Gurtov's and Nancy Murgalo's
16  signatures on this form?
17      A.   It appears to be theirs, yes.
18      Q.   Okay.
19          And underneath their signatures it
20  says, "Final approval for personal leave of
21  absence is made by the Starbucks Benefits
22  Center Leave Administration following the
23  guidelines outlined in the Starbucks's personal
24  leave of absence guidelines."
25          Was it your understanding that Jenn

Page 251

S. Marshall

1   S. Marshall
2   Gurtov and Nancy Murgalo had to sign off on
3   your personal leave before it was approved by
4   the Starbucks Benefits Center?
5       A.   Seeing this now, yes.  I -- I'm
6   sorry.  Yes.
7       Q.   Ms. Marshall, after the 30 days, did
8   you return to your position as a store manager
9   at the 6th and Waverly store?
10      A.   I did.
11      Q.   Okay.
12          And were -- did you have any issues
13  reintegrating into the store?
14          MR. GOTTLIEB:  Objection.
15      A.   None that I recall.
16          MS. DIAZ:  Can we take a five-minute
17  break?
18          MR. GOTTLIEB:  Sure.
19          THE VIDEOGRAPHER:  The time is
20  4:23 p.m.  We're going off the record.
21          (Recess taken from 4:23 p.m. to 4:38
22  p.m.)
23          THE VIDEOGRAPHER:  The time is
24  4:38 p.m.  We're back on the record.  Video
25  No. 5.

Page 252

S. Marshall

1   S. Marshall
2   BY MS. DIAZ:
3       Q.   Ms. Marshall, you testified that you
4   sent a text message to Ms. Gurtov before you
5   went on leave on January 5, 2011?
6       A.   Yes.
7       Q.   Do you have a record of that text
8   message?
9       A.   No, I don't.
10      Q.   Why don't you have a record of that
11  text message?
12      A.   I believe because I got a new phone.
13  I had a BlackBerry and I have something
14  different now.  So I switched phones.
15      Q.   When did you get your new telephone?
16      A.   I don't remember.
17      Q.   Okay.
18          What did you do with your old
19  BlackBerry?
20      A.   I think -- I believe I gave it to
21  Sprint for a credit.
22      Q.   Okay.
23          And, Ms. Marshall, you testified that
24  during Jenn's follow-up phone call after your
25  text message, she indicated that she would

Page 253

S. Marshall

1   S. Marshall
2   follow up with you or that you would talk
3   later.
4           Did she ever call you for a
5   follow-up?
6       A.   No.
7       Q.   Okay.
8           And, Ms. Marshall, before you were
9   informed on December 30, 2011 that you would --
10  excuse me -- 2010, that you would need surgery,
11  when did you commence having symptoms related
12  to your condition?
13      A.   "Commence" against begin; right?
14      Q.   Uh-huh.
15      A.   So now say it again, because I got
16  caught on that word.
17      Q.   Okay.
18          When did you -- when did you start
19  having symptoms relating to your condition?
20      A.   My symptoms were chronic.  And
21  looking back, they were present for years and I
22  just had no explanation for them.
23      Q.   Okay.
24          And what -- what were the chronic
25  symptoms?

64 (Pages 250 to 253)

Page 254

S. Marshall

1
2    A.   Extreme exhaustion, exhaustion,
3 painful and heavy periods, severe anemia that
4 led me to have -- either pico or pica, I can
5 never remember how to pronounce it.
6    Q.   To what?
7    A.   It led me to have p-i-c-a, an extreme
8 desire to eat ice, which sounds pretty silly,
9 but I actually chipped teeth doing it; but that
10 was a result of my anemia.
11        Just lethargic.  I could sleep for --
12 no matter how much sleep I got, it just didn't
13 feel like enough.  The only thing I did was
14 work and sleep.  I did nothing else.  And I
15 thought that that was just -- I thought that
16 was normal.  I had a job and so, you know, I'm
17 tired.
18    Q.   Okay.
19        And do you know when these symptoms
20 began?
21    A.   I was diagnosed with anemia, I
22 believe when I was 13.  So I was 30.  So we
23 could say most of my life these symptoms have
24 been present in a chronic way.
25    Q.   Okay.

Page 255

S. Marshall

1
2        And did they become more persistent
3 at any point in time?
4    A.   Yes.  Just over time they just became
5 more and more chronic as my fibroids grew
6 largely.
7    Q.   Was there -- did there come a point
8 in time when your symptoms intensified?
9        MR. GOTTLIEB:  Objection.
10    A.   All they did was intensify.  Like
11 again, it was just -- I lived with it and it
12 was present.  So when something's that chronic.
13 You know, it's now not having them that I
14 realize how chronic they were and how, as I got
15 order and the fibroids grew, and all they did
16 was sap my energy and blood flow and make me
17 more and more anemic, that I was severely
18 anemic and severely exhausted my entire life,
19 for most of my life.
20    Q.   Okay.
21        Before December 30th of 2010, did
22 your symptoms affect your ability to work?
23    A.   Yes.
24    Q.   When did they start effecting your
25 ability to work?

Page 256

S. Marshall

1
2    A.   When?  So, again, because they were
3 chronic, I think they were always present there
4 and they always affected my ability.  But I
5 didn't have a name for it and I didn't have- I
6 didn't know that that's what caused me to feel
7 the way I did.  So that was just always
8 something that was part of who I was and what I
9 believed everyone went through.
10    Q.   Did you have to take days off as a
11 result of your symptoms?
12    A.   No, I didn't.
13    Q.   Okay.
14        So the first time that you had to
15 take days off because of your symptoms was in
16 early January of 2011?
17        MR. GOTTLIEB:  Objection.
18    A.   Well, again, because it was chronic
19 and I was always exhauster and I didn't have a
20 name for it, I thought that that was just part
21 of being an adult and having a job, that you
22 were tired.  So I wouldn't take a day off for
23 being tired.  That was just -- I'm just tired
24 like the rest of the world.
25        It wasn't until, you know, I was

Page 257

S. Marshall

1
2 diagnosed and understood that this was a
3 serious condition and problem that I had, that
4 I realized that I was doing myself an
5 injustice.  And the doctor agreed, that me
6 continuing to work wasn't a smart course of
7 action.
8    Q.   And when were you diagnosed with a
9 condition?
10    A.   This was in approximately July or
11 August of 2010.
12    Q.   And you continued to work after you
13 were diagnosed with the condition?
14    A.   I did.
15    Q.   What did you do to treat the
16 condition?
17    A.   Well, it was -- I went to the
18 emergency room because I believed that I had
19 TB, which I had which I was younger.  And so
20 for them to be very clear, they gave me -- a
21 CAT scan, the MRI, the one where they send the
22 dye through you.  They gave me that.  And he
23 told me afterwards you know you don't have --
24 the technician said you know you don't have TB,
25 you're fine, but did you know you had fibroids.

65 (Pages 254 to 257)

Page 258

S. Marshall

1    And so that was the first I had ever heard of
2    it.
3        Q.   Okay.
4            And this was in the July to August
5    time frame?
6        A.   I believe in those time frames.  Yes,
7    I believe that that's when I first went to the
8    emergency room.  It may have been earlier than
9    that.  I just...
10       Q.   And did you do any --
11       A.   I'm bad with dates.  So I'm going to
12   say it was early to mid 2010 and leave it at
13   that.
14       Q.   And after you found out that you had
15   fibroids, did you do anything to treat them?
16       A.   No, because, I mean, they're tumors,
17   so there is really nothing.  At that point I
18   started to look on the Internet and try to
19   understand, you know, what it is.  That's where
20   everyone goes first; right?  And try to
21   understand what that even meant and, you know,
22   what that looks like and how it affected me.
23           So because that was the first time I
24   ever heard of it, I started to try to have an

Page 259

S. Marshall

1    understanding of what it meant.
2        Q.   And did you take any medication after
3    your diagnosis?
4            MR. GOTTLIEB:  Objection.
5    BY THE WITNESS:
6        Q.   Did you take any medication for the
7    fibroids after your --
8        A.   No.  They're tumors, so, no, I didn't
9    take any medication.
10       Q.   Ms. Marshall, apart from being tired
11   and extremely exhausted, did your condition
12   affect you in any other way?
13           MR. GOTTLIEB:  Objection.
14           Other than what she's already
15   testified to?
16       A.   I also talked about my periods and
17   what those were like and how -- and how painful
18   and heavy they were, which I just attributed to
19   being a woman.  And that's all I can think of
20   for now.
21       Q.   Okay.
22           And did your symptoms affect you at
23   work, apart from being tired, being exhausted
24   or having to deal with heavy periods?

Page 260

S. Marshall

1            MR. GOTTLIEB:  Objection.
2        A.   Well, that -- so you're asking if
3    there were more symptoms, again, or are you --
4        Q.   Did it affect your ability to do your
5    job?
6        A.   What I've told you already?
7        Q.   Uh-huh.
8        A.   I believe I worked through everything
9    because I thought it was just part of, you
10   know, being an adult.  And I gave all of my
11   energy to Starbucks, 100 percent of it.  And I
12   think that, you know, my personal life
13   definitely suffered because I gave every ounce
14   of energy I had in me to being a partner at
15   Starbucks.
16       Q.   At some point did it affect your
17   ability to do your job at Starbucks?
18           MR. GOTTLIEB:  Objection.  She
19   already testified that it affected her
20   ability.
21           Are you asking other than what's she
22   already testified to, Estela?
23           MS. DIAZ:  At some point did the
24   condition affect her ability to do her job

Page 261

S. Marshall

1    at Starbucks.
2            MR. GOTTLIEB:  Other than what she's
3    already testified to?
4        A.   I guess in addition to that -- I
5    think that that's enough.  Being extremely
6    tired to the point of where just working an
7    eight-hour day is enough to make me sleep for
8    12 hours.  You know, there's nothing else I can
9    recall besides that.
10       Q.   And was your condition visible to
11   others?
12           MR. GOTTLIEB:  Objection.
13       A.   No.
14       Q.   Did you ever tell anyone at Starbucks
15   about your condition?
16           MR. GOTTLIEB:  Objection.  Other than
17   what she already testified to?
18       A.   I did.
19       Q.   Who did you tell?
20       A.   I told several other store managers
21   about it.  Zakia Slade, Christopher Martinez.
22   I told my shift supervisors, Niorka Juana
23   (phonetic), Giselle Mitchell.  And I also told
24   Jenn Gurtov.

Page 262

S. Marshall

1
2    Q.   Okay.
3         Other than Zakia, Christopher
4    Martinez, Niorka, Giselle and Jenn Gurtov, did
5    you tell any others at Starbucks about your
6    condition?
7    A.   Not that I recall at this moment.
8    Q.   Okay.
9         And when did you tell them about your
10   condition?
11        MR. GOTTLIEB:  Objection.
12        Do you want to go one at a time
13   through each person or are you asking
14   collectively?
15   BY THE WITNESS:
16   Q.   Let's start with Zakia.
17   A.   Pretty much right after the
18   diagnosis.
19   Q.   And when you say "right after the
20   diagnosis," is that mid to -- excuse me --
21   early to mid-2010?
22   A.   Yes.
23   Q.   And what about Chris Martinez, when
24   did you tell him about your condition?
25   A.   The same.  Pretty much right after

Page 263

S. Marshall

1
2    the diagnosis.
3    Q.   And what about Niorka Balfueno
4    (phonetic)?  When did you tell her about your
5    condition?
6    A.   The same.  Pretty much right after
7    the diagnosis.
8    Q.   And what about Giselle Mitchell, when
9    did you tell her about your condition?
10   A.   Pretty much right after the
11   diagnosis.
12   Q.   And when did you tell Jenn Gurtov
13   about your condition?
14   A.   She was a bit later.  So not right
15   after.  Again, several weeks after,
16   approximately.
17   Q.   Do you recall the time frame?
18        MR. GOTTLIEB:  Objection.
19   A.   You mean like within the year or
20   within like a morning or --
21   Q.   Do you recall the season?
22        MR. GOTTLIEB:  Objection.
23   A.   No, I don't.
24        MR. GOTTLIEB:  I'd like to take a
25   break.

Page 264

S. Marshall

1
2        THE VIDEOGRAPHER:  The time is
3    4:51 p.m. and we are going off the record.
4        (Recess taken from 4:51 p.m. to 5:00
5    p.m.)
6        THE VIDEOGRAPHER:  The time is
7    5:00 p.m.  We're back on the record.
8    BY MS. DIAZ:
9    Q.   Ms. Marshall, before the break we
10   were discussing who at Starbucks you told about
11   your medical condition.
12        With respect to Jenn Gurtov, you
13   testified that you don't remember the season
14   during which you told her about your medical
15   condition; is that correct?
16        MR. GOTTLIEB:  Objection.
17   A.   Is that correct that I remember or is
18   that --
19   Q.   You don't remember?
20   A.   Oh.  You want a season?
21   Q.   Do you remember the month?  The more
22   specific, the better.
23   A.   We can say -- I told her after.  So
24   it would have to have been in mid-November.
25   Q.   Okay.

Page 265

S. Marshall

1
2        Ms. Marshall, before the break you
3    said that you told Ms. Gurtov about your
4    condition a few weeks after you told the
5    others.
6        MR. GOTTLIEB:  Objection.
7    BY MS. DIAZ:
8    Q.   Is that correct?
9        MR. GOTTLIEB:  Objection.  The
10   transcript speaks for itself.  If you want
11   to read the transcript back, we could do
12   that.  But she doesn't have to testify
13   about how she testified.
14        So you can ask her a different
15   question.
16   BY MS. DIAZ:
17   Q.   Ms. Marshall, when did you tell Zakia
18   Slade about your medical condition?
19   A.   A few weeks after that appointment
20   where I learned I had fibroids.
21   Q.   And when was that appointment where
22   you learned you had fibroids?
23   A.   That was in, like I said, in July or
24   August.  And I believe it was August.

Page 266

S. Marshall
1
2     Q.   Okay.
3          And you told Zakia Slade about your
4  condition a few weeks after August?
5     A.   Yes.
6     Q.   And you told Chris Martinez about
7  your condition a few weeks after August of
8  2010?
9     A.   Approximately.  Yes.
10     Q.   And you told Niorka Balfueno about
11  your condition a few weeks after August of
12  2010?
13     A.   Correct.
14     Q.   And you told Giselle Mitchell about
15  your condition a few weeks after August 2010?
16     A.   Correct.
17     Q.   And when did you tell Jenn Gurtov
18  about your condition?
19          MR. GOTTLIEB:  Objection.  She
20  already answered the question.
21  BY MS. DIAZ:
22     Q.   You can answer.
23          MR. GOTTLIEB:  She already answered
24  the question.  You don't get to keep asking
25  the question to get a different answer.

Page 267

S. Marshall
1
2  BY MS. DIAZ:
3     Q.   You can answer the question.
4          MR. GOTTLIEB:  You're already
5  answered the question.
6          Do you have a different question?
7          MS. DIAZ:  Are you advising her not
8  to answer the question?
9          MR. GOTTLIEB:  What I'm saying,
10  Estela, is that you can't keep asking the
11  same question over and over again when she
12  has already answered it.  That would be
13  harassing the witness, which I know is
14  something you would not do.
15          She's already answered the question.
16  You can ask a different question.
17          MS. DIAZ:  David, it's not the same
18  question.  And you took a break while I was
19  in the middle of the questioning.  I'm just
20  trying to establish what the witness's
21  testimony is.
22          MR. GOTTLIEB:  Estela, I did not take
23  a break in the middle of a question.
24          MS. DIAZ:  I didn't say in the middle
25  of a question.

Page 268

S. Marshall
1
2          MR. GOTTLIEB:  You know that.
3          MS. DIAZ:  In the middle of a string
4  of questioning.  I'm just trying to
5  establish what the witness is testifying
6  to.
7          MR. GOTTLIEB:  The entire deposition
8  is a string of questions.  So any break you
9  take is, in some sense, during a string of
10  questions.
11          MS. DIAZ:  I'm not going to -- I'm
12  not continue this.
13          MR. GOTTLIEB:  Estela, she has
14  answered the question.  You don't get to
15  keep asking it.
16  BY MS. DIAZ:
17     Q.   Ms. Gurtov --
18          MS. DIAZ:  Excuse me.  Are you
19  instructing the witness not to answer?
20          MR. GOTTLIEB:  She has already
21  answered your question.
22          MS. DIAZ:  Are you instructing the
23  witness not to answer my last question?
24          MR. GOTTLIEB:  She has already
25  answered your questioning.

Page 269

S. Marshall
1
2          MS. DIAZ:  I'm asking you if you're
3  instructing her not to answer my last
4  question.
5          MR. GOTTLIEB:  My answer is that
6  she'd asked -- she's already answered your
7  question.
8  BY MS. DIAZ:
9     Q.   Ms. Marshall, you can answer my
10  question.
11          When did you tell Ms. Gurtov about
12  your medical condition?
13          MR. GOTTLIEB:  Objection.  Estela,
14  she has already answered your question.
15  You don't get to keep asking the witness
16  the same question to try to get a different
17  answer.
18          MS. DIAZ:  She gave me two different
19  answers.
20          MR. GOTTLIEB:  No, she didn't.  She
21  gave you one answer.
22          MS. DIAZ:  Okay.
23          MR. GUHA:  Are you instructing her
24  not to answer the question?
25          MR. GOTTLIEB:  What I'm saying, and

68  (Pages 266 to 269)

S. Marshall

1
2  you missed the entire colloquy, is that she
3  already answered the question. It was when
4  you actually weren't in the room. She
5  already answered the question, and then the
6  same exact question was asked again.
7      MR. GUHA: Putting that aside, are
8  you instructing her not to answer again?
9      MR. GOTTLIEB: That's not an
10  aside. The objection is that she has
11  already answered the question. You don't
12  get to keep asking the same question to try
13  to get a different answer.
14      So I think she can move on to a
15  different question.
16      MR. GUHA: Well, can we go off the
17  record a moment.
18      (A Discussion was Held off the
19  Record.)
20      MS. DIAZ: We can go back on the
21  record.
22      Mr. Gottlieb, are you instructing the
23  witness to answer the question?
24      MR. GOTTLIEB: We have already been
25  over this. She's answered the question,

S. Marshall

1
2  so --
3      MS. DIAZ: Are you instructing her
4  not to answer?
5      MR. GOTTLIEB: If you're asking the
6  same exact question that she already
7  answered, I don't think she has to answer
8  the same question multiple times because
9  you apparently want to get a different
10  answer than she already gave.
11      So the answer to your question is,
12  your question is improper. She has already
13  answered your question. You don't get to
14  keep asking the same question.
15      MS. DIAZ: Are you instructing her
16  not to answer the question?
17      MR. GOTTLIEB: You've already
18  heard -- you've already heard my objection.
19  So I think you need to move on to a
20  different question.
21      MS. DIAZ: I'd like to preserve my
22  right to reopen the deposition on this
23  issue and note for the record that counsel
24  is not permitting his witness to answer my
25  question.

S. Marshall

1
2      MR. GOTTLIEB: Then I want to note
3  for the record that I have permitted the
4  witness to answer the question. She has
5  already answered it.
6  BY MS. DIAZ:
7      Q.  Ms. Marshall, what did you tell
8  Ms. Gurtov about your condition?
9      MR. GOTTLIEB: Objection. At what
10  point?
11      MS. DIAZ: At any point.
12      MR. GOTTLIEB: I'm going to object to
13  that question.
14      You can answer it.
15  BY MS. DIAZ:
16      Q.  The first time you told Ms. Gurtov
17  about your condition, what did you tell her?
18      A.  I told her that I've been diagnosed
19  with fibroids and that I really didn't know a
20  lot about it besides what I read on the
21  Internet, and I would keep her posted.
22      Q.  Did you tell her when you were
23  diagnosed with fibroids?
24      A.  I don't remember.
25      Q.  Did you tell her how long it had been

S. Marshall

1
2  since your diagnosis?
3      A.  I don't recall.
4      Q.  Did you describe how the condition
5  was affecting you?
6      A.  I don't recall.
7      Q.  What was Ms. Gurtov's response?
8      A.  To keep her posted.
9      Q.  Did she say anything else?
10      A.  That initial time I told her, not
11  that I recall.
12      Q.  Do you recall saying anything else to
13  her?
14      MR. GOTTLIEB: At that point? At
15  that point?
16  BY MS. DIAZ:
17      Q.  During that first conversation.
18      A.  Not that I recall right now.
19      Q.  And where did this conversation take
20  place?
21      A.  In the district office after a
22  huddle.
23      Q.  And when did this conversation take
24  place?
25      MR. GOTTLIEB: I'm sorry, what's the

Page 274

1        S. Marshall
2    question?
3    BY MS. DIAZ:
4        Q.   When did this conversation take
5    place?
6        MR. GOTTLIEB:  You're asking the same
7    question that we just had an entire
8    colloquy about.  So I'm going to object and
9    ask you to move on to a different question.
10        MS. DIAZ:  Mr. Gottlieb, are you
11    instructing the witness --
12        MR. GOTTLIEB:  I'm not instructing
13    the witness not to answer.  She has already
14    answered the question.
15    BY MS. DIAZ:
16        Q.   You can answer.
17        MR. GOTTLIEB:  You don't need to
18    listen to the opposing attorney.
19        Ms. Diaz, she's already answered your
20    question.  You don't get to keep asking the
21    same question over and over to try to get a
22    different answer.
23    BY MS. DIAZ:
24        Q.   Ms. Marshall, when did the first
25    conversation with Ms. Gurtov take place --

Page 275

1        S. Marshall
2        MR. GOTTLIEB:  Objection.
3    Q.   -- regarding your condition?
4        MR. GOTTLIEB:  Same objection.  You
5    need to move on to a different question.
6        MR. GUHA:  Well, you certainly can't
7    instruct Ms. Diaz to move on to another
8    question.  Are you instructing the witness
9    to answer the question or not?
10        MR. GOTTLIEB:  Well, first, the
11    active attorney right now is Ms. Diaz, and
12    I really think this should be...
13        This is really kind of an unfair
14    situation to have two attorneys speaking at
15    a deposition.  Really should be one on one.
16        And the answer to your question is
17    that she has already answered your
18    question, so I'm not instructing her not to
19    answer because she has already answered it.
20    You don't get to keep asking the same
21    question to try to get a different answer.
22    That's harassment.
23        MS. DIAZ:  Mr. Gottlieb, are you
24    instructing your witness --
25        MR. GOTTLIEB:  You've already

Page 276

1        S. Marshall
2    heard --
3        MS. DIAZ:  -- not to answer the
4    question?
5        MR. GOTTLIEB:  You've already heard
6    my objection.  She's already answered your
7    question.
8        MS. DIAZ:  I'd like to preserve for
9    the record that Mr. Gottlieb is instructing
10    his witness not to answer the question that
11    I just posed.
12        MR. GOTTLIEB:  And I'd like to make
13    sure the record is clear that she has
14    already answered that question.
15    BY MS. DIAZ:
16        Q.   Ms. Marshall, after your first
17    conversation with Jenn Gurtov, did you speak to
18    her about your condition again?
19        A.   Yes.
20        Q.   When did your next conversation with
21    Ms. Gurtov occur regarding your condition?
22        A.   I made a doctor's appointment to go
23    and start figuring out exactly, you know, what
24    this meant for me.  And I had to let her know
25    that the timing of the appointment would cause

Page 277

1        S. Marshall
2    me to miss a huddle.  So I believe that's the
3    next time we spoke.
4        Q.   And do you remember when this
5    conversation took place?
6        A.   I believe that was late November.
7        Q.   Did you tell Ms. Gurtov anything
8    else?
9        A.   Besides that I would miss a huddle?
10    Well, no, I informed her that I needed to go to
11    a doctor -- to the doctor and that the
12    appointment occurred on a Monday, which is the
13    day of our huddles, and that I would miss the
14    huddle.  And she was very upset about it and
15    she told me that it wasn't a valid reason, that
16    I would be -- I'm sorry, that I would be held
17    accountable for the information that happened
18    in the huddle.
19        Q.   Did she say anything else to you?
20        A.   Not that I recall right now.
21        Q.   And why do you say that she was very
22    upset?
23        A.   Why was she upset?  Why do I say she
24    was upset?
25        Because of the tone of her voice.

70 (Pages 274 to 277)

Page 278

S. Marshall

1
2  The quick way she spoke over the phone, the way
3  that she made it very clear that I would be
4  held accountable even though I explained that I
5  would have Chris Martinez take notes for me
6  during the huddle and get them back to me, and
7  that this was for something serious and that I
8  wasn't just calling out, that I needed to go to
9  the doctor.  And she said, well, you are going
10 to -- you are still responsible for this
11 information.
12    Q.    Did you have a subsequent
13 conversation regarding your condition with
14 Ms. Gurtov?
15    A.    Yes.
16    Q.    And when was the next conversation
17 with Ms. Gurtov?
18    A.    The next one, I believe, was -- we
19 had one more before the last one.  So there was
20 one more, another one, not one more, another
21 one that we had.  So this would be...
22        MR. GOTTLIEB:  Take your time.
23    A.    Early to mid-December.
24    Q.    And where did that conversation take
25 place?

Page 279

S. Marshall

1
2    A.    I believe --
3        MR. GOTTLIEB:  Objection.
4        Go ahead.
5    A.    I believe it was over the phone.
6    Q.    Did you call Ms. Gurtov?
7    A.    I don't remember.
8    Q.    What did you discuss?
9    A.    The continued diagnosis of my
10 fibroids, and that where I stood at that point,
11 that I had seen a doctor and that surgery was
12 going to be -- was a probability at that point.
13    Q.    Did you tell her anything else?
14    A.    I don't believe I did.
15    Q.    And what was Ms. Gurtov's response?
16    A.    She began to just ask me a lot of
17 questions about it.  About -- well, how long
18 will you be out, when -- how long was this
19 going to be, what does the length of time look
20 like.  Things that I wasn't able to answer at
21 that time.
22    Q.    Apart from the questions about how
23 long your leave was going to be, did Ms. Gurtov
24 ask you anything else?
25    A.    Not that I recall right now.

Page 280

S. Marshall

1
2    Q.    Did she say anything else during that
3  conversation?
4    A.    Not that I recall right now.
5    Q.    And did she seem upset during that
6  conversation?
7    A.    Yes, she did.
8    Q.    Why do you think she was upset?
9    A.    She seemed frustrated at my, I guess
10 ability to answer her questions and have some
11 dates, times, what exactly was going on.
12 And -- so it was like she kept rephrasing
13 questions trying to see if I could answer them,
14 but I couldn't.
15        I remember just finally, I can't
16 answer the questions, I did not know at this
17 point.  I had not seen Barry Schachter who
18 confirmed that would have surgery yet.
19    Q.    And, to be clear, you couldn't answer
20 the questions regarding the length of time that
21 you would be out?
22    A.    Correct.
23    Q.    And you couldn't answer questions
24 about when your leave would commence?
25    A.    Correct.

Page 281

S. Marshall

1
2    Q.    Were there any other questions that
3  you couldn't answer at that time?
4    A.    I couldn't answer pretty much any of
5  the questions that she asked of me.  I just
6  didn't know.  I have now gone to see -- the
7  huddle I missed, I went to see another doctor
8  and I had a sonogram who confirmed that beyond
9  the scope of the, I believe what I said was an
10 MRI, that there were several very large
11 fibroids in and around my uterus.  And that he
12 believed that I would -- that it was no doubt,
13 that I would -- there was no choice, that I
14 would need surgery.
15        But at that point he was -- he wasn't
16 the surgeon.  He was just a doctor performing
17 those things, giving me his diagnosis and what
18 he believed to be true, based on what he saw.
19 And so, that's all the information I had when I
20 spoke to her.
21        And she just seemed frustrated
22 because she wanted -- she wanted answers.  She
23 wanted me to answer her questions, which I
24 could not.
25    Q.    So other than what we've discussed,

Page 282

S. Marshall

1  do you recall anything else from that
2  conversation in early to mid-December with
3  Ms. Gurtov?
4      A.   Not at this moment.
5      Q.   After the conversation in earlier to
6  mid December, did you have another conversation
7  with Ms. Gurtov about your condition?
8      A.   Yes, I did.
9      Q.   And when was that?
10     A.   December 22nd, I believe.
11 December 22nd.
12     Q.   Ms. Marshall, is it December 22nd or
13 December 21st?
14     A.   Either the 21st or the 22nd.
15     Q.   And where was -- where did that
16 conversation take place?
17     A.   It took place at Hudson and King.
18     Q.   Well, what did you discuss with
19 Ms. Gurtov about your condition?
20     A.   She came in and it was for a
21 scheduled SPA visit.  And she observed for a
22 while while I worked, and then I joined her at
23 a table in the front.  And I told her that I
24 finally had some answers for her, and that I

Page 283

S. Marshall

1  was definitely going to be going out for
2  surgery, and that it was longer than what I
3  believed it to be when I read it on the
4  Internet.
5      You know, the Internet tells you, I
6  think maybe two to four weeks.  And meeting
7  with a doctor, it was more 8 to 12 weeks.  And
8  I told her that, so I would now definitely, not
9  probably, not possibility, I would definitely
10 be going out for surgery and that it would
11 definitely be between 8 and 12 weeks, and that
12 it would be happening pretty soon.  And that I
13 was going on the 30th and I would then know the
14 exact date that I would be leaving.
15     Q.   Ms. Marshall, what was Jenn Gurtov's
16 response?
17     A.   She was very upset.  And I could tell
18 by the questions.  She started to ask me -- we
19 were sitting there and we were observing Niorka
20 and Giselle as they ran the floor.
21     And she asked me, she said, so, do
22 you think that they're able to -- do you think
23 that they can run this?  Do you think that they
24 can do this, run this store without you?

Page 284

S. Marshall

1      She began to ask me, like, who do you
2  think is going to run the store?  And, you
3  know, of course, I defended my girls and said,
4  you know, they can do it, you know.  She said,
5  but you know this operation is pretty -- it
6  runs like -- it's -- she didn't say that.  I'm
7  saying that the store and the way it operated
8  was like a machine.  And she said this cannot
9  run without you.  Who is going to run it?
10 These ladies cannot run it.  You know, she said
11 I'd like to, but I cannot hold the store for
12 you.
13     Q.   Did she say anything else?
14     A.   Not that I recall right now.
15     Q.   And, Ms. Marshall, you testified that
16 Ms. Gurtov came into your store for a scheduled
17 SPA visit.
18     A.   Correct.
19     Q.   And that is a Store Plan of Action
20 visit?
21     A.   Correct.
22     Q.   Do you recall when the Store Plan of
23 Action visit was scheduled?
24     A.   I don't.

Page 285

S. Marshall

1      Q.   Can you approximate how far in
2  advance it was scheduled?
3      A.   I'm not going to guess, no.
4      Q.   How often did you have Store Plan of
5  Actions -- Store Plan of Action visits with
6  Ms. Gurtov while she was your store manager?
7      MR. GOTTLIEB:  Objection.
8      You can answer.
9  BY MS. DIAZ:
10     Q.   Excuse me.  While she was your
11 district manager?
12     MR. GOTTLIEB:  Objection.
13     A.   Approximately once a quarter.
14     Q.   Okay.
15     And before your December 2010 SPAV,
16 when did you have your -- excuse me.
17     Before the December 2010 SPAV, how
18 many SPAVs have you had with Ms. Gurtov in
19 2010?
20     MR. GOTTLIEB:  Objection.
21     A.   I believe we had three previous to
22 that one.
23     Q.   And do you recall the months?
24     A.   No.

Page 286

S. Marshall

1             S. Marshall
2   Q.  Can you approximate when that
3 occurred?
4   A.  No.
5   Q.  You don't have any recollection when
6 your other SPAVs occurred in 2010?
7      MR. GOTTLIEB:  Objection.
8   A.  I'm not going to guess months, so,
9 no.
10   Q.  Did they occur once a quarter?
11   A.  Approximately.
12   Q.  And do you believe they occurred once
13 a quarter in 2010?
14   A.  I do.
15   Q.  And, Ms. Marshall, what happened
16 during a SPAV conducted by Ms. Gurtov of your
17 store at the 345 Hudson Street location?
18      MR. GOTTLIEB:  Objection.
19      You can answer.
20   A.  There wasn't necessarily a document
21 that said what needed to happen.  If there was,
22 we didn't follow it.  It was sort of a whatever
23 was going on in the moment.  So we always
24 touched on cleanliness.  That was very
25 important, so we touched on cleanliness.  We

Page 287

S. Marshall

1             S. Marshall
2 touched on the values walk.  So we would
3 usually do one of those together.  Review the
4 P&L.  Sometimes -- a majority of the times she
5 looked at my cash management log.
6      But, yeah, there weren't any, I
7 guess, things that seemed mandatory.  It was
8 not an extremely structured day.  We would sort
9 of go with the flow and -- and so there were
10 things that definitely happened.  There were
11 cleanliness.  A majority of times she would
12 look at my cash log, you know.  Values walk,
13 that we started in 2010, I believe, so that was
14 something that we did pretty often.
15      But, again, there were things that
16 might happen and might not happen.
17   Q.  How long did the Store Plan of Action
18 visits take?
19      MR. GOTTLIEB:  Objection.
20   A.  Again, there was a range.  I've done
21 days -- I did day SPAV visits with her that
22 were 10 hours plus.  And then I have had her
23 visit for only two hours.
24   Q.  Did she inspect your daily records
25 books at every Store Plan of Action visit?

Page 288

S. Marshall

1             S. Marshall
2      MR. GOTTLIEB:  Objection.
3   A.  The majority of them.
4   Q.  And did she inspect your daily
5 records books for each month during the
6 quarter?
7      MR. GOTTLIEB:  Objection.
8   A.  The majority of the time, yes.
9   Q.  And did she inspect every page of
10 your daily records book or cash management log
11 during each quarter?
12      MR. GOTTLIEB:  Objection.
13   A.  Again, the majority of the time.
14   Q.  Ms. Marshall, going back to the Store
15 Plan of Action visit on December 21st or
16 December 22nd, what time did Ms. Gurtov arrive
17 at your store for that visit?
18   A.  It was early in the morning, still
19 during my morning rush, during peek.
20   Q.  And how long was her visit?
21   A.  She left approximately early to
22 mid-afternoon.
23   Q.  Okay.
24      And, Ms. Marshall, you testified that
25 she came in for the Store Plan of Action visit

Page 289

S. Marshall

1             S. Marshall
2 and observed the store for a while; is that
3 correct?
4   A.  Correct.
5   Q.  Okay.
6      And is that before you had the
7 conversation with her regarding your medical
8 condition?
9   A.  Yes.
10   Q.  How long did she observe your store
11 for?
12   A.  Approximately 45 minutes.  Half an
13 hour to 45 minutes.
14   Q.  Was that the first thing she did when
15 she came in to visit the store?
16      MR. GOTTLIEB:  Objection.
17   A.  Then or always?
18   Q.  That day.
19   A.  Yes.  That was the first thing she
20 did.
21   Q.  Okay.
22      So after observing your store for --
23 did you say 30 to 45 minutes?
24   A.  Yes.
25   Q.  What did she do next?

Page 290

S. Marshall

1
2     A.   She asked me to come sit with her --
3     Q.   Okay.
4     A.   -- so that she could start chatting.
5     Q.   And that's when you had the
6  conversation that you described?
7     A.   Yes, it is.
8     Q.   And how long was -- how long was your
9  conversation with her regarding your medical
10  condition?
11     A.   No more than 10, 15 minutes.
12     Q.   And after your conversation regarding
13  your medical condition, what -- what happened
14  next?
15     A.   She said let's go into the back room.
16          And so we went into the back room and
17  we sat down. And she said -- we started to --
18  we were still, we were just chatting, small
19  talk. And she said, I want to take a look at
20  your cash management log.
21          And I give it to her. So I gave her
22  the December book. I handed it to her, and I
23  said I need to go to the bathroom. So I left
24  her with it and I went to the bathroom.
25          I came back from the bathroom. She

Page 291

S. Marshall

1
2  has -- she was writing on a separate sheet of
3  paper, I believe, or in a notepad, but she was
4  writing on something. And she said to me, you
5  know, something long the lines, you've got some
6  issues in your cash log. And she said, why
7  don't you tell me what they are. Why don't you
8  tell me what they are rather than me just
9  telling you the things that I see.
10          So I started to just talk about the
11  log a little bit and as we flipped through the
12  pages. And she started to just point out on
13  every single page literally everything. Like,
14  well, here on this page, look, you guys don't
15  have a closing count. Here, look on this page,
16  you guys didn't fill out the deposit bag.
17  Here, look on this page. It's literally every
18  single page we went through. She started to
19  point out stuff and she started to write it
20  down, she started to take notes, and she
21  started to get visibly upset.
22          Then she started to point out the
23  fact that deposits were not being -- she
24  noticed the dates and she said deposits are not
25  being brought to the bank on a daily basis.

Page 292

S. Marshall

1
2  And I said, yeah. And she said, do you have a
3  floating deposit. Again, this is all -- she
4  was suddenly like zero to 60 extremely upset.
5          And I was just sort of clueless about
6  how we had gotten to this point so quickly
7  where she is, like, and do you have a floating
8  deposit? And then I said, I don't -- what is a
9  floating deposit? And she said, are you -- are
10  you taking money home because your dates don't
11  match? And I said, no, of course not. And she
12  said, I want you to go open the safe because
13  I'm going to check to make sure that your bags
14  are there.
15          So, in essence, calling me a thief
16  because she said accusing me of having floating
17  deposits suddenly. When I tell her no, I
18  just -- I did, I dropped them. They were in
19  the safe and they went to the bank the next
20  day. She said, well, that's not what this
21  looks like. This looks like you have a
22  floating deposit. So we're going to go out
23  there and we're going to count your -- we're
24  going to count your safe.
25          So she went out. I set the safe. I

Page 293

S. Marshall

1
2  opened it. She counted all the money which was
3  all in there and accounted for. She pulled out
4  the till bag and she went into the back and she
5  checked them off to make sure that they were
6  physically there, which they were. And we put
7  the money back.
8          And then she just -- she just started
9  to say, you know, how upset she was about this
10  and how terrible this was and she couldn't
11  believe it.
12          And at that point I just started
13  crying. And I just -- I'm like, I mean, like
14  in trouble, like this is -- you're really,
15  really upset. And she just said, you know, I
16  want to end the day. This was also the day of
17  our holiday meeting that we were going to have
18  later. And she said, you know, I just want to
19  end here now. I just want to end here now.
20  And I'm going leave you and I'm going to leave
21  you to do your deposit, and I'm just going to
22  leave the store with the book at this point.
23          And I just remember asking her
24  like what -- like, really, I'm in trouble?
25  Like because she was so angry. And I just like

74 (Pages 290 to 293)

Page 294

S. Marshall

1   S. Marshall
2   saying, I'm crying, I'm like I'm in trouble,
3   like you're really upset, like this -- the
4   money's fine, like I -- there is no floating
5   deposit. Everything is accounted for. Like
6   why is this suddenly -- why am I suddenly in
7   trouble? And to this extent where like you're
8   ending the day. You went out there and counted
9   my safe, you counted my till bags. Like this
10  is not -- this is not -- this is not different.
11  My books are not different, you know.
12          And she just said, well, you know,
13  I've got to take this. I've got to look this
14  over. And she left me there counting money and
15  I, you know, and we said I hope -- she said to
16  me, well, are you -- are you going to come back
17  tomorrow, while I had, you know, the money out.
18  And I said yes, of course, I'm going to come
19  back. If you -- like you'd leave me counting
20  the money, if that's what you believed. Of
21  course, why wouldn't I come back? She said,
22  well, I just want to be sure.
23          And so I did the deposit and she
24  left. And she left and she said to me, well, I
25  hope to see you tonight, talking about the

Page 295

1   S. Marshall
2   holiday party. And that is pretty much what I
3   recall about that date and that visit.
4       Q.   Ms. Marshall, just so I'm clear on
5   the timing, you testified that Ms. Gurtov
6   observed your store for 30 to 45 minutes and
7   then that you had 10 to 15-minute long
8   conversation about your medical condition; is
9   that correct?
10      A.   That is correct.
11      Q.   And that after that point, after
12  that, the next thing that happened after your
13  conversation regarding your medical condition
14  was that Ms. Gurtov reviewed your daily records
15  book for December; is that correct?
16      A.   Correct.
17      Q.   Was that all she did during that
18  visit?
19          MR. GOTTLIEB: Objection.
20          You can answer.
21      A.   Yes.
22      Q.   Okay.
23          And how long did she -- how much time
24  did she spend reviewing your daily records
25  book?

Page 296

1   S. Marshall
2       A.   Not very long. I only went to the
3   bathroom. And when I came back, that's when
4   she said to me, like, oh, you know, there's a
5   lot of issues in this book. I'm not going to
6   tell you, you tell me what they are. And then
7   together as she started to go through every
8   single page and point out every single thing
9   that was wrong. So I'd say we -- and then when
10  you put in the safe time going up there and
11  waiting for a 10-minute delay on the safe and
12  taking the till bags back and making sure that
13  they were actually there, maybe that whole
14  process itself was 45 minutes to an hour.
15      Q.   And then the visit ended, as you
16  described?
17      A.   Yes.
18      Q.   Ms. Marshall, were you having cash
19  management issues during the November or
20  December 2010 time period?
21          MR. GOTTLIEB: Objection.
22      A.   No.
23      Q.   Were you having any cash shortage
24  issues during the November 20 -- November or
25  December 2010 time period?

Page 297

1   S. Marshall
2          MR. GOTTLIEB: Objection.
3      A.   I don't recall.
4      Q.   Okay.
5          And did you ask Ms. Gurtov to review
6   your DRB for December?
7      A.   Did I ask her? No.
8      Q.   Ms. Marshall, you said that
9   Ms. Gurtov went page by page through your DRB?
10      A.   Correct.
11      Q.   Did you tell Ms. Gurtov that a
12  deposit had been taken to the bank when it had
13  not actually been taken to the bank?
14          MR. GOTTLIEB: Objection.
15      A.   No.
16      Q.   Did Ms. Gurtov suggest to you that
17  the two of you -- go should should go to the bank to
18  obtain a bank receipt for one of the deposits
19  in your daily records book?
20      A.   No.
21      Q.   And, Ms. Marshall, did you admit that
22  you had not been making deposits on a daily
23  basis?
24          MR. GOTTLIEB: Objection.
25          You can answer.

Page 298

S. Marshall

1           S. Marshall
2    A.   Admit? I mean, there was -- there
3  was nothing to admit to. Like, it was clear.
4  We pointed it out. I didn't say I did it. I
5  said I wasn't doing it and then suddenly I
6  admitted I did. Like that was just -- this was
7  there, it was clear. The way we went through
8  it, it was very clear to her also. So there
9  wasn't anything to admit.
10    Q.   Okay.
11       And other than what you've described
12  about your conversation regarding the DRBs, was
13  anything else said between -- was anything else
14  said during that conversation regarding the
15  DRBs?
16    A.   Not that I recall --
17       MR. GOTTLIEB: Objection.
18    A.   Not that I recall right now.
19    Q.   Did you ask Ms. Gurtov whether you
20  would be disciplined for the DRB violations?
21       MR. GOTTLIEB: Objection.
22       You're asking at that time?
23  BY MS. DIAZ:
24    Q.   During that visit.
25    A.   Yes.

Page 299

S. Marshall

1           S. Marshall
2    Q.   What did you say?
3    A.   That's when I started to cry. I
4  said, am I in trouble? So, yeah.
5    Q.   Did you ask her whether you would be
6  terminated?
7    A.   No.
8    Q.   Did Ms. Gurtov tell you whether or
9  not she was going to conduct an investigation?
10    A.   No.
11    Q.   Before the December 2010 SPAV, did
12  you ever discuss bank deposit practices with
13  Ms. Gurtov?
14       MR. GOTTLIEB: Objection.
15       I think this question has been asked,
16  but I'll let her answer this one.
17    A.   Again, her reviewing my books was
18  something that had been pretty consistent on
19  most visits, and bank practices was not
20  something that was ever discussed. It just
21  wasn't. What we talked about when we talked
22  about money was over/shorts.
23    Q.   So you did not discuss bank deposit
24  practices with Ms. Gurtov before the
25  December 2010 visit?

Page 300

S. Marshall

1           S. Marshall
2       MR. GOTTLIEB: Objection.
3    A.   No.
4    Q.   Ms. Marshall, after the SPAV visit on
5  December 21st, when was the next time you spoke
6  to Ms. Gurtov?
7    A.   At the holiday meeting that evening.
8    Q.   And what was your interaction with
9  Ms. Gurtov during that holiday gathering?
10    A.   It was very minimal. We greeted each
11  other. She gave us all gifts. And, I mean, it
12  was a holiday party, so it was very informal.
13  And we sat around and everyone chatted with
14  each other. There was a room full of managers,
15  along with her, and she gave out gifts and she
16  left.
17    Q.   On your interactions with her at the
18  holiday party, when was the next time that you
19  spoke to Ms. Gurtov?
20    A.   I believe it was when she returned my
21  text message.
22    Q.   Okay.
23       And were you aware that Ms. Gurtov
24  was on vacation shortly after your December
25  SPAV?

Page 301

S. Marshall

1           S. Marshall
2    A.   She took time -- no, not that I
3  recall.
4    Q.   Ms. Marshall, was another DM covering
5  your store when you requested FMLA leave?
6    A.   Yes.
7    Q.   And why was that?
8    A.   She took time off.
9       MR. GOTTLIEB: Objection.
10       MS. DIAZ: Can we take a five-minute
11  break?
12       MR. GOTTLIEB: Sure.
13       THE VIDEOGRAPHER: The time is
14  5:39 p.m. and we are going off the record.
15       (Recess taken from 5:39 p.m. to 5:54
16  p.m.)
17       THE VIDEOGRAPHER: The time is
18  5:54 p.m. We're back on the record.
19  BY MS. DIAZ:
20    Q.   Ms. Marshall, going back to the
21  December SPAV visit with Ms. Gurtov.
22       Other than what you've testified to,
23  did Ms. Gurtov say anything else to you that
24  you can remember?
25       MR. GOTTLIEB: Objection.

76 (Pages 298 to 301)

Page 302

S. Marshall

1          S. Marshall
2   A.  Not that I recall right now.
3   Q.  And after the phone call in early
4 January in which Ms. Gurtov responded to your
5 text message, when was the next time you spoke
6 to Ms. Gurtov?
7      MR. GOTTLIEB:  Objection.
8   A.  When she -- when I called Nancy
9 Murgalo, I believe her title is HR supervisor,
10 to find out about where I should be returning,
11 because my date to return was March 1st and I
12 hadn't heard from anybody and I called Nancy.
13      So the next time I heard from Jenn
14 was when she returned that call.
15   Q.  Okay.
16      When did you call Nancy Murgalo?
17   A.  Approximately a week before
18 March 1st.
19   Q.  And you heard from Jenn Gurtov after
20 you spoke to Nancy Murgalo?
21   A.  Yes.
22   Q.  And what did -- what did Jenn Gurtov
23 say to you during that conversation?
24   A.  She told me that on the 1st I needed
25 to report to the district office.

Page 303

S. Marshall

1          S. Marshall
2   Q.  Did she say anything else?
3   A.  No.
4   Q.  What was your response?
5   A.  Okay.  See you then.
6   Q.  Did you say anything else?
7   A.  No.
8   Q.  Ms. Marshall, are you aware of other
9 store managers in your district who held
10 deposits from one day to the next?
11   A.  Yes.
12   Q.  Who does that?
13      MR. GOTTLIEB:  Objection.
14      Go ahead.
15   A.  Who I can speak to specifically is
16 the day of the Christmas party when we were --
17 when we all went outside for a cigarette break,
18 "we" being myself, Zakia Slade, Christopher
19 Martinez, Sharice Lau, Kevin Nagle, and there's
20 one more store manager whose house we were at
21 whose name escapes me.  And they all -- we were
22 just, you know, we were talking with your peers
23 and we were talking about everything going on.
24 And they were all like, oh, you had a SPA visit
25 today, how did it go?

Page 304

S. Marshall

1          S. Marshall
2      And I said, oh, my gosh, it didn't go
3 well.  She got so upset about, you know, my
4 book and the fact that I was dropping deposits.
5 And both Kevin and Sharice said, oh, no worry,
6 no big deal.  She caught us dropping deposits
7 also.  She made us write ourselves up.
8      So that just became this kind of
9 funny story, funny anecdote that we sat there
10 and laughed about over the fact that she made
11 them fill it out corrective actions, write
12 themselves up, sign it and fax her a copy, that
13 that was their punishment for doing the same
14 thing, dropping deposits.  And they kind of
15 showed me that that was it, they got written
16 up.
17   Q.  Did Zakia tell you that she also held
18 deposits?
19   A.  She did.  However, she hadn't been
20 one of the people that were written up.
21   Q.  Did Chris Martinez tell you that he
22 held deposits?
23   A.  I don't recall him specifically.
24   Q.  Okay.
25      And did the other store manager who

Page 305

S. Marshall

1          S. Marshall
2 was hosting the holiday party tell you that he
3 held deposits?
4   A.  I don't recall him specifically.
5   Q.  What else did you tell this group
6 about your SPA visit with Jenn?
7   A.  I mean, that was it.  That was the
8 big thing, the fact that she had gotten so
9 upset that she had taken my book and ended my
10 day, had me in tears over -- and over this and,
11 oh, my God, what's going to happen.  And they
12 just basically were like, you're fine, happened
13 to us.
14   Q.  And did Zakia Slade tell you that
15 Jenn Gurtov was aware of her practice of
16 holding deposits or was aware that she was
17 holding deposits?
18      MR. GOTTLIEB:  Objection.
19   A.  I don't know that we specifically
20 talked about whether Jenn was aware.  The
21 conversation was about who did it.  And she
22 said that she did it.  She was like, I do it.
23   Q.  Did Chris Martinez tell you that Jenn
24 Gurtov was aware that he held bank deposits?
25   A.  I don't remember saying he

S. Marshall

1  specifically told me that he did.  So...
2  Q.   Okay.
3      And what about the other store
4  manager?
5  A.   Same.  I don't remember specifically
6  discussing it with him.
7  Q.   Apart from the people you just
8  identified, were there other store managers in
9  your district who held deposits?
10     MR. GOTTLIEB:  Objection.
11 A.   This was the group that I was close
12 to, so this was the group that I could speak
13 of.  Besides that, it's just hearsay that
14 everyone says everyone else does it.
15 Q.   You don't have personal knowledge of
16 other --
17 A.   Exactly.
18 Q.   Okay.
19     MS. DIAZ:  I'd like to mark this as
20 Exhibit 30.
21     (Defendants' Exhibit 30, Copy of
22 Complaint, was marked for
23 identification.)

S. Marshall

1  BY MS. DIAZ:
2  Q.   Ms. Marshall, take a few moments to
3  review the document and let me know when you're
4  finished.
5  A.   (Document Review.)
6      (Time noted:  6:00 p.m.)
7  A.   Okay.
8  Q.   Ms. Marshall, are you familiar with
9  this document?
10 A.   I've seen it before, yes.
11 Q.   And you see the top of the document
12 says April -- filed April 13, 2011?
13 A.   Yes.
14 Q.   Did you see this document before
15 April 13, 2011?
16 A.   Yes.
17 Q.   You reviewed it before it was filed
18 with the court?
19 A.   Yes.
20 Q.   And is it accurate?
21     MR. GOTTLIEB:  Objection.
22     You're asking about a specific
23 paragraph, Estela?
24     MS. DIAZ:  Is the complaint accurate

S. Marshall

1  if she reviewed it?
2      MR. GOTTLIEB:  Okay.  This is a
3  19-page document.
4  BY MS. DIAZ:
5  Q.   Ms. Marshall, to your knowledge, is
6  the complaint accurate?
7  A.   To my knowledge this complaint is
8  accurate, yes.
9  Q.   Was there anything that you felt was
10 inaccurate when you reviewed it?
11 A.   No, there was not.
12     MR. GOTTLIEB:  Objection.
13     When she reviewed it just now?
14 BY MS. DIAZ:
15 Q.   Before it was filed.
16 A.   No.  That I -- no, nothing I can
17 recall now.
18 Q.   Ms. Marshall, are you claiming that
19 you were discriminated against by Starbucks?
20 A.   Yes, I am.
21 Q.   In what ways do you claim you were
22 discriminated against by Starbucks?
23 A.   In what ways?
24     In the ways that I was treated from

S. Marshall

1  the moment that Jenn Gurtov found out that day,
2  December 21st or 22nd, that I was definitely
3  going to be out, and the way that we have sat
4  and pretty much established these were the ways
5  that banking was handled my entire Starbucks
6  store career.  And the day that I tell her that
7  I'm going out on a 12-week leave, she begins to
8  question me in the front of my store about --
9  not about whether -- not about my health, not
10 about how I was going to be, but about who was
11 going to run the store, and if they couldn't
12 run the store, and just her line of
13 questioning.
14     And then to go in the back room and
15 to suddenly take the book that looks no
16 different from all the books or all the years
17 that I've been a store manager, including under
18 her, and suddenly to take that book and to
19 point out these things that were standard
20 practice and that she was aware of as my
21 district manager looking through books on
22 numerous SPA visits, and to take that and
23 suddenly make that the reason, quote/unquote,
24 that I no longer should be employed with the

Page 310

S. Marshall

1
2 company, that I was -- I had been employed for
3 so long is the only reason that I could have
4 been terminated.
5    Q.   Apart from what you've just testified
6 to and Ms. Gurtov's actions on December 21st,
7 are you claiming that Starbucks or Jenn Gurtov
8 discriminated against you in any other way,
9 apart from that day?
10       MR. GOTTLIEB: Objection.
11    A.   Well, we can include every
12 interaction I had with her around this entire
13 situation, from the way that she was just upset
14 that I had to miss a huddle, from the way that
15 she -- there's the word barrage, like just kept
16 asking me questions after that the next time we
17 spoke, wanting to know about what was going on,
18 because she wanted to know, you know.  And I
19 get, you know, everyone has to manage, but she
20 just was concerned with her and what was going
21 to happen with her having to manage that store
22 without me for such an extended time.  We're
23 talking 8 to 12 weeks here.  There's two to
24 three months.  And then, so that also.  And
25 then finally leading up to her -- the day she

Page 311

S. Marshall

1
2 finds out that I'm going to have to take 8 to
3 12 weeks, to suddenly like take this book and
4 dissect it that way.
5       So, yes, I was discriminated against.
6    Q.   Okay.
7       So other than Ms. Gurtov's actions on
8 December 21st, her reaction when you told her
9 that you were going to miss the huddle, and the
10 fact that she kept asking questions about your
11 leave, do you claim that Ms. Gurtov or
12 Starbucks discriminated against you in any
13 other way?
14       MR. GOTTLIEB: Objection.
15       I'm going to object because I think
16 she mentioned things in addition to what
17 you just listed.
18 BY MS. DIAZ:
19    Q.   Is there anything else in addition to
20 what I just listed?
21    A.   In addition to all the things I've
22 said for the last several questions, I believe
23 that that's all for now.
24    Q.   When you say "that's all for now," is
25 that all that you can remember?

Page 312

S. Marshall

1
2    A.   Yes.
3    Q.   And just to be clear, what is the
4 basis for your claim of discrimination?
5    A.   I don't understand the question.
6    Q.   Why do you think they discriminate --
7 why do you think Starbucks discriminated
8 against you?
9    A.   I believe that Starbucks
10 discriminated against me because of the way
11 Jenn Gurtov treated me.  The reason why?
12 Because she didn't want to have to -- like I
13 said, that was extremely high-profile store.
14 It was Monday through Friday.  We made maybe
15 not the most money dollar wise, but when you
16 think about the condensed hours that we ran, we
17 made the most money per hour for her in that
18 building.
19       We had, like I said before, that
20 advertising company or whatever, marketing
21 firm, whatever it was that dealt with
22 Starbucks, there were big wigs that would come
23 into the building.  It was a very, very
24 important store.  And we talked about it like
25 it was a very important store.

Page 313

S. Marshall

1
2       And for her to suddenly have to deal
3 with having to find coverage for me for that
4 long, she didn't want to.  And you could see it
5 in all the ways that she acted from the first
6 time I told her about it.
7    Q.   So are you claiming that she
8 discriminated -- that Ms. Gurtov discriminated
9 against you because you were going to take
10 leave?
11    A.   Because of my --
12       MR. GOTTLIEB: Objection.
13       Go ahead.
14    A.   Because of my medical condition.  And
15 my medical condition is the reason I had to
16 take leave.
17    Q.   Okay.
18       And other than your medical condition
19 or your leave, are you claiming that Starbucks
20 or Ms. Gurtov discriminated against you for any
21 other reason?
22       MR. GOTTLIEB: Objection.
23    A.   Besides my medical condition?  No.
24    Q.   Ms. Marshall, you previously
25 described a number of conversations with

79 (Pages 310 to 313)

Page 314

```
 1            S. Marshall
 2  Ms. Gurtov regarding your medical condition.
 3         Were there ever any witnesses to
 4  those conversations?
 5         MR. GOTTLIEB:  Objection.
 6     A.  No.
 7     Q.  Ms. Marshall, are you claiming that
 8  you were retaliated against for taking medical
 9  leave?
10     A.  I am.
11     Q.  And what's the basis for that claim?
12     A.  The basis for that claim is, again,
13  everything that happened to me from the minute
14  that I told her that I was going to need to
15  take a possible medical leave or that I had a
16  possible medical condition, all the way up to
17  the day when I told her that I definitely
18  needed surgery and would be leaving for up to 8
19  to 12 weeks.
20         So because of all those reasons and
21  because of the workload -- that possibly
22  because of the workload that now had landed on
23  her shoulders, yes.
24         MR. GOTTLIEB:  Is there a question
25      pending?
```

Page 315

```
 1            S. Marshall
 2  I don't think there is.  I'd like to
 3  take just a short break.
 4         THE VIDEOGRAPHER:  The time is
 5  6:09 p.m.  We're off the record.
 6         (Recess taken from 6:09 p.m. to 6:13
 7  p.m.)
 8         THE VIDEOGRAPHER:  The time is
 9  6:13 p.m.  We're back on the record.  Video
10  No. 6.
11  BY MS. DIAZ:
12     Q.  Ms. Marshall, did anyone at Starbucks
13  tell you that you were fired because they
14  worried about Store 11649?
15         MR. GOTTLIEB:  Objection.
16     A.  Did anyone tell -- no.
17     Q.  Why do you think that Ms. Gurtov was
18  worried about your store during your leave of
19  absence?
20         MR. GOTTLIEB:  Objection.
21     A.  Why do I think that she was worried?
22     I mean, I've said that it was a busy
23  store.  It was -- for hours pretty much the
24  busiest store in the district.  It was high
25  profile.  You had people that were -- took the
```

Page 316

```
 1            S. Marshall
 2  time to write letters because they cared about
 3  the service in the store.  It was a store that
 4  was visited by regional directors.  It was a
 5  good store.
 6     Q.  Did she tell you directly that she
 7  was worried about what would happen to the
 8  store while you were on leave?
 9     A.  Yes, she did.
10     Q.  Did anyone else tell you that they
11  were worried about the store while you were
12  going to be on leave?
13     A.  No.
14     Q.  Ms. Marshall, going back to your
15  claim of retaliation, what is the basis for
16  your claim of retaliation?
17         MR. GOTTLIEB:  Objection.
18     A.  The basis for my claim, again, is
19  everything that commenced from the moment that
20  I told her that I had a medical condition, from
21  the way that, again, that she -- that she gave
22  me trouble for having to take a day off from a
23  huddle, even though I had someone take notes
24  for me and giving me information; from the next
25  conversation where she asked me a barrage of
```

Page 317

```
 1            S. Marshall
 2  questions about what was going to happen, all
 3  the way leading up to the day of the SPA visit,
 4  where she did what she did in the lobby asking
 5  me all of those questions and making all those
 6  comments about the store running properly and
 7  if the girls could do it, and she didn't think
 8  she could hold it for me; and then going into
 9  the back room and taking my daily records book
10  that, again, looked no different than the ones
11  that are from years ago looked, and suddenly
12  making that the basis for ending my SPA visit
13  early, to leave.
14         For then asking me afterwards, you
15  know, are you going to come back tomorrow; for
16  never even following up with me at all, you
17  know, not even after she returned my text and
18  said that had we would speak later.
19         You know, I had major surgery, major
20  surgery, that left me, you know, bedridden, not
21  able to walk for a couple of weeks.  I had to
22  live with my mom so that she could take care of
23  me.  And I didn't receive one phone call from
24  her?
25         And then, finally, I was fired so --
```

Page 318

S. Marshall

1        on my first day back.
2            Q.   Other than what you've described, is
3        there any other reason why you claim that
4        Starbucks or Jenn Gurtov retaliated against
5        you?
6                MR. GOTTLIEB:  Objection.
7            A.   Not at this moment.
8            Q.   Ms. Marshall, did you ever make a
9        complaint about discrimination to Starbucks?
10           A.   In regards to this?
11               MR. GOTTLIEB:  Can you answer "yes"
12       to her question?
13       BY MS. DIAZ:
14           Q.   Did you ever make a complaint about
15       discrimination generally at Starbucks?
16           A.   Once I was terminated, I called
17       the -- the hotline.
18           Q.   Okay.
19               And before you were terminated, did
20       you ever make a complaint of discrimination?
21           A.   No.
22           Q.   Did you ever complain to anyone at
23       Starbucks that they weren't permitting you to
24       take your medical leave?

Page 319

S. Marshall

1            A.   No.
2            Q.   Did you ever make a complaint to
3        anyone at Starbucks that you weren't being
4        treated fairly because of your medical
5        condition?
6                MR. GOTTLIEB:  Objection.
7                You're talking about before she was
8        terminated?
9        BY MS. DIAZ:
10           Q.   Before you were terminated.
11           A.   No.
12           Q.   Ms. Marshall, when were you scheduled
13       to return to work after your leave?
14           A.   March 1, 2011.
15           Q.   And did you return to work?
16           A.   Yes, I did.
17           Q.   And what happened when you returned
18       to work?
19           A.   I went to the district office where
20       Jenn Gurtov booked me into a conference room
21       with another district manager, whose name I
22       don't remember, and she pulled out a document
23       and slid it across the table.  And she said,
24       based on my last visit, we're terminating your

Page 320

S. Marshall

1        employment with Starbucks.  And she asked me to
2        read it and sign it, which I refused to sign.
3        And I left.
4            Q.   Other than what you just described,
5        did Jenn Gurtov say anything else to you during
6        that meeting?
7            A.   She read the document.  So she read
8        it word by word right there.
9            Q.   Did the other district manager say
10       anything to you during that meeting?
11           A.   No.
12           Q.   Did you say anything to Jenn during
13       that meeting?
14           A.   Not that I recall.  I was in shock.
15       I mean, I was being fired on my first day back
16       to work after being on a medical leave.  I was
17       just -- I didn't say anything.
18               She said you're terminated.  She gave
19       me a separation paper that tells you like a
20       bunch of stock options and things like that.  I
21       mean, I was in shock.  I took the paper and I
22       left the office.
23           Q.   And how long did that meeting last?
24           A.   Ten minutes, maximum, if that.

Page 321

S. Marshall

1                MS. DIAZ:  I'd like to mark this as
2        Exhibit 31.
3                (Defendants' Exhibit 31, Document,
4        Bates No. Star/Marshall 1564, was marked
5        for identification.)
6        BY MS. DIAZ:
7            Q.   This document is Bates stamped
8        Star/Marshall 1564.
9                Ms. Marshall, are you familiar with
10       this document?
11           A.   This could be what she showed me but,
12       I mean, I didn't sign it.  I didn't get a copy.
13       So it could be.  I don't know.
14           Q.   Do you recall, were the stated
15       reasons on this document the reasons why
16       Ms. Gurtov told you that you were being
17       terminated?
18           A.   Yes.
19           Q.   So did Ms. Gurtov tell you during
20       that March 1st meeting that you were being
21       terminated for the admitted falsification of
22       the daily records book?
23           A.   Yes.  She read that.
24           Q.   Okay.

81 (Pages 318 to 321)

Page 322

S. Marshall

1  
2     And did she also read the portion
3  that said that you were being terminated for
4  your admitted breaking company policy in
5  regards to bank deposits in which on numerous
6  occasions throughout the months of
7  November 2010 and December 2010 you did not
8  bring the store deposits to the bank daily?
9     A.   She read that.
10    Q.   And that was -- was that your
11 understanding of why Ms. Gurtov was terminating
12 you?
13        MR. GOTTLIEB:  Objection.
14    A.   No, it was not my understanding.
15        I immediately knew why I was being
16 terminated immediately, which is why I just
17 took my separation paper, left, called the
18 hotline and contacted a lawyer.
19    Q.   And why do you think you were being
20 terminated?
21    A.   I knew I was being terminated because
22 of my leave.  That's why I was being
23 terminated, because of my medical leave,
24 because of my medical condition and because she
25 had to deal with it.

Page 323

S. Marshall

1  
2     Q.   And when did you call -- the hotline,
3  did you say?
4     A.   Yes.
5     Q.   When did you call them?
6     A.   The afternoon of the 1st.
7     Q.   Okay.
8         And what did you tell the person who
9  picked up the phone at the hotline?
10    A.   It was along the lines of, I'm being
11 terminated, I'm -- believe it was I'm being
12 terminated.  And I'm being told this because of
13 falsification of records.
14        I told them I did not falsify
15 records.  That falsification implies a
16 deliberate attempt to change or conceal
17 something, and that's not what I did.  And if
18 dates were wrong, it was accidental.  And that
19 if the other reason was bank deposits being
20 dropped, that there was not even any
21 documentation my entire career for that, and
22 it's something that had been being done, and
23 that I believed that that wasn't the reason for
24 my termination and that I wanted to know why
25 because that couldn't have been the reason.

Page 324

S. Marshall

1  
2     Q.   Is that all that you told them?
3         MR. GOTTLIEB:  Objection.
4     A.   I don't recall word for word.  I know
5  that there's a transcript of it.  But I don't
6  recall word for word, but it was long those
7  lines.
8     Q.   Okay.
9         And did anyone follow up with you
10 after your call?
11    A.   Yes.
12    Q.   Who followed up with you?
13    A.   Nancy Murgalo.
14    Q.   And did she call you?
15    A.   She did call me.
16    Q.   Okay.
17        When did she call you?
18    A.   Later that evening.
19    Q.   Okay.
20        And what did Nancy say?
21    A.   She asked me if I had made a call.
22 And I said yes, and I reiterated that this was
23 not -- that I didn't believe that this was why
24 I was being terminated, that it didn't make any
25 sense.  I didn't falsify records.  And that the

Page 325

S. Marshall

1  
2  bank deposits, again, were not something that,
3  if she was suddenly going to hold me
4  accountable to move to termination in lieu of
5  something that was an accepted practice.
6         And that I just didn't believe these
7  were the reasons I was being terminated right
8  after my FMLA leave.  And I made that clear.  I
9  was on an approved leave, and to come back and
10 to be terminated like that over these reasons
11 just didn't -- they didn't seem right and I
12 didn't believe them.
13    Q.   And what was Nancy's response?
14    A.   That I didn't need to be warned.
15 That was the essence of it.  She said, well, we
16 didn't have to warn you.  We don't -- it's
17 within our rights to not give you warnings.
18 And so I basically just ended the conversation.
19    Q.   Did she say anything else other than
20 what you've just testified to?
21    A.   Not that I recall now.
22    Q.   And did you say anything else other
23 than what you testified to?
24    A.   Not that I recall now.
25    Q.   Okay.

82 (Pages 322 to 325)

Page 326

1             S. Marshall
2        Ms. Marshall, do you know whether
3    your call to the hotline was recorded?
4        A.   I believe it was, yes.
5             MS. DIAZ:  I'd like to mark this as
6    Exhibit 32.
7             (Defendants' Exhibit 32, Document,
8        Bates No. Star/Marshall 2, was marked for
9        identification.)
10   BY MS. DIAZ:
11       Q.   Ms. Marshall, please review
12   Star/Marshall 2 at the bottom of the page, and
13   let me know when you're done.
14       A.   (Document Review.)
15            Okay.
16       Q.   Ms. Marshall, do you agree with this
17   summary of your call?
18            MR. GOTTLIEB:  Objection.
19       A.   I mean, should we -- it's a summary,
20   so it's not verbatim.  So she's going to
21   summarize it based on what -- or she, yes, is
22   going to summarize it based on what she
23   believes I said.
24            So, overall, yes.
25       Q.   Are there any portions of the summary

Page 327

1             S. Marshall
2    that you think are inaccurate?
3             MR. GOTTLIEB:  Objection.
4        A.   She was unaware of the policy.  I
5    believe that might have just been her
6    summarization of my speech to her.
7        Q.   A few lines down where it says, "She
8    was unaware of the policy and explains that she
9    sometimes got very busy"?
10       A.   Yes.
11       Q.   Do you recall saying that you were
12   unaware of the bank deposit policy?
13       A.   No, I don't recall saying that.
14   Overall, though, it seems to be accurate.
15       Q.   Ms. Marshall, towards the bottom
16   about ten lines -- eight to ten lines from the
17   bottom of the paragraph, it says, "She was
18   basically terminated without any previous
19   documentation of any wrongdoing."
20            MR. GOTTLIEB:  It starts on the
21       right-hand side.  "She was" on the
22       right-hand side.
23            A little further down.
24       A.   "She was" --
25            MR. GOTTLIEB:  Do you see it?

Page 328

1             S. Marshall
2             THE WITNESS:  Yes.
3        A.   Okay.
4        Q.   Is that an accurate statement?
5        A.   That is.
6        Q.   And, Ms. Marshall, about eight lines
7    above that there's a sentence that says, "There
8    is a procedure to be followed" -- excuse me.
9    Let me back up.
10            "As store manager, she could not fire
11   anyone for a first occurrence unless it
12   involved theft.  There is a procedure to be
13   followed which involves warnings and a series
14   of write-ups before termination."
15            Is that an accurate statement?
16            MR. GOTTLIEB:  Objection.
17       A.   That is -- yes.
18       Q.   Ms. Marshall, when did you first
19   consider contacting an attorney in connection
20   with your termination?
21       A.   Immediately upon being terminated.
22       Q.   Okay.
23            And when did you contact an attorney?
24            MR. GOTTLIEB:  Without going into the
25       substance of any communications you may

Page 329

1             S. Marshall
2    have had.
3        A.   I believe it was either the 1st or
4    the 2nd.  I think I was actually devastated and
5    cried for the first day, and then the next day
6    I made -- I started making contacts.
7        Q.   Okay.
8             And which attorneys did you contact?
9             MR. GOTTLIEB:  Objection.  Just hold
10       on a second.
11            What's the relevance of that
12       question?
13            MS. DIAZ:  I want to determine
14       whether -- I'm sorry, going to back up.
15   BY MS. DIAZ:
16       Q.   Ms. Marshall, why did you contact an
17   attorney?
18       A.   Because upon my termination, I knew
19   that the reason for my termination was
20   discrimination and retaliation against me
21   because of my medical condition and because of
22   my leave.  And I knew that immediately.  I
23   stated that in my call to the hotline.
24            I already knew -- started saying that
25   I was suspicious that I knew that this could

Page 330

1          S. Marshall
2    not be the reason.  It made absolutely no
3    sense.  And so pretty immediately I knew that
4    that was a need to contact an attorney.
5        Q.   At that time were you thinking about
6    suing Starbucks?
7            MR. GOTTLIEB:  Objection.
8            Just to be clear of the time you're
9        asking about.
10   BY MS. DIAZ:
11       Q.   At the time you considered contacting
12   an attorney, were you considering suing
13   Starbucks?
14           MR. GOTTLIEB:  But before she
15       actually spoke to an attorney?
16           MS. DIAZ:  Yes.
17       A.   No, I wasn't.  I didn't -- I had
18   never been -- I had never been fired from a
19   job.  I did not -- I just knew that this was
20   not right and that it was wrong.  And I wanted
21   to contact an attorney to find out what my
22   options were.
23       Q.   And which attorneys did you contact?
24           MR. GOTTLIEB:  Objection.
25           Again, what's the relevance of that?

Page 331

1          S. Marshall
2    BY MS. DIAZ:
3        Q.   You can answer the question.
4            MR. GOTTLIEB:  You can answer my
5        question.  You don't need to ignore my
6        question.  If I ask you question about your
7        question, you can answer it.  That's a
8        basic courtesy.
9            MS. DIAZ:  That's it.
10           MR. GOTTLIEB:  What's the relevance?
11           MS. DIAZ:  David, that's not a proper
12       objection.  Relevance.  If you think it's
13       irrelevant, you can do a motion in limine
14       down the line.
15           MR. GOTTLIEB:  If you can explain any
16       relevance to this case whatsoever, then
17       I'll -- maybe I'll let her answer the
18       question, but you need to explain to me why
19       that's at all relevant.
20           MS. DIAZ:  David, that's not --
21       relevance is not a proper objection, and
22       your speaking objection is not proper
23       either.
24           She can answer the question if she
25       understands it.

Page 332

1          S. Marshall
2            MR. GOTTLIEB:  Can you explain any
3        relevance to the question?  Because if you
4        can't, then it's a harassing question.  If
5        you're asking a question and you can't even
6        explain why it's relevant, you really
7        shouldn't be asking it.
8            MS. DIAZ:  I don't -- I don't -- I'm
9        not the person being deposed today and I
10       don't have to explain my theories of
11       relevance in terms of my questions.
12           MR. GOTTLIEB:  If you're asking a
13       question that's palpably irrelevant, then
14       you need to explain to me why the question
15       is being asked.
16           MS. DIAZ:  Can we take a five-minute
17       break?
18           MR. GOTTLIEB:  Sure.
19           THE VIDEOGRAPHER:  The time is
20       6:34 p.m.  We're going off the record.
21           (Recess taken from 6:34 p.m. to 6:42
22       p.m.)
23           THE VIDEOGRAPHER:  The time is
24       6:42 p.m.  We're back on the record.
25

Page 333

1          S. Marshall
2    BY MS. DIAZ:
3        Q.   Ms. Marshall, other than your
4    attorneys, with whom did you discuss your
5    termination?
6        A.   With --
7            MR. GOTTLIEB:  Attorneys or potential
8        attorneys.
9            Go ahead.
10       A.   With Zakia Slade, Christopher
11   Martinez, Sharice Lau, Kevin Nagle, the store
12   manager of Greenwich and Bank, whose house the
13   party was at and whose name I just can't
14   remember, Giselle Mitchell, Niorka Balfueno.
15           That's all I recall for now.
16       Q.   What did you tell Zakia Slade about
17   your termination?
18       A.   That I had just been terminated for
19   what they were saying was dropping bank
20   deposits.
21       Q.   Did you tell her anything else?
22       A.   Not that I recall.
23       Q.   And when was that conversation?
24       A.   Almost immediately after the
25   termination.

Page 334

S. Marshall

1
2    Q.   And what about Chris Martinez, what
3  did you tell him about your termination?
4    A.   That I had just been fired.  I mean,
5  I had just been fired.
6    Q.   Did you say -- tell him anything
7  else?
8    A.   He said why.  I said they're trying
9  to say it's for bank deposits, for dropping
10 bank deposits.
11   Q.   And when was that conversation?
12   A.   Again, pretty immediately, within the
13 hour.
14   Q.   Where was that conversation?
15   A.   It was on my --
16       MR. GOTTLIEB:  Objection.
17       Go ahead.
18   A.   It was on my cell phone a block away
19 from the district office.  I was standing out
20 in front of the mall just on the phone.
21   Q.   And was the conversation with Zakia
22 Slade also on your cell phone?
23   A.   Yes.
24   Q.   And what about Sharice Lau, what did
25 you tell her about your termination?

Page 335

S. Marshall

1
2    A.   That I had just been terminated.
3    Q.   Did you tell her anything else other
4  than that you had just been terminated?
5    A.   Again, they were saying it was
6  because I dropped deposits.
7    Q.   Did he tell Sharice that you thought
8  it was because you took medical leave?
9    A.   I don't recall saying that.
10   Q.   Did you tell her anything else?
11   A.   I don't recall saying anything else.
12   Q.   And when was that conversation?
13   A.   I believe that that was later that
14 afternoon.
15   Q.   And did you tell Chris Martinez that
16 you believed you were terminated because you
17 took medical leave?
18   A.   Yes.
19   Q.   Did you tell Zakia Slade that you
20 believe you why terminated because you took
21 medical leave?
22   A.   No.
23   Q.   What did you say to Chris about your
24 medical leave?
25   A.   Simply that I just didn't believe

Page 336

S. Marshall

1
2  this, and that I was going to call the hotline
3  and that I believe that it had to be because of
4  my medical leave; that no one gets fired for
5  this, which was a reaction that I got from
6  every store manager, that that's ridiculous,
7  you couldn't have gotten fired for dropping
8  deposits.  It's the most ridiculous thing I
9  ever heard.
10       And I agreed.  And Chris was the
11 person that I had the actual close relationship
12 with, so he was the one that I would go into
13 more detail and say, you know, this has got to
14 be because of the leave.
15   Q.   Did you discuss anything else with
16 Chris?
17   A.   Not that I recall.
18   Q.   What about Kevin Nagle, what did you
19 discuss with him?
20   A.   Simply told him I had been
21 terminated.
22   Q.   Did you tell him that you thought it
23 was because of your leave?
24   A.   No.
25   Q.   Did you tell him anything else?

Page 337

S. Marshall

1
2    A.   Not that I recall.
3    Q.   And when was that conversation?
4    A.   Later that afternoon.
5    Q.   What about the store manager of
6  Greenwich and Bank, what did you tell that
7  store manager?
8    A.   That I had been terminated.
9    Q.   Did you tell him that it was because
10 of your leave?
11   A.   No.
12   Q.   Did you tell him anything else?
13   A.   Not that I recall.
14   Q.   What about Giselle Mitchell, what did
15 you tell her about your termination?
16   A.   That I had been terminated.
17   Q.   Did you tell her that you thought it
18 was because of your leave?
19   A.   Yes.
20   Q.   What did you say to her?
21   A.   That I believed I had been terminated
22 because of my leave.
23   Q.   Anything else?
24   A.   Not that I recall.
25   Q.   And when was that conversation?

Page 338

S. Marshall

1                    S. Marshall
2       A.   That evening.
3       Q.   And what about Niorka Balfueno?  What
4  did you discuss with her regarding your
5  termination?
6       A.   Just that I had been terminated.
7       Q.   Did you tell her that you thought it
8  was because of your leave?
9       A.   No.
10      Q.   And when was that conversation?
11      A.   That afternoon.
12      Q.   Okay.
13           Ms. Marshall, after you were
14  terminated -- Ms. Marshall, let me strike that
15  first question.
16           You testified that other store
17  managers said no one gets terminated for
18  holding deposits.  Did you also tell the store
19  managers that you were terminated for
20  falsifying records?
21           MR. GOTTLIEB:  Objection.
22      A.   Did I specifically say those words?
23  No.
24      Q.   Ms. Marshall, after your employment
25  was terminated, did you look for employment?

Page 339

S. Marshall

1                    S. Marshall
2       A.   Yes.
3       Q.   What did you do to look for jobs?
4       A.   I sent out my resume.  I sent out my
5  resume and I contacted friends to see if they
6  had any sort of references for me or referrals
7  for me.
8       Q.   Where did you send your resume?
9       A.   All the places I recall.  Old Navy,
10  Gap, Target, Apple, Postgraduate Center for
11  Mental Health.  And also I was referred by a
12  friend to a temp agency, and the name of the
13  temp agency I don't remember.
14           Those were all the ones I recall.
15      Q.   And when did you start looking for
16  work?
17      A.   Within days.
18      Q.   Did you have to create a resume?
19      A.   I did.
20      Q.   You indicated that you posted --
21  Ms. Marshall, did you post your resume online?
22      A.   I did.
23      Q.   Where did you post your resume?
24      A.   It was either Hot Jobs or Monster.
25      Q.   And have you produced that resume?

Page 340

S. Marshall

1                    S. Marshall
2       A.   I have.
3           MR. GOTTLIEB:  Objection.
4           You can answer.
5       A.   I have.
6       Q.   Ms. Marshall, what was the first job
7  that you obtained after your employment at
8  Starbucks ended?
9       A.   It was as a mental health counselor.
10      Q.   And where was that?
11      A.   At Postgraduate Center for Mental
12  Health.
13      Q.   And what were your duties as a mental
14  health counselor?
15      A.   My duties were to basically socialize
16  with a population of adults that were diagnosed
17  with mental disease or defects; so, a majority
18  of my job was socialization, but it was also
19  securing the premises of the building and
20  dispensing medication.  Those are just a few of
21  the ones that I can recall now.
22      Q.   And when did you get that job?
23      A.   Approximately three weeks after.
24      Q.   And when did you stop working there?
25      A.   I haven't stopped working there.

Page 341

S. Marshall

1                    S. Marshall
2       Q.   You're still working there currently?
3       A.   I am a per diem there, yes.
4       Q.   Okay.
5           When you commenced employment
6  approximately three weeks after your
7  termination, how many hours were you working at
8  the Post Graduate Center for Mental Health?
9           MR. GOTTLIEB:  Per week or --
10          MS. DIAZ:  Per week.
11      A.   I was given a schedule of 28 hours
12  per week.
13      Q.   And how long did you work 28 hours
14  per week at the Post Graduate Center for Mental
15  Health?
16      A.   My actual hours working varied over
17  because I did pick up as many shift as possible
18  per week on top of what I was given on the
19  schedule.  And I worked there until mid-May
20  as a -- that was as a part-time mental health
21  counselor.  So I'll just correct that.  As
22  part-time mental health counselor.  I worked
23  there until mid-May with that title.
24      Q.   And were you receiving a salary or an
25  hourly wage as a part-time mental health

Page 342

1                    S. Marshall
2    counselor?
3        A.   Hourly.
4        Q.   What was your hourly wage?
5        A.   I believe it was $11 an hour.
6        Q.   And after May, what was your position
7    at the Post Graduate Center for Mental Health?
8        A.   I stepped down to per diem counselor.
9        Q.   And what does that mean?
10       A.   Basically I'm only available to pick
11   up shifts, if I can.
12       Q.   And how many hours are you working
13   approximately per week as a per diem counselor?
14       A.   Maybe once every two weeks.
15       Q.   Working one hour every two weeks?
16       A.   No.  One shift every two weeks.
17       Q.   And what's one shift consist of?
18       A.   An eight-hour shift.
19       Q.   Okay.
20            And is your hourly rate still $11 an
21   hour?
22       A.   No.  It's now $10 an hour.
23       Q.   Okay.
24            Ms. Marshall, how did you obtain
25   employment at the Post Graduate Center for

Page 343

1                    S. Marshall
2    Mental Health?
3        A.   Christopher Farmer is a program
4    director and he's also a long-time friend.
5        Q.   Who is Chris Farmer?
6        A.   He's a friend.
7        Q.   Is he related to John Farmer?
8        A.   Yes, he's his brother.
9        Q.   And John Farmer is a previous store
10   manager?
11       A.   Correct.
12       Q.   Did you submit a resume to the Post
13   Graduate Center for Mental Health?
14       A.   I did.
15       Q.   And did it mention Starbucks?
16       A.   It did.
17       Q.   Did you have an interview at the Post
18   Graduate Center for Mental Health before you
19   were hired?
20       A.   I did.
21       Q.   Did they ask you why you were no
22   longer working at Starbucks?
23       A.   Yes.
24       Q.   What did you respond?
25       A.   That I was terminated because of what

Page 344

1                    S. Marshall
2    they called inaccuracies.
3        Q.   Okay.
4             And who was your interview with?
5        A.   Chris -- John Farmer.
6             I keep mixing up their names.
7    Christopher Farmer.  I'm so sorry.  It's
8    getting late.
9             Chris Farmer was the program
10   director.  That's who I had the interview with.
11       Q.   Okay.
12            And what else did you tell him about
13   why you were terminated from Starbucks?
14       A.   Nothing.  It was a job interview.
15   It's not the time or the place to, you know,
16   talk about it.  I kept it as simple as
17   possible.
18
19            MS. DIAZ:  I'd like to mark this as
20        Exhibit 33.
21            (Defendants' Exhibit 33, Pay Stub,
22        Bates No. SM 389, was marked for
23        identification.)
24   BY MS. DIAZ:
25       Q.   This is Bates stamped SM389.

Page 345

1                    S. Marshall
2             Ms. Marshall, are you familiar with
3    this document?
4        A.   Yes.
5        Q.   What is it?
6        A.   It's a pay stub from Post Graduate
7    Center.
8        Q.   And have you given your attorney all
9    of the pay stubs that you have from the Post
10   Graduate Center for Mental Health?
11       A.   I have, yes.
12       Q.   And this is the only one that you
13   have from the time of your employment at the
14   Post Graduate Center for Mental Health?
15       A.   If it's the only one I gave him, then
16   it's the only one I had, yes.
17       Q.   Do you continue to receive pay stubs
18   from the Post Graduate Center for Mental
19   Health?
20       A.   If I work, yes.
21       Q.   Okay.
22            And what did you do with those pay
23   stubs?
24       A.   I -- what do I do with my pay stubs?
25       Q.   Uh-huh.

S. Marshall

1
2      A.   The reason I only had one is because
3  I typically don't keep them.
4      Q.   Are you aware that you're required to
5  preserve documents that may be relevant --
6  relevant your claims in this litigation?
7      A.   Yes.
8          MS. DIAZ:  Mr. Gottlieb, I ask that
9      you instruct your client to preserve her
10      pay stubs from all of her sources of
11      income.
12  BY MS. DIAZ:
13      Q.   Ms. Marshall, is this pay stub
14  accurate for the July 2011 time period?
15      A.   It looks accurate, yes.
16      Q.   In addition to your hourly salary, do
17  you receive any bonuses at the Post Graduate
18  Center for Mental Health?
19      A.   No.
20      Q.   Do you receive any type of benefits?
21      A.   No.
22      Q.   Ms. Marshall, other than the Post
23  Graduate Center for Mental Health, have you
24  held any other jobs since being terminated from
25  Starbucks?

S. Marshall

1
2      A.   Yes.
3      Q.   Where have you held those jobs?
4      A.   At Old Navy.
5      Q.   Okay.
6          And when did you start that job?
7      A.   Approximately mid-May.
8      Q.   And what is your position at Old
9  Navy?
10      A.   Assistant store manager of service
11  and operations.
12      Q.   What are your duties as assistant
13  store manager?
14      A.   Including, but not limited to,
15  supervising, training, hiring and managing a
16  group of associates, approximately 70 of them.
17  I run the service center in the building.
18      Q.   How did you find the job at Old Navy?
19      A.   I was contacted by a recruiter who
20  invited me to an open house.
21      Q.   And did you attend the open house?
22      A.   I did.
23      Q.   Did you have an interview with the
24  open house?
25      A.   I did.

S. Marshall

1
2      Q.   Do you recall who you interviewed
3  with?
4      A.   I interviewed with my current
5  district manager, Carlos Herrera.
6      Q.   And did you discuss with Carlos your
7  employment at Starbucks?
8      A.   I did.
9      Q.   Did you tell Mr. Herrera that your
10  employment was terminated at Starbucks?
11      A.   No, I did not.
12      Q.   What did you tell him about your
13  employment at Starbucks?
14      A.   I just said it ended and I went to
15  Post Graduate Center.
16      Q.   Okay.
17          Did Mr. Herrera ask you why it ended?
18      A.   No, not that I recall. I was very
19  sure to move the conversation along.
20          MS. DIAZ:  I'd like to mark this as
21      Exhibit 34.
22          (Defendants' Exhibit 34, Pay Stub,
23      Bates No. SM 388, was marked for
24      identification.)
25

S. Marshall

1
2  BY MS. DIAZ:
3      Q.   This is Bates stamped SM388.
4          Ms. Marshall, do you recognize this
5  document?
6      A.   Yes.
7      Q.   What is it?
8      A.   It's a pay stub from Old Navy, Gap,
9  Inc.
10      Q.   Is this pay stub accurate?
11      A.   Yes, it is.
12      Q.   And have you given your attorney all
13  the pay stubs that you have from Old Navy?
14      A.   I have some new ones that I have to
15  give you. So...
16          MS. DIAZ:  I'd like to request
17      production of those pay stubs and also ask
18      that you preserve any other pay stubs with
19      respect Old Navy.
20  BY MS. DIAZ:
21      Q.   Ms. Marshall, what's your salary at
22  Old Navy?
23      A.   It is $52,000 a year.
24      Q.   Okay.
25          And how does that compare to your

Page 350

S. Marshall

1  salary at Starbucks when you were terminated?
2
3      MR. GOTTLIEB: Objection.
4      A.   It is almost $5,000 less.  And also
5  does not include the opportunity to bonus the
6  way that Starbucks did.
7      Q.   Okay.
8          And when you say the opportunity to
9  bonus, you're learning the quarterly bonus?
10     A.   Yes.
11     Q.   And have you received any raises
12  since starting your position at Old Navy?
13     A.   No.
14     Q.   Have you received any bonuses since
15  you started your employment?
16     A.   No.
17     Q.   Are you familiar with Old Navy's
18  field incentive plan?
19     A.   Yes.
20     Q.   What is it?
21     A.   I'm vaguely familiar with it?  It's
22  based on criteria, like any plan.  And you meet
23  the criteria and you receive a monetary bonus.
24     Q.   And are you eligible for bonuses
25  under that program?

Page 351

S. Marshall

1
2      A.   I am.
3          MR. GOTTLIEB: Objection.
4          You can answer.
5      A.   I am.
6      Q.   Okay.
7          And, Ms. Marshall, are you at a large
8  volume store at Old Navy?
9          MR. GOTTLIEB: Objection.
10          You can answer.
11     A.   I'm at a high-volume store.
12     Q.   Okay.
13          Do you know whether you're considered
14  a Tier 2 worker at Old Navy?
15          MR. GOTTLIEB: Objection.
16     A.   I've never even heard that term used
17  there.
18     Q.   Okay.
19          MS. DIAZ: I'd like to mark this as
20  Exhibit 35.
21          (Defendants' Exhibit 35, Document,
22  Bates Nos. SM 395 to 400, was marked for
23  identification.)
24  BY MS. DIAZ:
25     Q.   It's Bates stamped SM395 to 400.

Page 352

S. Marshall

1
2          Ms. Marshall, are you familiar with
3  this document?
4      A.   Familiar, no.  I received it as part
5  of my hiring package.
6      Q.   Okay.
7          Ms. Marshall, on the first page, on
8  page 395, under Tier 2 Leader, there's a job
9  code that says "03015ASM services and ops."
10          Is that your position at Old Navy?
11     A.   It is.
12     Q.   And can you turn to the next page?
13          And in the middle of the page there's
14  a chart that says, "Level Incentive Target and
15  Maximum."  For a Tier 2 leader, the incentive
16  target says 9 percent, and the maximum target
17  is 18 percent; is that correct?
18     A.   According to this document.
19     Q.   Okay.
20          Do you know how the incentive targets
21  work at Old Navy?
22     A.   I don't.
23     Q.   And do you know whether or not you're
24  eligible for a quarterly bonus at Old Navy?
25     A.   I am eligible as a salaried manager,

Page 353

S. Marshall

1
2  yes.
3      Q.   Okay.
4          When you referred to your store as a
5  high-volume store, is that the same thing as a
6  large-volume store?
7          MR. GOTTLIEB: Objection.
8          Are you asking large volume --
9          MS. DIAZ: Great than 20 million.
10          MR. GOTTLIEB: -- as per what the
11  document says?
12     A.   What does the document say?
13     Q.   Ms. Marshall, the document, towards
14  the middle of the page says, "Large Volume
15  Stores." parentheses, "Greater than
16  20 million."
17          MR. GOTTLIEB: Are you asking if she
18  knows if whether her store did more than 20
19  million?
20          MS. DIAZ: Can you let me ask my
21  question?
22          MR. GOTTLIEB: Estela, I was asking
23  for clarification.
24          MS. DIAZ: I was in the middle of --
25          MR. GOTTLIEB: It was a reasonable

1           S. Marshall
2       thing to ask.
3           MS. DIAZ: -- speaking, David.
4           MR. GOTTLIEB:  You have a question
5       pending and I was asking you a question for
6       clarification.  But if you would like to
7       start over with a new question, go ahead.
8       BY MS. DIAZ:
9           Q.   Ms. Marshall, are you aware if your
10      store qualifies as a large-volume store under
11      this document?
12          A.   I don't know.
13          Q.   Okay.
14               And, Ms. Marshall, what kind of
15      benefits do you receive at Old Navy?
16          A.   I receive medical, dental, vision,
17      life insurance.
18          Q.   Are you eligible for home loan
19      services?
20          A.   Not that I'm aware of.
21          Q.   Okay.
22               And what about tuition reimbursement,
23      are you eligible for that?
24          A.   Not that I'm aware of.
25          Q.   Okay.

1           S. Marshall
2           Do you participate in a stock
3       purchase plan at Old Navy?
4           A.   No.
5           Q.   Are you -- is that available to you?
6           A.   I don't know.
7           Q.   Okay.
8               Do you participate in a 401(k) plan
9       at Old Navy?
10          A.   I'm not eligible yet, so, no.
11          Q.   Okay.
12               When do you become eligible?
13          A.   After a year of employment.
14          Q.   And do you obtain employee discounts
15      at Old Navy?
16          A.   Yes.
17          Q.   Do you shop there?
18          A.   Yes.
19               MS. DIAZ:  I'd like to mark this as
20      Exhibit No. 36.
21               (Defendants' Exhibit 36, Document,
22      Bates No. SM 393 and 394, was marked for
23      identification.)
24      BY MS. DIAZ:
25          Q.   It's Bates stamped SM393, 394.

1           S. Marshall
2           Ms. Marshall, are you familiar with
3       this document?
4           A.   Yes.  I remember this as being my
5       contract.
6           Q.   And, Ms. Marshall, five paragraphs
7       down from the top of the first page under
8       "Benefits," the second sentence says that, "In
9       addition to medical, dental, vision and life
10      and income protection, you are eligible for
11      Gap, Inc.'s lifestyle benefits, which include
12      an employee assistance program, home loan
13      services, and tuition reimbursement."
14               Is it your understanding from this
15      document that you're eligible for those
16      benefits?
17               MR. GOTTLIEB:  Objection.
18          A.   Yes.
19          Q.   Okay.
20               And the next sentence says, "Gap,
21      Inc. also offers an employee stock purchase
22      plan, a 401(k) plan with a generous
23      dollar-for-dollar company match up to 4 percent
24      of your pay, limited as provided in the plan
25      and employee discounts."

1           S. Marshall
2           Based with on this document, is it
3       your understanding that you're eligible to
4       participate in Gap's employee stock purchase
5       plan?
6           A.   Yes.
7               MS. DIAZ:  I'd like to mark this as
8       Exhibit No. 37.
9               (Defendants' Exhibit 37, E-Mail,
10      Bates Nos. SM 452 through 454, was marked
11      for identification.)
12               MR. GOTTLIEB:  What is our time
13      check?
14               THE VIDEOGRAPHER:  Give me a second.
15               MS. DIAZ:  Can we actually take a
16      five-minute break?
17               THE VIDEOGRAPHER:  The time is
18      7:09 p.m. and we're going off the record.
19               (Recess taken from 7:09 p.m. to 7:18
20      p.m.)
21               THE VIDEOGRAPHER:  The time is
22      7:18 p.m.  We're back on the record.
23      BY MS. DIAZ:
24          Q.   Ms. Marshall, can you go back to
25      Exhibit 36, which was your Old Navy offer

Page 358

S. Marshall

1    S. Marshall
2    letter?
3            Is it your understanding that this
4    letter captures the terms of your employment
5    with Old Navy?
6            MR. GOTTLIEB:  Objection.
7        A.  It seems to, yes.
8        Q.  Okay.
9            Ms. Marshall, going to Exhibit 37,
10   it's Bates stamped SM452 through 454, it's an
11   e-mail between you and somebody at Gap.com
12   which attaches your resume.
13           Can you slip to page 454, please.
14       A.  Okay.
15       Q.  At the bottom you list Starbucks
16   Coffee Company and the dates of your
17   employment; is that correct?
18       A.  That I list it?  Yes.
19       Q.  Okay.
20           And on the following page, are you
21   describing your experience at Starbucks?
22           MR. GOTTLIEB:  Objection.
23   BY MS. DIAZ:
24       Q.  At the top of the page?
25       A.  Yes.

Page 359

S. Marshall

1    S. Marshall
2        Q.  Okay.
3            Ms. Marshall, at the bottom of the
4    first paragraph says that, "Insured all
5    policies were implemented and maintained in a
6    consistent manner."
7            Do you believe that's an accurate
8    statement?
9        A.  I do.
10       Q.  Okay.
11           Ms. Marshall, after your employment
12   was terminated, did you attempt to attend
13   school?
14       A.  I did, yes.
15       Q.  Where did you attempt to enroll?
16       A.  New York Career Institute --
17       Q.  Okay.
18       A.  -- I believe is the name of it.
19       Q.  And did you enroll at the New York
20   Career Institute?
21       A.  I did not --
22       Q.  Okay.
23       A.  -- end up enrolling.
24       Q.  Did you ever -- did you have to pay
25   any fees to the New York Career Institute?

Page 360

S. Marshall

1    S. Marshall
2        A.  Yes.  I had to pay an application
3    fee.
4        Q.  Do you remember what the application
5    fee was?
6        A.  The amount of it?
7            I believe it was 40 bucks.
8        Q.  Okay.
9            And, Ms. Marshall, did you apply to
10   any other schooling or training programs?
11       A.  Not that I recall, no.
12       Q.  Okay.
13           Did you apply to the University of
14   Phoenix?
15       A.  Oh, I did.  That was actually during
16   my -- during my leave of absence, not after my
17   termination.
18       Q.  Okay.
19           And why did you apply to the
20   University of Phoenix during your leave of
21   absence?
22       A.  Because I wanted to get my master's
23   in human resources.
24       Q.  Okay.
25           And do you recall when during your

Page 361

S. Marshall

1    S. Marshall
2    leave of absence you -- you applied to the
3    University of Phoenix?
4        A.  Not exactly, no.
5        Q.  Okay.
6            MS. DIAZ:  I'd like to mark this as
7    Exhibit 38.
8            (Defendants' Exhibit 38, Document,
9    Bates No. SM 435 through SM 437, was
10   marked for identification.)
11   BY MS. DIAZ:
12       Q.  This is Bates stamped SM435 through
13   SM437.
14           Ms. Marshall, at the top of the
15   e-mail, at the top of the document on the first
16   page it's an e-mail from you to somebody at
17   Phoenix.edu, dated March 8, 2011.  And you
18   state, "I was informed yesterday that due to my
19   extended FMLA, I was no longer employed by
20   Starbucks."
21           Is that an accurate statement?
22       A.  That I wrote this line?
23       Q.  Is it an accurate statement that you
24   were informed the day before March 8th that you
25   were no longer employed by Starbucks?

91 (Pages 358 to 361)

Page 362

S. Marshall

1          S. Marshall
2      A.   No.
3          MR. GOTTLIEB:  Objection.
4  BY MS. DIAZ:
5      Q.   It's not?
6          MS. DIAZ:  What's that?
7          MR. GOTTLIEB:  I just objected.
8      A.   No.
9      Q.   I'm sorry, you said it was not an
10  accurate statement?
11     A.   It's not an accurate statement.
12     Q.   Then why did you write it?
13     A.   Because at the end of the day, I
14  mean, who was he?  I just wanted to at least be
15  courteous so that he would stop contacting me
16  at that point because I had been fired from my
17  job.  So I just wanted to at least send a
18  little note for him, letting him know that I
19  didn't have a job, so right now wasn't the time
20  to go to school.
21     Q.   So at the time you wrote it, you knew
22  that it was inaccurate?
23         MR. GOTTLIEB:  Objection.
24         You can answer the question.
25     A.   Yes.

Page 363

1          S. Marshall
2      Q.   Ms. Marshall, what did you do after
3  your employment was terminated and before you
4  obtained your employment at the Post Graduate
5  Center for Mental Health?
6          MR. GOTTLIEB:  Objection.
7      A.   What did I do during like those three
8  weeks?
9      Q.   Uh-huh.
10         MR. GOTTLIEB:  Other than what she
11  has already testified to?
12     A.   I cashed in my 401(k) and my -- I
13  believe I had some stock options left, and I
14  cashed them all in, so that I could survive.
15         And, I mean, I don't know.  There's
16  nothing that stands out that I did.  I lived.
17  I don't --
18     Q.   Did you attend school during that
19  time period?
20     A.   During those three weeks, school?
21     Q.   Uh-huh.
22     A.   No.  I believe that -- it might have
23  been during those three weeks I went to like a
24  workshop.  It wasn't school.  I didn't pay.  It
25  was sort of a workshop where they try to get

Page 364

1          S. Marshall
2  you to -- the Learning Annex, I believe that
3  that's what it was.
4          It was just a workshop that they
5  offer for free in the hopes that you'll sign
6  up.
7      Q.   What was the workshop about?
8      A.   Fiction writing.
9      Q.   Okay.
10     A.   -- I believe.
11     Q.   And did you travel during that
12  three-week period?
13     A.   I don't recall.
14     Q.   Okay.
15         Did you take any vacations?
16     A.   I don't recall.
17     Q.   Okay.
18         And what were your monthly expenses
19  during that period?  How much -- let me back
20  up.
21         How much was your rent during the
22  period after you were terminated from
23  Starbucks?
24     A.   $971.39 a month.
25     Q.   Okay.

Page 365

1          S. Marshall
2          Did you have any other monthly
3  expenses?
4      A.   Yes.
5      Q.   What other expenses did you have?
6      A.   Cable, gas and electric, phone bill,
7  Gap credit card, Old Navy credit card, two
8  Citibank credit cards, a Target credit card.
9  And that's all I can recall now.
10     Q.   Okay.
11         Did you have any student loan debt
12  or --
13     A.   Oh, and my student loan.
14     Q.   Okay.
15         And what did you do to earn money
16  during that time period?
17     A.   During my three weeks?  Nothing.
18     Q.   Okay.
19         Ms. Marshall, did you receive
20  employment for the period that you were -- for
21  the period after you were terminated from
22  Starbucks?
23     A.   I did.
24     Q.   And for what period of time did you
25  receive employment benefits?

S. Marshall

1
2      A.   I don't know the dates exactly.
3      Q.   Approximately how long did you
4   receive unemployment benefits?
5      A.   I still don't know the dates because
6   I earned less at Post Graduate.  So
7   unemployment does cover a certain amount up to
8   what my maximum was, because I earned the
9   maximum payout from unemployment because of my
10  salary.  So I really don't know how long that
11  was.
12     Q.   Okay.
13          So you continued to receive
14  unemployment after you started at the Post
15  Graduate Center for Mental Health?
16     A.   For a couple to several weeks, yes.
17     Q.   And do you recall how much you
18  received in unemployment benefits before you
19  started at the Post Graduate Center for Mental
20  Health?
21     A.   I actually did not receive them
22  before because they were denied, and I had to
23  go to a hearing.  So I was sent the amount owed
24  to me for that time period.
25     Q.   You were sent a lump sum?

S. Marshall

1
2      A.   Yes.
3      Q.   Do you recall what the lump sum was?
4      A.   I don't.
5      Q.   Okay.
6          And after the Post Graduate Center
7   for Mental -- after you commenced employment at
8   the Post Graduate Center for Mental Health, do
9   you recall how much you were receiving in
10  unemployment benefits each week?
11     A.   No.
12     Q.   Okay.
13          Ms. Marshall, do you have any records
14  regarding those benefits that you received from
15  unemployment?
16     A.   If I did, then I gave them to my
17  lawyer.
18          MS. DIAZ:  I'd like to request the
19  production of those documents.  I don't
20  think we have received anything regarding
21  the amount of unemployment benefits that
22  she received.
23          I'd like to mark this as Exhibit 39.
24          (Defendants' Exhibit 39, Hearing
25  Transcript, was marked for

S. Marshall

1
2   identification.)
3   BY MS. DIAZ:
4      Q.   Please review the document and let me
5   know when you're done.
6      A.   (Document Review.)
7          Okay.
8      Q.   Okay.
9          Ms. Marshall, are you familiar with
10  this document?
11         MR. GOTTLIEB:  Objection.
12     A.   Well, not familiar with the document,
13  no.
14     Q.   Do you know what it is?
15     A.   It's a transcript of my hearing.
16     Q.   And do you believe this is an
17  accurate transcript of the hearing that was
18  held on May 9, 2011?
19         MR. GOTTLIEB:  Objection.
20         You can answer.
21     A.   It seems to be.
22         MR. GOTTLIEB:  Just objection to any
23  question involving this document, but you
24  can go ahead.
25     A.   It seems to be accurate.

S. Marshall

1
2      Q.   Ms. Marshall, can you please turn to
3   page 7 of the document, or the Bates stamp
4   8894.  Line 5 says, "On what day were you
5   actually fired"?
6          Do you know who was asking the
7   question at the hearing that took place on
8   May 9, 2011?
9      A.   Do I know the judge's name?  No.
10     Q.   Okay.
11          It was a judge at the Unemployment
12  Appeals Board; is that correct?
13     A.   Yes.
14     Q.   Okay.
15          And you're the person answering the
16  questions on this page?
17     A.   Yes.
18     Q.   Okay.
19          Ms. Marshall, you say March 1, 2011
20  in response to the question on what day were
21  you actually fired.  And you respond that
22  Ms. Gurtov fired you; is that correct?
23     A.   Yes.
24     Q.   Can you turn to the next page,
25  page 8.

93 (Pages 366 to 369)

Page 370

```
                    S. Marshall
 1         Ms. Marshall, according to this
 2    document, the unemployment appeals judge asked
 3    you, "And what reason were you given for the
 4    discharge?"
 5         And your response was, "That I
 6    falsified bank deposits."
 7         MR. GOTTLIEB:  Objection.
 8    BY MS. DIAZ:
 9         Q.   Is that correct?
10         A.   That is correct, that that's my
11    response, yes.
12         Q.   Okay.
13         And she asked, or excuse me, the
14    judge asked you whether you falsified bank
15    deposits.  And your response was no; is that
16    correct?
17         MR. GOTTLIEB:  Objection.
18         Are you asking her what the document
19    says, Estela?
20    BY MS. DIAZ:
21         Q.   Is that your recollection of your
22    testimony at the hearing?
23         MR. GOTTLIEB:  Are you asking her
24    recollection or what the document says?
25
```

Page 371

```
                    S. Marshall
 1    BY MS. DIAZ:
 2         Q.   Is that your recollection of your
 3    testimony at the hearing?
 4         MR. GOTTLIEB:  Without regard to the
 5    document.
 6         A.   Yes.
 7         Q.   Ms. Marshall, do you think this is
 8    accurate in terms of the reason that you were
 9    given for your discharge?
10         MR. GOTTLIEB:  Objection.
11         A.   Yes.
12         Q.   Were you given any other reason other
13    than that you falsified bank deposits as the
14    reason for your discharge?
15         A.   And the dropping of deposits.
16         Q.   But you didn't mention that at your
17    unemployment appeals hearing?
18         MR. GOTTLIEB:  Objection.
19         Is that a question or is that a
20    statement?
21    BY MS. DIAZ:
22         Q.   Is that correct?
23         A.   That is correct.
24         Q.   Ms. Marshall, how has your
25
```

Page 372

```
                    S. Marshall
 1    termination affected you personally?
 2         A.   It has probably been the most
 3    traumatic thing I've ever had to experience.
 4    And, you know, I started working there when I
 5    was still in college and I started as a
 6    barista, and I worked there for -- through all
 7    my 20s and into my 30s.
 8         I loved that company.  I completely
 9    loved it.  I drunk Kool-Aid, I believed in it,
10    I believed in what they were doing, to a point
11    where people thought it was almost silly that
12    it's just a coffee company.  But I actually
13    believed in, I guess Howard Shultz and the
14    mission and that I bought into that and I
15    bought into service and I bought into being a
16    manager and I bought into being in a retail
17    environment.  And then with an opportunity of
18    having a degree and getting something else, I
19    didn't want to, I didn't want to leave that
20    company.
21         And it was like being dumped by my
22    significant other.  That's the way I -- to put
23    it, or even worse, you know, that it was
24    horrifying.  It was embarrassing.  It was -- it
25
```

Page 373

```
                    S. Marshall
 1    was unfair.  It was wrong.  It was -- it -- I
 2    cried for a very, very long -- very long time.
 3         I still feel a sense of almost loss
 4    about it, because I truly really loved
 5    Starbucks.  And I felt -- I doubted myself.  I
 6    doubted my abilities to find a new job.  I
 7    never had to really interview before because I
 8    had been promoted into my role.  So it was
 9    really typically maybe a sit-down with my next
10    level manager to get a promotion.  And suddenly
11    I was just thrust out into the world and I had
12    to, you know, figure it out.
13         And then I had this stigma around me
14    like I was some terrible employee.  You know,
15    the majority of my friends were partners and,
16    you know, now suddenly I'm not on part of that
17    group anymore.  I'm not in those relationships
18    with them.  It affected me.  I was -- it was
19    traumatic, embarrassing.  I cried.  I -- it was
20    upsetting.  It was -- it was just an emotional
21    rollercoaster.
22         Even with another job, it's just --
23    it's scarring.  It's scarring to go through
24    something like that.
25
```

94 (Pages 370 to 373)

Page 374

1          S. Marshall
2     Q.   And, Ms. Marshall, did your
3  termination cause any physical symptoms?
4          MR. GOTTLIEB: Objection.
5          You can answer.
6     A.   Physical symptoms?
7          Crying is physical.  Crying, being
8  upset, feeling like you can't eat.  It really
9  is like a reaction like being dumped.  That's
10 what -- you get all those same symptoms.  You
11 don't -- you can't eat.  All you want to do --
12 all I wanted to do is sleep.
13         But it's not like a boyfriend, like I
14 have to -- how am I going to support myself?
15 Like I have bills to pay, I have a loan to pay
16 back, I have rent, like, so I can't just lay in
17 the bed and bemoan my situation.
18         You know, so I have to put on a brave
19 face even though I felt like I was, you know,
20 kicked in my back, kicked while I was down,
21 kicked while I was -- you know, took time off.
22 After all those years with the company for that
23 to happen to me and for that to be okay was
24 just horrifying.
25    Q.   So other than crying and feeling like

Page 375

1          S. Marshall
2  you couldn't eat and wanting to sleep all the
3  time, did you suffer any other physical
4  symptoms as a result your termination?
5          MR. GOTTLIEB: Objection.  And
6    everything else she mentioned.
7          Go ahead.
8     A.   I'm sorry.  Say that, just crying,
9  just physically feeling ill, wanting to sleep
10 all the time, but I can't, I have to get up.
11 Just being upset.
12    Q.   Ms. Marshall, when you say
13 "physically feeling ill," what do you mean by
14 that?
15    A.   When you have that feeling in the pit
16 of your stomach like you want a -- maybe a
17 nervous -- the best way to put it is maybe
18 you're scared of public speaking and you want
19 to throw up before you get up in front of the
20 stage.  That's how I felt.  Like I just -- it
21 would just hit me.
22         Like I would wake up in the morning
23 and I'd just couldn't even -- I'd wake up in
24 the morning, it's like, I don't have a job.  It
25 was like -- and it wasn't just I don't have a

Page 376

1          S. Marshall
2  job, like I don't have a paying job.  It was
3  like I don't -- I don't have Starbucks.  Like
4  it was -- it was like every day I had to wake
5  up and realize that, you know, my job, it
6  wasn't just my job, like I was passionate about
7  it.
8          I gave it all my hours to the point
9  of where I didn't even realize I was sick
10 because I thought I was just exhausted from
11 working there so much.  And I was so involved
12 in the company and its mission and in
13 whatever was going on and whatever events we
14 had.
15         So just waking up every day and
16 realizing again, like Ground Hog Day, that, oh,
17 crap, I've been fired, I can't go there, was
18 just devastating.
19    Q.   Ms. Marshall, did you seek medical
20 treatment after your termination as a result of
21 the way you were terminated?
22         MR. GOTTLIEB: Objection.
23         You can answer.
24    A.   No.
25    Q.   Did you seek counseling as a result

Page 377

1          S. Marshall
2  of your termination?
3     A.   No.
4     Q.   Did you seek any type of mental
5  health treatment as a result of your
6  termination?
7     A.   No.
8     Q.   And did you take any medication to
9  allay the symptoms that you describe as a
10 result of your termination?
11         MR. GOTTLIEB: Objection.
12    A.   Unfortunately, I also didn't have
13 benefits anymore from being fired; so, no,
14 there was -- that wasn't -- none of that
15 happened, no.
16    Q.   And do you continue to -- to suffer
17 these symptoms that you've described, crying or
18 loss or self-worth, loss of self-worth?
19         MR. GOTTLIEB: Objection.
20         Go ahead.
21    A.   I definitely still feel a sense of a
22 loss of self-worth.  I -- there's still
23 something in me that is a stigma.  There's this
24 idea that I've never been terminated from a
25 position.  And I still have to wake up -- yes,

95 (Pages 374 to 377)

Page 378

S. Marshall

1
2  I have another job, that's great, but I was
3  still fired from the one that I loved.
4     Q.   Do you still cry over your
5  termination?
6     A.   Not on a regular basis, no.
7     Q.   When you say "on a regular basis,"
8  does that mean do you occasionally?
9     A.   Yes.
10    Q.   Okay.
11         And do you still have that -- a
12  feeling in the pit of your stomach over your
13  termination?
14    A.   I do.
15    Q.    Is there anything else that you've
16  felt or suffered as a result of your
17  termination that you haven't already described
18  to me?
19    A.   Nothing I can think of at the moment.
20    Q.   Ms. Marshall, what are you seeking to
21  obtain in this lawsuit?
22         MR. GOTTLIEB:  Objection.
23    A.   What am I seeking to obtain?
24         I don't even know how to answer that.
25    Q.   Are you seeking monetary damages?

Page 379

S. Marshall

1
2     A.   Yes.
3     Q.   What amount of monetary damages are
4  you seeking?
5         MR. GOTTLIEB:  I'm going to object.
6         I want to make sure that in your
7  answer you do not disclose any
8  communications with counsel or any
9  information you may have received during
10  communications with counsel.
11         THE WITNESS:  Understood.
12    A.   Sorry.
13         MS. DIAZ:  Can you repeat the
14  question, please.
15         (The Record was Read.)
16    A.   I don't know the amount.  My lawyer
17  wrote the thing.
18    Q.   What do you believe you're entitled
19  to?
20         MR. GOTTLIEB:  Same objection.
21         Do not disclose any communications
22  with counsel or any information you may
23  have received from counsel.
24         You can answer the question if you
25  can do it without doing any of those

Page 380

S. Marshall

1
2  things.
3     A.    That's just what amount do I think
4  I'm entitled to?
5         I can't answer that question.  I'm at
6  a loss.
7     Q.    You don't have any idea or any
8  opinion about what amount you're entitled to?
9         MR. GOTTLIEB:  She already answered
10  the question.
11    A.   I believe that my lawyer is better
12  equipped to understand that question and answer
13  it for me.
14    Q.   Okay.
15         MS. DIAZ:  Just a two-minute break,
16  but I think we're done.
17         MR. GOTTLIEB:  Sure.
18         THE VIDEOGRAPHER:  The time is
19  7:43 p.m.  We're going off the record.
20         (Recess taken from 7:43 p.m to 7:48
21  p.m.)
22         THE VIDEOGRAPHER:  The time is
23  7:48 p.m.  We're back on the record.
24  BY MS. DIAZ:
25    Q.   Ms. Marshall, are you aware that your

Page 381

S. Marshall

1
2  attorneys have computed your damages as
3  exceeding $4 million?
4         MR. GOTTLIEB:  Objection.
5         Only if you can answer that without
6  disclosing communications between you and
7  your attorneys.
8     A.   Well, that's the legal document which
9  I left up to my lawyers to do.
10    Q.   Okay.
11         And are you aware that that's the
12  computation of your damages?
13         MR. GOTTLIEB:  Actually, I'm going to
14  object, because the only way she could
15  answer the question would be by disclosing
16  a communication between counsel.
17  BY MS. DIAZ:
18    Q.   Independent of what you --
19         MS. DIAZ:  I'd like to mark this as
20  Exhibit No. 40, please.
21         (Defendants' Exhibit 40, Letter
22  dated October 10, 2011, was marked for
23  identification.)
24  BY MS. DIAZ:
25    Q.   Ms. Marshall, this is a letter dated

96 (Pages 378 to 381)

Page 382

1          S. Marshall
2  October 10, 2011 from David Gottlieb, your
3  counsel, to me.  If you turn to page 2 of the
4  document.  It says that "Defendants have
5  requested a computation of damages."  And it
6  says "That plaintiff hereby provides the
7  following approximate calculation of damages."
8          It then sets out various categories
9  of damages.  Back pay is 49,000, front pay
10  775,000, compensatory damages are a million
11  dollars, punitive damages are $2 million, and
12  liquidated damages are $824,000.
13          Have you seen this document before?
14          MR. GOTTLIEB:  I'm going to object.
15  That was an inaccurate reading of the
16  content, the text of the letter, but you
17  can answer the question.
18  A.    My lawyer wrote this, so I don't --
19  Q.    Have you seen this letter before?
20  A.    No.
21  Q.    No?
22          Do you think independent --
23          MR. GOTTLIEB:  I think your time is
24  up, but you can ask another question.
25

Page 383

1          S. Marshall
2  BY MS. DIAZ:
3      Q.    Independent of conversations you may
4  have had with your attorney, do you think that
5  this request for damages is reasonable?
6          MR. GOTTLIEB:  Objection.
7          Let me just think about this question
8  for a minute.
9          I think the question is really
10  getting into attorney-client privilege
11  communication.
12          MS. DIAZ:  It's independent,
13  independent of any communications that she
14  has had with you.
15          MR. GOTTLIEB:  You're asking her
16  about a document that I wrote that she
17  would only know about the content of
18  through a conversation with me.  So I think
19  that's going to privileged material.
20          So to the extent that I think it's
21  probing into a privileged communication, I
22  don't think the witness should answer the
23  question.
24  BY MS. DIAZ:
25      Q.    Ms. Marshall, do you think that

Page 384

1          S. Marshall
2  $4 million in damages is a reasonable demand --
3          MR. GOTTLIEB:  Objection.
4  Q.    -- for your damages in this lawsuit?
5          MR. GOTTLIEB:  You're asking her yes
6  or no?
7          THE WITNESS:  Am I directed not to
8  answer that question?
9          MR. GOTTLIEB:  You can answer yes or
10  no.
11  A.    Yes.
12          MR. GOTTLIEB:  Okay.  The
13  deposition's over.
14          MR. GUHA:  Hold on a second.
15          MR. GOTTLIEB:  We're over seven --
16  we're over seven hours, that's why.
17          MR. GUHA:  Well, if we cut out your
18  speaking objections, there's probably a
19  considerable amount of time left.  We're
20  not pushing that.
21          MR. GOTTLIEB:  I was --
22          MR. GUHA:  Don't end it like that.
23  If Ms. Diaz has more questions, she's
24  entitled to ask them within reason.  Let's
25  be fair about this, David.

Page 385

1          S. Marshall
2          MR. GOTTLIEB:  She is entitled to
3  seven hours.  Again, I think this should
4  really be a one-on-one communication.
5  There shouldn't be other lawyers chiming
6  in. I'm sure Serenity is flattered that
7  three lawyers are here to take this
8  deposition of hers.
9          But we've gone over -- we've gone
10  over seven hours.  My objections were not
11  excessive in any way.  There were few
12  colloquies between Ms. Diaz and I, but we
13  are over seven hours now and I think the
14  deposition is over.
15          MS. DIAZ:  I don't have any
16  additional questions, so the deposition is
17  over.
18          MR. GOTTLIEB:  Very good.
19          (Continued on the next page to
20  accommodate jurat.)
21
22
23
24
25

97 (Pages 382 to 385)

Page 386

```
1         S. Marshall
2         THE VIDEOGRAPHER: The time is
3   7:53 p.m. We're going off the record.
4         (The deposition was concluded at
5   7:53 p.m.)
6         (The exhibits were retained by the
7   court reporter to be attached to the
8   transcript.)
9
10
11
12
13
14
15
16
17
18
19   _____
           SERENITY MARSHALL
20
21   Subscribed and sworn to before me
22   this    day of        2011.
23
24   _____
25
```

Page 387

```
1         S. Marshall
2
3      C E R T I F I C A T E
4
5   STATE OF NEW YORK )
6               ) ss.:
7   COUNTY OF NEW YORK )
8
9        I, THOMAS A. FERNICOLA, Registered
10   Reporter and Notary Public within and for
11   the State of New York, do hereby certify
12   that the within is a true and accurate
13   transcript of the proceedings held on
14   December 8, 2011.
15        That I am not related to any of the
16   parties to this action by blood or
17   marriage; and that I am in no way
18   interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 9th day of December
21   2011.
22
23   _____
24      THOMAS A. FERNICOLA, RPR
25
```

Page 388

```
1         S. Marshall
2   ---------------------- EXHIBITS ----------------
3   DEFENDANT'S
4   DESCRIPTION                      PAGE  LINE
5   Exhibit 1 Document,              16    12
6   Exhibit 2 Application for        28    19
7   Employment,
8   Exhibit 3 Acknowledgment of      30    19
9   Receipt,
10   Exhibit 4 Starbucks's Partner   46     2
11   Guide,
12   Exhibit 5 Excerpt, Bates No.    69     5
13   Star/Marshall 938 through 943,
14   Exhibit 6 Document, Bates Nos.  76    24
15   871, 876 and 877,
16   Exhibit 7 Document, Bates Nos.  80    18
17   Star/Marshall 821 to 868,
18   Exhibit 8 Document, Bates Nos.  93    18
19   Star/Marshall 779 through 794,
20   Exhibit 9 Repeatable Routine    99    15
21   Instruction Sheet,
22   Exhibit 10 Memo from Serenity   119   23
23   Marshall,
24   Exhibit 11 Document, Bates Nos. 133   18
25   Star/Marshall 1179 through 1362,
```

Page 389

```
1         S. Marshall
2   -------------- EXHIBITS (Cont'd) ---------------
3   DEFENDANT'S
4   DESCRIPTION                      PAGE  LINE
5   Exhibit 12 Document, Bates Nos. 162    5
6   Star/Marshall 938 through 1178,
7   Exhibit 13 Document, Bates Nos. 179    8
8   1828 to 1832,
9   Exhibit 14 Facebook posting,    191   21
10   Exhibit 15 Performance Review,  193   21
11   Exhibit 16 Performance Review,  196   24
12   Exhibit 17 Performance Review   199   14
13   2010,
14   Exhibit 18 Document, Bates No.  208   20
15   Star/Marshall 1585,
16   Exhibit 19 Corrective Action,   216    3
17   Exhibit 20 Corrective Action,   218    3
18   Exhibit 21 Document, Bates Nos. 222    8
19   Star/Marshall 517, 549, 550 and
20   551,
21   Exhibit 22 Letter from Starbucks 226  16
22   Benefits Center Leave
23   Administration dated January 3,
24   2011,
25
```

98 (Pages 386 to 389)

Page 390

```
1              S. Marshall
2    -------------- EXHIBITS (Cont'd) ---------------
3    DEFENDANT'S
4    DESCRIPTION              PAGE   LINE
5    Exhibit 23 Document, Bates No. SM    235    11
6    163 to SM 164,
7    Exhibit 24 Document,             237   24
8    Exhibit 25 Incomplete Family     240    3
9    Medical Leave application,
10   additional information notice,
11   Exhibit 26 Document, Bates Nos.  241    2
12   Star/Marshall 60 and 62,
13   Exhibit 27 Attending Physician's 242   23
14   Statement,
15   Exhibit 28 Vacation Request,     245    4
16   Exhibit 29 Personal Leave of     249   17
17   Absence Request Form,
18   Exhibit 30 Copy of Complaint,    306   22
19   Exhibit 31 Document, Bates No.   321    3
20   Star/Marshall 1564,
21   Exhibit 32 Document, Bates No.   326    6
22   Star/Marshall 2,
23   Exhibit 33 Pay Stub, Bates No. SM  344  21
24   389,
25
```

Page 391

```
1              S. Marshall
2    -------------- EXHIBITS (Cont'd) ---------------
3    DEFENDANT'S
4    DESCRIPTION              PAGE   LINE
5    Exhibit 34 Pay Stub, Bates No. SM    348    22
6    388,
7    Exhibit 35 Document, Bates Nos. SM   351    21
8    395 to 400,
9    Exhibit 36 Document, Bates No. SM    355    21
10   393 and 394,
11   Exhibit 37 E-Mail, Bates Nos. SM     357     9
12   452 through 454,
13   Exhibit 38 Document, Bates No. SM    361     8
14   435 through SM 437,
15   Exhibit 39 Hearing Transcript,       367    24
16   Exhibit 40 Letter dated October      381    21
17   10, 2011,
18
19
20
21
22
23
24
25
```

Page 392

```
1                S. Marshall
2         ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:  Serenity Marshall v. Starbucks Corp.
4    Dep. Date:  December 8, 2011
5    Deponent:   SERENITY MARSHALL
6    Reason codes:
7        1. To clarify the record.
         2. To conform to the facts.
8        3. To correct transcription errors.
9    Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19
20          _____
21          SERENITY MARSHALL
22
23   Subscribed and sworn to before me
24   this    day of            2011.
25   _____
```

**A**

**abilities** 373:7
**ability** 7:3 73:24
    85:8 255:22,25
    256:4 260:5,18,21
    260:25 280:10
**able** 214:11 227:23
    228:2 279:20
    283:23 317:21
**absence** 199:6,9
    221:24 231:12
    249:18,25 250:21
    250:24 315:19
    360:16,21 361:2
    390:17
**absolutely** 145:16
    330:2
**acceptable** 121:2
    141:10 147:17
**accepted** 325:5
**access** 70:25 77:16
    77:19
**accessed** 116:21
**accidental** 323:18
**accommodate** 10:7
    385:20
**Accomplishments**
    195:8 198:3
**account** 214:11
**accountability**
    128:4
**accountable** 86:16
    87:19 128:17
    130:2 187:19,21
    205:15 213:16
    277:17 278:4
    325:4
**accounted** 293:3
    294:5
**accounting** 67:7
**accuracy** 107:4,9
    107:19 109:22
    110:11 185:11
**accurate** 29:15,18
    57:10 67:7 70:23
    74:7 124:22
    139:25 181:24
    196:4 244:9

307:21,25 308:7,9
    327:14 328:4,15
    346:14,15 349:10
    359:7 361:21,23
    362:10,11 368:17
    368:25 371:9
    387:12
**accurately** 72:24
    108:12 109:3
    127:21 128:7
**accusing** 292:16
**achieve** 198:5,21
    206:15,16
**achieved** 43:14
**Achieves** 198:10
    204:21 205:5
    206:25
**achieving** 56:12
    198:7 205:21
**acknowledge** 31:8
**Acknowledgment**
    30:20 31:4 388:8
**acronym** 195:12
**Act** 221:2
**acted** 313:5
**action** 15:6 46:22
    47:9 48:18 49:14
    52:7 88:14 123:12
    124:3 126:14,19
    210:4,12,25 216:4
    216:11,18 217:3
    218:4,12,18
    220:20 257:7
    284:20,24 285:6
    287:17,25 288:15
    288:25 387:16
    389:16,17
**actions** 33:6 119:6
    119:13 127:15
    215:19,23 285:6
    304:11 310:6
    311:7
**active** 275:11
**actively** 88:11
**activities** 96:20,23
**activity** 55:25
    94:14,20
**actual** 125:14

145:14 213:20
    214:6 336:11
    341:16
**addition** 97:5 261:5
    311:16,19,21
    346:16 356:9
**additional** 240:5,13
    385:16 390:10
**address** 6:9 18:20
    18:24 19:4,14,16
    19:19,25 20:5,7,9
    20:12
**addressed** 127:5
**adjust** 205:13
**admin** 89:11,20,22
**administered**
    194:12
**administration**
    223:5 226:18
    227:13 236:2
    250:22 389:23
**administrative**
    89:21
**admit** 297:21 298:2
    298:3,9
**admitted** 217:19
    298:6 321:22
    322:4
**adult** 256:21
    260:11
**adults** 340:16
**advance** 285:3
**advertisement**
    190:14
**advertising** 312:20
**advise** 225:20
**advising** 267:7
**advocates** 187:9
**affect** 255:22
    259:13,23 260:5
    260:17,25
**afternoon** 323:6
    335:14 337:4
    338:11
**agency** 13:2 339:12
    339:13
**ago** 8:18,18 13:22
    13:24 14:4,11

24:17 49:7 53:6
    195:21 221:16,19
    317:11
**agree** 180:22 181:2
    181:12,17,22
    197:22 198:14,20
    198:25 199:8
    200:15 201:23
    205:3 206:11
    211:9,11,14,20
    217:2,12 326:16
**agreed** 4:4,9,13
    211:6 257:5
    336:10
**ahead** 22:16 27:15
    36:16 89:4 96:9
    143:10,24 155:19
    180:19 203:20
    208:3 219:25
    279:4 303:14
    313:13 333:9
    334:17 354:7
    368:24 375:7
    377:20
**aid** 54:23
**Akin** 2:10 3:12
    5:17,21
**allay** 377:9
**alleging** 13:2
**allowed** 84:9 129:4
**allowing** 125:7,14
    128:14
**ambiguity** 47:24
**ambiguous** 72:17
    75:5
**amount** 72:23
    110:3 123:11
    129:22 138:19,21
    140:2 143:18
    146:3,17 150:6,17
    151:6,11,19 152:3
    152:23 153:5,13
    156:3 157:3,12
    158:5,16 163:10
    163:24 164:23
    165:10 166:6,8,23
    168:24 170:8,19
    171:18 172:2,23

173:8 174:2,14,21
    207:19 215:10
    360:6 366:7,23
    367:21 379:3,16
    380:3,8 384:19
**analyzed** 95:13
**Anatomy** 246:25
**and/or** 49:18 88:12
    105:12
**anecdote** 304:9
**anemia** 237:9
    254:3,10,21
**anemic** 228:8
    255:17,18
**angry** 293:25
**Annex** 364:2
**answer** 7:2,21,24
    8:7,10 9:5,15,16
    9:24 10:13,19
    11:7 13:14 22:16
    23:24 26:17 27:10
    27:15,22 28:5
    29:17 31:24 37:6
    42:8,16 47:24
    48:14,15 50:3,13
    50:21 63:19 68:22
    82:25 96:9 101:6
    102:4 109:12,13
    109:18 115:7,17
    116:11 119:16
    123:20 131:25
    137:21 138:9
    140:11 152:17
    155:10 160:12
    180:19 191:9
    239:21 266:22,25
    267:3,8 268:19,23
    269:3,5,9,17,21
    269:24 270:8,13
    270:23 271:4,7,10
    271:11,16,24
    272:4,14 274:13
    274:16,22 275:9
    275:16,19,21
    276:3,10 279:20
    280:10,13,16,19
    280:23 281:3,4,23
    285:9 286:19

295:20 297:25
299:16 318:12
331:3,4,7,17,24
340:4 351:4,10
362:24 368:20
374:5 376:23
378:24 379:7,24
380:5,12 381:5,15
382:17 383:22
384:8,9
**answered** 102:22
103:6 114:6
266:20,23 267:5
267:12,15 268:14
268:21,25 269:6
269:14 270:3,5,11
270:25 271:7,13
272:5 274:14,19
275:17,19 276:6
276:14 380:9
**answering** 7:20
10:8 137:15 138:2
152:21 369:15
**answers** 269:19
281:22 282:25
**anybody** 302:12
**anymore** 106:16
182:11 373:18
377:13
**apart** 21:19 42:11
43:18 57:19 60:8
176:19 211:18
214:17 247:9
259:11,24 279:22
306:8 310:5,9
**apparel** 24:13
**apparently** 271:9
**appeal** 12:9
**appeals** 369:12
370:3 371:18
**appear** 151:7
**appeared** 243:21
**appears** 46:14
168:2 250:17
**appease** 178:23
**Apple** 339:10
**apples** 182:12
**application** 28:11

28:15,19 29:7,14
29:20 239:9,15
240:4,13,17 360:2
360:4 388:6 390:9
**applied** 18:5,7
361:2
**apply** 223:3,18
360:9,13,19
**appointment**
265:19,22 276:22
276:25 277:12
**appropriate** 193:14
212:9
**approval** 250:20
**approve** 248:20,23
**approved** 225:14
229:10 236:7
251:3 325:9
**approving** 225:2,9
**approximate** 37:2
285:2 286:2 382:7
**approximately** 5:9
13:22 14:12,15
18:25 20:2,10
23:2 24:5 25:23
32:9 33:17 35:4,9
35:20 37:4 50:23
104:13 131:16
183:5 257:10
263:16 266:9
285:14 286:11
288:21 289:12
302:17 340:23
341:6 342:13
347:7,16 366:3
**April** 198:11 199:9
307:13,13,16
**area** 207:12 208:8
**areas** 95:13 123:24
177:21 205:23
206:21 207:7
**arguments** 191:3,5
191:7
**arrive** 288:16
**ASAP** 127:6,13
**aside** 270:7,10
**asked** 10:20 41:15
54:9 64:5,6,9 92:2

99:20 100:25
108:19 112:12
115:6 155:11
160:16 239:17
242:10 269:6
270:6 281:5
283:22 290:2
299:15 316:25
320:2 324:21
332:15 370:3,14
370:15
**asking** 7:21 47:14
47:16 52:10 72:2
72:3,8,10 95:2,2
104:3,14 107:18
109:7 110:8,13
111:5,13 112:6,14
112:17 113:4,5
122:4,5 151:4,6
151:12 152:18
161:16 191:7
192:18 198:17
260:3,22 262:13
266:24 267:10
268:15 269:2,15
270:12 271:5,14
274:6,20 275:20
293:23 298:22
307:23 310:16
311:10 317:4,14
330:9 332:5,7,12
353:8,17,22 354:5
369:6 370:19,24
383:15 384:5
**ASM** 53:22 68:11
73:25
**aspect** 59:11
**aspects** 58:25 60:20
86:16 87:20
**assessment** 181:18
211:20,24
**asset** 195:13,16,17
**assist** 101:18
102:10 103:2
**assistance** 356:12
**assistant** 33:20,23
34:13,22 35:3,6
53:18 58:16,21,24

59:5 60:22 61:5
63:17,24 120:14
120:18,20 122:10
122:17 203:6
224:9 347:10,12
**assisted** 190:19
**associates** 26:3
347:16
**association** 5:13
**assume** 8:8 134:4
154:10
**assuming** 134:16
146:21,24 152:25
**attached** 77:6
386:7
**attaches** 358:12
**attempt** 323:16
359:12,15
**attend** 347:21
359:12 363:18
**Attending** 242:23
243:8 390:13
**attention** 139:22
**attitude** 182:13
**attorney** 9:13
13:21 14:10 17:5
274:18 275:11
328:19,23 329:17
330:4,12,15,21
345:8 349:12
383:4
**attorneys** 3:5,13
4:5 15:22 275:14
329:8 330:23
333:4,7,8 381:2,7
**attorney-client**
383:10
**attributed** 259:19
**audit** 184:7 195:10
196:13
**August** 257:11
258:5 265:25,25
266:4,7,11,15
**authority** 32:23,25
33:5 34:11
**available** 232:6
342:10 355:5
**Avenue** 3:6 19:17

20:5 24:4
**Aveol** 224:16
**aware** 45:21 51:22
52:11 67:5,12
141:19 142:2
187:10 220:24
223:7 300:23
303:8 305:15,16
305:20,24 309:21
346:4 354:9,20,24
380:25 381:11
**a.m** 2:6 5:9 54:3,4
54:5,7 71:6 79:13
82:15 130:11,11
130:16,16

**B**
**back** 37:6 54:7,9
56:9 77:22 78:3,7
78:12 81:5 98:2
118:6 128:5,7,9,9
137:24 139:11
140:8 141:6
144:21 145:3
154:23 162:10
175:13 178:6,24
178:24 187:6
199:2 209:2 213:5
213:13 231:14
233:17,25 238:20
251:24 253:21
264:7 265:11
270:20 278:6
288:14 290:15,16
290:25 293:4,7
294:16,19,21
296:3,12 301:18
301:20 309:15
315:9 316:14
317:9,15 318:2
320:16 325:9
328:9 329:14
332:24 357:22,24
364:19 374:16,20
380:23 382:9
**backwards** 206:9
**bad** 176:25 179:3
182:12 196:2

217:15 229:12
237:10 258:12
**bag** 57:7 58:5 60:2
72:23 73:12 82:4
107:12,15,17,23
107:24 108:5,5,17
108:17,24,25
109:20,24 110:6,8
110:20,23 111:9
111:16 116:13
149:25 154:15
156:21 157:25
291:16 293:4
**bags** 292:13 294:9
296:12
**Balfueno** 263:3
266:10 333:14
338:3
**bank** 57:7,15,16,22
58:4,7 60:10,23
62:13 63:6,12,12
64:2,14,19,23
66:24 67:6,13
71:5,7,12 73:9,11
73:12,12,13,17
74:6,6,7,11 75:19
79:9,12,15,20
82:4,14 93:10
96:4 97:8,24 98:9
98:10,18,19,20,20
98:21 99:3 101:19
101:20 102:11,11
103:2,3,14,20
111:22 112:3,7,23
113:10,13,14,23
113:23 114:18,19
115:2,9,14,20
116:4,6 118:20
119:14 123:11
128:20,21 129:14
129:15,21 132:13
132:19 133:2,10
133:10 135:8,11
136:19 137:2,6,11
138:8,9,16,23,24
139:6,25 141:9,14
142:3,14,24,25
143:4,6,15,20

144:3,4,14,18,22
145:13,25 146:7,7
146:14 147:11
150:12,19 151:21
152:2,10,11 153:3
153:20 154:14,14
155:23 156:22
157:8,16,17,25
158:13,21 163:8
163:16,20 164:4
164:17,20 165:5
165:15,25 166:4
166:14,20 167:4
167:19,25 168:8
168:11,14,17,21
169:4,15,18 170:2
170:5,14,23,24
171:11,15,23
172:7,21 173:4,24
174:3,11,18 175:2
291:25 292:19
297:12,13,17,18
299:12,19,23
305:24 322:5,8
323:19 325:2
327:12 333:12,19
334:9,10 337:6
370:7,15 371:14
**banking** 74:3,9
75:22,22,23 94:15
94:17 96:12 97:5
111:19 121:16,25
122:11 133:6
136:20,25 142:22
167:22 168:6
169:22 172:18
309:6
**bank's** 133:5
**barista** 32:6,8,15
75:16 203:5 372:7
**baristas** 32:20 34:3
34:5 40:15 183:19
**barrage** 310:15
316:25
**Barry** 280:17
**based** 42:25 48:20
56:11 121:23
122:4,4,8,8,16

141:21 153:18
156:6 164:24
165:13 167:2
169:2 170:22
172:4 173:10
174:23 281:18
319:25 326:21,22
350:22 357:2
**basic** 331:8
**basically** 6:24
230:11 248:12
305:12 325:18
327:18 340:15
342:10
**basis** 42:19 91:6
124:12 128:21
129:15 213:11
214:24 215:14
291:25 297:23
312:4 314:11,12
316:15,18 317:12
378:6,7
**Bates** 69:6,10 76:25
77:5,5 80:19,23
93:19,22 103:24
133:19 162:6,11
179:9,16 208:21
209:5 222:9,12,13
227:11 235:12,15
238:18 241:3,6
321:5,8 326:8
344:22,25 348:23
349:3 351:22,25
355:22,25 357:10
358:10 361:9,12
369:3 388:12,14
388:16,18,24
389:5,7,14,18
390:5,11,19,21,23
391:5,7,9,11,13
**bathroom** 290:23
290:24,25 296:3
**bathrooms** 186:15
**becoming** 35:5
53:22 127:22
188:13
**bed** 374:17
**bedridden** 317:20

**began** 34:2,8
254:20 279:16
284:2
**beginning** 26:23
106:13 198:6
242:12,19 244:24
**begins** 309:8
**begun** 205:20
**believe** 17:3 18:2,6
18:10 19:16,16,17
21:4,18 22:3 24:9
24:10 25:20 26:2
26:13 28:10 35:10
35:20 37:2 38:13
40:9 41:21 43:7
50:23 55:3,4,8
56:11 59:10 60:3
64:4 70:4 92:14
92:17 96:24 97:19
102:9 106:3
116:25 119:17,17
121:24 130:13,17
133:7,8 160:24
161:6,8,11,12
169:11 182:25
189:21 190:13
195:12 196:5
197:15 204:18
207:17,20 208:7
210:21 218:16
221:3,18 223:12
226:11 227:18
228:19 231:18
232:18 234:15
235:4,7,18 239:5
241:23 242:8,16
244:11 247:19
250:12 252:12,20
254:22 258:7,8
260:9 265:25
277:2,6 278:18
279:2,5,14 281:9
282:11 285:22
286:12 287:13
291:3 293:11
300:20 302:9
311:22 312:9
323:11 324:23

325:6,12 326:4
327:5 329:3
335:13,20,25
336:3 342:5 359:7
359:18 360:7
363:13,22 364:2
364:10 368:16
379:18 380:11
**believed** 36:17 39:2
39:13 116:18
256:9 257:18
281:12,18 283:4
294:20 323:23
335:16 337:21
372:10,11,14
**believes** 326:23
**belongs** 115:19
**bemoan** 374:17
**Benefit** 223:5
**benefits** 43:22,24
44:13,17 223:20
226:17 227:12
229:7 230:15
235:19,25 250:21
251:4 346:20
354:15 356:8,11
356:16 365:25
366:4,18 367:10
367:14,21 377:13
389:22
**best** 7:2,23 8:10,19
9:5 65:10 70:16
75:6 85:8 123:23
191:18 375:17
**better** 95:11,15,19
96:5,19,20 97:14
99:2,20 103:15,21
105:7 143:5
203:24 210:9
212:8 264:22
380:11
**beverages** 185:11
**beyond** 21:12
68:24 120:25
233:23 281:8
**big** 44:21 58:3
215:6 304:6 305:8
312:22

**biggest** 187:8
**bill** 45:5 365:6
**bills** 374:15
**binder** 68:12
**birth** 18:18
**bit** 6:23 41:19 57:3
  176:7 189:13
  207:8 263:14
  291:11
**black** 75:3 84:2
**BlackBerry** 252:13
  252:19
**blank** 105:10
  147:22 148:4,21
  149:10,14
**block** 190:12,15
  334:18
**blood** 228:9 237:9
  237:11,13 255:16
  387:16
**board** 198:8 369:12
**bonus** 43:19 56:16
  350:5,9,9,23
  352:24
**bonuses** 42:18,22
  42:24,24 43:15,17
  43:18 56:10
  346:17 350:14,24
**book** 69:23 74:12
  75:25 89:12
  121:18 123:7
  137:8 140:17
  144:17 190:10
  195:15 212:18
  213:11,20 214:23
  215:14 223:11,14
  288:10 290:22
  293:22 295:15,25
  296:5 297:19
  304:4 305:9
  309:16,19 311:3
  317:9 321:23
**booked** 319:21
**booklet** 30:15 31:9
  31:11
**books** 14:24 76:5
  140:9 141:22
  148:14,24 149:6

287:25 288:5
  294:11 299:17
  309:17,22
**born** 22:22
**boss** 188:2 189:22
  189:22,24 191:13
  191:17 192:8
  193:3,15
**bottom** 29:10 46:9
  70:2 79:8 88:8
  126:22 127:9
  194:24 198:2
  209:17 218:21
  222:22 243:15
  250:5 326:12
  327:15,17 358:15
  359:3
**bought** 372:15,16
  372:16,17
**box** 97:4
**boyfriend** 374:13
**brave** 374:18
**break** 10:4,6,9
  53:24 117:2 118:9
  140:23 175:6
  208:16 251:17
  263:25 264:9
  265:2 267:18,23
  268:8 301:11
  303:17 315:3
  332:17 357:16
  380:15
**breaking** 322:4
**breathing** 62:8
**briefly** 205:2
**bring** 128:9 139:19
  139:22 322:8
**bringing** 62:7
  214:2
**Briones** 19:22
  20:13
**broad** 62:3 176:3
**Bronx** 6:11 18:21
  21:10 24:4
**Brooklyn** 20:6
**brother** 30:11
  343:8
**brought** 151:13

159:8,11 186:5
  188:7 291:25
**Bryant** 2:11 3:14
  5:7
**bucket** 119:9
**bucks** 360:7
**budget** 43:8
**budgeted** 43:8
**building** 40:12
  105:14 132:22
  136:12 139:24
  177:13 183:23,25
  184:8,12 186:12
  186:18,19,23
  195:19 213:8,22
  215:3 229:16
  312:18,23 340:19
  347:17
**built** 184:4
**bullet** 49:19 79:14
  82:4,13 94:16
**bullets** 79:10
**bunch** 320:21
**busiest** 186:3,3
  315:24
**business** 45:3 59:2
  59:11 62:4 84:3
  85:7 95:13 140:3
  178:15 184:4
  186:23 190:20
**busy** 116:7 181:13
  315:22 327:9
**B.S** 21:13

---
### C
**C** 3:2 387:3,3
**Cable** 365:6
**calculation** 382:7
**calculator** 98:4
**call** 24:14 91:14,18
  92:11,15,24 96:2
  232:21 233:6,11
  234:2,6,10,13,14
  252:24 253:4
  279:6 302:3,14,16
  317:23 323:2,5
  324:10,14,15,17
  324:21 326:3,17

329:23 336:2
**called** 6:4 23:8 26:3
  77:22,22 78:3
  82:12 89:21
  195:17 196:6
  201:10 222:25
  229:7,8,19,24
  230:10,14 233:9
  235:5 302:8,12
  318:17 322:17
  344:2
**calling** 278:8
  292:15
**calls** 41:13 93:12
**call-out** 201:14
**candidates** 201:4
  202:23
**capacities** 1:9
**captain** 203:23
**captures** 358:4
**card** 196:6 365:7,7
  365:8
**cards** 196:6 365:8
**care** 317:22
**cared** 316:2
**career** 84:18
  220:11 309:7
  323:21 359:16,20
  359:25
**Carlo** 187:7
**Carlos** 3:24 5:10
  348:5,6
**case** 16:2,7 17:6,15
  18:4 139:23
  331:16 392:3
**cases** 49:15 50:6
**cash** 53:2,8,10,15
  53:21 56:23 58:10
  58:20 59:13,16,18
  60:2,5,5,16,16
  61:10,14,22,25
  62:6,22 65:2,9,20
  66:2,15,17,21
  67:8,19,24 68:5
  68:17 70:8,11,14
  70:24,24 73:15,22
  73:23 74:10 75:14
  86:7,16,19,20

87:12,15,20 88:2
  88:3,9,11,12,12
  88:15,15,18,22
  89:12,17 90:7,11
  91:5 92:25 93:8
  94:5,8,17,24
  96:11,18 97:3,5,7
  97:15 99:2,21
  100:3 103:14,20
  103:21 104:4
  107:17,24 108:6
  108:12,12,18,25
  109:3,20 111:3,4
  116:3,16 118:11
  118:15,18 119:2,7
  119:8 120:24
  121:4,25 122:12
  122:19 124:21
  125:20 126:7
  127:3 129:3,7
  134:15 135:15,16
  136:5,7,10 142:8
  143:21 144:9
  145:21 146:24
  147:7 148:7
  153:25 154:23
  156:14 162:19
  163:2 164:12
  165:19 167:10
  169:9 171:5
  172:11 173:17
  196:14,17 205:25
  207:13 208:12
  212:17,23 213:8
  213:12,19,21
  214:5,5,6,13,16
  214:16,18 287:5
  287:12 288:10
  290:20 291:6
  296:18,23
**cashed** 363:12,14
**cashier** 23:7
**Castle** 22:17,20,25
  23:11,12 24:3,8
**CAT** 257:21
**catalog** 24:16
**categories** 382:8
**caught** 253:16

304:6
**cause** 228:7 276:25
  374:3
**caused** 256:6
**causing** 205:16
**cc** 71:20 72:22
  73:10,11 74:5,5
  75:13 179:22
**cell** 334:18,22
**center** 24:14 223:5
  226:17 227:13
  236:2 250:22
  251:4 339:10
  340:11 341:8,14
  342:7,25 343:13
  343:18 345:7,10
  345:14,18 346:18
  346:23 347:17
  348:15 363:5
  366:15,19 367:6,8
  389:22
**centered** 185:9
**cents** 151:7 166:17
**certain** 45:21 96:20
  207:19 366:7
**certainly** 275:6
**certification** 4:10
  240:18 241:16
**certify** 387:11
**certifying** 75:24
**cetera** 123:7
**challenge** 186:17
**challenged** 176:7
  176:11
**challenges** 175:22
  175:25 176:20
**change** 32:18 33:23
  90:2,3,4 94:18
  97:7 108:3 109:6
  111:6 123:11
  129:22 212:12
  323:16
**changed** 43:6 65:4
  65:5 108:20 131:5
**chaos** 180:10,23
**characterize**
  113:12 189:16
  190:2

**charge** 201:4,9,16
  203:12,17 204:3,8
  231:3,8
**chart** 352:14
**Chase** 133:6 138:8
  138:16 143:15
  146:14 150:14
  155:23 157:8
  166:20 168:21
  170:14 171:23
  173:4 174:18
**chatted** 300:13
**chatting** 290:4,18
**check** 44:19,25
  106:12 128:10
  205:13 292:13
  357:13
**checked** 64:15
  176:9 293:5
**children** 20:22
**chiming** 385:5
**chipped** 254:9
**choice** 281:13
**choose** 203:16
**Chris** 231:7 262:23
  266:6 278:5
  304:21 305:23
  334:2 335:15,23
  336:10,16 343:5
  344:5,9
**Christmas** 303:16
**Christopher** 30:4,5
  30:11 231:6
  261:22 262:3
  303:18 333:10
  343:3 344:7
**chronic** 236:24
  253:20,24 254:24
  255:5,12,14 256:3
  256:18
**CHS** 127:4,12
**chunk** 102:15
**cigarette** 303:17
**circle** 178:24 187:6
**Citibank** 365:8
**City** 21:15,16,19,22
  55:9,14 56:3
**claim** 308:22

311:11 312:4
  314:11,12 316:15
  316:16,18 318:4
**claiming** 308:19
  310:7 313:7,19
  314:7
**claims** 346:6
**clarification** 113:3
  353:23 354:6
**clarify** 52:20 392:7
**clean** 183:23 217:9
**cleaning** 182:9
  183:18
**cleanliness** 176:9
  176:14,19 184:9
  202:9,14,18
  215:24 216:20
  217:20 218:13
  219:10,13,20
  220:9,15,17,21
  286:24,25 287:11
**clear** 8:2 9:18 66:9
  66:11 112:19
  116:9 140:20,20
  161:9 219:16
  257:20 276:13
  278:3 280:19
  295:4 298:3,7,8
  312:3 325:8 330:8
**clearly** 141:22
  202:8
**client** 346:9
**Clinton** 21:8
**clock** 129:7
**close** 131:22 132:3
  132:6 182:16
  231:10 306:12
  336:11
**closed** 116:4
  118:20 130:7,12
  133:7 153:3
**closely** 185:7
  189:15 190:6
**closing** 130:21
  131:4 227:8
  291:15
**clueless** 292:5
**CML** 88:13,17

**coach** 124:12 177:3
**coached** 124:6,10
  177:10
**coaching** 124:15,18
  126:16 210:16
  212:19
**code** 352:9
**codes** 392:6
**coffee** 44:4 188:16
  201:21 358:16
  372:13
**cold** 24:22
**collectively** 262:14
**college** 21:15,17,20
  21:22 54:16 55:7
  55:9,13,14 56:4
  372:6
**colloquies** 385:12
**colloquy** 270:2
  274:8
**column** 107:3,3
  111:19 136:15,19
  142:17 146:4
  166:11
**come** 44:20 70:21
  127:24 148:13
  186:21 217:17
  237:8,12 242:15
  255:7 290:2
  294:16,18,21
  312:22 317:15
  325:9
**comes** 65:2 77:13
  176:10,24 177:15
**coming** 182:9
  213:2,23
**commence** 237:5
  253:11,13 280:24
**commenced** 316:19
  341:5 367:7
**comments** 166:11
  181:12 205:4
  317:6
**common** 80:11
  115:17
**communicate**
  89:24
**communicated**

15:17 80:6 92:10
**communicating**
  86:21
**communication**
  13:13 15:13 18:7
  381:16 383:11,21
  385:4
**communications**
  17:10 328:25
  379:8,10,21 381:6
  383:13
**companies** 45:2
  106:10
**company** 29:24
  31:19 42:25 48:21
  49:21 50:7 51:2,3
  51:12,17 52:4,11
  52:12 83:9 114:24
  176:8 310:2
  312:20 322:4
  356:23 358:16
  372:9,13,21
  374:22 376:12
**compare** 104:14
  349:25
**compensatory**
  382:10
**competencies**
  198:8,13 199:10
**competing** 202:11
**comping** 183:24
**complain** 178:2,7
  318:23
**complaining**
  178:19
**complaint** 12:25
  13:6 16:7 27:19
  306:23 307:25
  308:7,8 318:10,15
  318:21 319:3
  390:18
**complaints** 187:11
  187:15
**complete** 65:14
  78:25 85:16 94:14
  94:17 97:7,12
  110:2 111:18
  123:5 126:17

133:13 136:12
**completed** 133:14
151:18,20 156:20
213:16 240:18
**completely** 84:13
123:8,9,15 126:17
129:20 186:8
372:9
**completing** 60:10
89:19 94:19 96:11
97:23 100:24
111:22 112:3,6,7
112:23 113:10,12
113:14 124:25
**completion** 72:22
174:3
**compliant** 72:5
**comply** 119:13
**computation**
381:12 382:5
**computed** 381:2
**computer** 17:20,23
18:3,3,6,11
**conceal** 323:16
**concern** 216:19
**concerned** 204:6
230:21,22 310:20
**concerns** 86:22
216:20
**concluded** 386:4
**Concourse** 6:11
18:21 19:13
**condensed** 312:16
**condition** 237:16
242:2 253:12,19
257:3,9,13,16
259:12 260:25
261:11,16 262:6
262:10,24 263:5,9
263:13 264:11,15
265:4,18 266:4,7
266:11,15,18
269:12 272:8,17
273:4 275:3
276:18,21 278:13
282:8,20 289:8
290:10,13 295:8
295:13 313:14,15

313:18,23 314:2
314:16 316:20
319:6 322:24
329:21
**conditions** 248:5
**conduct** 96:20,23
299:9
**conducted** 96:24
286:16
**conference** 41:13
91:14,18 92:11,15
92:24 93:11 96:2
319:21
**confirmed** 73:5
280:18 281:8
**confirming** 72:21
74:4
**conform** 392:7
**confused** 92:4
152:22 153:13
**confusing** 50:20
72:8
**confusion** 55:16
**connected** 190:18
**connection** 328:19
**consecutively** 97:8
**consider** 39:7
328:19
**considerable**
384:19
**considered** 330:11
351:13
**considering** 330:12
**consist** 342:17
**consisted** 57:2
**consistent** 220:14
299:18 359:6
**consistently** 202:5
205:12,14
**Consolidating**
108:16
**constantly** 62:5
185:25
**constitute** 31:16
**contact** 223:4,19,20
230:25 328:23
329:8,16 330:4,21
330:23

**contacted** 229:14
322:18 339:5
347:19
**contacting** 328:19
330:11 362:15
**contacts** 329:6
**contained** 31:16
**content** 382:16
383:17
**context** 96:4
**continue** 185:18
268:12 345:17
377:16
**continued** 205:23
207:13 208:9
257:12 279:9
366:13 385:19
**continuing** 257:6
**continuous** 236:6
236:24 238:24
**continuously**
198:10
**contract** 31:17
356:5
**contradiction**
89:14
**control** 70:24 86:7
86:14,17,19,20
87:15,20 88:2,3
96:11
**controllable** 43:9
**controller** 70:11,14
70:24 73:15,22,23
74:10 75:15 97:5
97:7 100:3 129:7
136:5,7
**controllers** 94:17
**controlling** 195:19
**Cont'd** 389:2 390:2
391:2
**conversation** 14:5
62:24 65:7 83:24
124:16 126:16
177:16 209:12
210:8,13,17 211:3
211:7,12,25 212:3
212:11,21 214:5
214:22 215:14

219:8,19 231:14
231:22 232:11
233:24 234:22
273:17,19,23
274:4,25 276:17
276:20 277:5
278:13,16,24
280:3,6 282:3,6,7
282:17 289:7
290:6,9,12 295:8
295:13 298:12,14
302:23 305:21
316:25 325:18
333:23 334:11,14
334:21 335:12
337:3,25 338:10
348:19 383:18
**conversations**
61:13,21 62:12
63:25 64:22 66:23
141:25 149:9,12
212:19 220:9,13
313:25 314:4
383:3
**convicted** 22:6
**cook** 23:8
**coordinated** 201:17
**copy** 16:15 31:9,11
77:20 304:12
306:22 321:13
390:18
**Corp** 392:3
**corporate** 178:20
**Corporation** 1:7
5:6
**correct** 28:9 61:7
87:12 118:12
121:21 125:9
129:22 131:6
137:4 141:11,12
152:4 160:3 161:3
161:5,6,11,23
164:14 192:10
203:2,15 236:2
245:17,22 264:15
264:17 265:8
266:13,16 280:22
280:25 284:19,22

289:3,4 295:9,10
295:15,16 297:10
341:21 343:11
352:17 358:17
369:12,22 370:10
370:11,17 371:23
371:24 392:8
**correcting** 86:20
**corrective** 15:6
33:6 46:22 47:9
48:18 49:14 52:7
119:6,13 123:12
124:2 126:14,19
127:15 210:4,12
210:25 215:19,22
216:3,11,18 217:3
218:3,12,18
220:20 304:11
389:16,17
**correctly** 79:2
195:23,25
**correlate** 138:20
143:21 150:21
152:5,8 154:7
**correlates** 154:2
**corresponds**
223:10
**costs** 43:9
**cost-saving** 95:14
**counsel** 5:14 13:13
114:6 152:20
271:23 379:8,10
379:22,23 381:16
382:3
**counseling** 23:22
376:25
**counselor** 340:9,14
341:21,22 342:2,8
342:13
**count** 70:22 108:12
108:12 109:3
121:11 127:23,25
128:6,9 129:7,8
214:3 215:11
228:9 237:11
242:15 291:15
292:23,24
**counted** 101:12,15

104:4 109:20,25
110:18,19 127:20
128:16 151:23
213:13 293:2
294:8,9
**counting** 57:6
65:12 100:2,20
101:8 103:14,20
122:25 128:5
129:5 236:15
294:14,19
**COUNTY** 387:7
**couple** 43:7 179:24
221:9 317:21
366:16
**coupons** 196:7,8
**courageously**
198:10 200:23
**course** 8:16 116:14
186:20 237:14
257:6 284:4
292:11 294:18,21
**courses** 21:20
**court** 1:2 5:12,25
7:7,13 11:25
307:19 386:7
**courteous** 362:15
**courtesy** 331:8
**courtroom** 9:10
**cover** 46:15 77:5
227:6,9 366:7
**coverage** 225:24
226:5 234:12
249:2 313:3
**covered** 53:21 59:9
**covering** 301:4
**co-workers** 180:4
**crap** 376:17
**create** 339:18
**created** 105:10,13
105:17,20,22,25
**credit** 196:5 252:21
365:7,7,8,8
**cried** 329:5 373:3
373:20
**criteria** 43:2,6
350:22,23
**cross** 173:25

**cry** 299:3 378:4
**crying** 293:13
294:2 374:7,7,25
375:8 377:17
**curious** 155:15
**current** 18:20
188:6 348:4
**currently** 20:19
341:2
**custody** 248:3
**customer** 40:17
178:19,23 184:13
187:3,10 198:9
205:24
**customers** 40:17
177:25 178:7
182:3,3,7 184:13
186:5,25 190:16
**customizable**
105:14
**cut** 384:17

─────────
**D**
**daily** 14:24 64:13
69:22 74:12 75:25
82:6 88:14,22
128:21 129:15
148:24 195:9
212:18,19 213:10
213:11 214:23,23
215:13,14 223:11
287:24 288:4,10
291:25 295:14,24
297:19,22 317:9
321:23 322:8
**damages** 378:25
379:3 381:2,12
382:5,7,9,10,11
382:12 383:5
384:2,4
**dark** 79:24 80:3,6,9
80:10 82:20 83:6
83:22 84:21,23
85:17,22 113:16
**date** 15:10 18:17
71:21 73:11,13
74:5,11 137:20
138:17 142:8

143:16 144:14,18
145:12,14,20
146:6,7,15 147:7
150:3,15 151:13
153:25 154:6
155:25 156:13,24
157:10 158:3,14
163:3,14,22
164:19 165:6,19
166:3,21 167:10
168:16,22 169:9
169:17 170:16
171:5,13,24
172:11,20 173:6
173:17 174:9,19
192:5 209:20
216:15 227:18
235:21 236:10,12
236:13 238:14,25
239:3 240:14
241:24,25 242:5
243:20,22 244:5,8
245:16 283:15
295:3 302:11
392:4
**dated** 179:21
184:18 226:18
227:13 361:17
381:22,25 389:23
391:16
**dates** 13:19 137:19
225:21 250:7,11
258:12 280:11
291:24 292:10
323:18 358:16
366:2,5
**David** 3:9 5:23
267:17 331:11,20
354:3 382:2
384:25
**day** 28:14 57:16
60:24 62:9,23
63:12 71:5 75:10
79:16 82:14 89:11
89:20,22,22 97:6
98:10,21 101:20
102:11 103:3
111:22 112:24

113:24 114:19,24
115:10,13,22,22
133:15 135:14,15
136:6,18 139:17
140:7,15 141:9,15
142:4,18 145:7
153:2 159:5,9,11
180:5 185:16
186:5 191:16
213:24 217:24
225:15 229:4,5
230:16 232:17
234:25 237:2,8,13
256:22 261:8
277:13 287:8,21
289:18 292:20
293:16,16 294:8
303:10,16 305:10
309:2,7 310:9,25
314:17 316:22
317:3 318:2
320:16 329:5,5
361:24 362:13
369:4,20 376:4,15
376:16 386:22
387:20 392:24
**days** 176:25,25
229:11,16 230:7
242:9,11 245:25
248:8 249:13
251:7 256:10,15
287:21 339:17
**day's** 133:10,11
**deal** 259:25 304:6
313:2 322:25
**dealing** 178:16,18
**dealt** 60:4,5 312:21
**debt** 60:2 196:2
365:11
**December** 1:18 2:5
5:8 18:19 35:9
37:17 162:19
164:9,13,21 165:8
165:14,15,21
166:5,22 167:3,4
167:12 168:11,23
169:4,5,19 170:5
170:17,24,25

171:7,16,25 172:6
172:7,13 173:7,12
173:13,19 174:11
174:12,20,25
175:3 192:6,23
193:12 228:19,20
243:21 253:9
255:21 282:7,11
282:12,13,14
285:16,18 288:15
288:16 290:22
295:15 296:20,25
297:6 299:11,25
300:5,24 301:21
309:3 310:6 311:8
322:7 387:14,20
392:4
**decide** 131:22
132:3 193:4
**decided** 132:6
237:7,15
**decision** 27:12
237:12
**decisions** 202:6,7
**defects** 340:17
**defendants** 1:10
3:13 5:18 16:12
28:19 30:19 46:2
69:5 76:24 80:18
93:18 99:15
119:23 133:18
162:5 179:8
191:21 193:21
196:24 199:14
208:20 216:3
218:3 222:8
226:16 235:11
237:24 240:3
241:2 242:23
245:4 249:17
306:22 321:4
326:7 344:21
348:22 351:21
355:21 357:9
361:8 367:24
381:21 382:4
**DEFENDANT'S**
388:3 389:3 390:3

391:3
**defended** 284:4
**defined** 202:8
**definitely** 53:21
  68:11,12 75:5
  80:2 181:20 182:6
  183:25 184:15
  186:10,17 190:18
  260:14 283:2,9,10
  283:12 287:10
  309:3 314:17
  377:21
**definition** 70:16
  73:6
**definitively** 228:17
  228:25 236:20
**degree** 21:19
  372:19
**delay** 116:22
  296:11
**delayed** 229:11,16
**dELia's** 24:10,11
  24:12,20,25 25:4
  25:8
**deliberate** 323:16
**demand** 384:2
**denial** 239:20
**denied** 366:22
**dental** 44:8 354:16
  356:9
**deny** 225:15
**Dep** 392:4
**departure** 74:6
**depending** 78:4
**Deponent** 392:5
**deposed** 332:9
**deposit** 53:7 57:4
  57:10,16,22 59:9
  60:24 62:7,13
  63:6,12 64:2,23
  65:14 66:24 67:6
  67:13 68:10 70:11
  71:3,4,5,16,20,21
  71:23 72:20,22,23
  72:24 73:2,8,11
  73:12,13,14,16
  74:7 76:7,14 79:9
  79:11,15 82:4,6

82:12,13 83:5,21
84:21 85:5,17
93:10 94:18 96:15
97:7 98:10,18,19
98:20 99:4 101:14
101:19 102:11
103:2 107:3,8,12
108:4,20,24 110:2
110:11,13,23
111:22 112:3,7,23
113:10,23 114:19
115:9 116:2
118:10,25 119:14
121:16,25 122:12
122:18 123:5,10
123:15 124:19
126:6,18 129:21
133:10,13 135:8,8
135:11,11,22
136:2,12,15,16,19
138:19,20,23
139:6,17 140:14
141:9,14 142:3,14
142:14,16,17,25
144:3,22 145:14
145:24,24 146:4,4
146:7,19 147:2,10
147:10,22 148:4
148:21 149:10,14
149:25 150:6,21
151:9,18 152:2,10
153:14,19 154:20
154:24 155:24
156:7,21 157:9,17
158:8,20 159:17
160:25 161:21
163:8,8,10,11,15
164:3,16,16,20,24
165:14,25,25
166:4 167:3,16,18
167:25 168:17
169:3,15,15,18
170:2,4,9,23
171:11,11,14
172:5,17,17,21
173:12,24,24
174:2,10,25
196:19 291:16

292:3,8,9,22
293:21 294:5,23
297:12 299:12,23
327:12
**deposited** 138:24
  144:4 146:20
  147:2 156:9
  158:21 161:2,22
  173:13
**deposition** 1:16 2:9
  5:4,6 6:19 11:21
  13:10 14:18 15:23
  268:7 271:22
  275:15 385:8,14
  385:16 386:4
**deposition's** 384:13
**deposits** 60:10
  64:13,19 65:6,6
  65:12 71:13 79:20
  96:4 97:24 103:14
  103:20 113:13,14
  128:20 129:14
  132:14 158:23
  159:16,18 160:2
  213:16 291:23,24
  292:17 297:18,22
  303:10 304:4,6,14
  304:18,22 305:3
  305:16,17,24
  306:10 322:5,8
  323:19 325:2
  333:20 334:9,10
  335:6 336:8
  338:18 370:7,16
  371:14,16
**describe** 65:10
  189:8 273:4 377:9
**described** 57:20
  97:10 101:22
  108:16 290:6
  296:16 298:11
  313:25 318:3
  320:5 377:17
  378:17
**describing** 358:21
**DESCRIPTION**
  388:4 389:4 390:4
  391:4

**designed** 98:9
  100:19 101:10,18
  102:10,14 111:23
  112:2,4,24
**desire** 254:8
**desk** 57:4
**detail** 336:13
**details** 8:17
**determination**
  34:21
**determine** 154:6
  231:2,7 329:13
**determined** 49:24
  231:9
**devastated** 329:4
**devastating** 376:18
**Develops** 198:10
**DeWitt** 21:8
**diagnosed** 247:23
  254:21 257:2,8,13
  272:18,23 340:16
**diagnosis** 259:4
  262:18,20 263:2,7
  263:11 273:2
  279:9 281:17
**diagram** 100:8
**dialogue** 96:13
  148:9,16 177:16
  206:14 207:7,9
  214:9
**Diaz** 3:17 5:16,17
  6:13,16 10:3 14:8
  14:9 16:5,10,17
  28:17,22 30:17,23
  37:8 41:5 45:24
  46:5,17,25 47:16
  48:8 50:12,15
  51:25 53:25 54:8
  57:24 61:25 63:15
  63:23 64:6 66:10
  69:3,8,15 72:3,11
  76:22 77:3 80:16
  80:22 81:12 83:3
  86:4 87:4,7 91:2,9
  93:16,21 95:3
  98:14 99:13 102:2
  102:24 103:7
  104:2 108:9,15,21

109:7,14 110:15
112:8,14,21 113:4
113:8 114:6,14,16
117:3 118:8
119:21 120:6
122:7 132:2
133:16,21 134:6
137:16 138:3,6
140:23 141:7
148:2,23 151:2
152:9,16 153:12
153:17 155:13,20
159:2,23,24
160:11 161:8,13
161:18 162:3,8
175:5,15 178:5,11
179:6,11 183:7,17
184:23 185:2
191:8,19,23
192:20 193:19,24
196:22 197:3
198:19 199:12,17
203:11 205:8,10
205:11 206:10
208:13,17 209:3
215:25 216:5
217:25 218:5
220:4 222:6,11
226:14,20 235:9
235:14 237:22
238:2 239:23,25
240:7,24 241:5
242:21 245:2,6
249:15,20 251:16
252:2 260:24
264:8 265:7,16
266:21 267:2,7,17
267:24 268:3,11
268:16,18,22
269:2,8,18,22
270:20 271:3,15
271:21 272:6,11
272:15 273:16
274:3,10,15,19,23
275:7,11,23 276:3
276:8,15 285:10
298:23 301:10,19
306:20 307:2,25

308:5,15 311:18
315:11 318:14
319:10 321:2,7
326:5,10 329:13
329:15 330:10,16
331:2,9,11,20
332:8,16 333:2
341:10 344:19,24
346:8,12 348:20
349:2,16,20
351:19,24 353:9
353:20,24 354:3,8
355:19,24 357:7
357:15,23 358:23
361:6,11 362:4,6
367:18 368:3
370:9,21 371:2,22
379:13 380:15,24
381:17,19,24
383:2,12,24
384:23 385:12,15
**diem** 341:3 342:8
342:13
**differ** 103:21
104:10,11,17
**difference** 32:14,17
36:12,18 108:2
**different** 10:23
36:20 74:24 78:4
84:14,14 89:8,8
90:3 94:17 95:13
105:15 107:14
148:14 177:24
201:21 228:10
252:14 265:14
266:25 267:6,16
269:16,18 270:13
270:15 271:9,20
274:9,22 275:5,21
294:10,11 309:17
317:10
**differently** 212:13
**differs** 236:12
**difficult** 107:21
140:11
**difficulties** 175:17
175:20
**difficulty** 205:16

**directed** 384:7
**direction** 106:3
**directly** 34:15
90:23 91:10,24
92:5 316:6
**director** 343:4
344:10
**directors** 316:4
**disabilities** 247:24
**disability** 221:13
**disagree** 110:10,17
111:11 112:17
207:2 217:5
**disagreed** 191:15
200:18
**disagreement**
207:8 217:13,16
**disagreements**
190:23 191:2,7,10
192:15,22
**disappointed**
185:18
**discharge** 370:5
371:10,15
**discipline** 23:22
26:15 33:2 41:2
**disciplined** 25:3
298:20
**disclose** 379:7,21
**disclosing** 381:6,15
**discount** 43:25
45:2,5
**discounts** 44:16
45:4 355:14
356:25
**discover** 228:16
**discovered** 228:22
**discovering** 228:24
**discreet** 58:6
**discretion** 130:20
**discriminate** 312:6
**discriminated**
308:20,23 310:8
311:5,12 312:7,10
313:8,8,20
**discrimination**
13:7 27:20 312:4
318:10,16,21

329:20
**discuss** 93:10
126:24 191:15
202:2 206:18
207:11 213:9
214:16 218:17
225:24 226:5
231:15,21 249:2
279:8 282:19
299:12,23 333:4
336:15,19 338:4
348:6
**discussed** 15:22
85:3 95:16 211:15
211:16,19 234:20
249:6,7 281:25
299:20
**discussing** 264:10
306:7
**discussion** 63:21
114:10 200:22,24
213:18 270:18
**discussions** 202:16
**disease** 340:17
**disorders** 247:24
**disorganized**
181:16
**dispensing** 340:20
**dissect** 311:4
**district** 1:2,3 36:3,4
83:11,16 85:9
86:22 90:18 92:9
95:9 141:23
147:18 148:12
177:3,6,12,14
186:4,20 188:6,11
188:13 190:8,24
194:20 201:3,7,11
201:14,19 203:14
204:12,12 215:20
224:18 225:8
226:6 230:3,6
231:15,22 273:21
285:12 302:25
303:9 306:10
309:22 315:24
319:20,22 320:10
334:19 348:5

**diverge** 103:15
**DM** 35:15 37:18,21
37:22 38:4,7,12
41:16 106:12,15
130:24 140:21
188:17 229:8,24
229:25 230:9
232:7,11 301:4
**DMs** 56:15 89:7
90:2 140:9
**DM's** 139:22
**doctor** 229:10
237:7,18 243:15
257:5 277:11,11
278:9 279:11
281:7,16 283:8
**doctor's** 276:22
**document** 16:12,19
16:21,24 28:24,25
29:4 30:22,25
46:6,14,15,19
47:2,15 49:21
51:12 52:4,13,17
69:9,10,16,17
72:2,5,9,9 74:19
74:21,24 75:2
76:24 77:4,8,9
79:8 80:18,21,23
80:25 81:3 93:18
93:22,24 94:8
99:18 104:14,25
105:6 107:2 113:7
116:7 118:25
120:2,5,7,10
121:5,23 122:5
123:4,19 133:18
133:24,25 134:12
137:23 138:5,14
139:12 141:13
143:14,16 146:13
149:22 150:3,11
151:17 154:13,19
155:22 156:17,25
157:7,15,23 158:3
158:12,18 162:5
162:11,14,18
163:14,19 165:4,7
166:3,19 168:20

169:17 170:13
171:13,22 172:4
172:20 173:3,21
174:9,17,23 179:8
179:13,14,17
191:25 192:19
193:20 194:2,3,5
197:5,7,9 199:21
199:23 200:21
208:20 209:5,7,9
209:21,23 210:11
210:12 216:8,10
216:13,15 218:7,9
218:11,14 219:4
219:17 220:17
222:8,13,16
226:21,23 227:2
235:11,15,17,22
237:24 238:4,5,8
240:9,14,22 241:2
241:8,9,13,19,21
243:2,5,19 244:7
245:8 249:22
286:20 307:4,6,10
307:12,15 308:4
319:23 320:8
321:4,8,11,16
326:7,14 345:3
349:5 351:21
352:3,18 353:11
353:12,13 354:11
355:21 356:3,15
357:2 361:8,15
368:4,6,10,12,23
369:3 370:3,19,25
371:6 381:8 382:4
382:13 383:16
388:5,14,16,18,24
389:5,7,14,18
390:5,7,11,19,21
391:7,9,13
**documentation**
14:25 15:3 63:2,9
64:17 206:21
210:16 212:20
323:21 327:19
**documented**
116:15

**documents** 14:17
16:2,6,8 17:6,15
17:24 18:2 51:17
67:19,21 68:5
84:2,15 151:5,7
152:19 153:18
156:7 157:16
158:19 160:25
170:23 172:5
173:10,11 174:24
209:25 346:5
367:19
**doing** 55:16 57:10
63:2,10 64:18
68:13 89:19 96:12
97:9 101:15
104:18,20 116:5
121:7 128:13
139:16,21 140:2
183:8,13,22
186:22 204:16
212:7 213:7 254:9
257:4 298:5
304:13 372:11
379:25
**dollar** 312:15
**dollars** 382:11
**dollar-for-dollar**
356:23
**door** 132:21,22
214:3,8
**doubled** 186:4
**doubling** 213:14
**doubt** 281:12
**doubted** 373:6,7
**downs** 189:23
**downtown** 203:23
**Dr** 247:2
**drank** 11:13
**draw** 100:8
**DRB** 297:6,9
298:20
**DRBs** 298:12,15
**drink** 196:8
**dropped** 116:3
118:20 292:18
323:20 335:6
**dropping** 304:4,6

304:14 333:19
334:9 336:7
371:16
**drunk** 372:10
**due** 198:7 205:13
361:18
**duly** 6:4
**dumped** 372:22
374:9
**Duration** 238:19
**duties** 175:18 177:4
340:13,15 347:12
**dye** 257:22

─── **E** ───
**E** 3:2,2,9 6:3,3
118:2,2 387:3,3
**earlier** 41:19 52:20
94:4 125:20
149:15 258:9
282:6
**early** 237:8,13
256:16 258:13
262:21 278:23
282:3 288:18,21
302:3 317:13
**earn** 365:15
**earned** 366:6,8
**eat** 254:8 374:8,11
375:2
**eaten** 11:13
**EcoSure** 176:8
184:7
**education** 21:11
**effect** 10:24 11:14
105:16
**effecting** 255:24
**effective** 200:25
201:23,24 202:6
**efficient** 99:11,23
99:25 101:5,8
**efficiently** 98:6
**eight** 77:23 183:5
185:9 327:16
328:6
**Eighth** 35:13,18
139:12 222:4
**eight-hour** 261:8

342:18
**eight-month** 183:9
183:14
**Eisley** 35:16
**either** 31:19 34:17
91:12 92:15
121:16 122:11
155:6 160:18
178:19 180:9
186:3 224:12
232:19 235:4
254:4 282:15
329:3 331:23
339:24
**electric** 365:6
**eligible** 350:24
352:24,25 354:18
354:23 355:10,12
356:10,15 357:3
**eliminate** 97:22
100:16 129:24
**embarrassing**
372:25 373:20
**emergency** 257:18
258:9
**emotional** 373:21
**employed** 22:9
26:20 27:2 54:11
55:10 309:25
310:2 361:19,25
**employee** 27:8,13
48:11 49:24 50:8
52:2 355:14
356:12,21,25
357:4 373:15
**employees** 33:2
34:12,18,22 41:2
41:7 45:14 60:10
60:15 67:15 119:6
149:13 182:10
185:11,23 193:8
193:11
**employer** 13:6
22:12
**employers** 22:9
28:3
**employment** 28:20
29:21 31:17 41:25

47:8 49:16 55:5
55:21 68:3 320:2
338:24,25 340:7
341:5 342:25
345:13 348:7,10
348:13 350:15
355:13 358:4,17
359:11 363:3,4
365:20,25 367:7
388:7
**ended** 296:15 305:9
325:18 340:8
348:14,17
**energy** 255:16
260:12,15
**enforcing** 45:18
**engaged** 141:19
**English** 21:13,22
**enroll** 359:15,19
**enrolling** 359:23
**ensure** 40:14
101:14 144:17
213:12,14 229:15
231:11
**ensuring** 213:7
214:10
**entire** 37:23 48:20
76:13 95:11
110:14 130:3
138:5 186:15
201:6 213:3
255:18 268:7
270:2 274:7 309:6
310:12 323:21
**entitled** 8:18
160:15 379:18
380:4,8 384:24
385:2
**envelope** 107:16
111:3,10
**environment**
372:18
**equipped** 380:12
**ERRATA** 392:2
**error** 144:16
145:12,17
**errors** 121:2,3
125:21,24 392:8

**escapes** 224:21
303:21
**ESQ** 3:9,17,18,19
**essence** 292:15
325:15
**establish** 160:25
267:20 268:5
**established** 159:12
159:25 160:8
309:5
**establishment**
178:17
**Estela** 3:17 5:17
6:16 260:23
267:10,22 268:13
269:13 307:24
353:22 370:20
**et** 123:7
**evaluate** 212:18
213:10 214:23
215:3
**Eve** 229:4
**evening** 233:13
300:7 324:18
338:2
**events** 376:13
**everybody** 186:8
**everyone's** 176:11
**exact** 13:19 270:6
271:6 283:15
**exactly** 73:3 81:17
107:20 145:8
208:11 276:23
280:11 306:18
361:4 366:2
**examination** 4:6,10
6:12
**examined** 6:5
**example** 105:9,12
105:18,19 107:13
107:15
**examples** 49:17
201:2
**exceeding** 381:3
**exception** 51:7
**exceptional** 40:17
**excerpt** 69:5,9
388:12

excessive 385:11
excuse 7:20 14:8
  91:3 94:15 98:20
  123:8 137:7 167:5
  173:12 174:10
  194:20 211:10
  228:23 253:10
  262:20 268:18
  285:11,17 328:8
  370:14
exhausted 228:4,5
  236:24 255:18
  259:12,24 376:10
exhauster 256:19
exhaustion 254:2,2
exhibit 16:11,12
  28:18,19 30:18,19
  45:25 46:2 69:4,5
  76:23,24 80:17,18
  93:17,18 99:14,15
  99:20 103:24
  104:23 119:22,23
  133:17,18 162:4,5
  179:7,8 191:20,21
  193:20,21 196:23
  196:24 199:13,14
  208:14,20 210:5
  216:2,3 218:2,3
  222:7,8 226:15,16
  235:10,11 237:23
  237:24 240:2,3,25
  241:2 242:22,22
  242:23 245:3,4
  249:16,17 306:21
  306:22 321:3,4
  326:6,7 344:20,21
  348:21,22 351:20
  351:21 355:20,21
  357:8,9,25 358:9
  361:7,8 367:23,24
  381:20,21 388:5,6
  388:8,10,12,14,16
  388:18,20,22,24
  389:5,7,9,10,11
  389:12,14,16,17
  389:18,21 390:5,7
  390:8,11,13,15,16
  390:18,19,21,23

391:5,7,9,11,13
  391:15,16
exhibits 386:6
  388:2 389:2 390:2
  391:2
existing 183:20
expect 6:25
expectation 90:6
expectations 90:4
  90:18 202:2
  206:18,19,23
expected 244:3
expenses 364:18
  365:3,5
experience 99:7
  124:5 187:18
  358:21 372:4
experiences 185:17
experiencing 127:4
experiment 130:9
  131:10
explain 57:9,15
  331:15,18 332:2,6
  332:10,14
explained 53:3
  278:4
explains 327:8
explanation 145:16
  253:22
express 217:13
extended 100:3
  310:22 361:19
extends 222:23
extent 189:6 232:8
  233:18 294:7
  383:20
extra 201:13
extreme 254:2,7
extremely 127:11
  127:17 228:7,8
  259:12 261:6
  287:8 292:4
  312:13
eye-opening 101:16
e-mail 93:6,7
  120:18,23 179:20
  179:22 180:18
  181:8,11 183:3

184:18,20 185:4
  185:22 232:21
  245:20 357:9
  358:11 361:15,16
  391:11
e-mails 185:6

―――――――――

## F

F 118:2 387:3
face 374:19
Facebook 18:10
  191:21 192:4
  193:5,7,10,15
  389:9
facility 248:2
fact 137:18 141:21
  144:21,24 211:18
  291:23 304:4,10
  305:8 311:10
facts 392:7
failed 184:8
failing 119:13
failure 126:5
failures 126:6
fair 384:25
fairly 319:5
fall 119:9 121:8
  122:24 129:4,9
falsification 49:20
  51:11 52:3,12
  321:22 323:13,15
falsified 51:17
  370:7,15 371:14
falsify 323:14
  324:25
falsifying 52:17
  338:20
familiar 46:7 48:23
  69:18 77:10 78:7
  81:19 86:24,25
  93:25 194:5
  226:25 307:9
  321:10 345:2
  350:17,21 352:2,4
  356:2 368:9,12
family 220:25
  222:23 223:2,3,8
  236:6 239:15

240:4,12 390:8
far 110:2 111:6
  134:7 285:2
Farmer 30:4,5,9,10
  30:11 53:12 343:3
  343:5,7,9 344:5,7
  344:9
faster 65:17
favor 106:10
favorite 179:23
fax 304:12
faxed 247:4
February 216:16
Federal 12:25
fee 360:3,5
feel 8:11 99:10,22
  101:2,7 102:17
  152:23 182:16
  217:16 221:16
  254:13 256:6
  373:4 377:21
feeling 234:17
  374:8,25 375:9,13
  375:15 378:12
fees 359:25
Feld 2:11 3:12 5:18
  5:21
felony 22:6
felt 101:2,4,4,13
  139:20 152:23
  201:18,22 206:16
  207:5,5 248:13
  308:10 373:6
  374:19 375:20
  378:16
Fernicola 1:24 2:12
  5:12 387:9,24
fibroids 228:4,6,18
  255:5,15 257:25
  258:16 259:8
  265:20,23 272:19
  272:23 279:10
  281:11
Fiction 364:8
field 350:18
Fifth 3:6
figure 178:22,25
  187:20,22 373:13

figuring 276:23
file 79:2 127:15
  247:3
filed 6:18 12:25
  13:5 16:7 307:13
  307:18 308:16
filing 4:10
fill 123:8,9,15
  126:5,17 144:22
  145:4 149:16
  158:8 243:16
  248:17 291:16
  304:11
filled 136:14
  147:11 154:25
  159:18
filling 28:14 122:18
  124:19,23 129:20
final 48:19 51:9,19
  124:8 183:22
  250:20
Finalize 107:2
finalizing 107:7,8
  107:11 108:4,23
  110:10,13
finally 280:15
  282:25 310:25
  317:25
financial 39:25
  54:23 58:25 59:11
financials 68:13
find 95:14 139:10
  140:10 302:10
  313:3 330:21
  347:18 373:7
finds 311:2
fine 75:18 257:25
  294:4 305:12
finger 146:11
fingers 128:3 150:8
finish 7:20,24 9:23
  66:5,8 138:7
  246:15
finished 10:8 68:21
  307:5
fire 32:23 34:12
  328:10
fired 315:13 317:25

320:16 330:18
334:4,5 336:4,7
362:16 369:5,21
369:22 376:17
377:13 378:3
**firing** 40:21
**firm** 190:14 312:21
**firms** 190:9
**first** 22:12 30:8,13
41:20 69:25 77:10
78:20 79:10,22
82:4 97:3 107:3
112:12 120:19
126:23 133:23
139:9 140:7
147:18,19 152:23
162:13 181:25
184:6,9,10 188:3
191:9 198:2 224:7
232:3 236:5,13
238:18,21 243:21
244:8 256:14
258:2,8,21,24
272:16 273:17
274:24 275:10
276:16 289:14,19
313:5 318:2
320:16 328:11,18
329:5 338:15
340:6 352:7 356:7
359:4 361:15
**fiscal** 194:13
197:12 198:5,21
**five** 184:3 356:6
**five-minute** 175:5
251:16 301:10
332:16 357:16
**fixed** 31:18
**flattered** 385:6
**flip** 70:6 82:2,11
86:6,10 133:23
134:8 150:9 154:6
162:13 184:17
**flipped** 291:11
**floating** 201:10
203:13,17 204:3,8
292:3,7,9,16,22
294:4

**floor** 2:11 283:21
**flow** 255:16 287:9
**flown** 233:16
**FMLA** 221:6,11
223:17,22 224:4,7
225:3,9 226:2,10
227:16,20 239:8
242:13 247:10
301:5 325:8
361:19
**focus** 202:10
205:19,24 207:13
208:9
**focused** 88:10
**focuses** 185:9
**follow** 45:14 51:8
51:18 75:9 95:5
96:19 124:5 253:2
286:22 324:9
**followed** 86:17
87:20 195:25
324:12 328:8,13
**following** 37:17
86:10 94:23 141:9
141:14 142:3
183:21 185:13,14
227:8 250:22
317:16 358:20
382:7
**follows** 6:6
**follow-up** 252:24
253:5
**food** 178:17
**foot** 225:12
**forget** 123:5 224:21
**forgets** 106:14
**forgetting** 121:5,6
121:15,24 122:11
**form** 4:14 47:23
50:19 217:3
240:19 241:17
249:18 250:2,16
390:17
**formal** 21:11 23:9
53:17 61:12 62:25
63:9 64:17 68:15
**forward** 206:22
211:5 236:8

**forwarded** 187:16
**found** 230:12
236:19 258:15
309:2
**foundation** 206:6
**four** 70:10 283:7
**frame** 16:4 180:15
185:24,24 214:15
219:9,21 220:20
224:11 258:6
263:17
**frames** 258:7
**free** 44:4 196:8
364:5
**freely** 217:19
**frequent** 42:19
**frequently** 79:5
**Friday** 130:10
165:21 167:3
312:14
**friend** 339:12
343:4,6
**friendliness** 185:10
185:23
**friendly** 181:14
**friends** 193:7,11
339:5 373:16
**friendship** 188:23
**front** 9:10 75:8
77:5 223:10,14
282:24 309:9
334:20 375:19
382:9
**frustrated** 280:9
281:21
**fulfilling** 177:4
**full** 6:8 186:16
300:14
**Functions** 86:8
**funds** 86:13,15
100:20 107:15
108:5,17,24
111:16
**funny** 304:9,9
**further** 4:9,13
327:23
**FY11** 206:6

**G**

**Gap** 339:10 349:8
356:11,20 365:7
**gaps** 125:3 127:22
**Gap's** 357:4
**Gap.com** 358:11
**gas** 365:6
**gathering** 300:9
**geared** 59:15
**general** 80:4
177:20
**generally** 40:10
318:16
**generous** 356:22
**getting** 57:6 76:4
93:5 101:19
102:10 103:2
134:16 139:25
140:4 201:7
212:24 233:17,25
344:8 372:19
383:10
**Giancarlo** 181:8,25
184:19
**gifts** 300:11,15
**girls** 284:4 317:7
**Giselle** 261:24
262:4 263:8
266:14 283:21
333:14 337:14
**give** 7:9,16 9:4
10:13 23:4 37:17
196:7 233:6
245:23 290:21
325:17 349:15
357:14
**given** 8:9 36:11
85:7 341:11,18
345:8 349:12
370:4 371:10,13
**gives** 42:25
**giving** 57:7 281:17
316:24
**go** 22:16 27:15
36:16 58:4 70:10
75:18 80:10 84:7
89:4,11 96:9
106:25 110:8

113:16 115:9,14
116:7 124:4,6,7,7
126:22 128:14
134:7 137:24
139:11 140:7
143:10,24 144:21
145:3 155:19
178:24 179:25
180:19 182:13
189:5 193:3 195:2
197:19 200:12
201:15 203:20
206:20 208:3
219:25 229:10
237:18 242:13
246:6,9 262:12
270:16,20 276:22
277:10 278:8
279:4 287:9
290:15,23 292:12
292:22 296:7
297:17,17 303:14
303:25 304:2
309:15 313:13
333:9 334:17
336:12 354:7
357:24 362:20
366:23 368:24
373:24 375:7
376:17 377:20
**God** 305:11
**goes** 114:25 129:25
213:5 258:21
**going** 6:23,24 7:23
8:7 9:21 13:12
17:9 22:15 47:22
50:18 52:15 54:3
54:9 56:9 58:6
62:2,5,21 68:23
72:15 95:6 100:17
107:14 116:7,8
117:5 123:17
126:2 127:19
134:17 140:17
141:2 152:13
154:23 175:9,22
177:17 180:4,8,17
185:13 186:21,21

193:3 201:5 206:22 208:19 211:5 226:2 229:9 230:12,15,16,17 230:18 231:14 232:4 234:25 248:4 251:20 258:12 264:3 268:11 272:12 274:8 278:9 279:12,19,23 280:11 283:2,2,11 283:14 284:3,10 285:4 286:8,23 288:14 292:13,22 292:23,24 293:17 293:20,20,21 294:16,18 296:5 296:10 299:9 301:14,20 303:23 305:11 309:4,8,11 309:12 310:17,20 311:2,9,15 313:9 314:14 316:12,14 317:2,8,15 325:3 326:20,22 328:24 329:14 332:20 336:2 357:18 358:9 374:14 376:13 379:5 380:19 381:13 382:14 383:19 386:3

**good** 6:14,15 39:12 39:25 116:25 122:22 176:6,25 187:18 189:18 213:7 230:18 316:5 385:18

**gosh** 26:11 209:14 229:25 304:2

**gotten** 185:17 292:6 305:8 336:7

**Gottlieb** 3:9 5:23 5:23 9:21 10:18 11:6 13:11 14:6 15:21 16:3,14 17:8 22:15 23:23

25:5 26:16 27:9 27:14,21 28:4 29:16 31:23 32:16 33:8,12,25 34:14 36:15 37:5 38:24 41:4 42:7,15,23 46:13,23 47:13,19 47:22 48:5,13,15 48:25 49:6 50:2 50:10,18 51:13,23 52:5,14,23 53:4 56:13,17 57:11,17 57:23 58:2,12,22 59:21 60:11,18,25 61:16,23 62:2,15 63:7,14,19 64:4,8 64:25 66:4,7 67:2 67:9,16,25 68:7 68:21 69:13 71:14 71:25 72:7,15 73:18 74:13,25 76:2,9 79:19,21 81:11,21 82:9,24 84:25 85:19 86:3 87:2,5,22 88:5 89:3 90:13,15,24 91:8,25 93:14 94:25 95:6 96:8 97:17 98:12,22 99:9 100:21 101:21 102:4,12 102:22 103:5,17 103:23 104:7,12 107:10 108:8,13 108:19 109:4,9,17 110:12 111:24 112:5,11,16 113:2 113:6,9,25 114:4 114:8,20 115:5,23 116:24 119:15 120:3 122:3 123:17 126:8 129:2,16 131:24 132:16 133:12 134:2 135:17 137:3,9,14,25 138:4 139:3,7,18 140:16,24 141:16

143:2,9,23 144:6 144:15,23 145:5 145:15 147:4,15 147:23 148:22 150:24 151:4 152:7,13,18 153:11,15 155:10 155:18 158:25 159:14,20 160:4 160:14 161:5,10 161:16,24 166:12 168:7,12 175:7,19 176:2,22 177:5 178:4,9 179:15 180:17 183:6,11 183:15 184:21,24 187:13,25 188:21 189:3,20 190:25 191:6,11 192:17 196:20 198:16,22 200:5,16,20 203:10,19 205:6,9 206:3 207:4,16 208:2,10 210:19 211:13,22 214:25 215:15 219:6,23 220:7 225:4,10 229:2 231:23 236:22 239:16,24 246:14,17,23 247:14 248:22 251:14,18 255:9 256:17 259:5,14 260:2,19 261:3,13 261:17 262:11 263:18,22,24 264:16 265:6,9 266:19,23 267:4,9 267:22 268:2,7,13 268:20,24 269:5 269:13,20,25 270:9,22,24 271:5 271:17 272:2,9,12 273:14,25 274:6 274:10,12,17 275:2,4,10,23,25 276:5,9,12 278:22 279:3 285:8,13,21

286:7,18 287:19 288:2,7,12 289:16 295:19 296:21 297:2,14,24 298:17,21 299:14 300:2 301:9,12,25 302:7 303:13 305:18 306:11 307:22 308:3,13 310:10 311:14 313:12,22 314:5 314:24 315:15,20 316:17 318:7,12 319:7 322:13 324:3 326:18 327:3,20,25 328:16,24 329:9 330:7,14,24 331:4 331:10,15 332:2 332:12,18 333:7 334:16 338:21 340:3 341:9 346:8 350:3 351:3,9,15 353:7,10,17,22,25 354:4 356:17 357:12 358:6,22 362:3,7,23 363:6 363:10 368:11,19 368:22 370:8,18 370:24 371:5,11 371:19 374:4 375:5 376:22 377:11,19 378:22 379:5,20 380:9,17 381:4,13 382:2,14 382:23 383:6,15 384:3,5,9,12,15 384:21 385:2,18

**go-see** 94:14 96:10 97:3,9,12,14 100:7,12

**graduate** 21:3,16 341:8,14 342:7,25 343:13,18 345:6 345:10,14,18 346:17,23 348:15 363:4 366:6,15,19 367:6,8

**graduated** 20:25

**Grand** 6:10 18:21 19:13

**great** 353:9 378:2

**Greater** 353:15

**Greenwich** 333:12 337:6

**greeted** 300:10

**grew** 255:5,15

**Grey's** 246:25

**Ground** 376:16

**group** 40:15 305:5 306:12,13 347:16 373:18

**growing** 186:19 190:20

**guarantee** 47:6

**guess** 15:13,16 45:2 65:6 75:5 82:21 106:10 107:21 111:8,12 116:11 119:8 148:25 149:4 174:6 182:12 188:14 194:14 210:8 217:12 239:24 261:5 280:9 285:4 286:8 287:7 372:14

**guessing** 239:20

**Guha** 3:18 5:22 269:23 270:7,16 275:6 384:14,17 384:22

**guide** 46:3,9,12 49:5,9 52:22 53:19 94:23 95:5 96:21 103:16 222:19 388:11

**guidelines** 250:23 250:24

**Gump** 2:10 3:12 5:17,21

**Gurtov** 1:8 5:19 6:17 15:16 38:9 38:11 65:25 66:12 89:10,17,24 90:10 91:4 92:23 95:9

95:18 96:3 106:12
106:15 179:21
181:10 184:19
185:20 187:24
188:24 189:17
190:3,19,23
192:15,22 197:17
200:3,12 202:25
203:8,16 207:3
209:14,23 211:10
213:9 214:17
215:19 217:14
218:17 219:9
231:21 232:14
245:14 248:20
249:10 251:2
252:4 261:25
262:4 263:12
264:12 265:3
266:17 268:17
269:11 272:8,16
274:25 276:17,21
277:7 278:14,17
279:6,23 282:4,8
282:20 284:17
285:7,19 286:16
288:16 295:5,14
297:5,9,11,16
298:19 299:8,13
299:24 300:6,9,19
300:23 301:21,23
302:4,6,19,22
305:15,24 309:2
310:7 311:11
312:11 313:8,20
314:2 315:17
318:5 319:21
320:6 321:17,20
322:11 369:22
**Gurtov's** 187:12
205:3 206:11
211:20 218:22
250:15 273:7
279:15 283:16
310:6 311:7
**guys** 152:22 182:14
189:18 291:14,16

**H**

**H** 6:3
**half** 18:25 149:3
204:15 289:12
**Hancock** 20:7
**hand** 129:25,25
387:20
**handed** 188:7
290:22
**handled** 51:16
309:6
**handling** 59:14,18
60:16 62:22 88:12
88:15 124:21
212:17,23 214:16
**handoff** 185:12
**handwriting** 70:3
134:21 135:7
142:13,16 145:23
155:6 163:5
164:15 165:22
167:13,18,25
169:13 171:8
172:14 173:20
238:21 241:18,19
241:22 243:9
244:18 250:8
**happen** 212:5
286:21 287:16,16
305:11 310:21
316:7 317:2
374:23
**happened** 8:17
59:6 92:17 106:15
139:10,13 145:8,9
149:6 179:23
210:10 217:6,8
277:17 286:15
287:10 290:13
295:12 305:12
314:13 319:18
377:15
**happening** 225:17
233:4 283:13
**happens** 84:13,15
**happy** 180:12
181:3 187:2 193:3
**harassing** 267:13

332:4
**harassment** 13:2,7
27:19 275:22
**Harlem** 19:15
**Hauer** 2:10 3:12
5:18,21
**head** 7:14 26:12
**heading** 31:7 49:14
77:12 79:9 81:4
86:7,11 88:8
**headings** 70:10
**headsets** 184:6
186:7
**health** 43:24 44:6
44:14 77:12,16
78:17 230:22
241:25 309:10
339:11 340:9,12
340:14 341:8,15
341:20,22,25
342:7 343:2,13,18
345:10,14,19
346:18,23 363:5
366:15,20 367:8
377:5
**Healthcare** 240:19
241:16
**heard** 8:8 79:24
82:19 258:2,25
271:18,18 276:2,5
302:12,13,19
336:9 351:16
**hearing** 12:9,18,21
366:23 367:24
368:15,17 369:7
370:23 371:4,18
391:15
**hearsay** 306:14
**heavy** 228:7 254:3
259:19,25
**held** 2:9 5:7 63:21
114:10 141:14
196:9,10 205:14
270:18 277:16
278:4 303:9
304:17,22 305:3
305:24 306:10
346:24 347:3

368:18 387:13
**help** 98:9 101:11
177:17 186:6,21
201:15
**helped** 98:18 101:3
101:4,7 186:10
**helpful** 103:11
104:19 204:11
**helping** 202:10
**hereunto** 387:19
**Herrera** 348:5,9,17
**hey** 63:11 233:3,17
**high** 20:25 21:6,12
22:13 315:24
**higher** 36:11
**highly** 29:24 148:6
**high-profile** 190:17
312:13
**high-volume**
351:11 353:5
**hire** 30:14 31:9,11
32:23 34:12 68:18
**hired** 30:4,8,13
32:4 40:14 343:19
**hires** 52:25
**hiring** 40:21
183:19 347:15
352:5
**hit** 375:21
**Hog** 376:16
**hold** 16:9 26:20,25
32:11 33:19 35:2
41:6 55:5 73:24
75:18 128:17
136:10 140:14
159:23 187:19,21
213:15 284:12
317:8 325:3 329:9
384:14
**holding** 130:2
139:16 141:9
142:3 214:10
305:16,17 338:18
**holiday** 24:22
152:25 153:6
189:7 293:17
295:2 300:7,9,12
300:18 305:2

**holidays** 229:5
**home** 17:17 292:10
354:18 356:12
**honestly** 204:5
**hope** 243:16 294:15
294:25
**hopes** 364:5
**horrifying** 372:25
374:24
**hosting** 305:2
**Hot** 339:24
**hotline** 229:19
230:15 318:18
322:18 323:2,9
326:3 329:23
336:2
**hour** 10:5 289:13
296:14 312:17
334:13 342:5,15
342:21,22
**hourly** 341:25
342:3,4,20 346:16
**hours** 14:12 79:12
82:15 130:6 133:5
133:6 236:25
261:9 287:22,23
312:16 315:23
341:7,11,13,16
342:12 376:8
384:16 385:3,10
385:13
**house** 77:22 78:3,8
78:12 81:5 303:20
333:12 347:20,21
347:24
**Howard** 372:14
**HR** 248:18 302:9
**huddle** 91:12,17,18
92:12,15,23 96:2
273:22 277:2,9,14
277:18 278:6
281:7 310:14
311:9 316:23
**huddles** 93:11
277:13
**Hudson** 38:18,23
39:3,5,14,17 40:5
106:22 176:17

180:3,14 181:19
182:23 189:25
190:8 207:6
282:18 286:17
**huge** 68:12 201:18
215:5
**human** 360:23
**hung** 229:9

**I**

**ice** 254:8
**idea** 23:9 137:10,13
137:17 377:24
380:7
**ideas** 212:13
**identification**
16:13 28:21 30:21
46:4 69:7 77:2
80:20 93:20 99:17
119:25 133:20
162:7 179:10
191:22 193:23
197:2 199:16
208:22 216:4
218:4 222:10
226:19 235:13
237:25 240:6
241:4 242:25
245:5 249:19
306:24 321:6
326:9 344:23
348:24 351:23
355:23 357:11
361:10 368:2
381:23
**identified** 306:9
**identifying** 86:19
88:3
**ignore** 331:5
**ill** 375:9,13
**illness** 11:4
**imagine** 62:23
68:14
**immediate** 49:15
52:18
**immediately** 49:24
50:9,24 51:6
52:12 88:15 229:7

229:11 322:15,16
328:21 329:22
330:3 333:24
334:12
**implementation**
105:8
**implemented** 66:20
66:22 97:16
203:13 359:5
**implementing**
86:19 88:2
**implies** 323:15
**importance** 57:10
57:15
**important** 67:7,14
93:3 113:19 127:2
127:7 142:6
148:19 190:7
196:8 286:25
312:24,25
**improper** 160:5
271:12
**improve** 107:4,9
109:22 177:17
206:22
**improved** 190:5
215:2,11
**improvement**
198:12 199:10
**improves** 107:19
110:11
**inaccuracies** 344:2
**inaccurate** 123:19
180:19 308:11
327:2 362:22
382:15
**incentive** 350:18
352:14,15,20
**incident** 78:24,25
**include** 44:7 49:17
124:13 126:10
129:17 135:6
205:24 310:11
350:5 356:11
**included** 134:5
207:14 208:8
**includes** 86:8
**including** 106:15

123:10 129:21
309:18 347:14
**income** 346:11
356:10
**incomplete** 240:3
240:12 247:3
390:8
**incorrectly** 8:12
174:7
**increase** 36:22 39:4
**increases** 41:23,24
42:11,13,17
**independent**
381:18 382:22
383:3,12,13
**indicate** 151:17
154:19 156:7
157:16 158:19
163:15 164:19
166:4 169:18
170:23 171:14
172:5,21 173:11
174:9,24 236:9
242:4
**indicated** 56:21
190:19 202:22
203:7 244:22
252:25 339:20
**indicates** 152:2
244:2,7
**individual** 1:8
**ineffective** 204:23
**informal** 300:12
**information** 31:5
86:8 122:19
123:10,16 124:20
125:2 126:6,18
129:21 147:20,22
148:4,21 149:10
149:14 154:24
196:19 227:9
239:8,10,11,14,19
240:5,13,16
277:17 278:11
281:19 316:24
379:9,22 390:10
**informed** 237:20
243:23 253:9

277:10 361:18,24
**initial** 273:10
**initials** 71:20 72:21
72:22 73:4 74:4,5
135:23 136:20
142:21 143:7
169:21,24
**initiate** 248:11
**initiated** 223:8
**injustice** 257:5
**input** 56:15
**inside** 116:10,19
227:7
**inspect** 287:24
288:4,9
**Institute** 359:16,20
359:25
**instruct** 97:6 275:7
346:9
**instructed** 60:9
**instructing** 268:19
268:22 269:3,23
270:8,22 271:3,15
274:11,12 275:8
275:18,24 276:9
**instruction** 99:16
105:4,12 388:21
**insurance** 44:6,9
44:11,14 354:17
**Insured** 359:4
**intensified** 255:8
**intensify** 255:10
**interaction** 300:8
310:12
**interactions** 300:17
**intercepts** 179:4
**interested** 387:18
**interject** 9:22
**internal** 13:5
**Internet** 24:17
258:19 272:21
283:5,6
**interview** 29:25
33:10 34:17
343:17 344:4,10
344:14 347:23
373:8
**interviewed** 30:3

348:2,4
**interviewing** 201:5
**interviews** 202:24
**introduce** 5:14
187:6
**introduced** 184:6
188:5 204:11
**introduction**
188:15
**investigation** 299:9
**invited** 347:20
**involved** 27:12
28:2 225:2,9
328:12 376:11
**involves** 328:13
**involving** 368:23
**iPad** 18:13,16
**irregularities** 86:21
88:4
**irrelevant** 331:13
332:13
**issue** 33:5 119:5,12
129:13,19 176:14
217:20 271:23
**issues** 86:22 88:12
88:15 101:10
116:19 176:20
184:10 185:21
214:17,18 225:24
226:5 234:12
249:2 251:12
291:6 296:5,19,24
**items** 211:21
**I.D** 241:23
**i.e** 202:9

**J**

**January** 226:11,18
227:13,15 235:23
236:11 237:6
238:16,25 240:15
242:5,7,7,19
244:3,9,18,24
245:21,21 246:21
246:21 247:9
252:5 256:16
302:4 389:23
**Jenn** 89:10,16,24

90:10 91:4 95:9
95:18 96:3 106:12
106:15 132:7
178:20 179:21
181:9 184:19
185:20,25 187:12
192:15 197:15,16
197:17 200:3
201:5 207:3
209:13,13 218:22
230:7 231:21
232:2,5,14 245:14
245:23 248:12
250:15,25 261:25
262:4 263:12
264:12 266:17
276:17 283:16
302:13,19,22
305:6,15,20,23
309:2 310:7
312:11 318:5
319:21 320:6,13
**Jennelle** 3:19 5:20
**Jennifer** 1:8 5:19
6:17 15:16 38:9
38:11,21 65:25
66:12 209:13
**Jenny** 19:22 20:13
**Jenn's** 106:3
248:16 252:24
**job** 1:25 18:7 24:7
25:8 28:12 80:13
140:2 178:22,24
187:5,18 213:7
254:16 256:21
260:6,18,25
330:19 340:6,18
347:6,18 352:8
362:17,19 373:7
373:23 375:24
376:2,2,5,6 378:2
**jobs** 18:5 26:21
27:2,6,17 54:10
54:11 176:12
339:3,24 346:24
347:3
**John** 30:9,10 53:11

343:7,9 344:5
**join** 182:23
**joined** 282:23
**Joseph** 224:16
**journal** 55:18,20
55:21
**Juana** 261:23
**judge** 9:10 369:11
370:3,15
**judge's** 369:9
**judgment** 201:8
203:8 231:11
**July** 257:10 258:5
265:24 346:14
**June** 179:21 180:15
180:23 181:10
184:18 185:24
**junior** 55:4
**jurat** 385:20

### K

**keep** 17:17 106:4,6
106:17 115:22
146:10 266:24
267:10 268:15
269:15 270:12
271:14 272:21
273:8 274:20
275:20 344:6
346:3
**keeping** 116:19
150:8
**kept** 115:25,25
118:10,24 280:12
310:15 311:10
344:16
**Kevin** 303:19 304:5
333:11 336:18
**keys** 73:25 75:18
196:9
**kicked** 374:20,20
374:21
**kind** 85:4 95:12
106:13 109:10
125:24,25 217:21
248:2 275:13
304:8,14 354:14
**King** 38:18,23 39:3

39:5,14,17 40:6
176:17 207:6
282:18
**Kings** 180:3
**knew** 52:8 83:11
84:17 180:6,7
182:20 189:12,12
189:13 213:19
220:11 322:15,21
329:18,22,24,25
330:3,19 362:21
**know** 6:16 7:22 8:4
8:13 10:6 23:13
45:4 52:6 55:16
58:4,6 59:4,12,15
59:25,25 62:6,18
62:20,21 64:13,14
64:15,18 65:15
68:13 70:20 75:3
75:8 76:4,13,19
77:11,13 78:22
80:3,11 83:13,20
83:25 84:6,12,16
85:4,8,9 87:9 90:7
93:5,6,7 95:14,25
96:13 97:18,19
100:14 101:12
102:18 106:4,11
109:25 111:15
114:3,21,23
115:20 116:4,13
116:14,20 124:3,4
124:24 125:10
126:9 128:7 132:8
136:10 140:6
148:11 149:2,5
158:23 176:18
177:12,23 178:15
178:17,19,21
182:5,14,15
184:14,16 185:4
186:11,14,15,25
187:8,14,15
188:15 189:5,11
189:12 190:6,10
191:15 193:2
197:5 199:3,19
200:6,8 201:2,20

201:24 202:13
204:6 207:10,14
210:7 212:4
213:24 215:6,9
216:7 217:7,18,19
218:7,24 220:11
225:5,12 226:22
229:8,16 232:2,5
232:7 233:4,5,16
233:25 234:2
235:5 236:12,16
240:8 242:6
244:14 248:23
254:16,19 255:13
256:6,25 257:23
257:24,25 258:20
258:22 260:11,13
261:9 267:13
268:2 272:19
276:23,24 280:16
281:6 283:6,14
284:4,5,5,6,11
287:12 291:5
293:9,15,18
294:11,12,15,17
296:4 303:22
304:3 305:19
307:4 310:17,18
310:18,19 317:15
317:17,19,20
321:14 323:24
324:4 326:2,13
336:13 344:15
351:13 352:20,23
354:12 355:6
362:18 363:15
366:2,5,10 368:5
368:14 369:6,9
372:5,24 373:13
373:15,17 374:18
374:19,21 376:5
378:24 379:16
383:17
**knowing** 78:9
81:23 211:3
**knowledge** 306:16
308:6,8
**known** 75:9 140:22

**knows** 353:18
**Kool-Aid** 372:10

### L

**L** 6:3,3
**labeled** 5:3 98:4
**lackadaisical**
123:24
**ladies** 284:11
**laminate** 106:3
**laminated** 106:2
**landed** 314:22
**language** 31:22
32:2
**large** 46:15 69:10
81:17 186:13
281:10 351:7
353:8,14
**largely** 255:6
**larger** 36:13 80:25
**large-volume** 353:6
354:10
**late** 277:6 344:8
**Lately** 181:15
**Lau** 303:19 333:11
334:24
**laughed** 304:10
**law** 190:8
**lawsuit** 6:18 11:18
378:21 384:4
**lawsuits** 28:2
**lawyer** 13:15
322:18 367:17
379:16 380:11
382:18
**lawyers** 381:9
385:5,7
**lay** 374:16
**lead** 45:22 52:18
201:3
**leader** 352:8,15
**leadership** 123:23
201:18
**leading** 15:13
205:20 310:25
317:3
**leads** 198:9 200:23
**leaner** 65:17 97:25

**learn** 34:8 79:2
**learned** 52:17
  68:10 85:5 265:20
  265:23
**learning** 59:23
  62:19 78:25
  175:23 176:16
  177:2,12 350:9
  364:2
**leave** 23:11 26:5
  35:22 127:25
  128:2 147:21
  148:3 182:6 192:9
  199:6,9 221:2,6
  221:13,20,23
  222:23 223:2,4,5
  223:8,17,22 224:4
  224:8,22 225:3,9
  225:18 226:2,10
  226:17 227:13,16
  227:20 229:11,12
  230:17 232:15
  233:5 234:5 235:2
  235:8 236:2,6,10
  236:10,19 237:19
  238:20,24,25
  239:4,15 240:4,12
  244:15 246:22
  247:9,10,10,12,21
  247:25 248:7,11
  248:14,21,24
  249:3,13,18,25
  250:7,11,20,22,24
  251:3 252:5
  258:13 279:23
  280:24 293:20,20
  293:22 294:19
  301:5 309:8
  311:11 313:10,16
  313:19 314:9,15
  315:18 316:8,12
  317:13 318:25
  319:14 320:17
  322:22,23 325:8,9
  329:22 335:8,17
  335:21,24 336:4
  336:14,23 337:10
  337:18,22 338:8

  360:16,20 361:2
  372:20 389:22
  390:9,16
**leaves** 186:25
**leaving** 125:3
  127:22 149:10,13
  283:15 314:18
**led** 201:3 254:4,7
**Lee** 19:22 20:13
**Leedel** 120:19
**left** 116:8 148:20
  180:9 184:5 206:3
  206:5 210:14
  237:2 288:21
  290:23 294:14,24
  294:24 300:16
  317:20 320:4,23
  322:17 363:13
  381:9 384:19
**left-hand** 222:24
**legal** 381:8
**length** 231:16
  279:19 280:20
**lethargic** 228:4
  254:11
**letter** 184:16
  226:16 227:12
  236:4,5 358:2,4
  381:21,25 382:16
  382:19 389:21
  391:16
**letters** 179:3 316:2
**letting** 121:8
  122:24 129:9
  232:7 233:25
  234:2 362:18
**let's** 61:19 111:18
  122:8 126:23
  191:19 262:16
  290:15 384:24
**level** 206:18 352:14
  373:11
**lieu** 325:4
**life** 44:9,11 189:13
  189:13 192:9
  248:4 254:23
  255:18,19 260:13
  354:17 356:9

**lifestyle** 356:11
**limine** 331:13
**limited** 49:18
  176:15 347:14
  356:24
**line** 52:9 75:13
  110:14 112:2,6,12
  309:13 331:14
  361:22 369:4
  388:4 389:4 390:4
  391:4 392:9,11,13
  392:15,17
**lines** 60:4 135:10
  233:2,16 291:5
  323:10 324:7
  327:7,16,16 328:6
**liquidated** 382:12
**list** 179:22 208:5
  358:15,18
**listed** 74:11 137:7
  223:12,14 311:17
  311:20
**listen** 64:11 274:18
**lists** 185:21
**literally** 236:25
  245:25 291:13,17
**literary** 55:18,21
**litigation** 346:6
**little** 189:13 207:8
  291:11 327:23
  362:18
**live** 19:3,6,14,18,21
  20:5,8,11 317:22
**lived** 18:23 19:15
  20:6 255:11
  363:16
**living** 62:8
**LOA** 198:11 199:3
  221:9 247:15
**loan** 354:18 356:12
  365:11,13 374:15
**lobby** 186:16 317:4
**local** 82:16 179:23
**located** 21:9 132:19
  241:22
**location** 24:2 35:13
  35:15,18,22,24
  37:19 38:5,12,15

  38:17,20,23
  176:15 185:8
  186:13 189:18
  190:2,8 286:17
**locations** 24:15
**locked** 116:20
**log** 53:8 70:9,11
  71:3 88:18,22
  89:18 90:8,11
  91:5 92:25 107:17
  107:25 108:6,18
  109:2 111:3,4
  116:3,16 118:11
  118:16,19 119:2
  120:25 121:4
  122:2,13,19
  125:21 126:7
  134:16 135:15,16
  142:9 143:21
  144:9 145:21
  146:25 147:8
  154:2,24 156:14
  162:20 163:2
  164:12 165:20
  167:10 169:10
  171:6 172:12
  173:18 196:14,16
  196:17 287:5,12
  288:10 290:20
  291:6,11
**logged** 64:14
  121:20 195:23,25
**logging** 195:20
**logo** 58:5 113:17
**long** 14:4,11 18:23
  19:24 20:8 22:24
  24:17,20 25:22
  32:8 33:15 35:2
  35:17 55:2 75:15
  132:25 189:11
  221:19 224:22
  233:24 234:8
  248:7 249:10
  272:25 279:17,18
  279:23 287:17
  288:20 289:10
  290:8,8 291:5
  295:7,23 296:2

  310:3 313:4
  320:24 324:6
  341:13 366:3,10
  373:3,3
**longer** 227:23
  228:2 283:3
  309:25 343:22
  361:19,25
**longest** 90:20
**long-time** 343:4
**look** 28:23 46:6
  47:4 49:12 69:17
  77:9 78:22 79:4
  93:24 138:4
  140:19 149:5
  158:11 159:3
  160:20 181:7
  197:25 204:20
  222:24 233:3
  258:19 279:19
  287:12 290:19
  291:14,15,17
  294:13 338:25
  339:3
**looked** 17:16,25
  126:2 140:22
  148:15 149:15
  195:22,24 210:5
  287:5 317:10,11
**looking** 110:18
  157:15 158:18
  253:21 309:22
  339:15
**looks** 157:4 158:6
  227:5 258:23
  292:21,21 309:16
  346:15
**looped** 225:17
**Lopez** 3:24 5:10
**lose** 206:7 215:9
**losing** 127:8
**loss** 88:12,16 93:4
  195:16,19 373:4
  377:18,18,22
  380:6
**lost** 114:13
**lot** 96:13 101:13
  106:9 123:24

127:5 150:9
182:10 184:12,12
184:13 186:11
190:11 207:7
212:8,25 219:14
220:9,17 228:10
246:24 272:20
279:16 296:5
**loud** 46:23
**loved** 180:8 372:9
372:10 373:5
378:3
**low** 152:24 153:5
228:9 237:11
**loyal** 182:2
**lump** 366:25 367:3
**lunch** 117:2,6
189:4,5

**M**

**M** 6:3
**machine** 284:9
**machining** 88:11
**mail** 179:4 235:19
**maintain** 67:7
202:10
**maintained** 359:5
**major** 190:9
317:19,19
**majority** 130:8
287:4,11 288:3,8
288:13 340:17
373:16
**making** 9:22 60:23
62:6 120:25 121:3
127:14 132:10
140:3 213:21
214:12 217:21
296:12 297:22
317:5,12 329:6
**mall** 334:20
**man** 192:9 224:12
**manage** 40:12
58:11 59:5,24
89:8 129:6 186:10
310:19,21
**managed** 32:19,20
34:2,4,5 39:24

40:15 60:20 75:11
178:3 221:24
**management** 41:10
45:18 53:3,10,16
56:23 58:10,20
59:15 60:16 61:10
61:14,22,25 67:19
67:24 68:6 70:9
83:12 86:7,14
88:18,22 89:18
90:8,11 91:5
92:25 94:5 97:3
99:21 107:17,24
108:6,18,25 111:3
111:4 116:3,16
118:11,15,19
119:2,7 120:25
121:4 122:2,12,19
125:21 126:7,25
127:3,11 134:15
135:15,16 142:9
143:21 144:9
145:21 146:25
147:7 148:8 154:2
154:23 156:14
162:20 163:2
164:12 165:19
167:10 169:9
171:5 172:11
173:17 196:14,17
212:16,22 214:6,6
214:17 287:5
288:10 290:20
296:19
**manager** 14:25
15:2,4 30:3 33:20
33:24 34:9,13,23
35:3,6,7,8,12,19
36:3,4 40:2,5,11
40:20 41:20,25
48:21,22 49:8
50:22 51:21 52:21
53:11,18 56:22
57:9,14,20 58:17
58:21,24 59:5
60:20,22 61:3,6,6
61:10 63:17,24
64:21 65:4 66:25

68:2,15 77:15
78:6,20 81:8,18
83:12,16,17 85:9
85:16,25 86:9,12
86:15,18,22 87:14
87:19,25 88:21
94:13 98:19 115:3
115:8 120:14,20
122:10,17 130:21
136:11 140:3
175:16,25 176:6
176:21 177:6,7,12
177:14,18,22
178:10,12,16
179:4 180:14
183:25 184:7,10
185:7 186:20
187:11,17 188:6
188:11,13 190:24
194:9,20,21 203:3
203:6 212:10
215:20 221:7
224:9,14,18,25
225:2,8,20,25
226:6 231:15,22
242:10 247:18
251:8 285:7,12
303:20 304:25
306:5 309:18,22
319:22 320:10
328:10 333:12
336:6 337:5,7
343:10 347:10,13
348:5 352:25
372:17 373:11
**managers** 42:25
88:10,13 92:10
94:22 95:4,20
98:9 141:23
147:18 148:12
177:3 201:17
229:14 261:21
300:14 303:9
306:9 338:17,19
**managing** 88:9
90:17 125:5
183:20 186:18
214:7 347:15

**mandatory** 287:7
**manner** 47:10
212:20 359:6
**manual** 77:13,17
78:17 81:6,9,14
81:20
**manuals** 77:22
78:3,8,13
**March** 219:9,20
220:20 302:11,18
319:15 321:21
361:17,24 369:19
**mark** 16:10 28:17
30:17 45:24 69:3
76:22 80:16 93:16
99:13 119:21
133:16 162:3
179:6 191:19
193:19 196:22
199:12 208:13
215:25 217:25
222:6 226:14
235:9 237:22
239:25 240:24
242:21 245:2
249:15 306:20
321:2 326:5
344:19 348:20
351:19 355:19
357:7 361:6
367:23 381:19
**marked** 16:13,15
28:20 29:9 30:20
46:3,20 69:7,25
76:25 80:20 93:20
99:16 119:24
133:20 162:7
179:9 191:22
193:22 196:25
199:15 208:21
216:4 218:4
222:10 226:19
235:12 237:25
240:5 241:4
242:24 245:5
249:18 306:23
321:5 326:8
344:22 348:23

351:22 355:22
357:10 361:10
367:25 381:22
**marketing** 312:20
**markout** 44:3
**markouts** 43:25
**marriage** 387:17
**married** 20:16,18
20:18
**Marshall** 1:4,16
2:9 5:4,5 6:10,14
7:1 8:1 9:1 10:1
11:1,17 12:1 13:1
13:9 14:1 15:1,25
16:1,18,23 17:1
18:1,17 19:1 20:1
20:15 21:1 22:1,5
22:8 23:1 24:1
25:1 26:1,19 27:1
27:6,25 28:1,7
29:1,3 30:1,24
31:1 32:1,4 33:1
34:1 35:1,17 36:1
37:1 38:1,14 39:1
40:1,4 41:1,18
42:1 43:1 44:1
45:1,11 46:1,6,18
47:1,4 48:1,22
49:1,12 50:1 51:1
52:1 53:1,2 54:1,9
55:1 56:1,9 57:1
58:1,15 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1,5,18 68:1
69:1,12,17 70:1
71:1 72:1,13 73:1
73:15 74:1,9 75:1
76:1 77:1,9 78:1
79:1 80:1 81:1,2
82:1,23 83:1,4
84:1 85:1 86:1,24
87:1 88:1,7,20
89:1 90:1 91:1
92:1 93:1,24 94:1
94:12 95:1 96:1
96:17 97:1,15
98:1 99:1,19

100:1 101:1 102:1
103:1,13 104:1,22
105:1 106:1,25
107:1 108:1,22
109:1 110:1 111:1
112:1,22 113:1
114:1,17 115:1,21
116:1 117:1 118:1
118:9 119:1,5,24
120:1,9 121:1
122:1 123:1 124:1
125:1,19 126:1
127:1 128:1 129:1
130:1,5 131:1
132:1,12 133:1,9
133:22 134:1,11
135:1,14 136:1
137:1 138:1,14
139:1,5 140:1
141:1,8 142:1,7
143:1,12 144:1
145:1,18 146:1,10
147:1,6 148:1
149:1,18 150:1,19
151:1,9 152:1
153:1,8,18,23
154:1,12 155:1
156:1,11,13 157:1
157:20,22 158:1
158:18 159:1
160:1,19,19 161:1
161:19 162:1,9,12
163:1 164:1,6
165:1,13,17 166:1
167:1,2,6,8 168:1
168:18 169:1,2,8
170:1 171:1,3
172:1,9 173:1,10
173:15,25 174:1
174:23 175:1,16
176:1 177:1,25
178:1 179:1,12,19
180:1,13 181:1,6
182:1 183:1 184:1
184:17 185:1,3
186:1 187:1,23
188:1 189:1 190:1
190:22 191:1,24

192:1 193:1,18,25
194:1 195:1 196:1
197:1,4,9,25
198:1 199:1,18
200:1 201:1 202:1
202:22 203:1
204:1,20 205:1
206:1 207:1 208:1
209:1,4 210:1
211:1 212:1 213:1
214:1 215:1,18
216:1,6,10 217:1
218:1,6 219:1,3
219:16 220:1,24
221:1 222:1,15,21
223:1,22 224:1
225:1 226:1,9,25
227:1,15 228:1,16
229:1,18,23 230:1
231:1 232:1 233:1
234:1 235:1 236:1
236:4,18 237:1
238:1,7,18 239:1
239:7 240:1,8
241:1,12 242:1,18
243:1,4,19 244:1
244:22 245:1,7
246:1 247:1,8
248:1 249:1,21
250:1,14 251:1,7
252:1,3,23 253:1
253:8 254:1 255:1
256:1 257:1 258:1
259:1,11 260:1
261:1 262:1 263:1
264:1,9 265:1,2
265:17 266:1
267:1 268:1 269:1
269:9 270:1 271:1
272:1,7 273:1
274:1,24 275:1
276:1,16 277:1
278:1 279:1 280:1
281:1 282:1,13
283:1,16 284:1,16
285:1 286:1,15
287:1 288:1,14,24
289:1 290:1 291:1

292:1 293:1 294:1
295:1,4 296:1,18
297:1,8,21 298:1
299:1 300:1,4
301:1,4,20 302:1
303:1,8 304:1
305:1 306:1 307:1
307:3,9 308:1,6
308:19 309:1
310:1 311:1 312:1
313:1,24 314:1,7
315:1,12 316:1,14
317:1 318:1,9
319:1,13 320:1
321:1,10 322:1
323:1 324:1 325:1
326:1,2,11,16
327:1,15 328:1,6
328:18 329:1,16
330:1 331:1 332:1
333:1,3 334:1
335:1 336:1 337:1
338:1,13,14,24
339:1,21 340:1,6
341:1 342:1,24
343:1 344:1 345:1
345:2 346:1,13,22
347:1 348:1 349:1
349:4,21 350:1
351:1,7 352:1,2,7
353:1,13 354:1,9
354:14 355:1
356:1,2,6 357:1
357:24 358:1,9
359:1,3,11 360:1
360:9 361:1,14
362:1 363:1,2
364:1 365:1,19
366:1 367:1,13
368:1,9 369:1,2
369:19 370:1,2
371:1,8,25 372:1
373:1 374:1,2
375:1,12 376:1,19
377:1 378:1,20
379:1 380:1,25
381:1,25 382:1
383:1,25 384:1

385:1 386:1,19
387:1 388:1,23
389:1 390:1 391:1
392:1,3,5,21
**Martinez** 231:6
261:22 262:4,23
266:6 278:5
303:19 304:21
305:23 333:11
334:2 335:15
**master's** 21:21
360:22
**match** 137:19,20
292:11 356:23
**matches** 128:11
**material** 383:19
**math** 22:21
**matter** 5:5 254:12
387:18
**maximum** 320:25
352:15,16 366:8,9
**mean** 10:22 15:5
28:15 30:9 36:9
40:13 43:5 44:18
59:5 60:6 62:4,16
63:8 64:11 68:2
70:17 76:8,10,11
76:16 78:21 85:2
87:8,9 99:24
100:2,5,23 110:4
110:7 114:3,22
115:12 123:25
136:15 137:10,18
139:19 146:25
147:18 148:17
151:21 152:8
153:3 159:15
166:8,11 175:21
176:23 177:8,10
178:20 179:2
181:24 188:22
189:10,21 190:8
195:11 199:5
209:25 213:3
220:16 225:12
229:3 258:17
263:19 293:13
298:2 300:11

305:7 315:22
320:16,22 321:13
326:19 334:4
342:9 362:14
363:15 375:13
378:8
**meaning** 16:8
27:11 76:12 92:5
211:14
**means** 46:11 51:4
142:17 151:22
166:13 222:20
**meant** 143:8
258:22 259:2
276:24
**measures** 205:16
**mechanics** 104:4
**media** 107:16,23
**medical** 44:8 182:6
221:2 222:23
223:2,3,8 225:12
236:6 239:15
240:4,12 247:8,10
264:11,14 265:18
269:12 289:7
290:9,13 295:8,13
313:14,15,18,23
314:2,8,15,16
316:20 318:25
319:5 320:17
322:23,24 329:21
335:8,17,21,24
336:4 354:16
356:9 376:19
390:9
**medication** 11:10
259:3,7,10 340:20
377:8
**meet** 107:5,9
108:11 109:2
111:20,23 112:2,4
112:24 188:3
350:22
**meeting** 43:2,2,4,8
89:18 91:11,12
126:25 283:7
293:17 300:7
320:7,11,14,24

321:21
**meetings** 41:6,14
**meets** 206:19
**memo** 119:23
120:13 124:2
126:11 128:24
149:15 210:2,6
213:6 388:22
**memory** 10:25
11:14
**memos** 124:11,11
**Menendez** 3:19
5:20
**mental** 247:23
339:11 340:9,11
340:13,17 341:8
341:14,20,22,25
342:7 343:2,13,18
345:10,14,18
346:18,23 363:5
366:15,19 367:7,8
377:4
**mention** 57:21
343:15 371:17
**mentioned** 44:14
54:12 125:19
131:8 185:6
202:15 311:16
375:6
**mentions** 149:16
207:12
**message** 232:25
252:4,8,11,25
300:21 302:5
**met** 13:15 91:13
187:7,7 206:23
**Michael** 38:6 188:5
194:19
**mid** 258:13 262:20
282:7
**middle** 46:16
243:20 267:19,23
267:24 268:3
352:13 353:14,24
**mid-afternoon**
288:22
**mid-December**
278:23 282:3

**mid-May** 341:19
341:23 347:7
**mid-November**
264:24
**mid-2010** 262:21
**million** 353:9,16,19
381:3 382:10,11
384:2
**mind** 65:2 176:11
176:24
**mine** 107:13
**minimal** 300:10
**minimize** 100:10
**minimum** 47:7
48:10
**Minus/plus** 166:10
**minute** 314:13
383:8
**minutes** 14:15
133:3 179:12
289:12,13,23
290:11 295:6
296:14 320:25
**mischaracterizes**
109:5
**mischaracterizing**
109:11
**misconduct** 49:15
49:17,25
**miscount** 166:14
**misrep** 51:2
**misrepresentation**
49:20 51:12 52:3
**missed** 270:2 281:7
**missing** 105:10
127:19,24 128:3
147:20 239:8,14
239:19 240:16
**mission** 372:15
376:12
**mistake** 8:13
**misuse** 50:6 51:3
**Mitchell** 261:24
263:8 266:14
333:14 337:14
**mixing** 344:6
**mom** 317:22
**moment** 45:9

226:21 228:15
262:7 270:17
282:5 286:23
309:2 316:19
318:8 378:19
**moments** 28:23
133:22 193:25
197:4 199:18
209:4 216:6 218:6
238:3 307:3
**Monday** 89:11,18
93:8 127:16
130:10 134:23
135:20 147:9
156:15 159:7
162:25 167:12
169:3 229:6,19,21
232:19 235:5,6
277:12 312:14
**Mondays** 89:20,21
**monetary** 350:23
378:25 379:3
**money** 57:6 62:6
80:10 93:4 100:2
101:8,11 107:23
109:20,24,24
110:6,17,19,22
111:9 114:23,25
115:13,14,18,22
125:5,7,15 127:8
127:19 128:4
129:11 132:10
133:14 136:2
139:24 140:4
143:4,6 154:15
168:8,10 207:20
213:21,22 214:2,7
214:8 215:10
292:10 293:2,7
294:14,17,20
299:22 312:15,17
365:15
**money's** 294:4
**monitor** 59:12
**monitoring** 59:18
**Monster** 339:24
**month** 26:23 54:13
106:11 264:21

288:5 364:24
**monthly** 364:18
365:2
**months** 32:9 33:17
35:4 130:9 183:5
205:18 206:8
285:24 286:8
310:24 322:6
**month-long** 53:20
**morning** 6:14,15
180:6 184:4
185:19 263:20
288:18,19 375:22
375:24
**motion** 97:22 100:6
100:16 102:16
331:13
**move** 23:14 37:10
111:18 124:14
130:21 206:8
270:14 271:19
274:9 275:5,7
325:4 348:19
**moved** 36:10,19
37:3 130:11,15
177:23
**movement** 100:11
102:17
**movements** 65:15
**moving** 186:11
**MRI** 257:21 281:10
**MTV** 190:10
**multiple** 202:8
271:8
**Murgalo** 251:2
302:9,16,20
324:13
**Murgalo's** 250:15

**N**
**N** 3:2 6:3 118:2,2,2
**Nagle** 303:19
333:11 336:18
**name** 5:10 6:8,16
19:8,9,10,22 21:6
35:16 36:3,5
37:20 55:17,20
73:10,11 75:13

125:6 177:13
190:14 221:21
222:17 224:16,21
230:2 241:23
243:10 256:5,20
303:21 319:22
333:13 339:12
359:18 369:9
392:3
**names** 78:4 180:8
344:6
**Nancy** 250:15
251:2 302:8,12,16
302:20 324:13,20
**Nancy's** 325:13
**nature** 63:3
**Navy** 339:9 347:4,9
347:18 349:8,13
349:19,22 350:12
351:8,14 352:10
352:21,24 354:15
355:3,9,15 357:25
358:5 365:7
**Navy's** 350:17
**necessarily** 143:3
168:13 178:21
237:14 286:20
**necessary** 123:6
127:12
**need** 10:5 89:12
127:5 138:8
139:22 178:25
182:11 208:15
228:17,22,25
236:20 239:12
243:23 253:10
271:19 274:17
275:5 281:14
290:23 314:14
325:14 330:4
331:5,18 332:14
**needed** 40:16 73:21
76:3,5 81:24 89:2
89:5 115:9 121:20
130:23 206:22
207:18 220:12,12
223:19,20 248:13
277:10 278:8

286:21 302:24
314:18
**needing** 237:20
**needs** 16:14 115:14
121:9 192:8
**negative** 185:17
**Negovetti** 181:9
184:19
**nervous** 375:17
**never** 50:25 51:14
51:16 52:16,21
58:4 64:16 85:11
85:12 113:16,17
140:13 142:5,6
148:16,25 254:5
317:16 330:18,18
351:16 373:8
377:24
**new** 1:3,17,17 2:11
2:11,14 3:7,7,15
3:15 5:7,8 6:11
18:21 30:14 31:9
31:11 52:25 68:17
180:10 183:19
186:8 188:17
229:4,4 252:12,15
349:14 354:7
359:16,19,25
373:7 387:5,7,11
**nice** 77:25 180:7,12
181:3
**Nicodemus** 38:6
188:5 194:19
**nine** 33:17 184:5
**Niorka** 137:2
261:23 262:4
263:3 266:10
283:20 333:14
338:3
**nods** 7:14
**normal** 254:16
**Nos** 76:25 80:19
93:19 133:19
162:6 172:4 179:9
222:9 241:3
351:22 357:10
388:14,16,18,24
389:5,7,18 390:11

391:7,11
**Notary** 2:13 4:7 6:5
387:10
**note** 73:18 126:13
144:8 271:23
272:2 362:18
**noted** 118:3 125:21
307:7
**notepad** 291:3
**notes** 126:3 278:5
291:20 316:23
**notice** 31:20 240:5
240:13 390:10
**noticed** 291:24
**notified** 82:6
**November** 134:17
134:18 135:20
137:6,7 138:18,20
138:21,24,25
142:10,25 143:17
143:22 144:4,5,13
145:4,9,13,14
146:16,19,20,22
146:25 147:2,3,9
150:4,16,20,22
151:10 152:3,11
152:12 153:9,10
153:20,21 154:11
156:2,8,9,15
157:2,17,18 158:4
158:15,20,21,24
159:13,18 160:2,3
161:2,3,22,23
162:25 163:17,23
164:3,4 174:10
209:22 214:15
277:6 296:19,24
296:24 322:7
**number** 47:7 48:11
72:23 73:12 74:6
146:4 215:5,6
223:6,9,10,13
241:23 243:11
313:25
**numbered** 70:7
238:19
**numbers** 93:7
223:12

**numerous** 309:23
322:5
**N-I-O-R-K-A**
137:3

**O**

**O** 118:2,2,2
**oath** 8:24 9:4,8
12:4,13
**object** 22:15 47:22
50:18 62:2 72:15
95:6 123:18
135:17 152:14
180:17 272:12
274:8 311:15
379:5 381:14
382:14
**objected** 362:7
**objecting** 96:8
109:12
**objection** 9:17,22
9:23 10:18 11:6
13:11 14:6 16:3
17:8 23:23 25:5
26:16 27:9,14,21
28:4 29:16 31:23
32:16 33:8,12,25
34:14 36:15 38:24
41:4 42:7,15,23
47:13 48:5,13,25
49:6 50:2,10
51:13,23 52:5,14
52:23 53:4 56:13
56:17 57:11,17,23
58:2,12,22 59:21
60:11,18,25 61:16
62:15 63:7,14
64:4,25 67:2,9,16
67:25 68:7 71:14
71:25 73:18,19
74:13,14,25 76:2
76:9 79:19,21
81:11,21 82:9
84:25 85:19 86:3
87:2,22 88:5 89:3
90:13,24 91:8,25
93:14 94:25 97:17
98:12,22 99:9

100:21 101:21
102:12 103:17,23
104:7,12 107:10
108:8,13 109:4,17
110:12 111:24
112:5 113:25
114:5,8,20 115:5
115:23 119:15
122:3 126:8 129:2
129:16 131:24
132:16 133:12
137:9 139:3,7,18
140:16 141:16
143:2,9,23 144:6
144:15,23 145:5
145:15 147:4,15
147:23 148:22
152:7 158:25
159:14,20 160:4
161:24 166:12
168:7,12 175:19
176:2,22 177:5
178:4,9 183:11,15
187:13,25 188:21
189:3,20 190:25
191:6,11 192:17
196:20 198:16,22
200:5,16 203:10
203:19 207:4,16
208:2,10 210:19
211:13,22 214:25
215:15 219:23
220:7 225:4,10
229:2 231:23
236:22 239:16
246:23 247:14
248:22 251:14
255:9 256:17
259:5,14 260:2,19
261:13,17 262:11
263:18,22 264:16
265:6,9 266:19
269:13 270:10
271:18 272:9
275:2,4 276:6
279:3 285:8,13,21
286:7,18 287:19
288:2,7,12 289:16

295:19 296:21
297:2,14,24
298:17,21 299:14
300:2 301:9,25
302:7 303:13
305:18 306:11
307:22 308:13
310:10 311:14
313:12,22 314:5
315:15,20 316:17
318:7 319:7
322:13 324:3
326:18 327:3
328:16 329:9
330:7,24 331:12
331:21,22 334:16
338:21 340:3
350:3 351:3,9,15
353:7 356:17
358:6,22 362:3,23
363:6 368:11,19
368:22 370:8,18
371:11,19 374:4
375:5 376:22
377:11,19 378:22
379:20 381:4
383:6 384:3
**objections** 4:14
9:14 384:18
385:10
**observe** 94:15,16
96:11 289:10
**observed** 282:22
289:2 295:6
**observing** 283:20
289:22
**obstacles** 205:17
**obtain** 24:7 297:18
342:24 355:14
378:21,23
**obtained** 340:7
363:4
**obviously** 51:5
75:15 76:17 83:10
110:7 244:12
**occasion** 118:13,14
118:22
**occasionally** 378:8

**occasions** 322:6
**occur** 47:9 276:21
  286:10
**occurred** 37:14
  65:21 92:14 95:24
  277:12 286:3,6,12
**occurrence** 328:11
**occurs** 88:16
**October** 40:7
  182:25 200:10
  204:16 245:16
  381:22 382:2
  391:16
**offer** 30:2 357:25
  364:5
**offers** 356:21
**office** 247:2 273:21
  302:25 319:20
  320:23 334:19
**offices** 2:10 190:9
**official** 1:8 188:15
**oh** 54:17 55:15
  73:10 75:13 83:14
  129:4 167:20
  209:13 224:12
  241:11 264:20
  296:4 303:24
  304:2,5 305:11
  360:15 365:13
  376:16
**okay** 6:22 7:6,18
  8:6,15,22 9:2,7,12
  9:20 10:10,11,15
  10:21 11:3,9,12
  11:16,16,20,24
  12:3,7,11,15,19
  12:23 13:4,17,23
  14:2,13,16,22
  15:7,11,20 16:16
  16:22 17:4,12,18
  17:22 18:9,12,16
  19:2,12,23 20:3
  20:14,21,24 21:5
  21:23 22:4,11,18
  22:23 23:3,5,10
  23:15,20 24:6,19
  24:23 25:7,10,15
  25:21,24 26:4,24

27:5,24 28:16
29:2,8,13,19 30:7
30:12 31:6,13
32:7,10,13,21
33:4,9,14,18,21
34:7,10,25 35:25
36:6 37:9 38:3,10
39:15,21 40:19,24
41:9,17,22 42:3
42:10,20 43:3,10
43:13,16,21 44:5
44:12,22 45:10,16
46:10 47:3 48:16
49:3,11 51:10,20
52:19 54:18,22
55:23 56:6,19
57:8,13 58:8,14
59:17 61:4,4
62:10 63:4,16
64:8,20 65:8,19
65:24 66:7,20
67:4,11 68:20
69:2,20,24 70:5
71:2,10 72:19
73:7 74:2,2,16,22
75:7,20 76:6,21
78:11,15 79:6
81:7,25 82:22
83:19 84:19,21
85:14,23 86:5
88:19 89:12,15,23
90:9,15,21 91:15
91:22 92:13,21
94:6,11 95:17,22
96:16,25 98:7
99:6,12 101:17
102:8 103:8,12
104:9,21 105:5,21
106:5,8,21 107:11
110:9,24 111:14
111:17 113:9
116:6,23 118:17
118:23 119:4,11
119:20 120:8,16
121:22 122:15
123:3 124:17
125:25 126:4,12
126:21 128:7

129:12,18 130:4
130:14 131:7,17
131:21 132:11,18
132:24 133:4
134:10,20 135:2,5
135:9,13,21,25
136:8,13,18,23
137:16,22 138:3
138:13 139:14
140:12 142:11,15
142:20 144:2,20
145:10 146:2,23
149:7 150:2,5
151:24 153:7
154:4,17,22 155:3
155:7,14 156:5,23
157:5,14 158:2,7
159:10 160:21,23
161:17 162:2,2,17
163:9,13,21 164:2
164:11,18,22
165:2,9,12 166:2
166:9,16,25
167:17,23 168:4,9
168:15 169:12,16
169:20 170:3,7,11
170:15,18,21
171:12,17,20
172:19,25 173:5
174:8,13 176:13
179:18 181:5
184:16,24 188:9
192:7 193:6,17
194:4,10,15,18
196:12 197:8,13
197:24 198:24
199:7,22,25
200:11 202:3
203:25 204:19
207:23 209:8,15
209:19 211:8,17
212:14 215:12,17
216:9,17,22
218:10 219:2
220:18,23 221:4
221:10,12,25
222:5,5 224:3,6
224:10,13,17,24

225:7,19,23 226:4
226:8,13,24
227:10,19,25
228:13 229:22
230:4,8,24 231:20
232:9,13,20,23,23
233:7,10 234:4,11
234:19 235:20,24
236:17 237:4,17
238:6,13,17
239:22 240:20
242:17 243:3,13
243:18,25 244:17
244:21 245:12,19
246:3,17,19
247:16,20 248:6,9
248:15,25 249:5,9
249:14 250:3,13
250:18 251:11
252:17,22 253:7
253:17,23 254:18
254:25 255:20
256:13 258:4
259:22 262:2,8
264:25 265:21
266:2 269:22
285:15 288:23
289:5,21 290:3
295:22 297:4
298:10 300:22
302:15 303:5
304:24 306:3,19
307:8 308:3 311:6
313:17 318:19
321:25 323:7
324:8,16,19
325:25 326:15
328:3,22 329:7
338:12 341:4
342:19,23 344:3
344:11 345:21
347:5 348:16
349:24 350:7
351:6,12,18 352:6
352:19 353:3
354:13,21,25
355:7,11 356:19
358:8,14,19 359:2

359:10,17,22
360:8,12,18,24
361:5 364:9,14,17
364:25 365:10,14
365:18 366:12
367:5,12 368:7,8
369:10,14,18
370:13 374:23
378:10 380:14
381:10 384:12
**old** 25:18 252:18
  339:9 347:4,8,18
  349:8,13,19,22
  350:12,17 351:8
  351:14 352:10,21
  352:24 354:15
  355:3,9,15 357:25
  358:5 365:7
**once** 13:24 92:11
  109:19,23 166:13
  180:5,6 224:2
  242:14 245:24
  285:14 286:10,12
  318:17 342:14
**ones** 44:21 183:20
  206:16 317:10
  339:14 340:21
  349:14
**one-on-one** 385:4
**ongoing** 62:22
  217:20 219:13
**online** 339:21
**open** 79:16 130:8
  131:9,15 133:8
  292:12 347:20,21
  347:24
**opened** 180:5 293:2
**opening** 70:22
  130:12,16,21
  131:4
**operate** 231:11
  237:10
**operated** 75:4
  284:8
**operating** 80:14
  84:17 86:12
**operation** 181:14
  284:6

**operations** 81:5,9
81:14,20 347:11
**opinion** 102:20,25
175:24 380:8
**opportunities**
185:5 198:7
**opportunity** 350:5
350:8 372:18
**opposed** 83:22
84:23 85:17 242:7
**opposing** 274:18
**ops** 352:9
**option** 44:15
**options** 43:25
320:21 330:22
363:13
**order** 24:10 47:10
48:18 94:18 97:8
255:15
**orders** 24:18
**organized** 98:3
**original** 101:3
**ounce** 260:14
**outcome** 387:18
**outlined** 250:23
**outside** 67:21
188:25 213:2
303:17
**overages** 215:8
**overall** 95:11
100:24 129:23
176:6 177:20
189:21,23 195:4
200:17 206:24
217:8 326:24
327:14
**overlapped** 26:22
54:13
**oversee** 249:8
**overseeing** 230:2,5
242:11
**over/short** 60:2
206:2 207:13
213:8
**over/shorts** 64:15
93:2,8 109:25
119:8,18 121:6
122:23,24 124:23

129:9 148:9,10
195:24 196:16
207:17 208:12
213:12,17 215:2,4
215:7 299:22
**owed** 366:23
**owned** 201:6
**owner** 140:3
**owns** 70:20,21

**P**

**P** 3:2,2 196:6
**package** 54:24
235:19 352:5
**packet** 68:18
**page** 29:9 31:5
46:16,19,19 69:25
70:6,8,8 77:5,10
79:7 82:2,3,11
86:6,11,11 88:8,8
94:13 97:2,10
125:24 134:22
135:3,4,6,15,16
138:15 142:8,9,12
143:13,20,21
145:3,18,20,21,23
146:11,12,21,24
147:7,8,19,20
149:19,21 150:10
150:20,24 151:10
151:15,25,25
152:6 153:19,24
154:2,5,6,12,24
154:25 155:4,21
156:12,14,16
157:6,21,23
158:11 159:3,4
160:20,22 161:20
162:10,23,24
163:3,5,18 164:7
164:8,15,19,24
165:3,13,14,18,20
165:22 166:18
167:7,9,10,13
168:19 169:2,3,9
169:10,14 170:12
171:4,6,8,21
172:10,12,14

173:2,16,18
174:16 179:20
181:7,7,11 184:18
184:21 194:24
198:2,2 204:22,22
210:15 216:13
222:21,24,24
227:6,9 238:11,18
238:22 288:9
291:13,14,15,17
291:18 296:8
297:9,9 326:12
352:7,8,12,13
353:14 356:7
358:13,20,24
361:16 369:3,16
369:24,25 382:3
385:19 388:4
389:4 390:4 391:4
392:9,11,13,15,17
**pages** 69:22 77:25
78:2 81:22 133:23
134:4,15 150:9
156:6 162:13
167:2 170:22
291:12
**paid** 244:13
**paid-out** 195:20,22
196:16
**pain** 236:21,23
**painful** 254:3
259:18
**palpably** 332:13
**paper** 15:9 76:18
77:20 100:8 291:3
320:20,22 322:17
**papers** 123:6
**paperwork** 17:16
248:17
**paragraph** 31:14
47:5,6 49:13,13
126:24 127:10
185:3 198:4
204:21,25 206:12
207:2 212:15
236:5,9 307:24
327:17 359:4
**paragraphs** 179:24

356:6
**parentheses** 353:15
**Park** 2:11 3:14 5:7
**part** 42:5,12 53:21
54:23 55:19 59:16
64:12 76:4 77:21
79:3 80:14 89:7
89:10,20 90:17,18
95:10 96:17 97:13
100:23 105:7
113:10,13,15
123:14 125:14
126:11 129:23
137:18 177:11
178:15,16,18
186:5 187:16
188:12 196:13
201:20 206:23
222:20 235:18
256:8,20 260:10
352:4 373:17
**participate** 27:7,11
33:10 34:16,17,20
355:2,8 357:4
**participated** 41:13
**participation** 44:14
**particular** 145:6
207:3
**particularly** 181:3
**parties** 4:5 189:7
387:16
**partner** 31:4 43:25
44:16 45:6 46:3,8
46:12 47:7 49:5,9
52:22 186:6
195:13 201:10
203:13,18 204:3,8
222:19 223:4,17
260:15 388:10
**partners** 33:11
48:17 51:17
202:10 205:18
215:10 221:5
373:16
**parts** 185:16
186:12
**party** 11:18 295:2
300:12,18 303:16

305:2 333:13
**part-time** 341:20
341:22,25
**pass** 184:7,10
**passionate** 376:6
**Pathmark** 25:9,12
26:5,14,22,25
29:23 54:13 55:7
**Patient's** 243:10
**paused** 66:16
**pay** 242:9,10,11,14
244:13 344:21
345:6,9,17,22,24
346:10,13 348:22
349:8,10,13,17,18
356:24 359:24
360:2 363:24
374:15,15 382:9,9
390:23 391:5
**paying** 376:2
**payout** 366:9
**payroll** 41:12
**peak** 186:2
**peek** 288:12
**peer** 231:10
**peers** 83:13,17,21
303:22
**pencil** 213:20
**pending** 153:16
314:25 354:5
**people** 32:23 59:13
61:17 92:6 101:11
102:14 121:6
125:10 128:14
180:10 182:15,19
182:19 184:3,11
190:11 196:7
213:4,14,23 221:9
223:20 304:20
306:8 315:25
372:12
**percent** 187:2
195:9 207:20,21
260:12 352:16,17
356:23
**percentage** 207:18
213:2
**performance** 42:6

193:22 194:8
196:25 197:10
199:15,24 205:4
212:17,23 389:10
389:11,12
**performed** 244:3
**performing** 281:16
**period** 100:3
128:22 131:9,14
180:15,23 181:19
183:9,14 192:16
193:12 194:11
228:7 236:15
242:15 244:15
246:5,12 296:20
296:25 346:14
363:19 364:12,19
364:22 365:16,20
365:21,24 366:24
**periods** 254:3
259:17,25
**permissible** 80:7
**permission** 130:23
**permitted** 272:3
**permitting** 271:24
318:24
**persistent** 255:2
**person** 37:22 70:15
70:19 73:3,16
91:13 95:18 100:9
121:13 127:20
128:7 201:15
202:17 203:17
204:2 230:5,25
231:5 262:13
323:8 332:9
336:11 369:15
**personal** 17:19,23
18:3,3,11 188:19
221:9,23 247:15
247:21 248:4,14
248:24 249:3,12
249:17,25 250:11
250:20,23 251:15
260:13 306:16
390:16
**personally** 372:2
**person's** 221:21

**perspective** 182:13
186:2
**Phoenix** 360:14,20
361:3
**Phoenix.edu**
361:17
**phone** 13:16,24
14:4 24:18 45:5
223:6,12 234:6,10
234:13,14 252:12
252:24 278:2
279:5 302:3
317:23 323:9
334:18,20,22
365:6
**phones** 202:17
252:14
**phonetic** 224:16
261:24 263:4
**physical** 374:3,6,7
375:3
**physically** 28:14
151:22 293:6
375:9,13
**Physician's** 242:24
243:8 390:13
**pica** 254:4
**pick** 341:17 342:10
**picked** 245:25
323:9
**pico** 254:4
**pit** 375:15 378:12
**place** 101:14 111:2
115:4 125:22
167:24 229:13
230:18 246:13
273:20,24 274:5
274:25 277:5
278:25 282:17,18
344:15 369:7
**places** 84:9 339:9
**plaintiff** 1:5 3:5
5:24 382:6
**plan** 205:13 206:20
284:20,23 285:5,6
287:17,25 288:15
288:25 350:18,22
355:3,8 356:22,22

356:24 357:5
**planned** 242:19
244:23
**planning** 94:23
96:21 103:16
205:25 246:4
**plans** 246:9
**platforms** 201:21
**play** 201:18
**please** 5:14 6:2,8
7:9,19 10:7 86:6
86:10 109:15
135:4 145:19
149:21 153:23
155:21 156:11,16
162:23 163:18
164:6 165:3,17
167:6,9 168:18
169:8 170:12
171:3,21 172:9
173:2,15 174:16
179:19 184:17
326:11 358:13
368:4 369:2
379:14 381:20
**plus** 287:22
**PNAP** 195:10
196:13
**point** 35:23 38:14
89:6 90:6 99:5
100:12 109:24
110:18 140:19
176:18 213:25
217:12 228:8
255:3,7 258:18
260:17,24 261:7
272:10,11 273:14
273:15 279:10,12
280:17 281:15
291:12,19,22
292:6 293:12,22
295:11 296:8
309:20 362:16
372:11 376:8
**pointed** 298:4
**pointing** 128:3
**points** 217:19
**policies** 45:13,19

48:24 53:3,10,16
56:23 58:20 61:14
61:23 63:6 64:3
64:23 67:13,20,23
68:6 70:9 84:7
86:19 88:2 109:6
119:7 359:5
**policy** 45:22 47:12
47:18 48:2,4,10
49:23 51:22,24,25
71:12,23 72:6,14
72:16 74:24 79:18
82:8,18 86:25
87:8,11 88:25
99:21 101:18,23
102:9,21,25
103:15,22 108:3
115:4 139:6
147:14 220:25
223:16 322:4
327:4,8,12
**population** 340:16
**pop-up** 217:8
**portion** 80:25
222:13 322:2
**portions** 77:7 135:6
326:25
**posed** 276:11
**position** 32:11
33:19 35:3,5
55:10 160:7 251:8
342:6 347:8
350:12 352:10
377:25
**positions** 203:3
**positive** 155:5
**possession** 70:15
70:17
**possibility** 283:10
**possible** 53:24
122:20 221:15
237:19 314:15,16
341:17 344:17
**possibly** 57:18
121:19 314:21
**post** 192:5,8 193:15
339:21,23 341:8
341:14 342:7,25

343:12,17 345:6,9
345:14,18 346:17
346:22 348:15
363:4 366:6,14,19
367:6,8
**posted** 272:21
273:8 339:20
**Postgraduate**
339:10 340:11
**posting** 191:22
192:4 389:9
**potential** 333:7
**pound** 44:4
**practice** 51:8 76:12
76:18 80:11 83:4
83:8,9 84:12
85:16,24 86:2
107:25 139:9
141:10,20 147:21
148:3,5,17 305:15
309:21 325:5
**practices** 57:22
60:17 61:15 62:14
63:6 64:3,23
66:24 67:6,13,23
93:11 103:13
104:15 119:14
299:12,19,24
**premises** 340:19
**prep** 23:8 71:17,20
71:24 72:24
122:18 123:10,15
124:20 126:6,18
129:21 135:8,11
135:22 136:15
138:20 142:14,17
145:24 146:4
147:10 163:8,11
164:16 165:25
167:16 169:15
171:11 173:24
**prepare** 13:10,20
14:18 98:17
202:24
**prepared** 71:4,6
136:16 142:17
152:11 153:20
154:21 155:8

156:8 157:24
160:25 161:21
197:14 200:2,4,7
**Preparing** 82:3
**prepped** 202:23
**prepping** 201:4
**prerogative** 160:8
**present** 3:23 92:6
116:17 196:7
253:21 254:24
255:12 256:3
**presented** 15:9
**preserve** 271:21
276:8 346:5,9
349:18
**pretty** 99:10,23,24
101:4 176:5
186:12,13 213:2,5
215:5 229:5,20
254:8 262:17,25
263:6,10 281:4
283:13 284:6
287:14 295:2
299:18 309:5
315:23 330:3
334:12
**prevent** 88:12
**previous** 27:17
28:3 93:9 109:11
133:11,14 152:5
184:20 194:13
207:11 285:22
327:18 343:9
**previously** 181:13
313:24
**primarily** 24:15
**primary** 86:13
87:14 185:9
**printed** 140:7
**prior** 47:8
**priorities** 202:11
**priority** 202:11
**privilege** 383:10
**privileged** 383:19
383:21
**probability** 279:12
**probably** 84:10
176:10 182:14

246:7 283:10
372:3 384:18
**probing** 383:21
**problem** 112:11
125:8,12,17
155:17 177:21
247:4 257:3
**problems** 126:2
127:5 187:4
**problem-solving**
205:17
**procedure** 70:10
71:17 73:9 80:15
84:17 113:13,15
328:8,12
**procedures** 45:13
67:20 98:5
**proceed** 9:16
**proceeding** 12:5
**proceedings** 5:1
6:1 387:13
**process** 6:24 33:11
34:18 42:6,13
52:7 57:5 59:16
65:17,21 66:18,22
94:9,18 96:12,18
97:16 99:3,4
105:7 107:7 130:3
177:11 183:21
186:11 187:17,20
188:12 296:14
**processed** 71:21
73:14
**processes** 68:16
95:15 107:22
**processing** 65:12
**produced** 339:25
**production** 349:17
367:19
**professional** 2:13
21:25 22:2 189:9
**profile** 315:25
**program** 44:15
95:11 97:14
177:14 343:3
344:9 350:25
356:12
**programs** 90:3

360:10
**Promethean** 54:15
55:7,13,17,19,24
**promoted** 35:24
36:2 39:24 53:18
85:7,7 148:13
184:11 201:6
373:9
**promotion** 36:8
39:8,9 373:11
**promotions** 201:8
**prompted** 125:13
125:18
**pronounce** 254:5
**proof** 124:15
**proper** 160:9
331:11,21,22
**properly** 101:12
122:25 140:5
213:13 317:6
**property** 50:7 51:3
**protect** 86:14
**protection** 87:15
195:14,17,17
356:10
**provide** 17:5 40:16
**provided** 60:14
356:24
**Provider** 240:19
241:16
**provides** 223:6
382:6
**public** 2:14 4:7 6:5
375:18 387:10
**publishers** 190:11
**pull** 84:7,9
**pulled** 293:3
319:23
**punishment** 304:13
**punitive** 382:11
**purchase** 355:3
356:21 357:4
**purposely** 107:21
**purposes** 78:19
81:13 107:8
**pushed** 202:6
**pushing** 384:20
**put** 39:23 110:22

111:9,10 121:17
123:21 143:5
144:18 193:4
244:11,16 293:6
296:10 372:23
374:18 375:17
**Puts** 198:8
**putting** 107:12,15
107:23 108:4,16
108:24 109:19
110:6,20 111:15
127:14 270:7
**P&L** 59:12,23 60:4
60:6,8 287:4
**p-i-c-a** 254:7
**p.m** 71:7 79:13,23
82:15 83:22 84:24
85:18 117:6,7
118:3,6 130:12
137:6 141:2,3,4,6
175:9,10,11,13
180:6 208:19,23
208:24 209:2
251:20,21,22,24
264:3,4,5,7
301:14,15,16,18
307:7 315:5,6,7,9
332:20,21,22,24
357:18,19,20,22
380:19,20,21,23
386:3,5

**Q**

**QASA** 205:24
**qualifies** 354:10
**quarter** 246:2
285:14 286:10,13
288:6,11
**quarterly** 42:18,21
42:24 43:17,18
56:10 350:9
352:24
**question** 4:15 7:21
7:22,25 8:3,7,8,9
9:15,16,25 10:8
13:14 31:24 47:20
47:23 48:7 50:13
50:14,16,19 62:3

63:20 66:5,8,11
72:16 92:2 98:24
101:3 102:3,5,13
102:23 103:6
109:8,10,11,12,15
112:9,15,17,19
113:4 114:7 115:6
120:3 123:20
137:15 138:2,9
140:11 152:17
153:11,16 155:11
155:16,19 159:21
159:22 160:5,9,13
160:15,16 161:9
161:10,14 176:3
180:20 183:6
191:9 219:6 220:3
220:5 239:17
246:15 265:15
266:20,24,25
267:3,5,6,8,11,15
267:16,18,23,25
268:14,21,23
269:4,7,10,14,16
269:24 270:3,5,6
270:11,12,15,23
270:25 271:6,8,11
271:12,13,14,16
271:20,25 272:4
272:13 274:2,7,9
274:14,20,21
275:5,8,9,16,18
275:21 276:4,7,10
276:14 299:15
309:9 312:5
314:24 318:13
329:12 331:3,5,6
331:6,7,18,24
332:3,4,5,13,14
338:15 353:21
354:4,5,7 362:24
368:23 369:7,20
371:20 379:14,24
380:5,10,12
381:15 382:17,24
383:7,9,23 384:8
**questioning** 267:19
268:4,25 309:14

**questions** 4:14 6:25
10:17 127:13
268:8,10 279:17
279:22 280:10,13
280:16,20,23
281:2,5,23 283:19
310:16 311:10,22
317:2,5 332:11
369:16 384:23
385:16
**quick** 140:23 278:2
**quickly** 177:22
292:6
**quotes** 70:20
**quote/unquote**
70:21 188:8
309:24

**R**
**R** 3:2 6:3,3 118:2
387:3
**raises** 350:11
**ran** 51:16 85:4,8
186:2 283:21
312:16
**rang** 213:4
**range** 134:5 207:21
207:24 208:6
213:2 214:14
287:20
**rate** 342:20
**rating** 195:4
**reach** 187:3 232:3
232:4,7,14
**reacted** 182:20
**reaction** 182:9,21
184:15 311:8
336:5 374:9
**reactions** 184:13
**read** 31:8 37:5,7
46:21 47:21 50:17
52:21 55:22 59:12
59:23,25 73:5
87:3,6,7 107:13
109:16 114:15
179:17 198:18
202:13 204:25
205:6,8,10 206:4

220:6 265:11
272:20 283:4
320:3,8,8 321:24
322:2,9 379:15
**reading** 31:21
75:12 90:4 123:18
180:18 382:15
**ready** 201:7
**real** 125:12
**realize** 255:14
376:5,9
**realized** 257:4
**realizing** 376:16
**really** 24:17 51:4
59:22 61:2 73:22
75:4,13 83:24,24
84:6 87:8,11
99:10,22 100:4,6
102:19 103:10
104:17 109:21
111:12 184:14
195:18 210:2
211:2 221:23
225:13 233:24
247:6 258:18
272:19 275:12,13
275:15 293:14,15
293:24 294:3
332:6 366:10
373:5,8,10 374:8
383:9 385:4
**reason** 10:12,16
23:13 39:12 97:19
111:19 128:25
132:9 144:11
247:3 277:15
309:24 310:3
312:11 313:15,21
318:4 323:19,23
323:25 329:19
330:2 346:2 370:4
371:9,13,15
384:24 392:6,9,11
392:13,15,17
**reasonable** 353:25
383:5 384:2
**reasons** 79:11
107:4 145:12

248:14 314:20
321:16,16 325:7
325:10
**recall** 12:12 14:20
22:12 25:6 26:8
26:18 30:14 36:25
37:13 38:11 56:25
58:13 59:14,19,22
63:5 65:20 66:22
68:24 78:19 80:5
81:13 83:20 89:16
90:22 91:4,16,16
91:20,23 93:15
94:7,19 95:23
96:3 97:9 105:6
122:9 128:20
131:12,14 152:15
152:15 178:13
190:22 192:12,14
192:21 196:18,21
214:20 215:22
218:19 219:8,17
219:19 220:19
221:21 222:2
225:11,13 227:5
228:14 232:10,12
233:2,21 234:21
234:23 239:7
240:21 251:15
261:10 262:7
263:17,21 273:3,6
273:11,12,18
277:20 279:25
280:4 282:2
284:15,23 285:24
295:3 297:3
298:16,18 301:3
302:2 304:23
305:4 308:18
320:15 321:15
324:4,6 325:21,24
327:11,13 333:15
333:22 335:9,11
336:17 337:2,13
337:24 339:9,14
340:21 348:2,18
360:11,25 364:13
364:16 365:9

366:17 367:3,9
**recap** 211:3
**receipt** 30:20 31:4
138:9,16,17
143:15,18,20
146:14 150:19
154:14 155:23
157:8 158:13
163:20 165:5
166:20 168:21
170:14 171:23
173:4 174:18
297:18 388:9
**receipts** 150:12
**receive** 23:22 26:15
36:22 39:4 41:24
42:13,18 43:19,22
44:9,16 47:7
48:12 53:14 58:19
61:9 68:4 123:11
126:14 215:18
235:19 247:5
317:23 345:17
346:17,20 350:23
354:15,16 365:19
365:25 366:4,13
366:21
**received** 15:2,4
31:9,11 36:7
41:23 42:12 43:17
45:4,5 48:18
53:14 56:10,16
58:10,16 126:19
227:6 350:11,14
352:4 366:18
367:14,20,22
379:9,23
**receiving** 30:2,14
220:19 240:21
341:24 367:9
**Recess** 54:4 117:6
141:3 175:10
208:23 251:21
264:4 301:15
315:6 332:21
357:19 380:20
**recognize** 29:3
30:24 81:2 104:25

120:9 134:11
162:18 191:24
192:2 209:9
218:20 222:15
235:17 238:7
241:12 243:4
245:7 249:21
250:15 349:4
**recognized** 185:5
**recognizing** 182:4
**recollection** 8:19
104:16 122:4,9,16
152:19 250:10,12
286:5 370:22,25
371:3
**recommend** 130:25
131:3,4 237:18
**record** 5:15 6:9
37:7 46:13 47:21
50:17 54:3,7
63:22 65:14 71:19
73:4,10,11 104:13
109:16 112:19
114:9,11,15 117:5
118:6 134:3 141:2
141:6 150:21
175:9,13 179:15
205:7 208:19
209:2 210:8
211:11 220:6
251:20,24 252:7
252:10 264:3,7
270:17,19,21
271:23 272:3
276:9,13 301:14
301:18 315:5,9
332:20,24 357:18
357:22 379:15
380:19,23 386:3
392:7
**recorded** 72:24
74:7 326:3
**records** 14:24
69:23 72:21 74:4
74:12 75:25
148:24 195:9
212:18 213:11
214:23 215:13

223:11 236:9
287:24 288:5,10
295:14,24 297:19
317:9 321:23
323:13,15 324:25
338:20 367:13
**recruiter** 347:19
**redacted** 243:11
**refer** 81:8
**referenced** 112:12
**references** 339:6
**referrals** 339:6
**referred** 81:14
339:11 353:4
**referring** 39:18
87:3 103:24
108:14 113:6
150:25 184:22
202:13
**refused** 320:3
**regard** 371:5
**regarding** 61:14,22
61:23,25 62:13
64:2,23 66:24
67:13,19 180:2
219:20 275:3
276:21 278:13
280:20 289:7
290:9,12 295:13
298:12,14 314:2
338:4 367:14,20
**regards** 18:4 76:7
318:11 322:5
**regional** 316:4
**register** 119:10,19
128:8,15 213:4
214:4
**Registered** 2:13
387:9
**registers** 133:11,11
213:15
**regular** 124:12
378:6,7
**regulated** 148:7
**reimbursement**
354:22 356:13
**reins** 188:7
**reintegrating**

251:13
**reiterated** 324:22
**relate** 135:15,16
156:14 165:20
167:11 169:10
171:6 172:12
173:18
**related** 16:2,6 17:6
17:15 159:12
160:2 253:11
343:7 387:15
**relates** 145:21
154:7
**relating** 253:19
**relation** 132:20
**relationship** 45:4
187:24 188:20
189:8,17,19 190:3
231:10 336:11
**relationships**
373:18
**relaxed** 247:7
**released** 247:25
**relevance** 329:11
330:25 331:10,12
331:16,21 332:3
332:11
**relevant** 331:19
332:6 346:5,6
**remain** 88:10
**remains** 101:6
**remember** 8:16
13:25 15:12,18,19
19:16 20:7 23:7
23:25 24:21 28:14
31:21 36:5 37:21
43:12,20 44:2
45:6 55:2 58:3,9
59:3,7 60:19
62:17 63:11 65:13
65:18 68:12 78:24
79:4 80:12 81:17
89:6,10 90:5,10
92:12,22 95:8,10
96:12 100:7 105:9
105:19 118:21
120:22 122:21,22
122:23 123:2,13

127:21 145:6,8
174:5 190:14
193:2 195:20,21
196:3,11 200:22
204:4,7,13 212:21
224:20 225:18
228:12 230:2
232:18 249:6
252:16 254:5
264:13,17,19,21
272:24 277:4
279:7 280:15
293:23 301:24
305:25 306:6
311:25 319:23
333:14 339:13
356:4 360:4
**remembered** 12:17
221:17
**reminder** 63:8
**reminders** 63:5
**remove** 205:17
**renewed** 205:19
**rent** 364:21 374:16
**reopen** 271:22
**reorganize** 65:16
**repeat** 47:19 50:14
50:15 60:12
109:14 155:16
220:3,4 379:13
**repeatable** 99:15
105:4,11 106:17
388:20
**repeating** 97:21
**repetitive** 97:22
100:5,11 102:16
**rephrase** 60:13
98:25
**rephrasing** 280:12
**replying** 181:9
**report** 302:25
**Reported** 1:23
**reporter** 2:13 5:12
6:2,7 7:7,13 386:7
387:10
**reporting** 5:11,13
88:14
**reports** 78:25

**represent** 6:17
153:9
**request** 223:8
224:4 227:20
236:6 239:9 245:5
245:11,13 249:18
250:2 349:16
367:18 383:5
390:15,17
**requested** 227:16
245:20 250:7
301:5 382:5
**requesting** 222:25
223:16
**requests** 245:24
**require** 114:22
**required** 9:4,15
45:14 74:10 82:5
88:13,21 94:22
95:4 96:19 113:20
113:22 114:2,18
245:23 346:4
**reserved** 4:15
**residential** 248:2
**resolved** 43:8
**resource** 77:13,17
78:10,13,17,17
81:24
**resources** 78:23
81:16 360:23
**respect** 48:10 53:9
53:15 56:22 57:21
58:20 59:19 60:9
60:15 61:10 63:6
64:6 67:24 68:5
71:12,23 79:20
83:5 92:24 94:23
96:4 100:19
103:14,20 108:4
202:12 205:4
211:21 212:22
220:25 264:12
349:19
**respective** 4:5
**respond** 233:8
343:24 369:21
**responded** 302:4
**response** 7:9,17

230:20,21 248:16
273:7 279:15
283:17 303:4
325:13 369:20
370:6,12,16
**responsibilities**
32:18 33:22 40:11
75:21 86:13 87:14
**responsibility**
86:12
**responsible** 40:21
40:25 45:18 48:23
60:23 73:16 78:7
78:9 81:19,23
86:18 87:10,11,25
201:12 278:10
**rest** 256:24
**restroom** 53:24
208:16
**result** 254:10
256:11 375:4
376:20,25 377:5
377:10 378:16
**resulted** 239:20
**results** 39:25 43:2,4
56:12 198:3,5,7
198:11,21 204:21
205:5,21 206:15
206:25
**resume** 339:4,5,8
339:18,21,23,25
343:12 358:12
**retail** 372:17
**retained** 386:6
**retaliated** 314:8
318:5
**retaliation** 316:15
316:16 329:20
**return** 182:5 251:8
302:11 319:14,16
**returned** 300:20
302:14 317:17
319:18
**returning** 229:6
302:10
**review** 14:17,23
15:8 16:19,21
28:25 30:22 42:6

42:12 46:25 47:2
49:4,8 67:18 68:4
69:16 80:21 88:13
88:22 89:12,17
90:7,11 91:5
99:18 120:2,4,7
133:25 148:13
179:13,14 193:22
194:2,3,8 195:2,5
196:25 197:5,7,10
197:14,19,22
198:3,15 199:15
199:19,21,24
200:2,13,15,21
201:25 206:14,17
206:20,23 207:9
207:12,15 209:5,7
209:23 215:13
216:7,8 218:7,9
226:21,23 238:3,5
241:8 243:2 287:3
297:5 307:4,6
326:11,14 368:4,6
389:10,11,12
**reviewed** 14:20
15:9,12 89:5
141:23 196:14,19
295:14 307:18
308:2,11,14
**reviewing** 59:8
92:24 93:5 94:7
120:24 241:9
295:24 299:17
**reviews** 14:25
41:13
**ridiculous** 336:6,8
**right** 13:25 15:19
61:18 68:25 69:14
87:10 92:7 114:24
116:5 154:9
156:18 186:22
228:12 234:23
253:13 258:21
262:17,19,25
263:6,10,14
271:22 273:18
275:11 277:20
279:25 280:4

284:15 298:18
302:2 320:9 325:7
325:11 330:20
362:19
**rights** 325:17
**right-hand** 222:22
327:21,22
**ring** 128:15
**Robert** 35:16
**role** 34:9 41:15
65:4 175:21
176:24 201:18
373:9
**rolled** 95:8,12,19
100:13
**rollercoaster**
373:22
**rollout** 96:18 104:5
127:3
**room** 257:18 258:9
270:4 290:15,16
300:14 309:15
317:9 319:21
**roommate** 19:7
**roommates** 19:8,9
**roughly** 10:4
166:17
**routine** 64:13
99:16 105:4,11
106:18 388:20
**row** 146:7
**RPR** 1:24 387:24
**rule** 80:4
**rules** 49:19 51:8
**run** 59:11 84:3,4
97:8 98:15 175:22
283:24,25 284:3
284:10,10,11
309:12,13 347:17
**running** 78:21
119:10,18 128:8
184:3,5 220:10
317:6
**runs** 284:7
**rush** 288:19

─────────
**S**
─────────

**s** 3:2 6:3,3 7:1 8:1

9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1,2,2,2
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1

152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1

296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1,11 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1 372:1
373:1 374:1 375:1
376:1 377:1 378:1
379:1 380:1 381:1
382:1 383:1 384:1
385:1 386:1 387:1
388:1 389:1 390:1
391:1 392:1
**safe** 65:16 70:16,18
70:21,23 98:3
115:21,24,25
116:4,10,14,20
118:20 121:8,9
122:24 124:22
125:11,14 127:19
127:23,23,25
129:4,5 140:4
182:5 196:2,3
292:12,19,24,25
294:9 296:10,11
**safeguard** 124:13
**safely** 139:24 196:9
**safety** 49:18 67:14

77:12,16 78:16
79:11 111:20,23
112:2,4,24 113:11
113:18 116:19
**salaried** 42:25
352:25
**salary** 36:23 39:4
41:19 42:11,14,17
341:24 346:16
349:21 350:2
366:10
**sales** 43:8
**Samidh** 3:18 5:21
**sap** 255:16
**sat** 57:4 77:24
125:24 188:16
290:17 300:13
304:9 309:4
**Saturday** 130:9
152:25 153:6
**Saturdays** 131:9,15
131:23 132:3,6
**save** 65:11 97:23
99:3,7 100:14,15
100:19,23,25
103:10 104:18
**saved** 99:21
**saving** 98:17 100:5
102:16
**saw** 281:18
**saying** 74:18,20
76:16 110:5
151:14 153:12
212:4 233:21
247:4,5 267:9
269:25 273:12
284:8 294:2
305:25 327:11,13
329:24 333:19
335:5,9,11
**says** 31:8,15 46:8
47:6,15 49:14,20
71:3,16,19 72:2,5
72:9,9,20 73:3,8
74:3,19,21,24
79:9,14 82:3,5,13
86:7,11 87:9,9,11
88:9,10 94:13,14

94:16 96:11 97:3
97:4 107:2,4
111:19,20 122:6
123:4 126:24
127:10 140:21
179:22 180:2
181:11 185:4,15
192:8 195:8 198:4
202:4 204:22
205:23 208:11
211:2,12 223:3
236:5,9 238:24
243:20 250:20
306:15 307:13
327:7,17 328:7
352:9,14,16
353:11,14 356:8
356:20 359:4
369:4 370:20,25
382:4,6
**scan** 257:21
**scared** 375:18
**scarring** 373:24,24
**Schachter** 280:17
**Schacter's** 247:2
**schedule** 97:4,6
248:19 341:11,19
**scheduled** 201:13
227:24 230:13
282:22 284:17,24
285:3 319:13
**schedules** 229:13
230:17
**scheduling** 41:12
**school** 20:25 21:7
21:12 22:13
359:13 362:20
363:18,20,24
**schooling** 360:10
**scope** 281:9
**Scored** 195:9
**scrap** 100:8
**seal** 72:23
**sealed** 74:6
**search** 15:25 16:6
17:13,14,23
**season** 24:22
246:25 263:21

264:13,20
**seasonal** 24:21
**second** 16:9 29:9
46:19 47:5 79:7
79:10,14 82:13
94:16 137:12
166:8 185:3 186:3
198:4 216:13
226:9 238:11
329:10 356:8
357:14 384:14
**secondly** 230:23
**secretary** 247:4
**section** 31:16 46:21
71:16,17,20,24
72:25 73:8,9,13
74:3,8 82:12 86:8
87:3,4,5,7 144:22
145:4 146:8
149:16 167:25
195:10,20 196:19
198:17 202:4,12
222:22,25 238:19
**sections** 147:11
163:7 165:24
171:10 173:23
**securing** 340:19
**security** 49:19
67:15 77:12,16
78:16 243:11
**see** 51:15 53:17
55:15 70:12 71:8
84:8 97:24 136:14
138:8 140:8
142:12 155:9
176:4 182:18
195:18 220:10
239:12 280:13
281:6,7 291:9
294:25 303:5
307:12,15 313:4
327:25 339:5
**seeing** 105:6
219:17 251:5
**seek** 376:19,25
377:4
**seeking** 378:20,23
378:25 379:4

**seen** 16:23 24:16
141:24 218:14
219:4 279:11
280:17 307:11
382:13,19
**self-worth** 377:18
377:18,22
**semesters** 21:21
**send** 75:16 79:2
257:21 339:8
362:17
**sense** 80:11 109:21
115:17 137:21
140:18 177:20
186:18 213:23
268:9 324:25
330:3 373:4
377:21
**sent** 105:18 248:18
252:4 339:4,4
366:23,25
**sentence** 47:5
123:14 185:14
195:8 198:17
205:23 206:4,5
328:7 356:8,20
**sentences** 185:14
**separate** 34:22
291:2
**separation** 23:18
320:20 322:17
**Serenity** 1:4,16 2:9
5:4,5 6:10 63:11
119:24 185:8
188:18 198:4,6,12
205:12,19 206:6
212:18 385:6
386:19 388:22
392:3,5,21
**series** 6:25 328:13
**serious** 49:15,17,25
127:11,18 139:20
139:21 192:25
212:2 257:3 278:7
**service** 40:17
178:17 185:10,22
316:3 347:10,17
372:16

**services** 352:9
354:19 356:13
**set** 43:6 47:9 202:2
206:18 292:25
387:20
**sets** 382:8
**setting** 91:11,12
**seven** 50:23 53:6
84:9 384:15,16
385:3,10,13
**Seventh** 19:17 20:4
**severe** 254:3
**severely** 255:17,18
**shakes** 7:14
**share** 189:14
**Sharice** 303:19
304:5 333:11
334:24 335:7
**sheet** 99:16 105:4
105:12 106:18
291:2 388:21
392:2
**Shelby** 179:20
181:9 182:2 187:7
**Shelby's** 181:12
**she'd** 269:6
**shift** 32:12,15,22
33:6,13,15 34:5
53:5,14 54:25
56:21 58:11 59:6
61:20 62:11 64:7
68:9 85:6 120:13
120:17,21 122:10
122:17 203:5,6
212:16,22 214:11
261:23 341:17
342:16,17,18
**shifts** 86:17 87:21
342:11
**shock** 320:15,22
**shop** 355:17
**short** 119:9 121:12
125:10 128:16
213:23 315:3
**shortage** 128:16
129:3 214:18
296:23
**shortages** 207:22

212:25 214:13
215:7,8
**shortly** 300:24
**shoulders** 314:23
**show** 124:6 137:23
179:2,4 208:5
**showed** 57:5
198:12 199:9
203:7 304:15
321:12
**showing** 124:9
214:7
**shown** 67:22 68:17
139:8 205:19
**Shultz** 372:14
**sick** 376:9
**side** 204:5,6 222:22
222:25 327:21,22
**sight** 206:7
**sign** 127:14 200:9
209:20 210:15
217:11 251:2
304:12 320:3,3
321:13 364:5
**signature** 29:11
76:3,5,8,10 125:8
194:23 209:16
216:12 218:20,25
238:10,15 243:14
250:4
**signatures** 76:15
76:20 250:16,19
**signed** 168:14
200:8 211:4
217:24
**significant** 195:7
215:10 372:23
**signify** 169:25
**signing** 136:24
**silly** 254:8 372:12
**similar** 18:16
**simple** 344:16
**simplification** 65:3
65:9,21 66:2,15
66:18,21 68:17
94:5,8,24 96:18
97:16 99:3 103:21
127:4

**simply** 89:6 116:4
335:25 336:20
**single** 46:16 291:13
291:18 296:8,8
**sister** 247:22 248:5
**sit** 177:15 207:10
290:2
**sitting** 44:23
283:20
**situation** 50:25
51:15 52:16 72:17
127:10,17 178:25
275:14 310:13
374:17
**sit-down** 373:10
**six** 14:12 131:16
184:16 185:8
**skip** 185:13
**skipping** 205:22,22
236:8
**Slade** 261:22
265:18 266:3
303:18 305:14
333:10,16 334:22
335:19
**sleep** 254:11,12,14
261:8 374:12
375:2,9
**slept** 236:25 246:24
**slid** 319:24
**slight** 166:14
**slightly** 180:18
**slip** 137:11 154:14
154:15 156:20
157:24 158:9
358:13
**sloppiness** 129:24
129:25
**sloppy** 121:14
128:19,19
**slow** 181:16
**SM** 214:12 227:11
235:12,12 344:22
348:23 351:22
355:22 357:10
361:9,9 390:5,6
390:23 391:5,7,9
391:11,13,14

**small** 290:18
**smart** 257:6
**smarter** 65:17
**smooth** 181:14
**SM163** 235:15
**SM164** 235:16
**SM388** 349:3
**SM389** 344:25
**SM393** 355:25
**SM395** 351:25
**SM435** 361:12
**SM437** 361:13
**SM452** 358:10
**Social** 243:11
**socialization**
340:18
**socialize** 189:2
340:15
**somebody** 52:11
84:8 358:11
361:16
**something's** 255:12
**sonogram** 281:8
**soon** 234:3 237:19
283:13
**sooner** 233:4
**sophomore** 55:3
**sorry** 34:4 54:11
66:6 90:14 98:13
111:16 114:12
130:19 138:6
149:20 150:8
151:12 152:21
155:12,12,15
166:7 183:12
205:9 224:5
241:10 246:16
251:6 273:25
277:16 329:14
344:7 362:9 375:8
379:12
**sort** 62:25 64:17
65:5,10 70:19
78:2 80:3 82:20
100:13 115:17
121:17 182:12
188:7,13,14,17
201:12 207:21

210:7 212:12
233:18 286:22
287:8 292:5 339:6
363:25
**sounds** 72:10 254:8
**sources** 346:10
**SOUTHERN** 1:3
**SPA** 282:22 284:18
303:24 305:6
309:23 317:3,12
**SPAV** 285:16,18
286:16 287:21
299:11 300:4,25
301:21
**SPAVs** 285:19
286:6
**speak** 13:21 14:11
145:7 214:13
276:17 303:15
306:13 317:18
**speaking** 83:13,20
275:14 331:22
354:3 375:18
384:18
**speaks** 123:19
140:18 160:6
265:10
**specialist** 5:11
**specific** 23:25
62:11,25 64:10
67:3 80:2 132:13
168:16 191:13
204:12 264:22
307:23
**specifically** 52:8
59:4,8 60:6,19
61:24 62:17 81:15
85:12 90:2 96:6
126:10 178:14
202:14 212:15
219:11 303:15
304:23 305:4,19
306:2,6 338:22
**speech** 327:6
**speed** 185:10,22
**spell** 19:10
**spend** 295:24
**split** 72:22 201:11

203:22
**spoke** 13:15 14:3
14:10 29:24 80:4
94:4 277:3 278:2
281:20 300:5,19
302:5,20 310:17
330:15
**Sprint** 45:6 252:21
**ss** 387:6
**stack** 101:11
**staff** 181:14
**stage** 375:20
**stamp** 369:3
**stamped** 69:10
77:5,6 80:23
93:22 103:25
162:11 179:16
209:5 222:12,13
227:11 235:15
241:6 321:8
344:25 349:3
351:25 355:25
358:10 361:12
**standard** 80:14
82:21 83:8,9
84:16 92:9 121:9
309:20
**standards** 70:9
79:10 82:12 107:5
107:9 108:11
109:2 111:20,23
112:2,4,25 113:11
113:18 176:9
**standing** 334:19
**stands** 59:22
191:12 199:3
363:16
**stand-in** 232:11
**staple** 110:25 111:4
111:9 123:6
**stapling** 107:16,16
107:23,24 108:5
108:17,25
**Star** 193:10 222:12
**Starbucks** 1:7 5:6
5:18 6:17 12:24
22:8 26:7,9,20
27:3,7,18 28:8,12

29:21,23 30:2,14
31:17 32:5 34:12
38:15 43:23 44:10
44:17 45:3,12,13
51:18 54:10,12,16
55:6,11 56:7
64:24 76:11,18
113:20,22 114:2
114:18,21 115:19
119:14 141:10
148:8 179:24
180:3 182:14,15
186:13 210:24
223:4,13,23
226:17 227:12,17
228:23,24 229:7
229:19 235:25
247:13 250:21
251:4 260:12,16
260:18 261:2,15
262:5 264:10
308:20,23 309:6
310:7 311:12
312:7,9,22 313:19
315:12 318:5,10
318:16,24 319:4
320:2 330:6,13
340:8 343:15,22
344:13 346:25
348:7,10,13 350:2
350:6 358:15,21
361:20,25 364:23
365:22 373:6
376:3 389:21
392:3
**Starbucks's** 42:5
42:12 46:2,8
47:12,17 48:2,4
48:10,24 49:4,9
49:23 51:7 52:22
53:2 57:22 58:5
58:20 64:2 67:6
67:12,19 68:5
71:12,23 72:14
74:23 79:18 82:8
82:18 88:25
113:17 139:6
147:14 183:21

190:13 193:8,11
220:25 222:19
223:16 249:25
250:23 388:10
**start** 5:2 22:19
25:11 61:19 71:19
122:8 126:23
154:5,8 155:16
174:2 235:7
238:25 241:24,25
242:4 246:21
253:18 255:24
262:16 276:23
290:4 339:15
347:6 354:7
**started** 25:19 26:6
26:9 28:8 37:3
128:10 182:18
201:9 239:3
258:19,25 283:19
287:13 290:17
291:10,12,18,19
291:20,21,22
293:8,12 296:7
299:3 329:6,24
350:15 366:14,19
372:5,6
**starting** 151:15
236:19 237:6
350:12
**starts** 82:13 212:16
327:20
**Star/Marshall**
29:10 46:20 69:6
69:11 70:2,7 77:6
77:7 80:19,24,24
93:19,23 133:19
134:3 135:19
162:6,12 208:21
209:5 222:9,14
241:3,6 321:5,9
326:8,12 388:13
388:17,19,25
389:6,15,19
390:12,20,22
**state** 2:14 6:8 12:25
134:2 361:18
387:5,11

**stated** 8:12 321:15
329:23
**statement** 59:23
181:18,23 242:24
243:8 328:4,15
359:8 361:21,23
362:10,11 371:21
390:14
**statements** 31:15
206:12
**STATES** 1:2
**stay** 121:9 207:18
207:21 230:15
**stayed** 116:15
190:18 213:22
217:22
**staying** 125:11
**stepped** 342:8
**steps** 108:11,13,15
108:23
**stigma** 373:14
377:23
**stip** 111:4
**STIPULATED** 4:4
4:9,13
**STIPULATIONS**
4:2
**stock** 43:24 44:15
320:21 355:2
356:21 357:4
363:13
**stomach** 375:16
378:12
**stood** 58:7 279:10
**stop** 24:24 162:15
162:16 340:24
362:15
**stopped** 340:25
**store** 14:25 15:2,4
33:20,23 34:9,13
34:22 35:3,6,7,8
35:11,12,18,19
36:11,13,19 37:10
39:25 40:5,11,20
40:22 41:2,6,7,11
41:20,25 45:18
48:21,22 49:8
50:22 51:21 52:21

53:11,18 56:21
57:9,14,20 58:11
58:17,21,24 59:4
59:5 60:7,20,21
60:22 61:2,5,6,10
63:17,24 64:21
65:4 66:25 67:8
67:14 68:2,15
75:4 77:15,24
78:6,20,22 79:16
81:4,8,9,14,18,19
82:5 83:5,8,10,12
83:17 84:4,7,13
84:15 85:4,16,24
86:9,12,14,15,15
86:18 87:13,16,19
87:25 88:9,10,11
88:13,21 92:10
94:13,22 95:4,19
98:9,19 99:4
101:19 102:10
103:2,19 105:15
105:16,16 106:19
106:23 107:9
108:11 109:2
113:23 114:18
115:3,8,22 116:2
116:10 118:11,25
120:14,20 122:10
130:5,6,20,22
131:4,8,19 132:12
132:20 133:2
136:11 140:2,15
153:2 175:16,25
176:6,20 177:7,17
177:22 178:10,12
179:3 180:13,14
180:24 181:13,19
182:10,24 183:4
183:18 184:6
185:7 186:4
187:11 189:6
190:4,7,17,20
194:8,16,19 196:5
201:11,15 203:3,6
207:25 208:4,4
212:10 213:3
214:18 215:6,9

216:21,24 217:9
221:7 222:2 224:9
224:14,25 225:2
225:20,25 229:12
229:14 230:17
231:3,8,11 232:4
242:11 247:18
249:8 251:8,9,13
261:21 283:25
284:3,8,12,17,20
284:23 285:5,6,7
286:17 287:17,25
288:14,17,25
289:2,10,15,22
293:22 295:6
301:5 303:9,20
304:25 306:4,9
309:7,9,12,13,18
310:21 312:13,24
312:25 315:14,18
315:23,24 316:3,3
316:5,8,11 317:6
322:8 328:10
333:11 336:6
337:5,7 338:16,18
343:9 347:10,13
351:8,11 353:4,5
353:6,18 354:10
354:10
**stores** 177:24 178:2
203:22 353:15
**stories** 55:22
**story** 304:9
**Strauss** 2:10 3:12
5:17,21
**Street** 20:7 24:5
106:12 180:3,4,14
181:19 182:24
189:25 286:17
**strictly** 189:9,10
**strike** 14:8 113:20
144:12 167:8
193:8 338:14
**string** 268:3,8,9
**strip** 107:24 108:5
108:17,25 154:15
**stripped** 107:17
**strong** 207:9

210:12
**structured** 287:8
**struggled** 184:2
198:4,6,20 202:9
**stub** 344:21 345:6
346:13 348:22
349:8,10 390:23
391:5
**stubs** 345:9,17,23
345:24 346:10
349:13,17,18
**stuck** 246:7
**student** 365:11,13
**studios** 190:10
**study** 54:21 55:19
**stuff** 107:12 111:2
291:19
**subject** 127:2
**submit** 28:11 29:20
343:12
**submitted** 55:22
**Subscribed** 386:21
392:23
**subscription** 13:2
**subsequent** 278:12
**substance** 13:12
17:9 328:25
**success** 205:15
206:7
**successful** 38:25
39:13,23 205:20
207:6
**succession** 205:25
**sucks** 22:21
**suddenly** 80:13
292:4,17 294:6,6
298:5 309:16,19
309:24 311:3
313:2 317:11
325:3 373:11,17
**suffer** 375:3 377:16
**suffered** 260:14
378:16
**suffering** 11:4
**suffice** 185:15
**suggest** 297:16
**suggested** 104:18
**suing** 330:6,12

**sum** 366:25 367:3
**summarization**
327:6
**summarize** 326:21
326:22
**summary** 326:17
326:19,25
**supervised** 61:17
119:6 149:13
221:6
**supervising** 347:15
**supervision** 60:9
60:15 92:19
187:12
**supervisor** 32:12
32:15,19,22 33:6
33:13,16 53:6,14
54:25 56:21 58:11
59:7 61:20 62:12
64:7 65:25 66:12
68:9 70:22 73:25
85:6 203:5,6
212:17,23 214:12
223:21 302:9
**supervisors** 34:6
40:15 61:14,21
62:13 64:2,22
65:13 66:23 80:9
84:20 120:14,17
120:21 122:10,18
139:15 140:14
141:19 149:9
210:6 261:23
**support** 374:14
**supposed** 75:13,24
97:23,24 100:10
125:11 128:6
**sure** 5:16 7:9,16,19
16:20 53:25 60:23
70:23 76:19 83:14
90:7 92:16 98:2
100:16 112:18
114:25 117:3
122:24 123:2
124:25 128:11
140:3,24 155:17
175:7 179:16
186:22 195:23,24

196:3 208:17
210:14 213:21
214:12 217:21
219:3 229:13,20
230:24 235:3
236:16 239:13
251:18 276:13
292:13 293:5
294:22 296:12
301:12 332:18
348:19 379:6
380:17 385:6
**surgeon** 281:16
**surgery** 225:13,15
227:24 228:17,22
228:25 230:13,19
233:3 236:20
237:3,8,20 243:23
244:2,5 246:7
253:10 279:11
280:18 281:14
283:3,11 314:18
317:19,20
**surprised** 185:16
**survive** 363:14
**suspicious** 329:25
**swear** 6:2
**switched** 252:14
**sworn** 4:6 6:4
386:21 392:23
**symptoms** 228:3,10
228:14 243:20
253:11,19,20,25
254:19,23 255:8
255:22 256:11,15
259:23 260:4
374:3,6,10 375:4
377:9,17
**system** 51:9 100:4
104:10 110:3
203:13,18 204:3,9

———————

**T**

**T** 6:3 118:2 387:3,3
**tab** 149:25
**table** 186:14,15
282:24 319:24
**take** 6:19 10:5,9

16:18 23:4 28:23
37:17 53:23 63:11
84:21 88:14
110:22 113:23
114:18 116:25
128:8 132:25
133:22 140:23
158:11 160:7
175:5 179:12
181:7,25 193:25
197:4 199:18
200:20 208:16
209:4 216:6 218:6
221:6,9 223:22
226:21 238:3
246:4 247:11,21
251:16 256:10,15
256:22 259:3,7,10
263:24 267:22
268:9 273:19,23
274:4,25 278:5,22
278:24 282:17
287:18 290:19
291:20 294:13
301:10 307:3
309:16,19,23
311:2,3 313:9,16
314:15 315:3
316:22,23 317:22
318:25 332:16
357:15 364:15
377:8 385:7
**taken** 9:9 11:22
21:20 54:4 83:6
108:11 109:2
114:9 117:6
128:21 141:3
142:25 151:21
152:2,11 153:20
157:17 163:15
164:4,20 165:15
166:4,13 167:4
169:4,18 170:24
171:14 172:6,21
175:2,2,10 208:23
230:7 251:21
264:4 297:12,13
301:15 305:9

315:6 332:21
357:19 380:20
**talk** 211:5 217:18
233:18 234:3
253:2 290:19
291:10 344:16
**talked** 68:8,16,25
148:7,8,11 201:24
202:17 219:14
220:16 259:17
299:21,21 305:20
312:24
**talking** 7:25 62:5
68:13 89:17 96:6
102:15 135:18
177:20 190:10
294:25 303:22,23
310:23 319:8
**tape** 5:3 118:6
**target** 27:19 339:10
352:14,16,16
365:8
**targets** 352:20
**tasks** 41:10
**tattoos** 84:8,8
**taught** 57:3
**TB** 257:19,24
**team** 39:23 123:22
123:23 124:12,18
127:11 128:19
129:14 187:19
201:21 205:15,20
213:4 214:11
**tears** 305:10
**technically** 232:6
**technician** 257:24
**techniques** 95:15
**teeth** 254:9
**Tel** 3:8,16
**telephone** 252:15
**tell** 6:23 91:10
139:15 145:20
153:25 230:9
232:15 261:15,20
262:5,9,24 263:4
263:9,12 265:17
266:17 269:11
272:7,17,22,25

277:7 279:13
283:18 291:7,8
292:17 296:6,6
297:11 299:8
304:17,21 305:2,5
305:14,23 309:7
315:13,16 316:6
316:10 321:20
323:8 333:16,21
334:3,6,25 335:3
335:7,10,15,19
336:22,25 337:6,9
337:12,15,17
338:7,18 344:12
348:9,12
**telling** 90:22 91:4
291:9
**tells** 9:14 283:6
320:20
**temp** 339:12,13
**ten** 49:7 320:25
327:16,16
**tenure** 65:23
**tenured** 40:2
182:10
**term** 31:18 72:16
136:9 210:9,24,24
351:16
**terminate** 27:13
34:21 52:11
**terminated** 31:18
50:8,24 51:6 52:2
299:6 310:4
318:17,20 319:9
319:11 320:19
321:18,22 322:3
322:16,20,21,23
323:11,12 324:24
325:7,10 327:18
328:21 333:18
335:2,4,16,20
336:21 337:8,16
337:21 338:6,14
338:17,19,25
343:25 344:13
346:24 348:10
350:2 359:12
363:3 364:22

365:21 376:21
377:24
**terminating** 319:25
322:11
**termination** 15:10
15:14 27:8 45:22
47:8 48:12 49:16
52:18 323:24
325:4 328:14,20
329:18,19 333:5
333:17,25 334:3
334:25 337:15
338:5 341:7
360:17 372:2
374:3 375:4
376:20 377:2,6,10
378:5,13,17
**terms** 56:20 59:18
75:23 98:17 161:9
183:13,18 185:22
223:16 332:11
358:4 371:9
**terrible** 293:10
373:15
**testified** 6:6 11:25
12:4,20 118:10
141:8,18 160:24
161:7,11,12,13,15
161:17,20 252:3
252:23 259:16
260:20,23 261:4
261:18 264:13
265:13 284:16
288:24 295:5
301:22 310:5
325:20,23 338:16
363:11
**testify** 12:8 265:12
**testifying** 268:5
**testimony** 12:12
109:5 219:24
267:21 370:23
371:4
**text** 232:24 233:8
233:18 252:4,7,11
252:25 300:21
302:5 317:17
382:16

**texted** 232:22,22
**Thank** 239:6
**theft** 50:6 51:5
328:12
**theirs** 250:17
**theme** 220:10
**theories** 332:10
**thief** 292:15
**thing** 39:3,14,17
58:3 116:5 124:10
124:24 125:6
176:10 186:8
213:5 220:11,14
254:13 289:14,19
295:12 296:8
304:14 305:8
336:8 353:5 354:2
372:4 379:17
**things** 8:17 40:3
41:14 43:11 44:2
62:20 78:21 89:9
98:5 101:13,15
102:17 104:20
105:14 106:9
122:23 123:2
125:4 177:16
181:15 183:23
189:14 195:22
196:10,16 201:3
202:7 211:6,16,19
212:2,5,7,11,13
227:7 279:20
281:17 287:7,10
287:15 291:9
309:20 311:16,21
320:21 380:2
**think** 7:22 10:22
19:11 25:16,17
26:2 28:7,13 40:3
44:19,23 50:19
56:18 58:23 59:14
60:12 64:10 72:7
72:16 75:2,6
79:23 83:25 91:25
98:23 101:9,22
102:6,13 103:5
106:2 107:11
109:5,10 113:19

113:20,22 114:2
114:12,14,17
115:5,12,21,24
116:12 123:18
129:13,19,23
130:11 137:14,25
138:2 148:20
149:5 155:18
175:21 176:4,5,7
177:19 182:8,20
193:14 221:8,8,14
221:22 224:20
233:15 252:20
256:3 259:20
260:13 261:6
270:14 271:7,19
275:12 280:8
283:7,23,23,24
284:3 299:15
311:15 312:6,7,16
315:2,17,21 317:7
322:19 327:2
329:4 331:12
367:20 371:8
378:19 380:3,16
382:22,23 383:4,7
383:9,18,20,22,25
385:3,13
**thinking** 248:3
330:5
**third** 24:4 49:13,19
52:8
**Thomas** 1:24 2:12
387:9,24
**Thompson** 3:4 5:24
**thought** 116:5
191:17 200:25
231:16 254:15,15
256:20 260:10
335:7 336:22
337:17 338:7
372:12 376:10
**thousand** 78:2
81:22
**three** 32:9 77:25
92:2 118:7 128:14
188:16 285:22
310:24 340:23

341:6 363:7,20,23
365:17 385:7
**three-page** 77:4
**three-week** 364:12
**throw** 375:19
**thrust** 373:12
**Thursday** 1:18 2:5
164:9 171:7
172:6,13
**ticket** 159:17
161:21
**Tier** 36:10,10,13,13
36:19 351:14
352:8,15
**till** 293:4 294:9
296:12
**tills** 122:25 125:9
128:5,14 129:9
213:13
**time** 4:15 8:11 16:4
16:18 23:14 31:19
36:5 37:21,23
48:20 53:11 54:2
54:6 56:22 57:15
65:11,23 66:2,13
66:17,25 71:19
72:22 73:12 74:5
74:11 76:13 80:12
82:16 83:6 92:18
97:23 98:2,17
99:3,8,21 100:4,5
100:14,15,19,24
100:25 102:16
103:10 104:19
116:22,25 117:4
118:3,5 120:15
123:11 125:4
128:15,22 129:6
129:22 130:8,12
130:16 131:10,14
131:19 139:10,13
140:25 141:5
147:19 149:3
174:2,3,3 175:8
175:12 177:6
180:11,15,23
181:19 183:3
185:23,24 189:11

190:24 192:15
193:12 194:21
200:20 201:25
206:18 207:10
208:18,25 214:15
219:9,15,21
220:20 224:7,11
224:15,19 225:25
226:6,10 227:16
231:16 237:2,2
242:13 244:12
246:5,12 251:19
251:23 255:3,4,8
256:14 258:6,7,24
262:12 263:17
264:2,6 272:16
273:10 277:3
278:22 279:19,21
280:20 281:3
288:8,13,16
295:23 296:10,20
296:25 298:22
300:5,18 301:2,8
301:13,17 302:5
302:13 307:7
310:16,22 313:6
315:4,8 316:2
330:5,8,11 332:19
332:23 344:15
345:13 346:14
357:12,17,21
362:19,21 363:19
365:16,24 366:24
373:3 374:21
375:3,10 380:18
380:22 382:23
384:19 386:2
**timelines** 89:9
**timely** 202:5
212:20
**timer** 116:21
**times** 43:7 92:2
100:9 118:24
123:21 130:21
141:17 147:19
176:12 202:9
208:4 223:25
271:8 280:11

287:4,11
**time-saving** 95:14
**timing** 276:25
295:5
**tip** 36:4
**tired** 254:17 256:22
256:23,23 259:11
259:24 261:7
**title** 23:6,9 25:25
32:5 36:20 70:8
302:9 341:23
**today** 6:19,24 7:8
7:13 8:24 9:9,14
10:13,17,25 11:14
13:10 14:18 44:23
303:25 332:9
**told** 90:10 91:23
140:13 230:14
231:18 248:12,13
257:23 260:7
261:21,23,24
264:10,14,23
265:3,4 266:3,6
266:10,14 272:16
272:18 273:10
277:15 282:24
283:9 302:24
306:2 311:8 313:6
314:14,17 316:20
321:17 323:12,14
324:2 336:20
**Tom** 5:12
**tomorrow** 294:17
317:15
**tone** 277:25
**tongue** 36:4
**tonight** 294:25
**top** 70:3 82:2 94:13
97:2,4 126:23
134:22 181:15
217:22 243:10
307:12 341:18
356:7 358:24
361:14,15
**topic** 65:6 78:5
127:7
**touch** 100:11
**touched** 41:18

100:9 286:24,25
287:2
**town** 204:5,6
233:17,25
**Tracy** 19:9
**trade** 176:17
**trained** 40:14 53:6
53:9 56:22 75:17
80:8
**training** 21:24,25
22:2 53:5,13,15
53:17,19,20 56:20
56:25 57:25 58:16
58:19,24 59:6,20
60:14 61:9,12
62:16 68:9,16
183:20 347:15
360:10
**transcribe** 7:14
**transcribing** 7:8
**transcript** 8:2
160:6 161:8
265:10,11 324:5
367:25 368:15,17
386:8 387:13
391:15 392:2
**transcription** 392:8
**transfer** 38:15
39:10,11,12
**transferred** 38:19
38:22 39:5 180:9
**transfusion** 237:9
237:13
**transit** 44:19,25
**Transport** 79:9
**transported** 71:4,7
79:12,15 82:14
**traumatic** 372:4
373:20
**travel** 364:11
**treat** 257:15 258:16
**treated** 142:6
308:25 312:11
319:5
**treatment** 237:5,14
376:20 377:5
**trial** 4:16
**tricks** 176:17

**Trip** 82:12
**trouble** 127:12
293:14,24 294:2,7
299:4 316:22
**true** 281:18 387:12
**truly** 84:13 373:5
**trusted** 201:7 203:8
231:10
**truthful** 8:10 9:5
10:13
**truthfully** 7:2
12:20
**try** 65:11 76:19
95:13 191:14
258:19,21,25
269:16 270:12
274:21 275:21
363:25
**trying** 62:18
129:24 138:4
144:17 248:2
267:20 268:4
280:13 334:8
**TSG** 5:10,13
**Tuesday** 153:10
154:10 159:6
169:11 173:19
232:19 235:3,6
**tuition** 354:22
356:13
**tumors** 258:17
259:9
**turn** 46:18 79:7
88:7 94:12 97:2
104:22 135:4
138:10 142:7
143:12 145:18
146:11 147:6
149:18,21 153:23
154:12 155:4,21
156:11,16 157:6
157:20,22 161:19
162:9,23 163:18
164:6 165:3,17
166:18 167:6,9
168:18 169:8
170:12 171:3,21
172:9 173:2,16

174:16 179:19
181:6 187:19
352:12 369:2,21
382:3
**turning** 125:3
212:15
**turnover** 205:25
**tutor** 54:17 55:12
55:18 56:3
**tutored** 54:20
**tutoring** 54:24
**twice** 180:5 224:5
244:13 247:6
**two** 8:18 18:25
21:21 23:2 25:23
43:11 60:3 94:16
118:21 128:14
133:3 158:23
159:11,16 177:23
186:15 201:11
203:21,23 224:23
229:5,11,13,16
230:16 269:18
275:14 283:7
287:23 297:17
310:23 342:14,15
342:16 365:7
**two-minute** 380:15
**two-page** 46:14
**type** 26:15 43:19
247:12 346:20
377:4
**typical** 43:11
**typically** 43:7
48:19 79:25
136:12 153:2
180:11 346:3
373:10

_____

**U**

**uh-huh** 7:10 71:18
84:5,11 115:11,16
121:10 125:16
151:16 227:22
253:14 260:8
345:25 363:9,21
**uh-huh's** 7:15
**uh-uh** 7:11

**ultimately** 40:16
86:16 87:19
**unable** 244:8
**unacceptable** 125:4
**unaware** 327:4,8
327:12
**unclear** 112:13
**underneath** 31:14
250:19
**understand** 6:20
7:4,12 8:3,20,23
9:3,8,24 10:17
31:15 32:2 48:6
51:4 52:6 59:25
87:13,18,24 88:20
98:23 101:25
102:3 103:18
109:9 111:12
112:16 153:15
160:12,14,15,17
183:16 239:11,18
258:20,22 312:5
380:12
**understanding**
10:25 31:10 45:12
45:17 47:11,17,25
48:3,9,17,20
49:23 50:7 71:11
71:22 72:4,6,14
73:21 74:23 75:23
79:17 82:7,17
85:20 88:24 98:8
107:6 108:10,23
111:21,25 112:10
112:23 115:4
223:15 250:25
259:2 322:11,14
356:14 357:3
358:3
**understands**
331:25
**understood** 8:9
10:2 115:8 217:11
217:23,23 257:2
379:11
**unemployment**
12:8,17 366:4,7,9
366:14,18 367:10

367:15,21 369:11
370:3 371:18
**unfair** 275:13
373:2
**unfortunately**
230:11 377:12
**uniform** 58:5
**UNITED** 1:2
**University** 35:14
35:18 139:12
222:4 360:13,20
361:3
**unsafe** 116:12
**unsure** 153:4
**ups** 189:23
**upset** 277:14,22,23
277:24 280:5,8
283:18 291:21
292:4 293:9,15
294:3 304:3 305:9
310:13 374:8
375:11
**upsetting** 373:21
**uptown** 204:4
**upward** 202:7
**use** 78:12,16
107:14 210:23,24
217:16 242:11
244:12
**usually** 126:24
287:3
**uterus** 281:11
**utilized** 205:13
**U-huh** 15:15

_____
**V**
**v** 392:3
**vacation** 233:5
242:9,11,18
244:12,14,23
245:4,11,13,21,24
246:5,8 300:24
390:15
**vacations** 364:15
**vague** 177:10
**vaguely** 350:21
**vagueness** 47:23
**valid** 277:15

**value** 36:11
**valued** 182:19
**values** 287:2,12
**varied** 341:16
**various** 382:8
**verbal** 7:9,16 48:19
51:9,18 124:7,14
183:21
**verbatim** 326:20
**verified** 143:5
**verify** 74:10 129:8
**verifying** 137:5
142:24 143:3
168:5,10,13
**version** 105:24
**versus** 5:5
**video** 5:11 175:13
251:24 315:9
**videographer** 3:24
5:2,25 7:13 54:2,6
117:4 118:5
140:25 141:5
175:8,12 208:18
208:25 251:19,23
264:2,6 301:13,17
315:4,8 332:19,23
357:14,17,21
380:18,22 386:2
**videotaped** 5:3
**view** 100:18
**violation** 49:18,25
51:2 139:5 147:13
**violations** 45:22
86:20 88:3 119:7
298:20
**visible** 84:9 106:4,6
106:18 261:11
**visibly** 291:21
**vision** 44:8 354:16
356:9
**visit** 189:6 217:6
282:22 284:18,21
284:24 287:23,25
288:15,17,20,25
289:15 295:3,18
296:15 298:24
299:25 300:4
301:21 303:24

305:6 317:3,12
319:25
**visited** 217:9 316:4
**visits** 177:13 285:6
287:18,21 299:19
309:23
**voice** 205:24
277:25
**volume** 36:11,13
351:8 353:8,14
**voluntary** 23:16
**volunteer** 55:24
**vs** 1:6

_____
**W**
**wage** 341:25 342:4
**wait** 7:19,23 9:23
10:7 66:4,8 127:2
246:14
**waited** 202:7
**waiting** 242:13,15
244:15 296:11
**waived** 4:11
**wake** 375:22,23
376:4 377:25
**waking** 376:15
**walk** 132:25 214:8
229:17 287:2,12
317:21
**walking** 214:2
**want** 52:7 62:20
80:10 89:9 102:18
110:7 113:2
114:23,25 115:19
123:25 134:2
149:4 160:6 185:4
203:23 205:6
206:4 210:9
233:12 242:14
262:12 264:20
265:10 271:9
272:2 290:19
292:12 293:16,18
293:19 294:22
312:12 313:4
329:13 372:20,20
374:11 375:16,18
379:6

**wanted** 93:7,8
112:18 124:14
191:14 207:21
210:14 212:5,12
213:10,10 230:23
232:3 242:9
244:11 281:22,22
281:23 310:18
323:24 330:20
360:22 362:14,17
374:12
**wanting** 310:17
375:2,9
**warn** 325:16
**warned** 325:14
**warnings** 47:8
48:11 325:17
328:13
**warrant** 201:22
**warranted** 49:16
**Warrecker** 19:9
**wasn't** 12:16 64:15
68:14 75:7 79:5
83:15,18 101:16
103:11 104:19
108:2 116:13
123:23 127:20
129:14 139:23
148:5,6,6,18,18
186:24 192:25
193:16 202:21
211:25 213:19
215:3 217:7,9,15
217:16 219:24
225:6,14 233:24
256:25 257:6
277:15 278:8
279:20 281:15
286:20 298:5,9
299:21 323:23
330:17 362:19
363:24 375:25
376:6 377:14
**watch** 65:13 96:14
**watched** 246:24
**watching** 229:15
232:4
**Waverly** 37:12,19

37:23 38:5,12
39:2,19,22 65:22
90:19 92:19
106:19 176:7,15
188:4 189:18
216:23 247:19
251:9
**way** 10:23 65:5,11
80:8,13 84:3
95:11,15,19 96:5
96:19,20 97:14,21
97:22 98:5 99:2
99:20 100:13
103:15,22 104:3,4
105:7 124:9
140:11 143:5
147:16,16 148:15
182:16 210:5,7
212:4 231:12
254:24 256:7
259:13 278:2,2
284:8 298:7 309:4
310:8,13,14 311:4
311:13 312:10
314:16 316:21
317:3 350:6
372:23 375:17
376:21 381:14
385:11 387:17
**ways** 89:8 97:25
308:22,24,25
309:5 313:5
**wear** 113:17
**wearing** 58:4
**Wednesday** 142:10
153:10 179:21
235:7 236:19
**week** 13:22,24 14:4
14:11 44:4 89:13
90:8 93:9 159:5
245:25 302:17
341:9,10,12,14,18
342:13 367:10
**weekends** 130:7
133:8
**weekly** 91:6
**weeks** 131:16 185:9
224:23 231:19

263:15 265:4,19
266:4,7,11,15
283:7,8,12 310:23
311:3 314:19
317:21 340:23
341:6 342:14,15
342:16 363:8,20
363:23 365:17
366:16
**well-being** 230:23
**went** 24:9 41:14,14
53:8,19 64:14
65:2 121:18
125:20 136:11
137:2,5 154:16
156:21 157:24,25
168:8,11,14 170:2
170:4 187:20
195:14,15 196:3
215:4 236:18
246:25 247:6
249:3 252:5 256:9
257:17 258:8
281:7 290:16,24
291:18 292:19,25
293:4 294:8 296:2
297:9 298:7
303:17 319:20
348:14 363:23
**weren't** 100:17
124:19 128:5,13
128:23 129:20
132:10,10 133:8
177:4 213:7,14,23
270:4 287:6
318:24 319:4
**we'll** 10:4 128:9,9
128:10 233:18
**we're** 7:25 54:3,7
55:15 62:5,6,7,8
96:6 117:5 118:6
135:18 141:2,6
150:8 175:9,13
177:19 186:14
190:9 208:19
209:2 251:20,24
264:7 292:22,23
292:23 301:18

310:22 315:5,9
319:25 332:20,24
357:18,22 380:16
380:19,23 384:15
384:16,19 386:3
**we've** 68:8,24
211:15 234:20
281:25 385:9,9
**whatsoever** 331:16
**WHEREOF**
387:19
**whipping** 213:20
**white** 22:17,20,24
23:11,12 24:3,8
75:3 84:2
**Wigdor** 3:4 5:24
**wigs** 312:22
**window** 80:2 85:21
**wise** 312:15
**wished** 182:4
**witness** 6:2,4 10:2
16:16 48:14 53:23
66:6 72:20 73:2
74:4,9 75:22,24
83:2 90:14 98:13
101:24 112:20
114:12 121:16,16
121:25 122:11,12
136:21,25 142:22
145:2 155:12
160:10 167:22
168:6 169:22
172:17,18 208:15
219:7 220:2
246:16 259:6
262:15 267:13
268:5,19,23
269:15 270:23
271:24 272:4
274:11,13 275:8
275:24 276:10
328:2 379:11
383:22 384:7
387:19
**witnesses** 122:21
123:6 314:3
**witness's** 267:20
**woman** 259:20

**women** 24:13
**Wood** 179:20 181:9
**word** 75:6 203:24
217:15 228:5
253:16 310:15
320:9,9 324:4,4,6
324:6
**words** 338:22
**work** 22:24 24:20
25:22 54:15,20
55:19 59:13 94:15
97:6 147:17
182:16 188:25
189:10,14 227:23
228:2 234:25
236:13 244:8
254:14 255:22,25
257:6,12 259:24
319:14,16,19
320:17 339:16
341:13 345:20
352:21
**worked** 24:11,14
29:22,23 75:10
83:10 147:16
186:8 190:6
220:12 225:16
235:6,6 260:9
282:23 341:19,22
372:7
**worker** 351:14
**working** 22:19
24:24 25:4,11
26:6,9 28:8 185:7
185:20,25 189:19
190:3 261:7
340:24,25 341:2,7
341:16 342:12,15
343:22 372:5
376:11
**workload** 314:21
314:22
**Works** 198:9
**workshop** 363:24
363:25 364:4,7
**world** 256:24
373:12
**worried** 315:14,18

315:21 316:7,11
**worry** 304:5
**worse** 372:24
**wouldn't** 75:16
83:7,23,24 103:10
212:3 246:6
256:22 294:21
**write** 118:18 125:6
125:13,18 128:24
144:13 291:19
304:7,11 316:2
362:12
**write-up** 217:14
**write-ups** 328:14
**writing** 118:21
174:2 180:2
213:17 291:2,4
364:8
**written** 48:19 51:9
51:19 84:14 89:14
124:4,7 139:8
141:22 183:4,22
198:14 210:23
211:16,19 212:6,9
304:15,20
**wrong** 63:3,10
64:18 121:19
178:21 187:20
212:7 228:11
296:9 323:18
330:20 373:2
**wrongdoing** 327:19
**wrote** 116:2 118:11
118:15 120:13,22
121:18 123:13
144:17 174:6
192:12 207:3
210:6 213:6 242:6
361:22 362:21
379:17 382:18
383:16
**W-A-R-R-E-C-K...**
19:11

---

**Y**

**Y** 6:3
**yeah** 64:19 70:16
73:6 103:9 287:6

292:2 299:4
**year** 8:18 12:9 20:2
  20:10 26:8 28:10
  35:21 37:15 42:2
  42:5 134:18
  162:21 194:13,14
  197:11,12 198:5,6
  198:21 202:23
  205:14 207:11
  226:12 263:19
  349:23 355:13
**years** 8:18 18:25
  23:2 25:18,23
  26:11 49:7 50:23
  53:6 55:4 140:8
  184:16 221:16
  253:21 309:17
  317:11 374:22
**Year's** 229:4,5
**yesterday** 13:25
  14:14 361:18
**York** 1:3,17,17
  2:11,12,14 3:7,7
  3:15,15 5:7,8 6:11
  18:21 359:16,19
  359:25 387:5,7,11
**young** 24:13
**younger** 247:22
  257:19

___
**Z**

**Zakia** 261:22 262:3
  262:16 265:17
  266:3 303:18
  304:17 305:14
  333:10,16 334:21
  335:19
**zero** 292:4

___
**$**

**$10** 342:22
**$11** 342:5,20
**$2** 121:12 382:11
**$2,400** 121:9
**$20** 127:24 213:23
**$200** 128:10 129:10
**$2400** 121:8
**$3** 121:13
**$30** 213:24

**$4** 166:10,15 381:3
  384:2
**$40** 128:2
**$409.13** 136:3
**$495.51** 151:11
  152:3
**$5,000** 350:4
**$52,000** 349:23
**$7,000** 153:2
**$824,000** 382:12
**$971.39** 364:24

___
**0**

**03** 224:12
**03015ASM** 352:9
**04** 224:12
**05** 207:20
**07** 194:14
**08** 38:13
**09** 197:12,15
  247:19

___
**1**

**1** 5:3 16:11,12
  36:10,13 71:19
  135:20 319:15
  369:19 388:5
  392:7
**1E** 6:11
**1st** 138:21,24
  302:11,18,24
  321:21 323:6
  329:3
**1.9** 195:6
**1:00** 137:6
**1:26** 117:7 118:3,6
**1:51** 141:2,3
**1:55** 141:3,6
**10** 119:22,23
  146:16,20 171:25
  172:7 236:11
  242:5,7,16 244:9
  244:18 245:21
  287:22 290:11
  295:7 381:22
  382:2 388:22
  391:17
**10th** 147:3 171:16
  244:11,16 246:21

**10-minute** 116:21
  296:11
**10:15** 2:6
**10:16** 5:9
**100** 187:2 260:12
**1000** 167:9 169:3
**10003** 3:7
**1002** 170:12,22
**10036** 2:12 3:15
**1007** 169:9 170:22
**1013** 171:21 172:4
**1018** 171:4 172:4
**10457** 6:11 18:22
**1059** 173:2,10
**1064** 172:10 173:11
**1092** 174:16,24
**1097** 173:16 174:24
**11** 26:12 133:17,18
  135:3 388:24
  390:5
**11-CV-2521** 1:6
**11/16/10** 154:21
**11/16/2010** 151:19
**11/23/2010** 157:11
**11/3** 144:18,19
**11/9/10** 146:9
**11:07** 54:3,4
**11:15** 54:5,7
**11649** 130:6 131:9
  131:19 132:12
  315:14
**1178** 162:7,12
  389:6
**1179** 133:19 134:3
  388:25
**1182** 134:8,22
**1187** 138:10,11,15
**119** 388:22
**1193** 135:4,18,19
**12** 162:4,5 203:22
  231:19 236:25
  261:9 283:8,12
  310:23 311:3
  314:19 388:5
  389:5
**12-week** 309:8
**12/17** 172:22
**12/7/2010** 169:11

**12:22** 117:4,6
**12:30** 116:24
**1206** 143:13,20
**1210** 142:8
**1247** 146:12
**1252** 145:19 146:24
**1279** 149:21,23
  151:2,10,15
  153:19
**1280** 150:10,20
  151:2,25 153:19
**1284** 147:7 154:5,8
**1286** 154:12 156:6
**1287** 155:21 156:6
**1291** 153:24 154:6
  154:24
**13** 179:7,8 254:22
  307:13,16 389:7
**130** 227:11
**1312.12** 157:4
**1320** 157:6,15
  159:3 160:20
**1321** 156:16,18
  157:16 160:22
**1327** 158:11,19
  159:4 161:20
**1329** 157:23 158:19
  161:20
**133** 388:24
**1337** 156:12 157:21
**1362** 133:20 134:4
  388:25
**14** 191:20,21 389:9
  389:12
**14th** 238:16
**15** 147:9 193:20,21
  245:16 290:11
  388:20 389:10
**15-minute** 295:7
**1564** 321:5,9
  390:20
**1579** 204:22
**1585** 208:21 209:6
  389:15
**16** 150:4 151:10
  152:11 153:9,20
  154:11 156:8
  172:13 173:12

196:23,24 388:5
  389:11,21
**16th** 150:22
**162** 389:5
**163** 235:12 390:6
**164** 235:12 390:6
**169th** 24:5
**17** 150:16 152:12
  153:10,21 156:2,9
  173:7,13 199:13
  199:14 389:12
  390:16
**17th** 150:20 152:3
**179** 389:7
**18** 22:21 35:4
  208:14,20 352:17
  388:16,18,24
  389:14
**18th** 240:15
**1828** 179:9,16
  389:8
**1829** 181:7 184:23
**1830** 181:7,11
**1831** 179:20
**1832** 179:9,16
  389:8
**19** 25:13,14 216:2,3
  388:6,8 389:16
**19-page** 308:4
**191** 389:9
**1928** 184:18
**193** 389:10
**196** 389:11
**1964** 6:10 18:21
  19:13
**1978** 18:19
**199** 389:12

___
**2**

**2** 26:10 28:18,19
  36:10,13,19 164:9
  164:13 165:14
  166:17 326:8,12
  351:14 352:8,15
  382:3 388:6,10
  390:11,22 392:7
**2nd** 137:7 138:18
  138:20,25 226:11

329:4
**2:39** 175:9,10
**2:47** 175:10,13
**20** 14:15 25:13,13
174:10 216:16
218:2,3 296:24
353:9,16,18
389:14,17
**20s** 372:8
**20-page** 104:13
**2000** 26:12
**2002** 26:13 28:8
29:18
**2003** 21:18 26:10
247:11
**2004** 247:11
**2005** 35:9
**2006** 148:15
**2008** 209:22 214:15
**2009** 40:8,9 182:25
183:2 192:6,23
193:12 198:5,21
216:16
**2010** 40:7 134:19
135:20 142:10
143:17 146:19,20
147:9 150:4,16
151:10 152:11,12
153:9,10,20,21
154:11 156:2,9,15
157:2 158:4,15,21
159:19 161:2,22
161:23 162:22
164:4,4,10,13
165:8,14,15,21
166:22 167:4,4,12
168:11,23 169:7
170:17 171:7,25
172:6,7,13 173:7
173:12,13,19
174:12,20,25
175:3 179:21
180:15,23 181:10
185:24 199:15,24
200:10 204:14,15
204:17 219:9,20
220:20 228:20
243:21 245:16

253:10 255:21
257:11 258:13
266:8,12,15
285:16,18,20
286:6,13 287:13
296:20,25 299:11
299:25 322:7,7
389:13
**2011** 1:18 2:5 5:8
146:16 162:25
226:18 227:14,15
235:23 236:11
238:25 242:5,7,7
244:4,9,19 245:21
247:9 252:5 253:9
256:16 307:13,16
319:15 346:14
361:17 368:18
369:8,19 381:22
382:2 386:22
387:14,21 389:24
391:17 392:4,24
**206** 198:2
**208** 389:14
**21** 173:19 174:25
222:7,8 389:9,10
389:18 390:23
391:7,9,16
**21st** 174:11 282:14
282:15 288:15
300:5 309:3 310:6
311:8
**212.257.6800** 3:8
**212.872.1000** 3:16
**216** 389:16
**2172.04** 163:25
**2173.04** 163:12
**218** 389:17
**22** 25:14,16,18
156:15 157:2
158:4 159:18
161:2,22 174:12
174:20 175:3
226:15,16 389:21
390:18 391:5
**22nd** 137:6 157:17
158:20,24 159:6
159:13 160:3

282:11,12,13,15
288:16 309:3
**222** 389:18
**226** 389:21
**23** 158:15,21
161:23 235:10,11
388:22 390:5,13
**23rd** 157:18 159:5
159:6 160:2 161:3
**235** 390:5
**2363** 19:17 20:4
**237** 390:7
**2380** 127:24
**24** 235:23 237:23
237:24 388:14
389:11 390:7,7
391:15
**240** 390:8
**2400** 122:25 129:4
**241** 390:11
**242** 390:13
**245** 390:15
**249** 390:16
**25** 209:22 240:2,3
390:8
**26** 240:25 241:2
244:3 390:11
**27** 242:22,23
390:13
**28** 192:6,23 245:3,4
341:11,13 388:6
390:15
**2839.12** 154:20
156:4,8
**2852.39** 158:6,17
158:20 161:22
**2877.67** 164:25
165:11
**29** 162:25 164:3
249:16,17 390:16
**2922.34** 174:15,22
**2929.49** 166:7
**2933.51** 166:7,8,24
**2987.69** 172:24
173:9

---
**3**
---
**3** 30:18,19 121:17

123:4 126:13
142:10,25 143:22
165:21 166:5
167:3 226:18
227:13,15 245:21
388:8 389:16,17
389:23 390:8,19
392:8
**3rd** 144:4,13 145:4
145:9,13 164:21
226:11 235:4,5
244:10 246:21
**3:00** 71:7 79:13,23
82:15 83:15,22
84:24 85:18 180:6
**3:26** 208:19,23
**3:36** 208:24 209:2
**30** 164:4 179:21
180:15,23 181:10
184:18 185:24
228:19,20 248:8
249:13 251:7
253:9 254:22
289:23 295:6
306:21,22 388:8
390:18
**30s** 372:8
**30th** 163:17,23
229:3 230:12
243:21 255:21
283:14
**30-day** 249:12
**306** 390:18
**31** 321:3,4 390:19
**3101.36** 146:5,18
**312.72** 157:13
161:2
**3132.76** 170:10,20
**3160.04** 143:19
**32** 326:6,7 390:21
**321** 390:19
**326** 390:21
**3280.36** 171:19
172:3
**33** 344:20,21
390:23
**34** 348:21,22 391:5
**344** 390:23

**345** 106:22 180:3
180:14 181:18
182:23 189:25
286:17
**348** 391:5
**35** 351:20,21 391:7
**351** 391:7
**355** 391:9
**357** 391:11
**36** 355:20,21
357:25 391:9
**361** 391:13
**367** 391:15
**37** 357:8,9 358:9
391:11
**38** 361:7,8 391:13
**381** 391:16
**388** 348:23 391:6
**389** 344:22 390:24
**39** 367:23,24
391:15
**393** 355:22 391:10
**394** 355:22,25
391:10
**395** 351:22 352:8
391:8

---
**4**
---
**4** 18:19 45:25 46:2
69:13 94:14
143:17 175:14
200:10 356:23
388:10 390:15
**4th** 144:5 145:14
**4:23** 251:20,21
**4:38** 251:21,24
**4:51** 264:3,4
**40** 360:7 381:20,21
391:16
**400** 351:22,25
391:8
**401(k)** 43:24 44:15
355:8 356:22
363:12
**41,5** 37:3 41:21
**435** 361:9 391:14
**437** 361:9 391:14
**43896** 1:25

**44th** 2:11
**45** 289:12,13,23
  295:6 296:14
**452** 357:10 391:12
**454** 357:10 358:10
  358:13 391:12
**46** 37:3 388:10
**49,000** 382:9
**495** 151:6
**495.51** 150:7,18,20
  151:5,19 152:24

**5**

**5** 69:4,5 207:20
  238:25 242:7
  251:25 252:5
  369:4 388:12,12
  389:5
**5th** 237:6
**5:00** 133:7 264:4,7
**5:30** 130:10,11,16
**5:39** 301:14,15
**5:54** 301:15,18
**51** 151:6
**517** 222:9,14
  389:19
**537** 46:20
**549** 222:9,14,21
  389:19
**550** 222:9,14,24
  389:19
**551** 222:10,14
  389:20
**580.50** 168:25

**6**

**6** 76:23,24 107:2
  110:5,14,14,18
  165:8,15 166:22
  167:4,12 168:11
  315:10 388:14
  390:21
**6th** 37:12,18,23
  38:4,12,25 39:18
  39:22 65:22 90:19
  92:18 106:18
  139:11 169:4
  176:7,15 188:4
  189:17 216:23

**247**:18 251:9
**6:00** 130:11,16
  307:7
**6:09** 315:5,6
**6:13** 315:6,9
**6:34** 332:20,21
**6:42** 332:21,24
**60** 241:3,7 292:4
  390:12
**62** 241:3,7 390:12
**66** 238:19
**69** 388:12

**7**

**7** 80:17,18 369:3
  388:16
**7th** 169:19 170:5
  170:24
**7:09** 357:18,19
**7:18** 357:19,22
**7:30** 130:12
**7:43** 380:19,20
**7:48** 380:20,23
**7:53** 386:3,5
**70** 347:16
**76** 388:14
**775,000** 382:10
**779** 93:19,23
  103:25 388:19
**78** 22:22
**783** 94:13
**790** 97:2,10
**794** 93:19,23
  103:25 388:19

**8**

**8** 1:18 2:5 5:8 93:17
  93:18 103:24
  111:18 112:12
  168:23 169:5
  170:17 231:19
  283:8,12 310:23
  311:2 314:18
  361:17 369:25
  387:14 388:18
  389:7,18 391:13
  392:4
**8th** 170:25 361:24
**8:00** 71:6 79:13

**82**:15
**80** 388:16
**82** 134:16
**821** 80:19,24
  388:17
**844** 82:2
**846** 82:11
**847** 194:17 216:21
**85** 3:6
**855** 86:6
**856** 86:11
**867** 88:8
**868** 80:19,24
  388:17
**871** 76:25 77:6
  388:15
**876** 76:25 77:7
  388:15
**877** 76:25 77:7
  388:15
**8894** 369:4

**9**

**9** 99:14,15 104:23
  104:24 146:19
  171:7 172:6
  352:16 368:18
  369:8 388:20
  391:11
**9th** 146:22,25
  147:2 387:20
**9/18** 194:12
**93** 29:10 388:18
**938** 69:6,11 70:2
  162:6,12 388:13
  389:6
**943** 69:6,11 70:7
  388:13
**944** 162:16
**945** 163:18
**948** 162:23
**97** 21:4 195:9
**972** 165:3,14
**977** 164:7 165:13
**981** 166:18 167:3
**983** 165:18 167:2
**99** 388:20
**990** 167:7

**998** 168:19 169:2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

SERENITY MARSHALL,                              :
                                                :
                              Plaintiff,         :
                                                :    Civil Action No.: 11 Civ. 2521 (RMB)(KNF)
                    v.                           :
                                                :
STARBUCKS CORPORATION and JENNIFFER             :
GURTOV, in her individual and official capacities, :
                                                :
                              Defendants.        :
                                                :
------------------------------------------------------------- x

### PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Southern District of New York ("Local Civil Rules"), Plaintiff Serenity Marshall ("Plaintiff") responds and objects to Defendants' First Request for Production of Documents in accordance with the numbered requests as set forth below. These responses and objections reflect Plaintiff's current knowledge and the results of her investigation to date. Plaintiff reserves the right to amend or supplement these responses in the future in accordance with Fed. R. Civ. P. 26(e)(1) as may be necessary or appropriate.

### OBJECTIONS TO "INSTRUCTIONS" AND "DEFINITIONS"

Plaintiff objects to Defendants' "Instructions" and "Definitions" to the extent that they seek to impose obligations that go beyond the provisions and requirements of the Federal Rules of Civil Procedure and the Local Civil Rules.



DEFENDANT'S
EXHIBIT
12-8-11
NO. 1

1

# GENERAL OBJECTIONS

Plaintiff objects to Defendants' document requests on the following general grounds. All applicable general objections are also included among Plaintiff's specific objections to each of Defendants' document requests.

1.      Plaintiff objects to each document request to the extent that it seeks information or documents that are irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible evidence in this action.

2.      Plaintiff objects to each document request to the extent that it is overly broad, oppressive and/or unduly burdensome.

3.      Plaintiff objects to each document request to the extent that it seeks the disclosure of confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an appropriate order of this Court protecting the confidentiality of such information or documents is in place.

4.      Plaintiff objects to each document request to the extent that it seeks the disclosure of confidential information that concerns individuals other than Plaintiff who are not parties to this action, the disclosure of which would violate the privacy interests of such individuals.

5.      Plaintiff objects to each document request to the extent that it is vague, ambiguous and/or lacks sufficient particularity so that Plaintiff cannot understand what information and/or documents Defendants are seeking and is unable to formulate a responsive answer.

6.      Plaintiff objects to each document request to the extent that it seeks information or documents that are protected from disclosure under the attorney-client privilege, the work-product doctrine, and/or any other applicable privilege, protection, statute, rule, regulation or common law principle. Inadvertent identification or production of any such information or

2

document shall not constitute a waiver of any privilege with respect to the subject matter thereof or the information contained therein, and shall not waive the right of Plaintiff to object to the use of any such document or the information contained therein during any subsequent proceeding.

7.   Plaintiff objects to each document request to the extent that it is not reasonably limited in time or seeks information or documents outside the time period relevant to the present litigation.

8.   Plaintiff objects to each document request to the extent that it seeks to impose obligations beyond those required by the Federal Rules of Civil Procedure and/or the Local Civil Rules.

9.   Plaintiff objects to each document request to the extent that it seeks the disclosure of information already known or available to Defendants or documents in Defendants' possession that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense.

10.   Plaintiff objects to each document request to the extent that it is duplicative or cumulative of other requests.

## OBJECTIONS AND RESPONSES TO SPECIFIC DOCUMENT REQUESTS

**REQUEST NO. 1:**
All documents received or taken by you from Starbucks, including, without limitation, job offers, promotions, demotions, agreements, letters, handbooks, benefit descriptions, job descriptions, job duties, performance evaluations, corrective actions, policies or procedures, training materials, bank deposit receipts, bank deposit logs, pay records, work schedules, memoranda, emails, or notes.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly burdensome; that the request is vague and/or ambiguous; that it seeks the disclosure of information already known or available to Defendants or documents in Defendants' possession

3

that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden

and expense; that the request is not reasonably limited in time or seeks information or documents

outside the time period relevant to the present litigation.  Subject to and without waiving the

foregoing objections, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 2:**
All documents concerning your employment at Starbucks, including, without limitation, personal
or employment-related letters, notes, emails, journals, diaries, calendars, chronologies,
appointment books, audio or video recordings, and/or other logs or memoranda of dates or
records of events.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks the disclosure of

information already known or available to Defendants or documents in Defendants' possession

that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden

and expense; that the request is not reasonably limited in time or seeks information or documents

outside the time period relevant to the present litigation.  Subject to and without waiving the

foregoing objections, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 3:**
All documents concerning your employment at Starbucks in any social media, including without
limitation, any text messages, e-mails, status updates, entries, posts, comments or references on
Facebook, Twitter, or any other public or private internet site, chat board, blog, or messaging
media.

**RESPONSE:**

Plaintiff objects on the grounds that it seeks information or documents that are irrelevant,

immaterial, and/or not reasonably calculated to lead to the discovery of admissible evidence in

this action; that the request is over broad, oppressive and unduly burdensome; that the request is

4

vague and/or ambiguous; that it seeks the disclosure of information already known or available

to Defendants or documents in Defendants' possession that are more readily obtained by

Defendants without subjecting Plaintiff to unreasonable burden and expense; that the request is

not reasonably limited in time or seeks information or documents outside the time period

relevant to the present litigation.  Subject to and without waiving the foregoing objections,

Plaintiff states that responsive documents will be produced.

**REQUEST NO. 4:**
All documents concerning your job performance during the time period you were employed by
Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that it seeks the disclosure of information already known or available to Defendants

or documents in Defendants' possession that are more readily obtained by Defendants without

subjecting Plaintiff to unreasonable burden and expense; that the request is not reasonably

limited in time or seeks information or documents outside the time period relevant to the present

litigation.  Subject to and without waiving the foregoing objections, Plaintiff states that

responsive documents will be produced.

**REQUEST NO. 5:**
All communications between you and Defendants.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome; that

the request is vague and/or ambiguous; that it seeks the disclosure of information already known

5

or available to Defendants or documents in Defendants' possession that are more readily

obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense; that the

request is not reasonably limited in time or seeks information or documents outside the time

period relevant to the present litigation; that it is duplicative or cumulative of other requests.

Subject to and without waiving the foregoing objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO. 6:**
All communications or documents concerning communications between you and any other
person or entity with respect to the allegations of the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome; that

the request is vague and/or ambiguous; that it seeks the disclosure of information already known

or available to Defendants or documents in Defendants' possession that are more readily

obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense; that the

request is not reasonably limited in time or seeks information or documents outside the time

period relevant to the present litigation; that it is duplicative or cumulative of other requests.

Subject to and without waiving the foregoing objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO. 7:**
All documents concerning any communications between you and any Starbucks helpline or hotline.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks the disclosure of information already

known or available to Defendants or documents in Defendants' possession that are more readily

obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense; that the

request is not reasonably limited in time or seeks information or documents outside the time

period relevant to the present litigation; that it is duplicative or cumulative of other requests.

Subject to and without waiving the foregoing objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO.8:**
All documents concerning any complaints made by you to Defendants.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks the disclosure of

information already known or available to Defendants or documents in Defendants' possession

that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden

and expense; that the request is not reasonably limited in time or seeks information or documents

outside the time period relevant to the present litigation; that it is duplicative or cumulative of

other requests.  Subject to and without waiving the foregoing objections, Plaintiff states that

responsive documents will be produced.

7

**REQUEST NO. 9:**
All documents concerning any claim, complaint, helpline call, grievance, charge, petition, or protest by you to Defendants regarding any allegedly unlawful conduct by Defendants.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly burdensome; that the request is vague and/or ambiguous; that it seeks the disclosure of information already known or available to Defendants or documents in Defendants' possession that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense; that the request is not reasonably limited in time or seeks information or documents outside the time period relevant to the present litigation; that it is duplicative or cumulative of other requests.  Subject to and without waiving the foregoing objections, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 10:**
All documents concerning any claim, complaint, hotline call, grievance, charge, petition, or protest by you to any employer other than Starbucks regarding any allegedly unlawful conduct by such employer.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly burdensome; that the request is vague and/or ambiguous; that the request is not reasonably limited in time or seeks information or documents outside the time period relevant to the present litigation.  Subject to and without waiving the foregoing objections, Plaintiff states that she is not in possession of any documents responsive to this request.

8

**REQUEST NO. 11:**
All communications between you and any governmental agency (including, without limitation, the New York State Division of Human Rights, the New York City Commission on Human Rights ("NYCCHR"), the Office of the Corporation Counsel of the City of New York ("OCC"), or the Equal Employment Opportunity Commission), concerning the allegations in the Complaint, including but not limited to the allegation that you served a copy of the Complaint on the NYCCHR and OCC before filing the Complaint, as alleged in paragraph 9 of the Complaint.

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Plaintiff states that responsive

documents will be produced..

**REQUEST NO. 12:**
All documents concerning any lawsuits, complaints, charges, administrative actions, or other legal proceedings to which you have been a party at any time.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome; that

the request is vague and/or ambiguous; that the request is not reasonably limited in time or seeks

information or documents outside the time period relevant to the present litigation; that it seeks

the disclosure of confidential personal, medical and/or business information or documents

concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an

appropriate order of this Court protecting the confidentiality of such information or documents is

in place; that it seeks information or documents that are protected from disclosure under the

attorney-client privilege, the work-product doctrine, and/or any other applicable privilege,

protection, statute, rule, regulation or common law principle. Subject to and without waiving the

foregoing objections, Plaintiff states that she has not been a party to any other employment-

related litigation or any litigation involving allegations of unlawful discrimination or retaliation.

**REQUEST NO. 13:**
All documents concerning your convictions for any crimes.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome; that

the request is vague and/or ambiguous; that the request is not reasonably limited in time or seeks

information or documents outside the time period relevant to the present litigation; that it seeks

the disclosure of confidential personal, medical and/or business information or documents

concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff unless an

appropriate order of this Court protecting the confidentiality of such information or documents is

in place; that it seeks information or documents that are protected from disclosure under the

attorney-client privilege, the work-product doctrine, and/or any other applicable privilege,

protection, statute, rule, regulation or common law principle.  Subject to and without waiving the

foregoing objections, Plaintiff states that she has not been convicted of any crime within the last

5 years.

**REQUEST NO. 14:**
All declarations, statements, or affidavits you have obtained concerning the allegations in the
Complaint, including, but not limited to, all notes or summaries of any communication with a
person who has knowledge of facts alleged in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks information or documents

that are protected from disclosure under the attorney-client privilege, the work-product doctrine,

and/or any other applicable privilege, protection, statute, rule, regulation or common law

principle.  Subject to and without waiving the foregoing objections, Plaintiff states she in not in

possession of any non-privileged documents responsive to this request.

**REQUEST NO. 15:**
All documents concerning any and all damages you claimed to have suffered as a result of the
conduct alleged in the complaint, including but not limited to depression, humiliation,
embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain
and suffering.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks information or documents

that are protected from disclosure under the attorney-client privilege, the work-product doctrine,

and/or any other applicable privilege, protection, statute, rule, regulation or common law

principle; that Plaintiff has not made any determination as to the documents that will be used to

establish damages.  Subject to and without waiving the foregoing objections, Plaintiff states that

she has not received any mental health treatment to date as a result of the conduct alleged in the

Complaint.

**REQUEST NO. 16:**
All documents concerning any medical, psychiatric, or psychological treatment you received
from any physician, psychiatrist, psychologist, therapist, counselor or other health care provider
as a result of the conduct alleged in the Complaint, including, without limitation, all medical
records, bills and invoices.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks information or documents

that are protected from disclosure under the attorney-client privilege, the work-product doctrine,

and/or any other applicable privilege, protection, statute, rule, regulation or common law

11

principle.  Subject to and without waiving the foregoing objections, Plaintiff states that she has

not received any mental health treatment to date as a result of the conduct alleged in the

Complaint.

**REQUEST NO. 17:**
All documents concerning any medication prescribed or taken by you as a result of the conduct
alleged in the Complaint, including without limitation, prescriptions, receipts and pharmacy
records.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks information or documents

that are protected from disclosure under the attorney-client privilege, the work-product doctrine,

and/or any other applicable privilege, protection, statute, rule, regulation or common law

principle.  Subject to and without waiving the foregoing objections, Plaintiff states that she has

not been prescribed any medication to date as a result of the conduct alleged in the Complaint.

**REQUEST NO. 18:**
All communications between you and any insurance company concerning the damages and/or
injuries you allegedly sustained as a result of the conduct alleged in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that the request is vague and/or ambiguous; that it seeks information or documents

that are protected from disclosure under the attorney-client privilege, the work-product doctrine,

and/or any other applicable privilege, protection, statute, rule, regulation or common law

principle.  Subject to and without waiving the foregoing objections, Plaintiff states that she is not

in possession of any documents responsive to this request.

**REQUEST NO. 19:**
All documents supporting your claim for punitive damages as referenced in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that Plaintiff has not

yet made any determination as to which documents will be used to support her claim for punitive

damages.  Subject to and without waiving the foregoing objections, Plaintiff states that all

documents produced are arguably responsive to this request.

**REQUEST NO. 20:**
All documents supporting your claim for liquidated damages as referenced in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that Plaintiff has not

yet made any determination as to which documents will be used to support her claim for

liquidated damages.  Subject to and without waiving the foregoing objections, Plaintiff states that

all documents produced are arguably responsive to this request.

**REQUEST NO. 21:**
All documents concerning your contention that you have suffered monetary damages, including
lost wages, salary, employment benefits or other compensation as a result of the conduct alleged
in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that Plaintiff has not

yet made any determination as to which documents will be used to support her claim for

monetary damages.  Subject to and without waiving the foregoing objections, Plaintiff states that

all documents produced are arguably responsive to this request, in addition see the response to

Request Nos. 27 through 30.

13

**REQUEST NO. 22:**
All documents concerning your attempts, if any, to mitigate the damages you allegedly suffered as a consequence of the conduct alleged in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous. Subject to and without waiving the foregoing objection, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 23:**
All resumes, curricula vitae, job applications, or other documents that you have prepared before, during, or after your employment with Starbucks, including drafts, in which you describe or reference your employment with Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible evidence in this action; that the request is over broad, oppressive and unduly burdensome; that the request is vague and/or ambiguous; that it seeks the disclosure of information already known or available to Defendants or documents in Defendants' possession that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense; that the request is not reasonably limited in time or seeks information or documents outside the time period relevant to the present litigation; that it is duplicative or cumulative of other requests. Subject to and without waiving the foregoing objections, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 24:**
All documents concerning your attempts to obtain employment with any person or entity other
than Starbucks, including any employer and employment or temporary agency, since the
termination of your employment from Starbucks, including, without limitation, any and all cover
letters, offer letters, rejection letters, resumes, job applications or job listings utilized by you.

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO. 25:**
All documents concerning your hiring by, employment with, or termination or resignation from
work or employment with any person or entity, including any employer and employment or
temporary agency, since the termination of your employment from Starbucks.

**RESPONSE:**

Subject to and without waiving the foregoing general objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO. 26:**
All documents concerning any employment, self-employment or business endeavors in which
you have been engaged since the termination of your employment from Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiff states that responsive

documents will be produced.

**REQUEST NO. 27:**
All documents concerning your income from all sources other than employment, self-employment, and business endeavors since the termination of your employment from Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible evidence in this action; that the request is over broad, oppressive and unduly burdensome; that it seeks the disclosure of confidential personal, medical and/or business information or documents concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff. Subject to and without waiving the foregoing objections, Plaintiff states that responsive documents will be produced and Plaintiff's 2011 Form W-2s and/or 1099s will be produced when available.

**REQUEST NO. 28:**
All documents concerning any claims for unemployment insurance benefits, workers' compensation benefits, and/or disability benefits made by you, or on your behalf, since the termination of your employment from Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible evidence in this action; that the request is over broad, oppressive and unduly burdensome. Subject to and without waiving the foregoing objections, Plaintiff states that documents related to Plaintiff's unemployment benefits are attached hereto and that Plaintiff is not otherwise in possession of any documents responsive to this request.

16

**REQUEST NO. 29:**
All documents concerning the compensation you received during your employment with Starbucks, including, without limitation, pay stubs, pay checks, and W-2 forms.

**RESPONSE:**

Plaintiff objects on the grounds that the request is over broad, oppressive and unduly

burdensome; that it seeks the disclosure of information already known or available to Defendants

or documents in Defendants' possession that are more readily obtained by Defendants without

subjecting Plaintiff to unreasonable burden and expense; that the request is not reasonably

limited in time or seeks information or documents outside the time period relevant to the present

litigation; that it is duplicative or cumulative of other requests.  Subject to and without waiving

the foregoing objections, Plaintiff states that responsive documents will be produced.

**REQUEST NO. 30:**
All documents concerning any income and/or benefits you received from all sources since the termination of your employment from Starbucks, including, but not limited to pay stubs, pay checks and W-2 forms.

**RESPONSE:**

See response to Request No. 27.

**REQUEST NO. 31:**
All documents concerning Defendants' policies, practices or procedures concerning discrimination, retaliation, or the Family and Medical Leave Act ("FMLA").

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks the disclosure of information already

known or available to Defendants or documents in Defendants' possession that are more readily

obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense.

Subject to and without waiving the foregoing objection, Plaintiff states that responsive

documents will be produced.

17

**REQUEST NO. 32:**
All documents concerning your FMLA leave while employed at Starbucks.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents that are

irrelevant, immaterial, and/or not reasonably calculated to lead to the discovery of admissible

evidence in this action; that the request is over broad, oppressive and unduly burdensome; that

the request is vague and/or ambiguous; that the request is not reasonably limited in time or seeks

information or documents outside the time period relevant to the present litigation; that it seeks

the disclosure of confidential personal, medical and/or business information or documents

concerning Plaintiff, the disclosure of which would violate the privacy of Plaintiff; that it seeks

the disclosure of information already known or available to Defendants or documents in

Defendants' possession that are more readily obtained by Defendants without subjecting Plaintiff

to unreasonable burden and expense.  Subject to and without waiving the foregoing objections,

Plaintiff states that responsive documents will be produced.

**REQUEST NO. 33:**
All documents that support the contentions in paragraph 24 of the Complaint regarding your
alleged medical condition.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents regarding a legal

conclusion; that it seeks the disclosure of information already known or available to Defendants

or documents in Defendants' possession that are more readily obtained by Defendants without

subjecting Plaintiff to unreasonable burden and expense.  Subject to and without waiving the

foregoing objections, Plaintiff states that responsive documents in Plaintiff's possession will be

produced.

**REQUEST NO. 34:**
All documents that support the contentions in paragraph 25 of the Complaint regarding your alleged medical condition.

**RESPONSE:**

Plaintiff objects on the grounds that the request seeks information or documents regarding a legal conclusion; that it seeks the disclosure of information already known or available to Defendants or documents in Defendants' possession that are more readily obtained by Defendants without subjecting Plaintiff to unreasonable burden and expense. Subject to and without waiving the foregoing objections, Plaintiff states that responsive documents in Plaintiff's possession will be produced.

**REQUEST NO. 35:**
All documents concerning your claims that Defendants discriminated against you on the basis of an alleged disability, as alleged in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that the request is over broad, oppressive and unduly burdensome. Subject to and without waiving the foregoing objections, Plaintiff states that all documents produced are arguably responsive to this request.

**REQUEST NO. 36:**
All documents concerning your claim that you engaged in a protected activity, as alleged in paragraphs 62 and 67 of the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that the request is over broad, oppressive and unduly burdensome. Subject to and without waiving the foregoing objections, Plaintiff states that responsive documents in Plaintiff's possession will be produced.

19

**REQUEST NO. 37:**
All documents concerning your claims that Defendants retaliated against you for requesting and taking an accommodation for your alleged disability, as alleged in the Complaint.

**RESPONSE:**

Plaintiff objects on the grounds that the request is vague and/or ambiguous; that the request is

over broad, oppressive and unduly burdensome.  Subject to and without waiving the foregoing

objections, Plaintiff states that all documents produced are arguably responsive to this request.

**REQUEST NO. 38:**
All documents identified in your initial disclosures.

**RESPONSE:**

Subject to and without waiving the foregoing objections, Plaintiff states that all documents

produced are arguably responsive to this request.

Dated: August 1, 2011
　　　　New York, New York

THOMPSON WIGDOR LLP

By: _____
　　　　Kenneth P. Thompson
　　　　David E. Gottlieb

85 Fifth Avenue, 5th Floor
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845

*Counsel for Plaintiff*



**APPLICATION FOR EMPLOYMENT**

*Starbucks Coffee Company is an equal opportunity employer, dedicated to a policy of non-discrimination in employment on any basis including race, color, age, sex, religion, national origin, the presence of mental, physical, or sensory disability, sexual orientation, or any other basis prohibited by federal, state, or provincial law.*

**Please complete entire application to ensure processing.**

## PERSONAL INFORMATION   (Please print)

Name   Last **Marshall**   First **Serenity**   Middle **Fekisha**
Social Security/Social Insurance Number **[Redacted] 4674**   Date (M/D/Y) **06-20-02**

Other names you are known by _____   Are you less than 18 years of age? Yes ___ No **X** (Starbucks is required to comply with federal, state, or provincial law.)

U.S. Applicant Only:
Are you legally eligible for employment in the U.S.? Yes **✓** No ___
(proof of U.S. citizenship or immigration status will be required if hired for a position in the U.S.)

Have you been convicted of a felony in the last seven (7) years? Yes ___ No **✓**
If Yes, list convictions that are a matter of public record (arrests are not convictions). A conviction will not necessarily disqualify you for employment.

Present Address   Street **500 E. Houston St. #G**   City **New York**   State/Province **N.Y.**   Zip Code/Postal Code **10002**

Permanent Address   Street   City   State/Province   Zip Code/Postal Code

Phone Number   Daytime **(212)475-2558**   Evening **(866)215-4361**   Referred By **Christopher Farmer**

## EMPLOYMENT DESIRED   (If you are applying for a retail hourly position, please keep in mind that the availability of hours may vary.)

Position **Cashier**   Location/Department **52nd/8th**   Salary Desired **7.75/hr.**   Date You Can Start **06-24**

Specify hours available for each day of the week

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
|        | X      |         | X         |          |        |          |

Are you able to work overtime? **Yes.**

Have you ever worked for Starbucks Coffee Company? **No.**   If yes, when? _____   Which store/department? _____

## EDUCATION

| | Name and Address of School | Circle Last Years Completed | Did You Graduate? | Subjects Studied and Degrees Received |
|---|---|---|---|---|
| High School | DeWitt Clinton H.S. Bronx, NY | 1 2 3 (4) | (Y) N | Regents diploma |
| College | City College New York, NY | 1 2 (3) 4 | Y N | Still attending |
| Post College | | 1 2 3 4 | Y N | |
| Trade, Business, or Correspondence School | | 1 2 3 4 | Y N | |

List skills relevant to the position applied for _____

**SKILLS**   *For Office/Administrative positions only*   Typing WPM: _____   10-Key: ☐ Yes ☐ No

Computer Proficiency:   ☐ Word for Windows   ☐ Excel   ☐ Others: _____

DEFENDANT'S EXHIBIT 7F
12-8-11
NO. 2

Have you ever visited a Starbucks Coffee location?  Where?  Describe your experience **I've visited various Starbucks Coffee locations. My experiences have always been exceptional, from the atmosphere to the customer service.**

What do you like about coffee? **The taste, the variety, the smell. Coffee is an essential part of my day.**

Why would you like to work for Starbucks Coffee Company? **It is consistently named one of the best companies to work for and my own personal experiences with the people employed by Starbucks.**

Describe a specific situation where you have provided excellent customer service in your most recent position. Why was this effective? **I helped a pregnant woman to her car w/her bags. She was pleased and continued to shop with us because of my helpfulness.**

SKU# 146896

STAR_MARSHALL0000092

## FORMER EMPLOYERS

List below current and last three employers, starting with most recent one first.  Please include any non-paid/volunteer experience which is related to the job for which you are applying. Please complete even if you attach a resume.

Date (M/D/Y)

**1.**
| From 8-99 | Current Employer (Name and Address of Employer – Type of Business) Pathmark Stores Inc. 227 Cherry St | Salary or Hourly Starting 5.15/hr Ending 7.25/hr If hourly, average # of hours per week 32 | Position Cashier/ Stock | Reason For Leaving Still working. |
| To | | | | |

Duties Performed
Cashier, stock, customer service, money orders.

Supervisor's Name Ana Echerria    Phone Number (212) 227-8999    May We Contact? Yes.

**2.**
| From 5/97 | Previous Employer (Name and Address of Employer – Type of Business) White Castle Stores Inc. Bronx, NY | Salary or Hourly Starting 5.15/hr Ending 5.50/hr If hourly, average # of hours per week | Position operator (cashier) | Reason For Leaving Moved away. |
| To 8/99 | | | | |

Duties Performed
Cashier, stock.

Supervisor's Name Christine Demornin    Phone Number (718) 681-9146    May We Contact? Yes.

**3.**
| From | Previous Employer (Name and Address of Employer – Type of Business) | Salary or Hourly Starting Ending If hourly, average # of hours per week | Position | Reason For Leaving |
| To | | | | |

Duties Performed

Supervisor's Name    Phone Number    May We Contact?

**4.**
| From | Previous Employer (Name and Address of Employer – Type of Business) | Salary or Hourly Starting Ending If hourly, average # of hours per week | Position | Reason For Leaving |
| To | | | | |

Duties Performed

Supervisor's Name    Phone Number    May We Contact?

## REFERENCES

Give below the names of three professional references, whom you have known at least one year.

| | Name | Address & Phone Number | Business | Years Acquainted How Do You Know This Person? |
|---|---|---|---|---|
| 1 | Onica Cyrus | Brooklyn, NY (718) 282-8995 | Clerk | 3/co-worker |
| 2 | Christopher Farmer | Brooklyn, NY (718) 389-9399 | cashier | 3/former co-worker |
| 3 | Connie Mendez | New York, NY (212) 387-0260 | cashier | 3/former worker |

I hereby authorize Starbucks to thoroughly investigate my background, references, employment record and other matters related to my suitability for employment. I authorize persons, schools, my current employer (if applicable), and previous employers and organizations contacted by Starbucks to provide any relevant information regarding my current and/or previous employment and I release all persons, schools, employers of any and all claims for providing such information. I understand that misrepresentation or omission of facts may result in rejection of this application, or if hired, discipline up to and including dismissal. I understand that I may be required to sign a confidentiality and/or non-compete agreement, should I become an employee of Starbucks Coffee Company. I understand that nothing contained in this application, or conveyed during any interview which may be granted, is intended to create an employment contract. I understand that filling out this form does not indicate there is a position open and does not obligate Starbucks to hire me. (U.S. APPLICANTS ONLY: I understand and agree that my employment is at will, which means that it is for no specified period and may be terminated by me or Starbucks at any time without prior notice for any reason. MARYLAND APPLICANTS ONLY: Under Maryland law, an employer may not require or demand, as a condition of employment, prospective employment, or continued employment, that an individual submit to or take, a lie detector or similar test. An employer who violates this law is guilty of misdemeanor and subject to a fine not exceeding $100. MASSACHUSETTS APPLICANTS ONLY: It is unlawful in Massachusetts to require or administer a lie detector test as a condition of employment or continued employment. An employer who violates this law shall be subject to criminal penalties and civil liability.)

Date 06-20-02    Signature Serenity Marshall

For Retail positions please submit this application at your nearest store location. Otherwise, for non-retail openings, please send to:

**STARBUCKS COFFEE COMPANY**
P.O. BOX 84327
Seattle, Washington 98124-5627

**WE ARE AN EQUAL OPPORTUNITY EMPLOYER
COMMITTED TO HIRING A DIVERSE WORKFORCE.**

♻ PRINTED ON RECYCLED PAPER

# Partner Information

tear here

### Acknowledgment of Receipt of Partner Information

I acknowledge that I have received a copy of the New Hire Booklet. I understand that I am responsible for reading the Starbucks Partner Information section.

I also understand that statements contained in this section do not constitute a contract and that my employment with Starbucks is not for a fixed term and can be terminated at any time by either the company or me, with or without notice.

I also understand that company policies, practices, procedures or the Partner Information section may be changed by the company with or without notice and that this Partner Information section supersedes any and all prior Employee or Partner Guides issued by Starbucks.

Partner Name (Print): _Serenity Marshall_ Partner Number: _____

Partner Signature: _Serenity Marshall_

Date: _June 27th, 2002_

Manager Name (Print): _____

Manager Signature: _____

Location Name/Number: _52nd / 8th Ave_

Return to Partners Store/Department File



**Sign and return to partner's store/department file**

69

STAR_MARSHALL0000170

STAR_MARSHALL0000514

CONFIDENTIAL

# STARBUCKS COFFEE COMPANY
## PARTNER GUIDE

U.S. Store Version

*A Guide to Your Partner Experience*



DEFENDANT'S
EXHIBIT
12-8-11
NO. 4

PENGAD 800-631-6989

## Serving Customers with Disabilities

Starbucks goal is to provide the *Starbucks Experience* to as many people as possible. Many of our customers are persons with disabilities. To ensure that they will be able to enjoy the full *Starbucks Experience*, each partner should do the following:

*Store access:* Each store should have the appropriate number of wheelchair accessible tables inside and outside the store. Wheelchair accessible tables should be clear for customer use and not used for other purposes, such as merchandise display. The appropriate amount of clearance around the tables must also be maintained. Partners should make sure that the store pathways are clear for travel by wheelchair users and other customers with mobility impairments. Do not place chairs, trash cans, boxes, etc. on ramps, in hallways or in front of bathrooms or exits.

*Drink service:* A drink served to a customer using a wheelchair should easily be reached by the customers. Therefore, the partner should deliver the drink to the customer at the register counter or directly to his or her table. A partner should also offer to assist wheelchair users with their condiments if the condiment bar is difficult to reach.

*Service animals:* Service animals that assist persons with disabilities are allowed in Starbucks stores. Service animals include seeing-eye dogs or other animals trained to alert persons with hearing impairments. A partner should politely ask a customer with an animal to leave the animal outside the store, unless the customer informs the partner that the animal is a service animal. In that situation, no further questions may be asked of the customer, even if the animal does not have a harness or otherwise appears to be a service animal. The partner must not ask for proof that the customer is disabled or that the animal is trained. Nonetheless, the customer will be responsible for the service animal's care and supervision while in Starbucks. A service animal may be excluded from the store only if its behavior poses a direct threat to the health or safety of others.

## Corrective Action

Corrective action communicates to the partner that performance problems exist or that the partner is engaging in unacceptable behavior. The intent of corrective action is to give the partner a reasonable opportunity to re-establish an acceptable level of performance or behavior.

Corrective action may take the form of a verbal warning, a written warning, demotion, suspension or termination from employment. The form of corrective action taken will depend on the seriousness of the situation and the surrounding circumstances. The evaluation of the seriousness of the infraction and the form of the corrective action taken will be within the sole discretion of the manager. There is no guarantee that a partner will receive a minimum number of warnings prior to termination of employment or that corrective action will occur in any set manner or order.

In cases of serious misconduct, immediate termination from employment may be warranted. Examples of serious misconduct include, but are not limited to:

- Violation of safety and/or security rules
- Theft or misuse of company property or assets
- Falsification or misrepresentation of any company document
- Violation of Starbucks drug and alcohol policy
- Possession of or use of firearms or other weapons on company property
- Harassment or abusive behavior toward partners, customers or vendors
- Violence or threatened violence
- Insubordination (refusal or repeated failure to follow directions)
- Violation of any other company policy

**Section 6**

FEBRUARY 2007

CONFIDENTIAL

STAR_MARSHALL0000537

STORE NUMBER 11649



DEFENDANT'S
EXHIBIT
12-8-11
NO. 5

CONFIDENTIAL

# OUR STARBUCKS MISSION

To inspire and nurture the human spirit—
one person, one cup, and one neighborhood at a time.

Here are the principles of how we live that every day:

### Our Coffee
It has always been, and will always be, about quality.
We're passionate about ethically sourcing the finest coffee beans,
roasting them with great care,
and improving the lives of people who grow them.
We care deeply about all of this; our work is never done.

### Our Partners
We're called partners, because it's not just a job, it's our passion.
Together, we embrace diversity to create a place where each of us can be ourselves.
We always treat each other with respect and dignity.
And we hold each other to that standard.

### Our Customers
When we are fully engaged,
we connect with, laugh with, and uplift the lives of our customers—
even if just for a few moments.
Sure, it starts with the promise of a perfectly made beverage, but our work goes far beyond that.
It's really about human connection.

### Our Stores
When our customers feel this sense of belonging,
our stores become a haven, a break from the worries outside, a place where you can meet with friends.
It's about enjoyment at the speed of life—sometimes slow and savored, sometimes faster.
Always full of humanity.

### Our Neighborhood
Every store is part of a community, and we take our responsibility to be good neighbors seriously.
We want to be invited in wherever we do business. We can be a force for positive action—
bringing together our partners, customers, and the community to contribute every day.
Now we see that our responsibility—and our potential for good—is even larger.
The world is looking to Starbucks to set the new standard, yet again. We will lead.

### Our Shareholders
We know that as we deliver in each of these areas, we enjoy the kind
of success that rewards our shareholders. We are fully accountable to get each of these
elements right so that Starbucks—and everyone it touches—can endure and thrive.

### Onward.



© 2008 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

# HELPLINE AND EMAIL REFERENCE GUIDE

| STORE OPERATIONS | | |
|---|---|---|
| Accounts Payable | APCustomerCare@starbucks.com (888) 796-5282 ext. 20631-84307 | Questions regarding invoices and payment status |
| Enterprise Help Desk (EHD) | (888) 796-5282 ext. 1 | All POS/MWS computer system related issues, IT hardware, software, network, telephone |
| Entertainment Support Desk (ESD) | (888) 796-5282 ext. 1 | For 32" LCD screen, Black Box, "Now Playing" equipment screens |
| Facility Contact Center (FCC) | (877) 728-9349 | Brewing, grinding, Alarm System, Safe, Drive Thru headsets, and building facility issues (i.e. roof leaks, parking lot, landscaping) |
| Inventory | retinv@starbucks.net (888) 796-5282 ext. 20631-88441 | Questions regarding cycle counts, coffee counts, full inventories and P&L inventory adjustments |
| Licenses and Permits | (888) 796-5282 ext. 20631-88705 | Questions regarding licenses or permits |
| Play Network Customer Service | (888) 567-PLAY | Order CDs if necessary for overhead play |
| Promo/Operations Hotline | (888) 796-5282 ext. 50000-51184 option 3 | Requests for promotional materials (Workbook, Siren's Eye, training materials, job aids), Daily Records Books and Duty Roster Notebooks. Questions regarding Siren's Eye, operational issues, products, beverages, or Hear Music. |
| Purolator Shipping Labels | (800) 326-4963 ext. 4240 (CN) | Order preprinted shipping labels for mailpack to the SSC (CN) |
| Retail Accounting | RetAcct@starbucks.net | Questions regarding P&L |
| Sales Audit | SalesAudit@starbucks.net | Questions regarding banking issues and overs/shorts |
| Sales Reporting Hotline | (888) 796-5282 Ext. 20631-87400 | For questions from a landlord or mall office representative requesting store sales information |
| Signage | Preferred: signage@starbucks.com Back up: (888) 796-5282 ext. 20631-84782 | Requests for promotional signage, Drive thru and interior menu inserts, pastry signage, non-SKU'd core signage and POS transaction policy stickers |
| Starbucks North America Voicemail (SNA VM) | (888) 729-5656 | Field and support partner access |
| EMERGENCIES AND SECURITY | | |
| Emergency Communications | (800) 923-BEAN [2326] ext. 2 | Message board used for unexpected emergencies and information |
| Global Security Operations Center - GSOC | (888) 796-5282 ext. 85400 | Report non-emergency and emergency security incidents |
| Risk Management/Quality Assurance | (888) 796-5282 ext. 3 | Report damage to store property, work-related injuries, and customer incidents |
| Product Quality Hotline | (888) 796-5282 ext. 3, option 3 | Report specific product quality issues |
| PAYROLL AND PARTNER RESOURCES | | |
| Canadian Benefits Centre | (866) 821-7913 | To enroll or review your Benefit selections and RRSP contribution |
| Employee Assistance Program | (800) 327-5564 (U.S.) (800) 268-5211 (CN) | For assistance with personal issues and services to help balance work and life |
| Partner Contact Center (PCC) | (866) 504-7368 | Questions regarding pay- related issues, reporting partner injuries, benefit inquiries and direct deposit assistance Canada only - contact for personal information and direct deposit changes |
| US Benefits Center | (877) SBUX-BEN [7289-236] | To enroll, review elections, and make changes to Benefits |
| Partner Self Service/My Partner Info | Store Portal | View/update personal information including direct deposit, sick/vacation time, address, emergency contact, W-4 |
| CORPORATE COMPLIANCE | | |
| Business Conduct Helpline | (800) 611-7792 (866) 614-0760 – French-speaking partners | One of several ways that partners may ask questions or report concerns regarding Business Code of Conduct |

*The following is the only information that may be provided to customers.*

| CUSTOMER SERVICE | | |
|---|---|---|
| Customer Relations | (800) 23-LATTE [52883] | Store locations, donation requests, customer comments and questions, and equipment returns |
| Investor Relations | (888) 796-5282 20631-87118 | Starbucks stock information. |
| Media Relations | (206) 318-7100 | Starbucks media inquiries |
| Starbucks Internet website | Starbucks.com | Company information, Starbucks Card, nutritional information, job postings, etc. |
| Starbucks Card | (800) 782-7282 | Questions regarding Starbucks Card |

# DAILY RECORDS BOOK

**Use of the Daily Records Book (DRB)**
This monthly book is used to record daily store information and is divided into weekly tabs for quick reference.

**Retention and Destruction**
For security and legal compliance, the Daily Records Book must remain in store for six months and then be returned for long-term storage and destruction. Every six months you will receive communication requiring all DRBs older than six months to be boxed up and returned using an online return or pre-addressed mailing label. This ensures retention of legally required payroll documents that are included in the DRB.

**Calendar**
The Daily Records Book contains the Fiscal Year Calendar to use for planning and recording store events.

**Checklists and Logs**

- **Paid Out Log** is a monthly log located behind the Paid Out tab and is designed to ensure all paid outs are recorded and approved. This log should be reconciled weekly by the store manager.

- **Emergency Wage Advance Log** is a monthly log designed to record all emergency wage paid outs.

- **Store Repair and Maintenance Tracking Log** is a monthly log located in the front of the DRB and is designed to track calls made to the Enterprise Help Desk, Facility and Service Desk and the Facility Contact Center.

- **Punch Communication Log, Borrowed Partner Log,** and **Paid Time Off Log** are located at the end of the book under the Time and Attendance tab. Use these logs to record key time and attendance information using the policies and procedures on the Time and Attendance tab.

**Weekly Tabs**
The following information is included in each Weekly Tab section:

- **Store Partner Pages:** a flexible tool to capture store information in one easy-to-reference place.

  - *Store Communication* ~ communicate voicemail, email and barista need-to-know information for all store partners.

  - *Partner Till Drop Log* ~ all partners with assigned tills must complete this section using the policies and procedures behind each Weekly tab.

  - *Safe Count, Change Bank Reconciliation, Deposit, and Partner Till Audit* ~ for details refer to the policies and procedures behind each Weekly tab.

  - *Partner Tip Drop Log* ~ use this log to track all tip bags dropped into the safe on a daily basis.

  - *Partner Tip Drop Removal* ~ use this space to track tip bags being removed from the store safe on a weekly basis.

**Miscellaneous**

- **Sales Audit Envelope** ~ for credit card slips, refunds, voids and gift certificates.

- **P-Card/Paid Out Envelope** ~ for all P-Card, Paid In and Paid Out receipts.

**This book is the property of Starbucks Coffee Company.**
**The materials in this book should not be reproduced and should not be used by anyone**
**other than an authorized Starbucks partner.**
**Keep book secured when not in use.**

CONFIDENTIAL



# FISCAL YEAR 2011

**OCTOBER, PERIOD 1—FY '11**
**10/4/10–10/31/10**

|        | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|--------|-----|-----|-----|-----|-----|-----|-----|
| week 1 | 4   | 5   | 6   | 7   | 8   | 9   | 10  |
| week 2 | 11  | 12  | 13  | 14  | 15  | 16  | 17  |
| week 3 | 18  | 19  | 20  | 21  | 22  | 23  | 24  |
| week 4 | 25  | 26  | 27  | 28  | 29  | 30  | 31  |

**APRIL, PERIOD 7—FY '11**
**4/4/11–5/1/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 27 | 4   | 5   | 6   | 7   | 8   | 9   | 10  |
| week 28 | 11  | 12  | 13  | 14  | 15  | 16  | 17  |
| week 29 | 18  | 19  | 20  | 21  | 22  | 23  | 24  |
| week 30 | 25  | 26  | 27  | 28  | 29  | 30  | 1   |

**NOVEMBER, PERIOD 2—FY '11**
**11/1/10–11/28/10**

|        | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|--------|-----|-----|-----|-----|-----|-----|-----|
| week 5 | 1   | 2   | 3   | 4   | 5   | 6   | 7   |
| week 6 | 8   | 9   | 10  | 11  | 12  | 13  | 14  |
| week 7 | 15  | 16  | 17  | 18  | 19  | 20  | 21  |
| week 8 | 22  | 23  | 24  | 25  | 26  | 27  | 28  |

**MAY, PERIOD 8—FY '11**
**5/2/11–5/29/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 31 | 2   | 3   | 4   | 5   | 6   | 7   | 8   |
| week 32 | 9   | 10  | 11  | 12  | 13  | 14  | 15  |
| week 33 | 16  | 17  | 18  | 19  | 20  | 21  | 22  |
| week 34 | 23  | 24  | 25  | 26  | 27  | 28  | 29  |

**DECEMBER, PERIOD 3—FY '11**
**11/29/10–1/2/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 9  | 29  | 30  | 1   | 2   | 3   | 4   | 5   |
| week 10 | 6   | 7   | 8   | 9   | 10  | 11  | 12  |
| week 11 | 13  | 14  | 15  | 16  | 17  | 18  | 19  |
| week 12 | 20  | 21  | 22  | 23  | 24  | 25  | 26  |
| week 13 | 27  | 28  | 29  | 30  | 31  | 1   | 2   |

**JUNE, PERIOD 9—FY '11**
**5/30/11–7/3/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 35 | 30  | 31  | 1   | 2   | 3   | 4   | 5   |
| week 36 | 6   | 7   | 8   | 9   | 10  | 11  | 12  |
| week 37 | 13  | 14  | 15  | 16  | 17  | 18  | 19  |
| week 38 | 20  | 21  | 22  | 23  | 24  | 25  | 26  |
| week 39 | 27  | 28  | 29  | 30  | 1   | 2   | 3   |

**JANUARY, PERIOD 4—FY '11**
**1/3/11–1/30/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 14 | 3   | 4   | 5   | 6   | 7   | 8   | 9   |
| week 15 | 10  | 11  | 12  | 13  | 14  | 15  | 16  |
| week 16 | 17  | 18  | 19  | 20  | 21  | 22  | 23  |
| week 17 | 24  | 25  | 26  | 27  | 28  | 29  | 30  |

**JULY, PERIOD 10—FY '11**
**7/4/11–7/31/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 40 | 4   | 5   | 6   | 7   | 8   | 9   | 10  |
| week 41 | 11  | 12  | 13  | 14  | 15  | 16  | 17  |
| week 42 | 18  | 19  | 20  | 21  | 22  | 23  | 24  |
| week 43 | 25  | 26  | 27  | 28  | 29  | 30  | 31  |

**FEBRUARY, PERIOD 5—FY '11**
**1/31/11–2/27/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 18 | 31  | 1   | 2   | 3   | 4   | 5   | 6   |
| week 19 | 7   | 8   | 9   | 10  | 11  | 12  | 13  |
| week 20 | 14  | 15  | 16  | 17  | 18  | 19  | 20  |
| week 21 | 21  | 22  | 23  | 24  | 25  | 26  | 27  |

**AUGUST, PERIOD 11—FY '11**
**8/1/11–8/28/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 44 | 1   | 2   | 3   | 4   | 5   | 6   | 7   |
| week 45 | 8   | 9   | 10  | 11  | 12  | 13  | 14  |
| week 46 | 15  | 16  | 17  | 18  | 19  | 20  | 21  |
| week 47 | 22  | 23  | 24  | 25  | 26  | 27  | 28  |

**MARCH, PERIOD 6—FY '11**
**2/28/11–4/3/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 22 | 28  | 1   | 2   | 3   | 4   | 5   | 6   |
| week 23 | 7   | 8   | 9   | 10  | 11  | 12  | 13  |
| week 24 | 14  | 15  | 16  | 17  | 18  | 19  | 20  |
| week 25 | 21  | 22  | 23  | 24  | 25  | 26  | 27  |
| week 26 | 28  | 29  | 30  | 31  | 1   | 2   | 3   |

**SEPTEMBER, PERIOD 12—FY '11**
**8/29/11–10/2/11**

|         | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|---------|-----|-----|-----|-----|-----|-----|-----|
| week 48 | 29  | 30  | 31  | 1   | 2   | 3   | 4   |
| week 49 | 5   | 6   | 7   | 8   | 9   | 10  | 11  |
| week 50 | 12  | 13  | 14  | 15  | 16  | 17  | 18  |
| week 51 | 19  | 20  | 21  | 22  | 23  | 24  | 25  |
| week 52 | 26  | 27  | 28  | 29  | 30  | 1   | 2   |

CONFIDENTIAL

STAR_MARSHALL0000942

## Cash Management Log Policies, Standards & Procedures

The Cash Management Log must be completed each day. Print legibly and complete in pen.
Store operating funds and tip funds must be secured at all times.

**Till Drop Procedure (Cash Controller):**
1. Record register partner's name, Register ID (#, Top/Bottom), date and CC initials on till drop bag.
2. Place funds from drop box, sales media from POS drawer and Closing Register Receipt in till drop bag. Seal till drop bag.
3. Record register partner name, entire till drop bag #, CC initials and time on the matching Register ID section of the Till Drop Log.
4. Secure till drop bag in inner compartment of safe, behind door 2.

**Final Use Till Count Procedure (Cash Controller):**
1. Remove till, sales media from POS drawer, funds from drop box and Closing Register Receipt.
2. Count down combined funds from till and drop box using cash scale in cash calculator mode.
3. Remove funds in excess of opening fund amount, leaving opening fund amount in till.
4. Follow Till Drop Procedure to secure excess funds, sales media and closing register receipt.
5. Secure till with verified opening fund in POS drawer or safe.

**Safe Count Procedure (Cash Controller):**
The safe must not be left open and unattended.
The safe must not be opened or the time delay set during the first 30 minutes and the last 30 minutes of customer operations.
Only the Cash Controller may set and access the safe.
Complete and record an accurate physical "start" count when accepting the cash controller keys and an "end" count when passing the cash controller keys to the next cash controller or counting out at the end of day.
1. Record CC initials and start or end count time on the Safe Count Log.
2. Count and record change fund amount, opening till fund amounts, # of till drops, # of Customer Recovery certificates, PCard, and # of tip drops.
    NOTE: Lock Out Period Safes: When completing a safe count during the Lockout Period (3pm-8am) record "N/A" or "Locked Out" in the number of till and tip drop section of the safe count. All safe counts occurring outside of the lockout period (8am-3pm) must include an actual physical count of all till and tip drop bags.

**Deposit Log (Cash Controller):**
    NOTE: Procedures for preparing the deposit and transporting the deposit to the bank are located in the Store Operations manual section 4 Cash Control.
The deposit must be prepared and transported to the bank every day.
The deposit must be prepared after 8am and must be transported to the bank by 3pm.
The deposit must be taken inside the bank for processing if the bank is open. The weekend depository box must only be used if the bank is closed.

**Deposit Prep Section Procedure:**
1. Record the start time and CC initials in the Deposit Prep section on the date the deposit is processed.
2. Record deposit $, deposit bag # and completion time.
3. **Deposit Witness** records their initials after confirming that the CC initials, completion time, deposit slip amount and sealed deposit bag # are accurately recorded in the Deposit Prep section.
4. Secure sealed deposit bag in inner compartment of safe, behind door 2, if not immediately transported to bank.

**Deposit to Bank Section Procedure:**
1. Record CC name taking deposit to bank, date to bank, time to bank and deposit bag # in the Deposit to Bank section on the date the deposit is processed.
2. **Banking Witness** records their initials after confirming that the CC initials, date and time of the CC departure to bank and sealed bag # are accurate and recorded in the Deposit to Bank section.
3. Record validated deposit amount and validated time on Deposit to Bank section and attach validated deposit slip after returning from the bank or when the deposit slip has been retrieved for deposits made through the weekend depository.

**Till Audit Procedure (Store Manager):**
A minimum of two random till audits must be performed each week.
1. Follow steps 1-4 of Final Use Till Count.
2. Record SM name, date, register partner's name and Register ID on Partner Till Audit Log. Over/short will be recorded when deposit is prepared.
3. Secure till with verified opening fund in POS drawer or safe.
4. Ensure over/short is recorded after deposit is prepared on following day.

**Report Store Operating Funds Procedure (Store Manager):**
The Store Operating Funds (change bank and till bank) must be physically verified and updated on the MWS each week.
1. From the MWS select "Manager Menu", "Daily Bookkeeping Menu", "Report Store Operating Funds"
2. F1 – to Count Change/Till Bank Funds. Enter the amount of money actually in the Change and Till Bank in the two fields "Total Change Bank" and "Total Assigned/Unassigned Tills". Record the total on the Cash Management Log under "Report Store Operating Funds" and sign off.
3. Upon completion of entering the funds amounts press "F1" to Save and then "F7" to Quit.

**Tip Drop Procedure (all partners):**
Tip funds must be secured at all times.
1. Remove tip funds from plexi, place funds in a tip drop bag and seal tip drop bag.
2. Record date on tip drop bag.
3. Record partner #, initials, and entire tip drop bag # on the Tip Drop Log.
4. Secure tip drop bag in inner compartment of safe, behind door 2.
5. Witness records their initials and time after verifying the tips have been secured in the safe.

**Tip Drop Removal Procedure**
1. Remove tip drop bags from inner compartment of safe (cash controller).
2. Record entire tip drop bag # for each tip drop bag on Partner Tip Removal Log.
3. Record CC initials as **Witness** and time.
4. Transfer tip drop bags to partner processing tips.
5. Partner receiving tip drop bags records partner # and initials after verifying tip drop bag #'s.

**Accountability and Duty to Report**
Failure to comply with cash management log policy endangers partner safety. Acts in violation or omissions of policy are grounds for disciplinary action up to and including termination. Uncorrected or continuing violations must be reported to management, your local Partner Resources generalist or the Standards of Business Conduct Helpline at 800/611-7792 (866/614-0760 for French-speaking partners).

CONFIDENTIAL

# Preventing and Responding to Security Incidents

> **All US and Canada retail non-emergency and emergency security incidents should be reported to the Global Security Operations Center (GSOC) at 1-888-796-JAVA (5282), ext. 85400 or security@starbucks.com**

Create & Maintain a Safe, Secure & Legendary Environment ................................................ 5.2
   Access Standards: ..................................................................................... 5.3
   Opening and Closing Policy ......................................................................... 5.4
   Cash Handling Standards ............................................................................ 5.6
Facilities Standards ................................................................................................ 5.7
   Doors, Windows, Locks and Keys ................................................................ 5.7
Responding to Security Incidents ........................................................................... 5.10
   Robbery and Burglary ............................................................................... 5.10
   Shoplifting/Disruptive customers ................................................................ 5.13
   Shoplifting ............................................................................................. 5.14
   Expulsion .............................................................................................. 5.15
   Internal Theft ......................................................................................... 5.17
   Protest and Civil Disorder ......................................................................... 5.18
   Demonstration Guidelines ......................................................................... 5.19
   Bomb Threats ......................................................................................... 5.20
Additional Information .......................................................................................... 5.22
   Lost and Found Policy .............................................................................. 5.22
   Suspicious Mail Handling .......................................................................... 5.23
   Partner Bag and Package Check Policy ......................................................... 5.24
   Weapons Policy ...................................................................................... 5.25
   Drugs and Alcohol Policy .......................................................................... 5.25



DEFENDANT'S EXHIBIT
12-8-11
NO. 6
PENGAD 800-631-6989

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA.

CONFIDENTIAL

STAR_MARSHALL0000871

# Cash Handling Standards

- Funds must be secure at all times – in the safe, register or deposit.

## Safe Access Standards

- For partner safety, the safe must not be opened or the time delay activated during the first half hour and last half hour of customer operations. At open, this means that the safe must be securely closed before the store opens for customers and that the time delay must not be set until 30 minutes after the posted opening time. At close, this means that the safe must be securely closed 30 minutes before the posted closing time and that the time delay must not be set until the store is cleared of customers and the doors locked.

- Registers must not be cashed out in the last half hour of customer operations.

- Do not keep excess cash in your till. The store manager determines and communicates the store's cash limit. Use the drop boxes at all times for all bills $20 or greater, as well as any excess $1, $5 and $10 bills.

- When cashing out the register, ensure counting of funds takes place in an area not visible to people outside the store.

- Leave drop boxes unlocked and open at store close.

- Partners must not discuss sales volumes, cash handling policies, banking information, number of partners, opening and closing procedures, or back door policies with non-partners. Use discretion during discussions behind the counter.

- Do not open drop boxes to make change for customers. Compliance with use of cash drop boxes can act as a large deterrent. Studies show a correlation between cash available and robberies. Reducing the amount of money in the registers is a good robbery prevention strategy.

- Compliance with other cash control, safe and banking procedures helps eliminate or reduce the potential for robbery.

## Bank Deposit Transport Standards

Take special care when transporting the deposit and change order to the bank.

- For safety reasons, the deposit must only be transported to the bank between the hours of 8 a.m. and 3 p.m.

- The deposit must be transported to the bank every day the store is open.

- Only the cash controller may transport the deposit and change order to the bank. Tip funds must not be transported to the bank with the deposit and change order.

- Remove your apron and Starbucks logo items such as caps or jackets prior to leaving the store.

---

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA.                    5.6

CONFIDENTIAL                                      STAR_MARSHALL0000876

- Vary the time when the deposit and change order are transported to the bank. Vary the route to the bank as much as possible.

- Carry the deposit and change order in a non-descript bag without the Starbucks logo. Use different bags when possible.

- Do not announce where you are going or what you are carrying where customers or vendors can hear you. Be discreet and do not discuss banking issues where customers and vendors can hear you.

- Do not perform additional errands while conducting banking duties. Go directly to the bank, and return directly to the store.

- Comply with additional standards and procedures as dictated by senior field leadership or Partner & Asset Protection.

# Facilities Standards

The store manager must ensure the following standards are maintained at all times:

### Security Systems

Refer to the Store Security Systems chapter for more detailed information on the use and maintenance of the store security system.

# Doors, Windows, Locks and Keys

### Door Standards

- All exterior doors must be equipped with dead bolt locks (except back doors and where prohibited by code) and be in good working condition.

- There should not be anything on the exterior of a back door (door knobs, handles, key cores, etc.).

- Back doors must be equipped with self closers, a 360 degree viewing device, and approved armable panic hardware (push bar). Panic hardware must be armed so that an alarm sounds if the door is opened without a key. Panic hardware can be disarmed for a garbage run or delivery, but must be immediately rearmed when the door is closed.

- Any door leading to the office that is accessible by customers must be equipped with a lock and viewing device, and the door must remain locked during business hours.

- All doors must be locked each night at close.

CONFIDENTIAL

STAR_MARSHALL0000877

# Partner Cash Handling

System to Automate Retail (STAR) Overview ........................................................ 2
The Change Bank ................................................................................................... 3
Policy Violations .................................................................................................... 5
Cash Controller Functions .................................................................................... 6
Tip Security Standards and Procedures ................................................................ 6
Time Delay Safes ................................................................................................... 7
MWS Open Store Procedure ................................................................................. 8
Verifying Till Funds at Open and Close .............................................................. 10
Till Drop Procedure ............................................................................................. 12
Preparing Till Drops after Final Use ................................................................... 13
Final Use Till Count Procedure ........................................................................... 13
Preparing a Bank Deposit .................................................................................... 14
Counting Individual Till Drop Bags .................................................................... 15
Adjusting Till Drop Amounts .............................................................................. 17
Consolidating Till Drop Funds and Printing the Deposit Slip ............................ 19
Deposit Discrepancies .......................................................................................... 20
Preprinted Bank Deposit Slips ............................................................................. 22
Preparing and Taking the Deposit Bag to the Bank ........................................... 24
Journal Viewer ..................................................................................................... 28
Cash Transfers In/Out .......................................................................................... 29
Close Till from Manager's Workstation .............................................................. 32
Credit Card Chargeback Process ......................................................................... 33
Close Store Procedure .......................................................................................... 34

Management Cash Control Functions ............................................ 35
Adjust Opening Fund Amount ............................................................................. 37
Maintaining Store Operating Funds Balance ...................................................... 37
Random Till Audits .............................................................................................. 39
Point of Sale (POS) Manipulation ....................................................................... 40
Cash Management Reports ................................................................................... 44



DEFENDANT'S
EXHIBIT ᵱᵀ
12-8-11
NO. 7
PENGAD 800-631-6989

# System to Automate Retail (STAR) Overview

The System to Automate Retail (STAR) consists of Point of Sale (POS) registers in the front of the store, and a computer in the backroom, commonly referred to as the Manager's Workstation (MWS). This equipment helps store managers manage store funds and helps partners efficiently manage customer purchases.

The POS records the details of each transaction, including items bought or returned, discounts, and how the customer paid. This information is saved on the MWS computer in the backroom. The system organizes transactions into detailed reports that allow the store manager to monitor and analyze store sales.

The system also transmits each store's information daily, or "polls," to the Starbucks Support Center. This information is sorted and organized to allow the company to archive information, analyze the business and plan for future growth.

### Types of Store Funds

The STAR System tracks amounts of money in the following places in the store:

- The till bank which includes both active tills and opening (inactive) tills.

- Register Till Drop Bags.

- The Change Bank in the safe.

- The deposit.

**POS Register Functions**

The *POS Register Resource Manual* describes in detail all partner and register functions performed on the POS registers.

CONFIDENTIAL

STAR_MARSHALL0000822

# The Change Bank

**Maintaining
Adequate Change
Standards**

- Partners are responsible for maintaining an adequate amount of change (rolled and loose coin) in their assigned till drawer at all times.

- The partner should alert the store cash controller when his or her till fund is low on change. Partners should remember that there is usually a delay required in making change from the safe.

**Buying Change
Procedure**

If bills from the register partner's drop box are required to "buy" change for the register partner's till (e.g. rolls of pennies, quarters, etc.), the cash controller should perform the following procedure:

1. Open the register partner's drop box.

2. Ensure that the register partner removes the appropriate bills from the drop box.

   Note: the Cash Controller may not remove money from any register partner's till or drop box to buy change.

3. Exchange the funds for the necessary change from the store's change bank.

4. Give the change to the register partner. Wait for the register partner to count the change.

   Note: It is the register partner's responsibility to verify that he or she received the correct amount of change from the cash controller. The cash controller must wait while the register partner counts the change to verify the amount is accurate.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000823

# Capturing Refund Information

If a refund can be processed as cash back, credit card charge back or a Store Credit card, there is no need to capture customer information. Refunds without a receipt should be processed as a Store Credit. Refer to the Refund Policy in the Return and Exchange section of the POS Register Resource Manual for more information.

**Capturing Refund Information Standard**

Whenever a refund is made that requires a Send Check, customer information (name, address, phone, etc.) must be captured so that a check can be sent to the customer. **If this information is not completed, either at the POS or the MWS, the customer will not receive a check.**

**Capturing Refund Information Procedure**

The customer information should be keyed in at the POS at the time of the transaction. If that is not possible, have the customer write the information on the refund receipt. When this happens, the partner who conducted the transaction must enter it into the MWS **prior** to counting their till.

1. From the **Staff Menu**, select the **Record Refund Information** screen. This screen will bring up all refunds entered into the system for the day.

2. Use the **Page Down** key on the keyboard to page through the refunds.

3. Verify the transaction number, partner number and register number at the top of the screen against the register receipt to locate the correct refund.

4. Enter the information on the receipt completed by the customer (name, address, etc.) into the appropriate fields on the screen.

5. Press **F1**, **Update**. Save the refund receipt and place in the till drop bag.

6. Press **F7**, **Quit**, to return to the **Main Menu**.

7. Proceed with till count at currency scale.

CONFIDENTIAL                                                                      STAR_MARSHALL0000824

# Policy Violations

The following violations will result in corrective action up to and including termination:

- Sharing of tills or register operator passwords.

- Misuse of certificates, partner beverages, discounts or gift certificates.

- Voiding legitimate sales or failure to ring in sales.

- Giving free food or beverages to friends, relatives or partners.

- Any individual shortages and overages of $5 or more and any excessive or ongoing over/shorts.

- Excessive line voids.

- Not following cash handling policies, standards and procedures as outlined in the *POS Register Resource Manual.*

**Reporting Cash Control Violations Procedure**

If any partner believes that proper cash handling procedures are not being followed, they should report it to the store manager or district manager as soon as possible.

Partners may also contact the toll-free **Standard of Business Conduct Helpline**, (800) 611-7792, to report concerns anonymously. The Helpline is available 24 hours a day, seven days a week and all concerns will be taken seriously.

CONFIDENTIAL

STAR_MARSHALL0000825

# Cash Controller Functions

Information in this section applies to Cash Controllers and store management partners.

**Cash Management
Log Standards**

- To record and monitor cash handling, each store must use the Cash Management Log.

- It is the Cash Controller's responsibility to fill out this log throughout his or her shift. This log allows the store manager, district manager and Partner & Asset Protection (P&AP) to verify that cash handling policies are followed to standard as well as provide information to Sales Audit should a cash discrepancy arise. The Cash Management Log and policies are located in the Daily Records Book

# Tip Security Standards and Procedures

**Standards**

- Tip funds should be stored in the safe, in the secured compartment (behind the second locking door).

- Tip drop bags should only be accessed when tip funds are being counted (for distribution), or being changed into bills to increase space in the safe.

- The Cash Controller on duty is the only partner authorized to access the safe and remove tip funds.

- Tip funds should not be transported to the bank with the deposit and change order.

- All undistributed tip funds should be sealed in tip drop bags, recorded on the Partner Tip Drop Log and secured in the safe.

- Tips must be distributed on a weekly basis. There should be no more than seven days worth of tips in the store at any time.

**Procedure**

Refer to the Tip Drop Procedures and Tip Drop Removal Procedures on the Cash Management Log Policies, Standards & Procedures page which is located on the reverse side of the blue tab in the Daily Records Book.

Further policy information on distributing tips and tip imputation is located in the U.S. Partner Resources Manual in the Pay section. in the safe

---

CONFIDENTIAL
                                                        STAR_MARSHALL0000826

# Time Delay Safes

All stores are equipped with a safe that has a time delay function on the lock. The time delay function is provided for partner safety and security.

For more information on the operation of the safe, troubleshooting, or other safety features in the store, see the *Safety, Security and Health Standards Manual.*

## Cash Controller Responsibilities

The time delay safe imposes some challenges for the Cash Controller. Because of the time delay, the Cash Controller does not have immediate access to the safe funds. Proper communication and training of all partners to monitor their till status will ensure a smooth process of managing the change in the tills and avoid running out of change in a till.

## Opening the Time Delay Safe Procedure

1. When the Cash Controller is notified by a partner that change is needed, the Cash Controller enters his or her code combination on the safe, which will start a count down.

2. During the wait time, to the Cash Controller should collect the adequate amount of cash funds from the register partner who needs change or complete other tasks.

3. When the safe is ready, the lock beeps and the Cash Controller enters his or her code again. The safe can now be opened.

4. If the safe is not opened during the beeping, the safe automatically locks again and the procedure must be repeated.

© 2010 Starbucks Coffee Company. All rights reserved.                             Revised: July 2010

CONFIDENTIAL                             STAR_MARSHALL0000827

# MWS Open Store Procedure

**MWS Open Store Standards**

- The store's POS system requires the **Open Store** procedure to be completed every day the store is open for business.

- This procedure can only be completed once per day, immediately after the opening partners arrive at the store.

- Any problems or difficulties completing this operation should immediately be reported to the Enterprise Help Desk at (888) 796-JAVA, ext. 84352.

**MWS Open Store Procedure**

Follow these steps to successfully perform the Open Store procedure:

1. At the MWS, select **Open Store** from the **Main Menu**.

2. Enter the password and press **Enter**. The following message will appear: **You are about to begin the store open process. Are you sure? (Y/N)**

3. Enter **Y**, which will cause the POS registers to reboot. During this period (about one or two minutes) partners cannot punch in using the POS registers.

4. The screen will go back to the **Main Menu** and the store is now ready for business. If the screen does not go back within two minutes, call the Enterprise Help Desk for assistance at (888) 796-JAVA, ext. 84352.

**Troubleshooting Open Store Problems**

**Message:  Store Open Process has already been run.**

This message means either:

A. Someone has already opened the store.

B. No one closed the store the night before.

1. Verify with partners that the store open procedure has been completed that morning. If yes, no further action is needed.

2. If the store was not closed the night before, or you are unsure of whether it was closed, call the Enterprise Help Desk immediately at (888) 796-JAVA, ext. 84352.

3. To keep the previous and the current day's sales separate in the POS system, the **Close Store** procedure must be run.  This procedure takes approximately 20-30 minutes to complete, and the registers must be placed in "Stand Alone Mode" if the procedure is done while customers are being served. The Enterprise Help Desk will assist with this procedure. When the **Close Store** procedure is complete, the **Open Store** procedure must be run before the

CONFIDENTIAL                                                                    STAR_MARSHALL0000828

**Cash Controller Functions**

registers can be taken off Standalone Mode.

© 2010 Starbucks Coffee Company. All rights reserved.                          Revised: July 2010                    **4.9**

CONFIDENTIAL                                                                STAR_MARSHALL0000829

# Verifying Till Funds at Open and Close

**Till Fund
Verification
Standard**

Cash Controllers must verify that each till is at opening fund amount prior to placing tills in register drawers at store open and securing tills in safe at store close.

**Using the
Currency Scale
Procedure**

The currency scale is used to verify the opening funds at the beginning and end of day.

1. Remove each coin cup from the till drawer and place them, one at a time, in the basket on top of the scale to count.

2. Place bills directly into the basket. The currency scale displays the categories of "1c-penny," "5c-nickel," "10c-dime," as a prompt to place the till cup on the scale.

3. As each till cup or stack of bills is removed, the counter will automatically prompt for the next denomination of bills or coins.

### Recounting

To recount, or recount previous denominations, use the two arrow keys to toggle backward or forward to a different denomination.

**Verifying
Till Fund Amount
Procedure**

To use the currency scale to verify the amount of money in a till drawer (in "cash calculator" mode), follow these steps:

1. Remove any items on the scale. The basket on top of the scale must be empty.

2. Turn on the scale. The on/off key is on the bottom row of keys, second from the left.

3. Select **Function 2, Cash Calculator**.

4. Enter the opening fund amount.

5. All currency counted will be subtracted from the opening fund amount entered in step 4. The final quantity displayed on the screen at the end of the count will be $0.

Note: If $0 is entered as the opening fund, the scale will display a running total of the count. The amount displayed at the end of the count should be equal to the

Revised: July 2010

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000830

opening fund.

## Cash Counting Procedures

### Counting Loose Coins

Follow these steps to count loose coins:

1. Place the pennies cup from the till drawer into the basket on the cash counting scale. The cash counting scale will "beep" when the count is registered and both total lines on the scale will be updated.

2. Remove the till cup and place it back in register drawer.

3. Complete the counts for all loose coins by following the prompt for each coin denomination. The prompts will appear in the upper right corner of the cash counting scale display.

### Counting Rolled Coin

Follow these steps to count rolled coin:

1. Enter the number of rolls for each coin denomination. For example, for three rolls of pennies, key in "3" then press **Enter/Next** to add the rolls to the total.

2. Complete the count for all rolled coins by following the prompt for each coin denomination. The prompts will appear in the upper right corner of the display. Use the arrow keys to move or toggle between denominations.

### Counting Bills

Before counting the bills, visually "skim" the stacks of bills to ensure:

- The proper denomination (displayed in the upper right corner of screen).

- The bills are not taped excessively, which might alter the weight (bills with torn corners will be counted accurately).

- Bills are face up and all in the same direction.

To count bills follow these steps:

1. Place small stacks of bills (20 or less) on the currency scale.

2. Keep adding small stacks until all bills of the same denomination are in the basket. If too many bills are placed on the scale an audible "beep" will be heard and the message "TOO MANY, REMOVE SOME" will appear on the display. Remove some, but not all of the bills and gradually add a small amount of bills until all are counted.

3. When all bills of one denomination are in the basket, remove all bills at once and place back in register drawer.

4. This automatically adds the number of bills to the total and advances to the next denomination.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL
STAR_MARSHALL0000831

**Cash Controller Functions**                                    Store Operations

**Miscellaneous Cash**

The currency scale will prompt partners to enter amounts for miscellaneous cash after going through the standard denominations. Use this feature to enter amounts for $2, $50 and $100 bills, one (US and CAN) and two dollar coins (CAN only) and any torn/taped or forgotten currency.

1   Enter the total cash amount in cents. Make sure to enter zeros to equal whole dollar amounts without decimals. For example, a $10 bill would be entered as "1000."

**Final Step**

1   Skip through the prompts requesting check amounts, gift certificates, beverage certificates and latte certificates.

2   Press **Enter/Next**. This is the final step to verify the Opening Till amount.

3   After all cash in the till has been counted, check the **Grand Tot** (grand total) amount on the display to ensure it matches the opening amount for the till drawer.  If it does not match, alert your store manager or cash controller.

# Preparing Till Drops

**Preparing
Till Drops**

**Till Drop Procedure**

1.  Record register partner's name, Register ID (#, Top/Bottom), date and CC initials on till drop bag.
2.  Place funds from drop box, sales media from POS drawer and Closing Register Receipt in till drop bag.  Seal till drop bag.
3.  Record register partner name, entire till drop bag #, CC initials and time on the matching Register ID section of the Till Drop Log.
4.  Secure till drop bag in inner compartment of safe, behind door 2.

CONFIDENTIAL

STAR_MARSHALL0000832

# Preparing Till Drops after Final Use

**Preparing Till Drops after Final Use Procedure**

When a partner is closing a till and the till will not be used again that business day, the Cash Controller should remove the entire till and take it to the back room to be counted and returned to opening fund (status?).

A single till drop for the last register user will be made, consisting of the funds in the till over the opening fund

**Final Use Till Count Procedure:**
1. Remove till, sales media from POS drawer, funds from drop box and Closing Register Receipt.
2. Count down combined funds from till and drop box using cash scale in cash calculator mode. Refer to the Verifying Till Fund Amount procedure on page 4.12 for further information.
3. Remove funds in excess of opening fund amount, leaving opening fund amount in till.
4. Follow Till Drop Procedure to secure excess funds, sales media and closing register receipt.
5. Secure till with verified opening fund in POS drawer or safe.

© 2010 Starbucks Coffee Company. All rights reserved.                 Revised: July 2010            **4.13**

CONFIDENTIAL

# Preparing a Bank Deposit

**Preparing a Bank Deposit Overview**

It may be necessary for the Cash Controller to perform adjustments (post day voids, pay type adjustment) to ensure that the contents of a partner's till drop bag is reflected accurately in the MWS.

After any necessary adjustments have been made and the till drop bag contents have been counted and entered, the Cash Controller enters a consolidated deposit figure for each tender type (cash, coin and check) into the **STAR System** and prepares the deposit slip to take to the bank.

- Open each register partner's bag and counts the funds. Enter the funds total, each check (personal and travelers checks) and beverage, latte or gift certificates into the MWS.

- Verify the number of voided Customer Recovery Certificates against the Closing Register Receipt.

- Document and report to the store manager any variances in cash, checks, gift and beverage certificates, voided certificates (especially Customer Recovery Certificates).

- When the contents of each of the bags have been entered, combine the individual till drop bag contents into a single deposit, verify the combined total and enter the total into the MWS.

- File paid in/out slips in the Paid In/Out Envelope. File signed credit card receipts, customer refund receipts and voids in the Sales Media envelope in the Daily Records book. Discard and recycle any remaining sales media.

CONFIDENTIAL

STAR_MARSHALL0000834

# Counting Individual Till Drop Bags

**Counting Till Drop Bags Procedure**

To prepare a daily bank deposit, the Cash Controller counts each till drop bag.

1. Access the **Daily Bookkeeping Menu**, then select **Manager Till Count/Deposit**. The screen shows all tills that have been closed since the last deposit.

2. Verify the number of till drop bags dropped in the safe as indicated by the **Till Count Summary** screen and recorded on the **Till Drop Log** of the **Cash Management Log**.

**Counting and Entering Till Drop Bag Contents Procedure**

The Cash Controller uses the cash scale in Cash Calculator mode to count the cash contents of the register partner's till drop bag. Ensure that any necessary adjustments are made while counting and entering each till drop bag. Refer to the "Adjusting Till Drop Amounts" section below for details.

1. From the **Daily Bookkeeping Menu**, select **Manager Till Count/Deposit**.

2. Use the arrow key to highlight the till drop to enter

3. Press F3, **Recount**. A screen will appear listing options of tender types to enter.

4. Use the arrow keys to highlight and press **Enter**. Select each tender type that needs to be entered. Press **F1, Count** after all desired tender types have been selected. Count screens will appear in the following order (if selected).

**Cash Tender Type**

- Select **F5, Enter Total,** enter the lump sum amount in one entry and then press **F1 Save and Quit**. Select "Y" for Count Completed.

**Foreign Currency Tender Type**

- Select **F5, Enter Total,** enter the lump sum amount in one entry and then press **F1 Save and Quit**. Select "Y" for Count Completed.

**Check Tender Type**

- Enter dollar amount of each check. Each check must be entered individually by entering the dollar amount, then selecting **Enter**. When all checks have been entered, select **F1 Update**. Select "Y" for Count Completed.

**Certificate Tender Types**

- Enter dollar amount of each gift certificate. Each gift certificate must be entered individually by entering the dollar amount, then selecting **Enter**

- Enter quantity of Latte and Beverage certificates individually as a total number of each certificate type. Select **F1 Update**. Select "Y" for Count Completed.

© 2010 Starbucks Coffee Company. All rights reserved. Revised: July 2010 **4.15**

CONFIDENTIAL

5. After completing each tender type highlight the partner name, select "**Y**" in the field **Accept? Y/N**, then **Enter**. This will indicate this till drop has been entered and accepted for deposit. Drawer Over/Short begins subtotaling with each accepted till count.

CONFIDENTIAL                                                         STAR_MARSHALL0000836

# Adjusting Till Drop Amounts

When counting a till drop bag check for any notes from the register partner or cash controller indicating the need for an adjustment.

## Reasons to Adjust

Reasons to make an adjustment to a completed till drop include:

- Incomplete Paid In/Paid Outs.

- Tender type error (for example, cash instead of check). Partners can only adjust check to cash and vice versa.

- Void Transaction (V-Tran).

## Adjust Till Drop Amount Procedure

To adjust a till:

1. From the **Daily Bookkeeping** menu, select **Manager Till Count/Deposit**. A list of names of partners who have counted tills is displayed.

2. Use the cursor to highlight the till to adjust.

3. Press F2, **Adjust**. The **Adjustment Type** screen will appear.

4. Use the arrow keys to move the cursor to the first type of adjustment, then press **Enter**. The Transaction Adjustment screen will appear.

5. Enter the transaction number from the receipt. If the transaction number is missing, use **Journal Viewer** to find it. This function cannot be performed without the transaction number. Remember to convert the encrypted register receipt number to an actual transaction number.

6. Enter in the adjustment reason. The amount and type fields are automatically filled in by the system from the transaction number.

7. Press **F1, Update**.

8. Repeat steps 3-7 for any other adjustments to be made to this till. The system goes back to the **Transaction Adjustment** screen after each adjustment. Enter **ESC**, select "**Q**" to quit and return to the **Till Count Summary** screen.

9. Press **F3 Recount** to retotal the tender type affected by the adjustment. Without retotaling after adjusting, the system will not reflect the change in the count.

© 2010 Starbucks Coffee Company. All rights reserved.                    Revised: July 2010                    **4.17**

CONFIDENTIAL                                        STAR_MARSHALL0000837

**Cash Controller Functions**                                      Store Operations

## Void Transaction (V-Tran) Adjustment Procedure

1. Ensure the transaction receipt is included in the till drop bag, along with a reason for voiding that transaction.

2. Excessive amounts of V-Trans should immediately be discussed with the partner. Review the proper register operations with the partner to ensure accurate register transactions.

3. Follow the steps outlined on the previous page for adjustments.

## Adjustment Reports

To review all transaction adjustments (daily or weekly), access **Reporting Menu, Historical Reports, Transaction Adjustments** in the Manager's Menu on the MWS. This report identifies all adjustments made to individual tills. Use it to review repeated transaction corrections, paid-out adjustments and to monitor the amounts of transactions voided after till counts. This report is a management tool to identify loss prevention or training opportunities.

Revised: July 2010
© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000838

# Consolidating Till Drop Funds and Printing the Deposit Slip

**Consolidating
Till Drop Funds
Procedure**

After all till drop bags have been counted and entered into the MWS by the Cash Controller, consolidate the funds to make a final total for deposit at the bank.

Store deposits must be accompanied by:

1. The bank's preprinted deposit slip with the correct store number printed on it. See the Preprinted Bank Deposit Slips section for more information.
2. The **Check Deposit Report** which can be printed from the MWS (if available).

**Creating a System
Deposit Slip
Procedure**

1. From the **Manager's Menu**, select **Daily Bookkeeping Menu**. Select **Manager Till Count/Deposit.**
2. Verify that all tills have a **Y** in the **Accept Yes/No** field.
3. Press **F1, Deposit**. Verify that the consolidated amounts of cash, checks and foreign currency are the same as on the screen.
4. If the amount is correct, press **Y**, then press **Enter**. A currency breakdown screen will appear.
5. Key in the amount of currency and coins exactly.
6. Press **F1, Accept**.
7. A second currency window appears if foreign currency has been accepted. Enter the foreign currency the same way as the regular currency.
8. The System will display a dialog box that asks, "**Do you want to print the deposit sheet? Y or N**." Select **Y** (yes).
9. If applicable, the **Check Listing Report** will also print. Use these reports to prepare the bank deposit slip.

**Consolidating
Sales Media**

The term "Daily Sales Media" describes all printed receipts from voids and refunds, validated gift certificates, validated coupons, and signed credit card sales drafts. Daily Sales Media should be consolidated, stapled together, and retained in the Sales Media Envelope at the back of the Daily Records book. Paid in/out slips must be filed in the Paid In/Out Envelope.

---

© 2010 Starbucks Coffee Company. All rights reserved.   Revised: July 2010

CONFIDENTIAL

STAR_MARSHALL0000839

# Deposit Discrepancies

**Deposit Discrepancy**
**Standard**

A deposit discrepancy must be (e.g., over/short, till drop bag or the deposit is entirely lost) immediately reported to the district manager and the Sales Audit Department at the SSC using the **Explain Over/Short to Sales Audit function** in the Daily Bookkeeping Menu, Manager's Menu on the MWS.

**Deposit**
**Discrepancy –**
**Sales Audit**
**Department**

When Sales Audit finds a discrepancy in the deposit, they will email the store and district manager. Only the district manager is notified when the Sales Audit group finds that a deposit is missing. The district manager is expected to follow up with the store for resolution and communicate an explanation to Sales Audit.

In some more complicated situations, the Sales Audit Department may work directly with the store. However, the district manager will always be notified of the outcome.

Any cash or deposit discrepancies are subject to Corrective Action up to and including termination. It is the store manager's responsibility to research and help solve any deposit discrepancies.

**Correcting the**
**System Deposit**
**Amount**
**Procedure**

This situation should rarely occur if individual tills are carefully verified and all cash handling standards and procedures are followed. However, if the amount shown on the MWS deposit screen is not correct, do the following:

1. Press **F7** to go back to the previous screen (Till Count Summary).

2. Verify each till shown has been accepted.

3. Recount all the money, including the deposit, change bank and all unassigned tills. Use the cash scale, if necessary.

4. Press **F1, Deposit**

5. If the amount shown on the screen is still different than the deposit, enter "N."

6. Enter in the actual deposit amount.

7. Make a note about the discrepancy in the Cash Management Log.

CONFIDENTIAL                                         STAR_MARSHALL0000840

8.  Use the **Explain Over/Short to Sales Audit** to notify Sales Audit of any discrepancy of total sales (see Explain Over/Short to Sales Audit on the MWS steps in this section).

9.  Staple the copy of the email to Sales Audit to the Cash Management Log.

10. If the discrepancy is solved, adjust the next day's deposit by the amount of the discrepancy.

## Using Explain Over/Shorts Field on the MWS Procedure

In situations when the store identifies a deposit discrepancy such as an over/short, the Sales Audit Department must be notified by using the Explain Over/Short function on the MWS. This will serve as a "heads up" for the Sales Audit Department and can help research the situation. The cash controller that prepared the deposit must notify the DM of the discrepancy and write it in the Daily Records Book.

Use the following procedure to enter your comments:

1.  From the Daily Bookkeeping menu, select Explain Over/Short of sales.

2.  Enter the date of the incident.

3.  Enter in the explanation for the overage or shortage. If a mistake is made, press F6 to clear the screen and start over.

4.  When finished entering the explanation, Press F1, Update. This information is provided to Sales Audit after the store has polled.

5.  Press F7, Quit.

6.  Staple a copy of the email to Sales Audit to the Cash Management Log.

If Sales Audit discovers a discrepancy and you have not explained the over/short, Sales Audit will send an Action Required e-mail to the store and District Manager needing an explanation.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000841

# Preprinted Bank Deposit Slips

**Ordering Deposit Slips**

**U.S Stores:** All U.S. stores receive preprinted deposit slips directly from our vendor. Deposit slips can be reordered by calling the number printed on the deposit slip. Allow one to two weeks from the date of order to receive the deposit slips. Do not order deposit slips directly from the bank. If you have any questions regarding ordering deposit slips, please contact your district manager or email the Sales Audit department at salesaudit@starbucks.com.

**Canada Stores:**
- Email the Sales Audit department at SalesAudit@starbucks.com with the subject line "Deposit Slip Reorder" and the store number.
- Allow three weeks for shipping from the date of order.

**Bank Deposit Slip Numbers**

Upon receiving the pad of deposit slips, verify that the correct store number and name are printed on the deposit slip.

Below the store name and number is a line of reference numbers that start with the store number, followed by the store's account number. This information is crucial in depositing the money because it serves as a reference number to let the Sales Audit Department know the store that made the deposit.

Do not use "counter" or blank deposit slips offered by the bank. **Do not borrow deposit slips from another store. Your store will not be credited with deposits made using another store's deposit slip.**

**Deposits with No Foreign Currency Procedure**

After accepting the deposit by selecting **Y**, a **Deposit Report and Deposited Checks Report** will print. Use these two reports to prepare the deposit slip as follows:

1. Enter the **date of the sales** included in the deposit, not the date the deposit is prepared.

2. Count and record all bills by denomination.

3. Enter the total dollar amount of bills in the Currency Box.

4. Enter the total dollar amount of coins in the Coin Box.

5. In the List Each Check Box, write: **See Tape**.

6. Enter the sum total amount of bills, coins, and checks in the Total Deposit Box. This amount is printed on the **Deposit Report**.

7. Combine all checks and wrap them inside the **Deposited Check Report**. Include this report with the bank deposit.

8. Stores that use the plastic Starbucks tamper-evident bank bags must record

Revised: July 2010                  © 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL                                                    STAR_MARSHALL0000842

the security number from the bag onto the deposit slip.

9. Legibly record your initials on the deposit slip.

© 2010 Starbucks Coffee Company. All rights reserved.

Revised: July 2010

4.23

CONFIDENTIAL

STAR_MARSHALL0000843

# Preparing and Taking the Deposit Bag to the Bank

**Bank Deposit
Standards**

- The store is required to make one deposit daily, unless notified otherwise.

- The store is required to only go to the Bank assigned to them from Treasury. If there is a business need to change banks the District Manager must follow the steps provided by Treasury.

- A Starbucks plastic tamper-resistant deposit bag must be used.

- Duplicate copies of the daily deposit slip must be made, one for the bank and one for the store. The bank will validate all copies once they verify the deposit.

**Deposit Bag
Procedure**

Instructions for how funds should be prepared and placed in the deposit bag will vary depending on the bank.  Check with your store's bank for more information

Follow these procedures unless otherwise instructed by your bank:

1. Place all currency, coins, and checks in the tamper-resistant deposit bag.

2. Write the bag's serial number on the deposit slip. Verify the two numbers match.

3. Place the correct deposit slip copy in the bag (consult with the bank if unsure which copy). Ensure the deposit slip is readable through the bag. The deposit slip should be on the top, followed by checks and then currency with the largest bills visible on the reverse side.

4. Seal the bag with the one copy of the deposit slip inside. The second copy should be kept separate, as the bank teller will need to validate it.

5. Remove the serial numbered strip from the bag. Record the number and attach the strip in the Cash Management Log. Refer to the **Cash Management Log Policies** for further instructions.

6. Take deposit and copy of deposit slip to bank.  Review the deposit trip policy on next page for important details regarding Starbucks policy.

7. The bank will verify the deposit or send it to be processed at a central location, then the teller will validate the deposit slip. Verify its accuracy prior to leaving. If it does not match the deposit, ask the teller to recount it. If a discrepancy is verified, note the error and notify the district manager immediately, and follow procedures outlined in the **Deposit Discrepancy** section.

8  Return the validated deposit slip back to the store, record the validated deposit amount and time in the Cash Management Log. Attach the slip to the log on the day that the deposit was transported to the bank.

Deposits that are processed at a central location or dropped in an after hours deposit box are subject to adjustments by the bank if a discrepancy is found.

Revised: July 2010        © 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL                                                        STAR_MARSHALL0000844

All deposit corrections are sent to the Sales Audit Department and communicated to the district manager and/or store.

CONFIDENTIAL

**Cash Controller Functions**                                    Store Operations

## Deposit Trip Standards

- Only shift supervisors, assistant store managers and store managers should make deposit trips. Baristas and partners under the age of 18, regardless of their job title, are not permitted to make deposit trips.

- The deposit should be transported to the bank each day between the hours of 8 a.m. - 3 p.m. local time. The bank's hours of operation should be confirmed before transporting the deposit. Return deposit slips immediately to the store and attach to the Cash Management Log.

- If the bank is open on weekends or a holiday, the deposit must be taken inside to be processed.

- The after-hours depository should be used only when the bank is closed. Never transport a deposit after dark.

- Side trips or personal errands must not be made during the deposit trip.

- Do not take the deposit home or leave it in a car to be deposited the next day.

- The route and time the deposit is transported to the bank should vary. Note: in areas identified as "high-risk," the district manager may consider having two partners go to the bank together.

- Clothing that identifies you as a Starbucks partner such as an apron or logo shirt should not be worn. Do not carry a beverage with a Starbucks logo. Remove or cover up any identifying logos/names.

- The Starbucks tamper-resistant deposit bag should be concealed by carrying it in an unmarked bag or briefcase that conceals the deposit bag. Do not use any bag displaying the Starbucks logo such as any Starbucks shopping bag.

## Making Deposits When the Bank is Closed Procedure

1. When the bank is closed, all deposits should be taken to the after hours deposit box. Do not drop deposits in this box after dark.

2. Prepare the bank deposit and drop it in the after hours deposit box with both copies of the deposit slip. Ask the bank for the store copy of the deposit slip the next business day.

Revised: July 2010                  © 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL
STAR_MARSHALL0000846

**After Hours
Depository Key
Standards**

- The bank will provide a key to access the after hours depository. The store manager is accountable for all after-hours depository keys.

- One copy should be on the Cash Controller key ring, one on the manager's set of keys, and the third on the spare set of Cash Controller keys. If a key is lost, the manager must contact the bank immediately.

© 2010 Starbucks Coffee Company. All rights reserved.     Revised: July 2010   4.27

CONFIDENTIAL

STAR_MARSHALL0000847

# Journal Viewer

The Journal Viewer is an electronic copy of each POS register transaction. The Journal Viewer records transactions for the current day and the previous day only. If transactions need to be viewed beyond this time frame, a partner from Sales Audit or Partner & Asset Protection Department can help locate them for you.

When researching cash handling issues in the store, the Cash Controller may want to look at specific transactions that occurred during the day in the Journal Viewer. The search feature allows the Cash Controller to pinpoint a specific transaction or to research a group of transactions, rather than scrolling through transactions one by one.

The Journal Viewer is helpful in the following situations:

## Duplicate Receipts for Customers

If a customer returns several hours later and needs a receipt, the journal viewer can provide the transaction number to print a duplicate receipt.

## Lost V-Tran Receipts

If a v-tran receipt was lost, the Journal Viewer can be used to print a back-up copy.

## Training Issues

Use the Journal Viewer to monitor a partner's performance. Review the journal tape with the partner to explain the proper procedures for any mistakes made.

## Monitoring Accuracy

The Journal Viewer can be used to monitor cash handling accuracy in using the correct cash tender key on the POS register. It can also be used to monitor the frequency of no-sales, discounts, etc. Any unusual register activity must be further researched. Contact the district manager who can work with the Partner &Asset Protection Department to help resolve any loss prevention problems.

CONFIDENTIAL                                                   STAR_MARSHALL0000848

# Cash Transfers In/Out

The STAR system processes cash moving through the Change Bank. When transferring cash out of a till it goes into the Change Bank. When transferring cash into a till the cash comes from the Change Bank.

### Opening Fund Deficit Procedure

There are times when a till will be closed with less cash than the opening fund amount. The reason this may happen if the total refunds and/or paid outs are higher than the total sales rung for this till. If this happens, the Cash Controller must perform **three** steps to get this till back to the opening fund amount.

1.  A cash transfer **IN** must be done for the till that has less cash than the opening fund.

2.  A cash transfer **OUT** must be done from a till that has enough cash to cover the transfer.

3.  To confirm the accuracy of the cash transfer IN/OUT above, double-check and update your Store Fund balance. See Maintaining Store Operating Fund Balance for more information on how to verify and update the store operating fund balance.

Remember to physically remove the cash from the cash transfer OUT till and place it in the cash transfer IN till.

### Short Opening Fund Alert Message and Balancing the Change Bank

The Cash Controller will be notified when a partner cannot establish an opening fund when they use the system to verify the register partner's till drop bag. This is called the Short Opening Fund Alert message, and it appears when the Manager Till Count/Deposit menu on the MWS is accessed. A screen will appear to alert the Cash Controller of a short opening fund and how much cash needs to be transferred into the fund from the change bank to bring it up to the standard level.

After transferring cash out of the Change Bank to bring a short opening fund up to the correct amount, the Change Bank will be lower than it should be. To resolve this situation, transfer enough cash out of a different open till to bring the Change Bank to its correct level (perform a transfer out). At no time should the Change Bank fund be over/short. Remember to remove the cash from the till and physically add it to the Change Bank in the safe.

A printed receipt will document the transfer. The register partner should sign the receipt and place it in their till in exchange for the funds.

CONFIDENTIAL

STAR_MARSHALL0000849

**Cash Transfers
In or Out of a
Till Procedure**

To transfer cash into or out of a till, do the following:

1. Go to **Manager's Menu > Daily Bookkeeping Menu >Cash Transfer.**

2. Use the up and down arrow keys to highlight the till for the Transfer In or Out, then press **Enter**.

3. Make a note of the "Transfer Needed" amount and till number so that you can refer to it later. Press **F7** to quit.

4. Go to Cash Transfer under the Daily Bookkeeping menu. Select the short till and press **Enter**.

5. Select the Transfer In option. Enter the "Transfer Needed" amount from step #3. Press **F1 Update**.

6. Select an open till (one with enough cash to allow the transfer).

7. Select the Transfer Out option. Enter the "Transfer Needed" amount from step #3. Press **F1 Update**.

8. Remove the appropriate amount of cash from the till selected for the "Transfer Out."

9. Place the cash into the "Transfer In" till.

10. Recount the till using the Manager Till Count function.

CONFIDENTIAL                                          STAR_MARSHALL0000850

# Register Till Status

The Register Till Status screen is accessed through either the Manager's Menu > Daily Bookkeeping Menu, or through the Staff Menu. The till status screen shows:

- "Open tills" (tills that are in use on the sales floor).

- Tills that have been counted.

The Register Till Status screen provides information for these types of situations:

- Open vs. Counted Tills.

  Note: this may be important toward the end of the business day, as the POS system cannot close the store if there is anyone who has not closed their till at closing time.

- If a partner has gone home and did not close their till (Status: Open) contact the Enterprise Help Desk at (888) 796-JAVA, option 1, to close the till.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000851

# Close Till from Manager's Workstation

**Close Till from MWS Procedure**

If a POS register malfunctions, preventing a register partner from closing their till, the Cash Controller can close the till from the MWS. The Cash Controller completes the following procedure:

1. Place all operating registers at the Restaurant Line System (RLS) screen.

2. From the **Manager's Menu** on the MWS, **Daily Bookkeeping Menu > Close Till**.

3. Use the up and down arrow keys to highlight the register partner's name, then press "**Y**" to close the till. Select **F3 Close**, press "**Y**" to confirm close till.

4. To verify the till has been closed, select **Till Status** from the **Daily Bookkeeping Menu**. It will show **Closed**.

5. Reboot all registers.

6. Call the Enterprise Help Desk to determine the reason for the register malfunction.

Revised: July 2010         © 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL                                                    STAR_MARSHALL0000852

# Credit Card Chargeback Process

**Credit Card
Chargeback
Process**

After preparing the daily deposit, all signed credit card sales drafts should be consolidated, stapled together and stored in the dedicated Sales Media Envelope in the Daily Records Book. Do not send drafts to Sales Audit unless asked. Never send the originals.

If a credit card transaction is disputed by a customer, the Sales Audit team will send an email to the store and district manager requesting the specific Sales Draft(s) be faxed to Sales Audit. The store will have 10 days from the time the email is sent to the complete the fax.

The fax number and any other necessary information will be included in the email. If the Sales Draft is not faxed to Sales Audit, the amount of the disputed transaction will be charged to the non-sufficient funds (NSF) line of the store's P&L.

CONFIDENTIAL

STAR_MARSHALL0000853

# Close Store Procedure

To send the day's business information to the SSC from the MWS and POS system, it is necessary to complete the **Close Store** procedure. This allows the system to close transactions from the current day, create new files for the next day and set the store's system to be polled. Failure to properly complete this procedure will cause a polling failure that can result in lost or inaccurate sales reporting.

**Close Store
Procedure**

To complete the **Close Store Procedure**, follow these steps:

1. Make sure all tills are closed, and all register screens are in the first screen mode (the RLS key is displayed on screen).

2. From the **Main Menu** at the MWS, select **Close Store** and press **Enter**.

3. Enter password, then **Enter**.

4. The message **You are about to begin the end of day process (Y/N)?** will appear; select **Y**.

6. A black screen will appear and the register drawers will open. If one or more of the drawers did not open, check first that the drawer is not locked with the register key. If this isn't the problem, call the Enterprise Help Desk.

7. Leave all POS registers and the MWS on. Partners can punch out using the POS registers, but the MWS cannot be used.

CONFIDENTIAL

**Cash Controller Functions**

# Management Cash Control Functions

This section includes information for the store manager only.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000855

# Manager Responsibility for Store Operating Funds

One of the primary responsibilities of store management is to control and protect all funds in the store. The store manager is ultimately accountable for all aspects of cash control being followed on all shifts. The store manager is also responsible for implementing cash control policies, identifying and correcting cash control violations and irregularities, and communicating to the district manager any issues or concerns that arise.

## Cash Controller Keys Standards

- There should be three sets of cash controller keys for cash control in the store. There should be one set each for:

  - The store manager: This set is kept with the store manager at all times.

  - The cash controller on duty: This set rotates with the assignment of the cash controller role and is secured in the safe each night.

  - Emergency: This set is sealed in an envelope that is signed and dated by the store manager, and should be kept in the inner compartment of the safe.

- The cash controller's set of keys should be handed to the next cash controller at change of shift, or left inside the safe's non-locked compartment at store close.

- Each set of cash controller keys includes:

  - Drop box key(s)

  - POS register drawer key (IBM key)

  - Store key

  - Bank depository key

  - Keys for any locked drawers

  - Internal safe compartment key (for stores with Amsec™ safe only)

  - Closed circuit television (CCTV) and VCR lock box key (for limited stores)

  Note: Keys that are not specific to cash control, such as storage room keys and paper dispenser keys, should be attached via a removable clip. This prevents the cash controller from giving the cash controller key ring to a partner that needs access to non-cash control keys. The cash controller key rings should not include any Starbucks logo items.

## Cash Shortage Policy

The store manager is accountable for all store funds including over/short amounts. Total monthly cash overages or shortages in excess of 0.15% of sales may result in Corrective Action.

---

Revised: July 2010

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000856

# Adjust Opening Fund Amount

**Adjusting Opening Fund Amount Procedure**
The Opening Fund amount is set at a default of $200. This amount can be adjusted by the following procedures:

1. From the MWS select "Managers Menu", "System Support Menu", "Change Default Open Fund Amount"
2. Enter open fund amount between $50-$300.
3. Select **Enter**, save and quit.
4. Reboot **ALL POS** registers (The updated opening cash fund will not be reflected until the reboot occurs.)

Note: Changing the Default Open Fund amount here does not change any information within the Store Operating Funds screen.

# Maintaining Store Operating Funds Balance

**Store Fund Balance Standards**

- The store operating fund (change bank plus till bank) total must always remain the same.

- Store operating funds are changed only with the approval of the district manager.

- Any discrepancies over US$20 in these balances must be immediately reported to the district manager by the cash controller on duty for further investigation.

- If the change bank has been shorted to ensure a till is at opening fund, document the shortage in the comments box of Safe Count section of the Cash Management Log. The change bank must be returned to the correct amount the next time the deposit is prepared.

**Updating the Daily Store Fund Balance Standards**

- The balance of the Daily Store Funds (also known as the Daily Store Operating Fund) must match accounting records in Sales Audit at the SSC. Differences will be charged to the over/short line of the store's P & L.

- Store managers must verify and **update** the Change Bank and Till Bank in the **Daily Bookkeeping Menu weekly**.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL                                              STAR_MARSHALL0000857

**Cash Controller Functions**                                         Store Operations

**Updating the Daily
Store Fund
Balance
Procedure**

Refer to the Report Store Operating Fund Procedure on the Cash Management Log
Policies, Standards & Procedures page which is located on the reverse side of the
blue tab in the Daily Records Book.

**Adjusting Store
Operating Funds
Procedure**

The district manager and store manager should work together to determine when an
increase or decrease to the total store operating funds is necessary. Once the district
manager has approved the increase or decrease, follow this procedure to adjust store
operating funds.

1.  Prepare the daily deposit according to the procedures provided in this
    section.

2.  Select **F2 – Adjust** before entering the consolidated deposit figures for cash,
    coin and check. These four options will appear on the screen:

    - Increase Change Bank
    - Decrease Change Bank
    - Increase Till Bank
    - Decrease Till Bank

3.  Select the appropriate option, then add money to(or remove money from) the
    deposit for the Change Bank or Till Bank to complete the adjustment.

---

4.38                          Revised: July 2010              © 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL                                                      STAR_MARSHALL0000858

# Random Till Audits

## Random Till Audits Overview

Till audits will reduce the number of partners associated with a drawer over/short and can create individual over shorts. Till Audits can create individual cash over/shorts

Till audits can be used to identify cash mishandling, as well as internal theft. However, till audits should also be used to identify good cash handling.

If only one partner has been assigned to a till in a day, the cash variance is an individual over/short.

## Random Till Audit Standards

- Random till audits must occur a minimum of twice per week by the store manager.

- New partners should be till audited to ensure compliance to cash handling standards, such as dropping twenties.

- Any discrepancies in the audited till count must be addressed through coaching and/or corrective action following the standards for cash handling policy violation.

## Random Till Audit Procedure

Refer to the Till Audit Procedure on the Cash Management Log Policies, Standards & Procedures page which is located on the reverse side of the blue tab in the Daily Records Book.

CONFIDENTIAL

STAR_MARSHALL0000859

# Point of Sale (POS) Manipulation

POS manipulation is the most common form of cash theft in our stores. There are many ways to manipulate the POS record of register sales. Many of the ways are common to all businesses where a cash register exists, while some are unique to our business. Some of the common methods that dishonest Starbucks partners have stolen from the register are reviewed in this section. After the description of each method is a tool or technique for discovering and preventing it.

As a deterrent to theft, partners should be aware that all transactions rung into the registers are visible to P&AP and other SSC departments.

## Partner Potential Indicators

The following items are tracked and audited by the Partner & Asset Protection team for policy and procedure. Exception-based reporting of POS activity is regularly utilized to investigate policy exceptions and potential fraud. Corrective action, up to and including termination, and/or prosecution may result. Observation of these activities by any partner should be reported to the district manager for follow-up investigation with Partner & Asset Protection.

### High Line Item Voids

The line item void key has a legitimate use: to delete incorrectly rung items or correct a transaction when a customer changes their mind. Excessive line voids may be a training issue, or a sign of theft.

*Example:* A partner accepts the money, voids out the item purchased and takes the cash. When actual sales are voided, dishonest partners often place the amount of the voided sale in the register, giving the transaction the appearance of a typical sale. This creates an overage that can be discovered with a random till audit. The dishonest partners typically track these transaction amounts in different ways (see "Tracking Signs Outside Register").

### Low Transaction Amounts

Transactions that total less than US$1.10 are usually legitimate (when they are fairly consistent amongst partners in similar day parts). If a partner begins showing an exceptional trend that is different from other partners, and there are no other mitigating factors, this could be a sign of theft.

*Example:* A partner, knowing the cost of most items purchased, asks the customer for the correct amount and then rings in a small value item to open the drawer to deposit the cash or make change. The partner tracks (see "Tracking Signs Outside Register") the cash total and takes it from the till. Like fraudulent Line Voids, improper sales less than a dollar will lower a partner's total sales and average ticket.

### Partner Beverages

A significant increase in partner beverages may be a sign of theft. Partners are entitled to free beverages during their shift. All partner beverages must be rung in the

---

CONFIDENTIAL                                                        STAR_MARSHALL0000860

POS by another partner using the partner's number from their Partner Card. Stores and partners have consistent numbers of these Partner Beverages.

*Example:* A dishonest partner may use the partner beverage key when a customer makes a purchase. If the customer is purchasing more than one item (coffee and pastry) the drawer will open but the beverage will not be recorded as a sale. The dishonest partner will take the cash.

### Refill Key

A significant increase in the number of refill transactions, with no other mitigating factors, could be a sign of theft. Sit-down ("for here") customers are entitled to a coffee refill at a special price (U.S. only). Refills are not permitted when customers leave the store and return for another cup of coffee.

*Example:* The partner rings in a refill instead of the legitimate customer order. The cash drawer will open to deposit the cash or make change. The partner will take the cash.

### Frequent Cash Shortages or Overages

Frequent or significant overages or shortages could be a sign of theft.

*Example:* Overages/shortages can occur when a dishonest partner is stealing and cannot keep track of the exact amount they intend to take from their till drawer. Overages/shortages may also occur when dropping bills into the wrong drop box or making change, but the over/short amount would be offset by the other till drops in these situations.

### Excessive Refunds

Refunds are a normal part of doing business. Individual stores and partners will establish a fairly consistent refund pattern. A significant increase in cash or credit card refunds, with incomplete information, may be a sign of theft.

*Example:* A dishonest partner may frequently create cash or credit card refunds using false or incomplete "customer" information. The partner then takes the cash or credits their personal credit card with the refund amount.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

### Cash in Wrong Place in the Register Drawer

When coins or currency are in the wrong slot in the register, or under the till drawer, it may be a sign of theft.

*Example:* If a partner is stealing using one of the above methods they may place all the "stolen" cash in a separate slot in order to keep track. Coins of different values together in particular location could be a sign of tracking the "stolen" cash. The partner may have a system of assigning a dollar value to each coin (e.g., penny = dollar, nickel = five dollars etc.)

### Tracking Signs Outside the Register

A partner who is stealing may keep track of the "stolen" cash using a variety of items that would not normally seem out of place.

*Example:* Partners may use a calculator, paper clips, coins or even coffee beans on the till ledge, an improper coin slot, as a way of keeping track of "stolen" cash (e.g. pennies in the nickel cup, a piece of paper with marks on it, ink slashes on their hands, etc.). These items would be somewhat arranged near their work area at the register.

### Blocking the Register Window

If the customer readout window of the register is normally unobstructed but is covered by something whenever a partner is on the till may be a sign of theft. The partner may be using any of the aforementioned POS manipulation methods and does not want the customer to see what is actually being rung into the register.

### Comparative Sales

If comparative sales (comp sales) are decreasing for no apparent reason or are inconsistent daily, it may indicate that one or more partners are stealing.

### ALS Labor Compliance

If a store feels understaffed for the flow of customers or the customer count is dropping but the store seems busy, it may be a sign of theft.

*Example:* If one or more partners are not ringing in sales then the ALS system is not creating labor hours for the transactions generated. The result is lower ideal labor based on fraudulently low sales.

### Pastry Variance

High pastry cost of goods sold (COGS), combined with low markouts could be a sign of partner theft (consumption) or not being rung in. Unusually high markouts may be an indication that markouts being rung through the register to cover up theft.

---

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000862

**Average Ticket**

Low or unexplained fluctuations in average ticket may be a sign of theft, especially when measured against comparable store sales from previous days or weeks in the recent past.

*Example:* Partners ringing in items of small value, refills and/or modifiers instead of the actual purchase will reduce the average ticket.

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

# Cash Management Reports

The Deposit Activity Report and the 28 Day Cash Over/Short Trending Report provide the means to track cash over/shorts by drawer assignment and by partner.

These reports are critical tools that will support store management in reviewing cash over/shorts and following up appropriately when cash is mishandled or missing. These reports, when used in conjunction with the Cash Management Log, provide a record of cash movement.

Starbucks measures cash loss as a percentage of cash sales. The target is to be at or below .10%. That means if your weekly cash sales are $20,000 then your cash loss should not exceed $20 total per week. .10% is the maximum cash loss allowed.

## Deposit Activity Report

Shows cash over/shorts by register assignment (Register 1 Top, Register 1 Bottom, Register 2 Top, etc) for each day of the week.
- This report is archived weekly for 25 weeks.
- Lag time is 2 days

Under each register assignment are listed the names of each partner who rang on the register that day, for each day of the week.
- Each drawer over/short is the variance between the Total Cash Sales (as recorded by the POS) of a Drawer +/- the Actual Cash manually counted for that drawer during the deposit process by the cash controller.
- Example: Drawer 1 Top had a Total Cash Sales of $854.91, the Actual Cash manually counted during the deposit process for Drawer 1 Top is $850.87, cash shortage for Drawer 1 Top is -$4.04
  - Total Cash Sales ($854.91) +/- Actual Cash Counted ($850.87) = Drawer O/S (-$4.04)

### Total Drawer Over/Short

The Total Drawer over/short is the variance between the Total Cash Sales (as recorded by the POS) of a business day +/- the Actual Cash manually counted and entered into the BOPC for all Drawers during the deposit process for that business day.

Example: Total Cash Sales equal $2315.20, the Actual Cash counted of all Drawers equals $2317.12 for an overage of +$1.92
- Total Cash Sales ($2315.20) +/- Actual Cash Counted (accumulative of all cash drawers) ($2317.12) = Total Drawer O/S (+$1.92)
- Drawer over/short of $5 or more require documented coaching if the drawer is assigned to more than one partner. Corrective action should be used if the drawer is assigned to one partner.
- Mis-dropped and mishandled funds should also be addressed as they are cash handling issues.

CONFIDENTIAL                                                    STAR_MARSHALL0000864

### Deposit Count Over/Short

The Deposit Count over/short is variance between the Total Drawer count (the total combined $ amount from each drop bag as it was entered into the Back Office PC (BOPC) by the cash controller preparing the deposit) +/- Total Cash Sales (as recorded by the POS) of a business day.

- The Total Deposit count is the amount the cash controller manually enters into the BOPC prior to accepting the deposit. This amount includes any adjustments that have been made to the final deposit amount.
  - For example if $1 must be removed from the final deposit amount to balance out the safe that is short $1 or if $2 is found behind a drop box and needs to be added to the final deposit amount.

- An adjustment may also need to be made if the cash controller incorrectly counted an individual till drop bag.
  - For example: a till drop bag contains $387.52; however the cash controller mis-counts the funds by -$1and enters $386.52 into the BOPC. When counting the total cash amount to be deposited, the final deposit amount is over by +$1. Therefore, the Total Deposit count entered by the cash controller prior to accepting the deposit must be adjusted to account for the +$1.

### Variance

The Variance line on this report is calculated by Total Drawer Over/Short +/- the Deposit Count Over/Short.

Example: Total Drawer O/S = -$5.57, Deposit Count O/S = -$4.57 the Variance would be +$1

If all till drops bags have been counted and the amounts entered correctly into the BOPC and no adjustment, miscounting has occurred or incorrect entries have been made to the final deposit amount the Variance should be 0 (zero).

If the Total Drawer Over/Short and Deposit Count Over/Short do have a Variance +/- more then 0 (zero) follow up with the cash controller who prepared the deposit and inquire on the reason of the Variance.

### Total Drawer Deposit

The Total Drawer Deposit is the combined total cash of all till drop bags as entered by the cash controller.

### Final Adjusted Deposit

The Final Adjusted Deposit amount is the deposit amount accepted by the cash controller preparing the deposit and which will be transported to the bank. This amount includes any adjustment made to the deposit by the cash controller prior to the final accepting of the deposit.

**Cash Controller Functions**                                              Store Operations

## 28 Day Cash Over/Short Trending Report

This report displays cash over/short activity for the previous 28 days.

- This is a rolling report and at any time you can access the previous 28 days

  - NOTE: there is a 2 day lag on the report. If it is 05/04/2010 the report will show 05/02/2010 as the most recent date.

- This report is not archived.

Each time a partner is associated with a drawer over/short exceeding $5 (+/-) they will appear on the report. Drawer over/shorts *less* then (+/-) $5 do not appear on this report.

- The over/shorts displayed on this report are the drawer over/shorts which is why partners who worked on the same drawer will have the same over/short variance on a specific day.

  - For example: On 04/05 Joe Java and Betty Barista each show a shortage of -$20.24. This means that both Joe and Betty were on Drawer 1 Top and had a combined drawer shortage of -$20.24.

- This report is intended to aid the store manager in easily identifying partners most frequently associated with drawer over/shorts.

- The report is sorted with the partner associated with the greatest overall (28 day combined) negative variance at the top.

- The *Count* column indicates the number of times the partner has been associated with a drawer over/short (in excess of $5) in the past 28 days.

- This report should be used whenever cash variances occur to identify partners who may have cash handling performance issues.

- This report should be used in conjunction with the Deposit Activity Report which provides more detailed data.

- This report can help the store manager identify which partners should be till audited.
- Partners with the highest number of drawer over/short associations and the highest combined Total Over/Short should be till audited.

CONFIDENTIAL                                                        STAR_MARSHALL0000866

## Total Drawer Over/Short

The Total Drawer over/short is variance between Total Cash Sales of a business day +/- the Actual Cash manually counted for all Drawers during the deposit process for that business day.

- **NOTE:** the Total Drawer Over/Short includes ALL drawer over/shorts for that business day, not just the drawer over/short exceeding $5 (+/-) that are listed in this report.

    - The Total Drawer Over/Short will match the corresponding day's Total Drawer Over/Short from the *Deposit Activity Report*.
    - Example: Total Cash Sales equal $2315.20, the Actual Cash manually counted of all Drawers equals $2317.12 for an overage of +$1.92
        - Total Cash Sales ($2315.20) +/- Actual Cash Counted (accumulative of all cash drawers) ($2317.12) = Total Drawer O/S (+$1.92)

## Deposit Count Over/Short

The Deposit Count over/short is variance between the Total Drawer count (the total combined $ amount from each drop bag as it was entered into the BOPC by the cash controller preparing the deposit) +/- Total Cash Sales (as recorded by the POS) of a business day.

- The Total Deposit Count is the amount the cash controller manually enters into the BOPC prior to accepting the deposit. This amount includes any adjustments that have been made to the final deposit amount. For example if $1 must be removed from the final deposit amount to balance out the safe that is short $1 or if $2 is found behind a drop box and needs to be added to the final deposit amount. An adjustment may also need to be made if the cash controller incorrectly counted an individual till drop bag.

    - The Deposit Count Over/Short will match the corresponding day's Deposit Count Over/Short from the *Deposit Activity Report*.

## Managing Cash in Your Store

Store managers must remain focused on actively managing cash in their store to prevent cash handling issues and/or cash loss. Store managers are required to review the CML and reporting daily and to take action immediately when cash handling issues or cash loss occurs. Refer to Cash Management Reports section for more information.

Anytime a drawer over/short is $5 or more documented coaching and/or corrective

© 2010 Starbucks Coffee Company. All rights reserved.         Revised: July 2010                    **4.47**

CONFIDENTIAL                                                    STAR_MARSHALL0000867

action is required. Or, if the total over/short for any day is $5 or more documented coaching and/or corrective action is required.

1. Review which partners were on a drawer with the over/short.
   - If only one partner has been assigned to a till in a day, the cash variance is an individual over/short and should be addressed appropriately through corrective action.

2. Inform each partner that they were associated with an over/short and investigate issues that may have caused it.

3. Plan a till audit on each partner **within three days** of the occurrence to see if any trends emerge.
   - Random till audits by the store manager (SM) must occur a minimum of twice per week. Till audits will reduce the number of partners associated with a drawer over/short and can create individual over shorts.
   - Review the Till Audit Procedure on the Cash Management Log Policies, Standards and Procedures for more information about the till audit process.

Note: Mis-dropped funds are cash handling issues. Even if cash is not missing, follow up with partners in a timely manner and provide coaching on the importance of correctly dropping funds.

## Cash Loss Threshold

Starbucks measures cash loss as a percentage of cash sales. The target is to be at or below .10%. That means if your weekly cash sales are $20,000 then your cash loss should not exceed $20 per week.

## Performance Management

Timely and open communication is important to effective performance management. Partners should be aware when they worked on a drawer where cash handling issues or cash loss occurred. All over/shorts of $5 or more must be investigated by the store manager and timely follow-up coaching and/or corrective action must occur.

• If you complete a till audit or if only one partner was on a drawer with an over/short of $5 or more then written corrective action is required to be given immediately.

• Cash Handling does not remove individual accountability. It is your responsibility to actively manage cash in your store and take action in a timeline manner when necessary.

Revised: July 2010

© 2010 Starbucks Coffee Company. All rights reserved.

CONFIDENTIAL

STAR_MARSHALL0000868

# Better Way - SM Planning Guide

Use this Store Manager (SM) Planning Guide to determine each week's activities and when to review specific materials to support the activities. This will help you focus on the right materials at the right time.

Below is a summary of weekly activities with detailed weekly activities outlined on the following pages.

# Store Manager (SM) Activities

## Store Manager (SM) Activities

| Week | Activity Summary |
|---|---|
| Week 1 Aug 3-9 | ❖ Receive and review Safe Inventory Tracking Sheet |
| Week 2 Aug 10-16 | ❖ Begin weekly tracking of safe inventory<br>❖ Participate in DM/SM Conference Call |
| Week 3: Aug 17-23 | ❖ Review materials available on the Store Portal<br>❖ Complete Cash Management Go See<br>  * One hour to complete Go See Activity |
| Week 4 Aug 24-30 | ❖ Set up safe & MWS<br>❖ Implement & teach customized Repeatable Routine<br>  *One hour to complete safe and MWS setup<br>  *One hour to customize Repeatable Routine and implement<br>❖ Roll up first Go See data to DM. |
| Week 5: Aug 31-Sept. 6 | ❖ Continue teaching |
| Week 6: Sept. 7 – Sept. 13 | ❖ Complete follow-up Go See<br>  *One hour to complete follow-up Go See Activity |
| Week 7: Sept. 14 – 20 | ❖ Adjust, improve and sustain Repeatable Routine & change cadence<br>❖ Roll up follow-up Go See data to DM |

*Schedule in advance and charge time to training.





© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.    1

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management – Week 1

| Materials: | Location: |
|---|---|
| ☐ Safe Inventory Tracking Sheet | Store Portal>Documents>Program Materials>Better Ways>Cash Management |

| Date | Store Manager Activity: |
|---|---|
| 8/3 – 8/9 | 1. **Receive and review the Safe Inventory Tracking Sheet.**<br><br>2. **For the week of Aug. 10 plan to:**<br> • Begin tracking safe inventory on Aug. 10.<br> • Participate in the DM/SM Kick off conference call.<br><br>3. **For the week of Aug. 17 schedule time to complete the following:**<br><br>**Go See: Banking Work**<br>☐ Schedule two 30-minute Go Sees to observe two different cash controllers complete the banking process (change order and deposit).<br> ☐ Observe one cash controller who frequently completes these tasks.<br> ☐ Observe one cash controller who occasionally completes these tasks.<br> ☐ Bill this time to store "training."<br>**Go See: Safe Count**<br>☐ As part of your regular shifts observe two different cash controllers complete a safe count at shift change. (Do not bill to training time)<br><br>**Complete Change Order and Deposit (After Completing Go Sees)**<br>☐ Schedule yourself to be the cash controller who completes a change order and deposit at least two times using the Repeatable Routine. (Do not bill to training time) |



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.   2

STAR_MARSHALL0000780