1                         PIZARRO

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5     ----------------------------

6     SERENITY MARSHALL,

7                         Plaintiff

8     Vs.                        No. 11-CV-2521

9     STARBUCKS CORPORATION and

      JENNIFER GURTOV, in her

10    individual and official

      capacities,

11

                          Defendants.

12    ----------------------------

13

14        DEPOSITION OF TINA PIZARRO

15            Dallas, Texas

16          January 11, 2012

17

18

19

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No.:  45317

https://www.accessakingump.com/eRoom/AkinGump/Starbucks1/0_e3c08

1          PIZARRO
2
3
4          January 11, 2012
5          9:15 a.m.
6
7
8
9       Deposition of TINA PIZARRO, held at the
10   offices of Akin Gump Strauss Hauer & Feld, 1700
11   Pacific, Dallas, Texas, before Susan S.
12   Klinger, a Registered Merit Reporter and
13   Certified Realtime Reporter of the States of
14   Texas and California.
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1              PIZARRO
2   A P P E A R A N C E S:
3
4   Attorneys for Plaintiff(s):
5   Appearing telephonically
6       Mr. David E. Gottlieb
7       THOMPSON WIGDOR
8       85 Fifth Avenue
9       New York, New York  10003
10
11   Attorneys for Defendant(s):
12       Mr. Samidh Guha
13       AKIN GUMP STRAUSS HAUER & FELD
14       One Bryant Park
15       New York, New York  10036
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1              PIZARRO
2          TINA PIZARRO,
3   having been first duly sworn testified as
4   follows:
5          EXAMINATION
6   BY MR. GOTTLIEB:
7       Q.   Hi, Ms. Pizarro.  My name is David
8   Gottlieb and I represent Serenity Marshall in
9   her case against Starbucks and Jen Gurtov.  I
10   will be asking you some questions about that
11   case today.  Do you understand that?
12       A.   Yes.
13       Q.   Do you understand that you have just
14   taken an oath to tell the truth?
15       A.   Yes.
16       Q.   Okay.  Now, have you ever been
17   deposed before?
18       A.   Yes.
19       Q.   How many times?
20       A.   Twice.
21       Q.   And were both of those times live
22   in-person depositions?
23       A.   Yes.  Well, one was with a jury
24   actual trial and the other was a live
25   deposition.

TSG Reporting - Worldwide    877-702-9580

1              PIZARRO
2       Q.   Okay.  So I'm going to go through
3   some kind of ground rules for the deposition to
4   make sure that the deposition goes smoothly and
5   efficiently so that the court reporter can take
6   the deposition down accurately, okay?
7       A.   Okay.
8       Q.   And these rules are particularly
9   important given that this is over the phone.  I
10   want to make sure that you are able to hear and
11   understand everything I'm saying.  I need to be
12   able to hear and understand everything you are
13   saying and the court reporter needs to as well,
14   okay?
15       A.   Okay.
16       Q.   So if you do not hear any question
17   that I ask you, or even any word that I use in
18   the question, please let me know and I will
19   repeat it so that you can hear it, okay?
20       A.   Yes.
21       Q.   If you do not understand any
22   question that I ask you or even any word in any
23   question that I ask you, please let me know and
24   I will try to rephrase it in a way that you do
25   understand, okay?

TSG Reporting - Worldwide    877-702-9580

**PIZARRO**

1

2     A.   Okay.

3     Q.   It is important that you let me

4  finish my questions before answering so the

5  court reporter can take everything down

6  accurately and so that you fully understand the

7  question that I'm asking before you answer,

8  okay?

9     A.   Okay.

10    Q.   All your answers must be verbal,

11 otherwise I won't know what your response is.

12 And also so the court reporter can take

13 everything down accurately, okay?

14    A.   Okay.

15    Q.   I also ask, particularly because

16 this is over the phone that you keep your voice

17 up as much as possible so that I can hear

18 everything you are saying, okay?

19    A.   Okay.

20    Q.   Do you understand everything that I

21 have said so far?

22    A.   Yes.

23    Q.   Do you have any questions about

24 anything that I have said so far?

25    A.   No.

PIZARRO

1

2     Q.   Now, if you want to take a break at

3  any point during the deposition, that is fine.

4  Just let me know and we can take a break, okay?

5     A.   Okay.

6     Q.   The only thing I request is that no

7  breaks be taken while there is a question

8  pending, okay?

9     A.   Okay.

10    Q.   Now, are you currently taking any

11 medications that could affect your memory?

12    A.   No.

13    Q.   Are you taking any medications that

14 could affect your ability to understand my

15 questions or answer my questions truthfully?

16    A.   No.

17    Q.   Have you done anything to prepare

18 for this deposition?

19    A.   I have met -- yes.

20    Q.   Okay.  What have you done?

21    A.   I have met with our attorney here

22 and glanced at the documents.

23    Q.   Okay.  Did you have one meeting with

24 counsel to prepare for this deposition or more

25 than one meeting?

**PIZARRO**

1

2     A.   Yes, just one meeting.

3     Q.   Okay.  When was that?

4     A.   Yesterday.

5     Q.   Who was the attorney you met with?

6     A.   Samidh.

7          MR. GUHA:  Just for the record, she

8  met with Samidh Guha.

9     Q.   How long did you meet?

10    A.   Two hours.

11    Q.   Was anyone else present?

12    A.   No.

13    Q.   What documents did you review?

14    A.   The case documentation and the

15 attachments that were originally sent in from

16 DM Jen Gurtov.

17    Q.   You said the case documentation and

18 the e-mail with the attachments that was

19 originally sent by Jen Gurtov?

20    A.   Yes.

21    Q.   When you say "the case documents,"

22 what are you referring to?

23    A.   The case documentation that we take

24 through our AIM system, so my initial

25 interaction with DM Jen Gurtov.

PIZARRO

1

2     Q.   Was that roughly a four-page

3  document?

4     A.   That sounds about right.  I don't

5  recall.

6     Q.   Was that a document that had a

7  number of redactions on it?

8     A.   Yes.

9     Q.   Okay.  Anything else?

10    A.   No.

11    Q.   Did you discuss this deposition with

12 anyone else other than with your counsel?

13    A.   I informed my manager that I was

14 going to a deposition and one peer for case

15 coverage, but I did not discuss details with

16 anyone.

17    Q.   Okay.  What is your current position

18 at Starbucks?

19    A.   I am a partner resources associate

20 senior.

21    Q.   How long have you been in that

22 position?

23    A.   The senior position about three

24 months.  And I've been -- let me back up, it's

25 a little complicated.  I've been a senior

PIZARRO

1
2  position before, was laid off from Starbucks in
3  2009 and I held that position for about a year.
4  And then in the level below this is partner
5  resources associate. I've been in that
6  position for about four years total.
7      **Q.   Okay.  During what period were you**
8  **laid off?**
9      A.   Around February 2009 for a year and
10 rehired in June 2010.
11     **Q.   Now, you said you were previously an**
12 **associate senior for about a year.  Before that**
13 **you held another position?**
14     A.   Correct.
15     **Q.   What position was that?**
16     A.   Partner resources associate, so it
17 is basically the same role.
18     **Q.   Okay.**
19     A.   Just senior recognizes a promotion.
20     **Q.   You held that position you said for**
21 **approximately four years?**
22     A.   Correct.
23     **Q.   And did you have a position at**
24 **Starbucks before that?**
25     A.   Yes.

PIZARRO

1
2      **Q.   What was that?**
3      A.   I was a partner contact center
4  supervisor for three and a half years.
5      **Q.   Okay.  And did you have a position**
6  **at Starbucks before that?**
7      A.   No.
8      **Q.   Did you work somewhere else before**
9  **that or were you in college or something else?**
10     A.   I worked previously before that.
11     **Q.   Where did you work before that?**
12     A.   There was approximately three
13 companies that I worked at prior to Starbucks
14 that I would consider corporate jobs.
15     **Q.   Okay.  What was the -- what were the**
16 **companies you worked at just prior to**
17 **Starbucks?**
18     A.   That was Modus Media International
19 for two years.
20     **Q.   Now, as a partner associate senior,**
21 **what are your duties and responsibilities?**
22     A.   So with the team I am currently on
23 the responsibilities are to provide counsel
24 recommendations on employee relations concerns
25 for our field team which would include DM and

PIZARRO

1
2  below district manager and below.
3      **Q.   And you said you have held this**
4  **position for about three months?**
5      A.   No, I've had the senior role for
6  three months, but I really -- the senior is
7  just a new title.  So I've been doing this
8  position for this, for the partner resources
9  support center team for a year and a half.
10     **Q.   I see.**
11     A.   And partner resources total for five
12 years for Starbucks but the other years were
13 different departments.
14         MR. GOTTLIEB:  Can the court
15     reporter just read back to me the answer
16     regarding duties and responsibilities?
17         (Record read.)
18     **Q.   When you say you provide counseling**
19 **and recommendations, what do you mean by that?**
20     A.   So as concerns are routed into our
21 partner resources support center, the concerns
22 matters are routed out to different partners
23 within our team.  And with those cases or
24 matters, I will review them and if necessary
25 investigate the matters, research policy and

PIZARRO

1
2  provide recommendations to the partner
3  whomever, whatever level that may be.  And
4  provide policy interpretation, help provide
5  resolution and continue to discuss the matter
6  as needed, so whatever that looks like.  So it
7  is a matter of just reviewing the entire
8  employee relations matter and coming to a
9  resolution within a certain amount of time.
10     **Q.   Were your duties and**
11 **responsibilities the same as you have just**
12 **described during the period of January 2011?**
13     A.   Yes.
14     **Q.   Now, when you said with the team you**
15 **are currently on, what did you mean by that?**
16     A.   So the partner resource support
17 center we also call it the PRSC.  We are the
18 center that supports matters and concerns for
19 the field team.  So other partner resources
20 groups function differently.
21     **Q.   Well, what are the other -- what are**
22 **the other groups other than the field team?**
23     A.   So, for example, I was with store
24 development prior and IT prior.  So I would
25 support them in a similar manner, but I also

Page 14

PIZARRO

1
2  had a lot of strategic responsibility and
3  training and different elements that would also
4  go into employee relations.  This role is more
5  focused on employee relations and support to
6  the field.  So the field is very different than
7  corporate.
8      Q.   How long in total have you worked
9  with the field team?
10     A.   That would be a year and a half
11  since I've returned.
12     Q.   Okay.  And have you worked with the
13  field team ever before you were laid off?
14     A.   Many times.  It would be indirectly
15  and/or directly if an investigation involves
16  store partners.  But my primary customer client
17  group would have been the corporate partners
18  but there was a lot of crossover.
19     Q.   Now, do you know who Serenity
20  Marshall is?
21     A.   I am aware of who she is based on
22  this case.  I do not know her personally.
23     Q.   When was the first time you became
24  aware that somebody named Serenity Marshall
25  worked at Starbucks?

TSG Reporting - Worldwide    877-702-9580

Page 15

PIZARRO

1
2      A.   That can be difficult to tell.  I
3  became aware through the case with DM Jen
4  Gurtov there may have been a case where
5  Serenity called and perhaps used a partner
6  resource center, but I really don't know that.
7  So I may have spoken to her, but I have no
8  memory of that whatsoever.
9      Q.   So it is fair to say or as you sit
10 there today I should say you, the first
11 occasion that you can remember being aware that
12 Serenity Marshall worked at Starbucks was in
13 connection with Jen Gurtov's contacting partner
14 resources?
15     A.   Correct.
16     Q.   And do you remember when that was
17 the first time?
18     A.   Yes, I remember it was December of
19 2010.
20     Q.   Okay.  And do you remember how Ms.
21 Gurtov initially communicated to you in
22 December of 2010, was it by phone or by e-mail
23 or something else?
24     A.   From what I recall, it was through
25 the case, so I would have seen the case as part

TSG Reporting - Worldwide    877-702-9580

Page 16

PIZARRO

1
2  of my queue and a matter that I should work on.
3      Q.   Now, when you said you would see the
4  case, explain to me what exactly happens that
5  you see it?  Does something to come into you by
6  e-mail or something else?
7      A.   It is a case management system known
8  as AIM.  It is an Onyx development software
9  program.  And essentially our team each has
10 their own queue of cases.  And I will manage a
11 number of cases at any certain amount of time
12 or any given time.
13     Q.   And how is it determined what cases
14 go to you as opposed to other partner resources
15 associates?
16     A.   So our team is mainly broken down
17 into three levels of responsibility.  And that
18 is known as the PRM, which is the partner
19 resources manager, the PRA associate, associate
20 senior and the PRSs, and our partner resources
21 specialists.
22          Our partner resources specialist
23 will receive the case from the group that
24 intakes the call, which is the partner contact
25 center.  The partner resources specialist will

TSG Reporting - Worldwide    877-702-9580

Page 17

PIZARRO

1
2  review the case and depending upon the matter
3  of the case will either send it on to a PRA or
4  a PRM or they may keep very low less complex
5  cases or the case could be routed to our
6  compliance team.
7          So cases that would come to the PRA
8  level and within their territory would involve
9  cases that are separation consultations,
10 corrective action consultations, theft, partner
11 conflict, you know, partner concerns with store
12 manager or DM, complaints and general policies
13 and questions.  So it is a wide bucket that
14 will come to the PRA level.  We get the bulk of
15 the cases on the team.
16     Q.   Now, do you work with a particular
17 region?
18     A.   Yes.
19     Q.   What region is that?
20     A.   The regions are called -- it is two
21 regions.  It is called Region 7 which is
22 Manhattan downtown and Region 6 which is Texas,
23 Oklahoma, Arizona, part of Colorado and New
24 Mexico.
25     Q.   Do you remember when in December of

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2  2010 Ms. Gurtov first contacted you through
3  the, through the PRCS system?
4       A.   I do not recall the exact date.
5       Q.   Why do you believe it was in
6  December of 2010?
7       A.   I remember talking to her through
8  the holidays.  And I also remember my case
9  queue looking at the duration of the case
10 because I'm held to a standard on case closure
11 service levels.  So I do remember, you know,
12 reviewing this case a few times in my queue you
13 get to become familiar with the ones that are
14 in your queue for longer than two weeks.
15      Q.   Now, the first communication you
16 received was it regarding Ms. Marshall, was it
17 directly from Ms. Gurtov or did it come through
18 the system?
19      A.   I believe it was through the system,
20 but I don't know if I can say for sure.  A lot
21 of times DMs do reach out to me directly
22 because they know I get the case.  Typically, I
23 would contact a DM after I look at the case,
24 but I cannot recall for sure what the first
25 contact was.

PIZARRO

1
2       Q.   Can the court reporter please --
3  well, before I have an exhibit passed to you
4  Pizarro 1 through Pizarro 8.  And 8 -- just for
5  the sake of ease I'm going to have the exhibits
6  marked as such so they may appear out of order
7  numerically, but it will make things easier if
8  we do it that way.
9       So would the court reporter hand the
10 witness the document that was titled Exhibit 1?
11      (Exhibit 1 marked.)
12      Q.   Ms. Pizarro, I've handed you a
13 document been marked Pizarro 1.  It is a
14 four-page document Bates stamped STAR_MARSHALL
15 162 through 166.  Can you please review that
16 document and tell me if you recognize it?
17      A.   Yes.
18      Q.   You do recognize it?
19      A.   Yes.
20      Q.   What do you recognize this to be?
21      MR. GUHA:  David, just one
22 interruption.  I don't think this is
23 substantively important.  Just to make sure
24 the record is clear, this document doesn't

PIZARRO

1
2  bear those Bates numbers that you
3  mentioned.
4       MR. GOTTLIEB:  Does it bear Bates
5  numbers at all?
6       MR. GUHA:  No, it doesn't.
7       MR. GOTTLIEB:  I'm not sure why
8  printing documents has become such an
9  issue.  Is there anything that is
10 substantively not part of the document?
11      MR. GUHA:  I don't think so.
12      MR. GOTTLIEB:  That should be --
13      MR. GUHA:  I don't think so, but
14 just maybe for clarification I'm just
15 trying to think of a way we can identify
16 it.  I don't imagine there being a dispute
17 about it.
18      MR. GOTTLIEB:  I mean in an
19 abundance of caution I can e-mail the
20 documents and we can take a break.
21      MR. GUHA:  David, let's just
22 proceed.  I think that is going to be fine.
23 I just wanted to make sure, I just wanted
24 to bring that to your attention.
25      MR. GOTTLIEB:  Let me ask you a

PIZARRO

1
2  question just so we're on the same page in
3  terms of what exactly is in front of you.
4  On the bottom of the page there should be
5  on the document I have which above the
6  Bates stamp there is a long kind of HTTP
7  address.  Do you have that as part of the
8  document?
9       MR. GUHA:  Yes, we do.
10      MR. GOTTLIEB:  Okay.  So I will just
11 represent for the record on the actual
12 documents that were produced with the Bates
13 stamps.  The only thing on any of the pages
14 below that HTTP address is the Bates stamp,
15 so there is no substance of the document
16 that you do not have.
17      MR. GUHA:  Got it.  That is great,
18 thanks.
19      Q.   Again, I will just note for the
20 record that the document production ranges 1622
21 through 1626.
22      Ms. Pizarro, so you said you do
23 recognize this document; correct?
24      A.   Yes.
25      Q.   What do you recognize it to be?

PIZARRO

1
2    A.   A case through our AIM system.
3    Q.   Is this the case involving Serenity
4  Marshall?
5    A.   Correct.
6    Q.   Is there any case report regarding
7  Serenity Marshall other than the one that you
8  have in front of you?
9    A.   I'm not sure I understand the
10  question of report.
11    Q.   Well, is this the entire case?
12    A.   I don't know.  I would have to look
13  at our AIM system to determine if there is
14  other cases involved.  From looking at this we
15  start a case from beginning to end, so yes,
16  this looks like the entire case that I worked
17  with.
18    Q.   Okay.  What does AIM stand for?
19    A.   It is an acronym that we actually
20  call the Onyx system.  I think it is just an
21  internal name that we called it when we were
22  trying to name it.  AIM your interactions or
23  something like that.  There is no -- there is
24  no, you know, external name.  It is just an
25  internal name we came up with years ago.  It's

PIZARRO

1
2  just basically the customer management system.
3    Q.   Can you explain to me how this
4  document is generated?
5    A.   A partner, so in this case DM Jen
6  Gurtov would have called our partner contact
7  center and opened up a case.  And the partner
8  contact center representative would have
9  started a case and intakes all the information
10  and then routed it to our PRS, partner
11  resources specialist, team.
12    Q.   And is it fair to say that
13  subsequent actions taken would then be entered
14  by the person to whom it was routed?
15    A.   Correct.
16    Q.   Now, the first entry on this case if
17  you look on the third page 1625 indicates that
18  it was entered by Stephen Somers at 1/6/2001 at
19  10:51 a.m.; is that correct?
20    A.   Yes.
21    Q.   Okay.  Does that refresh your
22  recollection in any way as to the time frame in
23  which you spoke to Ms. Gurtov about Ms.
24  Marshall's case?
25    MR. GUHA:  Objection.

PIZARRO

1
2    A.   So when I reviewed the case I just
3  -- yes, from what I recall it was December
4  through February on this case.  So according to
5  this, looks like she called on the 6th and I
6  talked to her on the 10th.  I just remember
7  back that I had the case December through
8  January, so obviously I spoke with her or left
9  a message on the 10th.
10    Q.   My question is does this document
11  refresh your recollection as to the first time
12  you spoke or had any communication with Ms.
13  Gurtov regarding Serenity Marshall and her
14  discipline?
15    A.   I can only go off what the document
16  says.  So I'm remembering exact dates of when I
17  did actually speak to her, but I can look at
18  the document and say that must be when I spoke
19  with her.
20    Q.   When you say that must be when I
21  spoke with her, what are you referring to?
22    A.   When I left the message or had the
23  interactions with her when it says talk with DM
24  Jennifer on the 12th, so our case management
25  system captures those details.

PIZARRO

1
2    Q.   So this document indicates, you're
3  referring to the same page it says that there
4  was a voice mail you left for her on January
5  10th, 2011 and then you spoke to her on January
6  12th, 2011; correct?
7    A.   Correct.
8    Q.   Is there any conversation or
9  communication that you can remember having with
10  Jen Gurtov regarding Serenity Marshall before
11  January 10th, 2011?
12    A.   Not that I can recall.
13    Q.   Now, on January 10th, 2011, you
14  contacted Ms. Marshall -- excuse me, strike
15  that.
16    On January 10th, 2011 you contacted
17  Jen Gurtov after having Ms. Marshall's case
18  routed to you; is that correct?
19    A.   Correct.
20    Q.   Now, how did you first come to be
21  aware that the case was routed to you?
22    A.   The case was placed into my
23  queue.  And I have a queue of cases that I work
24  out of that are assigned to me.
25    Q.   Again, you learned of that through

PIZARRO

1
2  your computer?
3      A.   Correct.
4      Q.   And what information did you learn
5  or -- strike that.
6           What information is contained in the
7  communication to you that a case is assigned to
8  you?
9      A.   Can you rephrase that question?  I'm
10  not sure I understand the question.
11     Q.   Really what I'm asking is do you see
12  the portion of Pizarro 1 indicated underneath
13  where it says Stephen Somers at 1/6/2011?
14     A.   Uh-huh, yes.
15     Q.   Underneath there is
16  information regarding a telephone call Ms.
17  Gurtov had with Mr. Somers; correct?
18     A.   Correct.
19     Q.   Now, when the case is routed to you,
20  are you provided with that information?
21     A.   Yes.
22     Q.   Are you provided with that
23  information verbatim or something else?
24     A.   It would be in the case details, so
25  it appeared just as it does here on my computer

PIZARRO

1
2  screen.
3      Q.   I see.  So is it fair to say that
4  the first communication you had with anybody
5  regarding this case was the information
6  contained within the portion of this document
7  under 1/6/2011?
8      A.   I would have to say yes, from again,
9  in my -- I don't know if an e-mail preceded
10  this.  Again, sometimes DMs reach out to me
11  directly, but from looking at this, that is my
12  normal process.  So 90 percent of the time that
13  would have been my first review of the case.
14          MR. GOTTLIEB:  And now, to the
15  extent there are any e-mails between Ms.
16  Gurtov and Ms. Pizarro prior to 1/6/2011,
17  those should have been produced if they
18  actually exist.  I'm just going to call for
19  their production if, in fact, they do
20  exist.
21          MR. GUHA:  I will obviously
22  double-check, but I believe we have
23  produced everything that is, that is there.
24     Q.   Right.  Now, do you remember when
25  you first read the case that was routed to you

PIZARRO

1
2  with the information entered by Stephen Somers
3  at 1/6/2011?
4      A.   Yes, I don't know if I would
5  remember exactly the day and sitting down and
6  reading the case verbatim.  I have many cases
7  in my queue, so I wouldn't have necessarily
8  remembered reading that day what Stephen wrote.
9      Q.   How specifically are you notified
10  that you have a case in your queue?  Does
11  something pop up on your computer or do you
12  need to manually go into the AIM or something
13  else?
14     A.   Yes.  We manually go into the AIM
15  system and work out of that system all day
16  long.  And then I have due dates of cases that
17  are assigned to me, and work on them based on
18  due dates.
19     Q.   I guess what I'm asking is let me --
20  as an example in Outlook, do you have Outlook?
21     A.   Yes, sir.
22     Q.   In Outlook when you get an e-mail,
23  does your computer make a sound like a beep?
24     A.   No, I turn it off.  I don't like the
25  beeps.

