Page 1

1

2

3             UNITED STATES DISTRICT COURT

4             SOUTHERN DISTRICT OF NEW YORK

5    --------------------------X

6    SERENITY MARSHALL,

7                     Plaintiff,

8        -vs-                    No. 11-CV-2521

9    STARBUCKS CORPORATION

10   and JENNIFER GURTOV, in

11   her individual and official

12   capacities,

13                  Defendants.

14   --------------------------X

15

16

17           DEPOSITION OF JENNIFER GURTOV

18               New York, New York

19               December 21, 2011

20

21

22

23   Reported by:
     Bonnie Pruszynski, RMR
24   JOB NO. 44488

25

Page 2

```
 1
 2
 3
 4              December 21, 2011
 5              9:51 a.m.
 6
 7
 8
 9        Deposition of JENNIFER GURTOV, held
10  at the offices of Thompson Wigdor LLP, 85 Fifth
11  Avenue, New York, New York, before Bonnie
12  Pruszynski, a Registered Professional Reporter,
13  Registered Merit Reporter, Certified LiveNote
14  Reporter and  Notary Public of the State of New
15  York.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   THOMPSON WIGDOR
 4   Attorneys for Plaintiff
 5        85 Fifth Avenue
 6        New York, New York 10003
 7   BY:   DAVID E. GOTTLIEB, ESQ.
 8
 9   AKIN GUMP STRAUSS HAUER & FELD
10   Attorneys for Defendants
11        One Bryant Park
12        New York, New York 10036
13   BY:  ESTELA DIAZ, ESQ.
14        JENNELLE MENENDEZ, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              J. Gurtov
 2  JENNIFER GURTOV,
 3        called as a witness, having been first
 4        duly sworn, was examined and testified
 5        as follows:
 6  EXAMINATION
 7  BY MR. GOTTLIEB:
 8     Q     Good morning, Ms. Gurtov.
 9     A     Good morning.
10     Q     I represent Serenity Marshall in
11  connection with her case against Starbucks and
12  you.
13     A     Yes.
14     Q     I will be asking you some questions
15  today. Do you understand that?
16     A     Yep.
17     Q     Do you understand that you have just
18  taken an oath to tell the truth?
19     A     Yep.
20     Q     If you do not hear a question that I
21  ask you today, please tell me and I will repeat
22  it.
23     A     Okay.
24     Q     If you do not understand any question
25  that I ask you, please let me know and I will try
```

Page 5

```
 1              J. Gurtov
 2  to rephrase it in a way that you understand.
 3  Okay?
 4     A     Um-hum.
 5     Q     If you do not understand any term
 6  that I use in a question, please let me know.  I
 7  will try to rephrase it so that you understand
 8  what I am asking.
 9     A     Yes.
10     Q     I ask that you please let me finish
11  my questions before you answer so that the court
12  reporter can take down an accurate record.  Okay?
13     A     Um-hum.
14     Q     All your answers must be verbal.  A
15  head nod or a shake --
16     A     Okay.
17     Q     -- is difficult for the court
18  reporter to put on the record.
19           I also ask that you let me finish my
20  questions, again, before you answer, so the court
21  reporter can take everything down.
22     A     Um-hum.
23     Q     Do you understand everything I have
24  said so far?
25     A     I do.
```

Page 6

J. Gurtov

1   Q     Do you have any questions about
2   anything I have said so far?
3   A     No.
4   Q     Today is going to be a long day, as I
5   am sure your attorney has advised you. If at any
6   point you want to take any breaks, just let me
7   know, and we can take a break.
8   A     Okay.
9   Q     The only exception is that I ask that
10  there not be a question pending when we take a
11  break.
12  A     Yep.
13  Q     Are you currently taking any
14  medications that could affect your memory?
15  A     No.
16  Q     Are you current taking any
17  medications that could affect your ability to
18  understand the questions?
19  A     No.
20  Q     Are you taking any medication that
21  could affect your ability to testify truthfully
22  today?
23  A     No.
24  Q     Did you do anything to prepare for

Page 7

J. Gurtov

1   this deposition?
2   A     I did.
3   Q     What did you do?
4   A     I had meetings with my attorney.
5   Q     Okay. Anything else?
6   A     No.
7   Q     How many meetings did you have with
8   your counsel to prepare for this deposition?
9   A     Roughly like two, three.
10  Q     Two or three?
11  A     Yes.
12  Q     When was the most recent meeting you
13  had?
14  A     The most recent was last Thursday --
15  Q     Okay.
16  A     -- I believe.
17  Q     And how long was that meeting?
18  A     Probably a couple of hours or so.
19  Q     Did you review any documents?
20  A     Um-hum.
21  Q     What documents?
22  A     We went over some documents from
23  Serenity's file, some corrective actions. We had
24  looked at several e-mails from the past, from

Page 8

J. Gurtov

1   during that time period, things along those lines.
2   Q     Anything else?
3   A     Not that I recall specifically.
4   Q     Okay. What was the most recent
5   meeting before that?
6   A     I don't recall the specific time
7   frame. It may have been a week prior.
8   Q     Do you remember how long that meeting
9   was?
10  A     Similar in time, a couple of hours or
11  so.
12  Q     Do you remember if you reviewed any
13  documents at that meeting?
14  A     At that initial meeting, I don't
15  recall if we reviewed documents during that
16  initial one.
17  Q     So, there were two meetings?
18  A     Um-hum.
19        THE REPORTER: Yes?
20  A     Yes.
21  Q     Now at these meetings, let start with
22  the most recent one, who was present?
23  A     Estela and Jennelle here.
24  Q     Anyone else?

Page 9

J. Gurtov

1   A     Not at the most recent one.
2   Q     What about at the initial meeting?
3   A     It was Estela, Jennelle and Samidh.
4   Q     So, between the two meetings, in
5   total, how long did you prepare for this
6   deposition?
7   A     It must have been anywhere from six
8   to eight hours.
9   Q     Okay. Did you do anything else to
10  prepare for this deposition?
11  A     No.
12  Q     Did you discuss the fact that you
13  would be deposing -- excuse me. Strike that.
14        Did you discuss the fact that you
15  would be deposed today with anyone else?
16  A     I did share it with my boss.
17  Q     Okay. And who is that?
18  A     Victor Huetz.
19  Q     Anyone else?
20  A     No.
21  Q     Have you ever been deposed before?
22  A     No.
23  Q     When were you first hired by
24  Starbucks?

Page 10

J. Gurtov

1  A  I was first hired in August of 1998.
2
3  Q  What was your position?
4  A  A barista.
5  Q  Where?
6  A  At the location on 81st Street and
7  Broadway in Manhattan.
8  Q  How old were you at the time?
9  A  Like around 19, I believe.
10  Q  Okay.  And did you at some point
11  become a store manager?
12  A  Yes.
13  Q  When was that?
14  A  I don't remember the exact year.  It
15  must be three -- maybe five years into my tenure,
16  five or six years into my tenure with Starbucks.
17  Q  So, roughly in 2002 or 2003?
18  A  Around that time, yeah.
19  Q  And what store did you first become a
20  store manager at?
21  A  What was my first?  111th and
22  Broadway on the Upper West Side in Manhattan.
23  Q  Did you at some point become a
24  district manager?
25  A  I did.

Page 11

J. Gurtov

1  Q  When was that?
2
3  A  That was around three years ago, in
4  2008.
5  Q  Now, from 1998, when you were a
6  barista, up until the point that you became a
7  district manager, did you ever receive any
8  corrective actions?
9  A  I did.
10  Q  How many?
11  A  I don't know the specific amount.  I
12  just -- I know that in the past that I have.
13  Q  Okay.  For what?
14  A  I remember specifically one when I
15  was a barista, that I received one for being $20
16  short in one of my -- in one of my deposits from
17  my register, and that's really the only clear one
18  that I remember from a corrective action
19  standpoint.
20  Q  Did you ever receive any corrective
21  action as a store manager?
22  A  As a store manager?  I don't believe
23  so.
24  Q  What were your duties as a store
25  manager?

Page 12

J. Gurtov

1  A  As a store manager, to run an
2  operation.  So, it ranges from the day-to-day
3  operation, making sure that the team is fully
4  staffed to handle the customer flow that is coming
5  in, make sure that the customers are having a
6  great experience in the store, making sure that
7  the team is happy, creating a clean environment,
8  writing reviews, things on that end.
9  Q  Anything else?
10  A  There are many responsibilities of a
11  store manager, so I am sure there are things that
12  I am leaving out, but --
13  Q  Those are the basics?
14  A  Those are the basics, yeah.
15  Q  Okay.  Now, when you became a
16  district manager, is there a name for the district
17  that you were supervising?
18  A  Yeah, it's a number.  It's District
19  1096.
20  Q  What does that include?
21  A  It currently includes 13 locations
22  between -- on the West Side, from Chelsea down
23  through the West Village.
24  Q  And you are still the district
25

Page 13

J. Gurtov

1  manager of District 1096?
2  A  Yes.
3  Q  What are your duties and
4  responsibilities as a district manager?
5  A  Really to oversee the operations of
6  my locations through developing my store managers.
7  Q  What do you mean when you say
8  "oversee operations"?
9  A  The operations, it's my
10  responsibility that they are running in accordance
11  to Starbucks' standards, but I do that through
12  developing my store managers to be able to
13  complete their job roles and responsibilities.
14  Q  And when you say to make sure that
15  the stores are operating in accordance with
16  Starbucks' standards --
17  A  Um-hum.
18  Q  -- what do you mean by that?
19  A  Well, we are a corporation.  So,
20  there are general guidelines and responsibilities
21  and job descriptions for each job, but then even
22  without that, there is an outline of the
23  expectations of what we are responsible for
24  accomplishing at any given time throughout the
25

Page 14

1                J. Gurtov
2    year and executing at the stores.  So, as that
3    information comes to me, my job then is to make
4    sure that my store managers are executing it to
5    standards.
6        Q     Does that come to you, excuse me,
7    does that come to you in writing?
8        A     It comes in various formats.
9        Q     What formats does it come in?
10       A     Through -- what specifically I mean,
11   like from a job description standpoint of what I
12   am holding my team accountable to, that is in
13   documentation.  There are various forms of
14   communication through e-mails.
15            We also have what is called a company
16   portal that we can go on to find different
17   communications that are sent out throughout the
18   organization on different levels.
19            I also get communications from my
20   boss that I directly report to.
21       Q     So, you have a written job
22   description?
23       A     Yes.
24            MR. GOTTLIEB:  I'm going to call for
25   production of Ms. Gurtov's job description.

Page 15

1                J. Gurtov
2    Also for production of any e-mails or
3    communications regarding Ms. Gurtov's job
4    responsibilities.
5            MS. DIAZ:  We will take it under
6    advisement.
7    BY MR. GOTTLIEB:
8        Q     Now, when you say your job
9    responsibility is to oversee operations through
10   your store managers, what do you mean by the
11   "through the store managers" section of that?
12       A     Meaning my job is to help develop
13   them to ensure that they are operating to
14   standards.  So, I guess specifically under
15   anything, like if I look at, if I take a goal that
16   we have to achieve, my job is then to work with
17   the store manager to help them achieve that goal.
18   So, if something is getting in their way to
19   achieving them, I have to help remove barriers to
20   make them successful.
21       Q     Practically speaking, how do you do
22   that?
23       A     How do I do that?  Through sending
24   direction to them, again, through different
25   vehicles of communication, spending time with them

Page 16

1                J. Gurtov
2    in their stores, sharing information for different
3    rollouts, promotional executions, sharing with
4    them the company expectations and goals, and then
5    following up with them during store visits to
6    insure that they have a clear understanding of
7    that and are executing to those standards.
8        Q     Now, you said one of the ways you
9    accomplish that is by spending time with them in
10   their stores?
11       A     Right.
12       Q     And then also following up with them
13   on store visits?
14       A     Yes.
15       Q     Are there different types of store
16   visits that you engage in?
17       A     Yes.
18       Q     Okay.  What are the different types?
19       A     Roughly 80 percent of my job is in my
20   stores.  So, that can range from a scheduled store
21   visit that is a development day for that store
22   manager, so a store plan of action visit; it can
23   be an occasional pop-in.  So, there are times that
24   I just kind of go around, do routine checks, check
25   in with store managers, but also check in with the

Page 17

1                J. Gurtov
2    partners that are working in the store to insure
3    that they are -- that they feel good in the
4    environment that they are working in, things along
5    those lines.
6        Q     Okay.  When you say 80 percent of
7    your job is in stores, what do you mean by that?
8        A     Meaning my -- I'm in an operational
9    position.  So, the, you know, I have an office on
10   Fifth Avenue near 33rd Street, and I have, you
11   know, an admin portion of my responsibility to
12   gain all this information.  I then need to share
13   with my team and make sure that we are meeting
14   certain criteria.  But then the large portion of
15   my job is really being in the store with my store
16   managers, developing them to be business owners
17   and execute the standards.
18       Q     So, 80 percent of your working time
19   is actually in stores?
20       A     Yeah.
21       Q     Now, you used the term "development
22   day," right?
23       A     Um-hum.
24       Q     And also you used the term "store
25   plan of action visit."

1                    J. Gurtov
2    A    Yes.
3    Q    Are those the same thing?
4    A    Yes.
5    Q    And another type of meeting you
6  described is just sort of a "pop in," right?
7    A    Um-hum.
8    Q    That is not a Starbucks term, is it?
9    A    No.
10    Q    Are there any other kind of defined
11  visits, other than the development day?
12    A    Yeah.  There are times when I go in
13  specifically to perform a quality assurance
14  standards audit from a cleanliness perspective.
15          There are times when I will schedule
16  time in the stores to interview or sit down with
17  other partners at my locations to get them ready
18  for a next level position, whether it's a barista
19  for shift supervisor, shift supervisor for ASM.
20          There are also times when I go into
21  the stores to, if there is any disciplinary action
22  that needs to be taken on any level in the stores,
23  sometimes my store managers need guidance or my
24  support to those ends.
25    Q    Do you do follow-up visits after a

1                    J. Gurtov
2  development day?
3    A    I do.
4    Q    Would you consider that a pop-in or
5  would that be something separate?
6    A    I don't know that they are always
7  clearly defined.  I, whenever there is direction
8  that is set, there is a consistent follow up to
9  that direction.
10    Q    Always?
11    A    You know, I don't know.  "Always" Is
12  a strong term, but I follow the general guideline.
13    Q    Would you say you are responsible as
14  district manager for making sure the stores that
15  you supervisor are operating in accordance with
16  Starbucks' policies?
17    A    Yes.
18    Q    Are you responsible for monitoring
19  store compliance with Starbucks' policies?
20    A    Can you be clearer, as far -- in what
21  regard?
22    Q    As far as operations.
23    A    Yes.
24    Q    Are you responsible for monitoring
25  store compliance with Starbucks' cash management

1                    J. Gurtov
2  policies?
3    A    Yes.
4    Q    Are you responsible for monitoring
5  store compliance with Starbucks' cash handling
6  policies?
7    A    Yes.
8    Q    Are you responsible for monitoring
9  store compliance with Starbucks' policies related
10  to daily records books?
11    A    Yes.
12    Q    Are you responsible for supervising
13  any employees?
14    A    I have my store managers that are my
15  direct -- that directly report to me.
16    Q    Okay.  Anyone else?
17    A    My store managers, like they have
18  partners in their organization that I am also
19  responsible for, but those partners directly
20  report to the store manager, I would be a second
21  level.
22    Q    Is it fair to say though that you are
23  responsible for supervising all employees at the
24  Starbucks stores?
25    A    I am responsible for helping my store

1                    J. Gurtov
2  managers make appropriate decisions with their
3  employees, but my baristas don't directly report
4  to me, my shift supervisors don't directly report
5  to me, they report to their store manager.  Again,
6  I am responsible for making sure that the store
7  manager is acting in compliance with the standards
8  that are set.
9    Q    Are you responsible for making sure
10  that the cash handling records are properly
11  maintained at your stores?
12          MS. DIAZ:  Objection.
13    A    What do you mean specifically by
14  "cash handling records"?
15    Q    Let me ask you this:  What records
16  are there at Starbucks stores related to cash
17  handling?
18    A    There is the daily records book,
19  which is the book that we utilize to insure that
20  the standards are in place.
21    Q    Anything else?
22    A    Not that I can think of specifically.
23    Q    Okay.  So, when I asked you if you
24  have any responsibility to ensure that cash
25  handling records are properly maintained at your

Page 22

J. Gurtov

1             J. Gurtov
2 stores, do you understand what I am asking?
3    A    In reference to daily records books.
4    Q    Okay. So, do you have responsibility
5 to make sure daily records books are properly kept
6 and maintained at your stores?
7    A    Yes.
8    Q    You have responsibility to make sure
9 they are not destroyed?
10      MS. DIAZ: Objection.
11    A    I am responsible for insuring that
12 they are not -- destroyed, no, and -- no.
13    Q    No, you do not have responsibility to
14 make sure they are not destroyed?
15    A    I can't. I have 13 locations, that I
16 am not in every day. So, I have an overall
17 responsibility to cash handling policies and
18 procedures being maintained to the integrity of
19 Starbucks' standards in the store, but I can't
20 possibly oversee every daily records book in the
21 store.
22    Q    Well, I am not asking if you are
23 going to oversee every daily records book. What I
24 am asking is if you have a general responsibility
25 to make sure that the daily records books at your

Page 23

1             J. Gurtov
2 stores are not destroyed?
3      MS. DIAZ: Objection.
4    A    No.
5    Q    Do you have any responsibility to
6 make sure they are not destroyed?
7    A    I am unclear on the question that you
8 are asking.
9    Q    Okay. What is it that you don't
10 understand?
11    A    As far as destroyed, what I am
12 responsible for is making sure that policies and
13 procedures, that the store manager has an
14 understanding of the policies and procedures
15 around cash handling, and I do that by observing
16 random daily records books, looking for trends and
17 things on that end, but I -- I can't have a full
18 responsibility for each daily records book. That
19 would be the store manager's responsibility.
20    Q    Would you, is it fair to say that you
21 have a responsibility to make sure there is not a
22 trend of destroying daily records books?
23      MS. DIAZ: Objection.
24    A    Can you be clear on what you mean by
25 destroying a daily records book?

Page 24

1             J. Gurtov
2    Q    Well, one way of destroying a daily
3 records book would be to throw it in the garbage.
4    A    Right.
5    Q    Would you say that it's your
6 responsibility to make sure there is not a trend
7 of throwing daily records books in the garbage at
8 your stores?
9    A    No.
10    Q    Whose responsibility would that be?
11    A    The store manager's.
12    Q    And what if you found out that store
13 managers were throwing daily records books in the
14 garbage, what would your responsibility be?
15    A    Hypothetically speaking, I would then
16 have to probably conduct an investigation if that
17 was brought to my attention.
18    Q    Do you have any obligation to make
19 sure there is no trend of allowing daily records
20 books to go missing?
21      MS. DIAZ: Objection.
22    A    I don't have -- no.
23    Q    Whose responsibility would that be?
24    A    It would be the store manager's.
25    Q    If you observed a trend of allowing

Page 25

1             J. Gurtov
2 daily records books to go missing, what would your
3 responsibility be?
4    A    If I observed a trend?
5      MS. DIAZ: Objection.
6    A    Can you provide clarity on that
7 question?
8    Q    What aspect of it?
9    A    How -- on how I would observe it.
10 So, if I were to watch someone in a store
11 physically throw out several daily records books
12 to create that trend.
13    Q    Okay. Let's say that happened, what
14 would your responsibility be?
15    A    If I saw that happen, I would have a
16 conversation with the partner I saw doing that in
17 that moment, and then I would have to have a
18 better understanding of why they were putting them
19 in the garbage can.
20    Q    Would you terminate that employee
21 immediately?
22    A    No.
23    Q    Would you recommend termination
24 immediately?
25    A    I would have to get a better

J. Gurtov

1 understanding of what the situation was in that
2 moment.
3 Q     Would you think that would be a
4 terminable offense?
5 A     I would have to get a better
6 understanding of what the situation was in that
7 moment.
8 Q     If you learned that many months of
9 DRBs -- strike that.
10      DRB is an abbreviation for daily
11 records book?
12 A     Yes.
13 Q     Are you okay if I use the term DRB --
14 A     Yes.
15 Q     -- synonymously with daily records
16 book?
17 A     Yes.
18 Q     If you came to learn that many months
19 of DRBs at certain stores had simply vanished,
20 gone missing, what would your responsibility be?
21      MS. DIAZ: Objection.
22 A     If I learned they vanished, I would
23 have to conduct an investigation.  So, I would
24 have to go through a process to, I guess, have a

J. Gurtov

1 better understanding of if they went missing, how
2 they went missing.  I would have to gain more
3 information to know what action to take.
4 Q     Now, you said you supervise currently
5 13 stores; is that correct?
6 A     That I supervise how many?
7 Q     Thirteen.
8 A     Yes.
9 Q     Can you list them, the address
10 followed by the identification number?
11 A     I don't know all the addresses off
12 the top of my head, but I do know their
13 identification number.
14 Q     Okay.
15 A     847, 3421, 7255, 7261, 7547, 7586,
16 7675, 7711, 11649, 11650, 13538, 14618, and 15461.
17 Q     Has any of those stores been added to
18 your district within the last year?
19 A     Yes.
20 Q     Which one?
21 A     15461 was a new store opening.
22 Q     Okay.  When did that store open?
23 A     In June.
24 Q     The remaining 12 stores, have those

J. Gurtov

1 12 stores all been in your district since you
2 became a district manager?
3 A     No.
4 Q     Which were not in your district for
5 the entire time?
6 A     It's -- it changed a lot.  So, when I
7 first became a district manager, I had a core of
8 six stores.  I don't even remember those specific
9 six store numbers.  Then over the years I would
10 gain a couple in one direction.  There were
11 different alignments that changed that have led me
12 to this number and these specific stores.
13 Q     Have you received any corrective
14 actions as a district manager?
15 A     No.
16 Q     Do you receive yearly performance
17 reviews?
18 A     I do.
19 Q     Do you receive any other performance
20 reviews other than your annual review, mid-year
21 review?
22 A     We do a mid-year check in.
23 Q     Every year?
24 A     Yes.

J. Gurtov

1 Q     That's in writing?
2 A     Yeah.
3 Q     As is the annual review?
4 A     Yes.
5      MR. GOTTLIEB: I'm going to call for
6 production of all annual and mid-year
7 reviews of Ms. Gurtov.
8      MS. DIAZ: We will take it under
9 advisement.  I believe you have already
10 asked for them before.
11      MR. GOTTLIEB: I don't think they
12 have been produced.
13      MS. DIAZ: The judge -- I believe the
14 judge already ruled on that issue.
15 BY MR. GOTTLIEB:
16 Q     Do you have the ability to discipline
17 employees as a district manager?
18 A     I do.
19 Q     Is there any protocol that you need
20 to follow to discipline an employee?
21 A     It depends on the situation.  Every
22 situation is a little different.
23 Q     But is there a standard protocol you
24 are supposed to follow?

Page 30

J. Gurtov

1    A    There are guidelines.
2    Q    Are those guidelines in writing?
3    A    Yeah.
4    Q    Where?
5    A    In the partner handbook, there is a
6    section that I think speaks generally about
7    corrective actions.
8    Q    Anything else?
9    A    Not that I can recall specifically.
10   Q    Okay.  Is there any general protocol
11   that you follow with regard to contacting partner
12   resources, contacting human resources or anything
13   else?
14   A    Yeah.
15        MS. DIAZ:  Objection.
16   Q    What is the general protocol that you
17   follow?
18        MS. DIAZ:  Objection.
19   A    Again, it's different per situation.
20   Q    Well, when you terminate employees,
21   is there a protocol that you tend to follow?
22   A    Yes.
23   Q    What is it?
24   A    In reference to the partner, partner

Page 31

J. Gurtov

1    resources, as you put it.
2    Q    What is the protocol that you follow
3    to terminate employees?
4    A    Generally within, with separating or
5    terminating employees, I would contact the partner
6    resources contact center.
7    Q    And then what?
8    A    Again, it would depend on the
9    situation.
10   Q    Why would you contact partner
11   resources contact center?
12   A    If I have a recommendation to
13   terminate an employee's employment with Starbucks,
14   I want to make sure that it is consistent with the
15   rest of the organization.
16   Q    Have you contacted partner resources
17   before terminating any employee?
18   A    Can you be more --
19   Q    Sure.  For every employee that you
20   have terminated as a district manager, have you
21   first contacted partner resources?
22   A    I can't recall each situation unto
23   themselves, but I know, generally speaking, that
24   would be what I would do.

Page 32

J. Gurtov

1    Q    Okay.  Would that be, would you
2    contact partner resources by phone, by e-mail or
3    something else?
4    A    There -- again, there are different
5    ways of doing it.  The initial is typically by
6    phone call.
7    Q    Okay.  How many employees have you
8    terminated since you have been a district manager?
9    A    I don't know.  I don't know the exact
10   answer to that.
11   Q    Can you estimate?
12        MS. DIAZ:  Objection.
13   A    Again, I don't have an exact number
14   to it.
15   Q    I'm not asking for an exact number.
16   Could you estimate?
17        MS. DIAZ:  Objection.
18   A    I can't at this time.  I can't recall
19   a number at this time.
20   Q    Is it more than or less than 20?
21   A    I would assume less than 20.  I have
22   -- yeah.
23   Q    More than or less than five?
24   A    It could be around five.

Page 33

J. Gurtov

1    Q    How many store managers have you
2    terminated?
3    A    It could be around that number.
4    Q    Can you name all the store managers
5    you have terminated that you can remember?
6    A    I have separated Serenity.  I have
7    terminated the employment of Carlos.
8    Q    Carlos Monterra?
9    A    Carlos Monterra.
10   Q    Anyone else?
11   A    There are other separations that have
12   happened, but I can't recall the specifics around
13   it, so those two.
14   Q    But I am not asking the specifics.  I
15   am asking you to name all the store managers you
16   have terminated that you can remember.  So, other
17   than Serenity Marshall and Carlos Monterra, was
18   there anyone else?
19        MS. DIAZ:  Objection.
20   A    I can't recall at this time.
21   Q    Who is Nancy Murgalo?
22   A    Nancy Murgalo is my partner resources
23   manager.
24   Q    What is her role with regard to --

9 (Pages 30 to 33)

1                J. Gurtov
2  strike that.
3            What do you understand her role to
4  be?
5       A     My understanding of her role is that
6  she supports my role in the field with making
7  decisions in the best interest of our partners.
8       Q     Is she somebody who is superior or
9  subordinate to you?
10      A     We are in different roles.
11      Q     So neither?
12      A     Neither, yeah.
13      Q     Have you ever terminated an employee
14 without first giving them a corrective action to
15 improve the behavior they are being terminated
16 for?
17      A     I can't recall specifics of the
18 employees that I have separated, but I did with
19 Serenity Marshall, in the case that she was
20 separated for.
21      Q     My question is not with regard to
22 Serenity Marshall.  My question is with regard to
23 any employee you have terminated, have you ever
24 terminated an employee without first giving them
25 corrective action to improve on the conduct they

1                J. Gurtov
2  are being terminated for?
3            MS. DIAZ:  Objection.
4       A     I can't recall.
5       Q     Are you familiar with the way cash is
6  handled at Starbucks stores?
7       A     Yes.
8       Q     Can you walk me through how cash is
9  handled, from when the money first comes into the
10 register through the banking and recordkeeping
11 process?
12      A     I have been out of the stores for a
13 length of time that I can't recall the exact
14 process that it takes from register to the
15 banking.
16      Q     To the best of your ability.
17      A     That a partner is responsible for
18 ringing and managing their cash at the till.  So,
19 making sure that the money they are taking from
20 customers goes into their till; and from that
21 point, supervisors, or whoever is the cash
22 controller at any given time in a store, when an
23 employee is done on their register, that cash
24 controller is responsible for removing the money
25 appropriately, securing it into a till drop bag,

1                J. Gurtov
2  and dropping it into our safe in the store, I
3  guess at the end of a given day.  So, the
4  following day for a prior day's till bags, the
5  cash controller, who is completing the deposit, is
6  responsible for removing those bags from the safe,
7  counting the money, filling out a deposit slip,
8  and bringing the money to the bank.
9       Q     And then what?
10      A     And then accurately recording it in
11 a -- the daily records book.
12      Q     Anything else?
13      A     Like I said, there are many steps to
14 it, that I am not familiar with each specific
15 step, but that is my general understanding of the
16 process.
17      Q     What is a daily records book?
18      A     A daily records book is a document in
19 the store that is used to record, I guess, all of
20 the occurrences with cash within the store.  So,
21 there is a section that records when tills are
22 dropped into the safe, there is a section that
23 records the safe count, there is a section on it
24 that -- that records the deposit information,
25 there is a section on it that records in the

1                J. Gurtov
2  removal and putting together information, and
3  there is a section for till audits.
4       Q     What period of time does a daily
5  records book cover?
6       A     A physical month.
7       Q     Do you know how long Starbucks has
8  been using daily records books?
9       A     No.
10      Q     Has Starbucks been using DRBs as long
11 as you have been a district manager?
12      A     Yes.
13      Q     Has Starbucks been using DRBs as long
14 as you have been or from the start of you being a
15 store manager?
16      A     Yep.
17      Q     Is it fair to say that DRBs are
18 important documents at Starbucks?
19      A     Yes.
20      Q     Is it's fair to say that DRBs are
21 very important documents at Starbucks?
22            MS. DIAZ:  Objection.
23      A     They are an important document.
24      Q     Is there any document at Starbucks
25 stores that are more important than daily records

Page 38

J. Gurtov

1  books?
2      A    As far as level of importance, I -- I
3  feel like there are things that are subjective in
4  that, but the daily records book is an important
5  document.
6      Q    I am asking you a subjective
7  question --
8      A    Um-hum.
9      Q    -- whether there is any document in a
10  Starbucks store that are more important than DRBs?
11          MS. DIAZ:  Objection.
12      A    There are many documents in our
13  stores that hold importance.
14      Q    Okay.  Name one document that is more
15  important than a DRB.
16          MS. DIAZ:  Objection.
17      A    I don't understand what you are
18  asking as far as level of importance, but one
19  could say that their performance review is more
20  important to them than a daily records book.  So,
21  there are many important documents.  Daily records
22  book is an important document in our organization.
23      Q    Is there any document in a Starbucks
24  store that is more important to you, as the
25

Page 39

J. Gurtov

1  district manager, than the daily records book?
2      A    I don't know how to answer the
3  question any clearer.  There are many documents
4  that are important in a store.
5      Q    Is it fair to say that cash
6  management is one of the most important aspects of
7  a store?
8          MS. DIAZ:  Objection.
9      A    It is fair to say that it is -- there
10  are standards and policies and procedures as to
11  how cash should be handled.
12      Q    Is that one of the most important
13  procedures in a store?
14      A    Again, with the word importance, I am
15  not quite sure how to answer that question.
16      Q    Do you think making a profit is one
17  of the most important aspects of a Starbucks
18  store?
19      A    I think making a profit is another
20  important aspect of our stores.
21      Q    Name every aspect of a Starbucks
22  store that is more important than making money.
23          MS. DIAZ:  Objection.
24      A    Our organization is built on certain
25

Page 40

J. Gurtov

1  principles, where our top priority is not about a
2  profit.  Our organization is built around
3  principles that are focused on our partners and
4  our customers and creating great environments.
5  So, there are many things that hold importance in
6  a Starbucks store.
7      Q    Is there any document at Starbucks
8  stores that are more important to cash management
9  than daily records books?
10      A    A daily records book is the place
11  where all written documentation is put in
12  reference to cash handling.
13      Q    Is there any more important document
14  to cash handling than the DRBs?
15      A    I don't know.  I don't know what you
16  mean by that.  As far as a place for our partners
17  to fill out, it is the only place for our partners
18  to document information as far as cash handling is
19  concerned.
20      Q    Are there any other documents
21  maintained at Starbucks stores that relate to cash
22  management or cash handling?
23      A    There are reports that come through
24  the store portal.
25

Page 41

J. Gurtov

1      Q    Okay.  Explain what that means.
2      A    And, again, I am not as familiar with
3  these, because I don't work with them on a daily
4  basis, but there is a till activity report and a
5  deposit report till.
6      Q    What is a till activity report?
7      A    It is a summary of certain pieces of
8  partner's transactions in the store.  So, it will
9  show their average check.  It could show if they
10  have sales less than minimum.  It could show how
11  many line voids they have had, things on that end.
12      Q    And how is that report generated?
13      A    Everything that we do is by computer,
14  so it's generated from our POS systems, and it's
15  through to the back computer in the manager's work
16  station.
17      Q    When you say everything you do is by
18  computer, what do you mean by that?
19      A    All, meaning just that all of the
20  transactions that happen in the store go through a
21  register that happens to be a computer system.
22  So, those are then tracked through the computer
23  back of house, pieces of information.
24      Q    How often is a till activity report
25

J. Gurtov

1
2  generated?
3     A    I am not 100 percent sure.
4     Q    Are till activity reports printed up
5  and maintained in the store or do they remain
6  electronic on the computer?
7     A    They are electronic on the computer.
8     Q    What is a deposit report?
9     A    I don't know all the details of it.
10 I know that there is a report on the computer.  I
11 don't know all the details of it.
12    Q    Do you know what it is?
13    A    It shares something about the
14 deposit.
15    Q    Do you know if it's created
16 electronically?
17    A    Yep.
18    Q    It is?
19    A    Yes.
20    Q    Where, in a Starbucks store, is a DRB
21 supposed to be kept when it is in use.
22    A    When it's in use?
23    Q    Yes.
24    A    There is not a specific location.
25 It's used throughout.  So, there are times when

J. Gurtov

1
2  it's on the manager's work station, there are
3  times when it is being utilized out front by the
4  safe, depending on the store and where the staff
5  is in the store, but it moves around.  It's a
6  moving document.
7     Q    Is there a place in the store where a
8  DRB is supposed to be maintained when the store
9  closes for the day?
10    A    There is not a specific location.
11    Q    Is there a place in the store where a
12 DRB is supposed to be kept when that particular
13 monthly DRB is finished?
14    A    There is not a specific location.
15 Typically, they are kept in the back office.
16    Q    Does there come a point when a DRB is
17 moved from a store to another location?
18    A    There are alerts that come across the
19 manager's work station, through the portal,
20 directing them to -- that it's a time period to
21 mail them to Seattle.
22    Q    What is the portal?
23    A    It's just -- it's -- I don't know how
24 else to describe it other than that it's
25 essentially a place that holds Starbucks

J. Gurtov

1
2  information on the computers at the manager's work
3  station.
4     Q    You referred to an alert that comes
5  through a portal.  What does an alert look like?
6     A    I don't work off of the manager's
7  work station daily, so I don't know the specifics
8  of how that comes through.
9     Q    So, how do you know that an alert
10 comes through the portal then?
11    A    Because, in general conversation that
12 I have had with my store managers, that there is
13 action type items that come up.  So, an alert and
14 action item, I am calling them, those are two
15 synonymous things, that is something that notifies
16 them to take different steps, whether it's that or
17 another piece of operational news that they need
18 to know for a given day.  I am not sure how,
19 specifically where on that, it's generated.
20    Q    Before a DRB is transferred from a
21 store to another location, do you know if the
22 information from the DRB is extracted in any way?
23    A    What do you mean?
24    Q    Before a DRB is transferred from the
25 store to another location, is the information in

J. Gurtov

1
2  the DRB extracted and put somewhere else on a
3  computer in another book?
4     A    No, not that I am aware of.
5     Q    Other than a district manager, is
6  there anybody who would review a DRB before it is
7  shipped out of a store?
8     A    Can you clarify that question?
9     Q    What aspect of it?
10    A    Is that assuming that a district
11 manager reviews each book prior to it being
12 shipped?
13    Q    No.  Other than district manager, is
14 there anybody who might review the DRB?
15    A    The store manager.
16    Q    Anyone else?
17    A    I'm sorry.  Not to -- no, not to my
18 understanding.
19    Q    Do you understand monitoring DRBs at
20 your stores to be a part of your job duties?
21    A    There are -- yes.
22    Q    Why?
23    A    That's part of the steps to take to
24 insure that appropriate cash handling policies are
25 being adhered to.

J. Gurtov

1
2    Q    How do you accomplish that?
3         MS. DIAZ:  Objection.
4    A    How do I accomplish monitoring a
5  book?
6    Q    Yes.
7    A    In monitoring a -- what does the
8  process look like or what would trigger me to
9  monitor it?
10   Q    I will strike the question.
11        How do you insure proper cash
12  handling policies are being adhered to?
13   A    One of the key indicators to -- I
14  would look -- one of the key indicators that would
15  prompt me to look to see if cash handling policies
16  are being adhered to are cash over/shorts in a
17  store, and if those are out of company standard,
18  that would -- for me to then have conversations
19  with the store manager.
20        So, conversations with the store
21  manager I would have to find out information about
22  how things are being handled in the store, and I
23  would have them do a beginning look; and then,
24  based on that, then I would help them find what
25  challenges are in the store in reference to

J. Gurtov

1
2  policies.
3    Q    Is it your testimony that it's only
4  your responsibility to insure that proper cash
5  management policies are being adhered to if you
6  have reason to believe that they are not being
7  followed?
8         MS. DIAZ:  Objection.  Misstates
9  testimony.
10   A    No.
11        MR. GOTTLIEB:  Mark that 1.
12        We can just go off the record for a
13  minute.
14        (Gurtov Exhibit 1 marked for
15  identification as of this date.)
16  BY MR. GOTTLIEB:
17   Q    I have just handed you what has been
18  marked Gurtov 1.  Can you please review that
19  document and tell me if you recognize it?
20        Just for the record, this is Bates
21  stamped Star_Marshall 814 through 820.
22        I am not asking you to read every
23  word.  If you could just take a look at the
24  document and tell me if you recognize it.
25   A    I don't recognize this specific page,

J. Gurtov

1
2  but I would assume it's from the front portion of
3  the daily records book, describing what the book
4  is for.
5    Q    So, this looks familiar?
6    A    Yeah.
7    Q    I would like to direct your attention
8  to the top portion, the portion near the top --
9    A    Um-hum.
10   Q    -- called "retention and
11  destruction."
12   A    Yes.
13   Q    Do you see where it says, "for
14  security and legal compliance, the daily record
15  book must remain in the store for six months and
16  then be returned for long-term storage and
17  destruction."
18   A    Yes.
19   Q    Are you aware of that policy?
20   A    I am aware of -- yeah.
21   Q    Who is responsible for following that
22  policy?
23   A    The store manager.
24   Q    Do you have any responsibility to
25  make sure the store manager is following that

J. Gurtov

1
2  policy?
3    A    It's not within -- I don't check for
4  that.  It's not within my responsibility.
5    Q    Do you have any understanding of the
6  security reasons for this rule?
7    A    I don't.
8    Q    Do you know who would?
9    A    I would look to guidance with partner
10  and asset protection.  They might have more
11  information.
12   Q    Do you have any understanding of the
13  legal compliance reasons for this rule?
14   A    I don't.
15   Q    Do you see where it says, "every six
16  months you will receive communication requiring
17  all DRBs older than six months to be boxed up and
18  returned using an online return or preaddressed
19  mailing label"?
20   A    Yes.
21   Q    Are you aware of that policy?
22   A    Yes.
23   Q    Who is responsible for that policy?
24   A    The store manager.
25   Q    Do you have any responsibility to

1                  J. Gurtov
2  make sure that is being followed?
3      A    No.
4      Q    Do you see where it says, "this
5  insures retention of legally required payroll
6  documents that are included in the DRB"?
7      A    Yes.
8      Q    Do you know what "legally required
9  payroll documents" are included in the DRB"?
10     A    The payroll documents that I know of
11 in the DRB are -- I believe it's referring to the
12 punch communication log that is in the daily
13 records book.
14     Q    Anything else?
15     A    No, I can't recall.
16     Q    Do you see, towards the -- the
17 bottom, under the "weekly tabs" section, where it
18 says, "Safe count, change bank, reconciliation
19 deposit and partner till audit"?
20     A    Yes.
21     Q    And then it says, "for details refer
22 to the policies and procedures behind each weekly
23 tab"?
24     A    Yes.
25     Q    What do you understand that to mean?

1                  J. Gurtov
2      A    That is a page on, as it describes,
3  on each weekly tab that lays out the policies and
4  procedures for how to utilize the book in
5  different cash handling policies.
6      Q    I would like you to turn to the
7  following two pages, for the records Bates 815 and
8  816.
9           Are these the policies and procedures
10 that we were just referring to?
11     A    This looks similar to what's on that
12 page.
13     Q    Okay.  Would it be fair to say that
14 there are a lot of policies and procedures on this
15 document?
16         MS. DIAZ:  Objection.
17     A    "A lot" is a subjective word.  I
18 mean, there are several.
19     Q    Well, in your subjective opinion, do
20 you believe that there are a lot of policies on
21 this document?
22     A    I believe there are several policies
23 and procedures on this document.
24     Q    Would it be fair to say that some of
25 the policies are more important than others or are

1                  J. Gurtov
2  all the policies of equal importance?
3         MS. DIAZ:  Objection.
4      A    Again, these are policies and
5  procedures that are highlighted by the Starbucks
6  organization, so I would assume importance to each
7  point.
8      Q    Well, my question is:  Do you believe
9  all of these policies on this document are of
10 equal importance or are some more important than
11 others?
12         MS. DIAZ:  Objection.
13     A    I believe they are of equal
14 importance.
15     Q    Would it be fair to say that this
16 document is the most important policy document
17 with regard to DRBs?
18     A    I believe that this document
19 highlights the cash handling policies and
20 procedures that the teams or cash controllers are
21 held accountable to, so I believe it's an
22 important document.
23     Q    Is there any document that is more
24 important with regard to those items that you are
25 aware of?

1                  J. Gurtov
2      A    Not that I am aware of.
3      Q    Do you see, on the top of the
4  document, it says, "the cash management log must
5  be completed each day"?
6      A    Yes, I see that.
7      Q    Do you understand that to be an
8  important policy?
9      A    I understand that to be a policy, as
10 with the rest of the pieces on the page.
11     Q    Okay.  But do you understand it to be
12 an important policy?
13     A    I had shared earlier that I feel they
14 are all important, so, yes.
15     Q    Okay.  As a district manager
16 supervising a store, do you think you have an
17 obligation to insure that this policy is followed?
18     A    My role is to insure that policies
19 and procedures are followed in the store, yes.
20     Q    Do you see where it says, towards the
21 middle of the page, under deposit log --
22     A    Um-hum.
23     Q    -- "the deposit must be prepared and
24 transported to the bank every day"?
25     A    Yes.

J. Gurtov

1                J. Gurtov
2    Q     Do you understand that to be an
3  important policy?
4    A     Yes.
5    Q     Why?
6    A     For the same reason I understand all
7  of these pieces to be important policies.
8    Q     Which is what?
9    A     Because they are the policies and
10  procedures that are directed by the organization
11  for us to comply with.
12    Q     Anything else?
13    A     Not at this time.
14    Q     As a district manager supervising a
15  store, do you think you have any obligation to
16  insure that policy is followed?
17    A     Yes.
18    Q     Why?
19    A     Because it's part of my job to work
20  with the store manager to insure that all policies
21  and procedures are being followed in a store.
22    Q     Do you see where it says beneath
23  that, "the deposit must be prepared after 8 a.m.
24  and must be transported to the bank by 3 p.m."?
25    A     Yes.

J. Gurtov

1                J. Gurtov
2    Q     Do you understand that to be an
3  important policy?
4    A     As important as the other pieces on
5  the page.
6    Q     So your testimony is that it is
7  important?
8    A     Yes.
9    Q     As a district manager supervising a
10  store, do you think you have any obligation to
11  insure that that policy is followed?
12    A     In similar stating to the last
13  question, I have a responsibility against all of
14  these policies and procedures to work with my
15  store manager to make sure they have an
16  understanding of it and that they are complying
17  with the policies and procedures.
18    Q     Do you see where it says, "the
19  deposit must be taken inside the bank for
20  processing if the bank is open.  The weekend
21  depository box must only be used if the bank is
22  closed"?
23    A     Yes.
24    Q     Do you understand that to be an
25  important policy?

J. Gurtov

1                J. Gurtov
2    A     Yes.
3    Q     Why?
4    A     For the same reason I shared just
5  prior.
6    Q     Which is what?
7    A     That along with all of the other
8  pieces on this page, it is important for me to
9  work with the store manager to insure that they
10  and the team are upholding these policies and
11  procedures as directed by the company.
12    Q     As a district manager supervising a
13  store, do you think you have any obligation to
14  insure that that policy is followed?
15    A     To the same level and degree that I
16  do the others, yes.
17    Q     What is an employee supposed to do
18  with regard to a deposit if the bank is closed on
19  a Sunday?
20    A     Use the weekend depository box.
21    Q     What if the bank has no weekend
22  depository box?
23    A     To my understanding, our banks have a
24  weekend depository box.  It's part of how we
25  choose banks.

J. Gurtov

1                J. Gurtov
2    Q     Okay.  Do you know how a weekend
3  depository box is used?
4    A     Not in each bank for each location.
5    Q     Do you have a general idea of how
6  weekend depository boxes are used?
7    A     Yes.
8    Q     Can you explain?
9    A     That the store is equipped with a key
10  to that depository box and that they use that key
11  to drop that deposit.
12    Q     What happens after a deposit is
13  dropped in a weekend depository box?
14    A     I'm not sure specifically what
15  happens.  Our job is to put it into the documents.
16    Q     Do you see, towards the bottom of the
17  page it says, next to number three, all the way at
18  the bottom, it says "record validation deposit
19  amount and validated time on deposit to bank
20  section and attach validated slip after returning
21  from the bank or when the deposit slip has been
22  retrieved for deposits made through the weekend
23  depository"?
24    A     I do see that.
25    Q     What does that mean?

Page 58

```
 1              J. Gurtov
 2      A     That means that, upon returning from
 3 the bank, that whoever brings the deposit to the
 4 bank, then takes that receipt and attaches it to
 5 the book.
 6      Q     When say "that receipt," what receipt
 7 are you referring to?
 8      A     The receipt to the deposit that they
 9 just brought to the bank.
10      Q     So, that would be your receipt from
11 the bank?
12      A     Yes.
13      Q     Is that what the record validation
14 is?  Strike that question.
15            Is that what the validated slip is,
16 refers to there.
17      A     It could refer to that or to -- I
18 have also seen cases where the bank, for some
19 reason, doesn't provide an actual slip and will
20 put a stamp of approval and validate that the
21 deposit slip, that whoever brings the deposit in,
22 they will then leave with a copy of that with a
23 stamp from the bank.
24      Q     So there needs to be some, some
25 record from the bank that the deposit has been
```

Page 59

```
 1              J. Gurtov
 2 made?
 3      A     Yeah.
 4      Q     And the amount of the deposit?
 5      A     Yes.
 6      Q     And the date of the deposit?
 7      A     Yes.
 8      Q     Could you turn to page two, where it
 9 says "accountability and duty to report"?
10      A     Yes.
11      Q     It says, "failure to comply with cash
12 management log policy endangers partner safety,"
13 is that correct?
14      A     It says it right there, yes.
15      Q     Do you believe that to be true?
16      A     To my understanding of what I see on
17 the page, yeah.
18      Q     Why do you believe that to be true?
19      A     My belief in this case is that when
20 the policies are not followed, it does endanger
21 partner safety -- it could possibly lead to
22 endangering partner safety.
23      Q     How could it?
24      A     In a hypothetical situation, if the
25 bank deposits are not being brought to the bank on
```

Page 60

```
 1              J. Gurtov
 2 a daily basis, a large amount of cash can be
 3 stored in the store, and if other people are privy
 4 to that information, it could lead to someone
 5 trying to hold up the store or something on that
 6 end.
 7      Q     Okay.  Anything else?
 8      A     Yes.  It could also lead to then, if
 9 someone is bringing multiple deposits to the bank
10 at any given time and somebody else is privy to
11 that information, that partner being endangered on
12 the way to the bank.
13      Q     Would you consider that to be a
14 serious problem?
15      A     Yes.
16      Q     Do you see next to that or in the
17 next sentence it says, "uncorrected or
18 continuing" -- or strike that.  It is a couple
19 sentences later.
20            "Uncorrected or continuing violations
21 must be reported to management."
22      A     Yes, I see that.
23      Q     Do you think that is an important
24 policy?
25      A     Yes.
```

Page 61

```
 1              J. Gurtov
 2      Q     Is that a policy that you are
 3 obligated to follow?
 4      A     Yes, as directed in here.
 5      Q     Is that a policy that you have always
 6 followed?
 7      A     Again, always is a -- is a strong
 8 word.  Generally, my job is to follow these -- is
 9 really to insure that my store managers are
10 following these policies and procedures.
11      Q     Have you ever noticed an uncorrected
12 or continued violation of these policies and not
13 reported it upwards?
14      A     Yes.
15      Q     How many times?
16      A     I don't know the number of times.  I
17 don't know the number of times.
18      Q     Can you estimate?
19      A     No.
20      Q     More than 20?
21      A     I can't even estimate a number on
22 this.
23      Q     More than 100?
24      A     I can't estimate a number on this.
25      Q     More than a thousand?
```

1              J. Gurtov
2         MS. DIAZ:  Objection.
3    A    I can't estimate a number on this.
4    Q    So, it could be more than a thousand?
5         MS. DIAZ:  Objection.
6    A    I don't -- I don't believe I have
7  looked.  I don't know if I have been in position a
8  thousand days, so, no, I don't think it would be
9  upwards of a thousand.
10   Q    Could it be more than 500?
11        MS. DIAZ:  Objection.
12   A    Again, I can't estimate a number on
13  this.
14   Q    Can we have the next exhibit?  I am
15  done with this exhibit.
16        MS. DIAZ:  Can we actually take a
17  short break?
18        MR. GOTTLIEB:  Sure.
19        (Recess taken.)
20        MR. GOTTLIEB:  Back on.
21        I would like to have this marked
22  Gurtov 2.
23        (Gurtov Exhibit 2 marked for
24  identification as of this date.)
25   Q    Ms. Gurtov, can you review the

1              J. Gurtov
2  document you have been handed and tell me if you
3  recognize it?
4    A    No.
5    Q    You don't recognize it?
6    A    No.
7    Q    Have you ever seen this document
8  before?
9    A    Not to my recollection.
10   Q    Okay.  Thank you.
11        Just for the record, this is Bates
12  stamped 779 through 794.
13        Could I have the next exhibit,
14  please?
15        (Gurtov Exhibit 3 marked for
16  identification as of this date.)
17   Q    Ms. Gurtov, I have just handed you
18  what's been marked Gurtov 3.
19        Can you please review this document
20  and tell me if you recognize it?
21   A    I don't recognize it.
22   Q    Have you ever seen it before?
23   A    Not to my recollection.
24   Q    Just for the record, this is Bates
25  stamped 795 through 813.

1              J. Gurtov
2    Q    Can you turn to Bates stamp 805?
3    A    Okay.
4    Q    Have you ever seen this page before?
5    A    The outline of the page looks
6  familiar, but I don't recall specifically this
7  specific page.
8    Q    I would like to direct your attention
9  to -- strike that.
10        This appears to be an instruction
11  sheet and timeline with regard to cash handling;
12  is that correct?
13        MS. DIAZ:  Objection.
14   A    It's a repeatable routine instruction
15  sheet for something.
16        Can you repeat your question?
17   Q    I just asked if it appeared to be an
18  instruction sheet and timeline with regard to cash
19  handling.
20        MS. DIAZ:  Objection.
21   A    It appears to be.
22   Q    Do you believe that this document
23  accurately describes the cash handling process
24  that is expected of Starbucks stores?
25   A    Can you repeat the question again?

1              J. Gurtov
2         MR. GOTTLIEB:  Can you repeat it?
3         (Record read.)
4    A    I think it describes a cash handling
5  practice; however, I am not -- I am not personally
6  familiar with this sheet.
7         MR. GOTTLIEB:  I have no further
8  questions on that document.
9         (Gurtov Exhibit 4 marked for
10  identification as of this date.)
11   Q    Ms. Gurtov, you have just been handed
12  what has been marked Gurtov 4.  For the record
13  this is Bates stamped 684 through 778.
14        Can you tell me if you recognize that
15  document?
16   A    It appears to be the U.S. Stores
17  Partner Resources Manual.
18   Q    Okay.  And do you recognize that?
19   A    Not this specific page.
20   Q    Are you familiar with the U.S. Stores
21  Partner Resources Manual?
22   A    Not in this -- not in this format.
23   Q    What do you mean when you say "not in
24  this format"?
25   A    I am not -- I am not familiar with

Page 66

1              J. Gurtov
2    the -- with the manual.  The majority of this
3    stuff is now online, so, I am not -- I am not very
4    familiar with this manual.
5        Q    Can you please turn to page 694?
6        A    Okay.
7        Q    Do you see where it says "important
8    employment policies"?
9        A    Yes.
10        Q    Is there any section within the
11    important employee policies related to cash
12    management?
13             MS. DIAZ:  Objection.
14        A    There is a section that is in
15    reference to register operation and customer
16    transactions that I would assume has information
17    about cash handling.
18        Q    Any other section?
19        A    Not that I can tell from the chapters
20    on here that I read.
21        Q    Okay.  Let's turn to register
22    operation and customer transactions, which is
23    1.27, and is on Bates stamped page 720.
24        A    Okay.
25        Q    Does it mention anywhere on this page

Page 67

1              J. Gurtov
2    daily records book, recordkeeping or policies?
3        A    What was the question, specifically
4    just to the daily records book?
5        Q    Does it mention anywhere in this
6    section anything related to daily records book
7    policies?
8        A    I don't see that it mentions the
9    daily records book on this page.
10        Q    The answer is no?
11        A    No.
12        Q    I am done with that document.
13             Are you aware of any written policies
14    at Starbucks regarding progressive corrective
15    actions?
16        A    Of a written policy regarding it?
17             MS. DIAZ:  Objection.
18        A    No.
19        Q    Are you aware of any unwritten or
20    informal policies related to progressive
21    discipline at Starbucks?
22        A    No.  I'm unclear on the question that
23    you are asking.
24        Q    What is confusing about?
25        A    Can you repeat it, please?

Page 68

1              J. Gurtov
2         (Record read.)
3             MS. DIAZ:  Objection.
4        A    I am aware of general guidelines that
5    we follow in regards to disciplinary actions.
6        Q    Okay.  Are you aware of any general
7    guidelines with regard to progressive discipline?
8        A    Can you be clear on what you mean by
9    "progressive discipline"?
10        Q    Sure.  Discipline that starts with
11    something like a warning and then progresses to
12    something like a termination.
13        A    Yeah.
14        Q    You are aware of general policies
15    related to progressive discipline?
16             MS. DIAZ:  Objection.
17        A    Not policies.  Again, each case is
18    different unto itself, but there is a general
19    understanding of how that would take place.
20        Q    So, is it fair to say there is a
21    general practice of progressive discipline?
22        A    Depending on the circumstance.
23        Q    What is the general practice?
24             MS. DIAZ:  Objection.
25        A    There is a practice in regards to

Page 69

1              J. Gurtov
2    corrective action documents that are used to share
3    with a partner where there are problems with their
4    performance or their behaviors in the store; and,
5    again, depending on what those problems are, it
6    could take place in a verbal conversation, and
7    then it could move on to a written or final
8    written, but also, depending on the problem, it
9    could go right to a final written -- depending on
10    the problem it could go right to a separation of
11    employment.
12        Q    What are the different types of ways
13    you can issue corrective actions?
14        A    Can you clarify that as far as what
15    different infractions or like the different
16    reasons why one would issue a corrective action?
17        Q    No, not the different reasons, the
18    different ways you can issue a corrective action.
19        A    What do you mean by the different
20    ways?
21        Q    One way you can do it is through a
22    verbal warning; is that correct?
23        A    Yes.
24        Q    In what other manners can you issue a
25    corrective action?

J. Gurtov

1
2      A    In a written document.  The verbal is
3  typically written at the same time, but it's had
4  as a conversation.  You could issue it as a final
5  written or you could issue it as a separation
6  document.
7      Q    What is final written?
8      A    A final written means that there have
9  been a number of infractions against a certain
10 area in performance.  So, it's like the last
11 conversation that one would have, and if they do
12 that same thing again, it could lead to their
13 separation.
14     Q    So, final written does not mean a
15 separation?
16     A    No.
17         (Gurtov Exhibit 5 marked for
18         identification as of this date.)
19     Q    I have handed you what's been marked
20 Gurtov 5.  For the record, it's Bates stamped 514
21 on the first page and then it's 530 through 537.
22     A    Okay.
23     Q    Do you recognize that document?
24     A    Yes.
25     Q    What is it?

J. Gurtov

1
2      A    The partner guide.
3      Q    Could you please turn to page 547?
4  Excuse me.  Excuse me, 537.
5         I would like to direct your attention
6  to the section titled "Corrective Action."
7         Do you see where it says "corrective
8  action communicates to the partner that
9  performance problems exist or that the partner is
10 engaging in unacceptable behavior"?
11     A    Yes.
12     Q    Do you agree with that?
13     A    Yes.
14     Q    Do you see where it says, "the intent
15 of corrective action is to give the partner a
16 reasonable opportunity to re-establish an
17 acceptable level of performance"?
18     A    Yes.
19     Q    Do you agree with that?
20     A    Yes.
21     Q    What do you understand that to mean?
22     A    Meaning that, again, depending on the
23 severity of the performance problem, the reason we
24 give a corrective action is to give somebody an
25 opportunity to fix the challenge that is occurring

J. Gurtov

1
2  in their performance.
3      Q    It's goes on to say, "corrective
4  action may take the form of a verbal warning, a
5  written warning, demotion, suspension or
6  termination from employment.  The form of
7  corrective action taken will depend on the
8  circumstances."
9         MS. DIAZ:  Objection.
10     Q    "The evaluation of the seriousness of
11 the infraction and the form of the corrective
12 action taken will be within the sole discretion of
13 the district manager."
14         Do you see that?
15     A    It says "in the sole discretion of
16 the manager," yes.
17     Q    Okay.  Do you agree with that?
18     A    With guidance, with guidance.
19         So, it says, "the sole discretion of
20 the manager."  However, we do have a team of
21 partner resources that I utilize for guidance and
22 that I also encourage that my store managers use
23 for guidance when they are documenting their
24 partners.
25     Q    Okay.  What's the difference between

J. Gurtov

1
2  a verbal and a written warning?
3      A    The progression -- they are both on a
4  document.  They are circled, whether it's a verbal
5  or a written.  So the first -- I mean, if we use
6  an example of someone being late, the first time
7  they are late, they could be put on a verbal and
8  it's a documented discussion.  It's just the
9  verbal is circled.
10         Written would be the next step, or it
11 could be the first step, again, depending on the
12 severity of the situation, and it would just be --
13 you would know the difference by the way it's
14 circled on the form.
15     Q    In terms of progression, is it fair
16 to say that a written warning is one step more
17 serious than a verbal warning?
18     A    Yes, that is fair to say that.
19     Q    Is it fair to say that a final
20 written is more serious than a written?
21     A    Yes.
22     Q    Do you see where it says, "In cases
23 of serious misconduct, immediate termination from
24 employment may be warranted"?
25     A    Yes.

1           J. Gurtov
2      Q    And then it says, "Examples of
3  serious misconduct include but are not limited
4  to," and then one listed example is,
5  "falsification or misrepresentation of any company
6  document."
7      A    Yes.
8      Q    What do you understand the term
9  "falsification or misrepresentation of any company
10 document" to mean?  The phrase, I should say.
11     A    To misrepresent or to write something
12 incorrect on a company document.
13     Q    What do you understand the word
14 "falsification" to mean?
15     A    To falsify something, so it's not the
16 correct information.
17     Q    Do you think there is an intent
18 element to falsification?
19         MS. DIAZ:  Objection.
20     A    Falsification in its -- in its form
21 is to write something incorrect.
22     Q    Intentionally?
23     A    I don't -- I don't know.  That would
24 depend on the situation at hand.
25     Q    So, do you think somebody would be

1           J. Gurtov
2  guilty of falsification if they inadvertently
3  wrote something incorrectly on a document?
4      A    Hypothetically speaking, it's still
5  falsification because the information is not
6  correct.
7      Q    Okay.  Do you think somebody would be
8  guilty of misrepresentation if they inadvertently
9  wrote something incorrect on a document?
10     A    It would be misrepresenting if it was
11 incorrect information.
12     Q    Do you think falsification of any
13 company document requires immediate termination?
14     A    It depends on the situation at hand.
15     Q    Do you think misrepresentations on
16 any company document require immediate
17 termination?
18     A    It depends on the situation at hand.
19     Q    Do you think falsifications of DRBs
20 requires immediate termination?
21     A    Again, it would depend on the
22 specific situation at hand.
23     Q    What types of things would you
24 consider?
25     A    To lead towards?

1           J. Gurtov
2      Q    To determine whether falsification of
3  a DRB required termination.
4      A    You know, I am thinking back to the
5  situation that -- that has occurred, as what I
6  know of as falsification, so, misrepresenting and
7  writing incorrect information in the daily records
8  book during the deposit.
9      Q    What situation are you referring to?
10     A    This situation with Serenity
11 Marshall.
12     Q    Anything else?
13     A    I had also had a -- no, I am
14 referring to the one with Serenity.
15     Q    So, what I am asking is:  What else
16 would you need to consider whether falsification
17 of a DRB required immediate termination?
18     A    I would need to consider within my
19 organization the consistency of how we handle
20 those situations.
21     Q    Is there anything else you would need
22 to consider?
23     A    Not that I can think of at this time.
24     Q    Are you aware of a term at Starbucks
25 called "coaching"?

1           J. Gurtov
2      A    Yes.
3      Q    What is coaching?
4      A    It's having a conversation with
5  someone to help them improve performance in a
6  specific area.
7      Q    Is there any written policy at
8  Starbucks regarding coaching?
9      A    Not that I know of.
10     Q    Is coaching a corrective action?
11     A    No.
12     Q    What is the purpose of coaching as
13 compared to corrective action?
14     A    Coaching helps partners improve
15 behaviors, so it could be a behavioral piece,
16 that, for example, a new partner begins working
17 the bar and makes a mistake with a recipe, they
18 would be coached on how to do it the right way,
19 and it wouldn't necessarily be a documented
20 corrective action.
21     Q    Is it fair to say a coaching is less
22 serious than a corrective action?
23     A    I suppose, because it's not a
24 documented conversation.
25         (Gurtov Exhibit 6 marked for

J. Gurtov

1     identification as of this date.)
2        Q     I just handed you what has been
3  marked Gurtov 6.  For the record, it's 896 through
4  937.
5        Can you please review that document
6  and tell me if you recognize it?
7        A     It appears to be a section from the
8  operational excellence binder.
9        Q     How many pages are in that binder in
10 total?
11       A     I'm not sure.
12       Q     Can you estimate?
13       A     I'm not sure.
14       Q     It's much larger than what I have
15 just handed you, though?
16       A     I am not sure.  Like I said, a lot of
17 these documents have now been put into electronic
18 versions, so I don't have that visual
19 consistently.
20       MR. GOTTLIEB:  To the extent that
21 this is not the entire operational
22 excellence binder, I'm going to call for
23 production of the rest of it.
24       MS. DIAZ:  We will take it under

J. Gurtov

1     advisement.
2        Q     Do you see on the first page, towards
3  the upper middle of the table of contents, there
4  is reference to something called a store plan of
5  action?
6        A     Yes.
7        Q     What do you understand a store plan
8  of action to be?
9        A     An action plan in the store to work
10 towards a certain goal.
11       Q     Anything else?
12       A     That's the general understanding of
13 it.
14       Q     Can you please turn to page 900.
15       Have you seen this page before?
16       A     It looks familiar.
17       Q     On the top of the page it says, "The
18 operational excellence process is a consistent
19 approach to address the primary needs of the store
20 and the store manager, by emphasizing root causes
21 and a meaningful store plan of action."
22       Do you see that?
23       A     Yes.
24       Q     Do you agree with that?

J. Gurtov

1        A     Do I agree that that is what is
2  written here?  Yes.
3        Q     Do you agree that that is the policy
4  at Starbucks?
5        A     Yes.
6        Q     Do you see underneath that where it
7  says, "The DMs should complete a minimum of one
8  store plan of action visit per quarter"?
9        A     Yes.
10       Q     What is the difference between a
11 store plan of action and a store plan of action
12 visit?
13       A     A store plan of action is a document
14 that has the action steps to reach a goal.  The
15 store plan of action visit is when the DM and the
16 store manager are together in the store.
17       Q     Have you always completed at least
18 one store plan of action visit per quarter for all
19 of your stores?
20       A     It's the general guideline of what I
21 try to follow.
22       Q     And have you followed it?
23       A     I can't say with certainty, but it's
24 the general guideline that I try to follow.

J. Gurtov

1        Q     Do you see a few lines beneath that
2  where it says, "Each store should have a minimum
3  of two follow-up visits per quarter"?
4        A     I see that.
5        Q     Do you agree that that is a policy at
6  Starbucks?
7        A     I agree that it's a guideline.
8        Q     Is that a guideline that you follow?
9        A     It's a guideline that I try to
10 follow.
11       Q     Can you explain to me what a store
12 plan of action visit is?
13       A     A store plan of action visit is --
14 it's a dedicated visit in the store, with the
15 store manager and the district manager spending
16 portions of time together to discuss the business
17 from different perspectives, generally looking
18 into the partner experience, the customer
19 experience, as well as the overall business, or
20 portions of each for the visit at hand.
21       Q     Okay.  How long is a store plan of
22 action visit?
23       A     It can range.
24       Q     From?

1                     J. Gurtov
2      A      Four to six hours.
3      Q      And how long do follow-up visits
4  last?
5      A      They can range.  Follow-ups, again,
6  can be -- it could be like a pop-in visit.  It can
7  be a review of a plan.  They range.
8      Q      What is the time range?
9      A      It can be any -- any length of time
10  up to two hours.
11      Q      Is cash management at the store one
12  item that you would review during a store plan of
13  action visit?
14      A      It's something that I would typically
15  try to review during the visit.
16      Q      And how would you do that?
17      A      What would it look like on a visit?
18      Q      When you say it's something you would
19  typically try to review on a visit, how would you
20  actually do that?
21      A      Each day has an agenda, so cash
22  management and reviewing of the daily records
23  books is generally a portion of that agenda.
24  However, it's not something that I can say happens
25  on every visit.

1                     J. Gurtov
2      Q      Can you say it happens on most
3  visits?
4      A      I -- I can't really say a number, a
5  most, a least.  It's something that -- that is
6  part of an agenda that we try to get to.
7      Q      Would you say reviewing the daily
8  records book is something you get to at least
9  25 percent of the time?
10      A      Like I said, it's tough to categorize
11  into a number.
12      Q      Is it something --
13      A      Or a percentage.
14      Q      Okay.  Is it something that you would
15  estimate you do 90 percent of the time?
16      A      Like I said, it's hard to categorize
17  into a percentage.
18      Q      So, is it your testimony that you
19  can't estimate any better than between zero and
20  100 percent?
21           MS. DIAZ:  Objection.
22      A      I can't estimate it into a number of
23  times.
24      Q      I am not asking you to do it -- I'm
25  not asking you to estimate in terms of the number

1                     J. Gurtov
2  of times.  I'm asking you to estimate in terms of
3  what percentage.
4      A      That still goes towards a number of
5  times, and I can't estimate into that at this
6  time.
7      Q      So is it your testimony that you
8  cannot estimate whether you review the daily
9  records books during your SPA visiting any better
10  than between zero and 100 percent?
11           MS. DIAZ:  Objection.
12      A      I can't estimate a specific time
13  frame.
14      Q      Well, just, I want to make sure you
15  understand my question.  I am not asking for a
16  time frame.
17      A      I understand your question, and I
18  can't -- I apologize for using the wrong
19  terminology, but I can't estimate a percentage of
20  the number of times that I review a daily records
21  book during visits.
22      Q      Can you estimate whether you review
23  the daily records book more or less than 5 percent
24  of your visits?
25      A      I think it's clear to say that I do

1                     J. Gurtov
2  it on more than 5 percent of my visits.
3      Q      Can you say whether you review the
4  daily records books at more than or less than
5  90 percent of your visits?
6           MS. DIAZ:  Objection.
7      A      I can't estimate a percentage.
8      Q      I'm not asking you to estimate a
9  percentage.  I'm asking you if you can say if it's
10  more than or less than 90 percent.
11      A      I can't.
12      Q      So it's possible it's 90 percent of
13  the time?
14      A      I can't estimate a percentage on it.
15      Q      I'm not asking you to estimate a
16  percentage.  I'm asking, is it possible that you
17  review daily records books at 90 percent of your
18  store plan of action visits?
19      A      I can't estimate that for three, for
20  three years' worth of time.
21           MS. DIAZ:  Objection.
22      Q      How about in 2010?
23      A      It's -- each visit takes its own
24  shape, so I can't estimate a number from even --
25  even a year's worth of visits in different stores

J. Gurtov

1  with specific time frames.
2
3      Q    Can you say whether you reviewed
4  daily records books more than or less than
5  20 percent of the visits?
6      A    I can't estimate a percentage of time
7  that I reviewed the books.
8      Q    I'm not asking you to estimate a
9  percentage. I'm asking you whether --
10     A    It's more.
11         MS. DIAZ:  Objection.
12     Q    Whether you know you reviewed the
13  books on more than or less than 20 percent of the
14  visits. I'm not asking you to stick to a specific
15  percentage.
16         MS. DIAZ:  Objection.
17     A    I don't know with certainty. I know
18  it's a general guideline that I try to follow on
19  my visits in the stores. However, there are
20  different things that can push us in different
21  directions.
22
23     Q    I would like you to turn to page 902.
24     A    Okay.
25     Q    And do you see in the upper left, it

J. Gurtov

1
2  says, "SM and DM collaborate on agenda topics"?
3      A    Yes.
4      Q    SM refers to store manager, and DM
5  refers to district manager?
6      A    Yes.
7      Q    What is an agenda?
8      A    An agenda is a list of things that
9  the store manager and myself would like to review
10  during that time period.
11     Q    Okay.  Are agendas created for store
12  plan of action visits?
13     A    Generally speaking.
14     Q    Who creates those agendas?
15     A    I provide a general outline to my
16  store managers of the things that I would like to
17  review during that time frame, and then they add
18  on if there is something store specific that they
19  would like to review as well.
20     Q    Do you see the paragraph where it
21  says, "In order" -- it's at the top -- "in order
22  to create a customized agenda for each store, it's
23  important for the DM and SM to discuss each top
24  priorities"?
25     A    I see that.

J. Gurtov

1
2      Q    What do you understand that to mean?
3      A    That the district manager and the
4  store manager discuss priorities in the store
5  during the visit.
6      Q    Okay. What do you understand the
7  term "top priorities" to mean there?
8      A    The top priorities in the store in
9  any given visit.
10     Q    Is cash management generally a top
11  priority at a store?
12     A    Cash management is generally a
13  priority that is included on the agendas.
14  However, whether or not it is gotten to is not
15  consistent from visit to visit.
16     Q    Do you see below that, toward the
17  middle of the page, where it says "DM
18  responsibilities"?
19     A    I do.
20     Q    "The DM identifies and assesses the
21  business utilizing the following resources."
22         Do you see that?
23     A    Yes.
24     Q    Now, is this all in regards to a SPA
25  visit?

J. Gurtov

1
2      A    Can you clarify the question?  All of
3  these pieces?  Are all of these pieces?
4      Q    This document, this page that we are
5  looking at, does this page refer or relate to SPA
6  visits or something else?
7      A    It looks like it relates to -- I
8  would have to go back and look through.
9      Q    It looks like it refers to
10  operational excellence in general.
11     A    There are pieces on here that are
12  reviewed for that -- that can be reviewed for a
13  store plan of action visit.
14     Q    Okay.  Do you see where it says, "The
15  DM identifies and assess the business utilizing
16  the following resources"?
17     A    Yes.
18     Q    Towards the bottom of that list, the
19  daily records book is listed.
20     A    Yes.
21     Q    What do you understand that to mean?
22     A    That the daily records book is a
23  resource that can be used during a store plan of
24  action.
25     Q    That's what you understand that to

J. Gurtov

1  mean?
2      A    Yes.
3      Q    You understand that to mean that is a
4  resource that the district manager should use
5  during a SPA visit; is that correct?
6          MS. DIAZ:  Objection.
7      A    That it's something to review, that
8  it can be a piece, yes.
9      Q    Okay.  And do you see it says beneath
10 that, "The DM discusses the proposed agenda topics
11 with the SM prior to the store plan of action
12 visit"?
13     A    I do see that.
14     Q    Is that something that you follow?
15     A    Yes.  As I said, I provide a general
16 guideline of the things that I would like to
17 discuss during the store plan of action visit.
18     Q    Do you see where it says, "Agree and
19 finalize the agenda with SM"?
20     A    I see that.
21     Q    Is that something you follow as well?
22     A    Generally.  There are times that the
23 store manager doesn't reply back to me with the
24 things they would like to go over.

J. Gurtov

1
2      Q    Is it fair to say that you are in
3  constant communications with your stores?
4      A    I communicate with my stores often.
5      Q    On a daily basis?
6      A    No.
7      Q    On a weekly basis?
8      A    No.
9      Q    How often do you communicate with
10 your stores?
11     A    It depend per store, per store
12 manager, and the -- I guess whatever is
13 surrounding the operation, what the needs are of
14 the business and that store manager.
15     Q    Isn't it true that you communicate
16 with your stores at least once a week?
17     A    I would say that that is definitely
18 fair to say.
19     Q    Is it fair to say that on average,
20 you communicate with your stores at least three
21 times a week?
22         MS. DIAZ:  Objection.
23     A    Not with each store.  Not with each
24 store manager.
25     Q    What about on average, though?

J. Gurtov

1
2      A    You know, it -- there really are no
3  averages in -- in this -- in the operations.
4  There are e-mails that are sent out that will go
5  to the overall district.  But there is not an
6  average of when I speak with each store manager.
7          (Gurtov Exhibit 7 marked for
8  identification as of this date.)
9      Q    I have just handed you a document
10 that's been marked Gurtov 7, Bates stamped 871
11 through 895.
12         Can you please review that document
13 and tell me if you recognize it.
14     A    It appears to be something from the
15 Safety, Security and Health Resource Manual.
16     Q    Is this part of a -- is the section
17 you have part of a larger document?
18     A    It appears to be from the Safety,
19 Security and Health Resource Manual.  It looks to
20 be a chapter of it.
21     Q    Do you know if this Safety, Security
22 and Health Resources Manual is located in
23 Starbucks stores?
24     A    It may be.  It may also be documents
25 that they can pull off of their portal through an

J. Gurtov

1
2  electronic version.
3          MR. GOTTLIEB:  I'm going to call for
4  the production of the entire Safety,
5  Security and Health Resources Manual.
6          MS. DIAZ:  We will take it under
7  advisement.
8          (Gurtov Exhibit 8 marked for
9  identification as of this date.)
10     Q    You have just been handed what's been
11 marked Gurtov 8, Bates stamped 821 through 868.
12         Can you please review that document
13 and tell me if you recognize it.
14     A    It appears to be a portion from the
15 store operations binder.
16         MR. GOTTLIEB:  Okay.  I'm going to
17 call for production of the entire store
18 operations binder.
19         MS. DIAZ:  We'll take it under
20 advisement.  I don't see why it's relevant.
21     Q    Is this document maintained -- strike
22 that.
23         Is the store operations manual
24 maintained at Starbucks stores?
25     A    Again, at one time the binders in

1           J. Gurtov
2    general were in the stores, but they -- many of
3    them have been removed and are now just on
4    electronic version.
5           MR. GOTTLIEB:  Can we take a
6    few-minute break?
7           THE WITNESS:  Sure.
8           (Recess taken.)
9           MR. GOTTLIEB:  Back on the record.
10      Q     You know somebody named Serenity
11   Marshall; is that correct?
12      A     Um-hum.  Yes.  Sorry.
13      Q     When did you first meet her?
14      A     Back when I first became a district
15   manager in 2008.
16      Q     Do you remember the context in which
17   you first met her?
18      A     I feel it was in her store at -- when
19   she was in 6th and Waverly, Store 847.
20      Q     What was your initial impression of
21   her?
22      A     My initial impression of Serenity was
23   that she was a store manager with some tenure.
24   She had been around for several years.  I mean in
25   general, like from that first impression, it was a

1           J. Gurtov
2    positive first impression.
3       Q     Okay.  Why was it positive?
4       A     Just in, I guess, the average way a
5    general first impression would be positive.  It
6    was on a positive note.  It had a positive energy.
7    Just it was a basic first meeting.
8       Q     Okay.
9       A     Yeah.
10      Q     Do you remember where that meeting
11   took place?
12      A     I believe it was in the store during
13   store -- I think as I was doing tours of stores.
14   That's where I met each of my managers the first
15   time, was in their individual location.
16      Q     Now, going back to your store visits,
17   in addition to store plan of action visits, there
18   are also follow-ups, you said; right?
19      A     Yes.
20      Q     You said those could last up to two
21   hours?
22      A     Yes.
23      Q     During those visits, would you ever
24   review DRBs?
25      A     I could.

1           J. Gurtov
2       Q     Do you know how often you reviewed
3    DRBs during those follow-up visits?
4       A     No.  Those visits didn't have an
5    agenda to them.  It was really to follow up on the
6    actual action plan.
7       Q     Would you say you reviewed DRBs
8    during those follow-up visits in most of the
9    follow-up visits?
10      A     I can't give a specific time or a
11   specific number of times.
12      Q     I'm not asking for a specific number.
13      A     Sorry.
14      Q     Wait for me to finish my question
15   before you answer.
16           I'm asking whether you reviewed DRBs
17   during follow-up visits most of the time.
18      A     I would say no.
19      Q     Would you say you reviewed DRBs
20   during follow-up visits at least 10 percent of the
21   time?
22      A     No.
23      Q     Less than 10 percent of the time?
24      A     No.  I don't have a percentage of
25   time.  Cash management, reviewing of the daily

1           J. Gurtov
2    records books, was not part of an agenda, so, if,
3    an incident came up, if a store manager asked me
4    to review them, if it was -- if there was
5    something in the store that called for me to
6    review them, a challenge the store manager was
7    having with one of their cash controllers or with
8    cash over/short in general, then I would review
9    them with the store manager.
10      Q     During a follow-up visit?
11      A     It could be during a follow-up visit.
12   It could be during a non-follow-up visit.  It
13   could be just a visit to review that, if the store
14   manager asked for my help.
15      Q     There have been follow-up visits
16   where you have reviewed DRBs?
17      A     I'm sure there have been.
18      Q     Why are you sure there have been?
19      A     Because with the time that I am in
20   the store, it is not abnormal to look at a daily
21   records book.  I'm sure there have been at least a
22   moment where during a follow-up visit, I have
23   looked at a daily records book.
24      Q     What do you mean when you say for the
25   time that you are in the store it's not abnormal

J. Gurtov

1  to look at a daily records book?
2      A    It's part of something that can
3  happen on any typical day.  It's something that
4  can be scheduled during a SPA visit.  But it is
5  not top of mind with going into a store.  So cash
6  handling is a piece of an entire operation, of
7  many things that we are looking at, to make sure
8  are happening in a positive way.
9          So, it's not normal to go in and as
10 that specific focus.  It's not abnormal either,
11 but it can happen.
12     Q    And it does happen?
13         MS. DIAZ:  Objection.
14     A    That I look at daily records books?
15 Yes, I look at daily records books.
16     Q    Are there any other documents that
17 you review during store plan of action visits
18 other than daily records books?
19     A    Yes.
20     Q    Like what?
21     A    Values walks, quality assurance
22 audits, P&Ls sometimes, scorecards sometimes,
23 customer voice results, store plans of action,
24 duty roster notebooks.

J. Gurtov

1      There are -- there is a wide range of
2  documents that we will review or can review during
3  a visit.
4      Q    Okay.  Is there any document that you
5  review more than other documents?
6      A    It's hard to say.  It really depends
7  on the situation in the store.
8      Q    I am asking in general.  Is there any
9  document that you review more than the others?
10         MS. DIAZ:  Objection.
11     A    Values walks and duty roster
12 notebooks, so things around the customer
13 experience and cleanliness, are typical pieces
14 that I will review on a visit.
15     Q    Okay.  Anything else?
16     A    I would say those are some of the top
17 priorities.  We are a food establishment.
18 Sometimes I can't get beyond the cleanliness.  If
19 the store is not clean, we don't move on to
20 anything else.
21     Q    Is it fair to say a daily records
22 book you put at the bottom of that list?
23         MS. DIAZ:  Objection.
24     A    No.

J. Gurtov

1      Q    Is it fair to say you put the daily
2  records book at the top of the list?
3      A    No.
4      Q    Is it fair to say the DRB is
5  somewhere in the middle?
6      A    It's all situational, depending on
7  the situation of the store.
8      Q    When you became the district manager,
9  is it fair to say that you had to become familiar
10 with a number of stores and personnel?
11     A    Um-hum.
12     Q    How did you do that?
13     A    By introducing myself to the teams,
14 visiting the stores during different time periods
15 so I would get to know the larger group of
16 partners that worked in each store.
17     Q    Now, when you first reviewed each of
18 your stores, did you make a point to look at the
19 daily records book?
20     A    I don't know if that was a part of
21 initial visits.  It was more centered around
22 getting to know the team and the dynamics of the
23 team in the store, and seeing where the store
24 managers were in their own development.

J. Gurtov

1      Q    Why wouldn't viewing the daily
2  records book be something that you would do to
3  initiate your familiarity with the store?
4      A    I don't have a reason for it, but
5  with the -- again, the culture of who we are as an
6  organization, our top priority is really to get to
7  know the people that we work with.
8      Q    Is it fair to say that reviewing the
9  daily records book is important for understanding
10 the cash management and cash handling at a store?
11     A    Yeah.  That is the only way to really
12 understand it.
13     Q    And you didn't think that
14 understanding the cash management and cash
15 handling at a store was something you should do
16 when you were first learning the stores in your
17 district?
18         MS. DIAZ:  Objection.
19     A    The first visit in a store is
20 typically about meeting and getting to know a
21 team.  My job, with getting to know anyone, if I
22 need to help a store manager, and develop a store
23 manager, I have to have a broad understanding of
24 who they are.

Page 102

J. Gurtov

1    So, I would -- I think what I was
2    referring to, on the initial visit, meaning first
3    visit in a store, the daily records book was not
4    top of mind.  But within that initial getting to
5    know a store manager, daily records books could
6    have been reviewed.
7        Q    Do you think they were?
8        A    I don't remember.  It was three years
9    ago.  I don't remember.  And I was also learning a
10   new role.
11       Q    Did there ever come a point -- or
12   strike that.
13           Did there ever come a point that you
14   felt Ms. Marshall was having problems in her
15   store?
16       A    Yeah.
17       Q    When was the first time?
18       A    I don't remember the specific time
19   frame, but I do know that the time, the larger
20   time frame from beginning to end of working with
21   Serenity, there was a lot of ups and downs and
22   inconsistencies in performance.
23       Q    As you sit here today, can you
24   remember the first time you had any problem with

Page 103

J. Gurtov

1    her performance?
2        A    I don't remember the first time
3    specifically.  I do remember in the first location
4    she worked at, at Store 847, she did have
5    inconsistencies with her performance during the
6    time she was there.
7        Q    Can you estimate when the first time
8    was that you noticed inconsistencies?
9            MS. DIAZ:  Objection.
10       A    I don't remember off the top of my
11   mind.
12       Q    When you say she was having
13   inconsistencies, are you referring to some
14   deficiencies?
15       A    Deficiencies in performance, yeah.
16       Q    What deficiencies are you referring
17   to?
18       A    She struggled with maintaining a
19   clean environment, so the store was not meeting
20   standards from cleanliness and food safety
21   perspectives.
22           There was also a time in that first
23   location when she struggled with creating a great
24   environment for the partners, so there were some

Page 104

J. Gurtov

1    partner issues that arose, and I don't remember
2    the specifics of them, but I remember that
3    general -- that being -- that being a concern.
4            And I remember there were -- there
5    were also some times where there were some cash
6    handling issues and concerns from that original
7    location.
8        Q    Anything else?
9        A    No, not specifically that I can
10   recall at this time.
11       Q    When you say there were some cash
12   handling issues when she was at Store 847, what do
13   you mean by that?
14       A    There was a time period where the
15   store was struggling with large cash shortages,
16   and that was the key indicator that led to there
17   being challenges in the store.  And there was
18   reviewing of daily records books back at that
19   time, and there was work with one of her assistant
20   store managers that eventually was separated for
21   not complying with cash handling policies and
22   procedures with the daily records book.
23           (Record read.)
24       Q    Do you remember who it was that was

Page 105

J. Gurtov

1    not complying with cash handling standards?
2        A    Yeah.  His name was Leedel Griffin.
3        Q    Do you remember what his position
4    was?
5        A    An assistant store manager.
6        Q    Do you remember what his problems
7    were with regards to cash handling?
8        A    I don't remember the specifics.  I
9    don't remember what the specifics were and what
10   the challenges were, but it did lead to a
11   separation.
12       Q    Whose decision was it to separate his
13   employment?
14       A    It was a conclusion both Serenity and
15   I worked on together.
16       Q    Were any documents created with
17   regard to his termination?
18       A    I don't remember specifically.  I
19   know that just, I mean, the regular, like a
20   separation plan that we put in, that that was
21   created, but I don't remember, like specifically
22   with him at that time.
23           MR. GOTTLIEB:  I'm going to call for
24   production of all documents related to the

Page 106

J. Gurtov

1  termination or discipline of Leedel Griffin.
2  MS. DIAZ:  We will take that under
3  advisement.
4  Q    Is there anything that you can
5  remember about Mr. Griffin's cash handling
6  problems that you can recall at this time?
7  A    I just remember that he was
8  struggling, and the shift supervisor, she was
9  working with him to fix things, and things weren't
10  fixed.  I don't remember the details of it.
11  Q    Can you remember any more detail than
12  what you are describing?
13  A    I don't.
14  Q    You said you reviewed DRBs at the
15  time; right?
16  A    Yes.
17  Q    Why were you reviewing DRBs at the
18  time?
19  A    Because there were large cash
20  shortages coming out of her store.
21  Q    Would you have reviewed the DRBs if
22  there were not large cash shortages?
23  A    I could have reviewed the DRBs if
24  there were not cash shortages.

Page 107

J. Gurtov

1  Q    But was it the cash shortages that
2  was the impetus to you reviewing the DRBs?
3  A    In that particular case, yes.
4  Q    And when you reviewed the DRBs, what
5  did you find?
6  A    I don't remember specifics, but
7  inconsistencies that led to us being able to see
8  that it was challenges that her assistant was
9  having, but I don't remember specifics beyond
10  that.  That was some time ago.
11  Q    So all you remember about your review
12  of the DRBs is that it was clear that there were
13  challenges for Mr. Griffin?
14  A    That is what eventually led to his
15  separation, so I know of that, but I don't
16  remember the details of other pieces that I may
17  have seen in the daily records book of that time.
18  Q    Do you remember how much time you
19  spent reviewing the DRBs in that instance?
20  A    I don't remember.
21  Q    Do you remember what you reviewed in
22  the DRBs?
23  A    I don't remember the specifics.
24  Q    Do you remember if you sat down with

Page 108

J. Gurtov

1  Ms. Marshall and reviewed the DRBs together?
2  A    I do remember doing that.
3  Q    Do you remember how long you spent
4  doing that?
5  A    No.
6  Q    Do you remember any discussion you
7  had with Ms. Marshall with regard to the DRBs?
8  A    I don't remember the details.  I
9  remember during that time frame, because of the
10  challenges with the cash shortage, she and I sat
11  together, looked at the daily records book and
12  spoke about things in detail per pages and
13  sections to be able to build the trend that showed
14  that something was challenged with Leedel.
15  But I don't remember -- again, it was
16  some time ago.  I just don't remember the details
17  of that circumstance.
18  Q    Do you remember if the problems
19  Mr. Griffin was having at the store were serious?
20  A    I don't remember the detail.  They
21  eventually led to a separation, so, I would assume
22  seriousness.
23  Q    Did you think any of the deficiencies
24  with regard to Mr. Griffin's cash handling were

Page 109

J. Gurtov

1  Serenity Marshall's responsibility?
2  A    It's Serenity's responsibility to or
3  the store manager's responsibility in any case to
4  review the daily records book daily and coach --
5  monitor the performance of the partners and coach
6  them, daily, weekly.
7  Q    So, do you believe he -- do you
8  believe Ms. Marshall was responsible for any of
9  Mr. Griffin's cash handling deficiencies?
10  A    She is not responsible for him making
11  the mistakes that he made.  Her responsibility was
12  to recognize the mistakes and coach him through
13  it.
14  Q    Do you remember if Serenity Marshall
15  was deficient in any regard with regard to cash
16  handling at the store at that time?
17  A    She was the store manager of the
18  operation whose responsibility is to review the
19  daily records books and look for trends of
20  inconsistencies.  She was not holding her team --
21  if I remember correctly, she was not holding her
22  team accountable to all of the policies and
23  procedures during that time, and it was something
24  that she and I had discussed.

Page 110

J. Gurtov

1   Q   Did you consider that a problem?
2   A   Yes.
3   Q   Did you consider that a serious
4   problem?
5   A   I consider it a problem.  She wasn't
6   completing a portion of her responsibilities as
7   the store manager.
8   Q   Why did you consider that
9   specifically a serious problem?
10   A   I considered many things a problem,
11   so I -- the "serious" again is subjective, but
12   it's a problem because it can lead to -- it's a
13   problem because it's just not following policy and
14   procedures that are put before her as her
15   responsibility as a store manager.
16   Q   Is it also a problem because it could
17   affect the ability to properly manage cash at the
18   store?
19   A   Yeah.
20   Q   And that's an important thing to be
21   able to do at a store; correct?
22   A   It's one of the responsibilities of
23   the store manager.
24   Q   It's an important responsibility of

Page 111

J. Gurtov

1   the store manager, isn't it?
2   A   I think many of the responsibilities
3   of a store manager are important.
4   Q   And is that one of them?
5   A   Yes.
6   Q   Cash management is one of the
7   important policies?
8   A   Cash management is a policy that --
9   there are a large range of policies in which cash
10   management is a piece of that.  They are all
11   important to the store manager role in running a
12   successful business for a team.
13   Q   Some policies are more important than
14   others, though; correct?
15   A   I don't know in reference to -- is
16   there a specific other policy?
17   Q   I'm asking you -- there is many, many
18   policies at Starbucks.
19   A   There is many, many, um-hum.
20   Q   And some policies are more important
21   than others; correct?
22   A   You know, it's very difficult to talk
23   through this word "important," because I -- they
24   are all -- a policy and procedure is a policy and

Page 112

J. Gurtov

1   procedure.  Whether it falls under, you know,
2   completing a review on time or cash handling,
3   those are both policies and procedures that a
4   store manager is expected to abide by.
5   Q   Is there a reason that you have a
6   hard time committing to saying that cash
7   management is important?
8   MS. DIAZ:  Objection.
9   A   I am just trying to make clear that
10   it's one of many policies and procedures that
11   falls within the responsibilities of a store
12   manager.  So, I am not having a difficult time
13   committing to its importance.  I just -- the
14   relevance of it being more important or less
15   important to something else, I find many of those
16   things to fall on a similar level.
17   Q   So, is it fair to say that you cannot
18   say cash management is important?
19   MS. DIAZ:  Objection.  She already
20   testified to that question.
21   A   It's important, as is many other
22   pieces of the business.
23   Q   As a district manager, if you notice
24   a store is having problems with cash management

Page 113

J. Gurtov

1   and cash handling, is that something that you
2   would focus on?
3   A   Yes.
4   Q   Why?
5   A   Because it would be my responsibility
6   to do so.
7   Q   Anything else?
8   A   Is there something else that --
9   Q   Is there any other reason you would
10   focus on it other than just that it's your
11   responsibility?
12   A   It's an important part of the
13   business.
14   (Gurtov Exhibit 9 marked for
15   identification as of this date.)
16   Q   I just handed you a document, one
17   page, Bates stamped 1585.  Do you recognize this
18   document?
19   A   I do.
20   Q   What is this document?
21   A   It's a recap on a conversation that I
22   had had with Serenity Marshall on the 25th of
23   November, 2008.
24   Q   Okay.  Does this document relate at

Page 114

J. Gurtov

1  all to the discussion that you had with Serenity
2  Marshall that we were just going over?
3      A   I don't remember specifically.
4      Q   Okay.
5      A   Like a -- the Leedel situation?
6      Q   Yes.
7      A   I don't believe that this is in
8  reference to the Leedel situation.
9      Q   Okay.  Do you know if the Leedel
10 situation happened before November 25th, 2008, or
11 after?
12     A   I don't remember.
13     Q   Did you draft this document?
14     A   I did.
15     Q   Do you remember drafting it?
16     A   Yes.
17     Q   Where did you draft it?
18     A   I don't remember where.
19     Q   Did you type it?
20     A   Yeah.
21     Q   But you don't know where you typed
22 it?
23     A   No.  I work off of a laptop, so it
24 may have been in the office, which would be

Page 115

J. Gurtov

1  likely.
2      Q   Or it could have also been somewhere
3  else?
4      A   Yeah.  I may have -- I may have
5  drafted it from home.
6      Q   Do you remember why you drafted this
7  document?
8      A   Um-hum.
9      Q   Is that yes?
10         MS. DIAZ:  You have to remember to
11 respond verbally.
12     A   Yes.
13     Q   Why did you draft this document?
14     A   Because of the situations in here.
15 There were challenges in the store from an
16 environment perspective, and again, I don't
17 remember the details, but there were even -- there
18 were several partner issues that had arisen at the
19 time on here, so this was in response to some of
20 those.
21         So, I mean, there were challenges
22 around cleanliness.  There were challenges around
23 the performance management of partners and
24 insuring that they were treating, obviously on

Page 116

J. Gurtov

1  here, customers with respect.  There were
2  challenges around cash handling.
3      Q   Okay.
4      A   As well as obviously something about
5  closings, but I don't remember the details around
6  the closing.
7      Q   Do you remember how you came to learn
8  of all these issues at Ms. Marshall's store?
9      A   I don't remember the exact way that I
10 came to learn of these issues.
11     Q   Can you think of the way you came to
12 learn of any of the issues referenced on this
13 document?
14     A   It was some time ago, so I really
15 don't remember the details.  It's likely that it
16 was through store visits.  It's likely it was
17 through conversations with partners.  I remember
18 like a general understanding of that time frame,
19 but I don't remember the details.
20     Q   Okay.  I would like to direct your
21 attention to where it says "management of shift
22 supervisor performance and cash handling."
23         Do you see that?
24     A   I do.

Page 117

J. Gurtov

1      Q   Do you know why you wrote that?
2      A   I don't remember the specific
3  instance or instances that led to that specific
4  statement.  I would assume it's in response to,
5  there were challenges in the daily records book
6  that Serenity was not addressing with her shift
7  supervisors in the store at that time.
8      Q   Okay.  Go ahead.
9      A   Because -- because the action here is
10 that she needs to evaluate the daily records book
11 daily and have coaching conversations.
12     Q   Why do you assume that that is the
13 reason?
14     A   Because the action steps on here are
15 to help turn around performance, so, the action on
16 here is to ask her to look at it daily and have
17 coaching conversations with her team, so I would
18 assume that she wasn't doing that prior to.
19     Q   Does that action steps, that start,
20 "Serenity will evaluate," does that refresh your
21 recollection as to any specific problems
22 Ms. Marshall was having with regard to cash
23 management?
24     A   A specific problem, no, but a general

J. Gurtov

1    understanding that she wasn't following up with
2    her team in regards to the cash handling policies.
3        Q    Okay.  So, the sentence that starts
4    "Serenity will evaluate" refreshes your
5    recollection to some degree?
6        A    Of the time period of -- in that
7    store.
8        Q    What does that sentence refresh your
9    recollection of?
10       A    That there were a lot of challenges
11   in that store at that time.
12       Q    Does that sentence refresh your
13   recollection as to what those challenges were?
14       A    Not specifically.  The specific cash
15   handling situation I remember isn't from Leedel,
16   the assistant store manager.  I don't remember the
17   specifics of other occurrences that could be
18   around that.
19       Q    Now, you see at the top, that says,
20   "Below is a recap of a conversation Serenity
21   Marshall and Jennifer Gurtov had regarding
22   creating the environment on Tuesday,
23   November 25th, 2008"?
24       A    Yes.

J. Gurtov

1        Q    Do you see it's signed by you and
2    Ms. Marshall November 25th, 2008?
3        A    Yes.
4        Q    If the document is a recap, how is it
5    signed on the same day it was created?
6        A    I had scheduled a time to meet with
7    Serenity, and I dated it for the day I knew I was
8    going to sit down with her and have this
9    conversation.
10       Q    What was the purpose of the
11   conversation?
12       A    To provide her the action steps to
13   turn the performance around in the store.
14       Q    Do you remember how long that
15   conversation lasted?
16       A    I don't.
17       Q    Do you remember who was present for
18   the conversation?
19       A    I think it was just me and Serenity.
20       Q    Are you sure?
21       A    I don't -- I don't even remember
22   where we had the conversation.  I don't --
23       Q    Do you remember if it was at the
24   store?

J. Gurtov

1        A    It's likely it could have been.  I
2    don't remember the details of it.
3        Q    Is it possible that it was not in the
4    store?
5        A    It's possible.
6        Q    Do you remember anything you said
7    during that conversation?
8        A    It was such a long time -- I don't
9    even remember the specifics that directly led to
10   this document.  So I don't remember the specific
11   conversation that was had at that time.  I know we
12   definitely went over the bullet points on here,
13   but I am not sure of more specifics than that.
14       Q    Do you remember anything that
15   Ms. Marshall said during that conversation?
16       A    I don't.
17       Q    Do you remember how the conversation
18   ended?
19       A    I don't.
20       Q    Did you consider this document at the
21   time a corrective action?
22       A    No.  It's a recap of just a
23   conversation that we had, like a documented recap.
24       Q    Did you understand this document to

J. Gurtov

1    be a coaching?
2        A    Yeah.
3        Q    Why didn't you give Ms. Marshall a
4    corrective action at that time?
5        A    I don't know.  I was new in the role.
6    I was still learning my role at that time, and I
7    don't know.
8        Q    Do you think you should have?
9        A    It's hard to say, because I don't
10   even remember the specific pieces that led to
11   this.  I don't remember all of the details of that
12   time period.
13       Q    I have no more questions on that
14   document.
15           (Gurtov Exhibit 10 marked for
16           identification as of this date.)
17       Q    I have handed you a document marked
18   as Gurtov 10, Bates stamped 1589.  Do you
19   recognize this document?
20       A    It looks like a -- it was such a long
21   time ago, that I don't remember the details
22   specifically.  It looks my handwriting on it.  It
23   looks like it may have been a draft of that, of
24   the other document.

Page 122

```
1                J. Gurtov
2       Q    Okay.  Now, there is a lot of
3  handwriting on the document; right?
4       A    Yes.
5       Q    Is all the handwriting yours?
6       A    It looks like all my handwriting.  It
7  appears to be, yeah.
8       Q    Do you see where it says "cash
9  handling log not being filled out appropriately"?
10      A    Yes.
11      Q    It says "Chris Leedel and Nadine."
12      A    Yes.
13      Q    Do you know why you wrote that?
14      A    I don't remember the specifics.  I
15  can make assumptions, but I don't remember the
16  specifics.
17      Q    Does that sentence I just read
18  refresh your recollection as to anything?
19      A    Again, it's more assumptions.  I know
20  that the environment, during that time there were
21  a lot of struggles.
22           As I read the next sentence,
23  "Partners not being held accountable until I am
24  involved," she was not looking through the records
25  book and holding them accountable to the pieces
```

Page 123

```
1                J. Gurtov
2  where they were not adhering to policies and
3  procedures, that I remember, and that's why it led
4  to for that to be the action step for her to do.
5           I don't remember all of the specifics
6  with the partners.  Obviously Leedel I remember,
7  because he was an assistant store manager that was
8  separated at that time for that.
9       Q    When you read the sentence, "Partners
10  not being held accountable until I am involved,"
11  that reminded you that she was not making sure
12  policies were adhered to with regard to the daily
13  records book; is that right?
14      A    Yes.
15      Q    Do you recollect what policies were
16  not being adhered to in the daily records book?
17      A    I don't remember the specifics.
18      Q    Do you remember anything about the
19  policies that were not being followed with regard
20  to the daily records book?
21      A    I don't remember the specifics for
22  that store.  I don't at that time.
23      Q    Do you remember anything more
24  generally, other than what you have already
25  described?
```

Page 124

```
1                J. Gurtov
2       A    No.
3       Q    Do you see above that, it says in
4  handwriting, "Management of SS performance and
5  cash handling," and then in parentheses, "What do
6  I want her to do"?
7       A    Yes.
8       Q    Is that your handwriting?
9       A    Yes.
10      Q    Do you know why you wrote that?
11      A    I was walking through the process of,
12  these were the challenges that were there, and
13  what I wanted to do in the conversation with her
14  was provide her an avenue to better her
15  performance.  So, when I put, "What do I want her
16  to do," meaning what are the steps that she would
17  need to do to correct the behavior so that her
18  performance would be on a better level.
19      Q    And then do you see beneath that in
20  handwriting, it says, "Serenity" -- can you read
21  what it says in handwriting?
22      A    I think it says, "Serenity is to
23  check daily."
24      Q    What do you mean by that?
25      A    I think that's what led to that
```

Page 125

```
1                J. Gurtov
2  previous document where it says Serenity to review
3  daily records book daily and have coaching
4  conversations daily, meaning that is something
5  that I wanted her then to do.
6       Q    And did you then think that was important
7  for her to do?
8       A    Yes.
9       Q    Why did you think that was important
10  for her to do?
11      A    I remember -- this brings back a lot
12  of that time frame.  I remember there were a lot
13  of challenges going on in the store, and it was
14  hard to decipher and hold accountable partners for
15  certain things, because every time you would talk
16  to a partner for an issue, it would come back to
17  another issue.
18           So, this was kind of all of the
19  challenges, and I had to think through what are
20  the steps that I need her to do to improve her
21  performance to help get the store back operating
22  at standard.
23      Q    Why was checking the DRB daily
24  something you wanted her to do?
25      A    Because the policies and procedures
```

Page 126

1              J. Gurtov
2   were not being adhered to.
3       Q     And you wanted to make sure they were
4   adhered to?
5       A     Yes.
6       Q     I would like to direct your attention
7   back to Gurtov 9.
8       A     Okay.
9       Q     Do you see there is a section, it
10  says, "Cleanliness, operations of store"?
11      A     Yes.
12      Q     And there is a bracket around that
13  section; right?
14      A     Yeah.
15      Q     Is that your handwriting?
16      A     From the bracket, I don't know.
17      Q     Do you think you wrote that bracket?
18      A     I may have.
19      Q     Do you know why that bracket is
20  there?
21      A     I don't remember why the bracket is
22  there.
23      Q     Okay.  We are done with that exhibit.
24            Now, Ms. Marshall was disciplined --
25  strike that.

Page 127

1              J. Gurtov
2            After November 25th, 2008, did you
3   ever have any other issues with Ms. Marshall as
4   regards her DRBs?
5       A     I don't remember.
6       Q     Did you ever give her any corrective
7   action with regard to her DRBs?
8       A     I don't remember.
9       Q     Did you ever coach her with regard to
10  her DRBs?
11            MS. DIAZ:  Objection.
12      A     I don't --
13            MR. GOTTLIEB:  What is the basis for
14      the objection?
15            MS. DIAZ:  It's vague and ambiguous.
16      What is the time frame?  We have just gone
17      over a coaching incident.
18      Q     After November 25th, 2008, did you
19  ever coach Ms. Marshall with regard to her DRBs?
20      A     I may have.  I don't remember.
21      Q     Can you remember any specific
22  incident?
23      A     In regards specifically to her
24  personal daily records books?  I don't remember
25  specifics.

Page 128

1              J. Gurtov
2       Q     What do you mean when you say
3   personal daily records book?
4       A     As opposed to general coaching to --
5   to the team.
6       Q     So you can't remember any time you
7   coached her with regard to her personal DRB?
8       A     I can't remember off the top of my
9   head.  I worked with her for, it must have been
10  just under three years, so there are oftentimes
11  that I had contact and coaching conversations with
12  her that were either documented or not documented,
13  and I don't remember all of the details of those
14  conversations.
15      Q     Is there any document that would
16  refresh your recollection as to whether you had
17  any coaching conversations with her regarding
18  DRBs?
19      A     I don't know.  I know that there were
20  other documents.  It may have been noted in
21  performance reviews, but again, I am not sure of
22  the specific dates or instances or things that
23  would have led to it.
24      Q     Or even if there were any; right?
25      A     I don't recall.  I don't recall at

Page 129

1              J. Gurtov
2   this time.  I don't.
3       Q     Do you remember if you ever had any
4   follow up with Ms. Marshall with regard to the
5   issues raised in the November 25th, 2008
6   conversation?
7       A     I don't remember the details of the
8   follow-up.
9       Q     But you did follow up?
10      A     Yeah.  I would assume that I did,
11  yeah.
12      Q     Do you know that you did?
13      A     About certain pieces, yeah.
14      Q     What pieces did you follow up on?
15      A     I apologize, but I just don't
16  remember the details from that time frame.
17      Q     You don't need to apologize.  I just
18  want to be sure you are testifying to the best of
19  your ability.
20      A     I am.  I just don't know the details
21  from that time frame.
22      Q     The time frame would be any point
23  after November 25th, 2008, did you follow up with
24  her regarding any of the issues raised during that
25  conversation?

Page 130

J. Gurtov

1  MS. DIAZ:  Objection.
2  A    It could have been.  I don't -- I
3  guess where my challenge is, is whether they were
4  directly related to that specific conversation.
5  My recollection of the time that I worked with
6  Serenity was that there were times when she
7  performed extremely well, and there were times
8  where her performance took a dip and became very
9  challenged.
10          And during those ups and downs, there
11  were coaching conversations.  There were other
12  instances that had led to corrective action
13  documents.  But I don't remember the specifics,
14  because it was just this continuous up and down
15  cycle.
16  Q    Do you remember if you ever followed
17  up with Serenity Marshall as to the DRB issues
18  raised in the November 25th, 2008 conversation?
19          MS. DIAZ:  Objection.
20          MR. GOTTLIEB:  What is the basis for
21  the objection?
22          MS. DIAZ:  Asked and answered.
23  A    I don't remember specifics.
24  Q    Do you think you did?
25

Page 131

J. Gurtov

1  MS. DIAZ:  Objection.
2  A    I don't remember specifics of the
3  time frame.  I don't -- I know there was
4  additional follow-up around the circumstance with
5  Leedel, but I don't -- I can't recall even the
6  time frame of his separation, and how it relates
7  to that conversation on November 25th.
8  Q    Do you remember if, during follow-up
9  visits to Ms. Marshall's stores, whether at
10  Store 847 or 11649, you ever reviewed her DRBs to
11  follow up on the November 25th, 2008 recap?
12          MS. DIAZ:  Objection.
13  A    I don't remember specifically.
14  Q    You don't remember whether you did or
15  didn't?
16  A    I don't remember the specifics of it.
17  Q    What I am asking is, do you remember
18  whether you reviewed the DRBs at all in follow-up
19  to the November 25th, 2008 conversation?
20  A    I don't remember.  In direct
21  connection to that, I don't remember.
22  Q    Do you remember if you ever reviewed
23  Ms. Marshall's DRBs at any point after
24  November 25th, 2008?
25

Page 132

J. Gurtov

1  A    I don't remember specific instances.
2  I know that I had, again, on the -- obviously
3  leading into that, the situation at the end of
4  2010.
5  Q    I know you reviewed her daily records
6  books in December 2010; right?
7  A    Yes.
8  Q    Between November 25th, 2008, and
9  December 2010, did you ever review Ms. Marshall's
10  daily records books?
11  A    I don't remember specifics from the
12  time period.  I would assume, but I don't
13  remember.
14  Q    You would assume you did, but you
15  don't remember whether you did or didn't?
16  A    Yep.
17  Q    Between November 25th, 2008, and
18  December 2010, do you remember if you had any
19  discussions with Ms. Marshall as to whether she
20  had been improving on her DRB practices?
21          MS. DIAZ:  Objection.
22  A    I don't remember specific
23  conversations.
24  Q    So you may have, you just don't
25

Page 133

J. Gurtov

1  remember, you also may not have?
2  Q    You have to say "yes."
3  A    I'm sorry.  Yes, I don't remember.
4          MS. DIAZ:  Can you note my objection
5  to the, "so you may have, you may also not
6  have."  Thanks.
7  Q    Do you remember how many times you
8  visited Ms. Marshall's store in 2008?
9  A    No.
10  Q    Can you estimate?
11  A    No.
12  Q    Do you remember how many store plan
13  of action visits you conducted of her store in
14  2008?
15  A    No.
16  Q    Can you estimate?
17  A    In 2008, to be clear, we didn't use
18  store plan of action visits.  They weren't called
19  that.  It was known as something different.
20          And I -- I don't remember the number
21  of -- I was in position in May through December.
22  It's about six months.  I had six stores.  I
23  don't -- I can't estimate a number, from back at
24  that time.
25

34 (Pages 130 to 133)

Page 134

J. Gurtov

1  Q    When did "store plan of action
2  visits" become a term at Starbucks?
3  A    I don't remember the exact date.  At
4  one time they were called manager business
5  development days.  Then they turned into ops
6  excellence days.  And then they turned into, I
7  think, store plan of action visits.  I don't
8  remember the exact time frame.
9  Q    In a general sense, all of those
10 visits were an opportunity to review and go over
11 the store with the store manager?
12 A    Yep.
13 Q    Do you remember how many of those
14 types of visits you conducted of Ms. Marshall's
15 stores in 2009?
16 A    I -- I don't remember specific
17 numbers.  I don't.
18 Q    Can you estimate?
19 A    I would estimate around four.
20 Q    And what is the number you estimate
21 of those types of visits in 2010?
22 A    I would estimate four as well,
23 because it was typically one per quarter.
24 Q    Okay.  How many follow-up visits

*(line numbers 1–25)*

Page 135

J. Gurtov

1  would you estimate you had in 2009?
2  A    Again, it's hard to estimate, but
3  I -- I would say at least four.
4  Q    Four throughout the year?
5  A    Yes.
6  Q    And what about in 2010?
7  A    Similar.
8  Q    Okay.  Other than store plan of
9  action visits, or the equivalent, and follow-up
10 visits, were there any other visits you conducted
11 of Ms. Marshall's stores in 2009 or 2010?
12 A    I'm sure there were.  I just don't
13 remember the specific circumstances around them.
14 Q    Okay.  Well, you estimated
15 approximately eight visits per year between the
16 store plan of action visits and the follow-ups;
17 right?
18 A    Yes.
19 Q    How many other types of visits would
20 you say you conducted of Ms. Marshall's stores --
21 of Ms. Marshall's stores in 2009?
22 A    I can't -- I can't be sure.
23 Q    Estimate?
24 A    That is tough to estimate.

*(line numbers 1–25)*

Page 136

J. Gurtov

1  Q    To the best of your ability.
2  A    I don't even know how to go about
3  making that estimation.
4  Q    Well, would you visit her store in a
5  different -- in another type of visit more than
6  once a month?
7  A    I could have; I could not have.  It
8  depends on the situation at that time.  The
9  district changed several times.  The number of
10 stores I had changed several times.  So it's hard
11 to make that estimate.
12 Q    Would you say on average per year,
13 for 2009 and 2008 -- strike that.
14 Would you say during the 2009 year,
15 you visited, in total, Ms. Marshall's store at
16 least 15 times?
17 MS. DIAZ:  Objection.
18 A    I would say it's definitely safe to
19 estimate that I visited at least the eight times.
20 It's really hard to give that estimation.  15
21 times sound reasonable.
22 Q    Well, would it be safe to say you
23 reviewed her -- strike that.
24 Would it be safe to say you visited

*(line numbers 1–25)*

Page 137

J. Gurtov

1  her store at least nine times?
2  A    Yeah.
3  Q    Okay.  Would it be safe to say you
4  visited her store at least 12 times?
5  A    Yes.  I have also agreed that it's
6  probably safe to say that I did visit the 15 times
7  that you mentioned.
8  Q    Would it be safe to say that you have
9  visited her store 20 times in 2009?
10 A    That I couldn't be sure of.
11 Q    What about 2010?
12 A    I would say it's similar to what we
13 just discussed for 2009.
14 Q    So, in 2010, it would be safe to say
15 you visited her store 15 times?
16 A    Yeah.  It's a possibility.  Whether I
17 visited her store or we had a personal connection
18 outside of the stores.
19 Q    Well, I am asking you about store
20 visits.  I want to make sure we have it clear.
21 A    I would say 15 is probably a safe
22 number.
23 MR. GOTTLIEB:  It's just about
24 1 o'clock.  It's a logical time for me to

*(line numbers 1–25)*

Page 138

J. Gurtov

1  break, if that's okay with you guys.
2  (Recess taken.)
3  MR. GOTTLIEB:  Back on.
4  Q    Ms. Gurtov, other than what you have
5  already mentioned, did Ms. Marshall have any other
6  performance deficiencies while you were
7  supervising her during 2008?
8  A    During 2008 specifically, I believe
9  it's documented on that sheet, since that was from
10 the end of the year.
11 Q    Anything else other than what we
12 already discussed?
13 A    Not that I could think of from that
14 period.
15 Q    What would you say -- during 2008,
16 while you were supervising Ms. Marshall, what
17 would you say were her strengths?
18 A    It's interesting, because at times
19 the same thing that she had challenges with could
20 turn into strengths.  So, where she showed
21 opportunities that led to that document, I think
22 it was post 2008, that thing that started to then turn
23 around.
24
25 I know at times she showed strengths

Page 139

J. Gurtov

1  and she had put together a community project down
2  in her neighborhood during a portion of it, and it
3  was something that she got the rest of the team
4  involved in, so it showed even a strength with her
5  building relationships with her peers.
6  Q    That was in 2008?
7  A    I don't remember the time frame.
8  Q    Okay.
9  A    It could be 2008, it could be 2009.
10 There were also times --
11 Q    Try to keep to 2008, to the best of
12 your recollection.
13 A    That's a challenge.  I think the -- I
14 think more of the strengths play on the middle to
15 latter end of 2009.
16 (Gurtov Exhibit 11 marked for
17 identification as of this date.)
18 Q    I have just handed you what's been
19 marked Exhibit Gurtov 11, Bates stamped 183.  Do
20 you recognize that document?
21 A    It seems to be a performance review
22 for Serenity by her prior district manager,
23 Michael Nicadimas.
24 Q    Have you seen that document before?
25

Page 140

J. Gurtov

1
2  A    Yes.
3  Q    When was the last time you saw it?
4  A    I don't remember.  Some time ago.
5  Q    More than a month ago?
6  A    I believe so.
7  Q    More than six months ago?
8  A    I believe so.  I think it was
9  sometime like -- quite some time ago in the past.
10 Q    And this is a performance review
11 dated 9/18/08; right?
12 A    Yes.
13 Q    Do you remember if you were part of
14 this performance review?
15 A    No, I don't believe I was.
16 Q    I would like to direct your attention
17 to the significant accomplishments section.
18 A    Um-hum.
19 Q    Do you see where I am referring?
20 A    Yes.
21 Q    And the last sentence of that:
22 "Scored a 97 percent on the daily records books
23 section of the P&AP audit."
24 A    Yes.
25 Q    Do you understand what that means?

Page 141

J. Gurtov

1
2  A    Yes.  Partner and asset protection is
3  one of our support teams, and they occasionally
4  will do audits on stores, on their daily records
5  book.
6  Q    Okay.  And are there any documents
7  generated from those audits?
8  A    Yes.
9  MR. GOTTLIEB:  I would call for
10 production of any P&AP audit on any of
11 Ms. Marshall's DRBs throughout the time she
12 was supervised by Ms. Gurtov, as well as
13 P&AP audits of DRBs of the stores supervised
14 by Ms. Gurtov in 2010 and 2011.
15 MS. DIAZ:  I will take it under
16 advisement.
17 Q    Is 97 percent a good score?
18 A    I believe so.
19 Q    What documents are generated from a
20 P&AP audit?
21 A    I have not been part of one in some
22 time, but it's -- there is a questionnaire
23 document of things that they look for with cash
24 handling practices in the store, and I don't know
25 the details of the specifics on it, but it then

Page 142

J. Gurtov

1  would generate a document of kind of like a yes or
2  no and how many points they score in each section
3  of the audit.
4      Q    Do you know if any P&AP audit has
5  been conducted on any of your stores between -- in
6  2010?
7      A    I don't know the specific year.  They
8  don't -- there is not an audit done on a yearly
9  time frame.
10     Q    Who conducts P&AP audits?
11     A    The -- I can't think of the title.
12 One of the positions in the P&AP support line.
13 I -- I can't remember the exact title.
14     Q    Would the district manager be a part
15 of the audit?
16     A    The district manager can be a part of
17 the audit, but it's not mandatory.
18     Q    How many P&AP audits have been
19 conducted on your stores since you have been a
20 district manager?
21     A    I don't know the number.  Not many.
22     Q    Can you estimate?
23     A    Again, I don't know the exact number.
24 I would say it's under ten.

Page 143

J. Gurtov

1      Q    Would you say it's more than two?
2      A    I believe it might be more than two,
3  yeah.
4      Q    Did you have any performance issues
5  with Ms. Marshall in 2009?
6      A    I don't remember specifics off the
7  top of my head.
8      Q    Did there come a point when
9  Ms. Marshall was transferred to a different store
10 from 847?
11     A    Yes.
12     Q    Do you remember when that happened?
13     A    It was in the latter half of the
14 calendar year 2009.  I think it may have crossed
15 into the fiscal 2010 year.
16     Q    What store was she transferred to?
17     A    Hudson and King, 11469.
18     Q    Why was she transferred?
19     A    Because of her performance right
20 prior to that.
21     Q    What was it about her performance?
22     A    She had made significant
23 improvements.  If I can share a little bit.  To go
24 back even to your first question, in the earlier

Page 144

J. Gurtov

1  portion of 2009, she was trending in a negative
2  direction, and she was having personal challenges
3  at home.  And through conversations that I had had
4  with her, I believed those personal challenges had
5  an impact on her performance, and I had, through
6  speaking with her, talked to her about taking a
7  leave of absence so that she could handle her
8  personal challenges and be able to come back and
9  perform on a better level.
10         That's when, upon returning from her
11 personal leave of absence, that she began to make
12 changes.  It was probably over a
13 three-and-a-half-month time frame.  That was when
14 I made the decision to transfer her to 11649.
15     Q    You said in early 2009, she was
16 trending downwards due to, you believe, personal
17 problems?
18     A    It was in a time frame, so when you
19 look at November of 2008, and I believe it was
20 within three to four months after that that she
21 took the personal leave, because she had not made
22 a full recovery in the deficient performance that
23 she had, and she was having personal issues that
24 she had shared with me.

Page 145

J. Gurtov

1      Q    In what respects had she not made
2  recovery in her deficient performance?
3      A    I don't remember the details.  Enough
4  so that it led to us talking about her being able
5  to take a personal leave of absence to take care
6  of those challenges.
7      Q    Okay.  So, just to reiterate, she was
8  trending downward in 2009 in terms of her
9  performance?
10     A    Yes.
11     Q    Do you remember what aspects of her
12 performance were trending downward?
13     A    It was coming right off of that
14 document that we had looked at earlier, so it was
15 in those similar areas.
16     Q    Do you remember any specific issue
17 that she was trailing downward with in 2009, as
18 you sit here today?
19     A    I don't remember the specifics that
20 led to the leave, but I do remember the general
21 challenges that she was having that even stemmed
22 from the document we spoke about earlier, so, in
23 holding her team accountable to standards and
24 policies and procedures, cleanliness challenges in

J. Gurtov

1
2  the store.
3       I am not sure if she had continued
4  challenges with the daily records book.  There
5  were challenges in general that she couldn't --
6  she wasn't performing to meet the expectations of
7  the job.
8       Q    Did you document that in any way?
9       A    No.  It was in conversation.
10      Q    Why not?
11      A    Because she was having some extreme
12 personal challenges that I wanted to give her the
13 opportunity to take care of.
14      Q    What were the personal problems she
15 was having?
16      A    Her mother -- there were challenges
17 with her mother and her sister, and her mother had
18 originally, I think, had custody, may have lost
19 custody of her sister, and she would -- she got
20 into some kind of challenge, and again, I don't
21 know the details of it, but with her mother and
22 custody of her sister.
23      And I think at one point she was
24 trying to work out arrangements to have custody of
25 her sister, and it was affecting her performance

J. Gurtov

1
2  in the workplace.
3       Q    Do you remember when she took a leave
4  of absence?
5       A    I don't -- I don't remember the
6  specific dates.  It was, I believe, post -- either
7  during the end of the second quarter, or in the
8  third quarter, around, March, April.  Around that
9  time frame, I believe.
10      Q    Whose initial idea was it for her to
11 take a leave of absence?
12      A    Mine.
13      Q    How did you address that with her?
14      A    I addressed it with her in a
15 conversation, letting her know that per her
16 performance was declining, that there was a
17 possibility that would move forward to a partner
18 improvement plan, and she was at a point where she
19 needed to make decisions of what she needed to do,
20 and the situation with her sister was requiring an
21 extensive amount of time outside the store, or she
22 would have to leave the store during certain
23 shifts and she couldn't complete the
24 responsibilities that were under her job
25 description.

J. Gurtov

1
2       So, I suggested that she do that so
3  that she can provide the time that she needed to
4  get that situation under control.
5       Q    Did you ever document in any way that
6  you were considered putting Ms. Marshall on a
7  performance improvement plan?
8       A    No.
9       Q    Did you ever e-mail about it?
10      A    No.
11      Q    Ever e-mail anyone at partner
12 resources about it?
13      A    Not that I can recall.
14      Q    Did you ever e-mail Serenity Marshall
15 about it?
16      A    Not that I recall.
17      Q    Did you ever write down a note that
18 you were thinking about putting Serenity Marshall
19 on a performance plan?
20      A    Not that I recall.  I remember having
21 an intimate conversation with her at that time,
22 because she was having a lot of personal
23 struggles, so it wasn't really about documenting
24 performance.  I was more focused on her personal
25 aspect and trying to help her get through that.

J. Gurtov

1
2       Q    Did you ever tell anybody that you
3  were considering putting her on a performance
4  plan?
5       A    I may have.
6       Q    Who?
7       A    It may have been my -- my boss at
8  that time.
9       Q    Who was that?
10      A    I believe during that time, it was
11 Nicole Mozeliak.
12      Q    Is she still working at Starbucks?
13      A    She is not.
14      Q    Where does she work?
15      A    I'm not 100 percent sure.
16      Q    Do you know the circumstances under
17 which she left Starbucks?
18      A    No.  I -- she was a long-time partner
19 and it was a personal decision to leave.  I don't
20 remember -- I don't know the details around that.
21      Q    When Ms. Marshall returned from her
22 leave of absence in 2009, did her performance
23 improve?
24      A    It did.
25      Q    Did her performance improve

J. Gurtov

1   significantly?
2       A    Yep.
3       Q    In what respects?
4       A    Again, I don't remember the details,
5   but from the challenges that she was having, she
6   did make significant improvement, that she was my
7   top choice when I had this opening at the other
8   store, to put her in there.
9       Q    Okay.  When you said she made
10  significant improvements, in what areas did she
11  make significant improvements?
12      A    I believe she had turned things
13  around.  Cleanliness was always a challenge, and I
14  believe during that period, she had made
15  improvements in that area, and I think -- I don't
16  remember the specifics of it.  I really remember
17  the general idea around it.
18      I think that also made -- I think
19  she had developed a partner to another level,
20  like, I feel like she had a significant
21  accomplishment during that period.
22      Q    Anything else?
23      A    I don't remember the details of it.
24      Q    How did you come to learn that she

J. Gurtov

1   had been making significant improvements?
2       A    Through visits in the store, and
3   through conversations with her.
4       Q    Anything else?
5       A    I think it was mostly from the time I
6   spent with her in the store.  You know, I think --
7   I remember she had done something positive from a
8   development standpoint.  I had asked her to help
9   even another store manager, who was struggling
10  with assessing talent.  I had paired her up with
11  her, and she had helped him do something, and it
12  was a couple of moments like that.
13      Q    Between the time that she returned
14  from leave, in 2009, and when she was transferred
15  to 11649, did you ever review any of her daily
16  records books?
17      A    I don't know that I did.  I don't
18  remember.
19      Q    You said that when you had an opening
20  at 11649, she was your top choice?
21      A    Yes.
22      Q    Why do you say that?
23      A    Because of the improvements that she
24  had made during that time period.


J. Gurtov

1   significantly?
2       A    Yep.
3       Q    In what respects?
4       A    Again, I don't remember the details,
5   but from the challenges that she was having, she
6   did make significant improvement, that she was my
7   top choice when I had this opening at the other
8   store, to put her in there.
9       Q    Okay.  When you said she made
10  significant improvements, in what areas did she
11  make significant improvements?
12      A    I believe she had turned things
13  around.  Cleanliness was always a challenge, and I
14  believe during that period, she had made
15  improvements in that area, and I think -- I don't
16  remember the specifics of it.  I really remember
17  the general idea around it.
18      I think that also made -- I think
19  she had developed a partner to another level,
20  like, I feel like she had a significant
21  accomplishment during that period.
22      Q    Anything else?
23      A    I don't remember the details of it.
24      Q    How did you come to learn that she

J. Gurtov

1   had been making significant improvements?
2       A    Through visits in the store, and
3   through conversations with her.
4       Q    Anything else?
5       A    I think it was mostly from the time I
6   spent with her in the store.  You know, I think --
7   I remember she had done something positive from a
8   development standpoint.  I had asked her to help
9   even another store manager, who was struggling
10  with assessing talent.  I had paired her up with
11  her, and she had helped him do something, and it
12  was a couple of moments like that.
13      Q    Between the time that she returned
14  from leave, in 2009, and when she was transferred
15  to 11649, did you ever review any of her daily
16  records books?
17      A    I don't know that I did.  I don't
18  remember.
19      Q    You said that when you had an opening
20  at 11649, she was your top choice?
21      A    Yes.
22      Q    Why do you say that?
23      A    Because of the improvements that she
24  had made during that time period.

J. Gurtov

1       Q    When you say she was your top choice,
2   do you mean she was the top choice of all the
3   other store managers in your district?
4       A    To make that move, yes.  And it was
5   also something she had wanted.  There was a piece,
6   not only was she a top choice from that
7   perspective, but the store I was moving her to was
8   a Monday through Friday store, and the hours were
9   condensed, so it also helped her from a personal
10  perspective, be able to take care of the other
11  things that were going on.  It gave her weekends
12  off.  It insured that she was definitely out by a
13  certain time in the evening.  So, it helped her
14  quality of life as well.
15      Q    Did you consider the transfer from
16  847 to 11649 to be a promotion?
17      A    No.
18      Q    Did you consider it to be a vote of
19  confidence?
20      A    A vote of confidence in her
21  performance?
22      Q    Yes.
23      A    Yes, in that realm, I would.
24      Q    Why was it a vote of confidence?

J. Gurtov

1       A    Because I wouldn't move somebody who
2   was continuing to show opportunities in their
3   current role.
4       Q    Is 11649 a busier store than 847?
5       A    It doesn't look like it from a total
6   sales volume, but because of the condensed hours
7   that it operates in, it has busier portions of the
8   day.
9       Q    Would you say overall, 11649 is more
10  difficult to -- to run and manage than 847?
11      A    I think there are different
12  challenges.  847 has, some might argue, more
13  challenges because of the neighborhood that it's
14  in.  It has a very transient customer base that is
15  very challenging just from people in the
16  neighborhood.
17      The store at 11649 did not have that
18  transient base.  It was more vertical density
19  business, occupants from the building above that
20  were the customer base, so it was an easier
21  customer, but more of them.
22      Q    How did Ms. Marshall handle the
23  transfer to Store 11649?
24      A    She was very pleased with the

J. Gurtov

1  transfer. She was excited about it. I was
2  excited she it. Her beginning performance was
3  positive.
4      Q    Would you say her performance at
5  11649 was positive throughout the remainder of the
6  2009 calendar year?
7      A    About three months, yes. It was her
8  initial time period taking over the store, to my
9  recollection, yes.
10          (Gurtov Exhibit 12 marked for
11  identification as of this date.)
12      Q    You have just been handed what's been
13  marked Gurtov 12, Bates numbers 206 through 208.
14          Do you recognize this document?
15      A    I do.
16      Q    Can you please turn to the second
17  page. Is that your signature in the middle?
18      A    Yes, it is.
19      Q    This is a performance review of
20  Serenity Marshall for the 2009 year, fiscal year?
21      A    Yep.
22      Q    And you completed this review?
23      A    I did.
24      Q    Does this document identify any

J. Gurtov

1  problems with Ms. Marshall's cash management or
2  cash handling responsibilities?
3      A    I will take a moment to review it.
4          From the end of the year, no, but in
5  the Q2-Q3 check, it did note excessive cash
6  shortage for the month of March, being $286.
7      Q    Anything else?
8      A    That was all I saw in my initial read
9  through.
10      Q    I have no further questions on that
11  document.
12          How would you describe Ms. Marshall's
13  performance in the 2010 calendar year through
14  October 2010?
15      A    Inconsistent. And I don't remember
16  details or time frames, but I do know that at some
17  point during the time of the 2010 calendar year,
18  we had conversations again regarding cleanliness,
19  so there were some old challenges that she had
20  demonstrated prior that started to return again.
21      Q    Anything else?
22      A    I don't remember the details.
23  Nothing specifically jumps in front of my mind.
24      Q    Do you remember any strengths of hers

J. Gurtov

1  in 2010 through October?
2      A    Again, nothing specific. My time
3  that I have worked with Serenity was an up and
4  down rollercoaster. So there were months where
5  she exhibited positive performance, and then it
6  would decrease. We would coach, it would move
7  back up, and then it would fall back down.
8          So, I don't remember the full details
9  and time frame.
10      Q    On the whole, would you say
11  Ms. Marshall during 2010 through October was a
12  good store manager?
13      A    She struggled often. And I think it
14  was even -- when I think of even her performance
15  review, so, in 2010, in the September time frame
16  of 2010, I wrote a performance review for -- to
17  recap her fiscal 2010 year, and I remember even in
18  that one noting inconsistencies and sharing that
19  with her when I had that conversation with her,
20  for her performance review.
21      Q    So, when you say she had some
22  inconsistencies, what were these inconsistencies
23  she had in 2010?
24      A    I don't remember the details. It was

J. Gurtov

1  in behaviors. So, we critique our partners
2  against certain competencies of the way they lead
3  their team, the way they achieve results, the way
4  they develop others. We talk about puts customer
5  first, her way of leading a team to drive customer
6  results.
7          And in all of the results in the
8  different areas or her behaviors under those
9  competencies, they were just inconsistent. So,
10  there were moments where she would be meeting the
11  expectation, there were moments where she would
12  demonstrate behaviors in those competencies that
13  needed to be improved.
14      Q    Did you ever regret transferring
15  Ms. Marshall to Store 11649?
16      A    Not regret. Every manager that I
17  work with has strengths and opportunities. That's
18  why I have a job. So, I worked with her to
19  strengthen her areas of opportunity.
20      Q    How many stores did you manage in
21  2010?
22      A    I think the majority of the time it
23  was ten. I got the additional two in the latter
24  half of the calendar year. I think in October of

1           J. Gurtov
2   2010 is when I got two more.
3       Q     Would you say Serenity Marshall was
4   one of the better store managers that you had?
5       A     She was inconsistent.  To me, that is
6   not one of the better.  She had one of -- the
7   potential to be one of the better, because in her
8   times of strength, she could be really strong.
9   She just made bad decisions.
10      Q     On the whole, would you say she was
11  one of the better or one of the worse?
12      A     Middle of the road.
13          (Gurtov Exhibit 13 marked for
14      identification as of this date.)
15      Q     I just handed you a document that's
16  been marked Gurtov 13, Bates stamped 209 through
17  211.
18          Do you recognize this document?
19      A     Yeah.  It's her performance review
20  from 2010.
21      Q     Okay.  I would like to direct your
22  attention to the first box, and it's hard to read,
23  it says:  "Q1, what's important and where to
24  focus."
25      A     Yep.

1           J. Gurtov
2       Q     Do you see on the bottom, it says,
3   "Deliver a sustainable economic model"?
4       A     Yes.
5       Q     Goal nine, "Sales, 100 percent of
6   target."  What does that mean?
7       A     To achieve target.
8       Q     Okay.  And goal 12 is,
9   "Profitability, CC, 100 percent of target."
10      A     To achieve what your target is for
11  your controllable line.
12      Q     Okay.  Are those important goals?
13      A     As the others, they are all important
14  goals, yeah.
15      Q     Are those important goals with regard
16  to cash management?
17      A     Cash management has an effect, or I
18  should say can have an effect on controllables,
19  but that is not, I wouldn't say -- that is not the
20  top driver of your controllable line.
21      Q     I would like to direct your attention
22  to the second box, Q2/Q3.
23      A     Yes.
24      Q     And on the bottom, it says, "Goal
25  nine, sales, 100 percent of target.  Up $110,452

1           J. Gurtov
2   to target, 13.5 percent comp growth."
3           What does that mean?
4       A     That means that the store was -- had
5   grown 13.5 percent over the prior year.
6       Q     Is that a large percentage?
7       A     Yes.
8       Q     Goal 12 says, "Profitability, CC,
9   100 percent of target, up $90,671, up 6.7 to
10  target."
11          What does that mean?
12      A     That is also positive.  That means
13  she is coming in over target by 6.7 percent.
14      Q     Is that -- is 6.7 percent a large
15  number to be up on the target?
16      A     It's a positive trend, absolutely.
17      Q     Would you say that is a large
18  percentage to be up to target?
19      A     No.
20          MS. DIAZ:  Objection.
21      A     Sorry.  What's not written on here is
22  the actual CC percent.  And targets shift
23  throughout time.  But 6.7 percent to target is
24  definitely in the positive direction.
25      Q     What does CC stand for?

1           J. Gurtov
2       A     Controllable contribution.
3       Q     I would like to turn your attention
4   to the next page.
5       A     Um-hum.
6       Q     And in that box, it says, "Sales, '09
7   sales, 100 percent of target.  Up $245,447,
8   target, 20.5 percent comp growth."
9           Do you see that?
10      A     I do.
11      Q     What does that mean?
12      A     That means that she grew her business
13  20.5 percent over the prior year.
14      Q     Is that a large increase?
15      A     That is a large increase.
16      Q     Is that a very large increase?
17      A     That is a large increase.
18      Q     Is it a very --
19      A     It's a double-digit large increase.
20      Q     Is that very large in your experience
21  as a district manager?
22      A     It depends on the -- what I will
23  share is, we were on the uptick from 2008 being a
24  very challenging year, so we -- it is definitely a
25  large increase, but many stores were in a large

Page 162

J. Gurtov

1  increase, because we were comping over a year that
2  was struggling tremendously from an economic
3  standpoint.
4      Q    Goal 12 says, "Profitability, CC,
5  100 percent of target, up $182,473, up 5.8 percent
6  to target."
7      A    I do see that.
8      Q    Does that mean she was up 5.8 percent
9  to her target profitability?
10     A    It does.
11     Q    Do you see on the bottom, it says,
12 "Overall rating meets expectations"?
13     A    I do.
14     Q    Do you view that as a positive
15 review?
16     A    If you look deeper into the
17 competency base in the box underneath, where it
18 says, "Goal 12, profitability, summary of top
19 achievements, strengths and areas for
20 development," there are five competencies, two of
21 which she is rated ineffective.
22         So, meets expectations means that she
23 is meeting the expectations, but it's on a
24 variable scale, so she was on the lower end of

Page 163

J. Gurtov

1  meeting expectations.
2      Q    Where does it say that --
3      A    "Leads courageously" --
4      Q    Where does it say she is on the lower
5  end of the meets expectation scale?
6      A    That happens in conversation.
7      Q    That is not referenced anywhere in
8  this document?
9      A    No, except for the places where it
10 says, "Leads courageously and achieves results,"
11 that she is ineffective.
12     Q    Is there any reference to her DRB
13 practices in this performance review?
14     A    I'm going to have to look at that in
15 deeper detail.
16         It does say in the last line of that
17 section that areas of continued focus, and again,
18 this is under achieves results, where she was
19 marked ineffective, that she does need to continue
20 focusing on her cash over/shorts.
21     Q    Anything else?
22     A    That's all that I see in reference to
23 say.
24     Q    Handing you what has been marked as

Page 164

J. Gurtov

1  Gurtov 14.
2         (Gurtov Exhibit 14 marked for
3      identification as of this date.)
4      Q    This is Bates stamped 200 through
5  203.
6      A    Um-hum.
7      Q    Now, each of these documents
8  indicates towards the bottom, "Bonus type, MCM
9  bonus."
10        Do you see where I am referring?
11     A    Yes.
12     Q    And next to it, there is a bonus
13 amount.
14     A    Yes.
15     Q    What is an MCM bonus?
16     A    It's for -- we have certain store
17 managers that have gone through a course to become
18 a manager coach mentor.  Once they go through that
19 course, they are deemed ready to bring, what we
20 call RMTs, through the process of being trained.
21        So, it's an external hire who is
22 hired on the management level to bring them
23 through the training to become a store manager, be
24 able to take over a store.

Page 165

J. Gurtov

1      Q    Okay.  Why is there a bonus tied to
2  the first page?
3      A    Because there is -- because it's an
4  extra responsibility for the store manager during
5  that time frame, they get a bonus of $50 per week
6  to train the store manager.
7      Q    So, Ms. Marshall had completed the
8  MCM training course?
9      A    Yes.  She had completed it prior to
10 me working with her.
11     Q    Is it considered a positive for a
12 store manager to have completed the MCM training
13 course?
14     A    Yes.
15     Q    Is it expected of all store managers?
16     A    No.
17     Q    Did there come a time in 2010 when
18 you learned that Serenity Marshall had been
19 diagnosed with a medical condition?
20     A    Yeah.
21     Q    When did you first learn that?
22     A    I remember it being around the time
23 frame of that first fiscal quarter, so around
24 October, but I don't remember the exact time.

Page 166

```
1                 J. Gurtov
2       Q    Why do you believe it was around
3  October?
4       A    When I piece the events together from
5  that time period, it was around then.  She
6  wasn't -- she wasn't feeling well.  I -- at that
7  point, I didn't know that she had been diagnosed
8  with something.  I just knew that she wasn't
9  feeling well.
10      Q    How did you learn that?
11      A    From her sharing it with me.
12      Q    What did she say?
13      A    She said she wasn't feeling well, she
14 was having challenges with her stomach, she was
15 making amount appointments to go to the doctor,
16 and that she would keep me posted on what was
17 happening.
18      Q    Do you remember the context in which
19 she first told you this?
20      A    I don't.
21      Q    Do you remember if it was over the
22 phone?
23      A    I don't remember.  My -- I don't
24 recall.
25      Q    Do you remember if it was in person?
```

Page 167

```
1                 J. Gurtov
2       A    It believe it was in person.
3       Q    Why do you believe that it was in
4  person?
5       A    It's just what my memory is bringing
6  to me.  I don't remember the details of it.
7       Q    Do you remember where it was?
8       A    I don't.  I do remember having a
9  conversation with her at some point, I don't know
10 if it was that first conversation, but I remember
11 having it in her store.
12      Q    Other than saying that she was not
13 feeling well and that she was going to be seeing
14 some doctors, did she say anything else?
15      A    Not in the initial conversation.
16      Q    And how did you respond?
17      A    I said, "Let me know what you need
18 and we will take it from there."
19      Q    Did you say anything else?
20      A    Not that I recall.
21      Q    Did she tell you anything about the
22 medical condition she had other than what you have
23 already described?
24      A    At a later date, but not in the first
25 conversation when she first brought it to my
```

Page 168

```
1                 J. Gurtov
2  attention.
3       Q    Was anyone else party to that
4  discussion?
5       A    Not that I recall.
6       Q    Were you concerned during that
7  initial conversation that this medical condition
8  would have an effect on her work?
9       A    No.
10      Q    Why not?
11      A    Because she wasn't concerned that it
12 would have an effect on her work.
13      Q    Did you ask if she was going to have
14 to miss any work?
15      A    In that initial conversation, no.
16 She had said that she was going to need to make
17 some doctor's appointments.  I said, "Okay, we
18 will take care of things when you make the
19 doctor's appointments."
20      Q    Did that bother you?
21      A    No.
22      Q    When was the next time -- strike
23 that.
24           After Ms. Marshall had this
25 conversation with you initially, did you discuss
```

Page 169

```
1                 J. Gurtov
2  her medical condition with anyone else?
3       A    After that initial conversation, no.
4       Q    When was the next time you had a
5  conversation with anybody regarding Ms. Marshall's
6  medical condition?
7       A    That was with her after -- after she
8  had gone to a doctor and found out what she had
9  and found out that she had fibroids.  That's when
10 she had shared with me the diagnosis of it.  And
11 at that point, we knew it was on a more serious
12 extent, but she still wasn't sure of what the next
13 steps were within the process.  She just knew that
14 she had to go to the doctor's again and have
15 subsequent visits.
16      Q    When did that communication occur?
17      A    I don't know specifically.  It all
18 happened within time frames after -- it all began
19 in October, and it started to happen throughout
20 the upcoming months.
21      Q    Well, how long after your initial
22 conversation did you have that second
23 conversation?
24      A    Probably a couple weeks.
25      Q    Just wait for me to finish the
```

43 (Pages 166 to 169)

Page 170

1              J. Gurtov
2   question just so the court reporter can take it
3   down.
4        A    Yeah.
5        Q    How long after the first conversation
6   that we just discussed did you have the second
7   conversation with Ms. Marshall regarding her
8   medical conditions?
9        A    It may have been a couple of weeks
10  after she had gone to the doctor and found out her
11  diagnosis.
12       Q    Do you remember if that discussion
13  took place in person, over the phone or something
14  else?
15       A    I don't remember.  I believe it was
16  in person.
17       Q    Do you remember what she said?
18       A    That -- I don't remember the
19  specifics.  I just remember that she had shared
20  that it was diagnosed as fibroids.
21       Q    Do you remember anything else she
22  said?
23            MS. DIAZ:  Other than what she has
24       already testified to?
25            MR. GOTTLIEB:  Yes.

Page 171

1              J. Gurtov
2        A    I am not -- not that I recall, can
3   recall at this time.  There were a couple of
4   conversations that I have a tough time -- I don't
5   know the difference between what was said at which
6   one.
7        Q    Okay.  Well, you said you can't
8   recall at this time.  Is there anything that would
9   refresh your recollection?
10       A    I'm just saying I don't remember if
11  it was in that next conversation or the following
12  conversation as to how things kind of unfolded.
13       Q    Well, in the second conversation --
14       A    Yeah.
15       Q    -- after she told you that she had
16  been diagnosed with fibroids, did you say
17  anything?
18       A    I don't remember details.  Along the
19  lines of, "Let me know what you need as you
20  continue to find out what's going on," but it was
21  basically that, to that extent.
22       Q    Anything else that you can remember?
23       A    Not that I can recall.
24       Q    Was anyone else a party to that
25  second discussion?

Page 172

1              J. Gurtov
2        A    No, not that I can recall.  It was
3   just the two of us.
4        Q    And did you say that was in person or
5   over the phone or you don't remember?
6        A    I don't remember.  I believe it
7   was -- I believe I remember the majority of these
8   conversations happening in person.
9        Q    Do you remember how long that
10  conversation took place?
11       A    No.
12       Q    Do you remember how long the initial
13  conversation lasted?
14       A    No.
15       Q    Can you estimate?
16       A    The initial conversation, she just
17  wasn't feeling well.  I mean it maybe was a
18  ten-minute conversation.  She was kind of
19  describing to me some of the symptoms she was
20  having, and that she wanted to go to the doctor,
21  so it was maybe ten minutes.
22            The next one, she had gone to the
23  doctor and it was fibroids and knew she then had
24  subsequent visits she needed to make.  Again, it
25  might have been another ten-minute conversation.

Page 173

1              J. Gurtov
2        Q    Okay.  How did that second
3   conversation end?
4        A    Just with letting her know that as
5   she found out, as she went through these next
6   visits and she found out what she needed, just
7   keep me posted of what she needed.
8        Q    Do you remember if you asked her if
9   she was going to miss any work?
10       A    At that time I don't remember asking
11  that.
12       Q    Do you remember at that point being
13  concerned that she might have to miss some work?
14       A    I remember at some point she told me
15  she was going to have to miss like a meeting or a
16  call, and -- but I don't remember again if it was
17  in that specific conversation.
18            But no, it wasn't of concern, because
19  when something like that arises and somebody can't
20  make a meeting or a call, somebody else takes
21  notes for them and communicates the information.
22       Q    Is there anything else about the
23  second conversation that you had with Ms. Marshall
24  that you can remember that you haven't already
25  testified to?

Page 174

J. Gurtov

1    A    Not that I can recall, no.
2    Q    Between the time of the first
3    conversation and the second conversation, did you
4    communicate with anyone else at Starbucks
5    regarding Ms. Marshall's medical condition?
6    A    At that time, no, not yet.
7    Q    What was the third conversation you
8    had with Ms. Marshall regarding her medical
9    condition?
10    A    Maybe it was a couple of weeks after
11    that, and I feel at that point she had known that
12    surgery was something that she needed to have in
13    the future, and -- but she was concerned about it.
14    She didn't plan the surgery yet.  She needed to go
15    to the doctor again to find the time to plan the
16    surgery, but --
17    Q    When was the third conversation you
18    had?
19    MS. DIAZ:  Sorry.  Were you finished
20    with your answer?
21    THE WITNESS:  I was.  I was finished
22    with that answer.
23    Q    When was the third conversation you
24    had with Ms. Marshall regarding her medical

Page 175

J. Gurtov

1    conditions?
2    A    I don't remember.  I will be honest,
3    I don't remember how many specific conversations
4    we had.  I know we had several, so, there was a
5    conversation that we had prior to the conversation
6    that we had on the day of the SPA visit in the
7    latter end of December, and this is the
8    conversation that I am talking about right now,
9    where -- and again, I don't know what number
10    conversation that was, but at the conversation
11    that we had, the one, I guess, most recent prior
12    to the one we had during the day of the SPA, she
13    knew she was going to have surgery.  She knew she
14    was going to plan it for sometime in the upcoming
15    month.
16    She was concerned about it, so she
17    didn't have a time frame yet on it, because she
18    was nervous of having the surgery, and she said --
19    and at that time she had brought to me that she
20    would have to miss work, and she thought she was
21    going to have to miss about two or three weeks of
22    work.
23    And I had actually just had one of my
24    supervisors in another location had just been out

Page 176

J. Gurtov

1    on surgery for fibroids, and it wound up being an
2    eight-week leave because of it.  I suggested to
3    her, "Well, you might want to, when you are
4    thinking about it -- I just want you to realize
5    it's probably going to put you out for longer than
6    two to three weeks.  It could be up to eight
7    weeks."
8    Q    So, is it fair to say you had a few
9    conversations with Ms. Marshall before the
10    conversation you are just describing?
11    MS. DIAZ:  Objection.
12    Q    About her medical condition?
13    A    I believe I had -- we had conversed
14    about it prior to the one I was just discussing.
15    I'm not sure how many times.
16    Q    So, there was a conversation you had
17    with Ms. Marshall about her medical conditions
18    just -- strike that -- at some point before the
19    store plan of action visit in late December, 2010;
20    is that correct?
21    A    Before, yes.
22    Q    Do you know how long before the store
23    plan of action visit you had this discussion with
24    Ms. Marshall?

Page 177

J. Gurtov

1    A    I don't remember the time frame.
2    Q    Was it a day before?
3    A    No.  It was a little longer than a
4    day before.
5    Q    Was it three or four days before?
6    A    No.  I would probably say it was a
7    couple weeks prior to.
8    Q    Okay.  So, sometime in maybe early
9    December?
10    A    Early December, yeah.
11    Q    And let me focus on that discussion,
12    okay?
13    A    Okay.
14    Q    Was that discussion in person or over
15    the phone?
16    A    That was -- I believe it was in
17    person.
18    Q    Do you recall that was in person?
19    A    Again, I don't remember the details.
20    I remember our conversations in general about this
21    had been in person.  It may have been over the
22    phone, but I believe it was in person.
23    Q    Okay.  Do you know where the
24    conversation took place?

Page 178

J. Gurtov

1   A   I don't.  It may have been in her
2   store.  It may have been -- I know that -- I don't
3   know.  I remember having conversations with her in
4   her store.
5   Q   If it was on a phone, what phone
6   would it have been on?
7   A   It would likely either be on my cell
8   phone or the phone from the office.
9   Q   Is your cell phone a company phone?
10  A   Um-hum.
11  Q   Or is that a personal phone?
12  A   Company phone.
13  Q   Does Starbucks pay your phone bills?
14  A   Yes.
15  Q   Who is the carrier?
16  A   AT&T.
17  Q   What is the phone number?
18  A   917-975-1331.
19      MR. GOTTLIEB:  I'm going to call for
20  production of Ms. Gurtov's cell phone
21  records for the period of -- for the period
22  of 2010 through March of 2011.
23      MS. DIAZ:  We will take that under
24  advisement.

Page 179

J. Gurtov

1   Q   Focusing still on that discussion, do
2   you remember how long the discussion lasted?
3   A   No.  I mean, it probably -- again, it
4   was probably ten to 15 minutes.  It was the
5   conversation that I had just described of her
6   thinking like -- knowing that surgery was coming
7   down the pipelines, not knowing when she wanted to
8   do it.  She was very concerned about having
9   surgery.  She was just -- she was nervous about
10  having surgery.
11      She thought it was going to be a
12  short time frame.  I suggested to her it
13  could be longer, from what I had learned from my
14  last partner that just recently went on leave for
15  something of that nature.
16      So, it was probably around 15
17  minutes.
18  Q   Do you remember the first thing that
19  she said?
20  A   No.
21  Q   Do you remember -- do you remember
22  how you responded to her?
23  A   Through all of these conversations,
24  the response was -- was really out of concern and

Page 180

J. Gurtov

1   just her letting me know what she needed so that I
2   could make the appropriate accommodations on the
3   store level so that she could take care of herself
4   personally.
5   Q   Do you remember anything specifically
6   that you said?
7   A   No, other than what I have shared.
8   Q   Do you remember if you told her
9   anything to the extent that the store couldn't
10  operate without her?
11  A   Absolutely not.
12  Q   Do you remember if you were concerned
13  about the store being able to operate without her?
14  A   No.
15  Q   You weren't or you don't remember?
16  A   I was not concerned.
17  Q   Did Ms. Marshall ever tell you before
18  this discussion that she was likely going to have
19  surgery?
20  A   No.  That -- the one that we are
21  talking about, the early December, was I think
22  when she first brought to my attention that she --
23  that what was wrong was going to turn into that
24  she needed surgery.

Page 181

J. Gurtov

1   Q   Okay.  Do you remember how that
2   conversation ended?
3   A   I don't remember the details.  I just
4   remember saying, "Just let me know when you plan
5   the surgery, so that we can make the appropriate
6   accommodations on our end."
7   Q   Okay.  But you don't remember the
8   details?
9   A   No.
10  Q   What was the -- strike that.
11      Was there a conversation at some
12  point before that where she told you she was going
13  to have to miss a meeting due to a doctor's
14  appointment?
15  A   Yeah.
16  Q   When was that?
17  A   I don't remember.  It was during that
18  time frame.  I don't remember dates.
19  Q   Sometime in November?
20  A   It could have been November, early
21  December.
22  Q   Okay.  And do you remember if that
23  conversation was over the phone or in person?
24  A   I don't remember.  It's likely it

Page 182

J. Gurtov

1  could have been over the phone, yeah.
2      Q    Do you remember what she said?
3      A    That she had a doctor's appointment
4  and she wasn't going to be able to make -- it was
5  like -- I don't even remember.  Sometimes on
6  Mondays, we had huddles; sometimes we had
7  conference calls.  I don't remember if it was a
8  conference call or a huddle.  I just remember her
9  saying she wasn't going to be able to make it.
10     Q    Do you remember how you responded?
11     A    "Okay, let's just get somebody to
12 take notes for you."
13     Q    What did you know about
14 Ms. Marshall's medical condition at that point?
15     A    I think -- I don't know where they
16 laid within the conversations that happened.  I
17 just -- I knew that she wasn't feeling good.  I
18 knew she was having stomach problems.  I don't
19 know if at that point, that may have been the
20 doctor's appointment that she found out about the
21 fibroids.
22         I know you she was sick, wasn't
23 feeling well, had to go to the doctor and couldn't
24 make a meeting.

Page 183

J. Gurtov

1      Q    Between when Ms. Marshall initially
2  told you that she was not feeling well and was
3  going to need to go to the doctor, and the
4  conversation you had with her in early
5  December 2010, when she informed you that she was
6  likely going to need surgery --
7      A    Yeah.
8      Q    -- did you have any discussions with
9  anyone else at Starbucks regarding her medical
10 conditions?
11     A    Not before then.
12     Q    Not before early December 2010?
13     A    No.  It was once I found out that she
14 knew she was going to need the surgery, and me
15 knowing that there would then be an extended
16 period of time that she would be gone, it might
17 have been mid December, we had a partner planning
18 meeting, and I just kind of brought it up to my
19 peer team, to say, hey, a length of time, I don't
20 know dates, I don't know when I'm going to -- or
21 Serenity is going to be taking an extended leave
22 for surgery.
23     Q    What was that meeting called?
24     A    A partner planning meeting.

Page 184

J. Gurtov

1      Q    How often do those meetings take
2  place?
3      A    Typically monthly with my peer team
4  and my boss and partner resources manager.
5      Q    Where do those meetings take place?
6      A    In the regional office on 33rd Street
7  and Fifth Avenue.
8      Q    Who is generally present at a partner
9  planning meeting?
10     A    My boss, the partner resources
11 manager, and my peer team of district managers.
12     Q    Does anybody take notes at these
13 meetings?
14     A    We all take our own handwritten, like
15 in our notebooks.
16     Q    Are there any agendas created at
17 these meetings?
18     A    Typically my boss would create an
19 agenda, because half of it would be for partner
20 planning, half of it would be about operations.
21     Q    Did you raise the issue of
22 Ms. Marshall's medical conditions with anybody
23 before this partner planning meeting?
24     A    Not that I recall.

Page 185

J. Gurtov

1      Q    But you did raise it during the
2  meeting.
3      A    Yeah.
4      Q    What did you say?
5      A    Letting them know that she would be
6  absent for probably about like an eight-week
7  period.
8      Q    Did you say why?
9      A    I don't remember if I did.  I said
10 there was a medical condition that was going to be
11 surgery, but I don't know if I gave the exact
12 diagnosis of the fibroids at that point.  It was
13 something that needed immediate attention.  It was
14 just kind of a heads-up, that was coming down the
15 pipeline.
16     Q    Did anybody react to that in any way?
17     A    No.
18         MR. GOTTLIEB:  I'm going to call for
19 production of any notes taken by any
20 employees of Starbucks at the partner
21 planning meeting of December 2010.
22         MS. DIAZ:  Take it under advisement.
23     Q    Did there ever come a time when
24 Ms. Marshall's medical conditions caused any

J. Gurtov

1
2  problems for her at work that you are aware of?
3      A    Not that I am aware of.  I mean,
4  it -- like, I mean, she had to miss the one
5  meeting, but not that it affected her work in the
6  store.  I knew she was uncomfortable, but not to
7  a -- not to any degree that was preventing her
8  from doing what she needed to do in the store.
9      Q    At the time Ms. Marshall told you
10 that she was likely going to need surgery in early
11 December 2010, were you overall happy with her
12 performance at that point?
13     A    It was just coming off of that review
14 that I shared with you, so she was inconsistent.
15     Q    But she was meeting expectations?
16     A    Yep.
17     Q    Did there ever come a time when
18 Ms. Marshall's medical conditions caused any
19 problems for you?
20     A    No.
21     Q    Between the conversation you had with
22 Ms. Marshall in early December 2010, and the store
23 visit that you had in late December '10, did you
24 have any conversations with Ms. Marshall?
25     A    I'm sure I did, but I don't recall

J. Gurtov

1
2  what they were.  I typically speak to my managers
3  more than within a three-week time period.  I'm
4  sure I did.  I just don't remember what they were
5  about.
6      Q    Do you remember the day that you
7  conducted a visit of Ms. Marshall's store?
8      A    I do.
9      Q    What was it?
10     A    It was the week of December, the week
11 leading into the Christmas holiday.
12     Q    Okay.  Do you remember the specific
13 day that you visited her store?
14     A    I believe it was the Wednesday of
15 that week.  I don't remember the date.
16     Q    Okay.  Do you remember when that
17 meeting was planned?
18     A    A couple weeks prior to.
19     Q    Okay.  Do you know if it was planned
20 before or after Ms. Marshall informed you that she
21 was likely to need surgery?
22     A    It was probably prior, because --
23 that goes to the end of December.  I typically --
24 it was probably planned by mid October or early
25 November.

J. Gurtov

1
2      THE WITNESS:  Can I ask -- I just
3  drank a lot of water.  Can I just take a
4  quick break --
5      MR. GOTTLIEB:  Of course.
6      THE WITNESS:  -- and run to the
7  restroom.
8      (Recess taken.)
9  BY MR. GOTTLIEB:
10     Q    So, I would like to focus on this
11 store visit you had in late 2010.  Do you remember
12 what time you arrived at the store?
13     A    I don't actually.  I think it was
14 in -- typically, it would be like around nine to
15 two, so it may have been in the morning, but I
16 don't remember that time frame.
17     Q    I'm not asking typically.  I'm
18 asking, do you remember what time you arrived at
19 the store?
20     A    I don't remember the time of the
21 visit.
22     Q    And do you remember the first thing
23 that you did after you walked into the store?
24     A    We had sat down in the cafe, and we
25 had talked about the next step that we would take,

J. Gurtov

1
2  and we -- it was a very loose format to that day.
3  There wasn't a detailed agenda to the day.  And we
4  began going into a values walk --
5      Q    Okay.
6      A    -- of the store.
7      Q    When you say "we," who are you
8  referring to?
9      A    She and I.
10     Q    Serenity Marshall and you?
11     A    Yes.
12     Q    What is a values walk?
13     A    It's a tool that we utilize to do a
14 walk-through of the store and observe it through
15 the perspective of a customer, and you look at
16 different details to that, that would impact the
17 customer's overall satisfaction.
18         So, we were looking at different
19 pieces from the perspective of the pace of the
20 line, the speed, the overall, I guess like general
21 cleanliness of the cafe area, the interaction
22 between the partners working behind the counter
23 and the customers on the other side.
24         It was a general observation.
25     Q    What did you do next?

Page 190

J. Gurtov

1
2     A     I believe after we did the values
3   walk, we sat down at the table, and we started
4   talking about that, and talking about her -- her
5   peak period and the investments she was making
6   during the peak period. Because that was
7   something that was a big deal of what we spoke
8   about on our visits there.
9     Q     When you sat down after the values
10  walk, did you discuss anything else?
11    A     We were -- we sat at the table for a
12  while. It was during that time that we sat there
13  that we discussed the values walk. I think we did
14  peak periods. I think we eventually started
15  talking about her -- her medical condition, and
16  the things that she was going to need going into
17  the new year.
18    Q     Okay. How long were you sitting down
19  talking to Serenity Marshall at this point?
20    A     I don't remember. Maybe a couple
21  hours.
22    Q     What was the first thing that was
23  said with regard to Ms. Marshall's medical
24  condition?
25    A     I think she brought it up, saying

Page 191

J. Gurtov

1
2   that from her prior visit with the doctor, she
3   again knew of the surgery, and was planning --
4   didn't have specific dates, but was planning on
5   having the surgery done at the end of January.
6     Q     And how did you respond?
7     A     I said, "Okay. When you have the
8   specific dates, let me know so that we can -- I
9   can make the appropriate accommodations in the
10  store."
11    Q     Okay. And how did she respond to
12  that?
13    A     She said okay.
14    Q     Anything else do you remember
15  discussing about her medical conditions or leave
16  of absence?
17    A     No.
18    Q     Do you remember if you were concerned
19  about her missing work?
20    A     The concern that I felt was for her
21  and her health and her feeling better. But not
22  for -- not for the store.
23    Q     Did you convey to her that you were
24  concerned for her and feeling better?
25    A     Yeah.

Page 192

J. Gurtov

1
2     Q     What did you say?
3     A     "Let me know the dates of your
4   surgery so that you can do what you need to do to
5   get yourself better."
6     Q     Anything else?
7     A     Not that I can recall specifically.
8     Q     Did you say, "I hope everything is
9   okay"?
10    A     I may have said that.
11    Q     Do you remember saying that?
12    A     I don't recall it specifically.
13    Q     What happened next?
14    A     At that point -- at that point, I
15  think we had talked about then having to look at
16  the daily records book. We were getting towards
17  the end of the day where we were going to wrap
18  things up, because we had our holiday party later
19  that evening, and -- but we needed to look at the
20  daily records book, because the store was
21  experiencing cash shortages, and even leading into
22  that day, we had discussed it several times, and
23  she was going through her books to make sure
24  things were aligned or to standard, and she had
25  asked me for help in trying to find a trend to see

Page 193

J. Gurtov

1
2   where her cash shortages were coming from.
3     Q     You say, "Leading into that day we
4   had discussed it several times." What are you
5   referring to?
6     A     Her cash shortage in the store.
7     Q     Had you discussed her daily records
8   book with her at all during 2010?
9     A     Prior to being in the store that day?
10    Q     Prior to that, yes.
11    A     Just in the weeks leading up to that,
12  because of the cash shortages that were happening,
13  we had talked about -- I had asked her, because
14  she couldn't find where, like where -- whenever I
15  asked her why are we having this kind of cash
16  shortage, she couldn't understand or articulate
17  why.
18          I said, "Go through your daily
19  records books, look for inconsistencies in your
20  partners' performance or documentation, and see if
21  you can uncover something."
22          And she had told me that she couldn't
23  uncover something, and she had asked me for my
24  help in reviewing the books.
25    Q     So, is it your testimony that when

Page 194

J. Gurtov

1  you conducted this store visit, it was her idea to
2  look at the daily records books?
3      A    Yes.  Even going into the visit.
4      Q    What happened next?
5      A    We went into the back to look at the
6  daily records books.
7      Q    Okay.  And describe what happened.
8      A    I opened up the book, and just went
9  through.  I -- I believe I opened it up to like a
10  random week, and started looking for trends.  So,
11  I was going through; I was even taking notes on
12  one of the pages in the book, of things that I had
13  seen, and there were -- there was a lot of missing
14  spaces of information, in various areas, whether
15  in the safe count or in the deposit section, in
16  the tip section.  There was just lots of holes,
17  and I was documenting it on the side.
18      And as, you know, I was going through
19  the one week, and then I started to flip through
20  another week of information, and as I was going
21  through it, I realized that there was not a
22  deposit slip in the book, and I said to her,
23  "Where are all the deposit slips?"
24      And she opens up a drawer above the

Page 195

J. Gurtov

1  desk, it was like in a little Tupperware drawer
2  puller-out, and she grabs this handful of slips.
3      I said, "What are all the slips doing
4  up there?"
5      She said, "I just haven't had the
6  time to get them in the book."
7      I said, "Okay.  Well, let's put them
8  in the book."
9      We started going through and stapling
10  in slips to pages, and it was noted on -- there
11  were two instances that we didn't have a slip for.
12  One of them was from an earlier portion in the
13  month, and one of them was from the day prior.
14      And I said, "Well, where are the
15  slips to these two sections?"
16      And she said, "I don't know.  They
17  must be at the bank."
18      And I said -- I don't remember the
19  details of like what I said in that moment, but I
20  said, "The one from yesterday is at the bank?"
21      And she said, "Yes."
22      And I said, "Are you sure about
23  that?"
24      And she said, "Yes."

Page 196

J. Gurtov

1      "Okay.  Well, then let's go get it."
2      The bank is in the same block that
3  her store is in, and as we were getting up and
4  putting on my jacket, she goes, "Well, hold on a
5  second."
6      I said, "What?"
7      She goes, "I lied.  I didn't bring
8  that deposit to the bank."
9      And I said, "Well, what do you mean,
10  you didn't bring that deposit to the bank?"
11      And I don't -- I don't remember
12  specifically what she said in that moment, because
13  of I -- I had thought that the deposit was not
14  going to be anywhere, because I had just come off
15  of a similar situation in another store, with
16  deposits being taken out of the store, and so I
17  was like, "You mean the deposit, you didn't bring
18  it to the bank?"
19      And then she goes, "Oh, well, it's
20  still in the safe."
21      I said, "That's not what it says
22  here.  Here it says that you have completed the
23  deposit and that you brought it to the bank
24  yesterday."

Page 197

J. Gurtov

1      And she said, "But it's still in the
2  safe."
3      I said, "Well, I want to see the
4  money."
5      Then we sat there.  I had her set the
6  safe, and as she was setting the safe, I said, "I
7  want to see your November book."
8      So, I get her November book.  Again,
9  I open it up to a random week, and this book is
10  like practically all blank, like there are just
11  days and days upon days where nothing is filled
12  out in the deposit section at all.  There are
13  times when even the safe counts aren't being fully
14  recorded, where somebody will count in for a day
15  and then there won't be -- that person won't have
16  counted out.  The other person who is there that
17  day doesn't count in or count out.
18      It was almost like blank pages.  I
19  have never seen a book in that condition before.
20      And I said, "What's going on here?"
21      And she didn't say anything.  And
22  then she -- the safe eventually opened.  She
23  brought out the deposit bags from the day prior.
24  They were still in there.  They were still in the

Page 198

1           J. Gurtov
2  till drop bags, so they weren't even counted to
3  put into a deposit bag yet.
4           And I said to her, "Why would you do
5  this? Why would you fill all of this out saying
6  that you have completed the deposit and brought it
7  to the bank if you didn't do it?"
8           And she said, "I don't want to get in
9  trouble like Carlos did." And Carlos was the
10 manager from earlier in that month that had -- he
11 had taken deposits out of the store, and deposited
12 them like several days later.
13          But I -- like at that point, I was
14 almost like unsure what to do next, because of I
15 had never seen something so egregious in nature,
16 where it was just blatant neglect to policies in
17 the book.
18          And then she had said, I don't know
19 specifically, but along the lines of, "Are you
20 going to fire me?"
21          And I said -- I said, "Well, I have
22 to look into this further, and I need to get
23 counsel." I said, "What I would like to do is
24 wrap up the day, and we will figure things out in
25 the upcoming weeks," because I was also -- it was

Page 199

1           J. Gurtov
2  just a tough time, because two days later I was
3  leaving on vacation.
4      Q    Is that how the meeting ended?
5      A    Something was said about the holiday
6  party, and I said -- I remember saying to her,
7  "Don't let this get in the way of the holiday
8  party. That was something different that has been
9  planned for weeks. Go to the holiday party. That
10 is important, for you and your peers to celebrate
11 for the holidays." I said, "We will handle this
12 as I return."
13     Q    Did you tell Ms. Marshall to make
14 corrections to the sections of the DRB that you
15 had reviewed?
16     A    Absolutely not.
17     Q    Do you know if she did?
18     A    I do know that as we looked at
19 documents during this piece --
20          MS. DIAZ: Just stop. I don't want
21     you to get into anything that is privileged
22     that we did together.
23     Q    You can answer the question as long
24 as you don't disclose attorney-client
25 communications.

Page 200

1           J. Gurtov
2           As you sit here today, do you know if
3  she ever made any changes to those DRBs after you
4  reviewed them at that store visit?
5      A    I'm not sure.
6      Q    Did you review, prior to your
7  deposition today, the DRB from 11649 in the month
8  of November?
9      A    I did.
10     Q    Did you review, prior to your
11 deposition today, the DRB for the month of
12 December 2010?
13     A    Yes.
14     Q    As you left the store that day, did
15 you -- had you decided whether Ms. Marshall was
16 going to be disciplined for the problems that you
17 saw with the DRB?
18     A    I knew she would be disciplined, but
19 I didn't know to what extent, and I needed to get
20 counsel from the partner resources contact center.
21     Q    You said you went on vacation a few
22 days later?
23     A    I did.
24     Q    Where did you go?
25     A    To my sister's in Florida.

Page 201

1           J. Gurtov
2      Q    How long were you there for?
3      A    I was there for, I don't know, about
4  six days, and then I had -- I made a mistake. I
5  did not go to Florida that year. Stayed home. My
6  sister from Florida drove up, and she was in town
7  with us through the following Thursday, and then
8  that Thursday I went to the Bahamas with my
9  boyfriend and came back to work on Wednesday
10 afterwards.
11     Q    Do you remember the date that you
12 came back?
13     A    I think it was the 5th. I think
14 Wednesday, the 5th.
15     Q    Between the day of your store visit
16 to 11649, and your return to work on approximately
17 January 5th, had you discussed with anybody
18 Ms. Marshall's DRB issues?
19     A    I had shared with the DM that was
20 covering that I had uncovered something pretty
21 egregious in nature, so that he would be aware of
22 the situation in the store, because he was going
23 to oversee it for the time while I was gone, but
24 nothing specifically, and not what action was
25 going to be taken, because I wasn't sure yet.

51 (Pages 198 to 201)

Page 202

J. Gurtov

1  Q    You didn't speak to anybody the day
2  after the store plan of action visit?
3  A    Just the DM, the district manager
4  that was going to be overseeing my area while I
5  was gone.
6  Q    Who was that?
7  A    Adler Ludwigson.
8  Q    Do you remember when you spoke to
9  him?
10  A    I don't.  It might have been that
11  Thursday or Friday.
12  Q    Before you -- before you went away?
13  A    Yeah.
14  Q    Is he still working at Starbucks?
15  A    Yes.
16  Q    Do you remember what you said to him
17  other than what you have already testified to?
18  A    No.
19  Q    When was the first time you reached
20  out to anybody to discuss disciplinary action with
21  regard to Ms. Marshall?
22  A    I was -- once I had come back from
23  vacation, I don't remember if I made a phone call
24  that day or within the following days, but I

Page 203

J. Gurtov

1  called the Partner Resources Contact Center.
2  Q    And when you called the partner
3  resources contact center, had you made a decision
4  in terms of what disciplinary action you wanted to
5  take with regard to Ms. Marshall?
6  A    No.  I was still in the process of
7  trying to figure out what the appropriate
8  disciplinary action would be.
9  Q    How were you planning on determining
10  what the proper disciplinary action would be?
11  A    Through -- through their counsel and
12  through speaking with my partner resources
13  manager, Nancy, and I don't remember the details.
14  I just know that at one point, I had -- I didn't
15  know what the course of action was to take.  I
16  looked in the -- in the partner guide, and there
17  was a piece in there that talks about
18  falsification of company documents, and that
19  was -- which was like, well, that's what happened.
20  Here was the falsification of company documents.
21  And that's when I built my case to
22  recommend separation for what had happened.
23  Q    When did you build your case to
24  recommend separation?

Page 204

J. Gurtov

1  A    During this time frame, once I had
2  come back.  It was within the next couple of days.
3  Q    Was it before or after you called
4  partner resources?
5  A    The initial call to partner
6  resources, I didn't have that initial
7  recommendation.  The initial call to partner
8  resources was more of an inquiry, what should I
9  do.
10  And then through talking to them, and
11  Nancy, and again, I don't remember if it came from
12  them or Nancy, but it was brought to my attention
13  the portion of the partner guide that talks about
14  falsification of company documents, and that's
15  when I had -- you know, through the case of what
16  happened, I said, well, that's what happened in
17  this case.  And then that became my recommendation
18  based on her falsifying the materials.
19  Q    Did you review any other documents
20  before recommending termination?
21  A    No.
22  Q    When did you learn that Ms. Marshall
23  was going to commence a leave of absence because
24  of her medical condition?

Page 205

J. Gurtov

1  A    The day prior to coming back on the
2  4th, I had gotten kind of a prior day welcome back
3  e-mail from Adler, and he had shared with me in
4  that, that she was going on leave.
5  But then on that same day, I also
6  received something from the Starbucks leave
7  administration that notified me of her leave
8  beginning on the 5th.
9  Q    And that was not a surprise to you;
10  right?
11  A    That was a surprise to me.
12  Q    It was a surprise?
13  A    Yeah.
14  Q    Why was that a surprise?
15  A    Because from the conversation that we
16  had had during the SPA day, she had shared with me
17  that she was planning on her surgery taking place
18  at the end of January.
19  Q    What was your reaction when you
20  learned that her leave was going to start in early
21  January?
22  A    I was surprised by it, and -- but
23  there is no other way to react.  I just had to get
24  a plan in place to insure that the store was taken

Page 206

J. Gurtov

1  care of for the rest of the partners that were in
2  the store.
3      Q    Were you caught off guard by it?
4      A    Yeah.
5      Q    Do you remember what day it was that
6  you decided you wanted to recommend separation of
7  Ms. Marshall?
8      A    No.  It was during the time frame of
9  the couple of days after going into the following
10 week.  I don't remember the specific days, but I
11 recommended separation to the partner resources
12 contact center, and I shared with them information
13 from her, like her corrective actions and
14 performance reviews.
15     Q    We will get to that.  My only
16 question was if you remember what day.
17         MS. DIAZ:  She wasn't finished with
18 her answer.
19         MR. GOTTLIEB:  She wasn't answering
20 my question.
21         MS. DIAZ:  Let her finish the answer.
22     Q    The question was -- I will repeat the
23 question.
24         Do you remember what day it was you

Page 207

J. Gurtov

1  decided you wanted to recommend separation of
2  Ms. Marshall?
3      A    I don't recall at this time.
4      Q    Do you recall how many days after you
5  returned from your vacation you made that
6  decision?
7      A    I don't recall.
8      Q    Do you remember if before you decided
9  to recommend termination, you reviewed
10 Ms. Marshall's DRB, since your SPA visit?
11         MS. DIAZ:  Objection.
12     A    Did I review her daily records book
13 prior to?  I looked -- I had a November book that
14 I had --
15     Q    My question is whether you looked at
16 her DRB practices from the period of the day of
17 the meeting through the day that you returned from
18 vacation, before you decided to terminate her.
19     A    I did not.
20     Q    Why not?
21     A    I didn't see the need to.
22     Q    You didn't want to see if her DRB
23 practices had improved since that meeting?
24     A    No.

Page 208

J. Gurtov

1      Q    You didn't care?
2      A    I didn't need to see it.  It didn't
3  pertain to the case.
4         (Gurtov Exhibit 15 marked for
5         identification as of this date.)
6      Q    I have handed you Gurtov 15, which is
7  Bates stamped 222 to 225.
8         Do you recognize this document?
9      A    No.
10     Q    You have never seen this document
11 before?
12     A    Not that I can recall.
13     Q    I would like to refer you to page
14 224, and towards the middle of the page, it says,
15 "Entered by Steven Somers at 1/6, 2011,
16 10:51 a.m."
17         Do you see that?
18     A    I do.
19     Q    Underneath that it says caller name,
20 "Jennifer Ann Gurtov."
21         Do you see that?
22     A    I do.
23     Q    Do you remember speaking with someone
24 named Steven Somers on January 6th?

Page 209

J. Gurtov

1      A    I do not.
2      Q    Do you remember speaking with someone
3  at partner resources on January 6th, 2011?
4      A    I remember speaking with someone from
5  partner resources in those several days that I
6  returned from vacation, but I couldn't narrow down
7  the date.
8      Q    The first line underneath the name
9  and identification information says, "GM wants
10 separation consultation for SM issues for cash
11 handling issues."
12     A    Yes.
13     Q    Do you see that?
14         Does that refresh your recollection
15 as to whether you spoke to Steven Somers on that
16 day?
17     A    I remember speaking to a
18 representative.  I don't remember it specifically
19 being Steven Somers.
20     Q    Can you review the content throughout
21 the remainder of the document, the rest of page
22 224 and 225, and tell me if you think that
23 reflects a conversation you had with partner
24 resources after you returned from vacation?

J. Gurtov

1
2     A     Okay.
3            What is the question?
4     Q     The question is:  Does this -- does
5  this section of the document that you just read
6  reflect the conversation you remember having with
7  partner resources?
8     A     Yes.
9     Q     Okay.  Is it accurate?
10    A     It's someone else's account, so it's
11 similar to what I had shared.  The pieces in line
12 six, I don't -- I don't feel are fully accurate,
13 because I didn't recently separate a store manager
14 for the same reason.  I had separated Carlos for a
15 similar situation, but it was a different reason.
16 He was floating deposits and bringing them outside
17 of the store, not falsifying documents.
18           And because of that, I had spoken to
19 the district overall about insuring that deposits
20 are brought to the bank daily at that -- it just
21 doesn't say it clearly, but it was after that
22 incident of separating that store manager, that I
23 addressed the entire team about bank deposit
24 standards.
25    Q     Was that during a weekly meeting?

J. Gurtov

1
2        MS. DIAZ:  Objection.
3     Q     Was that during a weekly meeting that
4  you addressed deposit standards?
5     A     That was during -- it was during a
6  conversation with the entire team.
7     Q     Do you remember when that
8  conversation took place?
9     A     I don't.
10    Q     Was that an in-person conversation or
11 conference call?
12    A     I don't recall.  I believe it was a
13 conference call.
14    Q     Is there any document that reflects
15 that conversation you had with the team regarding
16 DRBs and bank deposits?
17    A     No.
18    Q     Before this call that you made to
19 partner resources on January 6th, had you spoken
20 to anyone else regarding your decision to
21 terminate Ms. Marshall?
22        MS. DIAZ:  Objection.
23    A     At that time, because of the nature
24 of it, I believe that I also brought in Nancy
25 Murgalo, my partner resources manager, as well as

J. Gurtov

1
2  my boss, Victor Huetz.
3     Q     So you talked to both of them before
4  your conversation with partner resources?
5     A     No.  I -- I don't recall the
6  specifics.  I believe I spoke with Nancy Murgalo
7  before Partner Resources Contact Center, but I may
8  have brought Victor in after the conversation that
9  I had with the contact center.
10    Q     So, you believe you spoke to Nancy
11 Murgalo about the conversation first?
12    A     I believe so.
13    Q     Do you remember that conversation?
14    A     I don't.
15    Q     Why do you believe you talked to her
16 first?
17    A     That's -- because I remember having a
18 conversation with her at that time frame.
19    Q     Do you remember if she recommended
20 termination or something else?
21    A     I believe she recommended me to call
22 the partner resources contact center.
23    Q     Had you decided that you were going
24 to seek separation before you contacted the
25 partner resources center?

J. Gurtov

1
2     A     I did.  It shares it in point ten.
3     Q     Why did you want to seek separation
4  as opposed to some other less final corrective
5  action?
6     A     Because of the nature of the
7  situation.  Even leading into the conversation and
8  that SPA visit, as I have shared with you even
9  today, I have had several conversations about cash
10 handling policies and procedures with Serenity,
11 either because of her doing something directly or
12 indirectly or one of her partners not abiding by
13 those standards.
14           As I have also shared, throughout
15 this time frame, her performance was inconsistent.
16 She made bad decisions.  This was a moment where
17 she understood the cash handling policies and
18 procedures.  She blatantly neglected them
19 throughout the entire month of November leading
20 into December with the cash shortages, and then
21 falsified a document and lied to me about it being
22 completed.
23           And I believe that that
24 falsification, coming from the extensive history
25 that I had with Serenity and knowing that she

Page 214

```
1              J. Gurtov
2  understood the policies and procedures, warranted
3  separation.
4      Q    Did you consider giving her
5  corrective action first?
6      A    Once I had learned of the
7  falsification of the company document and that
8  being something that led directly to separation, I
9  did not consider giving her corrective action
10 after I had found that out.
11     Q    I would like to direct your attention
12 to point five on page 224.  It says, "SM stated
13 reason for falsifying deposit information is they
14 were having trouble getting time off floor to
15 complete deposit before bank closed, so they could
16 complete the deposit information, show a deposit
17 was made, even though deposit was not brought to
18 the bank.  SM stated that they did not want to get
19 in trouble for not making deposits daily."
20         Do you see that?
21     A    I do.
22     Q    Do you remember saying that to
23 partner resources when you called?
24     A    Not that specific statement.
25     Q    Do you deny making that statement?
```

Page 215

```
1              J. Gurtov
2          MS. DIAZ:  Objection.
3      A    I deny it in the way that it's
4  written here.  I did share the information that
5  Serenity said the reason why deposits weren't
6  getting done daily was because she was having
7  difficulty getting off the floor.  However, that
8  was not her reason for falsifying the deposit.
9          As I shared with you earlier, in my
10 account, she had said she falsified the deposit
11 because of she didn't want to get in trouble the
12 way the previous store manager had, which is what
13 she had shared with me in the visit that day.
14     Q    Where do you think Mr. Somers got
15 that reasoning from?
16         MS. DIAZ:  Objection.
17     A    I can't speculate as to where he got
18 that reasoning.
19     Q    But you never said it?
20     A    His job is to write notes into a
21 page, not write verbatim what I say, and it looks
22 like he got confused in the order in which he was
23 writing notes onto the page.
24     Q    Do you claim that Ms. Marshall in the
25 daily records book wrote the wrong date bank
```

Page 216

```
1              J. Gurtov
2  deposits were actually being made?
3      A    Repeat that.
4      Q    Do you believe that Ms. Marshall
5  wrote in her daily records books in November and
6  December, 2010, the incorrect date regarding when
7  bank deposits were made?
8          MS. DIAZ:  Objection.
9      A    No, I -- I would have to look at
10 specific pages from that.  There were different
11 circumstances of different violations.
12     Q    I'm not asking about different
13 violations.  I'm asking, do you claim that
14 Ms. Marshall at times in November 2010 and
15 December 2010 wrote in her daily records book an
16 incorrect date for when a deposit was made at the
17 bank?
18     A    She did for the day prior to my visit
19 with her.
20     Q    Okay.  Why do you think she did that?
21     A    She told me that she did that because
22 she didn't want to get in trouble.
23     Q    Do you believe she did it for any
24 other dates?
25     A    I can't recall the specifics of both
```

Page 217

```
1              J. Gurtov
2  of those books.
3      Q    Don't bank receipts show the date a
4  deposit is made at the bank?
5      A    Yes.
6      Q    So wouldn't it be verifiable if she
7  was writing the wrong date in the daily records
8  book by referencing the actual bank receipt?
9      A    Yes.
10     Q    So why would she write the wrong date
11 in the daily records book if it could be verified
12 that it's wrong?
13         MS. DIAZ:  Objection.
14     A    I can't speculate as to why she would
15 do something like that.  What I can share is for
16 the specific date prior to the day that I was
17 there, there was no bank slip, because she had not
18 brought it to the bank or completed the deposit.
19     Q    Is it a problem if a DRB page does
20 not have a bank slip?
21     A    It's enough to cause inquiry as to
22 where the bank slip is.
23     Q    I would like to refer you to bullet
24 point nine.  I'm sorry, bullet point 7.  It says,
25 "Past history with SM over two-and-a-half years,
```

Page 218

J. Gurtov

1  
2 performance has never been consistent, between
3 very poor to very good performance."
4        Do you see that?
5    A    I see that.
6    Q    Do you remember saying that during
7 that phone call?
8    A    Not those words specifically.
9    Q    Something to that extent?
10   A    Yes.
11   Q    Was that a factor in your decision to
12 terminate Ms. Marshall?
13   A    No.
14   Q    I would like to refer you to bullet
15 point nine, where it says, "Recent performance
16 review."
17   A    Yes.
18   Q    Is that a reference to the 2010
19 performance review?
20   A    Yes.
21   Q    The one we already looked at?
22   A    Yes.
23   Q    I would like to refer you to bullet
24 point eight.  At the bottom of that bullet point,
25 it says, "No CA."  Does that refer to no

Page 219

J. Gurtov

1  
2 corrective action?
3    A    Yes.
4    Q    "But coaching conversation around
5 2009, near, prior to 2/18/09 CA for not managing
6 team from cash handling perspective, not
7 evaluating daily records book and coaching team in
8 a timely manner."
9        Do you see that?
10   A    Yes.
11   Q    Was that referring to the
12 conversation in November 2008 that we discussed
13 earlier?
14   A    I believe so.
15   Q    Other than the items listed on this
16 document, is there anything else you remember
17 discussing during that phone call to partner
18 resources?
19   A    No.
20   Q    Do you remember if you mentioned
21 during the call that the employee had a medical
22 condition?
23   A    I don't believe so.
24   Q    Why not?
25   A    Because it had nothing to do with her

Page 220

J. Gurtov

1  
2 separation.
3    Q    Do you remember if you mentioned it
4 to partner resources that the employee in question
5 had taken a leave of absence?
6    A    I don't believe so, because it was
7 not -- the leave of absence is completely separate
8 than the incident from the SPA day.
9    Q    How did that conversation end to
10 partner resources?
11   A    I don't remember specifically.
12   Q    Do you remember if you were told you
13 can go ahead and terminate this employee?
14   A    No.
15   Q    Do you remember if you were told we
16 will get back to you?
17   A    Yeah.  That's -- I -- there was going
18 to be a representative from the contact center
19 that would get back to me.
20   Q    After that call ended -- well, do you
21 remember how long that call lasted?
22   A    I don't.
23   Q    After that call ended, what was the
24 next conversation you had with anybody regarding
25 Serenity Marshall?

Page 221

J. Gurtov

1  
2    A    I don't remember specifically.
3    Q    Do you remember the next conversation
4 you had with anybody regarding Ms. Marshall's
5 termination?
6    A    I don't recall -- I don't recall the
7 specific conversations.  I know at some point, I
8 believe it was Tina Pizarro that got back to me.
9 This gentleman was just someone who documented the
10 stuff back into the file.  And Tina Pizarro was my
11 contact at the partner resources center.  At some
12 point I spoke with her.
13   Q    Just above the section we were just
14 looking at, it says, "Entered by Tina Pizarro at
15 1/10, 2011, 2:37 p.m."
16        Do you see that?
17   A    I do.
18   Q    Then it says, "LVM for Jennifer."
19        Do you see that?
20   A    Yes.
21   Q    Do you remember if January 10th,
22 2011, Ms. Pizarro left a voice mail for you?
23   A    I don't -- I don't remember the
24 specifics of this being a voice mail.  I -- I do
25 remember at some point speaking with Tina.

Page 222

J. Gurtov

1   Q    So, you don't remember the voice
2   mail, but you remember at some point speaking with
3   her?
4   A    Yes.
5   Q    And do you remember if you spoke to
6   her over the phone or in person?
7   A    Over the phone.
8   Q    Do you remember how long after your
9   initial call to partner resources that call took
10  place?
11  A    I don't remember the date.
12      (Gurtov Exhibit 16 marked for
13      identification as of this date.)
14  Q    I have just handed you what was
15  marked Gurtov 16, Bates stamp 1662.
16      Do you see on the bottom part of this
17  e-mail chain, there is an e-mail from you to Nancy
18  Murgalo dated January 12, 2011?
19  A    I do.
20  Q    And it starts off, "Hi, Nancy.  So I
21  heard back from partner resources contact center.
22  Tina Pizarro, a representative there, supports
23  Serenity's separation of employment from
24  Starbucks."

Page 223

J. Gurtov

1   Q    Do you see that?
2   A    I do.
3   Q    Does that indicate that at some point
4   before January 12, 2011, you had spoken with
5   Ms. Pizarro?
6   A    Yes.
7   Q    Do you remember that conversation?
8   A    I don't remember the specifics of the
9   conversation.
10  Q    What do you remember about the
11  conversation?  Without looking at the document.
12  Just from your recollection.
13  A    I don't even remember having -- I
14  don't remember that conversation.
15  Q    At all?
16  A    I don't remember the details of it.
17  I don't.
18  Q    What do you remember about it?
19  A    I know that at some point, I did
20  speak with Tina.  But I don't remember the details
21  of what that conversation held.
22  Q    Do you remember how long the
23  conversation lasted?
24  A    I don't.

Page 224

J. Gurtov

1   Q    Do you remember anything that was
2   discussed?
3   A    I mean, we discussed the --
4   everything that we had just reviewed was then
5   discussed.
6   Q    And did Ms. Pizarro make a
7   recommendation?
8   A    Yes.  I would assume yes from this
9   e-mail, but I would also assume yes from the voice
10  mail that was left, that we read from that
11  previous document.
12  Q    Well, without regard to any
13  documents, do you remember what she recommended on
14  that call from your own recollection?
15  A    I remember the recommendation to
16  separate for the falsification of company
17  documents.
18  Q    Okay.
19      MS. DIAZ:  Can we take a quick break,
20  please?
21      MR. GOTTLIEB:  Sure.
22      (Recess taken.)
23      MR. GOTTLIEB:  Back on.
24  Q    Is there anything else you remember

Page 225

J. Gurtov

1   about that initial telephone call with Ms. Pizarro
2   that you have not already testified to?
3   A    No.
4   Q    You have Gurtov 16 in front of you.
5   A    Um-hum.
6   Q    Why did you write that e-mail to
7   Ms. Murgalo?
8   A    Just to get -- since Nancy is our
9   partner resources manager on the ground in the
10  area to give her a heads-up of what was going on
11  and grab her recommendation at the same time.
12  Q    Any other reason?
13  A    Not that I can think of.
14  Q    Did she ever get back to you with a
15  recommendation?
16  A    Nancy?
17  Q    Yes.
18  A    On the top of the page there.
19  Q    It says, "Hi, Jen.  I concur with
20  Tina and with the support of legal.  I agree with
21  separation.  It's consistent with what we have
22  done in the past."  Right?
23  A    Yes.
24  Q    When she said, "It's consistent with

J. Gurtov

1  what we have done in the past," do you know what
2  she meant?
3         MS. DIAZ:  objection.
4     A    No.
5     Q    No more questions on that document.
6         After your conversation with Tina
7  Pizarro, do you remember having any discussions
8  with Ms. Murgalo regarding Serenity's termination?
9     A    At some point, I had shared -- once
10 it was determined that we were going to move
11 forward with separation, I did speak with Nancy to
12 figure out -- I think to confirm that that was
13 what we were moving forward with.
14    Q    Okay.  Do you remember how long after
15 the conversation you had with Ms. Pizarro you had
16 that conversation?  Strike that.
17        Do you remember how long after you
18 had that conversation with Ms. Pizarro that you
19 had that conversation with Ms. Murgalo?
20    A    I don't recall the specific time
21 frame.
22    Q    Can you estimate?
23    A    I feel like it all happened within
24 that following week.

J. Gurtov

1         (Gurtov Exhibit 17 marked for
2  identification as of this date.)
3     Q    I am handing you a document labeled
4  Gurtov 17.  Do you recognize this document?
5     A    I do.
6     Q    Okay.  And the bottom is an e-mail
7  from you to Ms. Pizarro cc'ing Ms. Murgalo, Victor
8  Huetz, and yourself, regarding Serenity Marshall;
9  correct?
10    A    Yes.
11    Q    Do you know why you wrote that
12 e-mail?
13    A    I do.
14    Q    Why?
15    A    It was my recap of the situation of
16 what had occurred on December 22nd, and Tina had
17 wanted my full recap of that day so that she could
18 make an appropriate recommendation.
19    Q    Hadn't she already made a
20 recommendation by January 13th?
21    A    She did.  I had also -- she had
22 wanted the recap in a written document.  But I
23 also had attached the corrective actions, like the
24 rest of Serenity's file that she had wanted to see

J. Gurtov

1  like that.
2     Q    She asked you to do that when you
3  called her?
4     A    Yes.
5     Q    Did you have any other discussions
6  with Ms. Pizarro over the phone?
7     A    Not that I can recall.
8     Q    Did you have any other discussions
9  with Ms. Murgalo surrounding Serenity Marshall's
10 termination?
11    A    Not that I can recall.
12        (Gurtov Exhibit 18 marked for
13 identification as of this date.)
14    Q    I have just handed you Gustav 18,
15 Bates stamped 1665.  Do you see the e-mail from
16 Ms. Murgalo to you dated February 28, 2011, on the
17 bottom?
18    A    Yes.
19    Q    And it says, "Hi, Jen.  Have we made
20 a determination of Serenity?  When is she due
21 back?"
22    A    Yes.
23    Q    Do you know why Ms. Murgalo asked you
24 that?

J. Gurtov

1     A    I believe it was to see if she was
2  coming back on her return date from LOA.
3     Q    Had a determination been made at that
4  point as to whether Serenity Marshall would be
5  terminated?
6     A    Yes.
7     Q    How do you know that?
8     A    Because I had -- I had made that
9  determination, and I had gotten the support from
10 partner resources.
11    Q    Had you ever communicated that to
12 Ms. Murgalo?
13    A    Yes.
14    Q    When?
15    A    I don't remember the exact date.  It
16 was during that time frame.
17    Q    So why would she be asking you, "Have
18 we made a determination on Serenity?"
19    A    Her determination, I don't believe is
20 referring to whether or not Serenity will be
21 separated.  It's have we made a determination on
22 is Serenity coming back on her day; is she going
23 to meet me in the office.
24    Q    Did you have any communications with

Page 230

J. Gurtov

1  anybody regarding Ms. Marshall's termination in
2  January 2011, other than what you have already
3  testified to?
4      A    I have -- I spoke about it with
5  Victor.  I don't -- I don't recall if I have
6  testified to that in these past statements, but
7  Victor was somebody else who I had spoken to about
8  it.
9      Q    How many times?
10     A    I don't know the number of times.  I
11 mean once it was determined and I got his -- that
12 he had supported that decision as well, we didn't
13 speak about it much after that.
14     Q    Did you ever speak -- without giving
15 me the substance, did you ever speak to legal
16 counsel in January 2011, about terminating
17 Ms. Marshall's employment?
18     A    Did I?
19     Q    Yes.
20     A    No.
21     Q    Do you know if anyone else did?
22     A    I believe Tina sought their counsel.
23     Q    Did you communication with
24 Ms. Marshall at all while she was out on leave?

Page 231

J. Gurtov

1      A    No, not that I recall.
2      Q    Did you feel bad about moving to
3  terminate Ms. Marshall while she was out on leave?
4      A    No.
5      Q    Why not?
6      A    Because of the nature of what she had
7  done.
8      Q    Did you ever have any discussions
9  with anybody about how to effectuate
10 Ms. Marshall's termination?
11     A    As far as deliver it to her when she
12 comes in --
13         MS. DIAZ:  Objection.  Just want to
14     remind the witness not to get into
15     privileged conversations in response.
16     A    Yeah.  No, I had asked -- just a
17 common practice with separating a store manager, I
18 would typically ask a peer to sit in on that
19 conversation, so, I had asked one of my peers,
20 Mark Ormsbee, to sit in on that conversation.
21     Q    And how did you determine you were
22 going to deliver to Ms. Marshall her termination?
23         MS. DIAZ:  Objection.  Same -- same
24     reminder.  Just don't get into the

Page 232

J. Gurtov

1  privileged conversations.
2      A    Yeah.  I -- as -- and again, it's
3  just typical practice, when delivering a
4  separation.  I just -- I wrote out a document, the
5  reason why she was being separated, so that I
6  could present that to her at the time of us having
7  the conversation.
8      Q    And did you determine that you were
9  going to terminate her on her first day back from
10 leave?
11     A    I did.
12     Q    Why did you decide to terminate her
13 on her first day back from leave?
14         MS. DIAZ:  Objection.  I am not sure
15     the witness can answer that question without
16     getting into privileged information.
17     Q    Can you answer the question without
18 getting into privileged information?
19     A    No.
20     Q    So, the reason -- so it was pursuant
21 to the advice of counsel that you decided to
22 terminate her on her first day back from leave?
23         MS. DIAZ:  Objection.  That is
24     privileged.

Page 233

J. Gurtov

1      Q    Can you answer why you terminated her
2  on her first day back from leave without getting
3  into the advice of counsel?
4      A    I don't believe I can.
5      Q    Did you ever speak with legal
6  counsel?
7      A    No.
8      Q    But you believe advice of counsel was
9  communicated to you?
10     A    Yes.
11     Q    Through who?
12     A    Tina.
13     Q    And why do you believe that she was
14 communicating to you advice of counsel?
15     A    Because she had shared that she was.
16     Q    So when you discussed with Tina --
17 strike that.
18         So did you discuss with Tina when you
19 would be separating Ms. Marshall's employment?
20     A    We had discussed that.
21     Q    And was it during that conversation
22 that she told you she had discussions with counsel
23 about that?
24     A    Yes.

Page 234

J. Gurtov

1  Q   Did you draft the termination letter?
2  A   I did.
3  Q   Did anyone assist you with it?
4  A   No.
5      (Gurtov Exhibit 19 marked for
6  identification as of this date.)
7  Q   I am handing you what's been marked
8  Gurtov 19.  Do you recognize this document?
9  A   Yes.
10 Q   This document is dated 3/1/11; is
11 that correct?
12 A   Yes.
13 Q   That was the date Ms. Marshall was
14 terminated?
15 A   Yes.
16 Q   Had you communicated with
17 Ms. Marshall at all before you handed her this
18 document?
19 A   I did in a phone call, I believe it
20 was the day prior, asking her to meet me in the
21 office as she returned to work.
22 Q   Did you tell her why?
23 A   Because I needed to have a
24 conversation with her.

Page 235

J. Gurtov

1  Q   Did she ask you why?
2  A   I don't remember if she asked me why.
3  Q   Did you indicate to her that she was
4  going to be terminated?
5  A   I did not in that conversation.
6  Q   Did you engage in any investigation
7  into her DRB practices before you made the
8  decision to terminate her, other than what you
9  have already testified to?
10     MS. DIAZ:  Objection.  I just want to
11     remind the witness not to get into any
12     privileged communications or instructions.
13     MR. GOTTLIEB:  I am not asking her
14     about communications.  I'm asking her if she
15     ever engaged in investigation.
16 A   Beyond what I have shared that led to
17 my decision to separate?
18 Q   Yes.
19 A   No.
20 Q   And this document says, quoting from
21 the second sentence, "Her employment at Starbucks
22 is being terminated on 3/1/11 for admitted
23 falsification of daily records book at
24 Store 11649, as well as for her admitted breaking

Page 236

J. Gurtov

1  company policy in regards to bank deposits in
2  which on numerous occasions throughout the months
3  of November 2010 and December 2010 she did not
4  bring store's deposits to the bank daily."  Right?
5  A   Yes.
6  Q   Is that the reason she was
7  terminated?
8  A   Yes.
9  Q   Was there any other reason?
10 A   No.
11 Q   Now, during the termination meeting,
12 do you remember what time she arrived at the
13 regional office?
14 A   I don't remember what time the
15 meeting was.  I know she was on time.
16 Q   Do you remember how long the meeting
17 lasted?
18 A   It was very short.
19 Q   Do you remember the first thing that
20 you said when she walked into the office?
21 A   I don't.
22 Q   Do you remember who else was in the
23 office at the time?
24 A   In the entire office?

Page 237

J. Gurtov

1  Q   No.
2  A   No.
3  Q   In the room where you had this
4  conversation with Ms. Marshall.
5  A   Mark Ormsbee.
6  Q   Was this in your office or a
7  conference room or something else?
8  A   It was in a separate office.
9  Q   What's in that office?  Is there a
10 desk, a table?
11 A   An L-shaped desk with a couple
12 chairs.  There may have been a bookcase in there.
13 Q   Did Ms. Marshall take a seat when she
14 walked into the office?
15 A   Yes.
16 Q   Okay.  What did you say to her?
17 A   I don't remember the exact specifics
18 of the conversation, but there wasn't small talk.
19 I basically jumped into the separation document.
20 Q   Anything else?
21 A   I gave her a packet of information
22 that we give salaried managers when they are
23 separated that gives them directions on how to
24 follow up on their benefits and their stock in the

Page 238

J. Gurtov

1   401(k) and things on that end.
2   Q   Anything else?
3   A   I had asked her to sign this.  She
4   wouldn't sign it.  And no.  She basically got up
5   and left.
6   Q   Did she say anything?
7   A   I think all she said was, "I'm not
8   signing this."  Snatched the paper from the table,
9   got up, and walked out of the room.
10   Q   And that was how the meeting ended?
11   A   Yes.
12   Q   When you -- when you talked to
13   Ms. Marshall on the phone, to schedule the meeting
14   with her --
15   A   Um-hum.
16   Q   -- do you remember how long that call
17   lasted?
18   A   It was short, maybe two minutes.
19   Q   Do you remember anything you said
20   other than to meet you at the office?
21   A   No.  It was really quick and to the
22   point.
23   Q   Did you ask her how she was feeling?
24   A   I may have, but I don't remember.

Page 239

J. Gurtov

1   Q   Did you ask her how she was feeling
2   when she came to your office?
3   A   I may have, but I don't remember
4   specifically.
5   Q   Do you remember anything else that
6   Ms. Marshall said during the termination meeting
7   other than what you have already testified to?
8   A   No.
9   Q   Do you remember anything else that
10   you said during the termination meeting other than
11   what you have already testified to?
12   A   No.
13   Q   Now, earlier when we were talking
14   about visits to stores --
15   A   Um-hum.
16   Q   -- you said that Ms. Marshall's
17   stores, it was fair to estimate you visited them
18   in total approximately 15 times in 2009 and
19   approximately the same number in 2010.
20   A   Yes.
21   Q   Would you say that that would be
22   accurate for all of your stores, approximately?
23   A   It really depends on the situation of
24   the store and the store manager, as well as the

Page 240

J. Gurtov

1   situation of the rest of the district.
2   Q   Okay.  But is it fair to say that you
3   have approximately four store plan of action
4   visits her year for each store?
5   A   Yes.
6   Q   Is it fair to say that you have at
7   least four follow-up meetings for each store
8   within your district each year?
9   A   I would say that is fair to say.
10   Q   Is it fair to say that on top of
11   that, you have additional visits to the store for
12   other various reasons?
13   A   It's possible.  It's not definite.
14   For each of the other stores.
15   Q   But each store, it's fair to say you
16   have at least eight visits per year?
17   A   I would think that that is fair to
18   say.
19   Q   Is it fair to say for some stores,
20   you may have upwards of 20 visits per year?
21   A   I would think that is fair to say,
22   depending on the situation of the store manager.
23   MR. GOTTLIEB:  Okay.  I need to just
24   take a few-minute break.

Page 241

J. Gurtov

1   (Recess taken.)
2   MR. GOTTLIEB:  Back on the record.
3   (Gurtov Exhibit 20 marked for
4   identification as of this date.)
5   Q   Ms. Gurtov, I have just handed you
6   what's been marked Gurtov 20.
7   A   Um-hum.
8   Q   Do you recognize this document?
9   A   It appears to be the daily records
10   book from July of 2010 from Store 847.
11   Q   Just for the record, I have this
12   document internally labeled DRB 8959 to DRB 10053.
13   Do you know if you ever reviewed the
14   daily records book from July of 2010 at Store 847?
15   A   I don't recall if I did, this
16   specific daily records book.
17   Q   You may have, though?
18   A   It's possible.  I don't recall.
19   Q   Okay.  Do you know if you ever
20   reviewed any daily records book at Store 847
21   during 2010?
22   A   I don't recall.
23   Q   I would like you to turn to page
24   9117.  Okay.  Now, this is the cash management log

Page 242

J. Gurtov

1  for July 22, 2010; is that correct?
2
3      A   Yes.
4      Q   Do you know who the store manager was
5  of Store 847 at that point?
6      A   I believe -- it should be Zakia, but
7  if I could take a peek through here.
8          Yes, it was Zakia Slade.
9      Q   Is she still employed at Starbucks?
10     A   She is still employed at Starbucks.
11     Q   Is she still the store manager at
12  847?
13     A   No.
14     Q   Where is she the store manager?
15     A   She actually transferred down to
16  Atlanta, Georgia. I'm not sure of the store
17  number.
18     Q   Do you see any errors with this page
19  of the cash?
20     A   I do.
21     Q   Where are the errors?
22     A   I see errors in the top section, that
23  the time is not filled out for the end time for
24  Tamara. The same with Pablo, the end time is not
25  filled in.

Page 243

J. Gurtov

1
2      I also see errors here where he has
3  slashes, Pablo on the right-hand side slashes in
4  different sections of the boxes.
5      I see another empty space down here
6  on the bottom left of his safe count.
7      I see the deposit section not filled
8  out for it having been brought to the bank, and I
9  also see that no partner tip bags were dropped on
10  that day.
11     Q   Are these violations of company
12  policy?
13     A   Yes, they all are.
14     Q   Can you please flip just a couple of
15  pages before this page of the cash handling
16  management log, and a couple pages after, and tell
17  me if you can identify the bank receipt for that
18  day.
19     A   No. It doesn't seem to be there.
20     Q   Is that a violation of company
21  policy?
22     A   Yes, that is.
23     Q   Can you look at this cash management
24  log and have any idea if a deposit was made to the
25  bank?

Page 244

J. Gurtov

1
2      A   From the information I am looking at
3  here?
4      Q   Yes.
5      A   No.
6      Q   Is that a problem?
7      A   Yes, that would be a problem.
8      Q   Is that a major problem?
9      A   It's a problem.
10     Q   I would like you to turn to page
11  9131. This is for July 25, 2010; is that correct?
12     A   Yes.
13     Q   Are there any errors on this page?
14     A   Again, there are blank spots up in
15  the safe count. And the deposit does not appear
16  to have been taken to the bank.
17     Q   Anything else?
18     A   There -- just that -- the blank spots
19  up top. The tips are removed.
20          Yeah, actually, there is another
21  violation. Tamara is the one that did the
22  deposit, and she began it at 3:10, after she had
23  already given the safe to Richie, so it would have
24  then been -- Richie would have been the cash
25  controller. He should have done the deposit. Or

Page 245

J. Gurtov

1
2  Tamara should have held on to the safe until she
3  completed doing the deposit.
4      Q   Was Zakia Slade responsible for
5  managing this cash management log?
6      A   She was.
7      Q   Do you have any idea when the
8  deposits for 7/25, 2010, went to the bank?
9          MS. DIAZ:  Based on the documents in
10  front of her?
11         MR. GOTTLIEB:  Or anything else.
12     A   No, I don't.
13     Q   Is that a problem?
14     A   Yes.
15     Q   Is that a major problem?
16     A   It's a problem.
17     Q   Why can't you say it's a major
18  problem?
19     A   Because I would have to investigate
20  to understand, have a better understanding of what
21  happened during these several days.
22     Q   Did you ever know that Ms. Slade was
23  keeping her DRB in this condition?
24     A   No.
25     Q   What would you have done had you

Page 246

J. Gurtov

1  known?
2      A    I would have had a conversation with
3  her to see -- to ask more questions and find out
4  where the deposit slips were for this bank deposit
5  and things on that end.
6      Q    Did you ever have a discussion like
7  that with her?
8      A    I did not.  I had not looked at this
9  before.
10      Q    Can you turn to page 10053.  Do you
11  see any errors on that page?
12      A    I do.
13      Q    Can you list them?
14      A    Pablo up on top in the safe count
15  doesn't have an end time to his safe count.  I
16  also see that the safe went out of its total
17  change fund, which was supposed to be 2400.  When
18  Zakia opened it, it was 2410.  When Richie closed
19  it, it was short at 2280.
20          I also see blank spots in Pablo's
21  section of the safe count.
22          Going down into the next section, I
23  see that Zakia did not have a deposit witness, and
24  I also see an incompletely filled-out section for

Page 247

J. Gurtov

1  Pablo bringing the deposit to the bank.
2          I actually also -- if you go down to
3  the tip section, under the partner number and the
4  initials, whoever's partner numbers those are and
5  initials they are, they should have wrote them
6  singularly per line.  The same thing with the
7  time.  But they doubled up into two brackets,
8  which is also against standards.
9      Q    It's fair to say there are a number
10  of problems with this cash management log entry?
11      A    Yes.
12      Q    Do you know whether a deposit went to
13  the bank on 3 -- on 7/31, 2010?
14      A    From the page that I am looking at,
15  no.
16      Q    What about any other pages?
17          MS. DIAZ:  Are you asking her to go
18  through the entire book?
19          MR. GOTTLIEB:  No.
20      Q    You can look at the few pages before
21  until you get to the previous day.
22      A    From these pages, no.
23          MS. DIAZ:  Let the record reflect the
24  witness is only looking at a few pages

Page 248

J. Gurtov

1  before and after 10053.
2      A    No.  From these pages, I wouldn't
3  know that.
4      Q    Is that a problem?
5      A    It would be something that I would
6  address with Zakia if I was going through this
7  book.
8      Q    Would you prefer if a deposit went to
9  the bank a couple of days late or would you prefer
10  to not know whether the deposit went to the bank
11  at all, if you had to choose between the two?
12      A    I prefer for standards to be
13  followed.  I mean both are violations and both
14  would be addressed with coaching.
15      Q    I guess what I am asking is, which
16  would be a worse violation, where you knew a
17  deposit went to the bank because you had a bank
18  receipt but it went to the bank a few days late,
19  or where you could not verify whether a deposit
20  went to the bank at all?
21      A    If I could not verify the deposit
22  went to the bank and the money was missing, that
23  would be a big -- that would be a larger issue.
24  If the money had made it to the bank, then the

Page 249

J. Gurtov

1  issues would be the same.
2      Q    Now, we have just gone through a few
3  pages of the July daily records book from
4  Store 847, and there have been a number of issues
5  on these pages; correct?
6      A    Correct.
7      Q    If those issues were systemic and
8  continuous, would you view that as a serious
9  problem?
10      A    That is something I would talk to the
11  store manager about.
12      Q    Is that something that you ever
13  talked to Ms. Slade about?
14      A    Not that I can recall.
15          (Gurtov Exhibit 21 marked for
16  identification as of this date.)
17      Q    I am handing you what has been marked
18  Gurtov 21.  Please review that document and tell
19  me if you recognize it.
20      A    It seems to be the daily records book
21  for October of 2011, from Store 3421.
22      Q    Can you just turn to page 4179?  Do
23  you see on the top it says 10/4, 2010?
24      A    Yes.

Page 250

J. Gurtov

1
2    Q    Does that indicate to you that this
3  daily records book may not be for the year 2011?
4    A    Oh, no.  First quarter of 2011.  It's
5  the new fiscal year, but on the calendar year it
6  would still be 2010.
7    Q    Okay.  I would like you to turn to
8  page -- well, let me ask you this:  For 3421, who
9  is the current store manager?
10   A    Blake Ringstaff.
11   Q    Was he the store manager in
12 October 2010?
13   A    Yes.
14   Q    Did you ever have any discussions
15 with him regarding his daily records book?
16   A    I may have.
17   Q    Can you identify any conversation you
18 have had with him regarding his daily records
19 book?
20   A    Not that I can recall specifically.
21   Q    How about generally?
22   A    Not that I can recall.
23   Q    Can you turn to page -- and just for
24 the record, this is internally Bates stamped DRB
25 4178 through DRB 4399.  A copy of all these

Page 251

J. Gurtov

1
2  documents have been provided to counsel during the
3  course of the deposition.
4        I would like you to turn to page
5  4207.  Can you identify all the errors on this
6  page?  For the record, it's dated Sunday, 10/1 --
7  10/10, 2010, on the top.
8        Please identify all the errors on
9  this page.
10   A    I am looking for them.
11       I notice that the deposits bank
12 section is not filled out, and partner tip drop
13 log is not filled out for the day.
14   Q    Anything else?
15   A    Not that I can see from first glance.
16   Q    Is this a failure on Blake's part?
17   A    Is what a failure on Blake's part?
18   Q    All these errors in the cash
19 management log.
20   A    It's Blake's responsibility as the
21 store manager to review his daily records book and
22 coach his partners.
23   Q    So any errors in the book would be
24 his responsibility?
25   A    Would be his responsibility to find

Page 252

J. Gurtov

1
2  and then coach his partners on them.
3    Q    Okay.  So, in addition to the errors
4  that you just mentioned, can you tell me whether
5  there is a bank receipt attached to this page?
6  You can look a few pages before and a few pages
7  after.
8    A    There doesn't appear to be.
9        MS. DIAZ:  Just let the record
10   reflect that the witness is only looking at
11   a few pages before and a few pages after.
12       MR. GOTTLIEB:  I think the record
13   already reflected that by my own direction.
14       MS. DIAZ:  I'm making a record.
15       MR. GOTTLIEB:  The record was clear.
16       MS. DIAZ:  I disagree.
17   Q    From looking at this cash management
18 log, do you have any idea when a deposit was made
19 for the day of 10/10/10?
20   A    I do not from the page that I am
21 looking at.
22   Q    From the pages you viewed of the cash
23 management log, can you verify whether a deposit
24 was ever even made to the bank?
25   A    I cannot verify that from the page

Page 253

J. Gurtov

1
2  that I am looking at.
3    Q    From the pages that you have looked
4  at?
5    A    I can't verify that.
6    Q    Okay.  Can you turn to page 4212.
7  Can you identify all the errors on this page.  For
8  the record, it's Monday, the next day, 10/11,
9  2010.
10   A    There is a missing spot in the till
11 audit under register ID.  There is also -- the
12 section of deposit to bank is not filled out
13 completely.
14   Q    Is it filled out at all?
15   A    No, it's not filled out at all.
16   Q    Okay.  What else?
17   A    Those are the two things that I
18 notice.
19   Q    Can you tell me by looking at the
20 pages before and the pages after when this deposit
21 went to the bank?
22   A    From the two pages prior, and the two
23 pages post, I cannot tell when this deposit was
24 made to the bank.
25   Q    There is no bank receipt; correct?

Page 254

```
1                J. Gurtov
2      A    There is no bank receipt.
3      Q    Is that a violation of company
4  policy?
5      A    Yes, it is.
6      Q    Is it a violation of company policy
7  that the bank deposit section is completely blank?
8      A    Yes, that is.
9      Q    Turn to page 4235.  This is -- can
10 you please identify every error on this page, and
11 for the record, it's dated 10/17/10 on the top.
12     A    During the deposit prep section,
13 there is not a completion time filled out for the
14 deposit to the bank.  It has non-applicable
15 written in the -- written in the slots, which is
16 not to standard.
17          And there is no witness for the tip
18 bags being dropped, as well as the partner who
19 dropped them, their partner number and their
20 initials, they have one set of numbers and one set
21 of initials occupying two boxes, and it should be
22 singular per line.
23     Q    Would you say it is fair to say there
24 is a lot of errors on this page?
25     A    There are several errors on this
```

Page 255

```
1                J. Gurtov
2  page.
3      Q    And there are several errors on this
4  page that are violations of company policy?
5      A    Yes.
6      Q    Is it fair to say there are several
7  errors on the three pages we have looked at which
8  is over the course of approximately a week?
9      A    Yes.
10     Q    Have you ever seen these errors
11 before?
12     A    I have not.
13     Q    Have you ever reviewed this book
14 before?
15     A    I have not.
16     Q    You are sure?
17     A    Not that I recall.
18     Q    Might you have reviewed this book
19 during one of your store visits?
20     A    No, because if I had reviewed this
21 book during a store visit, it would have either
22 been highlighted in sections that are missing, I
23 would have had coaching conversations, which I may
24 have but not remember, but I don't -- I don't
25 believe I have looked at this book.
```

Page 256

```
1                J. Gurtov
2      Q    And the reason you don't believe you
3  have looked at it is because the manager would
4  have been disciplined in some way had you looked
5  at it?
6      A    Yes, or spoken to.  I would have had
7  to uncover the circumstances behind it.
8      Q    What is the store manager's name
9  again?
10     A    Blake Ringstaff.
11     Q    Blake Ringstaff?
12     A    Yeah.
13     Q    Is that a man or a woman?
14     A    A man.  And to be clear on it, that
15 is his middle name.  His first name is Kenneth.
16     Q    If I were to represent to you that
17 the errors we have just seen occurred throughout
18 the month of October 2010, what would your
19 response be?
20     A    My response would be that there are
21 violations in this book.
22     Q    Violations that require corrective
23 action?
24     A    Violations that definitely required
25 initial coaching, if not corrective action.
```

Page 257

```
1                J. Gurtov
2      Q    Now that you see these errors, do you
3  plan on having a coaching conversation with him?
4      A    I don't know that I would have a
5  coaching conversation with him about his book from
6  October, but it's possible that I could go into
7  his store and look at his current book.
8      Q    I'm not asking if it's possible.  I'm
9  asking, are you going to?
10     A    I -- I don't know.  I don't have that
11 in my plan for the remainder of the week.
12     Q    Now that you have seen these errors,
13 do you have it in your plan at all?
14         MS. DIAZ:  Objection.
15     A    Right now, I'm focused on the moment
16 that we have in hand, not in taking further
17 disciplinary action on partners for things that
18 happened over a year ago.
19     Q    I'm not asking if you are going to
20 take disciplinary action at this point.  I'm
21 asking are you going to investigate Blake's cash
22 management protocol now that you have seen these
23 errors?
24     A    I plan on continuing business as
25 normal.  So when Blake's SPA day is coming up on
```

Page 258

J. Gurtov

1  the calendar, this is something that I will
2  address and look at during his SPA day.
3           (Gurtov Exhibit 22 marked for
4           identification as of this date.)
5       Q    I am handing you what's been marked
6  Gurtov 22.  For the record, it's internally Bates
7  stamped DRB 17114 to 17195.
8           Do you recognize this document?
9       A    It looks like the cover of a daily
10 records book from Store 7255.
11      Q    Who is the store manager of 7255?
12      A    David Smith.
13      Q    Do you know if he was the store
14 manager in December 2010?
15      A    Yes, he was.
16      Q    Is he still the store manager today?
17      A    Yes, he is.
18      Q    Have you ever disciplined him for any
19 problems with his DRBs?
20      A    I don't know specifically around
21 DRBs.
22      Q    Do you know if you ever reviewed his
23 November 2010 DRB?
24      A    I don't recall.

Page 259

J. Gurtov

1       Q    So you may have?
2       A    It's possible, but I don't recall.
3       Q    You don't recall whether you did or
4  whether you didn't?
5       A    Correct.
6       Q    Okay.  Could you turn to page 17122.
7  Can you please identify all the errors that you
8  notice on this page.
9           For the record, it's identified as
10 11/1, 2010, at the top.
11      A    There is nothing specifically that is
12 jumping out to me as an error.
13      Q    Do you see where it says "date to
14 bank"?
15      A    I do.
16      Q    And what does it say there?
17      A    November 1, of 2010.
18      Q    Okay.  And the deposit amount was
19 $2,284.38; correct?
20      A    And 36 is what it appears to be in
21 here, yes.
22      Q    Would you turn to the previous page.
23 Do you see toward the lower left-hand corner,
24 there is a bank receipt?

Page 260

J. Gurtov

1       A    I do.
2       Q    Does it say the date that the deposit
3  went to the bank?
4       A    It's unclear, but it appears to be
5  November 2nd.
6       Q    So is it fair to say that the date to
7  bank section of the cash management log was
8  falsified?
9       A    No.  I would have to investigate
10 further to have a better understanding of what
11 happened here.
12      Q    Well, what more do you need to know
13 to know that it's falsified if the bank receipt
14 says 11/2/10 and 11/1/10 was written in the date
15 to bank?
16      A    I would have to have a conversation
17 with the store manager.  I don't know, I --
18 don't -- I can't speculate as to what could have
19 happened.  I know that I would have to have a
20 conversation with the store manager to have a
21 better understanding of what did happen.
22      Q    Is it fair to say there is a
23 misrepresentation on the cash management log about
24 when the deposit went to the bank?

Page 261

J. Gurtov

1       A    It appears that way, but for all I
2  know, as a hypothetical situation, where there
3  could have been something wrong with the bank,
4  they could have had to drop it into the drop box
5  because of long lines, that they couldn't be away
6  for their business for a length of time.  If they
7  dropped it into the drop box, it could have been
8  done the following day.
9       Q    Turn to page 17124.  This is the
10 following day, 1/12, 2010; correct?
11      A    Yes.
12      Q    What does it say for date to bank?
13      A    Date to bank, 1/12, 2010.
14      Q    And the amount of the deposit is
15 $2,322.59; correct?
16      A    Yes.
17      Q    If you turn to the previous page,
18 there is a bank receipt.  You might need to turn
19 the book sideways to do it.
20      A    It says November 3rd.
21      Q    Does that indicate to you that the
22 date to bank section on the cash management log is
23 falsified?
24      A    No.  What it does indicate to me is

Page 262

J. Gurtov

1  that there is a two-day trend of something strange
2  happening, so I would have to ask the store
3  manager to get a better understanding of what it
4  is.
5      Q    Is it fair to say at the very least
6  there is a misrepresentation on the date of the
7  bank deposit?
8      A    It's not fair to say that unless I
9  have a conversation with the store manager and do
10  a further investigation.
11      Q    Please turn to page 17128.  Okay.
12  This is later in the week, on 1/19/2010, at the
13  top of the page.
14          Is there a date to bank indicated on
15  this page?
16      A    It appears to be November 4th.
17      Q    Okay.  Can you turn to the previous
18  page, 17121.  Is there a bank receipt there that
19  indicates the time that the bank deposit actually
20  went to the bank?
21      A    November 5th.
22      Q    Does that indicate to you that the
23  record was falsified here?
24      A    It appears -- in a similar answer, it

Page 263

J. Gurtov

1  appears that there is a trend here that I would
2  have to talk to the store manager about to have a
3  better understanding of what happened here.
4      Q    If I told you that what we have just
5  reviewed happened 14 times in the month of
6  November 2010, what would that indicate to you?
7          MS. DIAZ:  Objection.
8      A    It would indicate that there is a
9  trend similar to what I just shared that I would
10  have to review with the store manager to have a
11  better understanding of.
12      Q    Does it indicate to you that there is
13  misrepresentations going on in the daily records
14  book?
15      A    It does not until I would be able to
16  make that -- to have a clear understanding of it.
17      Q    So, what you have just reviewed, that
18  doesn't indicate to you any misrepresentation?
19          MS. DIAZ:  Objection.
20      A    I would have to speak with the store
21  manager to have a better understanding.
22      Q    Well, how could -- how could a store
23  manager allow a daily records book to say the
24  wrong date for a printed bank receipt?  What could

Page 264

J. Gurtov

1  the explanation be?
2          MS. DIAZ:  Objection.
3      Q    The date is wrong; correct?
4      A    There was a time when -- and this can
5  go back years ago, and this is a store manager
6  that has had a tenure for quite some time.  So I
7  would be interested in looking in all the books,
8  that the deposits were made for the day prior the
9  following day.
10          And there have been differences in
11  how people continue to do these things.  This is
12  something that I would need to look into, to have
13  a deeper understanding of.  Because it's such a
14  trend of it, I would assume that there is a larger
15  story behind it than what's on the page.
16      Q    Why would you assume that?
17      A    Because of the trend.
18      Q    Now, did you ever review this DRB
19  before?
20      A    I don't believe so.
21      Q    Do you know so?
22      A    No.
23      Q    So you may have?
24      A    No.  I don't believe so.  I would

Page 265

J. Gurtov

1  have caught it.
2      Q    You are certain of that?
3      A    I do feel confident in that.  I don't
4  believe I had looked at this one.
5      Q    Do you know if you have looked at any
6  of this store manager's DRBs in the last year?
7      A    I may have.
8      Q    But you don't know?
9      A    I don't know.
10      Q    Now that you see these errors, are
11  you going to investigate this issue?
12      A    There is some -- I will look in his
13  current daily records books.
14      Q    What else?
15      A    I will look at his current daily
16  records books.
17      Q    If he's unable to give you a
18  satisfactory explanation, is he going to be
19  disciplined for this?
20          MS. DIAZ:  Objection.
21      A    I need to have a conversation with
22  him.
23      Q    But discipline is a possibility?
24      A    I need to have a conversation with

Page 266

J. Gurtov

1  him.
2      Q      Why would you need to have a
3  conversation with him?
4      A      To have a better understanding of
5  what happened in these circumstances.
6      Q      Why do you need a better
7  understanding about what happened?
8          MS. DIAZ:  Objection.  Asked and
9      answered.
10     Q      Why do you need a better
11 understanding of what happened?
12     A      As I shared before, this is not a
13 clear representation of -- there is a trend in
14 here of something that looks against policy, and I
15 would have to do an investigation to understand
16 what is going on.
17     Q      Why would you need to do an
18 investigation?
19         MS. DIAZ:  Objection.
20     Q      Let me ask this:  Why do you need to
21 have a better understanding of what is going on?
22     A      This is the things that I do in every
23 situation with every store manager that I have.
24     Q      So, you want to make sure that this

Page 267

J. Gurtov

1  store manager is running the store properly.
2      A      Yes, that things are happening the
3  right way.
4      Q      If he's unable to give you an
5  adequate explanation for why the daily records
6  book isn't kept properly, is discipline a
7  possibility?
8      A      We are talking a hypothetical.
9      Q      Is discipline a possibility?
10     A      Discipline is a possibility.
11 Non-discipline is a possibility.
12         (Gurtov Exhibit 23 marked for
13     identification as of this date.)
14     Q      Okay.  I would like to hand you
15 what's been marked Gurtov 23.  Do you recognize
16 this document?
17     A      Yes.  I apologize.  What am I saying
18 yes to?
19         (Record read.)
20     A      Yes, I do.
21     Q      Just let me know if you can't hear.
22 I'll just say in the future, if there is any
23 question I ask that you don't hear, let me know so
24 I can make sure you understand what I am asking.

Page 268

J. Gurtov

1          This is a DRB for 7/10 of Store 7261?
2      A      It appears to be.
3      Q      Can you please turn to page 17926.
4  For the record, this is Bates stamped 17880
5  through 18005.
6          Can you please indicate all the
7  errors you see on that page.
8      A      Up top, whoever had the safe in the
9  morning closed it out at three.  The next person
10 doesn't appear to have counted in until six.  So
11 there is a three-hour gap there.
12         There is a crossed-out section in the
13 first column that it's illegible.
14     Q      Anything else?
15     A      The safe count does not remain
16 consistent.  It begins at 1801 and then goes to
17 1799 and stays at that throughout the day.
18         And there is not a bank validated
19 section on the bottom with a deposit slip.
20     Q      Okay.  What is the date to bank on
21 this page of the cash management log?
22     A      April 10, 2010.
23     Q      Okay.  And the amount of the deposit
24 for that day was what?

Page 269

J. Gurtov

1      A      There is nothing under the bank
2  validated section.
3      Q      Okay.  What about in the deposit prep
4  section?
5      A      It looks like it could read 1,959, or
6  it looks like it could read 1,459.
7      Q      Could you please turn to page 17928.
8      A      Yes.
9      Q      Okay.  And does that appear to be the
10 receipts for that page of the daily records book?
11     A      It does.
12     Q      Okay.  What's the date that the bank
13 receipt is dated?
14     A      April 12th.
15     Q      Okay.  And the cash management log
16 says April 10th; is that correct?
17     A      It does.
18     Q      So does that appear to be a
19 misrepresentation?
20     A      It appears to be something that I
21 would talk to the store manager about.
22     Q      If it is a misrepresentation, is that
23 a serious problem?
24     A      It is a problem, and it is against

1           J. Gurtov
2   company standards.
3        Q    Could you please turn to 17930.  Can
4   you please indicate all the errors on this page.
5        A    The opener is missing and end time.
6   There is blank sections in the safe count
7   underneath the opener.
8            The deposit prep is missing a
9   witness.  The deposit to bank is also missing a
10  witness.
11           The date is also not written on top,
12  and no tips were dropped.
13       Q    Okay.  Who is the store manager of
14  7261?
15       A    Currently it's Brandon Giles.
16       Q    Was Brandon Giles the store manager
17  in April 2010?
18       A    Yes.
19       Q    Do you know if you have ever reviewed
20  this DRB?
21       A    I don't know.  I don't believe that I
22  have.
23       Q    But can you say you have not?
24            MS. DIAZ:  Objection.
25       A    I don't believe that I have.  I don't

1           J. Gurtov
2   see my notes written in it.  No.  I would say that
3   I have not.
4        Q    You can definitively say that?
5            MS. DIAZ:  Objection.
6        A    I can't definitively say it, but
7   there would be some kind of notation.
8   Highlighting would show up on the Xerox copy of it
9   that would indicate that I had looked at it.
10       Q    Okay.  What does it say for bank, or
11  date to bank on this page?
12       A    April 11, 2010.
13       Q    Okay.  I would like you to turn to
14  the next page.  There is a bank receipt; right?
15       A    Yes.
16       Q    Does that appear to be the bank
17  receipt for the day we were just looking at?
18       A    It does.
19       Q    What does the bank deposit actually
20  say?
21       A    It's says 2012.  What I can share
22  actually in this case, which could possibly be,
23  because they are both weekend deposits, they could
24  have been brought to the bank and dropped in the
25  nighttime box.  Because the bank doesn't have

1           J. Gurtov
2   employees over the weekend, they would have put
3   the deposit through on Monday, and then they would
4   have picked up their tickets on Monday with that
5   date on them.
6        Q    Okay.  Let's turn to page 17951.
7   Okay.  Now, this was Friday, April 16th, 2010;
8   correct?
9        A    That is correct.
10       Q    Okay.  Is there a section there that
11  says date to bank?
12       A    There is.
13       Q    And it says 4/16, 2010?
14       A    It does.
15       Q    Can you turn to page 17593.  Does
16  that indicate the date that the deposit actually
17  went to the bank?
18       A    It does.
19       Q    And what was the date?
20       A    April 19, 2010.
21       Q    Is it fair to say there was a
22  misrepresentation made on the cash management log?
23       A    Not necessarily that there was a
24  misrepresentation made.  It could indicate several
25  things, and again, I would have to have a

1           J. Gurtov
2   conversation with the store manager.
3        Q    If it was a misrepresentation, is
4   that a serious problem?
5        A    It is a problem.
6        Q    Is that a violation of company
7   policy?
8        A    It is a violation of company policy.
9        Q    Turn to page 17955.  This is dated
10  4/17, 2010; correct?
11       A    It is.
12       Q    And it says date to bank, 4/17/10?
13       A    It does.
14       Q    If you turn to page 17957.
15       A    I am there, and it says that
16  April 19th, 2010.
17       Q    That is a misrepresentation; is that
18  correct?
19       A    It's not necessarily a
20  misrepresentation.  It could be a similar thing.
21  It could indicate something different.  It could
22  indicate something different that would also be a
23  violation.
24            There are definitely violations here,
25  but it's not necessarily a misrepresentation.

Page 274

J. Gurtov

1  Q   Have you ever reviewed this book
2  before?
3  A   I don't believe that I have.
4  Q   Is it fair to say that we reviewed a
5  number of errors in that book?
6  A   Yes.
7  Q   Is it fair to say we have reviewed a
8  number of violations of company policy in that
9  book?
10  A   Yes, we have.
11  MS. DIAZ:  Can we take a quick break,
12  please.
13  MR. GOTTLIEB:  Sure.
14  (Recess taken.)
15  MR. GOTTLIEB:  Back on.
16  (Gurtov Exhibit 24 marked for
17  identification as of this date.)
18  Q   I am handing you what has been marked
19  Gurtov 24.
20  A   Should I give that one back to you?
21  Q   Yes.
22  And this is the daily records book
23  from August 2010 for Store 7547; is that correct?
24  A   It appears to be.

Page 275

J. Gurtov

1  Q   And who is the store manager at 7547?
2  A   Kevin Nagel.
3  Q   Was he the store manager in August of
4  2010?
5  A   Yes.
6  Q   Could you please turn to page -- have
7  you ever reviewed this book?
8  A   Not that I can recall specifically.
9  Q   Do you know if you have?
10  A   No.
11  Q   So you may have or you may not have?
12  A   I -- I could have or could not have,
13  yeah.
14  Q   I would like to turn your attention
15  to page 16317.  For the record, it's Bates stamped
16  DRB 16262 to 16434.
17  For the record, this is a cash
18  management log of Friday, 8/6, 2010; correct?
19  A   Correct.
20  Q   Can you indicate any errors on this
21  page?
22  A   The change fund goes out of the 2000
23  in the closing shift.
24  Under the deposit information, we are

Page 276

J. Gurtov

1  missing a witness.
2  Under deposit prep and deposit to
3  bank, I am missing time to bank, a witness, and
4  the validation time.
5  Q   Are those all violations of company
6  policy?
7  A   Yes.
8  Q   Violations of company policy related
9  to cash management?
10  A   Yes.
11  Q   What is the date to bank?
12  A   August 6th.
13  Q   Okay.  And can you turn to page
14  16320.  Does that appear to be the receipt for
15  that day of the cash management log?
16  A   Yes.
17  Q   Okay.  And what was the date that it
18  actually went to the bank?
19  A   August 9th.
20  Q   Three days later?
21  A   That's what it appears to be.
22  Q   Does that appear to be a
23  misrepresentation?
24  A   It appears to be against a company

Page 277

J. Gurtov

1  policy or that it may be against a company policy.
2  Q   And do you think that is a major
3  problem?
4  A   I would have to talk to the store
5  manager.
6  Q   Can you turn to page 16403.  Can you
7  please identify all the errors in this page, which
8  is dated Sunday, 8/22/10.
9  A   Under the deposit prep, there is no
10  witness.  And there is no information filled out
11  for deposit to bank.
12  And down on the bottom, the
13  information is not filled out completely during
14  the tip drop log.
15  Q   Can you please review a few pages
16  before and a few pages after this cash management
17  page and tell me if you see a receipt for when
18  this deposit went to the bank.
19  A   I do not.
20  Q   Do you have any idea if the deposit
21  for 8/22/10 ever went to the back, from looking at
22  this book?
23  MS. DIAZ:  Let the record reflect the
24  witness only reviewed a few pages before and

Page 278

1             J. Gurtov
2    a few pages after 16403.
3    A    Not from these pages, I don't.
4    Q    Is that a violation of company
5    policy?
6    A    It could be.
7    Q    And who is the manager of the store?
8    A    Kevin Nagel.
9    Q    I am done with that.
10        We have just gone through a number of
11   daily records books in stores that you have
12   supervised; is that correct?
13   A    Yes.
14   Q    Is it fair to say that there are a
15   number of violations of company policies in each
16   book?
17   A    Yes.  Or what could have been.
18   Q    Is it also fair to say that you may
19   have reviewed those books during one of your
20   visits to the stores?
21        MS. DIAZ:  Objection.
22   A    I think it's fair to say that I
23   probably did not review those books.
24   Q    But you may have?
25   A    I don't believe I did.

Page 279

1             J. Gurtov
2    Q    Why don't you -- why do you believe
3    that you did not?
4    A    Because when I review a book,
5    typically -- and see challenges, I either write
6    notations or I highlight, which would show up in
7    the book in the photocopies.
8    Q    Any other reason?
9    A    That's the major reason.
10   Q    Is there any mark that you would tend
11   to make to indicate that you reviewed a daily
12   records book?
13   A    I typically utilize a highlighter.
14   Q    Anything else?
15   A    Occasionally I make notations on one
16   of the side pages.
17   Q    Do you ever put your initials in the
18   corner of the front page or anything like that, to
19   indicate that you reviewed the book?
20   A    Nothing consistent like that.
21   Q    Now, do you think it would be a
22   problem for Starbucks if a DRB went missing?
23   A    I don't know.
24   Q    Are you aware that during this
25   litigation, Starbucks was ordered by the court to

Page 280

1             J. Gurtov
2    produce DRBs from your stores from January 1,
3    2010, through March 2011, as well as all of
4    Serenity Marshall's DRBs while you supervised her?
5    A    Yes.
6    Q    Are you aware that all Serenity
7    Marshall's DRBs have been produced?
8    A    I am not aware of that.
9    Q    I am representing to you that they
10   have been.
11   A    Okay.
12   Q    Are you aware that of the remaining
13   DRBs, which would be 165 DRBs, 56 of them have not
14   been located or produced?
15        MS. DIAZ:  Objection.
16   Q    Are you aware of that?
17   A    I'm not aware of those numbers.
18   Q    Are you aware that a large number of
19   DRBs could not be located or produced?
20   A    I am not aware of that.
21   Q    Have you ever been made aware that
22   any DRBs could not be located or produced?
23   A    Yes.
24        MS. DIAZ:  I just want to remind the
25   witness not to get into any privileged

Page 281

1             J. Gurtov
2    conversations.
3    Q    Have you looked for any DRBs for
4    production?
5    A    Have I personally looked?  No.
6    Q    Do you have any idea how 56 of 165
7    DRBs could go missing?
8    A    No.
9    Q    Do you think you have any
10   responsibility for that?
11   A    No.
12   Q    Who does?
13   A    My store managers.
14   Q    Anyone else?
15   A    My store managers.
16   Q    Anyone else, I said.
17   A    No.
18   Q    Do you think part of the problem
19   could be that stores may not have even used DRBs
20   during some period?
21   A    No.
22   Q    Why don't you think that could be the
23   problem?
24   A    Because I have never -- I have never
25   experienced something like that.  It is one of the

71 (Pages 278 to 281)

Page 282

J. Gurtov

1  commonest forms of the way they communicate to one
2  another.
3  Q    Can you explain what you mean by
4  that?
5  A    Just that -- I mean it's such a
6  commonly used book, this book.  That and the duty
7  roster travel everywhere throughout the store.
8  Q    How do you know that the daily
9  records book is a commonly used book in your
10  stores?
11  A    Because I see it in the stores in
12  use.
13  Q    When you visit the stores?
14  A    Yeah.
15  Q    Can you identify any way Starbucks'
16  business is going to be impacted by the way 56
17  DRBs have apparently gone missing?
18  A    I don't know how it would be impacted
19  by that.
20  Q    Can you identify any way that you
21  will be impacted by that?
22  A    I don't know how I would be impacted
23  by it.
24  Q    Is there any way you can identify?
25

Page 283

J. Gurtov

1  A    I don't know.
2  Q    Do you know whether Store 847 used
3  DRBs from January 2010 through June 2010?
4  A    I can't comment on that in this
5  moment.
6  Q    Why is that?
7  A    Store 847, January 2010 to June of
8  2010, I would need to look and visually see them.
9  I don't know that I have looked at them.
10  Q    Is the answer that you don't know?
11  A    Yeah.
12  Q    Do you know whether Store 3421 used
13  any DRBs from January 2010 through April 2010?
14  A    I don't know.
15  Q    Do you know whether Store 3421 used
16  any DRBs from June 2010 through September 2010?
17  A    I don't know the answer to that.
18  Q    Do you know whether Store 7255
19  maintained any DRBs from January 2010 through
20  September 2010?
21  A    I don't know the specific answer to
22  that.
23  Q    Do you know whether Store 7547 used
24  any DRBs from October 2010 through December 2010?
25

Page 284

J. Gurtov

1  A    I -- I don't know the answer to this.
2  Q    Do you know whether Store 7675
3  maintained any DRBs from March 2010 through
4  March 2011?
5  A    I don't know the answer to it.
6  Q    That's a one-year period.
7  A    My assumption when I am in the
8  stores, the stores are constantly using daily
9  records book.  I don't know.  I don't -- I'm
10  assuming that the books you just shared with me
11  may be missing books.  I don't know why they are
12  missing.
13  Q    No, but what I am asking is, do you
14  know whether Store 7675 used any DRBs from
15  March 2010 to March 2011?
16  MS. DIAZ:  Objection.
17  Q    As you sit here today.
18  A    I would have to say yes, because I
19  have had store visits where I see the daily
20  records books in their stores.
21  Q    Do you know whether Store 7711 used
22  any DRBs from January 2010 through December 2010?
23  A    I have seen them in the stores.
24  Q    So you know they have?
25

Page 285

J. Gurtov

1  A    I -- I don't know for certain, but I
2  have been in the store within a year time frame
3  and I see their daily records books.
4  Q    Who's Carlos Monterra?
5  A    Carlos Monterra is a store manager
6  from Store 13538 from back -- I had him under my
7  supervision from October of 2010 through
8  December 2010.
9  Q    How would you describe him as an
10  employee?
11  A    Carlos was -- he was a long-term
12  store manager.  Had, had a lot of bad habits.
13  Didn't always follows policies and procedures.
14  Didn't know always -- wasn't focused on doing the
15  right thing for his partners.
16  (Gurtov Exhibit 25 marked for
17  identification as of this date.)
18  Q    I am handing you what's been marked
19  Gurtov 25.  Do you recognize this document?
20  A    I don't.
21  Q    Have you ever seen that before?
22  A    No.
23  Q    Were you supervising Mr. Montero as
24  of August 24th, 2009?
25

72 (Pages 282 to 285)

Page 286

```
                J. Gurtov
1
2       A      No.
3       Q      Was Steven Rivera his supervisor?
4       A      That appears to be from this form.
5       Q      Okay.  Was Mr. Montero store manager
6    as of August 2009?
7       A      It doesn't say that on here.
8       Q      Who is Steven Rivera?
9       A      Steve Rivera is another district
10   manager, was another district manager.
11      Q      Was Store 13538 not within your
12   district as of August 2009?
13      A      It was not.
14      Q      Do you remember if you reviewed this
15   document when you terminated Mr. Monterra?
16      A      I don't remember having seen this
17   document.
18             (Gurtov Exhibit 26 marked for
19   identification as of this date.)
20      Q      I am handing you what's been marked
21   Gurtov 26.  Do you recognize this document?
22      A      Yes.  It seems to be the separation
23   plan for Carlos.
24      Q      Okay.  And on the bottom there is a
25   comment section; right?
```

Page 287

```
                J. Gurtov
1
2       A      Yes.
3       Q      And did you write that comment?
4       A      Yes.
5       Q      It indicates the reason Mr. Monterra
6    was terminated; correct?
7       A      Yes.
8       Q      And it says that on two separate
9    occasions, Carlos took sealed deposits from his
10   store, he deposited them into the bank four days
11   later in drop bags with different numbers than the
12   bag the deposit was in when he took it out of his
13   store; correct?
14      A      Correct.
15      Q      What does that mean?
16      A      That --
17      Q      Or strike that.
18             What does it mean he took sealed
19   deposits from his store?
20      A      It means that he had prepared the
21   deposit, sealed the bag, put it in his bag, left
22   the store with it, and then when he brought it in
23   to deposit, the four days afterwards, he had
24   deposited it in a different sealed bag, indicating
25   that while the bag was out of the store, it was
```

Page 288

```
                J. Gurtov
1
2    opened, the money was taken out of it, and the
3    money was then put into a different bag by the
4    time it was put into the bank.
5       Q      Is that a problem?
6       A      Yes.
7       Q      Why?
8       A      He took money out of the store is the
9    initial problem.
10      Q      Why is that a problem?
11      A      That he took money home with him?
12      Q      Yes.
13      A      It goes against our policies and
14   standards.
15      Q      Any other reason?
16      A      That is the major reason.
17      Q      Okay.  Do you think that is a cash
18   safety issue?
19      A      I do.
20      Q      Do you think that is a serious cash
21   safety issue?
22      A      I do.
23      Q      Do you think that is a major cash
24   safety issue?
25      A      We continue to use these words.  This
```

Page 289

```
                J. Gurtov
1
2    is an issue that is against company policies and
3    standards.
4       Q      And you consider it a significant
5    violation?
6       A      Yes.  It leads to separation from our
7    company.
8       Q      How did you first learn that this was
9    a problem?
10      A      Believe it or not, I was in the store
11   with Carlos and he had asked me to look at his
12   daily records book because he wanted to show me
13   improvement from the month prior while he was
14   there.  While I was looking at the daily records
15   book, I noticed the discrepancy in one week's
16   worth, and I asked him what happened.
17             He wasn't sure, and it prompted me to
18   continue to look deeper into the log, and I saw it
19   the following week, and I asked him what happened,
20   and then he admitted to taking the funds out of
21   the store with him.
22      Q      Why do you say "believe it or not"?
23      A      Because we were not going to get to
24   this section that day and he asked me to look at
25   his book so that he could show me the improvements
```

Page 290

```
1              J. Gurtov
2   that he had made versus the prior week or the
3   prior time that I had looked at the books.
4       Q     Do you say "believe it or not"
5   because you think it's unbelievable that he would
6   ask you to look at the daily records book?
7       A     When he has an offense like this in
8   there.
9       Q     Why is that so unbelievable?
10      A     Because of he had taken money out of
11  the store, and it's a separable offense.
12      Q     Okay. After you learned that he had
13  taken money out of the store -- I want to ask you
14  this: Which is a worse offense, taking the money
15  out of the store or depositing the funds four days
16  late?
17            Let me ask you this: Can you
18  determine which is worse?
19      A     It's a full story of a picture that
20  happened. So if the facts happened that the money
21  sat in the store and was deposited four days late,
22  it -- it could have been handled differently, it
23  could not have been handled differently.
24            But the fact that that issue happened
25  on top of the fact that the money was brought out
```

Page 291

```
1              J. Gurtov
2   of the store, and he admitted that he brought the
3   money home with him, on top of the fact that it
4   wasn't deposited in the same bag that he brought
5   it out of the store with, that whole story
6   combined creates a different picture, which is
7   what he separated for, and that creates a serious
8   offense to be terminated.
9       Q     Now, did you terminate him on the
10  spot?
11      A     I did not.
12      Q     Okay. What did you do?
13      A     I conducted an investigation, and
14  gained insight from partner resources.
15      Q     What was your investigation?
16      A     I -- I may have misworded that. I
17  shared what I found from that visit with partner
18  resources, and it ended up in separation.
19      Q     I am going to call for production --
20  do you have something to say?
21      A     I did also include -- I had Carlos
22  come to the office at some point, and he did share
23  this in a written statement.
24            MR. GOTTLIEB: I'm going to call for
25      production of all communications with
```

Page 292

```
1              J. Gurtov
2   partner resources regarding the termination
3   of Mr. Monterra.
4           MS. DIAZ: We will take it --
5           MR. GOTTLIEB: It should have already
6       been produced.
7           MS. DIAZ: We will take it under
8       advisement.
9           MR. GOTTLIEB: If there are any
10      documents regarding Mr. Monterra's
11      termination, it should have been already
12      produced. I'm going to ask that the
13      deposition be held open for the purposes of
14      those documents.
15          MS. DIAZ: I believe all documents
16      have already been produced regarding
17      Mr. Monterra.
18      Q     You said you called partner resources
19  regarding how to handle the situation?
20      A     I believe I did.
21      Q     Do you recall who you spoke with?
22      A     I don't.
23      Q     Do you remember what you said?
24      A     I don't remember the details of this.
25  I believe that I contacted partner resources.
```

Page 293

```
1              J. Gurtov
2       Q     And what did they recommend?
3       A     I don't remember the detailed
4   conversations. It did lead to his separation.
5       Q     When you called partner resources, do
6   you remember if you were recommending termination?
7       A     I don't remember the details of that
8   time frame.
9       Q     Do you remember if anyone else was
10  involved in the decision to terminate
11  Mr. Monterra?
12      A     I know that before I ever terminate a
13  store manager, I do get the -- the approval from
14  both partner resources as well as my immediate
15  supervisor.
16          MR. GOTTLIEB: Call for production of
17      any e-mails regarding the termination of
18      Mr. Monterra. I believe it should have
19      already been produced.
20          MS. DIAZ: I believe they have also
21      already been produced.
22      Q     Now, you say at some point you had
23  Mr. Monterra come to the office and have a
24  discussion about his deposit practices.
25      A     Yes.
```

Page 294

```
1              J. Gurtov
2      Q      And was it during that meeting you
3  had him write a written confession?
4      A      A written statement, yes.
5      Q      Did you terminate him at that point?
6      A      I don't recall.  I -- I don't recall
7  the exact steps of that case.
8      Q      Did you ever recommend termination of
9  Mr. Monterra?
10     A      I believe I did.
11     Q      Do you know if you had reviewed his
12 prior corrective actions before you had
13 recommended termination?
14     A      I don't remember if I had.
15     Q      You may have, though?
16     A      I don't recall.
17     Q      Do you know if you considered issuing
18 Mr. Monterra a corrective action as opposed to
19 terminating him?
20     A      I don't believe I did.
21     Q      Why not?
22     A      Because of the serious severity of
23 his offense.
24     Q      Who is Charis Liu?
25     A      Charis Liu was a store manager of
```

Page 295

```
1              J. Gurtov
2  mine at Store 7711.
3      Q      What was your opinion of Ms. Liu as a
4  store manager?
5      A      Charis Liu, my opinion of her, she
6  worked very hard -- she tried her hardest to excel
7  in this job.  However, she struggled immensely.
8            (Gurtov Exhibit 27 marked for
9            identification as of this date.)
10     Q      I am handing you what has been marked
11 Gurtov 27.  Do you recognize that document?
12     A      I do.
13     Q      And this is a corrective action that
14 you issued to her in September of 2010?
15     A      Um-hum.  Yes.
16     Q      And on the top, it says -- oh, you
17 have my highlighted version.
18     A      I know.
19     Q      On the top of the document, it says,
20 "Date of occurrence, 9/25 and 9/26"; is that
21 correct?
22     A      Yes.
23     Q      And that is the date of the
24 occurrence?
25     A      Yes.
```

Page 296

```
1              J. Gurtov
2      Q      And then the description says,
3  "Charis violated cash handling procedures by not
4  processing deposits on a daily basis or insuring
5  partners process on a daily basis"; is that
6  correct?
7      A      Yes.
8      Q      Is that your handwriting?
9      A      No.
10     Q      Whose handwriting is that?
11     A      Charis's.
12     Q      Do you know why she wrote that?
13     A      I asked her to.
14     Q      Why did you ask her to write that?
15     A      I asked her to write a document
16 because I thought it would -- to write a document
17 for herself that the two of us would then discuss,
18 because I thought it would make a more profound
19 statement to her that she had done something
20 wrong.
21     Q      How did you learn she had done
22 something wrong with her cash handling procedures?
23     A      I don't recall the specific instance
24 around this.  I don't remember if it was looking
25 at her books or there was -- around that time,
```

Page 297

```
1              J. Gurtov
2  close after, there was a change in our -- in the
3  POS system in the store, which changed a report
4  that I received, whereas prior in September, I had
5  received daily reports letting me have insight
6  into whether or not store managers completed their
7  deposits on a daily basis, and I would see that
8  report, and it indicated that she had not
9  completed on a daily basis.
10            And I coached her on it, and after
11 coaching, she continued to struggle to complete it
12 on a daily basis.  After October, I lost insight
13 into that report.
14     Q      What do you mean when you say after
15 October you lost insight into that report?
16     A      Because there was a new point of sale
17 system that began in our stores, and the
18 information then did not track into the reporting
19 that I was receiving.  It's a new POS system
20 called Symphony.
21     Q      So POS is a point of sale system?
22     A      It's the register.
23     Q      And that indicates to you when there
24 could be cash handling problems?
25     A      No.  Point of sale is the register in
```

J. Gurtov

the store. When that software was upgraded, something was not compatible with the report that then was being transmitted to -- that we had visibility to as district managers. So starting in October of 2010, I no longer had insight into whether deposits were being made daily. And that's when a string of incidents began to happen.

Q When you no longer had insight into whether deposits were made daily through the POS system, did that apply to all stores --

A All --

Q -- or just Charis's stores?

A All stores.

Q So prior to October 2010, you were able to determine whether deposits were being made on a daily basis through the POS system; correct?

A Correct.

Q Go ahead.

A Just to clarify, it wasn't through -- the POS is a system in the store. When the system was upgraded, I lost visibility on my computer on the report I was getting generated on my computer.

So I -- I didn't have to look at the POS system. It was a report that was coming



J. Gurtov

through my laptop.

Q How long a period were you not able to look through your POS system to determine whether daily deposits were being made?

A I still don't have full accurate visibility, because we are still on the new system.

Q Can you explain how the POS system changed?

A It's just -- it's just an upgrade in the software. I'm not very tech savvy, so -- the way they did deposits changed. Their reporting changed. The way -- what the partner looked at when they rang in on the computer system changed.

There were a couple of different changes that affected business in general, but the biggest piece that I experienced from my end is that I began to lose accurate reporting on a daily report that I received that would show whether or not a deposit was being processed through the computer system daily.

Q How would the computer system reflect whether a deposit is made? Isn't that done through the bank?



J. Gurtov

A Prior to -- no. Prior to October, when a store manager processed their deposit in the store, so counted their money, completed it and accepted it in the store. They had to accept it into the computer system, which would then reflect on my reporting saying that it was processed in the store.

Q I see. Not necessarily deposited in the bank?

A Correct.

Q But processed in the store?

A But processed in the store.

Q And does that generate a document or an e-mail or anything like that?

A It was generated into a report on my computer.

Q And would you get those reports e-mailed to you or something else?

A They are -- I'd get an indicator that it's ready, and then I'd go through another outlet to pull up the report.

Q Are those reports saved anywhere?

A I believe so. It's called a sales flash.



J. Gurtov

MR. GOTTLIEB: I call for production of all sales flash reports throughout 2010, and 2011 through March.

MS. DIAZ: I will take it under advisement.

Q How many pages are these reports?

A It's just a single page.

Q Single page per day?

A Well, it's a single page, but then you can open up -- it's an Excel worksheet that you can open up different pieces, so it could turn into several pages.

Q And would that report indicate whether cash handling policies are being followed?

A No. It would have other indicators that would then make me go look, which I believe is what happened in this case. So I had seen on a certain day that she did not even process the deposit in the store, and she was struggling with her leadership role in general, and time management, and she couldn't get into the safe between the allotted time, eight and three, to even open it up, pull the money out and do it.

Q You had Charis write, "Violated cash

Page 302

J. Gurtov

1
2  handling procedures by not processing deposits on
3  a daily basis or insuring partners process on a
4  daily basis"; correct?
5      A    Yes.
6      Q    Other than those specific items, were
7  there any other cash handling procedures that
8  Charis had violated?
9      A    I can't recall any specifics.
10     Q    Why did you decide to give Ms. Liu a
11 written warning?
12     A    To coach her and help her get through
13 her time management pieces.  The root cause of
14 this was a time management issue that she was
15 struggling with.
16     Q    Did you consider termination at that
17 point?
18     A    No.
19         (Gurtov Exhibit 28 marked for
20         identification as of this date.)
21     Q    I am handing you what has been marked
22 Gurtov 28.  Do you recognize this document?
23     A    I do.
24     Q    Did you draft it?
25     A    I did.

Page 303

J. Gurtov

1
2      Q    It's a performance improvement plan;
3  right?
4      A    Correct.
5      Q    What is the purpose of a performance
6  improvement plan?
7      A    To help a partner who is not
8  demonstrating key behaviors in our competencies,
9  give them the opportunity to improve.
10     Q    And see on page 1759 -- for the
11 record, this is 1757 through 1765.
12         Do you see towards the middle of
13 1759, the last sentence of that middle box, it
14 says, "She does not maintain cash over/short
15 within company standard of .05 percent of sales
16 nor hold team accountable to cash handling
17 standards"?
18     A    I do see that.
19     Q    And that is one of a number of
20 problems listed in that section; is that correct?
21     A    Correct.
22     Q    What does it mean that she does not
23 maintain cash over/short within 0.5 percent --
24 .05 percent of sales?
25     A    .05 percent of sales is the company

Page 304

J. Gurtov

1
2  standard, so it was outside that range, which
3  probably means it ranked a higher cash shortage
4  than that.
5      Q    Was that a problem?
6      A    Yes, because it doesn't fall within
7  the company standard.
8      Q    Is that a serious problem?
9      A    It's a problem, because it doesn't
10 fall within the company standard.
11         MR. GOTTLIEB:  Can we take a short
12 break?
13         MS. DIAZ:  Sure.
14         (Recess taken.)
15 BY MR. GOTTLIEB:
16     Q    Referring back to Gurtov 28, can you
17 look on the bottom of page 1759.  It says --
18 number nine refers to additional problems with
19 regard to Charis's cash handling management; is
20 that correct?
21     A    Number nine refers to the steps to
22 help her fix the issue she has with cash handling.
23     Q    So Ms. Liu had already received one
24 corrective action before this regarding her cash
25 management; is that correct?

Page 305

J. Gurtov

1
2      A    Yes, because the other one is from
3  September of 2010.
4      Q    Okay.  So, why did you -- if she was
5  still having problems with cash management, why
6  did you put per on performance plan rather than
7  terminate her?
8      A    Charis was struggling because of
9  larger behavioral issues.  As you can see, even on
10 here, there were many areas from the competencies
11 of achieves results and the behaviors that goes
12 with that as well as with developing continuously
13 that she just wasn't able to grasp.
14         It was a larger issue at hand from a
15 behavior standpoint, so I put together a plan to
16 help her fix the behavior that was leading to her
17 not being able to be an effective leader.
18     Q    But if you had already given her one
19 corrective action, which was a written action, why
20 did you give her another corrective action as
21 opposed to just terminating her?
22         MS. DIAZ:  Objection.
23     Q    If she had cash management problems
24 in addition to all these other problems?
25     A    Because the root of what was

Page 306

J. Gurtov

1  happening was a larger behavioral issue.
2
3    Q    Anything else?
4    A    No.
5    Q    What was the root of the issue?
6    A    From a behavior standpoint, what I
7  had narrowed it down to was her inability to be
8  effective in these two areas from a competency
9  performance of the behaviors that lie under
10  achieves results, as well as the behaviors that
11  lie under develops continuously, as we define them
12  in our success profiles.
13         (Gurtov Exhibit 29 marked for
14         identification as of this date.)
15    Q    I am handing you what has been marked
16  Gurtov 29.
17    A    Thank you.
18    Q    And this is a multi-page document,
19  1784 through 1790. It's an e-mail on the first
20  page from you to Nancy and Victor.
21         The first sentence says, "I contacted
22  PRCC. Waiting to hear back from a specialist in
23  regards to separating Charis." Is that correct?
24    A    Yes.
25    Q    And this is dated 5/17, 2011?

Page 307

J. Gurtov

1
2    A    Yes.
3    Q    Which is approximately slightly more
4  than a month after Charis was put on a performance
5  plan?
6    A    Yes.
7    Q    Why did you want to terminate Charis
8  at that point?
9    A    Because as I -- when I did the 30-day
10  check-in, she had not made progress at -- at the
11  majority of the points that were on her plan.
12    Q    Okay.
13         MR. GOTTLIEB: I'm going to call for
14         production of all documents related to
15         Ms. Gurtov's contacting PRCC with regard to
16         separating Charis.
17         MS. DIAZ: I believe all the
18         documents have already been produced.
19    Q    I have no more questions on that
20  document.
21         Charis resigned before you terminated
22  her; is that correct?
23    A    That is correct.
24    Q    Did you ever get approval for her
25  termination?

Page 308

J. Gurtov

1
2    A    I don't recall.
3    Q    Did you ever get a recommendation
4  from Ms. Murgalo, from Victor or anyone else
5  regarding whether they agreed with your decision
6  to terminate?
7         MS. DIAZ: Objection.
8    A    I don't recall. Because once I had
9  her resignation -- excuse me. Once I had her
10  resignation, we went that avenue.
11         (Gurtov Exhibit 30 marked for
12         identification as of this date.)
13    Q    I have just handed you what has been
14  marked Gurtov 30. This is a multi-page -- this
15  set of documents, Bates stamped 2487 through 2505.
16  What are these documents?
17    A    They appeared to be agendas from
18  several different meetings that I had with my
19  team, huddles.
20    Q    Okay. When you say "huddles," what
21  do you mean by that term?
22    A    There was a practice that I had for
23  some time where on Mondays -- but it shifted from
24  every Monday to every other Monday, sometimes it
25  was a conference call, of getting the team

Page 309

J. Gurtov

1
2  together for a two-hour meeting.
3    Q    When you say the team, you mean the
4  store managers within your district?
5    A    Correct.
6    Q    And did you always make agendas like
7  these for your meeting?
8    A    I did not. I was not consistent with
9  having an agenda for the meeting.
10    Q    What types of things did you discuss
11  at these meetings?
12    A    Different things, typically around
13  operations. The huddles were typically around
14  upcoming week, past week, things that had
15  happened, things to focus on, maybe planning that
16  needs to happen for a promotional rollout that is
17  coming down the pipeline.
18         I think sometimes we would speak a
19  little bit about partner planning within our own
20  district, and the needs of the store hiring
21  practices.
22    Q    Did you ever discuss DRB issues
23  during these meetings?
24    A    When appropriate or when needed.
25    Q    Is there any meeting that you can

78 (Pages 306 to 309)

Page 310

J. Gurtov

1  specifically remember discussing DRB issues?
2      A    Not that I can remember a specific
3  meeting.
4      Q    Do you remember specifically that
5  you -- that you did at some point discuss DRBs
6  during a weekly huddle?
7      A    I remember discussing cash management
8  policies, not always necessarily the daily records
9  book.
10     Q    Do you remember discussing cash
11 over/shorts?
12     A    Yes.
13         (Gurtov Exhibit 31 marked for
14         identification as of this date.)
15     Q    I am handing you what has been marked
16 Gurtov 31.  I would like you to review this
17 document and tell me if you know what it is.
18         For the record, it's Bates stamped
19 2558 to 2563.
20     A    I am not clear on what this is,
21 because the majority of it is blacked out.
22     Q    Do you have any idea why the majority
23 of it is blacked out?
24     A    I don't know.

Page 311

J. Gurtov

1      MR. GOTTLIEB:  For the record, I
2  don't believe the basis for these redactions
3  was indicated on the redaction log.  I'm
4  going to call for production of unredacted
5  versions of these.
6      MS. DIAZ:  We indicated that they
7  were nonresponsive in our letters if they
8  were not on the privilege log.
9      MR. GOTTLIEB:  Ms. Gurtov can't even
10 identify what the document is the way they
11 are redacted.  I'm going to call for the
12 production of the entire document, unless
13 something may be privileged, and keep the
14 deposition open for those purposes.
15     MS. DIAZ:  I object to your request.
16         (Gurtov Exhibit 32 marked for
17         identification as of this date.)
18     Q    I am handing you a large document,
19 Bates stamp -- labeled Gurtov 32.  Do you
20 recognize this document?  For the record, it's
21 Bates stamped 1364 through 1560.
22     A    Yeah.  It seems to be portions of
23 entries from a notebook.
24     MS. DIAZ:  I would also like the

Page 312

J. Gurtov

1  record to reflect this is not the manner in
2  which these documents were produced.
3      MR. GOTTLIEB:  In what respect?
4      MS. DIAZ:  In terms of the documents
5  break, they are split up into separate
6  documents.
7      MR. GOTTLIEB:  These are sequentially
8  Bates stamped from 1364 to 1560.
9      MS. DIAZ:  We produced some of the
10 appropriate document breaks in our
11 production, so you could tell when a
12 document began and when a document ended.
13     MR. GOTTLIEB:  You indicated that?
14     MS. DIAZ:  We did.
15     Q    Do you recognize this document?
16     A    It appears to be entries from one of
17 my journals.
18     Q    Okay.  And why do you maintain
19 journals?
20     A    It's essentially to -- in me doing my
21 job, I maintain lists of things that I need to do.
22 There is information that I need to gather on a
23 weekly basis, so I know -- so I can keep track of
24 13 store managers and 13 stores and 13 operations.

Page 313

J. Gurtov

1      Q    Is it possible -- do you take notes
2  in your notebook or journal when you conduct SPA
3  visits of your stores?
4      A    Sometimes.
5      Q    Is it possible that your notes would
6  indicate whether you reviewed daily records books
7  during a SPA visit?
8      A    It could possibly.
9      Q    Would your notes indicate whether you
10 reviewed daily records books of a store during any
11 visit?
12     A    Say again.
13     Q    Is it possible that your notes would
14 indicate whether you reviewed a daily records book
15 in a different visit other than a SPA visit?
16     A    It could possibly.
17     MR. GOTTLIEB:  I'm going to call for
18 unredacted production of these documents,
19 other than of course to the extent something
20 is privileged.
21     MS. DIAZ:  We have already produced
22 any notations related to SPA visits or to
23 DRBs.
24     Q    When was the first time you ever

1              J. Gurtov
2    received any communication that was -- indicated
3    to you it was from counsel regarding this matter?
4        A    Repeat the question.
5        Q    When was the first time you ever
6    received any communication from counsel with
7    regard to this matter, whether through somebody
8    else or directly?
9             MS. DIAZ:  Just don't go into the
10   content of the communication.
11       A    From Starbucks legal counsel.
12   Sometime during my communications with Tina.
13       Q    So that would be after January 6?
14       A    Yes.
15       Q    Could you please turn to page 1375.
16   Do you see on the top, it says "Labor," and then
17   there is a list of items?
18       A    Yes.
19       Q    And then towards the bottom, it says
20   11649, and there are some numbers.
21       A    Yes.
22       Q    Can you explain to me what this --
23   apparently it's a chart -- what it says?
24       A    Yes.  V2I stands for variance to
25   ideal.  It's how we manage our labor.

1              J. Gurtov
2        If you look down by 11649, it has
3    negative 1.4 percent, and the expectation is that
4    the stores come in between positive .5 and minus
5    two.  So that came in line.
6        That slash number means that that
7    minus 1.4 equals minus six hours in labor.
8        The NC stands for noncoverage, which
9    is a specific type of time that is allocated for
10   the store manager or for any partner to do work
11   off of the floor.  I don't have an entry for 11649
12   under that.
13       OT stands for overtime.  Three would
14   indicate the number of hours for the prior week.
15       Train stands for training hours.
16   Zero would mean that there were no training hours
17   for the prior week.
18       And then there was an indication for
19   cash over/short, and because it's blank, it's
20   likely that I didn't get that information from the
21   store.
22       Q    Could you please turn to page 1390.
23       Are you looking at page 1390?
24       A    Yes.
25       Q    Now, you may need to --

1              J. Gurtov
2        A    I see.
3        Q    -- take the clip off, whatever those
4    things are called, to see the date.  And you see
5    on top it says, "Wednesday 1/5"?
6        A    Yes.
7        Q    And do you know if that is 1/5 of
8    2011 or something else?
9        A    From the information written on here,
10   I would assume it's from 1/5 of '11.
11       Q    Do you see where it says, "Call
12   Serenity/Chris overseeing now"?
13       A    Yes.
14       Q    Why did you write that?
15       A    Because that was the day I came back
16   from vacation and I was trying to gain an
17   understanding of what happened throughout the
18   time.
19       Q    Do you see where it says, "Plan for,"
20   an arrow up, "being gone"?
21       A    Yes.
22       Q    Why did you write that?
23       A    Because I needed to create a plan
24   because I had a store without a store manager.
25       Q    Did you write that because you were

1              J. Gurtov
2    planning on terminating her?
3        A    No.  I wrote that because she was --
4    she was not in the store at the time.  She had
5    commenced a leave of absence.  So I had to create
6    a plan so that the store still maintained.
7        Q    Do you know what you wrote just
8    beneath that where it says "redacted"?
9        A    No.
10       MR. GOTTLIEB:  Call for production.
11       MS. DIAZ:  I object.  If it's
12   redacted, it's because it's privileged or
13   nonresponsive.
14       MR. GOTTLIEB:  It can't be
15   privileged.  She said she didn't receive any
16   communication from counsel until at least
17   after 1/6.
18       MS. DIAZ:  Then the redaction was
19   nonresponsive.
20       MR. GOTTLIEB:  Call for production of
21   that.
22       Q    Do you see where it says, "Call
23   PRSC/Nate?
24       MS. DIAZ:  I object.
25       Q    It says Nate equals Serenity equals

Page 318

```
 1              J. Gurtov
 2   cash handling.
 3     A     Yes.
 4     Q     Why did you write that?
 5     A     Call PRSC was the reminder me to
 6   bring this to their attention to see what next
 7   steps I had.  Nate is with partner and asset
 8   protection.  He is our advisor.  So I wanted to
 9   gain his insight into what his thoughts were with
10   that.
11            Serenity, cash handling, it just
12   means it was in response to Serenity, cash
13   handling.  The equals don't mean anything.  They
14   could be slashes or parentheses.
15     Q     Do you see where it says, "Has it
16   been documented," before "equals check corrective
17   actions"?
18     A     Yes.
19     Q     Did you write that?
20     A     I did write that.
21     Q     Why did you write that?
22     A     To see if -- I am assuming to see if
23   it had been documented in past corrective
24   actions.
25     Q     Why did you want to see if it had
```

Page 319

```
 1              J. Gurtov
 2   been documented before in past corrective actions?
 3     A     So I had a full understanding of what
 4   I was working with.
 5     Q     What do you mean by that?
 6     A     So I could have that a bigger
 7   picture, the bigger story of what I was working
 8   with.
 9     Q     What do you mean by bigger picture,
10   bigger story?
11     A     To see if it was repetitive behavior,
12   if it was something that continued to happen, if
13   it was an isolated behavior, just so I have a
14   better understanding of the situation.
15     Q     Did you look into that?
16     A     I did.
17     Q     What did you determine?
18     A     That cash handling issues were
19   brought up in that coaching conversation from
20   November of 2008, I believe it was, and that
21   seemed to have been, from my recollection, the
22   only document or corrective action that I had in
23   regards to cash handling in the past with
24   Serenity.
25     Q     Did that help you determine the
```

Page 320

```
 1              J. Gurtov
 2   bigger picture?
 3     A     Yeah.  It's part of that bigger
 4   story.
 5     Q     What was that bigger story?
 6     A     That because of past coaching
 7   conversations that I had had with Serenity,
 8   Serenity had a full understanding of what the
 9   expectations were around -- around cash handling
10   policies and procedures, and her past daily
11   records books have also indicated that she had a
12   well-rounded understandings of cash handling
13   policies and procedures.
14     Q     When you say her past daily records
15   books indicate that she had a well-rounded
16   understanding of cash handling policies and
17   procedures, what do you mean by that?
18     A     Because there were times that she
19   adhered to cash handling policies.
20     Q     How do you know that?
21     A     Because I had seen it in her daily
22   records books.
23     Q     You are sure you reviewed her daily
24   records books after November 25th of 2008?
25     A     I believe that I had.
```

Page 321

```
 1              J. Gurtov
 2     Q     You said that her past daily records
 3   books indicated that she did have an
 4   understanding.
 5     A     Yes.
 6     Q     So, can you commit whether or not you
 7   actually reviewed her daily records books or not?
 8          MS. DIAZ:  Objection.
 9     A     I believe that I have looked at them.
10     Q     But you don't know?
11          MS. DIAZ:  Objection.  Let the
12   witness finish.
13     A     I don't know for certain.  This was
14   really in reference to the condition of the
15   November book, and I just really wanted to see a
16   bigger picture of what the situation was.
17     Q     When you looked at the bigger
18   picture, did you notice whether she had been
19   documented for any problems with cash management
20   from November 25th, 2008, until the present?
21     A     I had not documented her for
22   anything.
23     Q     Had you noticed where she had any
24   cash management problems during that period?
25     A     She may have.
```

J. Gurtov

1
2    Q    But you didn't know at that point?
3    A    What?
4    Q    You didn't know at that point?
5    A    At that point, not specific dates.
6    Q    Now, I would like you to turn to page
7    1388.  The date on the top of that page is 12/20;
8    correct?
9    A    Yes.
10    Q    And there is no date on the next
11    page, 1389, is there?
12    A    No.
13    Q    And it just says "11649 equals A";
14    right?
15    A    Yes.
16    Q    What does that mean?
17    A    I don't know.
18    Q    So the next dated page is 1390, and
19    it's dated 1/5; correct?
20    A    Yes.
21    Q    So this notebook, there is -- you
22    took no notes between 12/20 and 1/5, did you?
23    A    I was on vacation for a large portion
24    of that time.
25    Q    Is it fair to say between 12/20 and

J. Gurtov

1
2    1/5, you didn't take any notes?
3    A    It's fair to say that it could
4    possibly be this page could have had times or
5    there could be different dates in the redacted
6    sections.
7         MR. GOTTLIEB:  Okay.  I'm going to
8    call for production of those redacted
9    sections then.
10         MS. DIAZ:  We object to the
11    production of nonresponsive documents.
12    Q    Did you take any notes during the SPA
13    visit when you encountered the DRB issues at
14    Serenity Marshall's store?
15    A    Not that I recall in my personal
16    notebook.
17    Q    Why didn't you take any notes of
18    that?
19    A    Because I began taking notes in her
20    daily records book of the challenges that we were
21    having.
22         MR. GOTTLIEB:  I am just going to
23    take a couple-minute break.
24         (Recess taken.)
25    BY MR. GOTTLIEB:

J. Gurtov

1
2    Q    Turning to page 1548, please.  Do you
3    see it says, "Prepare final written for Serenity"?
4    A    Yes.
5    Q    Do you know why you wrote that?
6    A    No.
7    Q    Do you know when you wrote that?
8    A    No.  No, it's not clear for me.
9    Q    Do you remember writing that?
10    A    No.
11    Q    Are you aware of any store manager at
12    any of your stores currently who has a disability?
13    A    Not that I am aware of.
14    Q    Are you aware of any store manager in
15    2010 of yours who had a disability?
16    A    Not that I can think of specifically.
17    Q    Did you perceive anybody as having a
18    disability, any of your store managers as having a
19    disability in 2010?
20    A    Not that I can recall.
21    Q    Do you perceive any of your current
22    store managers as having a disability?
23    A    No.
24    Q    Are you aware of any store manager of
25    yours who has had a serious medical condition in

J. Gurtov

1
2    2011?
3    A    I -- no, not -- like, I have a store
4    manager that is slightly injured right now, who
5    shared with me that they are hurt, and I had a
6    store manager that had to leave for -- because he
7    had to have surgery done, I think on his septum,
8    but not a serious injury.
9    Q    Did either of those employees have to
10    miss any work?
11    A    One of them had to just, you know,
12    take a couple days off and had to go to doctor's
13    visits, and the other one had about a week's --
14    maybe to ten days.
15    Q    What were their names?  What are
16    their names?
17    A    Kevin Nagel was -- was -- I think it
18    was for his a deviated septum.  Kevin Nagel.
19         And David Smith is the one who has --
20    his ankle bothers him and it's been bothering him,
21    and I have been trying to encourage him to take
22    time off so that he can let it heal.
23    Q    Did any of your store managers have a
24    serious medical condition in 2010?
25    A    Not that I can recall.

Page 326

J. Gurtov

1    Q    What about Serenity Marshall?
2
3    A    In 2010?  Other than what we have
4 discussed as a medical --
5    Q    Including what we have discussed.
6    A    The fibroids.  She didn't -- she had
7 fibroids.
8    Q    Okay.  Other than Serenity Marshall
9 having fibroids, did any other store manager of
10 yours have a serious medical condition in 2010?
11       MS. DIAZ:  Objection.
12    A    I can't think of all of my store
13 managers and all of their personal conditions
14 during that -- during that time frame
15 specifically.
16       (Gurtov Exhibit 33 marked for
17       identification as of this date.)
18    Q    I am handing you what has been marked
19 as Gurtov 33.  You will see these are defendants'
20 responses to plaintiff's interrogatories.
21       Have you reviewed these documents
22 before, or this document before?
23       MS. DIAZ:  Take your time and look at
24 it.
25    Q    Have you ever seen that document

Page 327

J. Gurtov

1    before?
2
3    A    I believe that -- that it was sent to
4 me, via e-mail.
5    Q    Do you remember if you read it to
6 verify that the answers to the interrogatories
7 were accurate?
8    A    I know I had read through it.
9    Q    And did you verify that the entries
10 were accurate?  I'm not asking you to verify now.
11 I am asking you if you remember verifying they
12 were accurate.
13    A    I don't remember specifically.  I
14 remember getting an e-mail with stuff attached to
15 it.  And the wording in here is -- it's confusing,
16 because it's not the everyday wording that I would
17 use in certain cases, so, there were -- I skimmed
18 through it and did, I think, respond that they
19 were accurate.
20       MS. DIAZ:  Be careful not to get into
21       any attorney-client communications.
22       THE WITNESS:  Okay.
23    Q    I would like you to turn to
24 intergatory number four, which is on page seven.
25 And it says, "Identify each and every person with

Page 328

J. Gurtov

1    knowledge of plaintiff's medical conditions and/or
2 potential need for a disability, medical and/or
3 FMLA leave prior to November 1, 2010."
4    Q    Do you see that?
5    A    Yes.
6    Q    And then if you go through the next
7 paragraph, starting with -- the paragraph after
8 that, starting with "Subject to" on the bottom.
9 Do you see that?
10    A    Um-hum.
11    Q    Do you see it says, "Subject to and
12 without waiving the foregoing objections, at this
13 time defendants are not aware of any individuals
14 in management positions who had knowledge of
15 plaintiff's medical condition or potential need
16 for disability, medical or FMLA leave prior to
17 November 1, 2010."
18    Q    Do you see that?
19    A    Yes.
20    Q    Is that accurate?
21    A    I believe it to be.
22    Q    You believe that to be accurate?
23    A    Yeah.
24    Q    I would like to turn your attention

Page 329

J. Gurtov

1    to page 13, interrogatory number 14.  And do you
2 see where it says, "Identify each and" -- go --
3 moving on to the next page:  "Identify each and
4 every employee that defendant Gurtov has been
5 involved in disciplining in any manner, including
6 but not limited to verbal reprimands, written
7 notes and/or termination for violations of company
8 policy, regarding bank deposits, recording
9 information in the daily records book and/or the
10 falsification of records."
11    A    I see that.
12    Q    And do you see the answer starting
13 with "subject to," in the middle of the page,
14 says, "Subject to without waiving the foregoing
15 objections, defendants identify the following
16 store managers other than plaintiff who Ms. Gurtov
17 disciplined while she was a district manager for
18 the violations of company policy regarding bank
19 deposits," and so forth; correct?
20    A    Yes.
21    Q    And the two identified stored
22 managers are Carlos Monterra and Charis Liu;
23 right?
24    A    Yes.

Page 330

1              J. Gurtov
2      Q    Do you believe that is an accurate
3  answer?
4      A    I do.
5      Q    Have any other store managers been
6  disciplined in any manner, including verbal
7  reprimands, for violation of company policy
8  regarding bank deposits?
9      A    Not that I am aware of.
10     Q    Thank you.
11         (Gurtov Exhibit 34 marked for
12     identification as of this date.)
13         (Gurtov Exhibit 35 marked for
14     identification as of this date.)
15     Q    I am handing you what has been marked
16  34 and 35. Thirty-four is the complaint, and
17  35 -- sorry. 34 is the complaint, and 35 is the
18  answer.
19         I would like to direct your attention
20  to paragraph 21 on each document. Now, 21 of the
21  complaint says, "In or around November 2010,
22  Ms. Marshall informed Gurtov of her condition
23  but explained at the time she did not fully
24  understand the nature and the extent of the
25  condition. Ms. Marshall advised defendant Gurtov

Page 331

1              J. Gurtov
2  that she would need to schedule additional
3  doctor's appointments in the coming weeks or
4  months to determine the proper manner of
5  treatment."
6         Do you see that?
7      A    I do.
8      Q    Do you see in 21 of the answer, it
9  says, "Defendants admit the allegations"?
10     A    Yes.
11     Q    Is that accurate?
12     A    That statement is true, yes.
13     Q    Okay. Can you turn to paragraph 26.
14  Twenty-six in the complaint says, "In or around
15  early December, 2010, Ms. Marshall informed
16  defendant Gurtov that she would in all probability
17  need a myomectomy, surgery to remove uterine
18  fibroids."
19         Do you see that?
20     A    Yes.
21     Q    And 26 of the answer says that
22  defendants admit the allegations in paragraph 26;
23  correct?
24     A    Yes.
25     Q    Is that accurate?

Page 332

1              J. Gurtov
2      A    Yes.
3      Q    Can you turn to paragraph 29.
4  Paragraph 29 of the complaint says, "On or about
5  December 23, 2010, defendant Gurtov arrived at the
6  345 Hudson store purportedly to conduct a periodic
7  inspection. These were commonly referred to as
8  store plan of action visits. Defendant Gurtov
9  conducted a periodic inspection of all stores
10  within her district and had conducted dozens of
11  inspections of Ms. Marshall's branches in the
12  past."
13         Do you see that?
14     A    I do.
15     Q    And 29 of the answer says,
16  "Defendants admit that Ms. Gurtov conducted
17  periodic inspections of all stores within her
18  district and that she had conducted inspections of
19  plaintiff's store in the past."
20         Do you see that?
21     A    I do.
22     Q    Is that accurate?
23     A    Yes.
24     Q    Could you turn to paragraph 33.
25  Thirty-three of the complaint says, "Defendant

Page 333

1              J. Gurtov
2  Gurtov immediately reviewed the 345 Hudson store's
3  daily records book, which she had also reviewed
4  during each of her many previous inspections of
5  Ms. Marshall's stores. Though store managers are
6  generally required to make daily bank deposits,
7  many store managers occasionally hold bank
8  deposits to the following day if necessary due to
9  staffing issues, the amount of customer traffic in
10  the store or otherwise for important operational
11  reasons."
12         Do you see that?
13     A    I see that.
14     Q    Paragraph 33 of the answer says,
15  "Defendants admit that Ms. Gurtov reviewed the
16  daily records book for the store at 345 Hudson
17  Street, New York, New York, and that she also
18  reviewed the book during previous inspections."
19         Is that accurate?
20     A    Yes.
21     Q    The next sentence says, "Defendants
22  further admit that store managers are required to
23  insure that daily bank deposits are made."
24         Is that accurate?
25     A    Yes.

Page 334

J. Gurtov

1    Q    Is it accurate that you had reviewed
2
3  daily records books during previous inspections of
4  Ms. Marshall's stores?
5    A    Yes.
6    Q    Who is Courtney Howarth?
7    A    Courtney Howarth is the current store
8  manager at 11649.
9    Q    Does Ms. Howarth have a disability?
10   A    No, not that I am aware of.
11   Q    Do you perceive her as having a
12 disability?
13   A    Not that I am aware of.
14   Q    Are you aware of any medical
15 condition she has ever had?
16   A    No.
17   Q    When did you first meet Ms. Howarth?
18   A    I met Courtney in January of 2011.
19   Q    Was that in connection with
20 interviewing her for the store manager position at
21 11649?
22   A    Yes.
23   Q    Do you know if she was employed with
24 Starbucks before that?
25   A    Yes.

Page 335

J. Gurtov

1
2    Q    Was she?
3    A    Yes.
4    Q    Where was she employed?
5    A    I don't remember the specific store.
6  She was hired about eight weeks prior to my
7  meeting her, and she had gone through her manager
8  training in another location.
9    Q    How did it come to be that you
10 interviewed Courtney for the job?
11   A    She had just finished her eight weeks
12 of training, and we were looking to place her into
13 a location.
14   Q    Do you know the day that you
15 interviewed her?
16   A    I don't remember the specific date.
17   Q    When you were interviewing her, were
18 you interviewing her for a permanent position or
19 for a temporary position?
20   A    I was interviewing her for a
21 permanent position.
22   Q    Did you take any notes during your
23 interview?
24   A    I'm sure I did.  I don't recall
25 specifically.

Page 336

J. Gurtov

1
2    Q    And did you make a decision whether
3  to hire her?
4    A    I did.
5    Q    Was anyone else involved in that
6  decision?
7    A    Just to be clear on it, it wasn't to
8  hire her.  She was already hired into the company.
9  But I did make the decision to place her into the
10 location at 11649.
11   Q    Was anyone else involved in the
12 decision to place her at 11649?
13   A    Yes.  I did have support from both
14 Nancy and Victor.
15   Q    When she was placed at 11649, was it
16 on a temporary basis or a full-time basis?
17   A    It was on a full-time basis.
18   Q    Was she on some sort of probationary
19 period or was she a full hire right from the
20 start?
21       MS. DIAZ:  Objection.
22   A    All of our managers are hired on --
23 we don't really go through a probation period.
24   Q    When did you first learn that
25 Ms. Howarth was looking for a placement as a store

Page 337

J. Gurtov

1
2  manager?
3    A    Around the time that I interviewed
4  her.
5    Q    How did you first get in contact with
6  Ms. Howarth?
7    A    I don't remember specifically.  It
8  might have been through her district manager at
9  the time.
10   Q    Where was she placed before she
11 became a store manager at 11649?
12   A    I don't remember the exact store.  I
13 believe it was at Church and Murray.  I don't know
14 the store number.  The district manager down there
15 is Tracy Bryant.
16   Q    And you believe she contacted you to
17 let you know that she was looking for a placement?
18       MS. DIAZ:  Objection.
19   A    I believe I contacted her.
20   Q    You contacted Ms. Bryant or you
21 contacted Ms. Howarth?
22   A    Ms. Bryant.
23   Q    Okay.  Why did you contact
24 Ms. Bryant?
25   A    Because that's the route that we

85 (Pages 334 to 337)

Page 338

J. Gurtov

1  take.  We contact each other as peers, prior to
2  contacting the candidate.
3       Q    Do you remember if you e-mailed her
4  or if you called her?
5       A    I don't remember.
6            MR. GOTTLIEB:  I call for production
7       of any e-mails regarding Ms. Howarth from
8       Ms. Gurtov to Ms. Bryant.
9            MS. DIAZ:  The documents related to
10      Ms. Howarth have already been produced.
11      Q    Do you know when you contacted
12  Ms. Bryant regarding potentially hiring
13  Ms. Howarth?
14      A    I don't.
15      Q    Do you know if it was before or after
16  January 6?
17      A    I believe it was after January 6.
18      Q    Do you know?
19      A    I believe it was after January 6th.
20      Q    Do you know if it was before or after
21  January 10th?
22      A    I'm not sure.
23      Q    Is there anything that would refresh
24  your recollection?

Page 339

J. Gurtov

1       A    I don't think so.  There -- I don't
2  think so.
3       Q    Was it urgent that you hire a new
4  store manager, that you place a new store manager
5  after you determined that Ms. Marshall was going
6  to be terminated?
7       A    It was important to place a new store
8  manager after I realized that Ms. Marshall was on
9  an extended leave.
10      Q    Initially, you had Chris Martinez
11  handle store manager responsibilities at that
12  store?
13      A    Yes.
14      Q    Why is that?
15      A    He is one of my other store managers
16  and I had asked him to insure that payroll was
17  being processed and that other store manager
18  duties were being completed and that the team had
19  a support in Serenity's absence.
20      Q    So was Mr. Martinez managing two
21  stores at the time?
22      A    For a couple weeks, yes.
23      Q    Is that abnormal to ask a store
24  manager to do on occasion?

Page 340

J. Gurtov

1       A    No.
2       Q    Did he ever complain to you about
3  managing two stores?
4       A    No.
5       Q    Did it seem like he was having a
6  problem managing two stores?
7       A    Not during that two-week time period.
8       Q    Was it an urgent matter for you to
9  hire another store manager so that Mr. Martinez
10  didn't have to handle two stores?
11           MS. DIAZ:  Objection.
12      A    It was important to relieve him of
13  the duties of the two stores.  We try not to have
14  any store manager manage two stores.  It's very
15  challenging to do so.
16      Q    Did you have a time frame for how --
17  how soon after Ms. Marshall had gone on leave that
18  you wanted to hire a new store manager?
19      A    Like a predetermined time frame?
20      Q    Well, after you learned that
21  Ms. Marshall had gone on leave --
22      A    Right.
23      Q    -- did you have in your mind a time
24  by which you wanted to hire a new store manager?

Page 341

J. Gurtov

1       A    Not that I can recall.  I -- there
2  was obviously a lot of moving pieces that I came
3  back to from vacation, so I was trying to wrap my
4  arms around all those pieces and take the
5  appropriate next steps.
6       Q    If you had decided not to terminate
7  Ms. Marshall, how would you have staffed 11649
8  with regard to a manager during the period of her
9  leave?
10      A    I would have continued to put
11  Courtney Howarth in that place.
12      Q    Then what would have happened after
13  Ms. Marshall returned?
14      A    We would have found her a new home
15  store that would -- that would be comparable to
16  the store that she had left.
17      Q    When you say you would have found her
18  a new store, the "her" you are referring to is
19  Ms. Marshall or Ms. Howarth?
20      A    It could have been either/or.
21      Q    So when Ms. Howarth was hired --
22  strike that.
23           (Gurtov Exhibit 36 marked for
24      identification as of this date.)

J. Gurtov

1            J. Gurtov
2   Q   I have just handed you what has been
3  marked as Gurtov 36.  Do you recognize this
4  document?
5   A   I do recognize this document.
6   Q   I think I gave you my version as
7  well.
8        What is this document?
9   A   This is a changed version of an
10  original document that I had made.  This is a
11  changed version that one of my peers had compiled
12  from one of my original versions.
13   Q   And what is it?
14   A   On a basic outline of the things to
15  review during a SPA visit.
16   Q   Okay.  When you say one of your peers
17  changed it, who is the peer who changed it?
18   A   Simone, Simone Harper.
19   Q   Who is that?
20   A   One of my peers, a district manager.
21   Q   Also a district manager?
22   A   Yes.
23   Q   What changes did she make to the
24  document?
25   A   I don't know specifically.  Like I

J. Gurtov

1            J. Gurtov
2  mean, she took the same basic outline -- the areas
3  where she includes notes, I didn't have that.  I
4  didn't have these lines on top.
5        I feel like I had it in a little
6  different order.  She added a couple of bullet
7  points that I didn't have.  She made a couple of
8  changes.  She took my basic outline and changed it
9  around a little bit.
10   Q   You have -- for the record, this is
11  Bates stamped 2506, 2507.
12        Do you see the second page, toward
13  the bottom it says, "cash management:  Check cash
14  management log/P card log."
15   A   Yes.
16   Q   What does that mean?
17   A   It means to check the daily records
18  book, and within the daily records book there is a
19  P card section.
20   Q   What is a P card section?
21   A   It's something, I will be honest, I
22  am not familiar with, because I don't typically
23  check the P card section.  That is an adjustment
24  Simone had made.
25   Q   What is an adjustment Simone had

J. Gurtov

1            J. Gurtov
2  made?
3   A   Putting on P card log.  That wasn't
4  on my original.
5   Q   Was cash management, check cash
6  management log in your original?
7   A   I don't know if in those words.  I do
8  know I did have an section to review the daily
9  records book.
10   Q   Is this intended to be an outline of
11  SPA visits for 2011?
12   A   Yes.
13   Q   Did you have a similar type of
14  document for 2010?
15   A   I don't know that I did.
16   Q   If you had, would the outline have
17  been pretty similar?
18   A   It would have been similar, yeah.
19   Q   Would it -- if you were to outline
20  your 2010 SPA visits, would you also include cash
21  management, check cash management log as a bullet
22  point?
23       MS. DIAZ:  Objection.
24   A   I would have had something in
25  reference to daily records book.

J. Gurtov

1            J. Gurtov
2   Q   Why?
3   A   Because it's part of the
4  responsibility to review daily records books.
5   Q   It's part of your responsibility?
6   A   To review them, yeah.
7       MR. GOTTLIEB:  I'm going to take just
8  a couple-minute break.  I think I am pretty
9  much done.  I guess I am pretty much done
10  whether I like it or not.  I think I have
11  nine minutes or so.
12       (Recess taken.)
13       MR. GOTTLIEB:  Okay.
14   Q   You just testified that it's part of
15  your responsibility to review the daily records
16  books.
17   A   Yes.
18   Q   And what do you do to insure that you
19  fulfill that obligation?
20   A   When I review a daily records book, I
21  will open the current book that the store manager
22  is utilizing, I will open a random week and look
23  for trends, and depending on what I see there, I
24  will go through other portions of the book.  And
25  then I will coach the manager based on those

Page 346

```
 1                  J. Gurtov
 2  trends that I see.
 3       Q    What I am asking is, you described
 4  how you reviewed daily records books; right?
 5       A    Yes.
 6       Q    I'm asking what do you do to insure
 7  that you comply with your responsibility to review
 8  daily records books.
 9       A    I incorporate them onto -- onto the
10  plans, the agenda for the store plans of action.
11  However, I don't consistently get to them.
12       Q    But do you make sure to periodically
13  review daily record books of the stores that you
14  supervise?
15       A    It's something that I try to do, yes.
16       Q    Is it something that you try to do
17  successfully?
18       A    I try to do it successfully.
19       Q    Are you successful in attempting to
20  review daily records books periodically at your
21  stores?
22            MS. DIAZ: Objection.
23       A    Yes.
24       Q    And you are successful in that -- in
25  that you actually do review them; is that correct?
```

Page 347

```
 1                  J. Gurtov
 2       A    Periodically, yeah.
 3       Q    What do you do to insure that
 4  deposits are made between 8 a.m. and 3 p.m.?
 5       A    I -- you know, I look for trends,
 6  again, when I am looking in daily records books.
 7  That is not something I monitor on a daily,
 8  weekly, monthly basis.
 9       Q    What do you do to insure that bank
10  receipts are attached to the daily records book?
11       A    It's something that I would see
12  trends in, in reviewing a daily records book.
13       Q    Can you identify any way that
14  Ms. Marshall's cash handling problems that led to
15  her termination negatively impacted Starbucks'
16  operations?
17       A    There were large negative cash
18  shortages coming out of the store the months
19  leading up to what had happened.  And lying is an
20  integrity issue.  So, I mean, I am not going to
21  speculate on how far that can go into how it
22  affects a team.
23       Q    I don't want you to speculate.  I
24  want you to tell me -- Ms. Marshall was terminated
25  for two reason; right?  Falsification of
```

Page 348

```
 1                  J. Gurtov
 2  records --
 3       A    Yes.
 4       Q    -- and for not making daily deposits.
 5       A    Right.
 6       Q    Is that correct?
 7       A    Yes.
 8       Q    How did it affect Starbucks' business
 9  that she did not make daily deposits?
10            MS. DIAZ: Objection.  Asked and
11  answered.
12       Q    Other than being a violation of
13  policy, how did it actually affect Starbucks'
14  business?
15            MS. DIAZ: Objection.  Misstates
16  testimony.
17       A    Repeat the question, because --
18       Q    How did Ms. Marshall not making daily
19  deposits actually affect Starbucks' business?
20            MS. DIAZ: Objection.  Asked and
21  answered.
22       A    Her not complying with policies and
23  procedures led to cash shortages, and essentially
24  it wasn't just the not doing the daily deposit
25  that she was separated.  She was separated for
```

Page 349

```
 1                  J. Gurtov
 2  falsifying a legal company document.
 3       Q    But I am focusing right now on the
 4  not making daily deposits.
 5       A    Right.
 6       Q    Did Starbucks -- can you identify any
 7  way Starbucks lost money because she did not make
 8  a daily deposit?
 9       A    The cash shortages in the store are a
10  repercussion from many policies and procedures not
11  being adhered to.
12       Q    I'm not asking many policies and
13  procedures.
14       A    One of --
15       Q    Wait for me to finish.
16            I'm asking only with regard to daily
17  bank deposits.  How did Ms. Marshall not making
18  daily bank deposits result in a loss of money to
19  Starbucks?
20            MS. DIAZ: Objection.
21       A    It was one of the policies that led
22  to cash shortages in the store.
23       Q    How did it lead to cash shortages?
24       A    Policies and procedures being in
25  place, as we discussed in the past, are there to
```

Page 350

```
1              J. Gurtov
2  protect partners and the assets of the company, so
3  in violating one or multiple, and there were
4  multiple that were violated, so that was one of
5  multiple that were violated, it did result in cash
6  shortage to the store.
7      Q     How?
8      A     Because in her not holding herself
9  accountable to standards, she was also not holding
10 her team accountable to standards.
11     Q     And how did that result in a loss of
12 money?
13     A     I don't -- I don't have the specific
14 answer to that.
15     Q     Do you know if it did result in a
16 loss of money?
17     A     I know that her store was coming in
18 short.
19         MS. DIAZ: Let the witness finish.
20         MR. GOTTLIEB: She's not answering my
21 questions.
22         MS. DIAZ: Let the witness finish
23 answering the question that she understood.
24     Q     I'm asking how do you know that the
25 specific practice of not making daily deposits led
```

Page 351

```
1              J. Gurtov
2  to a loss of money for Starbucks?
3         MS. DIAZ: Objection.
4      A     My responsibility is to hold a team
5  of partners accountable to policies and
6  procedures. And my responsibility is to -- when I
7  note that those policies have been violated, is to
8  reprimand those actions. That's my job
9  description.
10     Q     That's not what I am asking. You are
11 not answering my question. I'm going to mark it
12 for a ruling from the judge.
13         I'm going to ask you one more time:
14 How did Ms. Marshall not making daily deposits
15 result in a loss of cash to Starbucks?
16     A     I don't know how to answer the
17 question.
18     Q     Did it?
19     A     I believe it did.
20     Q     And you believe it based on what?
21     A     Based on the prior statements that I
22 have made.
23     Q     Anything else?
24     A     Not at this time.
25     Q     Did Ms. Marshall's falsification of
```

Page 352

```
1              J. Gurtov
2  documents lead to a loss of money for Starbucks?
3      A     I believe it did.
4      Q     How?
5      A     For the same reasons that I have
6  already given.
7      Q     The answer is a violation of policy?
8      A     Yes.
9      Q     Anything else?
10         MS. DIAZ: Objection. Misstates
11 testimony.
12     A     For the answers that I have given.
13     Q     Well, you are giving answers as to
14 the daily records book, as to -- excuse me -- not
15 making daily deposits. Explain to me how
16 falsifying the daily records book led to a loss of
17 money for Starbucks.
18     A     Her being separated was not for a
19 loss --
20     Q     You are not answering my question.
21         MS. DIAZ: Objection. Let the
22 witness answer it.
23     A     I don't know how to.
24     Q     I'm not asking why she was
25 terminated. I'm asking how did her falsifying
```

Page 353

```
1              J. Gurtov
2  documents lead to a loss of money for Starbucks.
3      A     Who said that her falsification led
4  to a loss?
5      Q     Did it?
6      A     It may not have.
7      Q     Okay. Do you believe it did?
8      A     I do believe it did.
9      Q     Why do you believe it led to a loss
10 of money?
11     A     For the same reasons that I shared.
12 She was not upholding -- from the books from
13 November and December, she was not upholding not
14 just bringing daily deposits to the bank. They
15 were not accurately recording safe counts. They
16 were not accurately recording anything in the
17 entire store.
18         She herself, she was not holding her
19 team accountable to that, and during those months,
20 there was extreme cash shortage in the store.
21     Q     Was she terminated for having cash
22 shortages?
23     A     She was separated for falsifying
24 company documents.
25     Q     Was cash shortage one of the reasons
```

89 (Pages 350 to 353)

Page 354

1           J. Gurtov
2 for her termination?
3      A     No.
4      Q     Was not accurately recording, not
5 accurately recording register information one of
6 the reasons for her termination?
7      A     No.
8      Q     Was she terminated for not accurately
9 recording safe counts?
10     A     No.
11     Q     Do you believe any of your other
12 store managers have blatantly neglected policies?
13     A     They may have.
14     Q     Would you know if they had?
15     A     I am not aware at this time.
16     Q     Do you think it's your responsibility
17 to know if a store manager blatantly neglects
18 important policies?
19     A     It's my responsibility to take
20 appropriate disciplinary action for the things
21 that I am aware of.
22     Q     Do you think you should know if an
23 employee is blatantly neglecting cash management
24 policies at one of your stores?
25     A     I can't possibly know that for 13

Page 355

1           J. Gurtov
2 stores for daily operations.
3      Q     On a general basis, do you think it's
4 your responsibility to know if store managers are
5 blatantly neglecting cash management policies?
6      A     It's my responsibility from the
7 report and key indications that I get through my
8 reports and through visual cues in the store to
9 investigate when I see something that is not
10 happening to standard, and if I uncover that a
11 store manager is blatantly neglectful to policies
12 and procedures, then it is my responsibility to
13 take appropriate disciplinary action.
14     Q     Do you think you should know if an
15 important cash management policy is being
16 blatantly violated?
17     A     If I am being given the indicators
18 that the store is not -- that something would be
19 happening, yes.
20     Q     Will the daily records book indicate
21 to you whether cash management policies are being
22 blatantly violated?
23     A     If I have looked at that daily
24 records book.
25           MS. DIAZ:  Counsel, you have one

Page 356

1           J. Gurtov
2 minute.
3           MR. GOTTLIEB:  I think I have nothing
4 else.  Do you have any questions?
5           MS. DIAZ:  No.
6           MR. GOTTLIEB:  I am just going to say
7 for the record I am leaving the deposition
8 open for the reasons stated on the record,
9 and in addition, for other documents that
10 have not been produced pursuant to my
11 requests.
12           (Continued on next page with witness
13 jurat.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 357

1           J. Gurtov
2           MS. DIAZ:  We object to your request
3 and to leaving the deposition open for those
4 reasons.
5           (Time noted:  7:03 p.m.)
6              oOo
7           I, JENNIFER GURTOV, the witness herein,
8 do hereby certify that the foregoing testimony of
9 the pages of this deposition to be a true and
10 correct transcript, subject to the corrections, if
11 any, shown on the attached page.
12           _____
13
14 Subscribed and sworn to before me this
15 _____day of _____,_____.
16 _____
17           NOTARY PUBLIC
18
19
20
21
22
23
24
25

Page 358

```
 1
 2   STATE OF NEW YORK  )     Pg.   of  Pgs.
 3   COUNTY OF NEW YORK  )
 4       I wish to make the following changes
 5   for the following reasons:
 6   PAGE  LINE
 7   ____ ____ CHANGE:_____
 8          REASON:_____
 9   ____ ____ CHANGE:_____
10          REASON:_____
11   ____ ____ CHANGE:_____
12          REASON:_____
13   ____ ____ CHANGE:_____
14          REASON:_____
15   ____ ____ CHANGE:_____
16          REASON:_____
17   ____ ____ CHANGE:_____
18          REASON:_____
19   ____ ____ CHANGE:_____
20          REASON:_____
21   ____ ____ CHANGE:_____
22          REASON:_____
23   ____ ____ CHANGE:_____
24          REASON:_____
25          _____
```

Page 359

```
 1
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK   )
 4                : SS.
 5   COUNTY OF NEW YORK   )
 6
 7       I, BONNIE PRUSZYNSKI, a Notary
 8   Public with and for the State of New York,
 9   do hereby certify:
10       That JENNIFER GURTOV, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   the witness.
15       I further certify that I am not related
16   to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 4th of January, 2012.
21
22
23            _____
24            Bonnie Pruszynski
25
```

Page 360

```
 1
 2            I N D E X
 3   WITNESS                PAGE
 4   JENNIFER GURTOV
 5   BY MR. GOTTLIEB            4
 6
 7         E X H I B I T S
 8   Gurtov Exhibit 1 Star_Marshall     47
 9      814-820
10   Gurtov Exhibit 2 Document 779-794    62
11   Gurtov Exhibit 3 Document, 795-813   63
12   Gurtov Exhibit 4 Document, 684-778   65
13   Gurtov Exhibit 5 Document, 514,    70
14      530-537
15   Gurtov Exhibit 6 Document, 896-937   77
16   Gurtov Exhibit 7 Document, 871-895   92
17   Gurtov Exhibit 8 Document, 821-868   93
18   Gurtov Exhibit 9 Document, 1585    113
19   Gurtov Exhibit 10 Document, 1589   121
20   Gurtov Exhibit 11 Document, 183    139
21   Gurtov Exhibit 12 Document, 206-208  154
22   Gurtov Exhibit 13 Document, 209-211  158
23   Gurtov Exhibit 14 Document, 200-203  164
24   Gurtov Exhibit 15 Document, 222-225  208
25   Gurtov Exhibit 16 Document, 1662   222
```

Page 361

```
 1
 2   Gurtov Exhibit 17 E-mail       227
 3   Gurtov Exhibit 18 Document, 1665     228
 4   Gurtov Exhibit 19 Document, 3/1/11    234
 5   Gurtov Exhibit 20 DRB 8959-10053     241
 6   Gurtov Exhibit 21 DRB 4178-4399     249
 7   Gurtov Exhibit 22 DRB 17114-195     258
 8   Gurtov Exhibit 23 DRB 17880-18005    267
 9   Gurtov Exhibit 24 Document,      274
10      16262-434
11   Gurtov Exhibit 25 Document       285
12   Gurtov Exhibit 26 Document,      286
13      separation plan
14   Gurtov Exhibit 27 Correcctive     295
15      Action, 9/10
16   Gurtov Exhibit 28 Document, 1757-765   302
17   Gurtov Exhibit 29 Document,      306
18      1784-1790
19   Gurtov Exhibit 30 Document,      308
20      2847-2505
21   Gurtov Exhibit 31 Document, 2558-563   310
22   Gurtov Exhibit 32 Document 1364-1560   311
23   Gurtov Exhibit 33 Defendants'     326
24      responses to plaintiff's
25      interrogatories
```

Page 362

```
 1
 2    Gurtov Exhibit 34 Complaint           330
 3    Gurtov Exhibit 35 Answer              330
 4    Gurtov Exhibit 36 Document, 2506-507   341
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide      877-702-9580

**A**

**abbreviation** 26:11
**abide** 112:5
**abiding** 213:12
**ability** 6:18,22
  29:17 35:16
  110:18 129:19
  136:2
**able** 13:13 107:8
  108:14 110:22
  144:9 145:5
  152:11 164:25
  180:14 182:5,10
  263:16 298:16
  299:3 305:13,17
**abnormal** 97:20,25
  98:11 339:24
**absence** 144:8,12
  145:6 147:4,11
  149:22 191:16
  204:24 220:5,7
  317:5 339:20
**absent** 185:7
**absolutely** 160:16
  180:12 199:16
**accept** 300:5
**acceptable** 71:17
**accepted** 300:5
**accommodations**
  180:3 181:7 191:9
**accomplish** 16:9
  46:2,4
**accomplishing**
  13:25
**accomplishment**
  150:22
**accomplishments**
  140:17
**account** 210:10
  215:10
**accountability** 59:9
**accountable** 14:12
  52:21 109:23
  122:23,25 123:10
  125:14 145:24
  303:16 350:9,10
  351:5 353:19
**accurate** 5:12

210:9,12 239:23
  299:6,19 327:7,10
  327:12,19 328:21
  328:23 330:2
  331:11,25 332:22
  333:19,24 334:2
**accurately** 36:10
  64:23 353:15,16
  354:4,5,8
**achieve** 15:16,17
  157:4 159:7,10
**achievements**
  162:20
**achieves** 163:11,19
  305:11 306:10
**achieving** 15:19
**acting** 21:7
**action** 11:18,21
  16:22 17:25 18:21
  27:4 34:14,25
  44:13,14 69:2,16
  69:18,25 71:6,8
  71:15,24 72:4,7
  72:12 77:10,13,20
  77:22 79:6,9,10
  79:22 80:9,12,12
  80:14,15,16,19
  81:13,14,23 82:13
  85:18 87:12 89:13
  89:24 90:12,18
  95:17 96:6 98:18
  98:24 117:10,15
  117:16,20 119:13
  120:22 121:5
  123:4 127:7
  130:13 133:14,19
  134:2,8 135:10,17
  176:20,24 201:24
  202:3,21 203:5,9
  203:11,16 213:5
  214:5,9 219:2
  240:4 256:23,25
  257:17,20 294:18
  295:13 304:24
  305:19,19,20
  319:22 332:8
  346:10 354:20
  355:13 359:16

361:15
**actions** 7:24 11:8
  28:15 30:8 67:15
  68:5 69:13 206:14
  227:24 294:12
  318:17,24 319:2
  351:8
**activity** 41:5,7,25
  42:4
**actual** 58:19 96:6
  160:22 217:8
**add** 87:17
**added** 27:18 343:6
**addition** 95:17
  252:3 305:24
  356:9
**additional** 131:5
  157:24 240:12
  304:18 331:2
**address** 27:10
  79:20 147:13
  248:7 258:3
**addressed** 147:14
  210:23 211:4
  248:15
**addresses** 27:12
**addressing** 117:7
**adequate** 267:6
**adhered** 45:25
  46:12,16 47:5
  123:12,16 126:2,4
  320:19 349:11
**adhering** 123:2
**adjustment** 343:23
  343:25
**Adler** 202:8 205:4
**admin** 17:11
**administration**
  205:8
**admit** 331:9,22
  332:16 333:15,22
**admitted** 235:23,25
  289:20 291:2
**advice** 232:22
  233:4,9,15
**advised** 6:6 330:25
**advisement** 15:6
  29:10 79:2 93:7

93:20 106:4
  141:16 178:25
  185:23 292:8
  301:6
**advisor** 318:8
**affect** 6:15,18,22
  110:18 348:8,13
  348:19
**agenda** 82:21,23
  83:6 87:2,7,8,22
  90:11,20 96:5
  97:2 184:20 189:3
  309:9 346:10
**agendas** 87:11,14
  88:13 184:17
  308:17 309:6
**ago** 11:3 102:10
  107:11 108:17
  116:15 121:22
  140:4,5,7,9
  257:18 264:6
**agree** 71:12,19
  72:17 79:25 80:2
  80:4 81:6,8 90:19
  225:21
**agreed** 137:6 308:5
**ahead** 117:9 220:13
  298:19
**AKIN** 3:9
**alert** 44:4,5,9,13
**alerts** 43:18
**aligned** 192:24
**alignments** 28:12
**allegations** 331:9
  331:22
**allocated** 315:9
**allotted** 301:23
**allow** 263:24
**allowing** 24:19,25
**ambiguous** 127:15
**amount** 11:11
  57:19 59:4 60:2
  147:21 164:14
  166:15 259:19
  261:15 268:24
  333:9
**and/or** 328:2,3
  329:8,10

**ankle** 325:20
**Ann** 208:21
**annual** 28:21 29:4
  29:7
**answer** 5:11,20
  32:11 39:3,16
  67:10 96:15
  174:21,23 199:23
  206:19,22 232:16
  232:18 233:2
  262:25 283:11,18
  283:22 284:2,6
  329:13 330:3,18
  331:8,21 332:15
  333:14 350:14
  351:16 352:7,22
  362:3
**answered** 130:23
  266:10 348:11,21
**answering** 206:20
  350:20,23 351:11
  352:20
**answers** 5:14 327:6
  352:12,13
**anybody** 45:6,14
  149:2 169:5
  184:13,23 185:17
  201:17 202:2,21
  220:24 221:4
  230:2 231:10
  324:17
**apologize** 84:18
  129:15,17 267:18
**apparently** 282:18
  314:23
**appear** 244:15
  252:8 268:11
  269:10,19 271:16
  276:15,23
**appeared** 64:17
  308:17
**appears** 64:10,21
  65:16 78:8 92:14
  92:18 93:14 122:7
  241:10 259:21
  260:5 261:2
  262:17,25 263:2
  268:3 269:21

274:25 276:22,25
286:4 312:17
**apply** 298:11
**appointment**
181:15 182:4,21
**appointments**
166:15 168:17,19
331:3
**approach** 79:20
**appropriate** 21:2
45:24 180:3 181:6
191:9 203:8
227:19 309:24
312:11 341:6
354:20 355:13
**appropriately**
35:25 122:9
**approval** 58:20
293:13 307:24
**approximately**
135:16 201:16
239:19,20,23
240:4 255:8 307:3
**April** 147:8 268:23
269:15,17 270:17
271:12 272:7,20
273:16 283:14
**area** 70:10 77:6
150:16 189:21
202:5 225:11
**areas** 145:16
150:11 157:9,20
162:20 163:18
194:15 305:10
306:8 343:2
**argue** 153:13
**arisen** 115:19
**arises** 173:19
**arms** 341:5
**arose** 104:2
**arrangements**
146:24
**arrived** 188:12,18
236:13 332:5
**arrow** 316:20
**articulate** 193:16
**asked** 21:23 29:11
64:17 97:3,14

130:23 151:9
173:8 192:25
193:13,15,23
228:3,24 231:17
231:20 235:3
238:4 266:9
289:11,16,19,24
296:13,15 339:17
348:10,20
**asking** 4:14 5:8
22:2,22,24 23:8
32:16 33:15,16
38:7,19 47:22
67:23 76:15 83:24
83:25 84:2,15
85:8,9,15,16 86:8
86:9,14 96:12,16
99:9 111:18
131:18 137:20
173:10 188:17,18
216:12,13 229:18
234:21 235:14,15
247:18 248:16
257:8,9,19,21
267:25 284:14
327:10,11 346:3,6
349:12,16 350:24
351:10 352:24,25
**ASM** 18:19
**aspect** 25:8 39:21
39:22 45:9 148:25
**aspects** 39:7,18
145:12
**assess** 89:15
**assesses** 88:20
**assessing** 151:11
**asset** 49:10 141:2
318:7
**assets** 350:2
**assist** 234:4
**assistant** 104:20
105:6 107:9
118:17 123:7
**assume** 32:22 48:2
52:6 66:16 108:22
117:5,13,19
129:10 132:13,15
224:9,10 264:15

264:17 316:10
**assuming** 45:10
284:11 318:22
**assumption** 284:8
**assumptions**
122:15,19
**assurance** 18:13
98:22
**Atlanta** 242:16
**attach** 57:20
**attached** 227:24
252:5 327:14
347:10 357:11
**attaches** 58:4
**attempting** 346:19
**attention** 24:17
48:7 64:8 71:5
116:22 126:6
140:16 158:22
159:21 161:3
168:2 180:23
185:14 204:13
214:11 275:15
318:6 328:25
330:19
**attorney** 6:6 7:5
**Attorneys** 3:4,10
**attorney-client**
199:24 327:21
**AT&T** 178:17
**audit** 18:14 50:19
140:23 141:10,20
142:4,5,9,16,18
253:11
**audits** 37:3 98:23
141:4,7,13 142:11
142:19
**August** 10:2 274:24
275:4 276:13,20
285:25 286:6,12
**avenue** 2:11 3:5
17:10 124:14
184:8 308:10
**average** 41:10
91:19,25 92:6
95:4 136:13
**averages** 92:3
**aware** 45:4 48:19

48:20 49:21 52:25
53:2 67:13,19
68:4,6,14 76:24
186:2,3 201:21
279:24 280:6,8,12
280:16,17,18,20
280:21 324:11,13
324:14,24 328:14
330:9 334:10,13
334:14 354:15,21
**a.m** 2:5 54:23
208:17 347:4

**B**

**B** 360:7
**back** 41:16,24
43:15 62:20 76:4
89:8 90:24 94:9
94:14 95:16
104:19 125:11,16
125:21 126:7
133:24 138:4
143:25 144:9
156:8,8 194:6
201:9,12 202:23
204:3 205:2,3
220:16,19 221:8
221:10 222:22
224:24 225:15
228:22 229:3,23
232:10,14,23
233:3 241:3 264:6
274:16,21 277:22
285:7 304:16
306:22 316:15
341:4
**bad** 158:9 213:16
231:3 285:13
**bag** 35:25 198:3
287:12,21,21,24
287:25 288:3
291:4
**bags** 36:4,6 197:24
198:2 243:9
254:18 287:11
**Bahamas** 201:8
**bank** 36:8 50:18
53:24 54:24 55:19

55:20,21 56:18,21
57:4,19,21 58:3,4
58:9,11,18,23,25
59:25,25 60:9,12
195:18,21 196:3,9
196:11,19,24
198:7 210:20,23
211:16 214:15,18
215:25 216:7,17
217:3,4,8,17,18
217:20,22 236:2,5
243:8,17,25
244:16 245:8
246:5 247:2,14
248:10,11,18,18
248:19,21,23,25
251:11 252:5,24
253:12,21,24,25
254:2,7,14 259:15
259:25 260:4,8,14
260:16,25 261:4
261:13,14,19,23
262:8,15,19,20,21
263:25 268:19,21
269:2,13 270:9
271:10,11,14,16
271:19,24,25
272:11,17 273:12
276:4,4,12,19
277:12,19 287:10
288:4 299:25
300:10 329:9,19
330:8 333:6,7,23
347:9 349:17,18
353:14
**banking** 35:10,15
**banks** 56:23,25
**bar** 77:17
**barista** 10:4 11:6
11:15 18:18
**baristas** 21:3
**barriers** 15:19
**base** 153:15,19,21
162:18
**based** 46:24 204:19
245:9 345:25
351:20,21
**basic** 95:7 342:14

343:2,8
**basically** 171:21
237:20 238:5
**basics** 12:14,15
**basis** 41:5 60:2
91:5,7 127:13
130:21 296:4,5
297:7,9,12 298:17
302:3,4 311:3
312:24 336:16,16
336:17 347:8
355:3
**Bates** 47:20 51:7
63:11,24 64:2
65:13 66:23 70:20
92:10 93:11
113:18 121:19
139:20 154:14
158:16 164:5
208:8 222:16
228:16 250:24
258:7 268:5
275:16 308:15
310:19 311:20,22
312:9 343:11
**began** 144:12
169:18 189:4
244:22 297:17
298:8 299:19
312:13 323:19
**beginning** 46:23
102:21 154:3
205:9
**begins** 77:16
268:17
**behavior** 34:15
71:10 124:17
305:15,16 306:6
319:11,13
**behavioral** 77:15
305:9 306:2
**behaviors** 69:4
77:15 157:2,9,13
303:8 305:11
306:9,10
**belief** 59:19
**believe** 7:17 10:9
11:22 29:10,14

47:6 50:11 51:20
51:22 52:8,13,18
52:21 59:15,18
62:6 64:22 95:12
109:8,9 114:8
138:9 140:6,8,15
141:18 143:3
144:17,20 147:6,9
149:10 150:13,15
166:2 167:2,3
170:15 172:6,7
176:14 177:17,23
187:14 190:2
194:10 211:12,24
212:6,10,12,15,21
213:23 216:4,23
219:14,23 220:6
221:8 229:2,20
230:23 233:5,9,14
234:20 242:6
255:25 256:2
264:21,25 265:5
270:21,25 274:4
278:25 279:2
289:10,22 290:4
292:15,20,25
293:18,20 294:10
294:20 300:24
301:17 307:17
311:3 319:20
320:25 321:9
327:3 328:22,23
330:2 337:13,16
337:19 338:18,20
351:19,20 352:3
353:7,8,9 354:11
**believed** 144:5
**beneath** 54:22 81:2
90:10 124:19
317:8
**benefits** 237:25
**best** 34:7 35:16
129:18 136:2
139:12
**better** 25:18,25
26:6 27:2 83:19
84:9 124:14,18
144:10 158:4,6,7

158:11 191:21,24
192:5 245:20
260:11,22 262:4
263:4,12,22 266:5
266:7,11,22
319:14
**beyond** 99:19
107:10 235:17
**big** 190:7 248:24
**bigger** 319:6,7,9,10
320:2,3,5 321:16
321:17
**biggest** 299:18
**bills** 178:14
**binder** 78:9,10,23
93:15,18
**binders** 93:25
**bit** 143:24 309:19
343:9
**blacked** 310:22,24
**Blake** 250:10
256:10,11
**Blake's** 251:16,17
251:20 257:21,25
**blank** 197:11,19
244:14,18 246:21
254:7 270:6
315:19
**blatant** 198:16
**blatantly** 213:18
354:12,17,23
355:5,11,16,22
**block** 196:3
**blood** 359:17
**Bonnie** 1:23 2:11
359:7,23
**bonus** 164:9,10,13
164:16 165:2,6
**book** 21:18,19
22:20,23 23:18,25
24:3 26:12,17
36:11,17,18 37:5
38:5,21,23 39:2
40:11 45:3,11
46:5 48:3,3,15
50:13 51:4 58:5
67:2,4,6,9 76:8
83:8 84:21,23

89:19,22 97:21,23
98:2 99:23 100:3
100:20 101:3,10
102:4 104:23
107:18 108:12
109:5 117:6,11
122:25 123:13,16
123:20 125:3
128:3 141:5 146:4
192:16,20 193:8
194:9,13,23 195:7
195:9 197:8,9,10
197:20 198:17
207:13,14 215:25
216:15 217:8,11
219:7 235:24
241:11,15,17,21
247:19 248:8
249:4,21 250:3,15
250:19 251:21,23
255:13,18,21,25
256:21 257:5,7
258:11 261:20
263:15,24 267:7
269:11 274:2,6,10
274:23 275:8
277:23 278:16
279:4,7,12,19
282:7,7,10,10
284:10 289:12,15
289:25 290:6
310:10 313:15
321:15 323:20
329:10 333:3,16
333:18 343:18,18
344:9,25 345:20
345:21,24 347:10
347:12 352:14,16
355:20,24
**bookcase** 237:13
**books** 20:10 22:3,5
22:25 23:16,22
24:7,13,20 25:2
25:11 37:8 38:2
40:10 82:23 84:9
85:4,17 86:4,7,13
97:2 98:15,16,19
102:6 104:19

109:20 127:24
132:7,11 140:22
151:17 192:23
193:19,24 194:3,7
216:5 217:2 264:8
265:14,17 278:11
278:19,23 284:11
284:12,21 285:4
290:3 296:25
313:7,11 320:11
320:15,22,24
321:3,7 334:3
345:4,16 346:4,8
346:13,20 347:6
353:12
**boss** 9:17 14:20
149:7 184:5,11,19
212:2
**bother** 168:20
**bothering** 325:20
**bothers** 325:20
**bottom** 50:17 57:16
57:18 89:18 99:23
159:2,24 162:12
164:9 218:24
222:17 227:7
228:18 243:6
268:20 277:13
286:24 304:17
314:19 328:9
343:13
**box** 55:21 56:20,22
56:24 57:3,10,13
158:22 159:22
161:6 162:18
261:5,8 271:25
303:13
**boxed** 49:17
**boxes** 57:6 243:4
254:21
**boyfriend** 201:9
**bracket** 126:12,16
126:17,19,21
**brackets** 247:8
**branches** 332:11
**Brandon** 270:15,16
**break** 6:8,12 62:17
94:6 138:2 188:4

224:20 240:25
274:12 304:12
312:6 323:23
345:8
**breaking** 235:25
**breaks** 6:7 312:11
**bring** 164:20,23
196:8,11,18 236:5
318:6
**bringing** 36:8 60:9
167:5 210:16
247:2 353:14
**brings** 58:3,21
125:11
**broad** 101:24
**Broadway** 10:7,22
**brought** 24:17 58:9
59:25 167:25
175:20 180:23
183:19 190:25
196:24 197:24
198:6 204:13
210:20 211:24
212:8 214:17
217:18 243:8
271:24 287:22
290:25 291:2,4
319:19
**Bryant** 3:11 337:15
337:20,22,24
338:9,13
**build** 108:14
203:24
**building** 139:6
153:20
**built** 39:25 40:3
203:22
**bullet** 120:13
217:23,24 218:14
218:23,24 343:6
344:21
**busier** 153:5,8
**business** 17:16
81:17,20 88:21
89:15 91:14
111:13 112:23
113:14 134:5
153:20 161:12

257:24 261:7
282:17 299:17
348:8,14,19

**C**

**C** 3:2 359:2,2
**CA** 218:25 219:5
**cafe** 188:24 189:21
**calendar** 143:15
154:7 155:14,18
157:25 250:5
258:2
**call** 14:24 29:6 32:7
78:23 93:3,17
105:24 141:9
164:21 173:16,20
178:20 182:9
185:19 202:24
204:6,8 211:11,13
211:18 212:21
218:7 219:17,21
220:20,21,23
222:10,10 224:15
225:2 234:20
238:17 291:19,24
293:16 301:2
307:13 308:25
311:5,12 313:18
316:11 317:10,20
317:22 318:5
323:8 338:7
**called** 4:3 14:15
48:10 76:25 79:5
97:5 133:19 134:5
183:24 203:2,3
204:4 214:23
228:4 292:18
293:5 297:20
300:24 316:4
338:5
**caller** 208:20
**calling** 44:14
**calls** 182:8
**candidate** 338:3
**capacities** 1:12
**card** 343:14,19,20
343:23 344:3
**care** 145:6 146:13

152:11 168:18
180:4 206:2 208:2
**careful** 327:20
**Carlos** 33:8,9,10,18
198:9,9 210:14
285:5,6,12 286:23
287:9 289:11
291:21 329:23
**carrier** 178:16
**case** 4:11 34:19
59:19 68:17 107:4
109:4 203:22,24
204:16,18 208:4
271:22 294:7
301:18
**cases** 58:18 73:22
327:17
**cash** 19:25 20:5
21:10,14,16,24
22:17 23:15 35:5
35:8,18,21,23
36:5,20 39:6,12
40:9,13,15,19,22
40:23 45:24 46:11
46:15,16 47:4
51:5 52:19,20
53:4 59:11 60:2
64:11,18,23 65:4
66:11,17 82:11,21
88:10,12 96:25
97:7,8 98:6
101:11,11,15,15
104:6,12,16,22
105:2,8 106:6,20
106:23,25 107:2
108:11,25 109:10
109:16 110:18
111:7,9,10 112:3
112:7,19,25 113:2
116:3,23 117:23
118:3,15 122:8
124:5 141:23
155:2,3,6 159:16
159:17 163:21
192:21 193:2,6,12
193:15 209:11
213:9,17,20 219:6
241:25 242:19

243:15,23 244:24
245:5 247:11
251:18 252:17,22
257:21 260:8,24
261:23 268:22
269:16 272:22
275:18 276:10,16
277:17 288:17,20
288:23 296:3,22
297:24 301:15,25
302:7 303:14,16
303:23 304:3,19
304:22,24 305:5
305:23 310:8,11
315:19 318:2,11
318:12 319:18,23
320:9,12,16,19
321:19,24 343:13
343:13 344:5,5,20
344:21 347:14,17
348:23 349:9,22
349:23 350:5
351:15 353:20,21
353:25 354:23
355:5,15,21
**categorize** 83:10,16
**caught** 206:4 265:2
**cause** 217:21
302:13
**caused** 185:25
186:18
**causes** 79:21
**CC** 159:9 160:8,22
160:25 162:5
**cc'ing** 227:8
**celebrate** 199:10
**cell** 178:8,10,21
**center** 31:7,12
200:20 203:2,4
206:13 212:7,9,22
212:25 220:18
221:11 222:22
**centered** 100:22
**certain** 17:14 26:20
39:25 41:8 70:9
79:11 125:15
129:13 147:22
152:14 157:3

164:17 265:3
285:2 301:19
321:13 327:17
**certainty** 80:24
86:17
**Certified** 2:13
**certify** 357:8 359:9
359:15
**chain** 222:18
**chairs** 237:13
**challenge** 71:25
97:6 130:4 139:14
146:20 150:14
**challenged** 108:15
130:10
**challenges** 46:25
104:18 105:11
107:9,14 108:11
115:16,22,23
116:3 117:6
118:11,14 124:12
125:13,19 138:20
144:3,5,9 145:7
145:22,25 146:4,5
146:12,16 150:6
153:13,14 155:20
166:14 279:5
323:20
**challenging** 153:16
161:24 340:16
**change** 50:18
246:18 275:23
297:2 358:7,9,11
358:13,15,17,19
358:21,23
**changed** 28:7,12
136:10,11 297:3
299:10,13,14,15
342:9,11,17,17
343:8
**changes** 144:13
200:3 299:17
342:23 343:8
358:4
**chapter** 92:20
**chapters** 66:19
**Charis** 294:24,25
295:5 296:3

301:25 302:8
305:8 306:23
307:4,7,16,21
329:23
**Charis's** 296:11
298:13 304:19
**chart** 314:23
**check** 16:24,25
28:23 41:10 49:3
124:23 155:6
318:16 343:13,17
343:23 344:5,21
**checking** 125:23
**checks** 16:24
**check-in** 307:10
**Chelsea** 12:23
**choice** 150:8
151:21 152:2,3,7
**choose** 56:25
248:12
**Chris** 122:11
339:11
**Christmas** 187:11
**Church** 337:13
**circled** 73:4,9,14
**circumstance**
68:22 108:18
131:5
**circumstances** 72:8
135:14 149:16
216:11 256:7
266:6
**claim** 215:24
216:13
**clarify** 45:8 69:14
89:2 298:20
**clarity** 25:6
**clean** 12:8 99:20
103:20
**cleanliness** 18:14
99:14,19 103:21
115:23 126:10
145:25 150:14
155:19 189:21
**clear** 11:17 16:6
23:24 68:8 84:25
107:13 112:10
133:18 137:21

252:15 256:14
263:17 266:14
310:21 324:8
336:7
**clearer** 19:20 39:4
**clearly** 19:7 210:21
**clip** 316:3
**close** 297:2
**closed** 55:22 56:18
214:15 246:19
268:10
**closes** 43:9
**closing** 116:7
275:24
**closings** 116:6
**coach** 109:5,6,13
127:9,19 156:7
164:19 251:22
252:2 302:12
345:25
**coached** 77:18
128:7 297:10
**coaching** 76:25
77:3,8,10,12,14
77:21 117:12,18
121:2 125:3
127:17 128:4,11
128:17 130:12
219:4,7 248:15
255:23 256:25
257:3,5 297:11
319:19 320:6
**collaborate** 87:2
**column** 268:14
**combined** 291:6
**come** 14:6,7,9
40:24 43:16,18
44:13 102:12,14
125:16 143:9
144:9 150:25
165:18 185:24
186:17 196:15
202:23 204:3
291:22 293:23
315:4 335:9
**comes** 14:3,8 35:9
44:4,8,10 231:13
**coming** 12:5

106:21 145:14
160:13 179:7
185:15 186:13
193:2 205:2
213:24 229:3,23
257:25 298:25
309:17 331:3
347:18 350:17
**commence** 204:24
**commenced** 317:5
**comment** 283:5
286:25 287:3
**commit** 321:6
**committing** 112:7
112:14
**common** 231:18
**commonest** 282:2
**commonly** 282:7
282:10 332:7
**communicate** 91:4
91:9,15,20 174:5
282:2
**communicated**
229:12 233:10
234:17
**communicates** 71:8
173:21
**communicating**
233:15
**communication**
14:14 15:25 49:16
50:12 169:16
230:24 314:2,6,10
317:16
**communications**
14:17,19 15:3
91:3 199:25
229:25 235:13,15
291:25 314:12
327:21
**community** 139:2
**comp** 160:2 161:8
**company** 14:15
16:4 46:17 56:11
74:5,9,12 75:13
75:16 178:10,13
203:19,21 204:15
214:7 224:17

236:2 243:11,20
254:3,6 255:4
270:2 273:6,8
274:9 276:6,9,25
277:2 278:4,15
289:2,7 303:15,25
304:7,10 329:8,19
330:7 336:8 349:2
350:2 353:24
**comparable** 341:16
**compared** 77:13
**compatible** 298:3
**competencies**
157:3,10,13
162:21 303:8
305:10
**competency** 162:18
306:8
**compiled** 342:11
**comping** 162:2
**complain** 340:3
**complaint** 330:16
330:17,21 331:14
332:4,25 362:2
**complete** 13:14
80:8 147:23
214:15,16 297:11
**completed** 53:5
80:18 154:23
165:8,10,13
196:23 198:6
213:22 217:18
245:3 297:6,9
300:4 339:19
**completely** 220:7
253:13 254:7
277:14
**completing** 36:5
110:7 112:3
**completion** 254:13
**compliance** 19:19
19:25 20:5,9 21:7
48:14 49:13
**comply** 54:11
59:11 346:7
**complying** 55:16
104:22 105:2
348:22

**computer** 41:14,16
41:19,22,23 42:6
42:7,10 45:3
298:22,23 299:15
299:22,23 300:6
300:17
**computers** 44:2
**concern** 104:4
173:18 179:25
191:20
**concerned** 40:20
168:6,11 173:13
174:14 175:17
179:9 180:13,17
191:18,24
**concerns** 104:7
**conclusion** 105:15
**concur** 225:20
**condensed** 152:10
153:7
**condition** 165:20
167:22 168:7
169:2,6 174:6,10
176:13 182:15
185:11 190:15,24
197:20 204:25
219:22 245:23
321:14 324:25
325:24 326:10
328:16 330:22,25
334:15
**conditions** 170:8
175:2 176:18
183:11 184:23
185:25 186:18
191:15 326:13
328:2
**conduct** 24:16
26:24 34:25 313:3
332:6
**conducted** 133:14
134:15 135:11,21
142:6,20 187:7
194:2 291:13
332:9,10,16,18
**conducts** 142:11
**conference** 182:8,9
211:11,13 237:8

308:25
**confession** 294:3
**confidence** 152:20
152:21,25
**confident** 265:4
**confirm** 226:13
**confused** 215:22
**confusing** 67:24
327:15
**connection** 4:11
131:22 137:18
334:19
**consider** 19:4
60:13 75:24 76:16
76:18,22 110:2,4
110:6,9 120:21
152:16,19 214:4,9
289:4 302:16
**considered** 110:11
148:6 165:12
294:17
**considering** 149:3
**consistency** 76:19
**consistent** 19:8
31:15 79:19 88:15
218:2 225:22,25
268:17 279:20
309:8
**consistently** 78:20
346:11
**constant** 91:3
**constantly** 284:9
**consultation**
209:11
**contact** 31:6,7,11
31:12 32:3 128:11
200:20 203:2,4
206:13 212:7,9,22
220:18 221:11
222:22 337:5,23
338:2
**contacted** 31:17,22
212:24 292:25
306:21 337:16,19
337:20,21 338:12
**contacting** 30:12
30:13 307:15
338:3

**content** 209:21
314:10
**contents** 79:4
**context** 94:16
166:18
**continue** 163:20
171:20 264:12
288:25 289:18
**continued** 61:12
146:3 163:18
297:11 319:12
341:11 356:12
**continuing** 60:18
60:20 153:3
257:24
**continuous** 130:15
249:9
**continuously**
305:12 306:11
**contribution** 161:2
**control** 148:4
**controllable** 159:11
159:20 161:2
**controllables**
159:18
**controller** 35:22,24
36:5 244:25
**controllers** 52:20
97:7
**conversation** 25:16
44:11 69:6 70:4
70:11 77:4,24
113:22 118:21
119:10,12,16,19
119:23 120:8,12
120:16,18,24
124:13 129:6,25
130:5,19 131:8,20
146:9 147:15
148:21 156:20
163:7 167:9,10,15
167:25 168:7,15
168:25 169:3,5,22
169:23 170:5,7
171:11,12,13
172:10,13,16,18
172:25 173:3,17
173:23 174:4,4,8

174:18,24 175:6,6
175:9,11,11
176:11,17 177:25
179:6 181:3,12,24
183:5 186:21
205:16 209:24
210:6 211:6,8,10
211:15 212:4,8,11
212:13,18 213:7
219:4,12 220:9,24
221:3 223:8,10,12
223:15,22,24
226:7,16,17,19,20
231:20,21 232:8
233:22 234:25
235:6 237:5,19
246:3 250:17
257:3,5 260:17,21
262:10 265:22,25
266:4 273:2
319:19
**conversations**
46:18,20 116:18
117:12,18 125:4
128:11,14,17
130:12 132:24
144:4 151:4
155:19 171:4
172:8 175:4
176:10 177:21
178:4 179:24
182:17 186:24
213:9 221:7
231:16 232:2
255:23 281:2
293:4 320:7
**conversed** 176:14
**convey** 191:23
**copy** 58:22 250:25
271:8
**core** 28:8
**corner** 259:24
279:18
**corporation** 1:9
13:20
**Correcetive** 361:14
**correct** 27:6 59:13
64:12 69:22 74:16

75:6 90:6 94:11
110:22 111:15,22
124:17 176:21
227:10 234:12
242:2 244:11
249:6,7 253:25
259:6,20 261:11
261:16 264:4
269:17 272:8,9
273:10,18 274:24
275:19,20 278:12
287:6,3,14
295:21 296:6
298:17,18 300:11
302:4 303:4,20,21
304:20,25 306:23
307:22,23 309:5
322:8,19 329:20
331:23 346:25
348:6 357:10
**corrections** 199:14
357:10
**corrective** 7:24
11:8,18,20 28:14
30:8 34:14,25
67:14 69:2,13,16
69:18,25 71:6,7
71:15,24 72:3,7
72:11 77:10,13,20
77:22 120:22
121:5 127:6
130:13 206:14
213:4 214:5,9
219:2 227:24
256:22,25 294:12
294:18 295:13
304:24 305:19,20
318:16,23 319:2
319:22
**correctly** 109:22
**counsel** 7:9 198:23
200:20 203:12
230:17,23 232:22
233:4,7,9,15,23
251:2 314:3,6,11
317:16 355:25
**count** 36:23 50:18
194:16 197:15,18

197:18 243:6
244:15 246:15,16
246:22 268:16
270:6
**counted** 197:17
198:2 268:11
300:4
**counter** 189:22
**counting** 36:7
**counts** 197:14
353:15 354:9
**COUNTY** 358:3
359:5
**couple** 7:19 8:11
28:11 60:18
151:13 169:24
170:9 171:3
174:11 177:8
187:18 190:20
204:3 206:10
237:12 243:14,16
248:10 299:16
325:12 339:23
343:6,7
**couple-minute**
323:23 345:8
**courageously** 163:4
163:11
**course** 164:18,20
165:9,14 188:5
203:16 251:3
255:8 313:20
**court** 1:3 5:11,17
5:20 170:2 279:25
**Courtney** 334:6,7
334:18 335:10
341:12
**cover** 37:5 258:10
**covering** 201:20
**create** 25:12 87:22
184:19 316:23
317:5
**created** 42:15
87:11 105:17,22
119:6 184:17
**creates** 87:14 291:6
291:7
**creating** 12:8 40:5

103:24 118:23
**criteria** 17:14
**critique** 157:2
**crossed** 143:15
**crossed-out** 268:13
**cues** 355:8
**culture** 101:6
**current** 6:17 153:4
250:9 257:7
265:14,16 324:21
334:7 345:21
**currently** 6:14
12:22 27:5 270:15
324:12
**custody** 146:18,19
146:22,24
**customer** 12:5
66:15,22 81:19
98:24 99:13
153:15,21,22
157:5,6 189:15
333:9
**customers** 12:6
35:20 40:5 116:2
189:23
**customer's** 189:17
**customized** 87:22
**cycle** 130:16

**D**

**D** 360:2
**daily** 20:10 21:18
22:3,5,20,23,25
23:16,18,22,25
24:2,7,13,19 25:2
25:11 26:11,16
36:11,17,18 37:4
37:8,25 38:5,21
38:22 39:2 40:10
40:11 41:4 44:7
48:3,14 50:12
60:2 67:2,4,6,9
76:7 82:22 83:7
84:8,20,23 85:4
85:17 86:4 89:19
89:22 91:5 96:25
97:20,23 98:2,15
98:16,19 99:22

100:2,20 101:2,10
102:4,6 104:19,23
107:18 108:12
109:5,5,7,20
117:6,11,12,17
123:12,16,20
124:23 125:3,3,4
125:23 127:24
128:3 132:6,11
140:22 141:4
146:4 151:16
192:16,20 193:7
193:18 194:3,7
207:13 210:20
214:19 215:6,25
216:5,15 217:7,11
219:7 235:24
236:5 241:10,15
241:17,21 249:4
249:21 250:3,15
250:18 251:21
258:10 263:14,24
265:14,16 267:6
269:11 274:23
278:11 279:11
282:9 284:9,20
285:4 289:12,14
290:6 296:4,5
297:5,7,9,12
298:7,10,17 299:5
299:19,22 302:3,4
310:9 313:7,11,15
320:10,14,21,23
321:2,7 323:20
329:10 333:3,6,16
333:23 334:3
343:17,18 344:8
344:25 345:4,15
345:20 346:4,8,13
346:20 347:6,7,10
347:12 348:4,9,18
348:24 349:4,8,16
349:18 350:25
351:14 352:14,15
352:16 353:14
355:2,20,23
**date** 47:15 59:6
62:24 63:16 65:10

70:18 78:2 92:8
93:9 113:16
121:17 134:4
139:18 154:12
158:14 164:4
167:24 187:15
201:11 208:6
209:8 215:25
216:6,16 217:3,7
217:10,16 222:12
222:14 227:3
228:14 229:3,16
234:7,14 241:5
249:17 258:5
259:14 260:3,7,15
261:13,14,23
262:7,15 263:25
264:4 267:14
268:21 269:13
270:11 271:11
272:5,11,16,19
273:12 274:18
276:12,18 285:18
286:19 295:9,20
295:23 302:20
306:14 308:12
310:15 311:18
316:4 322:7,10
326:17 330:12,14
335:16 341:25
**dated** 119:8 140:11
222:19 228:17
234:11 251:6
254:11 269:14
273:9 277:9
306:25 322:18,19
**dates** 128:22 147:6
181:19 183:21
191:4,8 192:3
216:24 322:5
323:5
**David** 3:7 258:13
325:19
**day** 6:5 16:21 17:22
18:11 19:2 22:16
36:3,4 43:9 44:18
53:5,24 82:21
98:4 119:6,8

153:9 175:7,13
177:3,5 187:6,13
189:2,3 192:17,22
193:3,9 195:14
197:15,18,24
198:24 200:14
201:15 202:2,25
205:2,3,6,17
206:6,17,25
207:17,18 209:17
215:13 216:18
217:16 220:8
227:18 229:23
232:10,14,23
233:3 234:21
243:10,18 247:22
251:13 252:19
253:8 257:25
258:3 261:9,11
264:9,10 268:18
268:25 271:17
276:16 289:24
301:9,19 316:15
333:8 335:14
357:15
**days** 62:8 134:6,7
177:6 197:12,12
197:12 198:12
199:2 200:22
201:4 202:25
204:3 206:10,11
207:5 209:6
245:21 248:10,19
276:21 287:10,23
290:15,21 325:12
325:14
**day's** 36:4
**day-to-day** 12:3
**deal** 190:7
**December** 1:19 2:4
132:7,10,19
133:22 175:8
176:20 177:10,11
180:22 181:22
183:6,13,18
185:22 186:11,22
186:23 187:10,23
200:12 213:20

216:6,15 227:17
236:4 258:15
283:25 284:23
285:9 331:15
332:5 353:13
**decide** 232:13
302:10
**decided** 200:15
206:7 207:2,9,19
212:23 232:22
341:7
**decipher** 125:14
**decision** 105:13
144:15 149:19
203:4 207:7
211:20 218:11
230:13 235:9,18
293:10 308:5
336:2,6,9,12
**decisions** 21:2 34:7
147:19 158:9
213:16
**declining** 147:16
**decrease** 156:7
**dedicated** 81:15
**deemed** 164:20
**deeper** 162:17
163:16 264:14
289:18
**defendant** 329:5
330:25 331:16
332:5,8,25
**defendants** 1:13
3:10 326:19
328:14 329:16
331:9,22 332:16
333:15,21 361:23
**deficiencies** 103:15
103:16,17 108:24
109:10 138:7
**deficient** 109:16
144:23 145:3
**define** 306:11
**defined** 18:10 19:7
**definite** 240:14
**definitely** 91:17
120:13 136:19
152:13 160:24

161:24 256:24
273:24
**definitively** 271:4,6
**degree** 56:15 118:6
186:7
**deliver** 159:3
231:12,23
**delivering** 232:4
**demonstrate**
157:13
**demonstrated**
155:21
**demonstrating**
303:8
**demotion** 72:5
**density** 153:19
**deny** 214:25 215:3
**depend** 31:9 72:7
74:24 75:21 91:11
**depending** 43:4
68:22 69:5,8,9
71:22 73:11 100:7
240:23 345:23
**depends** 29:22
75:14,18 99:7
136:9 161:22
239:24
**deposed** 9:16,22
**deposing** 9:14
**deposit** 36:5,7,24
41:6 42:8,14
50:19 53:21,23
54:23 55:19 56:18
57:11,12,18,19,21
58:3,8,21,21,25
59:4,6 76:8
194:16,23,24
196:9,11,14,18,24
197:13,24 198:3,6
210:23 211:4
214:13,15,16,16
214:17 215:8,10
216:16 217:4,18
243:7,24 244:15
244:22,25 245:3
246:5,5,24 247:2
247:13 248:9,11
248:18,20,22

252:18,23 253:12
253:20,23 254:7
254:12,14 259:19
260:3,25 261:15
262:8,20 268:20
268:24 269:4
270:8,9 271:19
272:3,16 275:25
276:3,3 277:10,12
277:19,21 287:12
287:21,23 293:24
299:21,24 300:3
301:20 348:24
349:8
**deposited** 198:11
287:10,24 290:21
291:4 300:9
**depositing** 290:15
**deposition** 1:17 2:9
7:2,9 9:7,11 200:7
200:11 251:3
292:13 311:15
356:7 357:3,9
359:11,12
**depository** 55:21
56:20,22,24 57:3
57:6,10,13,23
**deposits** 11:16
57:22 59:25 60:9
196:17 198:11
210:16,19 211:16
214:19 215:5
216:2,7 236:2,5
245:8 251:11
264:9 271:23
287:9,19 296:4
297:7 298:7,10,16
299:5,13 302:2
329:9,20 330:8
333:6,8,23 347:4
348:4,9,19 349:4
349:17,18 350:25
351:14 352:15
353:14
**describe** 43:24
155:13 194:8
285:10
**described** 18:6

123:25 167:23
179:6 346:3
**describes** 51:2
64:23 65:4
**describing** 48:3
106:13 172:19
176:11
**description** 14:11
14:22,25 147:25
296:2 351:9
**descriptions** 13:22
**desk** 195:2 237:11
237:12
**destroyed** 22:9,12
22:14 23:2,6,11
**destroying** 23:22
23:25 24:2
**destruction** 48:11
48:17
**detail** 106:12
108:13,21 163:16
**detailed** 189:3
293:3
**details** 42:9,11
50:21 106:11
107:17 108:9,17
115:18 116:6,16
116:20 120:3
121:12,22 128:13
129:7,16,20
141:25 145:4
146:21 149:20
150:5,24 155:17
155:23 156:9,25
167:6 171:18
177:20 181:4,9
189:16 195:20
203:14 223:17,21
292:24 293:7
**determination**
228:21 229:4,10
229:19,20,22
**determine** 76:2
231:22 232:9
290:18 298:16
299:4 319:17,25
331:4
**determined** 226:11

230:12 339:6
**determining**
203:10
**develop** 15:12
101:23 157:5
**developed** 150:20
**developing** 13:7,13
17:16 305:12
**development** 16:21
17:21 18:11 19:2
100:25 134:6
151:9 162:21
**develops** 306:11
**deviated** 325:18
**diagnosed** 165:20
166:7 170:20
171:16
**diagnosis** 169:10
170:11 185:13
**DIAZ** 3:13 15:5
21:12 22:10 23:3
23:23 24:21 25:5
26:22 29:9,14
30:16,19 32:13,18
33:20 35:3 37:22
38:12,17 39:9,24
46:3 47:8 51:16
52:3,12 62:2,5,11
62:16 64:13,20
66:13 67:17 68:3
68:16,24 72:9
74:19 78:25 83:21
84:11 85:6,21
86:11,16 90:7
91:22 93:6,19
98:14 99:11,24
101:19 103:10
106:3 112:9,20
115:11 127:11,15
130:2,20,23 131:2
131:13 132:22
133:5 136:18
141:15 160:20
170:23 174:20
176:12 178:24
185:23 199:20
206:18,22 207:12
211:2,22 215:2,16

216:8 217:13
224:20 226:4
231:14,24 232:15
232:24 235:11
245:9 247:18,24
252:9,14,16
257:14 263:8,20
264:3 265:21
266:9,20 270:24
271:5 274:12
277:24 278:21
280:15,24 284:17
292:4,7,15 293:20
301:5 304:13
305:22 307:17
308:7 311:7,16,25
312:5,10,15
313:22 314:9
317:11,18,24
321:8,11 323:10
326:11,23 327:20
336:21 337:18
338:10 340:12
344:23 346:22
348:10,15,20
349:20 350:19,22
351:3 352:10,21
355:25 356:5
357:2
**difference** 72:25
73:13 80:11 171:5
**differences** 264:11
**different** 14:16,18
15:24 16:2,15,18
28:12 29:23 30:20
32:5 34:10 44:16
51:5 68:18 69:12
69:15,15,17,18,19
81:18 85:25 86:20
86:20 100:15
133:20 136:6
143:10 153:12
157:9 189:16,18
199:8 210:15
216:10,11,12
243:4 273:21,21
287:11,24 288:3
291:6 299:16

301:12 308:18
309:12 313:16
323:5 343:6
**differently** 290:22
290:23
**difficult** 5:17
111:23 112:13
153:11
**difficulty** 215:7
**dip** 130:9
**direct** 20:15 48:7
64:8 71:5 116:21
126:6 131:21
140:16 158:21
159:21 214:11
330:19
**directed** 54:10
56:11 61:4
**directing** 43:20
**direction** 15:24
19:7,9 28:11
144:3 160:24
252:13
**directions** 86:21
237:24
**directly** 14:20
20:15,19 21:3,4
120:10 130:5
213:11 214:8
314:8
**disability** 324:12
324:15,18,19,22
328:3,17 334:9,12
**disagree** 252:16
**disciplinary** 18:21
68:5 202:21 203:5
203:9,11 257:17
257:20 354:20
355:13
**discipline** 29:17,21
67:21 68:7,9,10
68:15,21 106:2
265:24 267:7,10
267:11
**disciplined** 126:24
200:16,18 256:4
258:19 265:20
329:18 330:6

**disciplining** 329:6
**disclose** 199:24
**discrepancy** 289:15
**discretion** 72:12,15
72:19
**discuss** 9:13,15
81:17 87:23 88:4
90:18 168:25
190:10 202:21
233:19 296:17
309:10,22 310:6
**discussed** 109:25
137:14 138:13
170:6 190:13
192:22 193:4,7
201:17 219:12
224:3,4,6 233:17
233:21 326:4,5
349:25
**discusses** 90:11
**discussing** 176:15
191:15 219:17
310:2,8,11
**discussion** 73:8
108:7 114:2 168:4
170:12 171:25
176:24 177:12,15
179:2,3 180:19
246:7 293:24
**discussions** 132:20
183:9 226:8 228:6
228:9 231:9
233:23 250:14
**district** 1:3,4 10:24
11:7 12:17,17,19
12:25 13:2,5
19:14 27:19 28:2
28:3,5,8,15 29:18
31:21 32:9 37:11
39:2 45:5,10,13
53:15 54:14 55:9
56:12 72:13 81:16
87:5 88:3 90:5
92:5 94:14 100:9
101:18 112:24
136:10 139:23
142:15,17,21
152:4 161:21

184:12 202:4
210:19 240:2,9
286:9,10,12 298:5
309:4,20 329:18
332:10,18 337:8
337:14 342:20,21
**DM** 80:16 87:2,4
87:23 88:17,20
89:15 90:11
201:19 202:4
**DMs** 80:8
**doctor** 166:15
169:8 170:10
172:20,23 174:16
182:24 183:4
191:2
**doctors** 167:14
**doctor's** 168:17,19
169:14 181:14
182:4,21 325:12
331:3
**document** 36:18
37:23,24 38:6,10
38:15,23,24 40:8
40:14,19 43:6
47:19,24 51:15,21
51:23 52:9,16,16
52:18,22,23 53:4
63:2,7,19 64:22
65:8,15 67:12
70:2,6,23 73:4
74:6,10,12 75:3,9
75:13,16 78:6
80:14 89:4 92:9
92:12,17 93:12,21
99:5,10 113:17,19
113:21,25 114:14
115:8,14 116:14
119:5 120:11,21
120:25 121:15,18
121:20,25 122:3
125:2 128:15
138:22 139:21,25
141:21 142:2
145:15,23 146:8
148:5 154:15,25
155:12 158:15,18
163:9 208:9,11

209:22 210:5
211:14 213:21
214:7 219:16
223:12 224:12
226:6 227:4,5,23
232:5 234:9,11,19
235:21 237:20
241:9,13 249:19
258:9 267:17
285:20 286:15,17
286:21 295:11,19
296:15,16 300:14
302:22 306:18
307:20 310:18
311:11,13,19,21
312:11,13,13,16
319:22 326:22,25
330:20 342:4,5,8
342:10,24 344:14
349:2 360:10,11
360:12,13,15,16
360:17,18,19,20
360:21,22,23,24
360:25 361:3,4,9
361:11,12,16,17
361:19,21,22
362:4
**documentation**
14:13 40:12
193:20
**documented** 73:8
77:19,24 120:24
128:12,12 138:10
221:9 318:16,23
319:2 321:19,21
**documenting** 72:23
148:23 194:18
**documents** 7:20,22
7:23 8:14,16
37:18,21 38:13,22
39:4 40:21 50:6,9
50:10 57:15 69:2
78:18 92:24 98:17
99:3,6 105:17,25
128:20 130:14
141:6,19 164:8
199:19 203:19,21
204:15,20 210:17

224:14,18 245:9
251:2 292:10,14
292:15 307:14,18
308:15,16 312:3,5
312:7 313:19
323:11 326:21
338:10 352:2
353:2,24 356:9
**doing** 25:16 32:6
95:13 108:3,5
117:19 186:8
195:4 213:11
245:3 285:15
312:21 348:24
**doubled** 247:8
**double-digit**
161:19
**downs** 102:22
130:11
**downward** 145:9
145:13,18
**downwards** 144:17
**dozens** 332:10
**draft** 114:14,18
115:14 121:24
234:2 302:24
**drafted** 115:6,7
**drafting** 114:16
**drank** 188:3
**drawer** 194:25
195:2
**DRB** 26:11,14
38:16 42:20 43:8
43:12,13,16 44:20
44:22,24 45:2,6
45:14 50:6,9,11
76:3,17 100:5
125:23 128:7
130:18 132:21
163:13 199:14
200:7,11,17
201:18 207:11,17
207:23 217:19
235:8 241:13,13
245:23 250:24,25
258:8,24 264:19
268:2 270:20
275:17 279:22

309:22 310:2
323:13 361:5,6,7
361:8
**DRBs** 26:10,20
37:10,13,17,20
38:11 40:15 45:19
49:17 52:17 75:19
95:24 96:3,7,16
96:19 97:16
106:15,18,22,24
107:3,5,13,20,23
108:2,8 127:4,7
127:10,19 128:18
131:11,19,24
141:11,13 200:3
211:16 258:20,22
265:7 280:2,4,7
280:13,13,19,22
281:3,7,19 282:18
283:4,14,17,20,25
284:4,15,23 310:6
313:24
**drive** 157:6
**driver** 159:20
**drop** 35:25 57:11
198:2 251:12
261:5,5,8 277:15
287:11
**dropped** 36:22
57:13 243:9
254:18,19 261:8
270:12 271:24
**dropping** 36:2
**drove** 201:6
**due** 144:17 181:14
228:21 333:8
**duly** 4:4 359:12
**duties** 11:24 13:4
45:20 339:19
340:14
**duty** 59:9 98:25
99:12 282:7
**dynamics** 100:23

**E**

**E** 3:2,2,7 359:2,2
360:2,7
**earlier** 53:13

143:25 145:15,23
195:13 198:10
215:9 219:13
239:14
**early** 144:16 177:9
177:11 180:22
181:21 183:5,13
186:10,22 187:24
205:21 331:15
**easier** 153:21
**economic** 159:3
162:3
**effect** 159:17,18
168:8,12
**effective** 305:17
306:8
**effectuate** 231:10
**egregious** 198:15
201:21
**eight** 9:9 135:16
136:20 176:7
218:24 240:17
301:23 335:6,11
**eight-week** 176:3
185:7
**either** 98:11 128:12
147:6 178:8
213:11 255:21
279:5 325:9
**either/or** 341:21
**electronic** 42:6,7
78:18 93:2 94:4
**electronically**
42:16
**element** 74:18
**else's** 210:10
**emphasizing** 79:21
**employed** 242:9,10
334:23 335:4
**employee** 25:20
29:21 31:18,20
34:13,23,24 35:23
56:17 66:11
219:21 220:4,13
285:11 329:5
354:23
**employees** 20:13
20:23 21:3 29:18

30:21 31:4,6 32:8
34:18 185:21
272:2 325:9
**employee's** 31:14
**employment** 31:14
33:8 66:8 69:11
72:6 73:24 105:14
222:24 230:18
233:20 235:22
**empty** 243:5
**encountered**
323:13
**encourage** 72:22
325:21
**endanger** 59:20
**endangered** 60:11
**endangering** 59:22
**endangers** 59:12
**ended** 120:19 181:3
199:4 220:20,23
238:11 291:18
312:13
**ends** 18:24
**energy** 95:6
**engage** 16:16 235:7
**engaged** 235:16
**engaging** 71:10
**ensure** 15:13 21:24
**Entered** 208:16
221:14
**entire** 28:6 78:22
93:4,17 98:7
210:23 211:6
213:19 236:25
247:19 311:13
353:17
**entries** 311:24
312:17 327:9
**entry** 247:11
315:11
**environment** 12:8
17:4 103:20,25
115:17 118:23
122:20
**environments** 40:5
**equal** 52:2,10,13
**equals** 315:7
317:25,25 318:13

318:16 322:13
**equipped** 57:9
**equivalent** 135:10
**error** 254:10
259:13
**errors** 242:18,21
242:22 243:2
244:13 246:12
251:5,8,18,23
252:3 253:7
254:24,25 255:3,7
255:10 256:17
257:2,12,23 259:8
265:11 268:8
270:4 274:6
275:21 277:8
**ESQ** 3:7,13,14
**essentially** 43:25
312:21 348:23
**establishment**
99:18
**Estela** 3:13 8:24
9:4
**estimate** 32:12,17
61:18,21,24 62:3
62:12 78:13 83:15
83:19,22,25 84:2
84:5,8,12,19,22
85:7,8,14,15,19
85:24 86:6,8
103:8 133:11,17
133:24 134:19,20
134:21,23 135:2,3
135:24,25 136:12
136:20 142:23
172:15 226:23
239:18
**estimated** 135:15
**estimation** 136:4
136:21
**evaluate** 117:11,21
118:5
**evaluating** 219:7
**evaluation** 72:10
**evening** 152:14
192:19
**events** 166:4
**eventually** 104:21

107:15 108:22
190:14 197:23
**everyday** 327:16
**exact** 10:14 32:10
32:14,16 35:13
116:10 134:4,9
142:14,24 165:25
185:12 229:16
237:18 294:7
337:12
**EXAMINATION**
4:6
**examined** 4:4
**example** 73:6 74:4
77:16
**Examples** 74:2
**excel** 295:6 301:11
**excellence** 78:9,23
79:19 89:10 134:7
**exception** 6:10
**excessive** 155:6
**excited** 154:2,3
**excuse** 9:14 14:6
71:4,4 308:9
352:14
**execute** 17:17
**executing** 14:2,4
16:7
**executions** 16:3
**exhibit** 47:14 62:14
62:15,23 63:13,15
65:9 70:17 77:25
92:7 93:8 113:15
121:16 126:23
139:17,20 154:11
158:13 164:3
208:5 222:13
227:2 228:13
234:6 241:4
249:16 258:4
267:13 274:17
285:17 286:18
295:8 302:19
306:13 308:11
310:14 311:17
326:16 330:11,13
341:24 360:8,10
360:11,12,13,15

360:16,17,18,19
360:20,21,22,23
360:24,25 361:2,3
361:4,5,6,7,8,9,11
361:12,14,16,17
361:19,21,22,23
362:2,3,4
**exhibited** 156:6
**exist** 71:9
**expectation** 157:12
163:6 315:3
**expectations** 13:24
16:4 146:6 162:13
162:23,24 163:2
186:15 320:9
**expected** 64:24
112:5 165:16
**experience** 12:7
81:19,20 99:14
161:20
**experienced** 281:25
299:18
**experiencing**
192:21
**explain** 41:2 57:8
81:12 282:4 299:9
314:22 352:15
**explained** 330:23
**explanation** 264:2
265:19 267:6
**extended** 183:16,22
339:10
**extensive** 147:21
213:24
**extent** 78:21
169:12 171:21
180:10 200:19
218:9 313:20
330:24
**external** 164:22
**extra** 165:5
**extracted** 44:22
45:2
**extreme** 146:11
353:20
**extremely** 130:8
**e-mail** 32:3 148:9
148:11,14 205:4

222:18,18 224:10
225:7 227:7,13
228:16 300:15
306:19 327:4,14
361:2
**e-mailed** 300:19
338:4
**e-mails** 7:25 14:14
15:2 92:4 293:17
338:8

**F**

**F** 359:2
**fact** 9:13,15 290:24
290:25 291:3
**factor** 218:11
**facts** 290:20
**failure** 59:11
251:16,17
**fair** 20:22 23:20
37:17,20 39:6,10
51:13,24 52:15
68:20 73:15,18,19
77:21 91:2,18,19
99:22 100:2,5,10
101:9 112:18
176:9 239:18
240:3,7,10,11,16
240:18,20,22
247:10 254:23
255:6 260:7,23
262:6,9 272:21
274:5,8 278:14,18
278:22 322:25
323:3
**fall** 112:17 156:8
304:6,10
**falls** 112:2,12
**falsification** 74:5,9
74:14,18,20 75:2
75:5,12 76:2,6,16
203:19,21 204:15
213:24 214:7
224:17 235:24
329:11 347:25
351:25 353:3
**falsifications** 75:19
**falsified** 213:21

215:10 260:9,14
261:24 262:24
**falsify** 74:15
**falsifying** 204:19
210:17 214:13
215:8 349:2
352:16,25 353:23
**familiar** 35:5 36:14
41:3 48:5 64:6
65:6,20,25 66:4
79:17 100:10
343:22
**familiarity** 101:4
**far** 5:24 6:3 19:20
19:22 23:11 38:3
38:19 40:17,19
69:14 231:12
347:21
**February** 228:17
**feel** 17:3 38:4 53:13
94:18 150:21
174:12 210:12
226:24 231:3
265:4 343:5
**feeling** 166:6,9,13
167:13 172:17
182:18,24 183:3
191:21,24 238:24
239:2
**FELD** 3:9
**felt** 102:15 191:20
**few-minute** 94:6
240:25
**fibroids** 169:9
170:20 171:16
172:23 176:2
182:22 185:13
326:6,7,9 331:18
**field** 34:6
**Fifth** 2:10 3:5
17:10 184:8
**figure** 198:24 203:8
226:13
**file** 7:24 221:10
227:25
**fill** 40:18 198:5
**filled** 122:9 197:12
242:23,25 243:7

251:12,13 253:12
253:14,15 254:13
277:11,14
**filled-out** 246:25
**filling** 36:7
**final** 69:7,9 70:4,7
70:8,14 73:19
213:4 324:3
**finalize** 90:20
**find** 14:16 46:21,24
107:6 112:16
171:20 174:16
192:25 193:14
246:4 251:25
**finish** 5:10,19
96:14 169:25
206:22 321:12
349:15 350:19,22
**finished** 43:13
174:20,22 206:18
335:11
**fire** 198:20
**first** 4:3 9:24 10:2
10:19,21 28:8
31:22 34:14,24
35:9 70:21 73:5,6
73:11 79:3 94:13
94:14,17,25 95:2
95:5,7,14 100:18
101:17,20 102:3
102:18,25 103:3,4
103:8,23 143:25
157:6 158:22
165:3,22,24
166:19 167:10,24
167:25 170:5
174:3 179:19
180:23 188:22
190:22 202:20
209:9 212:11,16
214:5 232:10,14
232:23 233:3
236:20 250:4
251:15 256:15
268:14 289:8
306:19,21 313:25
314:5 334:17
336:24 337:5

**fiscal** 143:16
154:21 156:18
165:24 250:5
**five** 10:15,16 32:24
32:25 162:21
214:12
**fix** 71:25 106:10
304:22 305:16
**fixed** 106:11
**flash** 300:25 301:3
**flip** 194:20 243:14
**floating** 210:16
**floor** 214:14 215:7
315:11
**Florida** 200:25
201:5,6
**flow** 12:5
**FMLA** 328:4,17
**focus** 98:11 113:3
113:11 158:24
163:18 177:12
188:10 309:15
**focused** 40:4
148:24 257:15
285:15
**focusing** 163:21
179:2 349:3
**follow** 19:8,12
29:21,25 30:12,18
30:22 31:3 61:3,8
68:5 80:22,25
81:9,11 86:18
90:15,22 96:5
129:4,9,14,23
131:12 237:25
**followed** 27:11
47:7 50:2 53:17
53:19 54:16,21
55:11 56:14 59:20
61:6 80:23 123:19
130:17 248:14
301:15
**following** 16:5,12
36:4 48:21,25
51:7 61:10 88:21
89:16 110:14
118:2 171:11
201:7 202:25

206:10 226:25
261:9,11 264:10
289:19 329:16
333:8 358:4,5
**follows** 4:5 285:14
**follow-up** 18:25
81:4 82:3 96:3,8,9
96:17,20 97:10,11
97:15,22 129:8
131:5,9,19 134:25
135:10 240:8
**follow-ups** 82:5
95:18 135:17
**food** 99:18 103:21
**foregoing** 328:13
329:15 357:8
**form** 72:4,6,11
73:14 74:20 286:4
**format** 65:22,24
189:2
**formats** 14:8,9
**forms** 14:13 282:2
**forth** 329:20
359:11
**forward** 147:17
226:12,14
**found** 24:12 169:8
169:9 170:10
173:5,6 182:21
183:14 214:10
291:17 341:15,18
**four** 82:2 134:20,23
135:4,5 144:21
177:6 240:4,8
287:10,23 290:15
290:21 327:24
**frame** 8:8 84:13,16
87:17 102:20,21
108:10 116:19
125:12 127:16
129:16,21,22
131:4,7 134:9
139:8 142:10
144:14,19 147:9
156:10,16 165:6
165:24 175:18
177:2 179:13
181:19 188:16

204:2 206:9
212:18 213:15
226:22 229:17
285:3 293:8
326:14 340:17,20
**frames** 86:2 155:17
169:18
**Friday** 152:9
202:12 272:7
275:19
**front** 43:3 48:2
155:24 225:5
245:10 279:18
**fulfill** 345:19
**full** 23:17 144:23
156:9 227:18
290:19 299:6
319:3 320:8
336:19
**fully** 12:4 197:14
210:12 330:23
**full-time** 336:16,17
**fund** 246:18 275:23
**funds** 289:20
290:15
**further** 65:7
155:11 198:22
257:16 260:11
262:11 333:22
359:15
**future** 174:14
267:23

---

**G**

**gain** 17:12 27:3
28:11 316:16
318:9
**gained** 291:14
**gap** 268:12
**garbage** 24:3,7,14
25:19
**gather** 312:23
**general** 13:21
19:12 22:24 30:11
30:17 36:15 44:11
57:5 68:4,6,14,18
68:21,23 79:13
80:21,25 86:18

87:15 89:10 90:16
94:2,25 95:5 97:8
99:9 104:4 116:19
117:25 128:4
134:10 145:21
146:5 150:18
177:21 189:20,24
299:17 301:21
355:3
**generally** 30:7 31:5
31:24 61:8 81:18
82:23 87:13 88:10
88:12 90:23
123:24 184:9
250:21 333:6
**generate** 142:2
300:14
**generated** 41:13,15
42:2 44:19 141:7
141:19 298:23
300:16
**gentleman** 221:9
**Georgia** 242:16
**getting** 15:18
100:23 101:21,22
102:5 192:16
196:4 214:14
215:6,7 232:17,19
233:3 298:23
308:25 327:14
**Giles** 270:15,16
**give** 71:15,24,24
96:10 121:4 127:6
136:21 146:12
225:11 237:23
265:18 267:5
274:21 302:10
303:9 305:20
**given** 13:25 35:22
36:3 44:18 60:10
88:9 244:23
305:18 352:6,12
355:17 359:13
**gives** 237:24
**giving** 34:14,24
214:4,9 230:15
352:13
**glance** 251:15

**GM** 209:10
**go** 14:16 16:24
18:12,20 24:20
25:2 26:25 41:21
47:12 69:9,10
89:8 90:25 92:4
98:10 117:9
134:11 136:3
143:24 164:19
166:15 169:14
172:20 174:15
182:24 183:4
193:18 196:2
199:9 200:24
201:5 220:13
247:3,18 257:6
264:6 281:7
298:19 300:21
301:17 314:9
325:12 328:7
329:3 336:23
345:24 347:21
**goal** 15:15,17 79:11
80:15 159:5,8,24
160:8 162:5,19
**goals** 16:4 159:12
159:14,15
**goes** 35:20 72:3
84:4 187:23 196:5
196:8,20 268:17
275:23 288:13
305:11
**going** 6:5 14:24
22:23 29:6 78:23
93:3,16 95:16
98:6 105:24 114:3
119:9 125:13
152:12 163:15
167:13 168:13,16
171:20 173:9,15
175:14,15,22
176:6 178:20
179:12 180:19,24
181:13 182:5,10
183:4,7,15,21,22
185:11,19 186:10
189:4 190:16,16
192:17,23 194:4

194:12,19,21
195:10 196:15
197:21 198:20
200:16 201:22,25
202:5 204:24
205:5,21 206:10
212:23 220:17
225:11 226:11
229:23 231:23
232:10 235:5
246:23 248:7
257:9,19,21
263:14 265:12,19
266:17,22 282:17
289:23 291:19,24
292:12 307:13
311:5,12 313:18
323:7,22 339:6
345:7 347:20
351:11,13 356:6
**good** 4:8,9 17:3
141:17 156:13
182:18 218:3
**gotten** 88:14 205:3
229:10
**GOTTLIEB** 3:7
4:7 14:24 15:7
29:6,12,16 47:11
47:16 62:18,20
65:2,7 78:21 93:3
93:16 94:5,9
105:24 127:13
130:21 137:24
138:4 141:9
170:25 178:20
185:19 188:5,9
206:20 224:22,24
235:14 240:24
241:3 245:11
247:20 252:12,15
274:14,16 291:24
292:5,9 293:16
301:2 304:11,15
307:13 311:2,10
312:4,8,14 313:18
317:10,14,20
323:7,22,25 338:7
345:7,13 350:20

356:3,6 360:5
**grab** 225:12
**grabs** 195:3
**grasp** 305:13
**great** 12:7 40:5
103:24
**grew** 161:12
**Griffin** 105:3 106:2
107:14 108:20
**Griffin's** 106:6
108:25 109:10
**ground** 225:10
**group** 100:16
**grown** 160:5
**growth** 160:2 161:8
**guard** 206:4
**guess** 15:14 26:25
36:3,19 91:12
95:4 130:4 175:12
189:20 248:16
345:9
**guidance** 18:23
49:9 72:18,18,21
72:23
**guide** 71:2 203:17
204:14
**guideline** 19:12
80:21,25 81:8,9
81:10 86:18 90:17
**guidelines** 13:21
30:2,3 68:4,7
**guilty** 75:2,8
**GUMP** 3:9
**Gurtov** 1:10,17 2:9
4:1,2,8 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1,8 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1

47:1,14,18 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1,22,23
62:25 63:1,15,17
63:18 64:1 65:1,9
65:11,12 66:1
67:1 68:1 69:1
70:1,17,20 71:1
72:1 73:1 74:1
75:1 76:1 77:1,25
78:1,4 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1,7
92:10 93:1,8,11
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1,15
114:1 115:1 116:1
117:1 118:1,22
119:1 120:1 121:1
121:16,19 122:1
123:1 124:1 125:1
126:1,7 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1,5
139:1,17,20 140:1
141:1,12,14 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
154:11,14 155:1
156:1 157:1 158:1
158:13,16 159:1
160:1 161:1 162:1
163:1 164:1,2,3
165:1 166:1 167:1

168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1,5,7
208:21 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1,13,16 223:1
224:1 225:1,5
226:1 227:1,2,5
228:1,13 229:1
230:1 231:1 232:1
233:1 234:1,6,9
235:1 236:1 237:1
238:1 239:1 240:1
241:1,4,6,7 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1,16,19 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1,4,7
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
267:13,16 268:1
269:1 270:1 271:1
272:1 273:1 274:1
274:17,20 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1,17,20 286:1
286:18,21 287:1
288:1 289:1 290:1
291:1 292:1 293:1

294:1 295:1,8,11
296:1 297:1 298:1
299:1 300:1 301:1
302:1,19,22 303:1
304:1,16 305:1
306:1,13,16 307:1
308:1,11,14 309:1
310:1,14,17 311:1
311:10,17,20
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
326:16,19 327:1
328:1 329:1,5,17
330:1,11,13,22,25
331:1,16 332:1,5
332:8,16 333:1,2
333:15 334:1
335:1 336:1 337:1
338:1,9 339:1
340:1 341:1,24
342:1,3 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1,7
359:10 360:4,8,10
360:11,12,13,15
360:16,17,18,19
360:20,21,22,23
360:24,25 361:2,3
361:4,5,6,7,8,9,11
361:12,14,16,17
361:19,21,22,23
362:2,3,4
**Gurtov's** 14:25
15:3 178:21
307:15
**Gustav** 228:15
**guys** 138:2

**H**

**H** 360:7
**habits** 285:13
**half** 143:14 157:25

184:20,21
**hand** 74:24 75:14
75:18,22 81:21
257:16 267:15
305:14 359:20
**handbook** 30:6
**handed** 47:17 63:2
63:17 65:11 70:19
78:3,16 92:9
93:10 113:17
121:18 139:19
154:13 158:15
208:7 222:15
228:15 234:18
241:6 308:13
342:2
**handful** 195:3
**handing** 163:25
227:4 234:8
249:18 258:6
274:19 285:19
286:20 295:10
302:21 306:15
310:16 311:19
326:18 330:15
**handle** 12:5 76:19
144:8 153:23
199:11 292:19
339:12 340:11
**handled** 35:6,9
39:12 46:22
290:22,23
**handling** 20:5
21:10,14,17,25
22:17 23:15 40:13
40:15,19,23 45:24
46:12,15 51:5
52:19 64:11,19,23
65:4 66:17 98:7
101:11,16 104:7
104:13,22 105:2,8
106:6 108:25
109:10,17 112:3
113:2 116:3,23
118:3,16 122:9
124:5 141:24
155:3 209:12
213:10,17 219:6

243:15 296:3,22
297:24 301:15
302:2,7 303:16
304:19,22 318:2
318:11,13 319:18
319:23 320:9,12
320:16,19 347:14
**handwriting**
121:23 122:3,5,6
124:4,8,20,21
126:15 296:8,10
**handwritten**
184:15
**happen** 25:15
41:21 98:4,12,13
169:19 260:22
298:8 309:16
319:12
**happened** 25:13
33:13 114:11
143:13 169:18
182:17 192:13
194:5,8 203:20,23
204:17,17 226:24
245:21 257:18
260:12,20 263:4,6
266:6,8,12 289:16
289:19 290:20,20
290:24 301:18
309:15 316:17
341:13 347:19
**happening** 98:9
166:17 172:8
193:12 262:3
267:3 306:2
355:10,19
**happens** 41:22
57:12,15 82:24
83:2 163:7
**happy** 12:8 186:11
**hard** 83:16 99:7
112:7 121:10
125:14 135:3
136:11,21 158:22
295:6
**hardest** 295:6
**Harper** 342:18
**HAUER** 3:9

**head** 5:15 27:13
128:9 143:8
**heads-up** 185:15
225:11
**heal** 325:22
**health** 92:15,19,22
93:5 191:21
**hear** 4:20 267:22
267:24 306:22
**heard** 222:22
**held** 2:9 52:21
122:23 123:10
223:22 245:2
292:13
**help** 15:12,17,19
46:24 77:5 97:14
101:23 117:16
125:21 148:25
151:9 192:25
193:24 302:12
303:7 304:22
305:16 319:25
**helped** 151:12
152:10,14
**helping** 20:25
**helps** 77:14
**hereinbefore**
359:11
**hereunto** 359:19
**hey** 183:20
**Hi** 222:21 225:20
228:20
**higher** 304:3
**highlight** 279:6
**highlighted** 52:5
255:22 295:17
**highlighter** 279:13
**Highlighting** 271:8
**highlights** 52:19
**hire** 164:22 336:3,8
336:19 339:4
340:10,19,25
**hired** 9:24 10:2
164:23 335:6
336:8,22 341:22
**hiring** 309:20
338:13
**history** 213:24

217:25
**hold** 38:14 40:6
60:5 125:14 196:5
303:16 333:7
351:4
**holding** 14:12
109:21,22 122:25
145:24 350:8,9
353:18
**holds** 43:25
**holes** 194:17
**holiday** 187:11
192:18 199:5,7,9
**holidays** 199:11
**home** 115:6 144:4
201:5 288:11
291:3 341:15
**honest** 175:3
343:21
**hope** 192:8
**hours** 7:19 8:11 9:9
82:2,10 95:21
152:9 153:7
190:21 315:7,14
315:15,16
**house** 41:24
**Howarth** 334:6,7,9
334:17 336:25
337:6,21 338:8,11
338:14 341:12,20
341:22
**huddle** 182:9 310:7
**huddles** 182:7
308:19,20 309:13
**Hudson** 143:18
332:6 333:2,16
**Huetz** 9:19 212:2
227:9
**human** 30:13
**hurt** 325:5
**hypothetical** 59:24
261:3 267:9
**Hypothetically**
24:15 75:4

I
**ID** 253:11
**idea** 57:5 147:10

150:18 194:2
243:24 245:7
252:18 277:21
281:6 310:23
**ideal** 314:25
**identification**
27:11,14 47:15
62:24 63:16 65:10
70:18 78:2 92:8
93:9 113:16
121:17 139:18
154:12 158:14
164:4 208:6
209:10 222:14
227:3 228:14
234:7 241:5
249:17 258:5
267:14 274:18
285:18 286:19
295:9 302:20
306:14 308:12
310:15 311:18
326:17 330:12,14
341:25
**identified** 259:10
329:22
**identifies** 88:20
89:15
**identify** 154:25
243:17 250:17
251:5,8 253:7
254:10 259:8
277:8 282:16,21
282:25 311:11
327:25 329:3,4,16
347:13 349:6
**illegible** 268:14
**immediate** 73:23
75:13,16,20 76:17
185:14 293:14
**immediately** 25:21
25:24 333:2
**immensely** 295:7
**impact** 144:6
189:16
**impacted** 282:17
282:19,22,23
347:15

**impetus** 107:3
**importance** 38:3
38:14,19 39:15
40:6 52:2,6,10,14
112:14
**important** 37:18,21
37:23,25 38:5,11
38:16,21,22,23,25
39:5,7,13,18,21
39:23 40:9,14
51:25 52:10,16,22
52:24 53:8,12,14
54:3,7 55:3,4,7,25
56:8 60:23 66:7
66:11 87:23
101:10 110:21,25
111:4,8,12,14,21
111:24 112:8,15
112:16,19,22
113:13 125:6,9
158:23 159:12,13
159:15 199:10
333:10 339:8
340:13 354:18
355:15
**impression** 94:20
94:22,25 95:2,5
**improve** 34:15,25
77:5,14 125:20
149:23,25 303:9
**improved** 157:14
207:24
**improvement**
147:18 148:7
150:7 289:13
303:2,6
**improvements**
143:24 150:11,12
150:16 151:2,24
289:25
**improving** 132:21
**inability** 306:7
**inadvertently** 75:2
75:8
**incident** 97:3
127:17,22 210:22
220:8
**incidents** 298:8

**include** 12:21 74:3
291:21 344:20
**included** 50:6,9
88:13
**includes** 12:22
343:3
**including** 326:5
329:6 330:6
**incompletely**
246:25
**inconsistencies**
102:23 103:6,9,14
107:8 109:21
156:19,23,23
193:19
**inconsistent** 155:16
157:10 158:5
186:14 213:15
**incorporate** 346:9
**incorrect** 74:12,21
75:9,11 76:7
216:6,16
**incorrectly** 75:3
**increase** 161:14,15
161:16,17,19,25
162:2
**indicate** 223:4
235:4 250:2
261:22,25 262:23
263:7,9,13,19
268:7 270:4 271:9
272:16,24 273:21
273:22 275:21
279:11,19 301:14
313:7,10,15
315:14 320:15
355:20
**indicated** 262:15
297:8 311:4,7
312:14 314:2
320:11 321:3
**indicates** 164:9
262:20 287:5
297:23
**indicating** 287:24
**indication** 315:18
**indications** 355:7
**indicator** 104:17

300:20
**indicators** 46:13,14
301:16 355:17
**indirectly** 213:12
**individual** 1:11
95:15
**individuals** 328:14
**ineffective** 162:22
163:12,20
**informal** 67:20
**information** 14:3
16:2 17:12 27:4
36:24 37:2 40:19
41:24 44:2,22,25
46:21 49:11 60:4
60:11 66:16 74:16
75:5,11 76:7
173:21 194:15,21
206:13 209:10
214:13,16 215:4
232:17,19 237:22
244:2 275:25
277:11,14 297:18
312:23 315:20
316:9 329:10
354:5
**informed** 183:6
187:20 330:22
331:15
**infraction** 72:11
**infractions** 69:15
70:9
**initial** 8:15,17 9:3
32:6 94:20,22
100:22 102:3,5
147:10 154:9
155:9 167:15
168:7,15 169:3,21
172:12,16 204:6,7
204:8 222:10
225:2 256:25
288:9
**initially** 168:25
183:2 339:11
**initials** 247:5,6
254:20,21 279:17
**initiate** 101:4
**injured** 325:4

**injury** 325:8
**inquiry** 204:9
217:21
**inside** 55:19
**insight** 291:14
297:5,12,15 298:6
298:9 318:9
**inspection** 332:7,9
**inspections** 332:11
332:17,18 333:4
333:18 334:3
**instance** 107:20
117:4 296:23
**instances** 117:4
128:22 130:13
132:2 195:12
**instruction** 64:10
64:14,18
**instructions** 235:13
**insure** 16:6 17:2
21:19 45:24 46:11
47:4 53:17,18
54:16,20 55:11
56:9,14 61:9
205:25 333:23
339:17 345:18
346:6 347:3,9
**insured** 152:13
**insures** 50:5
**insuring** 22:11
115:25 210:19
296:4 302:3
**integrity** 22:18
347:20
**intended** 344:10
**intent** 71:14 74:17
**Intentionally** 74:22
**interaction** 189:21
**interest** 34:7
**interested** 264:8
359:18
**interesting** 138:19
**intergatory** 327:24
**internally** 241:13
250:24 258:7
**interrogatories**
326:20 327:6
361:25

**interrogatory**
329:2
**interview** 18:16
335:23
**interviewed** 335:10
335:15 337:3
**interviewing**
334:20 335:17,18
335:20
**intimate** 148:21
**introducing** 100:14
**investigate** 245:19
257:21 260:10
265:12 355:9
**investigation** 24:16
26:24 235:7,16
262:11 266:16,19
291:13,15
**investments** 190:5
**involved** 122:24
123:10 139:5
293:10 329:6
336:5,11
**in-person** 211:10
**isolated** 319:13
**issue** 29:15 69:13
69:16,18,24 70:4
70:5 125:16,17
145:17 184:22
248:24 265:12
288:18,21,24
289:2 290:24
302:14 304:22
305:14 306:2,5
347:20
**issued** 295:14
**issues** 104:2,7,13
115:19 116:9,11
116:13 127:3
129:5,24 130:18
143:5 144:24
201:18 209:11,12
249:2,5,8 305:9
309:22 310:2
319:18 323:13
333:9
**issuing** 294:17
**item** 44:14 82:12

**items** 44:13 52:24
219:15 302:6
314:17

---

**J**

**J** 4:1 5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1

135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1

279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1
**jacket** 196:5
**January** 191:5
201:17 205:19,22
208:25 209:4
211:19 221:21
222:19 223:5
227:21 230:3,17
280:2 283:4,8,14
283:20 284:23
314:13 334:18
338:17,18,20,22
359:20
**Jen** 225:20 228:20
**Jennelle** 3:14 8:24
9:4
**Jennifer** 1:10,17
2:9 4:2 118:22
208:21 221:18
357:7 359:10
360:4
**job** 1:24 13:14,22

13:22 14:3,11,21
14:25 15:3,8,12
15:16 16:19 17:7
17:15 45:20 54:19
57:15 61:8 101:12
146:7 147:24
157:19 215:20
295:7 312:22
335:10 351:8
**journal** 313:3
**journals** 312:18,20
**judge** 29:14,15
351:12
**July** 241:11,15
242:2 244:11
249:4
**jumped** 237:20
**jumping** 259:13
**jumps** 155:24
**June** 27:24 283:4,8
283:17
**jurat** 356:13

---

**K**

**keep** 139:12 166:16
173:7 311:14
312:24
**keeping** 245:23
**Kenneth** 256:15
**kept** 22:5 42:21
43:12,15 267:7
**Kevin** 275:3 278:8
325:17,18
**key** 46:13,14 57:9
57:10 104:17
303:8 355:7
**kind** 16:24 18:10
125:18 142:2
146:20 171:12
172:18 183:19
185:15 193:15
205:3 271:7
**King** 143:18
**knew** 119:8 166:8
169:11,13 172:23
175:14,14 182:18
182:19 183:15
186:6 191:3

200:18 248:17
**know** 4:25 5:6 6:8
11:11,12 17:9,11
19:6,11,11 27:4
27:12,13 31:24
32:10,10 37:7
39:3 40:16,16
42:9,10,11,12,15
43:23 44:7,9,18
44:21 49:8 50:8
50:10 57:2 61:16
61:17 62:7 73:13
74:23 76:4,6 77:9
86:12,17,17 92:2
92:21 94:10 96:2
100:16,21,23
101:8,21,22 102:6
102:20 105:20
107:16 111:16,23
112:2 114:10,22
117:2 120:12
121:6,8 122:13,19
124:10 126:16,19
128:19,19 129:12
129:20 131:4
132:3,6 136:3
138:25 141:24
142:5,8,22,24
146:21 147:15
149:16,20 151:7
151:18 155:17
166:7 167:9,17
169:17 171:5,19
173:4 175:5,10
176:23 177:24
178:3,4 180:2
181:5 182:14,16
182:20,23 183:21
183:21 185:6,12
187:19 191:8
192:3 194:19
195:17 198:18
199:17,18 200:2
200:19 201:3
203:15,16 204:16
221:7 223:20
226:2 227:12
228:24 229:8

230:11,22 236:16
241:14,20 242:4
245:22 247:13
248:4,11 257:4,10
258:14,21,23
260:13,14,18,20
261:3 264:22
265:6,9,10 267:22
267:24 270:19,21
275:10 279:23
282:9,19,23 283:2
283:3,10,11,13,15
283:16,18,19,22
283:24 284:2,3,6
284:10,12,15,22
284:25 285:2,15
293:12 294:11,17
295:18 296:12
310:18,25 312:24
316:7 317:7
320:20 321:10,13
322:2,4,17 324:5
324:7 325:11
327:8 334:23
335:14 337:13,17
338:12,16,19,21
342:25 344:7,8,15
347:5 350:15,17
350:24 351:16
352:23 354:14,17
354:22,25 355:4
355:14
**knowing** 179:7,8
183:16 213:25
**knowledge** 328:2
328:15
**known** 133:20
174:12 246:2

---

**L**

**label** 49:19
**labeled** 227:4
241:13 311:20
**labor** 314:16,25
315:7
**laid** 182:17
**laptop** 114:24
299:2

**large** 17:14 60:2
104:16 106:20,23
111:10 160:6,14
160:17 161:14,15
161:16,17,19,20
161:25,25 280:18
311:19 322:23
347:17
**larger** 78:15 92:17
100:16 102:20
248:24 264:15
305:9,14 306:2
**lasted** 119:16
172:13 179:3
220:21 223:24
236:18 238:18
**late** 73:6,7 176:20
186:23 188:11
248:10,19 290:16
290:21
**lays** 51:3
**lead** 59:21 60:4,8
70:12 75:25
105:11 110:13
157:3 293:4
349:23 352:2
353:2
**leader** 305:17
**leadership** 301:21
**leading** 132:4
157:6 187:11
192:21 193:3,11
213:7,19 305:16
347:19
**leads** 163:4,11
289:6
**learn** 26:19 116:8
116:11,13 150:25
165:22 166:10
204:23 289:8
296:21 336:24
**learned** 26:9,23
165:19 179:14
205:21 214:6
290:12 340:21
**learning** 101:17
102:10 121:7
**leave** 58:22 144:8

144:12,22 145:6
145:21 147:3,11
147:22 149:19,22
151:15 176:3
179:15 183:22
191:15 204:24
205:5,7,8,21
220:5,7 230:25
231:4 232:11,14
232:23 233:3
317:5 325:6 328:4
328:17 339:10
340:18,22 341:10
**leaving** 12:13 199:3
356:7 357:3
**led** 28:12 104:17
107:8,15 108:22
117:4 120:10
121:11 123:3
124:25 128:23
130:13 138:22
145:5,21 214:8
235:17 347:14
348:23 349:21
350:25 352:16
353:3,9
**Leedel** 105:3 106:2
108:15 114:6,9,10
118:16 122:11
123:6 131:6
**left** 86:25 149:17
200:14 221:22
224:11 238:6
243:6 287:21
341:17
**left-hand** 259:24
**legal** 48:14 49:13
225:21 230:16
233:6 314:11
349:2
**legally** 50:5,8
**length** 35:13 82:9
183:20 261:7
**letter** 234:2
**letters** 311:8
**letting** 147:15
173:4 180:2 185:6
297:5

**let's** 25:13 66:21
182:12 195:8
196:2 272:6
**level** 18:18,22
20:21 38:3,19
56:15 71:17
112:17 124:18
144:10 150:20
164:23 180:4
**levels** 14:18
**lie** 306:9,11
**lied** 196:8 213:21
**life** 152:15
**limited** 74:3 329:7
**line** 41:12 142:13
159:11,20 163:17
189:20 209:9
210:11 247:7
254:22 315:5
358:6
**lines** 8:2 17:5 81:2
171:19 198:19
261:6 343:4
**list** 27:10 87:8
89:18 99:23 100:3
246:14 314:17
**listed** 74:4 89:19
219:15 303:20
**lists** 312:22
**litigation** 279:25
**little** 29:23 143:24
177:4 195:2
309:19 343:5,9
**Liu** 294:24,25
295:3,5 302:10
304:23 329:23
**LiveNote** 2:13
**LLP** 2:10
**LOA** 229:3
**located** 92:22
280:14,19,22
**location** 10:6 42:24
43:10,14,17 44:21
44:25 57:4 95:15
103:4,24 104:8
175:25 335:8,13
336:10
**locations** 12:22

13:7 18:17 22:15
**log** 50:12 53:4,21
59:12 122:9
241:25 243:16,24
245:5 247:11
251:13,19 252:18
252:23 260:8,24
261:23 268:22
269:16 272:22
275:19 276:16
277:15 289:18
311:4,9 343:14
344:3,6,21
**logical** 137:25
**log/P** 343:14
**long** 6:5 7:18 8:9
9:6 37:7,10,13
81:22 82:3 108:4
119:15 120:9
121:21 169:21
170:5 172:9,12
176:23 179:3
190:18 199:23
201:2 220:21
222:9 223:23
226:15,18 236:17
238:17 261:6
299:3
**longer** 176:6 177:4
179:14 298:6,9
**long-term** 48:16
285:12
**long-time** 149:18
**look** 15:15 44:5
46:8,14,15,23
47:23 49:9 82:17
89:8 97:20 98:2
98:15,16 100:19
109:20 117:17
141:23 144:20
153:6 162:17
163:15 189:15
192:15,19 193:19
194:3,6 198:22
216:9 243:23
247:21 252:6
257:7 258:3
264:13 265:13,16

283:9 289:11,18
289:24 290:6
298:24 299:4
301:17 304:17
315:2 319:15
326:23 345:22
347:5
**looked** 7:25 62:7
97:23 108:12
145:15 199:18
203:17 207:14,16
218:21 246:9
253:3 255:7,25
256:3,4 265:5,6
271:9 281:3,5
283:10 290:3
299:14 321:9,17
355:23
**looking** 23:16
81:18 89:5 98:8
122:24 189:18
194:11 221:14
223:12 244:2
247:15,25 251:10
252:10,17,21
253:2,19 264:8
271:17 277:22
289:14 296:24
315:23 335:12
336:25 337:17
347:6
**looks** 48:5 51:11
64:5 79:17 89:7,9
92:19 121:21,23
121:24 122:6
215:21 258:10
266:15 269:6,7
**loose** 189:2
**lose** 299:19
**loss** 349:18 350:11
350:16 351:2,15
352:2,16,19 353:2
353:4,9
**lost** 146:18 297:12
297:15 298:22
349:7
**lot** 28:7 51:14,17
51:20 78:17

102:22 118:11
122:2,21 125:11
125:12 148:22
188:3 194:14
254:24 285:13
341:3
**lots** 194:17
**lower** 162:25 163:5
259:24
**Ludwigson** 202:8
**LVM** 221:18
**lying** 347:19
**L-shaped** 237:12

**M**

**mail** 43:21 221:22
221:24 222:3
224:11
**mailing** 49:19
**maintain** 303:14,23
312:19,22
**maintained** 21:11
21:25 22:6,18
40:22 42:5 43:8
93:21,24 283:20
284:4 317:6
**maintaining**
103:19
**major** 244:8
245:15,17 277:3
279:9 288:16,23
**majority** 66:2
157:23 172:7
307:11 310:22,23
**making** 12:4,7
19:14 21:6,9
23:12 34:6 35:19
39:17,20,23
109:11 123:11
136:4 151:2
166:15 190:5
214:19,25 252:14
348:4,18 349:4,17
350:25 351:14
352:15
**man** 256:13,14
**manage** 110:18
153:11 157:21

314:25 340:15
**management** 19:25
39:7 40:9,23 47:5
53:4 59:12 60:21
66:12 82:11,22
88:10,12 96:25
101:11,15 111:7,9
111:11 112:8,19
112:25 115:24
116:22 117:24
124:4 155:2
159:16,17 164:23
241:25 243:16,23
245:5 247:11
251:19 252:17,23
257:22 260:8,24
261:23 268:22
269:16 272:22
275:19 276:10,16
277:17 301:22
302:13,14 304:19
304:25 305:5,23
310:8 321:19,24
328:15 343:13,14
344:5,6,21,21
354:23 355:5,15
355:21
**manager** 10:11,20
10:24 11:7,21,22
11:25 12:2,12,17
13:2,5 15:17
16:22 19:14 20:20
21:5,7 23:13 28:3
28:8,15 29:18
31:21 32:9 33:24
37:11,15 39:2
45:5,11,13,15
46:19,21 48:23,25
49:24 53:15 54:14
54:20 55:9,15
56:9,12 72:13,16
72:20 79:21 80:17
81:16,16 87:4,5,9
88:3,4 90:5,24
91:12,14,24 92:6
94:15,23 97:3,6,9
97:14 100:9
101:23,24 102:6

105:6 109:18
110:8,16,24 111:2
111:4,12 112:5,13
112:24 118:17
123:7 134:5,12
139:23 142:15,17
142:21 151:10
156:13 157:17
161:21 164:19,24
165:5,7,13 184:5
184:12 198:10
202:4 203:14
210:13,22 211:25
215:12 225:10
231:18 239:25
240:23 242:4,11
242:14 249:12
250:9,11 251:21
256:3 258:12,15
258:17 260:18,21
262:4,10 263:3,11
263:22,24 264:6
266:24 267:2
269:22 270:13,16
273:2 275:2,4
277:6 278:7 285:6
285:13 286:5,10
286:10 293:13
294:25 295:4
300:3 315:10
316:24 324:11,14
324:24 325:4,6
326:9 329:18
334:8,20 335:7
337:2,8,11,14
339:5,5,9,12,18
339:25 340:10,15
340:19,25 341:9
342:20,21 345:21
345:25 354:17
355:11
**managers** 13:7,13
14:4 15:10,11
16:25 17:16 18:23
20:14,17 21:2
24:13 33:2,5,16
44:12 61:9 72:22
87:16 95:14

100:25 104:21
152:4 158:4
164:18 165:16
184:12 187:2
237:23 281:13,15
297:6 298:5 309:4
312:25 324:18,22
325:23 326:13
329:17,23 330:5
333:5,7,22 336:22
339:16 354:12
355:4
**manager's** 23:19
24:11,24 41:16
43:2,19 44:2,6
109:4 256:8 265:7
**managing** 35:18
219:5 245:5
339:21 340:4,7
**mandatory** 142:18
**Manhattan** 10:7,22
**manner** 219:8
312:2 329:6 330:6
331:4
**manners** 69:24
**manual** 65:17,21
66:2,4 92:15,19
92:22 93:5,23
**March** 147:8 155:7
178:23 280:3
284:4,5,16,16
301:4
**mark** 47:11 231:21
237:6 279:10
351:11
**marked** 47:14,18
62:21,23 63:15,18
65:9,12 70:17,19
77:25 78:4 92:7
92:10 93:8,11
113:15 121:16,18
139:17,20 154:11
154:14 158:13,16
163:20,25 164:3
208:5 222:13,16
227:2 228:13
234:6,8 241:4,7
249:16,18 258:4,6

267:13,16 274:17
274:19 285:17,19
286:18,20 295:8
295:10 302:19,21
306:13,15 308:11
308:14 310:14,16
311:17 326:16,18
330:11,13,15
341:24 342:3
**marriage** 359:17
**Marshall** 1:6 4:10
33:18 34:19,22
76:11 94:11
102:15 108:2,8
109:9,15 113:23
114:3 117:23
118:22 119:3
120:16 121:4
126:24 127:3,19
129:4 130:18
132:20 138:6,17
143:6,10 148:6,14
148:18 149:21
153:23 154:21
156:12 157:16
158:3 165:8,19
168:24 170:7
173:23 174:9,25
176:10,18,25
180:18 183:2
186:9,22,24
187:20 189:10
190:19 199:13
200:15 202:22
203:6 204:23
206:8 207:3
211:21 215:24
216:4,14 218:12
220:25 227:9
229:5 230:25
231:4,23 234:14
234:18 237:5,14
238:14 239:7
326:2,8 330:22,25
331:15 339:6,9
340:18,22 341:8
341:14,20 347:24
348:18 349:17

351:14
**Marshall's** 109:2
116:9 131:10,24
132:10 133:9
134:15 135:12,21
135:22 136:16
141:11 155:2,13
169:5 174:6
182:15 184:23
185:25 186:18
187:7 190:23
201:18 207:11
221:4 228:10
230:2,18 231:11
233:20 239:17
280:4,7 323:14
332:11 333:5
334:4 347:14
351:25
**Martinez** 339:11
339:21 340:10
**materials** 204:19
**matter** 314:3,7
340:9 359:18
**MCM** 164:9,16
165:9,13
**mean** 13:8,19 14:10
15:10 17:7 21:13
23:24 40:17 41:19
44:23 50:25 51:18
57:25 65:23 68:8
69:19 70:14 71:21
73:5 74:10,14
88:2,7 89:21 90:2
90:4 94:24 97:24
104:14 105:20
115:22 124:24
128:2 152:3 159:6
160:3,11 161:11
162:9 172:17
179:4 186:3,4
196:10,18 224:4
230:12 248:14
282:4,6 287:15,18
297:14 303:22
308:21 309:3
315:16 318:13
319:5,9 320:17

322:16 343:2,16
347:20
**meaning** 15:12
17:8 41:20 71:22
102:3 124:16
125:4
**meaningful** 79:22
**means** 41:2 58:2
70:8 140:25 160:4
160:12 161:12
162:23 287:20
304:3 315:6
318:12 343:17
**meant** 226:3
**medical** 165:20
167:22 168:7
169:2,6 170:8
174:6,9,25 176:13
176:18 182:15
183:10 184:23
185:11,25 186:18
190:15,23 191:15
204:25 219:21
324:25 325:24
326:4,10 328:2,3
328:16,17 334:14
**medication** 6:21
**medications** 6:15
6:18
**meet** 94:13 119:7
146:6 229:24
234:21 238:21
334:17
**meeting** 7:13,18
8:6,9,14,15 9:3
17:13 18:5 95:7
95:10 101:21
103:20 157:11
162:24 163:2
173:15,20 181:14
182:25 183:19,24
183:25 184:10,18
184:24 185:3,22
186:5,15 187:17
199:4 207:18,24
210:25 211:3
236:12,16,17
238:11,14 239:7

239:11 294:2
309:2,7,9,25
310:4 335:7
**meetings** 7:5,8 8:18
8:22 9:5 184:2,6
184:14 240:8
308:18 309:11,23
**meets** 162:13,23
163:6
**memory** 6:15 167:5
**MENENDEZ** 3:14
**mention** 66:25 67:5
**mentioned** 137:8
138:6 219:20
220:3 252:4
**mentions** 67:8
**mentor** 164:19
**Merit** 2:13
**met** 94:17 95:14
334:18
**Michael** 139:24
**mid** 183:18 187:24
**middle** 53:21 79:4
88:17 100:6
139:15 154:18
158:12 208:15
256:15 303:12,13
329:14
**mid-year** 28:21,23
29:7
**mind** 98:6 102:5
103:12 155:24
340:24
**mine** 147:12 295:2
**minimum** 41:11
80:8 81:3
**minus** 315:4,7,7
**minute** 47:13 356:2
**minutes** 172:21
179:5,18 238:19
345:11
**misconduct** 73:23
74:3
**misrepresent** 74:11
**misrepresentation**
74:5,9 75:8
260:24 262:7
263:19 269:20,23

272:22,24 273:3
273:17,20,25
276:24
**misrepresentatio...**
75:15 263:14
**misrepresenting**
75:10 76:6
**missing** 24:20 25:2
26:21 27:2,3
191:19 194:14
248:23 253:10
255:22 270:5,8,9
276:2,4 279:22
281:7 282:18
284:12,13
**Misstates** 47:8
348:15 352:10
**mistake** 77:17
201:4
**mistakes** 109:12,13
**misworded** 291:16
**model** 159:3
**moment** 25:17 26:3
26:8 97:22 155:4
195:20 196:13
213:16 257:15
283:6
**moments** 151:13
157:11,12
**Monday** 152:9
253:8 272:3,4
308:24,24
**Mondays** 182:7
308:23
**money** 35:9,19,24
36:7,8 39:23
197:5 248:23,25
288:2,3,8,11
290:10,13,14,20
290:25 291:3
300:4 301:24
349:7,18 350:12
350:16 351:2
352:2,17 353:2,10
**monitor** 46:9 109:6
347:7
**monitoring** 19:18
19:24 20:4,8

45:19 46:4,7
**Montero** 285:24
286:5
**Monterra** 33:9,10
33:18 285:5,6
286:15 287:5
292:3,17 293:11
293:18,23 294:9
294:18 329:23
**Monterra's** 292:10
**month** 37:6 136:7
140:5 155:7
175:16 195:14
198:10 200:7,11
213:19 256:18
263:6 289:13
307:4
**monthly** 43:13
184:4 347:8
**months** 26:9,19
48:15 49:16,17
133:23 140:7
144:21 154:8
156:5 169:20
236:3 331:4
347:18 353:19
**morning** 4:8,9
188:15 268:10
**mother** 146:16,17
146:17,21
**move** 69:7 99:20
147:17 152:5
153:2 156:7
226:11
**moved** 43:17
**moves** 43:5
**moving** 43:6 152:8
226:14 231:3
329:4 341:3
**Mozeliak** 149:11
**multiple** 60:9 350:3
350:4,5
**multi-page** 306:18
308:14
**Murgalo** 33:22,23
211:25 212:6,11
222:19 225:8
226:9,20 227:8

228:10,17,24
229:13 308:4
**Murray** 337:13
**myomectomy**
331:17

**N**

**N** 3:2 360:2
**Nadine** 122:11
**Nagel** 275:3 278:8
325:17,18
**name** 12:17 33:5,16
38:15 39:22 105:3
208:20 209:9
256:8,15,15
**named** 94:10
208:25
**names** 325:15,16
**Nancy** 33:22,23
203:14 204:12,13
211:24 212:6,10
222:18,21 225:9
225:17 226:12
306:20 336:14
**narrow** 209:7
**narrowed** 306:7
**Nate** 317:25 318:7
**nature** 179:16
198:15 201:21
211:23 213:6
231:7 330:24
**NC** 315:8
**near** 17:10 48:8
219:5
**necessarily** 77:19
272:23 273:19,25
300:9 310:9
**necessary** 333:8
**need** 17:12 18:23
29:20 44:17 76:16
76:18,21 101:23
124:17 125:20
129:17 163:20
167:17 168:16
171:19 183:4,7,15
186:10 187:21
190:16 192:4
198:22 207:22

208:3 240:24
260:13 261:19
264:13 265:22,25
266:3,7,11,18,21
283:9 312:22,23
315:25 328:3,16
331:2,17
**needed** 147:19,19
148:3 157:14
172:24 173:6,7
174:13,15 180:2
180:25 185:14
186:8 192:19
200:19 234:24
309:24 316:23
**needs** 18:22 58:24
79:20 91:13
117:11 309:16,20
**negative** 144:2
315:3 347:17
**negatively** 347:15
**neglect** 198:16
**neglected** 213:18
354:12
**neglectful** 355:11
**neglecting** 354:23
355:5
**neglects** 354:17
**neighborhood**
139:3 153:14,17
**neither** 34:11,12
**nervous** 175:19
179:10
**never** 197:20
198:15 208:11
215:19 218:2
281:24,24
**new** 1:4,18,18 2:11
2:11,14 3:6,6,12
3:12 27:22 77:16
102:11 121:6
190:17 250:5
297:16,19 299:7
333:17,17 339:4,5
339:8 340:19,25
341:15,19 358:2,3
359:3,5,8
**news** 44:17

**Nicadimas** 139:24
**Nicole** 149:11
**nighttime** 271:25
**nine** 137:2 159:5,25
188:14 217:24
218:15 304:18,21
345:11
**nod** 5:15
**noncoverage** 315:8
**nonresponsive**
311:8 317:13,19
323:11
**non-applicable**
254:14
**Non-discipline**
267:12
**non-follow-up**
97:12
**normal** 98:10
257:25
**Notary** 2:14 357:17
359:7
**notation** 271:7
**notations** 279:6,15
313:23
**note** 95:6 133:5
148:17 155:6
351:7
**notebook** 311:24
313:3 322:21
323:16
**notebooks** 98:25
99:13 184:16
**noted** 128:20
195:11 357:5
**notes** 173:21
182:13 184:13
185:20 194:12
215:20,23 271:2
313:2,6,10,14
322:22 323:2,12
323:17,19 329:8
335:22 343:3
**notice** 112:24
251:11 253:18
259:9 321:18
**noticed** 61:11
103:9 289:15

321:23
**notified** 205:8
**notifies** 44:15
**noting** 156:19
**November** 113:24
114:11 118:24
119:3 127:2,18
129:5,23 130:19
131:8,12,20,25
132:9,18 144:20
181:20,21 187:25
197:8,9 200:8
207:14 213:19
216:5,14 219:12
236:4 258:24
259:18 260:6
261:21 262:17,22
263:7 319:20
320:24 321:15,20
328:4,18 330:21
353:13
**number** 12:19
27:11,14 28:13
32:14,16,20 33:4
57:17 61:16,17,21
61:24 62:3,12
70:9 83:4,11,22
83:25 84:4,20
85:24 96:11,12
100:11 133:21,24
134:21 136:10
137:23 142:22,24
160:15 175:10
178:18 230:11
239:20 242:17
247:4,10 249:5
254:19 274:6,9
278:10,15 280:18
303:19 304:18,21
315:6,14 327:24
329:2 337:14
**numbers** 28:10
134:18 154:14
247:5 254:20
280:17 287:11
314:20
**numerous** 236:3

**O**

**oath** 4:18
**object** 311:16
317:11,24 323:10
357:2
**objection** 21:12
22:10 23:3,23
24:21 25:5 26:22
30:16,19 32:13,18
33:20 35:3 37:22
38:12,17 39:9,24
46:3 47:8 51:16
52:3,12 62:2,5,11
64:13,20 66:13
67:17 68:3,16,24
72:9 74:19 83:21
84:11 85:6,21
86:11,16 90:7
91:22 98:14 99:11
99:24 101:19
103:10 112:9,20
127:11,14 130:2
130:20,22 131:2
131:13 132:22
133:5 136:18
160:20 176:12
207:12 211:2,22
215:2,16 216:8
217:13 226:4
231:14,24 232:15
232:24 235:11
257:14 263:8,20
264:3 265:21
266:9,20 270:24
271:5 278:21
280:15 284:17
305:22 308:7
321:8,11 326:11
336:21 337:18
340:12 344:23
346:22 348:10,15
348:20 349:20
351:3 352:10,21
**objections** 328:13
329:16
**obligated** 61:3
**obligation** 24:18
53:17 54:15 55:10

observation 189:24
observe 25:9
189:14
observed 24:25
25:4
observing 23:15
obviously 115:25
116:5 123:6 132:3
341:3
occasion 339:25
occasional 16:23
occasionally 141:3
279:15 333:7
occasions 236:3
287:9
occupants 153:20
occupying 254:21
occur 169:16
occurred 76:5
227:17 256:17
occurrence 295:20
295:24
occurrences 36:20
118:18
occurring 71:25
October 155:15
156:2,12 157:25
165:25 166:3
169:19 187:24
249:22 250:12
256:18 257:6
283:25 285:8
297:12,15 298:6
298:15 300:2
offense 26:5 290:7
290:11,14 291:8
294:23
office 17:9 43:15
114:25 178:9
184:7 229:24
234:22 236:14,21
236:24,25 237:7,9
237:10,15 238:21
239:3 291:22
293:23
offices 2:10
official 1:11

oftentimes 128:10
oh 196:20 250:4
295:16
okay 4:23 5:3,12,16
6:9 7:6,16 8:5
9:10,18 10:10
11:13 12:16 16:18
17:6 20:16 21:23
22:4 23:9 25:13
26:14 27:15,23
30:11 32:2,8
38:15 41:2 51:13
53:11,15 57:2
60:7 63:10 64:3
65:18 66:6,21,24
68:6 70:22 72:17
72:25 75:7 81:22
83:14 86:24 87:11
88:6 89:14 90:10
93:16 95:3,8 99:5
99:16 113:25
114:5,10 116:4,21
117:9 118:4 122:2
126:8,23 134:25
135:9,15 137:4
138:2 139:9 141:6
145:8 150:10
158:21 159:8,12
165:2 168:17
171:7 173:2 177:9
177:13,14,24
181:2,8,23 182:12
187:12,16,19
189:5 190:18
191:7,11,13 192:9
194:8 195:8 196:2
210:2,9 216:20
224:19 226:15
227:7 237:17
240:3,24 241:20
241:25 250:7
252:3 253:6,16
259:7,19 262:12
262:18 267:15
268:21,24 269:4
269:10,13,16
270:13 271:10,13
272:6,7,10 276:14

276:18 280:11
286:5,24 288:17
290:12 291:12
305:4 307:12
308:20 312:19
323:7 326:8
327:22 331:13
337:23 342:16
345:13 353:7
old 10:8 155:20
older 49:17
once 91:16 136:7
164:19 183:14
202:23 204:2
214:6 226:10
230:12 308:8,9
one-year 284:7
online 49:18 66:3
oOo 357:6
open 27:23 55:20
197:10 292:13
301:11,12,24
311:15 345:21,22
356:8 357:3
opened 194:9,10
197:23 246:19
288:2
opener 270:5,7
opening 27:22
150:8 151:20
opens 194:25
operate 180:11,14
operates 153:8
operating 13:16
15:13 19:15
125:21
operation 12:3,4
66:15,22 91:13
98:7 109:19
operational 17:8
44:17 78:9,22
79:19 89:10
333:10
operations 13:6,9
13:10 15:9 19:22
92:3 93:15,18,23
126:10 184:21
309:13 312:25

347:16 355:2
opinion 51:19
295:3,5
opportunities
138:22 153:3
157:18
opportunity 71:16
71:25 134:11
146:13 157:20
303:9
opposed 128:4
213:4 294:18
305:21
ops 134:6
order 87:21,21
215:22 343:6
ordered 279:25
organization 14:18
20:18 31:16 38:23
39:25 40:3 52:6
54:10 76:19 101:7
original 104:7
342:10,12 344:4,6
originally 146:18
Ormsbee 231:21
237:6
OT 315:13
outcome 359:18
outlet 300:21
outline 13:23 64:5
87:15 342:14
343:2,8 344:10,16
344:19
outside 137:19
147:21 210:16
304:2
overall 22:16 81:20
92:5 153:10
162:13 186:11
189:17,20 210:19
oversee 13:6,9 15:9
22:20,23 201:23
overseeing 202:5
316:12
overtime 315:13
over/short 97:8
303:14,23 315:19
over/shorts 46:16

163:21 310:12
owners 17:16
o'clock 137:25

**P**

P 3:2,2 343:19,20
343:23 344:3
Pablo 242:24 243:3
246:15 247:2
Pablo's 246:21
pace 189:19
packet 237:22
page 47:25 51:2,12
53:10,21 55:5
56:8 57:17 59:8
59:17 64:4,5,7
65:19 66:5,23,25
67:9 70:21 71:3
79:3,15,16,18
86:23 88:17 89:4
89:5 113:18
154:18 161:4
165:3 208:14,15
209:22 214:12
215:21,23 217:19
225:19 241:24
242:18 243:15
244:10,13 246:11
246:12 247:15
249:23 250:8,23
251:4,6,9 252:5
252:20,25 253:6,7
254:9,10,24 255:2
255:4 259:7,9,23
261:10,18 262:12
262:14,16,19
264:16 268:4,8,22
269:8,11 270:4
271:11,14 272:6
272:15 273:9,14
275:7,16,22
276:14 277:7,8,18
279:18 301:8,9,10
303:10 304:17
306:20 314:15
315:22,23 322:6,7
322:11,18 323:4
324:2 327:24

329:2,4,14 343:12
356:12 357:11
358:6 360:3
**pages** 51:7 78:10
108:13 194:13
195:11 197:19
216:10 243:15,16
247:17,21,23,25
248:3 249:4,6
252:6,6,11,11,22
253:3,20,20,22,23
255:7 277:16,17
277:25 278:2,3
279:16 301:7,13
357:9
**paired** 151:11
**paper** 238:9
**paragraph** 87:20
328:8,8 330:20
331:13,22 332:3,4
332:24 333:14
**parentheses** 124:5
318:14
**Park** 3:11
**part** 45:20,23 54:19
56:24 83:6 92:16
92:17 97:2 98:3
100:21 113:13
140:13 141:21
142:15,17 222:17
251:16,17 281:18
320:3 345:3,5,14
**particular** 43:12
107:4
**parties** 359:16
**partner** 25:16 30:6
30:12,25,25 31:6
31:11,17,22 32:3
33:23 35:17 49:9
50:19 59:12,21,22
60:11 65:17,21
69:3 71:2,8,9,15
72:21 77:16 81:19
104:2 115:19
125:16 141:2
147:17 148:11
149:18 150:20
179:15 183:18,25

184:5,9,11,20,24
185:21 200:20
203:2,3,13,17
204:5,6,8,14
206:12 209:4,6,24
210:7 211:19,25
212:4,7,22,25
214:23 219:17
220:4,10 221:11
222:10,22 225:10
229:11 243:9
247:4,5 251:12
254:18,19 291:14
291:17 292:2,18
292:25 293:5,14
299:14 303:7
309:19 315:10
318:7
**partners** 17:2
18:17 20:18,19
34:7 40:4,17,18
72:24 77:14
100:17 103:25
109:6 115:24
116:18 122:23
123:6,9 125:14
157:2 189:22
193:20 206:2
213:12 251:22
252:2 257:17
285:16 296:5
302:3 350:2 351:5
**partner's** 41:9
**party** 168:3 171:24
192:18 199:6,8,9
**pay** 178:14
**payroll** 50:5,9,10
339:17
**peak** 190:5,6,14
**peek** 242:7
**peer** 183:20 184:4
184:12 231:19
342:17
**peers** 139:6 199:10
231:20 338:2
342:11,16,20
**pending** 6:11
**people** 60:3 101:8

153:16 264:12
**perceive** 324:17,21
334:11
**percent** 16:19 17:6
17:18 42:3 83:9
83:15,20 84:10,23
85:2,5,10,12,17
86:5,13 96:20,23
140:22 141:17
149:15 159:5,9,25
160:2,5,9,13,14
160:22,23 161:7,8
161:13 162:6,6,9
303:15,23,24,25
315:3
**percentage** 83:13
83:17 84:3,19
85:7,9,14,16 86:6
86:9,15 96:24
160:6,18
**perform** 18:13
144:10
**performance** 28:17
28:20 38:20 69:4
70:10 71:9,17,23
72:2 77:5 102:23
103:2,6,16 109:6
115:24 116:23
117:16 119:14
124:4,15,18
125:21 128:21
130:9 138:7
139:22 140:10,14
143:5,20,22 144:6
144:23 145:3,10
145:13 146:25
147:16 148:7,19
148:24 149:3,22
149:25 152:22
154:3,5,20 155:14
156:6,15,17,21
158:19 163:14
186:12 193:20
206:15 213:15
218:2,3,15,19
303:2,5 305:6
306:9 307:4
**performed** 130:8

**performing** 146:6
**period** 8:2 37:4
43:20 87:10
104:15 118:7
121:13 132:13
138:15 150:15,22
151:25 154:9
166:5 178:22,22
183:17 185:8
187:3 190:5,6
207:17 281:20
284:7 299:3
321:24 336:19,23
340:8 341:9
**periodic** 332:6,9,17
**periodically** 346:12
346:20 347:2
**periods** 100:15
190:14
**permanent** 335:18
335:21
**person** 166:25
167:2,4 170:13,16
172:4,8 177:15,18
177:19,22,23
181:24 197:16,17
222:7 268:10
327:25
**personal** 127:24
128:3,7 137:18
144:3,5,9,12,17
144:22,24 145:6
146:12,14 148:22
148:24 149:19
152:10 178:12
323:15 326:13
**personally** 65:5
180:5 281:5
**personnel** 100:11
**perspective** 18:14
115:17 152:8,11
189:15,19 219:6
**perspectives** 81:18
103:22
**pertain** 208:4
**Pg** 358:2
**Pgs** 358:2
**phone** 32:3,7

166:22 170:13
172:5 177:16,23
178:6,6,9,9,10,10
178:12,13,14,18
178:21 181:24
182:2 202:24
218:7 219:17
222:7,8 228:7
234:20 238:14
**photocopies** 279:7
**phrase** 74:10
**physical** 37:6
**physically** 25:11
**picked** 272:4
**picture** 290:19
291:6 319:7,9
320:2 321:16,18
**piece** 44:17 77:15
90:9 98:7 111:11
152:6 166:4
199:19 203:18
299:18
**pieces** 41:8,24
53:10 54:7 55:4
56:8 89:3,3,11
99:14 107:17
112:23 121:11
122:25 129:13,14
189:19 210:11
301:12 302:13
341:3,5
**pipeline** 185:16
309:17
**pipelines** 179:8
**Pizarro** 221:8,10
221:14,22 222:23
223:6 224:7 225:2
226:8,16,19 227:8
228:7
**place** 21:20 40:11
40:17,18 43:7,11
43:25 68:19 69:6
95:11 170:13
172:10 177:25
184:3,6 205:18,25
211:8 222:11
335:12 336:9,12
339:5,8 341:12

349:25
**placed** 336:15
337:10
**placement** 336:25
337:17
**places** 163:10
**plaintiff** 1:7 3:4
329:17
**plaintiff's** 326:20
328:2,16 332:19
361:24
**plan** 16:22 17:25
79:5,8,10,22 80:9
80:12,12,14,16,19
81:13,14,22 82:7
82:12 85:18 87:12
89:13,23 90:12,18
95:17 96:6 98:18
105:21 133:13,19
134:2,8 135:9,17
147:18 148:7,19
149:4 174:15,16
175:15 176:20,24
181:5 202:3
205:25 240:4
257:3,11,13,24
286:23 303:2,6
305:6,15 307:5,11
316:19,23 317:6
332:8 361:13
**planned** 187:17,19
187:24 199:9
**planning** 183:18,25
184:10,21,24
185:22 191:3,4
203:10 205:18
309:15,19 317:2
**plans** 98:24 346:10
346:10
**play** 139:15
**please** 4:21,25 5:6
5:10 47:18 63:14
63:19 66:5 67:25
71:3 78:6 79:15
92:12 93:12
154:17 224:21
243:14 249:19
251:8 254:10

259:8 262:12
268:4,7 269:8
270:3,4 274:13
275:7 277:8,16
314:15 315:22
324:2
**pleased** 153:25
**point** 6:7 10:10,23
11:6 35:21 43:16
52:7 100:19
102:12,14 129:22
131:24 143:9
146:23 147:18
155:18 166:7
167:9 169:11
173:12,14 174:12
176:19 181:13
182:15,20 185:13
186:12 190:19
192:14,14 198:13
203:15 213:2
214:12 217:24,24
218:15,24,24
221:7,12,25 222:3
223:4,20 226:10
229:5 238:23
242:5 257:20
291:22 293:22
294:5 297:16,21
297:25 302:17
307:8 310:6 322:2
322:4,5 344:22
**points** 120:13
142:3 307:11
343:7
**policies** 19:16,19
20:2,6,9 22:17
23:12,14 39:11
45:24 46:12,15
47:2,5 50:22 51:3
51:5,9,14,20,22
51:25 52:2,4,9,19
53:18 54:7,9,20
55:14,17 56:10
59:20 61:10,12
66:8,11 67:2,7,13
67:20 68:14,17
104:22 109:23

111:8,10,14,19,21
112:4,11 118:3
123:2,12,15,19
125:25 145:25
198:16 213:10,17
214:2 278:15
285:14 288:13
289:2 301:15
310:9 320:10,13
320:16,19 348:22
349:10,12,21,24
351:5,7 354:12,18
354:24 355:5,11
355:21
**policy** 48:19,22
49:2,21,23 52:16
53:8,9,12,17 54:3
54:16 55:3,11,25
56:14 59:12 60:24
61:2,5 67:16 77:7
80:4 81:6 110:14
111:9,17,25,25
236:2 243:12,21
254:4,6 255:4
266:15 273:7,8
274:9 276:7,9
277:2,2 278:5
329:9,19 330:7
348:13 352:7
355:15
**poor** 218:3
**pop** 18:6
**pop-in** 16:23 19:4
82:6
**portal** 14:16 40:25
43:19,22 44:5,10
92:25
**portion** 17:11,14
48:2,8,8 82:23
93:14 110:7 139:3
144:2 195:13
204:14 322:23
**portions** 81:17,21
153:8 311:23
345:24
**POS** 41:15 297:3
297:19,21 298:10
298:17,21,25

299:4,9
**position** 10:3 17:9
18:18 62:7 105:4
133:22 334:20
335:18,19,21
**positions** 142:13
328:15
**positive** 95:2,3,5,6
95:6 98:9 151:8
154:4,6 156:6
160:12,16,24
162:15 165:12
315:4
**possibility** 137:17
147:17 265:24
267:8,10,11,12
**possible** 85:12,16
120:4,6 240:14
241:19 257:6,8
259:3 313:2,6,14
**possibly** 22:20
59:21 271:22
313:9,17 323:4
354:25
**post** 138:23 147:6
253:23
**posted** 166:16
173:7
**potential** 158:7
328:3,16
**potentially** 338:13
**practically** 15:21
197:11
**practice** 65:5 68:21
68:23,25 231:18
232:4 308:22
350:25
**practices** 132:21
141:24 163:14
207:17,24 235:8
293:24 309:21
**PRCC** 306:22
307:15
**preaddressed**
49:18
**predetermined**
340:20
**prefer** 248:9,10,13

**prep** 254:12 269:4
270:8 276:3
277:10
**prepare** 6:25 7:9
9:6,11 324:3
**prepared** 53:23
54:23 287:20
**present** 8:23
119:18 184:9
232:7 321:20
**pretty** 201:20
344:17 345:8,9
**preventing** 186:7
**previous** 125:2
215:12 224:12
247:22 259:23
261:18 262:18
333:4,18 334:3
**primary** 79:20
**principles** 40:2,4
**printed** 42:4
263:25
**prior** 8:8 36:4
45:11 56:5 90:12
117:19 139:23
143:21 155:21
160:5 161:13
165:10 175:6,12
176:15 177:8
187:18,22 191:2
193:9,10 195:14
197:24 200:6,10
205:2,3 207:14
216:18 217:16
219:5 234:21
253:22 264:9
289:13 290:2,3
294:12 297:4
298:15 300:2,2
315:14,17 328:4
328:17 335:6
338:2 351:21
**priorities** 87:24
88:4,7,8 99:18
**priority** 40:2 88:11
88:13 101:7
**privilege** 311:9
**privileged** 199:21

231:16 232:2,17
232:19,25 235:13
280:25 311:14
313:21 317:12,15
**privy** 60:3,10
**probability** 331:16
**probably** 7:19
24:16 137:7,22
144:13 169:24
176:6 177:7 179:4
179:5,17 185:7
187:22,24 278:23
304:3
**probation** 336:23
**probationary**
336:18
**problem** 60:14
69:8,10 71:23
102:25 110:2,5,6
110:10,11,13,14
110:17 117:25
217:19 244:6,7,8
244:9 245:13,15
245:16,18 248:5
249:10 269:24,25
273:4,5 277:4
279:22 281:18,23
288:5,9,10 289:9
304:5,8,9 340:7
**problems** 69:3,5
71:9 102:15 105:7
106:7 108:19
112:25 117:22
144:18 146:14
155:2 182:19
186:2,19 200:16
247:11 258:20
297:24 303:20
304:18 305:5,23
305:24 321:19,24
347:14
**procedure** 111:25
112:2
**procedures** 22:18
23:13,14 39:11,14
50:22 51:4,9,14
51:23 52:5,20
53:19 54:10,21

55:14,17 56:11
61:10 104:23
109:24 110:15
112:4,11 123:3
125:25 145:25
213:10,18 214:2
285:14 296:3,22
302:2,7 320:10,13
320:17 348:23
349:10,13,24
351:6 355:12
**process** 26:25
35:11,14 36:16
46:8 64:23 79:19
124:11 164:21
169:13 203:7
296:5 301:19
302:3
**processed** 299:21
300:3,8,12,13
339:18
**processing** 55:20
296:4 302:2
**produce** 280:2
**produced** 29:13
280:7,14,19,22
292:6,12,16
293:19,21 307:18
312:3,10 313:22
338:11 356:10
**production** 14:25
15:2 29:7 78:24
93:4,17 105:25
141:10 178:21
185:20 281:4
291:19,25 293:16
301:2 307:14
311:5,13 312:12
313:19 317:10,20
323:8,11 338:7
**Professional** 2:12
**profiles** 306:12
**profit** 39:17,20
40:3
**profitability** 159:9
160:8 162:5,10,19
**profound** 296:18
**progress** 307:10

**progresses** 68:11
**progression** 73:3
73:15
**progressive** 67:14
67:20 68:7,9,15
68:21
**project** 139:2
**promotion** 152:17
**promotional** 16:3
309:16
**prompt** 46:15
**prompted** 289:17
**proper** 46:11 47:4
203:11 331:4
**properly** 21:10,25
22:5 110:18 267:2
267:7
**proposed** 90:11
**protect** 350:2
**protection** 49:10
141:2 318:8
**protocol** 29:20,24
30:11,17,22 31:3
257:22
**provide** 25:6 58:19
87:15 90:16
119:13 124:14
148:3
**provided** 251:2
**PRSC** 318:5
**PRSC/Nate** 317:23
**Pruszynski** 1:23
2:12 359:7,23
**Public** 2:14 357:17
359:8
**pull** 92:25 300:22
301:24
**puller-out** 195:3
**punch** 50:12
**purportedly** 332:6
**purpose** 77:12
119:11 303:5
**purposes** 292:13
311:15
**pursuant** 232:21
356:10
**push** 86:20
**put** 5:18 31:2 40:12

45:2 57:15 58:20
73:7 78:18 99:23
100:2 105:21
110:15 124:15
139:2 150:9 176:6
195:8 198:3 272:2
279:17 287:21
288:3,4 305:6,15
307:4 341:11
**puts** 157:5
**putting** 25:18 37:2
148:6,18 149:3
196:5 344:3
**P&AP** 140:23
141:10,13,20
142:5,11,13,19
**P&Ls** 98:23
**p.m** 54:24 221:15
347:4 357:5

---

**Q**

**quality** 18:13 98:22
152:15
**quarter** 80:9,19
81:4 134:24 147:7
147:8 165:24
250:4
**question** 4:20,24
5:6 6:11 23:7
25:7 34:21,22
38:8 39:4,16 45:8
46:10 52:8 55:13
58:14 64:16,25
67:3,22 84:15,17
89:2 96:14 112:21
143:25 170:2
199:23 206:17,21
206:23,24 207:16
210:3,4 220:4
232:16,18 267:24
314:4 348:17
350:23 351:11,17
352:20
**questionnaire**
141:22
**questions** 4:14 5:11
5:20 6:2,19 65:8
121:14 155:11

226:6 246:4
307:19 350:21
356:4
**quick** 188:4 224:20
238:22 274:12
**quite** 39:16 140:9
264:7
**quoting** 235:21
**Q1** 158:23
**Q2-Q3** 155:6
**Q2/Q3** 159:22

---

**R**

**R** 3:2 359:2
**raise** 184:22 185:2
**raised** 129:5,24
130:19
**random** 23:16
194:11 197:10
345:22
**rang** 299:15
**range** 16:20 81:24
82:5,7,8 99:2
111:10 304:2
**ranges** 12:3
**ranked** 304:3
**rated** 162:22
**rating** 162:13
**reach** 80:15
**reached** 202:20
**react** 185:17
205:24
**reaction** 205:20
**read** 47:22 65:3
66:20 68:2 104:24
122:17,22 123:9
124:20 155:9
158:22 210:5
224:11 267:20
269:6,7 327:5,8
**ready** 18:17 164:20
300:21
**realize** 176:5
**realized** 194:22
339:9
**really** 11:17 13:6
17:15 61:9 83:4
92:2 96:5 99:7

101:7,12 116:15
136:21 148:23
150:17 158:8
179:25 238:22
239:24 321:14,15
336:23
**realm** 152:24
**reason** 47:6 54:6
56:4 58:19 71:23
101:5 112:6
113:10 117:14
210:14,15 214:13
215:5,8 225:13
232:6,21 236:7,10
256:2 279:8,9
287:5 288:15,16
347:25 358:8,10
358:12,14,16,18
358:20,22,24
**reasonable** 71:16
136:22
**reasoning** 215:15
215:18
**reasons** 49:6,13
69:16,17 240:13
333:11 352:5
353:11,25 354:6
356:8 357:4 358:5
**recall** 8:4,7,16
30:10 31:23 32:19
33:13,21 34:17
35:4,13 50:15
64:6 104:11 106:7
128:25,25 131:6
148:13,16,20
166:24 167:20
168:5 171:2,3,8
171:23 172:2
174:2 177:19
184:25 186:25
192:7,12 207:4,5
207:8 208:13
211:12 212:5
216:25 221:6,6
226:21 228:8,12
230:6 231:2
241:16,19,23
249:15 250:20,22

255:17 258:25
259:3,4 275:9
292:21 294:6,6,16
296:23 302:9
308:2,8 323:15
324:20 325:25
335:24 341:2
**recap** 113:22
118:21 119:5
120:23,24 131:12
156:18 227:16,18
227:23
**receipt** 58:4,6,6,8
58:10 217:8
243:17 248:19
252:5 253:25
254:2 259:25
260:14 261:19
262:19 263:25
269:14 271:14,17
276:15 277:18
**receipts** 217:3
269:11 347:10
**receive** 11:7,20
28:17,20 49:16
317:15
**received** 11:15
28:14 205:7 297:4
297:5 299:20
304:23 314:2,6
**receiving** 297:19
**Recess** 62:19 94:8
138:3 188:8
224:23 241:2
274:15 304:14
323:24 345:12
**recipe** 77:17
**recognize** 47:19,24
47:25 63:3,5,20
63:21 65:14,18
70:23 78:7 92:13
93:13 109:13
113:18 121:20
139:21 154:15
158:18 208:9
227:5 234:9 241:9
249:20 258:9
267:16 285:20

286:21 295:11
302:22 311:21
312:16 342:3,5
**recollect** 123:15
**recollection** 63:9
63:23 117:22
118:6,10,14
122:18 128:16
130:6 139:13
154:10 171:9
209:15 223:13
224:15 319:21
338:25
**recommend** 25:23
203:23,25 206:7
207:2,10 293:2
294:8
**recommendation**
31:13 204:8,18
224:8,16 225:12
225:16 227:19,21
308:3
**recommended**
206:12 212:19,21
224:14 294:13
**recommending**
204:21 293:6
**reconciliation**
50:18
**record** 5:12,18
36:19 47:12,20
48:14 57:18 58:13
58:25 63:11,24
65:3,12 68:2
70:20 78:4 94:9
104:24 241:3,12
247:24 250:24
251:6 252:9,12,14
252:15 253:8
254:11 258:7
259:10 262:24
267:20 268:5
275:16,18 277:24
303:11 310:19
311:2,21 312:2
343:10 346:13
356:7,8 359:13
**recorded** 197:15

**recording** 36:10
329:9 353:15,16
354:4,5,9
**recordkeeping**
35:10 67:2
**records** 20:10
21:10,14,15,18,25
22:3,5,20,23,25
23:16,18,22,25
24:3,7,13,19 25:2
25:11 26:12,16
36:11,17,18,21,23
36:24,25 37:5,8
37:25 38:5,21,22
39:2 40:10,11
48:3 50:13 51:7
67:2,4,6,9 76:7
82:22 83:8 84:9
84:20,23 85:4,17
86:4 89:19,22
97:2,21,23 98:2
98:15,16,19 99:22
100:3,20 101:3,10
102:4,6 104:19,23
107:18 108:12
109:5,20 117:6,11
122:24 123:13,16
123:20 125:3
127:24 128:3
132:6,11 140:22
141:4 146:4
151:17 178:22
192:16,20 193:7
193:19 194:3,7
207:13 215:25
216:5,15 217:7,11
219:7 235:24
241:10,15,17,21
249:4,21 250:3,15
250:18 251:21
258:11 263:14,24
265:14,17 267:6
269:11 274:23
278:11 279:12
282:10 284:10,21
285:4 289:12,14
290:6 310:9 313:7
313:11,15 320:11

320:14,22,24
321:2,7 323:20
329:10,11 333:3
333:16 334:3
343:17,18 344:9
344:25 345:4,15
345:20 346:4,8,20
347:6,10,12 348:2
352:14,16 355:20
355:24
**recovery** 144:23
145:3
**redacted** 311:12
317:8,12 323:5,8
**redaction** 311:4
317:18
**redactions** 311:3
**refer** 50:21 58:17
89:5 208:14
217:23 218:14,23
218:25
**reference** 22:3
30:25 40:13 46:25
66:15 79:5 111:16
114:9 163:13,23
218:18 321:14
344:25
**referenced** 116:13
163:8
**referencing** 217:8
**referred** 44:4 332:7
**referring** 50:11
51:10 58:7 76:9
76:14 102:3
103:14,17 140:19
164:11 189:8
193:5 219:11
229:21 304:16
341:19
**refers** 58:16 87:4,5
89:9 304:18,21
**reflect** 210:6
247:24 252:10
277:24 299:23
300:7 312:2
**reflected** 252:13
**reflects** 209:24
211:14

**refresh** 117:21
  118:9,13 122:18
  128:16 171:9
  209:15 338:24
**refreshes** 118:5
**regard** 19:21 30:12
  33:25 34:21,22
  52:17,24 56:18
  64:11,18 68:7
  105:18 108:8,25
  109:16,16 117:23
  123:12,19 127:7,9
  127:19 128:7
  129:4 159:15
  190:23 202:22
  203:6 224:13
  304:19 307:15
  314:7 341:9
  349:16
**regarding** 15:3
  67:14,16 77:8
  118:22 128:17
  129:24 155:19
  169:5 170:7 174:6
  174:9,25 183:10
  211:15,20 216:6
  220:24 221:4
  226:9 227:9 230:2
  250:15,18 292:2
  292:10,16,19
  293:17 304:24
  308:5 314:3 329:9
  329:19 330:8
  338:8,13
**regards** 68:5,25
  88:24 105:8 118:3
  127:4,23 236:2
  306:23 319:23
**regional** 184:7
  236:14
**register** 11:17
  35:10,14,23 41:22
  66:15,21 253:11
  297:22,25 354:5
**Registered** 2:12,13
**regret** 157:15,17
**regular** 105:20
**reiterate** 145:8

**relate** 40:22 89:5
  113:25
**related** 20:9 21:16
  66:11 67:6,20
  68:15 105:25
  130:5 276:9
  307:14 313:23
  338:10 359:15
**relates** 89:7 131:7
**relationships** 139:6
**relevance** 112:15
**relevant** 93:20
**relieve** 340:13
**remain** 42:5 48:15
  268:16
**remainder** 154:6
  209:22 257:11
**remaining** 27:25
  280:12
**remember** 8:9,13
  10:14 11:14,18
  28:9 33:6,17
  94:16 95:10 102:9
  102:10,19,25
  103:3,4,11 104:2
  104:3,5,25 105:4
  105:7,9,10,19,22
  106:6,8,11,12
  107:7,10,12,17,19
  107:21,22,24,25
  108:3,4,7,9,10,16
  108:17,19,21
  109:15,22 114:4
  114:13,16,19
  115:7,11,18 116:6
  116:8,10,16,18,20
  117:3 118:16,17
  119:15,18,22,24
  120:3,7,10,11,15
  120:18 121:11,12
  121:22 122:14,15
  123:3,5,6,17,18
  123:21,23 125:11
  125:12 126:21
  127:5,8,20,21,24
  128:6,8,13 129:3
  129:7,16 130:14
  130:17,24 131:3,9

131:14,15,17,18
131:21,22,23
132:2,12,14,16,19
132:23 133:2,4,8
133:13,21 134:4,9
134:14,17 135:14
139:8 140:4,13
142:14 143:7,13
145:4,12,17,20,21
147:3,5 148:20
149:20 150:5,17
150:17,24 151:8
151:19 155:16,23
155:25 156:9,18
156:25 165:23,25
166:18,21,23,25
167:6,7,8,10
170:12,15,17,18
170:19,21 171:10
171:18,22 172:5,6
172:7,9,12 173:8
173:10,12,14,16
173:24 175:3,4
177:2,20,21 178:4
179:3,19,22,22
180:6,9,13,16
181:2,4,5,8,18,19
181:23,25 182:3,6
182:8,9,11 185:10
187:4,6,12,15,16
188:11,16,18,20
188:22 190:20
191:14,18 192:11
195:19 196:12
199:6 201:11
202:9,17,24
203:14 204:12
206:6,11,17,25
207:9 208:24
209:3,5,18,19
210:6 211:7
212:13,17,19
214:22 218:6
219:16,20 220:3
220:11,12,15,21
221:2,3,21,23,25
222:2,3,6,9,12
223:8,9,11,14,15

223:17,19,21,23
224:2,14,16,25
226:8,15,18
229:16 235:3
236:13,15,17,20
236:23 237:18
238:17,20,25
239:4,6,10 255:24
286:14,16 292:23
292:24 293:3,6,7
293:9 294:14
296:24 310:2,3,5
310:8,11 324:9
327:5,11,13,14
335:5,16 337:7,12
338:4,6
**remind** 231:15
  235:12 280:24
**reminded** 123:11
**reminder** 231:25
  318:5
**removal** 37:2
**remove** 15:19
  331:17
**removed** 94:3
  244:19
**removing** 35:24
  36:6
**repeat** 4:21 64:16
  64:25 65:2 67:25
  206:23 216:3
  314:4 348:17
**repeatable** 64:14
**repercussion**
  349:10
**repetitive** 319:11
**rephrase** 5:2,7
**reply** 90:24
**report** 14:20 20:15
  20:20 21:3,4,5
  41:5,6,7,13,25
  42:8,10 59:9
  297:3,8,13,15
  298:3,23,25
  299:20 300:16,22
  301:14 355:7
**reported** 1:23
  60:21 61:13

**reporter** 2:12,13,14
  5:12,18,21 8:20
  170:2
**reporting** 297:18
  299:13,19 300:7
**reports** 40:24 42:4
  297:5 300:18,23
  301:3,7 355:8
**represent** 4:10
  256:16
**representation**
  266:14
**representative**
  209:19 220:18
  222:23
**representing** 280:9
**reprimand** 351:8
**reprimands** 329:7
  330:7
**request** 311:16
  357:2
**requests** 356:11
**require** 75:16
  256:22
**required** 50:5,8
  76:3,17 256:24
  333:6,22
**requires** 75:13,20
**requiring** 49:16
  147:20
**resignation** 308:9
  308:10
**resigned** 307:21
**resource** 89:23
  90:5 92:15,19
**resources** 30:13,13
  31:2,7,12,17,22
  32:3 33:23 65:17
  65:21 72:21 88:21
  89:16 92:22 93:5
  148:12 184:5,11
  200:20 203:2,4,13
  204:5,7,9 206:12
  209:4,6,25 210:7
  211:19,25 212:4,7
  212:22,25 214:23
  219:18 220:4,10
  221:11 222:10,22

225:10 229:11
291:14,18 292:2
292:18,25 293:5
293:14
**respect** 116:2 312:4
**respects** 145:2
150:4
**respond** 115:12
167:16 191:6,11
327:18
**responded** 179:23
182:11
**response** 115:20
117:5 179:25
231:16 256:19,20
318:12
**responses** 326:20
361:24
**responsibilities**
12:11 13:5,14,21
15:4 88:18 110:7
110:23 111:3
112:12 147:24
155:3 339:12
**responsibility**
13:11 15:9 17:11
21:24 22:4,8,13
22:17,24 23:5,18
23:19,21 24:6,10
24:14,23 25:3,14
26:21 47:4 48:24
49:4,25 55:13
109:2,3,4,12,19
110:16,25 113:6
113:12 165:5
251:20,24,25
281:10 345:4,5,15
346:7 351:4,6
354:16,19 355:4,6
355:12
**responsible** 13:24
19:13,18,24 20:4
20:8,12,19,23,25
21:6,9 22:11
23:12 35:17,24
36:6 48:21 49:23
109:9,11 245:4
**rest** 31:16 53:10

78:24 139:4 206:2
209:22 227:25
240:2
**restroom** 188:7
**result** 349:18 350:5
350:11,15 351:15
**results** 98:24 157:4
157:7,8 163:11,19
305:11 306:10
**retention** 48:10
50:5
**retrieved** 57:22
**return** 49:18
155:21 199:12
201:16 229:3
**returned** 48:16
49:18 149:21
151:14 207:6,18
209:7,25 234:22
341:14
**returning** 57:20
58:2 144:11
**review** 7:20 28:21
28:22 29:4 38:20
45:6,14 47:18
62:25 63:19 78:6
82:7,12,15,19
84:8,20,22 85:3
85:17 87:9,17,19
90:8 92:12 93:12
95:24 97:4,6,8,13
98:18 99:3,3,6,10
99:15 107:12
109:5,19 112:3
125:2 132:10
134:11 139:22
140:10,14 151:16
154:20,23 155:4
156:16,17,21
158:19 162:16
163:14 186:13
200:6,10 204:20
207:13 209:21
218:16,19 249:19
251:21 263:11
264:19 277:16
278:23 279:4
310:17 342:15

344:8 345:4,6,15
345:20 346:7,13
346:20,25
**reviewed** 8:13,16
86:3,7,12 89:12
89:12 96:2,7,16
96:19 97:16
100:18 102:7
106:15,22,24
107:5,22 108:2
131:11,19,23
132:6 136:24
199:15 200:4
207:10 224:5
241:14,21 255:13
255:18,20 258:23
263:6,18 270:19
274:2,5,8 275:8
277:25 278:19
279:11,19 286:14
294:11 313:7,11
313:15 320:23
321:7 326:21
333:2,3,15,18
334:2 346:4
**reviewing** 82:22
83:7 96:25 101:9
104:19 106:18
107:3,20 193:24
347:12
**reviews** 12:9 28:18
28:21 29:8 45:11
128:21 206:15
**re-establish** 71:16
**Richie** 244:23,24
246:19
**right** 16:11 17:22
18:6 24:4 59:14
69:9,10 77:18
95:18 106:16
122:3 123:13
126:13 128:24
132:7 135:18
140:11 143:20
145:14 175:9
205:11 225:23
236:5 257:15
267:4 271:14

285:16 286:25
303:3 322:14
325:4 329:24
336:19 340:23
346:4 347:25
348:5 349:3,5
**right-hand** 243:3
**ringing** 35:18
**Ringstaff** 250:10
256:10,11
**Rivera** 286:3,8,9
**RMR** 1:23
**RMTs** 164:21
**road** 158:12
**role** 33:25 34:3,5,6
53:18 102:11
111:12 121:6,7
153:4 301:21
**roles** 13:14 34:10
**rollercoaster** 156:5
**rollout** 309:16
**rollouts** 16:3
**room** 237:4,8
238:10
**root** 79:21 302:13
305:25 306:5
**roster** 98:25 99:12
282:8
**roughly** 7:10 10:17
16:19
**route** 337:25
**routine** 16:24
64:14
**rule** 49:6,13
**ruled** 29:15
**ruling** 351:12
**run** 12:2 153:11
188:6
**running** 13:11
111:12 267:2

**S**

**S** 3:2 360:7
**safe** 36:2,6,22,23
43:4 50:18 136:19
136:23,25 137:4,7
137:9,15,22
194:16 196:21

197:3,7,7,14,23
243:6 244:15,23
245:2 246:15,16
246:17,22 268:9
268:16 270:6
301:22 353:15
354:9
**safety** 59:12,21,22
92:15,18,21 93:4
103:21 288:18,21
288:24
**salaried** 237:23
**sale** 297:16,21,25
**sales** 41:11 153:7
159:5,25 161:6,7
300:24 301:3
303:15,24,25
**Samidh** 9:4
**sat** 107:25 108:11
188:24 190:3,9,11
190:12 197:6
290:21
**satisfaction** 189:17
**satisfactory** 265:19
**saved** 300:23
**savvy** 299:12
**saw** 25:15,16 140:3
155:9 200:17
289:18
**saying** 112:7
167:12 171:10
181:5 182:10
190:25 192:11
198:5 199:6
214:22 218:6
267:18 300:7
**says** 48:13 49:15
50:4,18,21 53:4
53:20 54:22 55:18
57:17,18 59:9,11
59:14 60:17 66:7
71:7,14 72:15,19
73:22 74:2 79:18
80:8 81:3 87:2,21
88:17 89:14 90:10
90:19 116:22
118:20 122:8,11
124:3,20,21,22

125:2 126:10
158:23 159:2,24
160:8 161:6 162:5
162:12,19 163:11
196:22,23 208:15
208:20 209:10
214:12 217:24
218:15,25 221:14
221:18 225:20
228:20 235:21
249:24 259:14
260:15 261:21
269:17 271:21
272:11,13 273:12
273:15 287:8
295:16,19 296:2
303:14 304:17
306:21 314:16,19
314:23 316:5,11
316:19 317:8,22
317:25 318:15
322:13 324:3
327:25 328:12
329:3,15 330:21
331:9,14,21 332:4
332:15,25 333:14
333:21 343:13
**scale** 162:25 163:6
**schedule** 18:15
238:14 331:2
**scheduled** 16:20
98:5 119:7
**score** 141:17 142:3
**scorecards** 98:23
**Scored** 140:22
**sealed** 287:9,18,21
287:24
**seat** 237:14
**Seattle** 43:21
**second** 20:20 147:7
154:17 159:22
169:22 170:6
171:13,25 173:2
173:23 174:4
196:6 235:22
343:12
**section** 15:11 30:7
36:21,22,23,25

37:3 50:17 57:20
66:10,14,18 67:6
71:6 78:8 92:16
126:9,13 140:17
140:23 142:3
163:18 194:16,17
197:13 210:5
221:13 242:22
243:7 246:22,23
246:25 247:4
251:12 253:12
254:7,12 260:8
261:23 268:13,20
269:3,5 272:10
286:25 289:24
303:20 343:19,20
343:23 344:8
**sections** 108:14
195:16 199:14
243:4 255:22
270:6 323:6,9
**securing** 35:25
**security** 48:14 49:6
92:15,19,21 93:5
**see** 46:15 48:13
49:15 50:4,16
53:3,6,20 54:22
55:18 57:16,24
59:16 60:16,22
66:7 67:8 71:7,14
72:14 73:22 79:3
79:23 80:7 81:2,5
86:25 87:20,25
88:16,22 89:14
90:10,14,19,21
93:20 107:8
116:24 118:20
119:2 122:8 124:3
124:19 126:9
140:19 159:2
161:9 162:8,12
163:23 164:11
192:25 193:20
197:4,8 207:22,23
208:3,18,22
209:14 214:20
218:4,5 219:9
221:16,19 222:17

223:2 227:25
228:16 229:2
242:18,22 243:2,5
243:7,9 246:4,12
246:17,21,24,25
249:24 251:15
257:2 259:14,24
265:11 268:8
271:2 277:18
279:5 282:12
283:9 284:20
285:4 297:7 300:9
303:10,12,18
305:9 314:16
316:2,4,4,11,19
317:22 318:6,15
318:22,22,25
319:11 321:15
324:3 326:19
328:5,10,12,19
329:3,12,13 331:6
331:8,19 332:13
332:20 333:12,13
343:12 345:23
346:2 347:11
355:9
**seeing** 100:24
167:13
**seek** 212:24 213:3
**seen** 58:18 63:7,22
64:4 79:16 107:18
139:25 194:14
197:20 198:15
208:11 255:10
256:17 257:12,22
284:24 285:22
286:16 301:18
320:21 326:25
**sending** 15:23
**sense** 134:10
**sent** 14:17 92:4
327:3
**sentence** 60:17
118:4,9,13 122:17
122:22 123:9
140:21 235:22
303:13 306:21
333:21

**sentences** 60:19
**separable** 290:11
**separate** 19:5
105:13 210:13
220:7 224:17
235:18 237:9
287:8 312:6
**separated** 33:7
34:18,20 104:21
123:8 210:14
229:22 232:6
237:24 291:7
348:25,25 352:18
353:23
**separating** 31:5
210:22 231:18
233:20 306:23
307:16
**separation** 69:10
70:5,13,15 105:12
105:21 107:16
108:22 131:7
203:23,25 206:7
206:12 207:2
209:11 212:24
213:3 214:3,8
220:2 222:24
225:22 226:12
232:5 237:20
286:22 289:6
291:18 293:4
361:13
**separations** 33:12
**September** 156:16
283:17,21 295:14
297:4 305:3
**septum** 325:7,18
**sequentially** 312:8
**Serenity** 1:6 4:10
33:7,18 34:19,22
76:10,14 94:10,22
102:22 105:15
109:2,15 113:23
114:2 117:7,21
118:5,21 119:8,20
124:20,22 125:2
130:7,18 139:23
148:14,18 154:21

156:4 158:3
165:19 183:22
189:10 190:19
213:10,25 215:5
220:25 227:9
228:10,21 229:5
229:19,21,23
280:4,6 317:25
318:11,12 319:24
320:7,8 323:14
324:3 326:2,8
**Serenity's** 7:24
109:3 222:24
226:9 227:25
339:20
**Serenity/Chris**
316:12
**serious** 60:14 73:17
73:20,23 74:3
77:22 108:20
110:4,10,12
169:11 249:9
269:24 273:4
288:20 291:7
294:22 304:8
324:25 325:8,24
326:10
**seriousness** 72:10
108:23
**set** 19:8 21:8 197:6
254:20,20 308:15
359:11,20
**setting** 197:7
**seven** 327:24
**severity** 71:23
73:12 294:22
**shake** 5:15
**shape** 85:24
**share** 9:17 17:12
69:2 143:24
161:23 215:4
217:15 271:21
291:22
**shared** 53:13 56:4
144:25 169:10
170:19 180:8
186:14 201:19
205:4,17 206:13

210:11 213:8,14
215:9,13 226:10
233:16 235:17
263:10 266:13
284:11 291:17
325:5 353:11
**shares** 42:13 213:2
**sharing** 16:2,3
156:19 166:11
**sheet** 64:11,15,18
65:6 138:10
**shift** 18:19,19 21:4
106:9 116:22
117:7 160:22
275:24
**shifted** 308:23
**shifts** 147:23
**shipped** 45:7,12
**short** 11:16 62:17
179:13 236:19
238:19 246:20
304:11 350:18
**shortage** 108:11
155:7 193:6,16
304:3 350:6
353:20,25
**shortages** 104:16
106:21,23,25
107:2 192:21
193:2,12 213:20
347:18 348:23
349:9,22,23
353:22
**show** 41:10,10,11
153:3 214:16
217:3 271:8 279:6
289:12,25 299:20
**showed** 108:14
138:21,25 139:5
**shown** 357:11
**sick** 182:23
**side** 10:22 12:23
189:23 194:18
243:3 279:16
**sideways** 261:20
**sign** 238:4,5
**signature** 154:18
**signed** 119:2,6

**significant** 140:17
143:23 150:7,11
150:12,21 151:2
289:4
**significantly** 150:2
**signing** 238:9
**similar** 8:11 51:11
55:12 112:17
135:8 137:13
145:16 196:16
210:11,15 262:25
263:10 273:20
344:13,17,18
**Simone** 342:18,18
343:24,25
**simply** 26:20
**single** 301:8,9,10
**singular** 254:22
**singularly** 247:7
**sister** 146:17,19,22
146:25 147:20
201:6
**sister's** 200:25
**sit** 18:16 102:24
119:9 145:19
200:2 231:19,21
284:18
**sitting** 190:18
**situation** 26:2,7
29:22,23 30:20
31:10,23 59:24
73:12 74:24 75:14
75:18,22 76:5,9
76:10 99:8 100:8
114:6,9,11 118:16
132:4 136:9
147:20 148:4
196:16 201:22
210:15 213:7
227:16 239:24
240:2,23 261:3
266:24 292:19
319:14 321:16
**situational** 100:7
**situations** 76:20
115:15
**six** 9:8 10:16 28:9
28:10 48:15 49:15

49:17 82:2 133:23
133:23 140:7
201:4 210:12
268:11 315:7
**skimmed** 327:17
**Slade** 242:8 245:4
245:22 249:14
**slash** 315:6
**slashes** 243:3,3
318:14
**slightly** 307:3
325:4
**slip** 36:7 57:20,21
58:15,19,21
194:23 195:12
217:17,20,22
268:20
**slips** 194:24 195:3
195:4,11,16 246:5
**slots** 254:15
**SM** 87:2,4,23 90:12
90:20 209:11
214:12,18 217:25
**small** 237:19
**Smith** 258:13
325:19
**Snatched** 238:9
**software** 298:2
299:12
**sole** 72:12,15,19
**somebody** 34:8
60:10 71:24 74:25
75:7 94:10 153:2
173:19,20 182:12
197:15 230:8
314:7
**Somers** 208:16,25
209:16,20 215:14
**soon** 340:18
**sorry** 45:17 94:12
96:13 133:4
160:21 174:20
217:24 330:17
**sort** 18:6 336:18
**sought** 230:23
**sound** 136:22
**SOUTHERN** 1:4
**SPA** 84:9 88:24

89:5 90:6 98:5
175:7,13 205:17
207:11 213:8
220:8 257:25
258:3 313:3,8,16
313:23 323:12
342:15 344:11,20
**space** 243:5
**spaces** 194:15
**speak** 92:6 187:2
202:2 223:21
226:12 230:14,15
230:16 233:6
263:21 309:18
**speaking** 15:21
24:15 31:24 75:4
87:13 144:7
203:13 208:24
209:3,5,18 221:25
222:3
**speaks** 30:7
**specialist** 306:22
**specific** 8:7 11:11
28:9,13 36:14
42:24 43:10,14
47:25 64:7 65:19
75:22 77:6 84:12
86:2,14 87:18
96:10,11,12 98:11
102:19 111:17
117:3,4,22,25
118:15 120:11
121:11 127:21
128:22 130:5
132:2,23 134:17
135:14 142:8
145:17 147:6
156:3 173:17
175:4 187:12
191:4,8 206:11
214:24 216:10
217:16 221:7
226:21 241:17
283:22 296:23
302:6 310:3 315:9
322:5 335:5,16
350:13,25
**specifically** 8:4

11:14 14:10 15:14
18:13 21:13,22
30:10 44:19 57:14
64:6 67:3 103:4
104:10 105:19,22
110:10 114:4
118:15 121:23
127:23 131:14
138:9 155:24
169:17 180:6
192:7,12 196:13
198:19 201:24
209:19 218:8
220:11 221:2
239:5 250:20
258:21 259:12
275:9 310:2,5
324:16 326:15
327:13 335:25
337:7 342:25
**specifics** 33:13,15
34:17 44:7 104:3
105:9,10 107:7,10
107:24 118:18
120:10,14 122:14
122:16 123:5,17
123:21 127:25
130:14,24 131:3
131:17 132:12
141:25 143:7
145:20 150:17
170:19 212:6
216:25 221:24
223:9 237:18
302:9
**speculate** 215:17
217:14 260:19
347:21,23
**speed** 189:20
**spending** 15:25
16:9 81:16
**spent** 107:20 108:4
151:7
**split** 312:6
**spoke** 108:13
145:23 190:7
202:9 209:16
212:6,10 221:12

222:6 230:5
292:21
**spoken** 210:18
211:19 223:5
230:8 256:6
**spot** 253:10 291:10
**spots** 244:14,18
246:21
**SS** 124:4 359:4
**staff** 43:4
**staffed** 12:5 341:8
**staffing** 333:9
**stamp** 58:20,23
64:2 222:16
311:20
**stamped** 47:21
63:12,25 65:13
66:23 70:20 92:10
93:11 113:18
121:19 139:20
158:16 164:5
208:8 228:16
250:24 258:8
268:5 275:16
308:15 310:19
311:22 312:9
343:11
**stand** 160:25
**standard** 29:24
46:17 125:22
192:24 254:16
303:15 304:2,7,10
355:10
**standards** 13:12,17
14:5 15:14 16:7
17:17 18:14 21:7
21:20 22:19 39:11
103:21 105:2
145:24 210:24
211:4 213:13
247:9 248:13
270:2 288:14
289:3 303:17
350:9,10
**standpoint** 11:19
14:11 151:9 162:4
305:15 306:6
**stands** 314:24

315:8,13,15
**stapling** 195:10
**Starbucks** 1:9 4:11
9:25 10:16 13:12
13:17 18:8 19:16
19:19,25 20:5,9
20:24 21:16 22:19
31:14 35:6 37:7
37:10,13,18,21,24
38:11,24 39:18,22
40:7,8,22 42:20
43:25 52:5 64:24
67:14,21 76:24
77:8 80:5 81:7
92:23 93:24
111:19 134:3
149:12,17 174:5
178:14 183:10
185:21 202:15
205:7 222:25
235:22 242:9,10
279:22,25 282:16
314:11 334:24
347:15 348:8,13
348:19 349:6,7,19
351:2,15 352:2,17
353:2
**start** 8:22 37:14
117:20 205:21
336:20
**started** 138:23
155:21 169:19
190:3,14 194:11
194:20 195:10
**starting** 298:5
328:8,9 329:13
**starts** 68:10 118:4
222:21
**Star_Marshall**
47:21 360:8
**State** 2:14 358:2
359:3,8
**stated** 214:12,18
356:8
**statement** 117:5
214:24,25 291:23
294:4 296:19
331:12

**statements** 230:7
351:21
**STATES** 1:3
**stating** 55:12
**station** 41:17 43:2
43:19 44:3,7
**Stayed** 201:5
**stays** 268:18
**stemmed** 145:22
**step** 36:15 73:10,11
73:16 123:4
188:25
**steps** 36:13 44:16
45:23 80:15
117:15,20 119:13
124:16 125:20
169:13 294:7
304:21 318:7
341:6
**Steve** 286:9
**Steven** 208:16,25
209:16,20 286:3,8
**stick** 86:14
**stock** 237:25
**stomach** 166:14
182:19
**stop** 199:20
**storage** 48:16
**store** 10:11,19,20
11:21,22,24 12:2
12:7,12 13:7,13
14:4 15:10,11,17
16:5,13,15,20,21
16:22,25 17:2,15
17:15,24 18:23
19:19,25 20:5,9
20:14,17,20,25
21:5,6 22:19,21
23:13,19 24:11,12
24:24 25:10 27:22
27:23 28:10 33:2
33:5,16 35:22
36:2,19,20 37:15
38:11,25 39:5,8
39:14,19,23 40:7
40:25 41:9,21
42:5,20 43:4,5,7,8
43:11,17 44:12,21

44:25 45:7,15
46:17,19,20,22,25
48:15,23,25 49:24
53:16,19 54:15,20
54:21 55:10,15
56:9,13 57:9 60:3
60:5 61:9 69:4
72:22 79:5,8,10
79:20,21,22 80:9
80:12,12,14,16,17
80:17,19 81:3,12
81:14,15,16,22
82:11,12 85:18
87:4,9,11,16,18
87:22 88:4,4,8,11
89:13,23 90:12,18
90:24 91:11,11,14
91:23,24 92:6
93:15,17,23 94:18
94:19,23 95:12,13
95:16,17 97:3,5,6
97:9,13,20,25
98:6,18,24 99:8
99:20 100:8,17,24
100:24 101:4,11
101:16,20,23,23
102:4,6,16 103:5
103:20 104:13,16
104:18,21 105:6
106:21 108:20
109:4,17,18 110:8
110:16,19,22,24
111:2,4,12 112:5
112:12,25 115:16
116:9,17 117:8
118:8,12,17
119:14,25 120:5
123:7,22 125:13
125:21 126:10
131:11 133:9,13
133:14,19 134:2,8
134:12,12 135:9
135:17 136:5,16
137:2,5,10,16,18
137:20 141:24
143:10,17 146:2
147:21,22 150:9
151:3,7,10 152:4

152:8,9 153:5,18
153:24 154:9
156:13 157:16
158:4 160:4
164:17,24,25
165:5,7,13,16
167:11 176:20,23
178:3,5 180:4,10
180:14 186:6,8,22
187:7,13 188:11
188:12,19,23
189:6,14 191:10
191:22 192:20
193:6,9 194:2
196:4,16,17
198:11 200:4,14
201:15,22 202:3
205:25 206:3
210:13,17,22
215:12 231:18
235:25 239:25,25
240:4,5,8,12,16
240:23 241:11,15
241:21 242:4,5,11
242:14,16 249:5
249:12,22 250:9
250:11 251:21
255:19,21 256:8
257:7 258:11,12
258:14,17 260:18
260:21 262:3,10
263:3,11,21,23
264:6 265:7
266:24 267:2,2
268:2 269:22
270:13,16 273:2
274:24 275:2,4
277:5 278:7
281:13,15 282:8
283:3,8,13,16,19
283:24 284:3,15
284:20,22 285:3,6
285:7,13 286:5,11
287:10,13,19,22
287:25 288:8
289:10,21 290:11
290:13,15,21
291:2,5 293:13

294:25 295:2,4
297:3,6 298:2,21
300:3,4,5,8,12,13
301:20 309:4,20
312:25 313:11
315:10,21 316:24
316:24 317:4,6
323:14 324:11,14
324:18,22,24
325:3,6,23 326:9
326:12 329:17
330:5 332:6,8,19
333:5,7,10,16,22
334:7,20 335:5
336:25 337:11,12
337:14 339:5,5,8
339:12,13,16,18
339:24 340:10,15
340:19,25 341:16
341:17,19 345:21
346:10 347:18
349:9,22 350:6,17
353:17,20 354:12
354:17 355:4,8,11
355:18
**stored** 60:3 329:22
**stores** 13:16 14:2
16:2,10,20 17:7
17:19 18:16,21,22
19:14 20:24 21:11
21:16 22:2,6 23:2
24:8 26:20 27:6
27:18,25 28:2,9
28:13 35:6,12
37:25 38:14 39:21
40:9,22 45:20
64:24 65:16,20
80:20 85:25 86:19
91:3,4,10,16,20
92:23 93:24 94:2
95:13 100:11,15
100:19 101:17
131:10 133:23
134:16 135:12,21
135:22 136:11
137:19 141:4,13
142:6,20 157:21
161:25 239:15,18

239:23 240:15,20
278:11,20 280:2
281:19 282:11,12
282:14 284:9,9,21
284:24 297:17
298:11,13,14
312:25 313:4
315:4 324:12
332:9,17 333:5
334:4 339:22
340:4,7,11,14,15
346:13,21 354:24
355:2
**store's** 236:5 333:2
**story** 264:16
290:19 291:5
319:7,10 320:4,5
**strange** 262:2
**STRAUSS** 3:9
**Street** 10:6 17:10
184:7 333:17
**strength** 139:5
158:8
**strengthen** 157:20
**strengths** 138:18
138:21,25 139:15
155:25 157:18
162:20
**strike** 9:14 26:10
34:2 46:10 58:14
60:18 64:9 93:21
102:13 126:25
136:14,24 168:22
176:19 181:11
226:17 233:18
287:17 341:23
**string** 298:8
**strong** 19:12 61:7
158:8
**struggle** 297:11
**struggled** 103:19
103:24 156:14
295:7
**struggles** 122:21
148:23
**struggling** 104:16
106:9 151:10
162:3 301:20

302:15 305:8
**stuff** 66:3 221:10
327:14
**subject** 328:9,12
329:14,15 357:10
**subjective** 38:4,7
51:17,19 110:12
**subordinate** 34:9
**Subscribed** 357:14
**subsequent** 169:15
172:24
**substance** 230:16
**success** 306:12
**successful** 15:20
111:13 346:19,24
**successfully** 346:17
346:18
**suggested** 148:2
176:3 179:13
**summary** 41:8
162:19
**Sunday** 56:19
251:6 277:9
**superior** 34:8
**supervise** 27:5,7
346:14
**supervised** 141:12
141:13 278:12
280:4
**supervising** 12:18
20:12,23 53:16
54:14 55:9 56:12
138:8,17 285:24
**supervision** 285:8
**supervisor** 18:19
18:19 19:15 106:9
116:23 286:3
293:15
**supervisors** 21:4
35:21 117:8
175:25
**support** 18:24
141:3 142:13
225:21 229:10
336:13 339:20
**supported** 230:13
**supports** 34:6
222:23

**suppose** 77:23
**supposed** 29:25
42:21 43:8,12
56:17 246:18
**sure** 6:6 12:4,6,7,12
13:15 14:4 17:13
19:14 21:6,9 22:5
22:8,14,25 23:6
23:12,21 24:6,19
31:15,20 35:19
39:16 42:3 44:18
48:25 50:2 55:15
57:14 62:18 68:10
78:12,14,17 84:14
94:7 97:17,18,21
98:8 119:21
120:14 123:11
126:3 128:21
129:18 135:13,23
137:11,21 146:3
149:15 169:12
176:16 186:25
187:4 192:23
195:23 200:5
201:25 224:22
232:15 242:16
255:16 266:25
267:25 274:14
289:17 304:13
320:23 335:24
338:23 346:12
**surgery** 174:13,15
174:17 175:14,19
176:2 179:7,10,11
180:20,25 181:6
183:7,15,23
185:12 186:10
187:21 191:3,5
192:4 205:18
325:7 331:17
**surprise** 205:10,12
205:13,15
**surprised** 205:23
**surrounding** 91:13
228:10
**suspension** 72:5
**sustainable** 159:3
**sworn** 4:4 357:14

359:12
**Symphony** 297:20
**symptoms** 172:19
**synonymous** 44:15
**synonymously**
26:16
**system** 41:22 297:3
297:17,19,21
298:11,17,21,21
298:25 299:4,8,9
299:15,22,23
300:6
**systemic** 249:8
**systems** 41:15

---

**T**

**T** 359:2,2 360:7
**tab** 50:23 51:3
**table** 79:4 190:3,11
237:11 238:9
**tabs** 50:17
**take** 5:12,21 6:7,8
6:11 15:5,15 27:4
29:9 44:16 45:23
47:23 62:16 68:19
69:6 72:4 78:25
93:6,19 94:5
106:3 141:15
145:6,6 146:13
147:11 152:11
155:4 164:25
167:18 168:18
170:2 178:24
180:4 182:13
184:2,6,13,15
185:23 188:3,25
203:6,16 224:20
237:14 240:25
242:7 257:20
274:12 292:4,7
301:5 304:11
313:2 316:3 323:2
323:12,17,23
325:12,21 326:23
335:22 338:2
341:5 345:7
354:19 355:13
**taken** 4:18 18:22

55:19 62:19 72:7
72:12 94:8 138:3
185:20 188:8
196:17 198:11
201:25 205:25
220:5 224:23
241:2 244:16
274:15 288:2
290:10,13 304:14
323:24 345:12
**takes** 35:14 58:4
85:23 173:20
**talent** 151:11
**talk** 111:23 125:15
157:5 237:19
249:11 263:3
269:22 277:5
**talked** 144:7
188:25 192:15
193:13 212:3,15
238:13 249:14
**talking** 145:5 175:9
180:22 190:4,4,15
190:19 204:11
239:14 267:9
**talks** 203:18 204:14
**Tamara** 242:24
244:21 245:2
**target** 159:6,7,9,10
159:25 160:2,9,10
160:13,15,18,23
161:7,8 162:6,7
162:10
**targets** 160:22
**team** 12:4,8 14:12
17:13 56:10 72:20
100:23,24 101:22
109:21,23 111:13
117:18 118:3
128:5 139:4
145:24 157:4,6
183:20 184:4,12
210:23 211:6,15
219:6,7 303:16
308:19,25 309:3
339:19 347:22
350:10 351:4
353:19

**teams** 52:20 100:14
141:3
**tech** 299:12
**telephone** 225:2
**tell** 4:18,21 47:19
47:24 63:2,20
65:14 66:19 78:7
92:13 93:13 149:2
167:21 180:18
199:13 209:23
234:23 243:16
249:19 252:4
253:19,23 277:18
310:18 312:12
347:24
**temporary** 335:19
336:16
**ten** 142:25 157:24
172:21 179:5
213:2 325:14
**tend** 30:22 279:10
**tenure** 10:15,16
94:23 264:7
**ten-minute** 172:18
172:25
**term** 5:5 17:21,24
18:8 19:12 26:14
74:8 76:24 88:7
134:3 308:21
**terminable** 26:5
**terminate** 25:20
30:21 31:4,14
207:19 211:21
218:12 220:13
231:4 232:10,13
232:23 235:9
291:9 293:10,12
294:5 305:7 307:7
308:6 341:7
**terminated** 31:21
32:9 33:3,6,8,17
34:13,15,23,24
35:2 229:6 233:2
234:15 235:5,23
236:8 286:15
287:6 291:8
307:21 339:7
347:24 352:25

353:21 354:8
**terminating** 31:6
31:18 230:17
294:19 305:21
317:2
**termination** 25:23
68:12 72:6 73:23
75:13,17,20 76:3
76:17 105:18
106:2 204:21
207:10 212:20
221:5 226:9
228:11 230:2
231:11,23 234:2
236:12 239:7,11
292:2,11 293:6,17
294:8,13 302:16
307:25 329:8
347:15 354:2,6
**terminology** 84:19
**terms** 73:15 83:25
84:2 145:9 203:5
312:5
**testified** 4:4 112:21
170:24 173:25
202:18 225:3
230:4,7 235:10
239:8,12 345:14
**testify** 6:22
**testifying** 129:18
**testimony** 47:3,9
55:6 83:18 84:7
193:25 348:16
352:11 357:8
359:13
**Thank** 63:10
306:17 330:10
**Thanks** 133:7
**thing** 18:3 70:12
110:21 138:20,23
179:19 188:22
190:22 236:20
247:7 273:20
285:16
**things** 8:2 12:9,12
17:4 23:17 38:4
40:6 41:12 44:15
46:22 75:23 86:20

87:8,16 90:17,25
98:8 99:13 106:10
106:10 108:13
110:11 112:17
125:15 128:22
141:23 150:13
152:12 168:18
171:12 190:16
192:18,24 194:13
198:24 238:2
246:6 253:17
257:17 264:12
266:23 267:3
272:25 309:10,12
309:14,15 312:22
316:4 342:14
354:20
**think** 21:22 26:4
29:12 30:7 39:17
39:20 53:16 54:15
55:10 56:13 60:23
62:8 65:4 74:17
74:25 75:7,12,15
75:19 76:23 84:25
95:13 101:14
102:2,8 108:24
111:3 116:12
119:20 121:9
124:22,25 125:6,9
125:19 126:17
130:25 134:8
138:14,22 139:14
139:15 140:8
142:12 143:15
146:18,23 150:16
150:19,19 151:6,7
153:12 156:14,15
157:23,25 180:22
182:16 188:13
190:13,14,25
192:15 201:13,13
209:23 215:14
216:20 225:14
226:13 238:8
240:18,22 252:12
277:3 278:22
279:21 281:9,18
281:22 288:17,20

288:23 290:5
309:18 324:16
325:7,17 326:12
327:18 339:2,3
342:6 345:8,10
354:16,22 355:3
355:14 356:3
**thinking** 76:4
148:18 176:5
179:7
**third** 147:8 174:8
174:18,24
**Thirteen** 27:8
**Thirty-four** 330:16
**Thirty-three**
332:25
**Thompson** 2:10 3:3
**thought** 175:21
179:12 196:14
296:16,18
**thoughts** 318:9
**thousand** 61:25
62:4,8,9
**three** 7:10,11 10:15
11:3 57:17 85:19
85:20 91:20 102:9
128:10 144:21
154:8 175:22
176:7 177:6 255:7
268:10 276:21
301:23 315:13
**three-and-a-half-...**
144:14
**three-hour** 268:12
**three-week** 187:3
**throw** 24:3 25:11
**throwing** 24:7,13
**Thursday** 7:15
201:7,8 202:12
**tickets** 272:4
**tied** 165:2
**till** 35:18,20,25
36:4 37:3 41:5,6,7
41:25 42:4 50:19
198:2 253:10
**tills** 36:21
**time** 8:2,7,11 10:8
10:18 13:25 15:25

16:9 17:18 18:16
28:6 32:19,20
33:21 35:13,22
37:4 43:20 54:13
57:19 60:10 70:3
73:6 76:23 81:17
82:8,9 83:9,15
84:6,12,16 85:13
85:20 86:2,6
87:10,17 93:25
95:15 96:10,17,21
96:23,25 97:19,25
100:15 102:18,19
102:20,21,25
103:3,7,8,23
104:11,15,20
105:23 106:7,16
106:19 107:11,18
107:19 108:10,17
109:17,24 112:3,7
112:13 115:20
116:15,19 117:8
118:7,12 119:7
120:9,12,22 121:5
121:7,13,22
122:20 123:8,22
125:12,15 127:16
128:6 129:2,16,21
129:22 130:6
131:4,7 132:13
133:25 134:5,9
136:9 137:25
139:8 140:3,4,9
141:11,22 142:10
144:14,19 147:9
147:21 148:3,21
149:8,10 151:6,14
151:25 152:14
154:9 155:17,18
156:3,10,16
157:23 160:23
165:6,18,23,25
166:5 168:22
169:4,18 171:3,4
171:8 173:10
174:3,7,16 175:18
175:20 177:2
179:13 181:19

183:17,20 185:24
186:9,17 187:3
188:12,16,18,20
190:12 195:7
199:2 201:23
202:20 204:2
206:9 207:4
211:23 212:18
213:15 214:14
225:12 226:21
229:17 232:7
236:13,15,16,24
242:23,23,24
246:16 247:8
254:13 261:7
262:20 264:5,7
270:5 276:4,5
285:3 288:4 290:3
293:8 296:25
301:21,23 302:13
302:14 308:23
313:25 314:5
315:9 316:18
317:4 322:24
325:22 326:14,23
328:14 330:23
337:3,9 339:22
340:8,17,20,24
351:13,24 354:15
357:5
**timeline** 64:11,18
**timely** 219:8
**times** 16:23 18:12
18:15,20 42:25
43:3 61:15,16,17
83:23 84:2,5,20
90:23 91:21 96:11
104:6 130:7,8
133:8 136:10,11
136:17,20,22
137:2,5,7,10,16
138:19,25 139:11
158:8 176:16
192:22 193:4
197:14 216:14
230:10,11 239:19
263:6 320:18
323:4

**Tina** 221:8,10,14
221:25 222:23
223:21 225:21
226:7 227:17
230:23 233:13,17
233:19 314:12
**tip** 194:17 243:9
247:4 251:12
254:17 277:15
**tips** 244:19 270:12
**title** 142:12,14
**titled** 71:6
**today** 4:15,21 6:5
6:23 9:16 102:24
145:19 200:2,7,11
213:9 258:17
284:18
**told** 166:19 171:15
173:14 180:9
181:13 183:3
186:9 193:22
216:21 220:12,15
233:23 263:5
**tool** 189:13
**top** 27:13 40:2 48:8
48:8 53:3 79:18
87:21,23 88:7,8
88:10 98:6 99:17
100:3 101:7 102:5
103:11 118:20
128:8 143:8 150:8
151:21 152:2,3,7
159:20 162:19
225:19 240:11
242:22 244:19
246:15 249:24
251:7 254:11
259:11 262:14
268:9 270:11
290:25 291:3
295:16,19 314:16
316:5 322:7 343:4
**topics** 87:2 90:11
**total** 9:6 78:11
136:16 153:6
239:19 246:17
**tough** 83:10 135:25
171:4 199:2

**tours** 95:13
**town** 201:6
**track** 297:18
312:24
**tracked** 41:23
**Tracy** 337:15
**traffic** 333:9
**trailing** 145:18
**train** 165:7 315:15
**trained** 164:21
**training** 164:24
165:9,13 315:15
315:16 335:8,12
**transactions** 41:9
41:21 66:16,22
**transcript** 357:10
**transfer** 144:15
152:16 153:24
154:2
**transferred** 44:20
44:24 143:10,17
143:19 151:15
242:15
**transferring**
157:15
**transient** 153:15,19
**transmitted** 298:4
**transported** 53:24
54:24
**travel** 282:8
**treating** 115:25
**treatment** 331:5
**tremendously**
162:3
**trend** 23:22 24:6,19
24:25 25:4,12
108:14 160:16
192:25 262:2
263:2,10 264:15
264:18 266:14
**trending** 144:2,17
145:9,13
**trends** 23:16
109:20 194:11
345:23 346:2
347:5,12
**tried** 295:6
**trigger** 46:8

**trouble** 198:9
214:14,19 215:11
216:22
**true** 59:15,18 91:15
331:12 357:9
359:13
**truth** 4:18
**truthfully** 6:22
**try** 4:25 5:7 80:22
80:25 81:10 82:15
82:19 83:6 86:18
139:12 340:14
346:15,16,18
**trying** 60:5 112:10
146:24 148:25
192:25 203:8
316:16 325:21
341:4
**Tuesday** 118:23
**Tupperware** 195:2
**turn** 51:6 59:8 64:2
66:5,21 71:3
79:15 86:23
117:16 119:14
138:21,23 154:17
161:3 180:24
241:24 244:10
246:11 249:23
250:7,23 251:4
253:6 254:9 259:7
259:23 261:10,18
261:19 262:12,18
268:4 269:8 270:3
271:13 272:6,15
273:9,14 275:7,15
276:14 277:7
301:12 314:15
315:22 322:6
327:23 328:25
331:13 332:3,24
**turned** 134:6,7
150:13
**Turning** 324:2
**Twenty-six** 331:14
**two** 7:10,11 8:18
9:5 33:14 44:14
51:7 59:8 81:4
82:10 95:20 143:2

143:3 157:24
158:2 162:21
172:3 175:22
176:7 188:15
195:12,16 199:2
238:19 247:8
248:12 253:17,22
253:22 254:21
287:8 296:17
306:8 315:5
329:22 339:21
340:4,7,11,14,15
347:25
**two-and-a-half**
217:25
**two-day** 262:2
**two-hour** 309:2
**two-week** 340:8
**type** 18:5 44:13
114:20 136:6
164:9 315:9
344:13
**typed** 114:22
**types** 16:15,18
69:12 75:23
134:15,22 135:20
309:10
**typical** 98:4 99:14
232:4
**typically** 32:6
43:15 70:3 82:14
82:19 101:21
134:24 184:4,19
187:2,23 188:14
188:17 231:19
279:5,13 309:12
309:13 343:22

**U**

**um-hum** 5:4,13,22
7:21 8:19 13:18
17:23 18:7 38:9
48:9 53:22 94:12
100:12 111:20
115:9 140:18
161:5 164:7
178:11 225:6
238:16 239:16

241:8 295:15
328:11
**unable** 265:18
267:5
**unacceptable** 71:10
**unbelievable** 290:5
290:9
**unclear** 23:7 67:22
260:5
**uncomfortable**
186:6
**uncorrected** 60:17
60:20 61:11
**uncover** 193:21,23
256:7 355:10
**uncovered** 201:20
**underneath** 80:7
162:18 208:20
209:9 270:7
**understand** 4:15
4:17,24 5:2,5,7,23
6:19 22:2 23:10
34:3 38:18 45:19
50:25 53:7,9,11
54:2,6 55:2,24
71:21 74:8,13
79:8 84:15,17
88:2,6 89:21,25
90:4 101:13
120:25 140:25
193:16 245:20
266:16 267:25
330:24
**understanding**
16:6 23:14 25:18
26:2,7 27:2 34:5
36:15 45:18 49:5
49:12 55:16 56:23
59:16 68:19 79:13
101:10,15,24
116:19 118:2
245:20 260:11,22
262:4 263:4,12,17
263:22 264:14
266:5,8,12,22
316:17 319:3,14
320:8,16 321:4
**understandings**

320:12
**understood** 213:17
214:2 350:23
**unfolded** 171:12
**UNITED** 1:3
**unredacted** 311:5
313:19
**unsure** 198:14
**unwritten** 67:19
**upcoming** 169:20
175:15 198:25
309:14
**upgrade** 299:11
**upgraded** 298:2,22
**upholding** 56:10
353:12,13
**upper** 10:22 79:4
86:25
**ups** 102:22 130:11
**uptick** 161:23
**upwards** 61:13
62:9 240:21
**urgent** 339:4 340:9
**use** 5:6 26:14 42:21
42:22 56:20 57:10
72:22 73:5 90:5
133:18 282:13
288:25 327:17
**uterine** 331:17
**utilize** 21:19 51:4
72:21 189:13
279:13
**utilized** 43:3
**utilizing** 88:21
89:15 345:22
**U.S** 65:16,20

**V**

**vacation** 199:3
200:21 202:24
207:6,19 209:7,25
316:16 322:23
341:4
**vague** 127:15
**validate** 58:20
**validated** 57:19,20
58:15 268:19
269:3

**validation** 57:18
58:13 276:5
**values** 98:22 99:12
189:4,12 190:2,9
190:13
**vanished** 26:20,23
**variable** 162:25
**variance** 314:24
**various** 14:8,13
194:15 240:13
**vehicles** 15:25
**verbal** 5:14 69:6,22
70:2 72:4 73:2,4,7
73:9,17 329:7
330:6
**verbally** 115:12
**verbatim** 215:21
**verifiable** 217:6
**verified** 217:11
**verify** 248:20,22
252:23,25 253:5
327:6,9,10
**verifying** 327:11
**version** 93:2 94:4
295:17 342:6,9,11
**versions** 78:19
311:6 342:12
**versus** 290:2
**vertical** 153:19
**Victor** 9:19 212:2,8
227:8 230:6,8
306:20 308:4
336:14
**view** 162:15 249:9
**viewed** 252:22
**viewing** 101:2
**Village** 12:24
**violated** 296:3
301:25 302:8
350:4,5 351:7
355:16,22
**violating** 350:3
**violation** 61:12
243:20 244:21
248:17 254:3,6
273:6,8,23 278:4
289:5 330:7
348:12 352:7

**violations** 60:20
216:11,13 243:11
248:14 255:4
256:21,22,24
273:24 274:9
276:6,9 278:15
329:8,19
**visibility** 298:5,22
299:7
**visit** 16:21,22 17:25
80:9,13,16,19
81:13,14,15,21,23
82:6,13,15,17,19
82:25 85:23 88:5
88:9,15,15,25
89:13 90:6,13,18
97:10,11,12,13,22
98:5 99:4,15
101:20 102:3,4
136:5,6 137:7
175:7 176:20,24
186:23 187:7
188:11,21 191:2
194:2,4 200:4
201:15 202:3
207:11 213:8
215:13 216:18
255:21 282:14
291:17 313:8,12
313:16,16 323:13
342:15
**visited** 133:9
136:16,20,25
137:5,10,16,18
187:13 239:18
**visiting** 84:9
100:15
**visits** 16:5,13,16
18:11,25 81:4
82:3 83:3 84:21
84:24 85:2,5,18
85:25 86:5,14,19
87:12 89:6 95:16
95:17,23 96:3,4,8
96:9,17,20 97:15
98:18 100:22
116:17 131:10
133:14,19 134:3,8

134:11,15,22,25
135:10,11,11,16
135:17,20 137:21
151:3 169:15
172:24 173:6
190:8 239:15
240:5,12,17,21
255:19 278:20
284:20 313:4,23
325:13 332:8
344:11,20
**visual** 78:19 355:8
**visually** 283:9
**voice** 98:24 221:22
221:24 222:2
224:10
**voids** 41:12
**volume** 153:7
**vote** 152:19,21,25
**vs** 1:8
**V2I** 314:24

**W**

**wait** 96:14 169:25
349:15
**Waiting** 306:22
**waiving** 328:13
329:15
**walk** 35:8 189:4,12
190:3,10,13
**walked** 188:23
236:21 237:15
238:10
**walking** 124:11
**walks** 98:22 99:12
**walk-through**
189:14
**want** 6:7 31:15
84:14 124:6,15
129:18 137:21
176:4,5 197:4,8
198:8 199:20
207:23 213:3
214:18 215:11
216:22 231:14
235:11 266:25
280:24 290:13
307:7 318:25

347:23,24
**wanted** 124:13
125:5,24 126:3
146:12 152:6
172:20 179:8
203:5 206:7 207:2
227:18,23,25
289:12 318:8
321:15 340:19,25
**wants** 209:10
**warning** 68:11
69:22 72:4,5 73:2
73:16,17 302:11
**warranted** 73:24
214:2
**wasn't** 110:6
117:19 118:2
146:6 148:23
166:6,6,8,13
168:11 169:12
172:17 173:18
182:5,10,18,23
189:3 201:25
206:18,20 237:19
285:15 289:17
291:4 298:20
305:13 336:7
344:3 348:24
**watch** 25:10
**water** 188:3
**Waverly** 94:19
**way** 5:2 15:18 24:2
35:5 44:22 57:17
60:12 69:21 73:13
77:18 95:4 98:9
101:12 116:10,12
146:8 148:5 157:3
157:4,4,6 185:17
199:7 205:24
215:3,12 256:4
261:2 267:4 282:2
282:16,17,21,25
299:13,14 311:11
347:13 349:7
359:17
**ways** 16:8 32:6
69:12,18,20
**Wednesday** 187:14

201:9,14 316:5
**week** 8:8 91:16,21
165:6 187:10,10
187:15 194:11,20
194:21 197:10
206:11 226:25
255:8 257:11
262:13 289:19
290:2 309:14,14
315:14,17 345:22
**weekend** 55:20
56:20,21,24 57:2
57:6,13,22 271:23
272:2
**weekends** 152:12
**weekly** 50:17,22
51:3 91:7 109:7
210:25 211:3
310:7 312:24
347:8
**weeks** 169:24 170:9
174:11 175:22
176:7,8 177:8
187:18 193:11
198:25 199:9
331:3 335:6,11
339:23
**week's** 289:15
325:13
**welcome** 205:3
**well-rounded**
320:12,15
**went** 7:23 27:2,3
120:13 173:5
179:15 194:6,9
200:21 201:8
202:13 245:8
246:17 247:13
248:9,11,18,19,21
248:23 253:21
260:4,25 262:21
272:17 276:19
277:19,22 279:22
308:10
**weren't** 106:10
133:19 180:16
198:2 215:5
**West** 10:22 12:23

12:24
**We'll** 93:19
**WHEREOF**
359:19
**whoever's** 247:5
**wide** 99:2
**Wigdor** 2:10 3:3
**wish** 358:4
**witness** 4:3 94:7
174:22 188:2,6
231:15 232:16
235:12 246:24
247:25 252:10
254:17 270:9,10
276:2,4 277:11,25
280:25 321:12
327:22 350:19,22
352:22 356:12
357:7 359:10,14
359:19 360:3
**woman** 256:13
**word** 39:15 47:23
51:17 61:8 74:13
111:24
**wording** 327:15,16
**words** 218:8 288:25
344:7
**work** 15:16 41:4,16
43:2,19 44:2,6,7
54:19 55:14 56:9
79:10 101:8
104:20 114:24
146:24 149:14
157:18 168:8,12
168:14 173:9,13
175:21,23 186:2,5
191:19 201:9,16
234:22 315:10
325:10
**worked** 100:17
103:5 105:16
128:9 130:6 156:4
157:19 295:6
**working** 17:2,4,18
77:16 102:21
106:10 149:12
165:11 189:22
202:15 319:4,7

**workplace** 147:2
**worksheet** 301:11
**worse** 158:11
248:17 290:14,18
**worth** 85:20,25
289:16
**wouldn't** 77:19
101:2 153:2
159:19 217:6
238:5 248:3
**wound** 176:2
**wrap** 192:17
198:24 341:4
**write** 74:11,21
148:17 215:20,21
217:10 225:7
279:5 287:3 294:3
296:14,15,16
301:25 316:14,22
316:25 318:4,19
318:20,21
**writing** 12:9 14:7
29:2 30:3 76:7
215:23 217:7
324:9
**written** 14:21
40:12 67:13,16
69:7,8,9 70:2,3,5
70:7,8,14 72:5
73:2,5,10,16,20
73:20 77:7 80:3
160:21 215:4
227:23 254:15,15
260:15 270:11
271:2 291:23
294:3,4 302:11
305:19 316:9
324:3 329:7
**wrong** 84:18
180:24 215:25
217:7,10,12 261:4
263:25 264:4
296:20,22
**wrote** 75:3,9 117:2
122:13 124:10
126:17 156:17
215:25 216:5,15
227:12 232:5

247:6 296:12
317:3,7 324:5,7

**X**

**X** 1:5,14 360:2,7
**Xerox** 271:8

**Y**

**yeah** 10:18 12:15
12:19 17:20 18:12
29:3 30:4,15
32:23 34:12 48:6
48:20 59:3,17
68:13 95:9 101:12
102:17 103:16
105:3 110:20
114:21 115:5
121:3 122:7
126:14 129:10,11
129:13 137:3,17
143:4 158:19
159:14 165:21
170:4 171:14
177:11 181:16
182:2 183:8 185:4
191:25 202:14
205:14 206:5
220:17 231:17
232:3 244:20
256:12 275:14
282:15 283:12
311:23 320:3
328:24 344:18
345:6 347:2
**year** 10:14 14:2
27:19 28:24 135:5
135:16 136:13,15
138:11 142:8
143:15,16 154:7
154:21,21 155:5
155:14,18 156:18
157:25 160:5
161:13,24 162:2
190:17 201:5
240:5,9,17,21
250:3,5,5 257:18
265:7 285:3
**yearly** 28:17 142:9
**years** 10:15,16 11:3

28:10 85:20 94:24
102:9 128:10
217:25 264:6
**year's** 85:25
**Yep** 4:16,19 6:13
37:16 42:17
132:17 134:13
150:3 154:22
158:25 186:16
**yesterday** 195:21
196:25
**York** 1:4,18,18
2:11,11,15 3:6,6
3:12,12 333:17,17
358:2,3 359:3,5,8

**Z**

**Zakia** 242:6,8
245:4 246:19,24
248:7
**zero** 83:19 84:10
315:16

**$**

**$110,452** 159:25
**$182,473** 162:6
**$2,284.38** 259:20
**$2,322.59** 261:16
**$20** 11:15
**$245,447** 161:7
**$286** 155:7
**$50** 165:6
**$90,671** 160:9

**0**

**0.5** 303:23
**05** 303:15,24,25
**09** 161:6

**1**

**1** 47:11,14,18
137:25 259:18
280:2 328:4,18
360:8
**1,459** 269:7
**1,959** 269:6
**1.27** 66:23
**1.4** 315:3,7
**1/10** 221:15

**1/12** 261:11,14
**1/19/2010** 262:13
**1/5** 316:5,7,10
322:19,22 323:2
**1/6** 208:16 317:17
**10** 96:20,23 121:16
121:19 186:23
268:23 360:19
**10th** 221:21 269:17
338:22
**10/1** 251:6
**10/10** 251:7
**10/10/10** 252:19
**10/11** 253:8
**10/17/10** 254:11
**10/4** 249:24
**10:51** 208:17
**100** 42:3 61:23
83:20 84:10
149:15 159:5,9,25
160:9 161:7 162:6
**10003** 3:6
**10036** 3:12
**10053** 241:13
246:11 248:2
**1096** 12:20 13:2
**11** 139:17,20
271:12 316:10
360:20
**11-CV-2521** 1:8
**11/1** 259:11
**11/1/10** 260:15
**11/2/10** 260:15
**111th** 10:21
**113** 360:18
**11469** 143:18
**11649** 27:17 131:11
144:15 151:16,21
152:17 153:5,10
153:18,24 154:6
157:16 200:7
201:16 235:25
314:20 315:2,11
322:13 334:8,21
336:10,12,15
337:11 341:8
**11650** 27:17
**12** 27:25 28:2 137:5

154:11,14 159:8
160:8 162:5,19
222:19 223:5
360:21
**12th** 269:15
**12/20** 322:7,22,25
**121** 360:19
**13** 12:22 22:15 27:6
158:13,16 312:25
312:25,25 329:2
354:25 360:22
**13th** 227:21
**13.5** 160:2,5
**13538** 27:17 285:7
286:11
**1364** 311:22 312:9
**1364-1560** 361:22
**1375** 314:15
**1388** 322:7
**1389** 322:11
**139** 360:20
**1390** 315:22,23
322:18
**14** 164:2,3 263:6
329:2 360:23
**14618** 27:17
**15** 136:17,21 137:7
137:16,22 179:5
179:17 208:5,7
239:19 360:24
**154** 360:21
**15461** 27:17,22
**1548** 324:2
**1560** 311:22 312:9
**158** 360:22
**1585** 113:18 360:18
**1589** 121:19 360:19
**16** 222:13,16 225:5
360:25
**16th** 272:7
**16262** 275:17
**16262-434** 361:10
**16317** 275:16
**16320** 276:15
**164** 360:23
**16403** 277:7 278:2
**16434** 275:17
**165** 280:13 281:6

**1662** 222:16 360:25
**1665** 228:16 361:3
**17** 227:2,5 361:2
**17114** 258:8
**17114-195** 361:7
**17121** 262:19
**17122** 259:7
**17124** 261:10
**17128** 262:12
**17195** 258:8
**1757** 303:11
**1757-765** 361:16
**1759** 303:10,13
304:17
**17593** 272:15
**1765** 303:11
**1784** 306:19
**1784-1790** 361:18
**17880** 268:5
**17880-18005** 361:8
**1790** 306:19
**17926** 268:4
**17928** 269:8
**17930** 270:3
**17951** 272:6
**17955** 273:9
**17957** 273:14
**1799** 268:18
**18** 228:13,15 361:3
**18005** 268:6
**1801** 268:17
**183** 139:20 360:20
**19** 10:9 234:6,9
272:20 361:4
**19th** 273:16
**1998** 10:2 11:5

**2**

**2** 62:22,23 360:10
**2nd** 260:6
**2/18/09** 219:5
**2:37** 221:15
**20** 32:21,22 61:20
86:5,13 137:10
240:21 241:4,7
361:5
**20.5** 161:8,13
**200** 164:5

**200-203** 360:23
**2000** 275:23
**2002** 10:17
**2003** 10:17
**2008** 11:4 94:15
113:24 114:11
118:24 119:3
127:2,18 129:5,23
130:19 131:12,20
131:25 132:9,18
133:9,15,18
136:14 138:8,9,16
138:23 139:7,10
139:12 144:20
161:23 219:12
319:20 320:24
321:20
**2009** 134:16 135:2
135:12,22 136:14
136:15 137:10,14
139:10,16 143:6
143:15 144:2,16
145:9,18 149:22
151:15 154:7,21
219:5 239:19
285:25 286:6,12
**2010** 85:22 132:5,7
132:10,19 134:22
135:7,12 137:12
137:15 141:14
142:7 143:16
155:14,15,18
156:2,12,16,17,18
156:24 157:22
158:2,20 165:18
176:20 178:23
183:6,13 185:22
186:11,22 188:11
193:8 200:12
216:6,14,15
218:18 236:4,4
239:20 241:11,15
241:22 242:2
244:11 245:8
247:14 249:24
250:6,12 251:7
253:9 256:18
258:15,24 259:11

**259:**18 261:11,14
263:7 268:23
270:17 271:12
272:7,13,20
273:10,16 274:24
275:5,19 280:3
283:4,4,8,9,14,14
283:17,17,20,21
283:25,25 284:4
284:16,23,23
285:8,9 295:14
298:6,15 301:3
305:3 324:15,19
325:24 326:3,10
328:4,18 330:21
331:15 332:5
344:14,20
**2011** 1:19 2:4
141:14 178:23
208:16 209:4
221:15,22 222:19
223:5 228:17
230:3,17 249:22
250:3,4 280:3
284:5,16 301:4
306:25 316:8
325:2 334:18
344:11
**2012** 271:21 359:20
**203** 164:6
**206** 154:14
**206-208** 360:21
**208** 154:14 360:24
**209** 158:16
**209-211** 360:22
**21** 1:19 2:4 249:16
249:19 330:20,20
331:8 361:6
**211** 158:17
**22** 242:2 258:4,7
361:7
**22nd** 227:17
**222** 208:8 360:25
**222-225** 360:24
**224** 208:15 209:23
214:12
**225** 208:8 209:23
**227** 361:2

**228** 361:3
**2280** 246:20
**23** 267:13,16 332:5
361:8
**234** 361:4
**24** 274:17,20 361:9
**24th** 285:25
**2400** 246:18
**241** 361:5
**2410** 246:19
**2487** 308:15
**249** 361:6
**25** 83:9 244:11
285:17,20 361:11
**25th** 113:23 114:11
118:24 119:3
127:2,18 129:5,23
130:19 131:8,12
131:20,25 132:9
132:18 320:24
321:20
**2505** 308:15
**2506** 343:11
**2506-507** 362:4
**2507** 343:11
**2558** 310:20
**2558-563** 361:21
**2563** 310:20
**258** 361:7
**26** 286:18,21
331:13,21,22
361:12
**267** 361:8
**27** 295:8,11 361:14
**274** 361:9
**28** 228:17 302:19
302:22 304:16
361:16
**2847-2505** 361:20
**285** 361:11
**286** 361:12
**29** 306:13,16 332:3
332:4,15 361:17
**295** 361:14

**3**

**3** 54:24 63:15,18
247:14 347:4

360:11
**3rd** 261:21
**3/1/11** 234:11
235:23 361:4
**3:10** 244:22
**30** 308:11,14
361:19
**30-day** 307:9
**302** 361:16
**306** 361:17
**308** 361:19
**31** 310:14,17
361:21
**310** 361:21
**311** 361:22
**32** 311:17,20
361:22
**326** 361:23
**33** 326:16,19
332:24 333:14
361:23
**33rd** 17:10 184:7
**330** 362:2,3
**34** 330:11,16,17
362:2
**341** 362:4
**3421** 27:16 249:22
250:8 283:13,16
**345** 332:6 333:2,16
**35** 330:13,16,17,17
362:3
**36** 259:21 341:24
342:3 362:4

**4**

**4** 65:9,12 360:5,12
**4th** 205:3 262:17
359:20
**4/16** 272:13
**4/17** 273:10
**4/17/10** 273:12
**401(k)** 238:2
**4178** 250:25
**4178-4399** 361:6
**4179** 249:23
**4207** 251:5
**4212** 253:6
**4235** 254:9

**4399** 250:25
**44488** 1:24
**47** 360:8

**5**

**5** 70:17,20 84:23
85:2 315:4 360:13
**5th** 201:13,14,17
205:9 262:22
**5.8** 162:6,9
**5/17** 306:25
**500** 62:10
**514** 70:20 360:13
**530** 70:21
**530-537** 360:14
**537** 70:21 71:4
**547** 71:3
**56** 280:13 281:6
282:17

**6**

**6** 77:25 78:4 314:13
338:17,18 360:15
**6th** 94:19 208:25
209:4 211:19
276:13 338:20
**6.7** 160:9,13,14,23
**62** 360:10
**63** 360:11
**65** 360:12
**684** 65:13
**684-778** 360:12
**694** 66:5

**7**

**7** 92:7,10 217:24
360:16
**7/10** 268:2
**7/25** 245:8
**7/31** 247:14
**7:03** 357:5
**70** 360:13
**720** 66:23
**7255** 27:16 258:11
258:12 283:19
**7261** 27:16 268:2
270:14
**7547** 27:16 274:24
275:2 283:24

**7586** 27:16
**7675** 27:17 284:3
  284:15
**77** 360:15
**7711** 27:17 284:22
  295:2
**778** 65:13
**779** 63:12
**779-794** 360:10
**794** 63:12
**795** 63:25
**795-813** 360:11

---
**8**

**8** 54:23 93:8,11
  347:4 360:17
**8/22/10** 277:9,22
**8/6** 275:19
**80** 16:19 17:6,18
**805** 64:2
**81st** 10:6
**813** 63:25
**814** 47:21
**814-820** 360:9
**815** 51:7
**816** 51:8
**820** 47:21
**821** 93:11
**821-868** 360:17
**847** 27:16 94:19
  103:5 104:13
  131:11 143:11
  152:17 153:5,11
  153:13 241:11,15
  241:21 242:5,12
  249:5 283:3,8
**85** 2:10 3:5
**868** 93:11
**871** 92:10
**871-895** 360:16
**895** 92:11
**8959** 241:13
**8959-10053** 361:5
**896** 78:4
**896-937** 360:15

---
**9**

**9** 113:15 126:7
  360:18

**9th** 276:20
**9/10** 361:15
**9/18/08** 140:11
**9/25** 295:20
**9/26** 295:20
**9:51** 2:5
**90** 83:15 85:5,10,12
  85:17
**900** 79:15
**902** 86:23
**9117** 241:25
**9131** 244:11
**917-975-1331**
  178:19
**92** 360:16
**93** 360:17
**937** 78:5
**97** 140:22 141:17

# DAILY RECORDS BOOK

## Use of the Daily Records Book (DRB)
This monthly book is used to record daily store information and is divided into weekly tabs for quick reference.

## Retention and Destruction
For security and legal compliance, the Daily Records Book must remain in store for six months and then be returned for long-term storage and destruction. Every six months you will receive communication requiring all DRBs older than six months to be boxed up and returned using an online return or pre-addressed mailing label. This ensures retention of legally required payroll documents that are included in the DRB.

## Calendar
The Daily Records Book contains the Fiscal Year Calendar to use for planning and recording store events.

## Checklists and Logs
- **Paid Out Log** is a monthly log located behind the Paid Out tab and is designed to ensure all paid outs are recorded and approved. This log should be reconciled weekly by the store manager.
- **Emergency Wage Advance Log** is a monthly log designed to record all emergency wage paid outs.
- **Store Repair and Maintenance Tracking Log** is a monthly log located in the front of the DRB and is designed to track calls made to the Enterprise Help Desk, Facility and Service Desk and the Facility Contact Center.
- **Punch Communication Log, Borrowed Partner Log**, and **Paid Time Off Log** are located at the end of the book under the Time and Attendance tab. Use these logs to record key time and attendance information using the policies and procedures on the Time and Attendance tab.

## Weekly Tabs
The following information is included in each Weekly Tab section:
- **Store Partner Pages:** a flexible tool to capture store information in one easy-to-reference place.
    - *Store Communication* ~ communicate voicemail, email and barista need-to-know information for all store partners.
    - *Partner Till Drop Log* ~ all partners with assigned tills must complete this section using the policies and procedures behind each Weekly tab.
    - *Safe Count, Change Bank Reconciliation, Deposit, and Partner Till Audit* ~ for details refer to the policies and procedures behind each Weekly tab.
    - *Partner Tip Drop Log* ~ use this log to track all tip bags dropped into the safe on a daily basis.
    - *Partner Tip Drop Removal* ~ use this space to track tip bags being removed from the store safe on a weekly basis.

## Miscellaneous
- **Sales Audit Envelope** ~ for credit card slips, refunds, voids and gift certificates.
- **P-Card/Paid Out Envelope** ~ for all P-Card, Paid In and Paid Out receipts.

**This book is the property of Starbucks Coffee Company.**
**The materials in this book should not be reproduced and should not be used by anyone other than an authorized Starbucks partner.**
**Keep book secured when not in use.**

Gurtov - 1

STAR_MARSHALL0000814

# Cash Management Log Policies, Standards & Procedures

The Cash Management Log must be completed each day. Print legibly and complete in pen.
Store operating funds and tip funds must be secured at all times.

**Till Drop Procedure (Cash Controller):**
1. Record register partner's name, Register ID (#, Top/Bottom), date and CC initials on till drop bag.
2. Place funds from drop box, sales media from POS drawer and Closing Register Receipt in till drop bag.  Seal till drop bag.
3. Record register partner name, entire till drop bag #, CC initials and time on the matching Register ID section of the Till Drop Log.
4. Secure till drop bag in inner compartment of safe, behind door 2.

**Final Use Till Count Procedure (Cash Controller):**
1. Remove till, sales media from POS drawer, funds from drop box and Closing Register Receipt.
2. Count down combined funds from till and drop box using cash scale in cash calculator mode.
3. Remove funds in excess of opening fund amount, leaving opening fund amount in till.
4. Follow Till Drop Procedure to secure excess funds, sales media and closing register receipt.
5. Secure till with verified opening fund in POS drawer or safe.

**Safe Count Procedure (Cash Controller):**
- The safe must not be left open and unattended.
- The safe must not be opened or the time delay set during the first 30 minutes and the last 30 minutes of customer operations.
- Only the Cash Controller may set and access the safe.
- Complete and record an accurate physical "start" count when accepting the cash controller keys and an "end" count when passing the cash controller keys to the next cash controller or counting out at the end of day.
  1. Record CC initials and start or end count time on the Safe Count Log.
  2. Count and record change fund amount, opening till fund amounts, # of till drops, # of Customer Recovery certificates, PCard, and # of tip drops.
  **NOTE**: Lock Out Period Safes: When completing a safe count during the Lockout Period (3pm-8am) record "N/A" or "Locked Out" in the number of till and tip drop section of the safe count. All safe counts occurring outside of the lockout period (8am-3pm) must include an actual physical count of all till and tip drop bags.

**Deposit Log (Cash Controller):**
NOTE: Procedures for preparing the deposit and transporting the deposit to the bank are located in the Store Operations manual section 4 Cash Control.
1. The deposit must be prepared and transported to the bank every day.
2. The deposit must be prepared after 8am and must be transported to the bank by 3pm.
3. The deposit must be taken inside the bank for processing if the bank is open. The weekend depository box must only be used if the bank is closed.

**Deposit Prep Section Procedure:**
1. Record the start time and CC initials in the Deposit Prep section on the date the deposit is processed.
2. Record deposit $, deposit bag # and completion time.
3. **Deposit Witness** records their initials after confirming that the CC initials, completion time, deposit slip amount and sealed deposit bag # are accurately recorded in the Deposit Prep section.
4. Secure sealed deposit bag in inner compartment of safe, behind door 2, if not immediately transported to bank.

**Deposit to Bank Section Procedure:**
1. Record CC name taking deposit to bank, date to bank, time to bank and deposit bag # in the Deposit to Bank section on the date the deposit is processed.
2. **Banking Witness** records their initials after confirming that the CC initials, date and time of the CC departure to bank and sealed bag # are accurate and recorded in the Deposit to Bank section.
3. Record validated deposit amount and validated time on Deposit to Bank section and attach validated deposit slip after returning from the bank or when the deposit slip has been retrieved for deposits made through the weekend depository.

1 of 2

STAR_MARSHALL0000815

**Till Audit Procedure (Store Manager):**
A minimum of two random till audits must be performed each week.
1. Follow steps 1-4 of Final Use Till Count.
2. Record SM name, date, register partner's name and Register ID on Partner Till Audit Log. Over/short will be recorded when deposit is prepared.
3. Secure till with verified opening fund in POS drawer or safe.
4. Ensure over/short is recorded after deposit is prepared on following day.

**Report Store Operating Funds Procedure (Store Manager):**
The Store Operating Funds (change bank and till bank) must be physically verified and updated on the MWS each week.
1. From the MWS select "Manager Menu", "Daily Bookkeeping Menu", "Report Store Operating Funds"
2. F1 – to Count Change/Till Bank Funds. Enter the amount of money actually in the Change and Till Bank in the two fields "Total Change Bank" and "Total Assigned/Unassigned Tills". Record the total on the Cash Management Log under "Report Store Operating Funds" and sign off.
3. Upon completion of entering the funds amounts press "F1" to Save and then "F7" to Quit.

**Tip Drop Procedure (all partners):**
Tip funds must be secured at all times.
1. Remove tip funds from plexi, place funds in a tip drop bag and seal tip drop bag.
2. Record date on tip drop bag.
3. Record partner #, initials, and entire tip drop bag # on the Tip Drop Log.
4. Secure tip drop bag in inner compartment of safe, behind door 2.
5. Witness records their initials and time after verifying the tips have been secured in the safe.

**Tip Drop Removal Procedure**
1. Remove tip drop bags from inner compartment of safe (cash controller).
2. Record entire tip drop bag # for each tip drop bag on Partner Tip Removal Log.
3. Record CC initials as **Witness** and time.
4. Transfer tip drop bags to partner processing tips.
5. Partner receiving tip drop bags records partner # and initials after verifying tip drop bag #'s.

**Accountability and Duty to Report**
Failure to comply with cash management log policy endangers partner safety. Acts in violation or omissions of policy are grounds for disciplinary action up to and including termination. Uncorrected or continuing violations must be reported to management, your local Partner Resources generalist or the Standards of Business Conduct Helpline at 800/611-7792 (866/614-0760 for French-speaking partners).

CONFIDENTIAL                                                     STAR_MARSHALL0000816

## Cash Management Log

**STORE COMMUNICATIONS**

### REGISTER 1 TOP — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 1 BOTTOM — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 2 TOP — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 2 BOTTOM — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 3 TOP — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 3 BOTTOM — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 4 TOP — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### REGISTER 4 BOTTOM — TILL DROP LOG

| PARTNER NAME | DROP BAG # | CC INITIALS | TIME |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

STAR_MARSHALL0000817

# Cash Management Log

## SAFE COUNT

| NAME | OPEN: | | MID 1: | | MID 2: | | MID 3: | | CLOSE: | |
|---|---|---|---|---|---|---|---|---|---|---|
| SAFE COUNT | START | END | START | END | START | END | START | END | START | END |
| TIME | | | | | | | | | | |
| $0.01 | | | | | | | | | | |
| $0.05 | | | | | | | | | | |
| $0.10 | | | | | | | | | | |
| $0.25 | | | | | | | | | | |
| $1.00 | | | | | | | | | | |
| $2.00 | | | | | | | | | | |
| $5.00 | | | | | | | | | | |
| $10.00 | | | | | | | | | | |
| $20.00 | | | | | | | | | | |
| OTHER $'s | | | | | | | | | | |
| Total Change Fund | | | | | | | | | | |
| # Tills/Total $ | | | | | | | | | | |
| # Till Drops | | | | | | | | | | |
| Cust. Recov. Cert. | | | | | | | | | | |
| P-Card | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N |
| # Tip Bags | | | | | | | | | | |
| Comments: | | | | | | | | | | |

## Report Store Operating Funds

| Signature: | | $ Amount Entered: | |
|---|---|---|---|

*Attach validated deposit slip/courier slip and deposit bag receipt to this sheet*

## DEPOSIT INFORMATION

| Deposit Prep | | Deposit to Bank | |
|---|---|---|---|
| Cash Controller Preparing Deposit: | | Taken By Cash Controller: | |
| Start Time: | | Date to Bank: | |
| Deposit Bag #: | | Time to Bank: | |
| Deposit Witness: | | Deposit Bag #: | |
| Deposit $: | | Banking Witness: | |
| Completion Time: | | Bank Validated $: | |
| Change Order $: | | Bank Validation Time: | |
| Comments: | | Change $ Received: | |
| | | Comments: | |

*Deposit Witness confirms that cc initials, completion time, deposit slip amount and sealed deposit bag # are accurately recorded in Deposit Prep section

*Banking Witness confirms that the cc initials, date and time of cc departure to bank and sealed bag # are accurate and recorded in the Deposit to Bank section

### PARTNER TILL AUDIT #1
| Store Manager: | |
|---|---|
| Date: | |
| Partner Name: | |
| Register ID | |
| Over/Short $: | |
| Comments: | |

### PARTNER TILL AUDIT #2
| Store Manager: | |
|---|---|
| Date: | |
| Partner Name: | |
| Register ID | |
| Over/Short $: | |
| Comments: | |

### PARTNER TILL AUDIT #3
| Store Manager: | |
|---|---|
| Date: | |
| Partner Name: | |
| Register ID | |
| Over/Short $: | |
| Comments: | |

## PARTNER TIP DROP LOG

| PARTNER # | INITIALS | DROP BAG # | WITNESS (mandatory) | TIME |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## PARTNER TIP REMOVAL (weekly)

| PARTNER #: | | INITIALS: | |
|---|---|---|---|
| CC WITNESS (mandatory): | | TIME | |
| DROP BAG #'s: | | | |

*Witness on tip drop removals must be the scheduled cash controller

## DM VERIFICATION

| DM Signature: | | Date Reviewed: | |
|---|---|---|---|
| Comments: | | | |

STAR_MARSHALL0000818

# CASH MANAGEMENT TROUBLESHOOTING

**ISSUE: Till is short opening fund when CC counts down drawer after final use.**
Possible Causes:
- Drop box funds were not pulled.
- Drop box swept and till drop made without realization that till would not be used again that day.
- Paid Out brought drawer below opening funds.
- Register partner dropped funds in wrong drop box.

Solution:
1. Verify drop box funds were pulled (do not mix funds from other Register ID's).
2. Calculate funds needed to bring till to opening fund (whole $ amount only) and remove that amount from change bank.
3. ***Record removal of funds ($ amount and Register ID [#, Top/Bottom]) on Comments section of Safe Count Log.***
4. The shortage in the change bank must be corrected when the deposit is prepared.

***NEXT DAY:***
1. Before beginning to prepare the deposit, to balance the change bank, review Comments section of the Safe Count Log from the previous day to determine which Register ID was associated with the change bank shortage.
2. Remove funds from the last logged till drop bag of that Register ID and place funds in the change bank to return it to the correct amount.
3. ***Record removal of funds ($ amount and Register ID [#, Top/Bottom]) on the Comments section of the Deposit Prep Log.***


**ISSUE: Unassigned till is over opening funds.**
Possible Causes:
- Drop box funds were not pulled the last time the till was closed.
- Till drop was made without realization that the till would not be used again that day.
- Funds were dropped from another till in this till's drop box.

Solution:
1. Using the cash scale in cash calculator mode return the till to opening fund.
2. Refer to the Till Drop Log to determine which partner was the last to use that Register ID.
3. Place extra funds in till drop bag and record Register ID (#, Top/Bottom), the final register partner's name, and "extra funds drop" on the till drop bag.
4. Record till drop bag in the correct Till Drop section per normal.

***NEXT DAY:***
1. When preparing the deposit combine the contents of the two drop bags before entering that partner's till funds at the MWS.


**ISSUE: Forgot to pull drop box funds and sales media before next register partner begins ringing transactions.**
Possible Cause: Drop box funds and sales media not pulled by CC before next register partner begins to ring transactions.
Solution:
1. As soon as possible, pull drop box funds and sales media and prepare a till drop per normal.
2. Make a note on the till drop bag that funds/sales media were pulled late.


**ISSUE: There are no drop box funds/sales media to pull and drop after register partner closes till.**
Possible Cause: Register partner rang very few transactions and received no 20's or sales media.
Solution:
1. Even though there are no funds or sales media to drop, prepare a till drop bag per normal, placing the Closing Register Receipt in the bag.
2. Record the till drop bag on the Till Drop Log under the appropriate Register ID (#, Top/Bottom) and secure the till drop bag in the safe.


Confidential. For internal use only.    ©2011 Starbucks Coffee Company.   All rights reserved.

# CASH MANAGEMENT TROUBLESHOOTING

**ISSUE: "undocumented till drop bag" Till drop bag in safe; not logged on Till Drop Log; no till assignment listed on MWS.**

Possible Causes:

- Till drop not recorded when a drawer overage was found and dropped.
- Change bank was over during safe count and overage was removed to balance safe.
- Funds were discovered FOH and were dropped without documentation.

Solution:

1. Look for any documentation on CML, on or inside bag (Register ID or Closing Register Receipt) to indicate source of funds.
2. If funds belong to an identified partner combine the contents of the two drop bags before entering that partner's till funds at the MWS.
   - If the partner had two till assignments, combine the contents of the two drop bags that are from the same Register ID before entering that partner's till funds at the MWS.

   **NOTE:** If the Register ID is unknown, combine the contents of the undocumented till drop bag to one of the identified partner's till drop bags before entering that partner's till funds at the MWS. This will create an overage in one of the partner's Register ID Drawer O/S and a shortage in the partner's other Register ID Drawer O/S. These two Drawer O/S should balance each other out.
3. If funds belong to a Register ID but no partner is identified, combine the contents of the undocumented till drop bag with the contents of the till drop bag of the final partner assigned to that Register ID before entering that partner's till funds at the MWS.
4. If funds can not be matched to a partner or Register ID, the funds will be added to the deposit total after all other till drop bags have been processed and accepted.
5. ***After adjusting the deposit total to include the undocumented till drop bag funds make a note in the Deposit Prep section Comments box. Notify Sales Audit (Explain Over/Short to Sales Audit).***


**ISSUE: Consolidated till drop bag funds do not match MWS deposit total:**

Possible Cause:

- A data entry error was made when entering funds at the MWS during the recount process.
- A till assignment was not Accepted (Y) on the MWS deposit screen.
- An error was made when counting funds.

Solution:

1. Recount consolidated deposit funds using the cash scale in cash calculator mode.
2. Verify that all till assignments have been Accepted (Y) on the MWS deposit screen.
3. Adjust deposit total to match actual funds on hand and accept deposit.
4. ***Make a note in the Deposit Prep section Comments box of the deposit adjustment amount. Notify Sales Audit (Explain Over/Short to Sales Audit).***

Confidential.  For internal use only.     ©2011 Starbucks Coffee Company.   All rights reserved.

STAR_MARSHALL0000820

# Better Way - SM Planning Guide

Use this Store Manager (SM) Planning Guide to determine each week's activities and when to review specific materials to support the activities. This will help you focus on the right materials at the right time.

Below is a summary of weekly activities with detailed weekly activities outlined on the following pages.

# Store Manager (SM) Activities

## Store Manager (SM) Activities

| Week | Activity Summary |
|------|------------------|
| Week 1 Aug 3-9 | ❖ Receive and review Safe Inventory Tracking Sheet |
| Week 2 Aug 10-16 | ❖ Begin weekly tracking of safe inventory<br>❖ Participate in DM/SM Conference Call |
| Week 3: Aug 17-23 | ❖ Review materials available on the Store Portal<br>❖ Complete Cash Management Go See<br>  * One hour to complete Go See Activity |
| Week 4 Aug 24-30 | ❖ Set up safe & MWS<br>❖ Implement & teach customized Repeatable Routine<br>  *One hour to complete safe and MWS setup<br>  *One hour to customize Repeatable Routine and implement<br>❖ Roll up first Go See data to DM. |
| Week 5: Aug 31-Sept. 6 | ❖ Continue teaching |
| Week 6: Sept. 7 – Sept. 13 | ❖ Complete follow-up Go See<br>  *One hour to complete follow-up Go See Activity |
| Week 7: Sept. 14 – 20 | ❖ Adjust, improve and sustain Repeatable Routine & change cadence<br>❖ Roll up follow-up Go See data to DM |

*Schedule in advance and charge time to training.





© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.     1

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management – Week 1

| Materials: | Location: |
|---|---|
| ❏ Safe Inventory Tracking Sheet | Store Portal>Documents>Program Materials>Better Ways>Cash Management |

| Date | Store Manager Activity: |
|---|---|
| 8/3 - 8/9 | **1.** **Receive and review the Safe Inventory Tracking Sheet.**<br><br>**2.** **For the week of Aug. 10 plan to:**<br>&bull; Begin tracking safe inventory on Aug. 10.<br>&bull; Participate in the DM/SM Kick off conference call.<br><br>**3.** **For the week of Aug. 17 schedule time to complete the following:**<br><br>**Go See: Banking Work**<br>❏ Schedule two 30-minute Go Sees to observe two different cash controllers complete the banking process (change order and deposit).<br>   ❏ Observe one cash controller who frequently completes these tasks.<br>   ❏ Observe one cash controller who occasionally completes these tasks.<br>   ❏ Bill this time to store "training."<br>**Go See: Safe Count**<br>❏ As part of your regular shifts observe two different cash controllers complete a safe count at shift change. (Do not bill to training time)<br><br>**Complete Change Order and Deposit (After Completing Go Sees)**<br>❏ Schedule yourself to be the cash controller who completes a change order and deposit at least two times using the Repeatable Routine. (Do not bill to training time) |



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.   2

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management – Week 2

| Materials: | Location: |
|---|---|
| ❏  Safe Inventory Tracking Sheet | Store Portal>Documents>Program Materials>Better Ways>Cash Management |

| Date | Store Manager Activity: |
|---|---|
| 8/10-8/16 | 1. Track safe inventory daily using the Safe Inventory Tracking Sheet.<br><br>2. For the week of Aug. 24 schedule time to complete the following:<br><br>   Set Up Safe, MWS and Change Cadence<br>   ❏ Schedule one hour to set up visual management in the safe (50 min.), set up the MWS (10 min.) and establish a change order cadence.<br>   ❏ Bill this hour time to store "training."<br><br>   Customize your store's Repeatable Routine. Implement and teach the customized routine to cash controllers.<br>   ❏ Bill one hour to store "training." |



BETTER
WAYS
CASH
MGMT.

© 2009 Starbucks Coffee Company.  All Rights Reserved.  For Internal Use Only.     3

    STAR_MARSHALL0000781

# Better Way - SM Planning Guide

## Cash Management – Week 3

For this week's activities, you will use the following materials:

| Materials: | Location: |
|---|---|
| ❑ Safe Inventory Tracking Sheet | |
| ❑ SM Planning Guide for Cash Management | |
| ❑ Two copies of each Go See Worksheet for Cash Management<br>   o   Part 1: Banking Process<br>   o   Part 2: Safe Count | Store Portal>Documents>Program Materials>Better Ways>Cash Management |
| ❑ Cash Management Program Guide | |
| ❑ Repeatable Routine Instruction Sheet for Cash Management | |
| ❑ Repeatable Routine Job Aid | |
| ❑ Deposit Workflow Job Aid | |
| ❑ Deposit Workflow Placemat | |

| Date | Store Manager Activity: |
|---|---|
| 8/17-8/23 | **1. Continue tracking safe inventory daily using the Safe Inventory Tracking Sheet.**<br><br>**2. Receive and print Cash Management Better Way materials.**<br>  ❑ Print two copies of each Go See Worksheet.<br>  ❑ Use the SM Planning Guide to determine when you should review specific program materials. This will help you focus on the right materials at the right time.<br>  ❑ Read the Program Guide to learn how to approach and implement this Better Way. The purpose of the Program Guide is to understand:<br>    ❖  What are the key concepts of this Better Way?<br>    ❖  What's different?<br>    ❖  Ideas on how to set up:<br>      ❑ Visual management in the safe.<br>      ❑ The managers' workstation (MWS) area to support the Repeatable Routine and Deposit Workflow.<br>    ❖  How to get started using a change cadence<br><br>**3. Print Go See Worksheets.**<br>  ❑ Print two copies of each Go See Worksheet.<br>  ❑ Review in advance of observations.<br>  ❑ Complete the Go See activity prior to reviewing the remainder of the materials in order to remain objective during observation and prevent thinking about what the future state may be. |

**See Cash Management Week 3 - continued on the following page.**

BETTER
WAYS
CASH
MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.    4

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management Week 3—continued

| Date | Store Manager Activity: |
|------|-------------------------|
| 8/17–8/23 | **4. Complete Go See: Banking Work.**<br>☐ Create the environment for an effective Go See. Put partners at ease – let them know you will be watching the work, not the partners.<br>☐ Observe two different cash controllers complete the banking process (change order and deposit).<br>    ☐ Observe one cash controller who frequently completes these tasks.<br>    ☐ Observe one cash controller who occasionally completes these tasks.<br>☐ Record measurements on the Go See Worksheet. Document each observation separately.<br><br>**5. Complete Go See: Safe Count.**<br>☐ As part of your regular shifts observe two different cash controllers complete a safe count at shift change.<br>☐ Create the environment for an effective Go See. Put partners at ease – let them know you will be watching the work, not the partners.<br>☐ Record measurements on the Go See Worksheet. Document each observation separately.<br><br>**6. Reflect on Go See observations.**<br>☐ What did you see?<br>☐ What were the differences between the partners you observed?<br><br>    ❖ Troubleshooting approaches from other store managers<br><br>**7. Complete introduction to Repeatable Routine for Cash Management.**<br>☐ Compare and identify key differences between observed Go Sees and the Repeatable Routine. What differences do you notice? What may need to be customized for your store?<br>☐ Complete a change order and deposit at least two times using the Repeatable Routine. (Do not bill to training time)<br><br>**8. Discuss Go See findings and other learnings with your district manager (DM).** |

BETTER
WAYS
CASH
MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.   5

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management – Week 4

For this week's activities, you will use the following materials:

| Materials: | Location: |
|---|---|
| ☐ Safe Inventory Tracking Sheet | |
| ☐ Repeatable Routine Customized Instruction Worksheet | |
| ☐ Repeatable Routine Customized Job Aid | |
| ☐ Cash Management Program Guide<br>   o MWS Station Setup Guide for Repeatable Routine<br>   o Visual Workflow for Repeatable Routine – Deposit<br>   o Understanding the Change Cadence | Store Portal>Documents>Program Materials>Better Ways>Cash Management |
| ☐ Colored Tape | Arrived in store mail on Aug. 17 |
| ☐ Safe Station Setup Guide for Repeatable Routine and Visual Management for Repeatable Routine – Safe Setup | Color copy arrived in store mail on Aug. 17 (also included in Cash Management Program Guide) |

| Date | Store Manager Activity: |
|---|---|
| 8/24-8/30 | 1. **Continue tracking safe inventory** Monday June 29 – Sunday, July 5 using the Safe Inventory Tracking Sheet.<br><br>2. **Set up and implement visual management in the safe.**<br>   ☐ Use the Setup Guide to prepare your store.<br>   ☐ Locate colored tape that arrived in store mail.<br><br>3. **Set up and organize MWS area.**<br>   ☐ Use the Setup Guide to prepare your store.<br><br>4. **Set up and implement change order cadence.**<br>   ☐ Refer to the Program Guide for an overview on how to get started using a change cadence.<br>   ☐ Refer to the completed Safe Inventory Tracking sheets.<br><br>5. **Complete your store's Repeatable Routine Customized Instruction Worksheet.**<br>   ☐ Review and understand the major steps of the Repeatable Routine.<br>   ☐ Evaluate where adjustments must be made to customize the Repeatable Routine for your store.<br>      ❖ In this Better Way the sequence of work directly correlates to an overall improvement in time and quality. Carefully consider before modifying.<br>      ❖ Customization is anticipated primarily in adjustments to station setups and variation based on safe location.<br>      ❖ Customization to the major steps and/or sequence of the steps should be minimal. |

BETTER
WAYS
CASH
MGMT.

**See Cash Management Week 4- continued on the following page.**

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.     6

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management Week 4– continued

| Date | Store Manager Activity: |
|------|------------------------|
| 8/24–8/30 | **5. (cont.) Complete your store's Repeatable Routine Customized Instruction Worksheet.**<br><br>❑ Consider ways to involve your team. Since they are closest to the work, they have great ideas to contribute, appreciate the involvement and gain a sense of pride in the work.<br>❑ Complete the Repeatable Routine Customized Instruction Worksheet. You will use this worksheet to teach the Repeatable Routine at your store.<br>Complete the Repeatable Routine Job Aid.<br><br>**6. Implement and teach your store's customized Repeatable Routine.**<br>❑ Teach cash controllers your store's Repeatable Routine.<br>❑ Consider the following when teaching your store's Repeatable Routine:<br>  ❖ Demonstrate the Major Steps.<br>  ❖ Demonstrate the routine a second time and explain the Major Steps, Key Points and Reasons Why.<br>  ❖ Have the partner demonstrate the routine and coach adjustments with the partner to ensure partner follows routine.<br>  ❖ To ensure comprehension, have the partner teach the process to you, including the Major Steps, Key Points and Reasons Why.<br>  ❖ Some partners may benefit from seeing the first Go See results and/or materials in the Program Guide or Setup Guides.<br>❑ Place the Repeatable Routine Job Aid and Deposit Workflow in the line of sight of the cash controller.<br>❑ Throughout the week, check in with cash controllers.<br>  ❖ Ask for feedback:<br>    • What are they experiencing?<br>    • Why?<br><br>**7. For the week of Sept. 7 schedule time to complete the following:**<br><br>**Follow-up Go See: Banking Process**<br>❑ Schedule two 30-minute Go Sees to observe two different cash controllers complete the banking process (change order and deposit).<br>  ❑ Plan to observe one cash controller who frequently completes these tasks.<br>  ❑ Plan to observe one cash controller who occasionally completes these tasks.<br>  ❑ Bill this time to store "training."<br><br>**Follow-up Go See: Safe Count**<br>❑ As part of your regular shifts plan to observe two different cash controllers complete a safe count at shift change. (Do not bill to training time)<br><br>**8. Roll up first Go See data to DM.** |

BETTER
WAYS
CASH
MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.     7

CONFIDENTIAL

# Better Way - SM Planning Guide

## Cash Management – Week 5

For this week's activities, you will use the following materials:

| Materials: | Location: |
|---|---|
| ❑ No materials needed | |

| Date | Store Manager Activity: |
|---|---|
| 8/31-9/6 | 1. **Teach remaining cash controllers your store's customized Repeatable Routine.**<br><br>2. **Continue using the Repeatable Routine.**<br>  ❑ Be accessible to coach the routine and safe count.<br>  ❑ Consider tracking improvements to the deposit, change cadence and safe count.<br><br>3. **Check and adjust change order cadence.**<br>  ❑ Does the reduced change order frequency support the business?<br>  ❑ Could you further reduce the frequency?<br>  ❑ Did you have sufficient change across all days? If not, why?<br>  ❑ What other information would you need to adjust the cadence?<br><br>4. **Review the deposit start/stop times on the Cash Management Log as a tool to gauge if there is an improvement in time.** |



BETTER WAYS CASH MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.     8

CONFIDENTIAL

STAR_MARSHALL0000786

# Better Way - SM Planning Guide

## Cash Management – Week 6

For this week's activities, you will use the following materials:

| Materials: | Location: |
|---|---|
| ❑ Two copies of each Go See Worksheet for Cash Management<br>　o Part 1: Change Order & Deposit<br>　o Part 2: Safe Count | Store Portal>Documents>Program Materials>Better Ways>Cash Management |

| Date | Store Manager Activity: |
|---|---|
| 9/7-9/13 | 1. **Complete follow-up Go Sees:**<br>❑ Go See the Banking Work and Safe Count process at your store. Observe and collect data on your store's customized Repeatable Routine.<br>❑ Create the environment for an effective Go See. Put partners at ease – let them know you will be watching the work, not the partners.<br><br>**Go See: Banking Process**<br>❑ Observe two different cash controllers complete the banking process (change order and deposit).<br>　❖ Observe one cash controller who frequently completes these tasks.<br>　❖ Observe one cash controller who occasionally completes these tasks.<br>　❖ Bill this time to store "training."<br><br>**Go See: Safe Count**<br>❑ As part of your regular shifts observe two different cash controllers complete a safe count at shift change. (Do not bill to training time)<br><br>❑ Did you see improvements between your first Go Sees and your follow-up Go Sees?<br>❑ How does the improved proficiency time compare to time observed in the first Go Sees?<br>　❖ Was there less motion?<br>　❖ Did it take less time?<br>　❖ Why or why not? How do you know?<br>❑ How will you sustain improvements?<br>❑ What additional adjustments will contribute to the success of this routine?<br>❑ Discuss findings with your DM. |



BETTER WAYS CASH MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.　　9

　　　　　　　　　　　　　　　　　　**STAR_MARSHALL0000787**

# Better Way - SM Planning Guide

## Cash Management — Week 7

For this week's activities, you will use the following materials:

| Materials: | Location: |
|---|---|
| ❑　Reference tools and materials as needed. | Store Portal>Documents>Program Materials>Better Ways>Cash Management |

| Date | Store Manager Activity: |
|---|---|
| 9/14-9/20 | **1. Continue to coach partners and improve your store's customized Repeatable Routine.**<br>　❑　Establish a place for your store's Repeatable Routine Customized Instruction Sheet to live as reference for improvement and/or training.<br>**2. Use data and observations collected from the follow-up (and future) Go Sees to check, adjust and improve the Repeatable Routine.**<br>　❑　The purpose of the Cash Management Repeatable Routine is to:<br>　　❖　Reduce Time<br>　　❖　Simplify the Process<br>　　❖　Ensure Quality<br><br>**3.　Sustain the Repeatable Routine at your store.**<br>　❑　Periodically check and adjust. By engaging your team and observing the work, you will find more opportunities for improvement over time. Share your future learning and results with your DM and peers.<br><br>3. Roll up follow-up Go See data to DM.<br><br>*Go to www.mystarbucksidea.com/partner and locate the Starbucks Lean Thinking Blog to submit questions and suggestions and to engage in dialogue with the Lean Team and fellow partners* |



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.　10

CONFIDENTIAL

# Safe Inventory Tracking Sheet

Week # _____

**The purpose of this tool is to track your safe inventory in order to understand how much is in your safe today. This will help you establish appropriate inventory levels, set pars and follow a change order cadence.**

- Count and log at the same time every day (following the morning peak period and prior to completing the change order and deposit)
- Record if the tills are stocked at the time of the safe count.
- Record the start and stop time of the safe the count and change order (when completed)
- Record daily thoughts/feelings about inventory levels and a brief explanation of why a change order was/was not completed.

| Day | EXAMPLE | | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 6/8 | | | | | | | | | | | | | | | |
| Cash Controller Name | Hollie | | | | | | | | | | | | | | | |
| Tills Stocked (Y/N) | Y | | | | | | | | | | | | | | | |
| Start Time | 10:13 | | | | | | | | | | | | | | | |
| Stop Time | 10:19 | | | | | | | | | | | | | | | |
| Change Order (Y/N) | Y | | | | | | | | | | | | | | | |
| Change Order Amount | $200 in 5s | | | | | | | | | | | | | | | |
| Pennies | $0.01 | 9 | $0.01 | | $0.01 | | $0.01 | | $0.01 | | $0.01 | | $0.01 | | $0.01 | |
| Nickels | $0.05 | 21 | $0.05 | | $0.05 | | $0.05 | | $0.05 | | $0.05 | | $0.05 | | $0.05 | |
| Dimes | $0.10 | 48 | $0.10 | | $0.10 | | $0.10 | | $0.10 | | $0.10 | | $0.10 | | $0.10 | |
| Quarters | $0.25 | 150 | $0.25 | | $0.25 | | $0.25 | | $0.25 | | $0.25 | | $0.25 | | $0.25 | |
| Dollars | $1 | 172 | $1 | | $1 | | $1 | | $1 | | $1 | | $1 | | $1 | |
| Two Dollars | $2 | 0 | $2 | | $2 | | $2 | | $2 | | $2 | | $2 | | $2 | |
| Fives | $5 | 0 | $5 | | $5 | | $5 | | $5 | | $5 | | $5 | | $5 | |
| Tens | $10 | 0 | $10 | | $10 | | $10 | | $10 | | $10 | | $10 | | $10 | |
| Twenties | $20 | 200 | $20 | | $20 | | $20 | | $20 | | $20 | | $20 | | $20 | |
| Other | OTHER $s | | OTHER $s | | OTHER $s | | OTHER $s | | OTHER $s | | OTHER $s | | OTHER $s | | OTHER $s | |
| Total Change Fund | 600 | | | | | | | | | | | | | | | |
| Daily Notes | Tills fully stocked, may have had enough 5s for Tues. | | | | | | | | | | | | | | | |

General Observations & Notes


BETTER
WAYS
CASH
MGMT

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

STAR_MARSHALL0000789

## Go See Cash Management

For this activity, go where the work is done and observe another cash controller completing the banking work for the day (safe count, change order, and deposit completion)

### Before you go see...

- Schedule yourself in addition to a cash controller to do the banking work for the day
- Schedule and instruct the cash controller to complete the deposit, change order and bank run consecutively
- Ensure that you have the following supplies:
    1. Cash Go See (this document)
    2. A writing utensil
    3. A timing device
    4. A notebook/timing sheet

### While you are in the store...

- Watch the banking work and safe count
- Use the worksheet to draw, measure and observe the banking work and safe count
- Record the time, hand movements, organization, general observations and reasons why



### Objectives:

See the banking process and know how long it takes

See hand and body motion and its impact on the customer, partner and process

See how the way the work is done affects quality

### Remember:

Focus on what actually happens, not what should happen

Be an unbiased learner, not an inspector or judge of the work

Focus on the "how" not the "who"



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

1

CONFIDENTIAL

STAR_MARSHALL0000790

**Sample**

## Part 1: Banking Work

### Step 1:
### Record Deposit Prep and Bank Time

| Start:<br>Set Safe | Stop:<br>Bank Witness | Total: |
|---|---|---|
| 10:06 | 10:35 | 29 min |

| Start:<br>Leave Store | Stop:<br>All Banking Complete! | Total: |
|---|---|---|
| 10:40 | 11:03 | 23 min |

*including putting change away and completing Cash Management Log

### Step 2:
### Record Hand Motion for Deposit Work

*Example*

| | Searching | |
|---|---|
| Tally | Reason(s) |
| //// /// | Pulling out keyboard tray |

| Keystrokes (Record only 3 bags) | |
|---|---|
| Tally | Reason(s) |
| ///// ///// ///// / | Partner had to keystroke down to get to right place to enter amount |

### Step 3:
### Record Instances of Mental Strain

| Troubleshooting (searching, fixing or rework | |
|---|---|
| Tally | Reason(s) |
| //// | Recount of bags, much rework |

### Step 4:
### Draw Deposit Work Area



*Example*

Store #: 5223
Date: Monday, May 12

BETTER WAYS
CASH MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

2

CONFIDENTIAL

STAR_MARSHALL0000791

**Sample**

## Part 2: Safe Count

### Step 1:
### Record Total Safe Count Time

| Start: Set Safe | Stop: Close Safe | Total |
|---|---|---|
| 9:45 | 9:52 | 7 min |

### Step 2:
### Record Partner Motion at the Safe
(every time partner touches an item)

| Tally | Reasons |
|---|---|
| IIII IIII IIII IIII IIII | Partner recounted change multiple times and touched items multiple times |

### Step 3:
### Record General Observations

Partner picked up/put down pen multiple times
Many items in the safe seemed unnecessary
Counting incurred much mental strain

### Step 4:
### Draw the Content of the Safe





© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

Store #: 5223
Date:  Monday, May 12

3

CONFIDENTIAL

STAR_MARSHALL0000792

## Part 1: Banking Work

### Step 1
### Record Deposit Prep and Bank Time

| Start: Set Safe | Stop: Bank Witness | Total |
|---|---|---|
| | | |

| Start: Leave Store | Stop: All Banking Complete* | Total |
|---|---|---|
| | | |

*including putting change away and completing Cash Management Log

### Step 2
### Record Hand Motion for Deposit Work

| | Reaching |
|---|---|
| Tally | Reason(s) |
| | |

| Keystrokes (Record only 3 bags) | |
|---|---|
| Tally | Reason(s) |
| | |

### Step 3
### Record Instances of Mental Strain

| | Troubleshooting (searching, fixing or rework) |
|---|---|
| Tally | Reason(s) |
| | |

### Step 4
### Draw Deposit Work Area

| |
|---|
| |

BETTER WAYS CASH MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

4

Store #:
Date:

CONFIDENTIAL

STAR_MARSHALL0000793

## Part 2: Safe Count

### Step 1:
### Record Total Safe Count Time

| Start:<br>Set Safe | Stop:<br>Close Safe | Total |
|---|---|---|
| | | |

### Step 2:
### Record Partner Motion at the Safe
(every time partner touches an item)

| Tally | Reasons |
|---|---|
| | |

### Step 3:
### Record General Observations

### Step 4:
### Draw the Content of the Safe



Store #:
Date:

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

5

CONFIDENTIAL

STAR_MARSHALL0000794

# Program Guide for
# Cash Management

| Table of Contents |
| --- |
| Introduction..........................................................................................................2 |
| The Better Way Differences..................................................................................3 |
| Safe Station Setup Guide for Repeatable Routine...................................................4 |
| Visual Management for Repeatable Routine - Safe Setup.........................................5 |
| MWS Station Setup Guide for Repeatable Routine..................................................6 |
| Understanding a Change Cadence..........................................................................7 |
| Make it Yours.......................................................................................................9 |





Gurtov - 3

CONFIDENTIAL

STAR_MARSHALL0000795

# Introduction

Building on capability you developed in the first two Better Ways, the Cash Management Better Way will expand your understanding of Starbucks Lean Thinking. Digging deeper into the key concepts of Go See, Motion ≠ Work and Repeatable Routine, the Cash Management Better Way will help your **store management team reduce the time spent on administrative tasks** (offline work) and allow your **team to spend more time with your customers** (online work).

The Cash Management Better Way will give you a starting place to improve cash handling in the areas of safe counting, deposit creation and change order; to reduce partner time and simplify the process while ensuring quality.

# The Better Way Blueprint

With each of the Better Ways you will:
- ❖ "Go See"- spend time observing the current method of work in your store and record measurements.
- ❖ Familiarize yourself with the example Repeatable Routine.
- ❖ Make adjustments to the Repeatable Routine and customize the work method for your store.
- ❖ Go See the new work method and validate your improvements.
- ❖ Document your Repeatable Routine and ensure that it is a consistent way of doing the work that can be taught and performed by any cash controller.
- ❖ Teach your cash controllers the Repeatable Routine.
- ❖ Sustain and coach the Repeatable Routine in your store.
- ❖ Continue to Go See and improve the method of work in your store.

# Cash Management Better Way

The Cash Management Better Way is a starting point that will enable your partners to:
- ❖ **Reduce Time:** less motion = less time
- ❖ **Simplify the Process:** Reduce complexity and eliminate redundancies to make the work more repeatable and less burdensome for your partners
- ❖ **Ensure Quality:** Fewer errors while maintaining current standards

# Building on Key Concepts:

In the Cash Management Better Way we will dive deeper into the following concepts:

- ❖ Go See:
  - ○ More Detailed View of Motion: learn to see the impact of the finer motion of hand and body in a more detailed way.
  - ○ Inventory levels: Less inventory = less complexity and less time per count.
- ❖ Motion ≠ Work:
  - ○ Reduce Motion: reaching, kneeling, key stroking and doing the same work again.
  - ○ Visual Management: any cash controller on any daypart knows, at a glance, how much you have of an item and what to do with that information.
- ❖ Repeatable Routine:
  - ○ Sequence Matters: the order in which steps are completed impacts the end result.
  - ○ First-time quality: the process helps us to do it right the first time; quality checks are built into the work to eliminate duplicative work and errors.



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

STAR_MARSHALL0000796

# The Better Way Differences

Here is a preview of the major differences in the Cash Management Better Way:

| Getting Change on a Cadence: | |
|---|---|
| **Current:**<br>Get change daily<br><br>**Future:**<br>Get change on a cadence | Many stores get change while at the bank on a daily basis. The cash controller will begin to track the store's change bank inventory and the store manager (SM) will establish a reduced frequency of replenishment on a cadence. By adjusting the mix in your change bank inventory and replenishing less often, you will reduce the time it takes to count the safe. You will also save time on daily banking trips by preparing change orders less often each week (target a 50% reduction in change orders per week). |

| Using Machine/Safe Time: | |
|---|---|
| **Current:**<br>Use safe wait time to do filler tasks<br><br>**Future:**<br>Use safe wait time to prep for the deposit | Many stores set their safe and then continue to work on the floor while waiting for the safe timer to go off.  Using the safe wait time to prepare for the banking work will reduce the overall time because you are moving work usually left to the end of the deposit to the safe wait time. The cash controller will complete the change order, prepare all paperwork and set up the desk for banking work while waiting for the safe to open to retrieve funds. |

| Visual Management: | |
|---|---|
| **Current:**<br>Safe storage isn't organized<br>**Future:**<br>Safe is organized, color coded and only essential items are stored inside. | There are often things in the safe that don't belong (Sharpies, log books, paperwork) and that makes counting more difficult. The safe is the place to store items that must remain secure. To help you organize your safe, you will use visual management. Visual management will allow you to know at a glance how much you have, how much you need, and where it belongs. |

| Counting Money: | |
|---|---|
| **Current:**<br>Varying methods are used to count contents of till drop bags and total funds<br><br>**Future:**<br>Funds in till drop bags are hand counted and total funds machine counted | There are varying ways to count both till drop bags and total deposit funds. The cash controller will use a Repeatable Routine to hand count till drop bags. Once all bags are verified in the manager's workstation (MWS), the cash controller will group the funds by denomination (see Visual Management for Repeatable Routine Safe Setup) and use the cash calculator to verify the total deposit funds. This is a more efficient and effective way to count the money. |



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.                          3

# Station Setup Guide for Repeatable Routine

This guide can aid in your initial setup so you can experiment and identify solutions. Your store's setup should maintain Starbucks safety and security standards. Try to use existing store supplies for little to no cost or partner with other stores in your district to exchange supplies.

## Safe Setup (50—55 min.)

| What? | How? / Why? |
|---|---|
| **Safe Storage and Visual Management** | Remove unnecessary items out from your safe. The safe should contain store funds, certificates, cards, tips, paychecks, calculator (Staples Item # 679425/$2.49); valuable lost and found items and drops bags from till sweeps. The goal of visual management is: **Everything has its place and everything is its place.**<br><br>During this set up you will have to close the safe every 10 minutes and reset the timer for the safe door to complete safe setup. Plan to organize the work knowing you will have this pause/interruption.<br><br>**Coin Storage**<br>• Colored tape arrived in store mail on Aug. 17. This item is also being added to the Staples order form.<br>• Label the coin shelf using colored tape to help you count up the money. Line mark the tape at each level of coin roll and indicate the corresponding amount for each line.<br>• Label the inside of the shelf with a different color tape, and line mark the tape at each level of coin roll working back from your par level to show home much change you need at a glance.<br>• Create a status indicator next to the "how much do I need?" colored tape that will show you what level your change inventory is at and what action to take (for example Green: no need for more Yellow: may need more Red: definitely need more). Reference the Visual Management for Repeatable Routine document for example.<br><br>**Cash Storage**<br>Use a pocket file (Staples Item # 661902/$4 - see photo on the following page of organized bills) to store your cash bank. Sort your cash funds into bundles of denominations, keeping bundles and loose cash separate for easy counting and recognition of what you have. Clearly label each section of the pocket file with "loose or bundle" and the denomination. Use color coding to help keep it clear and simple.<br><br>**"Other" Items**<br>Bundle items not being daily counted (e.g., pay checks, lost and found) and store out of the way. Organize the safe so that all items counted daily are grouped and easily accessible. Make it is easier to access what you need when you need it. |



BETTER
WAYS
CASH
MGMT.

CONFIDENTIAL

STAR_MARSHALL0000798

## MWS Station Setup (5-10 minutes)

| What? | How? / Why? |
|---|---|
| **Banking Supply Location** | • Store items as appropriate at MWS and backstock additional quantities in the back room (e.g., change order form, deposit bags, drop bags, deposit slips, etc). Having what you need close to you when you need it will reduce motion and complexity. |
| **Desk Space (always)** | • Organize and clean your desk space so that any partner can find and use necessary items to perform administrative tasks easily. Ensure everything has a place and is easily accessible. A clean and clutter-free workspace with all necessary tools and equipment handy makes it easier to effectively and consistently complete the work error free. |
| **Desk Space (during deposit work)** | Arrange your desk so that all of the banking work can be done within arm's reach:<br>• Set up Daily Records Book (DRB), cash flow guide and job aid in visible/comfortable places so that when at the desk you are ready to work.<br>• Arrange necessary cash handling equipment to be within arm's reach: move 10-key, cash scale and garbage can closer to you so that you don't have to <u>reach</u> beyond an arm's length or stand to use the equipment. See picture below.<br><br>**All equipment in arm's length removing reach, stand and bend**<br><br>Safe    Monitor    10 key    Cash Calculator    Key Board    Partner    Garbage can |
| **Deposit Workflow Placemat** | • Place on desktop while completing banking work. |
| **Deposit Workflow** | • Post at MWS for training in the cash controller's line of sight. |
| **Repeatable Routine Job Aid** | • Place the Repeatable Routine Job Aid at the MWS for easy reference. |



BETTER WAYS CASH MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

5

CONFIDENTIAL

STAR_MARSHALL0000799

# Visual Management for Repeatable Routine - Safe Setup

This image portrays an example of visual management only. There are many ways to implement a visual management system based on the key principles of: How much do I have? How much do I need? Where does it belong?



**How much do I need?**
Change par support allows for quick, error-free change order calculation (Example: Order 6 dollars in nickels)

**Where does it belong?**
Velcro® allows for quick access to the calculator anytime

**How much do I have?**
Change level triggers signal when change must be ordered (Example: Red = order change)

**How much do I have?**
Counting support allows for quick, error-free counting (Example: 4 dollars in nickels)

**How much do I have?**
Bill organization allows for quick access to the correct denomination (located in main compartment)

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

STAR_MARSHALL0000800

# Understanding the Change Cadence

**Change Cadence:** The frequency of change orders

Cadence is a component of the Cash Management Better Way. Today, our partners decide when to get change based on multiple signals ranging from demand (quantity) to pars and bank accessibility. This Better Way gives you tools to understand these signals so that you can have what you need when you need it.

The steps below will help you get started on a cadence.

**Step 1**
Inventory your change bank once per day (during the deposit work) for a week, noting how much you have, when you have to replenish and how much you get as well as how that amount of inventory felt.
 ❑   Did you have sufficient change across all days? How do you know?

**Step 2**

Set up your safe with visual management to help support your change order process, keeping in mind how often you are running low on change. The cash controller should note each day, while preparing the change order and tracking the inventory, how often the change rolls end up in the "red", "yellow" and "green" zone.

**Step 3**
Once you have tracked inventory and status for two weeks you will have enough inventory and business pattern information to get started with your change cadence. Review your data and decide which days you need change and which days you could remove from your current pattern. For example, if you currently go to the bank for change six days each week, try going for three days and evaluate which days you have the most need for change.

**Factors to Consider When Setting a Cadence:**
 ❑   Banking Hours/Days of Operation
 ❑   Banking Peak Times
 ❑   Traffic

### Example of What Getting Started on a Cadence Looks Like:

| Current | MON | TUE | WED | THU | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| | Change Order Day | Change Order Day | Change Order Day | Change Order Day | Change Order Day | Change Order Day | |

| First Level Improvement | MON | TUE | WED | THU | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| | Change Order Day | Change Order Day | | Change Order Day | | Change Order Day | |

| Check and Adjust (Reduce Further) | MON | TUE | WED | THU | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| | Change Order Day | | | Change Order Day | | Change Order Day | |



© 2003 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only

7

CONFIDENTIAL

STAR_MARSHALL0000801

# Understanding the Cadence
# (Continued)

**Step 4**
Continue to track change inventory once per day (prior to doing the deposit) and track the status of that inventory (red, yellow or green). Check and adjust if you find your inventory does not match your business needs (too much/too little).

**Step 5**
Continue to track change inventory and status. Check and adjust your levels and your cadence as needed. Keep in mind that a typical change order takes about 12 minutes (start to finish, including bank and safe time) and each time you eliminate an unnecessary change order you are gaining that time to serve your customers.

Periodically reflect on your change bank inventory to ensure inventory levels continue to meet business needs.



CONFIDENTIAL

STAR_MARSHALL0000802

# Make it Yours

Each store is different and presents its own unique set of challenges. Below are examples of challenges store managers faced in their stores, as well as the approach they took to identify solutions. We encourage you to **Make It Yours** through continuous improvement grounded in Lean Thinking principals and maintaining Starbucks standards.

| Reduce Time |
|---|
| **Challenge:** Using the safe time to prepare for the deposit feels like taking time away from other work. |
| **Potential Solution:**<br>Consider that completing the deposit in less time allows you to get back to your customers sooner. Any work that can be completed during the 10-minute safe wait timer allows you to get back on the floor faster. Using the safe time to prepare for the deposit should be the priority in the 10 minutes you are waiting for the safe, but you will have some safe time left over that you could use to do the "other" work that you would have completed during that time before implementing this Better Way. For example, partners in one store felt like they wanted to use the safe time to do a lobby sweep and recognized they had time in Step 1 of the routine to complete the deposit prep and do a lobby. The safe takes 10 minutes and the prep work only takes about four-six minutes, so they have close to five minutes left to do a quick lobby sweep. |

| Simplify the Process |
|---|
| **Challenge:** Using the cash scale to count the total deposit was hard for my partners to adapt to. |
| **Potential Solution:**<br>Store managers wondered why it was difficult to use the cash scale. By asking questions, they discovered it was a lack of trust in the scales' consistency. Some SMs, along with their cash controllers, ran a few tests to help them compare the consistency of the scale to hand counting.  They discovered that the scale was quicker, easier for the partner and more consistent than hand counting alone. The cash controllers also found that using the scale provided a simple and more accurate way to validate hand counting than merely repeating the hand counting. |

| Ensure Quality |
|---|
| **Challenge:** We continue to make errors daily on the deposit work. |
| **Potential Solution:**<br>The Repeatable Routine, completed the same way by all  partners, will make it easier to see problems and identify why they are happening. Work with your partners to discover what the root cause of the problem/error is and what you can do to about it. |



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

STAR_MARSHALL0000803

# Make it Yours - Continued

| Change on a Cadence |
| --- |
| **Challenge:** We had a hard time creating a par and getting on a change cadence. |
| **Potential Solution:**<br>Change pars will differ by store based on business needs. However, by tracking your cash inventory levels you can create trend information that will help you make an informed decision. You may want to start out with a cash inventory par and a change cadence that is more conservative. Once the conservative levels and change cadence support your business needs, check and adjust to see if you can reduce your inventory and your bank trips to replenish by one more day. For example, some SMs found that when the reduced their penny rolls by three, they still didn't see themselves getting low, so the next week they tried to reduce their penny roll level by six and they found, by tracking their inventory, they were running out of pennies only one day per week. This information allowed them to adjust their pars. |

| Inventory Management |
| --- |
| **Challenge:** Our change bank felt really low and we wanted to increase it so that we could go to the bank less often. |
| **Potential Solution:**<br>Keeping in mind that more inventory increases the time it takes to count the funds as well as the complexity of the task. Gather factual data to help you problem solve.<br><br>Track your inventory for two weeks and tally each day if you land in the green, yellow, or red status areas.<br><ul><li>How often are you in the red? Is there a reason (e.g., busy holiday weekend, pars need adjusted, tills weren't stocked)?</li><li>Should your green, yellow and red change level triggers be adjusted?</li></ul> |



BETTER
WAYS
CASH
MGMT.

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

STAR_MARSHALL0000804

## Repeatable Routine Instruction Sheet

**Cash Management** — **Key Concepts: Motion ≠ Work   & Value of Repeatable Routines**

| | Major Step (Defines what to do) | Key Point (Indicates how to complete Major Step) | Reason Why (Tells why) | Time |
|---|---|---|---|---|
| 1 | Set Outer Safe, Set Inner Safe and Prepare for Deposit | • Prep deposit bag / slip / Cash Management Log (CML) during two minute safe timer<br>• Set screen to main menu<br><br>• Set up workstation<br>• Count log of previous day's bags | • Save time<br><br>• Save time and maintain security<br>• Reduce errors<br>• Reduce errors | 2 min |
| | IF CHANGE ORDER DAY: | • Prepare change order form at safe<br><br>• Call bank with change order | • Reduce motion and save time<br>• Save time | 4 min |
| 2 | Collect Previous Day's Till Drop Bags | • Verify previous day's drop bags and match to log<br><br>• Close the safe | • Quality: correct money, correct day<br>• Meet safety requirements | 1 min |
| 3 | Sort Bags | • Sort and stack by matching register and top/bottom drawer assignment | • Maintain order of bags | 30 sec |
| 4 | Count Bags & Verify Funds | • Follow sequence on MWS to enter amount by denomination or lump sum (F5) | • Save time and Quality | 40 sec per bag |
| 5 | Verify Total Deposit Funds | • Use cash scale to count funds<br><br>• If funds do not match, re-weigh<br>• If funds do not match a second time, hand-count | • Save time and improve quality<br>• Improve quality<br>• Quality check machine accuracy | 1 min, 10 sec |
| 6 | Finalize Deposit | • Finish deposit bag / slip / CML<br><br>• Consolidate funds in bag<br>• Bunch all previous day's sales media, staple and place in envelope<br>• Staple bag strip to CML | • Improve accuracy and meet standards<br>• Save time<br>• Improve quality and save time<br>• Meet standards | 2 min |
| 7 | Go To Bank | • Obtain bank witness | • Meet standards | Variable |
| 8 | Complete Banking | • Document bank records in CML (during two minute timer, if applicable) | • Meet safety standards | 30 sec |
| | IF CHANGE ORDER DAY: | • Set safe, control change funds<br>• Put change in safe and close safe | • Meet standards<br>• Meet safety standards | 2 min, 30 sec |

**Total Proficiency Time: 18 – 25 Minutes**
**(excluding bank trip)**



© 2009 Starbucks Coffee Company.  All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

## Repeatable Routine Customized Instruction Sheet

| Cash Management | Key Concepts: Work + Motion & Value of Repeatable Routines | | | |
|---|---|---|---|---|
| **Major Step** (Defines what to do) | **Key Point** (Indicates how to complete Major Step) | **Reason Why** (Tells why) | **Time** | |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |

Total Proficiency Time:



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

CONFIDENTIAL

*Place at Safe Workstation for quick reference*

## Repeatable Routine Job Aid
## Cash Management

1. Set Outer Safe, Set Inner Safe and Prepare for Deposit (change order)
2. Collect Previous Day's Drop Bags
3. Sort Bags
4. Count Bags and Verify Funds
5. Verify Total Deposit Funds
6. Finalize Deposit
7. Go to Bank
8. Complete Banking (put away change)

### Proficiency Time: 18 – 25 minutes (excluding bank trip)

(change order day only)

### Key Concepts: Motion ≠ Work & Value of Repeatable Routines



© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.

— — — — — Fold Here — — — — —

© 2009 Starbucks Coffee Company. All Rights Reserved. For Internal Use Only.



### Key Concepts: Motion ≠ Work & Value of Repeatable Routines





### Placemats Visual for Work Flow:

This placemat will assist you and your partners in implementing the Cash Management deposit workflow.   You can use this placemat when learning the routine, coaching the routine and/or as needed throughout the process.

One example of how to use the placemats is shown below.   Customize workflow direction (i.e. right to left or up and down) and spacing as needed.   Print page 4 to assist with drop bag sorting.

Store sales media here

Store large bills to be verified here

Store coins to be verified here

$20

$10

$5

$1

$20

$10

$5

$1

Store large bills that have been verified here

Store coins that have been verified here

Face Up          Face Down

Work flows from left to right

© 2009 Starbucks Coffee Company  All Rights Reserved. For Internal Use Only.

CONFIDENTIAL



CONFIDENTIAL

STAR_MARSHALL0000809



STAR_MARSHALL0000810



Use this guide to help you sort your drop bags.  Once sorted stack them in order:
drawer 1 top → drawer 1 bottom → drawer 2 top → drawer 2 bottom → drawer 3 top → drawer 3 bottom

CONFIDENTIAL

STAR_MARSHALL0000811



*Cut out and place near deposit work area for quick reference*

CONFIDENTIAL

STAR_MARSHALL0000812

| Cash Management Better Way | | Process Tracker | | | Store: | | DM: |
|---|---|---|---|---|---|---|---|
| | | | | | Store # : | | SM: |
| Activity | Date | Time for Deposit Work (in minutes)    START: set safe    STOP: bank witness | Time for Bank Trip (in minutes) START: leave store - STOP: All banking complete* | Change Frequency How many days a week are you getting change at the bank? | Notes / Problems | | |
| First "Go See" for Cash Management (week of 8/17) | | | | | | | |
| Second "Go See" for Cash Management (week of 9/7) | | | | | | | |
| Total difference between first and second Go See | | | | | | | |

| Store / Partner Comments | |
|---|---|
| Impact on the Partner Experience | Impact on the Customer Experience |
| | |

DEFINITION:
STOP: All banking complete* Including putting change away and completing Cash Management Log

CONFIDENTIAL

STAR_MARSHALL0000813

# U.S. Stores Partner Resources Manual



Starbucks Coffee Company
2401 Utah Avenue South
Seattle, WA 98134
(206) 318-1575



Gurtov - 4

These materials are the property of Starbucks Corporation. They contain sensitive information about Starbucks training, operations, methods and processes, much of which is confidential. Unauthorized distribution or use of these materials is strictly prohibited. These materials should not be photocopied and should not be used by or distributed to anyone other than a Starbucks partner. All materials should be kept secured when not in use.

© 2009 Starbucks Coffee Company. All rights reserved. 6/09 Printed in USA.

Partner Resources Manual – U.S

# Table of Contents

Introduction ......................................................................................................... vi
Resources ........................................................................................................... vii

Important Employment Policies

Multi-State Compliance .............................................................. 1.2
At-Will Employment ................................................................... 1.2
How We Communicate ................................................................ 1.2
Harassment and Discrimination ................................................. 1.5
Conflict of Interest ..................................................................... 1.8
Secret, Private and Internal Information .................................... 1.9
Close Relationships with Other Partners ................................... 1.10
Diversity in the Workplace ........................................................ 1.10
Drugs and Alcohol ..................................................................... 1.11
Acceptable Use Standard ........................................................... 1.12
Employment and Income Verification ....................................... 1.17
Receipt of Legal Documents ...................................................... 1.18
Employment of Minors .............................................................. 1.19
Employment of Relatives ........................................................... 1.20
Gifts and Entertainment ............................................................. 1.21
Inspections ................................................................................. 1.22
Distributing Notices/Soliciting .................................................. 1.22
Partners with Disabilities ........................................................... 1.23
Phone and Pager ........................................................................ 1.23
Register Operation and Customer Transactions ......................... 1.24
Dress Code and Personal Presentation ....................................... 1.25
Insider Trading/Securities Transactions .................................... 1.28
Smoking ..................................................................................... 1.31
Standards of Business Conduct .................................................. 1.31
Video and Audio Recording ....................................................... 1.32
Weapons ..................................................................................... 1.32
Workplace Violence ................................................................... 1.32

Staffing

Partner Job Classifications ........................................................ 2.2
Job Postings ............................................................................... 2.3
Applying for a Posted Position ................................................... 2.4
Internal Transfer Requests ......................................................... 2.5
Partner Referral Program ........................................................... 2.8
Relocation Program .................................................................... 2.10
Rehire Eligibility and Procedure ............................................... 2.11
New Hire/Rehire Paperwork ...................................................... 2.12
Adding and Maintaining Partner Information ............................ 2.16

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 6/09

CONFIDENTIAL

STAR_MARSHALL0000685

# Hours of Work

Work Schedule .................................................................................3.2
Attendance and Punctuality ..............................................................3.3
Rest and Meal Breaks .......................................................................3.4
Time Worked ...................................................................................3.6
Recording Time Worked ...................................................................3.7

# Pay

Pay Policy .......................................................................................4.2
Overtime Pay ...................................................................................4.3
Holiday Pay .....................................................................................4.4
Travel Pay .......................................................................................4.5
Tips ................................................................................................4.6
Processing Payroll ..........................................................................4.11
Paycheck Distribution .....................................................................4.13
Direct Deposit ...............................................................................4.15
Pay Advances and Loans .................................................................4.16
Payroll Processes for Payroll Errors .................................................4.17
Emergency Wage Advance Paid Out .................................................4.18

# Partner Development and Recognition

Training and Development .................................................................5.2
Performance Reviews .......................................................................5.3
Partner Development Plan .................................................................5.5
Coaching and Feedback ....................................................................5.6
Opportunities for Promotion .............................................................5.8
Corrective Action ............................................................................5.9
The Partner Development Path .........................................................5.10
Partner Services and Recognition .....................................................5.14

# Time Away From Work

Paid Time Off ..................................................................................6.2
Personal Days ..................................................................................6.3
Vacation .........................................................................................6.4
Jury /Witness Duty ..........................................................................6.8

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA.  6/09

CONFIDENTIAL                                                       STAR_MARSHALL0000686

Bereavement ........................................................................................ 6.9
Sick Pay .............................................................................................. 6.10
Reporting Time Off ............................................................................. 6.11
Unpaid Time Off ................................................................................. 6.12
Family/Medical Leave ......................................................................... 6.14
Pregnancy Disability Leave ................................................................. 6.18
Disability Leave .................................................................................. 6.19
Military Leave .................................................................................... 6.21
Personal Leave ................................................................................... 6.23
Sabbatical Leave of Absence .............................................................. 6.24
Leave of Absence Quick Reference Guide ........................................... 6.26

## Total Pay

Health and Welfare Benefits ................................................................ 7.2
Savings and Stock ............................................................................... 7.7
Other Partner Programs ...................................................................... 7.9

## Partner Records

Partner Records Information Policy ...................................................... 8.2
PAN/EPAN Process Overview .............................................................. 8.6
Using EPAN ........................................................................................ 8.10
Personal Information Changes ............................................................. 8.14
Promotion Guidelines ......................................................................... 8.15
Demotion Guidelines .......................................................................... 8.17
Merit Increases ................................................................................... 8.18
Lump Sum Merit ................................................................................ 8.19
Bonus Pay .......................................................................................... 8.20
Separation Reversals .......................................................................... 8.21
My Partner Info .................................................................................. 8.24

## Leaving Starbucks

Separation Overview ........................................................................... 9.2
Separation Process .............................................................................. 9.3
Benefits Continuation after Separation ................................................ 9.6
Unemployment Claims ........................................................................ 9.7
Retiring from Starbucks ...................................................................... 9.9

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 6/09

CONFIDENTIAL

STAR_MARSHALL0000687

## STARBUCKS IS AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER

Starbucks is an equal employment opportunity employer. All partners will be treated fairly, without regard to race, national origin, age, sex, religion, disability, sexual orientation, marital status, veteran status, or any other basis protected by local, state or federal law. This policy applies with regard to all aspects of one's employment, including hiring, transfer, promotion, compensation, eligibility for benefits, and termination.



© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA.  6/09

CONFIDENTIAL

STAR_MARSHALL0000688

# Introduction

## Purpose of Manual

This *Partner Resources Manual* serves as the store manager's primary resource for most Partner Resources-related questions. It is intended to give store managers information about specific Starbucks policies, standards, procedures and guidelines, and various partner programs and benefits.

This manual is a reference tool only and may not contain all of Starbucks complete policies.

## Overview of Manual

The policies, standards, procedures and guidelines in this manual are intended to govern Starbucks operations in the United States (U.S.). The manual provides Partner Resources policies, and the processes and procedures necessary to support them.

The information contained in this manual changes frequently. Any new or updated information will be communicated to stores and incorporated into the next update to the manual on *Starbucks Online*.

## Important Notice

All statements contained in this manual are general in nature. Depending on the circumstance, Starbucks reserves the right to handle individual situations appropriately as they arise.

Additionally, nothing in this manual should be construed as a promise or guarantee of employment or specific treatment in a specific situation. Starbucks reserves the right to terminate one's employment at any time, with or without notice.

The policies contained have been adopted with the intent to fully comply with all applicable laws governing employment practices and procedures in each of the various states where Starbucks does business. If any policy contained in this manual conflicts in any way with a federal, state or local law, it is Starbucks intent to fully comply with the applicable law.

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 6/09

CONFIDENTIAL

STAR_MARSHALL0000689

# Resources

### District Manager

Contact your district manager with any questions about the content of this manual, including questions about a policy or how to implement a policy in your store. If your district manager is unable to answer your question or is unavailable in an emergency, contact a member of your Partner Resources team.

### Partner Resources Team

Throughout this manual, there are numerous references to your Partner Resources manager or other partners. This team is knowledgeable of all Partner Resources policies at Starbucks and fully qualified to answer any questions regarding the implementation of policies in your store.

If there is information that would be a valuable addition to this manual, store managers are encouraged to contact their Partner Resources team.

If you are unsure of what partners make up your Partner Resources team, ask your district manager.

### Call Centers and Help Lines

#### Make the RIGHT Call:

There are many references throughout the manual to call centers that support Partner Resources issues at Starbucks. Following are descriptions and contact information for the main resources that apply to the content in this manual. If you are unsure of which number to call about a particular subject, look up that subject in this manual; an appropriate phone number will often be found with the subject matter.

#### Business Conduct Helpline                     (800) 611-7792

Call with sensitive questions or concerns regarding Starbucks Standards of Business Conduct – anonymously if you prefer. Every partner's concern will be taken seriously and treated in a confidential manner. No one will be retaliated against for calling the helpline.

**Hours of operations:** 24 hours a day, 7 days a week

#### Partner Contact Center (PCC)                     (866) 504-7368
                                                     FAX: (206) 318-6990

Call with questions or concerns about paychecks, direct deposit, deductions or taxes. The PCC may also assist with general questions related to Benefits, Savings, ALS files, My Partner Info or other issues.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA.  6/09

CONFIDENTIAL

STAR_MARSHALL0000690

**Hours of operation:** Monday–Friday 5 a.m. to 5 p.m. Pacific time

## Starbucks Benefits Center    (877) SBUXBEN (728-9236)

Call with questions regarding benefits eligibility, enrollment, plan options, to make changes to benefits, to order a benefits plan description and/or provider directory and to apply for a leave of absence and disability benefits or visit http://LifeAt.sbux.com.

**Hours of operation:**    Monday—Friday 9:30 a.m. to 6 p.m. Central Standard

(http://LifeAt.sbux.com Website is available 24 hours a day, 7 days a week)

## Starbucks Benefits Department
## and Health Privacy Office    (888) 796-JAVA ext 84708

Partners should call Starbucks Benefits Department/Health Privacy Office for:

- benefits eligibility appeals,
- adoption assistance and allowance,
- military allowance,
- life insurance, or
- AD&D claims.

**Hours of Operation:** Monday – Friday, 8 a.m. to 4 p.m. Pacific

## Fidelity (Starbucks Stock and Savings plans)    (866) 697-1048

Call to obtain information about Starbucks Stock Investment Plan (S.I.P.), stock options plans (e.g., *Bean Stock*), Future Roast 401(k) savings plan and/or to enroll or manage your account(s).

These same services are available online to partners through Fidelity's website– NetBenefits [SM] --at www.net benefitsfidelity.com

**Fidelity Representative Hours of Operation:**

S.I.P and stock options plans: Monday – Friday, 5 a.m. to 9 p.m. Pacific.

Future Roast 401(k) Savings Plan: Monday – Friday, 5:30 a.m. Pacific to 8 p.m. in your local time zone and until 9 p.m. local time for Hawaii partners.

Fidelity's website is available 7 days a week, 24 hours a day.

## Employee Assistance Program (EAP)    (800) 588-8414

**(800) 682-0364  New number** *Beginning 1/1/07*
Call for professional assistance with a broad rage of personal issues to help balance work and life.

©2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 6/09

CONFIDENTIAL

STAR_MARSHALL0000691

**Hours of operation:** 24 hours a day – 7 days a week

### Risk Management                                     **(888) 796-JAVA, ext. 3**

Call to report partner work-related injuries (also customer incidents and damage to store property).

**Hours of Operation:** Monday – Friday, 8 a.m. to 4 p.m. Pacific

### Enterprise Help Desk (EHD)                          **(888) 796-JAVA option 1**

If you discover a problem in using ALS, Time and Attendance or other programs on the Manager's Workstation (MWS), it may be due to a technical error. If you encounter such a problem, please call the EHD to log the issue.

**Hours of Operation:** 24 hours a day, 7 days a week

## Other Resources

- **Standards of Business Conduct** – A guide to help partners make appropriate decisions at work. Available in New Hire Kits and online, the Standards of Business Conduct provide guidance on such topics as Gifts and Entertainment, Conflicts of Interest, and other ethical or legal issues.

- **LifeAt.sbux.com** – Single Web source for partners to link to other important websites and obtain information about Partner Resources programs and initiatives.

- **My Partner Info** – An online resource to view/update your mailing address, phone number, pay deposit options, W4 selections and more.

- **MyPartnerCareer.com** – Single Web source for partners to network and manage their career at Starbucks. Includes access to job postings, job descriptions and skills needed for different jobs. Partners also have access to many tools such as help with interviewing and writing a resume.

- **Partner Guide** – U.S. Store Version, provides each partner with Starbucks policies and guidelines -- included in the Partner Kit, U.S. Store Version, for new hires.

- **Pay Administration Manual** contains the policies and guidelines for our pay programs.

- **Labor Management Resource Manual** contains the ALS Reference Guide, Time & Attendance Guide and Deployment Guide.

- **New Store Opening Guide** – New Store Opening Guide provides store managers operational information needed to open a new store, including staffing, ordering, marketing and store setup procedures.

- **Starbucks Benefits Plan Description** – Provided to all benefits-eligible

CONFIDENTIAL                                          STAR_MARSHALL0000692

partners in the U.S., this book provides details about Starbucks Benefits.

- ***Starbucks Online*** – This is the name of the store portal that is accessed from the Manager's Workstation (MWS). It provides store managers and partners with easy access to business functions, communications and resources that support the management and operations of our stores.

**Other important phone numbers**

| | |
|---|---|
| Aetna Partner Services | (888) 238-6271 |
| Aetna RX Home Delivery | (866) 612-3862 |
| Aetna COBRA Administration | (800) 429-9526 |
| CUP Fund | (888)796-JAVA, ext. 8CUPS |
| Hartford Life and Accident | (888) 563-1124 |
| Hawaii Medical Services Association (HMSA) | (808) 948-6111 |
| Kaiser Hawaii HMO | (800) 966- 5955 |
| Keystone Health Plan Central | (800) 622-2843 |
| Magellan Behavioral Health | (800) 588-8414 (Through 09/30/06) |
| Magellan Employee Assistance | (800) 588-8414 (Through 12/31/06) |
| Aetna Managed Behavioral Heath | (888) 238-6271 (Beginning 10/1/06 |
| Aetna Employee Assistance | (800) 682-0364 (Beginning 1/1/07) |
| Pacific Guardian Life (Hawaii TDI) | (800) 367-5354 |
| Unum Provident (disability) | (800) 858-6843 |
| VSP (Vision Service Plan) | (800) 877-7195 |

CONFIDENTIAL                                          STAR_MARSHALL0000693

# Important Employment Policies

It is the manager's responsibility to understand these policies and ensure new partners are made aware of them when hired. Many policies listed here are also included in the *Partner Guide* that is given to all new partners.

Multi-State Compliance ........................................................................1.2

At-Will Employment ............................................................................1.2

How We Communicate ........................................................................1.2

Harassment and Discrimination .........................................................1.5

Conflict of Interest .............................................................................1.8

Secret, Private and Internal Information ............................................1.9

Close Relationships with Other Partners...........................................1.10

Diversity in the Workplace.................................................................1.10

Drugs and Alcohol .............................................................................1.11

Acceptable Use Standard ...................................................................1.12

Receipt of Legal Documents ..............................................................1.18

Employment and Income Verification ...............................................1.19

Employment of Minors ......................................................................1.21

Employment of Relatives ...................................................................1.22

Gifts and Entertainment .....................................................................1.23

Inspections..........................................................................................1.24

Distributing Notices/Soliciting...........................................................1.25

Partners with Disabilities ...................................................................1.26

Phone and Pager .................................................................................1.26

Register Operation and Customer Transactions .................................1.27

Retail Dress Code and Personal Presentation.....................................1.28

Securities Transactions and Insider Trading ......................................1.31

Smoking ..............................................................................................1.34

Standards of Business Conduct...........................................................1.34

Video and Audio Recording................................................................1.35

Weapons ..............................................................................................1.35

Workplace Violence ............................................................................1.35

CONFIDENTIAL

STAR_MARSHALL0000694

# Multi-State Compliance

The various states and locales in which Starbucks conducts its business have enacted a multitude of laws that govern Starbucks workplace and the employment of its partners. These laws have been considered in the development of Starbucks personnel policies. Even so, if Starbucks policy is inconsistent with any law, the law will govern. Questions about application of a particular law or regulation to Starbucks workplace should be directed to your district manager, Partner Resources manager or the Business Conduct Helpline at (800) 611-7792.

# At-Will Employment

Each partner's employment with Starbucks Coffee Company is "at-will." This means that either Starbucks or the partner may terminate the employment relationship at any time for any reason, with or without notice, not prohibited by law. The only exception to this policy would be a written contract of employment, signed by the partner and Starbucks chief executive officer, president or executive vice president.

# How We Communicate

Starbucks reputation for integrity flows from our steadfast commitment to our core values and guiding principles found in the Mission Statement. Starbucks depends on its partners to ensure that those guiding principles are upheld in every facet of our business. For this reason, the company highly values the views of our partners.

Several resources are available to our partners for communicating their concerns, providing input about our business practices and reporting matters that fail to uphold the company's legal, ethical and moral objectives.

CONFIDENTIAL

**Communicating with Your Manager**

Starbucks has created a vital learning community for the sharing of talents, skills, knowledge and personal qualities. We strive to enrich our understanding and culture by focusing on a shared mission and value system. The essence of management development and training is supported by Starbucks acknowledgment that our managers and partners are the company's finest assets.

The most important working relationship partners have is one with the store manager. The store manager will support partners so that they can effectively perform their jobs. In order to provide support, however, the manager needs to know of concerns or questions. If partners have any questions, concerns or suggestions such as position and responsibilities, they are to be discussed with the store manager. If café manager is unable to assist the partner, questions or concerns can be referred to the district manager or to a Partner Resources team member.

**Problem Solving**

Starbucks endorses an atmosphere of mutual respect and support. If a partner experiences a disagreement or conflict with another partner, the partner should first discuss the problem with the other partner and make every effort to resolve it in a respectful manner. If unsuccessful, the partner should seek the store manager's assistance in resolving the matter respectfully and professionally.

The following chart is provided as a reference guide when resolving disputes. Alternatively, partners may call the Business Conduct Helpline (described below) to report concerns or ask for guidance.



**Resolving Disputes**

The partner discusses the conflict or problem directly with the other partner.

*If unsuccessful...*

The partner discusses the matter with the store manager.

*If unsuccessful...*

The partner discusses the matter with the district manager.

*If unsuccessful...*

The partner discusses the matter with a Partner Resources team member.

CONFIDENTIAL

STAR_MARSHALL0000696

**Mission Review**

Mission Review encourages Starbucks partners throughout the company to express views on whether our policies and practices are consistent with Starbucks Mission Statement and Guiding Principles. Mission Review submission cards are available at all work locations.

Completed comment cards sent to the Mission Review team are forwarded to the partner(s) directly involved in the product or program or in making the very decision your specific comment addresses. While it is possible to make an anonymous submission, including your name and work location will assure you receive a direct response to your comment (usually within 20 business days).

Reports of comments (without names), along with the responses, are made accessible to executives and managers throughout the company to enhance their awareness of partner ideas and concerns.

**The Business Conduct Helpline**

The Business Conduct Helpline has been established to answer partners' questions about legal or ethical issues at work, to clarify the Standards of Business Conduct and to provide partners yet another means to ask questions or report potential wrongdoing. Matters reported through the Helpline may include, but are not limited to, any form of harassment or discrimination, safety and security violations, violations or wage and hour laws, health code issues, situations involving illegal drugs, substance abuse, weapons or violence, or instances of improper conduct. Partners may remain anonymous when calling the Helpline.

The Business Conduct Helpline, (800) 611-7792, is available 24 hours a day, seven days a week.

All concerns reported to the Helpline will be taken seriously and treated in a confidential manner. Starbucks does not tolerate retaliation against any partner who, in good faith, raises concerns or questions regarding a potential violation of Starbucks policy.

**Emergency Communication Hotline**

Starbucks has established an Emergency Communication Hotline. This toll-free telephone number is (800) 923-BEAN or (800) 923-2326. By calling this number, a partner may receive local or regional information that may impact store operations, such as information about severe weather conditions and procedures during emergency situations. All partners are encouraged to use this emergency call-in number to access recorded information if you are unable to reach your store manager or district manager.

CONFIDENTIAL

STAR_MARSHALL0000697

# Harassment and Discrimination

One of Starbucks Coffee Company's guiding principles is *"to provide a great work environment and to treat each other with respect and dignity."* Accordingly, Starbucks strictly prohibits discrimination, sexual harassment, or harassment on the basis of gender, race, color, national origin, religion, sexual orientation, physical or mental disability, age, veteran status, or any other characteristic protected by law.

This prohibition applies to all partners, vendors, or customers. No partner is expected to tolerate any conduct prohibited by this policy from anyone while at work or while engaged in company business.

## Sexual Harassment defined

Sexual harassment prohibited by this policy includes any unwanted sexual advances, requests for sexual favors, or visual, verbal, or physical conduct of a sexual nature when:

- Submission to or rejection of such conduct is used as a basis for employment decisions affecting the partner; or

- Such conduct has the purpose or effect of interfering with a partner's work performance or creating an intimidating, hostile or offensive working environment.

Following is a partial list of conduct that would be considered sexual harassment:

- Unwanted sexual advances or propositions.

- Offering employment benefits in exchange for sexual favors.

- Leering, making sexual gestures, displaying sexually suggestive objects or pictures, cartoons, calendars or posters.

- Making or using derogatory comments, comments about a partner's body or dress, slurs, epithets or sexually suggestive jokes.

- Written communications of a sexual nature distributed in hard copy or via a computer network, suggestive or obscene letters, notes or invitations.

- Physical conduct such as unwanted touching, assault, impeding or blocking movements.

- Making or threatening retaliation after a negative response to sexual advances or for reporting or threatening to report sexual harassment.

Sexual harassment can occur between Starbucks partners of the same sex. It is unlawful for a male to sexually harass either females or males, or for a female to sexually harass either males or females.

CONFIDENTIAL

STAR_MARSHALL0000698

## Other Types of Harassment

Starbucks also prohibits harassment on the basis of race, color, national origin, religion, sexual orientation, physical or mental disability, age, veteran status, marital status or any other characteristic protected by applicable law. Such prohibited harassment may include, but is not limited to, the following examples:

- Threats, degrading comments or slurs
- Derogatory posters, photographs, cartoons, drawings, or gestures
- Written communications that could offend individuals in a particular group, such as references to racial or ethnic stereotypes or caricatures
- Making or threatening retaliation for reporting or threatening to report harassment or for participation in an investigation of a harassment complaint

## Complaint Procedure

A partner who believes he or she has been subjected to behavior prohibited by this policy should make his or her feelings known to the offending partner if comfortable doing so. The partner must also immediately report the behavior, preferably in writing, to a manager as follows:

**An hourly store partner (busperson, barista, or shift supervisor) must report the offensive behavior immediately to the store manager, district manager, or Partner Resources manager for your Region. Partners may also call the Business Conduct Helpline at (800) 611-7792 to report offensive behavior. The name and phone number of the appropriate Partner Resources manager may be found in the Starbucks Phone Directory ("Beanbook") located in every store.**

If any partner becomes aware of harassing conduct involving a Starbucks partner, regardless of whether such harassment directly affects that partner, the partner should immediately report that information, preferably in writing, to the appropriate manager as indicated above.

## Investigation and Discipline

When Starbucks is made aware of a situation that may violate this policy, an immediate, thorough and objective investigation will be undertaken. Starbucks will protect the confidentiality of those involved to the extent possible, consistent with the need to investigate and resolve the complaint.

Appropriate action will be taken against any partner found to have engaged in prohibited harassment to ensure that the conduct will not recur. Appropriate action will be taken against any partner who makes any report of harassment in bad faith. A partner found in violation of this policy may be subject to corrective action up to and including termination of employment. The type of corrective action taken will depend on the severity of the conduct as well as any other factors presented.

CONFIDENTIAL

STAR_MARSHALL0000699

Starbucks strictly prohibits any form of retaliation against any partner for reporting harassment in good faith, for using this Complaint Procedure, or for filing, testifying, assisting or participating in any matter in any investigation.

Starbucks will not tolerate any behavior prohibited by this policy and does not consider such behavior within the course and scope of employment, nor is such conduct authorized by Starbucks. Partners, including managers, may be held personally liable for actions that violate this policy.

**As a Starbucks partner, it is your responsibility to:**

1. Treat others with respect and dignity; maintain a professional workplace.

2. Understand Starbucks Anti-Harassment Policy, including the Complaint Procedure.

3. Take immediate steps to end the offensive behavior by requesting that it stop, if comfortable doing so.

4. Immediately report your concerns to your manager or Partner Resources manager.

5. Apologize if you have offended someone.

CONFIDENTIAL

STAR_MARSHALL0000700

# Conflict of Interest

Partners are prohibited from engaging in any transaction or activity that may constitute a conflict of interest. A conflict of interest exists when a personal interest or activity interferes or appears to interfere with the duties that you perform at Starbucks. Partners must avoid situations that affect or appear to affect their ability to act in the best interests of Starbucks.

Some situations in which a conflict of interest may arise, and therefore must be avoided, are:

- Being employed by or operating a business (including consulting) that does or desires to do business with Starbucks or that competes with Starbucks (for example, working in a competitor's coffee shop).

- Making a substantial direct investment in such a business, either by you or an immediate family member.

- Engaging a family member to perform services for Starbucks.

- Acting on behalf of anyone besides Starbucks in any transaction with Starbucks (for example, helping someone sell products and/or service to Starbucks).

- Personally engaging in real estate or other transactions in which Starbucks has an interest.

You should carefully review your own situation to determine whether any conflict of interest exists. You must immediately disclose any conflict or potential conflict to your manager. If you are unsure of whether an activity or role may constitute a conflict of interest, you should contact your manager, district manager, Partner Resources manager, or call the Business Conduct Helpline at (800) 611-7792.

CONFIDENTIAL

STAR_MARSHALL0000701

# Secret, Private and Internal Information

All Starbucks partners are expected to protect the confidentiality of information obtained in their capacity as a partner. Secret, private and internal information may only be discussed with another Starbucks partner when that partner has a legitimate business reason to share in the information. Secret, private and internal documents must be kept secured and may not be provided to any person, applicant, vendor, supplier, or consultant outside of the Starbucks organization except under very limited circumstances. For example, financial information may not be disclosed unless permission is first obtained from Starbucks chief financial officer. Other information may be disclosed only after an authorized confidentiality agreement has been executed with the outside party.

Following are types of secret, private and internal information. This list is not exhaustive but is provided to assist in identifying the type of information that must be protected:

- Secret, private and internal information includes financial information, such as budgets, sales goals, profit and loss statements, profit margins and pricing lists
- Personnel information
- Policies and procedures
- Training manuals and handouts
- Recruiting materials
- Marketing and business plans
- Strategic plans
- Product literature
- Software programs and manuals
- Artwork, drawings, designs, articles or manuscripts
- Production methods
- Inventions
- Store sites, designs and lease arrangements
- Proposals, work plans, interim and final reports, project files, customer contacts, lists or contracts
- Coffee blends, recipes, formulas and processes, or trade secrets.

If you are unsure whether there is a legitimate business reason to share confidential, sensitive or proprietary information, contact your manager, Partner Resources manager, or call the Business Conduct Helpline at (800) 611-7792.

CONFIDENTIAL

STAR_MARSHALL0000702

# Close Relationships with Other Partners

Starbucks encourages friendship and teamwork, but situations that may lead to a conflict of interest must be avoided. A conflict of interest may exist whenever a partner's judgment is affected or can be called into question because of a close relationship. For this reason, when a relationship develops between two partners, where one partner directly or indirectly supervises or is responsible for auditing the work of the other, one of the partners will be required to move to another store. If this is not possible, it may be necessary to terminate the employment of one or both partners. Starbucks may also refuse to recruit or hire an applicant, or transfer or promote a partner, if doing so would breach this policy.

A partner who develops a close relationship with another partner that would violate this policy must notify his or her manager immediately.

# Diversity in the Workplace

Diversity is at the core of our culture. One of Starbucks guiding principles is to embrace diversity as an essential component in the way we do business. At Starbucks, we are committed to providing a workplace that is inclusive of all people and their individual differences. Those individual differences may include, among others, race, national origin, gender, age, sexual orientation, disability, religion and marital status.

We believe that our partners are the most important assets in building Starbucks as both a successful company and desirable employer. Our goals are to attract and retain a diverse workforce, to develop policies and practices that fully use the human potential, and to build equity for our partners, neighborhoods and communities.

Updated July 2011

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000703

**Important Employment Policies**

# Drug and Alcohol Use

Starbucks partners are prohibited from any involvement with alcohol, drugs or any other substance that may impair work performance or the ability to professionally represent Starbucks. Specifically, this policy forbids working while under the influence of alcohol or drugs and prohibits the use, sale, manufacture, possession or illegal distribution of alcohol, illegal drugs or controlled substances on company premises, while conducting company business or during working time. For purposes of this policy, working time includes meal and rest breaks. Furthermore, partners are strictly prohibited from reporting to work under the influence of alcohol, illegal drugs or controlled substances not in accord with a valid prescription. Partners who are taking prescription drugs that may affect their performance should also discuss their situation with their manager prior to working.

The only exceptions to this policy are for moderate use of alcohol as may be appropriate when entertaining business associates or in similar social settings related to company business. Even in those limited circumstances, partners must remain professional at all times or risk corrective action.

Corrective action, including termination, will be taken against any partner who violates this policy. Excessive use of alcohol off-duty or off-duty drug activity may affect Starbucks image and thus may also result in disciplinary action. Starbucks reserves the right to deal with each case in its discretion, in accord with the specific circumstances involved. This may include requiring the partner to participate in, and satisfactorily complete, a treatment program.

If you have a problem with drugs or alcohol, you are encouraged to speak with your manager so that Starbucks can assist you in obtaining help.

CONFIDENTIAL                                                              STAR_MARSHALL0000704

# Acceptable Use Standard

**Introduction**

Starbucks most valuable assets are its partners, and the information they generate, collect, and maintain. The use of this information is an integral part of Starbucks daily business activities and it is important for partners and contingent workers to recognize, and participate in, all information security efforts. The purpose of this standard is to communicate the requirements and controls for the use of Starbucks electronic communication systems in connection with the Starbucks internal network, the Internet and related or supporting technologies. Starbucks recognizes the need of technological accommodations for partners with disabilities and supports authorized and secure use of these technologies. Due to the controlled nature of the manager workstation, the security requirements of the Acceptable Use Standard (AUS) that are most relevant within the store environment are detailed here.

**Purpose and Scope**

The purpose of this standard is to provide directives that contribute towards achieving and maintaining compliance with the Information Security Personnel Security Policy.
This standard applies to all partners employed by, and contingent workers working for, Starbucks or any entity in which Starbucks has a beneficial ownership that constitutes a controlling interest. In addition, this standard applies to any third party if it is contractually or otherwise legally, required to do so.

**Electronic Communications Policy**

The Starbucks electronic communications systems are provided to users at Starbucks expense to assist them in carrying out the company's business. Starbucks treats all information transmitted, processed, or stored on these systems, including email messages, as business information. Additionally, information stored on Starbucks information systems may be subject to disclosure in a legal proceeding. Accordingly, users cannot expect to maintain their privacy when sending, receiving or storing any information on Starbucks electronic communication system resources. Users should not use Starbucks electronic communication system resources to send, receive or store any information that they wish to keep private.

**Notice of Electronic Monitoring**

All users should be aware that all information stored, processed or communicated by electronic means using Starbucks electronic communication information resources, whether work-related or personal, are not private. Where allowable, Starbucks reserves the right to monitor or review electronic information to analyze the use of its electronic communications systems, obtain business information, monitor performance, assess the need for and perform training, review compliance with applicable regulatory requirements, for investigative purposes and use for other business reasons. Additionally, Starbucks reserves the right to disclose the information collected during such monitoring to any third parties deemed necessary, and will cooperate with any authorized law-enforcement agencies as appropriate.

**Handling Secret or Private Information and Records**

It is the responsibility of the individual in possession of all hardcopies of documents containing private or secret information to ensure that the hardcopies are secured or disposed of properly.
- Making or printing additional copies of private or secret information requires prior approval from the information owner.

---

1.12          Updated July 2011          ©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

- Printers, copiers and fax machines are not to be left unattended when private or secret information is being reproduced.

- **Access** to hardcopies of secret information should be kept to a minimum and limited to authorized personnel only. Unauthorized individuals are to be escorted while in a room or area containing secret information.

- Hardcopies containing secret information are to be stored in a secured room or area or in locked file cabinets.

- All paper waste generated in the course of handwriting, copying, printing, and faxing private or secret information is to be destroyed in accordance with the Records Management Handbook.

- When documents, including working drafts and/or notes, containing private or secret information are no longer required and the retention period for such documents has been met, documents will be destroyed under the provisions set forth in the Records Management Handbook.

Information sent via fax will include a standard Starbucks fax cover page with a disclaimer that the information sent is for the use of the intended recipient only. Private or secret information will not be faxed without following additional security precautions, such as:

- Sending only to known locations, where the physical security and monitoring practices of the receiving fax machine are known;

- Relying on preprogrammed (and tested) fax numbers set on the sending machine, to reduce dialing errors;

- Not sending to unattended fax machines, or where the physical security of the receiving system is unknown. Call ahead to let the receiver know the fax is being sent so they can pick it up upon receipt.

- Including a "confidentiality request" that information sent to an incorrect destination be destroyed, and requesting notification to the sender of such errors; and

- Not leaving a fax unattended unless the fax machine is located in a physically secure area.

**Verbal Communication**

Verbal communication discussing private or secret information should be conducted in isolated locations that are not susceptible to eavesdropping. This requirement extends to all telephone conversations.
Information classified as private or secret must never be entered into voicemail, automated answering systems, or disclosed to an answering service.

**Appropriate Business Use**

While the Starbucks electronic communications systems are intended for business use only, Starbucks recognizes the occasional need for personal use of certain resources, including the Internet and email. Additionally, Starbucks recognizes the critical role of the Internet and email for providing equal access to partners unable to obtain information through auditory channels. Users authorized to access these

CONFIDENTIAL

STAR_MARSHALL0000706

resources may make incidental and occasional personal use of these resources when done in a manner which does not affect productivity or job performance or place an undue burden on network resources, as long as the conditions outlined below are met. Personal use of Starbucks electronic communications systems may be allowed provided the usage:

- Does not violate either Starbucks Mission Statement and Guiding Principles or the Standards of Business Conduct;

- Is not for the purpose of accessing, downloading, storing, or otherwise processing information of a non-professional manner, which is sexually explicit, violent, vulgar, criminal in nature, intimidating, defamatory or otherwise unlawful or inappropriate material addressing age, gender, sexual orientation, race, religion, political beliefs, national origin, or disability;

- Is not for engaging in illegal, fraudulent, or malicious activities;

- Does not harass, intimidate, or threaten any other person;

- Does not infringe on the privacy or intellectual property rights of other individuals or organizations;

- Does not support, solicit, advertise, or promote commercial ventures, outside organizations, or other non-job related undertakings;

- Is not for political or religious activity, lobbying, or debate; or for activities on behalf of any organization having no affiliation with Starbucks;

- Is not for unauthorized personal activities, including gambling, day-trading,

- Web-based chat (web-based chat may be considered excessive if it results in substantial use of system capacity or has a negative impact on an individual's productivity);

- Is not for the purpose of solicitation of a personal business or for personal gain;

- Does not involve sending, forwarding, redistributing or replying to communications promoting lotteries, or "pools" based on chance, or chain letters; and

- Does not interfere with the proper functioning of Starbucks information technology resources, or unreasonably interfere with the ability of others to make use of Starbucks computer resources.

Where possible, such use is to be limited to non-business hours. In all cases, accessing, distributing or storing obscene, profane, abusive or otherwise offensive material using company-provide network resources or while using company owned information technology resources is prohibited.
Partners and contingent workers may use Starbucks electronic communications systems in support of company-sponsored or company supported events, groups and activities.

 Updated July 2011 ©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000707

**Important Employment Policies**

Electronic messages are considered company property and subject to monitoring, auditing and discovery acts. When composing electronic messages, users are responsible for complying with all policies and standards related to corporate communication.

- The use of ‚auto-forward' rules to send business email to non-Starbucks email account(s) is forbidden.

- Users are advised that offers and contracts made by email may be considered legally binding. For this reason, offers and contracts are only to be sent by authorized individuals.

- Personal messages should be marked as such by both sender and recipient so that it is clear that the email is not issued on behalf of Starbucks.

**Using Email**

Starbucks electronic mail systems are not to be used to:
- Send chain letters,

- Solicit for political candidates,

- Engage in any illegal, unethical or improper activities,

- Further any non-Starbucks business, and

- Disseminate internal mail addresses of partners and contingent workers, including to entities or external mailing lists.

**Passwords**

A poorly chosen password may result in compromising the security of the Starbucks electronic communications systems. Because passwords are the front line of defense for securing critical information, active management of passwords is required.

**Password Composition**

All user level passwords will have the following characteristics:
- A password will have minimum length of 8 characters (for applications that do not support 8 character passwords, use the maximum number of characters possible);

- Passwords will use a combination of upper and lower case characters, and where supported will also include either a number or a "special" character; and

- Password selection should attempt to avoid words found in an English or foreign dictionary.

Additionally, passwords cannot:
- Contain any username, or any part of a username;
- Contain computer terms and names, commands, sites, companies, hardware, software, etc
- Be personal information such as names, names of family members, pet names, fantasy characters, birthdays, home addresses, telephone numbers,

©2011 Starbucks Corporation. All rights reserved. For internal use only.          Updated July 2011          1.15

CONFIDENTIAL                                                        STAR_MARSHALL0000708

anniversaries, etc.;

- Be based on words that are easily associated with Starbucks such as Coffee, Mexico, Latte, etc;

- Be a word or number pattern such as abcdefgh, 123456789, **qwerty**, etc.;

- Be any of the above preceded or followed by a digit(s) such as Coffee3 or 3Coffee; and

- Be passwords used as examples in this or any other document discussing passwords.

It is recommended that the creation of passwords be based on a phrase, title, or some group of words that can be easily remembered. For example, the phrase might be: "This May Be One Way To Remember Passwords" and the password could be: "TmB1w2Rp!"

**Password Protection**

Because passwords provide access to Starbucks resources, all passwords are to be treated as private information and are to be protected as follows:

- Do not write passwords down unless they can be stored securely (encrypted, kept in a locked drawer or cabinet, kept in a password protected file, etc.).

- Do not talk about a password in front of others.

- Do not share passwords over any medium with anyone, including managers, administrative assistants, or family members. If someone requests your password(s), refer them to this document and immediately notify someone at the Enterprise Help Desk.

- Do not configure a system or application for automated entry of a password.

- When using an Internet browser based application (Internet or Intranet) do not check boxes that ask if you want to remember your password.

- Any password used to access Starbucks resources cannot be used as a password to access resources outside the Starbucks organization.

- The practice of using the same password for all systems to which a user has access is discouraged.

**Telephones**

Starbucks supports the use of secure functionally equivalent technologies for partners with disabilities provided usage meets the requirements of this standard.

**Reporting An Incident or Violation**

For the purpose of this standard, a security incident is defined as any security related event which appears to involve malicious intent or involves direct harm or the potential of direct harm to information assets, including any suspected operational or system security weakness or vulnerability. A security incident may also be an act or omission that impairs information security or is intended to harm information assets. Examples of events that should be reported as incidents include virus detections, unexplained account lockouts, suspicious processes or applications, or unknown network connections. It is the responsibility of every partner or contingent

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000709

worker to immediately notify the Enterprise Help Desk if they notice or suspect any security incident. The Enterprise Help Desk will follow the established guidelines and notify the appropriate groups who are responsible to respond to a security incident.

Partners or contingent workers who suspect unauthorized disclosure of private or secret information or any violation of Starbucks Information Security Policies and Standards should communicate their concerns confidentially (on a need-to-know basis) to their manager, Information Security or via the **Business Conduct Helpline** (800-611-7792), to which a report may be made anonymously, if preferred.

**Enforcement**

Failure to comply with the policies and standards may jeopardize the confidentiality, integrity, and availability of the Starbucks information assets and may result in disciplinary action, including loss of network and/or application privileges, or termination of employment. For contingent workers and consultants, violations may result in immediate termination of contract or reassignment of duties. In addition, if a violation of these policies and standards also constitutes a violation of law or statute, such a violation could result in a fine or imprisonment if so prescribed.

CONFIDENTIAL

STAR_MARSHALL0000710

# Receipt of Legal Documents

**Types of Legal Documents**

Legal documents concerning Starbucks are occasionally received in our stores or regional offices, either by mail or personal delivery. Many of these documents are time-sensitive and must be dealt with quickly and appropriately. Examples of legal documents include

- A summons and complaint
- A notice or threat of legal action
- A notice of hearing or court proceeding
- Any document containing a legal caption or reference to a case number
- Correspondence from an attorney
- Any communication from a federal, state, provincial or local government agency, such as the EEOC or state department of civil rights
- Order to garnish, assign or withhold the wages of a partner (whether current or former)
- A subpoena for document production or personal attendance at a court proceeding
- A notice of permit violation
- A request for personnel information

**Where to Forward Legal Documents**

It is imperative that any document that appears legal in nature be forwarded immediately, via fax or overnight delivery, to the following address:

Starbucks Corporation
FAX: (206) 318-7793
Attn: Law and Corporate Affairs
2401 Utah Avenue South, S-LA1
Seattle, WA USA 98134-1067

**Keep Copies**

Please note that copies of all documents that are sent to Law and Corporate Affairs should be retained at the store. In some cases, for example, when a store receives a notice of a health violation relating to the operation of the store, it still remains the responsibility of the store manager to correct the permit violation despite the fact that the violation may have been forwarded to the Starbucks Support Center in Seattle.

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000711

# Employment and Income Verification

Starbucks often receives inquiries from other businesses seeking employment references for former partners. Additionally, if a current Starbucks partner applies for a loan, mortgage or lease, the lender may need to verify the partner's employment and salary information.

To respond to requests for employment information, Starbucks currently uses a national service called The Work Number®. The Work Number® is a fully automated system available 24 hours a day, seven days a week. With the partner's authorization, a prospective employer or a lender may contact The Work Number® to obtain dates of employment, current or last job title, and/or salary information. For more information about how to use the services of The Work Number®, please call their customer service center at (800) 996-7566 or access their website at www.theworknumber.com.

Starbucks partners are strictly prohibited from responding to any requests for personnel information or employment references from any individual or business outside Starbucks. Rather, partners should refer all inquiries to The Work Number® at (800) 996-7566.

CONFIDENTIAL

**Important Employment Policies**

**Additional
Information About
The Work Number®**

Partners may need to obtain official employment verification for rental or mortgage applications, job reference checks or for other reasons. Starbucks will only provide the dates of employment to a third party unless the partner has requested that additional information be released. This can be done by the partner providing a "salary key" through The Work Number®.

### Quick Reference Guide

| | |
|---|---|
| Starbucks Coffee Company Code | 10523 |
| To obtain a partner salary key | (800) 367-2884 or www.theworknumber.com |
| Work Number Customer Service: | (800) 996-7566 |
| Partner Questions | 7 a.m. to 8 p.m. Central time |
| Verifier Questions | Monday – Friday for in-person service; automated service available 24 hours a day, 7 days a week. |
| Verifier Access Numbers: | (800) 367-5690, (900) 555-9675, or www.theworknumber.com |
| Public Assistance Requests: | (800) 607-4365 or www.theworknumber.com |

### Partner PIN numbers

Each partner will be required to enter his or her PIN to generate a salary key. Initially the PIN will be the partner's year of birth followed by the last four digits of their Social Security Number (for example, 19990000), and then the partner will have the option to change their PIN.

Because the PIN uses the partner's year of birth, it is important that this information is correct in our system. If a partner is having difficulty with the PIN, he/she should verify that the correct birth date is in the system. If it is incorrect, the partner should submit an EPAN for a personal information change. Please refer to page 8.14 of the Partner Records section for further guidance on submitting an EPAN.

---

1.20        Updated July 2011        ©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL        STAR_MARSHALL0000713

# Employment of Minors

**For all states except Montana**

Starbucks does not employ persons under the age of 16. Starbucks limits the daily and weekly hours of work of a 16 or 17-year-old partner. Generally, minors may not work:

- Before 7 a.m. or after 12 a.m. (exceptions: after 10 p.m. in Connecticut, District of Columbia, Indiana, Michigan, Rhode Island, Wisconsin).
- More than five consecutive days.
- More than six days per workweek.
- More than eight hours per day.
- More than 40 hours per week.

During the school year, including all holidays and breaks, further restrictions apply in addition to those detailed above. Minors may not work:

- While classes are in session, typically 8 a.m. to 3 p.m.
- After 10 p.m. any night of the week.
- More than four hours per weekday.
- More than eight hours on Saturday or Sunday.
- More than 28 hours per workweek (exceptions: no more than 20 hours in Maine and Washington; no more than 23 hours in Alaska; no more than 26 hours in Wisconsin).

Shift supervisors must be at least 18 years old.

**Employment of Minors in Montana**

**This policy applies only to store operations in the state of Montana.**

To be eligible for employment, Starbucks requires that the candidate be at least 14 years of age. There are no age restrictions on any partner holding the position of shift supervisor, assistant manager, or store manager.

Starbucks limits the daily and weekly hours of work of minors age 14 and 15. Minors age 14 or 15 <u>may not work</u>:

- During school hours, except as provided for in Work Experience and Career Exploration Programs approved by the department of the office of public instruction
- Before 7:00 a.m. or after 7:00 p.m., except that the minor may be employed until 9:00 p.m. during the period outside the school year (June 1 through Labor Day, depending on local standards)
- More than three hours on a school day
- More than 18 hours in a school week
- More than eight hours on a non-school day
- More than 40 hours in a non-school week

Please consult your district manager or Partner Resources manager for more information.

CONFIDENTIAL                                                    STAR_MARSHALL0000714

# Employment of Relatives

To avoid problems with security, supervision or conflict of interest, certain restrictions will apply regarding the employment of a partner's relative.

Starbucks prohibits the employment of relatives in situations where one relative directly or indirectly supervises the work of the other, or where one is responsible for auditing the work of the other. Furthermore, a partner will not be placed in a position where he or she may work with or have access to sensitive information regarding a relative, or where the placement of the two related partners may pose an actual or apparent conflict of interest.

For purposes of this policy, a relative or family member will be construed broadly, and will include a domestic partner.

As an example, a store manager will not be permitted to employ any relative to work in the same store. If a situation arises that conflicts with this policy, appropriate action will be taken, which may include a transfer or the termination of employment of one or both partners.

Updated July 2011

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000715

# Gifts and Entertainment

Starbucks desires to treat fairly all persons and companies with whom it does business such as its customers and vendors. Giving or accepting valuable gifts or entertainment might be construed as an improper attempt to influence the relationship.

A Starbucks partner may not give or receive a gift with a market value of more than $75 per year to or from someone who does or would like to do business with Starbucks. A gift of money should never be given or accepted (except hourly retail partners may accept customary tips for service well done). A gift of nominal value may be given or accepted if it is a common business courtesy, such as coffee samples, a coffee cup, pens or a similar token. A gift or favor should not be accepted or given if it might create a sense of obligation, compromise your professional judgment or create the appearance that it might. In deciding whether a gift is appropriate, consider whether public disclosure of the gift would embarrass you or Starbucks.

A Starbucks partner may not encourage or solicit meals or entertainment from anyone with whom Starbucks does business or from anyone who desires to do business with Starbucks. Partners may offer or accept meals and entertainment if it is reasonable and customary, occurs infrequently and is not expensive.

Starbucks prohibits offering, giving, soliciting or receiving any form of bribe or kickback. There are serious penalties, including criminal sanctions, for engaging in this conduct. Any partner who engages in such conduct will be subject to corrective action, including termination of employment.

If you have any questions about this policy, please talk to your manager or call the Business Conduct Helpline at (800) 611-7792.

CONFIDENTIAL

STAR_MARSHALL0000716

# Inspections

Starbucks strives to maintain a safe and secure work environment for its partners. Generally, Starbucks will respect the privacy of a partner's belongings or work area. Nonetheless, circumstances may justify conducting an inspection. Accordingly, Starbucks reserves the right to open and inspect certain items for prohibited materials, including weapons, dangerous substances, alcohol, illegal drugs or stolen property.

Items subject to inspection may include, but are not limited to, office equipment and furniture provided by Starbucks for partner use, desks, cabinets, lockers, computers, and computer memory, as well as the contents, effects or articles they may contain. An inspection may extend to a partner's personal belongings, such as a purse, briefcase, backpack or gym bag.

An inspection may occur at any time, with or without advance notice or consent from the partner involved; may take place either before, during or after normal working hours and in the absence of the partner involved; and may be conducted by any manager or security personnel designated by Starbucks.

Any partner who fails to cooperate in an inspection may be subject to disciplinary action, up to and including termination of employment.

For more information related to this policy, including the "Partner Bag and Package Check" policies and procedure, see the "Partner Safety and Crime Prevention" section of the *Safety, Security and Health Standards Manual.*

CONFIDENTIAL

STAR_MARSHALL0000717

# Distributing Notices/Soliciting

**For partners**

Partners are prohibited from distributing or posting in any work areas any printed materials such as notices, posters, or leaflets. Partners are further prohibited from soliciting other partners or non-partners in stores or Company premises during working time or the working time of the partner being solicited.

The only exception that may apply to this policy is when a partner is engaged in distribution or solicitation related to a Starbucks-sponsored event or activity. Persons not employed by Starbucks are at all times prohibited from selling, soliciting, distributing, or posting written materials on company premises.

**For non-partners**

If inappropriate solicitation occurs in your store by non-partners, you should politely ask the non-partners to stop, or to leave the store. If it involves partners, you should politely re-direct them back to focusing on work related activities. If you become aware of union solicitation in your store, notify your DM and Partner Resources representative immediately.

CONFIDENTIAL

STAR_MARSHALL0000718

# Partners with Disabilities

Starbucks complies with all federal and state laws regarding the employment of individuals with disabilities. Reasonable efforts will be made to accommodate a partner who has a disability as defined by state and federal law, such as a serious illness or a physical, mental or sensory condition that affects the partner's ability to perform the essential functions of his or her job.

A partner whose disability is negatively impacting his or her ability to perform the job is encouraged to contact his or her manager to discuss the circumstances, so that Starbucks can evaluate the situation and make reasonable accommodations. Managers will treat such information as confidential, except to the extent other partners need to know to accommodate the partner concerned. Starbucks will rely on one or more doctors' opinions if there is any question whether a partner's continued work may pose a health risk, or if there is reason to believe the partner may not be able to meet the demands of his or her job.

# Phone and Pager

**Personal Telephone Calls**

Providing the *Starbucks Experience* to every customer who walks in the door should be each partner's focus. Personal telephone calls while working can distract a partner from providing this experience. Therefore, partners are not permitted to receive personal telephone calls at the store, unless the nature of the call is an emergency. Partners are permitted to make personal telephone calls only while on break, from the store's back room or office, and only if absolutely necessary and without disruption to store operations. Making a personal long-distance telephone call from the store telephone is strictly prohibited.

**Pager and Cellular Phone**

Partners are not permitted to have their personal cell phones and pagers on them while working; cell phones and pagers must be turned off and stowed away with the partner's personal belongings.

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

# Register Operation and Customer Transactions

**Policies**

All partners are required to conduct themselves with the utmost honesty and integrity. This principle applies primarily when engaging in any transaction involving a customer of Starbucks and particularly when engaging in transactions involving the exchange of Starbucks product or merchandise for cash, coupons or store credit. Each partner will be held responsible for each transaction conducted at the cash register till assigned to him or her, including all transactions that take place, counting cash and balancing the till. Depending on one's position, a partner may additionally be responsible for accessing the store safe and preparing bank deposits.

The following standards and procedures apply to all partners:

**Standards and Procedures**

- Enter (ring) all customer transactions into the cash register and provide all customers receipts for their purchases when a receipt is generated; do not void a legitimate customer transaction.
- Leave the register on the "Begin Transaction Screen" prior to leaving the cash register unattended.
- Keep your till secure; do not share your cash register password or your till with any other partner.
- Deposit all bills equaling or exceeding $20 into the cash drop box assigned to the register, as well as any smaller bills when their numbers become excessive.
- Balance your till at the end of your shift; consistent overages and shortages are not acceptable.
- Secure the store safe at all times.
- To drive customer loyalty, Starbucks gives complimentary beverages to customers through various promotions and for customer recovery. Refer to the *POS Register Resource Manual* for use and restrictions of these tools. Complimentary beverages, products, or merchandise are only given to customers as prescribed and should not be given under other circumstances.
- Use Starbucks complimentary beverage invitations, store credit or Starbucks Cards only for their intended purpose.
- Use the "Partner Beverage" transaction appropriately. This is meant solely to process a beverage for a partner who works with you in your store only. Exceptions to this rule may be a district manager or regional director who is visiting your store during their work day. You cannot use it for your own drink, for a customer or for any other reason.
- Adhere to the partner discount policy at all times.

See the "Discount Procedures" section of the *POS Register Resource Manual* for more information.

Failure to abide by these standards may result in corrective action, up to and including termination of employment.

CONFIDENTIAL                                                          STAR_MARSHALL0000720

# Dress Code and Personal Presentation

**Policy**

Your appearance and personal hygiene are important not only to you, but also to our customers and to those who work with you. Starbucks partners must present a clean, neat and professional appearance appropriate of a retailer of specialty gourmet products. A partner who comes to work inappropriately dressed or with unacceptable appearance may not be permitted to start his or her shift. Exceptions to the dress code may be made where required by law to accommodate sincerely held religious beliefs. Please contact your Partner Resources team member for more information about exceptions. Failure to adhere to the dress code may result in corrective action, including termination of employment.

The following are standards that are expected of all partners during the working day.

**Clothing**

### Shirts/Blouses

Plain black or white shirts with collars, polo style shirts, turtlenecks or mock turtlenecks should be worn. No other colors, designs, logos (with the exception of a small manufacturer's logo), writings or combination of white or black are allowed. The shirt may be short- or long-sleeved, but not sleeveless. If an undershirt is worn, such as a turtleneck, it must be the same color as the outer shirt. The shirt must be clean, pressed and tucked in at all times. A sweater may be worn over a turtleneck or shirt in cooler weather and must be solid white or black. Crew neck or v-neck T-shirts are not acceptable, with the exception of Starbucks promotional T-shirts, which may be worn only for the duration of the promotion.

### Pants/Trousers/Shorts/Skirts

Pants, trousers, shorts and skirts must be solid black or khaki (tan). Shorts and skirts must be professional in appearance and never shorter than four inches above the knees. Denim (either blue or black), leather, athletic or stretch-style fabrics and leggings are not allowed.

### Footwear

Your footwear should provide support, comfort and safety. Socks, stockings or pantyhose are required and must be in dark or neutral colors. Shoes must be brown or black work-style shoes or boots with flat heels. Black or brown leather sport shoes are acceptable; white is not. Open-toed shoes, sandals, clogs, cowboy boots, canvas shoes, athletic or jogging shoes are not allowed.

While Starbucks does not require slip-resistant shoes, the company strongly encourages partners to participate in the Slip-resistant Shoe Program as a measure of prevention in our stores.  For details on our shoe program, please refer to the brochure inserted in *Safety at Starbucks: A Guide for Store Partners* found in *Starbucks Partner Kit, U.S. Store Version* (New Hire kit).  If you have general questions or concerns about the shoe program, contact Starbucks Risk Management at 888-796-5282, extension 87475. If partners prefer to purchase their shoes outside

CONFIDENTIAL                                          STAR_MARSHALL0000721

of the Starbucks program, approved brands of slip resistant shoes include: Skechers® Work, Keuka Cafe™, Kmart™ SafeTrax®, Lehigh® Dickies®, Lehigh® SlipGrips™, Payless SafeTStep®, Shoes for Crews® and Wal-Mart® TredSafe.

### Ties/Bows

Ties or bows are optional. If worn, the tie or bow must be a solid dark or neutral color (e.g., black, beige or white) and must be tasteful. Bolo ties are acceptable.

### Headwear

Hats are permitted only if required by state or local laws, or if related to a promotion. The hat must display the Starbucks logo and must always be worn with the bill forward. A scarf may be worn only as a hair band or to tie the hair back and must be in a dark or neutral color.

### Maternity Clothing

Pregnant partners must wear clothing consistent with the above, with certain exceptions. Stretch materials are permitted; the shirt or smock need not be tucked in. A jumper or shift in solid black or khaki (tan) may also be worn.

### Aprons

Upon hire, each partner will receive two or more aprons in good condition (free of holes, tears, stains, etc.), which meet or surpass dress code guidelines. If the partner is working more than 20 hours per week, three aprons will be issued. If the partner is working less than 20 hours per week, two aprons will be issued.

The apron must be worn at all times while working, but should not be worn while on a rest or meal period. The apron must be worn full length; it may not be folded in half and wrapped around one's waist. A clean apron is required at the beginning of each shift. Each partner is responsible for laundering and maintaining his or her own aprons.

Upon separation from employment, the partner is required to return all aprons in good condition (other than normal wear and tear). If the returned aprons are not in good condition, a replacement fee (presently $4.45 per apron, but subject to change) will be deducted from the partner's final paycheck. The partner provides authorization for this deduction by acknowledgement of the receipt of this Guide.

### Hair and Nails

Hair must be clean and brushed. Hair must be kept back from the face and, if it is long, should be tied back with plain clips or hair bands. Hair color should look natural; bright or unnatural colors (for example, purple, blue or green) are not allowed. Beards and mustaches must be neat and trimmed. Fingernails should be clean, well manicured and of short or moderate length. Nail polish or artificial nails of any type are not permitted.

### Perfumes and Aftershaves

Perfume, cologne, shaving lotion or highly fragrant deodorants or powders may not

CONFIDENTIAL

STAR_MARSHALL0000722

be worn because the smell affects the taste and aroma of our coffee.

### Tattoos

Tattoos cannot be visible.

### Jewelry/Body Piercings

Earrings must be small or moderately sized. No more than two earrings per ear may be worn. No other pierced jewelry or ornaments are allowed, including nose rings or tongue studs. Any other jewelry must be kept simple and may not be a distraction.

### Personal Hygiene

Partners must follow all reasonable personal grooming standards, including regular bathing and use of deodorant.

### Pins

Partners are not permitted to wear buttons or pins that advocate a political, religious or personal issue. The only buttons or pins that will be permitted are those issued to the partner by Starbucks for special recognition or advertising a Starbucks-sponsored event or promotion; and reasonably-sized and -placed buttons or pins that identify a particular labor organization or a partner's support for that organization, except if they interfere with safety or threaten to harm customer relations or otherwise unreasonably interfere with Starbucks public image.

Updated July 2011

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR MARSHALL0000723

# Securities Transactions and Insider Trading

**Overview and Purpose**

This policy sets forth a brief summary of the restrictions on securities transactions imposed by the federal securities laws and the policy of and the restrictions imposed by Starbucks Corporation and its subsidiaries (collectively, "Starbucks" or the "Company") regarding transactions in the Company's securities and the securities of other companies doing business with Starbucks. This policy applies to all directors, partners (employees), and independent contractors, advisors and consultants employed by Starbucks (collectively referred to herein as "Starbucks Personnel").

The purpose of this policy is to protect Starbucks Personnel and the Company from legal liability and to safeguard the Company's reputation for integrity. As a result, Starbucks policy and restrictions implemented in accordance with the policy are designed not only to prevent violations of the securities laws and protect Starbucks Personnel, but also to avoid any appearance of impropriety arising from securities transactions by persons associated with the Company.

**Restrictions under the Federal Securities Laws**

The antifraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") impose certain restrictions on all persons in the United States with respect to trading in securities. More specifically, the federal securities laws prohibit trading securities while in possession of material non-public information relating to such securities or disclosing material non-public information to enable another person to trade on such information.

The term "trading" refers to all purchases and sales of securities for value, including purchases effected through stock option exercises. The term "securities" includes not only common stock, but also preferred stock, bonds, notes, options, warrants, puts, calls and other equity and debt instruments. "Material non-public information" is confidential information that is not available to the general public relating to a company, its business operations or securities, which would be likely to affect the market price of any of its securities or would be considered important by a reasonable investor in determining whether to buy, sell or hold securities.

Examples of such information include sales and earnings estimates, the number of stores projected to be opened, plans for expansion into new markets, details of merger and acquisition activity, internal financial reports, developments in significant litigation and senior management changes. Trading on such information and improperly disclosing such information to others who may trade on the basis of such information are commonly known as "insider trading" and "tipping," respectively.

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

In addition to the general prohibitions against insider trading and tipping, the federal securities laws specifically prohibit directors and officers of the Company from engaging in securities transactions that are only profitable if the price of the Company's securities declines. These "short sales" of the Company's securities create a conflict of interest for individuals who have a duty to act in a manner that they reasonably believe to be in the best interests of the Company. Specifically, Section 16 of the Exchange Act prohibits directors and officers of the Company from (i) selling equity securities of the Company that they do not currently own, or (ii) failing to deliver equity securities after sale within twenty (20) days or failing to deposit such securities in the mail or other channel of transportation within five (5) business days after sale.

Insider trading, tipping, and improper short sales by directors and officers may result in substantial liability to Starbucks and criminal and civil liability for the individual involved. *Accordingly, it is the policy of Starbucks to prohibit Starbucks Personnel from trading on or improperly disclosing material non-public information and to prohibit short sales of Starbucks securities by directors and officers of the Company.*

If you are unsure whether an activity may constitute insider trading and/or tipping, call the Business Conduct Helpline at (800) 611-7792.

## Starbucks Trading and Disclosure Restrictions Policy

To assist Starbucks Personnel in complying with federal securities laws and Starbucks policies, Starbucks requires all Starbucks Personnel to abide by the following specific trading and disclosure restrictions.

Starbucks Personnel may not trade in the securities of Starbucks or a company doing business with Starbucks if they are aware of material information relating to Starbucks or such company that has not been available to the public for at least one full business day. Information is generally considered to be "available to the public" if it has been disclosed in a nationally distributed press release or included in a filing with the Securities and Exchange Commission or other government agency that makes such information available to the public.

In addition, Starbucks Personnel may not disclose material information relating to Starbucks or a company doing business with Starbucks to any other person, except when such other person needs to know such information in order for Starbucks to effectively conduct business, and there is no reason to believe that the information will be used for improper trading or inappropriately disclosed by such person, until the information has been available to the public for one full business day.

Under no circumstances may Starbucks Personnel recommend or suggest to another person that he or she buy, sell or hold securities of Starbucks or a company doing business with Starbucks on the basis of material non-public information.

In addition to the restrictions set forth above, directors, officers and certain partners

©2011 Starbucks Corporation. All rights reserved. For internal use only.

CONFIDENTIAL

STAR_MARSHALL0000725

of Starbucks with regular access to material non-public information will be subject to Company blackout periods during which they may not trade Starbucks securities. The general counsel of the Company will determine when such blackout periods are imposed and the duration of such blackout periods.

**Anyone in doubt about the application of this policy must consult with and seek the approval of the general counsel before proceeding with any transaction involving securities of Starbucks or a company doing business with Starbucks and before disclosing material information concerning Starbucks or a company doing business with Starbucks. A violation of this policy may result in immediate dismissal from Starbucks. To reach the general counsel, partners may call the Business Conduct Helpline at (800) 611-7792.**

CONFIDENTIAL

STAR_MARSHALL0000726

# Smoking

Starbucks provides a smoke-free environment for all partners and customers. Smoking in all forms, including electronic cigarettes, is not permitted in Starbucks stores or offices. Smoke or the smell of smoke is easily absorbed by coffee beans. If a partner chooses to smoke while on break and outside the premises, the partner must first remove his or her apron and hat, if applicable. The partner is also required to wash his or her hands before returning to work.

# Standards of Business Conduct and The Business Conduct Helpline

**Standards of Business Conduct**

Starbucks reputation for integrity flows from our steadfast commitment to our core values and guiding principles which require compliance with the law and ethical conduct. Starbucks depends on partners to follow the law and to make the right decisions. Starbucks has adopted a code of conduct that provides partners with this guidance. These guidelines are called the Starbucks Standards of Business Conduct (referred to herein as "Standards") and are in a separate booklet that is distributed to all new partners upon hire.

Starbucks Standards provide partners practical overviews of some of the legal and ethical standards that must be followed on a day-to-day basis. Some of those Standards are repeated in this *Partner Resources Manual,* such as those addressing Alcohol and Drugs, Conflict of Interest, and Wage and Hour Rules.

All partners should read and become familiar with these Standards. If a partner is uncertain about something he or she intends to do while acting as a Starbucks partner or conducting Starbucks business, and the partner cannot find the guidance needed in either the Standards or this manual, the partner should contact his or her manager or Partner Resources manager for assistance.

**The Business Conduct Helpline**

The Business Conduct Helpline has been established to answer partners' question about legal or ethical issues at work, to clarify the Standards of Business Conduct and to provide partners yet another means to ask questions or report potential wrongdoing. Matters reported through the Helpline may include, but are not limited to, any form of harassment or discrimination, safety and security violations, violations or wage and hour laws, health code issues, situations involving illegal drugs, substance abuse, weapons or violence, or instances of improper conduct. Partners may remain anonymous when calling the Helpline.

The Business Conduct Helpline, (800) 611-7792, is available 24 hours a day, seven days a week.

All concerns reported to the Helpline will be taken seriously and treated in a confidential manner. Starbucks does not tolerate retaliation against any partner who, in good faith, raises concerns or questions regarding a potential violation of Starbucks policy.

CONFIDENTIAL

STAR_MARSHALL0000727

# Video and Audio Recording

Starbucks installs security cameras in the stores for partner and customer safety and to monitor activities involving cash. Partners should be aware that these security cameras will capture video and/or audio recordings.

# Weapons

Starbucks strictly prohibits the possession of any weapon in a Starbucks store or on Starbucks property. For purposes of this policy, a weapon is broadly defined to include a firearm, knife, baseball bat, or as otherwise provided by the criminal code of any jurisdiction in which Starbucks does business.

# Workplace Violence

Starbucks does not tolerate violence or threats of violence in the workplace. Violence or a threat of violence may be defined as the use of physical force or a display of behavior or use of words that causes another person to believe that he or she is in imminent harm. Any partner who engages in workplace violence may be subject to immediate termination from employment.

If a partner observes a display of workplace violence, the partner should immediately inform his or her store manager, district manager or Partner Resources team member.

For more information related to this policy, including the conflict resolution procedure and additional tips for preventing workplace violence, see the "Partner Security and Crime Prevention" section of the *Safety, Security and Health Standards Manual*

CONFIDENTIAL

# Time Away From Work

This section describes the different types of time away from work available to partners.

Paid Time Off ................................................................................6.2

Personal Days ................................................................................6.3

Vacation ................................................................................6.4

Jury/Witness Duty ................................................................................6.8

Bereavement ................................................................................6.9

Sick Pay ................................................................................6.10

Reporting Time Off ................................................................................6.11

Unpaid Time Off ................................................................................6.12

Family/Medical Leave ................................................................................6.14

State Leave ................................................................................6.19

Medical Leave ................................................................................6.20

Pregnancy Disability Leave ................................................................................6.21

Disability Leave ................................................................................6.22

Military Leave ................................................................................6.24

Personal Leave ................................................................................6.26

Career Coffee Break ................................................................................6.28

Leave of Absence Quick Reference Guide ................................................................................6.32

CONFIDENTIAL

STAR  MARSHALL0000729

# Paid Time Off

Starbucks offers partners several forms of paid time off. These include:

- Personal Days
- Vacation
- Jury/Witness Duty
- Bereavement
- Sick Time
- Holidays

    Refer to "Holiday Pay Policy" in section 4 for more information.

Eligibility for each type of paid time off may vary depending on the partner's length of service and their position.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000730

# Personal Days

Starbucks awards salaried and nonretail hourly nonexempt partners two paid personal days each year. To be eligible, the partner must have worked for Starbucks at least 90 days prior to the award date. The first personal day is awarded on January 1 and the second personal day is awarded on July 1. A personal day may be taken at any time before the next award date. The partner must submit a request to take a personal day in advance for approval by his or her manager. An unused personal day will be forfeited if not taken by the next award date.

A full-time partner (one who regularly works 40 or more hours each week, such as a store manager or assistant store manager) will receive eight hours of pay for each personal day.

Personal day benefit hours cannot be split between days. Time must be recorded in the Paid Time Off Log.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000731

# Vacation

**Policy**

Starbucks offers paid vacation to its partners to refresh and relax. The following principles apply to all partners:

- Retail hourly partners are eligible to begin accruing and using vacation time after completing 12 months of continuous service with Starbucks. Retail salaried partners begin accruing vacation upon date of hire and can use it after six months of service.

- Vacation time is not available until the partner has worked at least 12 months for retail hourly nonexempt partners (baristas, shift supervisors and café attendants) and six months for salaried partners (store managers and assistant store managers).

- Vacation time must be requested in advance, preferably at least 30 days, to plan for the partner's absence. The partner should submit a vacation request to his or her manager.

- Vacation time may not be donated, borrowed or taken as cash in lieu of time off.

- Vacation is paid at the rate of pay the partner is earning at the time vacation is taken.

- Prior employment with Starbucks will not increase the amount of vacation time to which the partner is entitled.

- The partner may be required to use paid vacation to substitute for any or all unpaid leave, depending on the reason for the absence. Refer to the section "Unpaid Time Off."

Starbucks offers two different vacation programs for its retail partners: the Accrual Program and the Grant Program. The program that applies to you depends on your store position and where you work.

**Accrued Vacation**

The Accrual Program applies to all hourly nonexempt partners in all states, and to all store managers and assistant store managers who work in California, Colorado, Illinois, Louisiana or Massachusetts.

*For all retail hourly nonexempt partners:* After 12 months of continuous service retail hourly nonexempt partners accrue paid vacation for each hour worked as follows:

In the second and third year of employment, vacation accrues at the rate of .02 hours for each hour worked. At this rate, a full-time partner working 40 hours a week would receive 40 hours of vacation and a part-time partner working 20 hours a week would receive 20 hours of vacation.

In the fourth and fifth year of employment, vacation accrues at the rate of .04 hours for each hour worked. At this rate, a full-time partner working 40 hours a week would receive 80 hours of vacation and a part-time partner working 20 hours a week would receive 40 hours of vacation.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

In the sixth year of employment and thereafter, vacation accrues at the rate of .06 for each hour worked. At this rate, a full-time partner working 40 hours a week would receive 120 hours of vacation and a part-time partner working 20 hours a week would receive 60 hours of vacation.

Starbucks limits or "caps" the amount of vacation time a partner may accrue. The maximum amount that may accrue depends on how long the partner has been employed. If accrued but unused vacation hours reach the cap, a partner will cease to earn any additional vacation time until the partner uses some of the accumulated time and the total vacation time falls below the maximum accrual limit.

**Accrual Rates**   The following table summarizes the accrual limits for retail hourly partners:

| Completed Months of Service | Maximum Vacation Accrual Limit |
|---|---|
| 12 but less than 36 | 40 hours |
| 36 but less than 60 | 80 hours |
| 60 or more | 120 hours |

For salaried nonexempt partners (managers and assistant managers) in the states of California, Colorado, Illinois, Louisiana and Massachusetts, paid vacation time accrues with each hour the partner works, beginning with the date of hire. The accrual rate increases the longer the partner remains employed. In the first three years of employment, vacation accrues at the rate of 80 hours per year. In the fourth and fifth years of employment, vacation accrues at the rate of 120 hours per year. In the sixth, seventh, eighth, ninth and 10th years of employment, vacation accrues at the rate of 160 hours per year.

And, finally, beginning with the manager's 11th year of employment and every year thereafter, vacation accrues at the rate of 200 hours per year.

The following table summarizes the accrual rates and accrual limits for all store and assistant store managers working in California, Colorado, Illinois, Louisiana or Massachusetts:

| Completed Months of Employment | Maximum Vacation Accrual Limit |
|---|---|
| Less than 36 | 80 hours |
| 36 but less than 60 | 120 hours |
| 60 but less than 120 | 160 hours |
| 120 or more | 200 hours |

When employment ends: A partner will be paid any accrued but unused vacation hours at the time of separation from employment.

CONFIDENTIAL                                    STAR_MARSHALL0000733

**Granted Vacation**   The Grant Program applies to all managers and assistant managers working in states other than California, Colorado, Illinois, Louisiana and Massachusetts.

On October 1 of each year, each manager will receive a grant of a certain number of vacation hours. The number of hours will depend on how long the manager has been employed with Starbucks. These vacation hours are available for the manager to use through the following September 30. Any vacation hours not used by September 30 will be lost.

The following table summarizes the grant rates for all managers and assistant managers working in states other than California, Colorado, Illinois, Louisiana and Massachusetts:

| Completed Months of Employment as of October 1 | Annual Grant Amount |
|---|---|
| Less than 36 | 80 hours |
| 36 but less than 60 | 120 hours |
| 60 but less than 120 | 160 hours |
| 120 or more | 200 hours |

Grant amounts increase after the manager's third, fifth and 10th anniversaries with Starbucks. On the October 1 prior to the third, fifth and 10th anniversaries, the manager's vacation grant will be adjusted upward, on a pro-rata basis, to take into account the manager's upcoming anniversary.

*For example: On October 1, 2007, Jill has completed 30 months of employment with Starbucks, which according to the table above, would entitle her to 80 hours of vacation. However, she will celebrate her third anniversary with Starbucks at the mid-point of the next fiscal year, on April 1, 2007. Her grant on October 1, 2007, is 100 hours (80 hours plus one-half of the additional 40 hours she will receive for the next grant level).*

Vacation grants are rounded up to the next full day (or eight hours).

Therefore, in the above example, Jill's 100 hours (12.5 days) of vacation grant would be rounded up to 13 days.

*Grants for new managers:* A manager hired on or after October 1 but before March 1 will receive a pro-rated grant based on the partner's date of hire after completing six months of service. This grant is to be used by September 30. On October 1, the manager will receive the first full grant of 80 hours.

A manager hired in the month of March will receive his or her first vacation grant of 80 hours on the next October 1.

A partner hired on or after April 1 but before October 1 will receive his or her first vacation grant of 80 hours after completing six months of service.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL                                    STAR_MARSHALL0000734

When employment ends: Unused granted vacation time may not be used to extend the date on which employment ends. Unused granted vacation time is forfeited upon termination from employment.

## Changing Between Accrued and Granted Vacation

The method by which a partner receives vacation may change if the partner transfers, is promoted or is demoted from one position to another, or if the partner moves in or out of California, Colorado, Illinois, Louisiana or Massachusetts.

- If the partner changes from the accrual to the grant method, the unused balance of accrued vacation will be paid to the partner. The partner will then receive a pro-rated grant of vacation that must be used by September 30.

- If the partner changes from the grant to the accrual method, any unused granted vacation will be converted to accrued vacation. Partners can use accrued vacation even if they have not completed 12 months of service but will not accrue more until the later of the following; the date they have been employed for 12 continuous months and their vacation balance is below the maximum accrual limit or  on October 1 as long as their vacation balance is below the maximum accrual limit.

## When Employment Ends

A partner will be paid any accrued but unused vacation hours at the time of separation from employment. Partners with less than six months of service when separated from employment will not receive pay for unused accrued vacation time, except as required by law.

Any unused granted vacation time will be forfeited. Unused vacation time cannot be used to extend the date on which employment ends and cannot be used in the final four weeks of employment.

CONFIDENTIAL

STAR_MARSHALL0000735

# Jury Duty/Witness Duty

**Policy**

If summoned to serve on a jury or subpoenaed to testify as a witness, the store manager must immediately obtain a copy of the summons or subpoena from the partner and make arrangements for the partner's time away from work. Time must be recorded in the Paid Time Off Log.

**Jury/Witness Pay**

Pay is granted for time off required for jury service, including time actually sitting on a jury or testifying in court and is available only if the partner actually missed work or a scheduled shift as a result of the jury or witness duty. To receive pay, the partner must record the jury duty in the Paid Time Off Log, and provide the store manager with written documentation of service as a juror.

**Time Allowed for Leave**

Starbucks will pay a partner's regular salary or wages for up to 10 days missed for jury and witness duty; leave in excess of 10 days will be unpaid.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000736

**Time Away From Work**

# Bereavement

**Policy**

Starbucks provides time off with pay for a partner who experiences the death of a family member. The partner will receive up to two consecutive days off with pay. If overnight travel is required, up to two additional consecutive days (for a total of four days) of time away from work will be paid. If the partner is notified of the family member's death while working, the partner will be permitted to take the remainder of the shift off with pay.

For purposes of this policy, a "family member" includes the partner's spouse, domestic partner, parent, step-parent, grandparent, child, stepchild, grandchild, step-grandchild, sibling, or the partner's spouse or domestic partner's parent, grandparent, sibling or child.

To receive time off for bereavement, the partner must submit a written request to, and receive approval from, the store manager or district manager. An hourly nonexempt partner's daily pay for bereavement leave will be based on the average number of hours worked per day over a specified period of time. Store managers and assistant store managers will be paid their regular salary for the weeks in which bereavement time is taken. The store manager must ensure that the time is recorded in the Paid Time Off Log.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000737

# Sick Pay

**Policy**

Sick pay is available to store managers, assistant store managers and retail management trainees only. Sick pay is not available to hourly retail partners except as legally required.

Sick pay is provided to compensate for the occasional day off needed because of illness or injury, to attend medical or dental appointments, or to care for an ill family member. For purposes of this policy, a family member includes a spouse, domestic partner, parent, grandparent, child or grandchild.

Eligible partners may begin to use sick pay after 90 days of employment. Sick pay is paid at the partner's rate of pay at the time the sick pay is used.

**Accrual of Sick Pay**

Sick pay accrues from the partner's date of hire at a rate of approximately five days (40 hours) per year. A maximum of 65 days (520 hours) of sick pay will accrue. If accrued but unused sick pay reaches the limit, no additional sick pay will accrue until the partner uses some of the sick pay balance and the total sick pay falls below the maximum accrual limit. Accrued but unused sick pay is forfeited upon separation of employment.

A partner who misses more than three consecutive days may be eligible for Family/Medical leave and/or short-term disability benefits. For more information about short-term disability, refer to the Time Off and Income Protection chapters in the *U.S. Benefits Plan Description* or call Starbucks Benefits Center – Leave Administration at (877) SBUXBEN or (877) 728-9236.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000738

# Reporting Paid Time Off

## Policy for Managers

A manager or assistant store manager who misses a day of work must accurately report the time off during the same week the time off occurs. A store manager is required to receive approval for vacation, a personal day, jury/witness duty or bereavement leave from his or her district manager, and the assistant store manager must receive approval from his or her store manager. Similarly, the assistant store manager and store manager are expected to notify their next-level manager as far in advance as possible if the absence is due to illness or injury, and a sick day is being used.

All salaried managers (both exempt and nonexempt) report paid time off in Time and Attendance in full day (eight-hour) increments only. Paid time off as vacation or sick is not available if the manager has not accrued at least eight hours. If less than a full day is worked, no time is recorded as paid time off. For example, if a manager must leave early for the day due to illness, no time is reported as sick time. If, however, a manager misses a full day of work due to illness, eight hours are entered into Time and Attendance for that day as "sick." The store manager must ensure that the time is recorded in the Paid Time Off Log.

## Policy for Hourly Partners

An hourly partner is required to receive approval for paid time off from his or her store manager. The store manager will report paid time off in Time and Attendance for each day that work is missed. Paid time off must be recorded as vacation, personal day, jury duty or bereavement. The amount of pay that an hourly partner will receive for the day missed may be based on the average number of hours the hourly partner has worked for a certain period of time preceding the day off. The store manager must ensure that the time is recorded in the Paid Time Off Log.

CONFIDENTIAL

STAR_MARSHALL0000739

# Unpaid Time Off

**Policy**

Starbucks offers partners leaves of absence for extended periods, depending on the reason the partner needs time off. These leaves are unpaid and include:

- Family/Medical
- State
- Medical
- Pregnancy Disability
- Disability
- Military
- Personal
- Career Coffee Break

**Requesting a Leave of Absence**

To apply for a leave of absence or to obtain more information, a partner must contact Starbucks Benefits Center – Leave Administration at (877) 728-9236 and select the leave of absence option. Leave Administration will counsel partners about leave of absence eligibility, required documentation, use of paid time off, short-term disability benefits, continued health coverage and other topics. Leave Administration will also mail leave of absence applications, required forms and reference materials to the requesting partner.

In extreme circumstances, a manager may contact Leave Administration to initiate a leave for a partner that is unable to do so.

**Approval Process for Leave of Absence**

All required forms must be completed and returned to Leave Administration by the deadline date indicated on the materials sent to the partner. After review of the partner's request for leave, an email notification will be sent from Leave Administration informing if the partner's leave has been approved and their expected return to work date. Leave Administration will regularly update the partner, partner's manager and Partner Resources generalist as to the partner's leave status and if additional action is needed.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000740

**Performance Review and Merit Increases While on Leave**

All pay increases are delayed while a partner is on an approved leave (with the exception of Military leave). If the partner was in active status for enough of the performance period that a review is appropriate, the partner should receive a performance review and any corresponding pay change that was scheduled to occur during his or her leave upon returning to work. The effective date of the increase will be the date the partner returned to work.

The performance review schedule for retail hourly partners will be reset to six months from the date the partner returns to work. Store managers and assistant store managers will have no change to their performance review schedule.

For partners returning from Military leave, the partner should receive a performance review and any corresponding pay change that was scheduled to occur during his or her leave. The effective date of the increase will be retroactive to the date on which the review was scheduled, with no change to the schedule for upcoming performance reviews.

CONFIDENTIAL

STAR  MARSHALL0000741

# Family/Medical Leave

**Policy**

Starbucks Family/Medical Leave is intended to provide benefits consistent with the federal Family and Medical Leave Act of 1993. At all times, Starbucks will follow applicable state law to the extent state law provides benefits more generous than those provided here.

Family/Medical Leave is available if the partner is absent:

- Due to a serious health condition that prevents the partner from working, including an on-the-job injury;

- Due to pregnancy or childbirth;

- To care for a family member with a serious health condition;

- To stay home to care for a newborn child, newly adopted child or newly placed foster child:

    - Due to any qualifying exigency arising out of the fact that the partner's spouse, son, daughter, or parent is a covered military member on active duty or has been called to active duty in support of a contingency operation; or

    - To care for a covered service member with a serious injury or illness (if the partner is the spouse, son, daughter, parent or next of kin).

For purposes of this policy a family member includes the partner's spouse, domestic partner, parent or child. A child is defined as a biological, adopted, foster or stepchild under age 18 or as otherwise defined by state or federal law, or a child over age 18 who is incapable of self-care because of a mental or physical disability.

**Eligibility,
Frequency and
Duration of Leave**

To be eligible for Family/Medical Leave, the partner must have been continuously employed by Starbucks for at least 90 days and actively working during that time.

If eligible, the partner has available up to 12 weeks of Family/Medical Leave every 12 months or up to 26 weeks to care for a covered service member with a serious illness or injury (Military Caregiver leave). Starbucks calculates the amount of time the partner has available by reviewing the 12-month period preceding the partner's first day of leave. The amount of Family/Medical Leave taken in the prior 12 months will be subtracted from the 12 weeks of Family/Medical leave otherwise available to the partner. For Military Caregiver leave, the partner has 26 weeks available in the 12 months following the first date of leave.

If the partner and his or her spouse/domestic partner are both employed by Starbucks, together they are entitled to one 12 or 26 -week period. A maximum of 12 weeks to care for a newborn child, newly adopted or newly placed foster child or seriously ill parent. Family/Medical Leave taken for the care of a newborn, newly adopted, or newly placed foster child must be taken within 12 months of the birth or placement or

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000742

a maximum of 26 weeks to care for an ill or injured service member.

**Requesting Family/Medical Leave**

To apply for a leave of absence or to obtain more information, a partner must contact Starbucks Benefits Center – Leave Administration at (877) 728-9236 and select the leave of absence option. A request for Family/Medical leave must be made at least 30 days in advance of the partner's first day off work. If advance notice cannot be provided because of sudden or unexpected circumstances, notice should be provided as soon as possible. If less than 30 days notice is provided, the partner will be asked to provide a written explanation. Notice must be provided to the partner's manager and Starbucks Benefits Center – Leave Administration to initiate the leave.  Leave starts on the approved start date regardless of any pay the partner is receiving while on leave.

If Family/Medical leave is requested due to a serious health condition or to care for an ill family member, the partner will receive paperwork that must be completed by the partner's (or the family member's) health care provider. It is the partner's responsibility to ensure that all paperwork is completed and returned by the deadline date indicated in the materials sent to the partner. Failure to complete and return the necessary paperwork may delay the commencement of the partner's leave, or if leave has already begun, may result in a determination that the leave is unauthorized.

CONFIDENTIAL

STAR_MARSHALL0000743

## Continued Benefits

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage will continue while the partner is on an approved Family/Medical Leave, subject to Starbucks ongoing benefits eligibility requirements. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information. The partner will be responsible for remitting the contributions for continued coverage.

Partners will continue to pay the same active benefits contributions while on Family/Medical leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following his or her return to work.

If a partner does not maintain their benefits contributions while on Family/Medical leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000744

**Time Away From Work**

**Substitution of Paid Time Off**

Family/Medical Leave is unpaid. However, a partner may be required to substitute any accrued but unused sick pay if the reason for leave is due to the partner's own serious health condition (and they are not receiving short-term disability benefits) or to care for a family member with a serious health condition. If sick pay is not available or if the leave is for another qualifying purpose, the partner may be required to draw vacation pay for any or all of the unpaid Family/Medical Leave.

Depending on the partner's reason for leave they should use paid time off as follows:

| Use of paid time off during Family/Medical Leave | If the reason for leave is for partner's own serious health condition | If the reason for leave is to care for a partner's family member with a serious health condition | If reason for leave is to stay home and care for newborn child, newly adopted child or newly placed foster child |
|---|---|---|---|
| **First three days of leave** | Use accrued sick pay. If sick pay is not available, use vacation. | Use accrued sick pay. If sick pay is not available, use vacation. | Use vacation for duration of time off or until balance is exhausted. |
| **Remainder of leave** | If eligible for Starbucks short-term disability benefits, partner can apply to receive 66 2/3 % income replacement.<br><br>If not eligible for Starbucks short-term disability benefits or partner chooses to use paid time off in lieu of disability, partner should use accrued sick pay and/or vacation balance for duration of time off or until balance is exhausted. | Use accrued sick pay and/or vacation balance for duration of time off or until balance(s) are exhausted. | Use vacation for duration of time off or until balance is exhausted. |

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000745

In all cases, partners should not receive regular pay while on a leave of absence, so it is important to call Starbucks Benefits Center - Leave Administration to report the partner's time away from work.

A partner who is unable to work because of an on-the-job injury or illness may be eligible for time-loss compensation through Workers Compensation Insurance.

## Return to Work

When Family/Medical leave ends, the partner will return to work in the same position held when the leave began or to a similar position with similar pay, benefits and other terms and conditions of employment. The partner is required to contact his or her manager at least two weeks in advance of the return to work to ensure that the partner is scheduled to work. Additionally, a partner who has been unable to work due to his or her own serious health condition may be required to provide medical documentation of his or her fitness to return to work.

## Family and Medical Leave Act Poster

Starbucks Family/Medical Leave policy is intended to comply with the federal Family and Medical Leave Act of 1993. Posters placed in all U.S. stores provide partners with further details regarding their rights and responsibilities under the FMLA. Additional information can be obtained by contacting Starbucks Benefits Center - Leave Administration or your Partner Resources generalist.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000746

# State Leave

**Policy**

Partners who are not eligible for, or have exhausted Starbucks Family/Medical leave, may be eligible for a State leave if the state they work in offers job protected leaves. When applicable, State leaves will run concurrently with Starbucks Family/Medical leaves.

Eligibility requirements can be different by state. For more information or to apply for a State leave, contact Starbucks Benefit Center Leave Administration at 877-728-9236 and select the leave of absence option.

**If you do not apply for leave, your absence will not be approved.**

CONFIDENTIAL

STAR_MARSHALL0000747

# Medical Leave

**Policy**

Medical Leave is available to a partner who is unable to work due to a serious health condition and who qualifies for and is approved for short-term disability benefit, either under Starbucks short-term disability plan or a disability benefit pursuant to state law, presently in CA, HI, NY, NJ and RI.

The maximum duration of a continuous Medical Leave is 26 weeks. A Medical Leave may run concurrent with Family Medical Leave under Starbucks policy or state leave if available.

To apply for a Medical Leave or to obtain more information, a partner must contact Starbucks Benefits Center – Leave Administration at (877) 728-9236 and select the leave of absence option.

Generally, medical documentation verifying the reason for and the expected duration of the leave will be required. A partner's failure to submit medical documentation may result in denial of leave and/or separation from employment.

**Continued Benefits**

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage will continue while the partner is on an approved Medical Leave, subject to Starbucks ongoing benefits eligibility requirements and other restrictions. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information. The partner will be responsible for remitting the contributions for continued coverage.

Partners will continue to pay the same active benefits contributions while on Medical Leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following their return to work.

If a partner does not maintain their benefits contributions while on Medical Leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

**Return to Work**

A partner must contact his or her manager at least two weeks prior to the end of their leave to make arrangements to return. Generally, a partner will be reinstated to his or her same position. However, Starbucks cannot guarantee that he or she will retain the same position upon their return to work.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000748

# Pregnancy Disability Leave

**Policy**

Pregnancy Disability Leave is provided to a partner who is unable to work due to pregnancy or childbirth. Pregnancy Disability Leave will be administered in accordance with applicable state law. No eligibility restrictions apply. Unless otherwise prohibited by state law and upon satisfaction of eligibility requirements, Pregnancy Disability Leave will also be counted as Family/Medical Leave under Starbucks policy.

To apply for a Pregnancy Disability Leave of absence or to obtain more information, a partner must contact Starbucks Benefits Center – Leave Administration at (877) 728-9236 and select the leave of absence option.

**Continued Benefits**

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage will continue while the partner is on an approved leave, subject to Starbucks ongoing benefits eligibility requirements. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information. The partner will be responsible for remitting the contributions for continued coverage.

Partners will continue to pay the same active benefits contributions while on leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following his or her return to work.

If a partner does not maintain their benefits contributions while on Pregnancy Disability Leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

**Return to Work**

A partner must contact his or her manager at least two weeks prior to the end of their leave to make arrangements to return. Generally, a partner will be reinstated to his or her same position.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000749

# Disability Leave

**Policy**

A leave of absence may be granted to accommodate a disability, consistent with the requirements of the Americans with Disabilities Act (ADA) or applicable state laws. If the partner's disabling condition qualifies as a serious health condition under Starbucks Family/Medical leave policy, the partner's request for Disability leave will be treated as a request for Family/Medical leave. Disability Leave may be approved if Family/Medical, State or Medical Leave is not available.

To apply for a Disability Leave or to obtain more information, a partner must contact Starbucks Benefits Center – Leave Administration at (877) 728-9236 and select the leave of absence option.

Generally, medical documentation verifying the reason for and the expected duration of the leave will be required. A partner's failure to submit medical documentation may result in denial of leave and/or separation from employment. Upon receipt of the required medical documentation, Starbucks will conduct a review to determine whether the leave may be reasonably accommodated. Starbucks will also reasonably accommodate the partner's return to work by reinstating the partner into a suitable position.

**Continued Benefits**

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage may continue while the partner is on an approved Disability Leave, subject to Starbucks ongoing benefits eligibility requirements and other restrictions. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information. The partner will be responsible for remitting the contributions for continued coverage.

Partners will continue to pay the same active benefits contributions while on Disability Leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following their return to work.

If a partner does not maintain their benefits contributions while on Disability Leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000750

**Return to Work**   A partner must contact his or her manager at least two weeks prior to the end of their leave to make arrangements to return. Generally, a partner will be reinstated to his or her same position. However, Starbucks cannot guarantee that he or she will retain the same position upon their return to work.

CONFIDENTIAL

STAR_MARSHALL0000751

# Military Leave

**Policy**

Starbucks abides by all applicable federal and state laws in providing members of our military services with an unpaid leave of absence to attend to military duties. If a partner is a member of the military and receives notice of annual reserve training or active duty, the partner must immediately notify his or her manager to arrange for the time away from work. The partner should also contact Starbucks Benefits Center - Leave Administration at (877) 728-9236 to obtain a Military Leave of Absence packet. The partner may also be required to provide a copy of the military orders and/or extension to their orders.

**Military Allowance**

When a partner is called to active duty, Starbucks will pay the difference between the partner's pay from Starbucks and his or her military pay. An hourly partner's average weekly pay will be calculated on the basis of earnings for 26 weeks (or less if employed less than 26 weeks) prior to the commencement of military leave.

The military allowance will be paid for the duration of the military leave, up to 52 weeks for a partner with less than six months of continuous service with Starbucks or up to 78 weeks for a partner with six months or more of continuous service.

A partner participating in annual reserve training or whose military pay exceeds his or her regular pay with Starbucks will not be eligible for the allowance. In those instances, the partner may elect to draw vacation pay to substitute for any or all of the unpaid military leave.

**Continued Benefits**

Health care coverage (medical, dental and vision) for partners and their eligible enrolled dependents may continue through the end of the month in which the 52nd week of military leave falls for partners with less than six months of continuous service, and the 78th week for partners with six or more months of service. A partner's life and disability coverage will continue through the end of the 12th month of continued military leave.

If a partner loses benefits eligibility because the partner's military leave exceeds the maximum amount of time that active coverage is offered, the partner's benefits will be reinstated the first day of reemployment, provided that the partner has applied for reemployment within the required time frames outlined by USERRA.

The partner will be responsible for remitting the contributions for continued coverage.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000752

Partners will continue to pay the same active benefits contributions while on Military leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following their return to work.

If a partner does not maintain their benefits contributions while on Military Leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

## Return to Work

Upon return from Military Leave, Starbucks will make reasonable efforts to reinstate a partner to his or her same or similar position in accordance with USERRA. Reporting to work or applying to return to work varies based on the length of time the partner was called into military service. Consult your Partner Resources generalist for more information.

## Your Rights Under USERRA Poster

Starbucks intends for its Military Leave policy to comply with the Uniformed Services Employment and Reemployment Act (USERRA). A Notice Of Your Rights Under USERRA poster, which provides partners with further details, is placed in all U.S. stores. Additional information can be obtained by contacting Starbucks Benefits Center - Leave Administration or your Partner Resources generalist.

CONFIDENTIAL

# Personal Leave

**Policy**

An unpaid leave of absence for personal reasons is available in exceptional circumstances. To be eligible, the partner must have been continuously employed with Starbucks for at least 90 days. Personal Leave is limited to 30 days and only one Personal Leave will be granted every three years. A Personal leave of absence must be approved by the partner's manager and Partner Resources team member and/or district manager.

Managers should not approve requests for retail hourly partners to go "off the schedule" without first consulting with the Partner Resources manager to determine if that time off qualifies as a personal leave. Generally, a partner is considered off the schedule when a partner is not scheduled to work for two weeks or longer.

A partner on Personal Leave will be required to use unused vacation pay to substitute for any or all of the unpaid Personal leave.

Personal leave is not available to attend school or to extend Family/Medical Leave, Medical Leave, Disability Leave or paid vacation.

To apply for a Personal leave or to obtain more information, a partner must contact Starbucks Benefits Center - Leave Administration at (877) 728-9236 and select the leave of absence option.

**Continued Benefits**

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage will continue while the partner is on an approved Personal leave, subject to Starbucks ongoing benefits eligibility requirements. Personal leave does not extend benefits eligibility or coverage and does not exempt a partner from the quarterly ongoing benefits eligibility audit. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information.

Partners will continue to pay the same active benefits contributions while on Personal Leave through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved leave.

- Upon completion of the partner's leave, he or she will transition back to active payroll deducted benefits contributions the first of the month following their return to work.

Contributions owed for the period of time between when the leave begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments a partner receives while on leave or immediately following their return to work.

If a partner does not maintain their benefits contributions while on Personal Leave, any unpaid contributions may be collected upon their return to work through payroll deductions.

6.26

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

### Return to Work

A partner must contact his or her manager at least two weeks prior to the end of his or her leave to make arrangements to return. Generally, a partner will be reinstated to his or her same position. However, Starbucks cannot guarantee that he or she will retain the same position upon their return to work.

CONFIDENTIAL

STAR_MARSHALL0000755

# Career Coffee Break

**Eligibility,
Frequency,
Duration and Job
Protection while
on leave**

Career Coffee Break is intended to honor long term commitment to Starbucks, and to provide an opportunity for partners to refresh and relax.

A Career Coffee Break cannot be used to work for another employer. Requests to work for another employer for health coverage or similar needs are reviewed and may be approved on a case-by-case basis. The partner should work with their Partner Resources manager and the Benefits Department in advance of the Career Coffee Break to request approval to work. Partners who work for another employer while on a Break without pre-approval will be separated from Starbucks employment.

A partner is eligible for a Career Coffee Break after completing 10 years of continuous service and receiving a job performance rating of Meets Expectations (or better) at the time they request leave. A second Career Coffee Break will be available to the partner after working at least seven consecutive years after the first Career Coffee Break. The maximum duration of any approved Career Coffee Break is 12 consecutive months. A Career Coffee Break may be reduced by, and commensurate with, any amount of leave taken in the 12 months immediately preceding the Break. A partner may apply for a Career Coffee Break to follow a Family/Medical or Personal leave, provided that the partner applies for the Career Coffee Break at least six months prior to the first day of absence from work. When combined with any other type of leave or vacation, the total duration of the absence may not exceed 12 months.

**When the Break is six months or less** the partner is guaranteed reinstatement in the same position. If the partner takes another leave immediately prior to or following the Career Coffee Break, the total absence may not exceed six months to be eligible for a job guarantee. In limited circumstances, the partner's position may no longer exist or be available (i.e., due to department reorganization). If this occurs, the partner is guaranteed reinstatement to a position with similar pay, benefits and other terms and conditions of employment upon his or her return to work.

When the partner's absence is greater than six months **there is no job guarantee. If the business need dictates, the manager may replace the partner.**

**Requesting a
Career Coffee
Break**

A partner requesting a Career Coffee Break should do so at least six months prior to the requested start date. The request should be submitted in writing to the partner's manager, with a copy to the Partner Resources team member. The partner should also call Starbucks Benefits Center - Leave Administration at (877) 728-9236 to request a Career Coffee Break packet that includes a Starbucks Career Coffee Break Request form.

Approval for a Career Coffee Break is at the discretion of the partner's manager, Partner Resources manager and regional vice president and will depend on various

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

**Time Away From Work**

factors, including the partner's job performance (Meets Expectations or better), position, the timing and length of leave requested and current and future business needs. At all times, Starbucks retains sole discretion in determining whether or not a Career Coffee Break will be permitted.

Starbucks Career Coffee Break Request form should be completed, signed by the partner's immediate supervisor, Partner Resources manager and regional vice president and returned to Starbucks Benefits Center – Leave Administration at least two weeks prior to the start of the Career Coffee Break.

**Approving a Career Coffee Break**

The manager should consider the following factors before approving a Career Coffee Break:

- **The requested timing and length of leave.** If the timing and/or length of leave will put the business at risk, the manager should suggest alternative dates and/or leave duration. If unable to reach a mutually agreeable arrangement, the request may be denied.

- **Current and future business needs.** If granting the Career Coffee Break results in the inability to meet business needs (after assessing options to backfill), the request may be denied.

CONFIDENTIAL

STAR_MARSHALL0000757

## Continued Benefits

If a partner is enrolled in Starbucks medical, dental and/or vision plans, coverage will continue while the partner is on an approved Career Coffee Break, subject to Starbucks ongoing benefits eligibility requirements. The same applies to partner-paid voluntary benefits (i.e., supplemental life, accidental death and dismemberment and retail hourly long-term disability). Starbucks-paid partner life and long-term disability insurance will automatically continue for the duration of approved Career Coffee Break. Short-term disability coverage ends upon commencement of Career Coffee Break and is reinstated upon return to work. Refer to Starbucks U.S. Benefits Plan Description, Eligibility and Enrollments section for more information.

Partners will continue to pay the same active benefits contributions while on Career Coffee Break through monthly direct payments to Starbucks Benefits Center as follows:

- Direct billing will begin the first of the month following the start date of the approved Career Coffee Break.

- Upon completion of the partner's Career Coffee Break, he or she will transition back to active payroll deducted benefits contributions the first of the month following his or her return to work.

Contributions owed for the period of time between when the Career Coffee Break begins and when monthly direct billing starts will be collected through payroll deductions from regular pay and/or vacation payments the partner receives while on Career Coffee Break or immediately following your return to work.

## Paid Time Off While On Career Coffee Break

Partners must use all vacation pay available to them while on Career Coffee Break. Partners cannot use vacation time to extend their Career Coffee Break. For partners on the accrual vacation program, vacation time will not accrue while on Career Coffee Break. For partners with granted vacation time, they will receive a pro-rated vacation grant upon their return to work if their return to work is in a new vacation year.

Holidays, Personal days and sick pay will not be paid while on Career Coffee Break.

Use of vacation time is subject to manager approval. Generally, use of vacation time during the three months immediately following Career Coffee Break is discouraged. This will enable the partner to more quickly assimilate back into Starbucks and help meet the business needs. Evaluate each situation on its own merits and consult with the Partner Resources generalist, if needed.

## Return to Work

If the partner's position is guaranteed, arrangements for their return to work should begin at least two weeks prior to their Career Coffee Break end date.

© 2009 Starbucks Coffee Company. All rights reserved. Printed in USA. 8/09

CONFIDENTIAL

STAR_MARSHALL0000758

When the partner will not be returning to his or her position, the manager should begin working with the partner and PRO generalist to identify other opportunities that would align well with the partner's skill, experience and career interests. This work should begin at least three months prior to the partner's scheduled last day of leave. The partner should be informed that they will need to apply and interview for positions.

Whenever possible, the partner should return to the same position following a Career Coffee Break. Supporting the partner's return, either through reinstatement to the same position or by advocating for the partner for another position, is expected and aligned with Starbucks values and guiding principles.

If the partner does not have a position secured when the Career Coffee Break ends, the partner's manager separates the partner from employment effective the last day of the approved Break. The partner may apply for available positions following employment separation. If rehired, the partner's prior service will not count for purposes of any Starbucks benefits, savings, time off or stock programs. The exception is eligibility for participation in Starbucks Future Roast 401(k) Savings Plan.

## Manager Responsibilities

The partner's immediate manager plays the most critical role in the successful deployment of the Career Coffee Break. The manager will:

- Be the first to receive the partner's request for a Career Coffee Break

- Assess the partner's request, including the partner's job performance, timing and duration of the Break, and the ability of the business to support the partner's request

- Consult with your district manager and regional leadership, and approve or deny the request (if applicable)

- Deliver a performance review immediately prior to the commencement of the partner's approved Career Coffee Break and provide a copy to Career Services

- Confirm with the Partner Resources generalist that the congratulatory letter from the CEO and RVP was sent to the partner

- Maintain contact with the partner while on Career Coffee Break

- Plan and support the partner's return to work and re-engagement with the team and company

The manager will conduct a performance evaluation immediately prior to the commencement of the partner's Break. The performance evaluation will help align the manager and the partner on current performance. It will also serve as documentation on the partner's past contributions for the manager when the partner returns to work. This evaluation will replace any performance evaluation that would have otherwise occurred immediately upon their return to work.

CONFIDENTIAL

STAR_MARSHALL0000759