1

2               UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4      --------------------------X

5    SERENITY MARSHALL,

6                   Plaintiff,

7        -vs-                  No. 11-CV-2521

8    STARBUCKS CORPORATION

9    and JENNIFER GURTOV, in

10   her individual and official

11   capacities,

12                   Defendants.

13     --------------------------X

14

15

16           DEPOSITION OF NANCY MURGALO

17              New York, New York

18              December 23, 2011

19

20

21

22   Reported by:
     Bonnie Pruszynski, RMR
23   JOB NO. 44489

24

25

Page 2

```
 1
 2
 3
 4                  December 23, 2011
 5                  9:52 a.m.
 6
 7
 8
 9          Deposition of NANCY MURGALO, held at
10  the offices of Thompson Wigdor LLP, 85 Fifth
11  Avenue, New York, New York, before Bonnie
12  Pruszynski, a Registered Professional Reporter,
13  Registered Merit Reporter, Certified LiveNote
14  Reporter and  Notary Public of the State of New
15  York.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S :
 3  THOMPSON WIGDOR
 4  Attorneys for Plaintiff
 5        85 Fifth Avenue
 6        New York, New York 10003
 7  BY:   DAVID E. GOTTLIEB, ESQ.
 8
 9  AKIN GUMP STRAUSS HAUER & FELD
10  Attorneys for Defendants
11        One Bryant Park
12        New York, New York 10036
13  BY:   ESTELA DIAZ, ESQ.
14        JENNELLE MENENDEZ, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1               N. Murgalo
 2  NANCY MURGALO,
 3        called as a witness, having been first
 4        duly sworn, was examined and testified
 5        as follows:
 6  EXAMINATION
 7  BY MR. GOTTLIEB:
 8     Q    Good morning, Ms. Murgalo.
 9     A    Good morning.
10     Q    I represent Serenity Marshall in her
11  case against Starbucks, and you are here to
12  testify regarding that matter.  Do you understand
13  that?
14     A    Yes.
15     Q    Do you understand that you have just
16  taken an oath to tell the truth?
17     A    Yes.
18     Q    If you do not hear any question that
19  I ask you today, please let me know, and I will
20  repeat it so that you can hear it.  Okay?
21     A    Okay.
22     Q    If you do not understand any question
23  that I ask you today, please let me know that you
24  don't understand it, and I will try to rephrase it
25  in a way that you do understand.  Okay?
```

Page 5

```
 1               N. Murgalo
 2     A    Okay.
 3     Q    If I use any term that you don't
 4  understand, please let me know.  Okay?
 5     A    Okay.
 6     Q    It's important that you let me finish
 7  my questions before you answer, so that the court
 8  reporter can take down an accurate record.  Okay?
 9     A    Okay.
10     Q    All your answers must be verbal, as
11  opposed to a head nod or shake.  Okay?
12     A    Okay.
13     Q    Do you understand everything I have
14  said so far?
15     A    I do.
16     Q    Do you have any questions about
17  anything I have said so far?
18     A    No.
19     Q    If at any point today you would like
20  to take a break, that is fine, just let me know.
21     A    Okay.
22     Q    The only thing I ask is that there
23  not be a question pending when you take a break.
24  Okay?
25     A    Okay.
```

2 (Pages 2 to 5)

Page 6

```
 1              N. Murgalo
 2      Q    Are you currently taking any
 3  medications that could affect your memory?
 4      A    No.
 5      Q    Are you currently taking any
 6  medications that could affect your ability to
 7  understand my questions today?
 8      A    No.
 9      Q    Are you taking any medications that
10  could affect your ability to testify truthfully
11  today?
12      A    No.
13      Q    Have you ever been deposed before?
14      A    Yes.
15      Q    How many times?
16      A    Once.
17      Q    What was that for?
18      A    It was for a case with a former
19  partner against Starbucks.
20      Q    Okay.  What was that case about?
21      A    It was about a sexual harassment
22  issue.
23      Q    When was that?
24      A    It was this past summer.
25      Q    What was the name of the employee?
```

Page 7

```
 1              N. Murgalo
 2      A    Her name is Sherry Alfano.
 3      Q    Is she still working at Starbucks?
 4      A    She is not.
 5      Q    What Starbucks store did she work at?
 6      A    I can't remember.
 7      Q    Do you remember what her position
 8  was?
 9      A    Yes.  She was a barista.
10      Q    Do you know if that case is still
11  ongoing?
12      A    Yes, it is.
13      Q    Do you know who her district manager
14  was?
15      A    Yes.
16      Q    Who?
17      A    Ari Mendrinos.
18      Q    Do you know who her store manager
19  was?
20      A    Ivy Cuesta.  I believe that is her
21  maiden name.  I think she married since then.
22      Q    Do you know if she was terminated?
23      A    She was.
24      Q    What was the reason for her
25  termination?
```

Page 8

```
 1              N. Murgalo
 2      A    Time and attendance.
 3      Q    In her lawsuit, did she claim there
 4  was a different reason for her termination?
 5      A    No.
 6      Q    Have you been deposed in any other
 7  situation?
 8      A    I have not.
 9      Q    Did you do anything to prepare for
10  this deposition?
11      A    Yes.
12      Q    What did you do?
13      A    I met with Ms. Diaz yesterday.
14      Q    Anything else?
15      A    I sent whatever files I had to our
16  headquarters concerning anything I had with
17  Serenity Marshall.
18      Q    That was in preparation for today?
19      A    Well, that was in preparation for the
20  case, not specifically for today.
21      Q    Okay.  So the only thing you did in
22  preparation for today was meet with counsel
23  yesterday?
24      A    Correct.
25      Q    How long did you meet?
```

Page 9

```
 1              N. Murgalo
 2      A    Three hours.
 3      Q    And who did you meet with?
 4      A    I met with Estela and with Jenn.
 5      Q    Did you review any documents?
 6      A    Yes.
 7      Q    What documents did you review?
 8      A    We reviewed certainly e-mails.  We
 9  reviewed a report that was called in to our
10  compliance group.  We reviewed an approval of a
11  personal leave of absence for Serenity.
12           We reviewed some e-mails concerning
13  another former store manager, and I can't
14  remember, I think there were a few other documents
15  we reviewed.
16      Q    Do you remember the documents
17  regarding the other former store manager that you
18  reviewed?
19      A    Yes.  There were e-mails, and there
20  was a performance improvement plan.
21      Q    Okay.  And do you remember the name
22  of the employee?
23      A    Charis Liu.
24      Q    Anything else that you reviewed?
25      A    I don't recall any other documents,
```

N. Murgalo

1
2  other than e-mails.
3      Q     Have you discussed the fact that you
4  would be deposed today with anyone other than
5  counsel?
6      A     I did.
7      Q     Who?
8      A     My boss, who is a partner resources
9  director; the regional directors for New York
10 Metro, and -- and I mentioned to Jenn Gurtov that
11 I was being deposed.
12     Q     Okay.  Who is your boss?
13     A     Ketan Patel.
14     Q     And what did you discuss with Ketan
15 Patel about the fact that you would be deposed
16 today?
17     A     That I was being deposed today.
18     Q     Anything else?
19     A     And what the case was.
20     Q     Who were the regional directors in
21 New York Metro?
22     A     They are Victor Huetz; John Dunn, who
23 will be taking Victor's place, and Dija Fraser.
24     Q     What did you tell Victor Huetz about
25 the fact that you would be deposed today?

N. Murgalo

1
2      A     That I was being deposed.
3      Q     Anything else?
4      A     And that it concerned Serenity
5  Marshall.
6      Q     What about John Dunn?
7      A     The exact same thing, that I was
8  being deposed, and that it concerned a former
9  store manager.
10     Q     What did you tell Jenn Gurtov about
11 the fact that you were being deposed today?
12     A     The date that I was being deposed.
13     Q     Before your deposition today, did you
14 discuss with Jenn Gurtov the fact that she was
15 deposed earlier this week?
16     A     No.  I -- I knew she was being
17 deposed, but I didn't know when it was.
18     Q     Did you ask her how it went?
19     A     No.
20     Q     Did she tell you how it went?
21     A     No.
22     Q     Did she tell you anything she was
23 asked?
24     A     No.
25     Q     Did you ask her anything she was

N. Murgalo

1
2  asked?
3      A     No.
4      Q     How long have you been employed at
5  Starbucks?
6      A     Seventeen years.
7      Q     What's your current position?
8      A     Partner resources manager.
9      Q     How long have you had that position?
10     A     Five-and-a-half years.
11           (Discussion held off the record.)
12           MR. GOTTLIEB:  Back on.
13     Q     What was your position before you
14 were a partner resources manager?
15     A     I was a zone learning manager.
16     Q     And how long did you have that
17 position?
18     A     I had that position for about four
19 years.
20     Q     And before that?
21     A     I was a training specialist.
22     Q     How long did you hold that position?
23     A     About seven years.
24     Q     And before that?
25     A     I was a store manager.

N. Murgalo

1
2      Q     For how long?
3      A     Nine months.
4      Q     Have you held any other positions at
5  Starbucks?
6      A     No.
7      Q     What year was it when you first
8  started working at Starbucks?
9      A     1994.
10     Q     Now, as a partner resources manager,
11 do you cover a certain region or district?
12     A     I do.
13     Q     What is that?
14     A     I cover two areas.  One is the lower
15 half of Manhattan and Staten Island.  The other is
16 Long Island, Brooklyn and Queens.
17     Q     How long have you covered those
18 regions?
19     A     For five-and-a-half years.
20     Q     What are your duties and
21 responsibilities as a partner resources manager?
22     A     I support the operators, specifically
23 the regional director and the district managers,
24 in matters of talent management, manpower,
25 succession.  I am a business partner in how we are

Page 14

```
1               N. Murgalo
2    developing our talent.
3         Q     What do you mean by developing your
4    talent?
5         A     Seeing people who want to get to the
6    next level, that they have development plans that
7    are effective, giving support in -- helping to
8    determine some stretch assignments or various
9    activities that would build skills.
10            I also teach a class to new managers
11   on partner resources practices.
12        Q     Now, you listed a number of areas
13   where you support the operators.  You specified
14   the regional director and the district managers.
15   What do you mean by the word "support" in that
16   context?
17        A     I'm a consultant, so it would be
18   discussing skills and ability of their direct
19   reports, people who are progressing to the next
20   level, people who might be struggling in their
21   role, and how we can help them.
22        Q     Is it fair to say that you assist the
23   district managers that you supervise -- or strike
24   that.
25            Is it fair to say that you assist the
```

Page 15

```
1               N. Murgalo
2    district managers who you work with on personnel
3    and human resources decisions?
4             MS. DIAZ:  Objection.
5         A     Yes.
6             MS. DIAZ:  You can answer.
7             THE WITNESS:  I can, okay.
8         A     I counsel them.
9         Q     So the word "assist" would not be
10   accurate?
11        A     Assist, how do you mean assist?
12        Q     Well, what do you understand the word
13   "assist" to mean?
14        A     Well, it would be a -- having --
15   having decision-making responsibilities, which I
16   do not.  So, it would be more of a consultant.
17        Q     Who has decision-making
18   responsibilities with regard to personnel
19   decisions?
20        A     Regional directors, district
21   managers.
22        Q     Is there any written protocol for how
23   district managers are supposed to contact you to
24   provide counseling on personnel decisions?
25        A     No.
```

Page 16

```
1               N. Murgalo
2         Q     Is there any written policy on how
3    that is supposed to take place?
4         A     No.
5         Q     So, how do regional directors know
6    how to contact you or how to use your services?
7             MS. DIAZ:  Objection.
8             You can answer.
9         A     Okay.  I would meet with a district
10   manager upon their entry into the company and
11   explain to them how I provide support to them, so
12   they would know what I do, how I am available to
13   them, and then it would be for them to reach out
14   to me.
15            I might reach out to them if there is
16   an issue that I think they need to know about.  So
17   it's really through conversation.
18        Q     So you said you would explain to
19   them, "them" being the district managers, how you
20   provide support for them.  Is that right?
21        A     Yes.
22        Q     So what would you tell them?
23        A     I would tell them that I am their
24   consultant, that I am here to help them see all
25   sides of an issue, as many as we can look at, to
```

Page 17

```
1               N. Murgalo
2    discuss the situation, making sure that we are
3    looking at everything, and that they make the best
4    decision.
5         Q     Where are your offices located?
6         A     At 33rd and Fifth Avenue in
7    Manhattan.
8         Q     Is that the same office where the
9    district managers who you supervise -- or strike
10   that.
11            Is that the same office where the
12   district managers who you counsel are located?
13        A     Yes.  Some.  There is others who are
14   in Long Island.  So the Manhattan and Staten
15   Island, yes, they would be in that -- in that
16   office.
17        Q     The district managers who you work
18   with, how -- with what frequency do you
19   communicate with them?
20        A     It varies.
21        Q     Every day?
22        A     No.
23        Q     At least once a week?
24        A     Some.
25        Q     How many district managers do you
```

Page 18

1               N. Murgalo
2 currently work with?
3      A    Eighteen.
4      Q    Can you list them?
5      A    Can I list all the names?
6      Q    Yes.
7      A    Mark Ormsbee, Paul Grzorczyk, Jenn
8 Gurtov, Tracy Bryant, Mike Quintero, Vikki
9 Sanchez, Simone Harper, Melissa Tsiu, and okay,
10 I'm missing one for New York.
11          Let me go to Long Island.  Ari
12 Mendrinos, Paul Ehlinger, Kathleen Rainsbottom,
13 Rosa Grajada, Omar Ventura, Tanya Edwards, Nina
14 Boulay, Alvin Rampal.
15          And I would have to see my list.  I
16 am missing two DMs who I support.
17      Q    Can I ask that you supplement that
18 answer?
19      A    I'm sorry?
20      Q    I'm going to ask that you supplement
21 that answer when you do remember the names.
22      A    Sure.
23      Q    Whether that be during -- excuse me,
24 during the deposition or after it's over.
25      A    If you can read them back to me, I

Page 19

1               N. Murgalo
2 can probably tell you who I am missing.
3          MR. GOTTLIEB:  Can you do that.
4          (Record read.)
5      A    Adler Ludvigsen, L-U-D-V-I-G-S-E-N.
6 Kevin Sutton, S-U-T-T-O-N.
7      Q    When did you first come to know
8 someone name Serenity Marshall?
9      A    I don't remember the exact date.  It
10 was when Serenity was store manager with us.
11      Q    Can you estimate when you first came
12 to know that Serenity Marshall worked for
13 Starbucks?
14      A    I would guess that it might be seven
15 to eight years ago.
16      Q    Do you remember the context?
17      A    Maybe a little longer.
18          I don't remember the exact context,
19 no.
20      Q    Do you remember when the first time
21 was that you met her in person?
22      A    I don't.
23      Q    But you have met her in person?
24      A    I have.
25      Q    How many times?

Page 20

1               N. Murgalo
2      A    I don't remember.
3      Q    Did there ever come a time when you
4 learned that there were problems in her
5 performance?
6      A    Yes.
7      Q    Do you remember the first time?
8      A    No, I don't.
9      Q    What is the first time you can
10 remember?
11      A    I don't know when it was, but it was
12 from the district manager, who said that her
13 performance was slipping.  There had been some
14 issues in the store, but I don't -- I can't tell
15 you exactly when that was, nor where that was.
16      Q    Do you know who the district manager
17 was?
18      A    I -- I don't know -- no.  I don't
19 know which district manager it was.
20      Q    And what's the first time that you
21 can remember?
22          MS. DIAZ:  Objection.
23          You can answer.
24      A    Okay.  I really can't say.  I don't
25 know when it was.

Page 21

1               N. Murgalo
2      Q    As you sit here today, can you
3 remember any time a district manager reported to
4 you there were problems with Serenity Marshall's
5 performance?
6      A    Yes.
7      Q    When?
8      A    I can't tell you when, but I know a
9 district manager, and it may not have been Jenn, I
10 don't remember which district manager it was, if
11 it was the one before Jenn, which district manager
12 had told me, but I know that a district manager
13 did tell me that there were some issues with
14 Serenity's performance.
15      Q    Do you remember what the issues were?
16      A    I don't.
17      Q    What is the first instance that you
18 became aware of performance deficiencies with
19 Serenity Marshall that you can specifically
20 remember?
21      A    I can remember Jenn Gurtov telling me
22 that Serenity was struggling in her performance.
23 I don't remember when it was.
24      Q    Was it in 2010?
25      A    No.  It was before that.

Page 22

```
 1              N. Murgalo
 2      Q    Was it in 2009?
 3      A    I don't know for certain.
 4      Q    Other than Jenn Gurtov telling you
 5   that Serenity Marshall was struggling, can you
 6   provide any more detail about what Ms. Gurtov said
 7   at that moment?
 8      A    I can't.  I don't remember.
 9      Q    Can you remember at any time Jenn
10   Gurtov advising you of any performance
11   deficiencies in Serenity Marshall after that?
12      A    I can't recall specifically.
13      Q    To this day?
14      A    To this day, other than the incident
15   that led to her separation, that I remember
16   specifically.
17      Q    Do you ever remember a district
18   manager advising you of any strengths of Serenity
19   Marshall's?
20      A    I don't recall.
21      Q    Do you know if you ever formed an
22   opinion about whether Serenity Marshall was a good
23   store manager or otherwise?
24      A    I did form an opinion.
25      Q    What was your opinion?
```

Page 23

```
 1              N. Murgalo
 2      A    That there were times that Serenity
 3   was struggling and there were times when her
 4   performance would be back on track.
 5      Q    And how did you form that opinion?
 6      A    Through feedback from the district
 7   managers.  So, letting me know that Serenity then
 8   would be doing a good job.
 9      Q    Before December 2010, can you
10   remember any instance where you were advised that
11   Serenity Marshall was having any problems with
12   cash management?
13      A    No.
14      Q    Before December 2010, can you
15   remember any instance where you were advised that
16   Serenity Marshall was having problems with cash
17   handling?
18      A    No.
19      Q    Before December 2010, can you
20   remember any instance where you were advised that
21   Serenity Marshall had any problems with
22   recordkeeping?
23      A    No.
24      Q    Before December 2010, can you
25   remember any instance where you were advised that
```

Page 24

```
 1              N. Murgalo
 2   Serenity Marshall had any problem with policies
 3   and procedures related to daily records books?
 4      A    No.
 5      Q    Before December 2010, can you recall
 6   any instance where you were advised that Serenity
 7   Marshall had any problem following any Starbucks
 8   policies or procedures?
 9      A    Not specifically, no.
10      Q    Now, Jenn Gurtov became a district
11   manager in 2008; is that correct?
12      A    I don't know the exact date when she
13   became a DM.
14      Q    Would it be fair to say that it was
15   roughly in 2008?
16      A    I know she has been a DM for a few
17   years.  Three years may be correct.
18      Q    Did you know Jenn Gurtov before she
19   was a district manager?
20      A    I had met her.
21      Q    In what context?
22      A    At a leadership conference.
23      Q    Other than meeting her at a
24   leadership conference, did you know Jenn Gurtov in
25   any manner before she became a district manager?
```

Page 25

```
 1              N. Murgalo
 2      A    No.
 3      Q    What do you remember about meeting
 4   her at the leadership conference?
 5      A    Nothing other than I met her.
 6      Q    Did you work -- strike that.
 7           Between the time that Jenn Gurtov
 8   became a district manager and December 2010, would
 9   you say you worked very closely with Jenn Gurtov?
10      A    I -- well, define "closely."  I did
11   support her.
12      Q    Did you speak with her frequently?
13      A    Yes.
14      Q    Did you e-mail with her frequently?
15      A    Yes.
16      Q    Do you believe she felt comfortable
17   contacting you with any problems she had with
18   employees?
19      A    Yes.
20      Q    Why do you believe that?
21      A    Because she would come into my office
22   and tell me how things were going.
23      Q    Would she also communicate with you
24   by e-mail?
25      A    Yes.
```

TSG Reporting - Worldwide      877-702-9580

Page 26

N. Murgalo

1
2      Q     Would she communicate with you in any
3  other ways?
4      A     No.  E-mail or conversations, that is
5  the only way.
6      Q     What about calling you on the phone?
7      A     Sorry.  Yes, she would call me on the
8  phone.
9      Q     Would she ever call you on your cell
10 phone?
11     A     I -- I can't remember times when she
12 did, but she had my cell phone number.
13     Q     Do you have her cell phone number?
14     A     I -- I have access to it.
15     Q     Has Jenn Gurtov ever called you to
16 discuss an employee issue when you were out of the
17 office?
18     A     When I was at the office?
19     Q     When you were out of the office.
20     A     When I was out of the office?  I
21 can't remember a specific time when she did, but
22 it's very possible.
23     Q     So it's possible she called you on
24 your cell phone, when you were out of the
25 office --

Page 27

N. Murgalo

1
2      A     Possibly.
3      Q     -- to discuss an employee issue?
4      A     Yes.
5      Q     Is your cell phone, is that -- does
6  Starbucks provide you with a cell phone?
7      A     They do.
8      Q     And they pay your cell phone bills?
9      A     Correct.
10     Q     Do you know who the carrier is?
11     A     Verizon.
12     Q     What's your cell phone number?
13     A     (203)464-8634.
14          MR. GOTTLIEB:  I'm going to call for
15 production of Ms. Gurtov's cell phone
16 records for the year 2010, and 2011 through
17 Ms. Marshall's termination.
18          MS. DIAZ:  Take it under advisement.
19 I don't see the relevance.  Counsel, you
20 also said Ms. Gurtov's cell phone records.
21          MR. GOTTLIEB:  Thank you.  I'm going
22 to call for production of Ms. Murgalo's cell
23 phone records for that period.
24          MS. DIAZ:  We will take it under
25 advisement, but I don't see the relevance.

