UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
SERENITY MARSHALL,                                    :
                                                     :
                        Plaintiff,                   :
                                                     :
        v.                                           :
                                                     :   Civ. Action No. 11 Civ. 2521 (AJN)(KNF)
STARBUCKS CORPORATION and JENNIFER :
GURTOV, in her individual and official               :
capacities,                                          :
                        Defendants.                  :
                                                     :
-------------------------------------------------------- x


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    Background ..................................................................................................................... 2

    Starbucks' Policies Related to Daily Record Books ..................................................... 3

    Marshall's Performance as Store Manager ................................................................... 4

    Gurtov's Supervision of Cash Management .................................................................. 6

    Marshall's Termination .................................................................................................. 9

ARGUMENT ..................................................................................................................... 13

    I.     SUMMARY JUDGMENT STANDARD ........................................................ 13

    II.    DEFENDANTS CANNOT PROVE THAT DEFENDANTS DID NOT
          INTERFERE WITH PLAINTIFF'S FMLA RIGHTS .................................... 14

    III.   DEFENDANTS CANNOT PROVE THAT DEFENDANTS DID NOT
          DISCRIMINATE AGAINST PLAINTIFF ................................................... 16

    IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
          PLAINTIFF'S NYHRL RETALIATION CLAIMS ........................................ 25

    V.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
          PLAINTIFF'S "AIDING AND ABETTING" CLAIMS ..................................... 25

CONCLUSION .................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Abdu-Brisson v. Delta Air Lines, Inc.,*
    239 F.3d 456 (2d Cir. 2001) .......................................................................... 17

*Berube v. Great Atlantic & Pacific Tea Co., Inc.*
    348 Fed. Appx. 684 (2d Cir. 2009) .............................................................. 23

*Bickerstaff v. Vassar College,*
    196 F.3d 435 (2d Cir. 1999) .......................................................................... 18

*Byrnie v. Town of Cromwell Bd. of Educ.*
    243 F.3d 93 (2d Cir. 2001) ............................................................................ 17

*Cityspec, Inc. v. Smith,*
    617 F. Supp.2d 161 (E.D.N.Y. 2009) .......................................................... 14

*Cooper v. New York State Nurses Ass'n,*
    No. 09-cv-3135, 2012 WL 913080 (E.D.N.Y. March 16, 2012) ............... 18

*Cronin v. Aetna Life Ins. Co.,*
    46 F.3d 196 (2d Cir. 1995) ............................................................................ 17

*EEOC v. Ethan Allen, Inc.,*
    44 F.3d 116 (2d Cir. 1994) ............................................................................ 24

*Feingold v. New York,*
    366 F.3d 138 (2d Cir. 2004) .......................................................................... 25

*Foss v. Coca Cola Enterprises, Inc.,*
    No. 07-cv-1322, 2011 WL 1303346 (E.D.N.Y. March 31, 2011) ............. 23

*Gauthier v. Yardney Technical Products, Inc.,*
    No. 05-cv-1362, 2007 WL 2688854 (D. Conn. Sept. 13, 2007) ............... 15

*Goelzer v. Sheboygan County,*
    604 F.3d 987 (7th Cir. 2010) ........................................................................ 19

*Guinup v. Petr-All Petroleum Corp.,*
    786 F. Supp. 2d 501 (N.D.N.Y. 2011) ........................................................ 25

*Holcomb v. Iona College,*
    521 F.3d 130 (2d Cir. 2008) .......................................................................... 17

*Hite v. Vermeer Manufacturing Co.*,
   446 F.3d 858 (8th Cir. 2008) ................................................................................. 19

*Di Giovanna v. Israel Medical Center*,
   651 F. Supp. 2d 193 (S.D.N.Y. 2009) ................................................................ 15

*Jasco Tools, Inc. v. Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009) ................................................................................. 14

*Kessler v. Westchester Dep't of Social Servs.*,
   461 F.3d 199 (2d Cir. 2006) ................................................................................. 13

*King v. Preferred Technical Group*,
   166 F. 3d 887 (7th Cir. 1999) ............................................................................. 14

*Mann v. Mass. Correa Electric, J.V.*,
   No. 00-civ-3559 (DLC), 2002 WL 88915 (S.D.N.Y. Jan. 23, 2002) .............. 14

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) .............................................................................. 14, 16, 17

*Mohamed v. Marriott Int'l, Inc.*,
   905 F.Supp. 141 (S.D.N.Y. 1995) ...................................................................... 25

*Mullins v. Bondib Hotels, Inc.*,
   10-cv-4069, 2011 WL 6434328 (S.D.N.Y. December 22, 2011) .................... 18

*Patrick v. LeFevre*,
   745 F.2d 153 (2d Cir. 1984) ................................................................................. 18

*Potenza v. City of New York*,
   365 F.3d 165 (2d Cir. 2004) ............................................................................14-16

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ............................................................................................. 17

*Ridgeway v. Royal Bank of Scotland Group*,
   No. 11-cv-976, 2012 WL 1033532 (D. Conn. March 27, 2012) .................... 18

*Roberts v. Ground Handling, Inc.*,
   499 F. Supp.2d 340 (S.D.N.Y. 2007) ................................................................. 15

*Roge v. NYP Holdings, Inc.*,
   257 F.3d 164 (2d Cir.2001) ................................................................................. 24

iii

*Sabatino v. Flik International Corp.,*
    286 F.Supp. 2d 327 (S.D.N.Y. 2003) ........................................................ 14, 25

*Santos v. Costco Wholesale, Inc.,*
    271 F.Supp. 2d 565 (S.D.N.Y. 2003) ............................................................. 18

*Serby v. New York City Dept. of Educ.,*
    No. 09-cv-2727, 2012 WL 928194 (E.D.N.Y. March 19, 2012) ..................... 16

*Brown v. The Pension Boards,*
    488 F. Supp.2d 395 (S.D.N.Y. 2007) ............................................................ 26

*Tomassi v. Insignia Financial Group, Inc.,*
    478 F.3d 111 (2d Cir. 2007) ......................................................................... 13

*Weichman v. Chubb & Son,*
    552 F. Supp. 2d 271 (D. Conn. 2008)............................................................ 18

## STATUTES AND OTHER AUTHORITIES

29 U.S.C. § 2614 ................................................................................................. 15

Fed. R. Civ. P. 30(b)(6) ........................................................................................ 4

Fed. R. Civ. P. 56(c) ........................................................................................... 13

Plaintiff Serenity Marshall hereby submits this memorandum of law in opposition to Defendants Starbucks Corporation ("Starbucks") and Jennifer Gurtov's (collectively, "Defendants") motion for summary judgment. Defendants' motion should be denied as there are numerous issues of material fact and law that must be decided by a jury.