PIZARRO

1
2      Q.   You turn it off, I understand.
3      A.   Exactly.
4      Q.   When you get an e-mail in Outlook,
5  do you -- does it have a little preview of the
6  e-mail pop up in the corner of your screen?
7      A.   Yes.
8      Q.   And that when you see that box pop
9  up from the corner of the screen, you know you
10  have a new e-mail; correct?
11     A.   Correct.
12     Q.   So what I'm asking is how are you
13  notified through the AIM system that you have a
14  new case that you need to review?  Is there
15  some sound that is made?  Is there some --
16  something that pops up or is it something else?
17     A.   No, there is no sound, there is no
18  popup box.  The system contains cases that are
19  assigned to each person, and it is the
20  expectation to manage those cases according to
21  their due dates and priorities.
22     Q.   But how are you expected to know
23  that you have a new case?
24     A.   I have my own queue.  So every day,
25  every minute I'm working out of that queue

| Page 30 |
| --- |

PIZARRO

1
2  which contains multiple cases.  So I just
3  continue to work through the cases that are
4  assigned to me and by due date.
5     **Q.   Is it fair to say that if a new case**
6  **is put into your queue you would generally be**
7  **aware of it very quickly?**
8     A.   Yes, I constantly refresh and see my
9  case volume and I work off of due dates.
10    **Q.   Now, I would like to turn your**
11 **attention back to Pizarro 1.  And again, the**
12 **first entry is made by Stephen Somers on**
13 **1/6/2011; correct?**
14    A.   Correct.
15    **Q.   And you first left a voice mail for**
16 **Jen Gurtov four days later on January 10th,**
17 **2011; correct?**
18    A.   Correct.
19    **Q.   Do you know why you waited four days**
20 **to respond to Jen Gurtov?**
21    A.   So our system when a case is called
22 in, they have different due dates.  A case of
23 this type would have a two-day due date.  And
24 what that means is we must contact the partner
25 within two days and no later than that second

TSG Reporting - Worldwide    877-702-9580

| Page 31 |
| --- |

PIZARRO

1
2  business day based upon the volumes that we
3  have of our case management system.  Our
4  ability to contact them is typically at least
5  on that second day.  So if this involved a
6  weekend, my due date probably was the 10th.
7     **Q.   Do you remember your reaction when**
8  **you first read the case as entered by Stephen**
9  **Somers?**
10    A.   Yes.
11    **Q.   What was your reaction?**
12    A.   My reaction was the matter appeared
13 to be very straightforward.
14    **Q.   Okay.  What do you mean by that?**
15    A.   What I mean by that is in cases such
16 as this when it is a clear policy violation it
17 is a pretty straightforward case of misconduct.
18    **Q.   When you say there was a clear**
19 **policy violation, what are you referring to?**
20    A.   The policy that stuck out, the two
21 policies that stuck out for me were
22 falsification of any company document and then
23 our cash handling policies.
24    **Q.   What cash handling policies?**
25    A.   So the cash handling policies that

TSG Reporting - Worldwide    877-702-9580

| Page 32 |
| --- |

PIZARRO

1
2  require the bank deposit to be taken to the
3  bank daily which also violates the safety and
4  security policy, too, and those are --
5     **Q.   Go ahead.**
6     A.   Sorry, nothing.
7     **Q.   And I understood when you read the**
8  **case initially that the district manager, Jen**
9  **Gurtov, wanted to terminate Ms. Marshall; is**
10 **that correct?**
11    A.   Correct.
12    **Q.   Did you think termination was**
13 **appropriate from the summary report that you**
14 **received from Steve Somers?**
15    A.   Yes.
16    **Q.   Why is that?**
17    A.   The policy violations that were
18 pointed out were very straightforward and
19 consistent with where we separated previously
20 and what we calibrate on our team for serious
21 misconduct policy violations.
22    **Q.   Now, you say when it was consistent**
23 **with what you had done previously, what do you**
24 **mean by that?**
25    A.   So as we look at misconduct things

TSG Reporting - Worldwide    877-702-9580

| Page 33 |
| --- |

PIZARRO

1
2  of that nature are serious and each case is
3  reviewed individually and independently.  So in
4  looking at this case, it did have multiple
5  violations under the serious misconduct
6  guideline.
7     **Q.   But my question is you said it was**
8  **consistent with what you had done in the past.**
9  **What had you done in the past that was**
10 **consistent with this?**
11    A.   So it is difficult to speak without
12 having cases in front of me, but falsification
13 or bank deposits or safety and security
14 violations are a very serious and significant
15 policy violation that would result in
16 separation.
17    **Q.   Can you remember any other employee**
18 **who has been terminated for falsification of**
19 **company documents?**
20    A.   I know of several, but nothing that
21 I can speak to right now.  It is a very, very
22 common case that I've managed.  And again, it
23 would have multiple elements to the case that
24 are all fully reviewed.  Each case is unique.
25    **Q.   Is it fair to say that you have been**

TSG Reporting - Worldwide    877-702-9580

Page 34

PIZARRO

1
2 involved in many cases involving falsification
3 of company documents?
4     A.   Yes.
5     Q.   And each of those cases resulted in
6 termination?
7     A.   I would not be able to answer that
8 without looking at the case. Each case has so
9 many different elements to it.
10    Q.   Can you estimate how many cases you
11 have been involved in that involved
12 falsification of company documents?
13    A.   No.
14    Q.   Would you say it has been more than
15 or less than 10?
16    A.   On a quarter, I close about 500
17 cases each quarter. So for me to estimate or
18 average you don't -- all the variety of case
19 types that I handle, I'm just not capable of
20 doing that. I would hate to throw out any
21 numbers. It would be a complete guess, I
22 honestly do not know.
23    Q.   So you handle about 500 cases per
24 quarter?
25    A.   Correct.

TSG Reporting - Worldwide    877-702-9580

Page 35

PIZARRO

1
2     Q.   Can you remember the last case that
3 you were involved in that involved
4 falsification of company documents?
5     A.   Yes.
6     Q.   What was that?
7     A.   There was a case recently that a
8 shift supervisor indicated that he, in the
9 record book that he was on time. And he was
10 actually 45 minutes late and had wrote down a
11 different time. And so essentially it was a
12 time theft and falsification case.
13    Q.   And was that employee disciplined?
14    A.   I believe so and I cannot recall. I
15 believe my recommendation was separation in
16 this case. This was about three weeks ago.
17    Q.   Can you estimate how many cases
18 involving falsification of company documents
19 specifically related to the daily records book
20 you have received in the past year?
21    A.   I can't. I have too many case types
22 to estimate.
23    Q.   Now, if you wanted to sort through
24 your cases to find the ones in which there was
25 a falsification of company documents, how would

TSG Reporting - Worldwide    877-702-9580

Page 36

PIZARRO

1
2 you do that?
3     A.   I actually really don't have that
4 capability. We have at the header of our cases
5 is a description line, and that is what I see.
6 So basically each case is, like, a one line
7 case type across my screen with 80 or so below
8 it. And the case description may say DM
9 separation consultation. I won't know the case
10 details until I get into the bulk of the case.
11 So I do not have any sort of sorting or finding
12 based on keywords or anything of that nature.
13    Q.   Is there a search function within
14 the AIM system where you can search using the
15 keyword or something of that sort?
16    A.   Not that I have access to.
17    Q.   But are you aware of whether it
18 exists that somebody else might have access to?
19    A.   I believe it does exist, yes.
20    Q.   Why do you believe it exists?
21    A.   Because it has been utilized by our
22 reporting person on our team.
23    Q.   Who is that reporting person?
24    A.   Amy Corasko.
25    Q.   Where does she work?

TSG Reporting - Worldwide    877-702-9580

Page 37

PIZARRO

1
2     A.   She is in the corporate office in
3 Seattle.
4     Q.   And how do you know that searching
5 function has been used by her before?
6     A.   It has been discussed.
7     Q.   In what context?
8     A.   When we're looking at -- we have
9 what is called data reporting. So when we try
10 to get the bulk of what our cases are and what
11 they are to share with field leadership and/or
12 other leaders, that type of reporting analysis
13 will be used.
14        MR. GOTTLIEB: I'm going to call for
15 production of any, any case within the AIM
16 system containing the word falsification
17 and containing the word, the term daily
18 records book and likely some other search
19 terms. I'm going to call for production of
20 those documents during the period of 2010
21 and 2011 to the present.
22        MR. GUHA: We will take that under
23 advisement.
24    Q.   Now, you said the recent employee
25 that falsified records in the records book as

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1  to the time that he arrived at work you said
2  you think you recommended him for termination?
3      A.   Yes.
4      Q.   Okay.  Now, before that case, what
5  was the most recent case involving
6  falsification of company records that you can
7  remember?
8      A.   I can't recall.
9      Q.   Can you recall any instance where
10  there is an issue of falsification of company
11  documents where the employee was not
12  terminated?
13      A.   I can't recall.
14      Q.   Can you recall any instance where
15  there is an issue of falsification of company
16  records where the employee was terminated other
17  than Serenity Marshall?
18      A.   I can't recall right now.
19      Q.   I would like to turn your attention
20  to Pizarro 1.  The section where it says,
21  "Entered by Tina Pizarro at 1/10/2011."  Do you
22  see that?
23      A.   Yes.
24      Q.   Beneath that it says, "LVM for

PIZARRO

1  Jennifer;" right?
2      A.   Yes.
3      Q.   That means left voice mail for Jen
4  Gurtov?
5      A.   Correct.
6      Q.   I would like to go through this
7  section piece by piece.  So first it says, "On
8  VM I let Jennifer know that it appears the SM
9  violated our policy under Section 11 of the
10  partner guide, and has a case of serious
11  misconduct that can result in immediate
12  termination, 'falsification or
13  misrepresentation of any company document;'" is
14  that correct?
15      A.   Correct.
16      Q.   And you wrote that in response or --
17  strike that.
18          You wrote that because that is part
19  of the voice mail you left for Ms. Gurtov?
20          MR. GUHA:  Objection.
21      Q.   You can answer?
22      A.   I'm not sure if I understand the
23  question.
24      Q.   Okay.  You typed this entry into the

PIZARRO

1  AIM system; is that correct?
2      A.   Correct.
3      Q.   And you typed this entry based on
4  some actions that you took; correct?
5          MR. GUHA:  Objection.
6      A.   Yes, that would not be correct.
7      Q.   Why would that be incorrect?
8      A.   I typed this based upon what I had
9  already read, the case that Jen had called in
10  based on her details that she had provided to
11  Stephen.
12      Q.   Right.  But this is a summary of a
13  voice mail you left for Jen; is that correct?
14      A.   Yes, that's correct.
15      Q.   So what you wrote here would be a
16  summary of what you did?
17      A.   Correct, yes.
18      Q.   Okay.  So is it fair to say that on
19  the voice mail you left for Jen Gurtov you told
20  her that this was a case of serious misconduct
21  that can result in immediate termination?
22      A.   Yes.
23      Q.   And did you leave that information
24  for the reasons you previously testified to?

PIZARRO

1          MR. GUHA:  Objection.
2      A.   I left the voice mail based upon the
3  review that I had reviewed from Stephen.
4      Q.   What I'm asking about is the
5  specific section I just read.  Why did you say
6  that?
7      A.   I'm not sure if I understand the
8  question.
9      Q.   On the voice mail you left for Jen
10  Gurtov you said, you said that, "It appears the
11  SM violated our policy under Section 11 of the
12  partner guide and has a serious case of" --
13  strike that.  "And has a case of serious
14  misconduct that can result in immediate
15  termination;" right?
16      A.   Correct.
17      Q.   That is part of the voice mail you
18  left for Jen Gurtov?
19      A.   Correct.
20      Q.   Why did you say that on the voice
21  mail?
22      A.   As part of my review and assessment
23  of cases, I will work with the DM or SM to
24  ensure that the policy violation is clear.  So

PIZARRO

1
2  I left that saying, yes, I've got your case.
3  It looks like here is the policy violation.  It
4  sounds like this is a matter of this, let's
5  talk further.  So essentially that is what -- I
6  was leaving the message.
7      Q.   Now, between the time when you first
8  received the case from Stephen Somers until the
9  time that you called Jen Gurtov and left a
10  voice mail on January 10th, did you engage in
11  any actions regarding this case?
12      A.   I don't recall.
13      Q.   Do you know if you reviewed any
14  documents?
15      A.   I don't recall.
16      Q.   Okay.  The next section of the voice
17  mail says, "I asked Jennifer to let me know if
18  any money was missing and any other details
19  that weren't captured here."  Do you see that?
20      A.   Yes.
21      Q.   And is that part of the voice mail
22  you left for her?
23      A.   Yes.
24      Q.   Why did you ask Jennifer to let you
25  know if any money was missing?

PIZARRO

1
2      A.   Because if the deposit is not taken
3  to the bank, I also like to know how much money
4  is missing and whether or not I should involve
5  partner and asset protection.
6      Q.   Okay.  Why would you want to know if
7  any money was missing?
8          MR. GUHA:  Objection.
9      A.   I would want to know if any money
10  was missing whether or not to involve partner
11  and asset protection as that can be a
12  significant store concern if there is cash
13  loss.
14      Q.   If there is what?
15      A.   Cash loss.
16      Q.   So it is fair to say that the issue
17  would be more serious if cash was missing?
18          MR. GUHA:  Objection.
19      A.   It would only be a matter of to me
20  whether to involve P&AP to determine if we can
21  try to retrieve the cash.
22      Q.   My question to you is whether you
23  would consider the problem more significant if
24  cash, if cash was missing from the store?
25          MR. GUHA:  Objection.

PIZARRO

1
2      A.   I would view it still as a matter
3  that is significant.  Cash would just be
4  another element of the case that I would be
5  reviewing.  The matter itself was significant.
6      Q.   I understand the matter was
7  significant.  What I'm asking is whether it
8  would be more significant if cash was missing?
9          MR. GUHA:  Objection.
10      A.   I wouldn't classify it that way.
11  For me it was an administration process whether
12  or not to involve P&AP.
13      Q.   So you wouldn't have any opinion
14  whether it would be a more serious matter if
15  cash were missing?
16      A.   It would be another element to the
17  case for review.  And then it would be a
18  determination of where cash went.  Let's say if
19  the cash was missing and it resulted in an
20  investigation and Ms. Marshall had taken the
21  money, then yes that would also be another
22  layer of significance.  Not knowing any of
23  those details, it would just be a matter for me
24  whether or not to involve P&AP only, partner
25  and asset protection.

PIZARRO

1
2      Q.   So it is fair to say that you cannot
3  say that missing cash would make it more
4  significant?
5      A.   I wouldn't look at it that way.  I
6  wouldn't look at it in terms of what is more or
7  less significant.  I would look at it as where
8  do I go next with the case.  I just, I don't
9  look at it in those terms.
10      Q.   But you looked at it in those terms
11  with regard to falsification of company
12  documents; right?
13      A.   Correct, but if there is an
14  additional piece of already significant case I
15  wouldn't necessarily say oh, now this is a
16  higher level of significance.  To me, it was
17  already significant.  And if money was missing,
18  that would be another element to a significant
19  case.
20      Q.   The next sentence up says I let her
21  know or -- strike that.
22          You also ask Jen Gurtov if any --
23  were there any other details that weren't
24  captured here; is that correct?
25      A.   Correct.

PIZARRO

1
2    **Q. What does that mean?**
3    A. So when a DM and SM or other partner
4 calls in they may provide high levels of
5 details. And there may be other pieces now
6 that it has gone to the case investigator to
7 share with that person. So it is just a way of
8 ensuring is there anything else that I should
9 be aware of.
10    **Q. The last section of the voice mail**
11 **you wrote, "I let her know from the notes that**
12 **it appears the SM does admit to the situation**
13 **and I agree with the consequence of separation**
14 **but would like to discuss further and provide**
15 **number;" is that correct?**
16    A. Correct.
17    **Q. Now, you said, "I let her know from**
18 **the notes that it appears SM does admit to the**
19 **situation." Are you referring to Jen Gurtov's**
20 **statement that the SM admitted to it?**
21    A. Yes.
22    **Q. Anything else?**
23    A. Well, it would be the whole totality
24 of the case not just the admission, but for the
25 falsification and not adhering to the cash and

PIZARRO

1
2 safety and security policy. It was the whole
3 matter.
4    **Q. When you said, "SM does not admit to**
5 **the" -- excuse me. You said, "SM does admit to**
6 **the situation." What were you referring to?**
7    A. To Jen's notes that -- I will review
8 it here. So number 5, I was referring to
9 number 5 where SM reason for falsifying deposit
10 information, etcetera.
11    **Q. Anything else?**
12    A. So specifically referring to the
13 admission, it would have been that one and
14 again, the overall case situation.
15    **Q. You wrote, "I agree with the**
16 **consequence of separation;" right?**
17    A. Uh-huh, yes.
18    **Q. Can you tell me every reason why you**
19 **agreed with the consequence of separation at**
20 **that point?**
21    MR. GUHA: Objection. You can
22    answer the question.
23    A. In reviewing the, the case notes, I
24 reviewed it based upon the falsification, the
25 deposit, the safety and security and her

PIZARRO

1
2 admission. And those would have been the
3 reasons I would have said that statement.
4    **Q. Anything else?**
5    A. Well, I said I wanted to review it
6 further and provided the number, but those were
7 the main reasons I supported it.
8    **Q. Did you understand at that point**
9 **that Serenity Marshall was a nine year**
10 **employee?**
11    A. I don't recall if I reviewed that
12 piece yet or not.
13    **Q. Did you think the employee's tenure**
14 **at Starbucks was a important factor to consider**
15 **before termination?**
16    A. We have partners of all experience
17 levels. And it is an unfortunate part of the
18 job we have long tenured partners or short
19 tenured partners when it comes to policy
20 violations, tenure does not play a factor in my
21 decisions. It is just something that, you
22 know, feels unfortunate personally.
23    **Q. So when you said, "I agree with the**
24 **consequence of separation," it is fair to say**
25 **you had not considered the duration and body of**

PIZARRO

1
2 **work of Serenity Marshall at Starbucks?**
3    MR. GUHA: Objection.
4    A. I purely reviewed it based upon
5 policy violations at this point.
6    **Q. And at that point you did not**
7 **consider her employment at Starbucks beyond**
8 **that violation?**
9    MR. GUHA: Objection.
10    A. The things that I evaluate are the
11 policy violations and the level of severity of
12 those violations.
13    **Q. And that is it?**
14    A. Well, with each case, there is,
15 there is many unique factors that can go into a
16 full review. So at this point, we hadn't
17 finished the case. There was other pieces that
18 I wanted to discuss and review but yes, the
19 case was not finished at that point.
20    **Q. At that point, the only**
21 **consideration that you had made when agreeing**
22 **with the consequence of termination was the**
23 **violation as reported by Ms. Gurtov?**
24    MR. GUHA: Objection.
25    A. Can you rephrase the question,

1                    PIZARRO
2    please?
3        Q.   Is it fair to say that when you left
4    the voice mail for Ms. Pizarro and you said you
5    agree with the concept of separation, that that
6    was based only on the violation as reported by
7    Jen Gurtov?
8        A.   Correct.  And I agree with
9    separation and want to review further.
10       Q.   Okay.  When you say that, "I would
11   like to discuss further," what did you mean by
12   that?
13       A.   So for any case again, they have
14   unique properties and matters to them.  So
15   dependent upon the case will want to review and
16   discuss it further.  So whether there is
17   performance reviews to look at corrective
18   actions, that sort of thing, so it is obtaining
19   and reviewing the facts of the case further.
20       Q.   But if you already agreed with the
21   consequence of separation, what would you need
22   to discuss further?
23       A.   I would want to see that the
24   information also represents what was said here
25   by Jen.

TSG Reporting - Worldwide    877-702-9580

1                    PIZARRO
2        Q.   What do you mean by that?
3        A.   So just having a dialogue, so not to
4    have just these decisions made over voice mail
5    but to have an actual dialogue with the
6    district manager of what that conversation
7    looked like with the partner, reviewing
8    performance reviews, any prior corrective
9    actions or coaching, and then of course you
10   know, the information as far as what would have
11   been falsified and deposit slips and things of
12   that nature.
13       Q.   Why would you want to review
14   previous performance reviews and corrective
15   actions?
16       A.   It is just an element that is
17   typically done in a separation case just so
18   that I have the full picture.  And so that the
19   picture is on file for safekeeping it is the
20   best practice that we have.
21       Q.   Anything else?
22       A.   Anything else in which area?
23       Q.   Is there any other reason you would
24   need to see previous performance reviews and
25   corrective actions other than just to have it

TSG Reporting - Worldwide    877-702-9580

1                    PIZARRO
2    on file?
3        MR. GUHA:  Objection.
4        A.   Again, taking in the entire
5    performance corrective action history helps
6    demonstrate where this partner is at.  And it
7    is -- it all depends upon the case.  And it is
8    just a matter of recordkeeping and keeping it
9    on file.
10       Q.   Okay.  So just to be clear, is it
11   your testimony that separation determinations
12   are impacted by the employee's history and
13   performance at Starbucks or termination
14   decisions for violations are not impacted by
15   the partner's history and performance?
16       A.   It all depends upon the case type.
17   We, we do not have what is called progressive
18   discipline at Starbucks.  So if a partner --
19   you know, there is no guarantee that they will
20   get a, you know, verbal, written final
21   separation type conversation.  You know, any
22   corrective action up to and including
23   termination can happen at any time on any case.
24       So if I had a case on time and
25   attendance that might be something that might

TSG Reporting - Worldwide    877-702-9580

1                    PIZARRO
2    be -- they might be on a final.  And I will
3    want to review that documentation, see if there
4    is grounds for the separation.  So it is really
5    a matter of the history of performance on
6    something that might not be under the serious
7    misconduct violation.
8        So if it is something that has been
9    a behavioral performance issue, but is not
10   egregious enough or serious misconduct then
11   those things are relevant.  Otherwise, they
12   could be just part of the file.
13       Q.   Now, you spoke with Jen Gurtov on
14   January 12th, 2011; is that correct?
15       A.   Yes.
16       Q.   Are you aware of any actions you
17   took with regard to this case between January
18   10th, 2011 and January 12th, 2011?
19       A.   Not that I recall.
20       Q.   Do you remember that conversation?
21       A.   I remember it through my notes here.
22   I do not.
23       Q.   Do you have an independent
24   recollection of it separate from your notes?
25       A.   I do not.

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2    Q.   Separate from your notes, can you
3  tell me anything specifically that was
4  discussed during that conversation?
5    A.   I cannot recall.
6    Q.   Do you remember how long the
7  conversation lasted?
8    A.   I cannot recall.
9    Q.   Do you remember where you were when
10  the conversation took place?
11    A.   I cannot recall.
12    Q.   Do you remember if anyone else was
13  on the call?
14    A.   I cannot recall, but there would be
15  no reason for anybody else to be on the call.
16    Q.   Do you remember if you took any
17  notes of the call other than from this
18  document?
19    A.   I cannot recall.
20       MR. GUHA:  Dave, whenever it is a
21  good time for a couple of minutes break.  I
22  don't want to interrupt your questioning.
23  Let us know.
24       MR. GOTTLIEB:  We've been going for
25  an hour.  Now might be an okay time before

PIZARRO

1
2  I get into this section.
3       (Recess, 10:21 to 10:34 a.m.)
4    Q.   Ms. Pizarro, I would like to discuss
5  the conversation you had with Ms. Gurtov on
6  January 12th, 2011.  Now, the first sentence
7  says, "Jennifer will fax me her statement when
8  the SM admitted to falsifying the books to hide
9  the fact that the SM was not taking the
10  deposits to the bank daily;" is that correct?
11    A.   Yes.
12    Q.   Why did you write that?
13    A.   I was capturing our conversation.
14    Q.   That is what Jen Gurtov told you she
15  would do?
16    A.   From what I can tell from this
17  statement.  I don't recall the actual
18  conversation only based on this statement.
19    Q.   Does that statement refresh your
20  recollection of the conversation?
21    A.   It does not.
22    Q.   I would like to you to read this entire
23  section under where it says, "Talked with DM
24  Jennifer," and tell me if that section
25  refreshes your recollection in any way about

PIZARRO

1
2  the conversation you had with her?
3       MR. GUHA:  You mean read to herself?
4    A.   Yes.
5    Q.   You can read it to yourself?
6    A.   Yes.  This sounds, it sounds like
7  things I type but I physically cannot picture
8  myself or remember that exact conversation.
9    Q.   So even after reading that section,
10  it does not refresh your memory as to the
11  context of that conversation and what was said
12  and so forth; is that correct?
13    A.   Correct, I would not be able to
14  expand upon that conversation.  I don't recall
15  the physical actual conversation.
16    Q.   Well, I'm not asking you to expound
17  upon it.  I'm asking you if what you read
18  refreshes your recollection about it?
19    A.   No, it doesn't.
20    Q.   I would like to refer you to the
21  second sentence where it says, "DM Jennifer
22  stated that she found multiple days in which
23  the deposits were not taken to the bank and
24  were just sitting in the store.  We discussed
25  that it is a major violation of the safety and

PIZARRO

1
2  security policy in addition to the falsifying
3  of records which is a violation of the partner
4  guides policies."  Do you see that?
5    A.   Yes.
6    Q.   Do you remember discussing that with
7  Jen Gurtov during this call?
8       MR. GUHA:  Objection.
9    A.   I do not.
10    Q.   Next sentence says, "DM Jennifer
11  stated she also discovered on a regular basis
12  the store was short 300 to 400 dollars a month.
13  The SM was not conducting till audits and DM
14  stated it is suspicious where the money has
15  gone and was wondering if the books were being
16  manipulated to make up for lost amounts."  Do
17  you see that?
18    A.   Yes.
19    Q.   Do you remember discussing that
20  issue with Ms. Gurtov during the telephone
21  call?
22       MR. GUHA:  Objection.
23    A.   I do not.
24    Q.   The next sentence says, "DM Jennifer
25  will send me the entire file and her statement

PIZARRO

1 PIZARRO
2 of the conversation with SM Serenity." Do you
3 remember the content of the conversation?
4     A.   I do not.
5     Q.   And then it says, "SM Serenity is
6 commonly out on LOA.  I advised that I will
7 present to legal to determine if we can move
8 forward with this while on LOA."  Do you see
9 that?
10     A.   Yes.
11     Q.   And do you understand what LOA
12 stands for?
13     A.   Yes.
14     Q.   And is that leave of absence?
15     A.   Yes.
16     Q.   Do you remember discussing with Ms.
17 Gurtov on the telephone call that Serenity
18 Marshall was out on a leave of absence?
19     A.   I do not recall that conversation.
20     Q.   What was the next action you took
21 with regard to Ms. Marshall's termination after
22 the conversation you had with Ms. Gurtov on
23 January 12th, 2011?
24     A.   I do not recall.
25     Q.   As you sit here today?

PIZARRO

1 PIZARRO
2     A.   Pardon?
3     Q.   As you sit here today, you cannot
4 recall the next action you took?
5     A.   Correct.
6     Q.   Can you remember any action you took
7 after January 12th, 2011 with regard to Ms.
8 Marshall's termination?
9     A.   I would need to refer to my case
10 notes. I don't physically recall.
11     Q.   When you say your case notes, are
12 you referring to the redacted portion of this
13 document?
14     A.   Correct.
15     Q.   Do you remember if you ever spoke to
16 counsel regarding Ms. Gurtov's separation
17 consultation?
18         MR. GUHA:  I will instruct the
19     witness not to testify as to the substance
20     of any of those conversations, although she
21     can answer your question as to whether you
22     actually spoke to counsel.
23     Q.   Do you remember if you ever spoke
24 with counsel regarding Ms. Marshall's
25 separation?