Page 28

N. Murgalo

1
2      Q     Is it fair to say you counsel
3  district managers who you work with regarding
4  termination decisions?
5      A     Yes.
6      Q     How many employees have you
7  counseled, district managers or regional
8  directors, in terminating for issues related to
9  cash management?
10          MS. DIAZ:  Objection.
11     Q     You can answer.
12          MS. DIAZ:  You can answer.
13     A     I don't know.
14     Q     Can you estimate?
15     A     No, I can't.
16     Q     Was it more than one?
17     A     Yes.
18     Q     Was it more than two?
19     A     Yes.
20     Q     Was it more than five?
21     A     Yes.
22     Q     Was it more than ten?
23     A     Yes.
24     Q     Was it more than 20?
25     A     Possibly.

Page 29

N. Murgalo

1
2      Q     More than 30?
3      A     Possibly.
4      Q     More than 50?
5      A     I don't know.
6      Q     Can you list every such employee that
7  you can remember?
8      A     No.
9      Q     You can't list the ones you can
10 remember?
11     A     No.
12     Q     I'm asking you to list the ones you
13 can remember.
14     A     Sorry, I can't remember any offhand.
15     Q     Any?
16     A     Correct.
17     Q     You can't remember a single one?
18     A     Correct.
19     Q     As you sit here today; correct?
20     A     Oh, I can remember one.  I just
21 recalled one.  And this was around cash handling.
22 Was that what your question was?  Can you repeat
23 that question?
24     Q     Cash management.
25     A     Cash management.  Sorry, I just lost

N. Murgalo

1
2  her name. I can't remember her name. There have
3  been instances, but I can't remember a partner's
4  name.
5      Q    In your five-and-a-half years as a
6  partner resources manager, you can't remember a
7  single employee who you assisted in the
8  termination of for cash management issues?
9          MS. DIAZ: Objection.
10     Q    Is that accurate?
11     A    That's accurate. As I sit here
12 today, I can't remember someone who I assisted in
13 the termination of.
14     Q    As you sit here today, can you
15 remember a single person who you counseled a
16 regional director or district manager in
17 terminating due to cash management issues?
18         MS. DIAZ: Objection.
19     A    No, I can't.
20     Q    Now, you said there came a time --
21 strike that.
22         Were there any -- would there be
23 any -- strike that.
24         Do you take notes at work?
25     A    I take some notes.

N. Murgalo

1
2      Q    Where do you take notes?
3      A    In a notebook.
4      Q    What kind of notebook is it?
5      A    It's just a lined small notebook.
6      Q    Is it like a legal pad or a spiral
7  notebook?
8      A    It's a Levenger system.
9      Q    What is that?
10     A    So, you know, it's -- pages come in
11 and out easily, so similar to a spiral notebook,
12 but you don't have to rip pages out. You can take
13 them out and put them back in.
14     Q    Have you used that same notebook for
15 some time?
16     A    I have.
17     Q    When the pages fill up, do you just
18 replace them with new pages?
19     A    Correct.
20     Q    What do you do with the pages that
21 you remove after you are done with them?
22     A    I put them in a file.
23     Q    And you have been doing that for how
24 long?
25     A    I have been doing that for five

N. Murgalo

1
2  years.
3      Q    And do you take notes on this pad of
4  conversations you have with district managers?
5      A    Sometimes.
6      Q    Do you take notes on that pad of
7  counseling issues that you have with district
8  managers or regional managers?
9      A    Sometimes.
10         MR. GOTTLIEB: I'm going to call for
11 production of Ms. Murgalo's pad for the
12 period of 2010 through the date of
13 Ms. Marshall's termination.
14         MS. DIAZ: I will take it under
15 advisement. Again, I don't see the
16 relevance.
17     Q    Did you ever communicate directly
18 with Serenity Marshall regarding any
19 performance-related issue?
20     A    I did speak to her after she was
21 separated. Before that, I don't recall.
22     Q    Did there come a time when you
23 learned that Serenity Marshall, in 2010, had been
24 diagnosed with a medical condition?
25     A    I did know that she was going out on

N. Murgalo

1
2  a medical leave.
3      Q    Okay. And did you know why she was
4  going on a medical leave?
5      A    No.
6      Q    When was the first time in 2010 that
7  you learned Serenity Marshall was having some
8  medical issues?
9      A    I didn't. I just knew that she was
10 going out on a leave. I didn't know that -- it
11 was medical, because it was a medical leave, but I
12 didn't know anything else.
13     Q    When did you first learn that she was
14 going to need a medical leave?
15     A    I don't -- that was towards the end
16 of 2010, but I don't know what -- exactly when.
17     Q    Do you remember how you learned?
18     A    I don't remember specifically how I
19 learned, other than the district manager mentioned
20 it.
21     Q    Jenn Gurtov?
22     A    Yes.
23     Q    And do you remember what she said or
24 what she wrote?
25     A    No.

Page 34

N. Murgalo

1
2       Q      Do you remember what Ms. Gurtov told
3   you, other than that she wanted -- strike that.
4           Do you remember what Ms. Gurtov told
5   you, other than that Serenity Marshall was going
6   to be taking a medical leave?
7       A      No.
8       Q      Do you remember her saying that?
9       A      That she was going out on leave, yes.
10      Q      And you remember that it was towards
11  the end of 2010?
12      A      Yes, but I don't know when.
13      Q      Did you ever learn that Serenity
14  Marshall was going to be recommended for
15  termination, by Jenn Gurtov?
16      A      Yes.
17      Q      When did you first learn that?
18      A      It was after Jenn had gone to the
19  store and found that deposits were not being taken
20  to the bank, and that there was falsification of
21  the daily records book.
22      Q      Do you remember if it was in 2010 or
23  2011 that you first learned that Ms. Gurtov was
24  going to recommend separation of Ms. Marshall?
25      A      I -- I don't remember whether it was

Page 35

N. Murgalo

1
2   2010 or 2011, but it was right around that, that
3   time.  It would have been 2000 -- I believe it was
4   the end of 2010, when the incident happened.
5   Because she told me shortly after she found the
6   information.
7       Q      Do you know how long after Ms. Gurtov
8   had learned that information that she contacted
9   you?
10      A      I don't know exactly the amount of
11  time, no.
12      Q      Can you estimate?
13      A      Maybe a day.
14      Q      Do you remember if she contacted you
15  by phone, by e-mail or something else?
16      A      To the best of my recollection, it
17  was in person.
18      Q      Where?
19      A      In the office.
20      Q      Did she come to your office, did you
21  go to her office, or something else?
22      A      We work in the same office.  She sits
23  outside my office, so, she would have -- we are
24  right there together, so, she told me.
25      Q      But where did she tell you?  Was it

Page 36

N. Murgalo

1
2   in your office?  Was it in the hallway?  Was it in
3   a conference room?
4       A      It was -- to the best of my
5   recollection, she would have walked in -- she
6   walked into my office.  My door is open.  The
7   chair is right there.  She would walk into my
8   office.
9       Q      Do you remember that she walked into
10  your office to have that discussion with you or
11  are you just guessing that that is probably what
12  happened?
13      A      I remember her standing at my doorway
14  telling me.
15      Q      And where were you?
16      A      At my desk.
17      Q      You were sitting at your desk?
18      A      Yes.
19      Q      And she was standing in your doorway?
20      A      Yes.
21      Q      For the duration of the conversation?
22      A      Yes.
23      Q      How long did that conversation last?
24      A      I don't know.
25      Q      Can you estimate?

Page 37

N. Murgalo

1
2       A      It wasn't long.  It was informing me
3   of what she found, so, ten minutes.
4       Q      And do you remember what Jenn Gurtov
5   said?
6       A      That she had gone to the store, found
7   that there was -- she was doing a store plan of
8   action visit.  She found that the -- there were
9   deposits that had not been taken to the bank, and
10  when she checked the daily records book, she found
11  that there was false information in it, and this
12  was -- and then she checked the previous month's
13  book and that had -- that had not been filled out.
14      Q      Did she tell you anything else?
15      A      That she was -- that she considered
16  this a serious issue, and she was considering
17  possible separation.
18      Q      Anything else?
19      A      Nothing else I can remember.
20      Q      And how did you respond?
21      A      And I said -- I advised her to call
22  our Partner Resource Support Center, and to review
23  with them the information that she had.
24      Q      Did you say anything else?
25      A      Not that I can recall.

Page 38

N. Murgalo

1
2     Q     Did you tell her whether you agreed
3  that separation was a good idea?
4     A     I don't recall what I said as to
5  whether -- I did not say that it was a good idea.
6  I don't recall exactly what I said, other than it
7  was a serious issue.
8     Q     Do you remember if Ms. Gurtov told
9  you during that conversation anything that
10 Serenity Marshall said during Ms. Gurtov's visit
11 to her store?
12    A     To the best of my recollection, she
13 said that Serenity said she didn't have time to go
14 to the bank, which is why she wasn't taking the
15 deposit to the bank.
16    Q     Anything else?
17    A     Not that I can recall.
18    Q     At this point, when Jenn Gurtov came
19 to your office and had a discussion with you, did
20 you know that Serenity Marshall was going to be
21 taking a leave of absence?
22    A     At that point -- I couldn't say for
23 certain, because I am not sure of the timing when
24 I knew that Serenity was going out on leave.
25    Q     Do you know if Ms. Gurtov mentioned

Page 39

N. Murgalo

1
2  Serenity Marshall's medical condition at all
3  during that conversation?
4     A     Not that I recall, no.
5     Q     Do you specifically remember that she
6  did not mention it?
7     A     To my best -- the best of my
8  recollection, she did not mention it.
9     Q     Do you remember if she mentioned
10 during that conversation that Ms. Marshall would
11 be going on a leave of absence?
12    A     I don't recall that she mentioned
13 that.
14    Q     And how did that conversation end?
15    A     Jenn said that she was contacting the
16 PRSC, and I said, "Keep me posted.  Let me know."
17    Q     Now, you said that you agreed with
18 Ms. Gurtov that this was a serious issue.
19    A     Yes.
20    Q     Do you remember saying that to her?
21    A     Yes.
22    Q     Why did you say that?
23    A     Because it is -- it is falsification
24 of company documents.
25    Q     What about the not making daily bank

Page 40

N. Murgalo

1
2  deposits?
3     A     That's also against our cash handling
4  policy.
5     Q     But that is not a serious issue?
6     A     It is.
7     Q     Do you think any violation of cash
8  handling policies is a serious issue?
9     A     Yes.
10    Q     Do you think any violation of cash
11 management policies is a serious violation?
12          MS. DIAZ:  Objection.
13    A     It is serious, yes.
14    Q     Is it fair to say that cash
15 management violations are more serious than some
16 other violations?
17          MS. DIAZ:  Objection.
18    A     It would depend.  Depends on the
19 circumstances.  Depends on why it happened, what
20 happened, what are the others that you are
21 comparing it to.
22    Q     Was anyone else a party to that
23 conversation?
24    A     No.
25    Q     Did you take any notes of that

Page 41

N. Murgalo

1
2  conversation?
3     A     I did not.
4     Q     Do you remember if Ms. Gurtov had any
5  documents with her when you had that conversation?
6     A     She did not.
7     Q     Do you know if you gave Ms. Gurtov
8  any direction other than to call partner
9  resources?
10    A     I believe I also said to make sure
11 her regional director knew.
12    Q     Anything else?
13    A     Not that I can recall.
14    Q     When was the next time you had any
15 discussion with anybody regarding Serenity
16 Marshall?
17    A     I can't recall the next time.
18    Q     Was there any other time?
19    A     There would have -- there was --
20 there was Jenn letting me know that Serenity went
21 out on her leave of absence, so she notified me of
22 that.
23    Q     Do you remember when that was?
24    A     I don't recall the date, no.
25    Q     Was it in 2011?

11 (Pages 38 to 41)

Page 42

N. Murgalo

1
2     A     I don't know.  Because it was right
3  on the -- it was right around that time of the new
4  year, so I don't know if it was 2011, 2010.  I'm
5  not sure when Serenity took her leave.
6     Q     As you sit here today, you don't know
7  when Serenity took her leave?
8     A     No.
9     Q     When Ms. Gurtov told you that
10  Serenity had taken her leave, was that over the
11  phone or in person or something else?
12     A     I don't recall.
13     Q     Do you remember anything else she
14  said during that conversation?
15     A     No.
16     Q     Is there anything that would refresh
17  your recollection?
18     A     As to what else she said in the
19  conversation?
20     Q     Yes.
21     A     No.
22     Q     Did you have any further
23  communications with Ms. Gurtov regarding the
24  termination of Serenity Marshall?
25     A     I did.  I asked Jenn if a

Page 43

N. Murgalo

1
2  determination had been made -- I e-mailed Jenn if
3  a determination had been made as to Serenity's
4  status, if we were moving to termination, and I
5  also asked her when Serenity was coming back from
6  her leave of absence.
7     Q     Do you remember when you e-mailed
8  Jenn if a determination had been made as to
9  Serenity Marshall's termination?
10     A     I don't remember specifically.  It
11  would have been in 2011.
12     Q     Do you know what month?
13     A     One of the earlier months.  February,
14  maybe.
15     Q     Do you know if it was early February
16  or late February?
17     A     I don't know.
18     Q     Do you know if you had any
19  communications with Ms. Gurtov regarding the
20  termination of Serenity Marshall's employment
21  between the initial conversation you had with her,
22  that we just discussed, and the e-mail where you
23  asked her if a determination had been made?
24     A     I don't believe I did.  To the best
25  of my recollection, I did not.

Page 44

N. Murgalo

1
2         I am sorry.  Let me amend that.  I
3  believe Jenn did mention to me that she had
4  contacted the PRSC.
5     Q     Anything else?
6     A     That was it.
7     Q     Were you involved in any way in the
8  decision to terminate Serenity Marshall?
9     A     I was -- I was told what the
10  decision -- the recommendation of the PRSC was,
11  and I was asked my opinion.
12     Q     Do you remember when that was?
13     A     It may have been February or March.
14     Q     Do you know when Serenity Marshall
15  was terminated?
16     A     To the best of my recollection, it
17  was March, but I am not positive.
18     Q     And when you were asked your opinion,
19  what did you say?
20     A     I said based on the severity of the
21  issue, the -- and the -- the consultation from our
22  PRSC was in favor of separation, and I agreed.
23     Q     Do you know who made the ultimate
24  decision to terminate Serenity Marshall's
25  employment?

Page 45

N. Murgalo

1
2         MS. DIAZ:  Objection.
3         MR. GOTTLIEB:  What is the objection?
4         MS. DIAZ:  "Ultimate."
5         MR. GOTTLIEB:  Sorry?
6         MS. DIAZ:  "Ultimate," vague and
7  ambiguous.
8         MR. GOTTLIEB:  Vague and ambiguous?
9  BY MR. GOTTLIEB:
10     Q     Do you know who made the decision to
11  terminate Serenity Marshall's employment?
12     A     It would have been Jenn Gurtov, and
13  it may -- I know she was one of the people making
14  the decision, and the other may have been her
15  regional director would have approved it.
16     Q     Was Jenn Gurtov able to terminate
17  Serenity Marshall's employment without the
18  regional director's approval?
19     A     Yes.
20     Q     Now, at the time that you advised
21  Ms. Gurtov that you agreed that termination was
22  appropriate, did you know that Serenity Marshall
23  was out on medical leave?
24         MS. DIAZ:  Objection.
25         You can answer.