## PRELIMINARY STATEMENT

Serenity Marshall ("Marshall") was a nine year Starbucks employee who was terminated on the day she was expected to return from medical leave during which she had surgery to remove potentially cancerous uterine tumors. Moreover, the decision to terminate her employment was made the day after she commenced medical leave. Defendants claim Marshall was terminated for occasionally making late bank deposits and for inadvertently recording inaccurate information in a Daily Records Book ("DRB"). However, at the time of her termination, Marshall had been a store manager ("SM") for six years and had engaged in the same DRB and deposit practices throughout her tenure. Marshall had never been disciplined for these practices in any manner -- until took medical leave.

Jennifer Gurtov ("Gurtov") -- Marshall's District Manager ("DM") for more than two years -- was well aware of Marshall's DRB and deposit practices from reviewing her DRBs and store operations in detail on numerous occasions. Nonetheless, after six years as a SM, it was only two weeks after Marshall informed Gurtov of her need for medical leave, and the day after she commenced leave, that these practices became not only warranting of discipline, but a terminable offense. Immediately after Marshall commenced her medical leave, Gurtov testified that she "built a case" for her termination. Marshall was not given any corrective action or opportunity to improve before she was abruptly terminated, without notice, on the day she was

1

expected to return. Gurtov never terminated any other SM without first allowing the employee to receive a corrective action and have an opportunity to improve.

It is simply not credible to assert that Marshall's DRB and deposit practices were a legitimate basis for termination. If these practices were a *bona fide* terminable offense, Gurtov would be forced to terminate virtually every SM in her district. Without exception, every SM Gurtov has supervised has failed to comply with purported DRB policies and occasionally made late bank deposits. In many instances, these deviations from so-called company policy are far more egregious than Marshall's. However, Marshall is the only employee to be terminated for these supposed infractions. What is clear is that Gurtov, and Starbucks institutionally, did not require strict adherence to DRB policies. According to Starbucks, it is a mere coincidence that Gurtov "discovered" these performance issues the day Marshall told her she would need medical leave, and contrary to her own practices, decided to terminate her the day her leave began.

## STATEMENT OF FACTS[1]

### Background

In June 2002, Marshall commenced employment at Starbucks as a Barista earning approximately $7.75 per hour. ¶106. Within three months, she was promoted to Shift Supervisor and then within a year to Assistant Manager. ¶107-108. In mid-2004, Marshall was promoted to SM and her salary was increased to $41,000. ¶109. Throughout the next six years, Marshall consistently received bonuses, salary increases and transfers to busier locations. ¶110. In October 2009, Marshall became the SM of the Starbucks located at 345 Hudson Street, where she remained until her unlawful termination. ¶111. On March 1, 2011, at the time of her termination, Marshall was earning a base salary of approximately $56,000 per year. ¶112.

---

[1] Plaintiff's 56.1 counter-statement is referred to herein as "¶___."

**Starbucks' Policies Related to Daily Records Books**

Starbucks stores are organized in districts, with each supervised by a DM.  DMs' primary responsibilities include maintaining profitability of stores, ensuring compliance with company policies (in particular, policies related to cash management) and sustaining quality of operations. ¶113.  To carry out these responsibilities, DMs to visit each store on a quarterly basis and conduct a detailed review referred to as a Store Plan of Action Visit ("SPAV"). ¶114.  DMs must also conduct at least two follow-up visits per store per quarter. ¶116.  In addition, DMs visit their stores for other reasons throughout the year. ¶117.  SPAVs, and other visits, are critical to a DM's supervision of cash management at stores. ¶115.  The primary way cash management is reviewed during these visits is through an inspection of the store's DRBs. ¶118.  DMs are responsible for making sure DRBs are being maintained within their stores. ¶119.

DRBs are monthly books maintained by SMs which track daily information related to cash management.  ¶120.  Additionally, each DRB contains a list of dozens of policies related to DRB use and bank deposits.  ¶121.  In order to fully comply with these policies, a SM must, *inter alia*: 1) secure till funds in a sealed bag with identifying information; 2) secure till drop bag in safe; 3) prepare safe for count procedure; 4) record start and end time of safe count; 5) record information in safe count log; 5) record the start time and end time for deposit preparation; 6) make daily bank deposit; 7) make deposits between 8:00 a.m. and 3:00 p.m.; 8) use a bank depository box if the bank is closed; 9) record the start time and end time for making a deposit; 10) record confirmation of bank deposit amount; and 11) attach validated bank receipts.  ¶122.  These steps are merely a portion of the written DRB policies.  In addition to the DRB policies, Starbucks has hundreds of other policies related to cash management and cash security.  ¶123.

DMs are responsible for ensuring compliance with cash management policies within their

stores.  ¶124.  DMs typically review DRBs during SPAVs and other store visits to gather an

understanding of the store cash management.  ¶125.[2]  However, DRBs are complex documents

and the extensive policies related to their use are not closely followed by DMs or SMs.  ¶128.

DRBs are often incorrectly completed; namely, information is not recorded, information is

recording inaccurately, bank receipts are missing, bank deposits are occasionally late, and so

forth.  ¶129.  The reason for this is simple – DRBs are not important documents, they are nothing

more than a tool to assist SMs in store operations.  ¶130.  The information contained within

DRBs is not extracted for any accounting purpose or logged into a database for company use.

¶¶131, 132.  Thus, improperly maintained DRBs do not impact Starbucks' business operations in

any manner.[3]  Strict adherence to DRB policy is not a priority to DMs or SMs alike.  ¶135.

**Marshall's Performance as a Store Manager**

Marshall became an SM in or around 2005.  ¶136.  Throughout her tenure, her

performance was exemplary.  Similar to virtually all other SMs, Marshall never strictly followed

DRB policies. ¶137.  Marshall would occasionally make a late deposit (while the deposit bag

would be locked in the safe) if she was unable to leave the store due to customer traffic or other

business reasons.  ¶138.  Marshall also occasionally recorded deposit information incorrectly.

¶139.  However, Marshall's DRBs and deposit practices were frequently reviewed by DMs and

she was never disciplined for any so-called policy violations.  ¶140.