PIZARRO

1 PIZARRO
2     A.   I do recall reaching out to counsel,
3 yes.
4     Q.   Do you remember the first date that
5 you reached out to counsel?
6         MR. GUHA:  Same instruction to the
7     witness.
8     A.   I do not recall the exact date.  I
9 would have to refer to my case notes.
10     Q.   Do you recall if it was more than or
11 less than a week after your conversation with
12 Ms. Gurtov?
13         MR. GUHA:  Same instruction to the
14     witness.
15     A.   I do not recall, I would have to
16 again refer to my notes.
17         MR. GOTTLIEB:  I'm going to call for
18     production of unredacted portions of this
19     document to be produced for an in camera
20     review to determine whether redacted
21     portions are properly privileged given that
22     the witness cannot recall the dates on
23     which she spoke to counsel.
24         MR. GUHA:  I will take that under
25     advisement and we can obviously discuss

PIZARRO

1 PIZARRO
2 that later.
3     Q.   Do you remember if during the
4 conversation with Ms. Gurtov on January 12th,
5 2011 you made any recommendation regarding
6 separation?
7     A.   I can only refer to my notes here.
8 I don't recall that conversation.
9     Q.   And based on your notes, do you
10 believe you recommended termination?
11     A.   And did you say the 12th?
12     Q.   Yes.
13     A.   I cannot recall if my notes don't
14 say it specifically, I would have continued
15 discussing the matter.
16     Q.   Do you remember if during that
17 telephone call with Jen Gurtov you discussed
18 any of Ms. Marshall's previous corrective
19 actions?
20     A.   I don't recall.
21     Q.   Do you remember if during that
22 conversation with Ms. Gurtov you discussed any
23 of Serenity Marshall's previous performance
24 issues?
25     A.   I don't recall.

1       PIZARRO
2       MR. GOTTLIEB:  Can the court
3   reporter please hand the witness what was
4   previously marked?
5       (Exhibit 2 marked.)
6       Q.   Ms. Pizarro, you have in front of
7   you what has been marked Pizarro 2, which I
8   will represent be Bates stamped 2128 and 2129,
9   two-page document.  Are the Bates stamp numbers
10  cutoff on your end?
11      MR. GUHA:  We have them here.
12      MR. GOTTLIEB:  You do, okay.
13      Q.   Have you ever seen this document
14  before?
15      A.   Yes.
16      Q.   When?
17      A.   I believe I reviewed this yesterday.
18      Q.   Okay.
19      A.   And probably before, during my case
20  -- or e-mail appears.
21      Q.   Well, your e-mail doesn't appear
22  anywhere here?
23      A.   I was going to say -- never mind, I
24  might have looked at this yesterday.  I don't
25  know for sure.
        TSG Reporting - Worldwide    877-702-9580

1       PIZARRO
2       Q.   I would like to direct your
3   attention to the e-mail at the bottom of the
4   first page from Jennifer dated January 12th at
5   12:05 p.m.  Do you see that?
6       A.   Yes.
7       Q.   And the substance of the e-mail says
8   the -- I will read the first two sentences.
9   "So I heard back from partner resources contact
10  center Tina Pizarro, a representative there,
11  supports separation of Serenity's employment
12  with Starbucks for her admitted falsification
13  of company documents.  In this case the daily
14  record book as well for continuously not
15  depositing deposits into the bank daily."  Do
16  you see that?
17      A.   Yes.
18      Q.   Does reading this e-mail refresh
19  your recollection as to the content of any
20  conversation you had with Ms. Gurtov on January
21  12th, 2011?
22      A.   No.
23      Q.   Can you say one way or the other
24  whether it was accurate that you supported
25  separation at that point?
        TSG Reporting - Worldwide    877-702-9580

1       PIZARRO
2       A.   I would have to refer to my case
3   notes. I don't know.
4       Q.   Other than from what your case notes
5   may say, does this refresh your recollection of
6   whether you supported separation during your
7   conversation with Ms. Gurtov on January 12th,
8   2011?
9       A.   I don't recall the specifics of that
10  conversation.
11      Q.   I would like to refer you to the
12  bottom of that e-mail which is on the second
13  page.  And there is a paragraph that begins, "I
14  am sending Tina an e-mail stating specifically
15  the conversation I had with Serenity on her
16  development day, and I'm also faxing all past
17  corrective actions and performance reviews by
18  the end of this week.  She is planning on
19  bringing this case to the legal department.
20  She thinks they will support Serenity's
21  separation immediately even though she has
22  initiated her LOA."  Do you see that?
23      A.   Yes.
24      Q.   Does reading that refresh your
25  recollection in any way as to the conversation
        TSG Reporting - Worldwide    877-702-9580

1       PIZARRO
2   you had with Ms. Gurtov on January 12th, 2011?
3       A.   No.
4       Q.   And you see where it says she had
5   planning on bringing this case to the legal
6   department?
7       A.   Yes.
8       Q.   Do you remember saying that to Ms.
9   Gurtov?
10      A.   I do not recall physically saying it
11  to her, but I do see it in my prior case notes
12  that we just reviewed.
13      Q.   Okay.  Do you remember feeling as
14  though you should call legal after you had a
15  conversation with Jen Gurtov?
16      A.   I don't recall feeling that way.
17  Again, I can only refer to my case notes that
18  indicate that.
19      Q.   Well, you did, in fact, speak to
20  legal after you had the conversation with Jen
21  Gurtov; correct?
22      MR. GUHA:  Again, instruct the
23  witness not to answer the question, but
24  exclude from any of her answers any of her
25  conversations with legal.
        TSG Reporting - Worldwide    877-702-9580

PIZARRO

1          PIZARRO
2      A.    That is correct. I reached -- from
3  the case notes, I reached out to legal.
4      Q.    So there is a reason that you called
5  legal after you talked to Ms. Gurtov; is that
6  correct?
7      A.    Correct.
8      Q.    What was the reason you wanted to
9  talk to legal?
10         MR. GUHA:  Again, just David, just
11      to be very careful here about the privilege
12      I would instruct the witness to exclude any
13      conversations she had with legal although
14      she can answer the question with respect to
15      what was in her own mind prior to
16      contacting legal.
17      Q.    Okay.
18      A.    So in matters of LOA, it is a
19  general practice of mine to reach out to our
20  legal team.
21      Q.    Anything else?
22      A.    Well, if it is relevant to this
23  case, not that I can recall.
24      Q.    Why do you intend to contact legal
25  where there is an issue involving a leave of
       TSG Reporting - Worldwide    877-702-9580

1          PIZARRO
2  absence?
3      A.    So matters that involve a partner
4  when it comes to a job protected status, I want
5  to ensure that I have the full knowledge and/or
6  guidance, support, recommendation whatever you
7  want to call it from our legal department on
8  our decisions.
9      Q.    Why is that?
10      A.    Part of my role is a risk mitigator
11  to the company.  So to ensure we look at things
12  fully.  And again, it is an LOA status is just
13  a protected status that, that I take to legal
14  on a general basis.
15      Q.    When you contact legal with regard
16  to discipline of an employee who has a
17  protected status, are you doing so for legal
18  advice or for something else?
19         MR. GUHA:  Objection.
20      A.    Yes, I did not necessarily mention
21  protected status.  I was contacting legal on a
22  general basis for LOA cases.
23      Q.    Okay.  When you contact legal with
24  regard to cases involving a partner on a leave
25  of absence or who may take a leave of absence,
       TSG Reporting - Worldwide    877-702-9580

1          PIZARRO
2  are you contacting legal for legal advice or
3  for something else?
4         MR. GUHA:  Objection.
5      A.    I would be contacting legal just to
6  have the case fully reviewed to again to ensure
7  that our thought processes and decisions are in
8  line with the company standards and practices.
9      Q.    Okay.  Anything else?
10      A.    No.
11      Q.    When you contact legal, are you
12  calling them to make sure that the decisions
13  being made are -- strike that.
14         When you contact legal, are you
15  calling them for purposes of legal advice or to
16  make sure that you're following company
17  policies?
18         MR. GUHA:  Objection.
19      A.    It would depend upon the case type
20  and what is involved in the case.
21      Q.    What about for Serenity Marshall?
22         MR. GUHA:  Again, you can answer
23      that question to the extent it excludes
24      from your answer any conversations you did
25      have with legal.  But to the extent you are
       TSG Reporting - Worldwide    877-702-9580

1          PIZARRO
2  testifying only about your thought process,
3  I think that is appropriate.
4      A.    So in this case, the thought process
5  would be the LOA status.
6      Q.    Right.  But were you contacting
7  legal for the purpose of getting legal advice
8  or for the purpose of getting advice with
9  regard to following company policies and
10  business practices?
11         MR. GUHA:  Objection.
12      A.    So any time I connect with legal, it
13  is for all of that.  It is to either obtain
14  legal advice and/or to ensure I am adhering to
15  company policies, practices and standards.
16      Q.    Okay.  But in this particular
17  circumstance with Serenity Marshall, was it for
18  legal advice, was it for ensuring compliance
19  with company policies or was it for something
20  else?
21         MR. GUHA:  Objection.
22      A.    So those additional conversations
23  from my understanding are protected as to why
24  and that initial content at the present time of
25  that conversation.
       TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2   Q.   I'm not asking about the content of
3   the conversation.  What I'm asking is why you
4   were calling legal?
5          MR. GUHA:  Objection.
6   Q.   So is the reason you were calling
7   legal because you wanted to ensure that you
8   were following company policies or were you
9   calling legal because you wanted legal advice
10  or were there other reasons why you were
11  calling?
12         MR. GUHA:  Objection.
13  A.   As a best practice with my cases, I
14  connect with legal on most of the LOA cases.
15  Q.   Right.  But what I'm trying to get
16  at is why you called legal on your LOA cases
17  and specifically why you called legal, why you
18  called legal with regard to Serenity Marshall?
19         MR. GUHA:  Objection, it has been
20  asked and answered.
21  Q.   So why did you call legal with
22  regard to Serenity Marshall?
23         MR. GUHA:  Objection.
24  A.   As a best practice of my LOA cases
25  to connect with legal.

PIZARRO

1
2   Q.   And what are the reasons why you
3   call legal as part of your best practices on
4   LOA cases?
5          MR. GUHA:  Objection, asked and
6   answered.
7   A.   You can go ahead as a risk mitigator
8   for the company to ensure I am obtaining
9   appropriate legal guidance thought, support and
10  to adhere to standards, practices and policies.
11  Q.   And those are the reasons that you
12  -- strike that.
13         And those are the reasons you call
14  legal each time you call legal on an LOA case?
15         MR. GUHA:  Objection.
16  A.   Yes.  As LOA cases are reviewed as a
17  best practice, I will reach out to legal.
18  Q.   Okay.  But that is not exactly what
19  I'm asking.  And it is really important that
20  you understand the question that I'm asking,
21  because I would like this to be an efficient
22  deposition and I want to make sure the record
23  is clear.  So I just want to make sure, do you
24  understand what I'm asking?
25         MR. GUHA:  Is there a question

PIZARRO

1
2   pending right now?
3   Q.   Well, this has been a line of
4   questions based on an answer I'm not sure she
5   understands, I want to make sure she does.  So
6   can the court reporter read back the last three
7   questions and answers?
8          (Record read.)
9   Q.   Now, you testified that the reasons
10  you call legal with regard to LOA cases is for
11  legal guidance and to ensure compliance with
12  company policy; correct?
13  A.   In addition to the other reasons
14  stated.  So as a best practice, you know, it is
15  to review all of that and as I've mentioned the
16  standard practices, guidance, thoughts.  I mean
17  so many -- all of those reasons.
18  Q.   Okay.  So it is fair to say that
19  there are a number of reasons why you call
20  legal with regard to LOA cases generally?
21         MR. GUHA:  Objection, go ahead and
22  answer the question.
23  A.   And not to be repetitive and yes, it
24  is for guidance support, thoughts, you know and
25  policies, standards and adherence to those

PIZARRO

1
2   policies and standards.
3   Q.   Okay.  So guidance, support, what
4   else?
5   A.   Advice --
6          MR. GUHA:  Objection, asked and
7   answered.  You can go ahead and answer the
8   question.
9   A.   Advice and overall adherence to the
10  policies and standards of the company.
11  Q.   Okay.  So your testimony is that
12  there are four reasons why you call legal on
13  LOA cases.  Guidance is one, support is
14  another, advice is a third and adherence to
15  company standards is a fourth; is that correct?
16         MR. GUHA:  I will object that is a
17  mischaracterization of her testimony.  You
18  actually had the court reporter read back
19  her testimony that was more expansive than
20  that.  So I don't think this is an
21  appropriate way of questioning.  You can go
22  ahead, but I don't -- but I am going to
23  state my objection to that.
24  Q.   Okay.  Just so we're clear because
25  the, there have been a number of questions in

Page 74

PIZARRO

1  this area that have -- that seem to have gone
2  around in circles to a degree.  Other than --
3        MR. GUHA:  I object to that
4        characterization of the answers to the
5        questions, because I don't think they have
6        gone around in circles, but you can go
7        ahead.
8     Q.   Well, for the sake of clarity, other
9  than guidance, support, advice and adherence to
10 company standards, is there any other reason
11 that you generally call legal on LOA cases?
12       MR. GUHA:  Objection, asked and
13       answered numerous times.
14    A.   It is just a best practice to
15 contact legal for the reasons that I've
16 mentioned.
17    Q.   But I'm asking are there any reasons
18 other than the four I just mentioned?
19       MR. GUHA:  Objection, asked and
20       answered.  And from the question you had,
21       the question and answer you had the court
22       reporter read back you know that there
23       are --
24       MR. GOTTLIEB:  I would like her to

TSG Reporting - Worldwide     877-702-9580

Page 75

PIZARRO

1  list them.
2        MR. GUHA:  She already has.
3        MR. GOTTLIEB:  But then she limited
4        them in a subsequent answer.  I want to
5        make sure that everybody is clear,
6        clarification on why she generally calls
7        legal on LOA cases.
8        MR. GUHA:  I just want to make sure
9        my objection is clear.  You limited, by
10       mischaracterizing her testimony in your
11       question what you listed what you believe
12       what you identified as quote, unquote,
13       the four reasons were.  I think from the
14       questions and answers you received earlier
15       that is clearly not the case, but you can
16       go ahead and ask the question.
17       MR. GOTTLIEB:  I obviously disagree
18       with that characterization, but the record
19       and your objection is on the record.
20    Q.   Other than guidance, support,
21 advice, and adherence to company standards, are
22 there any other reasons you generally call
23 legal on LOA cases?
24       MR. GUHA:  I will object.  You can

TSG Reporting - Worldwide     877-702-9580

Page 76

PIZARRO

1  answer the question.
2     A.   As a best practice, I call LOA.  I
3  call legal on LOA cases for the reasons you
4  have mentioned, ones I've mentioned already.  I
5  think what else I've mentioned is legal advice,
6  thoughts, support, I've used several words that
7  describe that adherence to overall company
8  policies and standards and just overall review
9  as a risk mitigator approach for the company.
10       MR. GOTTLIEB:  Can I have the court
11       reporter read that answer back?
12       (Record read.)
13    Q.   Anything else?
14    A.   No.
15    Q.   Now, specifically with regard to
16 when you called legal for Serenity Marshall,
17 was part of the reason you called legal for
18 overall review as a risk mitigator approach?
19    A.   I called based on my best practice
20 on LOA cases.
21    Q.   But was that one of the reasons?
22    A.   I don't recall.
23    Q.   Do you recall whether one of the
24 reasons you called was adherence to company

TSG Reporting - Worldwide     877-702-9580

Page 77

PIZARRO

1  standards?
2     A.   I don't recall.
3     Q.   Do you recall whether one of the
4  reasons you called was for guidance?
5     A.   I don't recall.
6     Q.   Do you recall whether one of the
7  reasons you called was for support?
8     A.   I don't recall.
9     Q.   Do you recall whether one of the
10 reasons you called was for legal advice?
11    A.   I don't recall.
12    Q.   Do you recall whether the reason you
13 contacted legal at any point regarding Serenity
14 Marshall was for legal advice?
15    A.   I don't recall thinking the nature
16 of why I wanted to talk to legal.  It was
17 really for me about a best practice that I do
18 on --
19    Q.   I'm sorry, did I interrupt you?
20    A.   No, I just said on LOA cases.
21    Q.   Is there any company policy
22 regarding best practices with regard to
23 contacting legal?
24    A.   There is no policies, no.

TSG Reporting - Worldwide     877-702-9580

PIZARRO

1
2     Q.   Why isn't it your understanding
3  contacting legal is the best practice on LOA
4  cases?
5     A.   It is my best practice that I like
6  to do.  And I will consult with legal not only
7  on LOA cases or just other cases as our
8  internal resource available to us.  So it is
9  just a best practice that I have on LOA cases
10 to connect with legal.
11    Q.   What other cases do you generally
12 call legal on?
13    A.   I wouldn't be able to speak to that
14 without having the cases in front of me.
15    Q.   Well, LOA is one category of case or
16 -- strike that.
17        A case that involves an LOA is one
18 category of case where you generally contact
19 legal; is that correct?
20    A.   Yes.
21    Q.   Are there any other categories of
22 cases that you generally contact legal as a
23 result of?
24    A.   It is hard to describe.  There is so
25 many cases that have unique elements and

PIZARRO

1
2  matters combined into them, so I can't think of
3  necessarily another bucket that I would always
4  contact legal on.
5     Q.   So is it fair to say the only
6  category of cases that you generally call legal
7  for LOA cases?
8        MR. GUHA:  Objection.
9     A.   Yes.  If I -- I don't know if I can
10 say that I have a general practice on other
11 cases.  I think there are so many cases that I
12 do reach out to legal and so many unique
13 elements to the cases.  And LOA is one that I
14 know of of connecting with legal.
15        MR. GOTTLIEB:  Can the court
16    reporter hand Ms. Pizarro the exhibit that
17    has been marked Exhibit 3?
18        (Exhibit 3 marked.)
19    Q.   I'm sorry, you can put 3 aside.  I'm
20 not sure we're going to be using that at all.
21        MR. GOTTLIEB:  Would you hand Ms.
22    Pizarro Exhibit 8?
23        (Exhibit 8 marked.)
24    Q.   You have been handed what has been
25 marked Pizarro 3.  Can you see the Bates

PIZARRO

1
2  numbers on these documents?
3        MR. GUHA:  On this document, just to
4     help with identification, it is an e-mail
5     from Jen Gurtov sent Thursday, January 13,
6     2011 at 6:45 p.m. to Tina Pizarro and CCed
7     is Nancy Murgalo, Victor Heutz, Jen Gurtov
8     and the subject is Serenity Marshall.
9        MR. GOTTLIEB:  That's correct.  And
10    just for the record these documents were
11    produced as Bates stamped 1614 through
12    1621.
13    Q.   Ms. Pizarro, do you recognize this
14 document?
15        MR. GUHA:  Can you just give me a
16    second?  I will just count the pages to
17    make sure we're okay.
18        MR. GOTTLIEB:  Sure.  Should be
19    eight pages.
20        MR. GUHA:  We have eight pages,
21    that's right.
22    Q.   Okay.  Ms. Pizarro, please review
23 this document and let me know when you are done
24 reviewing.  Tell me if you recognize it?
25    A.   So it looks familiar based upon the

PIZARRO

1
2  documentation that I quickly reviewed
3  yesterday.
4     Q.   Do you remember receiving this
5  e-mail from Jen Gurtov on January 13th, 2011?
6     A.   I do not.
7     Q.   Do you know why Ms. Gurtov wrote you
8  this e-mail?
9     A.   I wouldn't be able to speculate as
10 to her reasons as to why she wrote it.
11    Q.   Do you know why she wrote it though?
12 Did she ever tell you, for instance?
13    A.   Not that I can recall.
14    Q.   Do you remember if you ever reviewed
15 this e-mail and the attachments before making
16 any recommendation to Ms. Gurtov regarding
17 termination?
18    A.   I don't recall.
19    Q.   As you sit here today, do you ever
20 remember making a recommendation to Ms. Gurtov
21 regarding termination?
22    A.   I don't recall the actual
23 conversation.  I just recall -- or I can only
24 see my case notes.
25    Q.   And you are referring to the voice

PIZARRO

1
2 mail?
3     A.   And the additional case notes that
4 after the voice mail where it looks like we
5 discussed it further.
6     Q.   Other than what it says in the case
7 notes on January 10th, 2011 to January 12th,
8 2011, are you aware of whether you ever
9 communicated with Jen Gurtov with regard to a
10 recommendation on termination?
11     A.   I don't recall actually having the
12 conversation.  I would refer to, to my notes.
13     Q.   Do you remember if you ever did
14 recommend termination?
15     A.   I would have to refer to my case
16 notes.
17     Q.   Do you remember when the decision to
18 terminate Serenity Marshall took place?
19     A.   I do not.
20     Q.   Do you know if it occurred before or
21 after January 12th, 2011?
22     A.   I do not.
23     Q.   Do you know if it occurred after
24 January 13th, 2011?
25     A.   I don't recall.

PIZARRO

1
2     Q.   Does Pizarro 8, the document you
3 have in front of you does that indicate to you
4 whether the decision to terminate Ms. Marshall
5 took place before or after January 13th?
6     A.   So can you repeat the question, make
7 sure I understand.
8     Q.   The question is whether the document
9 in front of you, Pizarro 8 indicates to you
10 whether the decision to terminate Ms. Marshall
11 occurred before or after January 13th?
12     A.   So based upon the documentation here
13 and in the initial case call in from DM Jen
14 Gurtov, she was looking for separation.  So
15 this does not indicate at what point or what
16 conversations I have had.
17     Q.   Do you remember if you ever reviewed
18 any documents in connection with Serenity
19 Marshall's case?
20     A.   I do not recall.
21     Q.   Do you remember if you ever reviewed
22 any corrective actions?
23     A.   I do not recall.
24     Q.   Do you remember if you ever reviewed
25 any coaching memos?

PIZARRO

1
2     A.   I do not recall.
3     Q.   Do you remember whether you reviewed
4 any performance reviews?
5     A.   I do not recall.
6     Q.   Now, looking at Pizarro 8, that was
7 the e-mail from Jen Gurtov to you; correct?
8     A.   Yes.
9     Q.   Do you remember if you ever
10 responded to that e-mail?
11     A.   I don't recall.
12         MR. GOTTLIEB:  Can the court
13 reporter pass Ms. Pizarro what was
14 previously marked Pizarro 3?
15         (Exhibit 3 marked.)
16     Q.   Now, Ms. Pizarro, do you see at the
17 top of that document there is an e-mail
18 redacted from you to Jen Gurtov dated January
19 18th, 2011?
20     A.   Yes.
21     Q.   Do you remember writing that e-mail
22 to Ms. Gurtov?
23     A.   I do not.
24     Q.   Do you remember why you wrote an
25 e-mail to Ms. Gurtov five days after she wrote

PIZARRO

1
2 one to you?
3     A.   I do not.
4         MR. GOTTLIEB:  I will call for
5 production of this e-mail unredacted.
6         MR. GUHA:  We will take it under
7 advisement.
8         MR. GOTTLIEB:  Would you hand Ms.
9 Pizarro Exhibit 4?
10         (Exhibit 4 marked.)
11     Q.   And is there a Bates stamp on there?
12         MR. GUHA:  There is 1767.
13         MR. GOTTLIEB:  Yes, correct, okay.
14     Q.   Now, Ms. Pizarro, do you recognize
15 this document?
16     A.   I recognize it that it is written
17 from me, but I don't recall it.
18     Q.   Okay.  Do you see where there is, it
19 says it is an e-mail from you to Shelly Ranus
20 on 12/5/2011; correct?
21     A.   Correct.
22     Q.   And towards the bottom of the header
23 area it is a, there is attachments; correct?
24     A.   I don't see the word attachments.
25 Oh, yes.

Page 86

PIZARRO

1
2   Q.   Do you see where it says
3   attachments?
4       A.   Yes.
5       Q.   And the document attached is titled,
6   "Issue with SM Serenity Marshall and number
7   1088330 store 11649, New York/attorney-client
8   privilege;" correct?
9       A.   Correct.
10      Q.   Do you know what document that is?
11      A.   No.
12      Q.   Okay.  Do you know if you typed,
13  came up with the title to that document or is
14  that something generated through the computer
15  system?
16      A.   Yes, that would have been something
17  I typed.
18      Q.   How do you know that?
19      A.   Just because our computer system
20  doesn't have cases marked that way.  Typically
21  when I send a case to legal I will put it in
22  this type of format.
23      Q.   Okay.  So is it fair to say when you
24  send in attachments to legal you include the
25  term attorney-client privilege as part of the

TSG Reporting - Worldwide     877-702-9580

---

Page 87

PIZARRO

1
2   title?
3       A.   Yes.
4       Q.   Why do you do that?
5       A.   As requested by our legal team on
6   any communication.
7       Q.   Any other reason?
8       A.   I wouldn't be able to speak to that,
9   I don't know.  Just as requested by our legal
10  team.
11      Q.   There is no reason you do that other
12  than because it is requested by the legal team?
13      A.   Correct.
14          MR. GUHA:  And I'm going to -- I
15      guess I could have anticipated this.  I
16      will instruct the witness not to share
17      communications from the legal team to her.
18      And obviously her response a moment ago is
19      not a waiver in any way, shape or form.
20      Q.   Do you know who Charis Liu is?
21      A.   I do not.
22      Q.   Do you recall being involved in the
23  separation of an employee from Starbucks named
24  Charis Liu?
25      A.   I do not.