12 (Pages 42 to 45)

Page 46

```
1              N. Murgalo
2      A    I did.
3      Q    Did you know that she was going to
4  have surgery?
5      A    I didn't know the nature of the --
6  the issue.  I know she had surgery, but I am not
7  sure if I knew it then or if I knew it at the
8  mediation meeting where you mentioned her medical
9  condition.
10     Q    But when you gave that
11 recommendation, or that counseling, you knew that
12 she was out on medical leave?
13     A    Yes, I did.
14     Q    Was that something that you thought
15 about when you counseled Ms. Gurtov that
16 separation was appropriate?
17     A    No.
18     Q    Did it factor into the decision in
19 any way?
20     A    It did not.
21     Q    Was it something you needed to think
22 about at all?
23     A    No.
24     Q    Did it occur to you that it might be
25 a problem to terminate an employee who was out on
```

Page 47

```
1              N. Murgalo
2  medical leave?
3          MS. DIAZ:  Objection.
4      Q    You can answer.
5      A    I know that it is -- that it can be a
6  problem to terminate an employee if they are on
7  medical leave.
8      Q    Why could that be a problem?
9      A    The medical leave should not in any
10 way affect, to my understanding, how an employee
11 is treated.  It should not have any bearing on how
12 they are treated.
13     Q    But that is not really my question.
14 My question is --
15         MS. DIAZ:  Objection.
16     Q    My question is --
17         MR. GOTTLIEB:  Can you please wait
18 until I finish my question before you
19 object.
20         MS. DIAZ:  You are harassing the
21 witness.  She's answering the question she
22 understood.  Let her answer the question she
23 understood.  There is no reason to harass
24 her.
25         MR. GOTTLIEB:  I did let her answer
```

Page 48

```
1              N. Murgalo
2  the question, but please, if I'm asking the
3  question, the same way the witness should
4  wait until I finish before answering, you
5  really should wait before you object,
6  because you don't know what question I'm
7  going to ask.
8          MS. DIAZ:  I objected to your
9  statement, and I have a right to object to
10 the statements you made to the witness.
11         MR. GOTTLIEB:  You shouldn't be
12 interrupting my questions.  It's
13 inappropriate.
14         MS. DIAZ:  It goes both ways, too.
15     Q    You testified that it can be a
16 problem to terminate an employee if they are on
17 medical leave; is that correct?
18     A    I said that it -- I think you asked
19 me do you see that it could be a problem.  Is that
20 what you asked?
21     Q    Well, you testified -- I will repeat
22 it -- "I know that it is -- that it can be a
23 problem to terminate an employee if they are on
24 medical leave."  Correct?
25     A    And then what did I say after that?
```

Page 49

```
1              N. Murgalo
2      Q    I'm just asking first, did you
3  testify to that?
4      A    Yeah, um-hum.
5      Q    Why do you think that could be a
6  problem?
7      A    Because a medical leave should not in
8  any way affect or be detrimental to someone's
9  performance, so the medical leave is a medical
10 leave.  It's this piece of -- of their employment
11 history, but it should not affect the partner or
12 the employee negatively in their -- in their job.
13     Q    So is it fair to say that you need to
14 be careful about terminating an employee when they
15 are on medical leave, to make sure that the
16 medical leave is not a factor in the termination?
17         MS. DIAZ:  Objection.
18     Q    You can answer.
19     A    Yes.
20     Q    So, how is it that if you knew
21 Ms. Marshall was on medical leave, when you were
22 giving counseling as to termination, they -- you
23 didn't even think about the fact that she was on
24 leave?
25         MS. DIAZ:  Objection.
```

TSG Reporting - Worldwide      877-702-9580

Page 50

N. Murgalo

1
2    Q    You can answer.
3         MS. DIAZ:  You can answer.
4    A    Because the situation happened before
5    she went on medical leave.  So the situation and
6    the infraction was back in November or December,
7    and that happened first, and then she went out on
8    medical leave.
9    Q    And what is the significance of that?
10   A    It's two separate issues.
11        (Murgalo Exhibit 1 marked for
12   identification as of this date.)
13   Q    I have just handed you what has been
14   marked Murgalo 1.  For the record it's Bates
15   stamped 2128 to 2129.  It's a two-page document.
16        Can you review this document and tell
17   me if you recognize it.
18   A    Okay.
19   Q    Do you recognize that?
20   A    I do.
21   Q    And it's an e-mail chain; correct?
22   A    Correct.
23   Q    Now, the bottom e-mail, dated
24   January 12, 2011, at 12:05 p.m., is an e-mail from
25   Jenn Gurtov to you; correct?

Page 51

N. Murgalo

1
2    A    Correct.
3    Q    Do you remember when Jenn Gurtov sent
4    you that e-mail?
5    A    Yes.
6    Q    Do you know why she wrote that?
7    A    I had asked her what the status was
8    on Serenity, and if we had a decision.
9    Q    Was this in follow-up from the
10   initial conversation you had with her?
11   A    Yes.
12   Q    Okay.  And you asked her in person,
13   over the phone, in e-mail or something else?
14   A    I sent an e-mail.
15   Q    You understand this to be her
16   response?
17   A    Yes.
18   Q    Okay.
19        MS. DIAZ:  Can we take a quick break,
20   please?
21        MR. GOTTLIEB:  Sure.
22        (Recess taken.)
23   A    I would like to go back to this for a
24   moment.  I'm not sure if this -- if Jenn's
25   response -- if Jenn's e-mail to me, the one on the

Page 52

N. Murgalo

1
2    12th at 12 o'clock, if that was in response to an
3    e-mail that I sent.  I did send her an e-mail, but
4    I don't know when it was.  I don't know if this
5    was in response to that.
6         This could have been Jenn keeping me
7    in the loop, which is what I asked her to do, so I
8    am not positive this was the result of an e-mail
9    that I sent.
10   Q    Okay.  So are you correcting your
11   answer --
12   A    I am.
13   Q    -- to the previous question?
14   A    I am, yes.
15   Q    And you are doing it directly after
16   we just took a break?
17   A    Yes.
18   Q    Did something happen during the break
19   that helped refresh your recollection?
20        MS. DIAZ:  Objection.
21        Don't discuss that.  They are
22   privileged communications.
23   Q    Can you answer that question without
24   going into communications with counsel?
25   A    No.

Page 53

N. Murgalo

1
2    Q    So to be clear, you took a break, and
3    then you wanted to correct your answer, and you
4    can't explain why you want to correct your answer
5    without going into communications with counsel?
6    A    Correct.
7         MS. DIAZ:  Objection.  David, the
8    witness is entitled to correct any mistakes
9    made or to correct the record at any point
10   in time.
11        MR. GOTTLIEB:  I'm not suggesting she
12   is not entitled to do that.
13   Q    I would like to direct your attention
14   to the last sentence of the e-mail that Jenn
15   Gurtov wrote to you.  She wrote, "Nancy, I wanted
16   to grab your thoughts on the above as well as your
17   recommendation so I can share with Victor."
18        Do you see that?
19   A    Yes.
20   Q    Do you remember receiving that
21   e-mail?
22   A    Yes.
23   Q    Okay.  And did you respond to that?
24   A    I did.
25   Q    Okay.  And I would like to direct

1              N. Murgalo
2  your attention to the e-mail dated January 12,
3  2011, at 12:11 p.m.
4          Do you see that?
5      A    Yes.
6      Q    And was this your response?
7      A    It is.
8      Q    And you wrote, "Hi, Jenn.  I concur
9  with Tina, and with the support of legal, I would
10 agree with separation.  It's consistent with what
11 we have done in the past."
12         Do you see that?
13     A    Yes.
14     Q    Now, before Jenn Gurtov wrote her
15 e-mail to you describing in substance why she was
16 seeking termination of Serenity Marshall, had she
17 discussed the substance of that e-mail with you in
18 advance?
19         MS. DIAZ:  Objection.
20     A    She had discussed the situation that
21 happened after her store visit, which happened
22 prior, which is what I testified to.
23     Q    Had you had any discussions with
24 Ms. Gurtov regarding Serenity Marshall between
25 that initial discussion, the day or two after her

1              N. Murgalo
2  visit, and when she wrote you this e-mail?
3      A    I don't recall.
4      Q    Do you recall if you reviewed any
5  documents between the date of the initial
6  discussion you had with Ms. Gurtov about Serenity
7  Marshall and her potential termination --
8      A    I don't recall.
9      Q    -- and the date that she wrote this
10 e-mail to you?
11     A    I don't recall.
12     Q    Do you remember if you looked into in
13 any way whether termination would be appropriate
14 between the initial discussion you had with
15 Ms. Gurtov and the date that Jenn Gurtov sent you
16 this e-mail?
17     A    Can you define looked into?
18     Q    Whether you did any investigation.
19     A    I did not.
20     Q    Are you sure?
21     A    To the best of my recollection, I did
22 not.
23     Q    Okay.  Now, the e-mail Jenn Gurtov --
24 strike that.
25         When you said, "It's consistent with

1              N. Murgalo
2  what we have done in the past," what did you mean
3  by that?
4      A    I meant that it's consistent with
5  having separated store managers or other partners
6  for falsification of company documents.
7      Q    And how did you know that it was
8  consistent with what we have done in the past when
9  you wrote that?
10     A    Through experience.
11     Q    What experience are you referring to?
12     A    Other store managers who were
13 separated for falsification of company documents.
14     Q    Who?
15     A    I can't -- I don't know.  I don't
16 remember names.
17     Q    At the time did you remember?
18     A    I did not remember specific names.
19     Q    And you don't remember specific names
20 now?
21     A    I do not.
22     Q    But you are sure that it's consistent
23 with what you had done in the past?
24     A    Yes.
25     Q    Have you ever done anything to verify

1              N. Murgalo
2  that?
3      A    I don't understand the question.
4      Q    Other than from your experience and
5  your memory, did you do anything, any
6  investigation, review any documents, to verify
7  that it's consistent with what you have done in
8  the past?
9      A    In this situation?
10     Q    Yes.
11     A    I did not.
12     Q    As you sit here today.
13     A    Yes.
14     Q    So the only way you know that it's
15 consistent with what you have done in the past is
16 from your experience and memory?
17     A    Yes.
18     Q    But you can't remember a single store
19 manager who was terminated for falsification of
20 company documents?
21         MS. DIAZ:  Objection.
22         You can answer.
23     A    I cannot remember a name; correct.
24     Q    Can you remember a situation?
25     A    Not offhand today.

Page 58

N. Murgalo

1
2     Q     If you wanted to verify that in the
3 past you had terminated -- or strike that -- you
4 had counseled a store manager regarding
5 termination of an employee for falsification of
6 company documents, how would you do that?
7     A     I would ask DMs that I work with
8 about any store manager that they have separated
9 for falsification of company documents.
10    Q     Any other way you would verify that?
11    A     I would contact the Partner Resource
12 Support Center to see if they have anything in
13 their records where we have separated a specific
14 store manager for falsification of company
15 documents.
16    Q     Any other way?
17    A     I would look through my notes to see
18 if I had anything written.
19    Q     Anything else?
20    A     That would be what I would do.
21    Q     And did you do any of those things
22 before you wrote, "It's consistent with what we
23 have done in the past"?
24    A     I did not.
25    Q     Have you done any of those things

Page 59

N. Murgalo

1
2 with regard to determining the appropriateness of
3 Serenity Marshall's termination to date?
4     A     I did not.
5     Q     You have not?
6     A     I have not.
7     Q     And when you wrote, "It's consistent
8 with what we have done" -- strike that.
9           When you wrote this entire e-mail,
10 you said, "I would agree with separation. It's
11 consistent with what we have done in the past."
12 Is that something you said after careful
13 consideration?
14          MS. DIAZ:  Objection.
15    A     Yes.
16    Q     That is not something you would say
17 lightly, is it?
18    A     It is not.
19    Q     Why not?
20    A     Because I want to be sure that every
21 partner has the opportunity to explain what they
22 have done, but once we know that they have done --
23 I take separation from the company very seriously.
24 I don't like seeing anybody lose their job.
25    Q     And at that point, Serenity Marshall

Page 60

N. Murgalo

1
2 had been an employee of Starbucks for some time;
3 right?
4     A     Yes.
5     Q     Do you know how long she had been
6 with Starbucks?
7     A     I don't know offhand.
8     Q     If I represent to you that she was an
9 employee at that point for approximately nine
10 years, would that sound accurate?
11    A     That would.
12    Q     So why is it that when Jenn Gurtov
13 wrote you the e-mail on January 12, 2011, at
14 12:05 p.m., it only took you six minutes to
15 respond and say, "I would agree with separation.
16 It's consistent with what we have done in the
17 past"?
18          MS. DIAZ:  Objection.
19          You can answer.
20    A     Because I knew of the issue for at
21 least a month.  And falsification of company
22 documents, we have separated for that, and I know
23 that because I -- from experience, I know that we
24 have done that.
25    Q     Do you think you should have verified

Page 61

N. Murgalo

1
2 that it's consistent with what you have done in
3 the past when you are agreeing to separate a
4 nine-year employee?
5          MS. DIAZ:  Objection.
6     A     My verification is my knowledge of
7 what we have done in the past.
8     Q     But as you sit here today, you can't
9 identify a single employee who has been terminated
10 for falsification of company documents?
11          MS. DIAZ:  Objection.  Asked and
12 answered.
13    Q     You can answer.
14    A     I can't give you a name, no.
15    Q     Can you give me a situation?
16    A     Offhand, today, no.
17    Q     Can you give me any information that
18 could identify an employee who has been terminated
19 for falsification of company documents?
20    A     As I sit here today, I can't give you
21 names, but I can give you situations, such as a
22 falsification of -- of hours when partners worked,
23 so store managers who have edited labor punches,
24 that is falsification of documents.
25    Q     And you have seen that take place?

Page 62

N. Murgalo

1        N. Murgalo
2     A    I have seen it take place, yes.
3     Q    And you have seen employees
4  terminated for that reason?
5     A    I have.
6     Q    How many?
7     A    I can't tell you.  I don't know how
8  many.
9     Q    When?
10    A    When?  Over the past five-and-a-half
11 years that I have been in this position.
12    Q    In what district?
13    A    In the New York -- I can't tell you
14 what district, I don't know specifically, but in
15 the New York Metro region.
16    Q    Do you know who the district manager
17 was?
18    A    Not offhand.
19    Q    Okay.  Any other instance where you
20 can recall that there was termination or
21 counseling regarding termination for an employee
22 who had falsified company documents?
23    A    I can't recall specifics, no.
24    Q    Anything else, any details at all
25 that you can recall that could identify an

Page 63

1        N. Murgalo
2  employee who has been terminated for falsification
3  of company documents?
4        MS. DIAZ:  Objection.
5     A    Not -- no.  No.  Not that I can
6  recall.
7     Q    So the only situation you can recall
8  is a situation where somebody had falsified the
9  hours that they had worked?
10    A    That was one example.  But it wasn't
11 the only situation.
12    Q    Okay.  What other examples can you
13 remember?
14    A    Right now, I can't.  I would have to
15 go back and -- and look at reasons for separation
16 of partners.  I don't have -- I don't know the
17 information offhand.
18    Q    You'd have to go back through the
19 steps that we discussed earlier --
20    A    Correct.
21    Q    -- that you would need to take to
22 verify?
23    A    Correct.
24    Q    Did you ask Ms. Gurtov to write you
25 that e-mail dated January 12, 2011, at 12:05 p.m.?

Page 64

1        N. Murgalo
2     A    I did not.
3     Q    Are you sure about that?
4     A    Ask her to write an e-mail?  I did
5  not.  I did ask her to keep me in the loop, which
6  I had mentioned.
7     Q    And in the e-mail you wrote back to
8  her, you wrote, "I concur with Tina, and with the
9  support of legal, I would agree with separation."
10       Do you see that?
11    A    Yes.
12    Q    Why did you write "with the support
13 of legal"?
14       MS. DIAZ:  You can answer.
15    A    Again, we take separation seriously.
16 Also, because Serenity was on leave of absence, I
17 wanted to be sure that that was not at all a
18 factor in it.
19    Q    Why did you want to make sure that
20 was not at all a factor?
21    A    As we discussed before, that a leave
22 of absence should not negatively impact a
23 partner's employment.
24    Q    Were you concerned that it could have
25 been a factor here?

Page 65

1        N. Murgalo
2     A    My feeling was that was not a factor,
3  and I wanted to be sure that it was not a factor
4  as far as -- as -- when Serenity came back, that
5  was when the decision was to separate her, and
6  that we had all of our information that would
7  support the separation, given our policy about
8  falsification of company documents.
9     Q    But when you wrote this e-mail, when
10 you wrote "with the support of legal," at that
11 point, did you believe that Serenity Marshall's
12 leave of absence or her medical condition was a
13 factor in Jenn Gurtov's decision to terminate her?
14       MS. DIAZ:  Asked and answered.
15    A    No.
16    Q    You did not?
17    A    I did not.
18    Q    Then why did you need the support of
19 legal?
20    A    Simply because of the timing of when
21 Serenity would be coming back, and that if we were
22 moving to separation, that it might be right when
23 she came back.  I didn't know exactly what the
24 timing was.
25    Q    Why did you need to speak to legal

```
1                N. Murgalo
2   about the timing?
3        A    We often connect with our legal team
4   to be sure that we are being as fair as we can be
5   with a partner.
6        Q    What do you mean, "to make sure we
7   are being as fair as we can be with a partner"?
8             MS. DIAZ:  Objection.
9             You can answer generally in terms of
10            the practice, but don't disclose any
11            privileged communications with respect to
12            this case specifically.
13       Q    Well, let me -- I will withdraw that
14   question.
15            Did you at any point speak with legal
16   counsel regarding this matter?
17       A    No.
18       Q    Did anybody ever convey to you any
19   advice provided by counsel?
20       A    No.
21            MS. DIAZ:  Objection.
22       A    Other than what you -- what you see
23   here in this conversation, that Jenn is telling me
24   that our PRSC -- she was bringing this case to the
25   legal department, so that is what I knew as far as
```

```
1                N. Murgalo
2   the involvement with legal.
3        Q    Anything else?
4        A    No.
5        Q    So as you sit here today, from the
6   date of this e-mail until Serenity Marshall's
7   termination, nobody ever conveyed to you any
8   communications from counsel?
9        A    No one did; correct.  Other than what
10   Jenn recapped here.
11       Q    Okay.  So you said that you contact
12   counsel sometimes to make sure you are being as
13   fair as you can be with a partner.
14       A    Correct.
15       Q    Do you think it's legal's
16   responsibility to determine if a termination is
17   fair?
18            MS. DIAZ:  Objection.
19       A    I am not sure what you mean by that
20   question.
21       Q    What about it don't you understand?
22       A    Well, what do you mean by do I think
23   it's legal's responsibility?
24       Q    Let me ask you this:  When you wrote
25   "with the support of legal" in that e-mail, did
```

```
1                N. Murgalo
2   you mean that you wanted to make sure the
3   termination was fair or that you wanted to make
4   sure the termination was not unlawful?
5             MS. DIAZ:  Objection.
6        A    Well, legal would certainly be not
7   unlawful, but our PRSC also looks to be sure that
8   it's fair, so in my mind it's both.
9        Q    It was both.  You wanted to make sure
10   it was fair, and you wanted to make sure that it
11   was not unlawful?
12       A    Correct.
13       Q    Were you concerned that it might be
14   unlawful?
15            MS. DIAZ:  Objection.
16       Q    To terminate Serenity Marshall?
17            MS. DIAZ:  You can answer.
18       A    I was not.
19       Q    Why not?
20       A    Because the decision to separate or
21   at least to seek counsel on separating Serenity
22   happened before she went on a leave of absence.
23       Q    Are you sure about that?
24            MS. DIAZ:  Objection.
25            You can answer.
```

```
1                N. Murgalo
2        A    The situation, which happened in
3   November, early December, so, when that happened,
4   that's when the possibility of separation was
5   going to -- was -- at least came up.
6             I don't know when Serenity went out
7   on LOA.  It was very, very shortly after that.
8   But I don't know when it was, so I don't know the
9   dates.
10       Q    Do you know if any disciplinary
11   action short of termination was ever considered
12   for Serenity Marshall?
13       A    I -- I couldn't -- I couldn't say,
14   other than if we are seeking separation and
15   consultation, there is always the possibility that
16   maybe we don't separate.
17       Q    Did Ms. Gurtov ever express any
18   possibility of a corrective action short of
19   termination in any discussion you had with her?
20       A    I don't recall specifically.
21       Q    Did you ever recommend any or counsel
22   any disciplinary action short of termination for
23   Serenity Marshall?
24       A    I -- I don't recall.  I don't recall
25   if I did or not.
```

Page 70

N. Murgalo

1    Q    Do you remember if you ever asked
2    Ms. Gurtov if there was any solution other than
3    termination?
4
5    A    I didn't ask her that, to my
6    recollection.
7    Q    So it's your understanding that
8    Ms. Gurtov thought the only resolution to this
9    issue was to terminate Serenity Marshall?
10        MS. DIAZ:  Objection.  Misstates
11        testimony.
12   A    No, that is not correct.  I don't
13   remember what she said, if she considered it a
14   final written or some other -- something else
15   other than termination.
16   Q    Do you remember if at any point you
17   asked Ms. Gurtov if Serenity Marshall had received
18   any corrective actions for similar conduct before?
19   A    I don't recall asking that
20   specifically.
21   Q    Did you ever ask anything like that?
22   A    I don't recall.
23   Q    In general, do you think it's a good
24   practice to give employees an opportunity to
25   improve before terminating them?