---

[2]     Mark Ormsbee, a Fed. R. Civ. P. 30(b)(6) representative, testified that DMs review DRBs at more than 50% of SPAVs and at least four times per year.  ¶126.  Moreover, Courtney Howarth ("Howarth"), the SM who replaced Marshall, testified that in approximately one year as SM, Gurtov reviewed her DRB *at least* five times, and *potentially as many as* 75 times.  ¶127.

[3]     DRBs are shipped out of their stores twice per year and sent to a storage facility in Washington for destruction.  DRBs cease to be records of any value outside the store. ¶¶133-34.

In fact, after more than two years as an SM, and even though she did not strictly follow the written DRB and deposits policies, Marshall scored an outstanding 97% on an audit of her DRB by the Partner & Asset Protection ("P&AP") department. ¶141. Marshall's 2008 performance review -- referring to her DRB practices -- stated that she "proactively analyzes financial reports to identify and address any trends or issues in store performance." ¶142. Moreover, while the 2008 review detailed her job performance and areas for improvement, there was no mention of any problems with her DRB practices. ¶143. Clearly, Marshall's underlying cash management was sufficient. No one -- not her DM and not the P&AP department -- was concerned with minor breaks from unenforced DRB policies.

Gurtov became Marshall's DM in or around October 2008. Gurtov understood her duties as DM were to ensure compliance with company policies, sustain appropriate cash management at stores and to oversee the day-to-day operations of her stores. ¶144. During the two-and-a-half year period Gurtov supervised Marshall, Gurtov conducted approximately 10 SPAVs, 20 follow-ups, and at least 20 additional store visits. ¶145. During the majority of these visits, Gurtov reviewed Marshall's DRBs. ¶¶146-47. Consistent with Marshall's previous DMs, Gurtov never issued her any corrective actions regarding DRB practices. ¶¶148, 151.[4] So long as Marshall's cash management was sufficient, the minutia of DRB policies was never a concern. ¶152.

Like the DMs that preceded her, Gurtov's reviews of Marshall's performance were largely positive. In 2009, Gurtov tracked Marshall's performance in a review that was updated

---

[4]     Defendants claim that Marshall previously received coaching regarding cash handling issues. Defs. Br. at n. 2. Though the nature of the coaching did not involve Marshall's DRB practices, there was a discussion in November 2008 regarding the cash handling issues of her subordinate employees. ¶149. The reason Defendants do not focus on this is that it is clear that if Gurtov had a *bona fide* issue with *Marshall's* cash management, it would have been her practice to follow up by reviewing her DRBs. ¶¶149-50, 225.

quarterly.  The review did not mention any problems with Marshall's cash management practices and stated that Marshall had met her expectations for the year.  ¶153.

In late 2009, due to Marshall's dedicated performance, Gurtov transferred Marshall to the Starbucks store located at 345 Hudson Street.  While not a formal promotion, Gurtov considered the transfer "a vote of confidence in her performance."  Marshall was Gurtov's "top choice of all the other store managers in [her] district" for the opening.  ¶154.

In 2010, Gurtov continued to be pleased with Marshall's performance.  Like the year before, Gurtov tracked Marshall's performance on a quarterly basis.  In the first quarter, Gurtov did not indicate any performance goals related to Marshall's DRB practices.  Gurtov was focused on "delivering a sustainable economic model and setting specific financial goals," not minor issues related to DRBs.  During Gurtov's mid-year check-in, she noted that Marshall's sales were "up $110,452 to target" for a "13.5% comp growth."  Moreover, as to profitability, Gurtov noted that Marshall was also "up $90,671, up 6.7% to target."  Marshall's performance continued to improve through the end of the year.  In total, her sales were "$245,447 up to target; 20.5% comp growth" and profits were "$182,473, up 5.8% to target."  In a detailed narrative section, Gurtov made no mention whatsoever of any problems regarding her DRB or deposit practices.  ¶155.

Gurtov unequivocally admits that Marshall's DRBs showed her well-rounded understanding of cash handling policies.  ¶156.

**Gurtov's Supervision of Cash Management**

Gurtov understands supervising cash management in her stores to be an integral aspect of her job.  ¶157.  While Starbucks policy requires approximately four SPAVs and eight follow-up visits per year, Gurtov visits stores far more frequently.  ¶158.  Gurtov spends 80% of her time in the field visiting stores and visits each store within her district at least 15 times per year.  ¶159.

During these visits, and consistent with Starbucks policy detailed above, she often reviews the store's DRB. ¶¶160-62. Gurtov was responsible for supervising DRB use. ¶162.

The DRBs maintained by Gurtov's SMs are rife with errors that would constitute a breach of company policy. ¶163. The DRBs indicate that not only Marshall, but virtually all SMs supervised by Gurtov, often make late deposits and record the incorrect deposit date. Moreover, DRBs across Gurtov's district are missing additional deposit information supposedly required by written DRB policies. Most SMs within Gurtov's district engage in these discrepancies in approximately the same or greater frequency as Marshall. In many cases, the breaks from policy far exceed any errors in Marshall's DRBs. For instance, there are numerous instances where bank receipts are not attached to the daily logs at all. ¶165. Gurtov admits these errors are the most egregious. ¶166. Absent an actual bank receipt, it is impossible to even determine whether numerous DRB entries are accurate (including deposit amount, deposit date, deposit time). More importantly, absent a bank receipt, it is impossible to even validate whether the cash in the store was *ever* even deposited in the first place. ¶167. Marshall's record with regard to preserving bank receipts is far better than other SMs. *See* Gottlieb Decl. at ¶¶ 42-54.