TSG Reporting - Worldwide     877-702-9580

---

Page 88

PIZARRO

1
2   Q.   How many employees are you involved
3   in separating from Starbucks would you estimate
4   during the course of a calendar year?
5       A.   I would not be able to guess on that
6   or speculate.  As I mentioned, I work at least
7   500 cases each quarter, so of all case types.
8       Q.   Well, if you are working 500 cases a
9   quarter, is it fair to say that you are
10  involved in less than 1,000 separations per
11  year?
12      A.   I honestly I cannot speculate.  If I
13  did, it would be just a guess.  There is so
14  many case types and at any given time the types
15  of cases can change.  So we could be high in
16  what is called separation consultations or we
17  could be higher in other case types, and it is
18  not something I mentally track.
19          MR. GOTTLIEB:  I'm going to take a
20      short break.  I don't have too much longer,
21      so I think just a few minute break.
22      (Recess, 11:21 to 11:29 a.m.)
23      Q.   Ms. Pizarro, can you remember any
24  conversations you had with Jen Gurtov other
25  than what we have already discussed today?

TSG Reporting - Worldwide     877-702-9580

---

Page 89

PIZARRO

1
2       A.   Yes.
3       Q.   Strike that.  Can you remember any
4   conversations you had with Jen Gurtov regarding
5   Serenity Marshall other than what you have
6   already testified to today?
7       A.   Yes.
8       Q.   And how many?
9       A.   I remember one.
10      Q.   When was that conversation?
11      A.   I don't recall the day.
12      Q.   Can you recall approximately when it
13  was?
14      A.   It was around this case time so
15  January, February'ish.  I don't recall the
16  specific day.
17      Q.   Do you remember if the conversation
18  was in-person or over the phone or something
19  else?
20      A.   Over the phone.
21      Q.   Do you remember how long the
22  conversation lasted?
23      A.   No, I do not.
24      Q.   Do you remember if you called Ms.
25  Gurtov or she called you?

TSG Reporting - Worldwide     877-702-9580

PIZARRO

1
2     A.   I don't recall.
3     Q.   Do you remember the -- do you
4  remember anything that was discussed during the
5  phone call?
6     A.   Yes.
7     Q.   What was discussed?
8     A.   We discussed the separation of Ms.
9  Marshall upon her return of leave of absence.
10    Q.   And what about that did you discuss?
11    A.   From what I recall, I informed Jen
12 to have the conversation with the partner on
13 the day back.  And I recall we discussed having
14 another partner there as a support witness.
15 And discussed to recapture what, what had
16 transpired previously.
17    Q.   Anything else?
18    A.   It would have included to follow-up
19 with me, too, at the end.  And I recall also
20 just having a general conversation with her
21 about the conversation with Serenity and just
22 recapturing what had taken place and then
23 moving forward with separation.
24    Q.   Do you recall whether during that
25 conversation a final decision to terminate had
      TSG Reporting - Worldwide     877-702-9580

PIZARRO

1
2  already been made?
3     A.   Yes.  I mean that was the basis of
4  the conversation is that we had come to that
5  decision to make a separation decision.
6     Q.   When you say, "we had come to that
7  decision," who are you referring to as "we"?
8     A.   Jen and I.
9     Q.   So is it fair to say you were
10 involved in the decision to terminate?
11    A.   I provided Jen that I supported her
12 decision to separate.
13    Q.   Why did you support her decision to
14 separate?
15    A.   Based upon the elements of the case
16 and the, the misconduct and --
17    Q.   Okay.  And that was as reported to
18 you by Ms. Gurtov; correct?
19    A.   Correct.
20    Q.   Did you have any other basis for
21 supporting termination other than the
22 information that was provided to you by Ms.
23 Gurtov?
24    A.   So based on my case notes, I would
25 have evaluated the other pieces of the case as
      TSG Reporting - Worldwide     877-702-9580

PIZARRO

1
2  far as additional documentation.  But what I
3  recall of that conversation I don't know if I
4  discussed that at that time or not, but many
5  pieces go into those decisions.
6     Q.   Did you engage in any investigation
7  before supporting Ms. Gurtov's decision to
8  terminate Ms. Marshall?
9     A.   I cannot recall.  I would have to
10 refer to my case notes.
11    Q.   Please review your case notes and
12 let me know if you engaged in any investigation
13 before supporting Ms. Gurtov's decision to
14 terminate Ms. Marshall.
15    A.   Well, the case notes that we have
16 reviewed do demonstrate that I supported that
17 based upon the misconduct, but I don't
18 necessarily recall those actual conversations
19 or e-mails going back and forth.
20    Q.   My question is other than the
21 conversations you had with Ms. Gurtov, did you
22 engage in any other actions, investigation or
23 otherwise before making the decision to support
24 terminating Ms. Marshall?
25    A.   I don't recall.
      TSG Reporting - Worldwide     877-702-9580

PIZARRO

1
2     Q.   Is there anything that would refresh
3  your recollection?
4     A.   Not that I can think of.  I mean
5  we've reviewed the case so far so it would have
6  been part of the process to review the
7  information.
8     Q.   Well, looking at -- if you could,
9  well, look at Pizarro 1 which was your case
10 notes, do you have that with you?
11    A.   Yes.
12    Q.   Do you think an unredacted version
13 of this might help refresh your recollection as
14 to whether you conducted any investigation with
15 regard to Ms. Marshall's termination?
16    MR. GUHA:  Objection.
17    A.   I would not have supported
18 separation without feeling comfortable with the
19 facts and documentation and information that
20 was presented to me.
21    MR. GOTTLIEB:  Would you read back
22 the answer?
23       (Record read.)
24    Q.   So my question was do you think an
25 unredacted version of Pizarro 1 would help
      TSG Reporting - Worldwide     877-702-9580

PIZARRO
1
2 refresh your recollection as to any actions you
3 took, any investigation you took before
4 agreeing to support Ms. Gurtov's termination of
5 Ms. Marshall?
6      MR. GUHA: Objection.
7      A.   My memory as of today is I recall
8 that conversation with Jen that we just
9 discussed. And other pieces whether they're
10 e-mails or case notes or what have you would
11 not strike any sort of memory. This is many,
12 many cases ago. All I do is that in each case
13 it is handled, you know, in the same manner
14 that is reviewed the DM will review, I will
15 review. So no, it would not necessarily
16 strike, it would not strike any additional
17 memories.
18      Q.   You know that without even looking
19 at the documents?
20      A.   I know that based upon our
21 conversation today that in reviewing and
22 thinking about this case what I do recall is
23 the conversation that I had with Jen.
24      Q.   Right. So is it your testimony that
25 because other documents were unable to refresh

PIZARRO
1
2 your recollection you don't think these, these
3 unredacted portions would help refresh your
4 recollection; is that correct?
5      A.   What I've already reviewed is that
6 I've made the decision to separate before the
7 redacted versions. And that is, the additional
8 pieces would be additional pieces to the file
9 of what was investigated and reviewed. So no,
10 I do not believe they would refresh my memory
11 of reviewing a document or what I did next.
12 That is a standard administrative process that
13 I do 100 times a week.
14      Q.   Now, when you said from reading your
15 case notes the decision to terminate, you agree
16 with the decision to terminate before these
17 unredacted sections; is that correct?
18      A.   I don't know when I made that
19 decision. I'm just saying that the decision
20 here is that I supported it and understood it,
21 but wanted to review further which would have
22 meant reviewing additional documentations,
23 files, and ensuring that there was sufficient
24 pieces to the case.
25      Q.   And do you think some of that

PIZARRO
1
2 information is contained in the entries that
3 were redacted?
4      MR. GUHA: Objection, you can answer
5 the question.
6      A.   Right. I'm trying to make sure I
7 understand the question. So essentially the
8 only additional information would be the pieces
9 of documentation that Jen sent. So again, as a
10 normal part of my review process, that is just
11 part of the case.
12      Q.   If you look at page 1624 which is
13 the second page of Pizarro 1, okay, the entire
14 page redacted other than where it says,
15 "entered by Tina Pizarro," on various dates;
16 correct?
17      A.   Correct.
18      Q.   And so those redacted portions
19 reflect entries you made into the, into the
20 AIM. It is the AIM system?
21      A.   Yes.
22      Q.   So these, this looks like the
23 entries you made into the AIM system with
24 regard to Serenity Marshall's case; right?
25      A.   Correct.

1                     PIZARRO
2      Q.   And those would constitute actions
3 and investigations that you took with regard to
4 the decision to terminate her; is that correct?
5      MR. GUHA: Objection.
6      A.   It would have included any updates
7 that I had to the case or just moving along on
8 the case and whatever that is.
9      Q.   After speaking with Jen Gurtov and
10 her providing you with an e-mail and documents
11 on January 13th, do you know if you ever made a
12 final determination as to whether termination
13 was appropriate?
14      A.   I recall having the conversation
15 with Jen that after reviewing everything I
16 would support her decision of moving forward
17 with separation. And that would occur upon her
18 return from leave. I don't recall.
19      Q.   Do you indicate where that
20 conversation took place from this AIM report?
21      MR. GUHA: Objection.
22      A.   I don't recall the dates in which I
23 spoke to Jen.
24      Q.   Is it possible one of those
25 conversations is indicated in a redacted

PIZARRO

1
2 portion?
3         MR. GUHA: Objection.
4     A.   So as part of our case, we capture
5 the contents of the case and update the case
6 and close it.
7     Q.   I'm sorry?
8     A.   So to answer --
9     Q.   Let me ask it again.  I want to make
10 sure you understand.  It is possible that any
11 conversation you had with Jen Gurtov where you
12 communicated that after reviewing the file that
13 you agreed with separation that that could be
14 retained in any of the redacted portions of
15 this document?
16         MR. GUHA: Objection, I will --
17         while I normally refrain from speaking
18         objections make one request, David.  I
19         think you are asking the witness to
20         speculate as to redacted materials.  I
21         don't think that is appropriate.  I'm not
22         going to prevent her from answering the
23         question.  And again, like I said, I
24         normally refrain from speaking objections
25         but I do think there is a danger here of

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2 confusing the witness with your question.
3     Q.   Let me ask the witness, then, if she
4 understands my question?
5     A.   Yes.  And I was actually just
6 thinking the same thing.  That it would be
7 speculation.  Again, I have so many cases I
8 can't recall what I would have input or not
9 input.
10     Q.   Well, do you think that might be
11 contained within one of the redacted sections?
12         MR. GUHA: Objection.
13     A.   Again, I don't know.  It would be
14 speculation.
15     Q.   Can you say with certainty that
16 notes regarding a conversation where you, where
17 you gave Jen Gurtov your recommendation for
18 termination is not in a redacted section?
19         MR. GUHA: Objection.
20     A.   Yes, I can't speculate as to how I
21 would have updated the case.
22     Q.   So you can't say whether notes
23 regarding a conversation with Jen Gurtov after
24 you reviewed documents and gave a final
25 recommendation regarding termination either is

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2 or is not contained in the redacted section; is
3 that correct?
4         MR. GUHA: Objection.
5     A.   Yes, I would be speculating.
6         MR. GOTTLIEB: Can the court
7     reporter hand the witness Exhibit 7?
8         (Exhibit 7 marked.)
9     Q.   And I assume these documents you can
10 see the Bates stamp; correct?
11         MR. GUHA: Yes, we can.  It starts
12     with 2064 and goes to 2069; is that
13     correct?
14         MR. GOTTLIEB: 2064 to 2069,
15     correct.
16         MR. GUHA: Yes, that is what we
17     have.
18     Q.   Okay.  Ms. Pizarro, can you review
19 this document and tell us if you recognize it?
20     A.   I don't recall it.
21     Q.   Okay.  Does this document refresh
22 your recollection as to your involvement in any
23 disciplinary action with regard to an employee
24 named Charis Liu?
25     A.   No, it doesn't.

TSG Reporting - Worldwide    877-702-9580

PIZARRO

1
2         MR. GOTTLIEB: I have no further
3     questions.
4         MR. GUHA: None here.
5         (Deposition adjourned at 11:46 a.m.)
6         _____
7             TINA PIZARRO
8 Subscribed and sworn to before me
9 this_____ day of_____2012,
10 _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1               PIZARRO
2           C E R T I F I C A T E
3
4       I, SUSAN S. KLINGER, a certified shorthand
5   reporter within and for the States of Texas and
6   California, do hereby certify:
7       That TINA PIZARRO, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11      I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set my
16  hand this 24th of January, 2012.
17
18          _____
19              Susan S. Klinger,
20              RMR-CRR, CSR
21              Texas CSR# 6531
22              California CSR # 13084
23
24
25

TSG Reporting - Worldwide    877-702-9580

1               PIZARRO
2             I N D E X
3
4   WITNESS                    PAGE
5
6   TINA PIZARRO
7
8   EXAMINATION BY MR. GOTTLIEB        4
9
10          E X H I B I T S
11
12  No.     Page     Description
13  Exhibit 1   19       PSS Case Information,
14              STAR_MARSHALL 1623
15  Exhibit 2   62       E-mail, 1/12/2011
16              STAR_MARSHALL 2128
17  Exhibit 3   79       E-mail, 1/18/2011
18              STAR_MARSHALL 1565
19  Exhibit 4   85       E-mail, 1/25/2011
20              STAR_MARSHALL 1767
21  Exhibit 7   79       E-mail, 5/26/2011
22              STAR_MARSHALL  2064
23  Exhibit 8  100       E-mail, 1/13/2011
24              STAR_MARSHALL 1614
25

TSG Reporting - Worldwide    877-702-9580

1               PIZARRO
2       ERRATA SHEET FOR THE TRANSCRIPT OF:
3   Case Name:  Serenity Marshall vs. Starbucks
4   Dep. Date: January 11, 2012
5   Deponent:  Tina Pizarro
6   Pg. Ln.  Now Reads  Should Read   Reason
7   ___ ___  _____ _____ _____
8   ___ ___  _____ _____ _____
9   ___ ___  _____ _____ _____
10  ___ ___  _____ _____ _____
11  ___ ___  _____ _____ _____
12  ___ ___  _____ _____ _____
13  ___ ___  _____ _____ _____
14  ___ ___  _____ _____ _____
15  ___ ___  _____ _____ _____
16  ___ ___  _____ _____ _____
17  ___ ___  _____ _____ _____
18
19          _____
20          Signature of Deponent
21  SUBSCRIBED AND SWORN BEFORE ME
22  THIS___DAY OF_____, 2012.
23
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

TSG Reporting - Worldwide    877-702-9580

**A**

**ability (2)**
7:14 31:4
**able (8)**
5:10,12 34:7 56:13
78:13 81:9 87:8
88:5
**absence (6)**
58:14,18 67:2,25,25
90:9
**abundance (1)**
20:19
**access (2)**
36:16,18
**accurate (1)**
63:24
**accurately (3)**
5:6 6:6,13
**acronym (1)**
22:19
**action (8)**
17:10 52:5,22 58:20
59:4,6 100:23
102:12
**actions (14)**
23:13 40:5 42:11
50:18 51:9,15,25
53:16 61:19 64:17
83:22 92:22 94:2
97:2
**actual (7)**
4:24 21:11 51:5 55:17
56:15 81:22 92:18
**addition (2)**
57:2 72:13
**additional (9)**
45:14 69:22 82:3 92:2
94:16 95:7,8,22
96:8
**address (2)**
21:7,14
**adhere (1)**
71:10
**adherence (7)**
72:25 73:9,14 74:10
75:22 76:8,25
**adhering (2)**
46:25 69:14
**adjourned (1)**
101:5
**administration (1)**
44:11
**administrative (1)**
95:12
**admission (3)**
46:24 47:13 48:2
**admit (4)**
46:12,18 47:4,5

**admitted (3)**
46:20 55:8 63:12
**advice (16)**
67:18 68:2,15 69:7,8
69:14,18 70:9 73:5
73:9,14 74:10 75:22
76:6 77:11,15
**advised (1)**
58:6
**advisement (1)**
37:23 60:25 85:7
**affect (2)**
7:11,14
**ago (4)**
22:25 35:16 87:18
94:12
**agree (6)**
46:13 47:15 48:23
50:5,8 95:15
**agreed (3)**
47:19 50:20 98:13
**agreeing (2)**
49:21 94:4
**ahead (7)**
32:5 71:7 72:21 73:7
73:22 74:8 75:17
**AIM (16)**
8:24 16:8 22:2,13,18
22:22 28:12,14
29:13 36:14 37:15
40:2 96:20,20,23
97:20
**Akin (2)**
2:10 3:13
**amount (2)**
13:9 16:11
**amounts (1)**
57:16
**Amy (1)**
36:24
**analysis (1)**
37:12
**and/or (4)**
14:15 37:11 67:5
69:14
**answer (21)**
6:7 7:15 12:15 34:7
39:22 47:22 59:21
65:23 66:14 68:22
68:24 72:4,22 73:7
74:22 75:5 76:2,12
93:22 96:4 98:8
**answered (5)**
70:20 71:6 73:7 74:14
74:21
**answering (2)**
6:4 98:22
**answers (5)**
6:10 65:24 72:7 74:5

75:15
**anticipated (1)**
87:15
**anybody (2)**
27:4 54:15
**appear (2)**
19:7 62:21
**appeared (2)**
26:25 31:12
**Appearing (1)**
3:5
**appears (5)**
39:9 41:11 46:12,18
62:20
**approach (2)**
76:10,19
**appropriate (6)**
32:13 69:3 71:9 73:21
97:13 98:21
**approximately (3)**
10:21 11:12 89:12
**area (3)**
51:22 74:2 85:23
**Arizona (1)**
17:23
**arrived (1)**
38:2
**aside (1)**
79:19
**asked (6)**
42:17 70:20 71:5 73:6
74:13,20
**asking (16)**
4:10 6:7 26:11 28:19
29:12 41:5 44:7
56:16,17 70:2,3
71:19,20,24 74:18
98:19
**assessment (1)**
41:23
**asset (3)**
43:5,11 44:25
**assigned (5)**
25:24 26:7 28:17
29:19 30:4
**associate (7)**
9:19 10:5,12,16 11:20
16:19,19
**associates (1)**
16:15
**assume (1)**
100:9
**attached (1)**
86:5
**attachments (7)**
8:15,18 81:15 85:23
85:24 86:3,24
**attendance (1)**

52:25
**attention (4)**
20:24 30:11 38:20
63:3
**attorney (2)**
7:21 8:5
**Attorneys (2)**
3:4,11
**attorney-client (1)**
86:25
**audits (1)**
57:13
**available (1)**
78:8
**Avenue (1)**
3:8
**average (1)**
34:18
**aware (10)**
14:21,24 15:3,11
25:21 30:7 36:17
46:9 53:16 82:8
**a.m (5)**
2:5 23:19 55:3 88:22
101:5

**B**

**B (1)**
103:10
**back (12)**
9:24 12:15 24:7 30:11
63:9 72:6 73:18
74:23 76:12 90:13
92:19 93:21
**bank (7)**
32:2,3 33:13 43:3
55:10 56:23 63:15
**based (21)**
14:21 28:17 31:2
36:12 40:4,9,11
41:3 47:24 49:4
50:6 55:18 61:9
72:4 76:20 80:25
83:12 91:15,24
92:17 94:20
**basically (3)**
10:17 23:2 36:6
**basis (5)**
57:11 67:14,22 91:3
91:20
**Bates (12)**
19:15 20:2,4 21:6,12
21:14 62:8,9 79:25
80:11 85:11 100:10
**bear (2)**
20:2,4
**beep (1)**
28:23

**beeps (1)**
28:25
**beginning (1)**
22:15
**begins (1)**
64:13
**behavioral (1)**
53:9
**believe (11)**
18:5,19 27:22 35:14
35:15 36:19,20
61:10 62:17 75:12
95:10
**Beneath (1)**
38:25
**best (14)**
51:20 70:13,24 71:3
71:17 72:14 74:15
76:3,20 77:18,23
78:3,5,9
**beyond (1)**
49:7
**blood (1)**
102:12
**body (1)**
48:25
**book (5)**
35:9,19 37:18,25
63:14
**books (2)**
55:8 57:15
**bottom (4)**
21:4 63:3 64:12 85:22
**box (2)**
29:8,18
**break (6)**
7:2,4 20:20 54:21
88:20,21
**breaks (1)**
7:7
**bring (1)**
20:24
**bringing (2)**
64:19 65:5
**broken (1)**
16:16
**Bryant (1)**
3:14
**bucket (2)**
17:13 79:3
**bulk (3)**
17:14 36:10 37:10
**business (2)**
31:2 69:10

**C**

**C (3)**
3:2 102:2,2

calendar (1)
88:4
calibrate (1)
32:20
California (3)
2:14 102:6,22
call (33)
13:17 16:24 22:20
26:16 27:18 37:14
37:19 54:13,15,17
57:7,21 58:17 60:17
61:17 65:14 67:7
70:21 71:3,13,14
72:10,19 73:12
74:12 75:23 76:3,4
78:12 79:6 83:13
85:4 90:5
called (25)
15:5 17:20,21 22:21
23:6 24:5 30:21
37:9 40:10 42:9
52:17 66:4 70:16,17
70:18 76:17,18,20
76:25 77:5,8,11
88:16 89:24,25
calling (6)
68:12,15 70:4,6,9,11
calls (2)
46:4 75:7
camera (1)
60:19
capability (1)
36:4
capable (1)
34:19
capacities (1)
1:10
capture (1)
98:4
captured (2)
42:19 45:24
captures (1)
24:25
capturing (1)
55:13
careful (1)
66:11
case (166)
4:9,11 8:14,17,21,23
9:14 14:22 15:3,4
15:25,25 16:4,7,23
17:2,3,5 18:8,9,10
18:12,22,23 22:2,3
22:6,11,15,16 23:5
23:7,9,16,24 24:2,4
24:7,24 25:17,21,22
26:7,19,24 27:5,13
27:25 28:6,10 29:14
29:23 30:5,9,21,22

31:3,8,17 32:8 33:2
33:4,22,23,24 34:8
34:8,18 35:2,7,12
35:16,21 36:6,7,8,9
36:10 37:15 38:5,6
39:11 40:10,21
41:13,14 42:2,8,11
44:4,17 45:8,14,19
46:6,24 47:14,23
49:14,17,19 50:13
50:15,19 51:17 52:7
52:16,23,24 53:17
59:9,11 60:9 62:19
63:13 64:2,4,19
65:5,11,17 66:3,23
68:6,19,20 69:4
71:14 75:16 78:15
78:17,18 81:24 82:3
82:6,15 83:13,19
86:21 88:7,14,17
89:14 91:15,24,25
92:10,11,15 93:5,9
94:10,12,22 95:15
95:24 96:11,24 97:7
97:8 98:4,5,5 99:21
103:13 104:3
cases (64)
12:23 16:10,11,13
17:5,7,9,15 22:14
25:23 28:6,16 29:18
29:20 30:2,3 31:15
33:12 34:2,5,10,17
34:23 35:17,24 36:4
37:10 41:24 67:22
67:24 70:13,14,16
70:24 71:4,16 72:10
72:20 73:13 74:12
75:8,24 76:4,21
77:21 78:4,7,7,9,11
78:14,22,25 79:6,7
79:11,11,13 86:20
88:7,8,15 94:12
99:7
cash (16)
31:23,24,25 43:12,15
43:17,21,24,24 44:3
44:8,15,18,19 45:3
46:25
categories (1)
78:21
category (3)
78:15,18 79:6
caution (1)
20:19
CCed (1)
80:6
center (10)
11:3 12:9,21 13:17,18
15:6 16:25 23:7,8

63:10
certain (2)
13:9 16:11
certainty (1)
99:15
certified (2)
2:13 102:4
certify (2)
102:6,11
change (1)
88:15
characterization (2)
74:5 75:19
Charis (3)
87:20,24 100:24
circles (2)
74:3,7
circumstance (1)
69:17
clarification (2)
20:14 75:7
clarity (1)
74:9
classify (1)
44:10
clear (9)
19:25 31:16,18 41:25
52:10 71:23 73:24
75:6,10
clearly (1)
75:16
client (1)
14:16
close (2)
34:16 98:6
closure (1)
18:10
coaching (2)
51:9 83:25
college (1)
11:9
Colorado (1)
17:23
combined (1)
79:2
come (7)
16:5 17:7,14 18:17
25:20 91:4,6
comes (2)
48:19 67:4
comfortable (1)
93:18
coming (1)
13:8
COMMISSION (1)
104:25
common (1)
33:22

commonly (1)
58:6
communicated (3)
15:21 82:9 98:12
communication (6)
18:15 24:12 25:9 26:7
27:4 87:6
communications (1)
87:17
companies (2)
11:13,16
company (30)
31:22 33:19 34:3,12
35:4,18,25 38:7,11
38:16 39:14 45:11
63:13 67:11 68:8,16
69:9,15,19 70:8
71:8 72:12 73:10,15
74:11 75:22 76:8,10
76:25 77:22
complaints (1)
17:12
complete (1)
34:21
complex (1)
17:4
compliance (3)
17:6 69:18 72:11
complicated (1)
9:25
computer (6)
26:2,25 28:11,23
86:14,19
concept (1)
50:5
concern (1)
43:12
concerns (5)
11:24 12:20,21 13:18
17:11
conducted (1)
93:14
conducting (1)
57:13
conflict (1)
17:11
confusing (1)
99:2
connect (4)
69:12 70:14,25 78:10
connecting (1)
79:14
connection (2)
15:13 83:18
consequence (6)
46:13 47:16,19 48:24
49:22 50:21
consider (4)