Page 71

N. Murgalo

1
2    A    Opportunity to improve, yes, in
3    general, um-hum.
4    Q    You do?
5    A    I do.
6    Q    Where possible, do you believe less
7    final corrective actions are appropriate for a
8    first infraction?
9        MS. DIAZ:  Objection.
10       Answer if you understand.
11   A    I think there are some infractions
12   that are so egregious that -- that a second chance
13   is not always fair to the business, the other
14   partners in the store.
15   Q    Do you think not making daily bank
16   deposits is so egregious that it does not allow
17   for a second chance?
18       MS. DIAZ:  Objection.
19   A    I -- it would depend on the
20   circumstance.  So, I couldn't really answer that.
21   Q    What circumstances would it depend
22   on?
23   A    It would be hypothetical.  So I don't
24   know, I don't know what would prevent someone from
25   not taking the deposits to the bank, that we would

Page 72

N. Murgalo

1
2    accept as -- or that we would say would be an
3    acceptable reason.
4    Q    Can you think of any?
5    A    I would not want to speculate.  I
6    don't -- I don't know.
7    Q    Do you think inadvertently putting
8    the wrong date for a bank deposit in a daily
9    records book is deserving of termination?
10       MS. DIAZ:  Objection.
11   A    Can you define "inadvertently"?
12   Q    By mistake.
13   A    Not necessarily.
14   Q    Why not?
15   A    If -- if mistakes are made, mistakes
16   are made.
17   Q    What do you mean by that?
18   A    Well, a mistake is something that is
19   not intentional.  A mistake is something that,
20   depending on how serious the issue, and the
21   circumstances surrounding it, you might give
22   somebody a second chance.
23   Q    Even for an error like inadvertently
24   putting the wrong date for a bank deposit in a
25   daily records book?

Page 73

N. Murgalo

1
2    A    I can't really answer that, because I
3    am not familiar enough with the actual cash
4    handling procedures, so how easy that would be to
5    make that mistake, so I couldn't really say.
6    Q    If you learned that it was a common
7    mistake made by many store managers, what would
8    you say at that point?
9        MS. DIAZ:  Objection.
10   A    I think it would be something the
11   district managers would have to look into.
12   Q    I would like to direct your attention
13   to the top e-mail on Murgalo 1.  Do you see where
14   it says -- this is an e-mail from Jenn Gurtov to
15   Victor Huetz; right?
16   A    Yes.
17   Q    And it says, "I recapped the
18   information" -- strike that.
19       It says, "I recapped below the
20   information I received from the Partner Resources
21   Support Center.  Nancy agrees."
22       Do you see that?
23   A    Yes.
24   Q    Now, when Ms. Gurtov wrote, "Nancy
25   agrees," do you know what she meant by that?

Page 74

```
1              N. Murgalo
2       A    I -- I couldn't speak for Jenn, so I
3  don't know exactly what she meant.
4       Q    Did you have any conversations with
5  Ms. Gurtov after the e-mail you wrote at
6  12:11 p.m. on that day?
7       A    I can't recall if I did.
8       Q    Do you remember if you had any
9  discussions with Ms. Gurtov regarding
10  Ms. Marshall's termination between January 12,
11  2011, and the date of Ms. Marshall's termination?
12       A    I can't recall.
13            (Murgalo Exhibit 2 marked for
14       identification as of this date.)
15       Q    Ms. Murgalo, you have been handed a
16  document marked Murgalo 2.  For the record, it is
17  Bates stamped 1665.
18            This is a short e-mail chain; is that
19  correct?
20       A    Yes.
21       Q    At the bottom there is an e-mail from
22  you to Jenn Gurtov dated Monday, February 28,
23  2011; correct?
24       A    Correct.
25       Q    It says, "Hi, Jenn.  Have we made a
```

Page 75

```
1              N. Murgalo
2  determination on Serenity?"
3            Do you see that?
4       A    Yes.
5       Q    Did you write that?
6       A    I did.
7       Q    Why did you write that?
8       A    I wanted to know what the status of
9  Serenity's employment was, if we made a decision
10  to separate or not.
11       Q    So it's fair to say that on
12  February 28, 2011, you did not know whether a
13  determination had been made as to whether to
14  separate Ms. Marshall's employment?
15       A    That would be fair to say, yes.
16       Q    Okay.  This is approximately a
17  month-and-a-half after the January 12 e-mail;
18  correct?
19       A    Correct.
20       Q    How is it that so much time had
21  passed and you did not yet know whether a
22  determination had been made?
23       A    Serenity was out on leave, so, in my
24  mind, there is never anything that is certain
25  until it is scheduled to happen.  Things can come
```

Page 76

```
1              N. Murgalo
2  up and people can change their minds.
3       Q    And you don't remember having any
4  conversations with Ms. Gurtov between January 12,
5  2011, and the date of this e-mail?
6       A    I don't recall.
7       Q    And then you wrote, "When is she due
8  back?"  Is that correct?
9       A    Correct.
10       Q    Why did you write that?
11       A    I was wondering when she was coming
12  back from her leave of absence.
13       Q    Why did you want to know that?
14       A    If we were going to separate her,
15  then when were we doing it; were we doing it when
16  she came back.  So, I wanted to know when her due
17  date was to return.
18       Q    Okay.  Did you ever learn when
19  Ms. Marshall would be terminated?
20       A    Yes.
21       Q    And what did you learn?
22       A    I learned that she was being
23  separated on, it looks like March 1st, from Jenn's
24  e-mail in response to me, that she was -- that
25  Serenity was coming up to the office the following
```

Page 77

```
1              N. Murgalo
2  day, and the -- and Jenn would be separating her
3  then.
4       Q    And what was your opinion on that?
5       A    That was fine.  That was the
6  information I needed.
7       Q    Do you know when the final decision
8  as to Ms. Marshall's termination was made?
9       A    I don't.
10       Q    Do you remember reviewing the
11  termination document that Jenn Gurtov drafted?
12       A    Yes.
13       Q    And do you remember what your opinion
14  of the document was?
15       A    That it was -- it was information
16  that was needed.
17       Q    Do you remember thinking it was
18  accurate?
19       A    Yes.
20       Q    Do you remember making any changes to
21  it?
22       A    I don't recall if I did.
23       Q    Do you know if any investigation was
24  ever done to determine whether Serenity Marshall's
25  termination was appropriate?
```

Page 78

N. Murgalo

1          N. Murgalo
2      A    There was a -- Serenity called -- so,
3  I'm sorry, are you talking about before Serenity
4  was terminated or after?
5      Q    Before.
6      A    The -- there would have been an
7  investigation, yes, by the PRSC.
8      Q    Okay.  Do you know anything about
9  that investigation?
10     A    I don't.
11     Q    You never asked Ms. Gurtov anything
12 about that investigation?
13     A    Just here, "Have we made a
14 determination?"
15     Q    Did you ever communicate with anyone
16 in PRSC regarding any investigation into
17 Ms. Marshall's termination?
18     A    I'm not certain if I did.
19     Q    Did you provide any counseling as to
20 Ms. Marshall's termination other than what you
21 have already testified to?
22     A    I don't recall.  I may have.  I may
23 have -- one of the -- I did ask Jenn to give her
24 a -- it's a separation document that says here is
25 who you call for benefits, here is -- it's a

Page 79

N. Murgalo

1          N. Murgalo
2  standard form that we have.
3      Q    Do you know if Ms. Gurtov did in fact
4  meet with Ms. Marshall on March 1st and terminate
5  her?
6      A    It had happened March 1st?  I
7  couldn't say for certain.
8      Q    But you know that a meeting took
9  place?
10     A    A meeting took place.
11     Q    Where Ms. Marshall was terminated?
12     A    Yes.
13     Q    How did you learn that that meeting
14 actually took place?
15     A    Jenn told me.
16     Q    Do you remember when she told you?
17     A    I don't.
18     Q    Do you remember if it was the same
19 day, a couple days later or something else?
20     A    I don't know.  I don't remember.
21     Q    Do you remember if she told you in
22 person or over the phone or some other way?
23     A    I don't.
24     Q    Do you remember if she ever told you
25 how it went?

Page 80

N. Murgalo

1          N. Murgalo
2      A    I don't remember that conversation.
3      Q    Do you remember anything at all
4  Ms. Gurtov told you about how that conversation
5  went?
6      A    I believe one thing that was said, to
7  the best of my recollection, was Serenity asked,
8  "Why did you bring me up here?  Why did you make
9  me come into the city?  Why didn't you just tell
10 me not to come back," something to that effect.
11     Q    And did Ms. Gurtov tell you how she
12 responded?
13     A    I don't recall.
14     Q    Do you remember if Ms. Gurtov told
15 you that Ms. Marshall was upset?
16     A    She may have.  Based on that comment
17 that she did tell me, my assumption was that
18 Serenity was upset.
19     Q    Did you ever learn that Ms. Marshall
20 was upset?
21     A    I did.
22     Q    How did you learn that?
23     A    Serenity called in to our business
24 compliance line and filed a -- a report that she
25 felt that she was separated unfairly, and was

Page 81

N. Murgalo

1          N. Murgalo
2  upset the way that -- that she was separated
3  for -- what she thought was not handled properly.
4      Q    Do you remember anything else about
5  her complaint?
6      A    Not offhand, no.
7      Q    How did you learn that Ms. Marshall
8  had called and made that complaint?
9      A    The report came to me.
10     Q    What report came to you?
11     A    The report that Serenity called in to
12 the compliance hotline.
13     Q    And when you say came in to you, was
14 an e-mail forwarded to you or something else?
15     A    E-mail.
16     Q    And do you remember your reaction
17 when you got that e-mail?
18     A    My reaction was in reading it, that
19 Serenity was incorrect in how she was looking at
20 the separation process and was assuming a
21 progressive discipline process, which we do not
22 have.
23     Q    Do you remember any other reaction
24 you had?
25     A    No.

N. Murgalo

1             N. Murgalo
2     Q    Do you remember if you thought
3 Ms. Marshall's complaint was frivolous?
4     A    I didn't think it was frivolous.  I
5 knew she was upset.  But I thought it was -- she
6 was mistaken.  She had the wrong information as to
7 how we would discipline somebody.
8     Q    Other than being mistaken as to a
9 policy of progressive discipline at Starbucks, was
10 there anything else you thought she was mistaken
11 as to?
12    A    Not that I can recall.  I can't
13 recall the -- everything that was on her
14 complaint.
15    Q    Do you remember if in the complaint
16 she claimed that she was being treated unfairly
17 because of her medical condition?
18    A    It -- I don't recall everything that
19 was on there, so, I don't recall if that was on
20 there.
21    Q    Do you recall if in the complaint she
22 said that she thought she was being treated
23 unfairly because she took a leave of absence?
24    A    Again, I don't recall, because I
25 don't recall everything on the complaint.

N. Murgalo

1             N. Murgalo
2     Q    But didn't you review that complaint
3 before you came here today?
4     A    I did.
5     Q    So do you recall --
6         MS. DIAZ:  Objection.
7     A    I don't recall --
8         MS. DIAZ:  You can answer.
9     A    I don't recall everything that was on
10 it, so I know that she was complaining about the
11 way her separation was handled, so I don't have
12 the particulars.  I would have to see the
13 complaint.
14    Q    Even though you reviewed it
15 yesterday, you don't remember whether the
16 complaint involves being treated unfairly because
17 of a medical condition?
18         MS. DIAZ:  Objection.
19    A    Correct.
20         (Murgalo Exhibit 3 marked for
21     identification as of this date.)
22    Q    I have just handed you a document, a
23 two-page document that's been marked Murgalo 3.
24 It's Bates stamped Star Marshall 1 to Star
25 Marshall 2.

N. Murgalo

1             N. Murgalo
2         Do you recognize this document?
3     A    I do.
4     Q    Is this a document that you reviewed
5 yesterday?
6     A    It is.
7     Q    I would like to direct your attention
8 to the second page.  And in the middle, it says,
9 "Call date, 3/1, 2011, 2:37 p.m."
10        Do you see that in the middle of the
11 page?
12    A    Yes.
13    Q    And then there is a long narrative
14 paragraph; is that correct?
15    A    Correct.
16    Q    Is this the report that you initially
17 received?
18    A    It is.
19    Q    Okay.  And then if you look towards
20 the top, there is an e-mail from Kami Norris to
21 you, March 1, 2011, at 2:01 p.m.
22        Do you see that?
23    A    Yes.
24    Q    And it says -- it starts, "Hi,
25 Nancy."

N. Murgalo

1             N. Murgalo
2     A    Um-hum.  Yes.
3     Q    Do you know how that e-mail to you
4 was at 2:01 p.m. when Ms. Marshall's initial
5 report was at 2:37 p.m.?
6     A    I don't know.  Oh, yes, I do.  It's
7 out in Seattle, so it's the three-hour difference.
8     Q    Okay.  Do you know who Kami Norris
9 is?
10    A    I know her, yes.  She is part of our
11 compliance group in taking the calls.
12    Q    Okay.  And she wrote to you, "Hi,
13 Nancy.  I hope you are doing well.  The attached
14 compliance matter 082822 is from a recently
15 separated store manager alleging her separation
16 was unfair and poorly handled.  Based on these
17 concerns, the report is being forwarded to you for
18 investigation."
19        Do you see that?
20    A    Yes.
21    Q    Okay.  When you received that, did
22 you read the narrative paragraph below?
23    A    Yes.
24    Q    Okay.  And how did you respond?
25        How did you respond?

Page 86

N. Murgalo
1
2     A     How did I respond to whom?
3     Q     To Ms. Norris.
4     A     I responded once I spoke to Serenity,
5  up at the top, you can see, but that was after I
6  spoke to Serenity.
7     Q     So after you received the report,
8  what was the first thing you did?
9     A     Tried to get in touch with Serenity.
10 Well, obviously, read the report.
11    Q     Okay.
12    A     And -- and then tried to get in touch
13 with Serenity.
14    Q     And how did you -- how did you try to
15 get in touch with Serenity?
16    A     By phone.
17    Q     Do you know when you called her?
18    A     The time?
19    Q     Yes.
20    A     No, I don't.
21    Q     Was it the same day?
22    A     I'm not positive. Let's see, when
23 did I write this? So, it was the same day, yes.
24 Then I got in touch with her the same day and I
25 tried to call her.

Page 87

N. Murgalo
1
2     Q     And do you remember having any
3  conversation with Ms. Marshall?
4     A     I did.
5     Q     Do you remember how long the
6  conversation lasted?
7     A     I don't recall.
8     Q     Can you estimate?
9     A     No, I can't.
10    Q     Was it more than half an hour?
11    A     I honestly don't remember how long it
12 was.
13    Q     Was it more than an hour?
14    A     I don't think -- I don't believe it
15 would be longer than -- more than an hour.
16    Q     Do you remember what you said when
17 she answered the phone?
18    A     I don't remember my exact words, no.
19    Q     Do you remember what you said in
20 substance?
21    A     In substance, I explained to her --
22 so, where I -- I focused was Serenity's issue that
23 she should have received a warning. She didn't
24 think that termination was fair, because she
25 hadn't received any previous warnings or

Page 88

N. Murgalo
1
2  documentation about that. Here she says there is
3  a procedure to be followed which involves a
4  warning and a series of write-ups before
5  termination.
6         So, what I explained to her was that
7  there are a variety of -- there are different
8  types of corrective actions based on severity, not
9  on progressive discipline. So, I explained the
10 situation, and why the decision was to separate
11 her, even though there had not been a final
12 written warning.
13    Q     How did she respond?
14    A     She thanked me. And to the best of
15 my recollection, that was it.
16    Q     Was she angry?
17    A     To the best of my recollection,
18 she -- she didn't seem angry with me.
19    Q     Did she address the fact that she
20 thought she had been terminated because of a
21 medical condition she had?
22    A     I -- I can't recall if she said that.
23 To the best of my recollection, she did not.
24    Q     Do you recall whether she gave you
25 any indication that she believed her termination

Page 89

N. Murgalo
1
2  was in part due to the leave of absence she had
3  taken?
4     A     I don't recall her saying that.
5     Q     Were you surprised when you received
6  the report that Ms. Marshall had made this
7  complaint?
8     A     No.
9     Q     Why not?
10    A     We often have partners who are
11 separated calling the compliance hotline.
12    Q     But particularly with regard to
13 Ms. Marshall, did it surprise you that she
14 complained?
15    A     Not -- would you -- I'm not sure what
16 your question is.
17    Q     My question is just whether you were
18 surprised that Serenity Marshall made a complaint
19 regarding her termination.
20    A     No.
21    Q     When you received a complaint from
22 Serenity Marshall, did it occur to you that her
23 complaint was due to the fact that she had been on
24 a leave of absence when the decision to terminate
25 her was made?

23 (Pages 86 to 89)

TSG Reporting - Worldwide    877-702-9580

Page 90

N. Murgalo

1
2    A    Would you repeat that.
3         (Record read.)
4    A    No.
5    Q    You didn't consider that that might
6    have been a factor in her complaint?
7         MS. DIAZ:  Objection.  Asked and
8    answered.
9    A    No.  I think -- no.
10   Q    Did it occur to you when you received
11   her complaint that her medical condition might
12   have been a factor in her complaint?
13   A    No.
14   Q    After you received this complaint and
15   before you contacted Ms. Marshall, did you speak
16   to anyone about it?
17   A    I did not.
18   Q    You didn't speak to legal?
19   A    No.
20   Q    After you talked to Ms. Marshall, you
21   wrote an e-mail to Ms. Norris; is that right?
22   A    Correct.
23   Q    Between the time that you finished
24   your conversation with Ms. Marshall and the time
25   that you wrote this e-mail to Ms. Norris, did you

Page 91

N. Murgalo

1
2    speak to anyone --
3    A    No.
4    Q    Let me finish my question.  I know I
5    sometimes pause.
6    A    I'm sorry.
7    Q    Between the time that you finished
8    your conversation with Ms. Marshall and the time
9    that you wrote this e-mail to Ms. Norris, did you
10   speak to anybody regarding Serenity Marshall?
11   A    No.
12   Q    After you wrote this e-mail to
13   Ms. Norris, did you speak to anybody about
14   Ms. Marshall's termination in the remainder of the
15   month of March?
16   A    I'm sorry.  Would you repeat that.
17   Q    After you wrote this e-mail to
18   Ms. Norris, did you speak to anybody regarding
19   Ms. Marshall's termination throughout the
20   remainder of the month of March?
21   A    I can't recall.
22   Q    Can you recall any conversation you
23   had regarding Ms. Marshall's termination after
24   March 1st, 2011?
25   A    I can't recall.

Page 92

N. Murgalo

1
2    Q    I would like to direct your attention
3    to the narrative report that you received
4    regarding Ms. Marshall's complaint, and towards
5    the bottom on the right-hand side, there is a
6    sentence that reads:  "The whole issue seems
7    suspicious to her."
8         Do you see where I am looking?
9    A    Um-hum, I see.
10   Q    Do you remember reading that when you
11   received the report?
12   A    Yes.
13   Q    And did you ask Serenity when you
14   talked to her what that meant?
15   A    I did not.
16   Q    Why not?
17   A    I was explaining the situation as to
18   how our termination works, and -- let me amend
19   that.  I don't remember what else I asked her
20   regarding this, other than hearing her out.  I did
21   ask her, "Is there anything else that you need to
22   tell me?  I have your report here."
23   Q    Did Ms. Marshall ever admit to you
24   that she falsified company documents?
25   A    I do not recall that she did.