The extent and scope of the so-called policy violations makes a succinct yet comprehensive summary difficult. The charts below attempt to summarize some errors present in the DRBs within Gurtov's district by tracking instances in each store where (i) bank deposits were made late, (ii) the incorrect or "falsified" deposit date was recorded in the DRB, (iii) bank receipts were not attached to the DRB, and (iv) other bank deposit information was missing. One chart covers Marshall's DRBs and the other covers all other SMs supervised by Gurtov.[5]

---

[5]       These charts require explanation. First, see Gottlieb Decl. at ¶¶42-54.  Second, Defendants produced approximately only 133 out of 190 DRBs from January 1, 2010 through March 2011. Either the DRBs remaining DRBs were not maintained for periods *in violation of*

| STORE NUMBER (# of DRBs) | ALL STORES (excluding Serenity Marshall's stores) | | | |
| --- | --- | --- | --- | --- |
| | Late Deposit | Falsified Deposit Date | No Bank Receipt | Missing Information |
| 13538 (12) | 91 | 45 | 35 | 172 |
| 7586 (15) | 80 | 17 | 50 | 53 |
| 3421 (7) | Unknown -- complete lack of bank receipts | Unknown -- complete lack of bank receipts | 110 (no receipts) | 54 |
| 7547 (12) | 43 | 17 | 39 | 150 |
| 7261 (15) | 98 | 68 | 140 | 98 |
| 7255 (6) | 62 | 58 | 16 | 29 |
| 7675 (2) | 7 | Unknown -- almost no bank receipts | 46 (almost no receipts) | 15 |
| 11650 (6) | 29 | 12 | 36 | 10 |
| 7711 (3) | 4 | 4 | 8 | 20 |
| 847 (6) | 32 | 9 | 11 | 16 |
| 14618 (15) | 82 | 36 | 68 | 104 |
| **Avg. Per Month** | **6.85** | **3.47** | **5.28** | **7.18** |

*Starbucks policy*, or, the SMs violated *additional DRB policies* by failing to comply with the storage and preservation policies. ¶168. Third, due to the limited DRBs, the raw numbers are misleading. Thus, the only meaningful way to compare across the stores is to use the average errors per month. Fourth, the entries for "Late Deposit" and "Falsified Date" are inherently misleading because for the instances where bank receipts were rarely saved, because it is impossible to determine the accuracy of the information. Fifth, Marshall was supposedly terminated for late bank deposits and falsified deposit dates, but these charts also show instances where bank receipts were missing and where other deposit information was left blank. These latter errors are included because (in addition to lost bank receipts being a more egregious error) Gurtov testified that all DRB policies "are of equal importance." ¶164. Sixth, Gurtov testified that even if the SM does not intend to mislead a DM and merely inadvertently inputs the incorrect deposit date in a DRB, that it would still constitute "falsification." ¶169. Thus, all the incorrect dates referenced in the chart are "falsified" entries per Gurtov.

| STORE NUMBERS (# of DRBs) | SERENITY MARSHALL'S STORES | | | |
|---|---|---|---|---|
| | Late Deposit | Falsified Deposit Date | No Bank Receipt | Missing Information |
| 11649 and 847 (22) | 126 | 37 | 31 | 147 |
| Avg. Per Month | 6.01 | 1.76 | 1.41 | 6.68 |

*See* Gottlieb Decl. at ¶¶42-54.  As demonstrated by the charts, the supposed violations in

Marshall's DRBs are consistent with (or even less than the) DRB practices throughout the

district.  Despite these widespread violations, Gurtov never terminated a SM for these supposed

infractions.  Gottlieb Decl. at ¶56.  The only discipline ever imposed by Gurtov for DRB or

deposit practices was two corrective actions of no actual consequence.  ¶222-223.  Again, the

written DRB policies were not actually adhered to in any fashion.  There is simply no other

explanation for the extent of the DRB policy violations and the lack of resulting SM discipline.

**Marshall's Termination**

In or around mid-2010, Marshall was diagnosed with tumors in her uterus commonly

known as uterine fibroids.  ¶171.  Marshall began to feel an exacerbation of chronic medical

symptoms she had been suffering from for years, including extreme exhaustion, lethargy, painful

menstrual cramps, and severe anemia.  ¶172.  In or around November 2010, Marshall informed

Gurtov of her diagnosis.  ¶173.  In the following weeks, Marshall and Gurtov had discussions

regarding her condition and how it would impact her work schedule.  ¶174.  Shortly thereafter,

Marshall informed Gurtov that she would be unable to attend a weekly meeting (known as a

"huddle") due to a doctor's appointment.  ¶175.  Gurtov was "upset about it and told [Marshall]

that it wasn't a valid reason . . . [and] that [Marshall] would be held accountable for the

information that happened in the huddle."  ¶176.  In December 2010, Marshall informed Gurtov

that her doctor had advised that surgery was a possibility. Gurtov responded by peppering

Marshall with questions about her medical condition which Marshall was unable to answer.

Gurtov expressed annoyance and frustration with Marshall's responses. ¶177.

Gurtov's frustration over Marshall's medical condition in 2010 is consistent with her

purported frustration with Marshall when she had personal issues requiring a leave in 2009. In

2009, Gurtov claimed to have problems with Marshall's performance when she had to take a

leave of absence for personal reasons (even though her 2009 review was quite favorable). ¶178.

On or about December 21, 2010, Gurtov visited Marshall's store for a SPAV. ¶179.

Marshall and Gurtov have virtually identical recollections of this visit. Gurtov started the SPAV

by conducting a short observation of the store and its operations. ¶180. Next, Gurtov sat

Marshall down to discuss her medical condition. Gurtov requested details of Marshall's

condition and information regarding any potentially anticipated leave. Marshall informed

Gurtov that she would, in fact, need surgery and a medical leave, and that the leave would likely

be approximately 8 to 12 weeks. Gurtov was upset and expressed doubt over whether Marshall's

staff would be able to operate the store in her absence. ¶181. Gurtov then told Marshall:

**"You know . . . I'd like to, but I cannot hold the store for you."**

¶182. Directly following this conversation, Gurtov asked Marshall to review her DRB. ¶183.[6]

As stated above, DRB reviews during SPAVs are customary. Gurtov was well aware of

Marshall's DRB practices from her previous store visits. As demonstrated above, these DRB

---

[6]      Gurtov claims that Marshall requested that Gurtov review her DRBs. ¶¶184-85. It is
simply incredible that Marshall would have requested her DM to review her DRBs unless she
knew that the deviations from written policy that are evident from a review would not be grounds
for discipline, because they never had been before.

practices were never mentioned in any performance review, never subjected Marshall to any corrective action, and were never the subject of any less formal verbal reprimand.

However, on this SPAV, moments after Marshall told Gurtov that a lengthy medical leave would be necessary, Gurtov purportedly took issue with Marshall's DRB practices. ¶186. Gurtov reviewed the November and December 2010 DRBs and purportedly took issue with Marshall's practice of occasionally taking deposits to the bank a couple of days late. ¶187. Marshall explained to her that deposits were not always brought to the bank immediately if she could not leave the store due to store traffic or other legitimate business concerns. ¶188.[7] Gurtov also took issue with the fact that the deposit date was incorrectly recorded on some pages. ¶187, 193. Gurtov feigned anger and reprimanded Marshall so harshly that it brought Marshall to tears and she feared formal discipline. ¶187, 194. Marshall was in shock at Gurtov's reaction to the DRBs given that she was well aware of Marshall's practices.