11:14 43:23 48:14
49:7
consideration (1)
49:21
considered (1)
48:25
consistent (4)
32:19,22 33:8,10
constantly (1)
30:8
constitute (1)
97:2
consult (1)
78:6
consultation (1)
36:9 59:17
consultations (3)
17:9,10 88:16
contact (18)
11:3 16:24 18:23,25
23:6,8 30:24 31:4
63:9 66:24 67:15,23
68:11,14 74:16
78:18,22 79:4
contacted (4)
18:2 25:14,16 77:14
contacting (8)
15:13 66:16 67:21
68:2,5 69:6 77:24
78:3
contained (5)
26:6 27:6 96:2 99:11
100:2
containing (2)
37:16,17
contains (2)
29:18 30:2
content (4)
58:3 63:19 69:24 70:2
contents (1)
98:5
context (2)
37:7 56:11
continue (2)
13:5 30:3
continued (1)
61:14
continuously (1)
63:14
conversation (52)
25:8 51:6 52:21 53:20
54:4,7,10 55:5,13
55:18,20 56:2,8,11
56:14,15 58:2,3,19
58:22 60:11 61:4,8
61:22 63:20 64:7,10
64:15,25 65:15,20
69:25 70:3 81:23
82:12 89:10,17,22

90:12,20,21,25 91:4
92:3 94:8,21,23
97:14,20 98:11
99:16,23
**conversations (11)**
59:20 65:25 66:13
68:24 69:22 83:16
88:24 89:4 92:18,21
97:25
**Corasko (1)**
36:24
**corner (2)**
29:6,9
**corporate (4)**
11:14 14:7,17 37:2
**CORPORATION (1)**
1:9
**correct (75)**
10:14,22 15:15 21:23
22:5 23:15,19 25:6
25:7,18,19 26:3,17
26:18 29:10,11
30:13,14,17,18
32:10,11 34:25 39:6
39:15,16 40:2,3,5,7
40:14,15,18 41:17
41:20 45:13,24,25
46:15,16 50:8 53:14
55:10 56:12,13 59:5
59:14 65:21 66:2,6
66:7 72:12 73:15
78:19 80:9 84:7
85:13,20,21,23 86:8
86:9 87:13 91:18,19
95:4,17 96:16,17,25
97:4 100:3,10,13,15
**corrective (10)**
17:10 50:17 51:8,14
51:25 52:5,22 61:18
64:17 83:22
**counsel (9)**
7:24 9:12 11:23 59:16
59:22,24 60:2,5,23
**counseling (1)**
12:18
**count (1)**
80:16
**couple (1)**
54:21
**course (2)**
51:9 88:4
**court (16)**
1:2 5:5,13 6:5,12
12:14 19:2,10 62:2
72:6 73:18 74:22
76:11 79:15 84:12
100:6
**coverage (1)**
9:15

**crossover (1)**
14:18
**CSR (4)**
1:24 102:20,21,22
**current (1)**
9:17
**currently (3)**
7:10 11:22 13:15
**customer (2)**
14:16 23:2
**cutoff (1)**
62:10

---

**D**

**D (1)**
103:2
**daily (6)**
32:3 35:19 37:17
55:10 63:13,15
**Dallas (2)**
1:15 2:11
**danger (1)**
98:25
**data (1)**
37:9
**date (7)**
18:4 30:4,23 31:6
60:4,8 104:4
**dated (2)**
63:4 84:18
**dates (9)**
24:16 28:16,18 29:21
30:9,22 60:22 96:15
97:22
**Dave (1)**
54:20
**David (6)**
3:6 4:7 19:22 20:21
66:10 98:18
**day (12)**
28:5,8,15 29:24 31:2
31:5 64:16 89:11,16
90:13 101:9 104:22
**days (5)**
30:16,19,25 56:22
84:25
**December (6)**
15:18,22 17:25 18:6
24:3,7
**decision (20)**
82:17 83:4,10 90:25
91:5,5,7,10,12,13
92:7,13,23 95:6,15
95:16,19,19 97:4,16
**decisions (7)**
48:21 51:4 52:14 67:8
68:7,12 92:5
**Defendants (1)**

1:11
**Defendant(s) (1)**
3:11
**degree (1)**
74:3
**demonstrate (2)**
52:6 92:16
**Dep (1)**
104:4
**department (3)**
64:19 65:6 67:7
**departments (1)**
12:13
**depend (1)**
68:19
**dependent (1)**
50:15
**depending (1)**
17:2
**depends (2)**
52:7,16
**Deponent (2)**
104:5,20
**deposed (1)**
4:17
**deposit (5)**
32:2 43:2 47:9,25
51:11
**depositing (1)**
63:15
**deposition (15)**
1:14 2:9 4:25 5:3,4,6
7:3,18,24 9:11,14
71:22 101:5 102:8,9
**depositions (1)**
4:22
**deposits (4)**
33:13 55:10 56:23
63:15
**describe (2)**
76:8 78:24
**described (1)**
13:12
**description (3)**
36:5,8 103:12
**details (9)**
9:15 24:25 26:24
36:10 40:11 42:18
44:23 45:23 46:5
**determination (2)**
44:18 97:12
**determinations (1)**
52:11
**determine (4)**
22:13 43:20 58:7
60:20
**determined (1)**
16:13

**development (3)**
13:24 16:8 64:16
**dialogue (2)**
51:3,5
**different (7)**
12:13,22 14:3,6 30:22
34:9 35:11
**differently (1)**
13:20
**difficult (2)**
15:2 33:11
**direct (1)**
63:2
**directly (4)**
14:15 18:17,21 27:11
**disagree (1)**
75:18
**disciplinary (1)**
100:23
**discipline (3)**
24:14 52:18 67:16
**disciplined (1)**
35:13
**discovered (1)**
57:11
**discuss (11)**
9:11,15 13:5 46:14
49:18 50:11,16,22
55:4 60:25 90:10
**discussed (14)**
37:6 54:4 56:24 61:17
61:22 82:5 88:25
90:4,7,8,13,15 92:4
94:9
**discussing (4)**
57:6,19 58:16 61:15
**dispute (1)**
20:16
**district (5)**
1:2,3 12:2 32:8 51:6
**DM (18)**
8:16,25 11:25 15:3
17:12 18:23 23:5
24:23 36:8 41:24
46:3 55:23 56:21
57:10,13,24 83:13
94:14
**DMs (2)**
18:21 27:10
**document (40)**
9:3,6 19:11,14,15,17
19:25 20:10 21:5,8
21:15,20,23 23:4
24:10,15,18 25:2
27:6 31:22 39:14
54:18 59:13 60:19
62:9,13 80:3,14,23
83:2,8 84:17 85:15
86:5,10,13 95:11

**development (3)**
98:15 100:19,21
**documentation (9)**
8:14,17,23 53:3 81:2
83:12 92:2 93:19
96:9
**documentations (1)**
95:22
**documents (25)**
7:22 8:13,21 20:8,20
21:12 33:19 34:3,12
35:4,18,25 37:20
38:12 42:14 45:12
63:13 80:2,10 83:18
94:19,25 97:10
99:24 100:9
**doing (1)**
12:7 34:20 67:17
**dollars (1)**
57:12
**double-check (1)**
27:22
**downtown (1)**
17:22
**due (8)**
28:16,18 29:21 30:4,9
30:22,23 31:6
**duly (2)**
4:3 102:8
**duration (2)**
18:9 48:25
**duties (3)**
11:21 12:16 13:10

**E**

**E (7)**
3:2,2,6 102:2,2 103:2
103:10
**earlier (1)**
75:15
**ease (1)**
19:6
**easier (1)**
19:8
**efficient (1)**
71:21
**efficiently (1)**
5:5
**egregious (1)**
53:10
**eight (3)**
19:4 80:19,20
**either (3)**
17:3 69:13 99:25
**element (4)**
44:4,16 45:18 51:16
**elements (6)**
14:3 33:23 34:9 78:25
79:13 91:15

**employee (13)**
11:24 13:8 14:4,5
33:17 35:13 37:24
38:12,17 48:10
67:16 87:23 100:23
**employees (1)**
88:2
**employee's (2)**
48:13 52:12
**employment (2)**
49:7 63:11
**engage (3)**
42:10 92:6,22
**engaged (1)**
92:12
**ensure (8)**
41:25 67:5,11 68:6
69:14 70:7 71:8
72:11
**ensuring (3)**
46:8 69:18 95:23
**entered (6)**
23:13,18 28:2 31:8
38:22 96:15
**entire (7)**
13:7 22:11,16 52:4
55:22 57:25 96:13
**entries (3)**
96:2,19,23
**entry (4)**
23:16 30:12 39:25
40:4
**ERRATA (1)**
104:2
**essentially (4)**
16:9 35:11 42:5 96:7
**estimate (5)**
34:10,17 35:17,22
88:3
**etcetera (1)**
47:10
**evaluate (1)**
49:10
**evaluated (1)**
91:25
**everybody (1)**
75:6
**exact (4)**
18:4 24:16 56:8 60:8
**exactly (5)**
16:4 21:3 28:5 29:3
71:18
**EXAMINATION (2)**
4:5 103:8
**example (2)**
13:23 28:20
**exclude (2)**
65:24 66:12

**excludes (1)**
68:23
**excuse (2)**
25:14 47:5
**exhibit (20)**
19:3,11,12 62:5 79:16
79:17,18,22,23
84:15 85:9,10 100:7
100:8 103:13,15,17
103:19,21,23
**exhibits (2)**
19:4,6
**exist (3)**
27:18,20 36:19
**exists (2)**
36:18,20
**expand (1)**
56:14
**expansive (1)**
73:19
**expectation (1)**
29:20
**expected (1)**
29:22
**experience (1)**
48:16
**EXPIRES (1)**
104:25
**explain (2)**
16:4 23:3
**expound (1)**
56:16
**extent (3)**
27:15 68:23,25
**external (1)**
22:24
**e-mail (33)**
8:18 15:22 16:6 20:19
27:9 28:22 29:4,6
29:10 62:20,21 63:3
63:7,18 64:12,14
80:4 81:5,8,15 84:7
84:10,17,21,25 85:5
85:19 97:10 103:15
103:17,19,21,23
**e-mails (3)**
27:15 92:19 94:10

_____
**F**
**F (1)**
102:2
**fact (3)**
27:19 55:9 65:19
**factor (2)**
48:14,20
**factors (1)**
49:15
**facts (2)**

50:19 93:19
**fair (15)**
15:9 23:12 27:3 30:5
33:25 40:19 43:16
45:2 48:24 50:3
72:18 79:5 86:23
88:9 91:9
**falsification (18)**
31:22 33:12,18 34:2
34:12 35:4,12,18,25
37:16 38:7,11,16
39:13 45:11 46:25
47:24 63:12
**falsified (2)**
37:25 51:11
**falsifying (3)**
47:9 55:8 57:2
**familiar (2)**
18:13 80:25
**far (5)**
6:21,24 51:10 92:2
93:5
**fax (1)**
55:7
**faxing (1)**
64:16
**February (2)**
10:9 24:4
**February'ish (1)**
89:15
**feeling (3)**
65:13,16 93:18
**feels (1)**
48:22
**Feld (2)**
2:10 3:13
**field (8)**
11:25 13:19,22 14:6,6
14:9,13 37:11
**Fifth (1)**
3:8
**file (7)**
51:19 52:2,9 53:12
57:25 95:8 98:12
**files (1)**
95:23
**final (5)**
52:20 53:2 90:25
97:12 99:24
**find (1)**
35:24
**finding (1)**
36:11
**fine (2)**
7:3 20:22
**finish (1)**
6:4
**finished (2)**

49:17,19
**first (22)**
4:3 14:23 15:10,17
18:2,15,24 23:16
24:11 25:20 27:4,13
27:25 30:12,15 31:8
39:8 42:7 55:6 60:4
63:4,8
**five (2)**
12:11 84:25
**focused (1)**
14:5
**following (3)**
68:16 69:9 70:8
**follows (1)**
4:4
**follow-up (1)**
90:18
**form (1)**
87:19
**format (1)**
86:22
**forth (3)**
56:12 92:19 102:8
**forward (3)**
58:8 90:23 97:16
**found (1)**
56:22
**four (7)**
10:6,21 30:16,19
73:12 74:19 75:14
**fourth (1)**
73:15
**four-page (2)**
9:2 19:15
**frame (1)**
23:22
**front (7)**
21:3 22:8 33:12 62:6
78:14 83:3,9
**full (3)**
49:16 51:18 67:5
**fully (4)**
6:6 33:24 67:12 68:6
**function (3)**
13:20 36:13 37:5
**further (12)**
42:5 46:14 48:6 50:9
50:11,16,19,22 82:5
95:21 101:2 102:11

_____
**G**
**general (6)**
17:12 66:19 67:14,22
79:10 90:20
**generally (9)**
30:6 72:20 74:12 75:7
75:23 78:11,18,22

79:6
**generated (2)**
23:4 86:14
**getting (2)**
69:7,8
**give (1)**
80:15
**given (5)**
5:9 16:12 60:21 88:14
102:10
**glanced (1)**
7:22
**go (17)**
5:2 14:4 16:14 24:15
28:12,14 32:5 39:7
45:8 49:15 71:7
72:21 73:7,21 74:7
75:17 92:5
**goes (2)**
5:4 100:12
**going (16)**
5:2 9:14 19:6 20:22
27:18 37:14,19
54:24 60:17 62:23
73:22 79:20 87:14
88:19 92:19 98:22
**good (1)**
54:21
**Gottlieb (34)**
3:6 4:6,8 12:14 20:4,7
20:12,18,25 21:10
27:14 37:14 54:24
60:17 62:2,12 74:25
75:4,18 76:11 79:15
79:21 80:9,18 84:12
85:4,8,13 88:19
93:21 100:6,14
101:2 103:8
**great (1)**
21:17
**ground (1)**
5:3
**grounds (1)**
53:4
**group (2)**
14:17 16:23
**groups (2)**
13:20,22
**guarantee (1)**
52:19
**guess (5)**
28:19 34:21 87:15
88:5,13
**Guha (78)**
3:12 8:7,8 19:22 20:6
20:11,13,21 21:9,17
23:25 27:21 37:22
39:21 40:6 41:2
43:8,18,25 44:9

47:21 49:3,9,24
52:3 54:20 56:3
57:8,22 59:18 60:6
60:13,24 62:11
65:22 66:10 67:19
68:4,18,22 69:11,21
70:5,12,19,23 71:5
71:15,25 72:21 73:6
73:16 74:4,13,20
75:3,9,25 79:8 80:3
80:15,20 85:6,12
87:14 93:16 94:6
96:4 97:5,21 98:3
98:16 99:12,19
100:4,11,16 101:4
**guidance (10)**
67:6 71:9 72:11,16,24
73:3,13 74:10 75:21
77:5
**guide (2)**
39:11 41:13
**guideline (1)**
33:6
**guides (1)**
57:4
**Gump (2)**
2:10 3:13
**Gurtov (68)**
1:9 4:9 8:16,19,25
15:4,21 18:2,17
23:6,23 24:13 25:10
25:17 26:17 27:16
30:16,24 32:9 39:5
39:20 40:20 41:11
41:19 42:9 45:22
49:23 50:7 53:13
55:5,14 57:7,20
58:17,22 60:12 61:4
61:17,22 63:20 64:7
65:2,9,15,21 66:5
80:5,7 81:5,7,16,20
82:9 83:14 84:7,18
84:22,25 88:24 89:4
89:25 91:18,23
92:21 97:9 98:11
99:17,23
**Gurtov's (6)**
15:13 46:19 59:16
92:7,13 94:4

---

**H**

**H (1)**
103:10
**half (3)**
11:4 12:9 14:10
**hand (7)**
19:10 62:3 79:16,21
85:8 100:7 102:16
**handed (2)**

19:13 79:24
**handle (2)**
34:19,23
**handled (1)**
94:13
**handling (3)**
31:23,24,25
**happen (1)**
52:23
**happens (1)**
16:4
**hard (1)**
78:24
**hate (1)**
34:20
**Hauer (2)**
2:10 3:13
**header (2)**
36:4 85:22
**hear (5)**
5:10,12,16,19 6:17
**heard (1)**
63:9
**held (6)**
2:9 10:3,13,20 12:3
18:10
**help (5)**
13:4 80:4 93:13,25
95:3
**helps (1)**
52:5
**hereinbefore (1)**
102:8
**hereunto (1)**
102:15
**Heutz (1)**
80:7
**Hi (1)**
4:7
**hide (1)**
55:8
**high (2)**
46:4 88:15
**higher (2)**
45:16 88:17
**history (4)**
52:5,12,15 53:5
**holidays (1)**
18:8
**honestly (2)**
34:22 88:12
**hour (1)**
54:25
**hours (1)**
8:10
**HTTP (2)**
21:6,14

---

**I**

**identification (1)**
80:4
**identified (1)**
75:13
**identify (1)**
20:15
**imagine (1)**
20:16
**immediate (3)**
39:12 40:22 41:15
**immediately (1)**
64:21
**impacted (2)**
52:12,14
**important (5)**
5:9 6:3 19:24 48:14
71:19
**include (2)**
11:25 86:24
**included (2)**
90:18 97:6
**including (1)**
52:22
**incorrect (1)**
40:8
**independent (1)**
53:23
**independently (1)**
33:3
**indicate (4)**
65:18 83:3,15 97:19
**indicated (3)**
26:12 35:8 97:25
**indicates (2)**
23:17 25:2 83:9
**indirectly (1)**
14:14
**individual (1)**
1:10
**individually (1)**
33:3
**information (18)**
23:9 26:4,6,16,20,23
27:5 28:2 40:24
47:10 50:24 51:10
91:22 93:7,19 96:2
96:8 103:13
**informed (2)**
9:13 90:11
**initial (3)**
8:24 69:24 83:13
**initially (1)**
15:21 32:8
**initiated (1)**
64:22
**input (2)**
99:8,9

**instance (3)**
38:10,15 81:12
**instruct (4)**
59:18 65:22 66:12
87:16
**instruction (2)**
60:6,13
**intakes (2)**
16:24 23:9
**intend (1)**
66:24
**interaction (1)**
8:25
**interactions (2)**
22:22 24:23
**interested (1)**
102:13
**internal (3)**
22:21,25 78:8
**International (1)**
11:18
**interpretation (1)**
13:4
**interrupt (2)**
54:22 77:20
**interruption (1)**
19:23
**investigate (1)**
12:25
**investigated (1)**
95:9
**investigation (7)**
14:15 44:20 92:6,12
92:22 93:14 94:3
**investigations (1)**
97:3
**investigator (1)**
46:6
**involve (7)**
17:8 43:4,10,20 44:12
44:24 67:3
**involved (12)**
22:14 31:5 34:2,11,11
35:3,3 68:20 87:22
88:2,10 91:10
**involvement (1)**
100:22
**involves (2)**
14:15 78:17
**involving (6)**
22:3 34:2 35:18 38:6
66:25 67:24
**in-person (2)**
4:22 89:18
**issue (8)**
20:9 38:11,16 43:16
53:9 57:20 66:25
86:6

**issues (1)**
61:24

---

**J**

**January (35)**
1:16 2:4 13:12 24:8
25:4,5,11,13,16
30:16 42:10 53:14
53:17,18 55:6 58:23
59:7 61:4 63:4,20
64:7 65:2 80:5 81:5
82:7,7,21,24 83:5
83:11 84:18 89:15
97:11 102:16 104:4
**Jen (50)**
4:9 8:16,19,25 15:3
15:13 23:5 25:10,17
30:16,20 32:8 39:4
40:10,14,20 41:10
41:19 42:9 45:22
46:19 50:7,25 53:13
55:14 57:7 61:17
65:15,20 80:5,7
81:5 82:9 83:13
84:7,18 88:24 89:4
90:11 91:8,11 94:8
94:23 96:9 97:9,15
97:23 98:11 99:17
99:23
**Jennifer (12)**
1:9 24:24 39:2,9
42:17,24 55:7,24
56:21 57:10,24 63:4
**Jen's (1)**
47:7
**job (3)**
1:25 48:18 67:4
**jobs (1)**
11:14
**June (1)**
10:10
**jury (1)**
4:23

---

**K**

**keep (2)**
6:16 17:4
**keeping (1)**
52:8
**keyword (1)**
36:15
**keywords (1)**
36:12
**kind (2)**
5:3 21:6
**Klinger (4)**
1:24 2:12 102:4,19
**know (63)**
5:18,23 6:11 7:4

14:19,22 15:6 17:11
18:11,20,22 22:12
22:24 27:9 28:4
29:9,22 30:19 33:20
34:22 36:9 37:4
39:9 42:13,17,25
43:3,6,9 45:21
46:11,17 48:22
51:10 52:19,20,21
54:23 62:25 64:3
72:14,24 74:23 79:9
79:14 80:23 81:7,11
82:20,23 86:10,12
86:18 87:9,20 92:3
92:12 94:13,18,20
95:18 97:11 99:13
**knowing (1)**
44:22
**knowledge (1)**
67:5
**known (2)**
16:7,18

————— L —————
**laid (3)**
10:2,8 14:13
**lasted (2)**
54:7 89:22
**late (1)**
35:10
**layer (1)**
44:22
**leaders (1)**
37:12
**leadership (1)**
37:11
**learn (1)**
26:4
**learned (1)**
25:25
**leave (8)**
40:24 58:14,18 66:25
67:24,25 90:9 97:18
**leaving (1)**
42:6
**left (15)**
24:8,22 25:4 30:15
39:4,20 40:14,20
41:3,10,19 42:2,9
42:22 50:3
**legal (79)**
58:7 64:19 65:5,14,20
65:25 66:3,5,9,13
66:16,20,24 67:7,13
67:15,17,21,23 68:2
68:2,5,11,14,15,25
69:7,7,12,14,18
70:4,7,9,9,14,16,17
70:18,21,25 71:3,9

71:14,14,17 72:10
72:11,20 73:12
74:12,16 75:8,24
76:4,6,17,18 77:11
77:14,15,17,24 78:3
78:6,10,12,19,22
79:4,6,12,14 86:21
86:24 87:5,9,12,17
**let's (3)**
20:21 42:4 44:18
**level (6)**
10:4 13:3 17:8,14
45:16 49:11
**levels (4)**
16:17 18:11 46:4
48:17
**limited (2)**
75:4,10
**line (4)**
36:5,6 68:8 72:3
**list (1)**
75:2
**listed (1)**
75:12
**little (2)**
9:25 29:5
**Liu (3)**
87:20,24 100:24
**live (2)**
4:21,24
**Ln (1)**
104:6
**LOA (31)**
58:6,8,11 64:22 66:18
67:12,22 69:5 70:14
70:16,24 71:4,14,16
72:10,20 73:13
74:12 75:8,24 76:3
76:4,21 77:21 78:3
78:7,9,15,17 79:7
79:13
**long (8)**
8:9 9:21 14:8 21:6
28:16 48:18 54:6
89:21
**longer (2)**
18:14 88:20
**look (13)**
18:23 22:12 23:17
24:17 32:25 45:5,6
45:7,9 50:17 67:11
93:9 96:12
**looked (3)**
45:10 51:7 62:24
**looking (10)**
18:9 22:14 27:11 33:4
34:8 37:8 83:14
84:6 93:8 94:18
**looks (7)**

13:6 22:16 24:5 42:3
80:25 82:4 96:22
**loss (2)**
43:13,15
**lost (1)**
57:16
**lot (3)**
14:2,18 18:20
**low (1)**
17:4
**LVM (1)**
38:25

————— M —————
**mail (18)**
25:4 30:15 39:4,20
40:14,20 41:3,10,18
41:22 42:10,17,21
46:10 50:4 51:4
82:2,4
**main (1)**
48:7
**major (1)**
56:25
**making (3)**
81:15,20 92:23
**manage (2)**
16:10 29:20
**managed (1)**
33:22
**management (4)**
16:7 23:2 24:24 31:3
**manager (6)**
9:13 12:2 16:19 17:12
32:8 51:6
**Manhattan (1)**
17:22
**manipulated (1)**
57:16
**manner (2)**
13:25 94:13
**manually (2)**
28:12,14
**marked (16)**
19:4,7,12,14 62:4,5,7
79:17,18,23,25
84:14,15 85:10
86:20 100:8
**marriage (1)**
102:13
**Marshall (35)**
1:6 4:8 14:20,24
15:12 18:16 22:4,7
24:13 25:10,14 32:9
38:18 44:20 48:9
49:2 58:18 68:21
69:17 70:18,22
76:17 77:15 80:8