Page 93

N. Murgalo

1
2    Q    What's your understanding of the
3    reason for Ms. Marshall's termination?
4    A    It was falsifying company documents,
5    specifically the daily records book, and not
6    taking the deposit to the bank on a daily basis.
7    Q    Are you -- go ahead.  Are you done?
8    A    Um-hum.
9    Q    That's it?
10        Are you aware of any other reason for
11   Ms. Marshall's termination?
12   A    And also that she lied to her
13   district manager, saying that she did take it to
14   the bank when she did not.
15   Q    Are you aware of any other reason for
16   her termination?
17   A    I'm not.
18   Q    Are you aware of any other factor
19   that led to her termination?
20   A    I am not.
21   Q    Are you aware of any way in which
22   Ms. Marshall's conduct resulted in a loss of money
23   to Starbucks?
24   A    I am not.
25   Q    Are you aware of any way in which

24  (Pages 90 to 93)

Page 94

N. Murgalo

1                  N. Murgalo
2   Ms. Marshall's conduct adversely affected
3   Starbucks' business?
4        A    I am not aware.
5        Q    Do you believe that Ms. Marshall's
6   conduct led to a loss of money for Starbucks?
7        A    Not to my knowledge.
8        Q    Do you believe that Ms. Marshall's
9   conduct adversely affected Starbucks' business in
10  any way?
11       A    I think keeping money in the safe and
12  not bringing it to the bank puts our partners at
13  risk, because it becomes known that there is
14  considerable money at the store, which can lead to
15  robberies.
16       Q    That's a potential problem.
17       A    Correct.
18       Q    What I am asking is, are you aware of
19  any way in which Ms. Marshall's conduct actually
20  adversely affected Starbucks' business?
21            MS. DIAZ:  Objection.
22       A    I am not.
23       Q    Was that considered ever in your
24  counseling as to whether she should be terminated?
25       A    That meaning?

Page 95

N. Murgalo

1                  N. Murgalo
2        Q    That you had no knowledge as to
3   whether her conduct had adversely affected
4   Starbucks' business.
5        A    No.
6        Q    That was not considered?
7        A    No.
8        Q    Was it considered that you had no
9   reason to believe that her conduct led to a loss
10  of money for Starbucks?  Was that considered?
11       A    No.
12       Q    Earlier we went through any employees
13  who you could remember counseling a district
14  manager or regional director on, with regard to
15  whether termination was appropriate for falsifying
16  company documents; correct?
17            MS. DIAZ:  Objection.
18            Answer if you understand.
19       A    We did.
20       Q    Okay.  And you couldn't remember
21  anybody; is that correct?
22       A    That's correct.
23       Q    Can you remember any employee who has
24  been disciplined for falsifying company documents?
25       A    Again, I can't recall offhand, no.

Page 96

N. Murgalo

1                  N. Murgalo
2        Q    Can you recall any employee who has
3   been disciplined for not making daily bank
4   deposits?
5        A    Offhand, I can't recall.
6        Q    Can you -- can you identify any
7   employee who you have been involved in counseling
8   regarding issues related to cash management?
9        A    Offhand, I can't recall.
10       Q    Can you recall any employee who you
11  have been involved in counseling with regard to a
12  disciplinary issue related to violations of
13  company cash handling policy?
14       A    I can recall -- I can recall speaking
15  with a former partner resources manager regarding
16  a partner, I don't know the partner's name, and
17  there was a loss of money.  I don't even know all
18  the circumstances, and talking about what the
19  appropriate disciplinary action was.
20       Q    And do you remember what the action
21  was?
22       A    She was terminated.
23       Q    Do you remember the person's name?
24       A    I don't.
25       Q    Do you remember when that took place?

Page 97

N. Murgalo

1                  N. Murgalo
2        A    It was at least two years ago.
3        Q    Do you remember who the district
4   manager was?
5        A    I don't.
6        Q    Do you remember if there was
7   suspicion that she stole money?
8        A    I don't believe it was stealing
9   money.  I think it was not handling our -- our
10  cash handling policies.
11       Q    Do you remember if you considered the
12  way her termination was handled when you gave
13  counseling with regard to Serenity Marshall?
14       A    I didn't -- I -- I don't recall that
15  I thought of that specifically.
16       Q    But did you think about it generally?
17       A    I thought about it -- really the
18  issue for me with Serenity was more around the
19  falsification of company documents.
20       Q    Do you know who Carlos Montero is?
21       A    I do.
22       Q    Who is that?
23       A    He's a former store manager.
24       Q    And do you know if he was terminated?
25       A    I couldn't say for certain if he was

Page 98

1          N. Murgalo
2  terminated or voluntarily separated.
3      Q     Did you provide any counseling with
4  regard to his termination?
5      A     I don't recall specifics, but he was
6  a store manager in the area that I support, so I
7  would have been involved in what was going on with
8  him.
9      Q     Do you remember if you considered
10 Mr. Montero's situation when making -- when giving
11 counseling with regard to Serenity Marshall?
12     A     I did not think of him specifically,
13 no.
14     Q     Did you think of him in a general
15 sense?
16     A     No.  I only thought of situations
17 where we have separated partners for falsification
18 of company documents.
19     Q     There is not one situation you can
20 identify?
21     A     No, not offhand.
22     Q     Were you involved in -- strike that.
23         Do you know who Charis Liu is?
24     A     Yes.
25     Q     Who is she?

Page 99

1          N. Murgalo
2      A     A former store manager.
3      Q     Do you know how her employment
4  separated?
5      A     I don't -- I don't know the
6  particulars around it, other than she resigned,
7  but I know that her performance was declining.
8      Q     Do you remember if you considered
9  her -- her employment in any way when you gave
10 counseling with regard to Serenity Marshall's
11 termination?
12     A     I did not.
13     Q     Why not?
14     A     Because I support an area of 200
15 store managers, and over five years it's hundreds
16 and hundreds of partners, so I -- I recall reasons
17 that we separate, such as have we separated
18 partners for falsification of company documents,
19 but the specific of a particular store manager, I
20 don't have that at my ready recall, so I would not
21 have considered that specific store manager.
22     Q     Do you think the way Mr. Montero's
23 termination was handled indicates in any way that
24 Ms. Marshall's termination was handled
25 appropriately?

Page 100

1          N. Murgalo
2          MS. DIAZ:  Objection.
3      A     I don't recall the situation around
4  Carlos' termination, so I couldn't say.
5      Q     Do you think the separation of Charis
6  Liu in any way indicates that Ms. Marshall's
7  termination was handled appropriately?
8          MS. DIAZ:  Objection.
9      A     I don't recall the circumstances
10 surrounding Charis' separation, so I couldn't say.
11         MR. GOTTLIEB:  I want to take a
12 few-minute break.
13         (Recess taken.)
14 BY MR. GOTTLIEB:
15     Q     Now, earlier, when you testified
16 that -- or strike that.
17         Earlier, we looked at an e-mail where
18 you wrote to Ms. Gurtov that separation was
19 consistent with "what we have done in the past" at
20 Starbucks; correct?
21     A     Correct.
22     Q     And you said you made that
23 determination based on your experience and
24 history; is that correct?
25     A     That's correct.

Page 101

1          N. Murgalo
2      Q     When you say you made that decision
3  based on your history and experience, did --
4          MS. DIAZ:  Objection.
5      Q     -- the termination of Carlos Montero
6  factor into that at all?
7          MS. DIAZ:  Objection.  Asked and
8  answered.
9      A     Not Carlos specifically.
10     Q     Did Carlos Montero's termination
11 factor in at all?
12     A     No.
13     Q     When you said that you -- when you
14 made the statement that separation was consistent
15 with what you have done in the past, did
16 disciplinary actions with regard to Charis Liu
17 factor into that at all?
18         MS. DIAZ:  Objection.
19     A     Not Charis specifically.
20     Q     Is there anyone specifically whose
21 disciplinary record you were referring to?
22     A     No.
23     Q     Is there anyone specifically whose
24 disciplinary actions were considered?
25     A     No one specifically.

26 (Pages 98 to 101)

Page 102

N. Murgalo

1
2     Q     And was any disciplinary action
3  toward Charis Liu a factor at all when you said to
4  Ms. Gurtov that separation of Ms. Marshall was
5  consistent with what we have done in the past?
6          MS. DIAZ:  Objection, Counsel.  How
7      many times are you going to ask the
8      question?
9     Q     You can answer it.
10    A     No.
11    Q     Do you think taking money from a
12  store and bringing it home is a serious violation
13  of Starbucks' policy?
14    A     If there is no valid reason to do
15  that, yes.
16    Q     What do you think is a more egregious
17  violation, taking money home from a store, or
18  putting the wrong date of a bank deposit in a
19  daily records book?
20          MS. DIAZ:  Objection.
21          You can answer.
22    A     It depends on the situation, what
23  were the reasons that the wrong date was put down,
24  what was the reason that the money was taken home.
25    Q     Can you explain a situation where

Page 103

N. Murgalo

1
2  putting the wrong date in a daily records book is
3  a more egregious violation than taking money from
4  a store home?
5     A     So, hypothetically?
6     Q     Yes.
7     A     If someone took the money home
8  because they were on their way to the bank, and
9  were about to be robbed or had to get out of that
10  situation, and they were doing it to -- to save
11  themselves and the money, and putting the wrong
12  date down, if it was done knowingly, and done
13  to -- to falsify records.
14    Q     Do you remember if you counseled
15  Ms. Gurtov regarding any disciplinary action as to
16  Charis Liu?
17    A     I -- yes, I did.
18    Q     What was the context of that?
19    A     Charis was put on a performance
20  improvement plan, and they are sent to me before
21  they are delivered to the department.
22    Q     Anything else?
23    A     Not that I can recall specifically.
24  But I know that was one of the counsels.
25    Q     You said there is no progressive

Page 104

N. Murgalo

1
2  discipline policy at Starbucks; correct?
3     A     That's correct.
4     Q     Do you think it's preferable to
5  engage in progressive discipline where possible?
6          MS. DIAZ:  Objection.
7     A     I think the policy that Starbucks has
8  is very fair, because it takes every situation
9  into account in its own circumstances, so, I think
10  what -- what we have is very fair to partners.
11    Q     Okay.  My question is:  Do you
12  believe as a practice it's best to engage in
13  progressive discipline where possible?
14          MR. ANTONETTI:  Objection.
15    A     Not necessarily.
16    Q     Why not?
17    A     Because I think every situation
18  should be taken on its own merit, and some
19  instances are more egregious than others, and --
20    Q     Go ahead.
21    A     And I think that -- that having the
22  ability to look at every situation and judge it on
23  its own is -- is a fair practice, fair to the
24  employee.
25    Q     Okay.  But what I am asking is:

Page 105

N. Murgalo

1
2  Given that every situation can be looked at
3  differently, including termination on an initial
4  infraction, where possible, do you believe
5  progressive discipline is best?
6          MS. DIAZ:  Objection.  Asked and
7      answered.
8     Q     You can answer.
9     A     I think where possible, given the
10  circumstances, I think every employee deserves
11  a -- I think every employee deserves a chance,
12  unless it is egregious enough that it's harming
13  other employees, harming the business, harming the
14  customer.
15    Q     Can you think of any situation where
16  an employee has been terminated for an infraction
17  for which they have not previously received some
18  sort of warning or corrective action?
19    A     Yes.
20    Q     How many?
21    A     I can think of one in particular that
22  I can give you a name for.
23    Q     Who?
24    A     Kenny Burris, B-U-R-R-I-S.
25    Q     When was he terminated?

27 (Pages 102 to 105)

Page 106

N. Murgalo

1    A    It was at -- I don't know exactly
2    when.  I would guess it was three or four years
3    ago.
4    Q    Do you know who his district manager
5    was?
6    A    I don't recall the district manager.
7    I do recall the regional director.
8    Q    Who was the regional director?
9    A    Kathy McCloud.
10   Q    What position did Tony Burris hold?
11   A    He was a store manager.
12   Q    Do you remember the infraction he
13   engaged in that led to his termination?
14   A    Yes.  He was ejecting a -- a
15   non-customer from the store, who had been causing
16   a disturbance, and then proceeded to go outside
17   the store and engage in a physical fight with the
18   person.
19   Q    And he was terminated immediately?
20   A    Well, immediately, I will define
21   that.  He was -- he was terminated after
22   consultation.  It was a matter of a day or two.
23   Q    Okay.  He wasn't given a warning?
24   A    He was not.
25

Page 107

N. Murgalo

1    Q    Do you know whether a warning or some
2    less form of corrective action was considered?
3    A    A final written warning was
4    considered.
5    Q    But ultimately it was determined that
6    separation was appropriate?
7    A    Correct.
8    Q    What do you think was a worse
9    infraction, what Serenity Marshall did or what
10   Kenny Burris did?
11   MS. DIAZ:  Objection.
12   A    I think they both violated our
13   policies.  So, worse?  I couldn't answer worse.  I
14   can tell you that they are both against policies
15   that we have in place to be sure that the business
16   stays safe, customers stay safe and partners stay
17   safe.
18   So both were severe infractions.
19   Both were -- both physical violence and
20   falsification of company documents are two things
21   that -- two of a number of things that we consider
22   to be egregious enough that they could result in
23   separation, without prior warning.
24   Q    Can you explain to me in some more
25

Page 108

N. Murgalo

1    detail what exactly Kenny Burris did when he got
2    into this physical altercation?
3    A    He walked out of the store and got
4    into a fight with this person, and I believe there
5    were brooms that were there, the street sweeper
6    was there, and they used those.  I don't know all
7    the actual particulars, but I know the police were
8    called, and so it was fighting with sticks, and
9    two people.
10   Q    So you believe Kenny Burris swung a
11   broomstick at a person who had been in a Starbucks
12   store?
13   MS. DIAZ:  Objection.  Misstates
14   testimony.
15   MR. GOTTLIEB:  I'm asking her if
16   that's what she believes.
17   A    I believe there was a -- I don't know
18   if -- exactly what he did.  If he swung, if he
19   poked, I don't know that, because I don't know the
20   particulars.  I know he did go out and engage in a
21   physical altercation with sticks with somebody.
22   Q    Do you know if Kenny Burris threw
23   punches at this person?
24   A    I don't know.
25

Page 109

N. Murgalo

1    Q    Do you know if either Mr. Burris or
2    the other person had to go to the hospital?
3    A    I am not certain.
4    Q    But you know the police were called?
5    A    I believe they were.
6    Q    And do you know what happened with
7    the police?
8    A    I don't know.  I don't know if they
9    ended up coming.
10   Q    Do you know if an incident report was
11   generated?
12   A    I don't know for certain.  My
13   assumption is that there was one, but I don't know
14   for certain.
15   Q    Do you have a file regarding this
16   incident?
17   A    I don't, because this was not my area
18   of -- this was not the area that I was supporting
19   at the time.
20   Q    Did you think about Mr. Burris'
21   termination at all when you considered whether it
22   was appropriate to terminate Ms. Marshall?
23   A    I did not.
24   MR. GOTTLIEB:  I have no further

Page 110

```
1              N. Murgalo
2    questions.
3         MS. DIAZ:  Okay.
4         (Time noted:  12:26 p.m.)
5              oOo
6         I, NANCY MURGALO, the witness herein, do
7    hereby certify that the foregoing testimony of the
8    pages of this deposition to be a true and correct
9    transcript, subject to the corrections, if any,
10   shown on the attached page.
11              _____
12
13   Subscribed and sworn to before me this
14   _____day of _____,_____.
15   _____
16        NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

Page 111

```
1
2    STATE OF NEW YORK  )   Pg.   of Pgs.
3    COUNTY OF NEW YORK )
4         I wish to make the following changes
5    for the following reasons:
6    PAGE  LINE
7    ____ ____  CHANGE:_____
8              REASON:_____
9    ____ ____  CHANGE:_____
10             REASON:_____
11   ____ ____  CHANGE:_____
12             REASON:_____
13   ____ ____  CHANGE:_____
14             REASON:_____
15   ____ ____  CHANGE:_____
16             REASON:_____
17   ____ ____  CHANGE:_____
18             REASON:_____
19   ____ ____  CHANGE:_____
20             REASON:_____
21   ____ ____  CHANGE:_____
22             REASON:_____
23   ____ ____  CHANGE:_____
24             REASON:_____
25              _____
```

Page 112

```
1
2         C E R T I F I C A T E
3    STATE OF NEW YORK   )
4              : SS.
5    COUNTY OF NEW YORK  )
6
7         I, BONNIE PRUSZYNSKI, a Notary
8    Public with and for the State of New York,
9    do hereby certify:
10        That NANCY MURGALO, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such deposition
13   is a true record of the testimony given by
14   the witness.
15        I further certify that I am not related
16   to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 6th of January, 2012.
21
22              _____
23        Bonnie Pruszynski
24
25
```

Page 113

```
1
2            I N D E X
3    WITNESS                  PAGE
4    NANCY MURGALO
5    BY MR. GOTTLIEB              4
6
7
8          E X H I B I T S
9    Murgalo Exhibit 1 Document,      50
10      2128-2129
11   Murgalo Exhibit 2 Document, 1665     74
12   Murgalo Exhibit 3 Star Marshall 1-2   83
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**A**

**ability** 6:6,10 14:18
   104:22
**able** 45:16
**absence** 9:11 38:21
   39:11 41:21 43:6
   64:16,22 65:12
   68:22 76:12 82:23
   89:2,24
**accept** 72:2
**acceptable** 72:3
**access** 26:14
**account** 104:9
**accurate** 5:8 15:10
   30:10,11 60:10
   77:18
**action** 37:8 69:11
   69:18,22 96:19,20
   102:2 103:15
   105:18 107:3
   112:16
**actions** 70:18 71:7
   88:8 101:16,24
**activities** 47:14
**actual** 73:3 108:8
**address** 88:19
**Adler** 19:5
**admit** 92:23
**advance** 54:18
**adversely** 94:2,9,20
   95:3
**advice** 66:19
**advised** 23:10,15
   23:20,25 24:6
   37:21 45:20
**advisement** 27:18
   27:25 32:15
**advising** 22:10,18
**affect** 6:3,6,10
   47:10 49:8,11
**ago** 19:15 97:2
   106:4
**agree** 54:10 59:10
   60:15 64:9
**agreed** 38:2 39:17
   44:22 45:21
**agreeing** 61:3
**agrees** 73:21,25

**ahead** 93:7 104:20
   109:18,19
**AKIN** 3:9
**Alfano** 7:2
**alleging** 85:15
**allow** 71:16
**altercation** 108:3
   108:22
**Alvin** 18:14
**ambiguous** 45:7,8
**amend** 44:2 92:18
**amount** 35:10
**angry** 88:16,18
**answer** 5:7 15:6
   16:8 18:18,21
   20:23 28:11,12
   45:25 47:4,22,25
   49:18 50:2,3
   52:11,23 53:3,4
   57:22 60:19 61:13
   64:14 66:9 68:17
   68:25 71:10,20
   73:2 83:8 95:18
   102:9,21 105:8
   107:14
**answered** 61:12
   65:14 87:17 90:8
   101:8 105:7
**answering** 47:21
   48:4
**answers** 5:10
**ANTONETTI**
   104:14
**anybody** 41:15
   59:24 66:18 91:10
   91:13,18 95:21
**appropriate** 45:22
   46:16 55:13 71:7
   77:25 95:15 96:19
   107:7 109:23
**appropriately**
   99:25 100:7
**appropriateness**
   59:2
**approval** 9:10
   45:18
**approved** 45:15
**approximately**
   60:9 75:16