Marshall's fears were temporarily abated when she returned to work for the next two weeks without incident. ¶195. Certainly, if Gurtov had genuine concern for her management practices, Marshall would not have been permitted to remain SM. However, for the next two weeks, Marshall continued to manage the store. Marshall then scheduled surgery to remove the uterine fibroids and requested a medical leave of absence commencing on January 5, 2011. ¶196. On January 5, 2011, Marshall commenced her FMLA leave. ¶197.

---

[7]     Though Gurtov claims that Marshall "admitted" to falsifying deposit information in the DRB so she would not get in trouble for late deposits, she did not document or report this to anyone until contacting the Partner Resources Service Center ("PRSC") two weeks later. ¶189. Notably, Nancy Murgalo, a Partner Resources Manager, testified that she and Gurtov spoke the day after the SPAV and -- consistent with Marshall's description -- Gurtov said that Marshall's explanation for her late deposits was her inability to leave the store due to traffic. Murgalo did not recall Gurtov stating anything about admitted falsifications. ¶190. More importantly, there would be no reason for Marshall to intentionally "falsify" the deposit date when Gurtov could easily verify the actual deposit date by viewing the bank receipt. ¶192.

On January 4, 2011, Gurtov learned that Marshall's medical leave would commence the next day. ¶198. On January 6, 2011, the day after Marshall commenced medical leave, Gurtov made the decision to terminate Marshall and contacted Starbucks' PRSC to request permission to do so. ¶199.[8] While Gurtov claims to have called PRSC for guidance as to how to proceed, the PRSC log of the initial communication plainly states that Gurtov "wants separation consultation." ¶202. Moreover, Tina Pizarro ("Pizarro"), a PRSC representative assigned to the matter following Gurtov's initial call, testified that Gurtov sought termination during their first conversation. ¶203. At that point, as Gurtov describes it, she "built a case" to get PRSC's approval. ¶204. Thus, it was only directly after Marshall first told Gurtov that she would need a medical leave that Gurtov feigned dissatisfaction over Marshall's DRB practices. However, no immediate discipline followed. Then, it was only the day Marshall commenced leave of absence after Gurtov learned that Marshall commenced a leave of absence that she "built a case" to terminate her employment. ¶204.

Based on the information provided by Gurtov, PRSC approved Marshall's termination. ¶205. PRSC was not privy to the fact that Gurtov routinely allows store managers to make late bank deposits or deviate from DRB policies. ¶206. PRSC was also not privy to Gurtov's exchanges with Marshall wherein Gurtov expressed her unhappiness with Marshall's medical leave. ¶207. Moreover, during a follow-up discussion with Pizarro, Gurtov strangely enhanced

---

[8]     Notably, Gurtov may have commenced the process of finding Marshall's replacement before she was ever terminated. Howarth, who replaced Marshall, was deposed on January 6, 2012 and he testified that her initial communication with Gurtov about becoming the SM at 345 Hudson Street took place "over a year ago." ¶200. Later in her deposition, following multiple breaks, Howarth changed her testimony and said the initial communication was "less than a year ago." During this initial call, Howarth testified that Gurtov told her there was an opening at the store because "the store manager was out on leave." ¶201.

the allegations against Marshall with details that were completely absent from either her initial call or the ultimate basis for termination. ¶208.

While Marshall was on leave, Gurtov never contacted her for a further discussion or explanation regarding the supposed breaks in company policy. ¶209. On February 28, 2011, Gurtov called Marshall and advised her that on March 1, 2011, the date she was scheduled to return to work, she should meet at Gurtov's office. Gurtov did not make any mention of any upcoming discipline. ¶210. On March 1, 2011, Marshall arrived at Gurtov's office ready to get back to work. Immediately, Gurtov told Marshall she was terminated due to her DRB and deposit practice violations. ¶211. Gurtov never provided Marshall with any corrective action or opportunity to improve as she had for any other SM she had terminated. ¶212. Marshall immediately called Starbucks' Ethics Hotline and complained about her termination. ¶213.

The supposed violations of company policy that Defendants claim led to Marshall's termination did not result in any loss to Starbucks and did not adversely impact Starbucks business in any manner. ¶219.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless the submissions of the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view all facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all inferences in their favor. *See Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 116 (2d Cir. 2007). At the summary judgment stage "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Kessler v.*

13

*Westchester Dep't of Social Servs.*, 461 F.3d 199, 206 (2d Cir. 2006); *Jasco Tools, Inc. v. Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony . . . the court considering a summary judgment motion must disregard all evidence favorable to the moving party that the jury is not required to believe"); *Cityspec, Inc. v. Smith*, 617 F. Supp.2d 161, 168 (E.D.N.Y. 2009) ("[t]he Court should not grant summary judgment if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party").

## II.   DEFENDANTS CANNOT PROVE THAT DEFENDANTS DID NOT INTERFERE WITH PLAINTIFF'S FMLA RIGHTS

To establish a *prima facie* case of FMLA interference, a plaintiff need only establish (1) that she is an eligible employee, (2) that she was entitled to leave under the FMLA, (3) that she gave notice of her intention to take leave, and (4) that she was denied benefits she was entitled to under the FMLA. *Sabatino v. Flik International Corp.*, 286 F.Supp. 2d 327, 335 (S.D.N.Y. 2003). In an interference case, the employee need only establish entitlement to an FMLA right and the deprivation of that right; there is no requirement to establish discriminatory intent. *Mann v. Mass. Correa Electric, J.V.*, No. 00-civ-3559 (DLC), 2002 WL 88915, at *7 (S.D.N.Y. Jan. 23, 2002) ("in order to prevail on an interference claim, a plaintiff need not show discriminatory intent"); *King v. Preferred Technical Group*, 166 F. 3d 887, 891 (7th Cir. 1999) ("[i]n such cases, the intent of the employer is immaterial"); *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (*citing King*, 166 F.3d at 891). Moreover, while FMLA retaliation cases follow the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), that approach is not followed in interference claims. *Id.* at 168.