82:18 83:4,10 86:6
89:5 90:9 92:8,14
92:24 94:5 104:3
**Marshall's (10)**
23:24 25:17 58:21
59:8,24 61:18,23
83:19 93:15 96:24
**materials (1)**
98:20
**matter (18)**
13:5,7,8 16:2 17:2
31:12 42:4 43:19
44:2,5,6,14,23 47:3
52:8 53:5 61:15
102:14
**matters (8)**
12:22,24,25 13:18
50:14 66:18 67:3
79:2
**mean (13)**
12:19 13:15 20:18
31:14,15 32:24 46:2
50:11 51:2 56:3
72:16 91:3 93:4
**means (2)**
30:24 39:4
**meant (1)**
95:22
**Media (1)**
11:18
**medications (2)**
7:11,13
**meet (1)**
8:9
**meeting (3)**
7:23,25 8:2
**memories (1)**
94:17
**memory (6)**
7:11 15:8 56:10 94:7
94:11 95:10
**memos (1)**
83:25
**mentally (1)**
88:18
**mention (1)**
67:20
**mentioned (8)**
20:3 72:15 74:17,19
76:5,5,6 88:6
**Merit (1)**
2:12
**message (3)**
24:9,22 42:6
**met (2)**
7:19,21 8:5,8
**Mexico (1)**
17:24

**mind (2)**
62:23 66:15
**mine (1)**
66:19
**minute (2)**
29:25 88:21
**minutes (2)**
35:10 54:21
**mischaracterizatio...**
73:17
**mischaracterizing (1)**
75:11
**misconduct (11)**
31:17 32:21,25 33:5
39:12 40:21 41:15
53:7,10 91:16 92:17
**misrepresentation (1)**
39:14
**missing (12)**
42:18,25 43:4,7,10,17
43:24 44:8,15,19
45:3,17
**mitigator (4)**
67:10 71:7 76:10,19
**Modus (1)**
11:18
**moment (1)**
87:18
**money (8)**
42:18,25 43:3,7,9
44:21 45:17 57:14
**month (1)**
57:12
**months (2)**
9:24 12:4,6
**move (1)**
58:7
**moving (3)**
90:23 97:7,16
**multiple (4)**
30:2 33:4,23 56:22
**Murgalo (1)**
80:7

————— N —————
**N (2)**
3:2 103:2
**name (6)**
4:7 22:21,22,24,25
104:3
**named (3)**
14:24 87:23 100:24
**Nancy (1)**
80:7
**nature (4)**
33:2 36:12 51:12
77:16
**necessarily (6)**

28:7 45:15 67:20
79:3 92:18 94:15
**necessary (1)**
12:24
**need (6)**
5:11 28:12 29:14
50:21 51:24 59:9
**needed (1)**
13:6
**needs (1)**
5:13
**never (1)**
62:23
**new (12)**
1:3 3:9,9,15,15 12:7
17:23 29:10,14,23
30:5 86:7
**nine (1)**
48:9
**normal (2)**
27:12 96:10
**normally (2)**
98:17,24
**Notary (1)**
104:25
**note (1)**
21:19
**notes (34)**
46:11,18 47:7,23
53:21,24 54:2,17
59:10,11 60:9,16
61:7,9,13 64:3,4
65:11,17 66:3 81:24
82:3,7,12,16 91:24
92:10,11,15 93:10
94:10 95:15 99:16
99:22
**notified (2)**
28:9 29:13
**number (9)**
9:7 16:11 46:15 47:8
47:9 48:6 72:19
73:25 86:6
**numbers (5)**
20:2,5 34:21 62:9
80:2
**numerically (1)**
19:8
**numerous (1)**
74:14

———————
**O**
———————
**oath (1)**
4:14
**object (3)**
73:16 74:4 75:25
**objection (44)**
23:25 39:21 40:6 41:2

43:8,18,25 44:9
47:21 49:3,9,24
52:3 57:8,22 67:19
68:4,18 69:11,21
70:5,12,19,23 71:5
71:15 72:21 73:6,23
74:13,20 75:10,20
79:8 93:16 94:6
96:4 97:5,21 98:3
98:16 99:12,19
100:4
**objections (2)**
98:18,24
**obtain (1)**
69:13
**obtaining (2)**
50:18 71:8
**obviously (2)**
24:8 27:21 60:25
75:18 87:18
**occasion (1)**
15:11
**occur (1)**
97:17
**occurred (3)**
82:20,23 83:11
**office (1)**
37:2
**offices (1)**
2:10
**official (1)**
1:10
**oh (2)**
45:15 85:25
**okay (64)**
4:16 5:2,6,7,14,15,19
5:25 6:2,8,9,13,14
6:18,19 7:4,5,8,9,20
7:23 8:3 9:9,17 10:7
10:18 11:5,15 14:12
15:20 21:10 22:18
23:21 31:14 38:5
39:25 40:19 42:16
43:6 50:10 52:10
54:25 62:12,18
65:13 66:17 67:23
68:9 69:16 71:18
72:18 73:3,11,24
80:17,22 85:13,18
86:12,23 91:17
96:13 100:18,21
**Oklahoma (1)**
17:23
**ones (3)**
18:13 35:24 76:5
**Onyx (2)**
16:8 22:20
**opened (1)**
23:7

**opinion (1)**
44:13
**opposed (1)**
16:14
**order (1)**
19:7
**originally (2)**
8:15,19
**outcome (1)**
102:14
**Outlook (4)**
28:20,20,22 29:4
**overall (1)**
47:14 73:9 76:8,9,19

———————
**P**
———————
**P (2)**
3:2,2
**Pacific (1)**
2:11
**page (11)**
21:2,4 23:17 25:3
63:4 64:13 96:12,13
96:14 103:4,12
**pages (4)**
21:13 80:16,19,20
**paragraph (1)**
64:13
**Pardon (1)**
59:2
**Park (1)**
3:14
**part (18)**
15:25 17:23 20:10
21:7 39:19 41:18,23
42:21 48:17 53:12
67:10 71:3 76:18
86:25 93:6 96:10,11
98:4
**particular (2)**
17:16 69:16
**particularly (2)**
5:8 6:15
**parties (1)**
102:12
**partner (41)**
9:19 10:4,16 11:3,20
12:8,11,21 13:2,16
13:19 15:5,13 16:14
16:18,20,22,24,25
17:10,11 23:5,6,7
23:10 30:24 39:11
41:13 43:5,10 44:21
46:3 51:7 52:6,18
57:3 63:9 67:3,24
90:12,14
**partners (6)**
12:22 14:16,17 48:16

48:18,19
**partner's (1)**
52:15
**pass (1)**
84:13
**passed (1)**
19:3
**peer (1)**
9:14
**pending (2)**
7:8 72:2
**percent (1)**
27:12
**performance (12)**
50:17 51:8,14,24 52:5
52:13,15 53:5,9
61:23 64:17 84:4
**period (3)**
10:7 13:12 37:20
**person (5)**
23:14 29:19 36:22,23
46:7
**personally (2)**
14:22 48:22
**Pg (1)**
104:6
**phone (6)**
5:9 6:16 15:22 89:18
89:20 90:5
**physical (1)**
56:15
**physically (3)**
56:7 59:10 65:10
**picture (3)**
51:18,19 56:7
**piece (4)**
39:8,8 45:14 48:12
**pieces (9)**
46:5 49:17 91:25 92:5
94:9 95:8,8,24 96:8
**Pizarro (147)**
1:1,14 2:1,9 3:1 4:1,2
4:7 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1,5,5
19:13,14 20:1 21:1
21:22 22:1 23:1
24:1 25:1 26:1,12
27:1,16 28:1 29:1
30:1,11 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1,21,22
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
50:4 51:1 52:1 53:1
54:1 55:1,4 56:1
57:1 58:1 59:1 60:1

61:1 62:1,6,7 63:1
63:10 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1,16,22,25
80:1,6,13,22 81:1
82:1 83:1,2,9 84:1,6
84:13,14,16 85:1,9
85:14 86:1 87:1
88:1,23 89:1 90:1
91:1 92:1 93:1,9,25
94:1 95:1 96:1,13
96:15 97:1 98:1
99:1 100:1,18 101:1
101:7 102:1,7 103:1
103:6 104:1,5
**place (5)**
54:10 82:18 83:5
90:22 97:20
**placed (1)**
25:22
**Plaintiff (1)**
1:7
**Plaintiff(s) (1)**
3:4
**planning (2)**
64:18 65:5
**play (1)**
48:20
**please (8)**
5:18,23 19:2,16 50:2
62:3 80:22 92:11
**point (11)**
7:3 47:20 48:8 49:5,6
49:16,19,20 63:25
77:14 83:15
**pointed (1)**
32:18
**policies (17)**
17:12 31:21,23,24,25
57:4 68:17 69:9,15
69:19 70:8 71:10
72:25 73:2,10 76:9
77:25
**policy (20)**
12:25 13:4 31:16,19
31:20 32:4,17,21
33:15 39:10 41:12
41:25 42:3 47:2
48:19 49:5,11 57:2
72:12 77:22
**pop (3)**
28:11 29:6,8
**pops (1)**
29:16
**popup (1)**
29:18
**portion (4)**

26:12 27:6 59:12
98:2
**portions (5)**
60:18,21 95:3 96:18
98:14
**position (13)**
9:17,22,23 10:2,3,6
10:13,15,20,23 11:5
12:4,8
**possible (3)**
6:17 97:24 98:10
**PRA (4)**
16:19 17:3,7,14
**practice (14)**
51:20 66:19 70:13,24
71:17 72:14 74:15
76:3,20 77:18 78:3
78:5,9 79:10
**practices (7)**
68:8 69:10,15 71:3,10
72:16 77:23
**PRCS (1)**
18:3
**preceded (1)**
27:9
**prepare (2)**
7:17,24
**present (4)**
8:11 37:21 58:7 69:24
**presented (1)**
93:20
**pretty (1)**
31:17
**prevent (1)**
98:22
**preview (1)**
29:5
**previous (4)**
51:14,24 61:18,23
**previously (9)**
10:11 11:10 19:4
32:19,23 40:25 62:4
84:14 90:16
**primary (1)**
14:16
**printing (1)**
20:8
**prior (8)**
11:13,16 13:24,24
27:16 51:8 65:11
66:15
**priorities (1)**
29:21
**privilege (3)**
66:11 86:8,25
**privileged (1)**
60:21
**PRM (2)**

16:18 17:4
**probably (2)**
31:6 62:19
**problem (1)**
43:23
**proceed (1)**
20:22
**process (7)**
27:12 44:11 69:2,4
93:6 95:12 96:10
**processes (1)**
68:7
**produced (5)**
21:12 27:17,23 60:19
80:11
**production (6)**
21:20 27:19 37:15,19
60:18 85:5
**program (1)**
16:9
**progressive (1)**
52:17
**promotion (1)**
10:19
**properly (1)**
60:21
**properties (1)**
50:14
**protected (5)**
67:4,13,17,21 69:23
**protection (3)**
43:5,11 44:25
**provide (7)**
11:23 12:18 13:2,4,4
46:4,14
**provided (6)**
26:20,22 40:11 48:6
91:11,22
**providing (1)**
97:10
**PRS (1)**
23:10
**PRSC (1)**
13:17
**PRSs (1)**
16:20
**PSS (1)**
103:13
**Public (1)**
104:25
**purely (1)**
49:4
**purpose (2)**
69:7,8
**purposes (1)**
68:15
**put (3)**
30:6 79:19 86:21

**P&AP (3)**
43:20 44:12,24
**p.m (2)**
63:5 80:6

---

**Q**

**quarter (5)**
34:16,17,24 88:7,9
**question (39)**
5:16,18,22,23 6:7 7:7
21:2 22:10 24:10
26:9,10 33:7 39:24
41:9 43:22 47:22
49:25 59:21 65:23
66:14 68:23 71:20
71:25 72:22 73:8
74:21,22 75:12,17
76:2 83:6,8 92:20
93:24 96:5,7 98:23
99:2,4
**questioning (2)**
54:22 73:21
**questions (12)**
4:10 6:4,23 7:15,15
17:13 72:4,7 73:25
74:6 75:15 101:3
**queue (12)**
16:2,10 18:9,12,14
25:23,23 28:7,10
29:24,25 30:6
**quickly (2)**
30:7 81:2
**quote (1)**
75:13

---

**R**

**R (2)**
3:2 102:2
**ranges (1)**
21:20
**Ranus (1)**
85:19
**reach (5)**
18:21 27:10 66:19
71:17 79:12
**reached (3)**
60:5 66:2,3
**reaching (1)**
60:2
**reaction (1)**
31:7,11,12
**read (21)**
12:15,17 27:25 31:8
32:7 40:10 41:6
55:22 56:3,5,17
63:8 72:6,8 73:18
74:23 76:12,13
93:21,23 104:6
**reading (6)**

28:6,8 56:9 63:18
64:24 95:14
**Reads (1)**
104:6
**really (7)**
12:6 15:6 26:11 36:3
53:4 71:19 77:18
**Realtime (1)**
2:13
**reason (13)**
47:9,18 51:23 54:15
66:4,8 70:6 74:11
76:18 77:13 87:7,11
104:6
**reasons (23)**
40:25 48:3,7 70:10
71:2,11,13 72:9,13
72:17,19 73:12
74:16,18 75:14,23
76:4,22,25 77:5,8
77:11 81:10
**recall (83)**
9:5 15:24 18:4,24
24:3 25:12 35:14
38:9,10,14,15,19
42:12,15 48:11
53:19 54:5,8,11,14
54:19 55:17 56:14
58:19,24 59:4,10
60:2,8,10,15,22
61:8,13,20,25 64:9
65:10,16 66:23
76:23,24 77:3,4,6,7
77:9,10,12,13,16
81:13,18,22,23
82:11,25 83:20,23
84:2,5,11 85:17
87:22 89:11,12,15
90:2,11,13,19,24
92:3,9,18,25 94:7
94:22 97:14,18,22
99:8 100:20
**recapture (1)**
90:15
**recapturing (1)**
90:22
**receive (1)**
16:23
**received (5)**
18:16 32:14 35:20
42:8 75:15
**receiving (1)**
81:4
**Recess (2)**
55:3 88:22
**recognize (10)**
19:17,19,21 21:23,25
80:13,24 85:14,16
100:19

**recognizes (1)**
10:19
**recollection (15)**
23:22 24:11 53:24
55:20,25 56:18
63:19 64:5,25 93:3
93:13 94:2 95:2,4
100:22
**recommend (1)**
82:14
**recommendation (8)**
35:15 61:5 67:6 81:16
81:20 82:10 99:17
99:25
**recommendations (3)**
11:24 12:19 13:2
**recommended (2)**
38:3 61:10
**record (15)**
8:7 12:17 19:25 21:11
21:20 35:9 63:14
71:22 72:8 75:19,20
76:13 80:10 93:23
102:10
**recordkeeping (1)**
52:8
**records (7)**
35:19 37:18,25,25
38:7,17 57:3
**redacted (13)**
59:12 60:20 84:18
95:7 96:3,14,18
97:25 98:14,20
99:11,18 100:2
**redactions (1)**
9:7
**refer (11)**
56:20 59:9 60:9,16
61:7 64:2,11 65:17
82:12,15 92:10
**referring (11)**
8:22 24:21 25:3 31:19
46:19 47:6,8,12
59:12 81:25 91:7
**reflect (1)**
96:19
**refrain (2)**
98:17,24
**refresh (15)**
23:21 24:11 30:8
55:19 56:10 63:18
64:5,24 93:2,13
94:2,25 95:3,10
100:21
**refreshes (2)**
55:25 56:18
**regard (18)**
45:11 53:17 58:21
59:7 67:15,24 69:9

76:16 77:23 82:9
93:15 96:24 97:3
100:23
**regarding (19)**
12:16 18:16 22:6
24:13 25:10 26:16
27:5 42:11 59:16,24
61:5 77:14,23 81:16
81:21 89:4 99:16,23
99:25
**region (4)**
17:17,19,21,22
**regions (2)**
17:20,21
**Registered (1)**
2:12
**regular (1)**
57:11
**rehired (1)**
10:10
**related (2)**
35:19 102:11
**relations (4)**
11:24 13:8 14:4,5
**relevant (2)**
53:11 66:22
**remember (56)**
15:11,16,18,20 17:25
18:7,8,11 24:6 25:9
27:24 28:5 31:7
33:17 35:2 38:8
53:20,21 54:6,9,12
54:16 56:8 57:6,19
58:3,16 59:6,15,23
60:4 61:3,16,21
65:8,13 81:4,14,20
82:13,17 83:17,21
83:24 84:3,9,21,24
88:23 89:3,9,17,21
89:24 90:3,4
**remembered (1)**
28:8
**remembering (1)**
24:16
**repeat (2)**
5:19 83:6
**repetitive (1)**
72:23
**rephrase (3)**
5:24 26:9 49:25
**report (4)**
22:6,10 32:13 97:20
**reported (1)**
1:24 49:23 50:6 91:17
**reporter (18)**
2:12,13 5:5,13 6:5,12
12:15 19:2,10 62:3
72:6 73:18 74:23
76:12 79:16 84:13

100:7 102:5
**reporting (4)**
36:22,23 37:9,12
**represent (3)**
4:8 21:11 62:8
**representative (2)**
23:8 63:10
**represents (1)**
50:24
**request (2)**
7:6 98:18
**requested (3)**
87:5,9,12
**require (1)**
32:2
**research (1)**
12:25
**resolution (2)**
13:5,9
**resource (3)**
13:16 15:6 78:8
**resources (15)**
9:19 10:5,16 12:8,11
12:21 13:19 15:14
16:14,19,20,22,25
23:11 63:9
**respect (1)**
66:14
**respond (1)**
30:20
**responded (1)**
84:10
**response (3)**
6:11 39:17 87:18
**responsibilities (4)**
11:21,23 12:16 13:11
**responsibility (2)**
14:2 16:17
**result (5)**
33:15 39:12 40:22
41:15 78:23
**resulted (2)**
34:5 44:19
**retained (1)**
98:14
**retrieve (1)**
43:21
**return (2)**
90:9 97:18
**returned (1)**
14:11
**review (29)**
8:13 12:24 17:2 19:16
27:13 29:14 41:4,23
44:17 47:7 48:5
49:16,18 50:9,15
51:13 53:3 60:20
72:15 76:9,19 80:22

92:11 93:6 94:14,15
95:21 96:10 100:18
**reviewed (24)**
24:2 33:3,24 41:4
42:13 47:24 48:11
49:4 62:17 65:12
68:6 71:16 81:2,14
83:17,21,24 84:3
92:16 93:5 94:14
95:5,9 99:24
**reviewing (12)**
13:7 18:12 44:5 47:23
50:19 51:7 80:24
94:21 95:11,22
97:15 98:12
**reviews (6)**
50:17 51:8,14,24
64:17 84:4
**right (16)**
9:4 27:24 33:21 38:19
39:2 40:13 41:16
45:12 47:16 69:6
70:15 72:2 80:21
94:24 96:6,24
**risk (4)**
67:10 71:7 76:10,19
**RMR-CRR (2)**
1:24 102:20
**role (4)**
10:17 12:5 14:4 67:10
**roughly (1)**
9:2
**routed (9)**
12:20,22 17:5 23:10
23:14 25:18,21
26:19 27:25
**rules (2)**
5:3,8

―――――――――――
**S**
―――――――――――
**S (6)**
1:24 2:11 3:2 102:4
102:19 103:10
**safekeeping (1)**
51:19
**safety (5)**
32:3 33:13 47:2,25
56:25
**sake (2)**
19:6 74:9
**Samidh (3)**
3:12 8:6,8
**saying (7)**
5:11,13 6:18 42:2
65:8,10 95:19
**says (21)**
24:16,23 25:3 26:13
38:21,25 39:8 42:17
45:20 55:7,23 56:21

57:10,24 58:5 63:7
65:4 82:6 85:19
86:2 96:14
**screen (4)**
27:2 29:6,9 36:7
**search (3)**
36:13,14 37:18
**searching (1)**
37:4
**Seattle (1)**
37:3
**second (6)**
30:25 31:5 56:21
64:12 80:16 96:13
**section (13)**
38:21 39:8,10 41:6,12
42:16 46:10 55:2,23
55:24 56:9 99:18
100:2
**sections (2)**
95:17 99:11
**security (5)**
32:4 33:13 47:2,25
57:2
**see (28)**
12:10 16:3,5 26:11
27:3 29:8 30:8 36:5
38:23 42:19 50:23
51:24 53:3 57:4,17
58:8 63:5,16 64:22
65:4,11 79:25 81:24
84:16 85:18,24 86:2
100:10
**seen (2)**
15:25 62:13
**send (4)**
17:3 57:25 86:21,24
**sending (1)**
64:14
**senior (9)**
9:20,23,25 10:12,19
11:20 12:5,6 16:20
**sent (4)**
8:15,19 80:5 96:9
**sentence (5)**
45:20 55:6 56:21
57:10,24
**sentences (1)**
63:8
**separate (5)**
53:24 54:2 91:12,14
95:6
**separated (1)**
32:19
**separating (1)**
88:3
**separation (31)**
17:9 33:16 35:15 36:9
46:13 47:16,19

48:24 50:5,9,21
51:17 52:11,21 53:4
59:16,25 61:6 63:11
63:25 64:6,21 83:14
87:23 88:16 90:8,23
91:5 93:18 97:17
98:13
**separations (1)**
88:10
**Serenity (32)**
1:6 4:8 14:19,24 15:5
15:12 22:3,7 24:13
25:10 38:18 48:9
49:2 58:2,5,17
61:23 64:15 68:21
69:17 70:18,22
76:17 77:14 80:8
82:18 83:18 86:6
89:5 90:21 96:24
104:3
**Serenity's (2)**
63:11 64:20
**serious (12)**
32:20 33:2,5,14 39:11
40:21 41:13,14
43:17 44:14 53:6,10
**service (1)**
18:11
**set (2)**
102:8,15
**severity (1)**
49:11
**shape (1)**
87:19
**share (3)**
37:11 46:7 87:16
**SHEET (1)**
104:2
**Shelly (1)**
85:19
**shift (1)**
35:8
**short (3)**
48:18 57:12 88:20
**shorthand (1)**
102:4
**Signature (1)**
104:20
**significance (2)**
44:22 45:16
**significant (12)**
33:14 43:12,23 44:3,5
44:7,8 45:4,7,14,17
45:18
**similar (1)**
13:25
**sir (1)**
28:21
**sit (4)**

15:9 58:25 59:3
81:19
**sitting (2)**
28:5 56:24
**situation (4)**
46:12,19 47:6,14
**slips (1)**
51:11
**SM (16)**
39:9 41:12,24 46:3,12
46:18,20 47:4,5,9
55:8,9 57:13 58:2,5
86:6
**smoothly (1)**
5:4
**software (1)**
16:8
**somebody (2)**
14:24 36:18
**Somers (8)**
23:18 26:13,17 28:2
30:12 31:9 32:14
42:8
**sorry (4)**
32:6 77:20 79:19 98:7
**sort (5)**
35:23 36:11,15 50:18
94:11
**sorting (1)**
36:11
**sound (3)**
28:23 29:15,17
**sounds (4)**
9:4 42:4 56:6,6
**SOUTHERN (1)**
1:3
**speak (6)**
24:17 33:11,21 65:19
78:13 87:8
**speaking (3)**
97:9 98:17,24
**specialist (3)**
16:22,25 23:11
**specialists (1)**
16:21
**specific (2)**
41:6 89:16
**specifically (8)**
28:9 35:19 47:12 54:3
61:14 64:14 70:17
76:16
**specifics (1)**
64:9
**speculate (5)**
81:9 88:6,12 98:20
99:20
**speculating (1)**
100:5

**speculation (2)**
99:7,14
**spoke (12)**
23:23 24:8,12,18,21
25:5 53:13 59:15,22
59:23 60:23 97:23
**spoken (1)**
15:7
**stamp (5)**
21:6,14 62:9 85:11
100:10
**stamped (3)**
19:15 62:8 80:11
**stamps (1)**
21:13
**stand (1)**
22:18
**standard (3)**
18:10 72:16 95:12
**standards (11)**
68:8 69:15 71:10
72:25 73:2,10,15
74:11 75:22 76:9
77:2
**stands (1)**
58:12
**Starbucks (20)**
1:9 4:9 9:18 10:2,24
11:6,13,17 12:12
14:25 15:12 48:14
49:2,7 52:13,18
63:12 87:23 88:3
104:3
**start (1)**
22:15
**started (1)**
23:9
**starts (1)**
100:11
**STAR_MARSHAL...**
19:15 103:14,16,18
103:20,22,24
**state (1)**
73:23
**stated (4)**
56:22 57:11,14 72:14
**statement (7)**
46:20 48:3 55:7,17,18
55:19 57:25
**States (3)**
1:2 2:13 102:5
**stating (1)**
64:14
**status (6)**
67:4,12,13,17,21 69:5
**Stephen (9)**
23:18 26:13 28:2,8
30:12 31:8 40:12