**area** 98:6 99:14
   109:18,19
**areas** 13:14 14:12
**Ari** 7:17 18:11
**asked** 11:23 12:2
   42:25 43:5,23
   44:11,18 48:18,20
   51:7,12 52:7
   61:11 65:14 70:2
   70:17 78:11 80:7
   90:7 92:19 101:7
   105:6
**asking** 29:12 48:2
   49:2 70:19 94:18
   104:25 108:16
**assignments** 14:8
**assist** 14:22,25 15:9
   15:11,11,13
**assisted** 30:7,12
**assuming** 81:20
**assumption** 80:17
   109:14
**attached** 85:13
   110:10
**attendance** 8:2
**attention** 53:13
   54:2 73:12 84:7
   92:2
**Attorneys** 3:4,10
**available** 16:12
**Avenue** 2:11 3:5
   17:6
**aware** 21:18 93:10
   93:15,18,21,25
   94:4,18
**a.m** 2:5

**B**

**B** 113:8
**back** 12:12 18:25
   23:4 31:13 43:5
   50:6 51:23 63:15
   63:18 64:7 65:4
   65:21,23 76:8,12
   76:16 80:10
**bank** 34:20 37:9
   38:14,15 39:25
   71:15,25 72:8,24

93:6,14 94:12
   96:3 102:18 103:8
**barista** 7:9
**based** 44:20 80:16
   85:16 88:8 100:23
   101:3
**basis** 93:6
**Bates** 50:14 74:17
   83:24
**bearing** 47:11
**believe** 7:20 25:16
   25:20 35:3 41:10
   43:24 44:3 65:11
   71:6 80:6 87:14
   94:5,8 95:9 97:8
   104:12 105:4
   108:5,11,18 109:6
**believed** 88:25
**believes** 108:17
**benefits** 78:25
**best** 17:3 35:16
   36:4 38:12 39:7,7
   43:24 44:16 55:21
   80:7 88:14,17,23
   104:12 105:5
**bills** 27:8
**blood** 112:17
**Bonnie** 1:22 2:11
   112:7,23
**book** 34:21 37:10
   37:13 72:9,25
   93:5 102:19 103:2
**books** 24:3
**boss** 10:8,12
**bottom** 50:23 74:21
   92:5
**Boulay** 18:14
**break** 5:20,23
   51:19 52:16,18
   53:2 100:12
**bring** 80:8
**bringing** 66:24
   94:12 102:12
**Brooklyn** 13:16
**brooms** 108:6
**broomstick** 108:12
**Bryant** 3:11 18:8
**build** 14:9

**Burris** 105:24
   106:11 107:11
   108:2,11,23 109:2
   109:21
**business** 13:25
   71:13 80:23 94:3
   94:9,20 95:4
   105:13 107:16
**B-U-R-R-I-S**
   105:24

**C**

**C** 3:2 112:2,2
**call** 26:7,9 27:14,22
   32:10 37:21 41:8
   78:25 84:9 86:25
**called** 4:3 9:9 26:15
   26:23 78:2 80:23
   81:8,11 86:17
   108:9 109:5
**calling** 26:6 89:11
**calls** 85:11
**capacities** 1:11
**careful** 49:14 59:12
**Carlos** 97:20 100:4
   101:5,9,10
**carrier** 27:10
**case** 4:11 6:18,20
   7:10 8:20 10:19
   66:12,24
**cash** 23:12,16 28:9
   29:21,24,25 30:8
   30:17 40:3,7,10
   40:14 73:3 96:8
   96:13 97:10
**causing** 106:16
**cell** 26:9,12,13,24
   27:5,6,8,12,15,20
   27:22
**Center** 37:22 58:12
   73:21
**certain** 13:11 22:3
   38:23 75:24 78:18
   79:7 97:25 109:4
   109:13,15
**certainly** 9:8 68:6
**Certified** 2:13
**certify** 110:7 112:9

112:15
**chain** 50:21 74:18
**chair** 36:7
**chance** 71:12,17
72:22 105:11
**change** 76:2 111:7
111:9,11,13,15,17
111:19,21,23
**changes** 77:20
111:4
**Charis** 9:23 98:23
100:5,10 101:16
101:19 102:3
103:16,19
**checked** 37:10,12
**circumstance**
71:20
**circumstances**
40:19 71:21 72:21
96:18 100:9 104:9
105:10
**city** 80:9
**claim** 8:3
**claimed** 82:16
**class** 14:10
**clear** 53:2
**closely** 25:9,10
**come** 19:7 20:3
25:21 31:10 32:22
35:20 75:25 80:9
80:10
**comfortable** 25:16
**coming** 43:5 65:21
76:11,25 109:10
**comment** 80:16
**common** 73:6
**communicate**
17:19 25:23 26:2
32:17 78:15
**communications**
42:23 43:19 52:22
52:24 53:5 66:11
67:8
**company** 16:10
39:24 56:6,13
57:20 58:6,9,14
59:23 60:21 61:10
61:19 62:22 63:3

65:8 92:24 93:4
95:16,24 96:13
97:19 98:18 99:18
107:21
**comparing** 40:21
**complained** 89:14
**complaining** 83:10
**complaint** 81:5,8
82:3,14,15,21,25
83:2,13,16 89:7
89:18,21,23 90:6
90:11,12,14 92:4
**compliance** 9:10
80:24 81:12 85:11
85:14 89:11
**concerned** 11:4,8
64:24 68:13
**concerning** 8:16
9:12
**concerns** 85:17
**concur** 54:8 64:8
**condition** 32:24
39:2 46:9 65:12
82:17 83:17 88:21
90:11
**conduct** 70:18
93:22 94:2,6,9,19
95:3,9
**conference** 24:22
24:24 25:4 36:3
**connect** 66:3
**consider** 90:5
107:22
**considerable** 94:14
**consideration**
59:13
**considered** 37:15
69:11 70:13 94:23
95:6,8,10 97:11
98:9 99:8,21
101:24 107:3,5
109:22
**considering** 37:16
**consistent** 54:10
55:25 56:4,8,22
57:7,15 58:22
59:7,11 60:16
61:2 100:19

101:14 102:5
**consultant** 14:17
15:16 16:24
**consultation** 44:21
69:15 106:23
**contact** 15:23 16:6
58:11 67:11
**contacted** 35:8,14
44:4 90:15
**contacting** 25:17
39:15
**context** 14:16
19:16,18 24:21
103:18
**conversation** 16:17
36:21,23 38:9
39:3,10,14 40:23
41:2,5 42:14,19
43:21 51:10 66:23
80:2,4 87:3,6
90:24 91:8,22
**conversations** 26:4
32:4 74:4 76:4
**convey** 66:18
**conveyed** 67:7
**CORPORATION**
1:8
**correct** 8:24 24:11
24:17 27:9 29:16
29:18,19 31:19
48:17,24 50:21,22
50:25 51:2 53:3,4
53:6,8,9 57:23
63:20,23 67:9,14
68:12 70:12 74:19
74:23,24 75:18,19
76:8,9 83:19
84:14,15 90:22
94:17 95:16,21,22
100:20,21,24,25
104:2,3 107:8
110:8
**correcting** 52:10
**corrections** 110:9
**corrective** 69:18
70:18 71:7 88:8
105:18 107:3
**counsel** 8:22 10:5

15:8 17:12 27:19
28:2 52:24 53:5
66:16,19 67:8,12
68:21 69:21 102:6
**counseled** 28:7
30:15 46:15 58:4
103:14
**counseling** 15:24
32:7 46:11 49:22
62:21 78:19 94:24
95:13 96:7,11
97:13 98:3,11
99:10
**counsels** 103:24
**COUNTY** 111:3
112:5
**couple** 79:19
**court** 1:2 5:7
**cover** 13:11,14
**covered** 13:17
**Cuesta** 7:20
**current** 12:7
**currently** 6:2,5
18:2
**customer** 105:14
**customers** 107:17

---

**D**

**D** 113:2
**daily** 24:3 34:21
37:10 39:25 71:15
72:8,25 93:5,6
96:3 102:19 103:2
**date** 11:12 19:9
24:12 32:12 41:24
50:12 55:5,9,15
59:3 67:6 72:8,24
74:11,14 76:5,17
83:21 84:9 102:18
102:23 103:2,12
**dated** 50:23 54:2
63:25 74:22
**dates** 69:9
**David** 3:7 53:7
**day** 17:21 22:13,14
35:13 54:25 74:6
77:2 79:19 86:21
86:23,24 106:23

110:14
**days** 79:19
**December** 1:18 2:4
23:9,14,19,24
24:5 25:8 50:6
69:3
**decision** 17:4 44:8
44:10,24 45:10,14
46:18 51:8 65:5
65:13 68:20 75:9
77:7 88:10 89:24
101:2
**decisions** 15:3,19
15:24 28:4
**decision-making**
15:15,17
**declining** 99:7
**Defendants** 1:12
3:10
**deficiencies** 21:18
22:11
**define** 25:10 55:17
72:11 106:21
**delivered** 103:21
**department** 66:25
103:21
**depend** 40:18
71:19,21
**depending** 72:20
**depends** 40:18,19
102:22
**deposed** 6:13 8:6
10:4,11,15,17,25
11:2,8,11,12,15
11:17
**deposit** 38:15 72:8
72:24 93:6 102:18
**deposition** 1:16 2:9
8:10 11:13 18:24
110:8 112:11,12
**deposits** 34:19 37:9
40:2 71:16,25
96:4
**describing** 54:15
**deserves** 105:10,11
**deserving** 72:9
**desk** 36:16,17
**detail** 22:6 108:2

details 62:24
determination 43:2
  43:3,8,23 75:2,13
  75:22 78:14
  100:23
determine 14:8
  67:16 77:24
determined 107:6
determining 59:2
detrimental 49:8
developing 14:2,3
development 14:6
diagnosed 32:24
Diaz 3:13 8:13 15:4
  15:6 16:7 20:22
  27:18,24 28:10,12
  30:9,18 32:14
  40:12,17 45:2,4,6
  45:24 47:3,15,20
  48:8,14 49:17,25
  50:3 51:19 52:20
  53:7 54:19 57:21
  59:14 60:18 61:5
  61:11 63:4 64:14
  65:14 66:8,21
  67:18 68:5,15,17
  68:24 70:10 71:9
  71:18 72:10 73:9
  83:6,8,18 90:7
  94:21 95:17 100:2
  100:8 101:4,7,18
  102:6,20 104:6
  105:6 107:12
  108:14 110:3
difference 85:7
different 8:4 88:7
differently 105:3
Dija 10:23
direct 14:18 53:13
  53:25 73:12 84:7
  92:2
direction 41:8
directly 32:17
  52:15
director 10:9 13:23
  14:14 30:16 41:11
  45:15 95:14 106:8
  106:9

directors 10:9,20
  15:20 16:5 28:8
director's 45:18
disciplinary 69:10
  69:22 96:12,19
  101:16,21,24
  102:2 103:15
discipline 81:21
  82:7,9 88:9 104:2
  104:5,13 105:5
disciplined 95:24
  96:3
disclose 66:10
discuss 10:14 11:14
  17:2 26:16 27:3
  52:21
discussed 10:3
  43:22 54:17,20
  63:19 64:21
discussing 14:18
discussion 12:11
  36:10 38:19 41:15
  54:25 55:6,14
  69:19
discussions 54:23
  74:9
district 1:2,3 7:13
  13:11,23 14:14,23
  15:2,20,23 16:9
  16:19 17:9,12,17
  17:25 20:12,16,19
  21:3,9,10,11,12
  22:17 23:6 24:10
  24:19,25 25:8
  28:3,7 30:16 32:4
  32:7 33:19 62:12
  62:14,16 73:11
  93:13 95:13 97:3
  106:5,7
disturbance 106:17
DM 24:13,16
DMs 18:16 58:7
document 50:15,16
  74:16 77:11,14
  78:24 83:22,23
  84:2,4 113:9,11
documentation
  88:2

documents 9:5,7,14
  9:16,25 39:24
  41:5 55:5 56:6,13
  57:6,20 58:6,9,15
  60:22 61:10,19,24
  62:22 63:3 65:8
  92:24 93:4 95:16
  95:24 97:19 98:18
  99:18 107:21
doing 23:8 31:23
  31:25 37:7 52:15
  76:15,15 85:13
  103:10
door 36:6
doorway 36:13,19
drafted 77:11
due 30:17 76:7,16
  89:2,23
duly 4:4 112:12
Dunn 10:22 11:9
duration 36:21
duties 13:20

E

E 3:2,2,7 112:2,2
  113:2,8
earlier 11:15 43:13
  63:19 95:12
  100:15,17
early 43:15 69:3
easily 31:11
easy 73:4
edited 61:23
Edwards 18:13
effect 80:10
effective 14:7
egregious 71:12,16
  102:16 103:3
  104:19 105:12
  107:23
Ehlinger 18:12
eight 19:15
Eighteen 18:3
either 109:2
ejecting 106:15
employed 12:4
employee 6:25 9:22
  26:16 27:3 29:6

30:7 46:25 47:6
  47:10 48:16,23
  49:12,14 58:5
  60:2,9 61:4,9,18
  62:21 63:2 95:23
  96:2,7,10 104:24
  105:10,11,16
employees 25:18
  28:6 62:3 70:24
  95:12 105:13
employment 43:20
  44:25 45:11,17
  49:10 64:23 75:9
  75:14 99:3,9
ended 109:10
engage 104:5,12
  106:18 108:21
engaged 106:14
entire 59:9
entitled 53:8,12
entry 16:10
error 72:23
ESQ 3:7,13,14
Estela 3:13 9:4
estimate 19:11
  28:14 35:12 36:25
  87:8
exact 11:7 19:9,18
  24:12 87:18
exactly 20:15 33:16
  35:10 38:6 65:23
  74:3 106:2 108:2
  108:19
EXAMINATION
  4:6
examined 4:4
example 63:10
examples 63:12
excuse 18:23
Exhibit 50:11
  74:13 83:20 113:9
  113:11,12
experience 56:10
  56:11 57:4,16
  60:23 100:23
  101:3
explain 16:11,18
  53:4 59:21 102:25

107:25
explained 87:21
  88:6,9
explaining 92:17
express 69:17
e-mail 25:14,24
  26:4 35:15 43:22
  50:21,23,24 51:4
  51:13,14,25 52:3
  52:3,8 53:14,21
  54:2,15,17 55:2
  55:10,16,23 59:9
  60:13 63:25 64:4
  64:7 65:9 67:6,25
  73:13,14 74:5,18
  74:21 75:17 76:5
  76:24 81:14,15,17
  84:20 85:3 90:21
  90:25 91:9,12,17
  100:17
e-mailed 43:2,7
e-mails 9:8,12,19
  10:2

F

F 112:2
fact 10:3,15,25
  11:11,14 49:23
  79:3 88:19 89:23
factor 46:18 49:16
  64:18,20,25 65:2
  65:3,13 90:6,12
  93:18 101:6,11,17
  102:3
fair 14:22,25 24:14
  28:2 40:14 49:13
  66:4,7 67:13,17
  68:3,8,10 71:13
  75:11,15 87:24
  104:8,10,23,23
false 37:11
falsification 34:20
  39:23 56:6,13
  57:19 58:5,9,14
  60:21 61:10,19,22
  61:24 63:2 65:8
  97:19 98:17 99:18
  107:21

**falsified** 62:22 63:8
  92:24
**falsify** 103:13
**falsifying** 93:4
  95:15,24
**familiar** 73:3
**far** 5:14,17 65:4
  66:25
**favor** 44:22
**February** 43:13,15
  43:16 44:13 74:22
  75:12
**feedback** 23:6
**feeling** 65:2
**FELD** 3:9
**felt** 25:16 80:25
**few-minute** 100:12
**Fifth** 2:10 3:5 17:6
**fight** 106:18 108:5
**fighting** 108:9
**file** 31:22 109:16
**filed** 80:24
**files** 8:15
**fill** 31:17
**filled** 37:13
**final** 70:14 71:7
  77:7 88:11 107:4
**fine** 5:20 77:5
**finish** 5:6 47:18
  48:4 91:4
**finished** 90:23 91:7
**first** 4:3 13:7 19:7
  19:11,20 20:7,9
  20:20 21:17 33:6
  33:13 34:17,23
  49:2 50:7 71:8
  86:8
**five** 28:20 31:25
  99:15
**five-and-a-half**
  12:10 13:19 30:5
  62:10
**focused** 87:22
**followed** 88:3
**following** 24:7
  76:25 111:4,5
**follows** 4:5
**follow-up** 51:9

**foregoing** 110:7
**form** 22:24 23:5
  79:2 107:3
**formed** 22:21
**former** 6:18 9:13
  9:17 11:8 96:15
  97:23 99:2
**forth** 112:11
**forwarded** 81:14
  85:17
**found** 34:19 35:5
  37:3,6,8,10
**four** 12:18 106:3
**Fraser** 10:23
**frequency** 17:18
**frequently** 25:12
  25:14
**frivolous** 82:3,4
**further** 42:22
  109:25 112:15

**G**

**general** 70:23 71:3
  98:14
**generally** 66:9
  97:16
**generated** 109:12
**give** 61:14,15,17,20
  61:21 70:24 72:21
  78:23 105:22
**given** 65:7 105:2,9
  106:24 112:13
**giving** 14:7 49:22
  98:10
**go** 18:11 35:21
  38:13 51:23 63:15
  63:18 93:7 104:20
  106:17 108:21
  109:3
**goes** 48:14
**going** 18:20 25:22
  27:14,21 32:10,25
  33:4,10,14 34:5,9
  34:14,24 38:20,24
  39:11 46:3 48:7
  52:24 53:5 69:5
  76:14 98:7 102:7
**good** 4:8,9 22:22

23:8 38:3,5 70:23
**GOTTLIEB** 3:7
  4:7 12:12 19:3
  27:14,21 32:10
  45:3,5,8,9 47:17
  47:25 48:11 51:21
  53:11 100:11,14
  108:16 109:25
  113:5
**grab** 53:16
**Grajada** 18:13
**group** 9:10 85:11
**Grzorczyk** 18:7
**guess** 19:14 106:3
**guessing** 36:11
**GUMP** 3:9
**Gurtov** 1:9 10:10
  11:10,14 18:8
  21:21 22:4,6,10
  24:10,18,24 25:7
  25:9 26:15 33:21
  34:2,4,15,23 35:7
  37:4 38:8,18,25
  39:18 41:4,7 42:9
  42:23 43:19 45:12
  45:16,21 46:15
  50:25 51:3 53:15
  54:14,24 55:6,15
  55:15,23 60:12
  63:24 69:17 70:3
  70:8,17 73:14,24
  74:5,9,22 76:4
  77:11 78:11 79:3
  80:4,11,14 100:18
  102:4 103:15
**Gurtov's** 27:15,20
  38:10 65:13

**H**

**H** 113:8
**half** 13:15 87:10
**hallway** 36:2
**hand** 112:20
**handed** 50:13
  74:15 83:22
**handled** 81:3 83:11
  85:16 97:12 99:23
  99:24 100:7