Defendants denied Marshall the FMLA right to restoration of her employment following the conclusion of her approved FMLA leave. The FMLA explicitly states,

> any eligible employee who takes leave . . . shall be entitled, on return
> from such leave . . . to be restored by the employer to the position of
> employment held by the employee when the leave commenced.

29 U.S.C. § 2614. Thus, in refusing to restore Marshall to the position held prior to her leave,

Defendants denied Marshall an FMLA benefit, satisfying the fifth prong of the *prima facie* case

on its face. *See, e.g., Roberts v. Ground Handling, Inc.*, 499 F. Supp.2d 340 (S.D.N.Y. 2007)

(denying summary judgment on FMLA interference claim where plaintiff's employment was not

restored following leave); *Brown v. The Pension Boards*, 488 F. Supp.2d 395, 409-10 (S.D.N.Y.

2007) (accepting that denying employee right to return from leave could constitute interference,

but granting summary judgment because employee unable to return); *Gauthier v. Yardney*

*Technical Products, Inc.*, No. 05-cv-1362, 2007 WL 2688854 at *4 (D. Conn. Sept. 13, 2007)

("[s]ubstantive rights under the FMLA subject to interference claims include the right to take

leave, receive benefits during leave and be restored to the same or equivalent position following

leave") (citing cases).[9]

Defendants incorrectly argue that an interference claim "requires a showing that the

plaintiff was prevented altogether from asserting her rights or at the very least was discouraged

from taking the full amount of leave." Defs. Br. at 15. Defendants' cited cases simply show that

that is one manner in which an interference claim may be established. The cited cases do not

stand for any rule that denying an employee the right to be restored to employment following

leave cannot constitute interference. *See Potenza*, 365 F.3d at 167 (stating that discouraging

leave may constitute interference); *Di Giovanna v. Beth Israel Medical Center*, 651 F. Supp. 2d

193 (S.D.N.Y. 2009) (retaliation, not interference, claim because based upon the facts of that

---

[9]      Though Defendants claim that "[a]t the conclusion of her leave, Marshall returned to
work" (Defs. Br. at 16), it can hardly be said that she "returned to work" when she was
summarily terminated the instant she reported.

case there was no substantive right plaintiff was denied); *Geromanos v. Columbia University*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004) (no interference claim where employee's because she was "incapable of performing the essential functions of her position at the end of the twelve weeks"); *Serby v. New York City Dept. of Educ.*, No. 09-cv-2727, 2012 WL 928194, at *6 (E.D.N.Y. March 19, 2012) (no interference claim where plaintiff testified that she took leave and was restored to the same position).

Plaintiff has set forth a *prima facie* FMLA interference case due to the denial of her right to job restoration following the conclusion of her leave. While a plaintiff is not entitled to use the FMLA to prevent legitimate termination, Marshall can clearly establish numerous issues of fact as to the legitimacy of Defendants' stated reason (*see infra* at §III). Therefore, Defendants' motion for summary judgment as to Plaintiff's First Cause of Action should be denied.

## III.   DEFENDANTS CANNOT PROVE THAT DEFENDANTS DID NOT DISCRIMINATE AGAINST PLAINTIFF

FMLA retaliation actions and New York State and City Human Rights Law (collectively, "NYHRL") employment discrimination actions are governed under the *McDonnell Douglas* burden shifting framework. *Potenza*, 365 F.3d at 168; *Forrest v. Jewish Guild for the Blind*, 2 N.Y.3d 295, 305 (N.Y. 2004). Under this approach, a plaintiff must first make a *prima facie* showing of discrimination and/or retaliation. To establish a *prima facie* case of FMLA retaliation and/or NYHRL discrimination, a plaintiff need only show that (i) she exercised her rights under the FMLA and/or suffered from a disability,[10] (ii) she was qualified for her position, (iii) she was subjected to an adverse employment action, and (iv) the adverse action occurred under circumstances giving rise to an inference of retaliation and/or discrimination. *Potenza*, 365 F.3d

---

[10]   Defendants do not argue that Marshall did not suffer from a disability under NYHRLs.

at 168. A plaintiff's burden at the prima facie phase is minimal. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). Defendants appropriately concede that Plaintiff can establish a *prima facie* case. Defts. Br. at 18, 19.

Once a plaintiff has established a *prima facie* case, the burden then shifts to the defendant to establish a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglass Corp.*, 411 U.S. at 802. The plaintiff must then establish an issue of fact as to the legitimacy of the articulated reason. *Id.* Summary judgment will be denied where "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Unless the employer can provide "evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).[11] Moreover, plaintiff need only create an issue of fact as to whether unlawful reason was a motivating factor, not the sole reason, for the adverse action. *Holcomb v. Iona College*, 521 F.3d 130, 142 (2d Cir. 2008).

Courts have consistently held that summary judgment is "ordinarily inappropriate in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision . . . [and] [e]mployers are rarely so cooperative as to include a notation in the personnel file that the

---

[11]     Defendants incorrectly state that at the summary judgment phase a plaintiff must "*prove that her termination was more likely than not, motivated in whole or part by discriminatory reasons.*" (Defts. Br. at 18) (emphasis added). At summary judgment, plaintiff is not obligated to prove her claims; she need only establish genuine issues of fact to be determined by a jury.

[adverse employment action] is for a reason expressly forbidden by law." *Santos v. Costco Wholesale, Inc.*, 271 F.Supp. 2d 565, 571 (S.D.N.Y. 2003) (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984)).

Defendants claim that Marshall was terminated for violation of company policy related to DRB practices and bank deposits. However, Plaintiff can establish numerous issues of fact as to whether this was the actual reason for her termination, and that Marshall's FMLA leave and medical condition was a factor in the decision to terminate.

First, the temporal proximity between Marshall's FMLA protected activities, and the decision to terminate her employment, demonstrate causation. Marshall was a nine year employee who Gurtov decided to terminate only two weeks after she learned of Marshall's need for medical leave and the day after she commenced leave. Marshall was then terminated the day she was expected to return. It is well established that close temporal proximity between assertion of an FMLA right and an adverse action creates an inference of retaliation. *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 289 (D. Conn. 2008) (decision to terminate one-and-a-half months after commencing FMLA leave creates inference of retaliation); *Ridgeway v. Royal Bank of Scotland Group*, No. 11-cv-976, 2012 WL 1033532, at *12 (D. Conn. March 27, 2012) (denying summary judgment where, among other evidence, plaintiff terminated on the final day of medical leave); *Cooper v. New York State Nurses Ass'n*, No. 09-cv-3135, 2012 WL 913080, at *8 (E.D.N.Y. March 16, 2012) (denying summary judgment where, among other evidence, plaintiff terminated less than two months after returning from leave); *Mullins v. Bondib Hotels, Inc.*, 10-cv-4069, 2011 WL 6434328, at *6 (S.D.N.Y. December 22, 2011) (denying summary judgment where plaintiff terminated upon attempt to return from FMLA leave). And, Plaintiff

does not seek to establish issues of fact based solely on temporal proximity as Defendants
disingenuously suggest.  Defts. Br. at 20.