41:4 42:8
**Steve (1)**
32:14
**store (8)**
13:23 14:16 17:11
43:12,24 56:24
57:12 86:7
**straightforward (3)**
31:13,17 32:18
**strategic (1)**
14:2
**Strauss (2)**
2:10 3:13
**strike (12)**
25:14 26:5 39:18
41:14 45:21 68:13
71:12 78:16 89:3
94:11,16,16
**stuck (2)**
31:20,21
**subject (1)**
80:8
**Subscribed (2)**
101:8 104:21
**subsequent (2)**
23:13 75:5
**substance (3)**
21:15 59:19 63:7
**substantively (2)**
19:24 20:10
**sufficient (1)**
95:23
**summary (3)**
32:13 40:13,17
**supervisor (2)**
11:4 35:8
**support (20)**
12:9,21 13:16,25 14:5
64:20 67:6 71:9
72:24 73:3,13 74:10
75:21 76:7 77:8
90:14 91:13 92:23
94:4 97:16
**supported (7)**
48:7 63:24 64:6 91:11
92:16 93:17 95:20
**supporting (3)**
91:21 92:7,13
**supports (2)**
13:18 63:11
**sure (26)**
5:4,10 18:20,24 19:24
20:7,23 22:9 26:10
39:23 41:8 62:25
68:12,16 71:22,23
72:4,5 75:6,9 79:20
80:17,18 83:7 96:6
98:10
**Susan (4)**

1:24 2:11 102:4,19
**suspicious (1)**
57:14
**sworn (4)**
4:3 101:8 102:9
104:21
**system (23)**
8:24 16:7 18:3,18,19
22:2,13,20 23:2
24:25 28:15,15
29:13,18 30:21 31:3
36:14 37:16 40:2
86:15,19 96:20,23

————————————
T
————————————
**T (3)**
102:2,2 103:10
**take (13)**
5:5 6:5,12 7:2,4 8:23
20:20 37:22 60:24
67:13,25 85:6 88:19
**taken (8)**
4:14 7:7 23:13 32:2
43:2 44:20 56:23
90:22
**talk (4)**
24:23 42:5 66:9 77:17
**talked (3)**
24:6 55:23 66:5
**talking (1)**
18:7
**team (21)**
11:22,25 12:9,23
13:14,19,22 14:9,13
16:9,16 17:6,15
23:11 32:20 36:22
66:20 87:5,10,12,17
**telephone (4)**
26:16 57:20 58:17
61:17
**telephonically (1)**
3:5
**tell (10)**
4:14 15:2 19:17 47:18
54:3 55:16,24 80:24
81:12 100:19
**tenure (2)**
48:13,20
**tenured (2)**
48:18,19
**term (2)**
37:17 86:25
**terminate (11)**
32:9 82:18 83:4,10
90:25 91:10 92:8,14
95:15,16 97:4
**terminated (3)**
33:18 38:13,17
**terminating (1)**

92:24
**termination (23)**
32:12 34:6 38:3 39:13
40:22 41:16 48:15
49:22 52:13,23
58:21 59:8 61:10
81:17,21 82:10,14
91:21 93:15 94:4
97:12 99:18,25
**terms (2)**
21:3 37:19 45:6,9,10
**territory (1)**
17:8
**testified (4)**
4:3 40:25 72:9 89:6
**testify (1)**
59:19
**testifying (1)**
69:2
**testimony (7)**
52:11 73:11,17,19
75:11 94:24 102:10
**Texas (6)**
1:15 2:11,14 17:22
102:5,21
**thanks (1)**
21:18
**theft (2)**
17:10 35:12
**thing (4)**
7:6 21:13 50:18 99:6
**things (7)**
19:8 32:25 49:10
51:11 53:11 56:7
67:11
**think (26)**
19:23 20:11,13,15,22
22:20 32:12 38:3
48:13 69:3 73:20
74:6 75:14 76:6
79:2,11 88:21 93:4
93:12,24 95:2,25
98:19,21,25 99:10
**thinking (3)**
77:16 94:22 99:6
**thinks (1)**
64:20
**third (2)**
23:17 73:14
**THOMPSON (1)**
3:7
**thought (4)**
68:7 69:2,4 71:9
**thoughts (3)**
72:16,24 76:7
**three (8)**
9:23 11:4,12 12:4,6
16:17 35:16 72:6
**throw (1)**

**Thursday (1)**
80:5
**till (1)**
57:13
**time (24)**
13:9 14:23 15:17
16:11,12 23:22
24:11 27:12 35:9,11
35:12 38:2 42:7,9
52:23,24 54:21,25
69:12,24 71:14
88:14 89:14 92:4
**times (7)**
4:19,21 14:14 18:12
18:21 74:14 95:13
**Tina (12)**
1:14 2:9 4:2 38:22
63:10 64:14 80:6
96:15 101:7 102:7
103:6 104:5
**title (3)**
12:7 86:13 87:2
**titled (2)**
19:11 86:5
**today (9)**
4:11 15:10 58:25 59:3
81:19 88:25 89:6
94:7,21
**told (2)**
40:20 55:14
**top (1)**
84:17
**total (3)**
10:6 12:11 14:8
**totality (1)**
46:23
**track (1)**
88:18
**training (1)**
14:3
**TRANSCRIPT (1)**
104:2
**transpired (1)**
90:16
**trial (1)**
4:24
**true (1)**
102:9
**truth (1)**
4:14
**truthfully (1)**
7:15
**try (3)**
5:24 37:9 43:21
**trying (4)**
20:15 22:22 70:15
96:6
**turn (4)**

28:24 29:2 30:10
38:20
**Twice (1)**
4:20
**two (7)**
8:10 11:19 17:20
18:14 30:25 31:20
63:8
**two-day (1)**
30:23
**two-page (1)**
62:9
**type (8)**
30:23 36:7 37:12
52:16,21 56:7 68:19
86:22
**typed (5)**
39:25 40:4,9 86:12,17
**types (6)**
34:19 35:21 88:7,14
88:14,17
**typically (4)**
18:22 31:4 51:17
86:20

———————————
**U**
**Uh-huh (2)**
26:14 47:17
**unable (1)**
94:25
**underneath (2)**
26:12,15
**understand (22)**
4:11,13 5:11,12,21,25
6:6,20 7:14 22:9
26:10 29:2 39:23
41:8 44:6 48:8
58:11 71:20,24 83:7
96:7 98:10
**understanding (2)**
69:23 78:2
**understands (2)**
72:5 99:4
**understood (2)**
32:7 95:20
**unfortunate (2)**
48:17,22
**unique (5)**
33:24 49:15 50:14
78:25 79:12
**UNITED (1)**
1:2
**unquote (1)**
75:13
**unredacted (6)**
60:18 85:5 93:12,25
95:3,17
**update (1)**

98:5
**updated (1)**
99:21
**updates (1)**
97:6
**use (1)**
5:17
**utilized (1)**
36:21

———————————
**V**
**variety (1)**
34:18
**various (1)**
96:15
**verbal (2)**
6:10 52:20
**verbatim (2)**
26:23 28:6
**version (2)**
93:12,25
**versions (1)**
95:7
**Victor (1)**
80:7
**view (1)**
44:2
**violated (2)**
39:10 41:12
**violates (1)**
32:3
**violation (11)**
31:16,19 33:15 41:25
42:3 49:8,23 50:6
53:7 56:25 57:3
**violations (9)**
32:17,21 33:5,14
48:20 49:5,11,12
52:14
**VM (1)**
39:9
**voice (19)**
6:16 25:4 30:15 39:4
39:20 40:14,20 41:3
41:10,18,21 42:10
42:16,21 46:10 50:4
51:4 81:25 82:4
**volume (1)**
30:9
**volumes (1)**
31:2
**vs (2)**
1:8 104:3

———————————
**W**
**waited (1)**
30:19
**waiver (1)**

87:19
**want (18)**
5:10 7:2 43:6,9 50:9
50:15,23 51:13 53:3
54:22 67:4,7 71:22
71:23 72:5 75:5,9
98:9
**wanted (11)**
20:23,23 32:9 35:23
48:5 49:18 66:8
70:7,9 77:17 95:21
**way (15)**
5:24 19:9 20:15 23:22
44:10 45:5 46:7
55:25 63:23 64:25
65:16 73:21 86:20
87:19 102:13
**week (3)**
60:11 64:18 95:13
**weekend (1)**
31:6
**weeks (2)**
18:14 35:16
**went (1)**
44:18
**weren't (2)**
42:19 45:23
**we're (5)**
21:2 37:8 73:24 79:20
80:17
**we've (2)**
54:24 93:5
**whatsoever (1)**
15:8
**WHEREOF (1)**
102:15
**wide (1)**
17:13
**WIGDOR (1)**
3:7
**witness (18)**
19:11 59:19 60:7,14
60:22 62:3 65:23
66:12 87:16 90:14
98:19 99:2,3 100:7
102:7,10,15 103:4
**wondering (1)**
57:15
**word (5)**
5:17,22 37:16,17
85:24
**words (1)**
76:7
**work (14)**
11:8,11 16:2 17:16
25:23 28:15,17 30:3
30:9 36:25 38:2
41:24 49:2 88:6
**worked (8)**

11:10,13,16 14:8,12
14:25 15:12 22:16
**working (2)**
29:25 88:8
**wouldn't (9)**
28:7 44:10,13 45:5,6
45:15 78:13 81:9
87:8
**write (1)**
55:12
**writing (1)**
84:21
**written (2)**
52:20 85:16
**wrote (12)**
28:8 35:10 39:17,19
40:16 46:11 47:15
81:7,10,11 84:24,25

———————————
**X**
**X (2)**
103:2,10

———————————
**Y**
**year (9)**
10:3,9,12 12:9 14:10
35:20 48:9 88:4,11
**years (7)**
10:6,21 11:4,19 12:12
12:12 22:25
**yesterday (4)**
8:4 62:17,24 81:3
**York (5)**
1:3 3:9,9,15,15
**York/attorney-clie...**
86:7

———————————
**1**
**1 (11)**
19:5,11,12,14 26:12
30:11 38:21 93:9,25
96:13 103:13
**1,000 (1)**
88:10
**1/10/2011 (1)**
38:22
**1/12/2011 (1)**
103:15
**1/13/2011 (1)**
103:23
**1/18/2011 (1)**
103:17
**1/25/2011 (1)**
103:19
**1/6/2001 (1)**
23:18
**1/6/2011 (5)**
26:13 27:7,16 28:3

30:13
**10 (1)**
34:15
**10th (11)**
24:6,9 25:5,11,13,16
  30:16 31:6 42:10
  53:18 82:7
**10:21 (1)**
55:3
**10:34 (1)**
55:3
**10:51 (1)**
23:19
**100 (2)**
95:13 103:23
**10003 (1)**
3:9
**10036 (1)**
3:15
**1088330 (1)**
86:7
**11 (5)**
1:16 2:4 39:10 41:12
  104:4
**11-CV-2521 (1)**
1:8
**11:21 (1)**
88:22
**11:29 (1)**
88:22
**11:46 (1)**
101:5
**11649 (1)**
86:7
**12th (15)**
24:24 25:6 53:14,18
  55:6 58:23 59:7
  61:4,11 63:4,21
  64:7 65:2 82:7,21
**12/5/2011 (1)**
85:20
**12:05 (1)**
63:5
**13 (1)**
80:5
**13th (5)**
81:5 82:24 83:5,11
  97:11
**13084 (1)**
102:22
**1565 (1)**
103:18
**1614 (2)**
80:11 103:24
**162 (1)**
19:16
**1621 (1)**
80:12

**1622 (1)**
21:20
**1623 (1)**
103:14
**1624 (1)**
96:12
**1625 (1)**
23:17
**1626 (1)**
21:21
**166 (1)**
19:16
**1700 (1)**
2:10
**1767 (2)**
85:12 103:20
**18th (1)**
84:19
**19 (1)**
103:13

---

**2**

**2 (3)**
62:5,7 103:15
**2009 (2)**
10:3,9
**2010 (6)**
10:10 15:19,22 18:2,6
  37:20
**2011 (25)**
13:12 25:5,6,11,13,16
  30:17 37:21 53:14
  53:18,18 55:6 58:23
  59:7 61:5 63:21
  64:8 65:2 80:6 81:5
  82:7,8,21,24 84:19
**2012 (6)**
1:16 2:4 101:9 102:16
  104:4,22
**2064 (3)**
100:12,14 103:22
**2069 (2)**
100:12,14
**2128 (2)**
62:8 103:16
**2129 (1)**
62:8
**24th (1)**
102:16

---

**3**

**3 (7)**
79:17,18,19,25 84:14
  84:15 103:17
**300 (1)**
57:12

---

**4**

**4 (4)**
85:9,10 103:8,19
**400 (1)**
57:12
**45 (1)**
35:10
**45317 (1)**
1:25

---

**5**

**5 (2)**
47:8,9
**5/26/2011 (1)**
103:21
**500 (4)**
34:16,23 88:7,8

---

**6**

**6 (1)**
17:22
**6th (1)**
24:5
**6:45 (1)**
80:6
**62 (1)**
103:15
**6531 (1)**
102:21

---

**7**

**7 (4)**
17:21 100:7,8 103:21
**79 (2)**
103:17,21

---

**8**

**8 (8)**
19:5,5 79:22,23 83:2
  83:9 84:6 103:23
**80 (1)**
36:7
**85 (2)**
3:8 103:19

---

**9**

**9:15 (1)**
2:5
**90 (1)**
27:12

**PSS Case Information**

| | |
|---|---|
| ID | 9001166 |
| Description | DM: Separtion consultation - Attorney client privilege |
| Assigned To | TPizarro |
| Categorization | PRSC General HR Questions/Policy -> Separation Consultation |
| Status | Closed |
| Priority | High - B |
| Activity | |
| Keyword | |
| Recall | |
| Reminder | ⊡ |

**Details**

| | |
|---|---|
| *Off Cycle Payment | No |
| *Payroll Area | NY (NY,CT,RI,PASQUA (NY)) |
| *State / Province | New York |
| *Type of Action | Action Request |
| Due Date | 01/10/2011 |
| *Store / Cost Center # | 11649 |

**Resolution Codes**

| | |
|---|---|
| Resolution 1 | Completed |

**Customer Information**

| | |
|---|---|
| ID | 1088330 |
| Customer | Serenity Marshall |

**Contact Information**

Contact: Jennifer Anne Gurtov
Partner #: 282805
Store #: 390830
Phone:
Fax:
Company:
Title:
Dept:
Email:
Address:

**Notes**

⊟**** Entered By: Tina Pizarro @ 03/02/2011 04:46 PM ****

Redacted

EXHIBIT
1
Pizarro
PENGAD 800-631-6989

http://aimcm.starbucks.net/onyxemployeeportalccc_windows/incident/incident_print.asp?I...   4/15/2011

PSS Case 9001166



**** Entered By: Tina Pizarro @ 02/21/2011 10:49 AM ****



**** Entered By: Tina Pizarro @ 02/16/2011 03:47 PM ****



**** Entered By: Tina Pizarro @ 02/15/2011 12:39 PM ****



**** Entered By: Tina Pizarro @ 02/08/2011 09:51 AM ****



**** Entered By: Tina Pizarro @ 01/25/2011 09:15 AM ****

STAR_MARSHALL0001624

PSS Case 9001166                                                                    Page 3 of 4

**[Redacted]**

⊟**** Entered By: Tina Pizarro @ 01/14/2011 07:31 PM ****

**[Redacted]**

⊟**** Entered By: Tina Pizarro @ 01/12/2011 11:02 AM ****

Talked with DM Jennifer
Jennifer will fax me her statement when the SM admitted to falsifying the books to hide the fact
that the SM was not taking the deposits to the bank on a daily basis. DM Jennifer stated that she
found multiple days in which the deposits were not taken to the bank and were just sitting in the
store--we discussed that is a major violation of the safety and security policy, in addition to the
falsifying of records which is a violation of the partner guide policies. DM Jennifer stated that she
also discovered that on a regular basis the store was short $300-$400 per month, the SM was not
conducting till audits and the DM stated it is suspicious where the money has gone and was
wondering if the books were being manipulated to make up for the lost amounts. DM Jennifer will
send me the entire file and her statement of the conversation with SM Serenity.
SM Serenity is currently out on LOA, I advised I will present to legal to determine if we can move
forward with separation while on LOA

⊟**** Entered By: Tina Pizarro @ 01/10/2011 12:37 PM ****

LVM for Jennifer
on vm, I let Jennifer know that it appears the SM violated our policy under section 11 of the
partner guide and has a case of serious misconduct that can result in immediate termination,
"falsification or misrepresentation of any company document", I asked Jennifer to let me know if
any money was missing and any other details that werent captured here, I let her know from the
notes it appears the SM does admit to the situation and I agree with the consequence of
separation, but would like to discuss further and provided number.

⊟**** Entered By: Stephen Somers @ 01/06/2011 10:51 AM ****

Caller Name:  Jennifer Anne Gurtov
Phone Number: 917-975-1331
SSN Verified (Y/N):  yes
Caller Position:   DM
---------------------

SM wants separation consultation for SM issues for cash handling issues

1. DM came in for store tour/eval on 12/22

2. DM noted that deposit records for 12/21 deposit were falsified

3. DM stated paperwork filledout stating deposit was given to bank, but there was no reciept from
bank confirming deposit

4. DM found several deposits in safe that have not been deposited with bank

5. SM stated reason for falisifying deposit information is they were having trouble getting time off
floor to complete deposit before bank closed, so they would complete the deposit information
showing deposit was made even though deposit was not brough to the bank, SM stated they did
not want to get in trouble for not making deposits daily

STAR_MARSHALL0001625

6. DM stated had recently separated another SM for same reason and had another SM having same issues of making sure bank deposits are done daily.  Stated recently reset district expectations to ensure deposits are done daily

7. past history with SM over 2 1/2 years, performance has never been consistent (between very poor to very good performance)

8. CA history

02/18/09 - not creating a great working environment, not meeting cleaniess standards, not providing clear direction to team
03/15/10 - for same reasons - not creating a great working environment, not meeting cleaniess standards, not providing clear direction to team

no CA - but coaching coversation around 2009 near prior to 02//18/2009 CA
for not managing team from cash handling perspective, not evaluating daily records book and coaching team in a timely manner

9.
recent performance review - issues under lead couragously
not consistently desicion making
not meeting cleaniness statndards
not holding team accountable

10. DM seeking separation consultation, stated has documents of CA and performance reviews if needs to send in additional documentation

0-2 bd tat

STAR_MARSHALL0001626

# FW: Serenity Marshall

| From: | Jen Gurtov </O=STARBUCKS/OU=SSC/CN=RECIPIENTS/CN=JGURTOV> |
|---|---|
| To: | Victor Heutz |
| Subject: | FW: Serenity Marshall |
| Sent: | 1/12/2011 5:54:08 PM +00:00 |

I recapped below the information I received from the partner resources support center. Nancy agrees.

I will copy you on all information I send to Tina by the end of this week.


Thanks-


*Jennifer Gurtov*

District Manager Starbucks Coffee Company 917.975.1331

---

**From:** Nancy Murgalo
**Sent:** Wednesday, January 12, 2011 12:11 PM
**To:** Jen Gurtov
**Subject:** RE: Serenity Marshall


Hi Jen – I concur with Tina and, with the support of legal, I would agree with separation.  It's consistent with what we have done in the past.


*Nancy*

---

**From:** Jen Gurtov
**Sent:** Wednesday, January 12, 2011 12:05 PM
**To:** Nancy Murgalo
**Subject:** Serenity Marshall


Hi Nancy-


So I heard back from Partner Resources Contact Center. Tina Pizarro, a representative there, supports separation of Serenity's employment with Starbucks for her admitted falsification of company documents(in this case the Daily Records Book) as well for continuously not depositing deposits into the bank daily.   For the first point, Serenity admitted to filling out



EXHIBIT
2
*Picarro*

the Daily Records Book to show that a deposit was completed in the store and brought to the bank, when in truth the money had not been counted yet, all drop bags were still in the safe.  Serenity also admitted to several times in the month of November holding onto several deposits in the store(not making deposits to the bank daily) and bringing up to 3 deposits to the bank at a time.  Serenity knew these actions were against Starbucks cash handling policies, but said she made these decisions because she wasn't able to get off of the floor to complete deposits.

I am sending Tina an email stating specifically the conversation I had with Serenity on her development day and am also faxing all past corrective actions and performance reviews by the end of this week.  She is planning on bringing this case to the legal department, she thinks they will support Serenity's separation immediately even though she has initiated her LOA.

Nancy, I just wanted to grab your thoughts on the above as well as your recommendation so I can share with Victor.

*Jennifer Gurtov*

District Manager  Starbucks Coffee Company 917.975.1331

---

**SourceLastModifiedTime:** 7/18/2011 4:25:31 PM +00:00

This HTML was generated by AccessData using data parsed from "jgurtov.pst".
Please refer to that file for the original evidence.

**Jen Gurtov**

| | |
|---|---|
| **From:** | Tina Pizarro |
| **Sent:** | Tuesday, January 18, 2011 10:20 AM |
| **To:** | Jen Gurtov |
| **Subject:** | RE: Serenity Marshall |



Redacted

*Regards,*
*Tina Pizarro, PHR*
*partner relations associate. PRSC*
*Starbucks Coffee Company*
*817-431-8838*

**From:** Jen Gurtov
**Sent:** Thursday, January 13, 2011 5:45 PM
**To:** Tina Pizarro
**Cc:** Nancy Murgalo; Victor Heutz; Jen Gurtov
**Subject:** Serenity Marshall

Hi Tina,

On December 22nd, 2010, I had spent a development day with Serenity Marshall, SM of store 11649. In reviewing her Daily Record's Book, I began to notice many discrepancies. The dates of the bank statements did not match the dates the deposits were completed. I asked Serenity why there were so many discrepancies and she said she was not able to complete the deposit daily. I asked her what Starbuck's policy was in reference to bringing deposits to the bank and she stated that it was policy to process deposits daily and bring them to the bank daily. I asked her why she had broken policy and she said she was not able to make it off of the floor daily to process the deposits.

I then began looking at the deposit that was supposed to be completed the day prior on 12/21. The deposit section was filled in by Serenity, she had signed off that she had brought the deposit to the bank, however there was not a printed bank slip attached. I asked her where the receipt was. She said she must have misplaced it and began going through a pile of slips looking for it. I asked her if she was sure she brought that deposit to the bank and she said yes. I then said, well then let's go to the bank to retrieve the slip. She paused and then said that she had lied and did not bring the deposit to the bank, she had not even yet processed it. I asked her why she lied and falsified the information in the Daily Record's Book and she said she was nervous she would get in trouble for not processing the deposit the day prior. The deposit bags for that deposit were still in the safe.

I then asked to see her log for the month of November. This log was in worse condition than December's. She had not even filled out the deposit section daily. There were also numerous occasions in which she did not even fill out safe counts. She has also been falsely documenting the deposit section in the Daily Record's Book on many occasions. She has filled in that her shift supervisors had brought the deposit to the bank on certain days when in truth she herself had brought the deposit to the bank the day after.

I have her November cash log for review with numerous instances of this behavior of falsifying documentation.

I would like to proceed with separating Serenity's employment with Starbucks for her admitted falsification of company documents(in this case the Daily Records Book) as well for continuously not depositing deposits into the bank daily.

3/1/2011

EXHIBIT
3
Pizarro

STAR_MARSHALL0001565

I am attaching prior corrective actions as well as Serenity's FY '10 Performance Review which highlights continued areas of focus in the Q4 competency section.

Please let me know if you need any other information or any of the attached documents faxed.

Thanks so much for your help,

*Jennifer Gurtov*
District Manager  Starbucks Coffee Company 917.975.1331

3/1/2011

STAR_MARSHALL0001566

| | |
|---|---|
| **From:** | Tina Pizarro </O=STARBUCKS/OU=SSC/CN=RECIPIENTS/CN=TPIZARRO> |
| **Sent:** | 1/25/2011 10:14:45 AM |
| **To:** | Shelly Ranus <sranus@starbucks.com> |
| **Subject:** | SM Serenity Marshall |
| **Location:** | Please call me at 817-431-8838 |
| **Start:** | Tue 1/25/2011 2:30:00 PM |
| **End:** | Tue 1/25/2011 3:00:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organized |
| | |
| **Required Attendees:** | Tina Pizarro; Shelly Ranus |
| **Attachments:** | Issue with SM Serenity Marshall #1088330, store 11649 NY / Attorney client privilege |

Hi Shelly,
I wanted to connect with you regarding SM Serenity Marshall.  I hope this time is convenient for you.
Thank you.



STAR_MARSHALL0001767

# RE: PRSC Case 9105586

| From: | Tina Pizarro </O=STARBUCKS/OU=SSC/CN=RECIPIENTS/CN=TPIZARRO> |
|-------|----------------------------------------------------------------|
| To: | Jen Gurtov |
| CC: | Nancy Murgalo; Victor Heutz |
| Subject: | RE: PRSC Case 9105586 |
| Sent: | 5/26/2011 6:59:19 PM +00:00 |

Thank you Jen. I attempted to call you, but missed you.

Based on everything I have read and understand, I also support separation.

Please let me know if you would like to discuss further, otherwise, please feel free to proceed accordingly.

Thanks

Regards,

Tina Pizarro, PHR

partner relations associate, PRSC

Starbucks Coffee Company

Phone: 817-431-8838 / Fax: 206-903-4067

---

**From:** Jen Gurtov
**Sent:** Thursday, May 26, 2011 11:18 AM
**To:** Tina Pizarro
**Cc:** Nancy Murgalo; Victor Heutz
**Subject:** RE: PRSC Case 9105586

CONFIDENTIAL

STAR_MARSHALL0002064



Hi Tina,

Yes, the 30 Day feedback was presented.  Charis said she felt overwhelmed with the job and feels she has 'hit capacity'.

Based on that as well as that since the 30 day check in, there has continued to be no improvement, both Nancy and Victor support separation.