**handling** 23:17
  29:21 40:3,8 73:4
  96:13 97:9,10
**happen** 52:18
  75:25
**happened** 35:4
  36:12 40:19,20
  50:4,7 54:21,21
  68:22 69:2,3 79:6
  109:7
**harass** 47:23
**harassing** 47:20
**harassment** 6:21
**harming** 105:12,13
  105:13
**Harper** 18:9
**HAUER** 3:9
**head** 5:11
**headquarters** 8:16
**hear** 4:18,20
**hearing** 92:20
**held** 2:9 12:11 13:4
**help** 14:21 16:24
**helped** 52:19
**helping** 14:7
**hereinbefore**
  112:11
**hereunto** 112:19
**Hi** 54:8 74:25 84:24
  85:12
**history** 49:11
  100:24 101:3
**hold** 12:22 106:11
**home** 102:12,17,24
  103:4,7
**honestly** 87:11
**hope** 85:13
**hospital** 109:3
**hotline** 81:12 89:11
**hour** 87:10,13,15
**hours** 9:2 61:22
  63:9
**Huetz** 10:22,24
  73:15
**human** 15:3
**hundreds** 99:15,16
**hypothetical** 71:23
**hypothetically**

103:5

**I**

**idea** 38:3,5
**identification**
  50:12 74:14 83:21
**identify** 61:9,18
  62:25 96:6 98:20
**immediately**
  106:20,21
**impact** 64:22
**important** 5:6
**improve** 70:25 71:2
**improvement** 9:20
  103:20
**inadvertently** 72:7
  72:11,23
**inappropriate**
  48:13
**incident** 22:14 35:4
  109:11,17
**including** 105:3
**incorrect** 81:19
**indicates** 99:23
  100:6
**indication** 88:25
**individual** 1:10
**information** 35:6,8
  37:11,23 61:17
  63:17 65:6 73:18
  73:20 77:6,15
  82:6
**informing** 37:2
**infraction** 50:6
  71:8 105:4,16
  106:13 107:10
**infractions** 71:11
  107:19
**initial** 43:21 51:10
  54:25 55:5,14
  85:4 105:3
**initially** 84:16
**instance** 21:17
  23:10,15,20,25
  24:6 62:19
**instances** 30:3
  104:19
**intentional** 72:19

**interested** 112:18
**interrupting** 48:12
**investigation** 55:18
  57:6 77:23 78:7,9
  78:12,16 85:18
**involved** 44:7 96:7
  96:11 98:7,22
**involvement** 67:2
**involves** 83:16 88:3
**Island** 13:15,16
  17:14,15 18:11
**issue** 6:22 16:16,25
  26:16 27:3 32:19
  37:16 38:7 39:18
  40:5,8 44:21 46:6
  60:20 70:9 72:20
  87:22 92:6 96:12
  97:18
**issues** 20:14 21:13
  21:15 28:8 30:8
  30:17 32:7 33:8
  50:10 96:8
**Ivy** 7:20

**J**

**January** 50:24 54:2
  60:13 63:25 74:10
  75:17 76:4 112:20
**Jenn** 9:4 10:10
  11:10,14 18:7
  21:9,11,21 22:4,9
  24:10,18,24 25:7
  25:9 26:15 33:21
  34:15,18 37:4
  38:18 39:15 41:20
  42:25 43:2,8 44:3
  45:12,16 50:25
  51:3 52:6 53:14
  54:8,14 55:15,23
  60:12 65:13 66:23
  67:10 73:14 74:2
  74:22,25 77:2,11
  78:23 79:15
**JENNELLE** 3:14
**JENNIFER** 1:9
**Jenn's** 51:24,25
  76:23
**job** 1:23 23:8 49:12

59:24
**John** 10:22 11:6
**judge** 104:22

**K**

**Kami** 84:20 85:8
**Kathleen** 18:12
**Kathy** 106:10
**keep** 39:16 64:5
**keeping** 52:6 94:11
**Kenny** 105:24
  107:11 108:2,11
  108:23
**Ketan** 10:13,14
**Kevin** 19:6
**kind** 31:4
**knew** 11:16 33:9
  38:24 41:11 46:7
  46:7,11 49:20
  60:20 66:25 82:5
**know** 4:19,23 5:4
  5:20 7:10,13,18
  7:22 11:17 16:5
  16:12,16 19:7,12
  20:11,16,18,19,25
  21:8,12 22:3,21
  23:7 24:12,16,18
  24:24 27:10 28:13
  29:5 31:10 32:25
  33:3,10,12,16
  34:12 35:7,10
  36:24 38:20,25
  39:16 41:7,20
  42:2,4,6 43:12,15
  43:17,18 44:14,23
  45:10,13,22 46:3
  46:5,6 47:5 48:6
  48:22 51:6 52:4,4
  56:7,15 57:14
  59:22 60:5,7,22
  60:23 62:7,14,16
  63:16 65:23 69:6
  69:8,8,10 71:24
  71:24 72:6 73:25
  74:3 75:8,12,21
  76:13,16 77:7,23
  78:8 79:3,8,20
  83:10 85:3,6,8,10

86:17 91:4 96:16
  96:17 97:20,24
  98:23 99:3,5,7
  103:24 106:2,5
  107:2 108:7,8,18
  108:20,20,21,23
  108:25 109:2,5,7
  109:9,9,11,13,14
**knowingly** 103:12
**knowledge** 61:6
  94:7 95:2
**known** 94:13

**L**

**labor** 61:23
**lasted** 87:6
**late** 43:16
**lawsuit** 8:3
**lead** 94:14
**leadership** 24:22
  24:24 25:4
**learn** 33:13 34:13
  34:17 76:18,21
  79:13 80:19,22
  81:7
**learned** 20:4 32:23
  33:7,17,19 34:23
  35:8 73:6 76:22
**learning** 12:15
**leave** 9:11 33:2,4
  33:10,11,14 34:6
  34:9 38:21,24
  39:11 41:21 42:5
  42:7,10 43:6
  45:23 46:12 47:2
  47:7,9 48:17,24
  49:7,9,10,15,16
  49:21,24 50:5,8
  64:16,21 65:12
  68:22 75:23 76:12
  82:23 89:2,24
**led** 22:15 93:19
  94:6 95:9 106:14
**legal** 31:6 54:9 64:9
  64:13 65:10,19,25
  66:3,15,25 67:2
  67:25 68:6 90:18
**legal's** 67:15,23

**letting** 23:7 41:20
**Let's** 86:22
**level** 14:6,20
**Levenger** 31:8
**lied** 93:12
**lightly** 59:17
**line** 80:24 111:6
**lined** 31:5
**list** 18:4,5,15 29:6,9
  29:12
**listed** 14:12
**little** 19:17
**Liu** 9:23 98:23
  100:6 101:16
  102:3 103:16
**LiveNote** 2:13
**LLP** 2:10
**LOA** 69:7
**located** 17:5,12
**long** 8:25 12:4,9,16
  12:22 13:2,16,17
  17:14 18:11 31:24
  35:7 36:23 37:2
  60:5 84:13 87:5
  87:11
**longer** 19:17 87:15
**look** 16:25 58:17
  63:15 73:11 84:19
  104:22
**looked** 55:12,17
  100:17 105:2
**looking** 17:3 81:19
  92:8
**looks** 68:7 76:23
**loop** 52:7 64:5
**lose** 59:24
**loss** 93:22 94:6 95:9
  96:17
**lost** 29:25
**lower** 13:14
**Ludvigsen** 19:5
**L-U-D-V-I-G-S-...**
  19:5

**M**

**maiden** 7:21
**making** 17:2 39:25
  45:13 71:15 77:20

96:3 98:10
**management** 13:24
  23:12 28:9 29:24
  29:25 30:8,17
  40:11,15 96:8
**manager** 7:13,18
  9:13,17 11:9 12:8
  12:14,15,25 13:10
  13:21 16:10 19:10
  20:12,16,19 21:3
  21:9,10,11,12
  22:18,23 24:11,19
  24:25 25:8 30:6
  30:16 33:19 57:19
  58:4,8,14 62:16
  85:15 93:13 95:14
  96:15 97:4,23
  98:6 99:2,19,21
  106:5,7,12
**managers** 13:23
  14:10,14,23 15:2
  15:21,23 16:19
  17:9,12,17,25
  23:7 28:3,7 32:4,8
  32:8 56:5,12
  61:23 73:7,11
  99:15
**Manhattan** 13:15
  17:7,14
**manner** 24:25
**manpower** 13:24
**March** 44:13,17
  76:23 79:4,6
  84:21 91:15,20,24
**Mark** 18:7
**marked** 50:11,14
  74:13,16 83:20,23
**marriage** 112:17
**married** 7:21
**Marshall** 1:5 4:10
  8:17 11:5 19:8,12
  21:19 22:5,11,22
  23:11,16,21 24:2
  24:7 32:18,23
  33:7 34:5,14,24
  38:10,20 39:10
  41:16 42:24 44:8
  44:14 45:22 49:21

54:16,24 55:7
59:25 68:16 69:12
69:23 70:9,17
76:19 79:4,11
80:15,19 81:7
83:24,25 87:3
89:6,13,18,22
90:15,20,24 91:8
91:10 92:23 97:13
98:11 102:4
107:10 109:23
113:12
**Marshall's** 21:4
22:19 27:17 32:13
39:2 43:9,20
44:24 45:11,17
59:3 65:11 67:6
74:10,11 75:14
77:8,24 78:17,20
82:3 85:4 91:14
91:19,23 92:4
93:3,11,22 94:2,5
94:8,19 99:10,24
100:6
**matter** 4:12 66:16
85:14 106:23
112:18
**matters** 13:24
**McCloud** 106:10
**mean** 14:3,15 15:11
15:13 56:2 66:6
67:19,22 68:2
72:17
**meaning** 94:25
**meant** 56:4 73:25
74:3 92:14
**mediation** 46:8
**medical** 32:24 33:2
33:4,8,11,11,14
34:6 39:2 45:23
46:8,12 47:2,7,9
48:17,24 49:7,9,9
49:15,16,21 50:5
50:8 65:12 82:17
83:17 88:21 90:11
**medications** 6:3,6,9
**meet** 8:22,25 9:3
16:9 79:4

**meeting** 24:23 25:3
46:8 79:8,10,13
**Melissa** 18:9
**memory** 6:3 57:5
57:16
**Mendrinos** 7:17
18:12
**MENENDEZ** 3:14
**mention** 39:6,8
44:3
**mentioned** 10:10
33:19 38:25 39:9
39:12 46:8 64:6
**merit** 2:13 104:18
**met** 8:13 9:4 19:21
19:23 24:20 25:5
**Metro** 10:10,21
62:15
**middle** 84:8,10
**Mike** 18:8
**mind** 68:8 75:24
**minds** 76:2
**minutes** 37:3 60:14
**missing** 18:10,16
19:2
**Misstates** 70:10
108:14
**mistake** 72:12,18
72:19 73:5,7
**mistaken** 82:6,8,10
**mistakes** 53:8
72:15,15
**moment** 22:7 51:24
**Monday** 74:22
**money** 93:22 94:6
94:11,14 95:10
96:17 97:7,9
102:11,17,24
103:3,7,11
**Montero** 97:20
101:5
**Montero's** 98:10
99:22 101:10
**month** 43:12 60:21
91:15,20
**months** 13:3 43:13
**month's** 37:12
**month-and-a-half**

75:17
**morning** 4:8,9
**moving** 43:4 65:22
**Murgalo** 1:16 2:9
4:1,2,8 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1,11,14 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1,13 74:1,13
74:15,16 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1,20,23
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
110:6 112:10
113:4,9,11,12
**Murgalo's** 27:22
32:11

### N

**N** 3:2 4:1 5:1 6:1

7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 113:2
**name** 6:25 7:2,21
9:21 19:8 30:2,2,4
57:23 61:14 96:16
96:23 105:22
**names** 18:5,21
56:16,18,19 61:21
**Nancy** 1:16 2:9 4:2
53:15 73:21,24
84:25 85:13 110:6
112:10 113:4
**narrative** 84:13
85:22 92:3
**nature** 46:5

**necessarily** 72:13
104:15
**need** 16:16 33:14
49:13 63:21 65:18
65:25 92:21
**needed** 46:21 77:6
77:16
**negatively** 49:12
64:22
**never** 75:24 78:11
**new** 1:3,17,17 2:11
2:11,14 3:6,6,12
3:12 10:9,21
14:10 18:10 31:18
42:3 62:13,15
111:2,3 112:3,5,8
**Nina** 18:13
**nine** 13:3 60:9
**nine-year** 61:4
**nod** 5:11
**non-customer**
106:16
**Norris** 84:20 85:8
86:3 90:21,25
91:9,13,18
**Notary** 2:14 110:16
112:7
**notebook** 31:3,4,5
31:7,11,14
**noted** 110:4
**notes** 30:24,25 31:2
32:3,6 40:25
58:17
**notified** 41:21
**November** 50:6
69:3
**number** 14:12
26:12,13 27:12
107:22

### O

**oath** 4:16
**object** 47:19 48:5,9
**objected** 48:8
**objection** 15:4 16:7
20:22 28:10 30:9
30:18 40:12,17
45:2,3,24 47:3,15

49:17,25 52:20
53:7 54:19 57:21
59:14 60:18 61:5
61:11 63:4 66:8
66:21 67:18 68:5
68:15,24 70:10
71:9,18 72:10
73:9 83:6,18 90:7
94:21 95:17 100:2
100:8 101:4,7,18
102:6,20 104:6,14
105:6 107:12
108:14
**obviously** 86:10
**occur** 46:24 89:22
90:10
**offhand** 29:14
57:25 60:7 61:16
62:18 63:17 81:6
95:25 96:5,9
98:21
**office** 17:8,11,16
25:21 26:17,18,19
26:20,25 35:19,20
35:21,22,23 36:2
36:6,8,10 38:19
76:25
**offices** 2:10 17:5
**official** 1:10
**Oh** 29:20 85:6
**okay** 4:20,21,25 5:2
5:4,5,8,9,11,12,21
5:24,25 6:20 8:21
9:21 10:12 15:7
16:9 18:9 20:24
33:3 50:18 51:12
51:18 52:10 53:23
53:25 55:23 62:19
63:12 67:11 75:16
76:18 78:8 84:19
85:8,12,21,24
86:11 95:20
104:11,25 106:24
110:3
**Omar** 18:13
**once** 6:16 17:23
59:22 86:4
**ones** 29:9,12

**ongoing** 7:11
**oOo** 110:5
**open** 36:6
**operators** 13:22
14:13
**opinion** 22:22,24
22:25 23:5 44:11
44:18 77:4,13
**opportunity** 59:21
70:24 71:2
**opposed** 5:11
**Ormsbee** 18:7
**outcome** 112:18
**outside** 35:23
106:17
**o'clock** 52:2

**P**

**P** 3:2,2
**pad** 31:6 32:3,6,11
**page** 84:8,11
110:10 111:6
113:3
**pages** 31:10,12,17
31:18,20 110:8
**paragraph** 84:14
85:22
**Park** 3:11
**part** 85:10 89:2
**particular** 99:19
105:21
**particularly** 89:12
77:12,15,20,23
**particulars** 83:12
99:6 108:8,21
**parties** 112:16
**partner** 6:19 10:8
12:8,14 13:10,21
13:25 14:11 30:6
37:22 41:8 49:11
58:11 59:21 66:5
66:7 67:13 73:20
96:15,16
**partners** 56:5
61:22 63:16 71:14
89:10 94:12 98:17
99:16,18 104:10
107:17
**partner's** 30:3

64:23 96:16
**party** 40:22
**passed** 75:21
**Patel** 10:13,15
**Paul** 18:7,12
**pause** 91:5
**pay** 27:8
**pending** 5:23
**people** 14:5,19,20
45:13 76:2 108:10
**performance** 9:20
20:5,13 21:5,14
21:18,22 22:10
23:4 49:9 99:7
103:19
**performance-rel...**
32:19
**period** 27:23 32:12
**person** 19:21,23
30:15 35:17 42:11
51:12 79:22
106:19 108:5,12
108:24 109:3
**personal** 9:11
**personnel** 15:2,18
15:24
**person's** 96:23
**Pg** 111:2
**Pgs** 111:2
**phone** 26:6,8,10,12
26:13,24 27:5,6,8
27:12,15,20,23
35:15 42:11 51:13
79:22 86:16 87:17
**physical** 106:18
107:20 108:3,22
**piece** 49:10
**place** 10:23 16:3
61:25 62:2 79:9
79:10,14 96:25
107:16
**Plaintiff** 1:6 3:4
**plan** 9:20 37:7
103:20
**plans** 14:6
**please** 4:19,23 5:4
47:17 48:2 51:20
**point** 5:19 38:18,22

53:9 59:25 60:9
65:11 66:15 70:16
73:8
**poked** 108:20
**police** 108:8 109:5
109:8
**policies** 24:2,8 40:8
40:11 97:10
107:14,15
**policy** 16:2 40:4
65:7 82:9 96:13
102:13 104:2,7
**poorly** 85:16
**position** 7:7 12:7,9
12:13,17,18,22
62:11 106:11
**positions** 13:4
**positive** 44:17 52:8
86:22
**possibility** 69:4,15
69:18
**possible** 26:22,23
37:17 71:6 104:5
104:13 105:4,9
**Possibly** 27:2 28:25
29:3
**posted** 39:16
**potential** 55:7
94:16
**practice** 66:10
70:24 104:12,23
**practices** 14:11
**preferable** 104:4
**preparation** 8:18
8:19,22
**prepare** 8:9
**prevent** 71:24
**previous** 37:12
52:13 87:25
**previously** 105:17
**prior** 54:22 107:24
**privileged** 52:22
66:11
**probably** 19:2
36:11
**problem** 24:2,7
46:25 47:6,8
48:16,19,23 49:6

94:16
**problems** 20:4 21:4
23:11,16,21 25:17
**procedure** 88:3
**procedures** 24:3,8
73:4
**proceeded** 106:17
**process** 81:20,21
**production** 27:15
27:22 32:11
**Professional** 2:12
**progressing** 14:19
**progressive** 81:21
82:9 88:9 103:25
104:5,13 105:5
**properly** 81:3
**protocol** 15:22
**provide** 15:24
16:11,20 22:6
27:6 78:19 98:3
**provided** 66:19
**PRSC** 39:16 44:4
44:10,22 66:24
68:7 78:7,16
**Pruszynski** 1:22
2:12 112:7,23
**Public** 2:14 110:16
112:8
**punches** 61:23
108:24
**put** 31:13,22
102:23 103:19
**puts** 94:12
**putting** 72:7,24
102:18 103:2,11
**p.m** 50:24 54:3
60:14 63:25 74:6
84:9,21 85:4,5
110:4

**Q**

**Queens** 13:16
**question** 4:18,22
5:23 29:22,23
47:13,14,16,18,21
47:22 48:2,3,6
52:13,23 57:3
66:14 67:20 89:16

89:17 91:4 102:8
104:11
**questions** 5:7,16
6:7 48:12 110:2
**quick** 51:19
**Quintero** 18:8

**R**

**R** 3:2 112:2
**Rainsbottom** 18:12
**Rampal** 18:14
**reach** 16:13,15
**reaction** 81:16,18
81:23
**read** 18:25 19:4
85:22 86:10 90:3
**reading** 81:18
92:10
**reads** 92:6
**ready** 99:20
**really** 16:17 20:24
47:13 48:5 71:20
73:2,5 97:17
**reason** 7:24 8:4
47:23 62:4 72:3
93:3,10,15 95:9
102:14,24 111:8
111:10,12,14,16
111:18,20,22,24
**reasons** 63:15
99:16 102:23
111:5
**recall** 9:25 22:12
22:20 24:5 32:21
37:25 38:4,6,17
39:4,12 41:13,17
41:24 42:12 55:3
55:4,8,11 62:20
62:23,25 63:6,7
69:20,24,24 70:19
70:22 74:7,12
76:6 77:22 78:22
80:13 82:12,13,18
82:19,21,24,25
83:5,7,9 87:7
88:22,24 89:4
91:21,22,25 92:25
95:25 96:2,5,9,10