     <u>Second</u>, Gurtov told Marshall that she was not going to restore her employment and made
other comments indicating frustration with Marshall's need for medical leave.  Specifically,
directly after Marshall advised Gurtov of her need for medical leave (and before any supposed
"discovery" of so-called policy violations), Gurtov said, "You know . . . I'd like to, but I cannot
hold the store for you."  ¶182.  Gurtov's admission that Marshall would not be permitted to
return from leave before any termination decision, creates issues of fact as to whether Marshall's
medical condition and leave was a motivating factor in her termination.  *Goelzer v. Sheboygan
County*, 604 F.3d 987 (7th Cir. 2010) (reversing summary judgment in part because comments
indicating frustration with employee's use of FMLA leave created issues of fact as to motivation
of termination); *Hite v. Vermeer Manufacturing Co.*, 446 F.3d 858 (8th Cir. 2008) (denying
judgment notwithstanding verdict where employee was terminated after supervisor made
comments indicating she could not return following medical leave).

     <u>Third</u>, Gurtov was aware of Marshall's DRB and deposit practices for more than two
years because she inspected Marshall's DRBs on numerous occasions and took no disciplinary
action until Marshall needed medical leave.  If these so-called policy violations were a legitimate
basis for discipline -- let alone immediate termination -- Marshall would have been disciplined in
some form on one of Gurtov's many prior store visits.  Marshall's performance reviews, written
by Gurtov, never indicated any problems with her DRB or deposit practices.  Moreover, based on
a review of Marshall's DRBs, Gurtov believed Marshall had a "well-rounded understanding of
cash handling policies and procedures."  ¶156.  Gurtov cannot, on the one hand, claim that
Marshall's DRBs show compliance with company policy, yet on the other hand, claim that the

same DRBs showed noncompliance with company policy to such a degree that immediate termination was necessary. These positions cannot be reconciled. Marshall's former DMs also did not discipline her in any manner for her DRB or deposit practices. However, directly after Marshall disclosed her need for medical leave, these purported violations became a basis for termination. Clearly, Gurtov targeted Marshall's DRBs directly following their discussion regarding her medical leave to locate a purported policy violation to use as a pretext for her termination. Thus, substantial issues of fact exist as to whether these policies were actually enforced and whether purported violations were the actual basis for termination.

Fourth, Gurtov was aware that many SMs within her district engaged in the same DRB practices as Marshall. As shown above, the DRBs maintained at Gurtov's stores were inundated with errors and in many cases the errors far exceeded any purported violations committed by Marshall. These errors would have been noticed by Gurtov with even *infrequent* and *cursory* DRB reviews. But, Gurtov reviews DRBs *frequently* pursuant to her own practices and Starbucks policy. Thus, Gurtov was aware of the DRB and deposit practices of her SMs, but they were never terminated for violations that are identical to Marshall's. Though Defendants argue SMs Carlos Montero ("Montero") and Charis Liu ("Liu") were terminated for similar reasons, this is simply not the case (as described below). Moreover, this ignores the DRB policies and deposit practices that pervaded Gurtov's district without discipline. Gurtov simply did not hold SMs accountable to DRB or deposit policies and acquiesced to deviations.

Defendants contend that because Gurtov was not required to review "every single page of every stores' DRBs," she cannot be held accountable for failing to discipline SMs with errors she did not observe. Defs. Mem. at fn. 22. This argument ignores the facts. It is simply impossible that the vast DRB and deposit practice violations documented in the DRBs would have been

overlooked if Gurtov reviewed the DRBs in the manner she testified to and the manner required by Starbucks. It strains credulity to suggest that the approximate 2,369 policy violations in the DRBs (in a period of slightly over a year during which 30% of the DRBs were not even included) could have only been caught by reviewing every page of every DRB. Gottlieb Decl. at ¶¶42-54. Moreover, and importantly, during her deposition, Gurtov was presented with numerous DRBs containing a multitude of policy violations committed by SMs under her watch and she could not confirm that the policy violations would lead to any discipline at all. To date, Gurtov has not disciplined any SM for any of the policy violations contained in the DRBs produced in discovery. ¶226. However, despite Gurtov's actual knowledge of substantial policy violations by her SMs, none have been disciplined to date. Gurtov's disparate treatment of Marshall relative to other SMs casts further doubt on the actual basis for Marshall's termination.

Fifth, Gurtov deviated from her practice of progressive discipline when she terminated Marshall. ¶¶214-215. Also, while Starbucks policy does not require progressive discipline, it clearly envisions immediate termination in only egregious circumstances. ¶216. Defendants argue that "Ms. Marshall was subjected to the same discipline – termination – that Gurtov imposed on other Starbucks [SMs] found to have similar violations, and that Marshall herself imposed on another Starbucks partner." Defs. Br. at 2, 8-11. This overlooks the dissimilarity and severity of the other partners' conduct and the progressive discipline they received.

Gurtov terminated SM Carlos Montero in December 2010 after he confessed in writing to bringing multiple deposit bags filled with cash home from the store before the start of the weekend where he opened the bags, removed the cash, later filled a different bag with cash, and then deposited the funds in the bank after the weekend. Gurtov supposedly learned of these

issues following a DRB review.  Montero had previously been given a corrective action for cash

management and deposit issues in August 2009.  ¶222.

In May 2011, SM Charis Liu resigned from her position while Gurtov was considering

termination.  In September 2010, Liu was issued a corrective action for violating cash handling

procedures for not making daily deposits, but no further action was taken at that time.  In April

2011, Liu was issued a 90 performance improvement plan ("PIP") which provided her an

opportunity to improve on an extensive list of deficiencies.  In addition to her failure to

"maintain cash over/short within company standards" or hold her "team accountable to cash

handling standards," she also showed "poor execution of maintaining a clean environment,"

"t[ook] several conversations to take action," "consistently misse[d] goals," and "d[id] not create

highly satisfied customer."  Gurtov provided Liu with nine detailed tasks intended to improve

her performance.  Despite this progressive discipline, Liu's performance did not improve and

Gurtov sought to terminate her for the panoply of performance problems.  ¶223.