Thanks,

*Jennifer Gurtov*

District Manager  Starbucks Coffee Company  917.975.1331

---

**From:** Tina Pizarro
**Sent:** Thursday, May 26, 2011 10:11 AM
**To:** Jen Gurtov
**Subject:** RE: PRSC Case 9105586

Hi Jen,

Thank you for checking, I apologize on the delay.  I have read through the documentation, thank you for having such great details and specifics.

Was the 30-day feedback provided to SM, and if yes, what was her response?

Are Nancy and Victor supportive of separation?

Thanks

CONFIDENTIAL

STAR_MARSHALL0002065

*Regards,*

*Tina Pizarro, PHR*

*partner relations associate, PRSC*

*Starbucks Coffee Company*

*Phone: 817-431-8838 / Fax: 206-903-4067*

**From:** Jen Gurtov
**Sent:** Wednesday, May 25, 2011 7:37 PM
**To:** Tina Pizarro
**Subject:** FW: PRSC Case 9105586

Hi Tina,

Just wanted to check in...do you have any recommendation on this case?

Thanks,

*Jennifer Gurtov*

District Manager  Starbucks Coffee Company 917.975.1331

**From:** Jen Gurtov
**Sent:** Monday, May 23, 2011 11:00 AM
**To:** Tina Pizarro
**Cc:** Nancy Murgalo; Victor Heutz
**Subject:** RE: PRSC Case 9105586

CONFIDENTIAL

STAR_MARSHALL0002066

Hi Tina,

I just faxed all information requested and would like to confirm you received the following:

- 1/18:  Verbal CA for QASA standards and Leadership
- 7/30:  Written CA for QASA standards and Leadership
- 9/29:  Written CA for violation of Cash Handling Procedures
- FY '10 Performance Review:  Low ME, Ineffective in Leads Courageously, Develops Continuously and Achieves Results
  - At that time spoke of changes in performance she needed to make through Q1
  - At end of Q1 Assessment, she was trending in a negative direction, led to PIP
- PIP:  Delivered 4/11/11
- FY '11 Midyear Review:  noted continued must improve behaviors in competencies

I have also attached notes from 30-Day Check in...please let me know if you need any other information.  I would like to move forward with separation at this time, and am seeking your recommendation.

Thanks,

*Jennifer Gurtov*

District Manager Starbucks Coffee Company 917.975.1331

---

**From:** Tina Pizarro
**Sent:** Thursday, May 19, 2011 2:51 PM
**To:** Jen Gurtov
**Subject:** PRSC Case 9105586

CONFIDENTIAL

STAR_MARSHALL0002067

Hi Jen,

I have received your case regarding SM Charis Liu.  When you have a moment, can you please send me the signed PIP, reviews, and any other corrective actions that you may have?  My fax number is 206-903-4067

Thank you.

*Regards,*

*Tina Pizarro, PHR*

*partner relations associate, PRSC*

*Starbucks Coffee Company*

*Phone: 817-431-8838 / Fax: 206-903-4067*

**Message Headers:**

```
Received: from CHDMS071.starbucks.net ([fe80::61bf:ae2e:4347:7202]) by
chdms073.starbucks.net ([fe80::f508:ff0e:e5d8:bfb4%10]) with mapi; Thu, 26
May 2011 11:59:22 -0700
Content-Type: application/ms-tnef; name="winmail.dat"
Content-Transfer-Encoding: binary
From: Tina Pizarro <tpizarro@starbucks.com>
To: Jen Gurtov <jgurtov@starbucks.com>
CC: Nancy Murgalo <NMurgalo@starbucks.com>, Victor Heutz
        <vheutz@starbucks.com>
Date: Thu, 26 May 2011 11:59:19 -0700
Subject: RE: PRSC Case 9105586
Thread-Topic: PRSC Case 9105586
Thread-Index: AcwWVaDYc6Gmo/fIQlOjDIQiwnPehADA5XXAAHjvLNAAHF8ScAAEXjwwAAW7oqA=
```

CONFIDENTIAL

STAR_MARSHALL0002068

```
Message-ID: <F592B5FF25DD2A46BE6569EDE4CF0BD3030E29D9B2@chdms071.starbucks.net>
References: <75FDFD783DBB58468A7FD27A640C8ACF030E06B71A@chdms071.starbucks.net>
 <F592B5FF25DD2A46BE6569EDE4CF0BD3030E26957B@chdms071.starbucks.net>
 <75FDFD783DBB58468A7FD27A640C8ACF030E09C39C@chdms071.starbucks.net>
In-Reply-To: <75FDFD783DBB58468A7FD27A640C8ACF030E09C39C@chdms071.starbucks.net>
Accept-Language: en-US
Content-Language: en-US
X-MS-Has-Attach:
X-MS-Exchange-Organization-SCL: -1
X-MS-TNEF-Correlator: <F592B5FF25DD2A46BE6569EDE4CF0BD3030E29D9B2@chdms071.starbucks.net>
MIME-Version: 1.0
```

**SourceLastModifiedTime:** 6/14/2011 11:28:12 PM +00:00

This HTML was generated by AccessData using data parsed from "jgurtov.pst".
Please refer to that file for the original evidence.

CONFIDENTIAL

STAR_MARSHALL0002069

## Davis, Sofia

| | |
|---|---|
| **From:** | Jen Gurtov [jgurtov@starbucks.com] |
| **Sent:** | Thursday, January 13, 2011 6:45 PM |
| **To:** | Tina Pizarro |
| **Cc:** | Nancy Murgalo; Victor Heutz; Jen Gurtov |
| **Subject:** | Serenity Marshall |
| **Attachments:** | Creating the environment with Serenity.doc; Serenity Marshall--Corrective Action--2.17.doc; Serenity Marshall--Corrective Action--3.15.10.doc; Serenity Marshall FY 10 Checkin-Assessment.doc |

Hi Tina,

On December 22nd, 2010, I had spent a development day with Serenity Marshall, SM of store 11649. In reviewing her Daily Record's Book, I began to notice many discrepancies. The dates of the bank statements did not match the dates the deposits were completed. I asked Serenity why there were so many discrepancies and she said she was not able to complete the deposit daily. I asked her what Starbuck's policy was in reference to bringing deposits to the bank and she stated that it was policy to process deposits daily and bring them to the bank daily. I asked her why she had broken policy and she said she was not able to make it off the floor daily to process the deposits.

I then began looking at the deposit that was supposed to be completed the day prior on 12/21. The deposit section was filled in by Serenity, she had signed off that she had brought the deposit to the bank, however there was not a printed bank slip attached. I asked her where the receipt was. She said she must have misplaced it and began going through a pile of slips looking for it. I asked her if she was sure she brought that deposit to the bank and she said yes. I then said, well then let's go to the bank to retrieve the slip. She paused and then said that she had lied and did not bring the deposit to the bank, she had not even yet processed it. I asked her why she lied and falsified the information in the Daily Record's Book and she said she was nervous she would get in trouble for not processing the deposit the day prior. The deposit bags for that deposit were still in the safe.

I then asked to see her log for the month of November. This log was in worse condition than December's. She had not even filled out the deposit section daily. There were also numerous occasions in which she did not even fill out safe counts. She has also been falsely documenting the deposit section in the Daily Record's Book on many occasions. She has filled in that her shift supervisors had brought the deposit to the bank on certain days when in truth she herself had brought the deposit to the bank the day after.

I have her November cash log for review with numerous instances of this behavior of falsifying documentation.

I would like to proceed with separating Serenity's employment with Starbucks for her admitted falsification of company documents(in this case the Daily Records Book) as well for continuously not depositing deposits into the bank daily.

I am attaching prior corrective actions as well as Serenity's FY '10 Performance Review which highlights continued areas of focus in the Q4 competency section.

Please let me know if you need any other information or any of the attached documents faxed.

Thanks so much for your help,

*Jennifer Gurtov*
District Manager Starbucks Coffee Company 917.975.1331



1

STAR_MARSHALL0001614



The below is a recap on the conversation Serenity Marshall and Jennifer Gurtov had regarding Creating the Environment on Tuesday, November 25th, 2008.

Creating the environment: Develops a positive, respectful, productive, and professional work environment.

Derailer: Allows discriminatory or inappropriate behavior to exist in the workplace

The issue was brought to Serenity's attention about challenging closings.
- Serenity will schedule herself for one closing a week.
- Serenity will pop in on store during times she is not scheduled.

Management of Shift Supervisor performance in cash handling.
- Serenity will evaluate the Daily Records Book daily and have coaching conversations and documentation in a timely manner.

Performance Management of partners treating customers with respect.
- Daily coaching conversations with partners around Green Apron Behaviors.
- Review conversations/connections with team daily.

Cleanliness/Operations of store:  Brought to attention on many occasions.
- Hold partners accountable daily to Duty Roster completeness.
- Hold SS accountable daily to FOH standards
- Re-visit cleanliness/general expectations of Bathroom Attendant and hold accountable.
- Utilize shifts to hold baristas accountable.
- Daily Values Walks

On review, was a needs improvement in Leadership.
Opportunity from review:  To raise personal sense of urgency regarding operational execution and presentation to raise the level of service, customer experience, and store success.


Partner Signature_____ Date_____


Manager Signature_____ Date_____

STAR_MARSHALL0001615



# Corrective Action Form

### Store/Dept: 847

**Employee's Name:**  Serenity Marshall

**Manager's name:**  Jennifer Gurtov

**Employee's Hire Date:**

**Today's Date:**
02/18/09

## Statement of Situation

**Manager's Statement**    Describe the situation leading to the completion of this notice.  Use Corrective Action Plan form if necessary.
Date of Occurrence(s):  02/15/09

Description:  Serenity has not consistently created a great environment by not setting clear direction to her team to maintain the store operations to cleanliness standards.  On the above date, during a tour of the store, bathrooms were dirty(floors and corners needed to be detailed, fixtures needed to be wiped down), whole bean stand display was facing the wrong direction, was not completely stocked, and was dirty.  Floors along edges of store were dusty and dirty.  Many flies were noted both front of house and back of house.  Felisha was out of dress code with bright red hair.  Serenity and I have had many conversations regarding the inconsistency of the cleanliness in her store.  I have repeatedly set direction on opportunities listed above.

**Employee's Statement**    Employee is encouraged to remark about this event.  Use Corrective Action Plan Form, if necessary.

Date of Occurrence(s):

Description:

## Corrective Action

(circle one)    Verbal    Written                 (circle one)    Verbal    Written

Date02/18/09;    By Whom: Jennifer Gurtov        Date:         By Whom:

Comments:  Serenity and I have had many conversations regard-      Comments:
ing the opportunities listed in this document.

X  Employee scheduled to meet for follow-up evaluation on 03/03/09 @ 4p and on 03/17/09 @ 4p to review Action Plan to improve performance.

X  See attached Action Plan.          ☐   Other:

## Reinforcing Improved Performance

Date:  03/17/09        Performance has (circle one):    improved        not improved

If performance has improved:                        | If performance has NOT improved:

Specific description of how employee performance has improved:    | Action Taken:

Action Plan for continued reinforcement of improved performance:

## Signatures

Manager preparing form        Date            Next level manager                Date

I have read the above document and understand the information.

SKU 104130        Signed Original Copy – employee        Signed Copy – Human Resources/Regional Office        Copy – manager/store copy

STAR_MARSHALL0001616

**Employee:  Serenity Marshall**                              **Date: 02/18/09**

**Setting Direction**:  Establishes and communicates a compelling and inspired vision and sense of core purpose; creates competitive strategies and plan; ensures department strategies are aligned with company strategies.

Serenity needs to set clear direction to her team and follow up accordingly to ensure operations are maintained to standards.

**What does success look like?**

- Ecosure Results to company standard of 90%

- Bathrooms are consistently detailed cleaned(corners, grouting on both floors and walls, area behind toilet, toilet brush holder)
- Mirrors and stainless on doors are consistently wiped down, free of fingerprints and splash marks.
- Bathroom is free of graffiti...if graffiti is noted in bathroom, it must be called in to facilities immediately and an e-mail must also be sent to DM to confirm with work order number.

- Front entranceway is consistently free of debri.
- Walk off mat is free of debri.
- Windows/Ledges are cleaned daily and free of fingerprints and smudges.

- Store is dusted daily(ie...retail wall bays, bean stand, ledges, electric outlets.
- Bases of basket stands, banner stand, tea stand are wiped down daily.

- Partners are consistently following standards with dress code.  If they don't, they will be sent home.

**Actions to be completed:**

- Serenity is to set clear expectations to leadership team around Values Walks being completed at the beginning of every SM/ASM/SS shift.  She is to set clear direction that action is to be taken in the moment on anything that needs to be corrected as noted on Values Walk.  **To be completed by:  02/23/09**

- Serenity is to clean the bathroom with her bathroom attendants to set clear direction on what the bathroom is to look like at all times.  She is to follow-up during her scheduled shifts with her bathroom attendants to ensure the cleanliness is to standards.                    **To be completed by:  02/23/09**

- Serenity is to set clear direction with new ASM, Alfred Berneti, on his first day in the store.  She is to review all expectations of all partners and positions and ensure he has a clear understanding of responsibilities.  She is to follow up weekly with Alfred to review operations, check for understanding, and provide feedback.                    **To be completed by:  02/23/09**

- Serenity is to perform a Values Walk along side each partner in the store to set clear direction to team and ensure they have a clear understanding of expectations.        **To be completed by:  03/02/09**

- Serenity is to perform weekly QASA audits in store.  She is to perform a QASA audit with every Shift Supervisor and ASM to set clear direction to leadership team and ensure they have a clear understanding of expectations.                    **To be completed by:  03/17/09**

SKU 104130        Signed Original Copy – employee        Signed Copy – Human Resources/Regional Office        Copy – manager/store copy

STAR_MARSHALL0001617



# Corrective Action Form

### Store/Dept: 847

**Employee's Name:** Serenity Marshall

**Manager's name:** Jennifer Gurtov

**Employee's Hire Date:**

**Today's Date:**
03/15/10

## Statement of Situation

**Manager's Statement**   Describe the situation leading to the completion of this notice. Use Corrective Action Plan form if necessary.
Date of Occurrence(s): 03/12/10

Description:  Serenity is not consistently setting clear direction to her team to maintain the store operations to cleanliness standards.  On the above date, during a tour of the store, bathrooms were dirty(walls/grout beneath hand dryer, rim of garbage bin).  Floors along edges of store were dirty.  There was multiple days worth of build up under counters of back line spanning from brewer area all the way to underneath the warming station.  Back of house floors were just as dirty.  Partners were not consistently making genuine connections at hand off, not delivering the promise.  Front of house was still in the process of being stocked when deployment standards should have already been in place.  Serenity and I have had many conversations regarding the inconsistency of the cleanliness in her store as well as the inconsistency in behaviors around creating highly satisfied customers.  I have repeatedly set direction on opportunities listed above.

**Employee's Statement**   Employee is encouraged to remark about this event. Use Corrective Action Plan Form, if necessary.

Date of Occurrence(s):

Description:

## Corrective Action

(circle one)     Verbal     Written

Date03/15/10:          By Whom: Jennifer Gurtov

Comments: Serenity and I have had many conversations regarding the opportunities listed in this document.

(circle one)     Verbal     Written

Date:          By Whom:

Comments:

☐  Other:

## Reinforcing Improved Performance

Date:          Performance has (circle one):     improved          not improved

If performance has improved:

Specific description of how employee performance has improved:

Action Plan for continued reinforcement of improved performance:

If performance has NOT improved:

Action Taken:

## Signatures

Manager preparing form          Date          Next level manager          Date

I have read the above document and understand the information.

Employee:  **Serenity Marshall**          **Date: 03/15/10**

SKU 104130          Signed Original Copy – employee          Signed Copy – Human Resources/Regional Office          Copy – manager/store copy

STAR_MARSHALL0001618

v. 01.20.09

 **PERFORMANCE EXPECTATIONS & RESULTS – Non Retail and Field Leadership**

| Partner Name: Serenity Marshall | Position Title: Store Manager |
|---|---|
| Partner Number: | Fiscal Year Date: 2010 |

**Q1: What's Important and Where to Focus** (for partners new to position complete within first month of hire) Date Completed:

*List the targeted results, goals and accountabilities to be achieved in order to be effective in your job. Reference the Core Competencies on the back of this form for determining how to achieve goals and accountabilities.*

**Be the Undisputed Coffee Authority**
    **Goal 1: Customer Sat.:** Taste of Beverage (% of highly satisfied) 78%
    **Goal 2:** VIA Sales variance to target

**Engage & Inspire our Partners**
    **Goal 3: Total Store Turnover** 65% or 10% improvement, measured on a rolling 12-month period
    **Goal 4: Barista New Hire Failure Rate:** 20%

**Ignite the emotional attachment with our customers**
    **Goal 5: Customer Overall Satisfaction:** 77%
    **Goal 6: Friendliness:** 85%
    **Goal 7: Speed of Service:** 75%
    **Goal 8: QASA overall score:** 90%

**Deliver a sustainable economic model:**
    **Goal 9: Sales:** 100% of target
    **Goal 10: Labor:** V2I not greater than 0%
    **Goal 11: Labor:** V2 NC not greater than 0%
    **Goal 12: Profitability:** CC: 100% of target

**Q2 / Q3: Check-in on Progress and Changes** Date Completed:

*Discuss performance to date, key learnings and next steps. Reference the Core Competencies on the back of this form as you explain how they were effectively utilized to achieve goals and accountabilities.*

**Be the Undisputed Coffee Authority**
    **Goal 1: Customer Sat.:** Taste of Beverage (% of highly satisfied) 78%: 40.4%
    **Goal 2:** VIA Sales variance to target: up $764

**Engage & Inspire our Partners**
    **Goal 3: Total Store Turnover** 65% or 10% improvement, measured on a rolling 12-month period : 122.6%
    **Goal 4: Barista New Hire Failure Rate:** 20% : 100%

**Ignite the emotional attachment with our customers**
    **Goal 5: Customer Overall Satisfaction:** 77%: 40%
    **Goal 6: Friendliness:** 85%: 63.6%
    **Goal 7: Speed of Service:** 75% : 36.4%
    **Goal 8: QASA overall score:** 90% : not shopped yet for this year, however has not shown consistency in QASA standards

**Deliver a sustainable economic model:**
    **Goal 9: Sales:** 100% of target: up $110,452 to target, 13.5% comp growth
    **Goal 10: Labor:** V2I not greater than 0%: (0.2%)
    **Goal 11: Labor:** V2 NC not greater than 0%: 0.1%
    **Goal 12: Profitability:** CC: 100% of target: up $90,671, up 6.7% to target

**Other:**
    **Food UPH growth:** up 3.1%- goal of 5% increase
    **Coffee Cadence:** not consistent
    **Development:** promoted Becky Bledsoe to SS
        MCM: Nicole Mateulewich, Mari Fetzer, Keri Errico

**Q4: Review Results and Accomplishments** Date Completed:

*Provide examples of the actual performance against goals. Describe the competencies/behaviors that were demonstrated in achieving these results. Reference the competencies on the back page of this form.*

Starbucks Confidential – Internal Use Only

STAR_MARSHALL0001619

v. 01.20.09

**Be the Undisputed Coffee Authority**
    Goal 1:  Customer Sat.: Taste of Beverage (% of highly satisfied) 78%:  57%
    Goal 2:  VIA Sales variance to target:  up $198
**Engage & Inspire our Partners**
    Goal 3:   Total Store Turnover 65% or 10% improvement, measured on a rolling 12-month period : 99.2%
    Goal 4:  Barista New Hire Failure Rate:  20% : 54.5%

**Ignite the emotional attachment with our customers**
    Goal 5:   Customer Overall Satisfaction:  77%: 72%
    Goal 6:   Friendliness:  85% : 81%
    Goal 7:   Speed of Service:  75% : 69%
    Goal 8:   QASA overall score:  90% : 87.6%
**Deliver a sustainable economic model:**
    Goal 9:   Sales:  100% of target:  up $245,447 to target, 20.5% comp growth
    Goal 10:  Labor:  V2I not greater than 0%: 0.6%
    Goal 11:  Labor:   V2 NC not greater than 0%: 0.2%
    Goal 12: Profitability: CC: 100% of target:  up $182,473, up 5.8% to target

---

**Summary of Top Achievements, Strengths and Areas for Development:**

---

**Puts Customer First:  Effective:** Serenity is aware of what creates satisfied customers, knows the key drivers of overall customer satisfaction, and coaches her team on how they contribute to overall store success.  Serenity has committed, in the latter half of this year, to consistently model and coach legendary service as well as set clear customer service and coaching expectations to her shift team.  Serenity needs to maintain this focus consistently throughout FY'11.  I would also like to see her continue to problem solve to achieve greater efficiency, influence customer decisions.

**Works Well with Others:  Effective:** Serenity creates an environment where partners feel comfortable and communicates with her team in a clear, concise and sincere manner.  She delivers difficult messages with confidence.  I would like to see Serenity effectively build and utilize working relationships, both with partners, peers and support to get things done.

**Leads Courageously: Ineffective:** Throughout this past year, Serenity has struggled with leading courageously.  She has not consistently made timely and effective decisions, she has pushed decisions upward, she has waited for things to be clearly defined(sometimes even multiple times...ie...cleanliness).  She has struggled with helping partners maintain focus during competing priorities.
Serenity has begun to turn around these behaviors over the course of the last quarter, however has not been a significant/consistent change to show full turn around in behaviors.  I would like to see Serenity focus on articulating a clear picture of future achievements to her team, as well as clear expectations on how to achieve results(QASA, customer focus expectations of values walks, 10 minute timer/lobby slide routine, VIA...)

**Develops Continuously:  Effective:** Serenity has been an MCM multiple times over the course of the past year.  She provides ongoing coaching to her team to strengthen performance and adapts her coaching style to meet diverse needs and learning styles.  She has also played a role within district to help prep partners for interviews for next level.  I would like to see Serenity ensure that she consistently utilizes tools, pdps to calibrate with partners and create specific, measurable and realistic development plans.

**Achieves Results:  Ineffective:** Serenity has not consistently utilized plan, do, check, adjust throughout this past year.  She has also not consistently held herself or her team accountable to success measures.  She has had difficulty root causing/problem solving to remove obstacles for her partners.  Again, over the past several months, Serenity has shown a renewed focus and has begun leading her team to be successful against achieving results.  This must be the foundation for FY'11.  Serenity is not to lose sight of the success she has had over the past few months and move backwards.  Areas of continued focus include:  VIA, QASA, Customer Voice, succession planning and turnover, cash over/short.

| OVERALL RATING: | Meets Expectations | Manager provides an overall rating at left based on performance against goals, accountabilities and the use of competencies in achieving results. | |
|---|---|---|---|
| **Must Improve** | **Meets Expectations** | **Above Expectations** | **Consistently Exceeds** |
| Achievement of goals and key accountabilities is below expectations<br>* MI rating requires Performance Improvement Plan | Achieves all or the majority of  goals and key accountabilities | Consistently meets and often exceeds in achieving goals and key accountabilities | Consistently exceeds in achieving goals and key accountabilities; pushes the organization to the next level and inspires others to excel |

| Partner Signature | Date | Manager Signature | Date |
|---|---|---|---|

*Partner's signature indicates this review has been discussed and does not necessarily indicate the partner's agreement with its contents*



# PERFORMANCE COMPETENCIES & DEVELOPMENT PLAN

**CORE COMPETENCIES FOR ALL PARTNERS:**

Starbucks Confidential – Internal Use Only

STAR_MARSHALL0001620

v. 01.20.09

**Puts the Customer First:** Has a relentless focus on the customer. Understands what the customer wants and how to best deliver the experience.

**Works Well with Others:** Listens and communicates well with others within and outside of Starbucks. Creates a team environment that is positive and productive.

**Leads Courageously:** Takes personal responsibility to do the right thing, and persists in times of challenge or uncertainty. Adapts quickly to change and makes timely, thoughtful decisions.

**Develops Continuously:** Continuously seek opportunities to improve self and others. Leads with trust, honesty and commitment to hire, coach and develop partners to achieve their potential.

**Achieves Results:** Understands what drives overall business success and is accountable to prioritize and deliver quality results. Demonstrates knowledge of core products and processes to get results. Anticipates obstacles and takes action to prevent or minimize their impact.

| DEVELOPMENT PLAN: | Using feedback from recent performance review, create a development plan with the partner. Review progress against the plan at mid-year. Be sure to provide ongoing feedback and progress throughout the year. |
|---|---|
| **Define skills and competencies for development; identify how success will be measured** | **Date Completed:** |

Attain VIA Goal in quarter one

Staff internal succession plan, independent of team.

Improve customer voice metrics by 10 points during the quarter, have action plans completed Tuesday after results are posted...problem solving go see completed prior. Every partner must know action step as well as the three behaviors they are committing to elevate customer experience by the following Friday.

Improve speed of service by 8 points and taste of beverage by 20 points through our beverage repeatable routine

Ensure Quality Assurance/Customer Voice tools are fully executed, Values Walks 3x a day, daily duty roster, NY Top 10 Criticals & weekly quality assurance audits.

Arrive at labor numbers including efficiency at 75% or better. Make investments during am/pm peak to drive business forward. Check and adjust daily.

Cash over/short to be no greater than .05% of sales

| **Identify specific activities and experiences to learn and apply new skills/competencies** | | | |
|---|---|---|---|
| | | | |

| **Document progress at mid-year and on-going, as needed** | **Date:** | **Date:** | **Date:** |
|---|---|---|---|

Starbucks Confidential – Internal Use Only