96:14,14 97:14
98:5 99:16,20
100:3,9 103:23
106:7,8
**recalled** 29:21
**recapped** 67:10
73:17,19
**received** 70:17
73:20 84:17 85:21
86:7 87:23,25
89:5,21 90:10,14
92:3,11 105:17
**receiving** 53:20
**Recess** 51:22
100:13
**recognize** 50:17,19
84:2
**recollection** 35:16
36:5 38:12 39:8
42:17 43:25 44:16
52:19 55:21 70:6
80:7 88:15,17,23
**recommend** 34:24
69:21
**recommendation**
44:10 46:11 53:17
**recommended**
34:14
**record** 5:8 12:11
19:4 50:14 53:9
74:16 90:3 101:21
112:13
**recordkeeping**
23:22
**records** 24:3 27:16
27:20,23 34:21
37:10 58:13 72:9
72:25 93:5 102:19
103:2,13
**referring** 56:11
101:21
**refresh** 42:16 52:19
**regard** 15:18 59:2
89:12 95:14 96:11
97:13 98:4,11
99:10 101:16
**regarding** 4:12
9:17 28:3 32:18

41:15 42:23 43:19
54:24 58:4 62:21
66:16 74:9 78:16
89:19 91:10,18,23
92:4,20 96:8,15
103:15 109:16
**region** 13:11 62:15
**regional** 10:9,20
13:23 14:14 15:20
16:5 28:7 30:16
32:8 41:11 45:15
45:18 95:14 106:8
106:9
**regions** 13:18
**Registered** 2:12,13
**related** 24:3 28:8
96:8,12 112:15
**relevance** 27:19,25
32:16
**remainder** 91:14
91:20
**remember** 7:6,7
9:14,16,21 18:21
19:9,16,18,20
20:2,7,10,21 21:3
21:10,15,20,21,23
22:8,9,15,17
23:10,15,20,25
25:3 26:11,21
29:7,10,13,14,17
29:20 30:2,3,6,12
30:15 33:17,18,23
34:2,4,8,10,22,25
35:14 36:9,13
37:4,19 38:8 39:5
39:9,20 41:4,23
42:13 43:7,10
44:12 51:3 53:20
55:12 56:16,17,18
56:19 57:18,23,24
63:13 70:2,13,16
74:8 76:3 77:10
77:13,17,20 79:16
79:18,20,21,24
80:2,3,14 81:4,16
81:23 82:2,15
83:15 87:2,5,11
87:16,18,19 92:10

92:19 95:13,20,23
96:20,23,25 97:3
97:6,11 98:9 99:8
103:14 106:13
**remove** 31:21
**repeat** 4:20 29:22
48:21 90:2 91:16
**rephrase** 4:24
**replace** 31:18
**report** 9:9 80:24
81:9,10,11 84:16
85:5,17 86:7,10
89:6 92:3,11,22
109:11
**reported** 1:22 21:3
**reporter** 2:12,13,14
5:8
**reports** 14:19
**represent** 4:10 60:8
**resigned** 99:6
**resolution** 70:8
**Resource** 37:22
58:11
**resources** 10:8 12:8
12:14 13:10,21
14:11 15:3 30:6
41:9 73:20 96:15
**respect** 66:11
**respond** 37:20
53:23 60:15 85:24
85:25 86:2 88:13
**responded** 80:12
86:4
**response** 51:16,25
52:2,5 54:6 76:24
**responsibilities**
13:21 15:15,18
**responsibility**
67:16,23
**result** 52:8 107:23
**resulted** 93:22
**return** 76:17
**review** 9:5,7 37:22
50:16 57:6 83:2
**reviewed** 9:8,9,10
9:12,15,18,24
55:4 83:14 84:4
**reviewing** 77:10

**right** 16:20 35:2,24
36:7 42:2,3 48:9
60:3 63:14 65:22
73:15 90:21
**right-hand** 92:5
**rip** 31:12
**risk** 94:13
**RMR** 1:22
**robbed** 103:9
**robberies** 94:15
**role** 14:21
**room** 36:3
**Rosa** 18:13
**roughly** 24:15

**S**

**S** 3:2 113:8
**safe** 94:11 107:17
107:17,18
**Sanchez** 18:9
**save** 103:10
**saying** 34:8 39:20
89:4 93:13
**says** 73:14,17,19
74:25 78:24 84:8
84:24 88:2
**scheduled** 75:25
**Seattle** 85:7
**second** 71:12,17
72:22 84:8
**see** 16:24 18:15
27:19,25 32:15
48:19 53:18 54:4
54:12 58:12,17
64:10 66:22 73:13
73:22 75:3 83:12
84:10,22 85:19
86:5,22 92:8,9
**seeing** 14:5 59:24
**seek** 68:21
**seeking** 54:16
69:14
**seen** 61:25 62:2,3
**send** 52:3
**sense** 98:15
**sent** 8:15 51:3,14
52:3,9 55:15
103:20

sentence 53:14
92:6
separate 50:10
61:3 65:5 68:20
69:16 75:10,14
76:14 88:10 99:17
separated 32:21
56:5,13 58:8,13
60:22 76:23 80:25
81:2 85:15 89:11
98:2,17 99:4,17
separating 68:21
77:2
separation 22:15
34:24 37:17 38:3
44:22 46:16 54:10
59:10,23 60:15
63:15 64:9,15
65:7,22 69:4,14
78:24 81:20 83:11
85:15 100:5,10,18
101:14 102:4
107:7,24
Serenity 1:5 4:10
8:17 9:11 11:4
19:8,10,12 21:4
21:19,22 22:5,11
22:18,22 23:2,7
23:11,16,21 24:2
24:6 32:18,23
33:7 34:5,13
38:10,13,20,24
39:2 41:15,20
42:5,7,10,24 43:5
43:9,20 44:8,14
44:24 45:11,17,22
51:8 54:16,24
55:6 59:3,25
64:16 65:4,11,21
67:6 68:16,21
69:6,12,23 70:9
70:17 75:2,23
76:25 77:24 78:2
78:3 80:7,18,23
81:11,19 86:4,6,9
86:13,15 89:18,22
91:10 92:13 97:13
97:18 98:11 99:10

107:10
Serenity's 21:14
43:3 75:9 87:22
series 88:4
serious 37:16 38:7
39:18 40:5,8,11
40:13,15 72:20
102:12
seriously 59:23
64:15
services 16:6
set 112:11,20
seven 12:23 19:14
Seventeen 12:6
severe 107:19
severity 44:20 88:8
sexual 6:21
shake 5:11
share 53:17
Sherry 7:2
short 69:11,18,22
74:18
shortly 35:5 69:7
shown 110:10
side 92:5
sides 16:25
significance 50:9
similar 31:11 70:18
Simone 18:9
Simply 65:20
single 29:17 30:7
30:15 57:18 61:9
sit 21:2 29:19 30:11
30:14 42:6 57:12
61:8,20 67:5
sits 35:22
sitting 36:17
situation 8:7 17:2
50:4,5 54:20 57:9
57:24 61:15 63:7
63:8,11 69:2
88:10 92:17 98:10
98:19 100:3
102:22,25 103:10
104:8,17,22 105:2
105:15
situations 61:21
98:16

six 60:14
skills 14:9,18
slipping 20:13
small 31:5
solution 70:3
somebody 63:8
72:22 82:7 108:22
someone's 49:8
sorry 18:19 26:7
29:14,25 44:2
45:5 78:3 91:6,16
sort 105:18
sound 60:10
SOUTHERN 1:3
speak 25:12 32:20
65:25 66:15 74:2
90:15,18 91:2,10
91:13,18
speaking 96:14
specialist 12:21
specific 26:21
56:18,19 58:13
99:19,21
specifically 8:20
13:22 21:19 22:12
22:16 24:9 33:18
39:5 43:10 62:14
66:12 69:20 70:20
93:5 97:15 98:12
101:9,19,20,23,25
103:23
specifics 62:23 98:5
specified 14:13
speculate 72:5
spiral 31:6,11
spoke 86:4,6
SS 112:4
stamped 50:15
74:17 83:24
standard 79:2
standing 36:13,19
Star 83:24,24
113:12
Starbucks 1:8 4:11
6:19 7:3,5 12:5
13:5,8 19:13 24:7
27:6 60:2,6 82:9
93:23 94:3,6,9,20

95:4,10 100:20
102:13 104:2,7
108:12
started 13:8
starts 84:24
State 2:14 111:2
112:3,8
statement 48:9
101:14
statements 48:10
Staten 13:15 17:14
STATES 1:2
status 43:4 51:7
75:8
stay 107:17,17
stays 107:17
stealing 97:8
steps 63:19
sticks 108:9,22
stole 97:7
store 7:5,18 9:13
9:17 11:9 12:25
19:10 20:14 22:23
34:19 37:6,7
38:11 54:21 56:5
56:12 57:18 58:4
58:8,14 61:23
71:14 73:7 85:15
94:14 97:23 98:6
99:2,15,19,21
102:12,17 103:4
106:12,16,18
108:4,13
STRAUSS 3:9
street 108:6
strengths 22:18
stretch 14:8
strike 14:23 17:9
25:6 30:21,23
34:3 55:24 58:3
59:8 73:18 98:22
100:16
struggling 14:20
21:22 22:5 23:3
subject 110:9
Subscribed 110:13
substance 54:15,17
87:20,21

succession 13:25
suggesting 53:11
summer 6:24
supervise 14:23
17:9
supplement 18:17
18:20
support 13:22 14:7
14:13,15 16:11,20
18:16 25:11 37:22
54:9 58:12 64:9
64:12 65:7,10,18
67:25 73:21 98:6
99:14
supporting 109:19
supposed 15:23
16:3
sure 17:2 18:22
38:23 41:10 42:5
46:7 49:15 51:21
51:24 55:20 56:22
59:20 64:3,17,19
65:3 66:4,6 67:12
67:19 68:2,4,7,9
68:10,23 89:15
107:16
surgery 46:4,6
surprise 89:13
surprised 89:5,18
surrounding 72:21
100:10
suspicion 97:7
suspicious 92:7
Sutton 19:6
sweeper 108:6
sworn 4:4 110:13
112:12
swung 108:11,19
system 31:8
S-U-T-T-O-N 19:6

T

T 112:2,2 113:8
take 5:8,20,23 16:3
27:18,24 30:24,25
31:2,12 32:3,6,14
40:25 51:19 59:23
61:25 62:2 63:21

64:15 93:13
100:11
**taken** 4:16 34:19
37:9 42:10 51:22
89:3 100:13
102:24 104:18
**takes** 104:8
**talent** 13:24 14:2,4
**talked** 90:20 92:14
**talking** 78:3 96:18
**Tanya** 18:13
**teach** 14:10
**team** 66:3
**tell** 4:16 10:24
11:10,20,22 16:22
16:23 19:2 20:14
21:8,13 25:22
35:25 37:14 38:2
50:16 62:7,13
80:9,11,17 92:22
107:15
**telling** 21:21 22:4
36:14 66:23
**ten** 28:22 37:3
**term** 5:3
**terminate** 44:8,24
45:11,16 46:25
47:6 48:16,23
65:13 68:16 70:9
79:4 89:24 109:23
**terminated** 7:22
44:15 57:19 58:3
61:9,18 62:4 63:2
76:19 78:4 79:11
88:20 94:24 96:22
97:24 98:2 105:16
105:25 106:20,22
**terminating** 28:8
30:17 49:14 70:25
**termination** 7:25
8:4 27:17 28:4
30:8,13 32:13
34:15 42:24 43:4
43:9,20 45:21
49:16,22 54:16
55:7,13 58:5 59:3
62:20,21 67:7,16
68:3,4 69:11,19

69:22 70:4,15
72:9 74:10,11
77:8,11,25 78:17
78:20 87:24 88:5
88:25 89:19 91:14
91:19,23 92:18
93:3,11,16,19
95:15 97:12 98:4
99:11,23,24 100:4
100:7 101:5,10
105:3 106:14
109:22
**terms** 66:9
**testified** 4:4 48:15
48:21 54:22 78:21
100:15
**testify** 4:12 6:10
49:3
**testimony** 70:11
108:15 110:7
112:13
**Thank** 27:21
**thanked** 88:14
**thing** 5:22 8:21
11:7 80:6 86:8
**things** 25:22 58:21
58:25 75:25
107:21,22
**think** 7:21 9:14
16:16 40:7,10
46:21 48:18 49:5
49:23 60:25 67:15
67:22 70:23 71:11
71:15 72:4,7
73:10 82:4 87:14
87:24 90:9 94:11
97:9,16 98:12,14
99:22 100:5
102:11,16 104:4,7
104:9,17,21 105:9
105:10,11,15,21
107:9,13 109:21
**thinking** 77:17
**Thompson** 2:10 3:3
**thought** 46:14 70:8
81:3 82:2,5,10,22
88:20 97:15,17
98:16

**thoughts** 53:16
**three** 9:2 24:17
106:3
**three-hour** 85:7
**threw** 108:23
**time** 8:2 19:20 20:3
20:7,9,20 21:3
22:9 25:7 26:21
30:20 31:15 32:22
33:6 35:3,11
38:13 41:14,17,18
42:3 45:20 53:10
56:17 60:2 75:20
86:18 90:23,24
91:7,8 109:20
110:4
**times** 6:15 19:25
23:2,3 26:11
102:7
**timing** 38:23 65:20
65:24 66:2
**Tina** 54:9 64:8
**today** 4:19,23 5:19
6:7,11 8:18,20,22
10:4,16,17,25
11:11,13 21:2
29:19 30:12,14
42:6 57:12,25
61:8,16,20 67:5
83:3
**told** 21:12 34:2,4
35:5,24 38:8 42:9
44:9 79:15,16,21
79:24 80:4,14
**Tony** 106:11
**top** 73:13 84:20
86:5
**touch** 86:9,12,15
86:24
**track** 23:4
**Tracy** 18:8
**training** 12:21
**transcript** 110:9
**treated** 47:11,12
82:16,22 83:16
**tried** 86:9,12,25
**true** 110:8 112:13
**truth** 4:16

**truthfully** 6:10
**try** 4:24 86:14
**Tsiu** 18:9
**two** 13:14 18:16
28:18 50:10 54:25
97:2 106:23
107:21,22 108:10
**two-page** 50:15
83:23
**types** 88:8

─────────
**U**
**ultimate** 44:23 45:4
45:6
**ultimately** 107:6
**um-hum** 49:4 71:3
85:2 92:9 93:8
**understand** 4:12
4:15,22,24,25 5:4
5:13 6:7 15:12
51:15 57:3 67:21
71:10 95:18
**understanding**
47:10 70:7 93:2
**understood** 47:22
47:23
**unfair** 85:16
**unfairly** 80:25
82:16,23 83:16
**UNITED** 1:2
**unlawful** 68:4,7,11
68:14
**upset** 80:15,18,20
81:2 82:5
**use** 5:3 16:6

─────────
**V**
**vague** 45:6,8
**valid** 102:14
**varies** 17:20
**variety** 88:7
**various** 14:8
**Ventura** 18:13
**verbal** 5:10
**verification** 61:6
**verified** 60:25
**verify** 56:25 57:6
58:2,10 63:22
**Verizon** 27:11

**Victor** 10:22,24
53:17 73:15
**Victor's** 10:23
**Vikki** 18:8
**violated** 107:13
**violation** 40:7,10
40:11 102:12,17
103:3
**violations** 40:15,16
96:12
**violence** 107:20
**visit** 37:8 38:10
54:21 55:2
**voluntarily** 98:2
**vs** 1:7

─────────
**W**
**wait** 47:17 48:4,5
**walk** 36:7
**walked** 36:5,6,9
108:4
**want** 14:5 53:4
59:20 64:19 72:5
76:13 100:11
**wanted** 34:3 53:3
53:15 58:2 64:17
65:3 68:2,3,9,10
75:8 76:16
**warning** 87:23 88:4
88:12 105:18
106:24 107:2,4,24
**warnings** 87:25
**wasn't** 37:2 38:14
63:10 106:24
**way** 4:25 26:5 44:7
46:19 47:10 48:3
49:8 55:13 57:14
58:10,16 79:22
81:2 83:11 93:21
93:25 94:10,19
97:12 99:9,22,23
100:6 103:8
112:17
**ways** 26:3 48:14
**week** 11:15 17:23
**went** 11:18,20
41:20 50:5,7
68:22 69:6 79:25

80:5 95:12
**WHEREOF**
112:19
**Wigdor** 2:10 3:3
**wish** 111:4
**withdraw** 66:13
**witness** 4:3 15:7
47:21 48:3,10
53:8 110:6 112:10
112:14,19 113:3
**wondering** 76:11
**word** 14:15 15:9,12
**words** 87:18
**work** 7:5 15:2
17:17 18:2 25:6
28:3 30:24 35:22
58:7
**worked** 19:12 25:9
61:22 63:9
**working** 7:3 13:8
**works** 92:18
**worse** 107:9,14,14
**write** 63:24 64:4,12
75:5,7 76:10
86:23
**write-ups** 88:4
**written** 15:22 16:2
58:18 70:14 88:12
107:4
**wrong** 72:8,24 82:6
102:18,23 103:2
103:11
**wrote** 33:24 51:6
53:15,15 54:8,14
55:2,9 56:9 58:22
59:7,9 60:13 64:7
64:8 65:9,10
67:24 73:24 74:5
76:7 85:12 90:21
90:25 91:9,12,17
100:18

**X**
**X** 1:4,13 113:2,8

**Y**
**Yeah** 49:4
**year** 13:7 27:16
42:4

**years** 12:6,10,19,23
13:19 19:15 24:17
24:17 30:5 32:2
60:10 62:11 97:2
99:15 106:3
**yesterday** 8:13,23
83:15 84:5
**York** 1:3,17,17
2:11,11,15 3:6,6
3:12,12 10:9,21
18:10 62:13,15
111:2,3 112:3,5,8

**Z**
**zone** 12:15

**0**
**082822** 85:14

**1**
**1** 50:11,14 73:13
83:24 84:21 113:9
**1st** 76:23 79:4,6
91:24
**1-2** 113:12
**10003** 3:6
**10036** 3:12
**11-CV-2521** 1:7
**12** 50:24 52:2 54:2
60:13 63:25 74:10
75:17 76:4
**12th** 52:2
**12:05** 50:24 60:14
63:25
**12:11** 54:3 74:6
**12:26** 110:4
**1665** 74:17 113:11
**1994** 13:9

**2**
**2** 74:13,16 83:25
113:11
**2:01** 84:21 85:4
**2:37** 84:9 85:5
**20** 28:24
**200** 99:14
**2000** 35:3
**2008** 24:11,15
**2009** 22:2

**2010** 21:24 23:9,14
23:19,24 24:5
25:8 27:16 32:12
32:23 33:6,16
34:11,22 35:2,4
42:4
**2011** 1:18 2:4 27:16
34:23 35:2 41:25
42:4 43:11 50:24
54:3 60:13 63:25
74:11,23 75:12
76:5 84:9,21
91:24
**2012** 112:20
**203)464-8634**
27:13
**2128** 50:15
**2128-2129** 113:10
**2129** 50:15
**23** 1:18 2:4
**28** 74:22 75:12

**3**
**3** 83:20,23 113:12
**3/1** 84:9
**30** 29:2
**33rd** 17:6

**4**
**4** 113:5
**44489** 1:23

**5**
**50** 29:4 113:9

**6**
**6th** 112:20

**7**
**74** 113:11

**8**
**83** 113:12
**85** 2:10 3:5

**9**
**9:52** 2:5