Moreover, though Gurtov, Murgalo, Pizarro and Ormsbee claimed that Marshall's

termination for policy violations was consistent with Starbucks practice, they could not identify

any circumstance where an employee was terminated for the similar reasons as Marshall without

first receiving a corrective action.  ¶¶217, 224.  And, Murgalo did not recall Gurtov even

considering progressive discipline for Marshall.  ¶218.  Moreover, Gurtov, who knows that other

SMs have "falsified" DRBs (according to her own understanding of the term), did not even

consider corrective action once she claims to have found out that falsification could lead to

termination.  ¶¶218, 226.

Thus, not only was Marshall treated differently than SMs with similar violations (she was

disciplined while others were not), Marshall was also treated worse than the SMs who had other

*more serious violations* because she was never given an corrective action and an opportunity to improve.[12] *See, e.g., Berube v. Great Atlantic & Pacific Tea Co., Inc.*, 348 Fed. Appx. 684, 686 (2d Cir. 2009) (denying summary judgment on ADEA claim finding discriminatory intent where younger employees received progressive discipline for comparable transgressions); *Foss v. Coca Cola Enterprises, Inc.*, No. 07-cv-1322, 2011 WL 1303346, at *9 (E.D.N.Y. March 31, 2011) (failure to follow progressive discipline policy evidence of discriminatory intent).

Sixth, Gurtov was frustrated with Marshall when she previously required time off from work for personal reasons. ¶178. Defendants argue that Gurtov's non-discriminatory motive for Marshall's termination is evidenced by the fact that Marshall previously took personal leave without incident. Defs. Mem. at 6. However, Gurtov testified that Marshall's performance purportedly declined at or about the time that Marshall took her earlier leave of absence. ¶178. Gurtov's frustration with Marshall during her previous leave of absence explains her dissatisfaction that Marshall's medical condition interfered with her employment. Gurtov likely recalled these previous issues when Marshall disclosed her need for a medical leave in December 2010. This raises issues of fact as to whether Gurtov harbored frustration with Marshall over her medical leave and whether it motivated the decision to terminate her.

Seventh, Defendants' contention that Marshall's policy violations were so egregious that termination without corrective action was necessary is belied by the fact that Marshall was permitted to remain SM for two weeks even after Gurtov "discovered" these violations. It is hardly believable that if Marshall's policy violations were so egregious, Defendants would have

---

[12]     Defendants argue that "Marshall was subjected to the same discipline . . . that Marshall herself imposed on another Starbucks partner." Defs. Br. at 2, 8-11. Defendants ignore that the employee Marshall terminated -- Leedel Griffin -- for cash management problems was provided substantial coaching and progressive discipline including four verbal warnings, five written warnings and a "final" warnings before termination. ¶221.

permitted her to remain in control of a store, managing thousands of dollars that flow through the store on a daily basis.  However, no corrective action was immediately taken nor did Gurtov take any immediate steps towards eventual discipline.  Moreover, during that period, Marshall corrected her DRB and deposit practices, as corrective actions are intended to accomplish.  It was not until only two weeks later, and the day after Marshall commenced her leave, that Gurtov decided to terminate her employment.  This raises issues of fact as to the legitimacy of the stated reason for termination.

Eighth, Gurtov has had inconsistent and changing justifications for Marshall's termination.  Initially, Gurtov claims to have sought termination because Marshall purportedly made late deposits and recorded incorrect deposit information in her DRB.  ¶203.  During the period when she "built a case" for her termination, Gurtov claimed store was short revenue, that Marshall was not conducting till audits, and that she was suspicious of whether the DRBs were being manipulated.  ¶208; 220.  These reasons, however, were absent from the termination letter and were not mentioned in Defendants' moving papers.  It is well established that inconsistent or changing justifications for a plaintiff's termination raise a genuine issues of fact as to the legitimacy of any proffered reason.  See EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (stating that from defendant's inconsistent explanations for termination a "juror could infer that the explanations given by [defendant] ... were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation."); Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir.2001) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff.").

Upon the totality of the circumstances, numerous issues of fact exist as to the legitimacy of Defendants' stated reason for termination and whether Marshall's FMLA leave was a factor in the decision to terminate her employment. Therefore, Defendants' motion for summary judgment as to Plaintiff's Second, Third and Fourth Causes of Action should be denied.

## IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S NYHRL RETALIATION CLAIMS

Marshall engaged in "protected activity" when she requested medical leave. Although generally a "protected activity" is a complaint, taking medical leave also constitutes a protected activity under employment discrimination laws. *See Guinup v. Petr-All Petroleum Corp.*, 786 F. Supp. 2d 501, 515 (N.D.N.Y. 2011) (taking leave protected activity under the ADA); *Sabatino*, 286 F. Supp. 2d at 339 (taking leave protected activity under the FMLA). The NYHRLs and the ADA are interpreted and analyzed in a "virtually identical manner," though the NYHRLs have a much broader definition of the term "disability." *See, e.g., Mohamed v. Marriott Int'l, Inc.*, 905 F.Supp. 141, 156 (S.D.N.Y. 1995). According to Defendants, the NYHRLs do not protect employees who request and take medical leave. This is contrary to the intent underlying the NYHRLs to provide greater protection from employment discrimination than federal laws.

## V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S "AIDING AND ABETTING" CLAIMS

Under New York law, an individual can be liable as an "aider and abettor" where the individual "actually participates" in the discriminatory conduct. *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (citations omitted). Gurtov "actually participated" in the discriminatory conduct perpetrated against Marshall's when she took steps to effectuate the termination of her employment from Starbucks. Therefore, Defendants' motion for summary judgment as to the Fifth and Eighth Causes of Action should be denied.

## **CONCLUSION**

Wherefore, for the foregoing reasons, the Court should issue an order denying

Defendants' motion for summary judgment in its entirety and granting Plaintiff such other and

further relief deemed just and proper.

Dated: New York, New York
     June 26, 2012

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____
    Kenneth P. Thompson
    David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
kthompson@thompsonwigdor.com
dgottlieb@thompsonwigdor.com

*Counsel for Plaintiff*